**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**Columbus Division**

AMERICAN SOUTHERN HOMES
HOLDINGS, LLC and ASH-
GRAYHAWK, LLC,

     **Plaintiffs,**

    **v.**

DAVID B. ERICKSON, GH LOT
HOLDINGS, INC., GH LOT
HOLDINGS OF ATLANTA
CORPORATION f/k/a GRAYHAWK
HOMES OF ATLANTA, INC., and GH
LOT HOLDINGS OF SOUTH
CAROLINA, INC., f/k/a GRAYHAWK
HOMES OF SOUTH CAROLINA, INC.,

    **Defendants.**

Case No: _____

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## <u>COMPLAINT</u>

    Plaintiffs American Southern Homes Holdings, LLC ("ASHH") and ASH-Grayhawk,

LLC ("ASH-GH" and, collectively with ASHH, "ASH") hereby allege as follows:

**I.    PRELIMINARY STATEMENT**

    1.    ASHH is in the business of acquiring, integrating, and operating homebuilding

companies in the United States.

    2.    On November 15, 2019, ASH-GH acquired the assets of Grayhawk Homes, Inc.

(the "Acquisition"), which was founded by David B. Erickson ("Erickson"), and the parties entered

into a number of contracts, representing and agreeing to their respective obligations to be bound

by, comply with, and be liable under such agreements.

3.      One of such agreements required Erickson to serve as a "land bank" for ASH-GH. In particular, he was to hold title to land (including land he already owned and land he might purchase in the future), develop such land into roughly 1,600 finished lots ready for home construction, and sell such lots to ASH-GH, whereupon ASH-GH would build homes on the lots. This was a key component of the Acquisition, insofar as it comports with ASH's "land light" business model and guaranteed ASH-GH a pipeline of developed lots for at least seven years.

4.      Erickson, acting both individually and through a number of related and affiliated entities that he owns and/or controls, has failed to comply with the terms of many, if not all, of these agreements, including his obligation to serve as a land bank for ASH-GH.

5.      Following the Acquisition in November 2019, Erickson became a member of the ASHH Board of Directors, and a unitholder in ASHH.  He also served as a consultant to ASH, advising on potential acquisitions and carrying out other tasks.

6.      On October 28, 2020, the ASHH Board appointed Erickson as its interim CEO, to serve for a transition period until ASHH could identify and retain a permanent CEO.  Erickson was appointed as interim CEO after he pushed for the removal of the incumbent CEO of ASHH, as well as the President of ASH-GH.

7.      Just days later, Erickson announced his desire to serve as the permanent CEO of ASHH, and he began to negotiate for a generous compensation package.  After such negotiations failed to produce an agreement, ASHH informed Erickson that it would continue its search for a permanent CEO and that he would remain as interim CEO.

8.      On December 16, 2020, Erickson sent a letter to the Chairman of the Board of ASHH, stating as follows:  "This letter is to acknowledge our joint understanding to discontinue

my role as interim CEO of American Southern Homes Holdings, LLC effective February 28, 2021. I shall continue to serve as Interim CEO between now and February 28th, unless informed to discontinue sooner.  I am disappointed in the decision to end my role as CEO, but fully understand the thinking involved."

9.      On December 20, 2020, Erickson sent another letter in which he abruptly resigned as the interim CEO of ASHH, despite his initial commitment to remain until February 28, 2021: "Clearly the board of ASH[H] does not have confidence in my filling the role of CEO for ASH[H]. As such, I am resigning effective immediately as interim CEO of ASH[H]."

10.      In the December 20 letter, Erickson also resigned from the ASHH Board, stating as follows: "I am hereby resigning from the Board of Directors for ASH[H] effective immediately. Obviously, I remain a shareholding member of ASH[H].  **In the past year, I have developed ambitions to do more things in the home building and development business and feel that my responsibilities with ASH[H] are likely to constitute a conflict of interest[] with those goals and possibilities**." (emphasis added).

11.      On December 30, 2020, Erickson sent another letter in which he sought clarification of restrictions imposed by his agreements with ASH, stating as follows: "**I am intending to purchase one or more home building companies in the near term for my own investments. If that step should go well, I may consider doing additional purchases in the future.**" (emphasis added).  Again, Erickson declared his intent to compete with ASHH.

12.      Thus, Erickson declared his intention to compete directly with ASHH, after serving as a director and consultant for more than a year, and as interim CEO since October 28, 2020.  Of course, Erickson had extensive access to confidential information about ASHH's business and acquisition strategies in all of such roles.

13.     Erickson's abrupt resignation as the interim CEO of ASHH and as a member of its Board, as well as his declared intention to compete directly with ASHH in the market for homebuilder acquisitions, understandably raised concerns for ASHH, particularly in light of his access to confidential information before separating from ASHH.  ASHH has taken steps to address such concerns, prompting a dispute with Erickson that is subject to arbitration.

14.     Confirming the reasonableness of such concerns, ASH has learned that Erickson, individually and on behalf of the other Defendants named in this lawsuit, has been acting in clear breach of various contractual restrictions and in violation of federal copyright law, as well as state and federal trademark and unfair competition law.

15.     First, Erickson has violated and is violating his confidentiality obligations as an ASH consultant, which are set forth in an Employment Agreement and Consulting Agreement.

16.     In particular, Erickson has misappropriated ASHH's confidential business information to pursue his own business ventures, using such information gathered during his time with ASHH as a basis to launch his own competing ventures.  For example, Erickson participated in ASHH's negotiation of a deal to acquire Dorn Homes ("Dorn"), dissuaded ASHH from increasing its purchase price offer, and then attempted to acquire Dorn on his own account, before taking on a position as the interim CEO of ASHH.  He has also pursued the acquisition of another homebuilding company in Austin, TX by leveraging confidential information he obtained while associated with ASHH.  He has also tried (unsuccessfully) to solicit ASH employees for employment using confidential information he obtained while associated with ASHH.

17.     Second, Erickson has ignored and is ignoring the reasonable non-compete restrictions in the Asset Purchase Agreement entered into at the time of the Acquisition, by

4

building and selling homes within a 100-mile radius of Atlanta, Georgia and also by operating a new competitive homebuilding operation from Columbus, Georgia.

18.     Third, Erickson has failed and is failing to comply with the terms of a Land Purchase Agreement entered into at the time of the Acquisition, which requires him to serve as a land bank and develop and sell lots that conform to certain standards, and, when they do not, to remediate the lots at his expense.  In recent months, Erickson has declined to sell lots to ASH-GH, despite his contractual obligation to do so.  In addition, he has (a) demanded an additional deposit before developing certain lots, despite ASH-GH having already made a $2.5 million deposit required by the Land Purchase Agreement; (b) upon information and belief, artificially inflated the sales price of developed lots under the Land Purchase Agreement, which are based in part on the "actual costs" of development, by improperly including above-market development costs paid to an entity in which he has an ownership interest; and (c) otherwise defaulted on his obligations to deliver lots to ASH, as required by a Land Purchase Agreement entered into by the parties.

19.     Fourth, Erickson has improperly used the "Grayhawk" and/or "Grayhawk Homes" trademark, trade name and logo, which he fully assigned to ASH-GH through the Asset Purchase Agreement and an accompanying Trademark Assignment Agreement, as well as state and federal trademark law.

20.     Fifth, Erickson has improperly marketed homes using the Grayhawk and/or Grayhawk Homes trademark and trade name, specifically via entities named "Grayhawk Homes of Atlanta" and "Grayhawk Homes of South Carolina."  He also has improperly used Grayhawk marketing materials and copyrighted Grayhawk building plans that ASH-GH purchased as part of the Acquisition ("Grayhawk Building Plans"), in violation of the Asset Purchase Agreement and an accompanying Copyright Assignment Agreement, as well as federal copyright law.

21.     Through this Complaint, Plaintiffs seek an injunction prohibiting Erickson from misappropriating confidential information; a judgment for specific performance requiring Erickson to perform his obligations under the LPA; an injunction preventing Erickson from continuing to violate his non-compete obligations; a judgement for specific performance requiring Erickson's compliance with the Copyright Assignment Agreement and Trademark Assignment Agreement; an injunction prohibiting Erickson's ongoing infringement of ASH-GH's intellectual property; a monetary judgment for damages arising from Erickson's breach of various contracts and from his willful trademark and copyright infringement; as well as the recovery of ASH's reasonable attorneys' fees.

## II.     THE PARTIES

22.     American Southern Homes Holdings, LLC (or ASHH), is a Delaware limited liability company and the indirect parent of ASH-Grayhawk, LLC.  As stated above, ASHH is in the business of acquiring, operating, and integrating homebuilders in the United States.

23.     ASH-Grayhawk, LLC (or ASH-GH) is a Virginia limited liability company with its principal place of business in Columbus, GA.  ASH-GH is in the business of building and selling single-family homes in Georgia and Alabama.

24.     Erickson owns and controls several related and affiliated entities, including but not limited to GH Lot Holdings, Inc. (Georgia corporation), Grayhawk Homes, Inc. (Georgia corporation), Homestead Residential, Inc. (Alabama corporation), and GH Services, Inc. (Georgia corporation) (collectively, the "Erickson Entities").

25.     GH Lot Holdings, Inc. is a Georgia corporation that is owned and controlled by Erickson.  GH Lot Holdings, Inc. was formerly known as "Grayhawk Homes, Inc." and is a member of ASHH.

26.     Grayhawk Homes of Atlanta, Inc. is a Georgia corporation that, on information and belief, is owned and controlled by Erickson.  On or about January 19, 2021, Grayhawk Homes of Atlanta, Inc. changed its name to "GH Lot Holdings of Atlanta Corporation."  According to the Office of the Georgia Secretary of State website, Erickson is its Chief Executive Officer.

27.     Grayhawk Homes of South Carolina, Inc. is a South Carolina corporation that, on information and belief, is owned and controlled by Erickson.  On or about February 3, 2021, Grayhawk Homes of South Carolina, Inc. filed articles of amendment with the South Carolina Secretary of State, changing its name to "GH Lot Holdings of South Carolina, Inc."

## III.    JURISDICTION & VENUE

28.     This Court has original subject matter jurisdiction over Plaintiffs' copyright and trademark claims pursuant to 28 U.S.C. §§ 1331 and 1338.

29.     This Court has supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367.  The remaining claims are so related to the federal claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

30.     This Court has personal jurisdiction over Defendant Erickson, as he is a citizen and resident of the State of Georgia and this District.  Erickson also conducts and transacts business in this District, with an office at 2301 Airport Thruway in Columbus, Georgia.

31.     This Court has personal jurisdiction over Defendant GH Lot Holdings, Inc. because it is a Georgia corporation that does business in the State of Georgia and in this District and has a principal place of business at 2301 Airport Thruway in Columbus, Georgia.

32.     This Court has personal jurisdiction over Defendant GH Lot Holdings of Atlanta Corporation f/k/a Grayhawk Homes of Atlanta, Inc. because it is a Georgia corporation that does

business in the State of Georgia and in this District and has a principal place of business at 2301 Airport Thruway in Columbus, Georgia.

33.    This Court has personal jurisdiction over Defendant GH Lot Holdings of South Carolina, Inc. f/k/a Grayhawk Homes of South Carolina, Inc. because it is a South Carolina corporation that does business in the State of Georgia and in this District and has an office at 2301 Airport Thruway in Columbus, Georgia.

34.    Working from their offices in Columbus, Georgia, Defendants have caused, directly and/or indirectly through intermediaries, Georgia and South Carolina property listings and other similar information to be made available on the internet, accessible and viewable by residents of the State of Georgia and this District.  Examples of these Georgia and South Carolina property listings are listed below.  The Georgia and South Carolina property listings and other information not only contain ASH-GH's copyrighted and trademarked material, but also are in violation of the several agreements the parties entered into as part of the Acquisition.

35.    Defendants are direct competitors of Plaintiffs, as detailed in the several agreements the parties entered into as part of the Acquisition, and Defendants compete with Plaintiffs in the State of Georgia and in this District.

36.    Venue is properly founded in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred and are occurring in this District, and Defendants are subject to personal jurisdiction in this District.

37.    Venue is properly founded in this Division pursuant to M.D. Ga. Local Civil Rule 3.4, because some or all Defendants reside in the Division and the actions giving rise to the claim arose in the Division.

38.     In addition, in the Asset Purchase Agreement ("APA") attached as **Ex. 1** to this Complaint, the parties "consent[ed] exclusively to the personal jurisdiction of any state or federal court sitting in the State of Georgia in any action or proceeding arising out of this Agreement." APA § 11.10(a).  The parties agreed that they "shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court."  *Id.* at § 11.10(c).

39.     Further, the parties agreed in the Land Purchase Agreement ("LPA") attached as **Ex. 2** to this Complaint that "any judicial action shall be brought exclusively in the U.S. District Court in Columbus, Georgia regardless of the location of the affected Lots, and the Parties consent to submit to the personal jurisdiction of that court in any action or proceeding arising out of or relating to this Agreement."  LPA § 26.

## IV.     FACTUAL BACKGROUND

40.     On November 15, 2019, ASH-GH acquired the operating assets of Grayhawk Homes, Inc. from Erickson.  In exchange, Erickson obtained an equity interest in ASHH (both in his own name and through GH Lot Holdings, Inc.) and agreed to receive deferred payments on an installment basis, subject to certain requirements.  Erickson is eligible to receive $3,600,000 in remaining deferred payments.

41.     After increasing his position in ASHH by acquiring and exercising warrants from other ASHH members, Erickson now holds 47,000 units in ASHH, and GH Lot Holdings, Inc. holds 40,000 units.  At the time of acquisition, such units were valued at $100 per unit.  Thus, Erickson and GH Lot Holdings, Inc. together acquired ASHH units valued at $8.7 million.

42.     The parties entered into several associated agreements at the time of the Acquisition, including:

- Asset Purchase Agreement ("APA," attached as **Ex. 1** and incorporated by reference);

- Land Purchase Agreement ("LPA," attached as **Ex. 2** and incorporated by reference);

- Trademark Assignment Agreement (attached as **Ex. 3** and incorporated by reference);

- Copyright Assignment Agreement (attached as **Ex. 4** and incorporated by reference);

- Consulting Agreement (attached as **Ex. 5** and incorporated by reference); and

- Employment Agreement (attached as **Ex. 6** and incorporated by reference).

43.     All of these agreements are governed by Georgia law.

44.     Since the Acquisition closed on November 15, 2019, Erickson has breached all of these agreements.

**A.     Relevant Terms of Agreements**

**1.     Consulting Agreement – Confidentiality Obligations**

45.     Erickson entered into a Consulting Agreement with a term that extends until on or about November 15, 2021, unless terminated earlier.  Ex. 5, Consulting Agreement § 2.

46.     Under the Consulting Agreement, Erickson was paid $48,000 per year in 12 monthly installments (for 16 hours of time per month), plus $250/hour for any additional time, $1,500 for travel days, and $1,000 per month for health insurance.  *Id.* § 3.

47.     Erickson acknowledged that, as a consultant, he would have access to ASH's "Confidential Information," which is defined as "non-public, proprietary and/or confidential information relating to the business and affairs of the Company and/or ASH…."  *Id.* § 7.  This includes "trade secrets, know how, research and development, databases, software, and other intellectual property; information concerning personnel, compensation, recruiting, and training; and information concerning the past, future, or current business of the Company, activities and

operations of the Company and/or ASH, including customers, clients, suppliers, contractors, products and prices (the 'Confidential Information')." *Id.*

48.     Erickson agreed "that such Confidential Information shall be subject to the terms and obligations described in Article 6.00 of the Employment Agreement, and that such terms and obligations shall survive the termination of this Agreement for a period of one year." *Id.*

49.     In Article 6 of the Employment Agreement, Erickson similarly acknowledged that he "will receive or have access to certain non-public, proprietary, and/or confidential information," which includes "trade secrets, know how, research and development, databases, software, and other intellectual property [...] and operations of [ASH], including customers, clients, suppliers, contractors, products and prices." Ex. 6, Employment Agreement § 6.01.

50.     He also "recognize[d] and acknowledge[d] the competitive value and confidential and proprietary nature of the Confidential Information for which he will have access in the performance of his duties and responsibilities for the Employer and/or ASH…." *Id.* § 6.02.

51.     Erickson further "recognize[d] and acknowledge[d]" the following:

> [T]he losses, costs and damages that could result to [ASH] if any Confidential Information is disclosed to any other Person and in connection therewith the **Executive agrees to keep the Confidential Information confidential, to use the Confidential Information only in connection with the carrying out of duties and responsibilities under this Agreement, not to use the Confidential Information after the termination of this Agreement for any reason**, and not to disclose any Confidential Information to any Person (other than employees and advisors of Employer and/or ASH who specifically need to know such Confidential Information and who have previously agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions substantially similar to those of this Section), in any manner whatsoever, in whole or in part.

*Id.* (emphasis added).

52.     Erickson's Consulting Agreement may be terminated for cause for a number of reasons, including if Erickson "misappropriat[es] any money, assets, or properties of the

Company" for "personal gain or enrichment," engages in conduct that involves "fraud, moral turpitude, dishonesty, misconduct, embezzlement, theft, or similar matters that are detrimental" to ASH, "breach[es] [the Consulting Agreement] or his non-competition obligations set forth in the APA," or the LPA is terminated as a result of an uncured breach.  Ex. 5, Consulting Agreement § 4.

53.     On April 8, 2021, ASH terminated the Consulting Agreement for cause for the reasons set forth in this Complaint, including but not limited to misappropriation and use of assets of the Company for personal gain (e.g., confidential information, copyrighted plans, and other intellectual property) and breach of the non-competition obligations set forth in the APA (e.g., by building and selling homes within 100 miles of Atlanta, GA, and by operating a competitive homebuilding operation headquartered in Columbus, GA).

### 2.     Asset Purchase Agreement

54.     Through the APA, Grayhawk Homes, Inc., Erickson, and certain of the Erickson Entities agreed to "sell, transfer, convey, and deliver to [ASH-GH] all tangible and intangible property and assets utilized or held for use in, related to, or arising from the Business, wherever located, and whether or not reflected in Seller's books and records."  Ex. 1, APA § 1.1.

55.     ASH-GH purchased "all of [Erickson's] right, title, and interest in, under, and to" several items, including real property, intellectual property, real property contracts, receivables, marketing materials, utilities, inventory, property reports, real property leases, personal property, sales contracts, permits, prepayments, customer information, employee records, phone numbers, claims and rights, claims, and the business as a going concern.  *Id.* § 1.1(a).

56.     "Business" is defined as the "business of residential lot acquisition, homebuilding and home sales in the Columbus, Georgia metropolitan area, inclusive of certain portions of Alabama." *Id.*, Recital A.

57.     "Intellectual Property" is defined as follows:  "All intellectual property, including all of the following and similar intangible property and related proprietary rights, interests and protections, whether registered or unregistered and however arising: (i) patents, **copyrights**, trademarks, **service marks**, **trade names**, domain names, trade secrets, websites, extranets, software as a service, Software, (ii) **architectural, building, and engineering designs, drawings, specifications, and plans, including house plans for any existing or planned community**, (iii) proprietary information or rights including any and all plans, and other project related information of prior and currently active real estate projects, and (iv) **goodwill associated therewith**."  Ex. 1, APA § 1.1(j) & § 12.1(v) (emphasis added).

58.     Erickson also agreed to certain enforceable restrictive covenants in connection with the sale of the business.  Specifically, Section 6.5(a) of the APA provides as follows:

> "<u>Non-Solicitation; Non-Competition.</u> **To further ensure that Buyer receives the anticipated benefits of acquiring the Business, each Seller agrees throughout the period that begins on the Closing Date and ends on the later to occur of (i) the third (3rd) anniversary of the Closing Date and (ii) the expiration of the Deferred Payments Period (the "Restricted Period")**, no Seller nor any Affiliate of a Seller (the "Restricted Parties") will employ or solicit for employment or otherwise attempt to employ any employee of (i) Buyer (so long as the Restricted Parties have actual knowledge that such persons are employees of Buyer) or (ii) any current employee of a Seller who is hired by Buyer or (iii) any person who is or becomes an employee of Buyer at any time during the Restricted Period (so long as the Restricted Parties have actual knowledge that such persons are employees of Buyer). The prohibitions set forth in this Section 6.5(a) shall (i) not prevent any Seller or its Affiliates from hiring any person who (a) is presented to it by a professional placement agency; (b) contacts a Seller or its Affiliates in response to general advertisements (including postings on LinkedIn or similar websites); (c) contacts a Seller or its Affiliates on his or her own initiative for the purpose of seeking employment in each case without direct or indirect solicitation or encouragement from such Seller or its Affiliates or (d) has been terminated by

Buyer prior to commencement of employment discussions with such Seller or its Affiliates. **Each Seller, D. Erickson, and R. Erickson further agree that during the Restricted Period, none of Seller, D. Erickson, or R. Erickson shall participate in a competitive homebuilding operation or business within 100 miles of the geographic markets of each Seller as of the Closing Date, which shall include Columbus, Georgia; Atlanta, Georgia; Macon, Georgia; Dothan, Alabama; and Montgomery, Alabama**, unless Buyer has breached any material obligations after the Closing Date and such material breach remains uncured for a period of thirty (30) days after receipt of written notice by Buyer from a Seller. In the event of such uncured breach, or in the event Seller terminates the Land Purchase Agreement as a result of an uncured breach of the Land Purchase Agreement (as more fully set forth in Section 34 therein), Seller or D. Erickson and R. Erickson may thereafter compete against Buyer free of any limitations imposed by this Section 6.5(a)."

Ex. 1, APA § 6.5(a) (emphasis added).

### 3.      Trademark Assignment Agreement

59.      In the Trademark Assignment Agreement, Erickson, through Grayhawk Homes, Inc. (now GH Lot Holdings, Inc.), conveyed to ASH-GH "all worldwide right, title, and interest in, to, and under all Trademarks." Ex. 3, Trademark Assignment Agreement § 1.

60.      "Trademarks" means "all of [Erickson's] right, title, and interest in and to Assignor's **trademarks, service marks, trade names**, trade secrets, **brand names, logos and corporate names**, slogans, **trade dress and other indicia of source of origin, whether or not registered**, including, but not limited to, all common law rights thereto and all goodwill associated therewith, and registrations and applications for registration thereof that constitute Purchased Intellectual Property, including, but not limited to, the trademark and/or service mark registrations and/or applications identified on Schedule 1." *Id.*, Recital B (emphasis added).

### 4.      Copyright Assignment Agreement

61.      In the Copyright Assignment Agreement, Erickson, through Grayhawk Homes, Inc. (now GH Lot Holdings, Inc.), "s[old], assign[ed], convey[ed], and transfer[red]" all Copyrights to ASH-GH, and ASH-GH "purchase[d], acquire[d], accept[ed], and assume[d]" all such Copyrights.

Ex. 4, Copyright Assignment Agreement § 1.

62.     This assignment is universal and unequivocal and has the following scope:

> **[A]ll worldwide right, title, and interest in, to, and under all Copyrights, whether registered or unregistered, and all elements thereof, including, without limitation, any and all derivative works of any of the foregoing and all privileges and goodwill associated with the Copyrights**, together with all now or hereafter existing rights of every kind and character whatsoever throughout the world pertaining to the Copyrights, and **all rights of Assignor to police, monitor, and enforce said Copyrights against any and all past and current infringement (including, without limitation, the right to sue for and collect damages caused by any such infringement)**, whether arising prior to or subsequent to the date hereof, the same to be held and enjoyed by Assignee, its successors and assigns from and after the date of this Agreement as fully and entirely as the same would have been held and enjoyed by Assignor had this Agreement not been made.

*Id.* (emphasis added).

63.     Schedule 1 of the Copyright Assignment Agreement lists registered copyrights, including specific building plans.  ASH-GH has recorded the Copyright Assignment Agreement with the U.S. Copyright Office, against all registered copyrights listed on Schedule 1.

64.     The copyrighted Grayhawk Building Plans at issue, along with copyright filing and registration information, are detailed below.

**5.      Land Purchase Agreement**

65.     When ASH-GH acquired Grayhawk Homes, the parties also entered into the LPA. Both the APA and LPA require Erickson and certain of the Erickson Entities, as well as any other entity owned or controlled by Erickson, to serve as a land bank and develop building lots for sale to ASH-GH.  *See* Ex. 1, APA § 8.2(v); Seller Disclosure Letter § 8.2(v); Ex. 2, LPA Recitals.  This was a central and critical aspect of the Acquisition.

66.     Erickson and the Erickson Entities are contractually obligated to develop approximately 1,600 lots for ASH-GH.  Ex. 2, LPA § 2.  The lots are designated, based on their status at the time of the Acquisition, as "Finished" lots (Phase A Lots), lots that were being

developed (Phase B Lots), and real property or lots that Erickson has purchased or has a right to purchase and that would be developed into finished lots (Phase C Lots).  *See id.*, Recitals & § 2.

### a.      The Takedown Schedule

67.      Erickson "is required to develop the Lots in accordance with [the LPA] and to satisfy the requirements of the Takedown Schedule."  *Id.* § 10.  The Takedown Schedule is set forth in Schedule 1 and extends for seven (7) years, or until all Phase C Lots have been developed by Erickson for purchase by ASH-GH.  *See id.*, Schedule 1.  The Takedown Schedule provides for a minimum of 180 closings per year, for a total of 1,263 lots.  *See id.*

68.      Erickson has covenanted and agreed "to pay for and be obligated for the costs of the development of the Lots and the Subdivisions."  *Id.* § 24.

69.      Section 6 of the LPA requires Erickson to deliver lots for sale to ASH-GH pursuant to the Takedown Schedule, and it states expressly that the Takedown Schedule sets forth only "the **minimum number of Lot closings, based on the availability of Finished Lots**" required of ASH-GH on a quarterly basis (with ASH to receive credit toward future takedowns if it is ahead of schedule):

> Seller is required to develop the Lots in accordance with this Agreement and to meet the requirement of the Takedown Schedule (defined below).  Starting with the calendar quarter ending on December 31, 2019, Buyer agrees to purchase from Seller the number of Lots set forth on the Lot takedown schedule attached as Schedule 1 to this Agreement (the "Takedown Schedule"). The number of Lots shown on the Takedown Schedule represents the **minimum number of Lot closings ("Lot Takedowns") that Buyer is required to complete, based on the availability of Finished Lots, during each calendar quarter**; provided, however, that to the extent Buyer purchases **more than the number of Lots shown on the Takedown Schedule** during any calendar quarter, the excess number of Lots shall be credited toward the Lot Takedowns required for the subsequent calendar quarter or quarters.  (emphasis added).

Thus, the LPA permits ASH-GH to take down more than the "minimum" number of lots set forth in the Takedown Schedule.

70.     Section 20 of the LPA provides, in turn, that "Buyer shall give Seller at least ten (10) business days' written notice of the intended Finished Lots to be purchased" by ASH-GH.

71.     Thus, the LPA expressly contemplates that ASH will have the opportunity to purchase more than the minimum number of finished lots set forth in the Takedown Schedule, to the extent such lots are finished and available to purchase.  ASH-GH has done so throughout the term of the LPA, putting it ahead of the Takedown Schedule for Phase B and C Lots.

### b.     Phase C Lots and Takedowns

72.     Pursuant to the LPA, ASH-GH provided Erickson with a $2,500,000 deposit, which is to be credited and returned to ASH-GH pro-rata as it purchases Phase C Lots.  *Id.* § 4.

73.     The purchase price for each Phase C Lot is determined by the "current basis of each Phase C Lot shown on Exhibit C for each neighborhood" (i.e., the purchase price paid by Erickson for the land) with an increase of 0.5% per month for each month since January 1, 2020, plus reimbursement for property taxes paid between November 2019 and the lot takedown, plus reimbursement for the "actual costs" incurred to develop the Phase C Lot, and plus a $3,000 management fee.  The price resulting from such formula is described in the LPA as the "Phase C Purchase Price."  *Id.* § 11.

74.     If the Phase C Purchase Price "is equal to or less than twenty percent (20%) of the average appraised market sales price of a house in such Subdivision (the 'Estimated Market Value')," ASH-GH is to purchase from Erickson at the Phase C Purchase Price.  *Id.* §§ 11, 12.

75.     If the Phase C Purchase Price "exceeds 20% of the Estimated Market Value," Erickson may "elect to sell such Phase C Lots to [ASH-GH] for a price equal to or less than 20%

of the Estimated Market Value (the 'Reduced Phase C Purchase Price')," subject to a true-up to 20% of the actual sales price for the home if it exceeds the Estimated Market Value.  *Id.* § 13(a).

76.     Alternatively, if the Phase C Purchase Price "exceeds 20% of the Estimated Market Value," Erickson may offer to sell such lots to ASH through a written right of first offer ("ROFO"), and ASH may elect to purchase at that price.  If ASH declines, Erickson "may accept any bona fide, arms-length offer . . . from any unrelated third party willing to purchase" such lots at the ROFO price.  *Id.* § 13(b)(i)-(ii).  The LPA defines these as the "Phase C ROFO Lots."  *Id.* § 13(b).

77.     Erickson may not sell Phase C ROFO Lots to an affiliated party or at a lower price or on better terms than are contained in the ROFO to ASH-GH.  *Id.* § 13(b)(ii).

78.     If Erickson does not accept a bona fide, arms-length offer from an unrelated third party within 120 days, on terms no more favorable than offered to ASH-GH, Erickson must again provide ASH-GH with a ROFO for the Phase C ROFO Lots at issue.  *Id.* § 13(b)(iii).

79.     If ASH-GH does not purchase any of the Phase C ROFO Lots, such lots do not count towards either party's obligations under the Takedown Schedule.  *Id.* § 13(b)(i).

### c.     Future Lots and Takedowns

80.     Should Erickson "acquire or develop and offer for sale additional land or lots in the States of Georgia or Alabama that are not Phase A, B, or C Lots" (called "Future Lots"), Erickson must first provide a written ROFO to ASH-GH for such lots ("Future ROFO Lots").  *Id.* § 14(a). ASH-GH has a 45-day review period to elect to purchase Future ROFO Lots.  *Id.*

81.     If ASH-GH elects to purchase the Future ROFO Lots, there is an additional 45-day period to negotiate a purchase agreement and to conduct due diligence.  *Id.* § 14(a).

82.     If ASH-GH declines to purchase the Future ROFO Lots, Erickson may accept a bona fide offer from an unrelated third party; however, Erickson again may not sell to the unrelated

18

third party for less than the ROFO price offered to ASH-GH or on terms that are more favorable than the terms offered to ASH-GH. *Id.* § 14.

83.    If Erickson does not accept a bona fide, arms-length offer from an unrelated third party within 120 days, then Erickson must again initiate the written ROFO process for the Future Lots by providing a new ROFO to ASH-GH. *Id.* § 14.

84.    Erickson must offer all Future Lots to ASH-GH "for the period through and including one (1) year after Erickson is no longer an employee, director, owner, officer, or member of [ASH-GH] or [ASHH]." *Id.* § 14(e).  Erickson is presently a member of ASHH.

### d.    Lot and Subdivision Development Standards and Conditions

85.    Erickson is required to deliver the Lots subject to certain development standards. *See generally id.* §§ 20-24.  Erickson agreed to "complete the development of the Lots and the Subdivisions in accordance with this Agreement at [his] sole cost and expense," subject to a variety of enumerated conditions. *Id.* §§ 22, 23.

86.    The LPA provides that "prior to the closing for each Lot Takedown, Buyer shall have the right to investigate the condition of the Lots, and [Erickson] shall have the obligation to provide access to all documents pertaining to the Lots if requested by Buyer." *Id.* § 20.  Following such a walk-through, "Seller shall utilize commercially reasonable efforts to remediate such condition in a timely manner and if not promptly cured by Seller, Buyer may postpone the purchase of the Finished Lots or waive any such condition but which will not alleviate Seller from its obligations per [the LPA]." *Id.*

87.    The LPA further provides that, at the closing for each lot, "there shall be no condition affecting any Finished Lot to be purchased that would prohibit Buyer from obtaining a

building permit to construct a house on such Finished Lot or from obtaining a certificate of occupancy for the house once completed." *Id.* § 21.

**B.    Misappropriation of ASHH's Confidential Business Information**

88.    Since the Acquisition in 2019, Erickson has been intimately and extensively involved in ASHH's business operations.  As a result, Erickson gained valuable and unique insight into ASHH's competitively sensitive and confidential business, strategy, and operations.

89.    As already explained, Erickson served as a member of the ASHH Board from November 15, 2019 until his resignation in December 2020.

90.    As a consultant to ASHH, Erickson focused on ASHH's acquisition strategy, as well as due diligence on potential acquisition targets.

91.    In late October 2020, after pressuring for the removal of the prior CEO and jockeying for the interim CEO title, Erickson became ASHH's interim CEO.  Erickson was appointed to serve as interim CEO for six months, until ASHH hired a permanent CEO.

92.    Nevertheless, Erickson immediately began to lobby and pressure ASHH to appoint him as permanent CEO, and he demanded a generous compensation and benefits package.  In making these demands, Erickson used confidential information and details of other ASHH and ASH entities' executive compensation and benefit packages.

93.    As a member of the ASHH Board, as a consultant to ASH, and as the interim CEO of ASHH, Erickson had frequent and regular access to ASH's confidential and competitively sensitive business information.

94.    In his December 20, 2020 resignation letter, Erickson explained that he had decided to resign as ASHH's interim CEO and from the Board because he "developed ambitions to do more things in the home building and development business and feel[s] that [his] board

responsibility with ASH are likely to constitute a conflict of interest[] with those goals and possibilities."

95.     In his December 30, 2020 letter, Erickson expounded on his intent to compete with ASHH, stating that he planned to "purchase one or more home building companies in the near term for my own investments.  If that step should go well, I may consider doing additional purchases in the future."

96.     In actuality, Erickson had already begun to compete with ASHH, using its confidential and proprietary assets to do so.

97.     For example, during negotiations with Dorn in fall 2020, ASHH considered increasing its purchase price offer.  Erickson dissuaded ASHH from increasing its offer and then attempted to purchase Dorn on his own, before becoming the interim CEO.  Ultimately, when ASHH closed the Dorn acquisition, it paid more than it otherwise would have paid if Erickson had not interfered and misused ASHH's confidential information for his own personal benefit.

98.     In another example, since resigning as ASHH's interim CEO and from the ASHH Board, Erickson has attempted to acquire a builder in Austin, Texas.  Erickson learned of and developed contacts with this builder during his tenure with ASHH, and he then used such confidential information in an attempt to acquire the builder.  For example, during his tenure as ASHH's interim CEO, Erickson traveled to Austin, Texas with other ASHH executives to meet in person with the owner of the business.

99.     As another example, on or about January 25, 2021, Erickson contacted a recently hired employee of ASHH and solicited him for employment.  Erickson was aware of ASHH's recruitment of that individual, having interviewed the new employee before he resigned and having attempted to sabotage ASHH's recruitment by offering him a "demotion" to work for ASHH,

despite the fact that he was being considered for a senior executive position.  Erickson had no other

relationship with this new ASHH employee.  Nevertheless, Erickson solicited this individual to

assist with his efforts to acquire the builder in Texas.

100.    Upon information and belief, Erickson also made offers of employment to other

ASH personnel, including at its corporate headquarters and in the Columbus, Georgia area.

101.    Moreover, Erickson prepared and distributed a draft business plan for the company

he formed to begin his strategy of acquiring homebuilders in competition with ASHH, which he

has apparently named "Grand Oak Builders."  Prior to joining ASH, Erickson's business was

limited to developing raw land into lots and building homes in a local market.  After approximately

a year working with ASH, however, he decided to form a holding company that, like ASH, is in

the business of acquiring and operating homebuilding companies.

102.    The business plan is strikingly similar to, and plagiarizes from, ASHH's Private

Placement Memorandum related to its acquisition of Dorn ("ASH Dorn PPM").  For example:

| **ASH Dorn PPM** | **Grand Oaks Business Plan** |
|---|---|
| Focus on markets that are growth oriented, with consistent job growth and demographics favorable to continued new home construction. | Focus on the Southern US area that is business-friendly, characterized by strong job growth, and as a result has a dynamic and growing housing market. |
| Capitalize on significant arbitrage between small and large builders that exist in the industry (because small single-market builders trade at material discounts to larger multi-market and public homebuilders). | Capitalize on the significant value delta between private, small scale builders and large builders (small single market builders routinely trade at significant discounts from large multi-market and publicly traded builders). |

103.    Erickson's draft business plan describes his planned formation of a "new home

construction holding company," Newco Homes, in which Erickson is the CEO.  Erickson's plan

states that he is "driving the vision for Newco Homes," and his business plan describes him as a

"long term builder/developer" who sold "his company Grayhawk Homes, Inc. in 2019" and achieved "routinely enviable business performance."

104.    His business plan states that "Newco Homes is being formed to take advantage of the many opportunities to purchase, capitalize, and operate small to mid-size builders with the purpose of gaining market share, drive better organization and operate at higher degrees of efficiency...."   Newco Homes will "operate from the Columbus[,] Georgia offices of David Erickson [and] as additional scale is achieved, Newco will stand up its own office."

105.    This is the same business conducted by ASHH, with which Erickson had little or no experience before he joined ASHH as a member and served as a consultant, director, and interim CEO.  Accordingly, Grand Oak Builders is a vehicle for Erickson to compete with ASHH using its confidential and competitively sensitive business information, including in his business plan, learned during his stint with ASH.

106.    Thus, Erickson has used ASHH's confidential information: (a) in an attempt to purchase Dorn on his own (after dissuading ASHH from increasing its offer); (b) to plagiarize an ASHH document for use as a business plan; (c) in an attempt to acquire a Texas builder that Erickson learned about through his positions with ASHH; (d) to solicit a recently-hired ASHH employee to assist with his potential acquisition of the builder in Texas; (e) to solicit other ASH employees; and (f) to compete with ASH via Grand Oak Builders.

107.    These activities all breach Erickson's confidentiality obligations to ASH, set forth in various agreements. Ex. 5, Consulting Agreement § 7; Ex. 6, Employment Agreement §§ 6.01, 6.02.  Upon information and belief, these are not the only instances in which Erickson has misappropriated ASHH's confidential information for his own use and personal gain.

C.       **Non-Compete Violations**

108.     In addition to the formation of Grand Oak Builders, until at least January 2021, Erickson operated a competitive homebuilding operation through an entity named "Grayhawk Homes of Atlanta Corporation," which is not affiliated with ASH.

109.     According to property records and other publicly available information, "Grayhawk Homes of Atlanta" has sold dozens of homes in two subdivisions—the Gates at Amberhill and the Reserve at Timberlands—in or near Dallas, Georgia during the period since November 15, 2019. According to public records, the sale of these homes appear to have generated revenue of at least $7,902,287.

110.     "Grayhawk Homes of Atlanta" also built four additional homes in Dallas, Georgia that were listed for sale with an aggregate list price of $1,406,359.

111.     In addition, Erickson owns 32 more lots (including many with active building permits) in or around Dallas, Georgia.

112.     All of these homes and lots are within 100 miles of Atlanta, Georgia.

113.     Erickson's continued operation of "Grayhawk Homes of Atlanta," plus Erickson's operation of Grand Oak Builders or "Newco Homes" in Columbus, Georgia, violate the restrictive covenant in Section 6.5 of the APA, which provides that "none of Seller, D. Erickson, or R. Erickson shall participate in a competitive homebuilding operation or business within 100 miles of the geographic markets of each Seller as of the Closing Date, which shall include Columbus, Georgia; Atlanta, Georgia; Macon, Georgia; Dothan, Alabama; and Montgomery, Alabama."  Ex. 1, APA § 6.5.

**D.      Unauthorized Use of the Grayhawk Trademark, Trade Name and Trade Dress**

114.     Since the Acquisition, Erickson, individually and on behalf of the other Defendants, has continued to operate and conduct business using the Grayhawk trademark and trade name, including as "Grayhawk Homes of Atlanta" and "Grayhawk Homes of South Carolina."

115.     As explained above, ASH acquired extensive intellectual property rights on November 15, 2019.  *Id.* § 1.1(j).  Such intellectual property includes "copyrights, trademarks, service marks, trade names [...] and goodwill associated therewith."  *Id.* § 12.1(v).

116.     The Trademark Assignment Agreement explicitly conveyed to ASH-GH "all worldwide right, title, and interest in, to, and under all Trademarks, including, without limitation, any and all common law rights thereto and the goodwill of the Business...."  Ex. 3, Trademark Assignment Agreement § 1.  "Trademarks" is defined to include "trademarks, service marks, trade names[,] brand names, logos and corporate names, slogans[,] whether or not registered..."  *Id.*, Recital B.

117.     Nevertheless, the Grayhawk trademark, trade name and logo appeared on materials provided to the public, brokers, realtors, and others related to the sale of homes constructed by Grayhawk Homes of Atlanta and Grayhawk Homes of South Carolina.  In most instances, Erickson either left the "Grayhawk Homes" trademark, trade name and logo as is or used a modified version that simply appended "of Atlanta" or "of South Carolina" after "Grayhawk Homes."

118.     Erickson's use of the Grayhawk trademark, trade names and logo has caused confusion and mistake by potential home buyers and the general public.  For example, on the "Grayhawk Homes" Yelp and Build Zoom webpages, an individual posted two January 11, 2020 one-star comments about "issues with this company [i.e., Grayhawk Homes] after buying one of their spec homes in Bluffton, SC."  *See* https://www.yelp.com/biz/grayhawk-homes-columbus (last visited March 12, 2021);  https://www.buildzoom.com/contractor/grayhawk-homes-inc-

beallwood (last visited March 12, 2021) (containing identical review).  ASH-GH has not built or sold any homes in South Carolina.  As evidenced by the review, this individual confused Erickson's "Grayhawk Homes of South Carolina" entity with ASH's "Grayhawk Homes."



### E.   Unauthorized Use of Copyrighted Building Plans

119.    In addition, Erickson, individually and on behalf of the other Defendants, is developing, building, and selling homes using copyrighted plans owned by ASH-GH, in both Georgia and South Carolina.

#### 1.   Georgia Copyright Violations

##### a.   Sycamore Plan

120.    Erickson used the "Sycamore" plan on at least one lot: 827 Pine Way, Dallas, Georgia.  The Sycamore plan is registered with the U.S. Copyright Office and is specifically listed

on Schedule 1 of the Copyright Assignment Agreement.  Attached hereto as **Ex. 7** are the "Sycamore" copyrighted plans, "ATL-Sycamore" plans ASH-GH obtained through the Acquisition, documents demonstrating Erickson's infringement, and property records.

121.   **Figure 1** below is a screenshot of the Re/Max listing (MLS #8912570) for the sale of the property at 827 Pine Way, Dallas Georgia.  The listing description states: "Welcome to the Sycamore!"  The only images used in the MLS listing are the copyrighted Grayhawk Building Plans; Erickson (and his agents) have no right to use these copyrighted materials.



122.   **Figure 2a** below is a partial screenshot of the Sycamore plan copyright, which has been filed and registered with the U.S. Copyright Office, Registration No. VAu 1-371-683, August 21, 2019.



123.   **Figure 2b** below is a zoomed-in and rotated screenshot from Figure 2a that shows the "Grayhawk Homes, Inc." logo and copyright notice, which states as follows:  "[A]ll drawings and material appearing herein constitute the original and unpublished work of Grayhawk Homes and the same or any part thereof may not be duplicated, distributed, disclosed, or used in any manner without the written consent of Grayhawk Homes.   Penalties shall apply when user duplicates Grayhawk Homes work, without Grayhawk Homes' written consent."



124.   **Figure 2c** below is a partial screenshot of the "ATL-Sycamore" plan, which is a substantially similar and derivative work to the "Sycamore" plan in Figure 2a.  Further, Figure 2c comprises part of the Copyrights ASH-GH obtained as part of the Acquisition under the APA and Copyright Agreement.



125.   **Figure 3a** below is a screenshot from the same MLS listing shown in Figure 1 that is identical or nearly identical to Figure 2a and also Figure 2c.



126.   **Figure 3b** below is a zoomed-in and rotated screenshot from the same listing shown in Figure 1 and Figure 3a that more clearly shows Erickson's use of the copyrighted Sycamore plan, on which is added "of Atlanta, Inc." below "Grayhawk." The image contains the same copyright notice as in the registered copyrighted plans shown in Figure 2b.



### b.     Elmwood Plan

127.     Erickson used the "Elmwood" plan on at least three lots including the following: 81 Cedar Ridge Way, Dallas, Georgia; 31 White Spruce Trail, Dallas Georgia; and 136 Grand Oak Trail, Dallas, Georgia.  The Elmwood plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-515, August 21, 2019.

### c.     Longleaf Plan

128.     Erickson used the "Longleaf" plan on at least four lots including the following: 853 Pine Way, Dallas, Georgia; 794 Pine Way, Dallas, Georgia; 795 Pine Way, Dallas, Georgia; and 596 Pine Way, Dallas, Georgia.  The Longleaf plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-701, August 21, 2019.

### d.     Marshall Plan

129.     Erickson used the "Marshall" plan on at least one lot: 153 Amberhill Court, Dallas, Georgia.  The "Marshall" plan is among the copyrights assigned to ASH-GH, insofar as it was owned by Grayhawk Homes, Inc. prior to November 15, 2019.   Nevertheless, on or about December 10, 2020 and while still serving as ASHH's interim CEO, Erickson improperly filed for registration with the U.S. Copyright Office a "BP-Marshall" plan that lists "Grayhawk Homes, Inc." as the copyright claimant and himself as holding the rights and permissions (Registration No. VAu001384084).

### e.     Poplar Plan

130.     Erickson used the "Poplar" plan on at least one lot: 15 White Spruce Trail, Dallas, Georgia.  The Poplar plan is registered with the U.S. Copyright Office and listed on Schedule 1 of

the Copyright Assignment Agreement, Registration No. VAu 1-371-720, August 21, 2019.

### f.    Coventry Plan

131.    Erickson used the "Coventry" plan on at least two lots: 822 Pine Way, Dallas, Georgia; and 576 Pine Way, Dallas, Georgia.   The Coventry plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-635, August 21, 2019.

### g.    Birch Plan

132.    Erickson used the "Birch" plan on at least three lots: 918 Pine Way, Dallas, Georgia; 848 Pine Way, Dallas, Georgia; and 544 Pine Way, Dallas, Georgia.   The Birch plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-311, August 21, 2019.

### h.    Alder Plan

133.    Erickson used the "Alder" plan on at least two lots: 99 Grand Oak Trail, Dallas, Georgia; and 77 White Spruce Trail, Dallas, Georgia.   The Alder plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-080, August 21, 2019.

### i.    Jasmine Plan (Atlanta)

134.    Erickson used the "Jasmine" plan on at least one lot: 229 Pine Way, Dallas, Georgia.   The Jasmine plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-738, August 21, 2019.

### j.    River Oak Plan

135.    Erickson used the "River Oak" plan on at least one lot: 61 Grand Oak Court, Dallas, Georgia.   The River Oak plan is registered with the U.S. Copyright Office and listed on Schedule

1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-718, August 21, 2019.

136.   Figures 1, 3a, and 3b are representative of the Georgia listings.  For every address listed herein, Erickson duplicated, disclosed, and used ASH-GH's copyrighted plans, ASH-GH's derivative plans, or created derivative plans without ASH-GH's consent.

2.   **South Carolina**

a.   **Willow Plan**

137.   Erickson used the "Willow" plan on at least one lot: 118 Waters Edge, Moncks Corner, South Carolina.  The Willow plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-700, August 21, 2019.  Attached hereto as **Ex. 8** are the "Willow" copyrighted plans, "SC-Willow" plans ASH-GH obtained through the Acquisition, documents demonstrating Erickson's infringement, and property records.

138.   **Figure 4** below is a screenshot of the Agent Owned listing (MLS #20028673) for the property at 118 Waters Edge Lane, Moncks Corner, South Carolina.  Several of the images used in the listing are the copyrighted Grayhawk Building Plans; Erickson (and his agents) have no right to use these copyrighted materials.  The listing begins: "Two Story "Willow" floor plan now under construction."



139.   **Figure 5a** below is a partial screenshot of the Willow plan, the registered copyright noted above.



140. **Figure 5b** below is a zoomed-in and rotated screenshot from Figure 5a that shows the "Grayhawk Homes, Inc." logo and states as follows: "[A]ll drawings and material appearing herein constitute the original and unpublished work of Grayhawk Homes and the same or any part thereof may not be duplicated, distributed, disclosed, or used in any manner without the written consent of Grayhawk Homes.  Penalties shall apply when user duplicates Grayhawk Homes work, without Grayhawk Homes' written consent."



141.   **Figure 5c** below is a partial screenshot of the "SC-Willow" plan, which is a substantially similar and derivative work to the "Sycamore" plan in Figure 5a.  Further, Figure 5c comprises part of the Copyrights ASH-GH obtained as part of the Acquisition under the APA and Copyright Assignment Agreement.



142.   **Figure 6a** below is a screenshot from the same MLS listing shown in Figure 4.



143.   **Figure 6b** below is a zoomed-in screenshot of two images from the same listing shown in Figure 4 and Figure 6a, which more clearly shows Erickson's manipulation and use of the copyrighted Willow plan by adding "of South Carolina, Inc." below "Grayhawk."  The image also contains the same copyright notice as in the filed and registered copyrighted plans, as shown in Figure 5b, and states as follows:  "Copyright Grayhawk Homes Inc. not to be reproduced without permission of Grayhawk Homes Inc."





### b.    Cardinal Plan

144.    Erickson used the "Cardinal" plan on at least one lot: 2243 Arthur Gaillard Lane, Charleston, South Carolina.  The Cardinal plan is filed with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement. If necessary, ASH intends to amend this Complaint upon issuance of the registration.

### c.    Carolina Plan

145.    Erickson used the "Carolina" plan on at least one lot: 2164 Military Way, Charleston, South Carolina.  The Carolina plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-033-819, May 11, 2010; Registration No. VAu 1-027-014, May 5, 2010.

### d.    Jasmine Plan (South Carolina)

146.    Erickson used the "Jasmine" plan on at least one lot: 119 Waters Edge Lane, Moncks Corner, South Carolina.  The Jasmine plan is registered with the U.S. Copyright Office and listed on Schedule 1 of the Copyright Assignment Agreement, Registration No. VAu 1-371-738, August 21, 2019.

### e.    Folly Plan

147.    Erickson used the "Folly" plan on at least two lots: 112 Waters Edge, Moncks Corner, South Carolina; and 2160 Military Way, Charleston, South Carolina.  The "Folly" plan is

among the copyrights assigned to ASH-GH or is a derivative work.

**f.    Cooper Plan**

148.    Erickson used the "Cooper" plan on at least one lot: 116 Waters Edge, Moncks Corner, South Carolina.  The "Cooper" plan is among the copyrights assigned to ASH-GH or is a derivative work.

**g.    Crane Plan**

149.    Erickson used the "Crane" plan on at least one lot: 121 Waters Edge, Moncks Corner, South Carolina.  The "Crane" plan is among the copyrights assigned to ASH-GH or is a derivative work.

**h.    Cape Plan**

150.    Erickson used the "Cape" plan on at least one lot: 2201 Arthur Gaillard Lane, Charleston, South Carolina.  The "Cape" plan is among the copyrights assigned to ASH-GH or is a derivative work.

**i.    Sullivan Plan**

151.    Erickson used the "Sullivan" plan on at least one lot: 2203 Arthur Gaillard Lane, Charleston, South Carolina.  The "Sullivan" plan is among the copyrights assigned to ASH-GH or is a derivative work.

152.    Figures 4, 6a, and 6b are representative of the South Carolina listings.  For every address listed herein, Erickson duplicated, disclosed, and used ASH-GH's copyrighted plans, or created derivative plans without ASH-GH's consent.

**F.    Erickson Has Not Complied With The LPA**

**1.    Lot Development Standards**

153.    In the LPA, Erickson "covenant[ed] and agree[ed] to pay for and be obligated for the costs of the development of the Lots and the Subdivision."  Ex. 2, LPA § 24.

154.     As stated above, the LPA provides that, at the time of each lot closing, there "shall be no condition affecting any Finished Lot to be purchased that would prohibit [ASH-GH] from obtaining a building permit to construct a house on such Finished Lot or from a certificate of occupancy for the house once completed." *Id.* § 21.

155.     The LPA also spells out various requirements in order for Erickson to sell the homes to ASH-GH and to be credited as part of the Takedown Schedule, including: development specifications, engineering standards, utility line construction and installation, interior roads and sidewalks, drainage and sewers, grading, curbs and gutters, etc. *Id.* §§ 22, 23.

156.     After Erickson delivered a series of lots that did not comply with such requirements, causing ASH-GH to incur remediation costs that should have been borne by Erickson, ASH-GH engaged a neutral-third party, Barrett-Simpson, Inc., to assess the conditions of certain lots within the Garrett Pines, Lexington Hills, and Riverbrook subdivisions using the development criteria set forth in the LPA.  This neutral third party has prepared reports identifying numerous instances in which Erickson has developed lots that do not comply with the criteria set forth in the LPA.

157.     ASH identified these certain issues to Erickson in a February 17, 2021 letter.

158.     Despite having identified these certain issues to Erickson, Erickson did not "promptly cure[]" the deficiencies, as required by the LPA.

### 2.     Phase A "Finished Lots"

159.     In addition, pursuant to the Takedown Schedule, Erickson was to deliver and ASH-GH was to purchase 25 Phase A Lots in the quarter ending on March 31, 2021.  Erickson did not, however, deliver 25 Phase A Lots to meet his obligations under the Takedown Schedule.  Instead, Erickson provided only 15 Phase A Lots, putting him in default under the LPA.

160.    Ironically, as ASH-GH attempted to work through this issue with Erickson, he insisted that ASH-GH had defaulted on the LPA by declining to take down four lots that did not meet the requirements for a "Finished Lot" under the LPA and could not be used to build homes without substantial remediation by ASH-GH.

161.    Two of the four lots at issue (9812 and 9220 Garrett Lake Drive) were not cleared of trees, feature steep slopes to a running creek, are located in a flood zone, and did not contain finished building pads.  The other two lots at issue (268 and 272 Solamere Lane) were uncleared and overgrown with brush, and they did not contain finished building pads; in addition, Erickson has known since January 2017 that the City of Auburn would not issue a building permit on the lots without additional drainage work specified by the City, but such work was never performed.

162.    The LPA makes clear that ASH-GH has no obligation to take down "any Finished Lot" with issues that could preclude the issuance of a building permit or certificate of occupancy (§§ 15 & 21), requires Erickson to make "commercially reasonable efforts" to remediate non-conforming "Finished Lots" before ASH-GH takes down such lots (§ 20), places no obligation on ASH-GH to take down a lot if part of the building envelope is in a flood plain (§ 22(k)), and requires specific drainage and grading standards (§ 23).  Together and in combination, these terms all relieved ASH-GH of any obligation to take down the four lots.

163.    Nevertheless, Erickson insisted that ASH-GH take down such lots as a condition to take down different lots ASH-GH was otherwise entitled to purchase.

### 3.    Lot Takedowns

164.    As explained above, Erickson "is required to develop the Lots in accordance with [the LPA] and to satisfy the requirements of the Takedown Schedule."  Ex. 2, LPA § 10 & Schedule 1.  Section 6 of the LPA requires Erickson to deliver lots for sale to ASH-GH pursuant

to the Takedown Schedule, and it states expressly that the Takedown Schedule sets forth "the minimum number of Lot closings" required of ASH-GH on a quarterly basis (with ASH to receive credit toward future takedowns if it is ahead of schedule). *Id.* § 6.

165.    Thus, the LPA expressly contemplates that ASH will have the opportunity to purchase more than the minimum number of finished lots set forth in the Takedown Schedule, to the extent such lots are finished and available to purchase.  ASH-GH has done so throughout the term of the LPA, putting it ahead of the Takedown Schedule for Phase B and C Lots.

166.    Erickson periodically provides to ASH-GH a list of lots that are released for purchase, after they have been fully developed, platted, and assigned addresses.  From the outset of the relationship between ASH and Erickson, ASH-GH has made such lots available to its sales agents (who operate under the auspices of Rose Anne Erickson Realty, an agency owned and controlled by Erickson's wife) to offer to prospective homebuyers.  When a customer enters into a contract to purchase a home on such a lot, ASH-GH schedules a takedown and purchases the lot from Erickson or one of the Erickson Entities before it begins construction.

167.    At the time of filing, Erickson had finished developing approximately 160 Phase B lots and approximately 38 Phase C lots, all of which have been released for purchase to ASH-GH. Upon information and belief, an additional 200-250 Phase C lots are in development and close to being completed.  Pursuant to the LPA and confirmed by historical practice, ASH-GH should be able to take down any lots released for purchase by Erickson, regardless of whether it has already reached the minimum number of quarterly takedowns set forth in the Takedown Schedule.

168.    In recent months, however, Erickson has blocked ASH-GH from taking down such lots as a result of disputes between the parties and in breach of the LPA.  Upon information and

belief, Erickson has no economic incentive to block the purchase of such lots and delay the recovery of his investments in development, except perhaps to gain negotiating leverage.

<u>COUNT ONE</u>
**BREACH OF CONFIDENTIALITY OBLIGATIONS –**
**EMPLOYMENT AGREEMENT, AND CONSULTING AGREEMENT**
**(Against Erickson)**

169.    ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

170.    The Consulting Agreement is a valid, binding, and enforceable contract between ASH and Erickson.

171.    Erickson is bound by the confidentiality provisions of the Consulting Agreement, whereby Erickson acknowledged that "he will receive or have access to certain non-public, proprietary, and/or confidential information relating to the business and affairs of [ASH], including trade secrets, know how, research and development, databases..."  Ex. 5, Consulting Agreement § 7.

172.    Erickson "agree[d] and acknowledge[d] that such 'Confidential Information' shall be subject to the terms and obligations described in [Employment Agreement §§ 6.00, *et seq.*]."

173.    The Employment Agreement is a valid, binding, and enforceable contract between ASH and Erickson.

174.    The Employment Agreement requires Erickson to protect all "Confidential Information" of ASH and use such information "only in connection with the carrying out of duties and responsibilities under the [Employment Agreement]."  Ex. 6, Employment Agreement § 6.02.

175.    Erickson agreed that a "breach of the covenants contained in [§ 6.02] would result in irreparable harm to [ASH] and that monetary damages alone would be an inadequate remedy." *Id.* § 6.05.

176.    Erickson has used and continues to use ASH's confidential information for his own

purposes, and not in connection with any legitimate duty or responsibility to ASH, including when he (a) attempted to purchase Dorn Homes after dissuading ASHH from increasing its offer price (with knowledge of ASHH's offer and negotiations); (b) attempted to purchase a Texas-based homebuilder using ASHH contacts and information obtained in his various positions at ASHH; (c) solicited an ASHH employee after interviewing that same employee during his tenure with ASHH; and (d) copied language from the Dorn Homes PPM for use in a draft business plan.

177.     Each of these examples is a breach of Erickson's confidentiality obligations.  Taken together, Erickson's conduct is particularly egregious.

178.     Upon information and belief, there are other violations of Erickson's confidentiality obligations of which ASH is not currently aware and which will be revealed through discovery in this action.

179.     Accordingly, ASH is entitled to an injunction prohibiting Erickson from engaging in such offending conduct, as well as damages (in an amount to be determined at trial) resulting from Erickson's willful misconduct, gross negligence in connection with ASH's business and affairs, and material breaches of the Consulting Agreement and Employment Agreement.

## COUNT TWO
### BREACH OF CONTRACT - LPA
### (Against Erickson, GH Lot Holdings, Inc.)

180.     ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

181.     The Land Purchase Agreement (Ex. 2) is a valid, binding, and enforceable contract among and between ASH, Erickson, Rose Anne Erickson, and certain of the Erickson Entities, including GH Lot Holdings, Inc. f/k/a Grayhawk Homes, Inc.

182.     ASH has complied with the terms and obligations of the LPA.

183.    As explained herein, Erickson, individually and on behalf of GH Lot Holdings, Inc., has failed and refused to comply with the terms and obligations of the LPA.

184.    First, Erickson is developing and delivering lots to ASH-GH that do not conform with the development standards contained in Sections 21-25 of the LPA.

185.    Second, Erickson has demanded that ASH-GH provide an additional deposit for Phase C Lots, which is not contemplated in the LPA.  Indeed, ASH-GH has already made a $2.5 million deposit as required by the LPA.

186.    Third, upon information and belief, Erickson has inflated the prices for Phase C ROFO Lots above the "actual costs" of development, by over-paying an entity in which he has an ownership stake.

187.    Fourth, Erickson has refused to permit ASH-GH to take down lots that are fully developed and have been released for purchase.

188.    Finally, the LPA requires that any future lots that Erickson acquires or develops in Georgia or Alabama ("Future ROFO Lots") must be first offered to ASH-GH.  Ex. 2, LPA § 14. According to property records and publicly available information, Erickson has developed and offered for sale at least 58 lots in and around Dallas, Georgia since the Acquisition, none of which were offered to ASH.

189.    In oral communications throughout 2020 and in letters dated February 17, 2021 and March 23, 2021, ASH-GH provided Erickson with notice that Erickson was failing to comply with certain terms of the LPA.

190.    Unless the default is cured within 15 days of providing a formal notice of default, ASH-GH's $2.5 million deposit "shall promptly be returned" to ASH by Erickson, ASH "shall have no further obligation to make Deferred Payments" to Erickson, and ASH may pursue other

rights or remedies, including "specific performance to compel [Erickson] to improve and/or sell the Lots to [ASH] and recovering all monetary damages and lost profits arising from [Erickson's] default." *Id.* § 35(c)(i)-(iii).

191.   Erickson and GH Lot Holdings, Inc. are in breach of the LPA, and ASH is entitled to specific performance, monetary damages, and lost profits in an amount to be determined at trial.

<u>**COUNT THREE**</u>
**BREACH OF CONTRACT - APA (NON-COMPETE)**
**(Against Erickson)**

192.   ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

193.   The Asset Purchase Agreement (Ex. 1) is a valid, binding, and enforceable contract between ASH and Erickson.

194.   The APA restricts Erickson, for a three-year period extended by the duration of any breach, from "participat[ing] in a competitive homebuilding operation or business within 100 miles of the geographic markets of [ASH] as of the [November 15, 2019], which shall include Columbia, Georgia; Atlanta, Georgia; Macon, Georgia; Dothan, Alabama; and Montgomery, Alabama." Ex. 1, APA § 6.5(a).  This restrictive covenant remains in effect.

195.   Erickson has breached these non-compete provisions by building and selling homes in and around Dallas, GA, which is less than 100 miles from Atlanta, and by operating competitive homebuilding operations in Columbus, GA, which is the headquarters for "Grand Oak Builders" (or "Newco Homes"), Grayhawk Homes of Atlanta, and Grayhawk Homes of South Carolina.

196.   Since November 2019, Erickson has sold dozens of homes in or near Dallas, Georgia, totaling at least $7,902,287.  Erickson has developed additional homes in Dallas, Georgia that are listed for sale as of the date of this filing.  Erickson also owns additional lots with active building permits.

197.    All of these homes and lots are within 100 miles of Atlanta, Georgia.

198.    Each of these activities—including the building, development, listing, and sale of the homes—constitutes a separate and distinct breach of Erickson's non-compete obligations.

199.    ASH is entitled to an injunction against Erickson to cease such offending conduct as well as damages (in an amount to be determined at trial) as result of Erickson's breach of Section 6.5 of the APA.

## COUNT FOUR
## BREACH OF CONTRACT - COPYRIGHT ASSIGNMENT AGREEMENT
### (Against GH Lot Holdings, Inc.)

200.    ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

201.    The Copyright Assignment Agreement is a valid, binding, and enforceable contract between and among ASH-GH and certain of the Erickson Entities, including GH Lot Holdings, Inc. f/k/a/ Grayhawk Homes, Inc.  ASH-GH owns all right, title, and interest in and to the Grayhawk Building Plans.  *See* Ex. 4, Copyright Assignment Agreement § 1.

202.    Pursuant to Section 1 of the Copyright Assignment Agreement, GH Lot Holdings, Inc. and certain of the other Erickson Entities, "s[old], assign[ed], convey[ed], and transfer[red]" to ASH, and ASH "purchase[d], acquire[d], accept[ed], and assum[ed]" from Erickson, "all worldwide right, title, and interest in, to, and under all Copyrights, whether registered or unregistered, and all elements thereof."

203.    This assignment included, "without limitation, any and all derivative works of any of the foregoing and all privileges and goodwill associated with the Copyrights." *Id.*

204.    Accordingly, GH Lot Holdings, Inc. has no right, title, interest, or proper basis to use any of ASH-GH's Copyrights, including the Grayhawk Building Plans.

205.    Nevertheless, GH Lot Holdings, Inc., through Erickson, continues to use ASH-GH's Copyrights, including the Grayhawk Building Plans, to build homes and by duplicating, distributing, and displaying the Copyrights, significant portions of the Copyrights, or improper derivatives of the Copyrights.

206.    GH Lot Holdings, Inc.'s conduct constitutes a breach of the Copyright Assignment Agreement, and ASH-GH is entitled to an injunction and monetary damages, including lost goodwill and profits, in an amount to be determined at trial.

## COUNT FIVE
## COPYRIGHT INFRINGEMENT
### (Against All Defendants)

207.    ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

208.    ASH-GH owns all right, title, and interest in and to the Grayhawk Building Plans. *See id.*

209.    These copyrighted plans have been filed and registered with the U.S. Copyright Office, and the Copyright Assignment Agreement has been recorded against all registered copyrights listed on Schedule 1 of the Copyright Assignment Agreement.  The copyrighted material is original and fixed in a tangible medium of expression.

210.    Erickson, individually and on behalf of all Defendants, has infringed ASH-GH's copyrights, without ASH-GH's authorization, by duplicating, distributing, displaying, and using significant copyrightable portions of the Grayhawk Building Plans, or, alternatively, making an unauthorized derivative work that is based upon and copies substantial portions of the copyrighted subject matter.

211.    Defendants have acted knowingly and willfully, in conscious disregard of the rights of ASH-GH.

212.    Erickson has previously acknowledged that the improper use and disclosure of such information would constitute irreparable harm.  *See* Ex. 6, Employment Agreement § 6.05.

213.    In addition to this irreparable harm, Defendants have been unjustly enriched as a direct and proximate result of their wrongful acts.

214.    ASH-GH has suffered damages and prays for either (a) disgorgement of all profits from Defendants' infringement of the copyrighted works, including without limitation the sale of homes built using the Grayhawk Building Plans (and any derivative works) or (b) statutory damages of up to $150,000 per instance of copyright infringement.

**COUNT SIX**
**BREACH OF CONTRACT - TRADEMARK ASSIGNMENT AGREEMENT**
**(Against GH Lot Holdings, Inc.)**

215.    ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

216.    The Trademark Assignment Agreement (Ex. 3) is a valid, binding, and enforceable contract between and among ASH-GHand certain of the Erickson Entities, including GH Lot Holdings, Inc. f/k/a Grayhawk Homes, Inc.  ASH-GH is the owner of the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

217.    Pursuant to the Trademark Assignment Agreement, Erickson "s[old], assign[ed], convey[ed], and transfer[red]" to ASH-GH, and ASH-GH "purchase[d], acquire[d], accept[ed], and assum[ed]" from Erickson, "all worldwide right, title, and interest in, to, and under all Trademarks, including, without limitation, any and all common law rights thereto and the goodwill of the Business symbolized thereby."  Ex. 3, Trademark Assignment Agreement § 1.

218.    The defined term "Trademarks" includes "service marks, trade names, trade secrets, brand names, logos and corporate names, slogans, trade dress and other indicia of source of origin, whether or not registered."  *Id.*, Recital B.

219.    Accordingly, GH Lot Holdings, Inc. has no right, title, interest, or proper basis to use or disseminate any of ASH-GH's Trademarks, including the "Grayhawk" and/or "Grayhawk Homes" trademark, trade name and logo and any similar trade names, trademarks, service marks, corporate names, or slogans.

220.    As explained herein, GH Lot Holdings, Inc., through Erickson, has used ASH-GH trademarks, trade names and logos (e.g., "Grayhawk" and/or "Grayhawk Homes") on documents, materials, and signage provided to the public, brokers, realtors, and others for the marketing and sale of homes that Erickson has developed through Grayhawk Homes of Atlanta and South Carolina.

221.    GH Lot Holdings, Inc.'s conduct constitutes a breach of the Trademark Assignment Agreement, and ASH-GH is entitled to an injunction, as well as monetary damages, including for lost goodwill and profits, in an amount to be determined at trial.

## COUNT SEVEN
### FEDERAL UNFAIR COMPETITION (TRADE NAME)
### (Against All Defendants)

222.    ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

223.    ASH-GH is the owner of the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

224.    ASH-GH, including by and through its affiliates, has used and continues to use the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names, and variations thereof, in connection with building and selling single-family homes in Georgia and Alabama.

225.    Individually and on behalf of all other Defendants, Erickson's unlicensed, unconsented to, and otherwise unauthorized use of ASH-GH's  "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names and/or variations thereof in connection with his directly

competing building and selling of single-family homes is likely to cause confusion, or to cause mistake, or to deceive consumers and the relevant public into falsely believing that Defendants' services are provided by, or are affiliated, connected or associated with, ASH-GH and/or the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

226.    Erickson, individually and on behalf of all other Defendants, has represented that certain entities are affiliated with Grayhawk Homes, including Grayhawk Homes of Atlanta Corporation and Grayhawk Homes of South Carolina, Inc.

227.    Erickson's representations regarding these two entities constitute false and misleading descriptions of fact and false and misleading representations of fact.

228.    Erickson's actions are likely to cause confusion and mistake, and to deceive as to the affiliation of Grayhawk Homes of Atlanta Corporation and Grayhawk Homes of South Carolina, Inc., and their respective goods and/or services.  His use of the "Grayhawk" and/or "Grayhawk Homes" trademark and trade name is an improper use of trademarks and trade names that are within ASH-GH's control and ownership.

229.    Erickson has previously acknowledged that the improper use and disclosure of such information would constitute irreparable harm.  *See* Ex. 6, Employment Agreement § 6.05.

230.    The foregoing acts of Erickson, individually and on behalf of all other Defendants, constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Erickson has acted knowingly and willfully, in conscious disregard of the rights of ASH-GH.

231.    In addition to irreparable harm from the unauthorized use of its intellectual property, Defendants have been unjustly enriched as a direct and proximate result of their wrongful acts, and ASH-GH is suffering damages in an amount to be determined at trial.

## **COUNT EIGHT**
## **GEORGIA TRADEMARK INFRINGEMENT - O.C.G.A. § 23-2-55**
### **(Against All Defendants)**

232.     ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

233.     ASH-GH is the owner of the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

234.     ASH-GH, including by and through its affiliates, has used and continues to use the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names, and variations thereof, in connection with building and selling single-family homes in Georgia and Alabama.

235.     Individually and on behalf of all other Defendants, Erickson's unlicensed, unconsented to, and otherwise unauthorized use of ASH-GH's "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names and/or variations thereof in connection with his directly competing building and selling of single-family homes is likely to cause confusion, or to cause mistake, or to deceive consumers and the relevant public into falsely believing that Defendants' services are provided by, or are affiliated, connected or associated with, ASH-GH and/or the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

236.     Erickson, individually and on behalf of all other Defendants, has represented that certain entities remain affiliated with ASH-GH's Grayhawk Homes operations based in Columbus, GA, including Grayhawk Homes of Atlanta Corporation and Grayhawk Homes of South Carolina, Inc.

237.     Erickson's representations regarding these two entities constitute false and misleading descriptions of fact and false and misleading representations of fact.

238.     Erickson's actions are likely to cause confusion and mistake, and to deceive as to the affiliation of Grayhawk Homes of Atlanta Corporation and their respective goods and/or

services.  His use of the "Grayhawk" and/or "Grayhawk Homes" trademark and trade name is an improper use of trademarks and trade names that are within ASH-GH's control and ownership.

239.    Erickson has previously acknowledged that the improper use and disclosure of such information would constitute irreparable harm.  *See* Ex. 6, Employment Agreement § 6.05.

240.    The foregoing acts of Erickson, individually and on behalf of all other Defendants, constitute trademark infringement in violation of O.C.G.A. § 23-2-55.  Erickson has acted knowingly and willfully, in conscious disregard of the rights of ASH-GH.

241.    In addition to irreparable harm from the unauthorized use of its intellectual property, Defendants have been unjustly enriched as a direct and proximate result of their wrongful acts, and ASH-GH is suffering damages in an amount to be determined at trial.

**COUNT NINE**
**VIOLATION OF GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT -**
**O.C.G.A. §§ 10-1-370, *et seq.***
**(Against Erickson, GH Lot Holdings, Inc., GH Lot Holdings of Atlanta Corporation)**

242.    ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

243.    ASH-GH is the owner of the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

244.    ASH-GH, including by and through its affiliates, has used and continues to use the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names, and variations thereof, in connection with building and selling single-family homes in Georgia and Alabama.

245.    Individually and on behalf of GH Lot Holdings, Inc, and GH Lot Holdings of Atlanta Corporation, Erickson's unlicensed, unconsented to, and otherwise unauthorized use of ASH-GH's "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names and/or variations thereof in connection with his directly competing building and selling of single-family homes is likely to cause confusion, or to cause mistake, or to deceive consumers and the relevant public into

falsely believing that Erickson's services are provided by, or are affiliated, connected or associated with, ASH-GH and/or the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

246.    Individually and on behalf of GH Lot Holdings, Inc. and GH Lot Holdings of Atlanta Corporation, Erickson has represented that certain entities are affiliated with ASH-GH and its Grayhawk Homes operations based in Columbus, GA, including Grayhawk Homes of Atlanta Corporation and Grayhawk Homes of South Carolina, Inc.

247.    Erickson's representations regarding these entities constitute false and misleading descriptions of fact and false and misleading representations of fact.

248.    Erickson's actions are likely to cause confusion and mistake, and to deceive as to the affiliation of Grayhawk Homes of Atlanta Corporation and Grayhawk Homes of South Carolina, Inc. and their respective goods and/or services.  His use of the "Grayhawk" and/or "Grayhawk Homes" trademark and trade name is an improper use of trademarks and trade names that are within ASH-GH's control and ownership.

249.    Erickson has previously acknowledged that the improper use and disclosure of such information would constitute irreparable harm.  *See* Ex. 6, Employment Agreement § 6.05.

250.    The foregoing acts of Erickson, GH Lot Holdings, Inc., and GH Lot Holdings of Atlanta Corporation constitute deceptive trade practices in violation of O.C.G.A. §§ 10-1-370, *et seq*.  Erickson, GH Lot Holdings, Inc, and GH Lot Holdings of Atlanta Corporation have acted knowingly and willfully, in conscious disregard of the rights of ASH-GH.

251.    In addition to irreparable harm from the unauthorized use of its intellectual property, Erickson, GH Lot Holdings, Inc., and GH Lot Holdings of Atlanta Corporation have been unjustly enriched as a direct and proximate result of their wrongful acts, and ASH-GH is suffering damages in an amount to be determined at trial.

**COUNT TEN**
**VIOLATION OF SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT -**
**S.C. CODE §§ 39-5-10, *et seq.***
**(Against Erickson, GH Lot Holdings, Inc., GH Lot Holdings of South Carolina, Inc.)**

252.    ASH incorporates and repeats the allegations of Paragraphs 1-168 herein.

253.    ASH-GH is the owner of the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

254.    ASH-GH, including by and through its affiliates, has used and continues to use the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names, and variations thereof, in connection with building and selling single-family homes in Georgia and Alabama.

255.    Individually and on behalf of GH Lot Holdings, Inc. and GH Lot Holdings of South Carolina, Inc., Erickson's unlicensed, unconsented to, unlawful, and otherwise unauthorized use of ASH-GH's  "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names and/or variations thereof in connection with his directly competing building and selling of single-family homes is likely to cause confusion, or to cause mistake, or to deceive consumers and the relevant public into falsely believing that Erickson's services are provided by, or are affiliated, connected or associated with, ASH-GH and/or the "Grayhawk" and/or "Grayhawk Homes" trademarks and trade names.

256.    Individually and on behalf of GH Lot Holdings, Inc. and GH Lot Holdings of South Carolina, Inc., Erickson has represented that certain entities are affiliated with Grayhawk Homes, including Grayhawk Homes of South Carolina, Inc.

257.    Erickson's representations regarding this entity constitutes false and misleading descriptions of fact and false and misleading representations of fact.

258.    Erickson's actions are likely to cause confusion and mistake, and to deceive as to the affiliation of Grayhawk Homes of South Carolina, Inc. and its respective goods and/or services.

His use of the "Grayhawk" and/or "Grayhawk Homes" trademark and trade name is an improper use of trademarks and trade names that are within ASH-GH's control and ownership.

259.   Erickson has previously acknowledged that the improper use and disclosure of such information would constitute irreparable harm. *See* Ex. 6, Employment Agreement § 6.05.

260.   The foregoing acts of Erickson, GH Lot Holdings, Inc., and GH Lot Holdings of South Carolina, Inc. constitute unfair and deceptive trade practices in violation of S.C. Code §§ 39-5-10, *et seq*.

261.   In addition to irreparable harm from the unauthorized use of its intellectual property, Erickson, GH Lot Holdings, Inc., and GH Lot Holdings of South Carolina, Inc. have been unjustly enriched as a direct and proximate result of their wrongful acts, and ASH-GH is suffering damages in an amount to be determined at trial.

## V.   PRAYER FOR RELIEF

WHEREFORE, ASH requests that judgment be entered in its favor and against Defendants and that ASH be awarded the following relief:

A.   A judgment: (a) finding Erickson and GH Lot Holdings, Inc. in breach of the LPA; (b) ordering specific performance to require Erickson and GH Lot Holdings, Inc. to meet all LPA obligations to improve and/or sell lots to ASH-GH, including (i) making finished lots available for purchase in advance of the minimum purchase requirements of the Takedown Schedule, (ii) compliance with all development standards contained in LPA §§ 21-24 and (iii) compliance with the procedures for Future ROFO Lots in LPA § 14; and (c) ordering that (i) such specific performance is not contingent on any additional deposit for Phase C Lots from ASH-GH and (ii)

the price of any lot offered by Erickson to ASH-GH shall not be inflated above the "actual costs" of development;

B.    A temporary restraining order, preliminary injunction during the pendency of this action, and a permanent injunction or specific performance order requiring Erickson and GH Lot Holdings, Inc. to comply with the LPA by permitting ASH to take down the minimum number of lots per quarter prescribed by the Takedown Schedule, as well as any additional finished lots that are available for purchase.

C.    A judgment awarding ASH monetary damages and lost profits arising from Erickson's and GH Lot Holdings, Inc.'s breach of the LPA in an amount to be determined at trial;

D.    A temporary restraining order, preliminary injunction during the pendency of this action, and a permanent injunction thereafter restraining Erickson, his agents, employees, attorneys, and all others in active concert or participation with any of them from obtaining, using, or disclosing ASH's confidential information for any improper purpose;

E.    A judgment awarding ASH monetary damages and lost profits arising from Erickson's breach of the confidentiality provisions of the Employment Agreement and Consulting Agreement in an amount to be determined at trial;

F.    A temporary restraining order, preliminary injunction during the pendency of this action, and a permanent injunction thereafter restraining Erickson, his agents, employees, attorneys, and all others in active concert or participation with any of them from operating a competitive homebuilding operation within any of the geographic areas described in the non-compete in Section 6.5 of the APA;

G.   A judgment awarding ASH monetary damages and lost profits arising from Erickson's breach of the APA non-compete in an amount to be determined at trial;

H.   A judgment: (a) finding GH Lot Holdings, Inc. in breach of the Copyright Assignment Agreement and Trademark Assignment Agreement; and (b) prohibiting the use any of the Intellectual Property (as defined by the agreements) assigned to and currently owned by ASH-GH;

I.   A judgment awarding ASH-GH monetary damages, including for lost profits and lost goodwill, from GH Lot Holdings, Inc.'s breach of the Copyright Assignment Agreement and Trademark Assignment Agreement in an amount to be determined at trial;

J.   A judgment finding that Erickson has infringed and willfully infringed, and is willfully infringing, ASH-GH's copyrights—specifically including the Grayhawk Building Plans;

K.   A judgment finding that Defendants have infringed and willfully infringed, and are willfully infringing by improperly using deceptive trademarks and trade names confusingly similar to the "Grayhawk" and/or "Grayhawk Homes" trademark and trade name owned by ASH-GH, including but not limited to "Grayhawk Homes of Atlanta" and "Grayhawk Homes of South Carolina";

L.   A temporary restraining order, preliminary injunction during the pendency of this action, and a permanent injunction thereafter restraining Defendants, their agents, employees, attorneys, and all others in active concert or participation with any of them from (a) using, offering for use, displaying the content of (in whole or part), or engaging in any act likely to cause confusion, mistake, or to mislead as to

origination and the source of ASH-GH's trademarks and trade names, specifically, "Grayhawk" and "Grayhawk Homes"; and (b) an order either seizing all Defendants' counterfeit marks—including "Grayhawk Homes of Atlanta" and "Grayhawk Homes of South Carolina"—or an order requiring Defendants to destroy all such counterfeit marks;

M.   A temporary restraining order, preliminary injunction during the pendency of this action, and a permanent injunction thereafter restraining Defendants, their agents, employees, attorneys, and all others in active concert or participation with any of them from: (a) using, offering for use, displaying the content of (in whole or part), or engaging in any act likely to cause confusion, mistake, or to mislead as to origination and source of the Grayhawk Homes goods, services, trademark and trade name, and copyrighted Grayhawk Building Plans, and/or any other commercial activities by Defendants that misrepresent the nature, characteristics, or qualities thereof; and (b) infringing ASH-GH's copyrights (including the Grayhawk Building Plans);

N.   An impoundment and destruction order requiring Defendants to deliver up all copies made or used in violation of ASH-GH's copyrights, and all articles by means of which such copies may be reproduced;

O.   Disgorgement of Defendants' profits from infringement in an amount to be proven at trial or statutory damages for each copyright violation under 17 U.S.C. § 504;

P.   Such actual damages as may be proven as a result of Defendants' wrongdoing;

Q.   Trebling of actual damages as may be proven as a result of Defendants' knowing and willful conduct in conscious disregard of the rights of ASH;

R.      Punitive damages to the extent permitted by governing law;

S.      An award of ASH's reasonable attorneys' fees and costs; and

T.      Any further relief as is deemed justified and appropriate.

Dated: June 14, 2021                          Respectfully submitted,

                                              /s/ Jerry A. Buchanan
                                              Jerry A. Buchanan
                                              Ga. Bar No. 092200
                                              **BUCHANAN LAW FIRM, PC**
                                              P.O. Box 2848
                                              The Corporate Center, Suite 614
                                              233 12th Street
                                              Columbus, Georgia 31902
                                              Phone:        (706) 323-2848
                                              E-mail:       jab@thebuchananlawfirm.com

                                              Jacob A. Kramer
                                                  *Pro hac vice forthcoming*
                                              **FAEGRE DRINKER BIDDLE & REATH, LLP**
                                              1500 K Street NW, Suite 1100
                                              Washington, D.C. 20005
                                              Phone:        (202) 230-5289
                                              E-mail:       jake.kramer@faegredrinker.com

                                              *Counsel for Plaintiffs*