# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

**among**

**GRAYHAWK HOMES, INC.**
("Grayhawk")

**HOMESTEAD RESIDENTIAL, INC.**
("Homestead")

**GH SERVICES, INC.**
("GHS")
(Grayhawk, Homestead, and GHS
collectively referred to as "Seller")

**DAVID B. ERICKSON**
("D. Erickson")

**ROSE ANNE ERICKSON**
("R. Erickson")

**ASH-GRAYHAWK, LLC**
("Buyer")

**and**

**AMERICAN SOUTHERN HOMES HOLDINGS, LLC**
("ASH")

**Dated as of November 15, 2019**

## TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF ASSETS AND ASSUMPTION OF CERTAIN
  LIABILITIES ........................................................................................... 1
  1.1    Purchased Assets ............................................................................. 1
  1.2    Excluded Assets ............................................................................... 4
  1.3    Assumed Liabilities .......................................................................... 5
  1.4    Excluded Liabilities .......................................................................... 6
  1.5    Unassignable Contracts and Permits ............................................... 7
  1.6    Specified Excluded Contracts .......................................................... 8
  1.7    Taking of Necessary Action; Further Action .................................... 8

ARTICLE II PURCHASE PRICE AND CLOSING ............................................. 9
  2.1    Purchase Price .................................................................................. 9
  2.2    Purchase Price Adjustments. ........................................................... 9
  2.3    Warranty Holdback ..........................................................................10
  2.4    Closing .............................................................................................10
  2.5    Purchase Price Payment Methodology .............................................11

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .............12
  3.1    Organization, Standing and Power ...................................................12
  3.2    Authority; No Conflict; Required Filings and Consents ....................12
  3.3    Financial Statements; Indebtedness ................................................13
  3.4    Absence of Certain Changes ...........................................................14
  3.5    No Undisclosed Liabilities ...............................................................16
  3.6    Taxes; Unclaimed Property ..............................................................16
  3.7    Property ............................................................................................17
  3.8    Intellectual Property .........................................................................24
  3.9    Software and Information Technology ...............................................26
  3.10   Contracts ..........................................................................................27
  3.11   Vendors and Suppliers .....................................................................29
  3.12   Insurance ..........................................................................................30
  3.13   Litigation ...........................................................................................30
  3.14   Environmental Matters ......................................................................30
  3.15   Employee Benefit Plans ....................................................................32
  3.16   Compliance with Law ........................................................................34
  3.17   Employee and Labor Matters ............................................................35
  3.18   Related-Party Transactions ..............................................................37
  3.19   Business Collateral ...........................................................................37
  3.20   Home Warranty Obligations ..............................................................37
  3.21   Covenants, Conditions and Restrictions ...........................................38
  3.22   Retail Sales Contracts ......................................................................38
  3.23   Homeowners' Associations ...............................................................38
  3.24   No Brokers; Fees ..............................................................................39
  3.25   Accounts Receivable .........................................................................39

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ..............39
  4.1    Organization, Standing and Power ...................................................39
  4.2    Authority; No Conflict; Required Filings and Consents ....................40

4.3     Litigation ..........................................................................................................40
4.4     No Brokers; Fees .............................................................................................40

**ARTICLE V [INTENTIONALLY OMITTED]** ..................................................**40**

**ARTICLE VI COVENANTS** ...........................................................................**41**
6.1     Preparation of Financial Information ..............................................................41
6.2     Actions Post-Closing .......................................................................................41
6.3     Public Disclosure .............................................................................................41
6.4     Confidentiality .................................................................................................42
6.5     Restrictive Covenants ......................................................................................42
6.6     Employee Matters ............................................................................................43
6.7     Substitution of Collateral .................................................................................45
6.8     Name Change ...................................................................................................46
6.9     Further Assurances ..........................................................................................46
6.10    Bulk Sales Laws ..............................................................................................46
6.11    Insurance ..........................................................................................................46

**ARTICLE VII TAX MATTERS** ......................................................................**46**
7.1     Property Taxes; Transfer Taxes .......................................................................46
7.2     Income and Franchise Taxes ...........................................................................48
7.3     Allocation of Purchase Price ...........................................................................48

**ARTICLE VIII CONDITIONS TO CLOSING** .................................................**49**
8.1     Conditions to Each Party's Obligation to Closing ..........................................49
8.2     Seller Closing Deliverables .............................................................................49
8.3     Additional Conditions to Obligation of Seller ...............................................52

**ARTICLE IX [INTENTIONALLY OMITTED]** ................................................**53**

**ARTICLE X INDEMNIFICATION** ..................................................................**53**
10.1    Indemnification by Seller ................................................................................53
10.2    Indemnification by Buyer ................................................................................54
10.3    Claims for Indemnification .............................................................................54
10.4    Survival ............................................................................................................56
10.5    Limitations and Other Terms ..........................................................................57

**ARTICLE XI MISCELLANEOUS** ...................................................................**58**
11.1    Notices .............................................................................................................58
11.2    Entire Agreement .............................................................................................59
11.3    No Third-Party Beneficiaries ..........................................................................59
11.4    Assignment ......................................................................................................59
11.5    Severability ......................................................................................................59
11.6    Counterparts and Signature .............................................................................60
11.7    Interpretation ...................................................................................................60
11.8    Governing Law ................................................................................................61
11.9    Remedies ..........................................................................................................61
11.10   Submission to Jurisdiction ..............................................................................61
11.11   Seller Disclosure Letter ..................................................................................61

11.12    Waiver of Jury Trial ................................................................................. 62
11.13    Headhunter Fee ......................................................................................... 62

**ARTICLE XII DEFINITIONS** ........................................................................**62**
12.1    Certain Defined Terms ............................................................................. 62
12.2    Index of Other Defined Terms ................................................................. 68

**SCHEDULES**
Schedule 1.1(k)           Assigned Contracts
Schedule 1.2(i)           Excluded Capitalized Costs
Schedule 1.2(j)           Specified Excluded Assets and Contracts
Schedule 1.2(k)           Excluded Motor Vehicles, Trailers and Law Equipment
Schedule 1.2(n)           Excluded Single-Family Rental Properties
Schedule 1.2(p)           Excluded Inactive Assets
Schedule 1.3(b)           Specified Assumed Liabilities
Schedule 1.4(b)(vi)       Excluded Construction and Acquisition Indebtedness

**EXHIBITS**
Exhibit A                 Form of Promissory Note
Exhibit B                 Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit C-1               Form of Trademark Assignment Agreement
Exhibit C-2               Form of Domain Name Assignment Agreement
Exhibit C-3               Form of Copyright Assignment Agreement
Exhibit D                 Form of Employment Agreement
Exhibit E                 Form of Consulting Agreement
Exhibit F                 Transition Services Agreement
Exhibit G-1               Form of Special Warranty Deed - Georgia
Exhibit G-2               Form of Special Warranty Deed - Alabama
Exhibit H                 Form of Land Purchase Agreement
Exhibit I                 Form of Brokerage Services Agreement


**SELLER DISCLOSURE LETTER**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of November 15, 2019 among (i) Grayhawk Homes, Inc., a Georgia corporation ("Grayhawk"), Homestead Residential Inc., an Alabama corporation ("Homestead"), and GH Services, Inc., a Georgia corporation ("GHS", collectively with Grayhawk and Homestead, "Seller"), (ii) David B. Erickson ("D. Erickson") and Rose Ann Erickson ("R. Erickson"), (iii) ASH-Grayhawk, LLC, a Virginia limited liability company ("Buyer"), and (iv) solely with respect to the applicable provisions of Section 2.5, American Southern Homes Holdings, LLC, a Delaware limited liability company and indirect parent of Buyer ("ASH").

## RECITALS

A.      Seller is in the business of residential lot acquisition, homebuilding and home sales in the Columbus, Georgia metropolitan area, inclusive of certain portions of Alabama (the "Business").

B.      Seller purchases or develops many of its residential building lots through a series of related entities owned by D. Erickson and/or R. Erickson as well as other third parties.

C.      Buyer desires to acquire substantially all of the assets and assume certain specified liabilities of Seller utilized in, related to, or arising from the Business, and Seller desires to sell, assign, and transfer such assets and assign such liabilities to Buyer, on the terms and conditions set forth herein.

D.      Certain capitalized terms used in this Agreement are defined in Section 12.1.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS AND ASSUMPTION OF CERTAIN LIABILITIES

1.1      Purchased Assets. Subject to and on the terms and conditions contained herein, and in reliance on the representations and warranties contained herein, Seller will sell, transfer, convey, and deliver to Buyer, and Buyer agrees to purchase and accept from Seller at the Closing, all tangible and intangible property and assets utilized or held for use in, related to, or arising from the Business, wherever located, and whether or not reflected in Seller's books and records (the "Purchased Assets"), other than the Excluded Assets, which Excluded Assets shall not constitute Purchased Assets. Without limiting the generality of the foregoing provisions of this Section 1.1, the Purchased Assets include all of Seller's right, title, and interest in, under, and to:

(a) *Real Property*.  All real estate directly or indirectly owned by Seller, without regard to whether such real property is used solely in the operation or conduct of the Business, including all buildings, model homes, structures, signage, installations, fixtures, furniture, software including but not limited to Builder MT and Timberline, and other improvements situated thereon and all access, easements, rights of way, alleys, strips or gores adjoining the real estate, air, water, mineral, riparian, development, utility, common areas, and other rights, entitlements, and appurtenances therein or thereunto pertaining, including, all accessions, privileges, and incentives, together with any and all fixtures attached to or used in connection with the ownership, maintenance, or operation of the real estate and improvements located thereon, (collectively, the "Owned Real Property").  Notwithstanding the foregoing, Buyer will not acquire more than $2,500,000 worth of finished lots set forth on the Seller Balance Sheet as to which no homes have been started (the "Excluded Real Property");

(b) *Real Property Contracts*.  All lot purchase agreements, land purchase contracts and any other executory land acquisition agreements between Seller, as buyer, and any other Person, as seller, including any and all agreements granting Seller a right of first refusal or right of first offer or purchase option with respect to certain real property (the "Takedown Contracts"), and all other rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Business or the Real Property.  The Parties acknowledge and confirm that virtually all of the Seller's Takedown Contracts are with affiliated entities controlled by D. Erickson and/or R. Erickson.  In addition, D. Erickson and R. Erickson control an estimated 1,600 lots which are not currently the subject of Takedown Contracts.  These approximately 1,600 lots shall be subject to the Land Purchase Agreement (as defined herein);

(c) *Receivables*.  All earnest money deposits, issued letters of credit and other forms of security (whether or not held in escrow and whether held by Seller or held by another party for the account of Seller), all accounts and notes receivable (including any security interests with respect thereto), and all promotional allowances, rebates, and similar items related to the Business or the Real Property or that otherwise constitute a portion of the Purchased Assets;

(d) *Marketing Materials*. All assets relating to each Seller's model homes including, but not limited to, all model home furnishings and fixtures; all offering circulars, manuals, advertising and marketing materials and brochures related to the Real Property; all form purchase and sale agreements and documents related thereto with respect to the Real Property; and all project monuments, billboard, signage, banners, and related materials;

(e) *Utilities*.  All utility arrangements, and other agreements, instruments, certificates, or documents including any and all rights and benefits under the Permitted Liens, relating to the ownership, operation, use, and occupancy of the Real Property;

(f)     *Inventory*.  All homes under construction, model homes, and any other inventory, together with all merchandise, supplies, construction materials, displays, promotional materials, raw materials, and work-in-process, net of impairment charges;

(g)     *Property Reports*.  All rights to architectural and engineering plans, water and sewer, electrical and building plans, environmental reports, geotechnical reports, archeological reports, biological reports, wetland reports, and all other plans and specifications, drawings and other similar documents relating to the Housing Units or the Real Property, except to the extent such items are owned by the Related Land Entities;

(h)     *Real Property Leases*.  Each Third Party Lease and Real Property Lease, including the Headquarters Lease, each of which shall be assumed by Buyer and all interests of Seller therein, fixtures, leasehold improvements, security and other deposits, common area maintenance refunds, adjustments, and other amounts now or hereafter payable to Seller under or in respect of such Real Property Leases;

(i)     *Personal Property*.  All furniture, fixtures, and equipment related to the Business, including construction equipment, computer and telecommunications hardware and software including but not limited to Builder MT and Timberline, and information technology systems, including all historic General Ledger, Cost Accounting records, Sales Contracts and all related records;

(j)     *Intellectual Property*.  All Intellectual Property of Seller and Seller's rights in any other Intellectual Property or related to the Business (the "Purchased Intellectual Property");

(k)     *Sales Contracts*.  All Retail Sales Contracts, all commitments and purchase orders received and accepted by Seller in the Ordinary Course of Business, all contracts related exclusively to the Business entered into by Seller in the Ordinary Course of Business, and any other contracts of Seller related to the Business that are listed on Schedule 1.1(k) (together with the Real Property Leases and the Takedown Contracts, but subject to Section 1.6, the "Assigned Contracts");

(l)     *Permits*.  Except as otherwise provided in Section 1.5(c), all Permits related to the Real Property or the Business, including those Permits listed as (i) assignable and (ii) non-assignable on Section 3.16(b) of the Seller Disclosure Letter (the "Assigned Permits");

(m)     *Prepayments*.  All prepaid utilities, including any utility refunds or credits, vendor refunds or credits, prepaid rents, prepaid development fees and deposits, impact fees, traffic concurrency fees, water and sewer fees, park fees, school fees, Association fees, shared cost agreement related fees, prepaid costs and expenses, advance payments and other prepayments, security deposits and other deposits, prepaid property Taxes, and other similar assets and amounts related to the Business or the Real Property;

(n)     *Customer Information; Employee Records*.  All customer, supplier, and service-provider lists, contracts and similar information related to the Business, all other contact information, mailing lists, and similar files related to the Business, all payroll,

personnel and employment records relating to current Transferred Employees (including, without limitation, Immigration and Naturalization Service Form I-9 for each of the Transferred Employees), all property records, environmental, soil, species, geological, studies and certificates, surveys, and other books, reports, technical descriptions, databases, information, and Records related to the Business, the Purchased Assets or the Assumed Liabilities (other than the Excluded Records);

(o)     *Phone Numbers*.   All land line telephone numbers (but not cellular telephone numbers), fax numbers, e-mail addresses, postal addresses, and postal boxes related to the Business;

(p)     *Claims and Rights*.   All rights, claims, demands and causes of action against third parties and all rights of Seller under any indemnification, representation, warranty, covenant, contractual rights, or guarantee by any third party related to the Business, the Purchased Assets or the Assumed Liabilities (including any builder, contractor, subcontractor, manufacturer, supplier, or other transferor of any Purchased Asset or any product or service that Seller received, all related rights under any insurance policy or coverage of any such third party, all actions pertaining to the development, construction, design or completion of the Real Property or the common areas, streets, utilities or other subdivision infrastructure), but only to the extent they are for the benefit of, and applicable to, the Real Property or the Business, the Purchased Assets or the Assumed Liabilities;

(q)     *Claims*.   All claims, causes of action, refunds, rights of recovery, rights of setoff, and rights of recoupment of any kind against third parties relating to the Business, the Purchased Assets or Assumed Liabilities, whether or not asserted before the Closing Date (including awards or proceeds in connection with insurance and any eminent domain taking); and

(r)     *Business as a Going Concern*.   All goodwill related to and the going concern value of the Business.

1.2     Excluded Assets.   Notwithstanding Section 1.1, the Purchased Assets do not include the following (the "Excluded Assets"):

(a)     Seller's Organizational Documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, stock ledgers, Tax Returns, seals, minute books, equity transfer books, and similar documents of Seller relating to the organization, maintenance, and existence of Seller as a limited liability company or business corporation (collectively, the "Excluded Records"); provided that Buyer shall be entitled to a copy of any Excluded Records that it reasonably requests;

(b)     all cash, cash equivalents, securities, bank accounts, cash accounts, investment accounts, deposit accounts, credit cards, debit cards, and similar items of Seller;

(c)     all Specified Excluded Contracts listed on Schedule 1.2(j);

(d)      all Employee Benefit Plans, all assets held in relation to Employee Benefit Plans, and any contract, policy, or arrangement relating to Employee Benefit Plans;

(e)      all rights of Seller under this Agreement or any Ancillary Document to which Seller is a party;

(f)      any refunds, credits or other assets or rights with respect to any income Taxes paid by Seller or other Taxes for which any Seller Party is responsible under this Agreement, excluding any Taxes related to Real Property included in this Agreement;

(g)      Seller's insurance policies, including premium adjustments, and prepaid insurance premiums, along with all rights, claims, and causes of action under such policies;

(h)      any claims against any Person to the extent they relate to Excluded Assets or Excluded Liabilities;

(i)      all capitalized costs in the work-in-progress of homes under construction, model homes, and any other inventory, accrued or paid to any Seller or any other related party or Person not otherwise disclosed on Schedule 1.2(i);

(j)      all assets and contracts listed on Schedule 1.2(j);

(k)      all motor vehicles, trailers and lawn equipment listed on Schedule 1.2(k);

(l)      all contracts pertaining exclusively to any of the Excluded Assets;

(m)      rebates, refunds, credits, deposits and/or accounts receivable attributable to homes sold or activities concluded prior to Closing;

(n)      any and all single-family rental properties which are held by entities other than a Seller, and are controlled by the Shareholders, as set forth on Schedule 1.2(n);

(o)      the Excluded Real Property and all Real Property subject to the Land Purchase Agreement;

(p)      any and all lots or related homebuilding assets in which Seller is not active, but where D. Erickson or R. Erickson conduct operations, as set forth on Schedule 1.2(p); and

(q)      all Seller assets exclusively pertaining to the geographic markets in Charleston, South Carolina; Atlanta, Georgia; and the State of Iowa.

1.3      Assumed Liabilities.  Subject to and on the terms and conditions contained herein, at the Closing, Buyer shall assume only the following liabilities and obligations of Seller (the "Assumed Liabilities"):

(a)     all liabilities and obligations of Seller under the Assigned Contracts (including but not limited to customer deposits), but only to the extent that such liabilities and obligations:

(i)     relate to performance to occur after the Closing Date;

(ii)     do not arise from or relate to a breach by any Seller Party or any of their respective Affiliates of any obligations under any provision of any of the Assigned Contracts;

(iii)     do not arise from or relate to any event, circumstance, or condition occurring or existing before the Closing Date that, with notice, lapse of time, or both, would constitute or result in either (A) a breach of any obligations under any provision of any Assigned Contract or (B) a breach of any of the representations and warranties set forth in Article III;

(iv)     are not expanded by virtue of the assignment and assumption of such Assigned Contract pursuant to this Agreement as compared to the liabilities and obligations that would have been applicable absent such assignment and assumption;

(b)     the warranty reserve on the books of each Seller; and

(c)     each of the liabilities of each Seller listed on Schedule 1.3(b).

1.4     Excluded Liabilities.     Notwithstanding Section 1.3, the Assumed Liabilities do not include, and Buyer shall not assume or be liable or obligated for, the following (the "Excluded Liabilities"):

(a)     any liability, obligation, or claim of any nature of any Seller or their Affiliates or Subsidiaries, or any Shareholder, whether matured or unmatured, liquidated or unliquidated, fixed or contingent, known or unknown, or whether arising out of acts or occurrences before, on, or after the date hereof, which such Seller or Shareholder shall solely be responsible for the satisfaction of; and

(b)     for the avoidance of doubt, Buyer will not assume or be liable for, and the Excluded Liabilities will include, with respect to each Seller:

(i)     all obligations or liabilities under or relating to any Employee Benefit Plan;

(ii)     all obligations or liabilities arising out of or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

(iii)   all obligations or liabilities owed to, or relating to any transaction with Seller, any present or former partner, joint venturer, or holder of Equity Interests in the Business or a Seller, any family member of a Seller or Shareholder, or any Affiliate of any of the foregoing;

(iv)   all warranty claims, liabilities, and obligations of a Seller arising prior to Closing;

(v)   all warranty claims, liabilities, and obligations of a Seller whenever arising in excess of the Warranty Amount;

(vi)   all third party construction and acquisition indebtedness of any kind as set forth on Schedule 1.4(b)(vi), all of which is currently personally guaranteed by D. Erickson or R. Erickson and which may only be assumed by Buyer if such guarantees are fully and absolutely discharged; and

(vii)   any obligations or liabilities arising out of, relating to or otherwise in respect of Excluded Assets.

1.5   <u>Unassignable Contracts and Permits</u>.   Notwithstanding anything to the contrary stated in this Agreement, if:

(a)   the assignment of any contract that would otherwise be an Assigned Contract without the approval, consent, or waiver of another party thereto would violate, conflict with, result in a breach or termination of, or constitute a default or event of default under (or an event that with due notice, lapse of time, or both, would constitute a default or event of default under) the terms of such contract or any Applicable Law, or result in the creation of any Lien on any Purchased Asset or enable another party to terminate the contract or impose a penalty or additional payment obligations or accelerate any obligation of Seller or Buyer under the contract; and

(b)   all necessary approvals, consents, and waivers required by the contract have not been obtained on or before the Closing Date in order to avoid the consequences set forth in Section 1.5(a);

then Buyer shall not be obligated to assume the contract (and if Buyer does not assume the contract, such contract shall not be included in the Assigned Contracts, or the Purchased Assets at Closing); *provided, however* that Buyer may, at its sole discretion, elect, by delivering written notice to D. Erickson, to assume the obligations and liabilities of Seller under the contract (to the extent the same would constitute Assumed Liabilities had such contract been included in the Assigned Contracts at the Closing) (but not the contract itself), in which event:

(i)   such obligations and liabilities (but not the contract itself) shall be included in the Assumed Liabilities, the claims, rights, and benefits of Seller arising under the contract or resulting therefrom (but not the contract itself) shall be included in the Assigned Contracts and transferred to Buyer hereunder, and any payments or other benefits received by Seller therefrom after the Closing shall immediately be transferred by Seller to Buyer;

(ii)     after the Closing, Seller shall have the continuing obligation to use their reasonable best efforts (at their own expense) to obtain all necessary approvals, consents, and waivers to the assignment or transfer of any such unassigned contracts, and each of the parties shall promptly execute all documents necessary to complete the transfer of the contract to Buyer if such approvals, consents, and waivers are obtained (whereupon such contract shall be included in the Assigned Contracts, and deemed a Purchased Asset for all purposes hereunder); and

(iii)    in addition to and notwithstanding the foregoing, in the event that, notwithstanding Seller's reasonable best efforts, Seller is unable to obtain the consent to the assignment of a Takedown Contract, Buyer and Seller agree to effect, at Buyer's sole option, the transfer of the Real Property that is the subject of such Takedown Contract by alternative means, including, without limitation, the acquisition of the Real Property that is the subject of such Takedown Contract by Seller and subsequent or simultaneous conveyance of such Real Property to Buyer.

(c)      The Parties agree that any construction building permits with respect to homes in process of construction as of such Closing (and included in the Purchased Assets) will not be assigned to Buyer.  Instead, in connection with the completion of construction of such homes, Buyer shall utilize the construction building permits issued to Seller and Buyer, shall indemnify, defend and hold Seller harmless from and against any and all claims, damages, liabilities, actions, causes of action, losses, injuries, demands, judgments, costs and expenses (including, without limitation, attorneys' fees and costs of suit) to the extent arising after the Closing from the completion of construction of such homes by Buyer and/or any defects arising therefrom.   Buyer's obligations under this Section 1.5(c) shall survive the Closing hereunder.

1.6     Specified Excluded Contracts.  Buyer may, with the consent of Seller (not to be unreasonably withheld, conditioned or delayed), designate that any agreement, commitment, purchase order or other contract be excluded from the Purchased Assets (any contract so designated, a "Specified Excluded Contract"); provided that Buyer may unilaterally designate, in their sole discretion without the consent of Seller, any of the following as Specified Excluded Contracts: (i) any contract in default or subject to a dispute described in the Seller Disclosure Letter, or (ii) any vendor contract (so long as Seller does not have material future commitments under such vendor contract that are not terminable without penalty).  Notwithstanding anything to the contrary, Specified Excluded Contracts shall be Excluded Assets, Specified Excluded Contracts shall not constitute Assigned Contracts or Purchased Assets, and all obligations and liabilities under the Specified Excluded Contracts shall be Excluded Liabilities.

1.7     Taking of Necessary Action; Further Action.  From and after the Closing Date, Seller shall, from time to time, at the request of Buyer and without further consideration due, execute, acknowledge, and deliver all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required to confirm the conveyance and transfer of the Purchased Assets to Buyer and otherwise give effect to the intent of this Agreement.

## ARTICLE II
## PURCHASE PRICE AND CLOSING

2.1     <u>Purchase Price</u>.   Subject to such further credits, adjustments and prorations as set forth herein, the aggregate consideration for the Purchased Assets and Assumed Liabilities (the "<u>Purchase Price</u>") shall be an amount equal to:

(a)     the Estimated Book Value, as set forth in the Estimated Closing Book Value Statement and subject to the Post-Closing Adjustment pursuant to <u>Section 2.2</u>; *plus*

(b)     up to Ten Million Dollars ($10,000,000) payable as set forth in <u>Section 2.5</u> (the "<u>Premium</u>").

2.2     <u>Purchase Price Adjustments</u>.

(a)     *Closing Adjustment*.   At least 10 days before the Closing, Seller shall prepare and deliver to Buyer a statement setting forth its good faith estimate of the Estimated Book Value as of the Closing Date (without giving effect to the transactions contemplated in this Agreement) (the "<u>Estimated Closing Book Value Statement</u>"), which statement shall be include an executed certificate of the treasurer of each Seller certifying that the Estimated Closing Book Value Statement was prepared consistently applied, subject to the accounting principles set forth on <u>Section 3.3</u> of the Seller Disclosure Letter.

(b)     *Post-Closing Adjustment*.   Within 90 days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of the Closing Book Value (the "<u> Closing Book Value Statement</u>").   The "Post-Closing Adjustment" shall be an amount equal to the Closing Book Value minus the Estimated Book Value.   If the Post-Closing Adjustment is a positive number, Buyer shall pay to Seller an amount equal to the Post-Closing Adjustment.   If the Post-Closing Adjustment is a negative number, Seller shall pay to Buyer an amount equal to the Post-Closing Adjustment.

(c)     *Examination*.   After receipt of the Closing Book Value Statement, Seller shall have 30 days (the "<u>Review Period</u>") to review the Closing Book Value Statement. During the Review Period, Seller and Seller's accountants shall have full access to the relevant books and records of Buyer, the personnel of, and work papers prepared by, Buyer and/or Buyer's Accountants to the extent that they relate to the Closing Book Value Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Book Value Statement as Seller may reasonably request for the purpose of reviewing the Closing Book Value Statement and to prepare an Objection Notice (defined below); *provided, that* such access shall be in a manner that does not interfere with the normal business operations of Buyer.

(d)     *Objection*. On or prior to the last day of the Review Period, Seller may object to the Closing Book Value Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item or amount and the basis for Seller's disagreement therewith (the "<u>Objection Notice</u>"). If

Seller fails to deliver the Objection Notice before the expiration of the Review Period, the Closing Book Value Statement and the Post-Closing Adjustment, as the case may be, reflected in the Closing Book Value Statement shall be deemed to have been accepted by Seller. If Seller delivers the Objection Notice before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within 30 days after the delivery of the Objection Notice (the "Resolution Period"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing Book Value Statement with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

(e)     Dispute Resolution.  If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Objection Notice before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts" and any amounts not so disputed, the "Undisputed Amounts") shall be submitted for resolution to the office of Frazier & Deeter, LLC or, if Frazier & Deeter, LLC is unable to serve, Buyer and Seller shall appoint by mutual agreement the office of an impartial nationally recognized firm of independent certified public accountants other than Seller's Accountants or Buyer's Accountants (the "Independent Accountant") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Book Value Statement. The Parties agree that all adjustments shall be made without regard to materiality. The Independent Accountant shall only decide the specific items under dispute by the Parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Book Value Statement and the Objection Notice, respectively.  The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Buyer, respectively, bears to the aggregate amount actually contested by Seller and Buyer.  The Independent Accountant shall make a determination as soon as practicable within 30 days (or such other time as the Parties shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Book Value Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the Parties.

(f)     Except as otherwise provided herein, any payment of the Post-Closing Adjustment shall be paid promptly after final resolution as determined by the Independent Accountant by wire transfer of immediately available funds to such account as is directed by Buyer or Seller, as the case may be.

2.3     Warranty Holdback.  Seller shall deposit with Buyer the Warranty Amount for the purposes of providing certain warranty services by Buyer after the Closing Date pursuant to the TSA.

2.4     Closing.  The closing of the transactions contemplated hereby (the "Closing") shall occur simultaneously with the execution of this Agreement effective as of the date of this Agreement (the "Closing Date").  The Closing Date is targeted to be Thursday, November 14, 2019 – Friday, November 15, 2019.  The Closing will be effective for all purposes as of 11:59

p.m. EST on Friday, November 15, 2019 (the "Effective Time").  The Closing shall be held in Columbus, Georgia at the offices of Robert "Randy" Lomax beginning at 9:00 a.m. on Thursday, November 14, 2019.  Mr. Lomax shall serve as Closing Agent.  Notwithstanding the foregoing, the parties acknowledge and agree that certain agreements, documents, and certificates related to the Closing and the transactions contemplated herein will be executed by the parties prior to, or contemporaneously with, the Closing and transmitted to the parties via electronic means.

2.5   Purchase Price Payment Methodology.   The Purchase Price shall be paid in accordance with the following:

(a)   Premium.  The Premium shall be payable as follows:

(i)   $4,000,000 of the Premium shall be paid by Buyer to Seller, by January 31, 2020, in the form of newly issued Equity Interests in ASH at a price of $1,000 per Unit plus an 8% coupon, and the effective date of the issuance of such Units shall be January 1, 2020; and

(ii)   up to $6,000,000 of the Premium shall be payable by Buyer to Seller in the form of deferred payments (the "Deferred Payments") in accordance with Section 2.5(e).

(b)   Estimated Book Value.  At Closing and subject to this Section 2.5, Buyer shall pay Seller the Estimated Book Value of the Business by:

(i)   a promissory note in the form attached hereto as Exhibit A (the "Note") in the amount of $5,000,000; and

(ii)   a wire transfer of immediately available funds to an account or accounts designated in writing by the Shareholders in the amount of the remaining balance of the Estimated Book Value of the Business in excess of the amount of the Note, if any.

(c)   Note. The Note shall be payable as provided in the form attached hereto and subject to a one percent (1%) origination fee to be paid by Buyer and collected at Closing.

(d)   Purchase of ASH Membership Interests.  Using proceeds from the cash portion of the Purchase Price payable hereunder, Seller (or an entity designated by the Shareholders and approved by ASH) shall subscribe for 2,000 ASH Membership Interests in the amount of $2,000,000  at a price of $1,000 per Unit.

(e)   Deferred Payments.  The Deferred Payments of $6,000,000 will be made payable to Grayhawk Homes, Inc. on an installment basis over a period of approximately four (4) years after Closing (the "Deferred Payments Period").  Grayhawk Homes, Inc. shall receive, respectively, $2,400,000 in Year 1 (2020), $1,200,000 in Year 2 (2021), $1,200,000 in Year 3 (2022), and $1,200,000 in Year 4 (2023).  The obligation for Buyer to make the Deferred Payments shall accrue on December 31 of each such year, and the Deferred Payments will be made to Seller by January 30 of the following year.  Buyer

shall have the option, in its sole discretion, to make any of the Deferred Payments in cash, ASH Membership Interests, or a combination of both. If Buyer elects to make any portion of the Deferred Payments with ASH Membership Interests, the effective date of the issuance of such Units shall be January 1 of the year in which such Units are issued. The ASH Membership Interests shall, for purposes of the Deferred Payments, be valued at $1,000 per unit (proportionately adjusted to reflect any: (i) membership interest split, reverse split, or combination; (ii) membership interest dividends; or (iii) membership interest exchanges). In the event that Buyer or Seller terminates the Land Purchase Agreement as a result of an uncured breach of the Land Purchase Agreement (as more fully set forth in Sections 34 and 35 therein), Buyer shall have no further obligation to make Deferred Payments.

<div align="center">

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

</div>

Each Seller jointly and severally represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the Closing Date, except as specifically set forth herein or in the correspondingly numbered section of the disclosure schedule attached to this Agreement (the "Seller Disclosure Letter"). For purposes of this Article III, the representations and warranties of each Seller are deemed to include each such Seller's Subsidiaries set forth in Section 3.1 of the Seller Disclosure Letter.

3.1     Organization, Standing and Power. The entities collectively making up the Seller are companies duly organized, validly existing, and in good standing under the laws of the State of Georgia and Alabama, respectively, and have all requisite power and authority to own, lease, and operate its properties and assets and to carry on its business (including, the Business) as now being conducted. Each Seller is duly qualified to do business and, where applicable as a legal concept, is in good standing as a foreign entity in each jurisdiction in which the character of the properties it owns, operates or leases or the nature of its activities makes such qualification necessary, except for such failures to be so qualified or in good standing, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. Section 3.1 of the Seller Disclosure Letter contains a complete and accurate list of (a) the jurisdictions in which each Seller is qualified to do business as a foreign limited liability company or business corporation and (b) each fictitious or assumed name or "DBA" used by the Business.

3.2     Authority; No Conflict; Required Filings and Consents.

(a)     Each Seller has the requisite power and authority to execute and deliver this Agreement and each other document to be executed by Seller in connection herewith and to perform its respective obligations hereunder and thereunder, all of which have been duly authorized by all requisite action. No further company or member action on the part of such Seller is necessary to authorize the execution, delivery and performance of this Agreement and each Ancillary Document by such Seller and the consummation by such Seller of the transactions contemplated hereby and thereby. This Agreement has been, and at Closing each Ancillary Document will be, duly executed and delivered by Seller (as applicable) and, assuming that this Agreement and each Ancillary Document is duly and validly authorized, executed, and delivered by the other Parties and thereto,

constitutes, or will constitute (as applicable), a valid and binding agreement of each Seller (as applicable), enforceable against such Seller in accordance with its terms, subject to any applicable bankruptcy, reorganization, insolvency, moratorium, or other similar Applicable Laws affecting creditors' rights generally and principles governing the availability of equitable remedies.

(b)      The execution and delivery of this Agreement by each Seller does not, and the consummation by such Seller of the transactions contemplated by this Agreement will not, (i) conflict with, or result in any violation or breach of, any provision of Organizational Documents of any Seller, (ii) conflict with, or result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default (or give rise to a right of termination, cancellation or acceleration of any material obligation or loss of any material benefit) under, require notice, consent or waiver (other than the notices, consents and waivers listed in Section 3.2(b) of the Seller Disclosure Letter) under, require the payment of a penalty under or result in the imposition of any mortgage, security interest, pledge, lien, charge, restriction, restrictive covenant, easement or encumbrance ("Liens") on any Seller's assets under, any of the terms, conditions, or provisions of any Assigned Contract or any other contract, agreement instrument, or obligation to which each such Seller is a party or by which each such Seller or any of their respective properties or assets may be bound, or (iii) conflict with or violate any permit, concession, franchise, license, judgment, injunction, order, decree, statute, law, ordinance, rule, or regulation applicable to any Seller or any of its respective properties or assets.

(c)      No consent, approval, license, permit, order, or authorization of, or registration, declaration, notice, or filing with, any Governmental Authority (other than the customary filings and recordings in connection with the transfer of title to the Real Property) is required by or with respect to any Seller in connection with the execution and delivery of this Agreement by such Seller or the consummation by such Seller of the transactions contemplated by this Agreement.

3.3      Financial Statements; Indebtedness.   As attached to Section 3.3 of the Seller Disclosure Letter, each Seller has provided its (a) unaudited balance sheet as of December 31 for each of 2018 and 2017 and the related financial statements for each of the years then ended prepared on a tax basis (the "Seller Prior Year Tax Basis Financial Statements"), and (b) the unaudited balance sheet as of August 31, 2019 and the related financial statement of operation for the eight (8) months then ended prepared in accordance with GAAP (the "Seller Current Year GAAP Financial Statements").   The Seller Current Year GAAP Financial Statements fairly present, in all material respects, the financial condition of each Seller as of the dates therein indicated and the results of operations of each Seller for the periods therein specified in accordance with GAAP.   Section 3.3 of the Seller Disclosure Letter shows (a) the accounting policies of the Seller for the Seller Current Year GAAP Financial Statements and (b) the departures from GAAP under the Seller Prior Year Tax Basis Financial Statements.   The financial records of each Seller, all of which such Seller has made available to Buyer, are true, correct and complete and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls.   Section 3.3 of the Seller Disclosure Letter lists all Indebtedness of each Seller

and specifies any property affected by such Indebtedness related to the Seller Current Year GAAP Financial Statements.  Each Seller is, and after giving effect to the transactions contemplated hereby, will be Solvent.

3.4    <u>Absence of Certain Changes</u>.    Except as expressly contemplated by this Agreement and as set forth in <u>Section 3.4</u> of the Seller Disclosure Letter, between August 31, 2019 and the date of this Agreement, the Business of Seller has been conducted in the Ordinary Course of Business and there has not occurred:

(a)    any event that has had, or is reasonably expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    material change in any method of accounting or accounting practice for the Business, except as required by GAAP, as disclosed in the notes to the Financial Statements, or as set forth on <u>Section 3.3</u> of the Seller Disclosure Letter;

(c)    material change in cash management practices and policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts receivable, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(d)    entry into any contract that would constitute a Material Contract;

(e)    incurrence, assumption, or guarantee of any indebtedness for borrowed money in connection with the Business except unsecured current obligations and liabilities incurred in the Ordinary Course of Business consistent with past practices;

(f)    transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Seller Financial Statements, except for the sale of inventory in the Ordinary Course of Business;

(g)    cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets;

(h)    transfer or assignment of or grant of any license or sublicense under or with respect to any Intellectual Property (except non-exclusive licenses or sublicenses granted in the Ordinary Course of Business consistent with past practice);

(i)    abandonment or lapse of or failure to maintain in full force and effect any Intellectual Property registration;

(j)    material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(k)    acceleration, termination, material modification to or cancellation of any Assigned Contract or Permit;

Page 14

(l)      material capital expenditures which would constitute an Assumed Liability;

(m)      imposition of any Lien upon any of the Purchased Assets;

(n)      any sale, lease, license, pledge, or other disposition of any material asset of Seller;

(o)      (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any current or former employees, officers, directors, independent contractors or consultants of the Business, other than as provided for in any written agreements or required by Applicable Law, (ii) change in the terms of employment for any employee of the Business or any termination of any employees for which the aggregate costs and expenses exceed $25,000, or (iii) action to accelerate the vesting or payment of any compensation or benefit for any current or former employee, officer, director, consultant or independent contractor of the Business;

(p)      adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, independent contractor or consultant of the Business, (ii) Employee Benefit Plan, or (iii) collective bargaining or other agreement with a union, in each case whether written or oral;

(q)      any loan to (or forgiveness of any loan to), or entry into any other transaction with, any current or former directors, officers or employees of the Business;

(r)      adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consent to the filing of any bankruptcy petition against it under any similar Applicable Law;

(s)      enter into any non-compete, non-solicit or any other agreement under which Buyer or any of their Affiliates, following the Closing, could be restricted from engaging in any business, operating in any market, or offering any product or services to customers or potential customers or any class of customers;

(t)      purchase, lease or other acquisition of the right to own, use or lease any property or assets in connection with the Business for an amount in excess of $25,000, individually (in the case of a lease, per annum) or $50,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of inventory or supplies in the Ordinary Course of Business consistent with past practice; and

(u)      any contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

3.5    <u>No Undisclosed Liabilities</u>.    Except liabilities (i) adequately reflected and disclosed in the Seller Balance Sheet, (ii) incurred in the Ordinary Course of Business since the date of the Seller Balance Sheet, (iii) arising in the Ordinary Course of Business from contractual obligations of a Seller (which do not arise out of, relate to or result from any breach of contract by such Seller) under any Assigned Contract, or (iv) created by this Agreement, no Seller has any liabilities of any nature (whether accrued, absolute, contingent, matured, unmatured or otherwise) whether or not required by GAAP to be reflected on a Seller Balance Sheet.

3.6    <u>Taxes; Unclaimed Property</u>.

(a)    Seller has filed all Tax Returns that Seller was required to file and has paid all Taxes due and owing, whether or not shown as due on any Tax Return.  Each Tax Return filed by Seller is complete and accurate in all material respects.  Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)    <u>Section 3.6(b)</u> of the Seller Disclosure Letter lists all federal, state, local, and foreign Tax Returns filed with respect to Seller for taxable periods ended on or after December 31, 2017 that have been audited or currently are the subject of audit.  There are no requests for rulings or determinations, or applications requesting permission for a change in Seller's accounting practices, in respect of Taxes, pending with any Governmental Authority.  There are no pending or, to the Knowledge of Seller, threatened audits, investigations, claims, proposals, or assessments that have been submitted to Seller in writing for or relating to any Taxes of Seller.

(c)    No deficiencies for Taxes of Seller have been claimed, proposed, or assessed in writing by any Tax authority or other Governmental Authority.  Seller has not (i) waived any statute of limitations with respect to Taxes of Seller, or (ii) agreed to any extension of time with respect to a Tax assessment or deficiency related to any such Taxes.

(d)    All Taxes that Seller is required by Applicable Law to withhold or collect, including sales and use taxes, and amounts required to be withheld for Taxes of employees, have been duly withheld or collected and, to the extent required, have been paid over to the proper Governmental Authorities or are held in separate bank accounts for such purpose.

(e)    No claim has ever been made or threatened by a Tax authority in any jurisdiction asserting that Seller is or may be subject to Taxes imposed by that jurisdiction but not paid by Seller, including sales and use Taxes required to be collected by Seller and remitted to that jurisdiction and income Taxes payable to that jurisdiction, nor is there any factual basis for any such claim.  <u>Section 3.6(e)</u> of the Seller Disclosure Letter lists all jurisdictions with which Seller has or has had a nexus for sales, use and income Tax purposes for taxable periods beginning on or after January 1, 2017, and Seller is not required to file any Tax Returns or collect any Taxes in any other jurisdiction.

(f)     Seller has (i) filed or caused to be filed with the appropriate Governmental Authority all reports required to be filed with respect to any material unclaimed property and has remitted to the appropriate Governmental Authority all material unclaimed property required to be remitted, or (ii) delivered or paid all material unclaimed property to its original or proper recipient.  No material asset or property, or material amount of assets or properties, of Seller or its Subsidiaries is escheatable to any Governmental Authority under any Applicable Law, including uncashed checks to vendors, customers, or employees, non-refunded over payments, credits, unused gift certificates or unused prepaid accounts.

(g)     There is no Lien for any Tax upon any Purchased Asset, except any inchoate statutory Lien for any current Tax not yet due.

3.7     _Property_.

(a)     _Title to Personal Property_.  Except for Excluded Assets, all equipment and other tangible personal property used in the Business are in good condition and repair, normal wear and tear excepted.  Section 3.7(a) of the Seller Disclosure Letter sets forth a complete and accurate list and a brief description of all personal property used in the Business with an individual value of $25,000 or greater.  Seller has (and upon Closing, Buyer will acquire and have) good and marketable title to, or (to the extent disclosed as a leased or licensed asset) a valid leasehold interest in or a valid license for, each Purchased Asset, free and clear of any Liens other than any Permitted Lien, except for any asset disposed of in its Ordinary Course of Business since the date of the Seller Balance Sheet.

(b)     _Housing Units_.  All of the Housing Units, improvements and buildings on the Real Property, and any other inventory of a Seller shown on the face of the Seller Balance Sheet and Estimated Closing Book Value Statement, were constructed in a good and workmanlike manner, comply in all material respects with Applicable Laws and all applicable CCRs, are structurally sound, are in good and proper working condition and repair (normal wear and tear, normal maintenance and normal warranty and customer services matters excepted), are useful for their intended purposes, are merchantable, fit for their purpose, and not obsolete, damaged or defective, are of a quality and quantity usable and salable in the Ordinary Course of Business, are free of asbestos and, except as would not reasonably be expected to create a liability, require disclosure to purchasers, or adversely affect the value thereof, are free of mold, radon and radon's progeny.

(c)     _Owned Real Property_.  Section 3.7(c) of the Seller Disclosure Letter sets forth a true and correct list of all Owned Real Property.  The Owned Real Property is not subject to any Liens other than Permitted Liens or Liens otherwise disclosed in this Agreement.  No Seller has granted any option or right of first refusal to purchase or lease any part of the Owned Real Property, except pursuant to Retail Sales Contracts.  Seller has made available to Buyer true and correct copies of (A) all deeds, mortgages, deeds of trust, Liens, zoning information, site plans, certificates of occupancy, environmental reports, title insurance policies and surveys relating to the Owned Real Property and (B) all lease, sublease, rental, use, license, occupancy or other agreements, possessory rights,

options and rights of first refusal, relating to or affecting any portion of the Owned Real Property, including all amendments, modifications, assignments, supplements, renewals, and guarantees thereof (collectively, the "Third Party Leases").  Each such Third Party Lease is valid, binding and enforceable in accordance with its terms and is in full force and effect, and constitutes the entire agreement between the parties thereto, and there are no other agreements, whether oral or written, between such parties.  No Seller is in default or otherwise in breach under any Third Party Lease, nor has any Seller received any notice of default under any Third Party Lease, and to each Seller's Knowledge, there are no existing defaults of any other party thereunder.  The consummation of the transactions contemplated by this Agreement will not constitute a default, or give rise to a right of termination, cancellation or acceleration of any right under, any Third Party Lease.  No Third Party Lease requires consent of the applicable tenant under such Third Party Lease in order to transfer such Third Party Lease to Buyer in accordance with the terms of such Third Party Lease.  Each guaranty, if any, under any Third Party Lease, is in full force and effect.  All rent and other sums and charges payable by any third party under any Third Party Lease are current.

(d)      *Leased Real Property*.  Section 3.7(d) of the Seller Disclosure Letter sets forth a true and correct list of all of the real property leases, subleases, occupancy, rental, use, license, or other agreements regarding real property, whether written or verbal and including all amendments, modifications, assignments, supplements, renewals, and guarantees thereof, which is leased or subleased by a Seller, or that a Seller has the right to occupy or use now or in the future (collectively, the "Real Property Leases" and any real property leased or occupied under a Real Property Lease being "Leased Real Property").  Seller has made available to Buyer true and correct copies of all Real Property Leases, including all amendments, modifications, assignments, supplements and renewals thereof.  All such Real Property Leases are valid, binding and enforceable in accordance with their terms and are in full force and effect, and constitute the entire agreement between the parties thereto, and there are no other agreements, whether oral or written, between such parties.  No Seller is in default or otherwise in breach under any Real Property Lease, nor has any Seller received any notice of default under any Real Property Lease, and to each Seller's Knowledge, there are no existing defaults of any other party thereunder.  The consummation of the transactions contemplated by this Agreement will not constitute a default, or give rise to a right of termination, cancellation or acceleration of any right under, any Real Property Lease.  Except as set forth in Section 3.7(d) of the Seller Disclosure Letter, no Real Property Lease requires consent of the applicable landlord under such Real Property Lease in order to transfer such Real Property Lease to Buyer in accordance with the terms of such Real Property Lease.  There are no guarantees under any Real Property Lease.  All rent and other sums and charges payable by a Seller as tenant under any Real Property Lease are current.

(e)      *Takedown Contracts*.  Section 3.7(e) of the Seller Disclosure Letter sets forth a true and correct list of all Takedown Contracts and, for each such Takedown Contract, the related Takedown Property, together with (A) a schedule of the all of the closings of lots or portions of real property to occur under each Takedown Contract, (B) the purchase price(s) for the real property, (C) the deposit being held in connection

therewith, and (D) a schedule of the status of each such real property (i.e. portion of the property that is not platted (and if not platted, the status of the preliminary subdivision plat or plan), portion of the property that is platted, the improvements completed to the property or any portion thereof (i.e. raw fully undeveloped land, utilities are available at lot lines or boundary of project, lots which have model homes or homes for sale constructed or in process of construction, lots which are fully prepared for construction, lots for which building permits have been pulled, etc.).  Except pursuant to the Takedown Contracts with respect to the Takedown Property, there are no real properties that Seller is obligated to buy, lease or sublease at some future date.  Seller has made available to Buyer true and correct copies of all Takedown Contracts, including all amendments, modifications, assignments, supplements and renewals thereof.  All Takedown Contracts are valid, binding and enforceable in accordance with their terms and are in full force and effect, and constitute the entire agreement between the parties thereto, and there are no other agreements, whether oral or written, between such parties.  Except as set forth in Section 3.7(e) of the Seller Disclosure Letter, no Seller is in default or otherwise in breach under any Takedown Contract, nor has any Seller received any notice of default under any Takedown Contract, and to each Seller's Knowledge, there are no existing defaults of any other party thereunder.  The consummation of the transactions contemplated by this Agreement will not constitute a default, or give rise to a right of termination, cancellation or acceleration of any right under, any Takedown Contract.  Except as set forth in Section 3.7(e) of the Seller Disclosure Letter, no Takedown Contract requires consent of the applicable owner or seller under such Takedown Contract in order to transfer such Takedown Contract to Buyer in accordance with the terms of such Takedown Contract.  Except as set forth in Section 3.7(e) of the Seller Disclosure Letter, there are no guarantees under any Takedown Contract.  All deposits and other sums and charges payable by a Seller under any Takedown Contract are current.

(f)     _Title to Real Property_.  Each Seller owns (and upon Closing, Buyer will acquire and have) good, marketable, and valid fee simple title to the Owned Real Property or a valid leasehold interest in the Leased Real Property (or in the case of Takedown Property, will have such title upon exercise of the Takedown Contracts), free and clear of all Liens, except any Permitted Liens.  Except as set forth in Section 3.7(f) of the Seller Disclosure Letter, no Seller has assigned its interests under any of the Takedown Contracts, Third Party Leases or Real Property Leases.

(g)     _Effectiveness of Leases and Takedown Contracts_.  Except as set forth in Section 3.7(g) of the Seller Disclosure Letter, no party to any Third Party Lease, Real Property Lease or Takedown Contract has exercised any termination right with respect thereto.  No party to any Third Party Lease, Real Property Lease or Takedown Contract has repudiated any provision thereof and there is no dispute, oral agreement or forbearance program in effect, or threat of modification, suspension or cancellation, with respect to any Third Party Lease, Real Property Lease or Takedown Contract.  No Seller has received written or, to such Seller's Knowledge, oral notice from any insurance company that such insurance company will require any alteration to any Real Property for continuance of a policy insuring such property or the maintenance of any rate with respect thereto (other than any notice of alteration that has been completed), to the extent

that such alteration is the responsibility of a Seller. Each Third Party Lease, Real Property Lease or Takedown Contract will continue to be valid, binding, enforceable and in full force and effect on identical terms following the consummation of the contemplated transactions.

(h)    *Permits*.   No Seller has received any written notice from any Governmental Authority that any Permits, certificate of occupancy, licenses or other permits with respect to the buildings, structures or improvements on any of the Real Property may be revoked, adversely modified or not renewed.

(i)    *No Tax Reduction Proceedings*.  There are no Tax reduction proceedings pending in respect of the Real Property and all Taxes for which there may arise any lien upon the Real Property and which are due and payable prior to the Closing Date have been or prior to the Closing Date will have been paid.

(j)    *Estoppels; Condemnation*.  (i) No Seller has given any mortgagee or other third party any estoppel certificates or similar instruments that would preclude assertion of any claim by the tenant under any Real Property Lease or affect any of the tenant's rights or obligations under such Real Property Lease; and (ii) no Seller has contested, since January 1, 2017, and is not currently contesting, any operating costs, real property taxes or assessments or other charges payable by the tenant under such Real Property Lease.  There are no pending (or, to the Knowledge of any Seller, threatened) actions or proceedings regarding condemnation or other eminent domain actions or proceedings affecting the Leased Real Property, or any part thereof, or of any sale or other disposition of the Leased Real Property or any part thereof in lieu of condemnation.

(k)    *Bankruptcy*.  To the Knowledge of each Seller, (i) no landlord under any Real Property Lease nor any tenant under any Third Party Lease (A) is in default under any of its obligations under any mortgage encumbering any Leased Real Property or Owned Real Property, (B) is seeking relief under any reorganization, arrangement, consolidation, readjustment, liquidation, dissolution or similar arrangement or proceeding under any state or federal bankruptcy or other Applicable Laws, or (C) has agreed, pursuant to any state or federal bankruptcy or other Applicable Laws, to the appointment of any trustee, receiver or liquidator for any of the Leased Real Property or Owned Real Property; and (ii) no foreclosure is pending (or, to the Knowledge of each Seller, threatened) with respect to any Leased Real Property or Owned Real Property.

(l)    *Third Party Rights*.  No Seller has entered into any reservation agreements with respect to or contracts for the sale of any of the Real Property, other than the Retail Sales Contracts.  No Seller has entered into, nor has received notice of and has no Knowledge, of any rights of first refusal or first offer, options to purchase any of the Real Property or other Purchased Assets (collectively, the "Property"), or any other rights or agreements that may delay, hinder or prevent this transaction.

(m)    *Trade Payables*.  Except for normal trade payables for homes under construction generated in the Ordinary Course of Business, no labor or materials of any

kind have been furnished to or for the benefit of the Property for which payment in full has not been made.

(n)     *No Third Party Possession*.  No Person or entity is entitled to possession of any of the Real Property, other than a Seller and the parties to the Third Party Leases (with respect to the portion of the Real Property subject to the Third Party Leases) and the parties to the Takedown Contracts (with respect to such Takedown Property), and except as permitted by Permitted Liens.

(o)     *Separate Parcels*.  To the extent subject to a recorded plat, each parcel of Real Property constitutes a separate parcel of record for real property tax assessment and conveyancing purposes, and complies with Applicable Law governing the platting and subdivision of real property.

(p)     *No Special Tax Rates*.  None of the Real Property has been classified under any designation to obtain a special low ad valorem tax rate or receive either an abatement or deferment of ad valorem taxes which, in such case, will result in any "green acres", rollback, catch up or other deferred ad valorem taxes in order to recover the amounts previously abated or deferred.  There are no community development districts or special taxing districts affecting, or planned to affect, any portion of the Real Property.

(q)     *No Special Assessments*.  No Seller has received notice of and no Seller has Knowledge of any pending or proposed special area or other assessments or moratorium affecting the Real Property or any proposed or pending public improvements which may give rise to any such assessments affecting the Real Property.

(r)     *No Condemnation*.  No Seller has received notice of and no Seller has Knowledge of any outstanding, pending or threatened condemnation or eminent domain proceeding or transfer in lieu thereof affecting any of the Real Property, nor has any Seller agreed or committed to dedicate any of the Real Property.

(s)     *Access to Roads*.  The Real Property has free, full, legal, valid, and perpetual access to and from an adjacent public road or street (or private road or street pursuant to an uninterrupted appurtenant perpetual easement) and all adjoining streets, roads, and highways, including specifically at the existing curb cuts or access points with adequate ingress and egress to such Real Property, and no Seller has received notice of, and no Seller has Knowledge of, any pending or threatened action or dispute which would materially impair such access.

(t)     *Development Status; Utilities*.  Section 3.7(t) of the Seller Disclosure Letter lists the development status of each parcel or portion of Real Property, which includes the number of lots expected from the development with the following development status of either (1) developed, (2) under development or (3) raw land. Additionally such schedule shall include the final plat date, estimated final plat date or preliminary plat date, if any and development status notes.  Except for any undeveloped Real Property as set forth therein, or except as otherwise provided in Section 3.7(t) of the Seller Disclosure Letter, the Real Property is serviced by utilities (including, as

Page 21

applicable, telephone and communications, electricity, gas, sanitary sewer, storm sewer and water (fire and domestic)), sufficient for the development and sale of the Real Property as contemplated by a Seller, and such utilities are provided to the Real Property by uninterrupted appurtenant perpetual easements and public rights of way. To each Seller's Knowledge, there is no actual or threatened curtailment, cancellation or suspension of any such utility.

(u)     *Flood Hazards*.   Except as set forth in <u>Section 3.7(u)</u> of the Seller Disclosure Letter, no portion of the Real Property is located within any flood plain or flood hazard area as designated on any federal flood insurance map or under Applicable Law or includes any "recognized environmental condition," wetlands, vegetation, species or habitat protected by any Applicable Laws.

(v)     *Property Restrictions*.   To each Seller's Knowledge, or except as otherwise provided in <u>Section 3.7(v)</u> of the Seller Disclosure Letter, none of the Real Property or its use or uses are in violation of Applicable Law or any private restriction or covenant or entitlements applicable to the Real Property, including the Permitted Liens, and no Person or entity that has a valid legal basis to issue such notice of non-compliance has threatened to do so.   There are no unrecorded easements or encroachments affecting any portion of the Real Property.

(w)     *Litigation*.   Except as set forth in <u>Section 3.7(w)</u> of the Seller Disclosure Letter, there are no claims, demands, actions, litigation, investigations, or proceedings of any kind pending or, to a Seller's Knowledge, threatened against any Seller or any of the Real Property, and to each Seller's Knowledge there are no facts which could give rise to any such claim, demand, action, litigation, investigation, or proceeding.

(x)     *Fixtures and Improvements*.   Any improvements and fixtures located on, under, over or within the Real Property, and all other aspects of each parcel of Real Property (i) are structurally sound and free of any material defects, and are in good repair, (ii) comply in all material respects with Applicable Law, without, to the best of each Seller's Knowledge, the benefit of any "grandfathering" or similar variance for their current use or Buyer's intended use, (iii) consist of sufficient land, parking areas, sidewalks, driveways and other improvements to permit the continued use of such facilities in the manner and or the purposes to which they are presently devoted; and (iv) do not encroach on real property not owned or leased by a Seller.   All mechanical, electrical, heating, air conditioning, drainage, sewer, water, telephone, communications, plumbing, and other facilities or utility systems of the improvements and fixtures owned by any Seller on the Real Property are in good operating condition.   To the extent required by Applicable Law, each Seller has been issued a certificate of occupancy, Permit or other approval or certificate as is required under Applicable Law with respect to such improvements and fixtures; all of which remain in full force and effect, and, to the extent required by law are displayed at the Real Property in compliance with Applicable Law.

(y)     *No Zoning or Use Restrictions*.   No part of the Real Property is subject to any building or use restrictions that would restrict or prevent the present or contemplated

use and enjoyment of the Real Property.  The Real Property is properly and duly zoned for its current and contemplated use and is in all respects a conforming use.  No Governmental Authority having jurisdiction over the Real Property has issued or, to each Seller's Knowledge, threatened to issue any notice or order that adversely affects the use, occupancy or operation of any part of the Real Property, or requires, as of the date hereof or a specified date in the future, any repairs or alterations or additions or improvements thereto, or the payment or dedication of any money, fee, exaction or property.

(z)     *Force Majeure*.  No part of the Real Property has been affected as a result of any fire, explosion, earthquake, flood, drought, windstorm, accident, strike or other labor disturbance, embargo, moratorium, requisition or cancellation of contract, permit, violation, incentive or concession by any domestic or foreign government or any agency thereof, riot, activities of armed forces or acts of God or any public enemy, or any other casualty, the occurrence of which would materially impair the value of any particular parcel of Real Property or the manner and extent of the current or contemplated use, occupancy and operation thereof or that would result in any Governmental Authority denying Permits necessary for the construction, use or occupancy of the Real Property for single-family dwellings.

(aa)     *All Real Property of the Business*.   The Real Property constitutes all interests in real property currently used or currently held for use or which a Seller has a right to acquire in connection with the Business.

(bb)     *No Governmental Authority Approvals*.  All of the Owned Real Property (and all Takedown Property prior to the requirement to acquire same) (i) has received final plat approval, with all common areas thereunder completed and all infrastructure improvements described or referenced in the final plat completed, (ii) has no preconditions to the issuance of building permits for the construction of single-family residences on the lots, other than payment of standard and ordinary permit and impact fees, (iii) has no precondition to the issuance of certificates of occupancy for single-family residences on the lots other than construction of such residence in accordance with Applicable Law, (iv) to the extent required, has obtained a concurrency certificate or written documentation from the applicable Governmental Authority confirming that property is entitled to and that sufficient infrastructure capacity has been reserved for the development of all of the lots, and (v) has written approval by the applicable Association as to all of the designs, models, plans and specifications for any Housing Units which are intended to be constructed on the lots (to the extent required by the applicable CCRs).

(cc)     *No Fees*.  No Seller has received written notice of any new or increases in existing development fees, impact fees, or other fees that will be levied (or are under consideration) in connection with the development of the Real Property, nor has any Seller received any written notice of any policy or action, nor is it aware of any such action, precluding or inhibiting (1) issuance of building permits with respect to the Real Property; or (2) issuance of certificates of occupancy for residences on the Real Property.

(dd)     *No Restrictions on Permits*.  To each Seller's Knowledge, there are no shared expense agreements, repayment agreements, reimbursement agreements, or

development payback agreements that affect all or any portion of the Real Property, and all on-site and off-site improvements necessary to obtain a building permit for a single-family residential dwelling to be constructed on each lot and a certificate of occupancy for a completed single-family residential dwelling constructed on each lot have been, with respect to the Owned Real Property, or will be, with respect to the Takedown Property prior to the requirement to acquire same, completed and accepted by all applicable Governmental Authorities, and to each Seller's Knowledge, no Governmental Authorities have refused or threatened to refuse to issue building permits and/or certificates of occupancy with respect to any portion of the Real Property.

(ee)    *Agreements to Pay Costs*.  Section 3.7(ee) of the Seller Disclosure Letter lists all current agreements (whether verbal or written) to fund deficits or otherwise pay assessments in connection with any portion of the Real Property (other than pursuant to CCRs included in the public record and set forth in the title commitments), and further sets forth (i) the Associations to which the Real Property is subject, (ii) the current assessment amount, if applicable and (iii) a listing of any and all transfer fees, capital contributions, capital improvement fees and other fees or charges payable under CCRs in connection with any transfer of the Real Property (whether payable to Associations or otherwise).  Seller has delivered to Buyer any and all budgets applicable to the Real Property as well as any and all notices received by a Seller from any Association regarding payment of assessments which are currently applicable to the Real Property or which may affect the Real Property in the future.

(ff)    *Permitted Liens; Binding Agreements*.  Except for Permitted Liens, or except as otherwise disclosed in Section 3.7(ff) of the Seller Disclosure Letter, the terms and conditions of the Assigned Contracts, and applicable governmental regulations, there are no contracts, agreements or other obligations, written or verbal, governing or relating to the development, use or operation of the Real Property that would be binding upon the Real Property or the Buyer as the owner thereof.  No Seller has received written notice, and no Seller has Knowledge, that any Governmental Authority has imposed any requirement that would bind Buyer to pay directly or indirectly any special fees or contributions, or incur any expenses or obligations in connection with the development of any portion of the Real Property, except for customary building permit, impact and inspection fees, if any.

3.8    Intellectual Property.

(a)    Section 3.8(a) of the Seller Disclosure Letter, sets forth a true and complete list of all of each Seller's (i) registered trademarks, service marks, trade names and domain names, including social media accounts, and pending applications to register any trademarks, service marks or trade names; (ii) patents and pending patent applications; or (iii) registered copyrights and pending applications to register copyrights. Each Seller either owns free and clear of all Liens (except for Permitted Liens), or has sufficient rights to use and access, all Intellectual Property used to conduct the Business as currently conducted and presently proposed to be conducted without payment of any royalty, license fee or similar fee, and has the right to convey all of such rights to Buyer as contemplated by this Agreement.  All patents and registrations for trademarks and

copyrights included in the Intellectual Property are valid, subsisting and enforceable and will not require any action to be taken within 120 days after the Closing to maintain or renew such items. All pending patent applications and pending applications to register any unregistered trademarks, service marks, trade names or copyrights included in the Intellectual Property are pending and in good standing and will not require any action to be taken within 120 days after the Closing to maintain or renew such items. There are no pending or threatened actions by third parties challenging the validity or enforceability of, or contesting a Seller's rights with respect to, any such Intellectual Property. No Seller has received any notice or claim challenging the validity or enforceability of Seller's Intellectual Property.

(b)     Section 3.8(b) of the Seller Disclosure Letter lists all license agreements and other contracts pursuant to which a Seller has the right to practice, use, copy or otherwise exploit any Intellectual Property owned by third parties ("Inbound Licenses"), other than Inbound Licenses that are standard end-user license agreements for off-the-shelf Software not in excess of $1,000 per seat. No Seller is party to any license agreements or other contracts pursuant to which any Person (other than a Seller) is authorized to exploit or has been granted other rights with respect to any Intellectual Property owned by such Seller.

(c)     Each Seller has taken all steps that are, as a whole, not less protective and comprehensive than the steps that would be taken by reasonably prudent business persons operating in Seller's industry, to protect, preserve and maintain the secrecy and confidentiality of its confidential and proprietary information and data.

(d)     No Seller, any of its products or services, or the operation of the Business have infringed upon or otherwise violated, or are infringing upon or otherwise violating, the Intellectual Property of any third party. No Seller has received any communications alleging or suggesting any of the foregoing is untrue, including any notices concerning Intellectual Property that might be relevant to the Business (or its products or services) or any offers to license Intellectual Property for use in connection with the Business. The exploitation of the Intellectual Property used by a Seller in the conduct of the Business as previously and currently conducted and as presently proposed to be conducted, does not infringe, violate or misappropriate any Intellectual Property owned by any third party. The consummation of the transactions contemplated hereby will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own, use or hold for use any Intellectual Property as owned, used or held for use in the conduct of the Business as currently conducted.

(e)     Each Seller complies with all Applicable Laws regarding the collection, retention, use and disclosure of personally identifiable information and any privacy policy published by it. Each Seller has taken measures to protect and maintain the confidential nature of the personally identifiable information provided to such Seller by individuals and to personal information collected from individuals against loss, theft and unauthorized access or disclosure, which measures are, as a whole, not less protective and comprehensive than those that would be taken by reasonably prudent business persons

Page 25

operating in Seller's industry. No Seller has received any claims, notices or complaints regarding such Seller's information practices or the disclosure, retention, or misuse of any personally identifiable information by the Federal Trade Commission, any similar foreign bodies, or any other Governmental Authority. During the past two (2) years, no complaint relating to an improper use or disclosure of, or a breach in the security of, any confidential information (including any personally identifiable information) has been made or, to the Knowledge of a Seller, threated against a Seller. To the Knowledge of each Seller, no unauthorized disclosure has occurred of any third party proprietary or confidential information in the possession, custody or control of such Seller. During the past two (2) years, no material breach has occurred of a Seller's security procedures wherein confidential information has been disclosed to a third Person.

(f)     All current and former employees within the past five (5) years (and to the Knowledge of each Seller, all other former employees), officers, contractors and consultants of each Seller have executed valid and enforceable Intellectual Property assignment and confidentiality agreements for the benefit of such Seller. To the Knowledge of each Seller, no current or former employee or contractor of a Seller holds or retains any right, title or interest in or to any Seller Intellectual Property owned by such Seller.

3.9     <u>Software and Information Technology</u>.

(a)     Except as set forth on <u>Section 3.9(a)</u> of the Seller Disclosure Letter, no Seller owns or uses any proprietary, custom or internally developed Software.

(b)     No Software owned or used by a Seller or the Business contains, and each Seller has taken reasonable precautions to prevent the presence of, any malicious code, program, or other internal component (e.g., computer virus, computer worm, computer time bomb, or similar component) that would damage, destroy, or alter the Software or databases (including any content therein) or other Software, firmware, or hardware used by a Seller or such Seller's customers, or that could, in any unintended manner, reveal, damage, destroy, or alter any data or other information accessed through or processed by the Software.

(c)     No Seller is and, to each Seller's Knowledge, no other party is, in breach or default under any Assigned Contracts, license, sublicense or other contract covering or relating to the Software and has not performed any act or omitted to perform any act which, with notice or lapse of time or both, will become or result in a violation, breach or default thereunder. No litigation is pending or, to each Seller's Knowledge, has been threatened against a Seller which challenges the legality, validity, enforceability or ownership of any license, sublicense or other contract covering or relating to any Software.

(d)     Each Seller has sufficient rights to use all Software, information technology equipment, databases, websites, content, e-commerce platforms, Software as a service and associated documentation used or held for use in connection with the operation of the Business as presently conducted (the "<u>IT Assets</u>"), all of which rights are

included in the Purchased Assets and will survive unchanged the consummation of the transactions contemplated hereby.  The IT Assets are sufficient to conduct the Business as currently conducted and presently proposed to be conducted without material malfunction or failure.  The IT Assets have not materially malfunctioned or failed and, to the Knowledge of each Seller, do not contain any viruses, bugs, faults or other devices or effects that (i) enable or assist any Person to access without authorization the IT Assets, or (ii) otherwise significantly adversely affect the functionality of the IT Assets, except as disclosed in their documentation.  Each Seller uses commercially reasonable efforts to secure and protect the IT Assets.  No Person has gained unauthorized access to any IT Assets.  Each Seller has implemented reasonable business continuity, and backup and disaster recovery technology, plans, procedures and facilities consistent with industry practices.

3.10    <u>Contracts</u>.

(a)    <u>Section 3.10(a)</u> of the Seller Disclosure Letter sets forth a complete and accurate list as of the date of this Agreement of the following contracts, agreements, commitments, arrangements or understandings of any kind, whether written or oral, to which a Seller is a party or by which a Seller or any of its assets is bound (collectively, the "<u>Material Contracts</u>"):

(i)    any Real Property Lease or Third Party Lease and any agreement (or group of related agreements) for the lease of personal property from or to third parties providing  for lease payments in excess of $25,000  per year;

(ii)    any Takedown Contract;

(iii)    any agreement (or group of related agreements) for the purchase, sale or license of products by a Seller or for the furnishing or receipt of services by a Seller or client referrals to a Seller which involves a contractual value of more than $25,000  (based on projections  set forth under such agreement);

(iv)    any agreement concerning the establishment or operation of a partnership, joint venture, or limited  liability  company;

(v)    any agreement (or group of related agreements) under which a Seller has created, incurred, assumed or guaranteed (or may create, incur, assume or  guarantee)  Indebtedness  in  excess  of $50,000 (including  capitalized  lease obligations  or capital expenditures);

(vi)    any agreement for the disposition of any significant portion of the assets of a Seller or the Business (other than sales of Housing Units in the Ordinary Course of Business) or any agreement for the acquisition of the assets or business  of  any  other  entity  (other  than  purchases  of  inventory  in  the  Ordinary Course of Business);

(vii)    any currently effective contract for the employment or engagement of  any  executive  officer,  employee,  or  other  individual  on  an  employment,

consulting, or independent contractor basis that (A) is not terminable at will (for any lawful reason or for no reason) without penalty, severance obligation, notice, or other liability or (B) provides for the payment or acceleration of payment of cash or other compensation or payment or acceleration of any other benefits under any compensation or benefit plan, program, or agreement, upon the consummation of the transactions contemplated by this Agreement;

(viii)   any currently effective contract for any bonus, incentive, commission, pension, profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, change-in-control, hospitalization, insurance, or other material plan or arrangement for the benefit of a Seller's current or former directors, officers, employees, or independent contractors;

(ix)   any agreement that grants any exclusive marketing, distribution, Intellectual Property, or other similar rights to any third party or otherwise purports to prohibit or limit, in any material respect, the right of a Seller or any of its Affiliates (including, in accordance with the terms of the contracts in effect on the date hereof, Buyer or any of its Affiliates after the Effective Time) to make, sell, market, advertise or distribute any products or services or use, transfer, license, distribute or enforce any of Seller's Intellectual Property;

(x)   any agreement containing exclusivity, non-compete or non-solicitation provision or that otherwise purports to limit in any material respect either the type of business or the geographic area in which a Seller or any Affiliates of such Seller (including, in accordance with the terms of the contracts in effect on the date hereof, Buyer or any of its Affiliates after the Closing Date) may engage in business;

(xi)   any agreement that grants a third party "most favored nation" status or purports to require a Seller or any of its Affiliates (including, in accordance with the terms of the contracts in effect on the date hereof, Buyer or any of its Affiliates after the Effective Time) to offer a third party the same or better price for a product or service if a Seller or such Affiliate offers a lower price for the same product or service to another third party;

(xii)   each agreement under which a Seller has advanced or loaned any other Person outstanding amounts in the aggregate for such Person exceeding $10,000;

(xiii)   each outstanding power of attorney with respect to a Seller;

(xiv)   each agreement that calls for performance over a period of more than three (3) months (other than those that are terminable at will or upon not more than 30-days' notice by a Seller without any liability or other obligation to such Seller), except for contracts for the sale of Housing Units in the Ordinary

Course of Business and that conform to a Seller's standard form contract (as provided to Buyer prior to the date hereof);

(xv)   any development agreement with any Governmental Authority;

(xvi)   any agreement related to the Real Property or other real property granting a Seller a direct or indirect right of first offer or right of first refusal or where a Seller has granted such rights to a third party;

(xvii)   any contract of surety, guarantee or indemnity;

(xviii)   any contract requiring or related to any Business Collateral;

(xix)   all contracts providing payment to or by any Person or entity based upon the sales, purchases or profits, other than direct payments for goods and services;

(xx)   any agreement with any contractor, subcontractor or other materialmen in connection with any work completed that remains unpaid or that has other obligations, covenants, indemnifications, representations or warranties which remain effective, being completed, or to be completed related to the Real Property; and

(xxi)   any other agreements that are material to a Seller or the Business and not otherwise disclosed pursuant to this Section 3.10(a).

(b)   Seller has made available to Buyer a true, correct and complete copy of each written Assigned Contract and each written Material Contract (together with any and all amendments, supplements, or modifications thereto) and accurate descriptions of all material terms of all non-written Assigned Contract and each non-written Material Contract.

(c)   Each Assigned Contract is in full force and effect with respect to each Seller, is legal valid and binding, and to the Knowledge of each Seller, with respect to each other party thereto, except as the enforceability of such Assigned Contract may be limited by principles of public policy and subject to the laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies. No Seller, nor to any Seller's Knowledge, any other parties to any Assigned Contract are in material violation of or in material default under any Assigned Contract, and to each Seller's Knowledge, all of the covenants to be performed by the parties thereunder to date have been fully performed and no claims have been made or issued for breach or indemnifications or notice of default or termination under any Assigned Contract.

3.11   Vendors and Suppliers.   Section 3.11 of the Seller Disclosure Letter contains a complete and accurate list of the names of each of the vendors and suppliers of the Business from whom any Seller has purchased at least $50,000 of goods or services within the twelve-month period ended December 31, 2018 and the amount of goods or services purchased from

them in each such period. None of such vendors or suppliers has expressed any intention or indication to any Seller that such supplier or vendor intends to terminate its business relationship with such Seller or to materially limit or alter its business relationship with such Seller. No Seller has received any notice from any vendor or supplier listed on <u>Section 3.11</u> of the Seller Disclosure Letter of any material increase in the price (excluding normal price fluctuations in the Ordinary Course of Business), quality and delivery terms and conditions on which such supplier or vendor will continue to make delivery of its products, nor has such a material change occurred since December 31, 2018.

3.12   <u>Insurance</u>. Each Seller has maintained and does maintain with third parties policies of fire and casualty, liability and other forms of insurance in such amounts, with such deductibles and retained amounts, and against such risks and losses, as contractually required and as are customarily carried by prudent Persons conducting businesses or owning assets similar in type and size to those of Seller, including all legally required workers' compensation insurance and casualty, fire and general liability insurance and customary title insurance. Such policies are listed on <u>Section 3.12</u> of the Seller Disclosure Letter and any reduction in the coverage of such policies during the 2019 calendar year is reflected thereon. To each Seller's Knowledge, there is no claim pending under any insurance policy or bond to which a Seller is a party or under which any of its assets, employees, officers or directors is or was a named insured or otherwise the beneficiary of coverage thereunder as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds. All premiums due and payable under all such policies and bonds have been paid, and each Seller and its Affiliates are otherwise in compliance with the terms of such policies and bonds in all material respects and all such policies are in full force and effect. No insurance carrier has threatened in writing termination of, or premium increase outside the Ordinary Course of Business with respect to, any such policies.

3.13   <u>Litigation</u>. Except as set forth in <u>Section 3.13</u> of the Seller Disclosure Letter, there is no action, suit, proceeding, claim, charge, arbitration, or investigation pending or, to each Seller's Knowledge, threatened against a Seller, its properties, or any of its officers, directors or employees in their capacities as officers, directors or employees of any Seller, in each case by or before any Governmental Authority which relates to the Purchased Assets. There are no judgments, orders or decrees outstanding against a Seller. <u>Section 3.13</u> of the Seller Disclosure Letter also lists each lawsuit, administrative charge, action or proceeding, by or before any Governmental Authority against a Seller or to which a Seller has been a party which relates to the Purchased Assets, in each case at any time during the last three (3) years.

3.14   <u>Environmental Matters</u>.

(a)   Each Seller and, to each Seller's Knowledge, the landlords under the Real Property Leases and the sellers under the Takedown Contracts, (i) have obtained all Permits, licenses, letters, approvals, and certificates that are required under any Environmental Law and (ii) is and has at all times been in compliance with all Environmental Laws including (A) the terms and conditions relating to obtaining and maintaining all Permits, licenses, letters, approvals, and certificates issued pursuant to any Environmental Law; (B) the notice, record keeping and reporting requirements thereunder; (C) all Applicable Laws, writs, orders, judgments, injunctions, governmental

communications, decrees, information requests or demands issued pursuant to, or arising thereunder; and (D) all requirements relating to the Release of Hazardous Substances and site development and operation.

(b)     To each Seller's Knowledge, except as disclosed in Section 3.14(b) of the Seller Disclosure Letter, (i) the Real Property is not in, nor has it been or is it currently under investigation for, violation of any Environmental Law; (ii) the Real Property has not been subject to a deposit of any Hazardous Substance; (iii) no Seller nor any third party has released, used, generated, manufactured, stored, managed, utilized, or disposed in, at, on, or under the Real Property or any off-site location any Hazardous Substance; (iv) there is not now in, on, or under the Real Property any underground or above ground storage tanks or surface impoundments, underground storage vaults or areas, any asbestos containing materials, or any polychlorinated biphenyls used in hydraulic oils, electrical transformers, or other equipment; (v) no threatened or endangered species or protected natural habitat, flora or fauna on the Real Property nor any areas of any lot located therein (or to be located therein) designated as wetlands or otherwise subject to the United States Army Corps of Engineers' Section 404 permit requirements; (vi) there are no wells, drilling holes, wellheads, or underground storage tanks located on or under the Real Property; and (vii) the Real Property, nor any portion thereof has been used as a landfill, waste disposal site (including construction waste), or burial site.

(c)     There is no (and to each Seller's Knowledge, there is no basis for any) Environmental Claim pending or, to each Seller's Knowledge, threatened, anticipated, or contemplated as of the date of this Agreement against a Seller or, to each Seller's Knowledge, the landlords under the Real Property Leases, the sellers under the Takedown Contracts, or under any law or regulation with respect to any of the Real Property or Purchased Assets.

(d)     No Seller nor, to each Seller's Knowledge, the landlords under the Real Property Leases, the sellers under the Takedown Contracts have installed, used, generated, treated, disposed of or arranged for the disposal of any Hazardous Substance in a manner so as to create any liability under any Environmental Law.

(e)     Seller has delivered to Buyer, to the extent in Seller's possession or control, true, correct and complete copies of all environmental audits, environmental compliance, environmental site assessments (including Phase I and Phase II environmental site assessments), occupational health studies, wetlands jurisdictional delineations, reports and investigations of which it is aware relating in any way or relative to the environmental, geotechnical, or physical condition of any of the Real Property or relating to compliance with Environmental Law by a Seller, including all written communications (or a summary of any verbal communication) between Seller and any Governmental Authority or third parties relating to or affecting to the Real Property, all of which are further set forth in Section 3.14(e) of the Seller Disclosure Letter.

(f)     No Seller is a party to any contract that requires such Seller to take any action or incur any expenses to remedy any non-compliance with any Environmental Law.

3.15   <u>Employee Benefit Plans</u>.

(a)   <u>Section 3.15(a)</u> of the Seller Disclosure Letter sets forth a complete and accurate list as of the date of this Agreement of all Employee Benefit Plans currently maintained, contributed to, or agreed to, by any Seller or any of its ERISA Affiliates.

(b)   Each Employee Benefit Plan has been maintained and administered in accordance with ERISA, the Tax Code, and all other Applicable Laws and the regulations thereunder and in accordance with its terms.  With respect to each Employee Benefit Plan, Seller has provided to Buyer a complete and accurate copy of (i) the plan document for such Employee Benefit Plan (where no text exists, a written summary has been provided), (ii) the three most recent annual reports (Form 5500) filed with the IRS, (iii) each trust agreement, group annuity contract, service agreement, and summary plan description, summary of material modifications, if any, and amendments thereto relating to such Employee Benefit Plan, (iv) the most recent determination, advisory or opinion letter received from the IRS (as applicable), (v) the annual actuarial valuations and reports and annual funding notices for the three most recently completed plan years, and (vi) all rulings, opinions and correspondence issued by the IRS or other Governmental Authority for any Employee Benefit Plan.

(c)   All contributions or premiums with respect to the Employee Benefit Plans (including, without limitation, all employer contributions, employee salary reduction contributions and other payments (other than claims)) that are due and payable by a Seller on or before the Closing Date have been timely paid or accrued consistent with Applicable Law, and to the extent not presently payable, applicable reserves have been established for payment and properly accrued in accordance with GAAP.

(d)   With respect to each Employee Benefit Plan (i) there has been no prohibited transaction within the meaning of Section 406 of ERISA and Tax Code Section 4975 (which is not otherwise exempt); (ii) no fiduciary within the meaning of Section 3(21) of ERISA has breached any fiduciary duty imposed under Title I of ERISA; (iii) there have been no other breaches or violations of any Applicable Law with respect to any Employee Benefit Plan that could directly or indirectly subject to a Seller or any Employee Benefit Plan to any taxes, penalties or other liabilities (including any liability arising from any indemnification agreement or policy).

(e)   No Seller nor any of its ERISA Affiliates has maintained, contributed to or been obligated to contribute to (i) a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA); (ii) a "multiple employer plan" (as defined in Section 4063 of ERISA) or (iii) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

(f)   With respect to each Employee Benefit Plan that is subject to Section 412 of the Tax Code or Title IV of ERISA, and any such plan of any Seller or any of its ERISA Affiliates ("<u>Title IV Plan</u>"): (1) no Seller nor any ERISA Affiliates has incurred any withdrawal liability under Title IV of ERISA; (2) no Seller nor any ERISA Affiliates has filed a notice of intent to terminate and the Pension Benefit Guaranty Corporation has

not initiated any action to terminate under Section 4042 of ERISA, or appoint a trustee to administer, any Title IV Plan and no condition exists that could reasonably be expected to present a risk that such proceeding be initiated; (3) each Seller and any ERISA Affiliates has paid all amounts due to the Pension Benefit Guaranty Corporation pursuant to Section 4007 of ERISA; (4) each Seller and any ERISA Affiliates has satisfied the minimum funding requirements of Section 302 of ERISA or Section 412 of the Code, or has applied for or obtained a waiver from the IRS of any minimum funding requirement that is still in force; (5) there has been no determination that any Title IV Plan is, or is expected to be, in "at risk" status, as defined in Section 303 of ERISA or Section 430 of the Code, and no Title IV Plan is subject to any limitations under Section 436 of the Code; (6) no Seller nor any ERISA Affiliates has been required to file information pursuant to Section 4010 of ERISA; (7) no "reportable event", as defined in Section 4043 of ERISA, has occurred or is reasonably expected to occur, including as a result of the transactions contemplated by this Agreement; (8) the actuarial reports and valuations fairly present the financial condition and the results of operations of each Title IV Plan, the funding method used in connection with such Title IV Plan is acceptable under ERISA and the actuarial assumptions are, in the aggregate, reasonable; and (9) since the last valuation date for each Title IV Plan, no event has occurred or circumstance exists that would increase the amount of benefits under any such Title IV Plan that would cause the excess of Plan assets over benefit liabilities, as defined in Section 4001 of ERISA, to decrease, or the amount by which benefit liabilities exceed assets to increase.

(g)     Except as set forth in Section 3.15(g) of the Seller Disclosure Letter, no Seller is a party to any oral or written compensatory agreement or understanding with any director, executive officer or other employee, or consultant of such Seller (i) the benefits of which are contingent, or the terms of which are materially altered, upon the occurrence of a transaction involving such Seller of the nature of any of the transactions contemplated by this Agreement, (ii) providing for employment that is not subject to termination by such Seller on notice of 30 days or less, (iii) providing severance benefits after the termination of employment of such director, executive officer, employee or consultant, or (iv) the benefits of which shall be increased, or the vesting or payment of the benefits of which shall be accelerated, by the occurrence of any of the transactions contemplated by this Agreement (either alone or in combination with any other action) or the value of any of the benefits of which shall be calculated on the basis of any of the transactions contemplated by this Agreement, except as provided in this Agreement.

(h)     No Seller has any existing obligations and there have been no oral or written representations or promises to provide retiree medical or other welfare benefits to any employee, former employee or beneficiaries or dependents of employees, former employees, except as required by Applicable Law.

(i)     There is no claim, suit, action, proceeding or investigation pending, or to the Knowledge of any Seller, threatened against such Seller with respect to any Employee Benefit Plan or against any Employee Benefit Plan, except for routine claims for benefits in the Ordinary Course of Business.

(j)     No Seller has announced any plan or commitment, whether legally binding or not, to create an additional Employee Benefit Plan or amend or modify any existing Employee Benefit Plan except as may be required by Applicable Law.

(k)     Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1) of the Tax Code) that is subject to Section 409A of the Tax Code has since (i) January 1, 2007 (or such later date as Section 409A of the Tax Code first applied to such Employee Benefit Plan), been maintained and operated in good faith compliance with Section 409A of the Tax Code and Notice 2005-1 and (ii) January 1, 2011 (or such later date as Section 409A of the Tax Code first applied to such Employee Benefit Plan), been in documentary and operational compliance with Section 409A of the Tax Code. No Employee Benefit Plan is subject to Section 457A of the Tax Code.

(l)     All Employee Benefit Plans that are intended to be qualified under Section 401(a) of the Tax Code have received opinion, advisory or determination letters from the IRS to the effect that such Employee Benefit Plans are qualified and the plans and trusts related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Tax Code, no such determination letters have been revoked and revocation has not been threatened, and no such Employee Benefit Plan has been amended or operated since the date of its most recent determination letter or application therefor in any respect, and no act or omission has occurred, that would reasonably be expected to adversely affect its qualification or materially increase its cost to a Seller.

(m)    Each Seller has complied in all material respects with the continuation coverage provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 and any applicable state laws mandating welfare benefit continuation coverage for employees (collectively, "COBRA"). Section 3.15(m) of the Seller Disclosure Letter sets forth a complete list of any person who is receiving continuation coverage under COBRA as of the date hereof, and Seller will supplement such list to be complete and accurate as of the Effective Time.

(n)     There are no surrender charges, penalties, or other costs or fees that would be imposed by any Person against a Seller, Employee Benefit Plan, or any other Person, including an Employee Benefit Plan participant or beneficiary, as a result of the hypothetical liquidation as of the Closing Date of any insurance, annuity, or investment contracts or any other similar investment held by any Employee Benefit Plan.

3.16    Compliance with Law.

(a)     Each Seller has complied in all material respects, and is now and at the Closing Date will be in material compliance, with all Applicable Laws applicable to such Seller, the Business, the Purchased Assets or the Assumed Liabilities.

(b)     Each Seller holds all Permits that are necessary for such Seller to conduct the Business as presently conducted without any violation of Applicable Laws, and all such Permits held by such Seller are in full force and effect. Since January 1, 2018 (or

earlier, with respect to any material notice or communication that remains unresolved), no Seller has received any notice or other communication from any Governmental Authority that alleges (i) any actual or possible violation of Applicable Laws or any Permit or any failure to comply with any term or requirement of any Permit, or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Permit.

(c)     To each Seller's Knowledge, neither such Seller, nor any officer, director or employee of such Seller, nor any agent or representative of such Seller, acting in such capacity, has (i) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; (ii) directly or indirectly violated or taken any act in furtherance of violating any provision of any Applicable Laws relating to anti-bribery or anti-corruption (collectively, the "Anti-Corruption Laws"); or (iii) made any other payment or provided anything of value to anyone in violation of Applicable Laws. In addition, without limiting the foregoing, each Seller: (A) has maintained its books and records in a manner that, in reasonable detail, accurately and fairly reflects the transactions and disposition of its assets; (B) has not established or maintained any material fund or asset that has not been recorded in its books and records; and (C) has maintained a system of internal accounting controls and procedures sufficient to provide reasonable assurance of compliance with the Anti-Corruption Laws and other Applicable Laws.

3.17    Employee and Labor Matters.

(a)     Section 3.17(a) of the Seller Disclosure Letter lists for each current employee of each Seller, such employee's (i) name, (ii) job title, (iii) location of employment, (iv) employing entity, (v) annual base compensation or regular hourly rate of pay, (vi) bonus opportunity, (vii) status as exempt or non-exempt for wage and hour purposes, (viii) status as full-time, part-time, and/or temporary, (ix) current or anticipated leave status and anticipated return to work date (if applicable, and excluding any scheduled paid time off to be taken in the Ordinary Course of Business), (x) total compensation paid for prior calendar year, (xi) accrued and unused vacation, sick leave and other paid time off, (xii) payment due such employee regarding accrued and unused vacation, sick leave and other paid time off as of Closing, and (xiii) a description of any other accrued and unpaid compensation.

(b)     Each Seller has complied in all material respects, and is now and at the Closing Date will be in material compliance, with all Applicable Laws relating to employment, including laws relating to discrimination, hours of work, the payment of wages or overtime wages, occupational health and safety, workers' compensation, collective bargaining, equal pay or treatment, parental or other leave and pay, immigration control, information and data privacy and security, and the withholding and payment of social security and other Taxes.  There are no complaints, demands, lawsuits, administrative charges, investigations, or other proceedings pending, or to each Seller's Knowledge, threatened against such Seller brought by or on behalf of any current or former applicant for employment, employee, independent contractor, or any class of the foregoing, relating to any such law or regulation, or alleging breach of any express or

implied contract of employment, of any law or regulation governing employment or termination thereof, or of any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship.

(c)     There are no pending or, to the Knowledge of each Seller, threatened investigations, audits, complaints, administrative charges or other proceedings against such Seller by or before any Governmental Authority respecting or involving any current or former applicant for employment, any employee, independent contractor, or any class of the foregoing.

(d)     Each current employee of each Seller has completed and such Seller has retained an Immigration and Naturalization Service Form I-9 in accordance with Applicable Laws.  No current employee of a Seller is an alien who is authorized to work in the United States in non-immigrant status (but there is one employee who has permanent resident status).  For each employee whose social security number (or purported social security number) or similar information has appeared on any notification identifying an issue, potential issue, or discrepancy with regard to the employee's authorization to work, such employee or such Seller has resolved in accordance with Applicable Law each discrepancy or non-compliance with Applicable Law with respect to such social security number (or, if applicable, such purported social security number) or other discrepancy regarding work authorization.

(e)     Except with respect to any accrued and unused vacation, sick leave or other paid time off for Transferred Employees to be transferred as provided in Section 6.6(d), each Seller has paid in full to all current and former employees of such Seller all wages, salaries, bonuses, vacation, sick leave and other paid time off, and commissions due and payable to such Seller's employees.

(f)     Any individual who has performed or is performing services for a Seller who has been classified as an independent contractor, as an employee of some other entity whose services are leased to such Seller, or as any other non-employee category, has been or is correctly so classified and has not been or is not in fact a common law employee of such Seller.

(g)     No employee of a Seller is covered by any collective bargaining agreement, and no collective bargaining agreement is being negotiated by a Seller.  No Seller is the subject of any proceeding asserting that such Seller has committed an unfair labor practice or is seeking to compel it to bargain with any labor union or labor organization.  There are no pending or, to each Seller's Knowledge, threatened labor strikes, disputes, walkouts, work stoppages, slow-downs or lockouts involving Seller, and there have not been any such actions during the past five (5) years.  To each Seller's Knowledge, no union organizing campaign or activity is in progress with respect to any employees of such Seller, and no question concerning representation exists respecting such employees.

(h)     To each Seller's Knowledge, no current employee has given notice to such Seller of his or her intent to terminate employment with such Seller.

(i)     The employment relationship between a Seller and each current employee is "employment  at will."

(j)     There are no workers' compensation claims pending against a Seller, nor is any Seller, to such Seller's Knowledge, aware of any facts that would give rise to such claim.

(k)     Except as disclosed in Section 3.17(a) of the Seller Disclosure Letter, no current employee is receiving short or long-term disability benefits or is on a leave of absence.

(l)     No Seller is engaged in any employee layoff or plant closing activities within the last three years that triggered the application of or violated (or would, together with the transactions contemplated by this Agreement, trigger the application of or violate) the WARN Act or any similar state or local mass layoff statute, rule or regulation.

(m)     No Seller is a government contractor or subcontractor with any affirmative action obligations  under Applicable Law.

3.18     Related-Party Transactions.   Except (i) for the purchase of real property from Affiliates of Seller, D. Erickson, or R. Erickson, which purchase(s) have been disclosed in the Data Room, or (ii) as otherwise disclosed in Section 3.18 of the Seller Disclosure Letter, no director or officer of a Seller or any of its Affiliates (regardless of the capacity of such Person, including as an individual or trustee) (a) has been involved in any business arrangement or relationship (including as a party to a contract) with another Seller or the Shareholders at any time since January 1, 2017 (other than as a director, an employee or an independent contractor providing services to such Seller or the Shareholders); (b) owns, licenses or leases any material asset used in the business of such Seller; or (c) owns, directly or indirectly, any interest in any Person that competes with such Seller.   None of such arrangements are necessary for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and the termination of such arrangements.

3.19     Business Collateral.   Section 3.19 of the Seller Disclosure Letter lists each letter of credit, escrowed funds, guarantee, surety bond or other collateral given by or on behalf of a Seller (the "Business Collateral").   Each item of Business Collateral was entered into in the Ordinary Course of Business and relates to the Purchased Assets.   None of the Business Collateral has been drawn against.

3.20     Home Warranty Obligations.

(a)     Each Housing Unit sold by a Seller and any other product constructed, manufactured, sold, leased or delivered by such Seller is and was at all times when such actions occurred in conformance with all applicable contractual obligations and all applicable warranties, whether express, implied or imposed by contract or statute (collectively, the "Home Warranty Obligations").

(b)      Except as set forth in Section 3.20(b) of the Seller Disclosure Letter where certain extended customer warranties are described, Section 3.20(b) of the Seller Disclosure Letter also contains copies of each Seller's standard terms and conditions of sale (including applicable guarantee, warranty and indemnity provisions), and no Housing Unit or other product manufactured, sold, leased or delivered by a Seller is subject to any guarantee, warranty or other indemnity beyond such applicable standard terms and conditions of sale and lease.  Seller has provided a true and correct list of each customer to whom each Seller has outstanding Home Warranty Obligations.

(c)      Section 3.20(c) of the Seller Disclosure Letter sets forth a true, correct and complete summary of each Seller's historical warranty experience on an annualized basis. Except as set forth in Section 3.20(c) of the Seller Disclosure Letter, no other Home Warranty Obligations exist or remain outstanding.

3.21     Covenants, Conditions and Restrictions.  All Housing Units sold by or subject to a Retail Sales Contract with a Seller or otherwise constructed or in the process of construction on the Real Property conform with the requirements of any applicable public or private covenants, conditions, restrictions, requirements and declarations (the "CCRs") and the building plans for such Housing Units have received all requisite approvals required pursuant to the CCRs; true, correct and complete copies of any and all approvals and applications and plans and specifications submitted in connection therewith of which have been delivered by Seller to Buyer.  No Seller has received notice of, nor to each Seller's Knowledge is there, any pending, anticipated, contemplated or threatened violation of any CCRs.   Section 3.21 of the Seller Disclosure Letter sets forth any special designation or status that has been given to any Seller under any CCRs in its capacity as a home builder or developer (e.g., a "Builder", "Developer" or similar term), to the extent that such Seller's designation or status as such is not expressly set forth in the recorded CCRs.

3.22     Retail Sales Contracts.  Section 3.22 of the Seller Disclosure Letter lists all of the retail sales agreements each Seller has entered into concerning the sale and delivery of Housing Units within the Real Property which have not yet closed (the "Retail Sales Contracts"), the earnest money deposits made pursuant thereto, the commissions (brokerage or other) due in connection therewith, the sales price thereunder (including all upgrades, incentives, credits etc.) and the anticipated closing date thereunder.  Each of the Retail Sales Contracts complies with Applicable Laws and is valid, binding and in full force and effect, is free of default and is not void, voidable or subject to cancellation or rescission (other than pursuant to the customary contingencies set forth in such Retail Sales Contracts).  True and complete copies of the Retail Sales Contracts have been made available to Buyer.  All earnest money deposits received by a Seller for Housing Units have been received and held by such Seller in accordance with Applicable Laws and the terms of each applicable Retail Sales Contract and no such earnest money deposits have been escrowed. No reservation or other deposits have been accepted. The amount of all such earnest money deposits has been fully reflected as a liability on the Seller Balance Sheet.

3.23     Homeowners' Associations.  All of the Associations controlled by a Seller, or to such Seller's Knowledge controlled by third parties, are in accordance with Applicable Laws, and have been duly organized and are in good standing under Applicable Laws, and have been

operated and managed by such Seller, or to such Seller's Knowledge by third parties, in accordance with Applicable Laws and all organizational documents applicable thereto, including the Organizational Documents and CCRs applicable to each Association, and declaration of condominium applicable to each such Association.   To each Seller's Knowledge, the homeowners or members of each Association are in material compliance with the Organizational Documents and CCRs applicable to each Association, and declaration of condominium applicable to each such Association.  The books and records of all Associations controlled by each Seller shall be made available to Buyer and shall be delivered to Buyer at Closing.  Section 3.23 of the Seller Disclosure Letter sets forth the financial accounts of each Association controlled by a Seller, the contact information for each Association, and identifies Seller-appointed or representative members to any boards of such Associations.

3.24   No Brokers; Fees.  Except for Builders Advisory Group (the fee for which shall be paid by Buyer at Closing) no Seller nor any Affiliate of a Seller is obligated for the payment of any fees or expenses of any investment banker, broker, finder or similar party in connection with the origin, negotiation or execution of this Agreement or in connection with the transactions contemplated by this Agreement, and Buyer shall not incur any liability, either directly or indirectly, to any such investment banker, broker, finder or similar party as a result of this Agreement, the transactions contemplated by this Agreement or any act or omission of a Seller or any of their respective employees, officers, directors, stockholders, agents or Affiliates.

3.25   Accounts Receivable.  The accounts receivable reflected on each Seller Balance Sheet and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by a Seller involving the sale of goods or the rendering of services in the Ordinary Course of Business consistent with past practice; (b) constitute only valid, undisputed claims of each Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the Ordinary Course of Business consistent with past practice.  The reserve for bad debts shown on each Seller Balance Sheet or, with respect to accounts receivable arising after such Seller Balance Sheet date, on the accounting records of the Business have been determined in accordance with GAAP, consistently applied, subject to the accounting principles set forth on Section 3.3 of the Seller Disclosure Letter.

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct:

4.1   Organization, Standing and Power.  Buyer is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation, has all requisite corporate, partnership or limited liability company power and authority (as applicable) to own, lease, and operate its properties and assets and to carry on its business as now being conducted, and is duly qualified to do business and, where applicable as a legal concept, is in good standing as a foreign corporation, partnership or limited liability company (as applicable) in each jurisdiction in which the character of the properties it owns, operates or leases or the nature of its

activities makes such qualification necessary, except for such failures to be so organized, qualified or in good standing, individually or in the aggregate, that would not have a Material Adverse Effect.

       4.2    <u>Authority; No Conflict; Required Filings and Consents</u>.

       (a)    Buyer has all requisite corporate, partnership or limited liability company power and authority (as applicable) to enter into this Agreement and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement by Buyer have been duly authorized by all necessary corporate, partnership or limited liability company action (as applicable) on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against each of them in accordance with its terms, subject to the any applicable bankruptcy, reorganization, insolvency, moratorium, or other similar Applicable Laws affecting creditors' rights generally and principles governing the availability of equitable remedies.

       (b)    The execution and delivery of this Agreement by Buyer does not, and the consummation by Buyer of the transactions contemplated by this Agreement will not, (i) conflict with, or result in any violation or breach of, any provision of the Organizational Documents of Buyer, (ii) conflict with, or result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default (or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any material benefit) under, require a consent or waiver under, constitute a change in control under, require the payment of a penalty under or result in the imposition of any Lien on Buyer's assets under, any of the terms, conditions or provisions of any lease, license, contract or other agreement, instrument or obligation to which Buyer is a party or by which any of them or any of their properties or assets may be bound, or (iii) conflict with or violate any permit, concession, franchise, license, judgment, injunction, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer or any of its or their respective properties or assets, except in the case of clauses (ii) and (iii) of this <u>Section 4.2(b)</u> for any such conflicts, violations, breaches, defaults, terminations, cancellations, accelerations, losses, penalties or Liens, and for any consents or waivers not obtained, that, individually or in the aggregate, would not have a Material Adverse Effect.

       4.3    <u>Litigation</u>. As of the date of this Agreement, there is no lawsuit or other legal proceeding pending or, to the knowledge of Buyer, threatened, against Buyer challenging the transactions contemplated by this Agreement.

       4.4    <u>No Brokers; Fees.</u> No broker, finder, investment banker, valuation firm or any other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer for which Seller will have any liability.

<div align="center">

**ARTICLE V**
**[INTENTIONALLY OMITTED]**

</div>

<div align="center">Page 40</div>

**ARTICLE VI**
**COVENANTS**

6.1     <u>Preparation of Financial Information</u>.   Seller shall provide such assistance as Buyer and their Affiliates may reasonably request with respect to any financial statements regarding the Business, audits of the Business, any private or public debt or equity financings and any public company securities filings or compliance, including providing access to books and records, auditor's work papers and other documents relating to the Business pre-Closing, providing access to personnel, providing consents or waivers of conflicts to allow auditors to work with Buyer and providing similar cooperation.

6.2     <u>Actions Post-Closing</u>.

(a)     Subject to the terms hereof, each Seller and Buyer shall each use its commercially reasonable efforts to:

(i)     take, or cause to be taken, all actions, and do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to fulfill and cause to be satisfied, the conditions in <u>Article VIII</u> (but with no obligation to waive any such condition) and to consummate and make effective the transactions contemplated hereby as promptly as practicable;

(ii)     as promptly as practicable, make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement and the transactions contemplated hereby required under (A) any applicable federal or state securities laws and (B) any other Applicable Law; and

(iii)     execute or deliver any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

(b)     At or prior to Closing, Seller and Buyer shall give any notices to third parties, and use, and cause their Subsidiaries, as applicable, to use, their commercially reasonable efforts to obtain any third-party consents required in connection with the transactions contemplated by this Agreement that are (i) necessary to consummate the transactions contemplated hereby, (ii) disclosed or required to be disclosed in the Seller Disclosure Letter, or (iii) required to prevent the occurrence of an event that would reasonably be expected to have a Material Adverse Effect or a Material Adverse Effect prior to or after the Effective Time.

6.3     <u>Public Disclosure</u>.   Each Seller acknowledges that Buyer intends to issue a press release (which Seller shall have a reasonable opportunity to review prior to the release thereof) and make public filings that may include this Agreement and/or a summary of its terms, and each Seller consents to any such disclosures (and subsequent disclosures consistent therewith).   No Seller shall make any press release or other public statement regarding this Agreement without the prior consent of Buyer.   Notwithstanding the foregoing, no public disclosure of any kind shall reveal in whole or in part the financial terms of this transaction.

6.4     Confidentiality.  For a period from and after the Closing Date, Seller and Buyer shall maintain in confidence, and each shall cause its agents, representatives and Affiliates to maintain in confidence, and none of them shall use to the detriment or competitive disadvantage of any other party, any information obtained in confidence from any other party, in connection with this Agreement or any of the transactions contemplated hereby and, the confidential, proprietary or other non-public information of Seller relating to the Business.  The foregoing covenants shall not apply (i) with respect to information that is already known to a party or to others not bound by a duty of confidentiality or such information that becomes publicly available through no fault of such party; (ii) to the extent necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the transactions contemplated by this Agreement; (iii) to the extent required under Applicable Law, including reporting the transactions contemplated by this Agreement on Tax Returns and disclosure requirements under the federal securities laws and the rules and regulations issued thereunder; and (iv) with respect to information that is deemed by Seller as no longer being confidential.  If the transactions contemplated by this Agreement are not consummated, each Party shall return or destroy as much of confidential information received from any other party.

6.5     Restrictive Covenants.

(a)     Non-Solicitation; Non-Competition.  To further ensure that Buyer receives the anticipated benefits of acquiring the Business, each Seller agrees throughout the period that begins on the Closing Date and ends on the later to occur of (i) the third (3rd) anniversary of the Closing Date and (ii) the expiration of the Deferred Payments Period (the "Restricted Period"), no Seller nor any Affiliate of a Seller (the "Restricted Parties") will employ or solicit for employment or otherwise attempt to employ any employee of (i) Buyer (so long as the Restricted Parties have actual knowledge that such persons are employees of Buyer) or (ii) any current employee of a Seller who is hired by Buyer or (iii) any person who is or becomes an employee of Buyer at any time during the Restricted Period (so long as the Restricted Parties have actual knowledge that such persons are employees of Buyer).  The prohibitions set forth in this Section 6.5(a) shall (i) not prevent any Seller or its Affiliates from hiring any person who (a) is presented to it by a professional placement agency; (b) contacts a Seller or its Affiliates in response to general advertisements (including postings on LinkedIn or similar websites); (c) contacts a Seller or its Affiliates on his or her own initiative for the purpose of seeking employment in each case without direct or indirect solicitation or encouragement from such Seller or its Affiliates or (d) has been terminated by Buyer prior to commencement of employment discussions with such Seller or its Affiliates.  Each Seller, D. Erickson, and R. Erickson further agree that during the Restricted Period, none of Seller, D. Erickson, or R. Erickson shall participate in a competitive homebuilding operation or business within 100 miles of the geographic markets of each Seller as of the Closing Date, which shall include Columbus, Georgia; Atlanta, Georgia; Macon, Georgia; Dothan, Alabama; and Montgomery, Alabama, unless Buyer has breached any material obligations after the Closing Date and such material breach remains uncured for a period of thirty (30) days after receipt of written notice by Buyer from a Seller.  In the event of such uncured breach, or in the event Seller terminates the Land Purchase Agreement as a result of an uncured breach of the Land Purchase Agreement (as more fully set forth in

Section 34 therein), Seller or D. Erickson and R. Erickson may thereafter compete against Buyer free of any limitations imposed by this Section 6.5(a).

(b)     *Equitable Relief*.  Each Seller specifically acknowledges and agrees that (i) this Section 6.5 any other Ancillary Document are reasonable and necessary to ensure that Buyer receives the expected benefits of acquiring the Business; (ii) Buyer would have refused to enter into this Agreement in the absence of such provisions; and (iii) breach of such provisions will harm Buyer to such an extent that monetary damages alone would be an inadequate remedy and Buyer would not have an adequate remedy at law.  Therefore, in the event of a breach by a Seller of this Section 6.5, and any other Ancillary Document, (A) Buyer (in addition to all other remedies Buyer may have) will be entitled to seek an injunction and other equitable relief (without posting any bond or other security) restraining such Seller from committing or continuing such breach and to enforce specifically this Agreement and its terms and (B) the duration of the Restricted Period will be extended with respect to such Seller beyond its then-scheduled termination date for a period equal to the duration of such breach.

6.6     Employee Matters.

(a)     Seller shall afford Buyer a reasonable opportunity to interview each Seller's employees for prospective employment by Buyer if so requested by Buyer, and shall not attempt to retain in such Seller's employ any such employees whom Buyer desires to hire, or to otherwise interfere with Buyer's discussions with such employees. Buyer shall be entitled (but shall have no obligation) to offer employment to any such person, on terms and conditions established by Buyer, to be effective on the Closing Date.  Seller will furnish to Buyer such information in its personnel files as Buyer may reasonably request in connection with determining whether to offer employment to any person presently employed by such Seller in the Business.  Seller will use its commercially reasonable efforts to assist Buyer in ensuring that all such employees who receive an offer of employment from Buyer accept such offer on the terms and conditions offered by Buyer.  Such efforts by Seller shall include immediately informing Buyer if a Seller learns that any such employee is contemplating declining Buyer's employment offer and encouraging any such employee to accept Buyer's employment offer, as applicable.  Buyer may refrain from offering employment to any person for any reason and nothing in this Agreement will obligate Buyer to continue the employment of any person for any specific period of time after the Closing Date.  Notwithstanding the foregoing, it is acknowledged that Chuck McClure is not an employee of any Seller and is expected to work on behalf of the Shareholders in connection with the ongoing development of residential building lots by the Shareholders post-Closing.

(b)     Effective immediately prior to the Closing Date, each Seller shall terminate the employment of each person who is employed by such Seller in the conduct of the Business and who receives an offer of employment by Buyer effective as of the Closing Date.  Each such person who accepts such employment is (whether effective at or after the Closing) referred to as a "Transferred Employee." Except as set forth in an Employment Agreement or other employment agreement duly executed by the applicable employer, such employment shall be "at will."

(c)     Effective as of Closing, each Seller shall release each Transferred Employee from any non-competition, non-solicitation, or other restrictive covenant that could restrict the Transferred Employees from providing services to Buyer from and after Closing.

(d)     Notwithstanding that each Seller uses a "use it or lose it" vacation policy, no liability accrual will be made prior to Closing for such accrued and unused vacation and employees who become employees of Buyer at Closing shall be authorized to carry such vacation over recognizing that it must be used by June 30, 2020.  In addition, a liability accrual will also be made for any unused sick or personal time.

(e)     Each Seller shall be responsible for all liabilities and obligations relating to or arising out of the employment, engagement, remuneration, or cessation of employment with Seller of the Transferred Employees (and the dependents of such Transferred Employees), including, but not limited to, with respect to all periods prior to and including each such employee's last day of employment with a Seller.  Each Seller shall pay each Transferred Employee all accrued wages, salary, severance benefits, commission (except for ordinary course commissions not yet due or payable with respect to Retail Sales Contracts closing after the Closing, set forth on Section 3.22 of the Seller Disclosure Letter), bonus, and other employee compensation and benefits related to employment with a Seller for all periods through the date of termination of each such employee's employment such Seller, including, but not limited to, all  such liabilities and obligations set forth on Section 3.17(a) of the Seller Disclosure Letter, in a timely fashion and not later than the date such payment is required by law or the provisions of any benefit plan or contract under which such compensation is or becomes duly payable.  In addition, for each Transferred Employee, each Seller shall pay or provide for all Employee Benefit Plans and other employee benefits maintained by such Seller for all periods prior to the termination of each such employee's employment with such Seller, all in accordance with Applicable Law.  In the event of a breach of this Section 6.6(e) by a Seller, and without prejudice to any other right or remedy contained in this Agreement, Buyer may offset any liabilities or obligations owed by such Seller to a Transferred Employee and any related Taxes owed by Buyer as a result of such breach against the Purchase Price.

(f)     Buyer shall cause employee benefits to be made available to each Transferred Employee eligible to participate in accordance with the terms of Buyer's employee benefit plans, as applicable; provided, however, that Buyer may elect to instead continue certain employee welfare benefit plans (as defined in Section 3(1) of ERISA) provided under third party contracts and, in such case, Seller will cooperate to effect the transfer of such third party contracts.  Service with a Seller prior to the Closing Date will generally be recognized as if it had been service with Buyer, as applicable, for purposes of determining eligibility for Buyer's insured medical, dental, life insurance, and other insured welfare benefit plans, and for purposes of determining eligibility and the amount of vacation, sick leave or paid time off under Buyer's vacation, sick leave or paid time off policies (in each case subject to Applicable Laws and the terms of such plans and policies), but will not be recognized for any other purposes under these plans or for any purposes under any of Buyer's other benefit plans, programs, policies, or arrangements.

(g)     Seller and Buyer shall cooperate in good faith to identify any potential plant closing, mass layoff, reduction in force, or other similar event requiring notice pursuant to the WARN Act or any similar state or local regulation, with respect to the employees of the Business in connection with the consummation of the transactions on the Closing Date.  Buyer shall have the opportunity to review and approve any notice or employee communication or other communication provided under this section.  Each Seller shall comply with the notice requirements and all other provisions of the WARN Act and any similar state or local regulation with respect to any event occurring at or prior to the Closing and with respect to any employees of the Business who are not hired by Buyer, whether such event occurs prior, at, or after the Closing, and shall be responsible for all liabilities and obligations in connection therewith, including any claims or demands arising from Buyer's review of each Seller's employees and their decision not to offer employment to an employee, and any severance amounts to which employees may be entitled to under any severance pay plan of Seller in effect on the Closing Date.  Seller shall fully indemnify and hold harmless Buyer and its Affiliates with respect to any liability incurred by Buyer or any of its Affiliates pursuant to the WARN Act in connection with any Transferred Employees.

(h)     For the avoidance of doubt, each Seller shall remain responsible for liabilities, including payment of all wages, salary, commission, bonus, accrued vacation, sick leave and other paid time off, severance, and other employee compensation and benefits for all periods, with respect to employees of a Seller who do not become Transferred Employees, and shall satisfy all obligations imposed by Applicable Law (including COBRA) relating to health and other benefit continuation privileges of any employee or former employee (or dependent of such an employee) of a Seller, whether terminated by such Seller incident to the Closing or otherwise.

(i)     The parties acknowledge and agree that, upon expiration or termination of that certain Employment Agreement by and between Buyer and Amy Allen, subject to any continuing obligations set forth therein, Amy Allen may work as an employee or as a consultant for Seller, D. Erickson, or any Affiliate of Seller or D. Erickson.

(j)     In the event that Seller terminates the Land Purchase Agreement as a result of an uncured breach of the Land Purchase Agreement (as more fully set forth in Section 34 therein), Buyer shall grant to Seller a perpetual, royalty-free, nonexclusive, sublicensable, assignable, and irrevocable license in and to any architectural, building, and engineering designs, drawings, specifications, and plans included among the Intellectual Property purchased by Buyer from Seller pursuant to this Agreement.

6.7     Substitution of Collateral.  All cash security given as Business Collateral will be reflected in the Estimated Closing Book Value Statement and will be conveyed to Buyer at Closing.  If, however, there are any such cash security deposits not currently known to Seller and not reflected as assets in the Estimated Closing Book Value Statement, then Buyer shall use commercially reasonable efforts in consultation with Seller to secure the unconditional release and, as appropriate, return to Seller of any Business Collateral (it being understood that any Business Collateral included as assets in the Estimated Closing Book Value Statement shall be

part of the Purchased Assets to be conveyed to Buyer hereunder and shall not be returned to Seller).

6.8    <u>Name Change</u>.  As soon as practicable, but in any event within ten (10) Business Days after the Closing, Seller will, and, if applicable, will cause each of its Affiliates to (a) amend its Organizational Documents, and take all other actions necessary, to change Seller's name and all names under which it does business to a name that does not include the word "Grayhawk," and that does not otherwise imply any affiliation with Buyer or any of its Affiliates, and (b) give to Buyer a true, correct and complete copy of the filings with the applicable Governmental Authorities showing that such name changes occurred.  Buyer may change its name after the Closing to "Grayhawk Homes" or to otherwise include the word "Grayhawk" in Buyer's name, and Seller will and, if applicable, will cause each of its Affiliates to, execute and deliver any written consent or other documentation that may be required by the Georgia Secretary of State or other Governmental Authority to facilitate such name change by Buyer. Seller will not use a name after the date hereof that includes the word "Grayhawk" or that otherwise implies any affiliation with Buyer or any of its respective Affiliates, including on letterhead or other correspondence, employee business cards, accounts or signage. Notwithstanding any other provision of this <u>Section 6.8</u>, D. Erickson may utilize the word "Grayhawk" for his operations outside of Seller's territory for up to eight (8) months after the Closing Date.

6.9    <u>Further Assurances</u>. Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to this Agreement and the transactions contemplated hereby.

6.10    <u>Bulk Sales Laws</u>. The Parties hereby waive compliance with the provisions  of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

6.11    <u>Insurance</u>.  Seller shall maintain general liability and builder's risk the insurance policies set forth on <u>Section 3.12</u> of the Seller Disclosure Letter for a minimum of twelve (12) months following the Closing Date or, in the alternative, purchase a "tail" policy for such specific coverages.

## ARTICLE VII
## TAX MATTERS

7.1    <u>Property Taxes; Transfer Taxes</u>.

(a)    In the case of real property Taxes, personal property Taxes, and special assessments relating to the Purchased Assets, Seller shall pay, on or prior to the Closing Date, all such taxes and installments of special assessments payable with respect to any year prior to the year of Closing.  Taxes for the year of Closing shall be pro-rated, except to the extent such taxes have been paid prior to Closing by Seller and included in Estimated Book Value.  Real property Taxes and personal property Taxes for the year of

Closing shall be prorated on the following basis: (i) if a Tax bill for the year of Closing is available, then proration shall be based upon the current bill; (ii) if the assessment for the year is available, but not the actual Tax bill, then proration shall be based upon the assessment and the applicable Tax rate for the prior year; (iii) if neither the assessment for the year nor the Tax bill is available, then proration shall be based upon the prior year's Tax bill; (iv) notwithstanding the foregoing clause (iii), if the applicable property subject to a Tax bill is a subdivided lot which was not a subdivided lot for purposes of the prior year's tax bill, proration for such property shall be based on the Taxes for similar subdivided lots in the applicable development; and (v) notwithstanding the foregoing clauses (iii) and (iv), if the applicable property subject to a Tax bill is a subdivided lot on which a residential home or similar structure has been or will be completed during the year of Closing, proration for such property shall be based on the Taxes for similar improved lots in the applicable development.  If Tax statements for any Purchased Assets are sent directly to Seller by a Tax authority or other Governmental Authority after the Closing Date, Seller shall cause such statements to be forwarded promptly to Buyer. Certified municipal non ad valorem liens and pending municipal liens for which work has been substantially completed as of the Closing shall be paid by Seller and any other pending liens shall be assumed by the Buyer, provided that if any such non ad valorem assessment liens relate to special taxing districts for municipal services that are payable in installments, then Seller shall only be responsible for the installment currently payable which shall be prorated in the same manner as Taxes.  At the Closing, the foregoing items shall be prorated and adjusted as indicated.  If, subsequent to the Closing, Taxes for the year of Closing are determined to be higher or lower than as prorated, a reproration and adjustment will be made at the request of Buyer or Seller upon presentation of actual Tax bills, and any payment required as a result of the reproration shall be made within 10 Business Days following  demand therefor.  This provision  shall survive the Closing.

(b)     Seller and Buyer shall share equally all transfer, documentary, conveyancing, or similar Taxes (other than mortgage taxes which shall be paid exclusively by Buyer), charges or expenses (including transfer fees, capital contributions, capital improvement fees and other fees or charges payable under CCRs, whether payable to Associations or otherwise) and all recording fees that may be imposed as a result of the sale and transfer of the Real Property under this Agreement (collectively, "Real Estate Transfer Taxes"), and the transfer of such property will be facilitated by an agent or agents of the Buyer's choosing who is reasonably acceptable to the Seller.  Buyer and Seller shall jointly agree on the valuation of the Real Property to the extent that valuations are needed for purposes of determining the amount of Real Estate Transfer Taxes prior to the Closing.  If a party disagrees with respect to a proposed valuation, the parties shall negotiate in good faith to resolve the issue prior to the Closing.  If payment of Real Estate Transfer Taxes are due prior to any such resolution, payment shall be made based on Seller's valuation and, upon resolution, Seller shall make such corrective filings with the appropriate Governmental Authority and shall pay any additional, and shall be entitled to any refund of, any Real Estate Transfer Taxes resulting from such corrective filings.  Seller shall remain ultimately responsible for the valuation of the Real Property used in the Real Estate Transfer Taxes filings, and shall ensure that such valuation complies with Applicable Laws relating thereto.   For the avoidance of doubt, such valuations are solely for the purposes of determining the amount of Real Estate Transfer

Taxes, and none of Buyer or any of their Affiliates shall be bound by such valuations for any purpose.

(c)     Seller shall pay all sales, use, value-added, business, goods and services, transfer, documentary, conveyancing or similar Taxes, charges or expenses and all recording fees that may be imposed as a result of the sale and transfer of the Business or the Purchased Assets to Buyer under this Agreement, other than the Real Estate Transfer Taxes. Seller will prepare, subject to Buyer's reasonable approval (which approval will not be unreasonably withheld or delayed), and timely file all Tax Returns required to be filed in respect of such Taxes, provided that Buyer may elect to prepare and file any such Tax Returns that are the primary responsibility of Buyer under Applicable Laws. Buyer's preparation of any such Tax Returns will be subject to Seller's reasonable approval, which approval will not be unreasonably withheld or delayed. Seller and Buyer will reasonably cooperate with each other to share information reasonably necessary for the preparation of those Tax Returns and any Tax clearance certificates that either Seller or Buyer may request.

7.2     <u>Income and Franchise Taxes</u>.  Nothing in this Agreement makes a party liable for the income or franchise Taxes of the other party.

7.3     <u>Allocation of Purchase Price</u>.

(a)     Seller and Buyer shall cooperate between the date hereof and the Closing Date to prepare a preliminary, estimated allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets for purposes of Section 1060 of the Tax Code and the Treasury Regulations thereunder, solely for informational purposes pending the preparation of the Allocation Statement.

(b)     As promptly as practicable, but in no event later than 120 days following the date the Purchase Price is finally determined pursuant to <u>Section 2.1</u>, will prepare and deliver to D. Erickson a statement allocating the Purchase Price and the Assumed Liabilities among the Purchased Assets (the "<u>Allocation Statement</u>").  The Allocation Statement will be consistent with the provisions of Section 1060 of the Tax Code and the Treasury Regulations thereunder.  The Allocation Statement will provide that no less than 75% of the Purchase Price shall be allocated to categories that will provide the Seller with long term capital gains treatment.

(c)     Within 30 days after Seller's receipt of the Allocation Statement, Seller shall indicate its concurrence therewith, or propose to Buyer any changes to the Allocation Statement.  Seller's failure to notify Buyer of any objection to the Allocation Statement within 30 days after receipt thereof shall constitute Seller's concurrence therewith.  Seller and Buyer shall negotiate in good faith to resolve any disputes regarding the Allocation Statement.  If Seller and Buyer are unable to resolve any disputes regarding the Allocation Statement within 30 days of Buyer's receipt of such changes, then the dispute shall be submitted to the Neutral Auditor for resolution as soon as practicable, but in any event within 30 days.  The Neutral Auditor shall act as an expert and not as an arbitrator to determine, based solely on the written submissions of

the parties and not by independent investigation, only the specific items under dispute by the parties. The Neutral Auditor shall deliver to Seller and Buyer, as promptly as practicable, but in any case no later than 30 days, a determination of the allocation. All fees and expenses of any the Neutral Auditor hired pursuant to this Section 7.3(c) shall be shared equally.

(d)     Except to the extent required by Applicable Law or a Governmental Authority, including pursuant to a "determination" within the meaning of Section 1313(a) of the Tax Code, Buyer and Seller agree to timely report the transaction contemplated herein for federal income tax purposes on all information returns and supplements thereto required to be filed with the Internal Revenue Service by the parties under Section 1060 of the Tax Code and the Treasury Regulations thereunder in a manner consistent with the Allocation Statement, as so finalized. In furtherance of the foregoing, and without limitation, the parties agree to jointly prepare an IRS Form 8594 consistent with the above allocation procedures and the Allocation Statement, as so finalized, and further agree to file such IRS Form 8594 with their respective Tax Returns for the Tax year which includes the date hereof. No party shall file any Tax Return or take a position with any taxing authority that is inconsistent with the Allocation Statement, as so finalized (except to the extent required by Applicable Law or a Governmental Authority, including pursuant to a "determination" within the meaning of Section 1313(a) of the Tax Code).

## ARTICLE VIII
## CONDITIONS TO CLOSING

8.1     Conditions to Each Party's Obligation to Closing.   The respective obligation of each party to this Agreement to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a)     *No Orders*.   No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any order, stay, decree, judgment, or injunction (preliminary or permanent) or statute, rule, or regulation that is in effect and that has the effect of making the transactions contemplated by this Agreement illegal or otherwise prohibiting consummation of the transactions contemplated by this Agreement.

8.2     Seller Closing Deliverables.   The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following additional conditions by Seller (all in form and substance reasonably acceptable to Buyer), any of which may be waived, in writing, exclusively by Buyer:

(a)     Seller shall have delivered evidence acceptable to Buyer to show it has:

(i)     made all required liability accruals to bring the Seller Financial Statements in accordance with GAAP;

(ii)     used all cash to net all related party accounts receivable and accounts payable against equity;

(iii)      disposed of the vehicle assets and corresponding liabilities and net all gain or loss on such disposition against equity;

(iv)      net all related party assets and liabilities against equity;

(b)      Seller shall have delivered evidence acceptable to Buyer to evidence each such Seller has transferred, or caused to be transferred, to Buyer all Real Property Assets and Assumed Liabilities, less the lots and real property assets subject to the Land Purchase Agreement for later purchase by Buyer;

(c)      the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties are specifically made as of a particular date, in which case such representations and warranties shall be true and correct in all material respects as of such date);

(d)      Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date;

(e)      there shall be no general moratorium imposed, announced or threatened by any Governmental Authority that would result in any Governmental Authority denying permits necessary for the construction, use or occupancy of the Real Property for single-family dwellings;

(f)      Buyer shall have received a certificate signed on behalf of Seller confirming the satisfaction of the conditions set forth in Sections 8.2(c), 8.2(d), and 8.2(e) dated as of the Closing Date;

(g)      a certificate of the secretary of each Seller certifying as to (A) the resolutions of the board of directors of each Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby; and (B) the names and signatures of the officers of each Seller authorized to sign this Agreement and the documents to be delivered hereunder the board of directors of each Seller shall have consented to the transactions contemplated in this Agreement;

(h)      copies of all consents, approvals, waivers and authorizations referred to in Section 3.2 of the Seller Disclosure Letter, to include each counterparty's consent to the consummation of the transactions contemplated by this Agreement and such other provisions as may be reasonably necessary or desirable in connection to the assignment of such contracts;

(i)      Buyer shall have received, at Buyer's expense, a title insurance policy or an irrevocable commitment to issue a title insurance policy for each parcel of Owned Real Property or Takedown Property (together with a leasehold title insurance policy or an irrevocable title commitment to issue a leasehold title insurance policy for each parcel of Leased Real Property) reasonably acceptable to Buyer, which shall not disclose any Lien (other than Permitted Liens) or other matter adversely affecting the use or value of

such real property and be an ALTA broad-form extended coverage policy and include endorsements reasonably requested by Buyer;

        (j)     a bill of sale and assignment and assumption agreement, in the form of Exhibit B (the "Bill of Sale and Assumption Agreement"), duly executed by Seller, which Bill of Sale and Assumption Agreement assigns, transfers, and conveys to Buyer (A) any improvements and equipment and similar property located on or related to the Real Property; (B) water, sewer, transportation, school and all other impact fee credits or reservations of Seller or associated with the Real Property; (C) all developer or declarant rights of Seller with respect to the Real Property, if any (and assignments of any Permitted Liens as are requested by Buyer); (D) all Permits and other rights, benefits and intangible property owned by Seller related to all or any portion of the Real Property, recognizing that such Permits will not be reissued to Buyer; (E) the Takedown Contracts, subject only to Permitted Liens, together with the written consent of any entity having a right to consent to such assignment; and (F) each Assumed Contract; provided, however, Buyer may elect by notice to Seller to require Seller to provide a separate assignment with respect to any of the Purchased Assets or Assumed Liabilities;

        (k)     a trademark assignment agreement in the form attached hereto as Exhibit C-1 (the "Trademark Assignment Agreement"), duly executed by each Seller;

        (l)     a domain name assignment agreement in the form attached hereto as Exhibit C-2 (the "Domain Name Assignment Agreement"), duly executed by each Seller;

        (m)     a copyright assignment agreement in the form attached hereto as Exhibit C-3 (the "Copyright Assignment Agreement"), duly executed by each Seller;

        (n)     an employment agreement in the form attached hereto as Exhibit D (the "Employment Agreement"), duly executed by D. Erickson;

        (o)     a consulting agreement in the form attached hereto as Exhibit E (the "Consulting Agreement"), duly executed by D. Erickson;

        (p)     a transition services agreement as attached hereto as Exhibit F (the "TSA"), duly executed by each Seller and the Shareholders;

        (q)     an affidavit of each Seller regarding liens, judgments, residence or jurisdiction of formation, tax liens, bankruptcies, parties in possession, survey (to the extent Seller has surveys of such Real Property) and mechanics' or materialmens' liens, and other matters affecting title to the Real Property and/or as may be reasonably required by the title company to satisfy the applicable "Schedule B-I" requirements and to delete the so-called "standard exceptions" from the title insurance policies described in Section 8.2(i);

        (r)     an executed IRS Form W-9 (or other applicable tax form) from each Seller;

(s)     a non-foreign affidavit, dated the Closing Date and executed by each Seller, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Tax Code and otherwise reasonably satisfactory to Buyer, accurately stating that Seller is not a "foreign person" or United States real property holding corporation (as defined in Section 897(c)(2) of the Tax Code) during the applicable period specified in Section 897(c)(1)(A)(ii) of the Tax Code;

(t)     a real estate closing statement;

(u)     a special warranty deed conveying to Buyer the Owned Real Property subject only to Permitted Liens, in the form attached hereto as Exhibit G-1 (Georgia) or Exhibit G-2 (Alabama);

(v)     the Land Purchase Agreement contemplated by Section 1.1(b) hereof, substantially in the form attached hereto as Exhibit H (the "Land Purchase Agreement"), duly executed by D. Erickson, R. Erickson, and the other parties set forth in Section 8.2(v) of the Seller Disclosure Letter;

(w)     the Brokerage Services Agreement substantially in the form attached hereto as Exhibit I (the "Brokerage Services Agreement"), duly executed by Rose Ann Erickson Realty, LLC;

(x)     all documents and instruments which may be required of each Seller under Applicable Law, including any revenue or tax certificates or statements, or any affidavits, certifications or statements relating to the environmental condition of any of the Real Property;

(y)     assignments of each Real Property Lease or Third Party Lease, in form and substance reasonably satisfactory to Buyer, duly executed by each Seller and, if required in order to complete the assignment, by the landlord or tenant of each such Real Property Lease or Third Party Lease; and

(z)     all other documents as Buyer or the title company may reasonably request to facilitate the consummation of the transactions contemplated by this Agreement, including customary closing certificates and curative instruments or documents necessary to satisfy the requirements and delete the standard exceptions set forth in the title commitments.

8.3     Additional Conditions to Obligation of Seller.  The obligation of each Seller to effect the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following additional conditions, each of which may be waived, in writing, exclusively by Seller:

(a)     *Representations and Warranties*.  The representations and warranties of ASH and Buyer set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties are specifically made as of a particular date, in which case such representations and warranties shall be true and correct in all

material respects as of such date). Solely for purposes of this Section 8.3(a), any representation or warranty of ASH or Buyer that is qualified by a Materiality Qualifier will be read as if such Materiality Qualifier is not present.

(b)     *Performance of Obligations of ASH and Buyer*.  ASH and Buyer shall have performed in all material respects all obligations required to be performed by them under this Agreement on or prior to the Closing Date.

(c)     *Officer's Certificate*.  Seller shall have received a certificate signed on behalf of Buyer by an authorized officer of Buyer, dated the Closing Date, confirming Buyer's satisfaction of the conditions set forth in Sections 8.3(a) and 8.3(b).

(d)     *Note*.  Buyer shall have delivered to Seller the Note executed on behalf of Buyer and American Southern Homes, LLC, in each case, by an authorized officer, dated as of the Closing Date.

(e)     *Other Closing Deliveries of Buyer*.  Buyer shall have delivered to Seller each of the other items expressly contemplated to be so delivered by this Agreement, including any applicable counterparts to the Ancillary Agreements and any of the other closing instruments requiring counter-execution by Buyer.

### ARTICLE IX
### [INTENTIONALLY OMITTED]

### ARTICLE X
### INDEMNIFICATION

10.1   Indemnification by Seller.  Subject to the terms and conditions of this Article X, Seller, jointly and severally, shall indemnify and defend ASH and Buyer in respect of, hold ASH and Buyer harmless against, and pay and reimburse ASH and Buyer for, any and all liabilities, damages, losses, claims, demands, fines, fees, interest, penalties, assessments, costs, and expenses, including reasonable attorneys' fees and expenses (but in no event punitive damages, except to the extent relating to a third-party claim) (collectively, "Damages") incurred or suffered by ASH, Buyer, or any director, officer, shareholder, member, employee, agent or Affiliate of ASH or Buyer resulting from, related to, or arising out of:

(a)     any breach of a representation or warranty of Seller contained in this Agreement or in any certificate delivered pursuant hereto;

(b)     any failure by Seller to perform any covenant or agreement contained in this Agreement;

(c)     any Excluded Liability, and any other liability or obligation of Seller that is not an Assumed Liability (including any such liability or obligation of Seller that becomes a liability or obligation of Buyer under any common-law doctrine of de-facto merger or any doctrine of successor liability or as a result of any failure of the parties in connection with the transactions contemplated hereby to comply fully with any applicable bulk-transfer laws);

(d)      any matter listed on Seller's Disclosure Letter.

10.2     <u>Indemnification by Buyer</u>.  Subject to the terms and conditions of this <u>Article X</u>, Buyer shall indemnify Seller in respect of, hold Seller harmless against, and pay and reimburse Seller for, any and all Damages incurred or suffered by Seller, or any director, officer, shareholder, member, employee, agent or Affiliate of Seller resulting from, related to, or arising out of:

(a)      any breach of a representation or warranty of Buyer or Buyer contained in this Agreement or in any certificate delivered pursuant hereto;

(b)      any failure by Buyer or Buyer to perform any covenant or agreement contained in this Agreement; or

(c)      the failure by Buyer to satisfy when due any Assumed Liability.

10.3     <u>Claims for Indemnification</u>.

(a)      *Procedure for Claims*.  A Person entitled to indemnification under this <u>Article X</u> (an "<u>Indemnified Party</u>") wishing to assert a claim for indemnification under this <u>Article X</u> (a "<u>Claim</u>") shall deliver to the Person from whom indemnification is sought (the "<u>Indemnifying Party</u>") a written notice (a "<u>Claim Notice</u>") that (i) states in reasonable detail the facts constituting the basis for the Damages claimed, (ii) states the amount (the "<u>Claim Amount</u>") of any Damages claimed by the Indemnified Party, to the extent then known, (iii) states that the Indemnified Party is entitled to indemnification under this <u>Article X</u> and set forth a reasonable explanation of the basis therefor, and (iv) includes a demand for payment in the amount of such Damages.  Within 30 days after receipt of a Claim Notice, the Indemnifying Party shall deliver to the Indemnified Party a written response in which the Indemnifying Party shall (A) agree that the Indemnified Party is entitled to receive all of the Claim Amount, (B) agree that the Indemnified Party is entitled to receive part, but not all, of the Claim Amount, or (C) contest that the Indemnified Party is entitled to receive any of the Claim Amount.  If the Indemnifying Party in such response contests the payment of all or part of the Claim Amount, the Indemnifying Party and the Indemnified Party shall use good faith efforts to resolve such dispute.  If such dispute is not resolved within 60 days following the delivery by the Indemnifying Party of such response, the Indemnifying Party and the Indemnified Party shall each have the right to submit such dispute to a court of competent jurisdiction in accordance with the provisions of <u>Section 11.10</u>.

(b)      *Third-Party Claims*.  All claims for indemnification made under this Agreement resulting from, related to, or arising out of a third-party claim shall be subject to the following additional procedures and provisions.  An Indemnified Party shall give prompt written notification to the Indemnifying Party of the commencement of any action, suit, or proceeding relating to a third-party claim for which indemnification may be sought or, if earlier, upon the assertion of any such claim or demand by a third party.  Such notification shall (i) state in reasonable detail (to the extent known by the Indemnified Party) the facts constituting the basis for such third-party claim, (ii) state the

Page 54

sections of this Agreement with respect to which indemnification is being claimed for such Damages and that the Indemnified Party if entitled to indemnification under this Article X, and (iii) state the amount of the Damage being claimed.  Within 30 days after receipt of such notification, the Indemnifying Party may, upon delivery of written notice thereof to the Indemnified Party, assume control of the defense of such action, suit, proceeding, or claim with counsel reasonably satisfactory to the Indemnified Party; provided that the Indemnifying Party may not assume control of the defense of any action, suit, proceeding, or claim that seeks non-monetary relief or criminal penalties.  If the Indemnifying Party does not assume control of such defense, the Indemnified Party shall control such defense.  The party not controlling such defense may participate therein at its own expense; provided that if the Indemnifying Party assumes control of such defense and the Indemnified Party reasonably concludes, based on advice from counsel, that the Indemnifying Party and the Indemnified Party have conflicting interests with respect to such action, suit, proceeding, or claim, the reasonable fees and expenses of counsel to the Indemnified Party solely in connection therewith shall be considered Damages for purposes of this Agreement; provided, however, that in no event shall the Indemnifying Party be responsible for the fees and expenses of more than one additional counsel for all Indemnified Parties.  The party controlling such defense shall (A) keep the other party advised of the status of such action, suit, proceeding, or claim and the defense thereof, (B) provide the other party with reasonable access to all relevant information and documentation relating to the claim and the prosecution or defense thereof, and (C) consider recommendations made by the other party with respect thereto.  The Indemnified Party shall not agree to any settlement of such action, suit, proceeding or claim without the prior written consent of the Indemnifying Party.  The Indemnifying Party shall not agree to any settlement of such action, suit, proceeding or claim that does not include a complete release of the Indemnified Party from all liability with respect thereto or that imposes any liability or obligation on the Indemnified Party without the prior written consent of the Indemnified Party.

(c)     _Treatment of Indemnity Payments_.  All indemnity payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Applicable Law.

(d)     _Assignment of Claims_.    If the Indemnified Party receives any payment from an Indemnifying Party in respect of any Claim for indemnification and the Indemnified Party could have recovered all or a part of such Damages claimed from a third party (a "Potential Contributor") based on the underlying Claim or demand asserted against the Indemnified Party, the Indemnified Party shall, upon the reasonable request of the Indemnifying Party, assign such of its rights to proceed against the Potential Contributor as are necessary to permit the Indemnifying Party to recover from the Potential Contributor the amount of such payment.  Notwithstanding the foregoing, to the extent any portion of the Indemnified Party's Damages with respect to such Claim have not been recovered from such Indemnifying Party (as a result of the Cap, the Deductible, or otherwise), the Indemnified Party shall be entitled to first recover such unrecovered Damages from the Potential Contributor before the Indemnifying Party may recover any portion of such payment.

(e)      _Computation of Damages_.  Whenever an Indemnifying Person is required to indemnify and hold harmless an Indemnified Person from and against, and hold the Indemnified Person harmless from, or to reimburse the Indemnified Person for, any Damages hereunder, the amount of the Damages to be paid by or on behalf of the Indemnifying Person will, subject to the provisions of this Article X, be calculated after giving effect to (i) any amounts to which the Indemnified Person has received from third parties in connection with such item of Damages, net of any costs or expenses of collecting such amounts ("Reimbursements"), and (ii) the Net Proceeds of any insurance policy received by the Indemnified Person with respect to such Damages.  For purposes of this Section 10.3(e), "Net Proceeds" means the insurance proceeds actually received, less any deductibles, co-payments and expenses of collecting from the insurance provider. If any Indemnified Person receives any Reimbursement or Net Proceeds after an indemnification payment is made which relates thereto, the Indemnified Person shall promptly repay to the Indemnifying Person such amount of the indemnification payment as would not have been paid had the Reimbursement or Net Proceeds reduced the original payment at such time or times as and to the extent that such Reimbursement or Net Proceeds is actually received. Notwithstanding the foregoing, Reimbursements and Net Proceeds shall not reduce the amounts an Indemnified Party is entitled to hereunder (nor will the Indemnified Party be obligated to repay any amounts to the Indemnifying Party with respect to any Reimbursements or Net Proceeds) to the extent any portion of the Indemnified Party's Damages with respect to the matter giving rise thereto are not subject to recovery (or have not been recovered) from the Indemnifying Parties (as a result of the Cap, the Deductible, or otherwise).

(f)      _No Duplicate Recovery_.  Notwithstanding anything to the contrary herein, an Indemnified Person may not assert multiple claims under Section 10.3 in order to recover duplicative Damages in respect of a single set of facts or circumstances under more than one representation, warranty, covenant or agreement in this Agreement whether such facts or circumstances would give rise to a breach of more than one representation, warranty, covenant or agreement in this Agreement.

(g)      _Preservation of Goodwill_.   In conducting any defense, dealing with any third-party claim, or seeking recovery from any Potential Contributor hereunder, Seller shall consult with Buyer and shall protect and preserve the reputation and goodwill associated with Buyer, and the Business.

10.4    Survival.

(a)      The representations and warranties of Seller and Buyer set forth in this Agreement (other than Fundamental Representations) shall survive the Closing and the consummation of the transactions contemplated hereby and continue until the third (3rd) anniversary of the Closing Date (the "Survival Date"), at which time they shall expire.

(b)      Notwithstanding anything to the contrary in this Agreement, all Fundamental Representations shall survive until the date that is 60 days following the expiration of the applicable statute of limitations with respect to the subject matter thereof.

(c)     The covenants and other agreements of each party set forth in this Agreement shall survive the closing and remain in full force and effect in accordance with their terms.

(d)     If an indemnification claim under Sections 10.1 or 10.2, as the case may be, is properly asserted under Section 10.3 prior to the Survival Date or other applicable survival date, then the related representation and warranty, covenant or agreement shall survive until, but only for the purpose of, the resolution of such claim and all claims of a similar nature.

10.5    Limitations and Other Terms.

(a)     Notwithstanding anything to the contrary herein, (i) the aggregate liability of Seller for Damages under Section 10.1(a) shall not exceed $2,500,000 (the "Cap"), and (ii) Seller shall not be liable under Section 10.1(a) unless and until the aggregate Damages for all claims under such section equal or exceed an amount equal to $50,000 in the aggregate (the "Basket"), at which time Seller shall be liable for all such Damages (including those equal to or less than the Basket); provided, however, that the limitations set forth in this Section 10.5(a) shall not apply to a claim arising out of a breach of a Fundamental Representation, intentional misconduct, or any representation that was fraudulently made.

(b)     Notwithstanding anything to the contrary herein, (i) the aggregate liability of Buyer for Damages under Section 10.2(a) shall not exceed the Cap, and (ii) Buyer shall not be liable under Section 10.2(a) unless and until the aggregate Damages for all claims under such section equal or exceed the Basket, at which time Buyer shall be liable for all such Damages (including those equal to or less than the Basket); provided, however, that the limitations set forth in this Section 10.5(b) shall not apply to a claim arising out of a breach of a Fundamental Representation, intentional misconduct, or any representation that was fraudulently made.

(c)     For purposes of this Article X, the representations and warranties of each of Seller and Buyer in this Agreement (other than Section 3.4(a)) and in any certificate delivered pursuant hereto shall be deemed not to include any Materiality Qualifiers.

(d)     No right or obligation under this Article X will be waived or otherwise affected by any knowledge (of any form or type) of Buyer or by any investigation, due diligence, or verification by or on behalf of Buyer.   All representations, warranties, covenants, and agreements herein will be deemed material and relied upon by each party, and subject to Section 11.11, none will be waived by any failure to pursue any action or by consummation of the transactions contemplated herein.

(e)     Any liability for indemnification hereunder shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach of more than one representation, warranty, covenant or agreement.

(f)     Except with respect to claims for equitable relief, except with respect to claims of fraud, and except as otherwise provided in Sections 6.5 and 11.9, the rights of

the Indemnified Parties under this Article X shall be the sole and exclusive remedies of the Indemnified Parties and their respective Affiliates for a breach of this Agreement from and after the Effective Time.

# ARTICLE XI
# MISCELLANEOUS

11.1    Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly delivered (i) four (4) Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid, (ii) one Business Day after being sent for next Business Day delivery, fees prepaid, via a reputable nationwide overnight courier service, (iii) on the date of confirmation of receipt (or, the first Business Day following such receipt if the date of such receipt is not a Business Day) of transmission by electronic mail or facsimile, or (iv) the date such notice is actually received by the party for whom it is intended (or, the first Business Day following such receipt if the date of such receipt is not a Business Day), in the case of any other means of transmission (including personal delivery, messenger service or ordinary mail), in each case to the intended recipient as set forth below:

(a)    if to ASH or Buyer:

American Southern Homes
c/o Michael Scott
Norton Scott LLC
1420 Beverly Road, Suite 240
McLean, VA 22101
Phone: (703) 738-8736
E-mail: mike@nortonscott.com

and

Greg Benson
21630 Ridgetop Circle, Suite 120
Sterling, VA 20166
Phone: (703) 863-5070
E-mail: gbenson@benmarlc.com

with a copy, which shall not constitute notice, to:

Jacob A. Kramer
Bryan Cave Leighton Paisner LLP
1155 F St NW
Washington, D.C. 20004
Phone: (202) 508-6153
Email: jake.kramer@bclplaw.com

(b)    if to a Seller or the Shareholders:

Grayhawk Homes Inc.
Homestead Residential Inc.
c/o David B. Erickson
324 Otter Drive
Cataula, GA 31804

with a copy to:

James M. Sack, Esq
The Sack Law Firm P.C.
8270 Greensboro Drive, Suite 810
McLean, Virginia 22102
Phone: (703) 883-0102
Fax: (703) 883-0108
Email: jms@sacklaw.com

Any party to this Agreement may change the address to which notices and other communications hereunder are to be delivered by giving the other parties to this Agreement notice in the manner herein set forth. Notices by a party may be given by such party's attorney.

11.2    Entire Agreement.   This Agreement (including the schedules and exhibits hereto and the documents and instruments referred to herein that are to be delivered at the Closing) constitutes the entire agreement among the Parties to this Agreement and supersedes any prior understandings, agreements or representations by or among the Parties, or any of them, written or oral, with respect to the subject matter hereof.

11.3    No Third-Party Beneficiaries.   Except as provided in Article X, this Agreement is not intended, and shall not be deemed, to confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns or to otherwise create any third-party beneficiary hereto.

11.4    Assignment.   Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise by any of the Parties without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void.   Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns.

11.5    Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.   If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement

shall be enforceable as so modified.  In the event such court does not exercise the power granted to it in the prior sentence, the Parties agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

11.6    <u>Counterparts and Signature</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the Parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.  The exchange of copies of this Agreement and the signature pages by facsimile transmission or other electronic means shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile or other electronic means shall be deemed to be their original signatures for all purposes.

11.7    <u>Interpretation</u>.  When reference is made in this Agreement to an Article or a Section, such reference shall be to an Article or Section of this Agreement, unless otherwise indicated.  Whenever the words "herein," "hereunder," "hereby" and similar words are used in this Agreement, they refer to this Agreement as a whole (and not to the particular sentence, paragraph or Section where they appear).  The table of contents, table of defined terms and headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any party.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.  Any reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, in whole or in part, and as in effect from time to time, and shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Unless expressly stated herein to the contrary, reference in this Agreement to any document means such document as amended, modified or supplemented and as in effect from time to time in accordance with the terms thereof.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The word "or" is used in the sense of "and/or"; "any" is used in the sense of "any or all"; and "with respect to" any item includes the concept "of," "under" or "regarding" such item or any similar relationship regarding such item. No summary of this Agreement prepared by any party shall affect the meaning or interpretation of this Agreement.  All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement. References in this Agreement to time periods in terms of a certain number of days mean calendar days unless expressly stated herein to be Business Days. Any notices that are to be delivered, or amounts that are due and owing hereunder, on a day that is not a Business Day shall be deemed to be due and owing on the next succeeding Business Day. For purposes of this Agreement, if any Seller Party or a Person acting on their behalf has posted a document to that certain online data room hosted at https://www.dropbox.com/home/Closing%20Data%20Room%20-%20NOV%201%20Docs (the "<u>Data Room</u>") for purposes of this transaction prior to 6:00 p.m. (Columbus, Georgia time) on

the date that is five (5) Business Days prior to the Closing Date, such document shall be deemed to have been "delivered," "furnished" or "made available" (or any phrase of similar import used in this Agreement) to Buyer by Seller.

11.8　Governing Law.　This Agreement and any controversy related to, arising directly or indirectly out of (whether sounding in contract, tort or statute), caused by, or resulting from this shall be governed by and construed in accordance with the internal laws of the State of Georgia, including its statute of limitations, without giving effect to any choice or conflict of law provision or rule (whether of the State of Georgia or any other jurisdiction) that would cause the application of laws of any jurisdictions other than those of the State of Georgia.

11.9　Remedies.　Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.　The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.　It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at law or in equity.

11.10　Submission to Jurisdiction.　Each of the Parties to this Agreement (a) consents to submit itself exclusively to the personal jurisdiction of any state or federal court sitting in the State of Georgia in any action or proceeding arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, (c) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (d) agrees not to bring any action or proceeding arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto.　Any party hereto may make service on another party by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Section 11.1.　Nothing in this Section 11.10, however, shall affect the right of any party to serve legal process in any other manner permitted by Applicable Law.

11.11　Seller Disclosure Letter.　Seller Disclosure Letter shall be arranged in Sections corresponding to the numbered Sections contained in Article III, and the disclosure in any Section shall qualify (a) the corresponding Section in Article III, and (b) the other Sections in Article III, to the extent that it is apparent from a reading of such disclosure that it also qualifies or applies to such other Sections.　The inclusion of any information in Seller Disclosure Letter, or in any update thereto, shall not be deemed to be an admission or acknowledgment, in and of itself, that such information is required by the terms hereof to be disclosed, is material, has resulted in or would result in a Material Adverse Effect, or is outside the Ordinary Course of Business.

11.12   <u>Waiver of Jury Trial</u>.   EACH OF THE PARTIES, HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TO THE EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, UNDER OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

11.13   <u>Headhunter Fee</u>.   As part of this transaction and in order to get a successor to D. Erickson in place, Seller has hired Chris Recker.  Buyer shall at Closing reimburse Seller for the headhunter fee of $62,500.

<div align="center">

**ARTICLE XII**
**DEFINITIONS**

</div>

12.1   <u>Certain Defined Terms</u>.   As used in this Agreement, the following terms have the following meanings:

(a)      "<u>Affiliate</u>" means with respect to any party, a Person or party which has overlapping or common ownership and is engaged in some aspect of the Business.

(b)      "<u>Ancillary Agreement</u>" means all other instruments and documents executed and delivered pursuant to the terms of this Agreement, including, but not limited to the Brokerage Services Agreement, Bill of Sale and Assumption Agreement, Domain Name Assignment, Trademark Assignment, Copyright Assignment, Employment Agreement, Consulting Agreement, TSA, and Land Purchase Agreement.

(c)      "<u>Applicable Law</u>" or "<u>Applicable Laws</u>" means any laws, constitutions, enactments, statutes, codes, treaties, rules, regulations, ordinances, writs, decrees, licenses, permits, authorizations, judgments and orders of any Governmental Authorities now existing or hereafter enacted, adopted, promulgated, entered, or issued applicable to a Party.

(d)      "<u>ASH Membership Interests</u>" means Equity Interests in ASH.

(e)      "<u>Association</u>" means all property owners and condominium owners associations applicable to the Real Property.

(f)      "<u>Business Day</u>" means any day other than (i) a Saturday or Sunday or (ii) a day on which banking institutions located in Columbus, Georgia are required by law, executive order, or governmental decree to remain closed.

(g)      "<u>Closing Book Value</u>" means: (a) current Assets, less (b) current Liabilities, determined as of the open of business on the Closing Date.

(h)      "<u>Employee Benefit Plan</u>" means any "employee pension benefit plan" (as defined in Section 3(2) of ERISA), any "employee welfare benefit plan" (as defined in Section 3(1) of ERISA), any "multiemployer plan" (as defined in Section 3(37) of

<div align="center">

Page 62

</div>

ERISA) and any other written or oral plan, agreement or arrangement involving direct or indirect compensation (but excluding the payment of regular salary and wages), including insurance coverage, severance, retention incentives, flexible spending accounts, medical, dental, vision, prescription drug, transportation, disability, paid time off, vacation, holiday, sick leave, educational assistance, adoption assistance, or fringe benefits, deferred compensation, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other equity based award, or other forms of incentive compensation or post-retirement compensation and all unexpired severance agreements, maintained by or contributed to by the Seller or any ERISA Affiliate for the benefit of, or relating to, any current or former employee, director or officer (or dependent) of Seller or its ERISA Affiliates.

(i)      "Environmental Claim" means any written claim, judgment, penalty, fine, demand, suit, action, proceeding, order, warning letter, investigation or notice by any Person alleging any pending, anticipated, threatened, or potential liability (including potential liability for investigatory costs, risk assessment costs, cleanup costs, removal costs, remedial costs, operation and maintenance costs, governmental response costs, natural resource damages, or penalties) arising out of, based on, or resulting from (i) noncompliance or alleged noncompliance with any Environmental Law or permit, license, certificate or letter, (ii) injury or damage (or alleged injury or damage) arising from exposure to Hazardous Substances, or (iii) the presence, Release or threatened Release into the environment, of any Hazardous Substance at or from any location, whether or not owned, leased, operated or otherwise used by Seller.

(j)      "Environmental Law" means (i) the Resource Conservation and Recovery Act, (ii) the Comprehensive Environmental Response, Compensation and Liability Act, (iii) the Superfund Amendments and Reauthorization Act of 1986, (iv) the Resource Conservation and Recovery Act, (v) the Toxic Substances Control Act, (vi) the Clean Water Act, (vii) the Clean Air Act, (viii) the Safe Drinking Water Act, (ix) the Endangered Species Act, (x) the Federal Insecticide, Fungicide and Rodenticide Act, and (xi) any other Applicable Law concerning (A) the air, water, groundwater, land, natural resources and/or pertaining to the production, storage, transport, use, control, development, disposal, contamination, remediation, handling, treatment, Release or threatened Release, or clean-up of Hazardous Substances, (B) the protection, investigation or restoration of the environment, human health and safety, or natural resources; or (C) noise or odor; flora, fauna, wetlands, or threatened or endangered species or their habitat, protection.

(k)      "Equity Interests" means, with respect to any Person, any and all shares, interests, participations, rights in or other equivalents of such Person's capital stock, partnership interests, membership interests, limited liability company interests or other equivalent equity or ownership interests and any rights, warrants or options exchangeable or exercisable for or convertible into such capital stock or other equity or ownership interests (whether embedded in other securities or not).

(l)      "ERISA" means the Employee Retirement Income Security Act of 1974.

(m)     "ERISA Affiliate" means any entity which is a member of (i) a controlled group of corporations (as defined in Section 414(b) of the Tax Code), (ii) a group of trades or businesses under common control (as defined in Section 414(c) of the Tax Code), or (iii) an affiliated service group (as defined under Section 414(m) of the Tax Code or the regulations under Section 414(o) of the Tax Code), any of which includes Seller.

(n)     "Estimated Book Value" means, as set forth in the Estimated Closing Book Value Statement, the total assets of the Business, less the total liabilities of the Business (including all Indebtedness), in each case as determined as of immediately prior to the Effective Time in accordance with, and based upon, the Seller Financial Statements and GAAP, which determination shall include all Real Property included in work-in-progress and all finished lot inventory at the prices set forth in Section 3.7(e) of the Seller Disclosure Letter, as adjusted to give effect to the provisions  hereof.

(o)     "Fundamental Representations" means (i) with respect to Seller, those representations and warranties set forth in Sections 3.2 (Authority; No Conflict; Required Filings and Consents), 3.6 (Taxes; Unclaimed Property), 3.7(a) (Title to Personal Property), 3.7(f) (Title to Real Property), 3.14 (Environmental Matters), 3.15 (Employee Benefit Plans), and 3.24 (No Brokers); and (ii) with respect to Buyer, those representations and warranties set forth in Sections 4.2(a) (Authority) and 4.4 (No Brokers; Fee).

(p)     "GAAP" means United States generally accepted accounting principles consistently applied.

(q)     "Governmental Authority" means any United States or international, federal, state, county, municipal, local government or political subdivision, any court, arbitrator or arbitral tribunal, any governmental, quasi-governmental, administrative or regulatory commission, entity, authority, commission, board, bureau, agency or instrumentality  and any self-regulatory body.

(r)     "Hazardous Substance" means (i) any substance that is regulated or which falls within the definition of a "hazardous substance," "hazardous waste," "hazardous material," "toxic material," "toxic substance," or "solid waste" under any Environmental Law, (ii) any flammable or explosive materials, any petroleum product or by-product, oil, poisons, refuse, trash, garbage and wastes, crude oil, natural gas or synthetic gas usable for fuel, fumes, gases, corrosive and radioactive materials, pollutants or contaminates, hazardous wastes or substances or toxic wastes or substances, asbestos-containing material, polychlorinated biphenyls, radioactive materials or radon, or (iii) any waste material, substance, mixture or compound which could constitute or create a nuisance, waste, or harmful or hazardous condition.

(s)     "Headquarters Lease" means that certain Lease, dated as of January 1, 2019, by and between Harmony Place Columbus, LLC, as landlord, and David B. Erickson D.B.A. Grayhawk Homes, Inc., as tenant.

(t)     "Housing Unit" means (i) a residential dwelling constructed, currently in process of construction, or to be constructed on a lot, together with the associated lot, or (ii) any condominium unit.

(u)     "Indebtedness" means any obligation or other liability under or for any of the following:   (i) indebtedness for borrowed money (including if guaranteed or for which a Person is otherwise liable or responsible, an obligation to assume indebtedness); (ii) obligation evidenced by a note, bond, debenture or similar instrument (including a standby letter of credit); (iii) surety bond; (iv) swap or hedging contract; (v) capital lease; (vi) banker acceptance; (vii) purchase money mortgage, indenture, deed of trust or other purchase money lien or conditional sale or other title retention agreement; (viii) indebtedness secured by any mortgage, indenture or deed of trust upon any asset; or (ix) interest, fee or other expense regarding any of the foregoing.

(v)     "Intellectual Property" means all intellectual property, including all of the following and similar intangible property and related proprietary rights, interests and protections, whether registered or unregistered and however arising: (i) patents, copyrights, trademarks, service marks, trade names, domain names, trade secrets, websites, extranets, software as a service, Software, (ii) architectural, building, and engineering designs, drawings, specifications, and plans, including house plans for any existing or planned community, (iii) proprietary information or rights including any and all plans, and other project related information of prior and currently active real estate projects, and (iv) goodwill associated therewith.

(w)     "IRS" means the Internal Revenue Service.

(x)     "Knowledge," "Knowledge of Seller" or "Seller's Knowledge" means, with respect to any fact or matter in question, (i) the actual knowledge of D. Erickson, R. Erickson, Amy Allen, and any other officers, managers, and directors of each Seller and (ii) the knowledge that each of the foregoing individuals would reasonably be expected to have in the ordinary and usual course of such individual's diligent performance of his or her professional responsibilities including that which would be obtained by making reasonable inquiry of personnel of Seller who would reasonably be expected to have knowledge of relevant facts and circumstances.

(y)     "Material Adverse Effect" means any change, event, circumstance, occurrence, fact or development that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, condition (financial or otherwise), assets, properties, liabilities, operations, or results of operations of Seller or of the Business (b) value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated by this Agreement; provided, however, that notwithstanding the foregoing, a "Material Adverse Effect" shall not include any change, event, development, effect, occurrence, fact or circumstance resulting from, arising out of, or related to (i) changes or conditions in, or generally affecting, any industry in which Seller participates or from generally prevailing conditions in global economies, provided that such conditions do not have a materially disproportionate effect or impact on Seller, or (ii) the taking of any action required to comply with the terms of this Agreement.

(z)     "Materiality Qualifier" means a qualification to a representation or warranty by use of "material," "materially," "in all material respects," or other variations of the word "material" or by a reference regarding the occurrence or non-occurrence or possible occurrence or non-occurrence of a Material Adverse Effect.

(aa)     "Neutral Auditor" means a financial expert from a nationally recognized independent public accounting firm selected with approval of each of Buyer and Seller (such approval not to be unreasonably withheld, conditioned or delayed); provided that the Neutral Auditor will not be an accounting firm used by either Seller or Buyer (or any of either's Affiliates) within the preceding three years for material audit or valuation services.

(bb)     "Ordinary Course of Business" means the ordinary course of conduct of the business of Seller, which is consistent in nature, scope and magnitude with past practices of Seller (including with respect to quantity and frequency) and is taken in the ordinary course of the normal, day-to-day operations.

(cc)     "Organizational Documents" means, for any Person: (a) the articles or certificate of incorporation, formation or organization (as applicable), deed of association, charter, or similar document adopted, executed, or filed in connection with the incorporation, formation, organization or governance of such Person; (b) any contract regarding the governance of such Person or relations among any holders of its Equity Interests, including any bylaws, limited liability company agreement, incorporation agreement, partnership agreement, operating agreement, shareholder agreement, buy-sell agreement, voting agreement, voting trust agreement or similar document of or regarding such Person; and (c) any amendment to any of the foregoing.

(dd)     "Parties" means Buyer, Seller, and the Shareholders.

(ee)     "Permits" means all permits, licenses, variances, ordinances, entitlements, allocations, filings, notices and approvals from, with or to any Governmental Authority or any third party, including zoning approval, certificate of occupancy, parking licenses, plan approval, signage licenses, drainage and detention rights, development rights, land disturbance or other similar rights, including any prepaid impact fees, impact fee credits, or similar development credits; building licenses or permits, homeowners' association approvals, and all utilities commitments and capacities and other similar documents.

(ff)     "Permitted Lien" means any Lien (i) for current Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings (of which Seller has notified Buyer in writing and for which Seller, not Buyer, will be responsible); (ii) for deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance, or similar programs mandated by Applicable Law; (iii) whether statutory or common law, that is not yet due and payable and was incurred in the Ordinary Course of Business, in favor of carriers, warehousemen, mechanics, and materialmen, to secure claims for labor, materials, or supplies, and other like liens; or (iv) such Liens, covenants, conditions, easements and exceptions to title as Buyer may agree to in writing.

(gg) "Person" means any individual, partnership, corporation, limited liability company, association, joint stock company, trustee or trust, joint venture, unincorporated organization or any other business entity or association or any Governmental Authority.

(hh) "Real Property" means, collectively the Owned Real Property, the Leased Real Property, and the Takedown Property.

(ii) "Records" means books, records, manuals or other materials or similar information (including customer records, personnel or payroll records, accounting or Tax records, purchase or sale records, price lists, correspondence).

(jj) "Release" means any release, spill, emission, leaking, pumping, pouring, dumping, emitting, emptying, escaping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment, including the uncontrolled presence or the movement of Hazardous Substances through the ambient air, soil, subsurface water, groundwater, wetlands, lands or subsurface strata, directly or indirectly into the environment.

(kk) "Software" means all computer software and subsequent and earlier versions thereof, including source code, object, executable or binary code, objects, comments, screens, user interfaces, report formats, templates, menus, buttons and icons and all files, data (whether embodied in firmware, software or otherwise), materials, manuals, design notes and other items and documentation related thereto or associated therewith.

(ll) "Solvent" means, with respect to any Person, that, as of the applicable date of determination, (i) the fair saleable value of the assets of such Person, as of such date, exceeds the sum of (A) all obligations of such Person (including contingent and other liabilities), as of such date, plus (B) the amount that will be required to pay the probable obligations of such Person on its existing debts (including contingent and other liabilities) as such debts become absolute and matured, (ii) such Person will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date, and (iii) such Person does not intend to incur or believe that it will incur obligations beyond its ability to pay as such obligations mature.

(mm) "Subsidiary" means any corporation, partnership, trust, limited liability company or other non-corporate business enterprise in which such party (or another Subsidiary of such party) holds stock or other ownership interests representing (i) more that 50% of the voting power of all outstanding stock or ownership interests of such entity or (ii) the right to receive more than 50% of the net assets of such entity available for distribution to the holders of outstanding stock or ownership interests upon a liquidation or dissolution of such entity.

(nn) "Takedown Property" means all real property and other property that is the subject of the Takedown Contracts, including all buildings, structures, installations, fixtures, and other improvements situated thereon and all easements, rights of way,

development orders, and other rights, entitlements, and appurtenances therein or thereunto pertaining.

(oo)　"Tax" or "Taxes" means all federal, territorial, state, provincial, local or foreign government taxes, levies, assessments, duties, imposts or other like assessments (including estimated taxes), including income, profits, gross receipts, transfer, excise, property, sales, use, value-added, ad valorem, excise, capital, wage, employment, payroll, withholding, Social Security, Medicare, severance, occupation, import, custom, duties, stamp, documentary, mortgage, alternative, escheat, unclaimed property, add-on minimum, environmental, franchise or other governmental taxes, imposed by any Governmental Authority responsible for the imposition of any such tax, including any interest, penalties or fines applicable or related thereto.

(pp)　"Tax Code" means the Internal Revenue Code of 1986, as amended.

(qq)　"Tax Return" means collectively: (i) all reports, declarations, filings, questionnaires, estimates, returns, information statements and similar documents relating to, or required to be filed in respect of any Taxes, including any amendments thereof; and (ii) any statements, returns, reports, or similar documents required to be filed pursuant to Part III of Subchapter A of Chapter 61 of the Tax Code or pursuant to any similar income, excise or other Tax provision of federal, territorial, state, provincial, local or foreign law, including any amendments thereof.

(rr)　"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

(ss)　"Warranty Amount" means $250,000.

12.2　Index of Other Defined Terms.  The following terms shall have the meanings set forth in the sections of this Agreement indicated below:

| Defined Term | Section | Defined Term | Section |
|---|---|---|---|
| "Agreement" | Preamble | "Cap" | 10.5(a) |
| "Allocation Statement" | 7.3(b) | "CCRs" | 3.21 |
| "Anti-Corruption Laws" | 3.16(c) | "Claim" | 10.3(a) |
| "ASH" | Preamble | "Claim Amount" | 10.3(a) |
| "Assigned Contracts" | 1.1(k) | "Claim Notice" | 10.3(a) |
| "Assigned Permits" | 1.1(l) | "Closing" | 2.4 |
| "Assumed Liabilities" | 1.3 | "Closing Date" | 2.4 |
| "Basket" | 10.5(a) | "Closing Book Value Statement" | 2.2(b) |
| "Bill of Sale and Assumption Agreement" | 8.2(j) | "COBRA" | 3.15(m) |
| "Brokerage Services Agreement" | 8.2(w) | "Consulting Agreement" | 8.2(o) |
| "Business Collateral" | 3.19 | "Copyright Assignment" | 8.2(m) |
| "Business" | Recitals | "Damages" | 10.1 |
| "Buyer" | Preamble | "Data Room" | 11.7 |
| | | "Deferred Payments" | 2.5(a)(ii) |

| Defined Term | Section |
|---|---|
| "Deferred Payments Period" | 2.5(e) |
| "Disputed Amounts" | 2.2(e) |
| "Domain Name Assignment" | 8.2(l) |
| "D. Erickson" | Preamble |
| "Effective Time" | 2.4 |
| "Employment Agreement" | 8.2(n) |
| "Estimated Closing Book Value Statement" | 2.2(a) |
| "Excluded Assets" | 1.2 |
| "Excluded Liabilities" | 1.4 |
| "Excluded Real Property" | 1.1(a) |
| "Excluded Records" | 1.2(a) |
| "Grayhawk" | Preamble |
| "Homestead" | Preamble |
| "Home Warranty Obligations" | 3.20(a) |
| "Inbound Licenses" | 3.8(b) |
| "Indemnified Party" | 10.3(a) |
| "Indemnifying Party" | 10.3(a) |
| "IT Assets" | 3.9(d) |
| "Independent Accountant" | 2.2(e) |
| "Land Purchase Agreement" | 8.2(v) |
| "Leased Real Property" | 3.7(d) |
| "Liens" | 3.2(b) |
| "Material Contracts" | 3.10(a) |
| "Net Proceeds" | 10.3(e) |
| "Note" | 2.5(b)(i) |
| "Objection Notice" | 2.2(d) |
| "Owned Real Property" | 1.1(a) |
| "Post-Closing Adjustment" | 2.2(b) |
| "Potential Contributor" | 10.3(d) |
| "Premium" | 2.1(b) |

| Defined Term | Section |
|---|---|
| "Property" | 3.7(l) |
| "Purchase Price" | 2.1 |
| "Purchased Assets" | 1.1 |
| "Purchased Intellectual Property" | 1.1(j) |
| "Real Estate Transfer Taxes" | 7.1(b) |
| "Real Property Leases" | 3.7(d) |
| "Reimbursements" | 10.3(e) |
| "Resolution Period" | 2.2(d) |
| "Restricted Parties" | 6.5(a) |
| "Restricted Period" | 6.5(a) |
| "Retail Sales Contracts" | 3.22 |
| "Review Period" | 2.2(c) |
| "R. Erickson" | Preamble |
| "Seller" | Preamble |
| "Seller Disclosure Letter" | Article III |
| "Seller Current Year GAAP Financial Statements" | 3.3 |
| "Seller Prior Year Tax Basis Financial Statements" | 3.3 |
| "Shareholders" | Preamble |
| "Specified Excluded Contract" | 1.6 |
| "Survival Date" | 10.4(a) |
| "Takedown Contracts" | 1.1(b) |
| "Third Party Lease" | 3.7(c) |
| "Title IV Plan" | 3.15(f) |
| "Trademark Assignment" | 8.2(k) |
| "Transferred Employee" | 6.6(b) |
| "TSA" | 8.2(p) |
| "Undisputed Amounts" | 2.2(e) |

*[Remainder of Page Intentionally Left Blank.]*

**IN WITNESS WHEREOF**, each of the undersigned has caused this Asset Purchase Agreement to be duly executed as of the date first written above.

<u>**BUYER**</u>:

**ASH-GRAYHAWK, LLC**

By: _____
    Name:  Gregory Benson
    Title:   Chief Executive Officer

<u>**SELLER**</u>:

**GRAYHAWK HOMES INC.**

By: _____
    Name:  David B. Erickson
    Title:  President

**HOMESTEAD RESIDENTIAL INC.**

By: _____
    Name:  David B. Erickson
    Title:  President

**GH SERVICES, INC.**

By: _____
    Name:  David B. Erickson
    Title:  President

_____
David B. Erickson, individually

_____
Rose Ann Erickson, individually

*[Signatures Continue on Following Page]*

Signature Page                              Asset Purchase Agreement

*[Signatures Continued from Previous Page]*

**AMERICAN SOUTHERN HOMES HOLDINGS, LLC**

By: _____

Name: J. Marshall Coleman
Title: Authorized Officer

<u>Schedule  1.1(k)</u>

Assigned Contracts

## **SCHEDULE 1.1(k) – ASSIGNED CONTRACTS**

i.      SALES CONTRACTS

ii.     PURCHASE ORDERS

iii.    REAL PROPERTY LEASES

iv.     LOT TAKEDOWN CONTRACTS

v.      OTHER CONTRACTS

## SCHEDULE 1.1(k) – ASSIGNED CONTRACTS
## 1.1(k) (i) - SALES CONTRACTS

See attached.

Schedule 1.1 (k) (i) Assigned Contracts - Sales Contracts BOYL 2 of 2 sales contract information
BOYOL

| | | Contract date | Address | BUYER | PRICE | Deposit Amt | Additional deposit per amendment | Total Deposits | CLOSING | Entity | Deposit Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68 | SPL | | 3232 Lee Rd 254 | | | | | $ - | TBD | | |
| 71 | SPL | 5/21/2019 | 678 Lee Road 735 | Sherfield | $ 263,551.00 | $ 2,000.00 | $ 500.00 | $ 2,500.00 | TBD | GH | *Constuction deposit |
| 72 | SPL | | 4237 Pobiddy Rd | | | | | $ - | TBD | | |
| 73 | SPL | 2019 Date not clear | 0 Cathy Court | Blum | $ 224,804.03 | $ 2,000.00 | | $ 2,000.00 | TBD | GH | *Construction deposit |
| 74 | SPL | 10/18/2019 | 3973 Essex Heights Ct. | Chiles | $ 379,210.00 | $ 2,000.00 | $ 500.00 | $ 2,500.00 | TBD | GH | *Construction deposit |
| 76 | SPL | 10/22/2019 | 2320 Lee Road 165 | Cauley | $ 193,229.00 | $ 2,000.00 | $ 500.00 | $ 2,500.00 | TBD | GH | *Construction deposit |
| 77 | SPL | 9/12/2019 | 0 Abercrombie Rd | Lamar | $ 211,829.00 | $ 2,000.00 | | $ 2,000.00 | TBD | GH | *Construction deposit |

Schedule 1.1 (k) (i) Assigned Contracts - Sales Contracts

Closings as of 11-13-2019

| | | Contract date | Address | SPEC/ LENDER | LOAN | BUYER | PRICE | Deposit Amt | Additional deposit per amendment | Total Deposits | CLOSING | TIME | ATTNY | Selling Broker | Entity | Deposit Type | Contingency | Date Contingency Expires | Expected Close Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | October/Rescheduled | | | | | | | | | | | | | | | |
| 27 | RR | 11/3/2018 | 255 Lee Rd 2046 | Navy Fed | VA | Butler | $ 240,910.00 | $ 2,000.00 | | $ 2,000.00 | 11/14/2019 | 11:00 AM | B. Vaught | Century 21 | GH | *Construction deposit | | | |
| | | | | November | | | | | | | | | | | | | | | |
| 68 | CPB | 7/8/2019 | 4835 Charleston Way | Synovus | Conv | Lewis | $ 305,925.00 | $ 4,000.00 | $ 7,095.00 | 11,095.00 | 11/21/2019 | 2:00PM | B.Vaught | Coldwell Banker | GH | *Construction deposit | None | | 11/21/2019 |
| 119 | DR | 7/19/2019 | 1959 Felicity Lane | Interlinc | FHA | Matthews | $ 275,120.00 | $ 2,000.00 | | $ 2,000.00 | 11/7/2019 | 12:00 EST | C.Melton | Keller Williams | GH | *Construction deposit | | | |
| 120 | DR | 7/5/2019 | 1963 Felicity Lane | Benchmark | FHA | Abney | $ 274,880.00 | $ 2,000.00 | $ 832.00 | 2,832.00 | 11/6/2019 | 12:00 EST | C.Melton | RAE Realty, LLC | GH | *Construction deposit | | | |
| 10J | GCH | 10/22/2019 | 8153 Highland Drive | First Bank | | | $ 289,900.00 | $ 1,000.00 | | $ 1,000.00 | 11/21/2019 | | B.Vaught | Remax | GH | | Financing | 11/12/2019 | 11/21/2019 |
| 32M | GCH | 7/8/2019 | 9901 Woodland Creek Ct | Envoy | FHA | Allen | $ 263,384.00 | $ 2,600.00 | $ 707.00 | 3,307.00 | 11/15/2019 | 2:00PM | B.Vaught | Coldwell Banker | GH | *Construction deposit | | | |
| 19D | LH | 8/28/2019 | 5177 Magazine Lane | USAA | VA | Moore | $ 204,279.00 | $ 2,000.00 | | $ 2,000.00 | 11/15/2019 | 4:00PM | B.Vaught | Coldwell Banker | GH | *Construction deposit | | | |
| 16B | NGF | 10/13/2019 | 9796 N Ivy Park Dr | Chase | Conv | Patel | $ 261,831.00 | $ 2,000.00 | | $ 2,000.00 | 11/22/2019 | 2:00PM | B.Vaught | Coldwell Banker | GH | | None | | 11/22/2019 |
| 21B | NGF | 7/22/2019 | 4889 Wisteria Ln | NAF | FHA | Matthess | $ 224,078.00 | $ 2,000.00 | $ 1,203.00 | 3,203.00 | 11/18/2019 | 2:00PM | B.Vaught | Milner & Harrleson | GH | *Construction deposit | | | 11/18/2019 |
| 72 | WT | 11/5/2019 | 51 Willow Trace Drive | | | Grove | $ 192,643.00 | $ 1,000.00 | | 1,000.00 | 11/27/2019 | | B.Vaught | Coldwell Banker | GH | | Financing | 11/19/2019 | 11/27/2019 |
| 125 | WT | 10/16/2019 | 6 Willow Court | | | Martin | $ 180,164.00 | $ 1,000.00 | | $ 1,000.00 | 11/11/2019 | | B.Vaught | Keller Williams | GH | | | | |
| 126 | WT | 8/23/2019 | 4 Willow Ct | Veterans United | VA | Murry | $ 174,270.00 | $ 3,000.00 | | $ 3,000.00 | 11/15/2019 | 3:00PM | B.Vaught | Remax | GH | | | | |
| 47B | WW | 6/22/2019 | 6801 Nuthatch Ct | Benchmark | Conv | Randall | $ 331,684.00 | $ 4,000.00 | $ 12,150.00 | 16,150.00 | 11/12/2019 | 2:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit exludes $ 500 fee | | | |
| | | | | December | | | | | | $ - | | | | | | | | | |
| 17 | CP | 11/6/2019 | 4901 Oriana Drive | | | Harvey | $ 267,000.00 | $ 2,000.00 | | $ 2,000.00 | 12/30/2019 | | | | GH | | Financing | 11/19/2019 | 12/30/2019 |
| 69 | CPB | 10/14/2019 | 4831 Charleston Way | BOA | Conv | Nicholson | $ 309,380.00 | $ 4,000.00 | | $ 4,000.00 | 12/20/2019 | 2:00PM | B.Vaught | Coldwell Banker | GH | *Construction deposit | None | | 12/20/2019 |
| 1A | | | | | | | | | | | | | | | | *Construction deposit/ Price different per contract | | | |
| | DW | 9/7/2019 | 7000 Deerwood Ln | Cash | N/A | N/A | $ 348,442.00 | $ 4,000.00 | | $ 4,000.00 | 12/31/2019 | 3:00PM | B.Vaught | RAE Realty, LLC | GH | $1400 | None | | 12/31/2019 |
| 123 | DR | 7/30/2019 | 1975 Felicity Lane | Quicken | Conv | Patel | $ 333,717.00 | $ 4,000.00 | $ 14,809.00 | 18,809.00 | 12/20/2019 | TBD | C.Melton | RAE Realty, LLC | GH | *Construction deposit | None | | 12/20/2019 |
| 26M | GCH | 7/2/2019 | 9925 Woodland Creek Ct | Benchmark | FHA | Londonos | $ 310,490.00 | $ 4,412.00 | | $ 4,412.00 | 12/2/2019 | 1:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit includes $412 overage deposit | None | | 12/2/2019 |
| 5I | GCL | 11/9/2019 | 7483 Coppice Drive | | | Kraus | $ 252,796.00 | $ 3,000.00 | | $ 3,000.00 | 12/23/2019 | | | RAE Realty, LLC | GH | | | | |
| 23I | GCL | 7/28/2019 | 7392 Prairie Valley Ct | Benchmark | VA | Carden | $ 283,323.00 | $ 4,000.00 | | $ 4,000.00 | 12/5/2019 | 2:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 12/5/2019 |
| 130I | GCL | 10/26/2019 | 7613 Coppice Drive | | | Rangel | $ 267,485.00 | $ 2,000.00 | | $ 2,000.00 | 12/17/2019 | | B.Vaught | Keller Williams | GH | | Financing | 11/15/2019 | 12/17/2019 |
| 5 | LFE | 8/28/2019 | 7350-5 Psalmond Rd | Silverton | VA | Campbell | $ 323,686.00 | $ 4,000.00 | $ 1,874.00 | 5,874.00 | 12/31/2019 | 1:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 12/31/2019 |
| 6 | LFE | 7/8/2019 | 7350-6 Psalmond Road | Cont. | FHA | Darby | $ 353,492.00 | $ 6,000.00 | $ 5,500.00 | 11,500.00 | 12/3/2019 | 2:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 12/3/2019 |
| 21D | LH | 11/12/2019 | 5161 Magazine Lane | | | Gardner | $ 188,389.00 | $ 1,000.00 | | $ 1,000.00 | 12/17/2019 | | B.Vaught | | GH | | | | |
| 31D | LH | 11/7/2019 | 5089 Magazine Lane | Jennings | | | $ 244,253.00 | $ 2,000.00 | | $ 2,000.00 | 12/6/2019 | | B.Vaught | Keller Williams | GH | | Financing | 11/21/2019 | 12/6/2019 |
| 67H | LH | 7/30/2019 | 1565 Lexington Lake Dr | NBKC | Conv | King/Adab | $ 243,677.00 | $ 5,000.00 | $ 3,756.00 | 8,756.00 | 12/2/2019 | 2:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 12/2/2019 |
| 26A | NGF | 8/28/2019 | 4918 Wisteria Lane | Guild | VA | Gossett | $ 237,687.00 | $ 1,000.00 | | $ 1,000.00 | 12/31/2019 | 2:00PM | B.Vaught | Coldwell Banker | GH | *Construction deposit | None | | 12/31/2019 |
| 34A | NGF | 7/20/2019 | 9819 N Ivy Park Dr | Veterans U | VA | McKinney | $ 249,716.00 | $ 2,000.00 | | $ 2,000.00 | 12/2/2019 | 3:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 12/2/2019 |
| 41A | NGF | 8/18/2019 | 9777 N Ivy Park Dr | Silverton | VA | Adams | $ 236,012.00 | $ 2,000.00 | $ 885.00 | 2,885.00 | 12/16/2019 | 2:00PM | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 12/16/2019 |
| 47D | SO | 11/7/2019 | 8141 Green Glen Drive | | | Baker | $ 353,492.00 | $ 1,000.00 | | $ 1,000.00 | 12/6/2019 | | B.Vaught | Century21 | GH | | Financing | 11/21/2019 | 12/6/2019 |
| 2 | SC | 11/6/2019 | 1170 Lee Road 243 | | | Woods | $ 215,890.00 | $ 2,000.00 | | $ 2,000.00 | 12/2/2019 | | | Bickerstaff | GH | | None | | 12/2/2019 |
| 59 | STO | | TBD- Lot hold | Lot Hold | | Wood | | $ 500.00 | $ 2,500.00 | 3,000.00 | 12/15/2019 | | | | GH | *Construction deposit | LOT HOLD | | 12/15/2019 |
| 95 | WT | 10/5/2019 | 6 Peachleaf Ct | Veterans United | VA | Augustin | $ 181,310.00 | $ 1,000.00 | | $ 1,000.00 | 12/2/2019 | 4:00PM | B.Vaught | Waddell Haskin | GH | *Construction deposit | None | | 12/2/2019 |
| 137 | WT | 8/17/2019 | 38 Willow Trace Dr | Guild | FHA | French | $ 181,892.00 | $ 2,000.00 | | $ 2,000.00 | 12/19/2019 | 2:00PM | B.Vaught | Bickerstaff | GH | *Construction deposit | None | | 12/19/2019 |

| | | Contract date | Address | SPEC/ LENDER | LOAN | BUYER | PRICE | Deposit Amt | Additional deposit per amendment | Total Deposits | CLOSING | TIME | ATTNY | Selling Broker | Entity | Deposit Type | Contingency | Date Contingency Expires | Expected Close Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **January** | | | | | | | | | | | | | | | | |
| 149 | AU | 8/31/2019 | 918 Falconer Dr | Benchmark | Conv | Spencer | $ 354,981.00 | $ 4,000.00 | $ 2,746.00 | 6,746.00 | 1/31/2020 | | N Davis | RAE Realty, LLC | HR | *Construction deposit | None | | 1/31/2020 |
| 122 | DR | 8/30/2019 | 1971 Felicity Lane | Southeast | FHA | Wine | $ 278,353.00 | $ 4,000.00 | $ 616.00 | 4,616.00 | 1/7/2020 | | C.Melton | Berkshire | GH | *Construction deposit | None | | 1/7/2020 |
| 4 | LFE | 8/23/2019 | 7350-4 Psalmond Rd | Envoy | VA | Neal | $ 327,281.00 | $ 4,000.00 | $ 7,291.00 | 11,291.00 | 1/31/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 1/31/2020 |
| 5133 | MC | 9/26/2019 | 5133 McCaghren Dr | Wells Fargo | | Hernandez | $ 210,235.00 | $ 2,000.00 | $ 723.00 | 2,723.00 | 1/31/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 1/31/2020 |
| 20B | NGF | 9/5/2019 | 4901 Wisteria Ln | Wells Fargo | Conv | Kim | $ 231,448.00 | $ 4,000.00 | | 4,000.00 | 1/15/2020 | | B.Vaught | Waddell Haskin | GH | *Construction deposit | None | | 1/15/2020 |
| 27A | NGF | 11/10/2019 | 4924 Wisteria Ln | | | Arballo | $ 239,504.00 | $ 2,000.00 | | 2,000.00 | 1/24/2019 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | |
| 65 | STO | 9/12/2019 | 21 Lee Road 2219 | USAA | VA | Johnson | $ 251,337.00 | $ 2,000.00 | $ 3,073.00 | 5,073.00 | 1/30/2020 | | B.Vaught | Century21 | GH | *Construction deposit | None | | 1/30/2020 |
| 134 | WT | 9/13/2019 | 44 Willow Trace Dr | Open Mort | FHA | Brundidge | $ 193,060.00 | $ 2,000.00 | $ 2,991.00 | 4,991.00 | 1/23/2020 | | B.Vaught | Keller Williams | GH | *Construction deposit | None | | 1/23/2020 |
| | | | | | | | | | | | | | | | | | | | |
| | | | **February** | | | | | | | | | | | | | | | | |
| 357 | AL | 9/2/2019 | 454 Monticello Dr | Prime Home | Conv | Cho | $ 403,560.00 | $ 4,000.00 | $ 1,087.00 | 5,087.00 | 2/21/2020 | | N.Davis | WRPP | HR | *Construction deposit | None | | 2/21/2020 |
| 23 | CP | 9/24/2019 | 8800 Sullivans Drive | Wells Fargo | Conv | Kang | $ 245,849.00 | $ 2,000.00 | $ 487.00 | 2,487.00 | 2/27/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 2/27/2020 |
| 14I | GCL | 10/14/2019 | 7448 Coppice Dr | NAF | VA | Hardy | $ 263,797.00 | $ 4,000.00 | $ 767.00 | 4,767.00 | 2/27/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | Closing of buyers home | UC- Closes 11/1 | 3/9/2020 |
| 1 | LFE | 9/19/2019 | 7350-1 Psalmond Rd | Benchmak | VA | Ward | $ 314,984.00 | $ 4,000.00 | | 4,000.00 | 2/27/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 2/27/2020 |
| 2 | LFE | 10/12/2019 | 7350-2 Psalmond Rd | Silverton | VA | Price | $ 344,860.00 | $ 4,000.00 | $ 8,082.00 | 12,082.00 | 2/28/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | Closing of buyers | UC- Closes 01/1 | 2/28/2020 |
| 37 | STO | 9/10/2019 | 238 Lee Rd 2217 | Firstchoice | VA | Chin | $ 266,742.00 | $ 2,000.00 | $ 3,558.00 | 5,558.00 | 2/12/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 2/12/2020 |
| 58 | STO | 10/13/2019 | 338 Lee Road 2217 | Benchmark | VA | Williams | $ 223,875.00 | $ 2,000.00 | | 2,000.00 | 2/28/2020 | | B.Vaught | RAE Realty, LLC | GH | *Construction deposit | None | | 2/28/2020 |
| 136 | WT | 10/8/2019 | 40 Willow Trace Dr | Keller Mort | VA | Hearn | $ 180,641.00 | $ 1,000.00 | | 1,000.00 | 2/28/2020 | | B.Vaught | Keller Williams | GH | *Construction deposit | None | | 2/28/2020 |
| | | | | | | | | | | $ - | | | | | | | | | |
| | | | **March** | | | | | | | $ - | | | | | | | | | |
| 62 | CPB | 10/21/2019 | 4859 Charleston Way | | | Mehta | $ 294,394.00 | $ 4,000.00 | $ 588.00 | 4,588.00 | 3/18/2020 | | | | GH | *Construction deposit | None | | 3/18/2020 |
| 65 | CPB | 11/6/2019 | 4847 Charleston Way | | | Pettibone | $ 269,500.00 | $ 4,000.00 | | 4,000.00 | 3/13/2020 | | | | GH | *Construction deposit | Financing / Meeting | 11/16/2019 & | 3/13/2020 |
| 12I | GCL | 11/4/2019 | 7441 Coppice Drive | | | Stallworth | $ 279,600.00 | $ 4,000.00 | | 4,000.00 | 3/31/2020 | | | | GH | *Construction deposit | Financing/ Lot approval | 11/19/2019 & | 3/31/2020 |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | 262589.3 | | | | |
| | | | | | | | | | | | | | | | 11833 | | | | |
| | | | | | | | | | | | | | | | 274422.3 | | | | |
| | | | | | | | | | | | | | | | 202915 | | | | |
| | | | | | | | | | | | | | | | 71507.3 | | | | |

## SCHEDULE 1.1(k) – ASSIGNED CONTRACTS
## 1.1(k) (ii) – PURCHASE ORDERS

See attached.

**Schedule 1.1 (k) (ii) Assigned Contracts - Purchase Orders for Closed Jobs After August 1, 2019 as of 11.**

| Row Labels | Sum of P.O. Balance |
|---|---|
| AUP-00140 | 3,737.05 |
| AUP-00151 | 10,147.84 |
| CCR-00115 | 1,552.54 |
| CP-00018 | 674.36 |
| CP-00021 | 75.00 |
| CP-00022 | 651.50 |
| CP-00026 | 3,706.60 |
| CP-00028 | 250.00 |
| CPB-00002 | 13,277.87 |
| CPB-00009 | 4,387.96 |
| CPB-00010 | 7,266.55 |
| CPB-00063 | 1,355.46 |
| DR-00094 | 5,067.08 |
| DR-00107 | 1,697.23 |
| DR-00109 | 9,046.78 |
| DR-00110 | 13,551.95 |
| DR-00119 | 22,552.65 |
| DR-00120 | 18,595.73 |
| DR-00124 | 1,472.27 |
| DR-00126 | 2,402.11 |
| GCH-0007J | 350.00 |
| GCH-0007M | 6,177.56 |
| GCH-0014M | 310.00 |
| GCH-0019M | 209.00 |
| GCH-0028M | 5,545.40 |
| GCL-0003I | 4,264.85 |
| GCL-0077C | 660.00 |
| GCL-0128I | 3,458.30 |
| GP-001FF | 1,401.42 |
| GP-0027K | 1,388.00 |
| HF-00006 | 1,522.53 |
| HF-00008 | 284.01 |
| HF-00009 | 1,246.30 |
| HF-00013 | 5,220.70 |
| HF-00015 | 9,859.02 |
| LH-0001E | 1,161.16 |
| LH-0003E | 762.88 |
| LH-0004E | 546.62 |
| LH-0013E | 1,024.36 |
| LH-0015E | 683.16 |
| LH-0020D | 4,938.80 |
| LH-0022D | 6,397.32 |
| LH-0022F | 125.00 |
| LH-0028D | 1,100.88 |

Case 4:1-cv-00069-CDL  Document 1-1 Filed 09/14/21  Page 83 of 397

**Schedule 1.1 (k) (ii) Assigned Contracts - Purchase Orders for Closed Jobs After August 1, 2019 as of 11.1**

| Row Labels | Sum of P.O. Balance |
| --- | --- |
| LH-0046H | 3,103.04 |
| NGF-0015B | 4,856.51 |
| NGF-0017B | 1,520.37 |
| NGF-0033A | 2,241.10 |
| NGF-0036A | 4,263.78 |
| NGF-0038A | 713.40 |
| NGF-0040A | 3,566.92 |
| NIP-0092C | 1,992.40 |
| RB-00073 | 2,184.79 |
| SO-0003F | 1,543.84 |
| SO-0046D | 1,881.02 |
| SP-0031A | 3,431.30 |
| SP-0032A | 908.08 |
| SP-0033A | 6,235.70 |
| SPL-00066 | 800.00 |
| SPL-00067 | 1,885.38 |
| SPL-00068 | 4,581.44 |
| SPL-00070 | 4,685.00 |
| STO-00011 | 1,692.00 |
| SWF-00069 | 6,807.07 |
| WT-00073 | 886.44 |
| WT-00123 | 1,555.52 |
| WT-00124 | 943.91 |
| WT-00129 | 363.50 |
| WT-00138 | 1,548.75 |
| WT-00139 | 1,307.88 |
| WT-00140 | 1,191.82 |
| WW-0027A | 827.00 |
| WW-0035A | 3,591.90 |
| WW-0047B | 25,883.39 |
| XW-00073 | 2,025.37 |
| **Grand Total** | **279,124.42** |

**Schedule 1.1 (k) (ii) Assigned Contracts - Purchase Orders for Jobs in Progress as of 11.12.19**

| Sum of P.O. Balance | |
| --- | --- |
| Row Labels | Grand Total |
| AL-00357 | 75,517.77 |
| AUP-00129 | 350.00 |
| AUP-00130 | 500.00 |
| AUP-00149 | 594.85 |
| AUP-00150 | 1,550.00 |
| AUP-00153 | 91,108.37 |
| AUP-00181 | 6,109.89 |
| AUP-00185 | 48,920.75 |
| AUP-00186 | 75,380.33 |
| AUP-00190 | 1,500.00 |
| AUP-00191 | 1,450.00 |
| AUP-00192 | 1,500.00 |
| AUP-00193 | 350.00 |
| CCR-00108 | 22,029.44 |
| CCR-00110 | 2,126.02 |
| CCR-00112 | 65,384.54 |
| CP-00012 | 134,942.90 |
| CP-00016 | 36,639.84 |
| CP-00017 | 37,873.88 |
| CP-00019 | 10,875.82 |
| CP-00023 | 113,536.57 |
| CPB-00011 | 2,975.07 |
| CPB-00062 | 157,262.77 |
| CPB-00068 | 3,905.62 |
| CPB-00069 | 23,433.39 |
| CPB-00070 | 25,113.61 |
| CPB-00072 | 75,881.46 |
| CPB-00073 | 83,465.73 |
| CR-00468 | 1,000.00 |
| CR-00666 | 8,623.35 |
| CR-00667 | 9,419.35 |
| DR-00085 | 400.00 |
| DR-00088 | 258.88 |
| DR-00091 | 1,992.05 |
| DR-00092 | 6,001.47 |
| DR-00098 | 80,914.45 |
| DR-00099 | 104,031.77 |
| DR-00100 | 400.00 |
| DR-00122 | 138,811.41 |
| DR-00123 | 102,173.56 |
| DR-00125 | 400.00 |
| DR-00129 | 35,047.93 |
| DR-00130 | 37,236.42 |

**Schedule 1.1 (k) (ii) Assigned Contracts - Purchase Orders for Jobs in Progress as of 11.12.19**

| Sum of P.O. Balance | |
|---|---|
| **Row Labels** | **Grand Total** |
| DR-00131 | 64,448.65 |
| DR-00132 | 61,100.88 |
| DW-0001A | 61,919.95 |
| DW-0009A | 13,766.58 |
| DW-0019A | 10,404.36 |
| DW-02013 | 951.38 |
| FC-00012 | 75.00 |
| GCH-0003M | 275.00 |
| GCH-0008J | 1,077.90 |
| GCH-0010J | 4,602.46 |
| GCH-0025M | 275.00 |
| GCH-0026M | 27,173.81 |
| GCH-0029M | 119,182.20 |
| GCH-0030M | 120,482.48 |
| GCH-0032M | 20,668.02 |
| GCL-0005I | 5,441.45 |
| GCL-0009I | 46,677.57 |
| GCL-0010I | 49,580.33 |
| GCL-0014I | 136,287.40 |
| GCL-0023I | 50,815.26 |
| GCL-0024I | 81,781.52 |
| GCL-0104I | 75.00 |
| GCL-0105I | 75.00 |
| GCL-0130I | 2,792.28 |
| GP-0041K | 19,415.90 |
| HF-00014 | 1,233.55 |
| HF-00016 | 71,545.70 |
| HF-00017 | 80,623.11 |
| HF-00018 | 85,847.93 |
| HH-00020 | 1,759.99 |
| HL-0024C | 250.00 |
| HL-0032C | 160,576.96 |
| HP-02016 | 151.91 |
| HR-IDC19 | 401.50 |
| IDC-GH019 | 15,790.87 |
| LC-00001 | 38,555.74 |
| LC-00002 | 18,227.59 |
| LC-00003 | 799.50 |
| LC-00022 | 21,585.47 |
| LC-00023 | 22,308.02 |
| LC-00024 | 14,437.52 |
| LC-00025 | 24,690.79 |
| LC-00031 | 400.00 |

**Schedule 1.1 (k) (ii) Assigned Contracts - Purchase Orders for Jobs in Progress as of 11.12.19**

| Sum of P.O. Balance | |
| --- | --- |
| Row Labels | Grand Total |
| LE-00001 | 150,125.44 |
| LE-00002 | 161,618.29 |
| LE-00003 | 137,568.96 |
| LE-00004 | 151,966.20 |
| LE-00005 | 16,475.83 |
| LE-00006 | 22,710.85 |
| LH-0019D | 24,260.81 |
| LH-0021D | 12,237.42 |
| LH-0025D | 45,921.89 |
| LH-0031D | 3,480.96 |
| LH-0043H | 2,568.90 |
| LH-0044H | 9,791.11 |
| LH-0045H | 2,690.62 |
| LH-0047H | 4,643.13 |
| LH-0066H | 275.00 |
| LH-0067H | 35,194.31 |
| LH-0068H | 456.17 |
| MCC-05133 | 71,375.48 |
| MKR-00104 | 142,258.04 |
| MKR-00105 | 124,929.80 |
| NGF-0002B | 769.54 |
| NGF-0016B | 1,619.85 |
| NGF-0020B | 68,520.59 |
| NGF-0021A | 120,472.18 |
| NGF-0021B | 17,337.55 |
| NGF-0022A | 120,570.05 |
| NGF-0023A | 127,893.37 |
| NGF-0024A | 83,372.22 |
| NGF-0025A | 84,483.42 |
| NGF-0026A | 66,652.26 |
| NGF-0027A | 85,795.21 |
| NGF-0028A | 122,514.97 |
| NGF-0029A | 126,496.44 |
| NGF-0030A | 122,766.14 |
| NGF-0034A | 47,970.27 |
| NGF-0035A | 64,748.75 |
| NGF-0041A | 67,911.68 |
| NGF-0042A | 124,303.33 |
| RB-00074 | 4,090.80 |
| RB-01228 | 1,575.00 |
| RB-01234 | 1,575.00 |
| RB-01240 | 1,575.00 |
| R-ENTAL | 21,414.52 |

**Schedule 1.1 (k) (ii) Assigned Contracts - Purchase Orders for Jobs in Progress as of 11.12.19**

| Sum of P.O. Balance | |
|---|---|
| Row Labels | Grand Total |
| RH-0055I | 85,021.86 |
| RH-0056I | 64,012.14 |
| RH-0057I | 75,092.95 |
| RH-0058I | 66,181.26 |
| RR-00002 | 138,010.12 |
| RR-00003 | 110,954.80 |
| RR-00012 | 178,422.87 |
| RR-00027 | 3,166.81 |
| RR-00040 | 4,341.21 |
| RR-00041 | 12,532.57 |
| RR-00057 | 1,583.19 |
| SC-00002 | 20,350.98 |
| SM-0149A | 75.00 |
| SM-0156A | 250.00 |
| SM-0157A | 250.00 |
| SO-0047D | 3,661.95 |
| SPL-00071 | 162,625.07 |
| SPL-00072 | 34,105.47 |
| SPL-00073 | 11,500.00 |
| STO-00001 | 6,217.30 |
| STO-00010 | 71,610.24 |
| STO-00022 | 140,064.62 |
| STO-00023 | 140,222.76 |
| STO-00024 | 139,350.11 |
| STO-00025 | 136,253.10 |
| STO-00026 | 128,228.05 |
| STO-00037 | 138,165.28 |
| STO-00042 | 130,756.87 |
| STO-00043 | 108,425.94 |
| STO-00044 | 119,641.83 |
| STO-00045 | 325.00 |
| STO-00058 | 111,362.82 |
| STO-00065 | 129,796.98 |
| SWF-00061 | 183,433.11 |
| SWF-00062 | 171,126.97 |
| SWF-00067 | 6,449.90 |
| SWF-00102 | 100.00 |
| WAR-R19GH | 9,582.51 |
| WAR-R19HR | 1,302.90 |
| WT-00001 | 450.00 |
| WT-00072 | 5,369.51 |
| WT-00095 | 692.20 |
| WT-00100 | 76,016.66 |

**Schedule 1.1 (k) (ii) Assigned Contracts - Purchase Orders for Jobs in Progress as of 11.12.19**

| Sum of P.O. Balance | |
| --- | --- |
| **Row Labels** | **Grand Total** |
| WT-00103 | 93,500.25 |
| WT-00125 | 5,117.11 |
| WT-00126 | 7,185.95 |
| WT-00133 | 81,972.17 |
| WT-00134 | 82,784.28 |
| WT-00135 | 95,198.22 |
| WT-00136 | 66,370.05 |
| WT-00137 | 62,464.88 |
| WW-0042B | 693.45 |
| WW-0044B | 1,197.50 |
| **Grand Total** | **9,114,064.91** |

## SCHEDULE 1.1(k) – ASSIGNED CONTRACTS
## 1.1(k) (iii) – REAL PROPERTY LEASES

Real property lease between Harmony Place Columbus, LLC ("Landlord") and David B. Erickson D.B.A. Grayhawk Homes, Inc. ("Tenant").  Commencement date January 1, 2019, Expiration date December 31, 2021.  Includes security deposit $ 4,000.

The lease will be assigned no later than December 31, 2019

**<u>SCHEDULE 1.1(k) – ASSIGNED CONTRACTS</u>**
**<u>1.1(k) (iv) – LOT TAKEDOWN CONTRACTS</u>**

None.

## SCHEDULE 1.1(k) – ASSIGNED CONTRACTS
## 1.1(k) (v)- OTHER CONTRACTS

All exclusive listing agreements are assigned to buyer.

All subcontractor agreements and vendor contracts listed in 3.10 of the Seller Disclosure letter.

Additional items – see attached

Any other copier, equipment, furniture and fixtures, leases and software licenses currently in place.

| | Schedule 1.1 (k) (v) Assigned Contracts - Other Contracts | | | |
|---|---|---|---|---|
| | Updated as of 10.31.19 | | | |
| | | | | |
| | **Name** | **Term** | **Amount** | **Copy of Contract** |
| A | **ABM** | Monthly | | x |
| B | **Alexander Systems Company (Alarm System)** | Monthly | $    20.00 | x |
| C | **Applied Software** | Yearly | $ 3,348.00 | x |
| D | **Auto Desk CAD** | | | x |
| E | **Container by Reaves** | | | |
| F | **Engaged IT** | Monthly | $ 1,341.50 | x Invoice includes 1 of 2 licenses that are excluded and 1 of 2 cloud premiums that will be excluded |
| G | **Fantastic Cleaning** | Weekly | | |
| H | **Go Daddy Domain Names:** | | | |
| | AUBURNALCUSTOMHOMEBUILDER.COM | 2021-05-03 UTC | | |
| | AUBURNALHOMEBUILDER.COM | 2021-05-03 UTC | | |
| | COLUMBUSGAHOMEBUILDER.COM | 2020-08-23 UTC | | |
| | CUSTOMHOMESCOLUMBUSGA.COM | 2020-08-23 UTC | | |
| | GRAYHAWK-HOMES.COM | 2019-11-30 UTC | | |
| | GRAYHAWKCUSTOMHOMES.COM | 2021-02-07 UTC | | |
| | GRAYHAWKHOMESAL.COM | 2019-11-30 UTC | | |
| | GRAYHAWKHOMESCOLUMBUS.COM | 2019-11-30 UTC | | |
| | GRAYHAWKHOMESFTBENNING.COM | 2019-11-30 UTC | | |
| | GRAYHAWKHOMESGA.COM | 2019-11-30 UTC | | |
| | GRAYHAWKHOMESINC.COM | 2023-11-30 UTC | | |
| | GRAYHAWKHOMESINC.NET | 2019-11-30 UTC | | |
| | GREYHAWKHOMESINC.COM | 2019-11-30 UTC | | |
| | GREYHAWKHOMESINC.NET | 2019-11-30 UTC | | |
| | HOMEBUILDERAUBURNAL.COM | 2021-05-03 UTC | | |
| | HOMESTEADAUBURN.COM | 2021-06-10 UTC | | |
| | HOMESTEADRES.COM | 2021-05-03 UTC | | |
| | HOMESTEADRESIDENTIALHOMES.COM | 2021-05-03 UTC | | |
| | HOMESTEADRESIDENTIALINC.COM | 2021-05-03 UTC | | |
| | HOMESTEADRESIDENTIALUS.COM | 2021-05-03 UTC | | |
| | WHYGRAYHAWK.COM | 2021-03-26 UTC | | |
| I | **Google Hosted Email:** | | | |
| | asovern@grayhawkhomesinc.com | Active | | |
| | ajoiner@grayhawkhomesinc.com | Active | | |
| | amy@grayhawkhomesinc.com | Active | | |
| | adezinna@grayhawkhomesinc.com | Active | | |
| | april@grayhawkhomesinc.com | Active | | |
| | billing@grayhawkhomesinc.com | Active | | |
| | bdowning@grayhawkhomesinc.com | Active | | |
| | cmoncus@grayhawkhomesinc.com | Active | | |
| | cfoster@grayhawkhomesinc.com | Active | | |
| | crogers@grayhawkhomesinc.com | Active | | |
| | crecker@grayhawkhomesinc.com | Active | | |
| | chuck@grayhawkhomesinc.com | Active | | |
| | dan@grayhawkhomesinc.com | Active | | |
| | dave@grayhawkhomesinc.com | Active | | |
| | dlinder@grayhawkhomesinc.com | Active | | |
| | dmorris@grayhawkhomesinc.com | Active | | |
| | ddeas@grayhawkhomesinc.com | Active | | |
| | dweber@grayhawkhomesinc.com | Active | | |
| | ebrownlee@grayhawkhomesinc.com | Active | | |
| | gavin@grayhawkhomesinc.com | Active | | |
| | estimating@grayhawkhomesinc.com | Active | | |
| | ghpo@grayhawkhomesinc.com | Active | | |
| | info@grayhawkhomesinc.com | Active | | |
| | scanner@grayhawkhomesinc.com | Active | | |
| | homesteadresidential@grayhawkhomesinc.com | Active | | |
| | hr@grayhawkhomesinc.com | Active | | |
| | iowascanner@grayhawkhomesinc.com | Active | | |
| | itadmin@grayhawkhomesinc.com | Active | | |
| | jhughes@grayhawkhomesinc.com | Active | | |
| | jearle@grayhawkhomesinc.com | Active | | |
| | jdempsey@grayhawkhomesinc.com | Active | | |
| | jason@grayhawkhomesinc.com | Active | | |
| | jbetts@grayhawkhomesinc.com | Active | | |
| | jjane@grayhawkhomesinc.com | Active | | |
| | jayne@grayhawkhomesinc.com | Active | | |
| | jshiley@grayhawkhomesinc.com | Active | | |
| | jcrabbe@grayhawkhomesinc.com | Active | | |
| | jweldon@grayhawkhomesinc.com | Active | | |
| | jewing@grayhawkhomesinc.com | Active | | |
| | jwhitford@grayhawkhomesinc.com | Active | | |
| | krogers@grayhawkhomesinc.com | Active | | |
| | atladmin@grayhawkhomesinc.com | Active | | |
| | kgammon@grayhawkhomesinc.com | Active | | |
| | krichardson@grayhawkhomesinc.com | Active | | |
| | kcrow@grayhawkhomesinc.com | Active | | |
| | lfordyce@grayhawkhomesinc.com | Active | | |

| | Schedule 1.1 (k) (v) Assigned Contracts - Other Contracts | | | |
|---|---|---|---|---|
| | Updated as of 10.31.19 | | | |
| | | | | |
| | **Name** | **Term** | **Amount** | **Copy of Contract** |
| | mhoefert@grayhawkhomesinc.com | Active | | |
| | mwindham@grayhawkhomesinc.com | Active | | |
| | marketing@grayhawkhomesinc.com | Active | | |
| | mmitchell@grayhawkhomesinc.com | Active | | |
| | ghadmin@grayhawkhomesinc.com | Active | | |
| | admin@grayhawkhomesinc.com | Active | | |
| | mlee@grayhawkhomesinc.com | Active | | |
| | mfoster@grayhawkhomesinc.com | Active | | |
| | madams@grayhawkhomesinc.com | Active | | |
| | mpope@grayhawkhomesinc.com | Active | | |
| | phillip@grayhawkhomesinc.com | Active | | |
| | randy@grayhawkhomesinc.com | Active | | |
| | rberdeaux@grayhawkhomesinc.com | Active | | |
| | rkelley@grayhawkhomesinc.com | Active | | |
| | robert@grayhawkhomesinc.com | Active | | |
| | rconine@grayhawkhomesinc.com | Active | | |
| | rspratlin@grayhawkhomesinc.com | Active | | |
| | smills@grayhawkhomesinc.com | Active | | |
| | svialet@grayhawkhomesinc.com | Active | | |
| | scwarranty@grayhawkhomesinc.com | Active | | |
| | swasdin@grayhawkhomesinc.com | Active | | |
| | smccorkle@grayhawkhomesinc.com | Active | | |
| | shaygood@grayhawkhomesinc.com | Active | | |
| | towenby@grayhawkhomesinc.com | Active | | |
| | tina@grayhawkhomesinc.com | Active | | |
| | tgrieve@grayhawkhomesinc.com | Active | | |
| | tclapper@grayhawkhomesinc.com | Active | | |
| | tsmith@grayhawkhomesinc.com | Active | | |
| | warranty@grayhawkhomesinc.com | Active | | |
| | web@grayhawkhomesinc.com | Active | | |
| | wmcreynolds@grayhawkhomesinc.com | Active | | |
| J | **Meredith Communications** | Monthly | x | Unsigned agreement |
| K | **Office 365 Subscriptions:** | | | |
| | adezinna@grayhawkhomesinc.com | Active | | |
| | april@grayhawkhomesinc.com | Active | | |
| | babeyta@grayhawkhomesinc.com | Active | | |
| | bdansby@grayhawkhomesinc.com | Active | | |
| | cmccormick@grayhawkhomesinc.com | Active | | |
| | crecker@grayhawkhomesinc.com | Active | | |
| | ghcad3@grayhawkhomesinc.com | Active | | |
| | ghcad5@grayhawkhomesinc.com | Active | | |
| | jared@grayhawkhomesinc.com | Active | | |
| | jason@grayhawkhomesinc.com | Active | | |
| | jbetts@grayhawkhomesinc.com | Active | | |
| | jginney@grayhawkhomesinc.com | Active | | |
| | jlugin@grayhawkhomesinc.com | Active | | |
| | jthomas@grayhawkhomesinc.com | Active | | |
| | kclouser@grayhawkhomesinc.com | Active | | |
| | krichardson@grayhawkhomesinc.com | Active | | |
| | lwest@grayhawkhomesinc.com | Active | | |
| | mike@grayhawkhomesinc.com | Active | | |
| | mlee@grayhawkhomesinc.com | Active | | |
| | mmitchell@grayhawkhomesinc.com | Active | | |
| | phillip@grayhawkhomesinc.com | Active | | |
| | rmarston@grayhawkhomesinc.com | Active | | |
| | support@grayhawkhomesinc.com | Unlicensed | | |
| | tgrieve@grayhawkhomesinc.com | Active | | |
| L | **Pota Jons** | | | No agreement |
| M | **Sprint:** | Monthly | | Excluded |
| | Dave Erickson 706 527 3303 | | | |
| N | **Utility Companies Used:** | Monthly | | |
| | Alabama Gas- AL | | | |
| | Alagasco- AL | | | |
| | Auburn Water Works- AL | | | |
| | Beauregard Water- AL | | | |
| | Columbus Water Works- GA | | | |
| | Flint Energies- GA | | | |
| | Georgia Power- GA | | | |
| | Opelika Power- AL | | | |
| | Opelika Utilities- AL | | | |
| | Phenix City Utilities- AL | | | |
| | Smiths Water- AL | | | |
| | Spire- AL | | | |
| | Tallapoosa Power- AL | | | |
| O | **Verizon Mobile:** | Monthly | | |
| | 706-366-0039 | | | |
| | 706-392-6258 | | | |
| | 706-505-8358 | | | |
| | 706-566-0288 | | | |

| Schedule 1.1 (k) (v) Assigned Contracts - Other Contracts | | | |
|---|---|---|---|
| Updated as of 10.31.19 | | | |
| | | | |
| **Name** | **Term** | **Amount** | **Copy of Contract** |
| 706-570-4625 | | | |
| 706-887-0210 | | | |
| 706-987-2146 | | | |
| 706-987-2250 | | | |
| 706-200-6286 | | | |
| 706-224-2761 | | | |
| 706-366-2249 | | | |
| 706-505-4398 | | | |
| 706-570-5488 | | | |
| 706-575-1519 | | | |
| 706-575-1902 | | | |
| 706-604-0063 | | | |
| 706-604-8266 | | | |
| 706-887-0129 | | | |
| 706-304-5626 | Exclude Erickson ipad | | |
| 706-566-6106 | | | |
| 706-604-4037 | | | |
| P | **WOW Business Landlines:** | Monthly | |
| 706-507-9628 | Terminate | | |
| 706-507-9631 | Terminate | | |
| 706-507-9634 | | | |
| 706-507-9637 | Extra line | | |
| 706-507-9638 | | | |
| 706-507-9641 | | | |
| 706-507-9647 | Extra line | | |
| 706-507-9657 | | | |
| 706-507-9658 | | | |
| 706-507-9960 | | | |
| 706-507-9961 | | | |
| 706-507-9962 | | | |
| 706-507-9963 | | | |
| 706-507-9964 | | | |
| 706-507-9965 | Terminate | | |
| 706-507-9966 | | | |
| 706-507-9967 | | | |
| 706-507-9968 | | | |
| 706-507-9969 | | | |
| 706-507-9970 | | | |
| 706-507-9971 | | | |
| 706-507-9972 | | | |
| 706-507-9973 | | | |
| 706-507-9974 | | | |
| 706-507-9975 | | | |
| 706-507-9976 | | | |
| 706-507-9977 | Terminate | | |
| 706-507-9981 | Terminate | | |
| 706-568-3779 | | | |

Schedule 1.2(i)

Excluded Capitalized Costs

## SCHEDULE 1.2(i) - EXCLUDED CAPITALIZED COSTS

EXCLUDED CAPITALIZED COSTS

Amounts below are as of 8/31/2019.  Per Section 2.2(b) Purchase Price Adjustments – Post Closing Adjustment, within 90 days after the Closing Date, amounts will be adjusted to equal Closing Book Value minus Estimated Closing Book Value.  However, adjustments to Excluded Capitalized Costs will remain excluded.

Interest capitalization costs
     Grayhawk Homes, Inc.        $ 359,000
     Homestead Residential, Inc.  $ 126,000
     GH Services, Inc           $      0

Overhead Capitalization costs
     Grayhawk Homes, Inc.        $ 701,868
     Homestead Residential, Inc   $ 122,051
     GH Service, Inc.           $      0

<u>Schedule 1.2(j)</u>

Specified Excluded Assets and Contracts

## <u>SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS</u>

i.      BANK ACCOUNTS

ii.     COMPANY INSURANCE

iii.    CREDIT CARDS

iv.    EMPLOYEE BENEFITS

v.     REBATES

vi.    EXCLUDED ASSETS

vii.   EXCLUDED ASSETS – DEPOSITS

viii.  EXCLUDED ASSETS – LOTS

ix.    EXCLUDED AGREEMENT:

      a.  Real property purchase and sale agreement dated May 17, 2019 between Links Crossing, LLC, Home Yard & Garden, Inc. and Grayhawk Homes, Inc.

`

## <u>SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS</u>
## <u>1.2  (j) (i) – BANK ACCOUNTS</u>

Grayhawk Homes Inc.
1. Auburn Bank - 6669
2. Colony Bank
3. Regions Bank - 5514
4. Southern States Bank (main operating account) – 3483/5701
5. SunTrust Bank - 7191
6. Texas Capital Bank - 9109

Homestead Residential Inc.
1. Southern States Bank - 2881

GH Services, Inc.
1. Southern States Bank - 2038

## SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS
## 1.2(j) (ii) – COMPANY INSURANCE

| | | | | EFFECTIVE | EXPIRATION | |
|---|---|---|---|---|---|---|
| **Schedule 1.2 (j) (ii) Specified Excluded Contracts - Company Insurance** | | | | | | |
| **Insurance Information** | | | | | | |
| **Updated as of 11.06.19** | | | | | | |
| | | | | | | |
| **TYPE OF INSURANCE** | **LIMITS OF LIABILITY** | **CARRIER** | **POLICY NUMBER** | **DATE** | **DATE** | **PREMIUM** |
| *General Liability Grayhawk* | $2,000,000  General Aggregate Limit | Employers Mutual Casualty Company | 4D9-03-03-20 | 3/24/2019 | 3/24/2020 | $   122,125.00 |
| | $1,000,000 Per Occurrence Limit | | | | | |
| | $1,000,000 Personal & Advertising Injury Limit | | | | | |
| | $500,000 Damage to Premises Rented to You | | | | | |
| | $10,000 Medical Expense Limit | | | | | |
| | | | | | | |
| | | | | | | |
| *General Liability Homestead* | $2,000,000  General Aggregate Limit | Employers Mutual Casualty Company | 4D9-46-41-20 | 3/24/2019 | 3/24/2020 | $     26,257.00 |
| | $1,000,000 Per Occurrence Limit | | | | | |
| | $1,000,000 Personal & Advertising Injury Limit | | | | | |
| | $500,000 Damage to Premises Rented to You | | | | | |
| | $10,000 Medical Expense Limit | | | | | |
| | | | | | | |
| *Commerical Property Grayhawk* | $63,175 Personal Property of Business | Employers Mutual Casualty Company | 4A8-03-03-20 | 3/24/2019 | 3/24/2020 | $          805.00 |
| | $500 Deductible per Occurrence | | | | | |
| | | | | | | |
| | | | | | | |
| *Commerical Property Homestead* | $10,824 Personal Property of Business | Employers Mutual Casualty Company | 4A8-46-41-20 | 3/24/2019 | 3/24/2020 | $          269.00 |
| | $500 Deductible per Occurrence | | | | | |
| | | | | | | |
| | | | | | | |
| *Cybersolutions Declarations Grayhawk* | $335,000 Annual Aggregate | Employers Mutual Casualty Company | 4Q9-03-03-20 | 3/24/2019 | 3/24/2020 | $          109.00 |
| | | | | | | |
| | | | | | | |
| *Business Auto Grayhawk* | $1,000,000 Covered Auto Liability | Employers Mutual Casualty Company | 4E9-03-03 | 3/24/2019 | 3/24/2020 | $       3,880.00 |
| | $5,000 Auto Medical Payments/ 2 covered | | | | | |
| | Uninsured and Underinsured Motorists | | | | | |
| | | | | | | |
| | | | | | | |
| *Business Auto Homestead* | $1,000,000 Covered Auto Liability | Employers Mutual Casualty Company | 4E9-46-41-20 | 3/24/2019 | 3/24/2020 | $          500.00 |
| | | | | | | |
| | | | | | | |
| *Commerical Inland Marine Grayhawk* | $50,000 at any one residential jobsite | Great American Insurance Group | IMP 1049793 03 00 | 3/24/2019 | 3/24/2020 | $     40,755.00 |
| | $50,000 at any one "temporary" scaffolding and construction forms | | | | | |
| | $50,000 while in transit | | | | | |
| | $5,000,000 in any one "loss" including Optional Coverages | | | | | |
| | | | | | | |
| | | | | | | |
| *Commerical Inland Marine* | $500 Deductible | Employers Mutual Casualty Company | 4C9-46-41-20 | 03/24/19 | 3/24/2020 | $          165.00 |

## <u>SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS</u>
## <u>1.2(j) (iii) – CREDIT CARDS</u>

**Grayhawk Homes, Inc. Credit Cards**

1. Visa credit card with Chase Bank - 2 cards in name of David Erickson (last 4 digits 8663), and Amy Allen
2. Chase
3. Office Depot
4. Lowes
5. Home Depot

**Grayhawk Homes, Inc. and Homestead Residential, Inc. – Vendors with personal guarantees**
Personal guarantees on file at vendor
1. 84 Lumber
2. Builders First
3. Source Auburn
4. Carter Lumber
5. SRS Roofing
6. Atlanta West Carpets
7. Argos Ready Mix
8. Cumberland Materials
9. Fairburn Ready Mix
10. Elite Flooring
11. Cherokee Pumping

**<u>SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS</u>**
**<u>1.2(j) (iv) – EMPLOYEE BENEFITS</u>**

AFLAC
Humana:
      Dental
      Life- All employees provided with $10,000 life insurance policy
      Medical
      Vision

## SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS
## 1.2(j) (v)- REBATES

Rebates are excluded for amounts earned and unpaid prior to Closing

**Grayhawk Homes, Inc. and Homestead Residential, Inc.**

Atlanta West Cabinets

Boise Cascade

Certainteed

Delta Faucet

Homesphere (includes Ruud, HVAC, Frigidaire appliances, Kwikset, Superior Fireplaces, Mastic Siding, Rubbermaid wire shelving)

James Hardie

Maxim Lighting

OX

Shaw Flooring

Sherwin Williams

Spire (Donahue Ridge lots)

Spire (Links Crossing)

Weyerhaeuser

Rebates can be paid up to 90 days after the quarterly period

## <u>SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS</u>
## <u>1.2(j) (vi) – EXCLUDED ASSETS</u>

See attached

**Schedule 1.2 (j) (vi) Specified Excluded Assets and Contracts - Excluded Assets**

**Items excluded from purchase:**

| |
|---|
| 2014 Z71 truck |
| 2014 650 M BMW |
| |

**Following Items from Dave Erickson Personal office:**

| |
|---|
| 2 leisure chairs |
| 2 shelving units |
| 3 conference chairs |
| 4 file Cabinets |
| All items currently hanging on walls |
| Area rug |
| Computer |
| Computer monitor |
| Curio cabinet |
| Desk |
| Executive chair |
| Floor mat |
| Large work desk |
| Mini fridge |
| Printer |
| Sofa |
| Television |
| White board |
| |

**Items currently in Chuck McClure office:**

| |
|---|
| 2 drawer regular file cabinet |
| 42 drawer lon filing cabinet |
| All current wall items |
| All subdivision maps |
| Any and all personal belongings of Chuck McClure |
| Computer |
| Computer monitor |
| Desk |
| Drafting table |
| Drafting table stool |
| Executive chair |
| Plan rack 6x9 openings |
| White board |
| |

**Items currently in Steve Wasdin old office:**

| |
|---|
| 2 Drawer file cabinet |
| 2 misc. chairs |
| 2 monitors |
| Computer |
| Desk |
| Executive chair |
| |
| Dell Server ID 2006832885011 |
| 3 metal file cabinets from main work area |
| All Pinnacle Homes, Grayhawk and personal plaques and awards, and paintings |
| Copier currently in the CAD office |
| Eventually RDC machine related to Southern States Bank |
| |
| |
| |
| Sprint contract under Dave Eriskson number 706-527-3303 |

**SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS**
**1.2(j) (vii)- DEPOSITS**

Grayhawk Homes, Inc.

1. Lot deposit in the amount of $ 250,000 pursuant to the real property purchase and sale agreement dated May 17,2019 by Links Crossing LLC and Home Yard & Garden, Inc. (individually and collectively the "Seller") and Grayhawk Homes, Inc. ("Purchaser")

2. Lot deposit in the amount of $ 288,000 pursuant to the commitment to purchase 36 lots from Garrett Creek Development LLC.

## <u>SCHEDULE 1.2(j) – SPECIFIED EXCLUDED ASSETS AND CONTRACTS</u>
## <u>1.2(j) (vii)- LOTS</u>

See Attached

**Schedule 1.2 (j) (vii) Specified Excluded Assets and Contracts - Excluded Lots  (Prepared 11/14/2019)**

| State | Lot ID | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|
| HR | AL-00358 | 450 Monticello Dr | Auburn | AL | 36830 | | Asheton Lakes | 59,466.50 |
| HR | AL-00369 | 453 Monticello Dr | Auburn | AL | 36830 | | Asheton Lakes | 60,469.00 |
| HR | AL-00370 | 2176 Columbia Ct | Auburn | AL | 36830 | | Asheton Lakes | 60,708.68 |
| HR | AL-00381 | 484 Bennington Ct | Auburn | AL | 36830 | | Asheton Lakes | 60,708.68 |
| HR | AL-00427 | 591 Monticello Dr | Auburn | AL | 36830 | | Asheton Lakes | 60,708.68 |
| AL | AP-0005A | Auburn Road | | | | | | 5,266.40 |
| HR | AUP-00129 | 1203 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 74,502.51 |
| HR | AUP-00130 | 1197 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 65,852.51 |
| HR | AUP-00131 | 1191 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 74,702.51 |
| HR | AUP-00134 | 1173 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 66,837.09 |
| HR | AUP-00135 | 1167 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 75,337.09 |
| HR | AUP-00136 | 1161 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 75,337.09 |
| HR | AUP-00137 | 1155 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 66,837.10 |
| HR | AUP-00142 | 1125 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 75,987.04 |
| HR | AUP-00145 | 900 Falconer Drive | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 75,815.48 |
| HR | AUP-00168 | 995 Falconer Drive | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 58,567.28 |
| HR | AUP-00188 | 1168 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 53,111.48 |
| HR | AUP-00190 | 1180 Still Hunt Club | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 53,337.48 |
| HR | AUP-00191 | 1186 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 62,503.39 |
| HR | AUP-00192 | 1192 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 50,707.51 |
| HR | AUP-00193 | 1198 Still Hunt lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 57,108.22 |
| GA | BVH-0004B | 829 Wilder Drive | | | | | | 5,762.89 |
| AL | CCC-0036A | 201 Cedar Creek Dr | Opelika | AL | 36801 | | Cedar Creek Cottages | 40,251.37 |
| AL | CCC-0037A | 205 Cedar Creek Dr | Opelika | AL | 36801 | | Cedar Creek Cottages | 39,999.37 |
| AL | CCC-0038A | 207 Cedar Creek Dr | Opelika | AL | 36801 | | Cedar Creek Cottages | 40,121.85 |
| GA | CP-00027 | | Midland | GA | 31820 | | Charleston Place | 3,681.75 |
| GA | CPB-00001 | 4822 Charleston Way | Midland | GA | 31820 | | Charleston Place Blvd | 556.46 |
| GA | CPB-00064 | 4851 Charleston Way | Midland | GA | 31820 | | Charleston Place Blvd | 295.00 |
| GA | CPB-00065 | 4847 Charleston Way | Midland | GA | 31820 | | Charleston Place Blvd | 295.00 |
| GA | CPB-00071 | 4810 Charleston Way | Midland | GA | 31820 | | Charleston Place Blvd | 528.73 |
| HR | CR-00443 | 1772 Roanoke Lane | Auburn | AL | 36830 | | Camden Ridge | 35,303.00 |
| HR | CR-00444 | 1766 Roanoke Lane | Auburn | AL | 36830 | | Camden Ridge | 35,303.00 |
| HR | CR-00455 | 1705 Roanoke Lane    or | Auburn | AL | 36830 | | Camden Ridge | 35,303.00 |
| HR | CR-00468 | | Auburn | AL | 36830 | | Camden Ridge | 36,285.84 |
| HR | CR-00676 | 1903 Talcott Circle | Auburn | AL | 36830 | | Camden Ridge | 35,778.20 |

DocuSign Envelope ID: 67A7FC6D-CD9E-4A72-882A-CD2524A2AA51    Page 109 of 397

**Schedule 1.2 (j) (vii) Specified Excluded Assets and Contracts - Excluded Lots  (Prepared 11/14/2019)**

| State | Lot ID | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|-------|--------|---------|------|-------|-----|-------------|-------------|------------------------------------------|
| AL | DR-00086 | 1596 Donahue Ridge | Auburn | AL | 36830 | | Donahue Ridge | 37,834.55 |
| AL | DR-00088 | 1597 Lilah Ct | Auburn | AL | 36830 | | Donahue Ridge | 40,334.55 |
| AL | DR-00089 | 1601 Lilah Ct | Auburn | AL | 36830 | | Donahue Ridge | 38,134.55 |
| AL | DR-00102 | 1982 Felicity Lane | Auburn | AL | 36830 | | Donahue Ridge | 39,834.89 |
| AL | DR-00103 | 1978 Felicity Lane | Auburn | AL | 36830 | | Donahue Ridge | 39,834.89 |
| AL | DR-00104 | 1974 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00106 | 1966 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00111 | 1946 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00112 | 1942 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00113 | 1935 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00114 | 1939 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00115 | 1943 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00116 | 1947 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00117 | 1951 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00118 | 1955 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| AL | DR-00121 | 1967 Felicity Ln | Auburn | AL | 36830 | | Donahue Ridge | 39,828.13 |
| GA | DW-0010A | 8032 Deerwood Ct | Upatoi | GA | 31829 | | Deerwood | 40,574.00 |
| GA | DW-0011A | 8036 Deerwood Ct | Upatoi | GA | 31829 | | Deerwood | 40,520.68 |
| GA | DW-0016A | 8033 Deerwood Ct | Upatoi | GA | 31829 | | Deerwood | 40,603.05 |
| GA | DW-0017A | 8029 Deerwood Ct | Upatoi | GA | 31829 | | Deerwood | 40,531.68 |
| GA | ESA-00040 | 5623 Hodges Drive | | | | | ESA | 20,824.97 |
| GA | FC-00012 | 78 Cypress Court | | | | | Foggy Cedars | 17,825.43 |
| GA | FD-01401 | 1401 FOREST DRIVE | | | | | Forest Drive | 6,013.52 |
| GA | GCH-0001M | 7867 Woodland Ridge Dr | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,657.55 |
| GA | GCH-0002M | 7859 Woodland Ridge Dr. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,652.93 |
| GA | GCH-0003M | | Midlands | GA | 31820 | | Garrett Creek Highlands | 47,125.56 |
| GA | GCH-0008M | 7815 Woodland Ridge Dr | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,590.37 |
| GA | GCH-0012M | 7800 Woodland Ridge Dr. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,631.10 |
| GA | GCH-0013M | 7808 Woodland Ridge Dr. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,605.91 |
| GA | GCH-0015M | 7822 Woodland Ridge Dr. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,600.87 |
| GA | GCH-0016M | 7830 Woodland Ridge Dr. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,597.65 |
| GA | GCH-0020M | 9920 Woodland Creek Ct. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,722.81 |
| GA | GCH-0021M | 9924 Woodland Creek Ct. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,621.44 |
| GA | GCH-0024M | 9934 Woodland Creek Ct. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,882.47 |
| GA | GCH-0027M | 9921 Woodland Creek Ct. | Midlands | GA | 31820 | | Garrett Creek Highlands | 47,739.37 |

**Schedule 1.2 (j) (vii) Specified Excluded Assets and Contracts - Excluded Lots  (Prepared 11/14/2019)**

| State | Lot ID | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|
| GA | GCH-0031M | 9905 Woodland Creek Ct. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,585.75 |
| GA | GCL-0104I | 9812 GARRETT Lake Dr | Midlands | GA | 31820 | | Garrett Creek Lakes | 47,016.68 |
| GA | GCL-0105I | 9220 Garrett Lake Drive | Midlands | GA | 31820 | | Garrett Creek Lakes | 45,906.17 |
| GA | GF-0003H | 4601 Ivy Patch Drive | | | | | Granite Field | 45,553.43 |
| GA | GP-003FF | 9797 Yellow Pine Drive | Midlands | GA | 31820 | | Garrett Pines | 30,864.85 |
| AL | HF-00001 | tbd | Salem | AL | 36874 | | Hornet Flats | 23,722.29 |
| AL | HF-00002 | tbd | Salem | AL | 36874 | | Hornet Flats | 23,722.29 |
| AL | LC-00003 | 2689 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,547.98 |
| AL | LC-00004 | 2683 Golf Mill Rd | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00005 | 2677 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00006 | 2671 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00007 | 2665 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00008 | 2659 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00009 | 2653 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00010 | 2647 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00011 | 2641 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00012 | 2635 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00013 | 2628 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00014 | 2634 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00015 | 2640 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00016 | 2646 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00017 | 2652 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00018 | 2658 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00019 | 2664 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00020 | 2670 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00021 | 2676 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00026 | 176 Westover St | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00027 | 2713 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00028 | 2719 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00029 | 2718 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| AL | LC-00030 | 2712 Golf Mill Ct | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| GA | LH-0035C | 1440 Antietam Drive | Columbus | GA | 31907 | | Lexington Hills | - |
| GA | LH-0072H | 1535 Lexington Lake Drive | Columbus | GA | 31907 | | Lexington Hills | - |
| AL | MG-00023 | 806 Shell Toomer Parkway | Auburn | AL | 36832 | | Magnolia Gardens | 27,198.80 |
| AL | MG-00024 | 808 Shell Toomer Parkway | Auburn | AL | 36832 | | Magnolia Gardens | 27,198.80 |

**Schedule 1.2 (j) (vii) Specified Excluded Assets and Contracts - Excluded Lots  (Prepared 11/14/2019)**

| State | Lot ID | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|-------|--------|---------|------|-------|-----|-------------|-------------|------------------------------------------|
| AL | MG-00025 | 816 Shell Toomer Parkway | Auburn | AL | 36832 | | Magnolia Gardens | 27,198.80 |
| AL | MG-00026 | 818 Shell Toomer Parkway | Auburn | AL | 36832 | | Magnolia Gardens | 27,220.40 |
| GA | ML-0001F | 4826 Acme Drive | Columbus | GA | 31907 | | Moonlake | 21,871.10 |
| GA | ML-0008F | 5035 Kingsberry Lane | Columbus | GA | 31907 | | Moonlake | 18,316.10 |
| GA | ML-0009F | 5039 Kingsberry Lane | Columbus | GA | 31907 | | Moonlake | 18,321.54 |
| GA | ML-0010F | 5043 Kingsberry Lane | Columbus | GA | 31907 | | Moonlake | 18,321.54 |
| GA | ML-0014E | 5150 Kingsberry Lane | Columbus | GA | 31907 | | Moonlake | 22,451.69 |
| GA | ML-0015E | 5170 Kingsberry Lane | Columbus | GA | 31907 | | Moonlake | 22,465.96 |
| GA | MR-00001 | 13733 Macon Rd | Columbus | GA | 31907 | | Macon Road | 41,789.49 |
| GA | MR-00002 | 13747 Macon Rd | Columbus | GA | 31907 | | Macon Road | 41,346.82 |
| GA | MR-00003 | 13763 Macon Rd | Columbus | GA | 31907 | | Macon Road | 41,247.19 |
| GA | MR-00004 | 13779 Macon Rd | Columbus | GA | 31907 | | Macon Road | 41,464.50 |
| GA | MR-00005 | 13787 Macon Rd | Columbus | GA | 31907 | | Macon Road | 41,614.63 |
| GA | MR-00006 | 13791 Macon Rd | Columbus | GA | 31907 | | Macon Road | 41,414.42 |
| GA | RB-01228 | 1228 Rockbridge Drive | Columbus | GA | 31904 | | Riverbrook | 20,481.77 |
| GA | RB-01234 | 1234 Rockbridge Drive | Columbus | GA | 31904 | | Riverbrook | 20,481.77 |
| GA | RB-01240 | 1240 Rockbridge | Columbus | GA | 31904 | | Riverbrook | 20,481.77 |
| GA | RE-0030B | 7524 Hedgestone Drive | | | | | Ridgewood Estates | 40,597.65 |
| GA | REN-51DRM | | | | | | | 3,291.61 |
| AL | RR-00018 | 348 Lee Road 644 | Smith Station | AL | 36877 | | Rocky Ridge | 29,717.17 |
| AL | RR-00019 | 336 Lee Road 644 | Smith Station | AL | 36877 | | Rocky Ridge | 30,130.43 |
| AL | RR-00024 | 189 Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 28,678.47 |
| AL | RR-00025 | 211 Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 28,912.17 |
| AL | RR-00026 | 233 Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 29,360.31 |
| AL | RR-00028 | 277 Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 29,119.45 |
| AL | RR-00030 | Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 18,361.97 |
| AL | RR-00033 | 387 Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 20,517.33 |
| AL | RR-00076 | 296 Lee Road 2046  or | Smith Station | AL | 36877 | | Rocky Ridge | 29,672.10 |
| AL | RR-00083 | 202 Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 29,129.55 |
| AL | RR-00084 | 180 Lee Road 2046 | Smith Station | AL | 36877 | | Rocky Ridge | 28,678.48 |
| AL | RR-0016A | 372 Lee Road 644 | Smith Station | AL | 36877 | | Rocky Ridge | 29,355.52 |
| AL | SF-00009 | LOT 9 SHENDOAH FARMS | Salem | AL | 36874 | | Shenandoah Farms | 10,984.00 |
| AL | SF-00010 | LOT 10 SHENDOAH FARMS | Salem | AL | 36874 | | Shenandoah Farms | 10,984.00 |
| AL | SF-00011 | LOT 11 SHENDOAH FARMS | Salem | AL | 36874 | | Shenandoah Farms | 10,984.00 |
| AL | SM-0155A | 315 Frontier Circle | Auburn | AL | 36832 | | Solamere | 33,987.31 |

Case 19-32231-KLP  Doc 517-1  Filed 01/14/20  Entered 01/14/20  Page 112 of 397

**Schedule 1.2 (j) (vii) Specified Excluded Assets and Contracts - Excluded Lots  (Prepared 11/14/2019)**

| State | Lot ID | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|
| AL | SM-0156A | 268 Solamere Lane | Auburn | AL | 36832 | | Solamere | 34,137.31 |
| AL | SM-0157A | 272 Solamere Lane | Auburn | AL | 36832 | | Solamere | 34,137.31 |
| GA | SP-0006D | 7284 Sorrell Drive | Columbus | GA | 31909 | | Sonoma Pointe | 43,595.55 |
| GA | SPL-00061 | | | | | Spot Lot 61-Johnson | BOYOL | - |
| GA | SPL-00064 | | | | | Spot Lot 64-Patel | BOYOL | - |
| AL | SPL-00075 | Rock Creek Rd | | | | Spot Lot 75 Dowdell | BOYOL | - |
| AL | SPL-00079 | | | | | SPOT LOT 79 - WELCH | BOYOL | - |
| AL | SPL-00080 | | | | | Lot 80 Spt Lot - Howr | BOYOL | - |
| GA | SRC-03006 | 3006 SLIPPERY ROCK COUR | Columbus | GA | 31909 | | Slippery Rock | 28,038.19 |
| GA | SRC-03008 | 3008 SLIPPERY ROCK COUR | Columbus | GA | 31909 | | Slippery Rock | 29,063.81 |
| AL | STO-00045 | 115 Lee Road 2217 | Smith Station | AL | 36877 | | Southern Oaks | |
| AL | STO-00055 | 282 Lee Road 2217 | Smith Station | AL | 36877 | | Southern Oaks | 42,000.00 |
| AL | STO-00059 | 350 Lee Road 2217 | Smith Station | AL | 36877 | | Southern Oaks | - |
| HR | SWF-00090 | 2632 Cantera Court | Auburn | AL | 36830 | | Stonewood Farms | 27,123.40 |
| HR | SWF-00102 | 261 Quarry Place | Auburn | AL | 36830 | | Stonewood Farms | 33,004.48 |
| GA | WSR-05012 | 5012 Warm Springs Rd | Columbus | GA | 31909 | | Warm Springs Rd | 28,836.47 |
| GA | WSR-05028 | 5028 Warm Springs Rd | Columbus | GA | 31909 | | Warm Springs Rd | 90,222.44 |

5,843,168.41

<u>Schedule 1.2(k)</u>

Excluded Motor Vehicles, Trailers and Law Equipment

## SCHEDULE 1.2(k) – EXCLUDED MOTOR VEHICLES, TRAILERS, AND LAWN EQUIPMENT

EXCLUDED MOTOR VEHICLES

Grayhawk Homes, Inc.

1. 2014 Z71 Truck
2. 2014 650 M BMW

TRAILERS – None

LAWN EQUIPMENT - None

Schedule  1.2(n)

Excluded  Single-Family  Rental Properties

| Schedule 1.2 (n) Excluded Single-Family Rental Properties | | | |
|---|---|---|---|
| **Owner** | **Address** | | **Rental Agent** |
| Erickson Investments | 3227 Urban Ave | | Bickerstaff Parham |
| | | | |
| Tiger Creek Development | 8816 Sullivans Dr | | RAE Realty |
| Tiger Creek Development | 8818 Veterans Pkwy | | RAE Realty |
| Tiger Creek Development | 298 Lee Road 677 | | Auburn Realty |
| | | | |
| | | | |
| Windsong Bonacre | 1537 Celia Dr | | Bickerstaff Parham |
| Windsong Bonacre | 154 Lee Road 2126 | | RAE Realty |
| Windsong Bonacre | 4809 Miller Rd. | | |
| Windsong Bonacre | 57 Lee Road 2126 | | RAE Realty |
| Windsong Bonacre | 60 Lincolnshire Lane | | RAE Realty |
| Windsong Bonacre | 694 Upland Court | | RAE Realty |
| Windsong Bonacre | 710 Crestline Drive | | RAE Realty |
| Windsong Bonacre | 8 Wales Way | | RAE Realty |
| Windsong Bonacre | 8070 Santee Ct | | Bickerstaff Parham |
| Windsong Bonacre | 10273 Green Meadows Ct | | RAE Realty |
| | | | |
| Windsong Bonacre | 4817 Miller Rd. | | |
| Windsong Bonacre | 4825 Miller Rd. | | |

Case 4:15-cv-00085-CDL   Document 1-1   Filed 06/14/15   Page 117 of 397

Schedule 1.2(p)

Excluded Inactive Assets

**SCHEDULE 1.2(p) – Excluded Inactive Assets**

i.      Schedule 1.2 (p) (i) – Phase B Lots – see Section 3.7 (t) of the Seller Disclosure Letter Phase B Lots

ii.     Schedule 1.2 (p) (ii) – Phase C Lots – see Secton 3.7 (t) of the Seller Disclosure Letter Phse C Lots specifically excluding Joseph Stevens Estates 4 acres which is owned by Grayhawk Homes, Inc.

<u>Schedule  1.3(b)</u>

Specified  Assumed Liabilities

## SCHEDULE 1.3 (b) – SPECIFIED ASSUMED LIABILITIES

(i)     Customer Deposits

See summary schedule of assigned sales contracts deposit amounts provided at Schedule 1.1(k).

(ii)    Accrued Personal Time Off

See attached

**SCHEDULE 1.3(b) (ii) Specified Assumed Liabilities - Accrued Personal Time Off**

**Updated 11/15/19**
**Subject to change if any personnel takes time off before closing**

| Name (Last, First) | Accrued Personal Time Off Gross amount |
|---|---|
| Joiner, Alan | 1,302.50 |
| Callahan/Dan | 713.17 |
| Deas/J. Devin | 1,745.76 |
| Johnson/Judy | 309.26 |
| Shiley/Jeffrey | 2,036.00 |
| Weldon/Jimmy | 1,488.23 |
| Crow/Kristie | 888.39 |
| Gammon/Kevin | 2,801.38 |
| Spitznagel/Marquett | 824.33 |
| Windham/Mark | 365.13 |
| Berdeaux/Reuben | 1,779.50 |
| Kelley/Robert | 2,104.90 |
| Spratlin/Russell | 551.35 |
| Haygood/Steven | 2,118.11 |
| Owenby/Timothy | 358.87 |
| Smith/Turnley | 511.26 |
| Downing/Brian | 764.47 |
| Moncus/Caleb | 355.37 |
| Recker/Chris | 1,130.99 |
| Conine/Roy | 284.90 |
| Allen/Amy | 1,611.16 |
| Clay/April | 478.00 |
| Morris/Dennis | 222.99 |
| Betts/Jason | 899.69 |
| Leggett/James | 436.93 |
| Long/Katherine | 145.38 |
| Richardson/Kristen | 176.22 |
| DiGiacomo/Phillip | 656.29 |
| Buss/Tina | 897.25 |
| Clapper/Tonya | 522.98 |
| Erickson/David | 0.00 |
| Jane/Jay | 1,027.03 |
| Foster/Christopher | 107.46 |
| | **29,615.25** |

<u>Schedule 1.4(b)(vi)</u>

Excluded Construction and Acquisition Indebtedness

## SCHEDULE 1.4 (b) (vi) – EXCLUDED CONSTRUCTION AND ACQUISITION INDEBTEDNESS

- Loan Agreement between Grayhawk Homes, Inc. and Southern State Bank dated January 3, 2019. Matures January 2021 with an interest rate of prime plus 0.5%, 5.5%. Monthly interest only payments. The loan is guaranteed by the sole stockholder and by a deed of trust over inventories.

- Loan Agreement between Grayhawk Homes, Inc. and Calumet Bank dated November 5, 2018. Matured on November 5, 2019 with an interest rate of prime plus 0.5%, 5.5%. Monthly interest only payments. The loan is guaranteed by the sole stockholder and by a deed of trust over inventories.   Loan is anticipated to be paid off by closing.

- Amended and restated promissory note dated August 1, 2017 between Grayhawk Homes, Inc. and Rainier Capital, LLC

- Amended and restated promissory note dated August 30, 2017 between Homestead Residential, Inc. and Rainier Capital, LLC

END OF SCHEDULES

<u>EXHIBIT A</u>

Form of Promissory Note

[See attached.]

# SECURED PROMISSORY NOTE

$5,000,000.00                                                        As of November 15, 2019

On the Maturity Date (as defined below), for value received, ASH-GRAYHAWK, LLC, a Virginia limited liability company qualified to transact business in the State of Georgia ("Borrower"), shall pay to the order of RAINIER CAPITAL, LLC, a Georgia limited liability company ("Lender"), at such office of Lender or at such other place as the holder hereof may from time to time appoint in writing, the principal sum of FIVE MILLION AND NO/100 DOLLARS ($5,000,000.00) (this "Note").  Borrower shall also pay interest (computed on the basis of a 360-day year for actual days elapsed) on the unpaid principal amount of this Note from time to time outstanding at a rate per annum equal to ten percent (10%).  Principal and interest pursuant to this Note shall be paid on the terms and conditions set forth below

All payments made in connection with this Note shall be in lawful money of the United States in immediately available funds.  All such payments shall be applied first to the payment of all fees, expenses and other amounts due to Lender (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after the occurrence of a default, payments will be applied to the obligations of Borrower to Lender as Lender determines in its sole discretion.

In consideration of the granting of the Loan evidenced by this Note, Borrower hereby agrees as follows:

1.    Loan.   Lender shall make a single (non-revolving) loan in the amount and on the date set forth in the schedule attached hereto   (the "Loan").   In addition, Borrower may prepay the Loan from time to time up to the day before the Maturity Date.

2.    Interest.   Interest on the Loan shall accrue and be payable, together with principal, at a rate of ten percent (10%) per annum on the Maturity Date; *provided, however,* that no interest shall accrue or be due if the Loan is paid in full by December 16, 2019.  In no event shall interest payable hereunder be in excess of the maximum rate of interest permitted under applicable law.  If any payment to be so made hereunder becomes due and payable on a day other than a business day, such payment shall be extended to the next succeeding business day and, to the extent permitted by applicable law, interest thereon shall be payable during such extension.

3.    Maturity Date.   The outstanding principal amount of the Loan, together with accrued and unpaid interest thereon, shall be due and payable in full as of March 31, 2020.

4.    Prepayment.   Borrower may prepay the Loan at any time in whole or in part without premium or penalty.  Each such prepayment shall be made together with interest accrued thereon to and including the date of such prepayment.

5.    Default.   Upon the occurrence of any of the following "Events of Default," all principal and accrued and unpaid interest at the option of Lender shall immediately become due and payable, together with interest on the amount due and payable at ten percent (10%), compounded monthly, commencing on the date of such Event of Default:

601312876

a. <u>Bankruptcy</u>.   The institution of bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors or similar law shall be instituted voluntarily by the Borrower; or involuntarily against the Borrower and such proceedings shall not have been vacated by appropriate court order within sixty (60) days of such institution.

b. <u>Dissolution</u>.   Any order, judgment, or decree shall have been entered against the Borrower decreeing the dissolution or liquidation of the Borrower and such order shall remain undischarged or unstayed for a period of ten (10) days.

c. <u>Insolvency, Receiver or Trustee</u>.   The making by the Borrower of an assignment for the benefit of creditors or similar action; or the making by the Borrower of an offer of settlement, composition or extension to the claims of all or substantially all of the Borrower's creditors or the application for or consent to the appointment of a receiver or trustee or similar party for it or for a substantial part of its property or business; or the appointment otherwise of such a receiver or trustee or a committee of the Borrower's creditors or similar party.

d. <u>Failure to Pay</u>.   The failure of the Borrower to make any payment of any amount when due under this Note, whether at maturity, upon acceleration or otherwise.

e. <u>Default under Deed to Secure Debt</u>.   The failure of Borrower to comply with all terms and conditions of that certain Deed to Secure Debt of even date herewith executed by Borrower in favor of Lender.

6.   <u>Miscellaneous</u>.

a. <u>Collection Costs</u>.   On any default by Borrower, Lender shall be entitled to recover from Borrower all costs of collection and enforcement, including, without limitation, reasonable attorneys' fees

b. <u>Remedies Cumulative</u>.   The rights and remedies of Lender under this Note, any related document or at law or in equity are cumulative and may be pursued singly, successively, or together against Borrower and any other funds or security held by Lender.

c. <u>Waiver of Protest</u>.   Borrower  waives protest, presentment, demand and notice of protest on any default and of any nonpayment under this Note, and agrees to and waives notice of any renewal of this Note or any extension, acceleration, postponement of the time of payment or any other indulgences, any substitution, exchange or release of collateral, and the release of any person primarily or contingently liable under this Note.

d. <u>Modification; Waiver</u>. No modification or waiver of any provision of this Note shall be effective unless such modification or waiver shall be in writing and signed by a duly authorized officer of Lender and Borrower, and the same shall then be effective only for the period and on the conditions and for the specific instances specified in such writing.   No failure or delay by Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial

2

exercise thereof preclude any other or further exercise thereof or the exercise of any rights, power or privilege.

e.   <u>Governing Law</u>.   This Note, and any controversy related to, arising directly or indirectly out of, caused by, or resulting from this Note, shall be construed, interpreted in accordance with, and governed by the internal laws of the State of Georgia, including its statute limitations, without regard to its conflict of laws principles.

f.   <u>Successors and Assigns</u>.   This Note shall be binding upon and inure to the benefit of Borrower, Lender, all future holders of this Note and their respective successors and assigns. The term "<u>Lender</u>" as used herein shall be deemed to include Lender and its successors, endorsees and assigns.   Lender shall have the unrestricted right at any time or from time to time, and without Borrower's consent, to assign all or any portion of its rights and obligations hereunder, and Borrower agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Note and to any other documents, instruments, and agreements executed in connection herewith as Lender shall deem necessary to effect the foregoing.

g.   <u>Severability</u>.   If any part of this Note is determined to be illegal or unenforceable by a court of competent jurisdiction, all other parts shall remain in effect.

h.   <u>Notice</u>. Any notice given pursuant to this Note will be given by delivering such notice by courier or by mailing such notice by certified or registered mail to the recipient party's principal place of business in Georgia as designated with the Secretary of State of Georgia.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned has caused it's duly authorized officer or representative to execute this Note, all as of the date first above written.

**BORROWER**:

**ASH-GRAYHAWK, LLC**

By: _____
Stephen Pehrkon, Vice President of Finance

<u>Mailing Address</u>:
c/o Michael Scott
Norton Scott LLC
1420 Beverly Road
Suite 240
McLean, Virginia 22101
Email: mike@nortonscott.com

*and*

c/o Greg Benson
21630 Ridgetop Circle, Suite 120
Sterling, VA 20166
Phone:  (703) 863-5070
E-mail:  gbenson@benmarlc.com

LOAN SCHEDULE

| Loan Date | Principal Amount of Loan | Amount of Principal Repayment | Unpaid Principal Balance | Repayment Notation Made By |
|---|---|---|---|---|
| November 14, 2019 | $5,000,000 | $5,000,000 | $5,000,000 | |

EXHIBIT B

Form of Bill of Sale and Assignment and Assumption Agreement

[See attached.]

## BILL OF SALE AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of November 15, 2019, is by and among Grayhawk Homes, Inc., a Georgia corporation ("Grayhawk"), Homestead Residential Inc., an Alabama corporation ("Homestead"), and GH Services, Inc., a Georgia corporation ("GHS", collectively with Grayhawk and Homestead, "Assignor"), and ASH-Grayhawk, LLC, a Virginia limited liability company ("Assignee").

### RECITALS

A.      Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of the date hereof, by and among Assignor, Assignee, and the other parties named therein (as amended, modified, or supplemented from time to time, the "Purchase Agreement").

B.      Pursuant to the terms of the Purchase Agreement, the parties hereto have agreed, among other things, that (i) Assignor shall assign, transfer, convey, and deliver to Assignee, and Assignee shall accept from Assignor, all of Assignor's right, title, and interest in and to all of the Purchased Assets, and (ii) Assignee shall accept, assume, and agree faithfully to perform, discharge, and fulfill all of the Assumed Liabilities in accordance with their respective terms.

C.      The parties hereto desire to provide for the assignment of such right, title, and interest in and to the Purchased Assets and for the assumption of the Assumed Liabilities.

D.      Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Purchase Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of Assignor and Assignee, intending to be legally bound, hereby agrees as follows:

1.      Assignment. Assignor hereby assigns, transfers, conveys, and delivers (collectively, the "Assignment") to Assignee all of Assignor's legal, beneficial, and other right, title, benefit, privileges, and interest in and to each of the Purchased Assets in accordance with the terms and conditions of the Purchase Agreement.

2.      Assumption. Assignee hereby accepts the Assignment, and assumes and agrees to observe, perform, pay, fulfill, and otherwise discharge when due the Assumed Liabilities in accordance with the terms and conditions of the Purchase Agreement.

3.      Terms of Purchase Agreement. The scope, nature, and extent of the Purchased Assets and the Assumed Liabilities are expressly set forth in the Purchase Agreement. Nothing contained herein will itself change, amend, extend, or alter (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever. This instrument does not create or establish rights, liabilities, or obligations not otherwise created or existing under or pursuant to the Purchase

Agreement.  Each of the parties hereto acknowledges and agrees that the terms and conditions contained in the Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein.   In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement, the terms of the Purchase Agreement will govern.

4.   <u>Delayed Transfer</u>. To the extent that any of the Purchased Assets are not actually delivered and turned over by Assignor to Assignee as of the date of this Agreement, such Purchased Assets will be held in trust by Assignor for Assignee and will be turned over and delivered to Assignee at any time and from time to time upon demand therefor.

5.   <u>Further Assurances</u>. Each party hereby agrees that it will, at any time and from time to time after the date hereof, and without further consideration, take all such further actions, and execute and deliver all such further instruments or documents, as may be reasonably requested by the other party to effectuate the purposes of this Agreement.

6.   <u>Expenses</u>. Except as otherwise expressly provided in the Purchase Agreement, Assignee and Assignor will each bear its own costs and expenses incurred in connection with the preparation, execution, and performance of this Agreement, including all fees and expenses of agents, representatives, financial advisors, legal counsel, and accountants.

7.   <u>Third Parties</u>.   The assumption by Assignee of certain obligations of Assignor as provided in <u>Section 2</u> is not intended by the parties hereto to expand the rights or remedies of any third party against Assignee or Assignor, as the case may be, as compared to the rights and remedies which such third party would have had against Assignor had Assignee not consummated the transactions contemplated by the Purchase Agreement.   Nothing contained herein will, or should be construed to, prejudice the right of Assignee or Assignor, as the case may be, to contest any claim or demand with respect to any litigation or liability assumed or not assumed, respectively, hereunder; and Assignee or Assignor, as the case may be, will have all rights which Assignor has or may have to defend or contest any such claim or demand (except as aforesaid).

8.   <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

9.   <u>Amendments and Waivers</u>. No amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Agreement will be valid, unless the same will be in writing and signed by Assignee and Assignor.

10.   <u>Governing Law</u>.  This Agreement and all disputes, claims, or controversies relating to, directly or indirectly arising out of (whether sounding in contract, tort or statute), caused by, resulting from, or in connection with this Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia, including its statute of limitations, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of law rules of the State of Georgia or any other jurisdiction.

11.   <u>Headings</u>. The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

12.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.  Facsimile or electronic mail transmission of counterpart signatures to this Agreement shall constitute effective execution and delivery of this Agreement as to the parties and shall be deemed to be original signatures for all purposes.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the parties have executed this Bill of Sale and Assumption Agreement as of this date first above written.

<div style="text-align:right">

**ASSIGNOR**:

**GRAYHAWK HOMES INC.**


By:_____
Name: David B. Erickson
Title:   President


**HOMESTEAD RESIDENTIAL INC.**


By:_____
Name: David B. Erickson
Title:  President


**GH SERVICES, INC.**


By:_____
Name: David B. Erickson
Title:  President


**ASSIGNEE**:

ASH-GRAYHAWK, LLC


By:_____
Name: Gregory Benson
Title:   Chief Executive Officer

</div>

EXHIBIT C-1

Form of Trademark Assignment Agreement

[See attached.]

# TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT (this "Agreement") is made and entered into as of the 15th day of November, 2019, by and among Grayhawk Homes, Inc., a Georgia corporation ("Grayhawk"), Homestead Residential Inc., an Alabama corporation ("Homestead"), and GH Services, Inc., a Georgia corporation ("GHS", collectively with Grayhawk and Homestead, "Assignor"), and ASH-Grayhawk, LLC, a Virginia limited liability company ("Assignee").

## RECITALS

A.    Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of the date hereof, by and among Assignor, Assignee, and the other parties named therein (the "Purchase Agreement").

B.    Pursuant to the Purchase Agreement, Assignor desires to assign to Assignee, and Assignee desires to acquire from Assignor, all of Assignor's right, title, and interest in and to Assignor's trademarks, service marks, trade names, trade secrets, brand names, logos and corporate names, slogans, trade dress and other indicia of source of origin, whether or not registered, including, but not limited to, all common law rights thereto and all goodwill associated therewith, and registrations and applications for registration thereof that constitute Purchased Intellectual Property, including, but not limited to, the trademark and/or service mark registrations and/or applications identified on **Schedule 1** attached hereto (collectively, the "Trademarks").

C.    Capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    Assignment.    Assignor hereby sells, assigns, conveys, and transfers to Assignee, and Assignee hereby purchases, acquires, accepts, and assumes from Assignor, all worldwide right, title, and interest in, to, and under all Trademarks, including, without limitation, any and all common law rights thereto and the goodwill of the Business symbolized thereby, together with Assignor's worldwide right to police, monitor, and enforce said Trademarks against any and all past and current infringements (including, without limitation, the right to sue for and collect damages caused by any such infringement), which may have occurred at any time in the unlimited past, up to the date of this Agreement, together with any and all further privileges in the United States and throughout the world to establish use, ownership, and/or registration of the Trademarks.

2.    Authorization.    Assignor hereby authorizes the United States Commissioner of Patents and Trademarks (and the equivalent authority in foreign trademark offices, as applicable) to record this Agreement and transfer the Trademarks to Assignee as assignee of the

entire right, title, and interest therein or otherwise as Assignee may direct, in accordance with this instrument of assignment.

3.     <u>Governing Agreement</u>.  This Agreement is executed and delivered pursuant to the terms and conditions of the Purchase Agreement.  In the event of an irreconcilable conflict between the terms and provisions of this Agreement and any term or provision of the Purchase Agreement, the conflicting term or provision of the Purchase Agreement shall govern and control to the extent of such conflict.  Nothing contained in this Agreement shall alter, extend, diminish, or amplify any of the representations, warranties, covenants, or obligations of any Party contained in the Purchase Agreement or the survival thereof.

4.     <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by Assignor and Assignee, or their respective successors and assigns.

5.     <u>Further Assurances</u>.  From and after the date hereof but subject to the terms and conditions herein, Assignor and Assignee shall do all such acts and execute all such further documents and instruments as may be reasonably required to memorialize and make effective the transactions contemplated hereby.

6.     <u>Governing Law</u>.  This Agreement and all disputes, claims, or controversies relating to, directly or indirectly arising out of (whether sounding in contract, tort or statute), caused by, resulting from, or in connection with this Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia, including its statute of limitations, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of law rules of the State of Georgia or any other jurisdiction.

7.     <u>Counterparts</u>.  This Agreement may be executed in two or more original, facsimile, or electronic counterparts, each of which will be deemed an original, and all of which when taken together will constitute one and the same instrument.

8.     <u>Third Parties</u>.  Nothing in this Agreement is intended to confer any rights or remedies, whether express or implied, on any third parties other than Assignor and Assignee and their respective successors and permitted assigns.

9.     <u>Successors and Assigns.</u>  The provisions of this Agreement shall be binding upon and inure to the benefit of each of Assignor and Assignee and their respective successors and assigns.

[*Signature Pages Follow*]

2

**IN WITNESS WHEREOF**, the parties hereto have caused this Trademark Assignment Agreement to be executed as of the date first set forth above.


**ASSIGNOR:**

**Grayhawk Homes, Inc.**


By:_____

Name:  David B. Erickson

Title:   President


STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of Grayhawk Homes, Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.


_____

Notary Public

Print Name: _____

My Commission Expires:

_____

**<u>ASSIGNOR</u>**:

**Homestead Residential Inc.**

By:_____
Name:  David B. Erickson
Title:   President

STATE OF _____

COUNTY OF _____

On the \_\_\_\_ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of Homestead Residential Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____
Notary Public

Print Name: _____

My Commission Expires:

_____

**ASSIGNOR**:

**GH Services, Inc.**


By:_____
Name:  David B. Erickson
Title:    President



STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of GH Services, Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.


_____
Notary Public

Print Name: _____

My Commission Expires:

_____

**ASSIGNEE**:

**ASH-Grayhawk, LLC**

By: _____

Name: Gregory Benson

Title:   Chief Executive Officer


STATE OF _____

COUNTY OF _____

On this _____ day of _____ in the year 2019, before me, a Notary Public, in and for said state, personally appeared Gregory Benson, the Chief Executive Officer of ASH-Grayhawk, LLC, known to me to be the person who executed the within Trademark Assignment Agreement, on behalf of said company and acknowledged to me that he executed the same for the purposes therein stated.


_____

Notary Public

Print Name: _____

My commission expires:

_____

## <u>SCHEDULE 1</u>

**Trademarks**

**Registered Trademarks**:

None


**Common Law Trademarks**:

None

<u>EXHIBIT C-2</u>

Form of Domain Name Assignment Agreement


[See attached.]

## DOMAIN NAME ASSIGNMENT AGREEMENT

This DOMAIN NAME ASSIGNMENT AGREEMENT (this "Agreement") is made and entered into as of the 15th day of November, 2019, by and among Grayhawk Homes, Inc., a Georgia corporation ("Grayhawk"), Homestead Residential Inc., an Alabama corporation ("Homestead"), and GH Services, Inc., a Georgia corporation ("GHS", collectively with Grayhawk and Homestead, "Assignor"), and ASH-Grayhawk, LLC, a Virginia limited liability company ("Assignee").

<div align="center">RECITALS</div>

A.      Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of the date hereof, by and among Assignor, Assignee, and the other parties named therein (the "Purchase Agreement").

B.      Pursuant to the Purchase Agreement, Assignor desires to assign to Assignee, and Assignee desires to acquire from Assignor, all of Assignor's right, title, and interest in and to Assignor's domain name registrations that constitute Purchased Intellectual Property, including, but not limited to, the domain name registrations, websites, and extranets identified on **Schedule 1** attached hereto (collectively, the "Domain Name Registrations").

C.      Capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Purchase Agreement.

<div align="center">AGREEMENT</div>

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment.   Assignor hereby sells, assigns, conveys, and transfers to Assignee, and Assignee hereby purchases, acquires, accepts, and assumes from Assignor, all worldwide right, title and interest in, to, and under all Domain Name Registrations, including, without limitation, any and all common law rights thereto and the goodwill of the Business symbolized thereby, together with all of Assignor's duties, liabilities, and obligations under and with respect to each of the Doman Name Registrations.

2.      Authorization.   Assignor hereby authorizes the applicable registrar of each of the Domain Name Registrations to accept this Agreement and transfer the Domain Name Registrations to Assignee as assignee of the entire right, title, and interest therein or otherwise as Assignee may direct, in accordance with this instrument of assignment.  In addition, Assignor hereby agrees, at any time, at the reasonable written request of Assignee, to execute, acknowledge, and deliver such further instruments of conveyance, sale, transfer, or assumption and to take such other actions as Assignee may reasonably request in order to more effectively consummate the assignments and transfers contemplated by this Agreement, including providing all transfer approvals and otherwise completing any online procedures set forth by the registrar for the Domain Name Registrations that are necessary to transfer the Domain Name Registrations.

3.     <u>Governing Agreement</u>.  This Agreement is executed and delivered pursuant to the terms and conditions of the Purchase Agreement.  In the event of an irreconcilable conflict between the terms and provisions of this Agreement and any term or provision of the Purchase Agreement, the conflicting term or provision of the Purchase Agreement shall govern and control to the extent of such conflict.  Nothing contained in this Agreement shall alter, extend, diminish, or amplify any of the representations, warranties, covenants, or obligations  of any Party contained in the Purchase Agreement or the survival thereof.

4.     <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by Assignor and Assignee, or their respective successors and assigns.

5.     <u>Further Assurances</u>.  From and after the date hereof but subject to the terms and conditions herein, Assignor and Assignee shall do all such acts and execute all such further documents and instruments as may be reasonably required to memorialize and make effective the transactions contemplated hereby.

6.     <u>Governing Law</u>.  This Agreement and all disputes, claims, or controversies relating to, directly or indirectly arising out of (whether sounding in contract, tort or statute), caused by, resulting from, or in connection with this Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia, including its statute of limitations, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of law rules of the State of Georgia or any other jurisdiction.

7.     <u>Counterparts</u>.  This Agreement may be executed two or more original, facsimile, or electronic counterparts, each of which will be deemed an original, and all of which when taken together will constitute one and the same instrument.

8.     <u>Third Parties</u>.  Nothing in this Agreement is intended to confer any rights or remedies, whether express or implied, on any third parties other than Assignor and Assignee and their respective successors and permitted assigns.

9.     <u>Successors and Assigns.</u>  The provisions of this Agreement shall be binding upon and inure to the benefit of each of Assignor and Assignee and their respective successors and assigns.

[*Signature Pages Follow*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Domain Name Assignment Agreement to be executed as of the date first set forth above.

<div align="center">

**<u>ASSIGNOR</u>**:

**Grayhawk Homes, Inc.**

</div>

By:_____

Name: David B. Erickson

Title: President

STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of Grayhawk Homes, Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

Print Name: _____

My Commission Expires:

_____

**<u>ASSIGNOR</u>**:

**Homestead Residential Inc.**


By:_____
Name:  David B. Erickson
Title:   President



STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of Homestead Residential Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.


_____
Notary Public

Print Name: _____

My Commission Expires:

_____

**ASSIGNOR**:

**GH Services, Inc.**

By: _____

Name: David B. Erickson

Title: President

STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of GH Services, Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

Print Name: _____

My Commission Expires:

_____

**ASSIGNEE**:

**ASH-Grayhawk, LLC**

By: _____

Name: Gregory Benson

Title:   Chief Executive Officer

STATE OF _____

COUNTY OF _____

On this _____ day of _____ in the year 2019, before me, a Notary Public, in and for said state, personally appeared Gregory Benson, the Chief Executive Officer of ASH-Grayhawk, LLC, known to me to be the person who executed the within Domain Name Assignment Agreement, on behalf of said company and acknowledged to me that he executed the same for the purposes therein stated.

_____

Notary Public

Print Name: _____

My commission expires:

_____

**SCHEDULE 1**
**Domain Name Registrations**

**Domain Names**:

**Go Daddy Domain Names with Expiration Dates**

| | | |
|---|---|---|
| AUBURNALCUSTOMHOMEBUILDER.COM | 2021-05-03 | UTC |
| AUBURNALHOMEBUILDER.COM | 2021-05-03 | UTC |
| COLUMBUSGAHOMEBUILDER.COM | 2020-08-23 | UTC |
| CUSTOMHOMESCOLUMBUSGA.COM | 2020-08-23 | UTC |
| GRAYHAWK-HOMES.COM | 2019-11-30 | UTC |
| GRAYHAWKCUSTOMHOMES.COM | 2021-02-07 | UTC |
| GRAYHAWKHOMESAL.COM | 2019-11-30 | UTC |
| GRAYHAWKHOMESCOLUMBUS.COM | 2019-11-30 | UTC |
| GRAYHAWKHOMESFTBENNING.COM | 2019-11-30 | UTC |
| GRAYHAWKHOMESGA.COM | 2019-11-30 | UTC |
| GRAYHAWKHOMESINC.COM | 2023-11-30 | UTC |
| GRAYHAWKHOMESINC.NET | 2019-11-30 | UTC |
| GREYHAWKHOMESINC.COM | 2019-11-30 | UTC |
| GREYHAWKHOMESINC.NET | 2019-11-30 | UTC |
| HOMEBUILDERAUBURNAL.COM | 2021-05-03 | UTC |
| HOMESTEADAUBURN.COM | 2021-06-10 | UTC |
| HOMESTEADRES.COM | 2021-05-03 | UTC |
| HOMESTEADRESIDENTIALHOMES.COM | 2021-05-03 | UTC |
| HOMESTEADRESIDENTIALINC.COM | 2021-05-03 | UTC |
| HOMESTEADRESIDENTIALUS.COM | 2021-05-03 | UTC |
| WHYGRAYHAWK.COM | 2021-03-26 | UTC |

**Social Media**:

GRAYHAWK
## Social Medias

| Platform | Username |
| --- | --- |
| Facebook (Dave's) | dave@grayhawkhomesinc.com |
| Facebook Page (Columbus) | @GrayhawkHomes |
| Instagram: Grayhawk (Columbus) | @GrayhawkHomes |
| LinkedIn | n/a |
| YouTube | grayhawkhomes@gmail.com |
| Pinterest: Grayhawk (Columbus) | gary@raerealty.net |
| Twitter: Grayhawk (Columbus) | @grayhawkhomes |
| Yelp: Grayhawk (Columbus) | jlynch@grayhawkhomesinc.com |
| | |
| Facebook Page (Homestead) | @HomesteadAuburn |
| Instagram: Homestead | @HomesteadResidential |
| Pinterest: Homestead | kclouser@grayhawkhomesinc.com |

<u>EXHIBIT C-3</u>

Form of Copyright Assignment Agreement


[See attached.]

## COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT (this "Agreement") is made and entered into as of the 15th day of November, 2019, by and among Grayhawk Homes, Inc., a Georgia corporation ("Grayhawk"), Homestead Residential Inc., an Alabama corporation ("Homestead"), and GH Services, Inc., a Georgia corporation ("GHS", collectively with Grayhawk and Homestead, "Assignor"), and ASH-Grayhawk, LLC, a Virginia limited liability company ("Assignee").

### RECITALS

A.     Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of the date hereof, by and among Assignor, Assignee, and the other parties named therein (the "Purchase Agreement").

B.     Pursuant to the Purchase Agreement, Assignor desires to assign to Assignee, and Assignee desires to acquire from Assignor, all of Assignor's right, title, and interest in and to Assignor's copyrights, copyright applications to register and registrations, works fixed in a tangible medium of expression including, but not limited to, advertising, marketing, packaging, designs, artwork, pictures, sketches, drawings, architectural, building, and engineering designs, drawings, specifications, plans and other project-related information of prior and currently active real estate projects (including house plans for any existing or planned community), script, characters, photographs, manuals, forms, and any and all registrations, renewals, extensions, and restorations of any of the foregoing that consitute Purchased Intellectual Property, including, but not limited to, the copyrights and/or copyright applications identified on **Schedule 1** attached hereto (collectively,  the "Copyrights").

C.     Capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Purchase Agreement.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.     Assignment.   Assignor hereby sells, assigns, conveys, and transfers to Assignee, and Assignee hereby purchases, acquires, accepts, and assumes from Assignor, all worldwide right, title, and interest in, to, and under all Copyrights, whether registered or unregistered, and all elements thereof, including, without limitation, any and all derivative works of any of the foregoing and all privileges and goodwill associated with the Copyrights, together with all now or hereafter existing rights of every kind and character whatsoever throughout the world pertaining to the Copyrights, and all rights of Assignor to police, monitor, and enforce said Copyrights against any and all past and current infringement (including, without limitation, the right to sue for and collect damages caused by any such infringement), whether arising prior to or subsequent to the date hereof, the same to be held and enjoyed by Assignee, its successors and assigns from

and after the date of this Agreement as fully and entirely as the same would have been held and enjoyed by Assignor had this Agreement not been made.

2.   <u>Authorization</u>.  Assignor hereby authorizes the United States Register of Copyrights (and the equivalent authority in foreign copyright offices, as applicable) to record this Agreement and transfer the Copyrights and any Copyright applications to Assignee as assignee of the entire right, title, and interest therein or otherwise as Assignee may direct, in accordance with this instrument of assignment.

3.   <u>Governing Agreement</u>.  This Agreement is executed and delivered pursuant to the terms and conditions of the Purchase Agreement.  In the event of an irreconcilable conflict between the terms and provisions of this Agreement and any term or provision of the Purchase Agreement, the conflicting term or provision of the Purchase Agreement shall govern and control to the extent of such conflict.  Nothing contained in this Agreement shall alter, extend, diminish, or amplify any of the representations, warranties, covenants, or obligations of any Party contained in the Purchase Agreement or the survival thereof.

4.   <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by Assignor and Assignee, or their respective successors and assigns.

5.   <u>Further Assurances</u>.  From and after the date hereof but subject to the terms and conditions herein, Assignor and Assignee shall do all such acts and execute all such further documents and instruments as may be reasonably required to memorialize and make effective the transactions contemplated hereby.

6.   <u>Governing Law</u>.  This Agreement and all disputes, claims, or controversies relating to, directly or indirectly arising out of (whether sounding in contract, tort or statute), caused by, resulting from, or in connection with this Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia, including its statute of limitations, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of law rules of the State of Georgia or any other jurisdiction.

7.   <u>Counterparts</u>.  This Agreement may be executed in two or more original, facsimile, or electronic counterparts, each of which will be deemed an original, and all of which when taken together will constitute one and the same instrument.

8.   <u>Third Parties</u>.  Nothing in this Agreement is intended to confer any rights or remedies, whether express or implied, on any third parties other than Assignor and Assignee and their respective successors and permitted assigns.

9.   <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of each of Assignor and Assignee and their respective successors and assigns.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Copyright Assignment Agreement to be executed as of the date first set forth above.

<div align="center">

**ASSIGNOR**:

**Grayhawk Homes, Inc.**

</div>

By:_____

Name:  David B. Erickson

Title:   President

STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of Grayhawk Homes, Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

Print Name: _____

My Commission Expires:

_____

**ASSIGNOR**:

**Homestead Residential Inc.**

By:_____

Name:  David B. Erickson

Title:   President

STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of Homestead Residential Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.

_____

Notary Public

Print Name: _____

My Commission Expires:

_____

**ASSIGNOR**:

**GH Services, Inc.**

By:_____
Name:  David B. Erickson
Title:   President


STATE OF _____

COUNTY OF _____

On the _____ day of _____ in the year 2019, before me personally came David B. Erickson to me known, who, being by me duly sworn, did depose and say that he is the President of GH Services, Inc., the corporation described in and which executed the above instrument; and that he signed his name thereto by authority of the board of directors of said corporation.


_____

Notary Public

Print Name: _____

My Commission Expires:

_____

**<u>ASSIGNEE</u>**:

**ASH-Grayhawk, LLC**

By: _____
Name: Gregory Benson
Title:   Chief Executive Officer

STATE OF _____

COUNTY OF _____

On this _____ day of _____ in the year 2019, before me, a Notary Public, in and for said state, personally appeared Gregory Benson, the Chief Executive Officer of ASH-Grayhawk, LLC, known to me to be the person who executed the within Copyright Assignment Agreement, on behalf of said company and acknowledged to me that he executed the same for the purposes therein stated.

_____

Notary Public

Print Name: _____

My commission expires:

_____

## SCHEDULE 1

### Copyrights and Copyright Applications

**Registered Copyrights**:

| Copyright Name | Filing Number | Registration Number |
|---|---|---|
| Aberdeen | 1-7978549797 | VA0001660892 |
| Alder | 1-7979238398 | VAu1-371-080 |
| Arbor | 1-7979238498 | VAu1-371-305 |
| Ashton | 1-7979238722 | VAu1-371-080 |
| Aspen | 1-7979238873 | Vau1-371-303 |
| Bailey | 1-797239110 | VAu1-371-375 |
| Bailey | | VAu001117485 |
| Bartlett | 1-7979270259 | Vau1-371-309 |
| Baywood | 1-7979270350 | Vau1-371-310 |
| Bedford | 1-7979270410 | VAu1-371-493 |
| Bedford | | VA0001660889 |
| Big Creek  -  Elevation C | 1-7979270470 | VAu001027112 |
| Birch | 1-7979270568 | VAu1-371-311 |
| Bonsai | 1-8015655082 | |
| Boston | 1-7979270658 | VAu1-371-313 |
| Boston II | 1-8015655120 | |
| Bradford | | VA0001660135 |
| Brentwood | 1-7979270715 | VAu1-371-321 |
| Brighton - Elevation A; Brighton - Elevation B; Brighton - Elevation C; Brighton - Elevation D | | VAu001027006 |
| Buckeye | 1-7979270755 | VAu1-371-316 |
| Cambridge | | VA0001669270 |
| Canterbury | | VAu001027029 |
| Canterbury | | VAu001027028 |
| Carolina - Elevation C | | VAu001033819 |
| Carolina with Bonus - Elevation C | | VAu001027014 |
| Cardinal | 1-8018789622 | |
| Charleston | 1-7979270794 | VAu1-371-502 |
| Chestnut | 1-7979270833 | VAu1-371-504 |
| Coventry | 1-7979270872 | VAu1-371-635 |
| Derby | 1-7979270951 | VA0001660121 |

| Copyright Name | Filing Number | Registration Number |
|---|---|---|
| Derby II | 1-8015655179 | |
| Devon | 1-7979271029 | VA0001660885 |
| Devon II | 1-8015655218 | |
| Dudley | 1-8015759317 | |
| Elmwood | 1-7979271066 | VAu1-371-515 |
| Exeter - Elevation D | | VAu001026994 |
| Gable - Elevation C Gable - Elevation D Gable - Elevation E Gable - Elevation F Gable - Elevation G Gable - Elevation H | | VAu001027115 |
| Grayrock - Elevation C Grayrock - Elevation D Grayrock - Elevation E Grayrock - Elevation F Grayrock - Elevation G Grayrock - Elevation H. | | VAu001026223 |
| Grouse | 1-8018789795 | |
| Grouse | 1-8018789795 | |
| Hampton | 1-7987368422 | VAu1-371-888 |
| Hampton - Elevation D | | VAu001027113 |
| Harrisburg | | |
| Hawthorne | 1-7987368461 | VAu1-371-748 |
| Hazlenut | 1-8015759364 | |
| Holley Brooke | 1-8015759401 | |
| Jasmine | 1-79787368501 | VAu001371738 |
| Kent | | VA0001660891 |
| Kingsbridge - Elevation E | | VAu001059723 |
| Kingsbridge - Elevation H | | VAu001058193 |
| Kodiak | 1-7987368540 | VAu1-371-722 |
| Laurel | 1-7987368580 | VAu1-371-752 |
| Longleaf | 1-7987368620 | VAu1-371-701 |
| Manchester | | VA0001660132 |
| Magnolia | 1-8015759490 | |
| Maryland | 1-7987368659 | VAu1-371-711 |
| Meade | 1-015759529 | |
| Meadow Creek | 1-7987368810 | VAu1-371-891 |
| Meadow Creek | | VAu001027024 |
| Mimoda | 1-8015759568 | |
| Montana | 1-7987368849 | VAu1-371-717 |
| Montrose | | VA0001669347 |

| Copyright Name | Filing Number | Registration Number |
|---|---|---|
| Myrtle | | |
| Nottingham | 1-7987368889 | VAu1-371-894 |
| Nottingham | | VAu001054668 |
| Olive | 1-8015759607 | |
| Orile | 1-8018789924 | |
| Oriole | 1-8018789924 | |
| Osprey | 1-8018790023 | |
| Osprey | 1-8018790023 | |
| Oxford | | VA0001660306 |
| Poplar | 1-7987368928 | VAu1-371-720 |
| Prescott | | VA0001660126 |
| River Oak | 1-7987368967 | VAu1-371-718 |
| Rockwood - Elevation C | | VAu001026996 |
| Sandhurst | 1-7987369006 | VAu1-371-897 |
| Sandhurst | | VA0001660130 |
| Sandpiper | 1-8018790163 | |
| Sandpiper | 1-8018790163 | |
| Santa Fe - Elevation C | | VAu001026999 |
| Sequoia - Elevation C | | VAu001027001 |
| Silverado - Elevation C | | VAu001027011 |
| Somerset | | VA0001669096 |
| Spruce | 1-7987369043 | VAu1-371-759 |
| St. Ives | | VA0001669353 |
| Stratford - Elevation H | | VAu001059720 |
| Sycamore | 1-7987369082 | Vau1-371-683 |
| Timberline | 1-8015759656 | |
| Truett | 1-7987369121 | VAu1-371-756 |
| Virginia - Elevation C | | VAu001026995 |
| Wakefield | | VAu001117482 |
| Walnt | 1-8015759693 | |
| Warbler | 1-8018790241 | |
| Warbler | 1-8018790241 | |
| Wellington | 1-7987369160 | VAu1-371-734 |
| Willow | 1-7987369199 | Vau1-371-700 |
| Windsor | | VA0001660843 |
| Wren | 1-8018815420 | |
| Wren | 1-8018815420 | |

| Copyright Name | Filing Number | Registration Number |
|---|---|---|
| York - Elevation A; York - Elevation B; York - Elevation C; York - Elevation D; York - Elevation E; York - Elevation F | | VAu001027016 |

**Unregistered Copyrights**:

None.

<u>EXHIBIT D</u>

Form of Employment Agreement


[See attached.]

## EMPLOYMENT AGREEMENT

This Employment Agreement is made as of the Effective Date by and among ASH-Grayhawk, LLC, a Virginia limited liability company (the "**Employer**"), American Southern Homes Holdings  LLC ("**ASH**") and David B. Erickson ("**Executive**").

**WHEREAS** the Employer proposes to employ the Executive and the Executive wishes to be employed by the Employer, all upon and subject to the provisions of this Agreement; and

**WHEREAS** the Executive is, pursuant to a separate Asset Purchase Agreement ("**APA**") selling to Employer substantially all of the operating assets of Grayhawk Homes, Inc. and related entities ("**Grayhawk  Transaction**"); and

**WHEREAS** this Agreement arises from and is inextricably linked to, the APA and the Grayhawk Transaction.

**NOW THEREFORE** this Agreement witnesses that in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1.00 – DEFINITIONS AND INTERPRETATION

1.01        <u>Definitions</u>.   The following terms shall have, for the purposes of this Agreement, the meanings set forth below:

(a)        "**Agreement**" means this agreement made between the Employer and the Executive as of the Effective Date.

(b)        "**Business**" or "**Business of the Employer**" means the business of building and marketing residential communities and projects carried on by Employer and by American Southern Homes ("**ASH**"), the parent of Employer, and businesses reasonably ancillary thereto.

(c)        "**Business Day**" means any day other than a Saturday, Sunday or statutory or civic holiday in the State of Georgia.

(d)        "**Confidential Information**" has the meaning ascribed thereto in Section 6.01.

(e)        "**Effective Date**" means the first business day after the Closing Date (as that term is defined in the APA) of the Grayhawk Transaction.

(f)        "**Employer**" means the corporation designated as Employer at the outset of this Agreement.

(g)     "**Executive**" means the individual designated as Executive at the outset of this Agreement.

(h)     "**includes**" and "**including**" mean includes without limitation and including without limitation, as the case may be.

(i)     "**Person**" means an individual, partnership, corporation, limited liability company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

(j)     "**Severance Payments**" means payment(s) made upon termination without cause in accordance with Section 7.04.

1.02     <u>Headings</u>.   The headings of the articles and sections of this Agreement are inserted for convenience of reference only and shall not affect its construction or interpretation.

1.03     <u>Number/Gender</u>.   In this Agreement words importing the singular number only shall include the plural and vice versa and words importing gender include all genders.

1.04     <u>Currency</u>.  All expressions of currency in this Agreement refer to US dollars.

1.05     <u>Partial Invalidity</u>.   If any provision of this Agreement is held to be illegal, invalid or unenforceable under any applicable law, then such provision will be deemed to be modified to the minimum extent necessary to render it legal, valid and enforceable, and if no such modification will render it legal, valid and enforceable, then this Agreement will be construed as if not containing the provision held to be invalid, and the rights and obligations of the parties will be construed and enforced accordingly.

1.06     <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia and the federal laws of the United States applicable therein.

## 2.00 - EMPLOYMENT OF EMPLOYEE, POSITION AND DUTIES

2.01     <u>Employment of Executive</u>.   The Employer appoints the Executive to undertake the duties as and exercise the powers of President of Employer, working from Employer's offices in Columbus, Georgia.   The Executive accepts such appointment and employment, upon the terms and conditions set forth in this Agreement, and agrees to serve the Employer in such capacity.

2.02     <u>Duties of Executive</u>.   The Executive shall perform the duties and exercise the functions of the President of Employer and any other related duties as may be determined from time to time by ASH or its representative (currently Greg Benson) in consultation with the Executive.   The Executive shall devote substantially all of his business time to Employer and

shall perform all duties and exercise his functions diligently, faithfully and in an honest manner and to the best of the Executive's ability.  The Executive will use his best efforts to promote the legitimate interests of Employer and ASH, and the Executive shall at all times promote the reputation and interests of Employer and ASH and its corporate affiliates, including with customers, vendors, lenders, investors, realtors, land sellers, subcontractors, and employees.

2.03        Transition Role.  The parties agree and acknowledge that Executive is playing a transitional role and, as contemplated by the APA, will serve until a qualified President can be identified and hired following the Closing Date (as that term is defined in the APA) of the Grayhawk transaction.  Thereafter, Executive shall train and serve as a mentor to his successor. This Agreement shall then terminate pursuant to Section 7.07, at which time Executive will become a consultant to the Employer and/or ASH pursuant to a separate agreement (the "**Consulting Agreement**").

2.04        Encumbrances.   By entering into this Agreement, and except as otherwise provided in the APA or as part of the Grayhawk Transaction, the Executive represents and warrants that he is not currently or about to become subject to any contract or obligation, either expressed or implied, with his current or previous employer, which could in any way restrict his employment with the Employer.  Executive shall, as contemplated by the APA, bring all written materials and information from Grayhawk Homes Inc. and/or Homestead Residential Inc. and/or GH Services Inc. to be utilized  on behalf of Employer and ASH.

2.05        Reporting.   Until further notice from the Employer, the Executive will, in the performance of his duties, report to ASH or its representative (currently Greg Benson).

2.06        Adherence to Policies.   The Executive will discharge his responsibilities within the framework of delegated authorities and consistent with the policies and procedures of the Employer.   Except as specifically provided in this Agreement and/or the APA and/or the Grayhawk Transaction, the Executive further agrees to adhere to all properly constituted policies of general application to ASH employees, including any codes of conduct developed for application to ASH employees generally, as the same may be revised and updated from time to time.

### 3.00 - TERM

3.01        Maximum Term.    The Executive's appointment shall commence as of the Effective Date, and shall continue for no more than six months unless terminated in accordance with the provisions  of this Agreement.

### 4.00 - COMPENSATION

4.01        Annual Base Salary.   The Employer agrees to pay the Executive a base salary of $350,000 per annum (the "**Base Salary**").   Base Salary will be deemed to accrue from day to day

and will be payable in equal biweekly instalments in arrears, in accordance with prevailing policies or practice of the Employer.

4.01     Deductions from Compensation.  All amounts payable as compensation under this Agreement are subject to all applicable tax withholdings and statutory deductions as well as any other amount owed by Executive to Employer or otherwise authorized for deduction by the Executive.

## 5.00 - VACATION/BENEFITS/PERQUISITES

5.01     Vacation.  The Executive is entitled to six (6) weeks (30 working days) paid vacation in respect of each calendar year of employment.  Vacation entitlement will be pro-rated for any part of a calendar year.  In the normal course the Executive will not be entitled to carry over any unused vacation time from a calendar year into the subsequent calendar year, except as permitted under the vacation policy of the Employer.  The Executive will take vacation at a time or times reasonable for the Executive and the Employer in the circumstances.

5.02     Benefits.  The Executive is entitled to participate in the Employer's group benefit plans and programs currently in effect as follows, subject to the eligibility provisions of such plans and programs:

   (a)     Health and dental benefits;

   (b)     Life insurance coverage;

   (c)     Participation in the Employer's 401(k) plan;

   (d)     Short Term & Long Term Disability;

   (e)     Vehicle allowance of $800 per month with Executive responsible for all operating and maintenance costs.

5.03     Changes to Benefit Programs.  The Executive acknowledges that the terms of Employer's benefit programs are not guaranteed and may change at any time, and the Employer acknowledges and agrees that the Executive will be eligible to participate in any new or modified programs as they apply to executives of Employer and/or ASH, subject to the eligibility provisions of such programs.

5.04     Expense Policy.  The Executive will be reimbursed by the Employer for approved expenses, including travel, parking, reasonable entertainment and other necessary business expenses required for and incurred as a result of the Executive's work on behalf of Employer and/or ASH.  The Employer will reimburse the Executive for such expenses upon presentation of supporting documentation reasonably satisfactory to the Employer and in accordance with the Employer's established reimbursement policies, as those policies may be modified from time to time in the Employer's discretion.

- 4 -

5.05      Taxable Benefits.   The Executive will be responsible for remitting all required taxes on any taxable benefits provided by the Employer in relation to the Executive's employment, if not already withheld at source.

## 6.00 - CONFIDENTIAL INFORMATION

6.01      Acknowledgement Respecting Confidential Information.  The Executive acknowledges that, in the performance of his duties and responsibilities under this Agreement, the Executive will receive or have access to certain non-public, proprietary and/or confidential information relating to the Business and affairs of Employer and/or ASH, including trade secrets, know-how, research and development, databases, software, and other intellectual property; information concerning personnel, compensation, recruiting, and training; and information concerning the past, future or current Business, activities and operations of Employer and/or ASH, including customers, clients, suppliers, contractors, products and prices (hereinafter referred to as the "**Confidential Information**").

6.02      Non-Disclosure of Confidential Information.   The Executive recognizes and acknowledges the competitive value and confidential and proprietary nature of the Confidential Information to which he will have access in the performance of his duties and responsibilities for Employer and/or ASH and the losses, costs and damages that could result to Employer and/or ASH if any Confidential Information is disclosed to any other Person and in connection therewith the Executive agrees to keep the Confidential Information confidential, to use the Confidential Information only in connection with the carrying out of duties and responsibilities under this Agreement, not to use the Confidential Information after the termination of this Agreement for any reason, and not to disclose any Confidential Information to any Person (other than employees and advisors of Employer and/or ASH who specifically need to know such Confidential Information and who have previously agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions substantially similar to those of this Section), in any manner whatsoever, in whole or in part.

6.03      Where No Obligation to Maintain Confidentiality.  The Executive shall have no obligation to maintain as confidential any Confidential Information to the extent that such Confidential Information:

(a)      is or becomes publicly known or readily ascertainable by the public, and through no wrongful act of the Executive; or

(b)      is received by the Executive from a third party without breaching an obligation owed to any other Person, if the Executive is not restricted by the third party from disclosing such Confidential Information; or

(c)      is required by law to be disclosed, provided the Executive shall give prompt written notice to the Employer of such requirements, disclose no more

information than is so required, and cooperate with any attempts by Employer and/or ASH to obtain a protective order or similar treatment.

6.04    Liability for Losses.   The Executive shall be liable to Employer and/or ASH for any actual and demonstrable losses, costs or damages to Employer and/or ASH if any Confidential Information is disclosed by the Executive in breach of this Agreement.

6.05    Irreparable Harm.   The Executive acknowledges and agrees that a breach of the covenants contained in Section 6.02 would result in irreparable harm to the Employer and/or ASH and that monetary damages alone would be an inadequate remedy.  In the event of a breach or threatened breach of Section 6.02, the Employer or ASH shall be entitled to an injunction restraining any such breach or threatened breach, without the necessity of posting a bond or other security, in addition to any other rights or remedies available.

6.06    Survival.   The obligations of the Executive set out in this Article 6.00 shall survive the termination of this Agreement for a period of three (3) years.

## 7.00 - TERMINATION

7.01    Resignation by Executive.   The Executive may resign his employment voluntarily upon giving thirty (30) days prior written notice to the Employer.  Following receipt of such notice, the Employer may relieve the Executive of some or all of his duties and place the Executive on paid administrative leave for all or any part of such thirty-day notice period.  Upon resignation, the Executive shall have no entitlement to compensation except for unpaid Base Salary, payment for unused vacation (if required by Employer policy), and entitlement to expense reimbursement accrued prior to the effective date of resignation.  All of the Executive's benefits shall cease upon the Executive's effective date of resignation, except as may be required under law such as COBRA.

7.02    Death of Executive.   This Agreement shall terminate automatically upon the death of the Executive, and subject to the continued entitlement of the estate to insurance proceeds, if any, the estate of the Executive shall not be entitled to notice or severance or any further compensation or benefits, other than Base Salary, payment for unused vacation (if required by Employer policy), and entitlement to expense reimbursement accrued to the date of the Executive's death.  All of the Executive's benefits shall cease upon the Executive's date of death.

7.03    Termination for Cause.   The Employer may terminate this Agreement at any time for cause without notice.   Upon termination of this Agreement for cause, the Executive will receive unpaid Base Salary, payment for unused vacation (if required by Employer policy), and entitlement to expense reimbursement accrued to the date of termination and which has not been paid at the date of termination.   All of the Executive's benefits shall cease immediately upon termination of this Agreement for cause.

For the purposes of this Agreement, "**cause**" shall include the following conduct by the Executive:

(i) a knowing breach of one or more material provisions of this Agreement by the Executive;

(ii) conviction of the Executive for any criminal offense involving moral turpitude, theft or fraud;

(iii) the Executive or any member of his family makes any personal gain or profit arising out of or in connection with a transaction to which any entity which is part of Employer and/or ASH is a party or with which it is associated without first making disclosure to and obtaining the prior written consent of the Employer (unless such transaction is permitted under the Agreement, the APA or the Grayhawk Transaction);

(iv) any act of dishonesty on the part of the Executive;

(v) the Executive fails to devote substantially all of his business time and effort to Employer;

(vi) the Executive knowingly fails to honor his fiduciary duties to the Employer, including the duty to act in the best interests of Employer and/or ASH; or

(vii) any and all omissions, commissions or other conduct which would constitute cause at law under the applicable Georgia case law or statutes, in addition to the specified causes.

Failure by the Employer to rely upon the provisions of this Section in any given instance or instances shall not constitute a precedent or be deemed a waiver of the Employer's rights under this Section.

7.04    <u>Termination Without Cause</u>.  The Employer may terminate this Agreement at any time without cause upon written notice to the Executive to be effective upon the date specified in such notice.  Upon a termination without cause, the Employer shall provide the Executive with payment of severance in an amount equal to one year's Base Salary, less applicable statutory deductions, which will be paid in accordance with the Employer's usual payroll cycle, and will end on the anniversary date of Executive's termination (the "Severance Payment"); provided, however, that no Severance Payment will be owed or paid unless Executive executes and delivers to Employer a full and final release of all claims against Employer and ASH and related persons in a form reasonably acceptable to Employer which becomes fully effective not later than the sixtieth (60th) day after the effective date of Executive's termination (the "Release"). For the avoidance of doubt, Executive shall not be entitled to a Severance Payment in the event that this Agreement is terminated pursuant to Sections 2.03 and 7.07.

7.05      <u>Fair Consideration</u>.   The Executive acknowledges that the payment provisions provided for in Section 7.04 supersede and replace any and all rights to reasonable notice of termination to which Executive might otherwise be entitled.   The Executive further acknowledges that the provisions of Section 7.04 have been freely negotiated in advance between the Employer and the Executive as representing reasonable notice of termination and specifically take into account all amounts owed or owing for notice and/or severance pay arising under contract, statute, common law or otherwise.   Payment of amounts under Section 7.04 is conditional upon the Executive both executing the Release and fully complying with all obligations arising under the employment relationship, including any post-termination obligations, as described in this Agreement.   In the event that the Executive breaches any of the restrictive covenants contained in this Agreement, the Executive agrees to immediately forfeit all of the Severance Payment that has been made to the Executive.

7.06      <u>Constructive Discharge</u>.   Executive shall receive a Severance Payment, in the same amount and on the same payment schedule set forth in Section 7.04 and subject to the same conditions set forth in Sections 7.04 and 7.05, if there is a termination of the Executive's employment by the Executive that is found by a court of competent jurisdiction to constitute a constructive discharge as a result of Executive's relocation without his consent to any base of operations other than the Columbus, Georgia Metropolitan Area.

7.07      <u>Transition</u>.   After the Employer has identified and hired, and the Executive and others have trained, a qualified President to succeed Executive, as contemplated in Section 2.03, the Employer may terminate this Agreement on a mutually agreed date (or, failing agreement, on a date fixed by Employer and/or ASH), after which time the terms of the Consulting Agreement shall control.   In the event of such termination, the Executive shall have no entitlement to further compensation under this Agreement, except for unpaid Base Salary, payment for unused vacation (if required by Employer policy), and entitlement to expense reimbursement accrued prior to the effective date of termination.

7.08      <u>At Will Employment</u>.   Notwithstanding the severance obligations in this Agreement, this Agreement shall not be construed as an agreement, either express or implied, to employ Executive for any stated term, and shall in no way alter the Employer's policy of employment at will, under which both the Executive and the Employer remain free to terminate the employment relationship, with or without cause, at any time, with or without notice. Similarly, nothing in this Agreement, except the obligations provided in Sections 7.04 and 7.06, shall be construed as an agreement, either express or implied, to pay Executive any compensation or grant Executive any benefit beyond the end of Executive's employment with the Employer.

### 8.00 - RETURN OF MATERIALS

8.01      All files, forms, brochures, books, materials, written correspondence, memoranda, documents, manuals, computer disks, communications devices, computers, laptops, software

products and lists (including lists of customers, clients, suppliers, contractors, products and prices) pertaining to the Business of the Employer which may come into the possession or control of the Executive shall at all times remain the property of the Employer.  On termination of the Executive's employment for any reason, the Executive agrees to deliver promptly to the Employer all such property of the Employer in the possession of the Executive or directly or indirectly under the control of the Executive.

### 9.00 - NON-DISPARAGEMENT

9.01         In further consideration of the amounts and rights granted to and received by the Executive under this Agreement, the Executive and Employer and/or ASH agree that neither party, during the course of Executive's employment under this Agreement and for five years after Executive ceases to be employed by the Employer, shall utter, publish or broadcast any statements, orally, or in writing, or through any electronic means, that disparage either the Executive or the Employer and/or ASH, or their directors, officers or principal(s), or are critical in any manner or fashion of either the Executive or the Employer and/or ASH, including their business strategy, products, management or employees.

### 10.00 - NON-SOLICITATION

10.01         Reasonable Restrictions.  The Executive recognizes and acknowledges the highly competitive nature of the Business of the Employer and accordingly agrees that the restrictions in this Article are reasonable.

10.02         Restricted Actions.  The Executive shall not be subject to any separate Restricted Actions by reason of this Agreement, but rather shall remain subject to those restrictions as are set forth in Section 6.5 of the APA.

10.03         Deliberately Omitted.

10.04         Controlling Instruments.   To the extent that there are conflicts or inconsistencies between this Agreement and/or the APA, the provisions of the APA shall control.

### 11.00 - GENERAL

11.01         Notice.   Any notice required or permitted under this Agreement must be in writing and will be deemed to have been given by electronic mail or when delivered personally or by overnight courier service or three days after being sent by U.S. certified or registered mail, postage prepaid, at the address indicated below or to such changed address as such person may subsequently give such notice of:

| | |
|---|---|
| If to Erickson: | David B. Erickson<br>324 Otter Drive<br>Cataula, GA 31804 |
| With a copy to: | The Sack Law Firm P.C.<br>8270 Greensboro Drive, Suite 810<br>McLean, Virginia  22102<br>Phone: (703) 883-0102<br>E-mail:  jms@sacklaw.com<br>Attn:  James M. Sack, Esq. |
| If to Employer or ASH: | American Southern Homes<br>c/o Michael Scott<br>Norton Scott LLC<br>1420 Beverly Road, Suite 240<br>McLean, VA 22101<br>Phone: (703) 738-8736<br>E-mail:  mike@nortonscott.com<br><br>and<br><br>Greg Benson<br>21630 Ridgetop Circle, Suite 120<br>Sterling, VA 20166<br>Phone: (703) 863-5070<br>E-mail:  gbenson@benmarlc.com |
| With a copy to: | Jacob A. Kramer<br>Bryan Cave Leighton Paisner LLP<br>1155 F Street NW, Suite 700<br>Washington, DC 20004<br>Phone: (202) 508-6153<br>E-mail:  jake.kramer@bclplaw.com |

11.02     Rendering Assistance.  The Executive agrees that he will, during this Agreement and for a period of five (5) years following the Executive's ceasing to be employed by the Employer, supply such information and render such assistance as may be reasonably required by the Employer or any other entity of ASH in connection with any legal or quasi-legal proceeding to which the Employer or such other entity either is or becomes a party.  The Employer agrees to reimburse the Executive for any expenses reasonably incurred in providing such services.

11.03     Attorney Fees and Costs.  In the event of any action or suit between or among the parties in connection with this Agreement, the prevailing party in such action or suit shall be entitled to have and recover from the other party all reasonable costs and expenses of suit or action, including, without limitation, attorneys' fees and costs.

11.04     Waiver of Jury Trial.  The parties further agree that to the fullest extent permitted by law, each party hereby irrevocably waives his or its right to trial by jury on all issues that are subject to the right to a jury.  *The parties make this waiver of a trial by jury intentionally, knowingly, voluntarily and free from fraud, duress and coercion.*  The parties recognize the benefits and disadvantages of a trial by jury and elect to waive their right to a jury and do so in consultation with counsel.

11.05     Assignability.   This Agreement is assignable by the Employer, without the Executive's consent, in connection with any reorganization of ASH, provided that there is no material change in any of the terms and conditions of the Executive's employment and/or this Agreement.

          The Executive may not assign, transfer, pledge or encumber the Executive's interest in this Agreement nor assign any of the rights or duties of the Executive under this Agreement without the prior written consent of the Employer.

11.06     Successors and Assigns.  This Agreement shall be binding on and inure to the benefit of the successors and assigns of the Employer and the heirs, executors, personal legal representatives and permitted assigns of the Executive.

11.07     No Tax Advice.  Executive acknowledges that the Employer and ASH have not provided him with any advice concerning any tax implications of any payments hereunder. Executive further acknowledges that he has the sole and exclusive responsibility for any tax liability in connection with any payments provided under Article 7 hereof.  Should any federal, state or local taxes be determined to be owing on such payment received by Executive, Executive shall be solely and completely responsible for such taxes, penalties and interest; the Employer and ASH shall not be responsible for any such taxes, interest or penalties. In addition, all payments hereunder shall be subject to all applicable federal, state or local employment and tax withholdings and deductions.

11.08     Entire Agreement.  This Agreement is the entire agreement between the Employer and the Executive pertaining to his employment with the Employer and supersedes all previous agreements. There are no warranties, representations or agreements between the parties in connection with the subject matter of this Agreement except as specifically set forth or referred to in this Agreement, the APA, or the Grayhawk Transaction.

11.09     Amendment to be in Writing.  Any amendment or modification of this Agreement will be in writing and signed by the Parties or it will have no effect.

11.10     Survival of Provisions.  Notwithstanding the termination of this Agreement for any reason whatsoever, the provisions of Articles 6.00, 8.00, 9.00, 10.00 and 11.02-11.04, inclusive, of this Agreement and any other provisions of this Agreement necessary to give efficacy thereto shall continue in full and force and effect following such termination.

11.11       Executive's Acknowledgement.   The Executive acknowledges that he: (a) has had sufficient time to review and consider this Agreement thoroughly; (b) has read and understands the terms of this Agreement and his obligations hereunder; (c) has had the opportunity to seek independent legal advice concerning the interpretation and effect of this Agreement prior to the execution and delivery of this Agreement, and (d) has voluntarily entered into this Agreement.

11.12       Counterparts.   This Agreement may be executed in counterparts, all of which together shall constitute one fully-executed agreement, and by signature to facsimile (fax) or electronic transmittal documents, and such signature shall be deemed to constitute an original signature for such party.

[Signature page to follow]

**IN WITNESS WHEREOF** the parties have caused this Agreement to be duly executed as of the Effective Date.

<div style="margin-left:40%">

**EMPLOYER:**

ASH-Grayhawk, LLC

By: _____
      Gregory Benson, CEO

I have authority to bind the Employer.


American Southern Homes Holdings LLC

By: _____
      J. Marshall Coleman, Authorized Officer

As Guarantor of the obligations of the Employer


_____
 David B. Erickson

November 15, 2019

</div>

EXHIBIT E

Form of Consulting  Agreement


[See attached.]

## Consulting Agreement

This **Consulting Agreement** (the "**Agreement**") is effective as of November 15, 2019 (the "**Effective Date**") by and among ASH-Grayhawk, LLC, a Virginia limited liability company (the "**Company**"), **American Southern Homes Holdings LLC** ("**ASH**") and **David B. Erickson** ("**Erickson**").  All capitalized terms used herein and not otherwise defined shall have the same meaning as set forth in the APA, as defined below.

**WHEREAS** this Agreement is entered into pursuant to an Asset Purchase Agreement (the "**APA**"), dated November 15, 2019, by and among the Company, ASH and others, including Erickson and **Grayhawk Homes, Inc.** ("**Grayhawk Homes**");

**WHEREAS** the Company desires to obtain the consulting services of Erickson ("**Consulting Services**"), and Erickson desires to provide such Consulting Services to the Company, in accordance with the terms, conditions and provisions of this Agreement at such time as Erickson's Employment Agreement with the Company has terminated pursuant to Sections 2.03 and 7.07 of the Employment Agreement.  As made clear in the APA, it is anticipated that Erickson shall enter into an Employment Agreement with the Company, but it is likely that such employment shall be terminated once a successor is identified, trained, and in place; and

**WHEREAS** the Company and ASH require, as a condition to the Company's utilizing Erickson as a consultant, that Erickson provide to the Company, in addition to the Consulting Services, the confidentiality and other protections set forth herein;

**NOW THEREFORE**, in consideration of the covenants and mutual agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in reliance upon the representations, covenants and mutual agreements contained herein, the Company, ASH and Erickson agree as follows:

## Agreement

1.      <u>Consulting</u>.

A.      Subject to the terms and conditions of this Agreement, the Company agrees to utilize Erickson as its primary consultant for the ongoing operations of the Company as contemplated by the APA, and Erickson agrees to diligently perform the services associated with such role.  The Consulting Services shall include responding to requests from Company personnel for advice and coordination of land purchases, accounting logistics, and general decision making; provided, however, that Erickson shall communicate any proposed changes to the business or its personnel, projects, or products only to the Company's President or ASH. Further, the Consulting Services may include utilizing Erickson to perform services for ASH, separate and apart from his work for the Company.

B.      Erickson will devote such time as may be reasonably required by the Company to the Consulting Services, but no more than 192 hours in any twelve month period, except by mutual agreement or pursuant to <u>Section 1.C</u>.  All such services shall be scheduled by

mutual agreement as to time and location. Erickson shall, at all times, be an independent contractor of the Company.

C.      In the event the Company's President (i.e., Erickson's successor) resigns within one year after the Effective Date, Erickson agrees that, upon the Company's request, the Consulting Services shall include up to thirty hours per week for a period of up to three months, during which time Erickson shall assist the Company with its day-to-day operations and with identifying, hiring, and training a new President.

2.      **Term**.  Erickson will be engaged under this Agreement for a term beginning the day after the termination of the Employment Agreement pursuant to Sections 2.03 and 7.07 of the Employment Agreement and ending on the second anniversary of that date, unless Erickson's services are extended by agreement or terminated earlier pursuant to Section 4.

3.      **Base Fee and Benefits**.

A.      Company will pay Erickson an annual base fee of $48,000 (representing two eight-hour days per month at $2,000 per day, or 16 hours per month at $250 per hour) (the "**Annual Base Fee**"), payable monthly, pro-rated into twelve equal installments.  Erickson will bill any additional time for Consulting Services, including pursuant to Section 1.C, at a rate of $250 per hour.  Travel outside of the geographic area in which the Company does business will be deemed a $1,500 fee.  None of Erickson's fees under this Agreement will be subject to deductions or withholding, and Erickson will be responsible for the payment of any and all taxes associated with such fees.  Erickson's compensation will be reported to the Internal Revenue Service on a Form 1099.

B.      The Company will pay Erickson an additional fee equal to the cost of maintaining individual health insurance policies for himself and his spouse, in an amount not to exceed $1,000 per month.

C.      Except as otherwise provided in this section, Erickson shall not be entitled to receive any employment benefits from Company and shall not be eligible to participate in any benefit programs that Company currently provides or may someday provide for its employees, including but not limited to vacation, paid holidays, sick leave, health insurance, life insurance, pension or retirement plans, disability programs, or other benefits, benefit plans or benefit programs.

D.      The Company shall reimburse Erickson for all reasonable out-of-pocket expenses incurred by Erickson in providing the Consulting Services, including reimbursement for expenses, mileage, and meals during travel outside of the geographic area in which the Company does business.

4.      **Termination.**

A.      If the Company discharges Erickson for Cause (as defined below), or Erickson voluntarily terminates, dies or becomes Disabled (as defined below), then the obligations of the Company and ASH to pay his consulting fee pursuant to this Agreement will

terminate immediately, except for the pro-rated payment for the month in which the Date of Termination is triggered and payment owed by the Company for any time previously billed.

        B.    If Erickson's consulting services with the Company are terminated by the Company without Cause, then the Company will be obligated to pay the Annual Base Fee and and health insurance reimbursement for the remainder of the term of this Agreement.

      For purposes of this Agreement,

        (1)    "**Cause**" is defined to mean (i) Erickson's misappropriation of any money, assets or properties of the Company, resulting, or intended to result, directly or indirectly, in personal gain or enrichment to Erickson; (ii) the indictment or conviction of Erickson of any felony (or significant misdemeanor); (iii) Erickson's conduct involving fraud, moral turpitude, dishonesty, misconduct, embezzlement, theft, or similar matters that are detrimental to the Company; (iv) Erickson's disregard of his primary duties to the Company; (v) breach of this Agreement or his non-competition obligations set forth in the APA; or (vi) termination by Buyer of the Land Purchase Agreement as a result of an uncured breach of the Land Purchase Agreement (as more fully set forth in Section 35 therein).

        (2)    "**Disabled**" or "**Disability**" means a disability (as reasonably determined by a physician acceptable to the Company) that results in Erickson being unable substantially to fulfill his duties under this Agreement for 90 consecutive days.

        (3)    "**Date of Termination**" shall mean (i) if the Agreement is terminated as a result of Erickson's death, the date of Erickson's death, (ii) if the Agreement is voluntarily terminated by Erickson, the date on which he delivers a notice of termination to the Company, (iii) if this Agreement is terminated as a result of Disability, the date a notice of termination is given, or (iv) if Erickson's employment is terminated by the Company for any other reason, the date on which a notice of termination is given to Erickson.

        (4)    <u>**Severability**</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any applicable law, then such provision will be deemed to be modified to the minimum extent necessary to render it legal, valid and enforceable, and if no such modification will render it legal, valid and enforceable, then this Agreement will be construed as if not containing the provision held to be invalid, and the rights and obligations of the parties will be construed and enforced accordingly.

    **5.**    <u>**Enforcement and Waiver**</u>.  Erickson acknowledges and agrees that the Company and ASH would be irreparably harmed by any violation of Erickson's obligations under this Agreement and that, in addition to all other rights or remedies available at law or in equity, the Company and ASH will be entitled to injunctive and other equitable relief, without bond or security therefore.  For avoidance of doubt, in the event of the breach of any provision hereof, ASH and the Company, individually or collectively, may seek any right or remedy against Erickson except as limited by the APA.  In the event of any suit or action with respect to this Agreement, the prevailing party shall be entitled to all its reasonable costs and expenses, including attorneys' fees.  The waiver by either party of a breach of any provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach.

**6.** **Assignment by Company**.  Nothing in this Agreement shall preclude Company from consolidating or merging into or with, or selling or transferring all or substantially all of its assets to, another corporation or entity that assumes this Agreement and all obligations and undertakings hereunder.  Upon such consolidation, merger, sale, or transfer of assets and assumption, the term "**Company**" as used herein shall mean such other corporation or entity, as appropriate, and this Agreement shall continue in full force and effect.  This Agreement may not be assigned by Erickson.

**7.** **Confidentiality**.  Erickson acknowledges that, in the performance of the Consulting Services under this Agreement, he will receive or have access to certain non-public, proprietary and/or confidential information relating to the business and affairs of the Company and/or ASH, including trade secrets, know how, research and development, databases, software, and other intellectual property; information concerning personnel, compensation, recruiting, and training; and information concerning the past, future, or current business of the Company, activities and operations of the Company and/or ASH, including customers, clients, suppliers, contractors, products and prices (the "**Confidential Information**").  Erickson agrees and acknowledges that such Confidential Information shall be subject to the terms and obligations described in Article 6.00 of the Employment Agreement, and that such terms and obligations shall survive the termination of this Agreement for a period of one year.

**8.** **Entire Agreement**.  Except as otherwise provided herein, this Agreement embodies the complete agreement of the parties hereto with respect to the subject matter hereof and supersedes any prior written, or prior or contemporaneous oral, understandings or agreements between the parties that may have related in any way to the subject matter hereof. This Agreement may be amended only in writing executed by the Company and Erickson.

**9.** **Governing Law**.  This Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by and construed in accordance with the internal laws, and not the law of conflicts, of the State of Georgia.

**10.** **Notice**.  Any notice required or permitted under this Agreement must be in writing and will be deemed to have been given by electronic mail or when delivered personally or by overnight courier service or three days after being sent by U.S. certified or registered mail, postage prepaid, at the address indicated below or to such changed address as such person may subsequently give such notice of:

|  |  |
|---|---|
| If to Erickson: | David B. Erickson |
|  | 324 Otter Drive |
|  | Cataula, GA 31804 |
|  |  |
| With a copy to: | The Sack Law Firm P.C. |
|  | 8270 Greensboro Drive, Suite 810 |
|  | McLean, Virginia  22102 |
|  | Phone:  (703) 883-0102 |
|  | E-mail:  jms@sacklaw.com |
|  | Attn:  James M. Sack, Esq. |

| | |
|---|---|
| If to Company or ASH: | American Southern Homes |
| | c/o Michael Scott |
| | Norton Scott LLC |
| | 1420 Beverly Road, Suite 240 |
| | McLean, VA 22101 |
| | Phone: (703) 738-8736 |
| | E-mail: mike@nortonscott.com |
| | |
| | and |
| | |
| | Greg Benson |
| | 21630 Ridgetop Circle, Suite 120 |
| | Sterling, VA 20166 |
| | Phone: (703) 863-5070 |
| | E-mail: gbenson@benmarlc.com |
| | |
| With a copy to: | Jacob A. Kramer |
| | Bryan Cave Leighton Paisner LLP |
| | 1155 F Street NW, Suite 700 |
| | Washington, DC 20004 |
| | Phone: (202) 508-6153 |
| | E-mail: jake.kramer@bclplaw.com |

11. **Jurisdiction, Venue and Waiver of Jury Trial.** The parties hereby consent to jurisdiction in Georgia for the purpose of any litigation relating to this Agreement and agree that any litigation by or involving them relating to this Agreement shall be brought in Columbus, Georgia. The parties agree that jurisdiction and venue in Columbus, Georgia are proper and waive any defense based upon jurisdiction and venue. The parties further agree that to the fullest extent permitted by law, each party hereby irrevocably waives his or its right to trial by jury on all issues that are subject to the right to a jury. *The parties make this waiver of a trial by jury intentionally, knowingly, voluntarily and free from fraud, duress and coercion.* The parties recognize the benefits and disadvantages of a trial by jury and elect to waive their right to a jury and do so in consultation with counsel.

12. **Assignability.** This Agreement is assignable by the Company, without Erickson's consent, in connection with any reorganization of ASH, provided that there is no material change in any of the terms and conditions of the Consulting Services and/or this Agreement. Erickson may not assign, transfer, pledge or encumber Erickson's interest in this Agreement nor assign any of his rights or duties under this Agreement without the prior written consent of the Company.

13. **Waiver of Breach.** The Company's or Erickson's waiver of any breach of a provision of this Agreement shall not waive any subsequent breach by the other party.

**14.**   <u>**Survival of Provisions**</u>.   Notwithstanding the termination of this Agreement for any reason whatsoever, the provisions of Sections 4, 5, 7, 10, and 11, inclusive, of this Agreement and any other provisions of this Agreement necessary to give efficacy thereto shall continue in full and force and effect following such termination.

**15.**   <u>**Executive's Acknowledgement.**</u>   The Executive acknowledges that he: (i) has had sufficient time to review and consider this Agreement thoroughly; (ii) has read and understands the terms of this Agreement and his obligations hereunder; (iii) has had the opportunity to seek independent legal advice concerning the interpretation and effect of this Agreement prior to the execution and delivery of this Agreement, and (iv) has voluntarily entered into this Agreement.

**16.**   <u>**Counterparts**</u>.   This Agreement may be executed in counterparts, all of which together shall constitute one fully-executed agreement, and by signature to facsimile (fax) or electronic transmittal documents, and such signature shall be deemed to constitute an original signature for such party.

[Signature page to follow]

**IN WITNESS WHEREOF**, the Company and Erickson have executed and delivered this Agreement as of the date first above written.

ASH-Grayhawk, LLC
a Virginia limited liability company


By: _____
    Gregory Benson, CEO

**Consultant**:


_____
David B. Erickson

**Guaranteed By:**

**American Southern Homes Holdings, LLC**


By: _____
    J. Marshall Coleman, Authorized Officer

<u>EXHIBIT F</u>

Transition Services Agreement

[See attached.]

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT, dated as of November 15, 2019 (this "Agreement"), is entered into by and between ASH-Grayhawk, LLC, a Virginia limited liability company ("Buyer"), and Grayhawk Homes, Inc., a Georgia corporation ("Grayhawk"), Homestead Residential Inc., an Alabama corporation ("Homestead"), and GH Services, Inc., a Georgia corporation ("GHS", collectively with Grayhawk and Homestead, "Seller").

## BACKGROUND

A.      Seller and Buyer, together with David B. Erickson and Rose Anne Erickson, are parties to that certain Asset Purchase Agreement, dated as of even date herewith (the "Purchase Agreement"), pursuant to which, as of the date hereof, Seller has agreed to sell, assign, and deliver to Buyer, and Buyer has agreed to purchase and assume from Seller, the Purchased Assets and Assumed Liabilities.

B.      As a condition to the consummation of the transactions contemplated by the Purchase Agreement and in order to ensure an orderly transition of the Purchased Assets and Assumed Liabilities to Buyer, Buyer and Seller have agreed to enter into this Agreement, pursuant to which Seller and Buyer will each provide, or cause one or more of their Affiliates to provide, certain services to the other party, in each case on a transitional basis and subject to the terms and conditions  set forth in this Agreement.

C.      Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, Seller and Buyer hereby agree as follows:

## ARTICLE I
### SERVICES

**Section 1.01      Provision of Services**.

(a)      Services.  Each of Seller and Buyer agrees to provide, or to cause one or more of its Affiliates to provide, to the other party the services (the "Services") set forth on Schedule I attached hereto (as amended or supplemented pursuant to the terms of this Agreement, the "Services Schedule"), in each case for the applicable time period and for the fee indicated (the "Service Fee") for such Service in the Services Schedule.  The intent is to complete these transitional matters as soon as practical, and to provide the reciprocal services between Buyer and Seller at cost without mark up.

(b)      Standard of Service.  Each of Seller and Buyer shall, and shall cause its Affiliates to, perform the Services in substantially the same manner and with substantially the same degree of care, skill, level of priority, treatment and diligence as was provided in the twelve (12)-month period immediately prior to the date hereof.  Buyer and Seller may, at any time after

the date hereof, mutually agree that either Seller or Buyer will provide, or cause one or more of its Affiliates to provide, additional services to the other party, which are not currently contemplated in the Services Schedule, at a price to be agreed upon after good faith negotiations between the parties.  Any such additional services so provided shall constitute Services under this Agreement.  The parties agree and acknowledge that none of Seller, Seller's Affiliates, Buyer, or Buyer's Affiliates is in the business of providing the Services described herein on a commercial arm's-length basis to independent third parties, and that this Agreement is only required for specific business circumstances on a transitional basis.

Section 1.02    **Third-Party Service Providers**.  It is understood that Seller has been retaining, and will continue to retain, third-party service providers to provide some of the Services to Buyer.  In addition, Seller shall have the right to hire other third-party subcontractors to provide all or part of any Service hereunder; *provided*, *however*, that in the event such subcontracting is inconsistent with past practices or such subcontractor is not already engaged with respect to such Service as of the date hereof, Seller shall obtain the prior written consent of Buyer to hire such subcontractor, such consent not to be unreasonably withheld.  Seller shall in all cases retain responsibility for the provision to Buyer of the Services to be performed by any third-party service provider, subcontractor, or by any of Seller's Affiliates.

Section 1.03    **Termination**.

(a)    Termination of the Services.  The obligation of each of Seller and Buyer to provide Services under this Agreement shall terminate with respect to each Service on the date specified in the applicable provision of the Services Schedule or as set forth in Article II, as applicable (the "End Date").  If a party determines at any time that it no longer requires any of the Services set out on one or more provisions of the Services Schedule, such party shall provide written notice to the other party to this Agreement and such party's obligation to provide such Service shall terminate.  No party shall be obligated to perform any Service after the applicable End Date except as such party may agree.  If a party agrees to continue to perform any Service after the applicable End Date, the Services so performed shall continue to constitute Services under this Agreement and shall be subject in all respects to the provisions of this Agreement for the duration of the agreed-upon extension period.  Upon termination or expiration of any or all Services pursuant to this Agreement, or upon the termination of this Agreement in its entirety, no party shall have any further obligation to provide the applicable terminated Services and no party shall have any obligation to pay any future fees or compensation relating to such Services other than for Services already provided in accordance with the terms of this Agreement and received by the receiving party prior to such termination.

(b)    Termination of the Agreement.  The term of this Agreement shall begin on the date hereof and end on the earlier of (i) the date upon which Seller has no continuing obligation to perform any Services, whether as a result of having reached the End Date for such Services or the mutual agreement of the parties, (ii) a filing of a petition in bankruptcy or declaration of insolvency, (iii) upon thirty (30) days' prior written notice to the other party, or (iii) December 31, 2020.  Upon a termination of this Agreement in its entirety, all obligations of the parties hereto shall terminate, except for the provisions of Section 1.03(a), Section 2.03, Section 2.04, Article V, and Article VI.

2

## ARTICLE II
### COMPENSATION

**Section 2.01    Responsibility for Wages and Fees**.  For such time as any employees of Seller or any of its Affiliates are providing the Services to Buyer, or Buyer or any of its Affiliates are providing the Services to Seller, under this Agreement, (a) such employees will remain employees of Seller or such Affiliate, or Buyer or such Affiliate, as applicable, and shall not be deemed to be employees of the party receiving the Services for any purpose, and (b) Seller or such Affiliate, or Buyer or such Affiliate, as applicable, shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable taxes relating to such employment.

Reimbursement for Services.    Each party providing Services shall invoice the recipient of such Services when due per the Service Schedule attached at cost and without markup

**Section 2.02    Invoice Disputes**. In the event of a dispute related to an invoice for Services, the disputing party shall deliver a written statement to the other party prior to the date payment is due on the disputed invoice listing the disputed items and providing a reasonably detailed description of each disputed item.  Amounts not so disputed shall be deemed accepted and shall be paid, notwithstanding disputes on other items.  The parties shall seek to resolve all such disputes expeditiously and in good faith.   The party providing Services shall continue performing the Services in accordance with this Agreement pending resolution of any dispute.

**Section 2.03    No Right of Setoff**.  Each of the parties hereby acknowledges that it shall have no right under this Agreement to offset any amounts owed (or to become due and owing) to the other party, whether under this Agreement, the Purchase Agreement or otherwise, against any other amount owed (or to become due and owing) to it by the other party.

**Section 2.04    Taxes**.  The recipient of any Services shall be responsible for all sales or use taxes imposed or assessed as a result of the provision of the Services by the other party.

## ARTICLE III
### EMPLOYEES

**Section 3.01**    Buyer and Seller shall use reasonable best efforts to cause all Seller employees to become employees of Buyer no later than December 15, 2019.  To the extent any Seller employees do not agree to terms of employment with Buyer prior to December 15, 2019, Buyer and Seller will continue to utilize reasonable best efforts to cause such employees to become Buyer employees through December 31, 2019.   Any Seller employees that do not become employees of Buyer prior to December 31, 2019 will no longer provide any Services pursuant to this Agreement.

**ARTICLE IV**

**ARTICLE V**
**LIMITED WARRANTY; INDEMNIFICATION**

      **Section 5.01   Limited Warranty**.   Except as expressly set forth herein, the parties acknowledge and agree that the Services are provided as-is.   Except as otherwise expressly set forth in this Agreement, EACH PARTY EXPRESSLY DISCLAIMS (A) ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, WORKMANSHIP, DESIGN, FITNESS FOR A PARTICULAR PURPOSE AND INFRINGEMENT, WITH RESPECT TO THE PERFORMANCE OF THE SERVICES UNDER THIS AGREEMENT, THE LEVEL OR QUALITY OF SUCH SERVICES OR ANY OTHER TANGIBLE PROPERTY DELIVERED BY IT PURSUANT TO THIS AGREEMENT; AND (B) THAT THE SERVICES PROVIDED HEREUNDER WILL YIELD ANY GIVEN OR STATED ECONOMIC, FINANCIAL, PROFIT OR BUSINESS RESULT TO BUYER OR WILL RESULT IN THE RECIPIENT HAVING ANY GIVEN STANDING OR POSITION IN ANY BUSINESS, MARKET OR PRODUCT. NOTHING HEREIN IS INTENDED TO MODIFY, LIMIT, OR OTHERWISE AFFECT THE REPRESENTATIONS, WARRANTIES, COVENANTS, AGREEMENTS, AND INDEMNIFICATIONS CONTAINED IN ANY OF THE OTHER TRANSACTION AGREEMENTS, AND SUCH REPRESENTATIONS, WARRANTIES, COVENANTS, AGREEMENTS, AND INDEMNIFICATION SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THE TERMS OF SUCH TRANSACTION AGREEMENTS.

      **Section 5.02   Limitation on Liability**.   EXCLUDING BREACHES OF CONFIDENTIALITY OR IN THE EVENT OF THE WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR FRAUD BY A PARTY, IN NO EVENT SHALL SUCH PARTY, ITS AFFILIATE(S) OR ITS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES OR AGENTS BE LIABLE TO THE OTHER PARTY WITH RESPECT TO ANY CLAIM RELATING TO THE SERVICES FOR LOSS OF USE (PROVIDED THE PROVIDER OF THE SERVICES MEETS ITS DUTY OF CARE REQUIREMENTS SET FORTH HEREIN), INTERRUPTION OF BUSINESS, ANY INDIRECT, SPECIAL, LIQUIDATED, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES (IN EACH CASE, OTHER THAN FOR DIRECT CLAIMS BY THIRD PARTIES), REGARDLESS OF THE LEGAL BASIS OF LIABILITY OR LEGAL OR EQUITABLE PRINCIPLE INVOLVED (INCLUDING VIOLATION OF LAW, BREACH OF CONTRACT, BREACH OF EXPRESS OR IMPLIED WARRANTY, INDEMNIFICATION, NEGLIGENCE, STRICT LIABILITY, STATUTORY LIABILITY, LIABILITY WITHOUT FAULT, OTHER TORT, PERSONAL INJURY, DEATH, DAMAGE TO OR LOSS OF PROPERTY OR EQUIPMENT, BUSINESS INTERRUPTION OR DOWNTIME COSTS, LOSS OF PROFITS, LOSS OF REVENUES OR OTHERWISE).

      **Section 5.03   Indemnification by Seller**.   Subject to <u>Section 5.02</u>, Seller agrees to release, discharge, defend, indemnify, save and hold harmless Buyer from and against any losses or damages relating to, resulting from, or arising out of Seller's (a) gross negligence in connection with any such Services, actions or inactions related thereto, (b) material breach of this Agreement in connection with any such Services, actions or inactions related thereto, (c) willful

4

misconduct in connection with any such Services, actions or inactions related thereto, or (d) fraud in connection with any such Services, actions or inactions related thereto. Notwithstanding anything contained herein to the contrary, the aggregate liability of Seller to Buyer under this Agreement (including under this Section 5.03), irrespective of the theory of liability or the nature of the claim, shall not exceed the amount actually collected by Seller from Seller's valid and binding insurance policies.

Section 5.04    **Indemnification by Buyer**.   Subject to Section 5.02, Buyer agrees to release, discharge, defend, indemnify, save and hold harmless Seller from and against any losses or damages relating to, resulting from, or arising out of Buyer's (a) gross negligence in connection with any such Services, actions or inactions related thereto, (b) material breach of this Agreement in connection with any such Services, actions or inactions related thereto, (c) willful misconduct in connection with any such Services, actions or inactions related thereto, or (d) fraud in connection with any such Services, actions or inactions related thereto. Notwithstanding anything contained herein to the contrary, the aggregate liability of Buyer to Seller under this Agreement (including under this Section 5.04), irrespective of the theory of liability or the nature of the claim, shall not exceed the amount actually collected by Buyer from Buyer's valid and binding insurance policies.

## ARTICLE VI
### MISCELLANEOUS

Section 6.01    **Confidentiality**.   During the term of this Agreement and thereafter, each party shall, and shall instruct its respective directors, officers, employees, agents and representatives (a) to maintain in confidence and not disclose any confidential information of the other party to any third party and (b) not to use any such confidential information for any purpose other than receiving or providing Services hereunder, in each case except to the extent such information (i) is generally available to and known by the public through no fault of a party; or (ii) is lawfully acquired by the non-disclosing party from and after the date hereof from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If a party is compelled to disclose any information by judicial or administrative process or by other requirements of law, such party shall promptly notify the other party in writing and shall disclose only that portion of such information which such party is advised by its counsel in writing is legally required to be disclosed; *provided that* such party shall, at the other party's sole cost and expense, use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

Section 6.02    **Notices**.   All notices to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given in the manner set forth in Section 11.1 of the Purchase Agreement.

Section 6.03    **Successors and Assigns**. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and its respective successors and permitted assigns.

Section 6.04    No Agency.    All Services performed under this Agreement shall be performed by a party as an independent contractor.  Nothing in this Agreement shall constitute or be deemed to constitute a partnership or joint venture between Seller, on the one hand, and Buyer, on the other hand, or cause or be deemed to cause Seller to be the agent of Buyer, Buyer to be the agent of Seller, cause Buyer to be the employer of any employees of any Seller for any purpose whatsoever, or cause Seller to be the employer of any employees of Buyer for any purpose whatsoever.  This Agreement shall not convey on Seller, on the one hand, or Buyer, on the other hand, the authority or power to bind the other or to contract in the name of, or create a liability against, the other in any way or for any purpose.    Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 6.05    Governing Law; Submission to Jurisdiction; Wavier of Jury Trial. The provisions of Sections 11.8, 11.10, and 11.12 of the Purchase Agreement (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial) are hereby incorporated into this Agreement, mutatis mutandis, as if set forth in its entirety herein.

Section 6.06    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 6.07    No Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties and their respective heirs, legatees, representatives, successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties and such assigns, any legal or equitable rights, including any rights of employment for any specified period, hereunder.

Section 6.08    Headings.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement

Section 6.09    Severability.    If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a

mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible

  **Section 6.10 Entire Agreement**. This Agreement, including the Services Schedule, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event and to the extent that there is a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement as it relates to the Services hereunder, the provisions of the Purchase Agreement shall control.

<p align="center">[<em>Signature Page Follows</em>]</p>

<p align="center">7</p>

601104064.3

IN WITNESS WHEREOF, the parties hereto have caused this Transition Services Agreement to be executed as of the date first written above by its respective officers thereunto duly authorized.

**BUYER**:

ASH-GRAYHAWK, LLC

By: _____

Name: _____

Title: _____

**SELLER**:

GRAYHAWK HOMES, INC.

By: _____

Name: _____

Title: _____

HOMESTEAD RESIDENTIAL INC.

By: _____

Name: _____

Title: _____

GH SERVICES, INC.

By: _____

Name: _____

Title: _____

Signature Page                    Transition Services Agreement

601104064.3

## SCHEDULE I

## SERVICES SCHEDULE

**[TO BE PROVIDED IN EXCEL]**

<u>EXHIBIT G-1</u>

Form of Special Warranty Deed - Georgia


[See attached.]

**After Recording Return To:**
Robert R. Lomax
ROBERT R. LOMAX, LLC
Post Office Box 2339
Columbus, GA 31902

## LIMITED WARRANTY DEED

**STATE OF GEORGIA,**
**COUNTY OF MUSCOGEE.**

       **THIS INDENTURE**, made and entered into this 15th day of November, 2019, between **GRAYHAWK HOMES, INC.**, a corporation organized and existing under and by virtue of the laws of the State of Georgia, hereinafter known and designated as "Grantor," and **ASH-GRAYHAWK, LLC**, a limited liability company organized and existing under and by virtue of the laws of the State of Georgia, hereinafter known and designated as "Grantee."

## WITNESSETH

       That the said Grantor, for and in consideration of Ten and 00/100 ($10.00) Dollars and other valuable consideration to Grantor in hand paid, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed and does by these presents grant, bargain, sell and convey unto Grantee, and Grantee's respective successors and assigns, the following described real estate, to-wit:

      INSERT LEGAL

      This conveyance is made subject to all valid and enforceable restrictive covenants and easements of record or in place and applicable thereto and subject also to all valid and enforceable zoning ordinances and regulations applicable thereto for so long as said ordinances and regulations remain in force and effect.

      **TO HAVE AND TO HOLD**, the said bargained premises unto Grantee and Grantee's respective successors and assigns, together with all and singular the rights, members and appurtenances thereof to the same in any manner belonging, to the own proper use, benefit and behoof, of Grantee, and Grantee's respective successors and assigns, forever, **IN FEE SIMPLE.**

And Grantor, for Grantor's heirs, successors and assigns, the said bargained premises unto Grantee, and Grantee's respective successors and assigns, will warrant and forever defend the right and title to the above described property unto Grantee, its successors and assigns, against the lawful claims of all persons claiming by, through or under Grantor, but not otherwise.

**IN TESTIMONY WHEREOF**, Grantor caused this Limited Warranty Deed to be executed by its duly authorized officer the date and year first written above.

Signed, sealed and delivered in
the presence of:

**GRAYHAWK HOMES, INC.**

_____
            By:_____
Witness                                          David B. Erickson, President

(CORPORATE SEAL)

_____          (Sole required signature pursuant to
Notary Public,                                   corporate resolution)
Muscogee County, Georgia.

(NOTARY SEAL)

<u>EXHIBIT G-2</u>

Form of Special Warranty Deed - Alabama

[See attached.]

PP - $0.00
**Send Tax Notices to:**
**ASH-GRAYHAWK, LLC**
**2301 Airport Thruway, Suite E6**
**Columbus, Georgia 31904**
**(Grantee)**

---

## LIMITED WARRANTY DEED

**STATE OF ALABAMA,**
**COUNTY OF LEE.**

   **THIS INDENTURE**, made and entered into this 15th day of November, 2019, between **GRAYHAWK HOMES, INC.**, a corporation organized and existing under the laws of the State of Georgia (hereinafter known and designated as "Grantor"), and **ASH-GRAYHAWK, LLC**, a limited liability company organized and existing under the laws of the State of Georgia, qualified to transact business in the State of Alabama, hereinafter known and designated as "Grantee."

## WITNESSETH

   That the said Grantor, for and in consideration of Ten and 00/100 ($10.00) Dollars and other valuable consideration to Grantor in hand paid, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed and does by these presents grant, bargain, sell and convey unto Grantee, and Grantee's successors and assigns, the following described real estate, to-wit:

   INSERT LEGAL

   Said property is conveyed subject to all valid and enforceable restrictive covenants and easements of record or in place and applicable thereto and subject also to all valid and enforceable zoning ordinances and regulations applicable thereto for so long as said ordinances and regulations remain in force and effect.

   TO HAVE AND TO HOLD, the said bargained premises unto Grantee and Grantee's respective successors and assigns, will warrant and forever defend the right and title to

the above described property unto Grantee, its successors and assigns, against the lawful claims of all persons claiming by, through or under Grantor, but not otherwise.

IN WITNESS WHEREOF, GRAYHAWK HOMES, INC. has caused this Limited Warranty Deed to be executed by its duly authorized officer this 15th day of November, 2019.

**GRAYHAWK HOMES, INC.**

By:_____
    David B. Erickson, President

(CORPORATE SEAL)

(Sole required signature pursuant to
corporate resolution)

STATE OF GEORGIA,
COUNTY OF MUSCOGEE.

I, ROBERT R. LOMAX, a Notary Public in and for said County, in said State, hereby certify that DAVID B. ERICKSON, in his capacity as President of GRAYHAWK HOMES, INC., whose name is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day, that, being informed of the contents of the conveyance, he executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this 15th day of November, 2019.

_____
    Notary Public
    Muscogee County, Georgia.

    (SEAL)

This Instrument Prepared by:
Robert R. Lomax
ROBERT R. LOMAX, LLC
Post Office Box 2339
Columbus, Georgia 31902
(706) 322-0100

<u>EXHIBIT H</u>

Form of Land Purchase Agreement

[See attached.]

# LAND PURCHASE AGREEMENT

THIS LAND PURCHASE AGREEMENT ("**Agreement**") made this 15th day of November, 2019 by and among ASH-GRAYHAWK, LLC, a Virginia limited liability company ("**AG**"), AMERICAN SOUTHERN HOMES HOLDINGS, LLC, a Delaware limited liability company ("**ASH**"), and DAVID B. ERICKSON, individually and on behalf of all Selling Entities ("**D. Erickson**"), and ROSE ANNE ERICKSON, individually and on behalf of all Selling Entities ("**R. Erickson**" and, together with D. Erickson, collectively, "**Erickson**"). AG, ASH, and Erickson are hereinafter sometimes referred to individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, AG, ASH, and D. Erickson and other parties have entered into an Asset Purchase Agreement ("**APA**") of even date pursuant to which AG and ASH (collectively, the "**Buyer**") have acquired the operating assets of 3 entities controlled by D. Erickson, namely Grayhawk Homes, Inc., a Georgia corporation, Homestead Residential, Inc., an Alabama corporation, and GH Services, Inc., a Georgia corporation (collectively, the "**Selling Entities**").

WHEREAS, the APA requires that D. Erickson and R. Erickson, the Selling Entities, and any other entity owned or controlled by Erickson for purchasing and developing residential land, including but not limited to Tiger Creek Development, Inc., Cusseta Road, LLC, Grey Rock Development, LLC, Windsong Bonacre, LLC, Erickson Investments, Inc., and Sage Development, Inc. (collectively, "**Seller**") will, after Closing under the APA, provide residential building lots ("**Lots**") to Buyer and that the Lots are currently comprised of (a) Lots that have been fully developed and finished ("**Finished Lots**") and that are listed on <u>**Exhibit A**</u> attached to this Agreement (sometimes referred to as the "**Phase A Lots**"), (b) Lots that are being developed and will be considered to be Finished Lots within 12 months after the date of this Agreement, that have an established purchase price agreed to by Seller and that are listed on <u>**Exhibit B**</u> attached to this Agreement (sometimes referred to as the "**Phase B Lots**"), and (c) real property or Lots that Seller either has purchased or has a right to purchase and that will be developed into Finished Lots, but for which a purchase price has not yet been determined, and that are listed on <u>**Exhibit C**</u> attached to this Agreement (sometimes referred to as the "**Phase C Lots**"). The list of Phase A Lots on Exhibit A, the list of Phase B Lots on Exhibit B and the list of Phase C Lots on Exhibit C may be amended and/or supplemented from time to time by agreement of the Parties, and any Lots reflected on such lists from time to time shall be subject to this Agreement and the terms of the APA.

WHEREAS, Seller may also develop Future Lots (as defined in Paragraph 14 below) and such Future Lots will also be subject to this Agreement.

WHEREAS, the Parties wish to enter into this Agreement to set forth the terms and conditions under which such Finished Lots shall be sold to Buyer, consistent with the APA.

NOW THEREFORE BE IT AGREED:

1.      The foregoing Recitals are hereby incorporated by reference.  Capitalized terms not defined in this Agreement shall have the meanings attributed to them in the APA.

2.      The Parties anticipate there are approximately 1,600 Lots (plus any Future Lots) located in various cities, counties and states that will be subject to the provisions of this Agreement.  The current number of Phase A Lots, Phase B Lots and Phase C Lots are shown on **Exhibit A**, **Exhibit B** and **Exhibit C**, respectively.  The Parties recognize and agree that as of the date of this Agreement many of the communities containing Lots or real property to be developed into communities with Lots that are identified on **Exhibit B** and **Exhibit C** have not been fully entitled, approved for development or final platted and the number of Lots may in fact increase or decrease during the life of this Agreement.

3.      Buyer will have all ownership rights in the Finished Lots once purchased, including mineral and air rights.

4.      In accordance with the APA, Buyer will deposit with Seller as of the date of this Agreement, the sum of Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00) (the "**Deposit**") as deposit for the Finished Lots subject to this Agreement.  The Deposit shall be credited to Buyer pro-rata as to only the Phase C Lots as follows:

(a)      Until two-thirds (2/3) of the Phase C Lots have been purchased by Buyer, at the closing of each Phase C Lot purchase by Buyer, the Buyer will receive a credit against the purchase price of such Phase C Lot (the "**Initial Phase C Lot Credit**") calculated as follows:

| | | |
|---|---|---|
| X | = | One-third (1/3) of the Deposit |
| Y | = | Two-thirds (2/3) of the number of Phase C Lots currently listed on Exhibit C |
| X divided by Y | = | Initial Phase C Lot Credit |

(b)      After two-thirds (2/3) of the Phase C Lots have been purchased by Buyer, at the closing of each Phase C Lot purchase by Buyer, Buyer will receive a credit against the purchase price of such Phase C Lot (the "**Subsequent Phase C Lot Credit**") calculated as follows:

| | | |
|---|---|---|
| X | = | Two-thirds (2/3) of the Deposit |
| Y | = | One-third (1/3) of the number of Phase C Lots currently listed on Exhibit C |
| X divided by Y | = | Subsequent Phase C Lot Credit |

5.      The number of Phase C Lots is fluid and **Exhibit C** will be amended from time to time by mutual agreement between the Parties as permitted per this Agreement.

6.      Seller is required to develop the Lots in accordance with this Agreement and to meet the requirement of the Takedown Schedule (defined below).  Starting with the calendar quarter ending on December 31, 2019, Buyer agrees to purchase from Seller the number of Lots set forth on the Lot takedown schedule attached as **Schedule 1** to this Agreement (the "**Takedown Schedule**").  The number of Lots shown on the Takedown Schedule represents the

minimum number of Lot closings ("**Lot Takedowns**") that Buyer is required to complete, based on the availability of Finished Lots, during each calendar quarter; provided, however, that to the extent Buyer purchases more than the number of Lots shown on the Takedown Schedule during any calendar quarter, the excess number of Lots shall be credited toward the Lot Takedowns required for the subsequent calendar quarter or quarters.

7.      All Phase A Lots will be considered "Finished Lots" (i.e., all work necessary to make such Phase A Lot a Finished Lot have been completed by Seller) unless the Phase A Lot is marked on **Exhibit A** as either (a) "AS IS" (meaning that Seller is not required to finish building pads, clearing or grading of the Lots) or (b) "SEPTIC" (meaning that the Lots will not be connected to municipal sewer systems.  For Lots marked "SEPTIC," if Seller is unable to obtain a septic tank permit or a permit for a septic field that will accommodate at least a 3 bedroom house, Buyer shall not be obligated to purchase such Lots.

8.      The base purchase price for the Phase A Lots (the "**Phase A Lot Purchase Price**") shall be the "WIP" amount shown on **Exhibit A**.  Commencing on October 1, 2020, the Phase A Lot Purchase Price for all Phase A Lots not yet purchased by Buyer shall increase at an annual rate of 6% (or 1/2 of 1% for each month) of the original Phase A Lot Purchase Price (non-compounding).  In addition, Buyer agrees to reimburse Seller for real property taxes applicable to the Phase A Lots that Seller has paid or that otherwise accrue from the date of this Agreement to the date of each Lot Takedown.  All Phase A Lots that Buyer is obligated to purchase under this Agreement will be purchased no later than December 31, 2021.

9.      The base purchase price for the Phase B Lots (the "**Phase B Lot Purchase Price**") shall be the "current lot price good through 6/30/2020" amount shown on **Exhibit B**.  Commencing on July 1, 2021, the Phase B Lot Purchase Price for all Phase B Lots not yet purchased by Buyer shall increase at an annual rate of 6% (or 1/2 of 1% for each month) of the original Phase B Lot Purchase Price (non-compounding).  In addition, Buyer agrees to reimburse Seller for real property taxes applicable to the Phase B Lots that Seller has paid or that otherwise accrue from the date of this Agreement to the date of each Lot Takedown.

10.      Seller is required to develop the Lots in accordance with this Agreement and to satisfy the requirements of the Takedown Schedule.  However, as to the Phase C Lots, during the first full year after the Closing under the APA, the Parties shall agree to the order in which specific Phase C Lots will be developed.  In addition, the Parties may mutually agree to eliminate some of the Phase C Lots shown on **Exhibit C**.

11.      The base purchase price for the Phase C Lots (the "**Phase C Purchase Price**") shall be determined as follows:

(a)      The basis of each Phase C Lot will be the current basis shown on **Exhibit C** for each neighborhood.

(b)      Commencing on January 1, 2020, the basis of each Phase C Lot shall increase at the rate of 1/2 of 1% per month until Buyer purchases the Phase C Lot.

(c)      In addition, at the closing of the purchase of each Phase C Lot, Buyer shall (i) reimburse Seller and/or pay (as applicable) for real property taxes applicable to each Phase C

Lot that Seller has paid or that otherwise accrue from the date of this Agreement to the date of each Lot Takedown, (ii) reimburse Seller for the actual costs incurred by Seller to develop the Phase C Lot (and Seller shall promptly disclose such costs and supporting documentation to Buyer upon request) and (iii) pay Seller a $3,000 management fee.

12.     If Buyer and Seller determine that the Phase C Purchase Price (as calculated according to Paragraph 11 above) for the Phase C Lots in a particular phase of a Subdivision ("**Phase**") is equal to or less than twenty percent (20%) of the average appraised market sales price of a house in such Subdivision (the "**Estimated Market Value**"), then Buyer shall be obligated to purchase such Phase C Lots for the Phase C Purchase Price.

13.     If Buyer and Seller determine that the Phase C Purchase Price (as calculated according to Paragraph 11 above) for the Phase C Lots in a particular Phase exceeds 20% of the Estimated Market Value:

(a)     Seller may elect to sell such Phase C Lots to Buyer for a price equal to or less than twenty percent (20%) of the Estimated Market Value (the "**Reduced Phase C Purchase Price**"), and Buyer shall be obligated to purchase such Phase C Lots for the Reduced Phase C Purchase Price, pursuant to the Takedown Schedule.  In such event, once the actual sales price of the house, including options and upgrades (the "**Actual Market Value**") on such Phase C Lots is determined, at the closing of such house Buyer shall pay to Seller the difference (if any) between the Reduced Phase C Purchase Price and twenty percent (20%) of the Actual Market Value (the "**True-Up Payment**").

(b)     If Seller does not elect to sell such Phase C Lots to Buyer for the Reduced Phase C Purchase Price, then Seller shall offer to sell such Phase C Lots (the "**Phase C ROFO Lots**") to Buyer by giving written notice to Buyer, in the form attached hereto as **Exhibit D** (the "**Phase C ROFO**").  Buyer shall have forty-five (45) days (the "**Review Period**") after receipt of the Phase C ROFO within which to give written notice to Seller of (A) its election to purchase the Phase C ROFO Lots for the price set forth in the Phase C ROFO or (B) its election not to purchase the Phase C ROFO Lots.  For the avoidance of doubt, Buyer shall not be obligated to pay any True-Up Payment to Seller if it elects to purchase the Phase C ROFO Lots.

(i)     If Buyer elects to purchase the Phase C ROFO Lots, such Lots shall be subject to the terms of this Agreement and the Takedown Schedule.

(ii)     If Buyer does not elect to purchase the Phase C ROFO Lots during the Review Period, Seller may then accept any bona fide, arms-length offer (the "**Bona Fide Offer**") from an unrelated third party willing to purchase such Phase C ROFO Lots and who has demonstrated the financial capacity to perform under such offer (a "**Potential Purchaser**") and enter into a purchase and sale agreement with the Potential Purchaser for the Phase C ROFO Lots for monetary consideration (after deducting third party commissions) that is equal to or greater than the monetary consideration originally offered to Buyer and on terms and conditions not in any way more favorable to the purchaser than the terms and conditions originally offered to Buyer (the "**Third Party Agreement**").

(iii)    If Seller does not accept a Bona Fide Offer from a Potential Purchaser within one hundred twenty (120) days after Buyer elects not to purchase the Phase C ROFO Lots, or if the closing of the purchase of the Phase C ROFO Lots under a Third Party Agreement is not consummated, Seller must once again initiate the ROFO process described in this Paragraph 13(b).

14.    In the event Seller should acquire or develop and offer for sale additional land or lots in the States of Georgia or Alabama that are not Phase A, B, or C Lots ("**Future Lots**"):

(a)    Seller shall first offer to sell such Future Lots (the "**Future ROFO Lots**") by giving written notice to Buyer, in the form attached hereto as **Exhibit E** (the "**Future ROFO**").  Buyer shall have a forty-five (45) day Review Period after receipt of the Future ROFO within which to give written notice to Seller of (A) its election to purchase the Future ROFO Lots for the price and on the terms set forth in the Future ROFO or (B) its election not to purchase the Future ROFO Lots.  For the avoidance of doubt, Buyer shall not be obligated to pay any True-Up Payment to Seller if it elects to purchase the Future ROFO Lots.

(b)    If Buyer elects to purchase the Future ROFO Lots (the "**Accepted Future ROFO Lots**") there shall be an additional period of forty-five (45) days (the "**Negotiation and Due Diligence Period**"), during which (i) the parties shall negotiate in good faith a purchase agreement for the Accepted Future ROFO Lots and (ii) Buyer may conduct normal due diligence, such as reviewing the condition of title of the Accepted Future ROFO Lots, investigating soil and environmental conditions, verifying the availability of utilities and other matters.

(c)    If Buyer does not elect to purchase the Future ROFO Lots, during either the Review Period or the Negotiation and Due Diligence Period, Seller may then accept a Bona Fide Offer from a Potential Purchaser and enter into a Third Party Agreement to sell the Future ROFO Lots for monetary consideration (after deducting third party commissions) that is equal to or greater than the monetary consideration originally offered to Buyer and on terms and conditions not in any way more favorable to the purchaser than the terms and conditions originally offered to Buyer.

(d)    If Seller does not accept a Bona Fide Offer from a Potential Purchaser within one hundred twenty (120) days after Buyer elects not to purchase the Future ROFO Lots, or if the closing of the purchase of the Future ROFO Lots under a Third Party Agreement is not consummated, Seller must once again initiate the ROFO process described in this Paragraph 14.

(e)    All Future Lots must be offered to Buyer in accordance with this Paragraph 14 for the period through and including one (1) year after Erickson is no longer an employee, director, owner, officer, or member of AG or ASH.

15.    Prior to closing as to any Finished Lot, Buyer will procure a title commitment from a national title company for an Owner's title insurance policy ("**Commitment**").  If the Commitment identifies one or more matters that could prevent Buyer from being able to obtain a building permit to construct a house on the Finished Lot or to obtain a certificate of occupancy for the house once completed, or convey such lot free of all liens and encumbrances or adverse

conditions of title (the "**Title Matters**"), Buyer shall provide Seller with written notice of the Title Matters (the "**Title Objection Notice**") and Seller shall have ten (10) days to cure and/or remove such Title Matters.  If Seller is unable to cure and/or remove the Title Matters within that period, Buyer may elect, by written notice to Seller, to either (a) waive the Title Matters and proceed with the closing for the Finished Lot or (b) not proceed with the purchase of such affected Finished Lot.

16.     As to any Finished Lot conveyed under this Agreement, Seller shall provide to Buyer exclusive possession of such Finished Lot, and Seller shall have removed any and all personal property from such Finished Lot prior to conveyance.

17.     As an inducement to Buyer to enter into this Agreement Seller makes the following representations and warranties that are true as of this date and shall remain true throughout the duration of this Agreement:

(a)     Seller has full power, right and authority to enter into this Agreement and Seller is in good standing under all applicable laws, and Seller's performance under this Agreement does not violate any other obligations of Seller; and

(b)     Except as disclosed in the APA, Seller has no knowledge and no written notice of any claims, demands, proceedings or investigations affecting the lots which are subject to this Agreement; and

(c)     Seller or the entities controlled by Seller hold fee simple title to the Lots and such Lots are not subject to any other leases, options, purchase agreements, tenancies or other encumbrances (other than customary acquisition and development financing which shall be satisfied at the time of each closing); and

(d)     Seller has not received any notices or does not have any knowledge of any change contemplated as to any law, ordinance or restriction that would prevent Buyer from building a residential dwelling on all such lots; and

(e)     Seller has no knowledge that any of the Lots which are subject to this Agreement are under investigation for any federal or state environmental issues and none of the lots has hazardous substances in any form on such lots; and

(f)     Seller has not made (other than disclosed in the APA) any commitments to any governmental authority (beyond normal and customary zoning proffers) as to the use of the Lots other than the construction of residential dwellings on such lots; and

(g)     Seller has no knowledge of any special assessments, fees or mandatory contributions as to any of the lots which are subject to this Agreement.

18.     At the time of each closing under this Agreement, Seller shall convey fee simple title through a Special Warranty Deed (or equivalent document, depending on the state(s) in which the Finished Lots are located).

19.     At the time of each closing under this Agreement, Seller shall be responsible for warranty deed preparation and transfer taxes.  Buyer shall reimburse Seller for accumulated and previously paid property taxes through such closing date as described in Paragraphs 8, 9, and 11(c) of this Agreement.  Buyer shall be solely responsible for all other expenses related to the purchase and financing of lots under this Agreement.

20.     Prior to the closing for each Lot Takedown, Buyer shall have the right to investigate the condition of the Lots, and Seller shall have the obligation to provide access to all documents pertaining to the Lots if requested by Buyer.  Buyer shall give Seller at least ten (10) business days' written notice of the intended Finished Lots to be purchased at such closing. Buyer may request and Seller shall cooperate if such request is made to do a "walk-through" as to the Finished Lots to be purchased and to the extent problems are identified as to the condition of the Finished Lot(s) Seller shall utilize commercially reasonable efforts to remediate such conditions in a timely manner and if not promptly cured by Seller, Buyer may postpone the purchase of the Finished Lots or waive any such condition but which will not alleviate Seller from its obligations per this Agreement.

21.     At the time of each closing, there shall be no condition affecting any Finished Lot to be purchased that would prohibit Buyer from obtaining a building permit to construct a house on such Finished Lot or from obtaining a certificate of occupancy for the house once completed.

22.     Subject to the Preliminary Plans as provided to Buyer, Seller agrees to complete the development of the Lots and the Subdivisions in accordance with this Agreement at its sole cost and expense as hereinafter provided:

(a)     The Seller shall develop the Lots with approximate dimensions of the Lots shown on the Preliminary Plat and Final Plat (as such terms are defined below); provided, however, if the Lots substantially conform with building pads which accommodate customary dimensions used on Seller's existing products then approval of the Preliminary Plans for the Lots by Buyer shall not be necessary. The Preliminary Plat for the Subdivision may hereinafter be referred to as the "**Preliminary Plat**".  Upon completion of Lots, and compliance with the rules and regulations for approval of a platted subdivision established by the applicable municipality (the "**Municipality**") and receipt of final approval (and the expiration of any appeal period) from the Municipality, Seller shall record a final subdivision plat for the Lots (a "**Final Plat**") in the official records for the county in which the Lots are located. The Final Plat shall be in substantial conformity with the Preliminary Plat.  Seller will work with Buyer, once Seller has provided a preliminary grading plan to Buyer, to minimize rear yard slopes on Lots as can be reasonably accommodated by Seller.

(b)     Seller agrees to complete all such improvements to the required engineering standards in the development of a Subdivision in a good and workmanlike manner.

(c)     Seller shall, at its expense, construct and install all utility lines necessary or required for the development of a Subdivision into the Lots.  All utility lines shall be constructed and installed by Seller in accordance with applicable rules, laws and any other requirements of the applicable Municipality and utility companies which will be providing utility services to the Subdivision (the "**Utility Companies**").  All utility lines shall be located

underground, except for such equipment and facilities that the Municipality and the applicable Utility Companies providing services to the Subdivision, customarily install above ground such as electrical boxes, feed boxes, junction cabinets, head walls, storm inlets, berms, etc., or that are otherwise shown on the Preliminary Plat or Final Plat.  As used herein, the term "utility lines" shall mean and refer to all lines, pipes, wiring, conduit, equipment, electrical boxes and other apparatus necessary or required in connection with providing any electrical, telephone, gas lines, cable television, water, sanitary sewer, storm sewer and drainage services on any portion of the Subdivision and the Lots to be developed therein.

(d)     All interior roadways within Subdivision shall be constructed by Seller at its cost and expense in a good and workmanlike manner in accordance with applicable rules and regulations of the Municipality and with the Preliminary Plat and Final Plat of the Subdivision. The interior roadways and/or street improvements shall include the grading, drainage and paving of streets proper width and the installation of curbs and gutters and curb cuts for driveways within the Subdivision as shown on the Preliminary Plat and the Final Plat.

(e)     Seller shall obtain at its sole cost and expense any re-subdivision of all or any portion of a Subdivision which is required to meet the requirements of the state and/or the Municipality.

(f)     Seller shall obtain all drainage letters, approvals, variances, licenses, permits and consents necessary from the Municipality, including without limitation, a storm water discharge permit from the state or any other controlling body, in connection with the development of the Lots and the Subdivision in which the Lots are located (collectively, the "**Permits**"), all at Seller's sole cost and expense.

(g)     The sanitary sewer system and water system shall be accepted by the Municipality and its agencies.

(h)     It is Seller's responsibility to pay all fees, post any bonds or letters of credit except for individual Lot bonds for completion of Buyer's purchased Lots until all such Lots are purchased by Buyer.

(i)     As to sidewalks required by the Preliminary Plat, only sidewalks fronting Lots owned by Buyer within the Subdivision, excluding sidewalks on the common area, if any, shall be the responsibility of Buyer once owned by Buyer.  If sidewalks are required in the Subdivision, Buyer will build said sidewalks in conjunction with the construction of the related house on that lot.  Buyer will not be responsible for installation of sidewalks fronting its Lots until home construction is completed.

(j)     Seller shall provide Buyer with copies of the proposed declaration of covenants, conditions and restrictions and related subdivision documents (the "**Project Documents**") for each community in which the Lots are located, and Buyer shall have the opportunity to timely provide reasonable comments to such Project Documents prior to Seller's execution and recording of them.  Once Buyer has purchased Finished Lots in a community, Seller shall not make any changes to the Project Documents for such community without Buyer's prior written consent, such consent not to be unreasonably withheld, delayed or conditioned.

8

Seller agrees to submit each Subdivision to the rights and obligations arising under the Project Documents in a manner consistent with the most recent amendments thereto, if any. Seller will maintain architectural control for all homes to be built even after turnover of control to the residence. Buyer will not be subject to any assessments on Lots it owns. Only third-party purchasers will be assessed by any association on or after their closing on a home. All Project Documents will allow Buyer or a builder to place signage, monuments, and advertising in the right of ways, common areas and on Lots it owns which are subject to this Agreement, as well as conduct business and construction on its Lots. Seller will maintain majority vote in all neighborhoods and Lots for architectural control until all lots are purchased by Buyer.

(k)     Notwithstanding any other terms in this Agreement, Buyer will not be required to purchase Lots with a building envelope within a flood plain. If a Lot is deemed to be partially in a floodplain by a mortgage company, Buyer may elect in its direction to (i) effect removal of the building envelope from FEMA flood insurance by executing a LOMA letter through FEMA, or (ii) elect not to purchase such Lot. In the event a flood elevation certificate states a lot is in or partially in a flood plain, and the Buyer elects not to purchase said lot, such election shall not constitute a breach of this Agreement. However, in such event, Seller is free to sell said lot to an unaffiliated third party without restriction.

23.     Subject to the Preliminary Plans and conditions set forth in this Agreement, on or before the closing of each Lot Takedown, Seller agrees to complete the Subdivision in which the Lots are located as hereinafter set forth in this Paragraph 23.

(a)     The grading of each Lot to an elevation that provides a minimum 1.0% positive drainage to a dedicated outfall area (drainage swale at the rear or gutter at the front) so as not to pond or trap surface water on the lot. Concrete bottom swales can be designed at 0.5% positive drain.

(b)     Final grading and paving and construction of internal roadways of the Subdivision for access to each Lot with paved and completed access to a main thoroughfare.

(c)     Curb and gutter and curb cuts for driveways and asphalt binder completed for all roadways abutting the Lots or as required by the Municipality and electricity, telephone, cable, and water available for use. Gas utility will be provided if requested by Buyer and available only on as it pertains to each Subdivision and not on a Lot-by-Lot or Phase-by-Phase basis.

(d)     Availability of all utilities as described herein or as platted to the Lots shall have been constructed and installed by Seller in accordance with applicable Municipality regulations, rules, and laws and to the requirements of the applicable utility companies.

(e)     Development Specifications are as follows:

(i)     A building pad of existing compacted material fill per ASTM standards shall be constructed except than no pad will be larger than the buildable area of each lot as defined by the Municipality's building code. Each Lot shall be graded to a uniform slope from the right-of-way to the front building line not to exceed twenty percent (20%).

(ii)    All Building pads shall be compacted to 95% of standard proctor. At Buyer's request, Seller shall provide Buyer with any soil reports in its possession evidencing compaction.  Buyer is entitled to test any lot(s) for compaction utilizing a certified soils engineer of its choosing at its expense.  In the event Buyer identifies a problem with compaction, Seller shall be responsible to correct the compaction for any Lots deemed questionable in such testing.

(iii)    The building pad elevation as measured form sideline to sideline shall be within +- 6 inches.

(f)    Property metal pins for the four corners of each Lot shall be in place.

(g)    All other slopes on the Lot will be mitigated to have even and consistent grades to the extent possible by topography with the goal of maximizing usable rear yards.

(h)    The Seller shall make reasonable efforts to obtain for each Lot any necessary drainage letters, approvals, variances, licenses, permits and consents from any relevant state and local government authority, including but not limited to necessary permits from the environmental authority for each Municipality.  The responsibility to comply with those requirements for each Lot shall become Buyer's responsibility at the time Buyer acquires such Lot.

(i)    Seller shall have paid all fees, costs and assessments levied against the Lots, including, but not limited, to impact fees of any type and aid to construction costs except as otherwise provided in this Agreement.

(j)    The performance of any and all other duties and services, if any, necessary so that a building permit may be issued and the Lots will be ready for the construction thereon of single-family detached dwellings.

(k)    Seller shall maintain the adjacent property that Seller owns in accordance with ordinances of the Municipality.

(l)    Seller to develop and complete all Subdivision common areas for recreation, open space and/or drainage.

24.    The Seller hereby covenants and agrees to pay for and be  obligated for the costs of the development of the Lots and the Subdivision, in accordance with this Agreement.

25.    Time is of the essence under this Agreement and the knowing waiver by any Party as to performance shall not be deemed a waiver as to any other condition as to any other Lot under the Agreement.

26.    This Agreement shall be governed and interpreted under the laws of the State of Georgia and the Parties agree that any judicial action shall be brought exclusively in the U.S. District Court in Columbus, Georgia regardless of the location of the affected Lots, and the Parties consent to submit to the personal jurisdiction of that court in any action or proceeding arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement.  In the event that the U.S. District Court in Columbus, Georgia lacks subject matter

jurisdiction, any such actions or proceedings may be initiated in a court of competent jurisdiction sitting in the State of Georgia. If a Georgia court does not have jurisdiction, then the action may be brought in a court where the property is located.

27.     No broker shall be entitled to a commission or fee in connection with this Agreement and each Party indemnifies and holds one another harmless as to any assertion of a commission alleged to have been authorized by the other Party.

28.     Seller may not assign its interests under this Agreement without the prior written consent of Buyer, such consent not to be unreasonably withheld, delayed or conditioned, other than to a parent, affiliate or subsidiary and then only so long as Seller remains in full control of such entity.

29.     Seller will not, in case of bankruptcy, liquidation, death or disability, subject the Lots to any other term, condition or indebtedness otherwise as stated in this Agreement, and this Agreement will be made prior and superior to any term under Seller's estate and binding upon its heirs, successors and assigns.

30.     Seller represents and warrants to Buyer that the list of plats, plans, drawings, designs, engineering materials and contracts relating to the Lots, set forth on **Schedule 2** attached to this Agreement, is true, correct and complete as of the date of this Agreement.

31.     Intentionally Omitted.

32.     Notwithstanding any contrary provision of this Agreement, the commencement of construction of the improvements to the Lots and the time for Seller's delivery of Finished Lots to Buyer for purchase shall be extended by a period of time equal to any period that progress in construction of the improvements is delayed due to any force majeure events such as strike, lockout, riot, act of war, act of violence, unseasonable or intemperate weather, fire or other casualty, material or labor shortage, act of God, interference by a third party, governmental regulations or controls, or unusual governmental approval delays.

33.     All risk of loss or damage to the Lots by casualty of any nature prior to the closing of a Lot Takedown shall be borne by Seller.  In the event of any casualty affecting the Lots during the pendency of this Agreement, Seller shall be entitled to retain any applicable insurance proceeds, and Seller's obligations under this Agreement shall continue notwithstanding such casualty.

34.     If Buyer shall default in any of the terms or provisions of this Agreement prior to the closing of any Lot Takedown, and shall fail to cure such default within forty-five (45) days following written notice thereof given by Seller to Buyer, Seller's sole and exclusive remedy, after the expiration of the foregoing 45-day period, shall be to terminate this Agreement and to retain the Deposit (or any portion thereof not previously credited to Buyer), as liquidated damages.  Seller and Buyer acknowledge that it would be extremely difficult if not impossible to ascertain Seller's actual damages and that the Deposit (or any portion thereof not previously credited to Buyer) is a reasonable forecast of just compensation to Seller resulting from Buyer's default.  Upon termination of this Agreement by Seller as set forth in this Paragraph, (a) Seller shall be released from the Restrictive Covenants in Section 6.5 of the APA, as more fully set

forth therein, (b) Buyer agrees to allow Seller to use certain Intellectual Property, as more fully set forth in Section 6.6(j) of the APA, (c) Buyer shall have no further obligation to make Deferred Payments, as more fully set forth in Section 2.5(d) of the APA, (d) Seller shall have no further obligation to provide a ROFO to Buyer for Future Lots pursuant to Section 14 above, and (e) neither Party shall have any further obligation or liability hereunder, except indemnity obligations contained herein.

35.     If Seller shall default in any of the terms or provisions of this Agreement or otherwise defaults hereunder, and fails to cure such default within fifteen (15) days following written notice thereof given by Buyer to Seller, Buyer may, at Buyer's election: (a) waive such default, in which case this Agreement shall remain in full force and effect; or (b) terminate this Agreement by written notice to Seller, whereupon (i) the Deposit (or any portion thereof not previously returned to Buyer) shall promptly be returned to Buyer by Seller, (ii) Buyer shall have no further obligation to make Deferred Payments, as more fully set forth in Section 2.5(d) of the APA, and (iii) Buyer shall be entitled to recover its monetary damages, including lost profits; or (c) give written notice to Seller of default, whereupon (i) the Deposit (or any portion thereof not previously returned to Buyer) shall promptly be returned to Buyer by Seller, (ii) Buyer shall have no further obligation to make Deferred Payments, as more fully set forth in Section 2.5(d) of the APA, and (iii) Buyer may pursue such other rights or remedies as are available at law or in equity, including but not limited to obtaining specific performance to compel Seller to improve and/or sell the Lots to Buyer and recovering all monetary damages and lost profits arising from Seller's default.

36.     The obligations of Seller and Buyer are contained in this Agreement and the APA. In the event of any conflict between this Agreement and the APA, this Agreement shall control.

IN WITNESS WHEREOF, the Parties have put their hands and seals on the date first above written.

[The balance of this page is intentionally left blank.]

ASH-GRAYHAWK, LLC,
a Virginia limited liability company


By: _____                    _____
Name:   Greg Benson                                 David Erickson, Individually and
Title:    Chief Executive Officer                   on behalf of all Sellers



AMERICAN SOUTHERN HOMES                             _____
HOLDINGS, LLC, a Delaware                           Rose Anne Erickson, Individually
limited liability company                           and on behalf of all Sellers



By: _____
Name:   J. Marshall Coleman
Title:    Authorized Officer

<u>Schedule 1</u>

<u>Takedown Schedule</u>

Schedule 2

Schedule of Plats, Plans, Drawings, Designs, Engineering Materials and Contracts

Exhibit A

Phase A Lots

<u>Exhibit  B</u>

<u>Phase B Lots</u>

<u>Exhibit  C</u>

<u>Phase C Lots</u>

<u>Exhibit  D</u>

<u>Form of Right of First Offer – Phase C Lots</u>

[date]

[Buyer name and address]

Re:     Right of First Offer for Phase C Lots Pursuant to the Land Purchase Agreement dated November _____, 2019

Seller hereby delivers this Right of First Offer to Buyer:

    1.      Number of Lots offered: _____

    2.      Location(s): _____

    3.      Legal Description(s): _____

    4.      Purchase Price per Lot: _____

    5.      Other Material Conditions: _____

    6.      Deadline for Response (45 days): _____

[Seller signature]

TO BE COMPLETED BY BUYER:

Accepted: _____

Not Accepted: _____

<u>Exhibit E</u>

<u>Form of Right of First Offer – Future Lots</u>

[date]

[Buyer name and address]

Re:     Right of First Offer for Future Lots Pursuant to the Land Purchase Agreement dated November _____, 2019

Seller hereby delivers this Right of First Offer to Buyer:

1.      Number of Lots offered: _____

2.      Location(s):  _____

3.      Legal Description(s):  _____

4.      Condition of Lots at time of purchase (e.g., raw or developed): _____

5.      Deposit Amount: _____

6.      Purchase Price per Lot:  _____

7.      Nature of Transaction (e.g., bulk purchase or option contract with takedown schedule and estimated first purchase date): _____

8.      Closing Date/Requirements: _____

9.      Other Material Conditions:  _____

10.     Deadline for Response (45 days): _____

[Seller signature]

TO BE COMPLETED BY BUYER:

Accepted: _____

Not Accepted: _____

<u>EXHIBIT I</u>

Form of Brokerage Services Agreement


[See attached.]

## BROKERAGE SERVICES AND LISTING AGREEMENT

This BROKERAGE SERVICES AND LISTING AGREEMENT (this "Agreement") is entered into the 15th day of November 2019 (the "Effective Date"), by and between ASH-GRAYHAWK, LLC, a Virginia limited liability company ("ASH"), and ROSE ANNE ERICKSON REALTY, LLC, a Georgia limited liability company ("Broker").

## RECITALS

**WHEREAS**, ASH, as buyer, and each of Grayhawk Homes, Inc., Homestead Residential, Inc., and GH Services, Inc. (collectively, "Sellers"), and certain other parties named therein, are parties to that certain Asset Purchase Agreement dated as of the date herein (the "Purchase Agreement");

**WHEREAS**, Broker is the managing broker providing (i) licensed sales personnel to sell residential homes owned by Sellers to third party customers and (ii) other services, including, but not limited to, buyer coordination, settlement coordination, website maintenance, model home and furniture staging, and the overall management of sales and marketing operations as directed by Sellers;

**WHEREAS**, pursuant to the terms and conditions of this Agreement, and in conjunction with the applicable Listing Agreements as hereafter identified, ASH desires to engage Broker to provide certain residential brokerage services and Listings (as defined below) for all of ASH's Homes (as defined below) as described on Exhibit A, and all services reasonably inferable therefrom or otherwise reasonably requested by ASH related thereto from time to time (collectively, the "Services");

**WHEREAS**, Broker desires to provide such Services to ASH on the terms and conditions stated herein; and

**WHEREAS**, it is the intention of ASH and Broker that this Agreement shall be effective upon the Closing (as defined in the Purchase Agreement) of the transactions contemplated by the Purchase Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions contained herein, ASH and Broker, intending to be legally bound, agree as follows:

1.   Definitions.

(a)   "Affiliate" of a party to this Agreement means any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such person or entity. The term "control" (including the terms "controlled by" and "under common control with") means the ownership of voting securities, by contract or otherwise in an entity.

(b)   "Applicable Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any federal, state, municipal or local government.

(c)   "Home" or "Homes" means those homes and lot real property assets which are (i) Sellers' pre-sold homes that are not settled with third parties as of the Closing or speculative inventory homes under construction, (ii) lots that have been enumerated and listed with Broker as of the Closing, and (iii) all new homes or lots owned by ASH and for sale after Closing that will be marketed by Broker.

(d)     "Listing" or "Listings" means any Home listed for sale with Broker, including lots which are released from a Seller to Broker for listing purposes as evidenced by a written release, a copy of which shall be provided to ASH, and which Homes or lots are for sale at a price set by a Seller and available to Broker to list with its agents, and will be listed on all available and appropriate listing services and advertised by Broker.

(e)     "Listing Agreement" or "Listing Agreements" means the Georgia Listing Agreement and Alabama Listing Agreement.

2.     Scope of Services; Term.

(a)     *Services Generally*.   Broker shall perform the Services in compliance with Applicable Law, in an accurate and timely manner, in accordance with that standard of care that a reasonably prudent professional in the business of providing residential brokerage services related to residential real estate would exercise under like circumstances, and in accordance with the degree to care, skill, level of priority, treatment, and diligence as was provided to Sellers in the twelve (12)-month period immediately prior to the Effective Date (the "Standard of Care").

(b)     *Brokerage Listings*.   All Listings shall require a separate listing agreement for each Listing as follows:

(i)     For Listings in the State of Georgia, such separate listing agreement shall be substantially in the form recommended by the Georgia Association of Realtors known as an "Exclusive Seller Listing Agreement," the form of which is attached hereto as Exhibit B-1 (the "Georgia Listing Agreement"); and

(ii)     For Listings in the State of Alabama, such separate listing agreement shall be substantially in the form recommended by the Alabama Association of Realtors known as an "Exclusive Seller Listing Agreement," the various county-specific forms of which are attached hereto as Exhibit B-2 (collectively, the "Alabama Listing Agreement").

(c)     *Governing Agreement*.   The parties hereto agree that the terms and conditions of this Agreement shall serve as the governing terms between Broker and ASH for all Listings and each individual Listing Agreement shall provide the terms and conditions solely for the specific Listing indicated in such Listing Agreement.   Where there is a conflict between this Agreement and any Listing Agreement, the parties hereto will mutually work to resolve such conflict and, in the event such conflict cannot reasonably be resolved, this Agreement shall control, so long as any resolution does not cause Broker to violate the aforestated Standard of Care, any licensing requirements to which Broker is subject, and any applicable code of ethics for realtors in Georgia or Alabama.   For the avoidance of doubt, the parties hereto acknowledge and agree that, where a Listing Agreement indicates it is the sole and entire agreement between the parties (without reference to this Agreement), the terms and conditions of this Agreement shall be interpreted as being included in such provision and incorporated therein.   ASH has the right to increase or decrease a listing price from time to time or take a Listing off the market for any reason.

(d)     *Term*.   The term of this Agreement shall be for the period commencing on the Effective Date through December 31, 2022 (the "Initial Term"), unless earlier terminated as set forth herein. Upon the conclusion of the Initial Term, this Agreement shall automatically continue on a month-to-month basis unless or until a party provides written notice of its intent not to renew upon at least sixty (60) days' prior notice.   The Initial Term together with any automatic extension shall be hereinafter referred to as the "Term."

(e)  *Notice of Breach and Opportunity to Cure.*  In the event of a breach of this Agreement, the non-breaching party shall provide written notice to the breaching party stating with reasonable specificity the nature of such breach.  The breaching party shall remedy the breach within thirty (30) days of said written notice. In the event the breaching party fails to do so, the non-breaching party may terminate this Agreement at the end of such thirty (30)-day period.  In addition, this Agreement may be terminated by either party during the Term, upon the filing of a bankruptcy petition, insolvency, assignment for the benefit of creditors, or inability of the other party to generally pay its debts as they mature in the ordinary course of business.

3.  Billing; Compensation.

(a)  *Commissions.*  Broker shall be paid any commissions due to Broker pursuant to the sale of a Home under this Agreement and any related Listing Agreement only at the closing of such sale as set forth on the final settlement and closing statement for such Home.  Any dispute between Broker and ASH regarding Broker commissions shall be resolved prior to the consummation of the sale of a Home to a third party.

(b)  *Monthly Services Fees.*  Fees which will be billed monthly for the Services provided during such month on the basis of the rates and charges for Services as set forth in the rate schedule attached hereto as Exhibit C (the "Rate Schedule") or for other ancillary Services as may be agreed to between Broker and Seller.  Each such invoice shall be supported by receipts evidencing the work performed by Broker, and such other documentation as ASH may reasonably request as evidence of the Services performed.  In the event of a dispute related to an invoice for Services, the disputing party shall deliver a written statement to the other party prior to the date payment is due on the disputed invoice listing the disputed items and providing a reasonably detailed description of each disputed item.  Amounts not so disputed shall be deemed accepted and shall be paid within fifteen (15) days of Broker's submission of the invoice and supporting documentation, notwithstanding disputes on other items.  The parties hereto shall seek to resolve all such disputes expeditiously and in good faith.  The Rate Schedule shall be amended only by signed written agreement of the parties.

4.  Representations, Warranties. Broker represents and warrants to ASH that:

(a)  Broker is duly organized, validly existing, and in good standing under the laws of the State of Georgia, is qualified to do business as a foreign corporation in the State of Alabama, and has all requisite corporate power and authority to enter into this Agreement.  No further action, consent, waiver, or approval by or on behalf of Broker or any third party is necessary to authorize the execution, delivery, or performance of this Agreement.

(b)  The execution and delivery of this Agreement by Broker does not, and the consummation by Broker of the transactions contemplated by this Agreement will not, (i) conflict with, or result in any violation or breach of, any provision of Broker's organizational documents, (ii) conflict with, or result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default under, or otherwise require notice, consent, or waiver under any contract, agreement, or obligation to which Broker is a party, or (iii) conflict with or violate any Applicable Law.

(c)  Broker owns or has the right to use all copyrights, trademarks, patents, and other intellectual property that it will use to perform the Services, and the use thereof will not infringe any intellectual property rights of any third party.

5.  Covenants. Broker covenants that, from and after the Effective Date:

3

(a)     Broker has the experience, expertise, and properly trained work force necessary to, and it shall, provide the Services in accordance with the Standard of Care.

(b)     As promptly as practicable, Broker shall notify ASH of any damage to the Homes and shall reasonably cooperate with ASH in the repair of any such damaged Homes.

(c)     Broker shall act in compliance with all Applicable Laws including, without limitation, holding all necessary licenses, registrations, permits, and other approvals required by any federal, state, municipal or local governments or organizations with respect to its performance of all Services hereunder.

(d)     Broker shall notify ASH in writing immediately upon discovery of any revocation, threatened revocation, or foreseeable change to such compliance or its licensed status, any inspection by a federal, state, municipal or local government having authority over Broker, its operations, or any matters that will make Broker no longer in compliance with its representations and warranties contained herein.

(e)     Broker shall take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper, or advisable to perform the Services in accordance with the terms of this Agreement and shall cooperate with ASH to carry out the purposes hereunder.

6.     <u>Agents and Personnel</u>.  In further consideration of the amounts charged in the Rate Schedule, Broker, at its sole cost and expense and in Broker's sole discretion and judgment, shall provide a sufficient number of qualified, trained licensed real estate agents or other personnel capable of performing all reasonable tasks associated with all Services to be rendered.

7.     <u>Special Services</u>.  If labor is required for services other than those services expressly contemplated by this Agreement (and the Exhibits hereto) ("<u>Special Services</u>"), prior to such Special Services being rendered, the parties will mutually agree to a reasonable charge to be assessed to ASH for expenses actually incurred, with such reasonable charges to include a ten percent (10%) handling charge by Broker.

8.     <u>Termination of Services</u>.  Broker shall cooperate with ASH and its Affiliates and shall assist ASH and its Affiliates in the orderly, uninterrupted transfer and migration of the Services (including, without limitation, continuing to perform and provide the Services) to ASH or another services provider in connection with the expiration or earlier termination of the Agreement for any reason, however described ("<u>Termination/Expiration Assistance</u>").  Such Termination/Expiration Assistance shall include assistance in the prompt and orderly sale or transfer of any Homes then under contract with another service provider to ASH.   The term of the Agreement shall not be deemed to have expired or terminated until the Termination/Expiration Assistance is completed.  Upon ASH's request, Broker shall provide, and shall cause its subcontractors to provide, Termination/Expiration Assistance commencing upon any notice of termination or of non-renewal of the Agreement and continue to provide, and cause to be provided, the Termination/Expiration Assistance for the later to occur of (i) the sale of all Homes then under contract, and (ii) 180 days beyond termination or expiration, provided that ASH shall take reasonable steps to complete its transition as soon as reasonably practicable.  ASH shall continue to pay the fees for the Services during this period of Termination/Expiration Assistance.  In the event ASH is in default with respect to the payment of fees or other amounts payable by ASH under the Agreement at the start of the Termination/Expiration Assistance period, Broker shall not be required to provide Termination/Expiration Assistance unless ASH cures such payment default.

9.     <u>Broker's Independent Contractor Status and Employees</u>.  Broker is, and shall act exclusively as, an independent contractor, and is not to be construed as, and will not hold itself out to be, an ASH employee, agent, partner, or joint venturer.  Broker shall have no right or authority to bind or incur any

liability on behalf of ASH.  Each party shall be solely responsible for all payroll, benefit, and all other employee expenses, without limitation, regarding its own employees, agents, and contractors, and Broker agrees to comply with all Applicable Laws related thereto.

10.    Indemnification.

(a)    Broker shall indemnify and hold harmless ASH and its Affiliates, and its and their employees, agents, officers, directors, members, successors and assigns from and against any and all liabilities, claims, demands, losses, damages or costs (including reasonable attorney's fees and court costs) of any kind or nature whatsoever (collectively, "Claims") to the extent arising out of or related to (i) damage caused to ASH or its Affiliates arising from Broker's performance of the Services, (ii) Broker's breach of this Agreement, or (iii) the gross negligence or willful misconduct of Broker or its employees or agents.

(b)    ASH shall indemnify and hold harmless Broker, its employees, agents, officer, directors, Affiliates, and permitted successors and assigns from and against any and all Claims to the extent arising out of or related to (i) negligent Home construction, (ii) warranty claims made with regards to a Home, (iii) ASH's breach of this Agreement, or (iv) the gross negligence or willful misconduct of ASH or its employees or agents.

11.    Insurance.

(a)    At all times while this Agreement is in effect, Broker shall maintain, at its sole cost and expense, appropriate insurance coverages as would be held by any reasonable and similarly situated residential real estate brokerage firm.

(b)    Upon execution of this Agreement, Broker shall furnish to ASH Certificates of Insurance evidencing appropriate insurance coverage and demonstrating that such coverages are in effect for the Term of this Agreement.

(c)    The minimum insurance requirements contained herein and Broker's maintenance of insurance shall in no way limit, impair, or affect the extent of Broker's liability under this Agreement.

12.    Notices.  All notices given under this Agreement shall only be sufficient if in writing and sent by certified mail, return receipt requested, nationally recognized overnight courier, or electronic mail to the parties at the addresses set forth below or at such other addresses designated by either party in writing. Notice shall be effective upon the date of receipt.

|  |  |
|---|---|
| If to Broker: | ROSE ANNE ERICKSON REALTY, LLC |
| | 110 B Enterprise Court |
| | Columbus, GA 31904 |
| | Attention:    Rose Ann Erickson |
| | Email:    Rerickson@RAERealty.net |
| | |
| If to ASH: | American Southern Homes |
| | Norton Scott LLC |
| | 1420 Beverly Road, Suite 240 |
| | McLean, VA 22101 |
| | Phone: (703) 738-8736 |
| | Attention: Michael Scott |
| | E-mail: mike@nortonscott.com |
| | |
| | and |

601147104

Greg Benson
21630 Ridgetop Circle, Suite 120
Sterling, VA 20166
Phone:  (703) 863-5070
E-mail:  gbenson@benmarlc.com

With a copy, which
shall not constitute
notice to:

Bryan Cave Leighton Paisner LLP
1155 F Street NW
Washington, D.C. 20004
Attention:     Jacob A. Kramer
Email:      jake.kramer@bclplaw.com

13.     Confidentiality.  Except as otherwise required by law, Broker shall not disclose (a) the terms or existence of this Agreement; or (b) any proprietary, non-public, trade, business or any other information regarding ASH or its Affiliates, including, without limitation, information regarding the Homes, customers, volume sold, analyses, or any other information ("Confidential Information").   For purposes of this Agreement, Confidential Information shall not include information that Broker customarily provides to any local multi-listing service relating to real estate sales or that is made generally available to the public through no fault of Broker, notwithstanding Broker's obligations herein.

14.     Successors and Assigns.   The benefits and burdens of this Agreement shall inure to the benefit of, and be binding upon, ASH and Broker, and their respective permitted successors and assigns.

15.     Assignment and Subcontracting.

(a)     Broker shall not assign, subrogate or transfer any interest, obligation or right that would affect this Agreement, by operation or otherwise, without the prior written consent of ASH, such consent which shall not be unreasonably withheld.  Any dissolution, merger, consolidation, reorganization or other business combination or any transfer of all or substantially all of the assets or a controlling percentage of the equity interests of Broker shall constitute an assignment of this Agreement.   Any purported or attempted assignment of this Agreement or any interest, obligation or right hereunder, will be void and of no force or effect if not done in accordance with this Section.

(b)     Broker may not delegate or subcontract any of its obligations under this Agreement to a third party that is not an Affiliate of Broker without prior notice to ASH.  Any such subcontractor or agent to which Broker delegates any of its obligations under this Agreement shall carry, or be covered by, industry-standard minimum insurance coverage.

16.     Headings; Recitals; Exhibits.  The headings contained herein are solely for convenience of reference and shall not be deemed to have substantive meaning.  The Recitals set forth above and the Exhibits attached hereto are incorporated herein by this reference.

17.     Waiver of Rights. Either party's failure to strictly enforce any provision of this Agreement shall not be construed as a waiver thereof or as excusing the other party from future performance.

18.     Severability.  Every provision in this Agreement is intended to be severable.  In the event that any provision in this Agreement shall be held invalid, the same shall not affect in any respect whatsoever the validity of the remaining provisions of this Agreement; provided that if any such provision may be made

6

601147104

enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by Applicable Law.

19. <u>Waiver of Jury Trial</u>.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

20. <u>Survival</u>.  No termination or expiration of this Agreement shall cause the termination of any outstanding liabilities of either party.  The provisions herein related to Confidentiality, Indemnification, Insurance, Termination/Expiration Assistance, and any other provision which by its nature or express duration extends beyond the termination of this Agreement, will survive any termination or cancellation hereof and continue in effect indefinitely.

21. <u>Remedies</u>.  In the event of any litigation concerning this Agreement, the non-prevailing party shall be liable for and pay to the prevailing party the reasonable attorneys' fees, costs and expenses which the prevailing party has incurred in connection with such litigation, including any appeals therefrom.  All remedies specified herein shall be cumulative and in addition to all other or further remedies provided in law or in equity.

22. <u>Entire Agreement</u>.  This Agreement, along with the Exhibits attached hereto, constitutes the entire understanding and agreement of the parties with regard to the subject matter thereof, and shall not be deemed or construed to be modified, amended, rescinded, canceled or waived, in whole or in part, except by written amendment signed by the parties thereto.  In the event any conflict or inconsistency exists between this Agreement and any other sources, this Agreement shall govern.  Both parties have read, reviewed, understood and agreed to the requirements and terms to this Agreement and all Exhibits.

23. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.  Counterpart signature pages to this Agreement transmitted by facsimile transmission, by electronic mail in portable document format (.pdf) form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

24. <u>Effectiveness</u>.  The effectiveness of this Agreement and the transactions contemplated by this Agreement shall be deemed to occur simultaneously with the effectiveness of the Purchase Agreement.

*[Signature page follows]*

601147104

**IN WITNESS WHEREOF**, the parties have caused this Brokerage Services and Listing Agreement to be executed by their duly authorized representatives as of the day and year first referenced above.

ASH-GRAYHAWK, LLC

By:_____
Name: _____
Title: _____

ROSE ANNE ERICKSON REALTY, LLC

By:_____
Name: _____
Title: _____

*Signature Page*

**EXHIBIT A**

**SCOPE OF SERVICES**

Broker shall provide to ASH:

A.    <u>Listing Coordination</u>.  Broker will coordinate the Listings of Homes for sale on behalf of ASH (in such capacity, as ASH's listing broker).  Such Listing coordination services shall include, but not be limited to, the provision of:

    (a)    Listing agreements
    (b)    MLS services
    (c)    Photos
    (d)    Signs
    (e)    Field questions for agents
    (f)    Help with option pricing for agents
    (g)    Work-up offers and contracts

B.    <u>Lead Coordination</u>.  Broker will coordinate leads regarding the sale of the Homes.  Such lead coordination services shall include, but not be limited to, the provision of:

    (a)    IDX/BDX
    (b)    Website
    (c)    CRM management
    (d)    Follow-up boss
    (e)    Photos
    (f)    Signage
    (g)    Spec materials

C.    <u>Closing Coordination</u>.  Broker will coordinate the closing of sales of the Homes to third party homebuyers.  Such closing coordination services shall include, but not be limited to, the provision of:

    (a)    Contract stipulations
    (b)    Coordination with design center regarding spec problems or changes
    (c)    Final selections, final addendum, and purchase price
    (d)    Liaison among lender, agents, appraisers and inspectors, and ASH
    (e)    Precontract meeting
    (f)    Inspections
    (g)    Construction questions
    (h)    NHO meetings
    (i)    Coordinate new home presentation
    (j)    Set-up of closings

D.    <u>Advertising and Marketing; Model Coordination</u>.  Broker will coordinate the advertising and marketing of the Homes and ASH to third party homebuyers, including the coordination of model homes.  Such advertising, marketing, and model coordination services shall include, but not be limited to, the provision of:

    (a)    Website
    (b)    Email blasts
    (c)    Social media
    (d)    Signage
    (e)    Search engine optimization (SEO) photos

E.      Model Home Coordination.  The parties acknowledge that Broker owns certain furniture for use in coordinating the staging and furnishing of model homes and that such furniture is the property of Broker.  Broker will coordinate the model home furnishing and services.  Such model home services shall include, but not be limited to, the provision of:

      (a)    Marketing materials

      (b)    Set-up, decorating, staging, and furnishing of model homes

      (c)    Recommendations for, and the coordination of, future furniture and accessories purchases.  Payment regarding the movement and purchase of furniture for staging and furnishing model homes will be provided at Sellers expense.

      (d)    Staffing of model home by at least one (1) full-time, trained and licensed agent

      (e)    Maintain staffing Monday – Saturday from 12 pm – 5 pm and on Sunday from 1 pm – 5 pm or at Broker's reasonable discretion based on market conditions.

      (f)    Staffing of two (2) trained and licensed agents per community, except for the Auburn community, which will be staffed by 1 such agent Wednesday – Sunday or at Broker's reasonable discretion based on market conditions

      (g)    Support with co-op agents

F.      Training.   Broker will coordinate the training of all employees and independent contractors regarding the Services listed above and the sale of the Homes to third party homebuyers.  Such training services shall include, but not be limited to, the provision of:

      (a)    RAE and managing broker

      (b)    RAE assistant

G.      Builder Guidelines.  Broker will coordinate sales using the Builder Guidelines attached hereto as Exhibit A-1, as may be amended from time to time.

H.      Additional Services.  Broker will coordinate certain additional services regarding the sale of the Homes to third party homebuyers.  Such additional services shall include, but not be limited to, the provision of:

      (a)    Price lists

      (b)    Contract packages

      (c)    Plats

      (d)    Directional signage

      (e)    Community signage

      (f)    Lot signage

I.      Other Services.  Other services that may be requested by ASH from time to time will be provided by Broker.  By agreement of the parties, this Exhibit A shall be updated to reflect such other services.

**<u>EXHIBIT A-1</u>**

**BUILDER GUIDELINES**

[See Attached.]

**<u>EXHIBIT B-1</u>**

**FORM OF EXCLUSIVE SELLER LISTING AGREEMENT  (GEORGIA)**

[See Attached.]

601147104

**EXHIBIT B-2**

**FORM OF EXCLUSIVE SELLER LISTING AGREEMENT  (ALABAMA)**

[See Attached.]

## EXHIBIT C

## COMMISSIONS

Broker Commissions:

On new sales from and after the Effective Date, Broker will be paid a commission not to exceed five percent (5%) in total representing commissions for all brokers in the transaction whether buyers broker, selling broker, dual agency, or transaction broker. The commission will be based on the final sales price at closing.

      (a)    Existing sales ratified prior to the Effective Date will be paid per previous agreements with ASH's predecessor-in-interest.

      (b)    No commission will be earned from ASH by Broker unless and until settlement with homebuyer. ASH will not owe any commissions due to a default or cancellation, regardless of whether such default occurs as a result of a homebuyer's or Broker's actions (or inactions), and whether the sale was prior to or after the Effective Date.

      (c)    All contracts will be submitted and negotiated between Broker and ASH. Broker shall continually communicate with the third party homebuyer and notify ASH of any problems related to construction or closing and supply to ASH each week a report on standing inventory and homes under contract.

The terms of this commission may be revised upon mutual agreement of the parties prior to conclusion of the Term.

Other Fees and Expenses:

1. *Website Expenses*: Expenses for maintenance of ASH's website shall be the sole responsibility and liability of ASH. ASH and Broker shall split 50/50 the expense of a single marketing employee who shall provide marketing services jointly to ASH and Broker, such expense to include the employee's salary and related employment costs and any expenses of Employee incurred in furtherance of Employee's marketing duties.. Such expenses will be paid initially by Broker. Broker shall subsequently invoice ASH for ASH's portion of such website expenses.

2. *Search engine optimization with Meredith Communications*: Any expenses related to SEO services shall be billed by Meredith Communications directly to ASH, separately from Broker.

## SELLER DISCLOSURE LETTER

Reference is made to the Asset Purchase Agreement ("the <u>Agreement</u>") entered into as of the date therein, among (i) Grayhawk Homes, Inc., a Georgia corporation ("<u>Grayhawk</u>"), Homestead Residential Inc., an Alabama corporation ("<u>Homestead</u>"), and GH Services, Inc., a Georgia corporation ("<u>GHS</u>", collectively with Grayhawk and Homestead, "<u>Seller</u>"), (ii) David B. Erickson ("<u>D. Erickson</u>") and Rose Ann Erickson ("<u>R. Erickson</u>"), (iii) ASH-Grayhawk, LLC, a Virginia limited liability company ("<u>Buyer</u>"), and (iv) solely with respect to the applicable provisions of Section 2.5 of the Agreement, American Southern Homes Holdings, LLC, a Delaware limited liability company and indirect parent of Buyer ("<u>ASH</u>").

This is the "Seller Disclosure Letter" defined in the Agreement, and is being delivered by Seller to Buyer subject to and in accordance with the Agreement. Capitalized terms used but not defined in this Seller Disclosure Letter shall have the meanings given to them in the Agreement.

## SECTION 3.1
## ORGANIZATION, STANDING AND POWER

**a)   Jurisdictions**

**Grayhawk  Homes, Inc.**
City of Auburn
AL Home Builders  License
Muscogee Occupation Tax Business License
City of Opelika
State of Alabama
Russell County
Smiths Station
City of Phenix City
State of GA Board for Residential and General Contractors

**Homestead Residential, Inc.**
City of Auburn
AL Home Builders  License

**GH Services, Inc.**
Muscogee Occupation Tax Business License

**b)  No Subsidiaries and No DBA**

## SECTION 3.2(b)

## AUTHORITY; NO CONFLICT, REQUIRED FILINGS AND CONSENTS

1. Resolutions unanimously approved by the Board of Directors of Grayhawk Homes, Inc. on November 13, 2019.
2. Resolutions unanimously approved by the Board of Directors of Homestead Residential, Inc. on November 13, 2019.
3. Resolutions unanimously approved by the Board of Directors of GH Services, Inc. on November 13, 2019.

**<u>SECTION 3.3(a)</u>**
**UNAUDITED FINANCIAL STATEMENTS – EOY 2017 AND 2018**

<u>Grayhawk Homes, Inc.</u>

See attached.



## GRAYHAWK
### HOMES INC.

# Balance Sheet
December 31, 2017

## Assets

### Current Assets

| | | |
|---|---|---|
| GH-000-10100.00000 | Petty Cash | $ 300.00 |
| GH-000-10205.00000 | SSB-Operating | 598,219.76 |
| GH-000-10206.00000 | SSB -- BOYL | 15,190.00 |
| GH-000-10210.00000 | Cash on Deposit - Suntrust | 2,450.62 |
| GH-000-10215.00000 | Cash on Deposit - Regions | 4,949.59 |
| GH-000-10225.00000 | Cash on Deposit - Auburn | 4,855.21 |
| GH-000-10250.00000 | Grayhawk F & M Bank | 1,515.00 |
| GH-000-10255.00000 | GH-TX CAP | 19,988.00 |
| GH-000-10265.00000 | CALUMET BANK | 3,267.33 |
| GH-000-13200.00000 | Land held for Development | 45,000.00 |
| GH-000-13500.00000 | CIP - ROCKY RIDGE | 96,140.00 |
| GH-000-13501.00000 | CIP - DONAHUE RIDGE | 186,046.13 |
| GH-000-14251.00000 | GA WIP | 8,716,198.81 |
| GH-000-14252.00000 | AL WIP | 8,825,829.95 |
| GH-000-14990.00000 | GA WIP Allocation | 203,929.00 |
| GH-000-14995.00000 | AL WIP Allocation | 184,877.00 |
| GH-000-15200.00000 | Model Homes | 530,272.41 |
| GH-000-16100.00000 | Deposits on Future Develo | 1,274,000.00 |
| GH-000-16500.00000 | Due from Affiliated Companies | 11,636.97 |

Total Current Assets $ 20,724,665.78

### Long Term Assets

| | | |
|---|---|---|
| GH-000-18300.00000 | Office Furniture and Equip | $ 24,163.10 |
| GH-000-18405.00000 | Dave's Truck | 34,561.20 |
| GH-000-18406.00000 | Dave's BMW | 55,637.00 |
| GH-000-18430.00000 | Construction Equipment | 6,435.00 |
| GH-000-18900.00000 | Computer Equipment and So | 55,807.49 |
| GH-000-19100.00000 | Accumulated Depreciation | (132,126.79) |

Total Long Term Assets $ 44,477.00

Total Assets $ 20,769,142.78

*Final*

May 24, 2018        Confidential:  For Internal Use Only



# GRAYHAWK
### HOMES INC.

## **Balance Sheet**
December 31, 2017

## <u>Liabilities and Equity</u>

### Current Liabilities

| | | |
|---|---|---|
| GH-000-20100.00000 | Contract Deposits | $ 180,384.00 |
| GH-000-20200.00000 | Contract Draws | 203,331.93 |
| GH-000-21100.00000 | Accounts Payable | 214,649.34 |
| GH-000-22355.00000 | Const Ln Payable: SSB | 1,975,645.54 |
| GH-000-22360.00000 | Const Ln Payable: Calumet | 780,753.17 |
| GH-000-22370.00000 | Const Loan-Texas Capital | 2,009,262.61 |
| GH-000-22405.00000 | BB&T - Dave's Truck | 3,484.33 |
| GH-000-22406.00000 | BMW Financial Svcs | 47,662.27 |
| GH-000-22420.00000 | Loan Payable - Rainier Capi | 15,324,000.00 |
| GH-000-23250.00000 | FUTA Payable | 332.93 |
| GH-000-23300.AL000 | AL State W/Holding | 2,890.00 |
| GH-000-23310.00000 | GA SUTA Payable | 881.63 |
| GH-000-23320.00000 | AL SUTA Payable | 105.63 |
| GH-000-23460.00000 | AFLAC WITHHOLDING | 346.16 |

Total Current Liabilities $ 20,743,729.54

### Long Term Liabilities

Long Term Liabilities

Total Liabilities $ 20,743,729.54

### Equity

| | | |
|---|---|---|
| GH-000-29250.00000 | Capital Stock | $ 10,000.00 |
| GH-000-29200.00000 | Retained Earnings | 1,025,251.12 |
| GH-000-29600.00000 | Distributions | (5,976,000.00) |
| | Net Income | 4,966,162.12 |

Total Equity $ 25,413.24

Total Liabilities & Equity $ 20,769,142.78

*Final*

# Grayhawk Homes, Inc

Income Statement

For the Period Ended December 31, 2017

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| **Income** | | | |
| GH-000-31000.00000 | Sales, GA | $ 1,114,393.00 | $ 24,189,105.83 |
| GH-000-31100.00000 | Sales, AL | 552,484.00 | 10,788,560.00 |
| GH-000-34000.00000 | Miscellaneous Income | 2,000.00 | 29,954.50 |
| GH-000-34500.00000 | Earned Discounts | 5,939.67 | 63,830.42 |
| GH-000-34570.00000 | Forfeitures of EM | 1,000.00 | 25,936.00 |
| GH-000-35000.00000 | Rebates | 14,325.00 | 424,887.45 |
| Total Income | | $ 1,690,141.67 | $ 35,522,274.20 |
| **Cost of Sales** | | | |
| GH-000-36000.00000 | COS, GA | $ 924,900.05 | $ 18,553,462.88 |
| GH-000-36100.00000 | COS, AL | 447,737.83 | 9,199,218.88 |
| Total Cost of Sales | | $ 1,372,637.88 | $ 27,752,681.76 |
| Gross Margin | | $ 317,503.79 | $ 7,769,592.44 |
| **Expenses** | | | |
| GH-000-37500.00000 | Prior Year 263A Costs - Ge | $ 626,325.00 | $ 626,325.00 |
| GH-000-37510.00000 | Prior Year 263A Costs - Al | 344,722.00 | 344,722.00 |
| GH-000-40100.00000 | Superintendents, Salaries | 37,800.01 | 415,713.57 |
| GH-000-40200.00000 | General Labor, Salaries an | (12,917.50) | 1,557.50 |
| GH-000-40300.00000 | Production Managers, Salar | 17,306.54 | 113,968.45 |
| GH-000-40400.00000 | CAD, Est, Purch, Salaries | 20,689.89 | 344,509.08 |
| GH-000-40500.00000 | Decorator, Salaries and Wa | 12,936.95 | 170,060.68 |
| GH-000-41100.00000 | GH Payroll Taxes | 9,788.43 | 148,671.79 |
| GH-000-41200.00000 | Worker's Compensation Insu | (3,223.33) | 60,338.42 |
| GH-000-41300.00000 | Health Insurance, Construc | 1,880.00 | 30,550.00 |
| GH-000-41400.00000 | Retirement Plan (AUL), Con | | 400.00 |
| GH-000-41900.00000 | Other Benefits, Constructi | 43.20 | 601.20 |

May 24, 2018          Confidential:   For Internal Use Only

*Final*

**Grayhawk Homes, Inc**

Income Statement

For the Period Ended December 31, 2017

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| GH-000-42650.00000 | Phone Reimbursement | $ 70.00 | $ 536.38 |
| GH-000-44100.00000 | Vehicle Reimbursement | 11,411.28 | 94,403.49 |
| GH-000-44900.00000 | Recruiting Fees and Exp | 171.04 | 1,111.04 |
| GH-000-45600.00000 | Small Tools and Supplies | 139.15 | 13,533.31 |
| GH-000-46100.00000 | Temporary Utilities | 5,722.80 | 80,019.38 |
| GH-000-46200.00000 | Trash / Dump /Porto Johns | 24,014.99 | 178,500.78 |
| GH-000-46300.00000 | Erosion Control | | 5,077.45 |
| GH-000-46400.00000 | Lawn Care | 3,275.00 | 14,050.00 |
| GH-000-46600.00000 | Warranty-Completed Units | 4,084.35 | 42,704.83 |
| GH-000-46700.00000 | Indirect Construction Cost | 1,905.50 | 45,810.40 |
| GH-000-46800.00000 | Contract Labor | 4,200.00 | 40,050.00 |
| GH-000-47050.00000 | Warranty, Salaries and Wag | 14,635.39 | 154,585.75 |
| GH-000-47150.00000 | Health Insurance, Warranty | 235.00 | 4,465.00 |
| GH-000-47200.00000 | Other Benefits, Warranty | 3.60 | 68.40 |
| GH-000-49200.00000 | Builder's Risk | 2,586.45 | (1,039.90) |
| GH-000-50200.00000 | Interest on Notes Payable | 77,120.00 | 873,940.00 |
| GH-000-50400.00000 | Interest on Construction L | 20,249.92 | 191,459.61 |
| GH-000-50900.00000 | Interest Expense, Other | 81.85 | 906.72 |
| GH-000-51200.00000 | Points and Fees | 1,479.20 | 8,066.74 |
| GH-000-51300.00000 | Appraisal and Related Fees | | 11,705.00 |
| GH-000-51400.00000 | Construction Loan Fees | 2,235.63 | 53,504.82 |
| GH-000-52100.00000 | Closing Costs for Purchase | (327.71) | 31,792.87 |
| GH-000-52500.00000 | Current Year 263A Costs | (388,806.00) | (388,806.00) |
| GH-000-60300.00000 | Mkt & Sales Manager, Salar | | 22,431.33 |
| GH-000-60400.00000 | Sales In-House Salaries an | | 25,093.18 |
| GH-000-61300.00000 | Health Insurance - IH Sale | | 940.00 |
| GH-000-61900.00000 | Other Employee Benefits-Sa | | 32.40 |
| GH-000-63100.00000 | Print Advertising | 78.10 | 6,088.82 |
| GH-000-63200.00000 | Radio Advertising | | 3,600.00 |

May 24, 2018                Confidential:   For Internal Use Only

**Grayhawk Homes, Inc**

Income Statement

For the Period Ended December 31, 2017

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| GH-000-63250.00000 | Television Advertising | $ 600.00 | $ 6,274.73 |
| GH-000-63300.00000 | Internet Fees, Web Page De | 1,903.03 | 20,468.52 |
| GH-000-63500.00000 | Signs & Billboards | 1,200.00 | 13,402.20 |
| GH-000-63550.00000 | Billboards | 900.00 | 20,749.92 |
| GH-000-66300.00000 | Model Home Expense | 192.00 | 9,404.46 |
| GH-000-66500.00000 | Model Home Utilities | 428.06 | 6,727.19 |
| GH-000-66700.00000 | Model Home Lawn Care and M |  | 1,181.00 |
| GH-000-67100.00000 | Market Research and Consul | 359.00 | 5,191.82 |
| GH-000-69990.00000 | Other Sales and Marketing | 504.00 | 14,250.78 |
| GH-000-80300.00000 | Salaries - Officers | 25,000.00 | 300,000.00 |
| GH-000-80400.00000 | Salaries - Management | 8,461.54 | 136,067.33 |
| GH-000-80500.00000 | Salaries and Wages - Offic | 24,633.20 | 317,751.30 |
| GH-000-80600.00000 | Development, Salaries and | 5,250.00 | 74,493.75 |
| GH-000-81100.00000 | Payroll Taxes - Office | 710.37 | 1,213.13 |
| GH-000-81200.00000 | Workers Comp Insurance - G | 12,061.40 | 11,682.39 |
| GH-000-81300.00000 | Health Insurance - General | 1,532.34 | 14,225.24 |
| GH-000-81900.00000 | Other Employee Benefits - | 32.40 | 392.40 |
| GH-000-82100.00000 | Rent | 7,872.72 | 94,672.64 |
| GH-000-82300.00000 | Repairs and Maintenance - |  | 637.50 |
| GH-000-82400.00000 | Office Cleaning | 400.00 | 5,200.00 |
| GH-000-82500.00000 | Utilities - Admin Office | 704.35 | 9,784.37 |
| GH-000-82600.00000 | Phone/Internet Access | 1,971.86 | 24,092.25 |
| GH-000-82650.00000 | Cell Phones | 1,366.93 | 19,322.31 |
| GH-000-82700.00000 | Office Supplies - Admin Of | 1,865.98 | 18,608.42 |
| GH-000-82800.00000 | Postage and Deliveries | 78.91 | 4,545.80 |
| GH-000-82850.00000 | Printing - Plans |  | 814.37 |
| GH-000-82900.00000 | Miscellaneous Expenses - A | 752.62 | 2,039.78 |
| GH-000-83350.00000 | Computer Hardware/Software |  | 15,446.17 |
| GH-000-83550.00000 | Computer/Copier Rep & Main | 2,065.34 | 25,281.33 |

May 24, 2018            Confidential:   For Internal Use Only

Final

**Grayhawk Homes, Inc**

Income Statement

For the Period Ended December 31, 2017

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| GH-000-84400.00000 | Veh Operating Exp | $ 320.75 | $ 7,153.59 |
| GH-000-84500.00000 | Veh Tag & Ins | | (327.46) |
| GH-000-84600.00000 | Travel | | 30,429.32 |
| GH-000-84725.00000 | Iowa Overhead | (50,000.00) | (600,000.00) |
| GH-000-84726.00000 | Eddie Brown Grading Overhe | (500.00) | (6,000.00) |
| GH-000-84727.00000 | HR Overhead | (294,984.00) | (1,179,936.00) |
| GH-000-84729.00000 | SC Overhead | (33,333.00) | (399,998.00) |
| GH-000-84735.00000 | Charleston Expenses | (2,140.67) | |
| GH-000-84771.00000 | Atlanta Overhead | (16,667.00) | (200,002.00) |
| GH-000-84800.00000 | Meeting Expenses | 5,629.95 | 8,821.71 |
| GH-000-85200.00000 | Real Estate/Property Tax | 1,017.23 | 864.38 |
| GH-000-85300.00000 | Personal Property Taxes | | 425.97 |
| GH-000-85400.00000 | License Fees / Tax | 408.75 | 6,401.55 |
| GH-000-85500.00000 | Renewals | 35.00 | 35.00 |
| GH-000-85900.00000 | Other Taxes | | 13,275.12 |
| GH-000-86100.00000 | Hazard / Property Insuranc | 112.45 | 1,236.09 |
| GH-000-86300.00000 | General Liability Insuranc | 13,599.72 | (8,258.50) |
| GH-000-86900.00000 | Other Insurance | 395.26 | 10,119.36 |
| GH-000-87100.00000 | Accounting Services | | 12,755.00 |
| GH-000-87200.00000 | Legal Services | 5,702.50 | 39,916.25 |
| GH-000-87250.00000 | Legal Settlement | | 1,500.00 |
| GH-000-87350.00000 | CLA Expenses | | 6,723.49 |
| GH-000-87700.00000 | Recruiting and Hiring Serv | 301.81 | 11,192.32 |
| GH-000-87900.00000 | Other Professional Service | 2,503.20 | 4,644.04 |
| GH-000-88300.00000 | Depreciation - Vehicles | 32,658.50 | 32,658.50 |
| GH-000-88700.00000 | Depreciation - Computer Eq | 12,999.91 | 12,999.91 |
| GH-000-89100.00000 | Contributions | 24,000.00 | 43,100.00 |
| GH-000-89200.00000 | Dues and Subscriptions | | 2,765.12 |
| GH-000-89500.00000 | Bank Charges | 134.89 | 1,232.66 |

May 24, 2018                    Confidential:    For Internal Use Only

**Grayhawk Homes, Inc**

Income Statement

For the Period Ended December 31, 2017

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| GH-000-89600.00000 | Finance / Late Charges | | $ 19.04 |
| GH-000-89900.00000 | Training and Education Exp | | 3,773.27 |
| GH-000-92900.00000 | Other Expenses | (1,223.00) | |
| | Total Expenses | $ 641,735.03 | $ 2,803,430.32 |
| | Net Income (Loss) | $ (324,231.24) | $ 4,966,162.12 |

May 24, 2018

Confidential:  For Internal Use Only

_Final_

# GRAYHAWK
## HOMES      INC.

# **Balance Sheet**
December 31, 2018

## Assets

### Current Assets

| | | |
|---|---|---|
| GH-000-10100.00000 | Petty Cash | $ 300.00 |
| GH-000-10205.00000 | SSB-Operating | 1,570,548.51 |
| GH-000-10206.00000 | SSB -- BOYL | 190.00 |
| GH-000-10210.00000 | Cash on Deposit - Suntrust | 2,390.62 |
| GH-000-10215.00000 | Cash on Deposit - Regions | 1,341.14 |
| GH-000-10225.00000 | Cash on Deposit - Auburn | 713.41 |
| GH-000-10255.00000 | GH-TX CAP | 1,832.00 |
| GH-000-10265.00000 | CALUMET BANK | 802.09 |
| GH-000-10905.00000 | Escrow Holdings | 4,500.00 |
| GH-000-13200.00000 | Land held for Development | 45,000.00 |
| GH-000-14251.00000 | GA WIP | 11,129,755.33 |
| GH-000-14252.00000 | AL WIP | 8,762,732.51 |
| GH-000-14990.00000 | GA WIP Allocation | 590,372.00 |
| GH-000-14995.00000 | AL WIP Allocation | 411,157.00 |
| GH-000-15200.00000 | Model Homes | 341,449.92 |
| GH-000-16100.00000 | Deposits on Future Develo | 1,146,000.00 |

Total Current Assets $ 24,009,084.53

### Long Term Assets

| | | |
|---|---|---|
| GH-000-18300.00000 | Office Furniture and Equip | $ 24,163.10 |
| GH-000-18405.00000 | Dave's Truck | 34,561.20 |
| GH-000-18406.00000 | Dave's BMW | 55,637.00 |
| GH-000-18430.00000 | Construction Equipment | 6,435.00 |
| GH-000-18900.00000 | Computer Equipment and So | 55,807.49 |
| GH-000-19100.00000 | Accumulated Depreciation | (137,226.79) |

Total Long Term Assets $ 39,377.00

Total Assets $ 24,048,461.53

March 11, 2019     Confidential:  For Internal Use Only

*Final*

# GRAYHAWK
## HOMES   INC.

# **Balance Sheet**
December 31, 2018

## Liabilities and Equity

### Current Liabilities

| Account | Description | Amount |
|---|---|---:|
| GH-000-20100.00000 | Contract Deposits | $ 121,572.00 |
| GH-000-20200.00000 | Contract Draws | 95,033.60 |
| GH-000-21100.00000 | Accounts Payable | 638,388.26 |
| GH-000-22355.00000 | Const Ln Payable: SSB | 3,554,747.29 |
| GH-000-22360.00000 | Const Ln Payable: Calumet | 865,189.64 |
| GH-000-22370.00000 | Const Loan-Texas Capital | 1,071,480.49 |
| GH-000-22406.00000 | BMW Financial Svcs | 36,797.39 |
| GH-000-22420.00000 | Loan Payable - Rainier Capi | 16,474,000.00 |
| GH-000-23200.00000 | Federal payroll tax withheld | (488.30) |
| GH-000-23250.00000 | FUTA Payable | 77.19 |
| GH-000-23300.AL000 | AL State W/Holding | 6,836.00 |
| GH-000-23300.GA000 | GA State W/Holding | (730.52) |
| GH-000-23310.00000 | GA SUTA Payable | (.01) |
| GH-000-23320.00000 | AL SUTA Payable | 104.43 |
| GH-000-23460.00000 | AFLAC WITHHOLDING | 62.40 |

Total Current Liabilities          $ 22,863,069.86

### Long Term Liabilities

Long Term Liabilities

Total Liabilities          $ 22,863,069.86

### Equity

| Account | Description | Amount |
|---|---|---:|
| GH-000-29250.00000 | Capital Stock | $ 10,000.00 |
| GH-000-29200.00000 | Retained Earnings | 15,413.24 |
| GH-000-29600.00000 | Distributions | (4,300,000.00) |
|  | Net Income | 5,459,978.43 |

Total Equity          $ 1,185,391.67

Total Liabilities & Equity          $ 24,048,461.53

March 11, 2019          Confidential:  For Internal Use Only

Graybark Homes, Inc
Income Statement
For the Period Ended December 31, 2018

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| **Income** | | | |
| GH-000-31000.00000 | Sales, GA | $ 2,930,737.06 | $ 26,201,634.91 |
| GH-000-31100.00000 | Sales, AL | 984,568.37 | 4,637,302.99 |
| GH-000-31200.00000 | Sales, AU/Opelika | 775,246.36 | 10,997,760.04 |
| GH-000-31990.00000 | Extra Decorator Fee | | 250.00 |
| GH-000-34000.00000 | Miscellaneous Income | 2,850.00 | 13,928.37 |
| GH-000-34500.00000 | Earned Discounts | 4,839.11 | 77,098.11 |
| GH-000-34570.00000 | Forfeitures of EM | 10,200.00 | 22,411.00 |
| GH-000-35000.00000 | Rebates | 19,285.00 | 367,140.88 |
|   Total Income | | $ 4,727,725.90 | $ 42,317,526.30 |
| | | | |
| **Cost of Sales** | | | |
| GH-000-36000.00000 | COS, GA | $ 2,322,746.18 | $ 20,136,071.70 |
| GH-000-36100.00000 | COS, AL | 811,273.53 | 3,984,703.59 |
| GH-000-36200.00000 | COS, AU/Opelika | 594,868.20 | 8,882,099.12 |
|   Total Cost of Sales | | $ 3,728,887.91 | $ 33,002,874.41 |
|   Gross Margin | | $ 998,837.99 | $ 9,314,651.89 |
| | | | |
| **Expenses** | | | |
| GH-000-37500.00000 | Prior Year 263A Costs - Ge | $ 203,929.00 | $ 203,929.00 |
| GH-000-37510.00000 | Prior Year 263A Costs - Al | 184,877.00 | 184,877.00 |
| GH-000-40100.ADMIN | GH Admin Sal | 5,923.10 | 83,784.65 |
| GH-000-40100.CTMGR | GH City Mgr Sal | | 13,940.39 |
| GH-000-40100.DEC00 | GH Decorator Sal | 3,076.94 | 44,000.22 |
| GH-000-40100.DEV00 | GH Development Sal | 5,118.56 | 71,922.26 |
| GH-000-40100.GENLB | GH General Labor Sal | 2,668.00 | 35,052.50 |
| GH-000-40100.IHSAL | GH In-House Sales Sal | 4,200.00 | 58,100.00 |
| GH-000-40100.PRMGR | GH Prod Mgr Sal | 6,556.35 | 85,441.00 |
| GH-000-40100.SUPER | GH Super Sal | 25,984.62 | 312,560.09 |
| GH-000-40100.WARRO | GH Warranty Sal | 10,609.32 | 113,840.11 |
| GH-000-40150.CTMGR | AU/OP City Mgr Sal | | 78,859.99 |
| GH-000-40150.PRMGR | AU/OP Prod Mgr Sal | 7,769.24 | 28,192.34 |
| GH-000-40150.SUPER | AU/OP Super Sal | 17,392.81 | 257,928.10 |
| GH-000-40150.WARRO | AU/OP Warranty Sal | 3,692.32 | 50,852.01 |
| GH-000-40400.00000 | CAD, Est, Purch, Salaries | | 10,204.62 |
| GH-000-41100.00000 | GH Payroll Taxes | 6,858.71 | 87,697.66 |
| GH-000-41150.00000 | AU/OP Payroll Tax | | 8,085.68 |
| GH-000-41200.00000 | Worker's Compensation Insu | | 5,046.00 |
| GH-000-41300.ADMIN | GH Admin Emp Med Ins | 235.00 | 3,760.00 |
| GH-000-41300.CTMGR | GH City Mgr Emp Med Ins | | 470.00 |
| GH-000-41300.DEC00 | GH Decorator Emp Med Ins | | 2,115.00 |
| GH-000-41300.IHSAL | GH In-House Sales Emp Med | 235.00 | 3,055.00 |
| GH-000-41300.PRMGR | GH Prod Mgr Emp Med Ins | | 2,585.00 |
| GH-000-41300.SUPER | GH Super Emp Med Ins | 470.00 | 6,110.00 |
| GH-000-41300.WARRO | GH Warranty Emp Med Ins | | 1,880.00 |
| GH-000-41350.CTMGR | AU/OP City Mgr Med Ins | | 2,115.00 |
| GH-000-41350.SUPER | AU/OP Super Med Ins | 235.00 | 6,345.00 |
| GH-000-41350.WARRO | AU/OP Warranty Med Ins | 235.00 | 1,645.00 |
| GH-000-41900.ADMIN | GH Adminr Life Ins | 8.40 | 93.60 |
| GH-000-41900.CTMGR | GH City Mgr Life Ins | | 3.60 |
| GH-000-41900.DEC00 | GH Decorator Life Ins | 4.20 | 50.40 |

March 11, 2019                Confidential:  For Internal Use Only

Graybark Homes, Inc.

*Final*

Income Statement
For the Period Ended December 31, 2018

| Account | Title | Current Activity | Current Balance |
|---------|-------|-----------------:|----------------:|
| GH-000-41900.DEV00 | GH Development Life Ins | $ 4.20 | $ 50.40 |
| GH-000-41900.IHSAL | GH In-House Sales Life Ins | 4.20 | 50.40 |
| GH-000-41900.PRMGR | GH Prod Mgr Life Ins | | 8.40 |
| GH-000-41900.SUPER | GH Super Life Ins | 25.20 | 256.20 |
| GH-000-41900.WARR0 | GH Warranty Life Ins | 12.60 | 113.40 |
| GH-000-41950.CTMGR | AU/OP City Mgr Life Ins | | 37.80 |
| GH-000-41950.SUPER | AU/OP Super Life Ins | | 153.00 |
| GH-000-41950.WARR0 | AU/OP Warranty Life Ins | 4.20 | 43.20 |
| GH-000-42650.00000 | Phone Reimbursement | | 147.00 |
| GH-000-44100.00000 | Vehicle Reimbursement | 5,564.29 | 73,243.32 |
| GH-000-44150.00000 | A/O Vehicle Reimbursement | 2,793.47 | 44,162.45 |
| GH-000-44900.00000 | Recruiting Fees and Exp | | 674.96 |
| GH-000-45600.00000 | Small Tools and Supplies | 786.31 | 11,870.01 |
| GH-000-45650.00000 | AU/OP Small Tools and Supp | 443.19 | 6,500.88 |
| GH-000-46100.00000 | Temporary Utilities | 7,990.66 | 80,716.63 |
| GH-000-46150.00000 | AU/OP Temporary Utilities | 1,545.45 | 19,758.78 |
| GH-000-46200.00000 | Trash / Dump /Porto Johns | 13,736.00 | 190,402.21 |
| GH-000-46250.00000 | AU/OP Trash / Dump /Porto | 4,209.67 | 80,627.68 |
| GH-000-46400.00000 | Lawn Care | 1,050.00 | 11,095.00 |
| GH-000-46450.00000 | AU/OP Lawn Care | | 4,500.00 |
| GH-000-46600.00000 | Warranty-Completed Units | 3,756.71 | 22,204.78 |
| GH-000-46650.00000 | AU/OP Warranty-Completed U | 34.11 | 4,062.08 |
| GH-000-46700.00000 | Indirect Construction Cost | 5,640.98 | 57,606.51 |
| GH-000-46710.00000 | AU/OP Indirect Constructio | 500.00 | 16,605.04 |
| GH-000-46800.00000 | Contract Labor | 2,187.50 | 34,575.00 |
| GH-000-46850.00000 | AU/OP Contract Labor | 700.00 | 5,637.50 |
| GH-000-49200.00000 | Builder's Risk | 3,625.15 | 19,842.62 |
| GH-000-50200.00000 | Interest on Notes Payable | 79,870.00 | 953,690.00 |
| GH-000-50400.00000 | Interest on Construction L | 25,829.99 | 308,426.64 |
| GH-000-50900.00000 | Interest Expense, Other | 62.31 | 829.94 |
| GH-000-51300.00000 | Appraisal and Related Fees | | 3,325.00 |
| GH-000-51400.00000 | Construction Loan Fees | 6,873.75 | 55,188.37 |
| GH-000-52100.00000 | Lot Purchase Exp | 617.35 | 32,572.92 |
| GH-000-52500.00000 | Current Year 263A Costs | (1,001,529.00) | (1,001,529.00) |
| GH-000-62000.00000 | Outsourced Internet/Mkt Ex | 1,782.50 | 4,197.50 |
| GH-000-63100.00000 | Print Advertising | | 759.08 |
| GH-000-63250.00000 | Television Advertising | | 1,200.00 |
| GH-000-63300.00000 | Internet Fees, Web Page De | | 2,881.09 |
| GH-000-63500.00000 | Signs & Billboards | | 22,418.55 |
| GH-000-63550.00000 | Billboards | 1,235.00 | 8,645.00 |
| GH-000-66300.00000 | Model Home Expense | 3,305.76 | 11,976.59 |
| GH-000-66350.00000 | AU/OP Model Home Expenses | 225.96 | 308.20 |
| GH-000-67100.00000 | Market Research and Consul | 10,200.00 | 75,847.01 |
| GH-000-69990.00000 | Other Sales and Marketing | 22.04 | 19,595.19 |
| GH-000-80400.00000 | Salaries - Management | | 10,538.46 |
| GH-000-80500.00000 | Salaries and Wages - Offic | | 3,201.93 |
| GH-000-81100.00000 | Payroll Taxes - Office | | 974.25 |
| GH-000-81200.00000 | Workers Comp Insurance - G | 8,368.60 | 35,228.90 |
| GH-000-81250.00000 | Workers Comp Insurance - A | | 900.00 |
| GH-000-81300.00000 | Health Insurance - General | (55.33) | 3,315.84 |
| GH-000-82650.00000 | Cell Phones | 1,094.87 | 12,438.22 |
| GH-000-82655.00000 | AU/OP Cell Phones | 265.04 | 4,999.17 |

March 11, 2019               Confidential:  For Internal Use Only

*Final*

Grayhawk Homes, Inc.
Income Statement
For the Period Ended December 31, 2018

| Account | Title | Current Activity | Current Balance |
|---------|-------|------------------:|----------------:|
| GH-000-82700.00000 | Office Supplies - Admin Of | $ 14.13 | $ 3,743.80 |
| GH-000-82800.00000 | Postage and Deliveries | 45.55 | 778.45 |
| GH-000-82850.00000 | Printing - Plans | | 433.70 |
| GH-000-82900.00000 | Miscellaneous Expenses - A | | 1,162.80 |
| GH-000-83350.00000 | Computer Hardware/Software | | 300.00 |
| GH-000-83550.00000 | Computer/Copier Rep & Main | | 60.00 |
| GH-000-84400.00000 | Veh Operating Exp | 227.99 | 7,841.26 |
| GH-000-84500.00000 | Veh Tag & Ins | | 42.00 |
| GH-000-84600.00000 | Travel | 856.12 | 9,424.09 |
| GH-000-84701.00000 | Gryahawk Overhead | 79,000.00 | 953,000.00 |
| GH-000-84727.00000 | HR Overhead | (88,763.92) | (355,055.68) |
| GH-000-84800.00000 | Meeting Expenses | 661.37 | 2,523.13 |
| GH-000-85200.00000 | Real Estate/Property Tax | 890.95 | 890.95 |
| GH-000-85300.00000 | Personal Property Taxes | | 529.02 |
| GH-000-85400.00000 | License Fees / Tax | 258.75 | 24,530.15 |
| GH-000-85900.00000 | Other Taxes | | 3,000.00 |
| GH-000-86100.00000 | Hazard / Property Insuranc | 114.63 | 1,141.99 |
| GH-000-86300.00000 | General Liability Insuranc | 10,586.85 | 66,381.02 |
| GH-000-86900.00000 | Other Insurance | 345.63 | 3,107.64 |
| GH-000-87100.00000 | Accounting Services | | 29,245.00 |
| GH-000-87200.00000 | Legal Services | 15,166.65 | 42,985.07 |
| GH-000-87350.00000 | CLA Expenses | (6,489.27) | 7,528.93 |
| GH-000-87700.00000 | Recruiting and Hiring Serv | 292.88 | 5,572.82 |
| GH-000-87750.00000 | AU/OP Recruiting | | 83.23 |
| GH-000-87900.00000 | Other Professional Service | | 219.00 |
| GH-000-88300.00000 | Depreciation - Vehicles | 5,100.00 | 5,100.00 |
| GH-000-89100.00000 | Contributions | | 13,500.00 |
| GH-000-89200.00000 | Dues and Subscriptions | | 2,447.28 |
| GH-000-89500.00000 | Bank Charges | 112.25 | 1,159.25 |
| GH-000-89600.00000 | Finance / Late Charges | | 486.63 |
| GH-000-92900.00000 | Other Expenses | 1,512.63 | 1,096.61 |
| Total Expenses | | $ (297,205.51) | $ 3,854,673.46 |
| | | | |
| Net Income (Loss) | | $ 1,296,043.50 | $ 5,459,978.43 |

March 11, 2019                 Confidential:  For Internal Use Only

## **SECTION 3.3(a) cont'd**
## **UNAUDITED FINANCIAL STATEMENTS – EOY 2017 AND 2018**

<u>Homestead Residential,  Inc.</u>

See attached.

**Homestead Residential**
Balance Sheet
December 31, 2017

## Assets

### Current Assets

| | | | |
|---|---|---|---|
| HR-000-10205.00000 | HR-SSB-Operating | $ 349,240.12 | |
| HR-000-14252.00000 | AL WIP | 4,300,684.51 | |
| HR-000-14257.00000 | Due from M Dilworth | 33,335.59 | |
| HR-000-14995.00000 | AL WIP Allocation | 99,127.00 | |
| HR-000-16100.00000 | Deposit on Future Developm | 182,925.00 | |
| | Total Current Assets | | $ 4,965,312.22 |

### Long Term Assets

Total Long Term Assets

Total Assets                                    $ 4,965,312.22

Confidential:  For Internal Use Only

**Homestead Residential**
Balance Sheet
December 31, 2017

## Liabilities and Equity

### Current Liabilities

| | | |
|---|---|---|
| HR-000-20100.00000 Contract Deposits | $ 42,270.00 | |
| HR-000-21100.00000 Accounts Payable | 49,577.40 | |
| HR-000-22370.00000 Const Loan-Texas Capital B | 991,903.40 | |
| HR-000-22420.00000 Loan Payable – Rainier Cap | 3,800,000.00 | |
| HR-000-22440.00000 Loan Payable – DBE – 4% | 297,000.00 | |
| Total Current Liabilities | | $ 5,180,750.80 |

### Long Term Liabilities

| | | |
|---|---|---|
| Long Term Liabilities | | |
| Total Liabilities | | $ 5,180,750.80 |

### Equity

| | | |
|---|---|---|
| HR-000-29300.00000 Capital Stock | $ 3,000.00 | |
| HR-000-29200.00000 Retained Earnings | 435,439.68 | |
| HR-000-29600.00000 Distributions | | |
| Net Income | (653,878.26) | |
| Total Equity | | $ (215,438.58) |
| Total Liabilities & Equity | | $ 4,965,312.22 |

Confidential:  For Internal Use Only

# Homestead Residential

Income Statement

For the Period Ended December 31, 2017

| Account | Title | Current Activity | Current Balance |
|---|---|---:|---:|
| **Income** | | | |
| HR-000-31100.00000 | Sales, AL | $ 701,674.00 | $ 4,477,554.00 |
| HR-000-34000.00000 | Miscellaneous Income | 500.00 | 2,000.00 |
| HR-000-34100.00000 | Interest Income | | 49.13 |
| HR-000-34500.00000 | Earned Discounts | 297.85 | 10,903.52 |
| HR-000-35000.00000 | Rebates | | 8,405.00 |
| | Total Income | $ 702,471.85 | $ 4,498,911.65 |
| **Cost of Sales** | | | |
| HR-000-36100.00000 | COS, AL | $ 534,050.00 | $ 3,523,355.76 |
| | Total Cost of Sales | $ 534,050.00 | $ 3,523,355.76 |
| | Gross Margin | $ 168,421.85 | $ 975,555.89 |
| **Expenses** | | | |
| HR-000-42650.00000 | Phone and Radio Reimburseme | | $ 619.34 |
| HR-000-44100.00000 | Vehicle Reimbursement - Con | | 3,091.30 |
| HR-000-45600.00000 | Small Tools and Supplies | 2,135.16 | 4,908.43 |
| HR-000-46100.00000 | Temporary Utilities | 1,303.23 | 14,100.06 |
| HR-000-46200.00000 | Trash / Dump Maintenance/po | 3,564.66 | 34,331.27 |
| HR-000-46400.00000 | Lawn Care | 1,900.00 | 5,650.00 |
| HR-000-46600.00000 | Warranty-Completed Units | 615.91 | 4,715.75 |
| HR-000-46700.00000 | Indirect Construction Cost | 500.00 | 22,602.16 |
| HR-000-46800.00000 | Contract Labor | 107.65 | 366.01 |
| HR-000-49200.00000 | Builder's Risk | 1,656.81 | 6,941.62 |
| HR-000-50200.00000 | Interest on Notes Payable | 19,990.00 | 197,880.00 |
| HR-000-50400.00000 | Interest on Construction Lo | 3,934.14 | 48,102.98 |
| HR-000-51200.00000 | Points and Fees | | 370.00 |
| HR-000-51300.00000 | Appraisal and Related Fees | 962.00 | 962.00 |
| HR-000-51400.00000 | Construction Loan Fees | 50.00 | 13,323.88 |
| HR-000-52100.00000 | Closing Costs | | 6,080.41 |
| HR-000-66500.00000 | Model Home Utilties | | 1,263.33 |
| HR-000-66700.00000 | Model Home Lawn Care and Ma | | 560.00 |
| HR-000-67100.00000 | Market Research and Consult | | 263.33 |
| HR-000-82800.00000 | Postage and Deliveries | | 98.00 |
| HR-000-82900.00000 | Miscellaneous Expenses - Ad | | 1,000.00 |
| HR-000-84725.00000 | Overhead Assessment | 294,984.00 | 1,146,600.41 |
| HR-000-85400.00000 | License Fees | | 155.00 |
| HR-000-85500.00000 | Renewals | | 100.00 |
| HR-000-85900.00000 | Other Taxes | | 1,156.00 |
| HR-000-86100.00000 | Hazard / Property Insurance | 36.91 | 327.31 |
| HR-000-86300.00000 | General Liability Insurance | 1,356.95 | 13,396.04 |

**Homestead Residential**

Income Statement

For the Period Ended December 31, 2017

| Account | Title | Current Activity | Current Balance |
|---------|-------|-----------------:|----------------:|
| HR-000-86900.00000 | Other Insurance | $ 21.75 | $ 191.07 |
| HR-000-87100.00000 | Accounting Services | | 1,315.00 |
| HR-000-87200.00000 | Legal Services | | 319.45 |
| HR-000-89500.00000 | Bank Charges | 62.00 | 322.00 |
| HR-000-89990.00000 | Current Year 263A Costs Cap | 98,322.00 | 98,322.00 |
| | Total Expenses | $ 431,503.17 | $ 1,629,434.15 |
| | Net Income (Loss) | $ (263,081.32) | $ (653,878.26) |

Confidential:  For Internal Use Only

Homestead Residential
Balance Sheet
December 31, 2018

## Assets

**Current Assets**

| | | | |
|---|---|---|---|
| HR-000-10205.00000 | HR-SSB-Operating | $ 479,701.48 | |
| HR-000-14252.00000 | AL WIP | 4,735,744.70 | |
| HR-000-14995.00000 | AL WIP Allocation | 219,216.00 | |
| Total Current Assets | | | $ 5,434,662.18 |

**Long Term Assets**

| | |
|---|---|
| Total Long Term Assets | |

| | |
|---|---|
| Total Assets | $ 5,434,662.18 |

Confidential:  For Internal Use Only

Balance Sheet
December 31, 2018

### Liabilities and Equity

#### Current Liabilities

| | | | |
|---|---|---|---|
| HR-000-20100.00000 | Contract Deposits | $ 35,975.00 | |
| HR-000-21100.00000 | Accounts Payable | 39,967.41 | |
| HR-000-22370.00000 | Const Loan-Texas Capital B | 1,160,394.80 | |
| HR-000-22420.00000 | Loan Payable - Rainier Cap | 4,450,000.00 | |
| | Total Current Liabilities | | $ 5,686,337.21 |

#### Long Term Liabilities

| | | |
|---|---|---|
| Long Term Liabilities | | |
| Total Liabilities | | $ 5,686,337.21 |

#### Equity

| | | | |
|---|---|---|---|
| HR-000-29300.00000 | Capital Stock | $ 3,000.00 | |
| HR-000-29200.00000 | Retained Earnings | (218,438.58) | |
| HR-000-29600.00000 | Distributions | | |
| | Net Income | (36,236.45) | |
| | Total Equity | | $ (251,675.03) |
| | Total Liabilities & Equity | | $ 5,434,662.18 |

Confidential: For Internal Use Only

**Homestead Residential**
Income Statement
For the Period Ended December 31, 2018

| Account | Title | Current Activity | Current Balance |
|---------|-------|-----------------|-----------------|
| **Income** | | | |
| HR-000-31100.00000 | Sales, AL | | $ 3,822,273.00 |
| HR-000-34000.00000 | Miscellaneous Income | | 1,250.00 |
| HR-000-34500.00000 | Earned Discounts | 331.28 | 8,747.91 |
| HR-000-35000.00000 | Rebates | 2,200.00 | 13,105.00 |
| Total Income | | $ 2,531.28 | $ 3,845,375.91 |
| | | | |
| **Cost of Sales** | | | |
| HR-000-36100.00000 | COS, AL | $ 156.50 | $ 3,077,307.56 |
| Total Cost of Sales | | $ 156.50 | $ 3,077,307.56 |
| Gross Margin | | $ 2,374.78 | $ 768,068.35 |
| | | | |
| **Expenses** | | | |
| HR-000-37510.00000 | Prior Year 263A Costs – Al | $ (120,089.00) | $ (120,089.00) |
| HR-000-45600.00000 | Small Tools and Supplies | 349.40 | 4,862.15 |
| HR-000-46100.00000 | Temporary Utilities | 1,396.69 | 14,536.27 |
| HR-000-46200.00000 | Trash / Dump Maintenance/p | 4,939.33 | 55,046.14 |
| HR-000-46400.00000 | Lawn Care | | 3,150.00 |
| HR-000-46600.00000 | Warranty-Completed Units | 330.15 | 16,911.86 |
| HR-000-46700.00000 | Indirect Construction Cost | 5,434.75 | 28,513.20 |
| HR-000-46800.00000 | Contract Labor | | 2,875.00 |
| HR-000-49200.00000 | Builder's Risk | | (1,302.00) |
| HR-000-50200.00000 | Interest on Notes Payable | 22,250.00 | 262,710.00 |
| HR-000-50400.00000 | Interest on Construction L | 5,748.70 | 62,998.02 |
| HR-000-51400.00000 | Construction Loan Fees | 2,090.56 | 9,214.87 |
| HR-000-52100.00000 | Closing Costs | | 1,680.00 |
| HR-000-63500.00000 | Signs & Billboards | | 1,629.07 |
| HR-000-69990.00000 | Other Sales and Marketing | | 1,698.43 |
| HR-000-82850.00000 | Printing – Plans | 103.00 | 103.00 |
| HR-000-84500.00000 | Taxes, Licenses, and Insur | | 110.00 |
| HR-000-84727.00000 | HR Overhead | 88,763.92 | 355,055.68 |
| HR-000-84728.00000 | HR Management Fee | | 83,335.59 |
| HR-000-85400.00000 | License Fees | 258.75 | 413.75 |
| HR-000-85500.00000 | Renewals | | 100.00 |
| HR-000-86100.00000 | Hazard / Property Insuranc | 34.74 | 282.33 |
| HR-000-86300.00000 | General Liability Insuranc | 2,085.32 | 13,467.27 |
| HR-000-86900.00000 | Other Insurance | 21.75 | 174.00 |
| HR-000-87100.00000 | Accounting Services | | 1,345.00 |
| HR-000-87200.00000 | Legal Services | | 609.00 |
| HR-000-87250.00000 | Legal Settlement | | 4,670.84 |
| HR-000-89500.00000 | Bank Charges | | 202.00 |
| HR-000-89600.00000 | Finance / Late Charges | | 2.33 |
| Total Expenses | | $ 13,718.06 | $ 804,304.80 |
| | | | |
| Net Income (Loss) | | $ (11,343.28) | $ (36,236.45) |

## <u>SECTION 3.3(a) cont'd</u>
## UNAUDITED FINANCIAL STATEMENTS – EOY 2017 AND 2018

<u>GH Services, Inc.</u>

1. None for 2017 (operations commenced in 2018).
2. See attached for 2018.

GH Services Inc.
Balance Sheet
December 31, 2018

*Final*

## Assets

**Current Assets**

| | | | |
|---|---|---|---|
| GS-000-10205.00000 | SSB Operating | $ 270,664.71 | |
| Total Current Assets | | | $ 270,664.71 |

**Long Term Assets**

| | | | |
|---|---|---|---|
| GS-000-18300.00000 | Office Furn. & Equipment | $ 4,832.24 | |
| gs-000-19100.00000 | Accumulated Depreciation | (4,832.24) | |
| Total Long Term Assets | | | |

Total Assets $ 270,664.71

Confidential:  For Internal Use Only

GH Services Inc.

Balance Sheet

December 31, 2018

 Final

## Liabilities and Equity

### Current Liabilities

| | | | |
|---|---|---|---|
| GS-000-23150.00000 | M/C W/H | $ 443.26 | |
| GS-000-23250.00000 | FUTA Payable | 63.60 | |
| GS-000-23350.00000 | SUTA Payable | 420.18 | |
| GS-000-23460.00000 | AFLAC W/H | 187.76 | |
| Total Current Liabilities | | | $ 1,114.80 |

### Long Term Liabilities

| | | |
|---|---|---|
| Long Term Liabilities | | |
| Total Liabilities | | $ 1,114.80 |

### Equity

| | | | |
|---|---|---|---|
| GS-000-29300.00000 | Capital Stock | $ 1,000.00 | |
| GS-000-29600.00000 | Distributions | (250,000.00) | |
| GS-000-29200.00000 | Retained Earnings | .01 | |
| | Net Income | 518,549.90 | |
| Total Equity | | | $ 269,549.91 |
| Total Liabilities & Equity | | | $ 270,664.71 |

Confidential:  For Internal Use Only

**GH Services Inc.**
Income Statement
For the Period Ended December 31, 2018

*Final*

| Account | Title | Current Activity | Current Balance |
|---|---|---:|---:|
| **Income** | | | |
| GS-000-31000.ATL00 | ATL Overhead Income | $ 12,500.00 | $ 150,000.00 |
| GS-000-31000.EBG00 | EBG Overhead Income | 500.00 | 6,000.00 |
| GS-000-31000.GH000 | GH Overhead Income | 79,000.00 | 953,000.00 |
| GS-000-31000.IA000 | IA Overhead Income | 47,500.00 | 570,000.00 |
| GS-000-31000.SC000 | SC Overhead Income | 26,000.00 | 312,000.00 |
| GS-000-31000.TH000 | TH Overhead Income | 3,000.00 | 36,000.00 |
| | Total Income | $ 168,500.00 | $ 2,027,000.00 |
| | | | |
| **Cost of Sales** | | | |
| | Total Cost of Sales | | |
| | Gross Margin | $ 168,500.00 | $ 2,027,000.00 |
| | | | |
| **Expenses** | | | |
| GS-000-40100.ACCT0 | Accounting Salaries | $ 9,418.53 | $ 121,792.93 |
| GS-000-40100.CAD00 | CAD Salaries | 6,481.86 | 140,211.93 |
| GS-000-40100.ESTM0 | ESTM Salaries | 15,083.68 | 226,225.84 |
| GS-000-40100.MGMT0 | Management Salaries | 26,076.92 | 310,885.15 |
| GS-000-40100.OWN00 | Owner Salary | 25,000.00 | 300,000.00 |
| GS-000-41100.00000 | PR Tax | 4,593.50 | 67,383.08 |
| GS-000-41100.ACCT0 | Acct PR Tax | | 659.41 |
| GS-000-41100.CAD00 | CAD PR Tax | | 1,105.95 |
| GS-000-41100.ESTM0 | Estimating PR Tax | | 1,822.59 |
| GS-000-41100.MGMT0 | Mgmt PR Tax | | 2,098.31 |
| GS-000-41100.OWN00 | Owner PR Tax | | 2,058.74 |
| GS-000-41300.ACCT0 | Acct Emp Med Ins | 470.00 | 7,520.00 |
| GS-000-41300.CAD00 | CAD Emp Med Ins | 470.00 | 6,110.00 |
| GS-000-41300.ESTM0 | Estimating Emp Med Ins | 470.00 | 7,285.00 |
| GS-000-41300.MGMT0 | Mgmt Emp Med Ins | 470.00 | 6,110.00 |
| GS-000-41300.OWN00 | Owner Emp Med Ins | 235.00 | 3,055.00 |
| GS-000-41900.ACCT0 | Acct Emp Life Ins | 8.40 | 127.80 |
| GS-000-41900.CAD00 | CAD Emp Life Ins | 8.40 | 146.40 |
| GS-000-41900.ESTM0 | Estimating Emp Life Ins | 12.60 | 163.80 |
| GS-000-41900.MGMT0 | Mgmt Emp Life Ins | 12.60 | 169.80 |
| GS-000-41900.OWN00 | Owner Emp Life Ins | 4.20 | 54.00 |
| GS-000-44100.00000 | Vehicle Reimbursement | | 1,488.78 |
| GS-000-45600.00000 | Small Tools & Supplies | | 203.84 |
| GS-000-50200.00000 | Interest Expense | 775.26 | 2,275.26 |
| GS-000-63300.00000 | Internet Fees | | 15,933.32 |
| GS-000-63400.00000 | Marketing Expense | | 18,269.23 |
| GS-000-81200.00000 | Workers Comp Ins. | 3,031.00 | 6,362.00 |

Confidential:  For Internal Use Only

**GH Services Inc.**
Income Statement
For the Period Ended December 31, 2018

*Final*

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| GS-000-81300.00000 | Employee Med Ins | $ 238.71 | $ 2,488.91 |
| GS-000-82100.00000 | Rent | 7,034.92 | 93,854.94 |
| GS-000-82400.00000 | Office Cleaning | (1,559.61) | 5,350.00 |
| GS-000-82500.00000 | Office Utilities | (8,464.89) | 13,575.41 |
| GS-000-82600.00000 | Phone / Internet | 13,814.66 | 22,159.37 |
| GS-000-82650.00000 | Cell Phone | 303.17 | 4,973.53 |
| GS-000-82700.00000 | Office Supplies | 1,381.34 | 20,620.50 |
| GS-000-82800.00000 | Postage | 559.37 | 4,510.38 |
| GS-000-83350.00000 | Computer Hardware/Software | 3,573.88 | 25,575.72 |
| GS-000-83550.00000 | Computer/Copier Rep & Maint | 2,350.69 | 25,979.11 |
| GS-000-84700.00000 | Company Expenses | 2,672.37 | 8,425.63 |
| GS-000-84700.ATL00 | ATL Company Exp | (278.54) | 17.61 |
| GS-000-84700.GH000 | GH Company Exp | | 62.40 |
| GS-000-84700.IA000 | IA Company Exp | (130.89) | 416.25 |
| GS-000-84700.SC000 | SC Company Exp | (1,132.64) | 272.88 |
| GS-000-85400.00000 | License Fees | | 155.00 |
| GS-000-85900.00000 | Taxes | | 5.00 |
| GS-000-86100.00000 | General Liability Insurance | | 17,492.00 |
| GS-000-87100.00000 | Accounting Services | | 750.00 |
| GS-000-87200.00000 | Legal Services | | 4,373.97 |
| GS-000-87700.00000 | Recruiting | | 2,573.33 |
| GS-000-88300.00000 | Depreciation Expense | 4,832.24 | 4,832.24 |
| GS-000-89200.00000 | Dues & Subscriptions | 20.05 | 120.30 |
| GS-000-89500.00000 | Bank Fees | 22.80 | 323.60 |
| GS-000-92900.00000 | Miscellaneous Expense | | 23.86 |
| | Total Expenses | $ 117,859.58 | $ 1,508,450.10 |

**Other Income**

Total Other Income

Net Income (Loss)   $ 50,640.42   $ 518,549.90

Confidential:  For Internal Use Only

## SECTION 3.3(b)
## UNAUDITED FINANCIAL STATEMENTS AS OF AUGUST 31, 2019

See attached Combined Financial Statements.

# Grayhawk Homes, Inc.
# Homestead Residential, Inc.
# GH Services, Inc.
# Columbus, Georgia

Combined Financial Statements
For the Eight (8) Months Ended
August 31, 2019

# Table of Contents

<u>Page(s)</u>

Independent Accountant's Compilation Report                          1

Combined Balance Sheet                                              2

Combined Statement of Income                                        3

Combined Statement of Changes in Stockholder's Equity              4

Combined Statement of Cash Flows                                    5

Notes to Combined Financial Statements                           6–13


<u>Supplementary Information</u>

Combining Balance Sheet                                            15

Combining Statement of Income                                      16

Combining Statement of Changes in Stockholder's Equity            17

Combined Statement of Income – Reconciliation from GAAP to        18
Management Basis of Presentation

# PRINCE CPA GROUP

CERTIFIED PUBLIC ACCOUNTANTS

## Independent Accountant's Compilation Report

To Management of:
Grayhawk Homes, Inc.
Homestead Residential, Inc.
GH Services, Inc.

Management is responsible for the accompanying combined financial statements of Grayhawk Homes, Inc., Homestead Residential, Inc. and GH Services, Inc (each a subchapter S Corporation, collectively called "the Company"), which comprise the combined balance sheet as of August 31, 2019, and the related combined statements of income, changes in stockholder's equity and cash flows for the eight (8) months then ended ("combined financial statements"), as well as the related notes to these combined financial statements in accordance with accounting principles generally accepted in the United States of America ("GAAP"). We have performed a compilation engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the American Institute of Certified Public Accountants. We did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements.

### Report on Supplementary Information

The supplementary schedules are presented for purposes of additional analysis and are not a required part of the combined financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the combined financial statements. We did not audit or review the combined financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on the supplementary information presented at pages 14-18.

*Prince CPA Group*

October 21, 2019
Orlando, Florida

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Combined Balance Sheet**
**For the Eight (8) Months Ended August 31, 2019**

| | | |
|---|---:|---:|
| **Assets** | | |
| Cash | $ | 2,605,250 |
| Restricted cash | | 10,548 |
| Inventories: | | |
| Work in progress: | | |
| Direct construction costs including lot costs | | 19,479,472 |
| Interest allocation | | 485,000 |
| Overhead allocation | | 823,919 |
| | | 20,788,391 |
| Finished lots | | 7,034,555 |
| Total Inventories | | 27,822,946 |
| Lot deposits | | 546,000 |
| Property and equipment, net of accumulated depreciation of $136,346 | | 45,089 |
| Other assets | | 4,000 |
| **Total assets** | $ | 31,033,833 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Accounts payable | $ | 3,776,634 |
| Interest payable | | 9,862 |
| Accrued bonuses | | 132,074 |
| Accrued salaries | | 51,944 |
| Accrued vacation and sick | | 23,021 |
| Notes payable to banks | | 2,926,163 |
| Loans payable to related party | | 21,549,000 |
| Customer on-your-lot deposits | | 541,677 |
| Warranty accrual | | 38,046 |
| Customer deposits | | 228,210 |
| Accrued reserve expense | | 117,013 |
| Other accrued liabilities | | 6,314 |
| **Total liabilities** | | 29,399,958 |
| | | |
| **Stockholder's equity** | | |
| Common stock | | 14,000 |
| Distributions | | (5,050,000) |
| Retained earnings | | 1,364,465 |
| Net income | | 5,305,410 |
| **Total stockholder's equity** | | 1,633,875 |
| **Total liabilities and stockholder's equity** | $ | 31,033,833 |

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Combined Statement of Income**
**For the Eight (8) Months Ended August 31, 2019**

| | | |
|---|---|---:|
| **Revenues:** | | |
| Home sales | $ | 43,372,950 |
| Overhead income | | 531,880 |
| Other income | | 514,772 |
| | | 44,419,602 |
| | | |
| **Cost and expenses:** | | |
| Cost of sales | | 35,867,555 |
| Selling, general and administrative | | 3,246,637 |
| | | 39,114,192 |
| | | |
| **Net income** | $ | 5,305,410 |

See reconciliation from GAAP to Management Basis of Presentation ("EBITDA") on page 18

*See independent accountant's compilation report and notes to combined financial statements*

3

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Combined Statement of Changes in Stockholder's Equity**
**For the Eight (8) Months Ended August 31, 2019**

| | | |
|---|---|---:|
| **Balance at December 31, 2018** | $ | 1,378,465 |
| Add: Net income | | 5,305,410 |
| Less: Distributions | | (5,050,000) |
| **Balance at August 31, 2019** | $ | 1,633,875 |

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Combined Statement of Cash Flows**
**For the Eight (8) Months Ended August 31, 2019**

| | | |
|---|---|---:|
| **Cash flows from operating activities:** | | |
| Net income | $ | 5,305,410 |
| Adjustments to reconcile net income to net cash provided by (used in) operating | | |
| Depreciation | | 15,453 |
| Increase (decrease) in cash due to: | | |
| Direct construction costs including lot costs | | (394,858) |
| Interest allocation | | 210,000 |
| Overhead allocation | | 163,266 |
| Lot and land deposits | | 600,000 |
| Other assets | | (4,000) |
| Accounts payable | | 1,993,793 |
| Interest payable | | (12,592) |
| Accrued bonuses | | 101,259 |
| Accrued salaries | | (47,409) |
| Accrued vacation and sick | | 5,419 |
| Customer on your lot deposits | | 446,643 |
| Warranty accrual | | 10,956 |
| Customer deposits | | 70,663 |
| Accrued reserve expense | | 6,917 |
| Other accrued liabilities | | (660) |
| **Net cash provided by operating activities** | | 8,470,260 |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from notes payable | | 3,547,737 |
| Repayments of notes payable | | (7,310,183) |
| Proceeds from loan payable related party | | 1,125,000 |
| Repayments of loan payable related party | | (500,000) |
| Distributions to stockholder | | (5,050,000) |
| **Net cash used in financing activities** | | (8,187,446) |
| | | |
| **Net increase in cash and restricted cash** | | 282,814 |
| **Cash and restricted cash at beginning of period** | | 2,332,984 |
| | | |
| **Cash and restricted cash at end of period** | $ | 2,615,798 |

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

## 1.   The Company

The combined financial statements include the accounts of the following entities: Grayhawk Homes, Inc. ("GH"), Homestead Residential, Inc. ("HR") and GH Services, Inc. ("GHS").

The Company is in the business of constructing single-family residences in primary markets of Columbus, Georgia and Auburn, Alabama and surrounding areas. GHS provides administrative support services to GH, HR and other related parties not included in these combined financial statements.  Residential homes are constructed on both a contractual basis, which have customer deposits, as well as homes built on a speculative basis, which do not have a customer contract or deposit.

The Company's ability to sell homes is affected by economic fluctuations and market conditions, in addition to many other controllable and non-controllable factors.

## 2.   Date of management's review

In preparing the financial statements, management has evaluated events and transactions for potential recognition or disclosure through October 21, 2019, the date these financial statements were issued.

## 3.   Summary of significant accounting policies

A summary of the major accounting policies followed by the Company in the preparation of the accompanying combined financial statements is presented below.

*Basis of presentation*

The combined financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company. All significant intercompany accounts, transactions and balances have been eliminated in combined statements.

*Use of estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates and those differences could be material.

*Cash and restricted cash*

The Company considers securities with maturities of three months or less, when purchased, to be cash equivalents. Cash and cash equivalents consist primarily of checking and savings accounts.

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

### 3.  Summary of significant accounting policies - continued

*Inventories*

Inventories are stated at the lower of cost or estimated net realizable value. Estimated net realizable value is based on the net sales proceeds anticipated in the normal course of business less estimated costs to complete or improve the property to the condition used in determining the estimated selling price.

Inventories consist principally of homes and lots subject to sales contracts, homes and lots (sometimes called "spec" speculative homes), unsold lots, lot deposits and model home lots. Developed lots are generally "ready to build", fully developed lots which are available for vertical construction.

Inventories include the costs of direct land acquisition, home construction, capitalized interest, real estate taxes, and other related direct overhead costs incurred during development and home construction.  Inventory costs include amounts paid through the closing date of the home plus an accrual for costs incurred, but not yet paid, based on an analysis of budgeted (as compared to paid) construction costs.  Homes closed to a buyer are charged to cost of sales on a specific identification basis when the home construction obligation is complete, and title passes from the Company to the end third-party homebuyer ("Closing").

*Property and equipment*

Property and equipment is capitalized as an asset when such property and equipment exceeds $1,000. Repairs and improvements that extend the useful lives of assets are capitalized. Depreciation is expensed using the straight-line method over the estimated useful lives of the related assets ranging from five (5) to seven (7) years. When assets are sold or otherwise disposed of, related costs and accumulated depreciation are removed from the combined balance sheet and any gain or loss is included in the combined statement of income.

*Customer deposits and customer on-your-lot deposits ("Customer deposits")*

The Company standard real estate contracts require the homebuyer to make an earnest money deposit. Cash received from homebuyers prior to Closing is recorded as customer deposits; or if the homebuyer already owns their lot, the deposit is included in Customer on-your-lot deposits. In addition, funds are received from financial institutions for funding of construction costs where the homebuyer has obtained construction financing. These funds are also included in Customer deposits. At Closing, the Customer deposits are applied as an offset to the home purchase price.

*Revenue recognition*

The construction time of the Company's homes is substantially less than one year. Revenues classified as Home sales and Cost of sales from home sales are recorded at the time each home is sold and title and possession are transferred to the buyer. Closing normally occurs shortly after construction is completed. Home construction and related costs are charged to the cost of homes closed under the specific identification method.

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

3.  **Summary of significant accounting policies - continued**

    *Income taxes*

    The Company has adopted *FASB ASC 740-10-25, Accounting for Uncertainty in Income Taxes*. The Company will record a liability for uncertain tax positions when it is more likely than not that a tax position would not be sustained if examined by the taxing authority. The Company continually evaluates expiring statutes of limitations, audits, proposed settlements, changes in tax law and new authoritative rulings.

    The Company's evaluation on August 31, 2019, revealed no uncertain tax positions that would have a material impact on the financial statements. Management does not believe that any reasonable possible changes will occur in 2019 that will have a material impact on the financial statements.

    The Company follows the liability method of accounting for income taxes in accordance with *FASB ASC 740, Accounting for Income Taxes*. As a limited liability company, the Company has elected to be taxed as an S Corporation. For tax purposes under this election, the Company passes its net income or net loss to its member; therefore, these financial statements do not include a provision for income taxes. Net income or loss for financial statement purposes may differ from taxable income or loss reported.

    *Accrued reserve costs*

    The Company accrues for estimated construction costs as Accrued reserve costs, where the subcontractor/vendor work has been completed at the closing date, but the respective costs have not been invoiced by the vendor and are not included in Accounts payable.

4.  **Fair value measurements**

    The Company's financial instruments include cash and cash equivalents, construction in progress, accounts payable and accrued expenses, and customer deposits. The recorded values of these financial instruments approximate their fair values based on their short-term nature.

5.  **Capitalized inventory costs**

    **Capitalized interest**

    The Company capitalizes interest during development and construction.  Capitalized interest is charged to cost of sales when title passes to the purchaser at closing.  Information regarding interest, which is included with inventories, is as follows:

    | | | |
    |---|---|---:|
    | Capitalized interest in inventory, beginning of year | $ | 695,000 |
    | Interest incurred and capitalized | | 1,296,721 |
    | Interest charged to cost of sales | | (1,506,721) |
    | | | |
    | Capitalized interest in inventory, end of period | $ | 485,000 |

*See independent accountant's compilation report and notes to combined financial statements*

8

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

### 5.   Capitalized inventory costs - continued

**Capitalized overhead costs**

The Company capitalizes certain overhead costs that related to the construction of homes to home and lot inventories.  Overhead costs are charged to cost of sales as homes are delivered to the purchaser at closing.  Information regarding capitalized overhead are as follows:

| | | |
|---|---|---:|
| Capitalized overhead in inventory, beginning of year | $ | 988,185 |
| Overhead incurred and capitalized | | 1,421,133 |
| Overhead charged to cost of sales | | (1,585,399) |
| | | |
| Capitalized overhead in inventory, end of period | $ | 823,919 |

### 6.   Property and equipment, net

Major classifications of property and equipment are as follows at August 31, 2019:

| | | |
|---|---|---:|
| Furniture and fixtures | $ | 84,802 |
| Construction equipment | | 6,435 |
| Vehicles | | 90,198 |
| Less: Accumulated depreciation furniture and fixtures | | (66,605) |
| Less: Accumulated depreciation construction equipment | | (6,435) |
| Less: Accumulated depreciation vehicles | | (63,306) |
| Property and equipment, net | $ | 45,089 |

### 7.   Accounts payable and accrued expenses

**Warranty accrual**

The Company warrants that its homes will comply with certain performance standards for a one (1) year period commencing at closing.  The Company estimates the future costs for such warranties as a liability as the time of closing.  Factors that affect the Company warranty liability include the number of homes sold, historical and anticipated rates of warranty claims and cost per claim.  The Company periodically assesses the adequacy of its recorded warranty liabilities and adjusts the amounts as necessary.  Information related to the warranty accrual is as follows at August 31, 2019:

| | | |
|---|---|---:|
| Warranty accrual, beginning of year | $ | 27,090 |
| Additional Warranty accrual provided during the period | | 28,376 |
| Warranty payments and adjustments during the period | | (17,420) |
| | | |
| Warranty accrual, end of period | $ | 38,046 |

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

8. **Notes payable to banks**

Notes payable to banks consist of the following at August 31, 2019:

| Notes payable | 8/31/2019 |
|---|---|
| **Construction loan with a multi-state bank** | |
| Matures January 2021 with an interest rate of prime plus 0.5%., 5.5% at August 31, 2019.  Monthly interest only payments.  The loan is guaranteed by the sole stockholder and by a deed of trust over inventories. | $  1,786,892 |
| **Construction loan with a local bank** | |
| Matures November 2019 with an interest rate of prime plus 0.5%, 5.5% at August 31, 2019.  Monthly interest only payments.  The loan is guaranteed by the sole stockholder and by a deed of trust over inventories. | 356,465 |
| **Construction loan with a commercial bank, ended August 31, 2019** | |
| Currently month to month, with an interest rate of the greater of 4.0% or 0.5% plus prime, 5.5% at August 31, 2019. Monthly interest only payments.  The Company is co-borrower with related parties.  The loan is guaranteed by the sole stockholder and his spouse and by a deed of trust over inventories. | 753,362 |
| **Vehicle loan, financial services company** | |
| Matures March 2022 with an interest rate of 1.8%.  Monthly payment of $973.53 principal and interest. | 29,444 |
| **Total notes payable to banks** | $  2,926,163 |

Required principal payments on notes payable as of August 31, 2019 are as follows:

| Period Ended August 31, | | Amount |
|---|---|---|
| 2020 | $ | 1,121,076 |
| 2021 | | 1,798,343 |
| 2022 | | 6,744 |
| | $ | 2,926,163 |

9. **Loans payable to related party**

The Company has an arrangement for up to $23,500,000 in unsecured, multiple disbursement loans from Rainier Capital, LLC, an entity owned by the sole stockholder and his spouse. The loans are interest bearing at 6% based upon principal outstanding.  This note is due on demand after reasonable notice of at least 30 days or December 31, 2019, whichever occurs first.

As of August 31, 2019, outstanding principal was $21,549,000 and $862,461 interest was paid during the eight months ended August 31, 2019 on these loans.

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

### 10. Other income

Other income consists of the following at August 31, 2019:

| | | |
|---|---|---:|
| Rebates | $ | 344,463 |
| Miscellaneous income | | 109,691 |
| Earned discounts | | 51,278 |
| Forfeitures of earnest money | | 9,340 |
| | $ | 514,772 |

### 11. Related party transactions

The Company conducts a significant portion of its business with other entities wholly or partially owned by the sole stockholder.

During the eight (8) months ended August 31, 2019, the Company purchased building lots totaling approximately $3,403,000 from related entities. These entities are Grey Rock Development, LLC, Tiger Creek Development, Cusseta Road, LLC, Garrett Creek Development, LLC and the sole stockholder of the Company.

At August 31, 2019, work in progress included $6,277,537 of finished lot costs, $4,433,555 of lots used in construction and $13,042 of other work from related parties.

During the eight (8) months ended August 31, 2019, the Company provided management services to Grayhawk Homes Inc., Homestead Residential Services, Inc which the intercompany revenues and expenses have been eliminated in the combined statements of the Company.  Additionally, the company provided management services to Grayhawk Homes of Atlanta, Inc. in the amount of $79,680, Grayhawk Homes of Iowa, Inc. in the amount of $268,920, Grayhawk Homes of South Carolina, Inc. in the amount of $159,360, and Grayhawk Townhomes in the amount of $19,920.

The Company paid $26,878 to Eddie Brown Grading, LLC during the eight months ended August 31, 2019 for grading and lot preparation services. The sole stockholder of the Company is the majority member of Eddie Brown Grading, LLC.

The Company charged management fees to Eddie Brown Grading, LLC in the amount of $4,000 for the eight months ended August 31, 2019.

During the eight (8) months ended August 31, 2019, the Company paid $983,811 in real estate commissions to the sole stockholder's spouse, who is a licensed real estate broker.

The sole stockholder is in a position to, and in the future may, influence the expenditures of the Company for the benefit of another company that is under his control.

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

**12. Income taxes**

The Company has adopted FASB ASC 740-10-25, Accounting for Uncertainty in Income Taxes. The Company will record a liability for uncertain tax positions when it is more likely than not that a tax position would not be sustained if examined by the taxing authority. The Company continually evaluates expiring statutes of limitations, audits, proposed settlements, changes in tax law and new authoritative rulings.

The Company's evaluation on August 31, 2019, revealed no uncertain tax positions that would have a material impact on the financial statements. The entity's federal and state income tax returns are subject to examination by the Internal Revenue Service and state governing bodies for a period of three (3) years from the date the respective return was due or filed, if extended. Management does not believe that any reasonably possible changes will occur within the next twelve (12) months that will have a material impact on the financial statements.

**13. Concentration of credit risk**

The Federal Deposit Insurance Corporation ("FDIC") insures all deposits up to a $250,000 limit. The Company is uninsured by the FDIC for excess deposits in a bank account with a certain bank which has in excess of the $250,000 insurable deposit limit.  The Company and its subsidiaries have not experienced any losses on such accounts and do not believe they are exposed to any significant credit risk with respect to cash and cash equivalents.

**14. Commitments and contingencies**

The Company leases office space under a lease agreement that expires on December 31, 2021. Total lease expense under this lease was $56,279 for the eight months ended August 31, 2019.

Future minimum lease payments under this operating lease are:

| Period Ended August 31, | | Amount |
|---|---|---|
| 2020 | $ | 73,177 |
| 2021 | | 74,329 |
| 2022 | | 24,905 |
| | $ | 172,411 |

**15. Advertising**

The Company expenses costs as incurred. Advertising expenses for the eight (8) months ended August 31, 2019 totaled $161,134.

**16. Backlog information**

At August 31, 2019, construction in progress includes 16 homes completed and 88 homes under construction. Customer deposits have been received and sales are pending on 44 of these homes.

The Company projects total 2019 sales to be in excess of $63,000,000 for approximately 245 homes, based upon the sole stockholder's experience and a stable economic environment.

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc., Homestead Residential Inc. and GH Services, Inc.**
**Notes to Combined Financial Statements**
**August 31, 2019**

**17. Subsequent events**

The Company has evaluated events and transactions that occurred between August 31, 2019 and October 21, 2019, which is the date that the financial statements were available to be issued, for possible recognition or disclosure in the financial statements. Management believes there were no subsequent event items which require disclosure.

# Supplementary Information

# Grayhawk Homes, Inc, Homestead Residential, Inc, and GH Services, Inc
## Supplementary Information - Combining Balance Sheet
## August 31, 2019

| | GH | HR | GHS | Combining Entries | Total |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash | $ 1,587,402 | $ 714,144 | $ 303,704 | $ - | $ 2,605,250 |
| Restricted cash | 10,548 | - | - | - | 10,548 |
| Inventories: | | | | | |
| Work in progress: | | | | | |
| Direct construction costs including lot costs | 17,400,344 | 2,079,128 | - | - | 19,479,472 |
| Interest allocation | 359,000 | 126,000 | - | - | 485,000 |
| Overhead allocation | 701,868 | 122,051 | - | - | 823,919 |
| | 18,461,212 | 2,327,179 | - | - | 20,788,391 |
| Finished lots | 5,304,055 | 1,730,500 | - | - | 7,034,555 |
| Total inventories | 23,765,267 | 4,057,679 | - | - | 27,822,946 |
| Lot deposits | 546,000 | - | - | - | 546,000 |
| Property and equipment, net of accumulated depreciation of $136,346 | 41,496 | - | 3,593 | - | 45,089 |
| Other assets | 4,000 | - | - | - | 4,000 |
| **Total assets** | $ 25,954,713 | $ 4,771,823 | $ 307,297 | $ - | $ 31,033,833 |
| **Liabilities and stockholder's equity** | | | | | |
| **Liabilities** | | | | | |
| Accounts payable | $ 3,645,319 | $ 131,315 | $ - | $ - | $ 3,776,634 |
| Interest payable | 9,862 | - | - | - | 9,862 |
| Accrued bonuses | 132,074 | - | - | - | 132,074 |
| Accrued salaries | 22,512 | - | 29,432 | - | 51,944 |
| Accrued vacation and sick | 16,332 | - | 6,689 | - | 23,021 |
| Notes payable to banks | 2,391,820 | 534,343 | - | - | 2,926,163 |
| Loans payable to related party | 17,099,000 | 4,450,000 | - | - | 21,549,000 |
| Customer on-your-lot deposits | 541,677 | - | - | - | 541,677 |
| Warranty accrual | 35,425 | 2,621 | - | - | 38,046 |
| Customer deposits | 225,210 | 3,000 | - | - | 228,210 |
| Accrued reserve expense | 117,013 | - | - | - | 117,013 |
| Other accrued liabilities | 5,896 | - | 418 | - | 6,314 |
| **Total liabilities** | 24,242,140 | 5,121,279 | 36,539 | - | 29,399,958 |
| **Stockholder's equity** | | | | | |
| Common stock | 10,000 | 3,000 | 1,000 | - | 14,000 |
| Distributions | (4,600,000) | (450,000) | - | - | (5,050,000) |
| Retained earnings (accumulated deficit) | 1,243,392 | (89,818) | 210,891 | - | 1,364,465 |
| Net income | 5,059,181 | 187,362 | 58,867 | - | 5,305,410 |
| **Total stockholder's equity** | 1,712,573 | (349,456) | 270,758 | - | 1,633,875 |
| **Total liabilities and stockholder's equity** | $ 25,954,713 | $ 4,771,823 | $ 307,297 | $ - | $ 31,033,833 |

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc, Homestead Residential, Inc, and GH Services, Inc**
**Supplementary Information - Combining Statement of Income**
**For the Eight (8) Months Ended August 31, 2019**

| | | GH | | HR | | GHS | | Combining Entries | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | | | | |
| Home sales | $ | 39,840,359 | $ | 3,532,591 | $ | - | $ | - | $ | 43,372,950 |
| Overhead income | | - | | - | | 1,000,000 | | (468,120) | | 531,880 |
| Other income | | 507,138 | | 7,634 | | - | | - | | 514,772 |
| | | 40,347,497 | | 3,540,225 | | 1,000,000 | | (468,120) | | 44,419,602 |
| | | | | | | | | | | |
| **Cost and expenses:** | | | | | | | | | | |
| Cost of sales | | 32,729,236 | | 3,138,319 | | - | | - | | 35,867,555 |
| Selling, general and administrative | | 2,559,080 | | 214,544 | | 941,133 | | (468,120) | | 3,246,637 |
| | | | | | | | | | | |
| | | 35,288,316 | | 3,352,863 | | 941,133 | | (468,120) | | 39,114,192 |
| | | | | | | | | | | |
| **Net Income** | $ | 5,059,181 | $ | 187,362 | $ | 58,867 | $ | - | $ | 5,305,410 |

*See independent accountant's compilation report and notes to combined financial statements*

**Grayhawk Homes, Inc, Homestead Residential, Inc, and GH Services, Inc**
**Supplementary Information - Combining Statement of Changes in**
**Stockholder's Equity**
**For the Eight (8) Months Ended August 31, 2019**

| | | GH | | HR | | GHS | | Combining Entries | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2018** | $ | 1,253,391 | $ | (86,818) | $ | 211,892 | $ | - | $ | 1,378,465 |
| Add: Net income | | 5,059,181 | | 187,362 | | 58,867 | | - | | 5,305,410 |
| Less: Distributions to members | | (4,600,000) | | (450,000) | | - | | - | | (5,050,000) |
| **Balance at August 31, 2019** | $ | 1,712,572 | $ | (349,456) | $ | 270,759 | $ | - | $ | 1,633,875 |

*See independent accountant's compilation report and notes to combined financial statements*

## Grayhawk Homes, Inc, Homestead Residential, Inc, and GH Services, Inc
## Supplementary Information - Combined Statement of Income
## Reconciliation from GAAP to Management Basis of Presentation
## For the Eight (8) Months Ended August 31, 2019

| | GAAP Basis | Management Reclassifications | Management Basis |
|---|---|---|---|
| **Revenues:** | | | |
| Home sales | $ 43,372,950 | $ - | $ 43,372,950 |
| Overhead income | 531,880 | | 531,880 |
| Other income | 514,772 | - | 514,772 |
| | 44,419,602 | - | 44,419,602 |
| | | | |
| **Cost and expenses:** | | | |
| Cost of sales | 35,867,555 | (1,296,721) | 34,570,834 |
| Selling, general and administrative | 3,246,637 | (15,454) | 3,231,183 |
| | 39,114,192 | (1,312,175) | 37,802,017 |
| | | | |
| **Earnings before depreciation, tax, and interest** | 5,305,410 | 1,312,175 | 6,617,585 |
| | | | |
| Depreciation | - | 15,454 | 15,454 |
| Interest | - | 1,296,721 | 1,296,721 |
| | | | |
| **Net income** | $ 5,305,410 | $ - | $ 5,305,410 |

-

Note:

The schedule above presents a reconciliation of the combined statement of income presented for the eight (8) months ended August 31, 2019 on a basis of presentation for generally accepted accounting principals in the United States to an alternative basis of presentation used by management. The difference in these classifications and the amounts of the related management reclassifications relate to:

Presenting a subtotal of earnings before depreciation, tax, and interest,
Separately presenting production related interest expense of $1,296,721 instead of in cost of sales.

*See independent accountant's compilation report and notes to combined financial statements*

## SECTION 3.3
## ACCOUNTING PRINCIPLES IN ACCORDANCE WITH AND DEVIATIONS FROM GAAP

**2017 and 2018**
Financial statements prepared on a tax basis of accounting.

Deviations from GAAP Include:
1. Tax basis depreciation
2. 263(a) calculation
3. No capitalization:
    i. Interest
    ii. Overhead
4. No accruals for:
    i. Warranties
    ii. Payroll
    iii. Bonuses
    iv. Vacation
    v. Interest
    vi. Accrued reserve
    vii. Other payables

**August 31, 2018**
Combined financial statements prepared in accordance with GAAP. See Notes to the Combined Financial Statements "Note 3 Summary of significant accounting policies" located at 3.3 (b) herein.

**SECTION 3.3**
**INDEBTEDNESS**

**Grayhawk  Homes, Inc.:**
    1.  Southern States Bank:
          Amount $1,529,865  as of 11/14/2019,  Indebtedness will be satisfied at Closing and the release of collateral will be effective within two business days.

    2.  Calumet Bank:
          Amount $ 0 at Closing

    3.  Texas Capital Bank:
          Amount $ 0 as of 11/8/2019

    4.  Rainier Capital, LLC Amount $ 17,599,000  as of 11/14/19,  unsecured

**Homestead Residential, Inc.:**
    1.  Texas Capital Bank:
          Amount $ 0 as of 11/8/2019

    2.  Rainier Capital, LLC  Amount of $ 4,450,000  as of 11/14/19,  unsecured

**GH Services, Inc.:**
    1.  None

## SECTION 3.4
## ABSENCE OF CHANGES

(a) None

(b) None

(c) None

(d) Development commitment dated November 8, 2019 to build house for Ellen Reeves, Auburn Farms Property with Grayhawk Homes, Inc.; Development commitment dated November 8, 2019 to build house for Jess House, Smiths Walk with Grayhawk Homes, Inc.

(e) None

(f) None

(g) Grayhawk Homes, Inc. and Homestead Residential, Inc. indebtedness with Texas Capital Bank, evidenced by that certain Fifth Amendment to Loan Agreement dated September 5, 2018, which indebtedness was paid in full on November 7, 2019.  Lien terminations have been filed of record.

(h) None

(i) None

(j) None

(k) None

(l) None

(m) None

(n) None

(o) Bonus for Amy Allen and Katherine Long will be responsibility of Grayhawk Homes, Inc. and related Seller companies.  Such bonuses are subject to a Memorandum of Understanding effective as of Closing.

(p) None

(q) None

(r) None

(s) None

(t) None

(u) None

(v) None

**<u>SECTION 3.6(b)</u>**
**TAX RETURNS SUBJECT TO AUDIT ON/AFTER DECEMBER 31, 2017**

None.

## <u>SECTION 3.6(e)</u>
## NEXUS FOR SALE, USE AND INCOME TAX SINCE JANUARY 1, 2017

<u>Nexus for Sale Tax</u>:
1. Grayhawk Homes, Inc.: None.
2. Homestead Residential, Inc.: None.
3. GH Services, Inc.: None.

<u>Nexus for Use Tax</u>:
1. Grayhawk Homes, Inc.: None.
2. Homestead Residential, Inc.: None.
3. GH Services, Inc.: None.

<u>Nexus for Income Tax</u>:

Federal Income Tax Return – Form 1120S
     Grayhawk Homes, Inc.
     Homestead Residential, Inc.
     GH Services, Inc.

Alabama S Corporation Information/Tax Return – Form 20S
     Grayhawk Homes, Inc.
     Homestead Residential, Inc.

Georgia S Corporation Income Tax Return – Form 600S
     Grayhawk Homes, Inc.
     GH Services, Inc.

**<u>SECTION 3.7(a)</u>**
**PERSONAL PROPERTY USED IN THE BUSINESS WITH AN INDIVIDUAL VALUE**
**OF $25,000 OR GREATER**

None.

**SECTION 3.7(c)**
**OWNED REAL PROPERTY**

See attached.

**3.7 (c)  Owned Real Property Last updated 11-14-19**

| State | Lot ID | Purchased at Closing | Lender | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|---|---|
| HR | AL-00357 | Yes | Flagstar | 454 Monticello Dr | Auburn | AL | 36830 | Lot 357 Asheton Lakes | Asheton Lakes | 181,926.79 |
| HR | AUP-00141 | Yes | Flagstar | 1131 Still Hunt Lane | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 76,619.50 |
| HR | AUP-00148 | Yes | Flagstar | 912 Falconer Drive | Auburn | AL | 36832 | | Yarbrough Farms-The Parc | 77,996.09 |
| HR | AUP-00149 | Yes | Flagstar | 918 Falconer Drive | Auburn | AL | 36832 | Lot 149 Ab Cl - Th Pr | Yarbrough Farms-The Parc | 74,922.17 |
| HR | AUP-00150 | Yes | Flagstar | 924 Falconer Drive | Auburn | AL | 36832 | Lot 150 Ab Cl - Th Pr | Yarbrough Farms-The Parc | 84,760.48 |
| HR | AUP-00153 | Yes | Flagstar | 942 Falconer Drive | Auburn | AL | 36832 | Lot 153 Ab Cl - Th Pr | Yarbrough Farms-The Parc | 173,321.19 |
| HR | AUP-00181 | Yes | Flagstar | 923 Falconer Drive | Auburn | AL | 36832 | Lot 181 Aub Clb-Th Pr | Yarbrough Farms-The Parc | 204,439.86 |
| HR | AUP-00185 | Yes | Flagstar | 1150 Still Hunt Lane | Auburn | AL | 36832 | Lot 185 Aub Cln-Th Pr | Yarbrough Farms-The Parc | 168,825.86 |
| HR | AUP-00186 | Yes | Flagstar | 1156 Still Hunt Lane | Auburn | AL | 36832 | Lot 186 Au Cl - Th Pr | Yarbrough Farms-The Parc | 151,699.46 |
| AL | CCR-00108 | Yes | Flagstar | LOT 108 CEDAR CREEK | Opelika | AL | 36801 | LOT 108 CEDAR CREEK | Cedar Creek Ridges | 208,985.99 |
| AL | CCR-00110 | Yes | Flagstar | LOT 110 CEDAR CREEK | Opelika | AL | 36801 | LOT 110 CEDAR CREEK | Cedar Creek Ridges | 225,432.05 |
| AL | CCR-00112 | Yes | Flagstar | LOT 112 CEDAR CREEK | Opelika | AL | 36801 | LOT 112 CEDAR CREEK | Cedar Creek Ridges | 179,468.86 |
| GA | CP-00012 | Yes | Centennial | 8831 Sullivan's Dr | Midland | GA | 31820 | | Charleston Place | 1,129.65 |
| GA | CP-00016 | Yes | Centennial | 8815 Sullivan's Drive | Midland | GA | 31820 | Lot 16 Charleston Plc | Charleston Place | 139,724.63 |
| GA | CP-00017 | Yes | Centennial | 4901 Oriana Dr | Midland | GA | 31820 | Lot 17 Charleston Plc | Charleston Place | 119,239.24 |
| GA | CP-00019 | Yes | Centennial | 4904 Oriana Dr | Midland | GA | 31820 | Lot 19 Charleston Plc | Charleston Place | 156,017.04 |
| GA | CP-00023 | Yes | Centennial | 8800 Sullivan's Dr | Midland | GA | 31820 | Lot 23 Charleston Plc | Charleston Place | 2,148.79 |
| GA | CPB-00002 | Yes | Centennial | 4826 Charleston Way | Midland | GA | 31820 | Lot 2 Christn Plc Bl. | Charleston Place Blvd | - |
| GA | CPB-00011 | Yes | Centennial | 4862 Charleston Way | Midland | GA | 31820 | | Charleston Place Blvd | 855.00 |
| GA | CPB-00062 | Yes | Centennial | 4859 Charleston Way | Midland | GA | 31820 | | Charleston Place Blvd | 310.00 |
| GA | CPB-00068 | Yes | Centennial | 4835 Charleston Way | Midland | GA | 31820 | Lot 68 Chrlst Plc Bl. | Charleston Place Blvd | 193,052.32 |
| GA | CPB-00069 | Yes | Centennial | 4831 Charleston Way | Midland | GA | 31820 | Lot 69 Chrlst Plc Bl. | Charleston Place Blvd | 173,071.54 |
| GA | CPB-00070 | Yes | Centennial | 4825 Charleston Way | Midland | GA | 31820 | Lot 70 Chrlst Plc Bl. | Charleston Place Blvd | 159,685.98 |
| GA | CPB-00072 | Yes | Centennial | 4814 Charleston Way | Midland | GA | 31820 | Lot 72 Chrlst Plc Bl. | Charleston Place Blvd | 85,405.04 |
| GA | CPB-00073 | Yes | Centennial | 4818 Charleston Way | Midland | GA | 31820 | Lot 73 Chrlst Plc Bl. | Charleston Place Blvd | 87,110.61 |
| HR | CR-00666 | Yes | Flagstar | 1840 Talcott Court | Auburn | AL | 36830 | Lot 666 Camden Ridge | Camden Ridge | 234,898.32 |
| HR | CR-00667 | Yes | Flagstar | 1843 Talcott Court | Auburn | AL | 36830 | Lot 667 Camden Ridge | Camden Ridge | 245,050.98 |
| AL | DR-00085 | Yes | Flagstar | 1600 Lilah Ct | Auburn | AL | 36830 | | Donahue Ridge | 37,834.55 |
| AL | DR-00091 | Yes | Flagstar | 1609 Lilah Ct | Auburn | AL | 36830 | Lot 91 Donahue Ridge | Donahue Ridge | 185,281.17 |
| AL | DR-00092 | Yes | Flagstar | 1615 Lilah Ct | Auburn | AL | 36830 | Lot 92 Donahue Ridge | Donahue Ridge | 198,237.22 |
| AL | DR-00094 | Yes | Flagstar | 1623 Lilah Ct | Auburn | AL | 36830 | Lot 94 Donahue Ridge | Donahue Ridge | - |
| AL | DR-00098 | Yes | Flagstar | 1998 Felicity Lane | Auburn | AL | 36830 | Lot 98 Donahue Ridge | Donahue Ridge | 92,539.99 |
| AL | DR-00099 | Yes | Flagstar | 1994 Felicity Lane | Auburn | AL | 36830 | Lot 99 Donahue Ridge | Donahue Ridge | 73,487.01 |
| AL | DR-00100 | Yes | Flagstar | 1990 Felicity Lane | Auburn | AL | 36830 | | Donahue Ridge | 39,834.89 |
| AL | DR-00122 | Yes | Flagstar | 1971 Felicity Ln | Auburn | AL | 36830 | Lot 122 Donahue Ridge | Donahue Ridge | 47,895.98 |
| AL | DR-00123 | Yes | Flagstar | 1975 Felicity Ln | Auburn | AL | 36830 | Lot 123 Donahue Ridge | Donahue Ridge | 119,134.85 |
| AL | DR-00125 | Yes | Flagstar | 1983 Felicity Lane | Auburn | AL | 36830 | | Donahue Ridge | 39,834.89 |
| AL | DR-00129 | Yes | Flagstar | 1999 Felicity Lane | Auburn | AL | 36830 | Lot 129 Donahue Ridge | Donahue Ridge | 133,701.33 |

**3.7 (c)  Owned Real Property Last updated 11-14-19**

| State | Lot ID | Purchased at Closing | Lender | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|---|---|
| AL | DR-00130 | Yes | Flagstar | 2003 Felicity Lane | Auburn | AL | 36830 | Lot 130 Donahue Ridge | Donahue Ridge | 130,326.77 |
| AL | DR-00131 | Yes | Flagstar | 2007 Felicity Lane | Auburn | AL | 36830 | Lot 131 Donahue Ridge | Donahue Ridge | 103,033.02 |
| AL | DR-00132 | Yes | Flagstar | 2011 Felicity Lane | Auburn | AL | 36830 | Lot 132 Donahue Ridge | Donahue Ridge | 106,039.66 |
| GA | DW-0001A | Yes | Centennial | 7000 Deerwood Lane | Upatoi | GA | 31829 | Lot 1A Deerwood | Deerwood | 154,009.15 |
| GA | DW-0009A | Yes | Centennial | 8028 Deerwood Ct | Upatoi | GA | 31829 | Lot 9A Deerwood | Deerwood | 309,126.81 |
| GA | DW-0019A | Yes | Centennial | 8017 Deerwood Ct | Upatoi | GA | 31829 | Lot 19A Deerwood | Deerwood | 324,936.23 |
| GA | GCH-0008J | Yes | Centennial | 8156 Highlands Drive | Midlands | GA | 31820 | Lot 8J Garrtt Crk Hgh | Garrett Creek Highlands | 213,624.96 |
| GA | GCH-0010J | Yes | Centennial | 8153 Highlands Drive | Midlands | GA | 31820 | Lot 10J Garrt Crk Hgh | Garrett Creek Highlands | 202,243.59 |
| GA | GCH-0023M | Yes | Centennial | 9930 Woodland Creek Ct. | Midlands | GA | 31820 | | Garrett Creek Highlands | 46,779.18 |
| GA | GCH-0025M | Yes | Centennial | 9929 Woodland Creek Ct. | Midlands | GA | 31820 | | Garrett Creek Highlands | 51,095.63 |
| GA | GCH-0026M | Yes | Centennial | 9925 Woodland Creek Ct. | Midlands | GA | 31820 | Lot 26M Garrt Crk Hgh | Garrett Creek Highlands | 156,709.23 |
| GA | GCH-0029M | Yes | Centennial | 9913 Woodland Creek Ct. | Midlands | GA | 31820 | Lot 29M Garrt Crk Hgh | Garrett Creek Highlands | 56,568.98 |
| GA | GCH-0030M | Yes | Centennial | 9909 Woodland Creek Ct. | Midlands | GA | 31820 | Lot 30M Garrt Crk Hgh | Garrett Creek Highlands | 54,513.13 |
| GA | GCH-0032M | Yes | None | 9901 Woodland Creek Ct. | Midlands | GA | 31820 | Lot 32M Garrt Crk Hgh | Garrett Creek Highlands | 143,489.56 |
| GA | GCL-0005I | Yes | Centennial | 7483 Coppice Drive | Midlands | GA | 31820 | LOT 5I Garrtt Crk Lak | Garrett Creek Lakes | 165,850.04 |
| GA | GCL-0009I | Yes | Centennial | 7459 Coppice Drive | Midlands | GA | 31820 | LOT 9I Garrtt Crk Lak | Garrett Creek Lakes | 112,290.97 |
| GA | GCL-0010I | Yes | Centennial | 7453 Coppice Drive | Midlands | GA | 31820 | LOT 10I Garrt Crk Lak | Garrett Creek Lakes | 112,825.97 |
| GA | GCL-0012I | Yes | Centennial | 7441 Coppice Drive | Midlands | GA | 31820 | | Garrett Creek Lakes | 42,000.00 |
| GA | GCL-0014I | Yes | Centennial | 7448 Coppice Drive | Midlands | GA | 31820 | | Garrett Creek Lakes | 42,310.00 |
| GA | GCL-0023I | Yes | Centennial | 7392 Prairie Valley Court | Midlands | GA | 31820 | Lot 23I Garrt Crk Lak | Garrett Creek Lakes | 106,110.97 |
| GA | GCL-0024I | Yes | Centennial | 7396 Prairie Valley Court | Midlands | GA | 31820 | Lot 24I Garrt Crk Lak | Garrett Creek Lakes | 79,136.76 |
| GA | GCL-0130I | Yes | Centennial | 7613 Coppice Drive | Midlands | GA | 31820 | Lot 130I Garr Crk Lak | Garrett Creek Lakes | 183,337.63 |
| GA | GP-0041K | Yes | Centennial | 9726 Hollow Pine Dr. | Midlands | GA | 31820 | Lot 41K Garrett Pines | Garrett Pines | 129,942.10 |
| AL | HF-00014 | Yes | Flagstar | 361 Lee Road 123 | Salem | AL | 36874 | Lot 14 Hornet Flats | Hornet Flats | 165,654.06 |
| AL | HF-00016 | Yes | Flagstar | 421 Lee Road 123 | Salem | AL | 36874 | Lot 16 Hornet Flats | Hornet Flats | 52,322.07 |
| AL | HF-00017 | Yes | Flagstar | 451 Lee Road 123 | Salem | AL | 36874 | Lot 17 Hornet Flats | Hornet Flats | 44,667.23 |
| AL | HF-00018 | Yes | Flagstar | 481 Lee Road 123 | Salem | AL | 36874 | Lot 18 Hornet Flats | Hornet Flats | 39,382.79 |
| GA | HH-00120 | Yes | Centennial | 7007 HUNTER HILL COURT | Columbus | GA | 31907 | LOT 20 HUNTER HILL | Hunter Hill | 66,793.27 |
| GA | HL-0024C | Yes | Centennial | 9410 Forest Crown Drive | Fortson | GA | 31808 | | Highlands | 31,996.14 |
| GA | HL-0032C | Yes | Centennial | 9397 Forest Crown Drive | Fortson | GA | 31808 | Lot 32C Highland | Highlands | 45,911.92 |
| AL | LC-00001 | Yes | Flagstar | 2701 Golf Mill COurt | Auburn | AL | 36832 | Lot 1 Links Crossing | Links Crossing | 179,701.64 |
| AL | LC-00002 | Yes | Flagstar | 2695 Golf Mill Ct | Auburn | AL | 36832 | Lot 2 Links Crossing | Links Crossing | 173,855.09 |
| AL | LC-00022 | Yes | Flagstar | 2682 Golf Mill Ct | Auburn | AL | 36832 | Lot 22 Links Crossing | Links Crossing | 184,932.01 |
| AL | LC-00023 | Yes | Flagstar | 2688 Golf Mill Ct | Auburn | AL | 36832 | Lot 23 Links Crossing | Links Crossing | 163,747.99 |
| AL | LC-00024 | Yes | Flagstar | 2694 Golf Mill Ct | Auburn | AL | 36832 | Lot 24 Links Crossing | Links Crossing | 185,986.46 |
| AL | LC-00025 | Yes | Flagstar | 2700 Golf Mill Ct | Auburn | AL | 36832 | Lot 25 Links Crossing | Links Crossing | 207,384.95 |
| AL | LC-00031 | Yes | Flagstar | 2706 Golf Mill Court | Auburn | AL | 36832 | | Links Crossing | 50,000.00 |
| GA | LE-00001 | Yes | Centennial | 7350-1 Psalmond Road | Midlands | GA | 31820 | Layfield Estats Lot 1 | Layfield Estates | 39,606.39 |

3.7 (c)  Owned Real Property Last updated 11-14-19

| State | Lot ID | Purchased at Closing | Lender | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|---|---|
| GA | LE-00002 | Yes | Centennial | 7350-2 Psalmond Road | Midlands | GA | 31820 | Layfield Estats Lot 2 | Layfield Estates | 37,483.62 |
| GA | LE-00003 | Yes | Centennial | 7350-3 Psalmond Road | Midlands | GA | 31820 | Layfield Estats Lot 3 | Layfield Estates | 39,419.77 |
| GA | LE-00004 | Yes | Centennial | 7350-4 Psalmond Road | Midlands | GA | 31820 | Layfield Estats Lot 4 | Layfield Estates | 43,275.31 |
| GA | LE-00005 | Yes | Centennial | 7350-5 Psalmond Road | Midlands | GA | 31820 | Layfield Estats Lot 5 | Layfield Estates | 175,458.86 |
| GA | LE-00006 | Yes | Centennial | 7350-6 Psalmond Road | Midlands | GA | 31820 | Layfield Estats Lot 6 | Layfield Estates | 196,347.62 |
| GA | LH-0019D | Yes | Centennial | 5177 Magazine Lane | Columbus | GA | 31907 | Lot 19D Lexngtn Hills | Lexington Hills | 110,457.22 |
| GA | LH-0021D | Yes | Centennial | 5161 Magazine Lane | Columbus | GA | 31907 | Lot 21D Lexngtn Hills | Lexington Hills | 112,042.72 |
| GA | LH-0025D | Yes | Centennial | 5129 Magazine Lane | Columbus | GA | 31907 | Lot 25D Lexngtn Hills | Lexington Hills | 68,138.84 |
| GA | LH-0031D | Yes | Centennial | 5089 Magazine Lane | Columbus | GA | 31907 | Lot 31D Lexngtn Hills | Lexington Hills | 182,975.88 |
| GA | LH-0043H | Yes | Centennial | 5176 Sand Hill Drive | Columbus | GA | 31907 | LOT 43H LEXINGTON HIL | Lexington Hills | 159,887.81 |
| GA | LH-0044H | Yes | Centennial | 5172 Sand Hill Drive | Columbus | GA | 31907 | LOT 44H LEXINGTON HIL | Lexington Hills | 161,162.82 |
| GA | LH-0045H | Yes | Centennial | 5168 Sand Hill Drive | Columbus | GA | 31907 | LOT 45H LEXINGTON HIL | Lexington Hills | 150,572.28 |
| GA | LH-0047H | Yes | Centennial | 5142 Sand Hill Drive | Columbus | GA | 31907 | LOT 47H LEXINGTON HIL | Lexington Hills | 151,400.69 |
| GA | LH-0066H | Yes | Centennial | 1571 Lexington Lake Drive | Columbus | GA | 31907 | | Lexington Hills | - |
| GA | LH-0067H | Yes | Centennial | 1565 Lexington Lake Drive | Columbus | GA | 31907 | Lot 67H Lexngtn Hills | Lexington Hills | 102,295.71 |
| GA | LH-0068H | Yes | Centennial | 1559 Lexington Lake Drive | Columbus | GA | 31907 | | Lexington Hills | 235.00 |
| GA | MCC-05133 | Yes | Centennial | 5133 McCaghren Dr | Columbus | GA | 31909 | 5133 McCaghren Dr | McCaghren Dr | 43,963.88 |
| GA | MKR-00104 | Yes | Centennial | 7770 McKee Road | Upatoi | GA | 31829 | Lot 104 McKee Road | McKee Road | 42,196.00 |
| GA | MKR-00105 | Yes | Centennial | 7758 McKee Road | Upatoi | GA | 31829 | Lot 105 McKee Road | McKee Road | 42,088.00 |
| GA | NGF-0002B | Yes | Centennial | 9710 N. Ivy Park Drive | Fortson | GA | 31807 | Lot 2B Nrth Grnt Fld | North Granite Field | |
| GA | NGF-0016B | Yes | Centennial | 9796 North Ivy Park Drive | Fortson | GA | 31807 | Lot 16B Nrth Grnt Fld | North Granite Field | 175,425.26 |
| GA | NGF-0020B | Yes | Centennial | 4901 Wisteria Lane | Fortson | GA | 31807 | Lot 20B Nrth Grnt Fld | North Granite Field | 73,275.58 |
| GA | NGF-0021A | Yes | Centennial | 4888 Wisteria Lane | Fortson | GA | 31807 | Lot 21A Nrth Grnt Fld | North Granite Field | 62,075.84 |
| GA | NGF-0021B | Yes | Centennial | 4889 Wisteria Lane | Fortson | GA | 31807 | Lot 21B Nrth Grnt Fld | North Granite Field | 128,607.47 |
| GA | NGF-0022A | Yes | Centennial | 4894 Wisteria Lane | Fortson | GA | 31807 | Lot 22A Nrth Grnt Fld | North Granite Field | 60,806.79 |
| GA | NGF-0023A | Yes | Centennial | 4900 Wisteria Lane | Fortson | GA | 31807 | Lot 23A Nrth Grnt Fld | North Granite Field | 51,534.94 |
| GA | NGF-0024A | Yes | Centennial | 4906 Wisteria Lane | Fortson | GA | 31807 | Lot 24A Nrth Grnt Fld | North Granite Field | 89,066.00 |
| GA | NGF-0025A | Yes | Centennial | 4912 Wisteria Lane | Fortson | GA | 31807 | Lot 25A Nrth Grnt Fld | North Granite Field | 84,110.60 |
| GA | NGF-0026A | Yes | Centennial | 4918 Wisteria Lane | Fortson | GA | 31807 | Lot 26A Nrth Grnt Fld | North Granite Field | 91,205.67 |
| GA | NGF-0027A | Yes | Centennial | 4924 Wisteria Lane | Fortson | GA | 31807 | Lot 27A Nrth Grnt Fld | North Granite Field | 75,278.34 |
| GA | NGF-0028A | Yes | Centennial | 9848 North Ivy Park Drive | Fortson | GA | 31807 | | North Granite Field | 41,954.84 |
| GA | NGF-0029A | Yes | Centennial | 9849 North Ivy Park Drive | Fortson | GA | 31807 | Lot 29A Nrth Grnt Fld | North Granite Field | 62,637.80 |
| GA | NGF-0030A | Yes | Centennial | 9843 North Ivy Park Drive | Fortson | GA | 31807 | Lot 30A Nrth Grnt Fld | North Granite Field | 61,412.39 |
| GA | NGF-0034A | Yes | Centennial | 9819 North Ivy Park Drive | Fortson | GA | 31807 | Lot 34A Nrth Grnt Fld | North Granite Field | 93,442.47 |
| GA | NGF-0035A | Yes | Centennial | 9813 North Ivy Park Drive | Fortson | GA | 31807 | Lot 35A Nrth Grnt Fld | North Granite Field | 94,622.10 |
| GA | NGF-0041A | Yes | Centennial | 9777 North Ivy Park Drive | Fortson | GA | 31807 | Lot 41A Nrth Grnt Fld | North Granite Field | 77,843.07 |
| GA | NGF-0042A | Yes | Centennial | 9771 North Ivy Park Drive | Fortson | GA | 31807 | Lot 42A Nrth Grnt Fld | North Granite Field | 54,832.84 |
| GA | RB-00074 | Yes | Centennial | 6854 Shadybrook Drive | Columbus | GA | 31904 | LOT 74 RIVERBROOK | Riverbrook | 256,812.05 |

**3.7 (c)  Owned Real Property Last updated 11-14-19**

| State | Lot ID | Purchased at Closing | Lender | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|---|---|
| GA | RH-0055I | Yes | Centennial | 5782 SANDY VIEW DRIVE | Columbus | GA | 31907 | LOT 55-I ROOSEVELT HE | Roosevelt Heights | 33,418.13 |
| GA | RH-0056I | Yes | Centennial | 5788 SANDY VIEW DRIVE | Columbus | GA | 31907 | LOT 56-I ROOSEVELT HE | Roosevelt Heights | 33,130.13 |
| GA | RH-0057I | Yes | Centennial | 5794 SANDY VIEW DRIVE | Columbus | GA | 31907 | LOT 57-I ROOSEVELT HE | Roosevelt Heights | 33,298.13 |
| GA | RH-0058I | Yes | Centennial | 5800 SANDY VIEW DRIVE | Columbus | GA | 31907 | LOT 58-I ROOSEVELT HE | Roosevelt Heights | 33,158.13 |
| AL | RR-00002 | Yes | Flagstar | 197 Lee Road 644 | Smith Station | AL | 36877 | Lot 2 Rocky Ridge | Rocky Ridge | 37,650.96 |
| AL | RR-00003 | Yes | Flagstar | 219 Lee Road 644 | Smith Station | AL | 36877 | Lot 3 Rocky Ridge | Rocky Ridge | 37,451.29 |
| AL | RR-00012 | Yes | Flagstar | 397 Lee Road 644 | Smith Station | AL | 36877 | Lot 12 Rocky Ridge | Rocky Ridge | 28,445.11 |
| AL | RR-00027 | Yes | None | 255 Lee Road 2046 | Smith Station | AL | 36877 | Lot 27 Rocky Ridge | Rocky Ridge | 188,316.67 |
| AL | RR-00040 | Yes | Flagstar | 511 Lee Road 2046 | Smith Station | AL | 36877 | Lot 40 Rocky Ridge | Rocky Ridge | 219,611.42 |
| AL | RR-00041 | Yes | Flagstar | 533 Lee Road 2046 | Smith Station | AL | 36877 | Lot 41 Rocky Ridge | Rocky Ridge | 208,061.07 |
| AL | RR-00057 | Yes | Flagstar | 141 Lee Road 2048 | Smith Station | AL | 36877 | Lot 57 Rocky Ridge | Rocky Ridge | 194,372.30 |
| AL | SC-00002 | Yes | Flagstar | 1170 Lee Road 243 | | | | Lot 2 Smiths Crossing | Smiths Crossing | 118,149.77 |
| AL | SM-0149A | Yes | Flagstar | 341 Frontier Circle | Auburn | AL | 36832 | | Solamere | 34,062.31 |
| AL | SM-147A1 | Yes | Flagstar | 349 Frontier Circle | Auburn | AL | 36832 | | Solamere | 34,137.31 |
| AL | SM-148A1 | Yes | Flagstar | 345 Frontier Circle | Auburn | AL | 36832 | | Solamere | 34,137.36 |
| GA | SO-0047D | Yes | Centennial | 8141 Green Glen Dr | Midland | GA | 31820 | Lot 47D Sable Oaks | Sable Oaks | 211,026.87 |
| AL | SPL-00071 | Yes | BOYOL | 300 Lee Road 735 | | | | SPL00071 Sherfield | BOYOL | 2,202.00 |
| GA | SPL-00072 | Yes | BOYOL | 4237 Pobiddy Road | | | | Spot Lot 72 Powell | BOYOL | 86,489.45 |
| GA | SPL-00073 | Yes | BOYOL | 0 Cathy Ct | | | | Spot Lot 73  Blum | BOYOL | 175.00 |
| GA | SPL-00074 | Yes | BOYOL | 3973 Essex Heights COurt | | | | Spot Lot 74 Chiles | BOYOL | - |
| AL | SPL-00076 | Yes | BOYOL | 2320 Lee Road 165 | | | | Spot Lot 76  Cauley | BOYOL | - |
| AL | SPL-00077 | Yes | BOYOL | Abercrombie Road | | | | Spot Lot 77 Lamar | BOYOL | 275.00 |
| AL | SPL-00078 | Yes | BOYOL | 68 Bluff Creek Road | | | | Spot Lot 78 Hodge | BOYOL | 4,000.00 |
| AL | STO-00001 | Yes | Flagstar | 22 Lee Rd 2216 | Smith Station | AL | 36877 | Lot 01 Southern Oaks | Southern Oaks | - |
| AL | STO-00010 | Yes | Flagstar | 140 Lee Road 2216 | Smith Station | AL | 36877 | Lot 10 Southern Oaks | Southern Oaks | 83,244.88 |
| AL | STO-00022 | Yes | Flagstar | 58 Lee Road 2217 | Smith Station | AL | 36877 | Lot 22 Southern Oaks | Southern Oaks | 49,167.57 |
| AL | STO-00023 | Yes | Flagstar | 70 Lee Road 2217 | Smith Station | AL | 36877 | Lot 23 Southern Oaks | Southern Oaks | 49,100.71 |
| AL | STO-00024 | Yes | Flagstar | 82 Lee Road 2217 | Smith Station | AL | 36877 | Lot 24 Southern Oaks | Southern Oaks | 48,998.47 |
| AL | STO-00025 | Yes | Flagstar | 94 Lee Road 2217 | Smith Station | AL | 36877 | Lot 25 Southern Oaks | Southern Oaks | 49,178.49 |
| AL | STO-00026 | Yes | Flagstar | 106 Lee Road 2217 | Smith Station | AL | 36877 | Lot 26 Southern Oaks | Southern Oaks | 48,957.04 |
| AL | STO-00037 | Yes | Flagstar | 238 Lee Road 2217 | Smith Station | AL | 36877 | Lot 37 Southern Oaks | Southern Oaks | 49,476.82 |
| AL | STO-00042 | Yes | Flagstar | 79 Lee Road 2217 | Smith Station | AL | 36877 | Lot 42 Southern Oaks | Southern Oaks | 48,907.21 |
| AL | STO-00043 | Yes | Flagstar | 91 Lee Road 2217 | Smith Station | AL | 36877 | Lot 43 Southern Oaks | Southern Oaks | 6,720.18 |
| AL | STO-00044 | Yes | Flagstar | 103 Lee Road 2217 | Smith Station | AL | 36877 | Lot 44 Southern Oaks | Southern Oaks | 48,292.92 |
| AL | STO-00058 | Yes | Flagstar | 338 Lee Road 2217 | Smith Station | AL | 36877 | Lot 58 Southern Oaks | Southern Oaks | 395.00 |
| AL | STO-00065 | Yes | Flagstar | 21 Lee Road 2219 | Smith Station | AL | 36877 | Lot 65 Southern Oaks | Southern Oaks | 49,531.59 |
| HR | SWF-00061 | Yes | Flagstar | 206 Flagstone Place | Auburn | AL | 36830 | Lot 61 Stonewood Frms | Stonewood Farms | 71,847.82 |
| HR | SWF-00062 | Yes | Flagstar | 210 Flagstone Place | Auburn | AL | 36830 | Lot 62 Stonewood Frms | Stonewood Farms | 71,027.19 |

**3.7 (c)  Owned Real Property Last updated 11-14-19**

| State | Lot ID | Purchased at Closing | Lender | Address | City | State | ZIP | Description | Subdivision | 10/30/19 Open WIP (Exludes Closed Homes) |
|---|---|---|---|---|---|---|---|---|---|---|
| HR | SWF-00067 | Yes | Flagstar | 246 Flagstone Place | Auburn | AL | 36830 | Lot 67 Stonewood Frms | Stonewood Farms | 210,463.73 |
| AL | WT-00001 | Yes | Flagstar | 1 Willow Trace Drive | Phenix City | AL | 36869 | | Willow Trace | 27,808.01 |
| AL | WT-00072 | Yes | Flagstar | 51 Willow Trace Drive | Phenix City | AL | 36869 | Lot 72 Willow Trace | Willow Trace | 134,435.92 |
| AL | WT-00095 | Yes | Flagstar | 6 Peachleaf Court | Phenix City | AL | 36869 | Lot 95 Willow Trace | Willow Trace | 143,570.30 |
| AL | WT-00100 | Yes | Flagstar | 31 Forest Ridge Lane | Phenix City | AL | 36869 | LOT 100 WILLOW TRACE | Willow Trace | 41,784.03 |
| AL | WT-00103 | Yes | Flagstar | 30 Forest Ridge Lane | Phenix City | AL | 36869 | LOT 103 WILLOW TRACE | Willow Trace | 37,002.13 |
| AL | WT-00125 | Yes | None | 6 Willow Court | Phenix City | AL | 36869 | Lot 125 Willow Trace | Willow Trace | 138,492.04 |
| AL | WT-00126 | Yes | None | 4 Willow Court | Phenix City | AL | 36869 | Lot 126 Willow Trace | Willow Trace | 130,004.31 |
| AL | WT-00133 | Yes | Flagstar | 46 Willow Trace Drive | Phenix City | AL | 36869 | Lot 133 Willow Trace | Willow Trace | 43,525.73 |
| AL | WT-00134 | Yes | Flagstar | 44 Willow Trace Drive | Phenix City | AL | 36869 | Lot 134 Willow Trace | Willow Trace | 46,848.01 |
| AL | WT-00135 | Yes | Flagstar | 42 Willow Trace Drive | Phenix City | AL | 36869 | Lot 135 Willow Trace | Willow Trace | 40,823.19 |
| AL | WT-00136 | Yes | Flagstar | 40 Willow Trace Drive | Phenix City | AL | 36869 | Lot 136 Willow Trace | Willow Trace | 59,734.28 |
| AL | WT-00137 | Yes | Flagstar | 38 Willow Trace Drive | Phenix City | AL | 36869 | Lot 137 Willow Trace | Willow Trace | 77,311.79 |
| AL | WT-00155 | Yes | Flagstar | 2 Willow Trace Drive | Phenix City | AL | 36869 | | Willow Trace | 26,539.90 |
| GA | WW-0042B | Yes | Centennial | 6939 Nuthatch Ct | Columbus | GA | 31909 | | Wrenwood | 56,230.79 |
| GA | WW-0044B | Yes | Centennial | 6883 Nuthatch Ct | Columbus | GA | 31909 | Lot 44B Wrenwood | Wrenwood | 204,088.87 |

16,151,545

## <u>SECTION 3.7(d)</u>
## LEASED REAL PROPERTY

1.  Real property lease (the "<u>Lease</u>") between Harmony Place Columbus, LLC ("<u>Landlord</u>") and David B. Erickson D.B.A. Grayhawk Homes, Inc. ("<u>Tenant</u>").  Commencement date January 1, 2019, expiration date December 31, 2021.  Includes security deposit $4,000. No consent from Landlord is required under the Lease pursuant to the terms and conditions of the Agreement. The lease will be assigned no later than December 31, 2019.

**<u>SECTION 3.7(e)</u>**
**LIST OF TAKEDOWN CONTRACTS**

None.  No Takedown Contracts exist and no consents are therefore required.

## <u>SECTION 3.7(f)</u>
## ASSIGNMENT OF INTEREST IN TAKEDOWN CONTRACTS

None.

<u>**SECTION 3.7(g)**</u>
**EFFECTIVENESS OF LEASES AND TAKEDOWN CONTRACTS**

<u>Third Party Lease</u>
   1.  None

<u>Real Property Lease</u>
   1.  None

<u>Takedown Contract</u>
   1.  None

## **SECTION 3.7(t)**
## **DEVELOPMENT STATUS OF REAL PROPERTY**
## **PHASE "A" LOTS**

See attached.

| State | Job | Description | Status | GH Owned & Lots Platted | Utilities Available | Improvements in Place | Comments |
|---|---|---|---|---|---|---|---|
| **Schedule 3.7 (t) Development Status of Real Property** | | | | | | | |
| **Updated as of 11.14.19** | | **"A" Lots** | | | | | |
| Ala | AL-00358 | Lot 358 Asheton Lakes | Lot | 1 | Power, water. | YES | |
| Ala | AL-00369 | Lot 369 Asheton Lakes | Lot | 1 | Power, water. | YES | |
| Ala | AL-00370 | Lot 370 Asheton Lakes | Lot | 1 | Power, water. | YES | |
| Ala | AL-00381 | Lot 381 Asheton Lakes | Lot | 1 | Power, water. | YES | |
| Ala | AL-00427 | Lot 427 Asheton Lakes | Lot | 1 | Power, water. | YES | |
| Ala | AP-0005A | Lot 5A Addtn Aumn Prk | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00129 | Lot 129 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| GA | Muscogee | Villages at St Mary's | Lot | 1 | | | developed |
| GA | Muscogee | Eagle Pointe II | Lot | 1 | | | developed |
| Ala | AUP-00130 | Lot 130 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00131 | Lot 131 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00134 | Lot 134 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00135 | Lot 135 Abr Cl- Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00136 | Lot 136 Aub Cl- Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00137 | Lot 137 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00141 | Lot 141 - Ab Cl Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00142 | Lot 142- Ab Cl- Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00145 | Lot 145 - AU Cl Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00148 | Lot 148 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00168 | Lot 168 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00188 | Lot 188 Aub Cl- Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00190 | Lot 190 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00191 | Lot 191 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00192 | Lot 192 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| Ala | AUP-00193 | Lot 193 Ab Cl - Th Pr | Lot | 1 | Power, water. | YES | |
| GA | BVH-0004B | 4B Buen Vst Hghts/829 Wilder Drive | Lot | 1 | Power  & water available | NO | Utilties in area some coordination needed for install |
| Ala | CCC-0036A | LOT 36A CEDAR CREEK | Lot | 1 | power, water | YES | |
| Ala | CCC-0037A | LOT 37A CEDAR CREEK | Lot | 1 | power, water | YES | |
| Ala | CCC-0038A | LOT 38A CEDAR CREEK | Lot | 1 | power, water | YES | |
| Ala | CR-00443 | Lot 443 Camden Ridge | Lot | 1 | power, water | YES | |
| Ala | CR-00444 | Lot 444 Camden Ridge | Lot | 1 | power, water | YES | |
| Ala | CR-00455 | Lot 455 Camden Ridge | Lot | 1 | power, water | YES | |
| Ala | CR-00468 | Lot 468 Camden Ridge | Lot | 1 | power, water | YES | |
| Ala | CR-00676 | Lot 676 Camden Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00085 | Lot 85 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00086 | Lot 86 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00088 | Lot 88 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00089 | Lot 89 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00100 | Lot 100 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00102 | Lot 102 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00103 | Lot 103 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00104 | Lot 104 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00106 | Lot 106 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00111 | Lot 111 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00112 | Lot 112 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00113 | Lot 113 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00114 | Lot 114 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00115 | Lot 115 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00116 | Lot 116 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00117 | Lot 117 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00118 | Lot 118 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00121 | Lot 121 Donahue Ridge | Lot | 1 | power, water | YES | |
| Ala | DR-00125 | Lot 125 Donahue Ridge | Lot | 1 | power, water | YES | |
| GA | DW-0010A | 10A Deerwood | Lot | 1 | power, water | YES | |
| GA | DW-0011A | 11A Deerwood | Lot | 1 | power, water | YES | |
| GA | DW-0016A | 16A Deerwood | Lot | 1 | power, water | YES | |
| GA | DW-0017A | 17A Deerwood | Lot | 1 | power, water | YES | |
| GA | ESA-00040 | 40 EAST SIDE ACRE | Lot | 1 | power, water | NO | Future townhome lots |
| GA | FC-00012 | 12 Foggy Cedar | Lot | 1 | power, water | YES | |
| GA | FD-01401 | FOREST DRIVE | Lot | 1 | power, water | YES | |
| GA | GCH-0001M | 1M Garrtt Crk Hgh | Lot | 1 | power, water | YES | |

| State | Job | Description | Status | GH Owned & Lots Platted | Utilities Available | Improvements in Place | Comments |
|---|---|---|---|---|---|---|---|
| | **Schedule 3.7 (t) Development Status of Real Property** | | | | | | |
| | **Updated as of 11.14.19** | **"A" Lots** | | | | | |
| GA | GCH-0002M | 2M Garrtt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0008M | 8M Garrtt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0012M | 12M Garrtt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0013M | 13M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0015M | 15M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0016M | 16M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0020M | 20M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0021M | 21M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0023M | 23M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0024M | 24M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0025M | 25M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0027M | 27M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCH-0031M | 31M Garrt Crk Hgh | Lot | 1 | power, water | YES | |
| GA | GCL-0012I | 12I Garrt Crk Lak | Lot | 1 | power, water | YES | |
| GA | GCL-0014I | 14I Garrt Crk lak | Lot | 1 | power, water | YES | |
| GA | GCL-0104I | Crk Lak 4I Sec 11 | Lot | 1 | power, water | YES | |
| GA | GCL-0105I | Crk Lak 5 Sec 11 | Lot | 1 | power, water | YES | |
| GA | GF-0003H | 3H Granite Field | Lot | 1 | power, water | YES | |
| GA | GP-003FF | 3FF Garrett Pines | Lot | 1 | power, water | YES | Power Pole to move with new G. Pines lots |
| Ala | HF-00001 | Lot 1 Hornet Flats | Lot | 1 | power, water | YES | |
| Ala | HF-00002 | Lot 2 Hornet Flats | Lot | 1 | power, water | YES | |
| GA | HL-0024C | 24 C HIGHLAND | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00003 | Lot 3 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00004 | Lot 4 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00005 | Lot 5 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00006 | Lot 6 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00007 | Lot 7 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00008 | Lot 8 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00009 | Lot 9 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00010 | Lot 10 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00011 | Lot 11 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00012 | Lot 12 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00013 | Lot 13 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00014 | Lot 14 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00015 | Lot 15 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00016 | Lot 16 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00017 | Lot 17 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00018 | Lot 18 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00019 | Lot 19 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00020 | Lot 20 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00021 | Lot 21 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00026 | Lot 26 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00027 | Lot 27 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00028 | Lot 28 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00029 | Lot 29 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00030 | Lot 30 Links Crossing | Lot | 1 | power, water, gas | YES | |
| Ala | LC-00031 | Lot 31 Links Crossing | Lot | 1 | power, water, gas | YES | |
| GA | LE-00002 | 2 Layfield Estates | Lot | 1 | power, water | YES | |
| GA | LE-00003 | 3 Layfield Estates | Lot | 1 | power, water | YES | |
| Ala | MG-00023 | Lot 23 Magnolia Grdns | Lot | 1 | power, water | YES | |
| Ala | MG-00024 | Lot 24 Magnolia Grdns | Lot | 1 | power, water | YES | |
| Ala | MG-00025 | Lot 25 Magnolia Gardns | Lot | 1 | power, water | YES | |
| Ala | MG-00026 | Lot 26 Magnolia Grdns | Lot | 1 | power, water | YES | |
| GA | ML-0001F | 1F Moonlake | Lot | 1 | power, water | YES | |
| GA | ML-0008F | 8F Moonlake | Lot | 1 | power, water | YES | |
| GA | ML-0009F | 9F Moonlake | Lot | 1 | power, water | YES | |
| GA | ML-0010F | 10F Moonlake | Lot | 1 | power, water | YES | |
| GA | ML-0014E | 14E Moonlake | Lot | 1 | power, water | YES | |
| GA | ML-0015E | 15E Moonlake | Lot | 1 | power, water | YES | |
| GA | MR-00001 | 1 Macon Rd | Lot | 1 | power & water available | NO | Utilties in area some coordination needed for install |

| Schedule 3.7 (t) Development Status of Real Property | | | | | | | |
|---|---|---|---|---|---|---|---|
| Updated as of 11.14.19 | | "A" Lots | | | | | |
| State | Job | Description | Status | GH Owned & Lots Platted | Utilities Available | Improvements in Place | Comments |
| GA | MR-00002 | 2 Macon Rd | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| GA | MR-00003 | 3 Macon Rd | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| GA | MR-00004 | 4 Macon Rd | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| GA | MR-00005 | 5 Macon Rd | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| GA | MR-00006 | 6 Macon Rd | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| GA | RB-01228 | Rockbridge Drive | Lot | 1 | power, water | YES | |
| GA | RB-01234 | Rockbridge Drive | Lot | 1 | power, water | YES | |
| GA | RB-01240 | Rockbridge | Lot | 1 | power, water | YES | |
| GA | RE-0030B | 30B Ridgewd Esats | Lot | 1 | power, water | YES | |
| Ala | RR-00018 | Lot 18 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00019 | Lot 19 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00024 | Lot 24 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00025 | Lot 25 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00026 | Lot 26 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00028 | Lot 28 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00030 | Lot 30 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00033 | Lot 33 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00076 | Lot 76 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00083 | Lot 83 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-00084 | Lot 84 Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | RR-0016A | Lot 16A Rocky Ridge | Lot | 1 | power, water | YES | |
| Ala | SF-00009 | LOT 9 SHENDOAH FARMS | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| Ala | SF-00010 | LOT 10 SHENDOAH FARMS | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| Ala | SF-00011 | LOT 11 SHENDOAH FARMS | Lot | 1 | power & water available | NO | Utilities in area some coordination needed for install |
| Ala | SM-0149A | Lot 149A Solamr Phs 3 | Lot | 1 | power, water | YES | |
| Ala | SM-0155A | Lot 155A Solamr Phs 3 | Lot | 1 | power, water | YES | |
| Ala | SM-0156A | Lot 156A Solamr Phs 3 | Lot | 1 | power, water | YES | |
| Ala | SM-0157A | Lot 157A Solamr Phs 3 | Lot | 1 | power, water | YES | |
| Ala | SM-147A1 | Lot 147A-1 Solm Phs 3 | Lot | 1 | power, water | YES | |
| Ala | SM-148A1 | Lot 148A-1 Solm Phs 3 | Lot | 1 | power, water | YES | |
| GA | SP-0006D | 6D SONOMA POINTE | Lot | 1 | power, water | YES | |
| GA | SRC-03006 | SLIPPERY ROCK CO | Lot | 1 | power, water | YES | |
| GA | SRC-03008 | SLIPPERY ROCK CO | Lot | 1 | power, water | YES | |
| Ala | SWF-00090 | Lot 90 Stonewood Frms | Lot | 1 | power, water | YES | |
| Ala | SWF-00102 | Lot 102 Stonewd Frms | Lot | 1 | power, water | YES | |
| GA | WSR-05012 | Warm Springs Rd | Lot | 1 | power, water, | YES | FUTURE 15 TOWNHOME LOTS |
| GA | WSR-05028 | Warm Springs Rd | Lot | 1 | power, water, | YES | WITH ABOVE TOWNHOME LOTS |
| Ala | WT-00001 | Lot 1 WILLOW TRACE | Lot | 1 | power, water, | YES | |
| Ala | WT-00155 | LOT 155 WILLOW TRACE | Lot | 1 | power & water available | YES | POWER LINE ANCHORS TO BE MOVED. |
| Total | | | | 160 | | | |

**<u>SECTION 3.7(t)</u>**
**DEVELOPMENT STATUS OF REAL PROPERTY**
**PHASE "B" LAND AND LOTS**

See attached.

| Schedule 3.7 (t) Development Status of Real Property | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Updated as of 11.14.19 | | | | | LAND AND LOTS | | | |
| State | County | Subdivision | "B" Estimated Lots | Current Status | DEVELOPED PLATTED LOTS (W/POWER AND WATER) | UNDER DEV. | RAW | TOTAL |
| GA | Muscogee | Charleston Place | 43 | Developed | 13 | 30 | | 43 |
| GA | Muscogee | Lexington Hills | 31 | Under Development | 8 | 23 | | 31 |
| GA | Muscogee | Roosevelt Heights | 35 | Developed | 35 | | | 35 |
| AL | Lee | Southern Oaks | 57 | Developed | 59 | | | 59 |
| AL | Lee | Auburn Links (Links Crossing) | 69 | Different  Developer | | 30 | 39 | 69 |
| GA | Muscogee | Garrett Creek | 36 | Under Development | | 36 | | 36 |
| GA | Muscogee | North Ivy Park | 34 | Under Development | | 34 | | 34 |
| GA | Muscogee | Riverbrook | 43 | Under Development | | 43 | | 43 |
| GA | Muscogee | Eagle Point II | 11 | Developed | 9 | | | 9 |
| GA | Muscogee | Villages at St. Marys | 8 | Developed | 8 | | | 8 |
| GA | Muscogee | Pinecrest | 1 | Developed | 1 | | | 1 |
| GA | Harris | Coca Lake | 3 | Developed/Lake Front | 3 | | | 3 |
| GA | Muscogee | Winall Drive | 2 | Developed | 2 | | | 2 |
| Ga | Muscogee | Beeman Court | 1 | Developed | 1 | | | 1 |
| Ga | Muscogee | Aldora Drive | 1 | Developed | 1 | | | 1 |
| AL | Lee | Smiths Walk | 39 | Under Development | | 39 | | 39 |
| | | TOTAL | 414 | | 140 | 235 | 39 | 414 |
| | | | | | | | | |
| | | | | | | | | |

Schedule 3.7 (t) Development Status of Real Property
Updated as of 11.14.19

| | | | "B" Estimated Lots | Estimated Prelim Plat Date | Prelim Plat Approved | | Seller Owned | Related Party Owned Lots | Related Party Owned By | Third Party Owned/Controlled Optioned/Contract | Third Party Name | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Updated as of 11.14.19** | | | | | | | | | | | | |
| **State** | **County** | **Subdivision** | | | | **Development Status Notes** | | | | | | |
| GA | Muscogee | Charleston Place | 43 | 12/3/2019 | Yes | Roads complete, w/ city for acceptance | 0 | 43 | Tiger Creek Dev. | | | |
| GA | Muscogee | Lexington Hills | 31 | 5/15/2020 | Yes | Civil plans in review | 0 | 31 | Cusseta Road LLC | | | |
| GA | Muscogee | Roosevelt Heights | 35 | Platted | Yes | All facilities | 0 | 35 | Tiger Creek Dev. | | | |
| AL | Lee | Southern Oaks | 57 | Platted | Yes | All facilities | 0 | 59 | Tiger Creek Dev. | | | |
| AL | Lee | Auburn Links (Links Crossing) | 69 | 8/15/2020 | Yes | Hayley as developer , 39 raw lots do not have est plat dat | 0 | 0 | | 69 | Hayley | |
| GA | Muscogee | Garrett Creek | 36 | 12/15/2019 | Yes | Power pending,  city acceptance pending | 0 | 36 | Garr Creek Dev. | | | |
| GA | Muscogee | North Ivy Park | 34 | 1/15/2020 | Yes | Sewer, storm in,  curb pending as of 11/2 | 0 | 34 | Grey Rock Dev. LLC | | | |
| GA | Muscogee | Riverbrook | 43 | 2/1/2020 | Yes | Sewer, storm in,  curb pending as of 11/2 | 0 | 43 | Sage Dev. Inc. | | | |
| GA | Muscogee | Eagle Point II | 11 | Platted | n/a | 2008 lot ready to build small pines on lot | 0 | 11 | Sage Dev inc | | | |
| GA | Muscogee | Villages at St. Marys | 8 | Platted | n/a | 2008 lot ready to build small pines on lot | 0 | 8 | Sage Dev inc | | | |
| GA | Muscogee | Pinecrest | 1 | Platted | n/a | Finished lot sewer in street, water avail. | 0 | 1 | Erickson Inv. Inc. | | | |
| GA | Harris | Coca Lake | 3 | Platted | n/a | Finishd lot, w/ water, septic tank sewer | 0 | 3 | Rose A Erickson | | | |
| GA | Muscogee | Winall Drive | 2 | Platted | n/a | Platted, no water, no sewer, but available | 0 | 2 | Tiger Creek Dev. | | | |
| Ga | Muscogee | Beeman Court | 1 | Platted | n/a | Platted, sewer on lot, w/water | 0 | 1 | Tiger Creek Dev. | | | |
| Ga | Muscogee | Aldora Drive | 1 | Platted | n/a | Platted, no water, no sewer, but available | 0 | 1 | D. Erickson | | | |
| AL | Lee | Smiths Walk | 39 | 11/20/2019 | Yes | Roads complete, w/ city for acceptance | 0 | 39 | Tiger Creek Dev. | | | |
| | | **TOTAL** | **414** | | | | **0** | **347** | | **69** | | **416** |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Schedule 3.7 (t) Development Status of Real Property
Updated as of 11.14.19

| Updated as of 11.14.19 | | | | |
|---|---|---|---|---|
| State | County | Subdivision | "B" Estimated Lots | Other information |
| GA | Muscogee | Charleston Place | 43 | |
| GA | Muscogee | Lexington Hills | 31 | |
| GA | Muscogee | Roosevelt Heights | 35 | |
| AL | Lee | Southern Oaks | 57 | |
| AL | Lee | Auburn Links (Links Crossing) | 69 | |
| GA | Muscogee | Garrett Creek | 36 | |
| GA | Muscogee | North Ivy Park | 34 | |
| GA | Muscogee | Riverbrook | 43 | |
| GA | Muscogee | Eagle Point II | 11 | *3  of lots may move to Grayhawk before close to be reviewed |
| GA | Muscogee | Villages at St. Marys | 8 | *3  of lots may move to Grayhawk before close to be reviewed |
| GA | Muscogee | Pinecrest | 1 | |
| GA | Harris | Coca Lake | 3 | |
| GA | Muscogee | Winall Drive | 2 | Platted, no road, has sewer and water avail. |
| Ga | Muscogee | Beeman Court | 1 | |
| Ga | Muscogee | Aldora Drive | 1 | |
| AL | Lee | Smiths Walk | 39 | |
| | | TOTAL | 414 | |
| | | | | |
| | | | | |

**<u>SECTION 3.7(t)</u>**
**DEVELOPMENT STATUS OF REAL PROPERTY**
**PHASE "C" LAND**

See attached.

Schedule 3.7 (t)  Development Status of Real Property
Updated as of 11.14.19

| "C" LAND | | | Estimated | | | LOT | | UNDER | |
| State | County | Subdivision | Lots | Apx acres | Status | RATING | RAW | DEVELOP | Total |
|---|---|---|---|---|---|---|---|---|---|
| GA | Muscogee | BeechNorth/Parkwest | 80 | 24 | Undeveloped | b lots | 80 | | 80 |
| GA | Muscogee | Belvedere Park | 123 | 36 | Undeveloped | b lots | 123 | | 123 |
| GA | Muscogee | Buena Vista Road | 30 | 11 | Undeveloped | b lots | 30 | | 30 |
| GA | Muscogee | Charleston Place | 62 | N/A | Undeveloped | A+ | 62 | | 62 |
| GA | Muscogee | Mckee Road | 80 | 143 | Undeveloped | ?? | 80 | | 80 |
| GA | Muscogee | Garrett Pines | 96 | 43 | Undeveloped | | 54 | 42 | 96 |
| GA | Muscogee | Lexington Hills | 29 | N/A | undeveloped | A but low end | 29 | | 29 |
| GA | Muscogee | North Ivy Park | 50 | N/A | Undeveloped | A high end' | 50 | | 50 |
| AL | Lee | Auburn Farms | 308 | 148 | Undeveloped | | 308 | | 308 |
| | | Joseph Stevens Estates | 4 | 4 | Undeveloped | | 4 | | 4 |
| AL | Lee | Southern Oaks | 54 | N/A | Undeveloped | | 54 | | 54 |
| GA | Muscogee | Hodges Drive | 12 | 2 acres townhomes | Undeveloped | | 12 | | 12 |
| GA | Muscogee | Upland Way Group/7pcs | 40 | | Undeveloped | | 40 | | 40 |
| | | Total | 968 | | | | 926 | 42 | 968 |

Schedule 3.7 (t)  Development Status of Real Property
Updated as of 11.14.19

| "C" LAND | | | Estimated | Prelim | | Related |
|---|---|---|---|---|---|---|
| **State** | **County** | **Subdivision** | **Lots** | **Plat** | **Est. Final Plat** | **Party** |
| GA | Muscogee | BeechNorth/Parkwest | 80 | No | Undefined, will start upon request | 80 |
| GA | Muscogee | Belvedere Park | 123 | No | Undefined, will start upon request | 123 |
| GA | Muscogee | Buena Vista Road | 30 | No | Undefined, will start upon request | 30 |
| GA | Muscogee | Charleston Place | 62 | Yes | Undefined, will start upon request | 62 |
| GA | Muscogee | Mckee Road | 80 | No | Undefined, will start upon request | 80 |
| GA | Muscogee | Garrett Pines | 96 | Yes | Fiirst  42  3/15/2020, others upon request | 96 |
| GA | Muscogee | Lexington Hills | 29 | Yes | Undefined, will start upon request | 29 |
| GA | Muscogee | North Ivy Park | 50 | Yes | Undefined, will start upon request | 50 |
| AL | Lee | Auburn Farms | 308 | Yes | Undefined, will start upon request | 308 |
| | | Joseph Stevens Estates | 4 | | Undefined, will start upon request | 4 |
| AL | Lee | Southern Oaks | 54 | Yes | Undefined, will start upon request | 54 |
| GA | Muscogee | Hodges Drive | 12 | No | Undefined, will start upon request | 12 |
| GA | Muscogee | Upland Way Group/7pcs | 40 | No | Undefined, will start upon request | 40 |
| | | **Total** | **968** | | | **968** |

Schedule 3.7 (t)  Development Status of Real Property
Updated as of 11.14.19

| "C" LAND | | | | | | |
|---|---|---|---|---|---|---|
| State | County | Subdivision | Estimated Lots | Related Party Owned Lots | Dev. Status Notes | |
| GA | Muscogee | BeechNorth/Parkwest | 80 | Tiger Creek Dev. | | |
| GA | Muscogee | Belvedere Park | 123 | Tiger Creek Dev. | | |
| GA | Muscogee | Buena Vista Road | 30 | Tiger Creek Dev. | | |
| GA | Muscogee | Charleston Place | 62 | Tiger Creek Dev. | In Planning | |
| GA | Muscogee | Mckee Road | 80 | D. Erickson | | |
| GA | Muscogee | Garrett Pines | 96 | Tiger Creek Dev. | | |
| GA | Muscogee | Lexington Hills | 29 | Cusseta Road LLC | In Planning | |
| GA | Muscogee | North Ivy Park | 50 | Grey Rock Dev. LLC | | |
| AL | Lee | Auburn Farms | 308 | Tiger Creek Dev. | In Permitting | |
| | | Joseph Stevens Estates | 4 | *Grayhawk Homes, Inc | Corner parcel in SW Smiths s | |
| AL | Lee | Southern Oaks | 54 | Tiger Creek Dev. | | |
| GA | Muscogee | Hodges Drive | 12 | Windsong Bon, LLC | | |
| GA | Muscogee | Upland Way Group/7pcs | 40 | Erickson Inv. Inc. | | |
| | | **Total** | **968** | | | |

**SECTION 3.7(u)**
**FLOOD HAZARDS**

**Lots owned in Flood Zone**
**As of 10/21/19**
**Garrett Creek Lakes**

**Lot**

| | | | |
|---|---|---|---|
| 3I | 7495 Coppice Drive | Midland | GA |
| 5I | 7483 Coppice Drive | Midland | GA |
| 9I | 7459 Coppice Drive | Midland | GA |
| 10I | 7453 Coppice Drive | Midland | GA |
| 14I | 7448 Coppice Drive | Midland | GA |
| 25m | 9929 Woodland Creek Ct. | Midland | GA |
| 24m | 9934 Woodland Creek Ct. | Midland | GA |
| 8j | 8156 Highlands Drive | Midland | GA |
| 10J | 8153 Highlands Drive | Midland | GA |
| 104I | 9212 Garrett Lake Drive | Midland | GA |
| 105I | 9220 Garrett Lake Drive | Midland | GA |
| 12A | 1240 Rockbridge Drive | Columbus | GA |
| 13A | 1234 Rockbridge Drive | Columbus | GA |
| 14A | 1228 Rockbridge Drive | Columbus | GA |
| 48A | 3008 Slippery Rock Ct | Columbus | GA |
| 49A | 3006 Slippery Rock Ct | Columbus | GA |
| 41K | 9726 Hollow Pine Drive | Midland | GA |
| 3FF | 9797 Yellow Pine Road | Midland | GA |
| 6D | 7284 Sorrel Drive | Columbus | GA |

**Possible Future lots in the following subdivision**
Southern Oaks
Riverbrook
Auburn Farms
Links Crossing

## SECTION 3.7(v)
## PROPERTY RESTRICTIONS

None

**SECTION 3.7(w)**
**LITIGATION**

**Pending Litigation**

1. **CASE NO: 4:17-CV-161 (LJA): FILED IN US DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA – COLUMBUS DIVISION Fair Labor Standards Act ("FLSA") allegation.** *Michael Sizemore, et al (Plaintiffs) vs. Grayhawk Homes, Inc. (Defendant)*.   Mr. Sizemore and 7 or 8 former Grayhawk Homes, Inc. superintendents is claiming defendant unfairly classified their work as supervisory when they allege they were hourly with no authority.   Also claiming defendant incorrectly failed to keep hourly records of their time because of misclassification.   Claim is for unpaid overtime plus damages.   Case still pending in discovery.   Mediation session is scheduled for late November. Likely exposure is anticipated to be attorney fees plus settlement.

2. **Case: Bill Addison Non-compete case.** *Bill Addison vs. Grayhawk Homes Inc.*. Mr. Addison was a production manager for Grayhawk Homes, Inc. during which he executed a non-compete agreement restricting his employment for two years.   Mr. Addison left Grayhawk Homes, Inc. and subsequently went to work for America's Home Place as a General Manager.   Grayhawk Homes, Inc. is currently appealing a summary judgement in favor of Mr. Addison.   *Likely Exposure*: Attorney Fees plus settlement costs.

3. **Case: Michael Cameron Sizemore non-compete case.** *Grayhawk Homes vs. Michael Cameron Sizemore*.   Mr. Sizemore left Grayhawk Homes, Inc. and subsequently went to work with Hughston Homes, which Grayhawk Homes, Inc. claims is a violation of his non-compete agreement.   Grayhawk Homes, Inc. also claims that Hughston Homes induced Mr. Sizemore to leave with the promise of court cost assistance.   Case is pending. *Likely Exposure*: Attorney Fees plus settlement costs.

4. **Case: Randy Rogers non-compete case.** *Grayhawk Homes, Inc. vs. Rogers*.   Mr. Rogers left Grayhawk Homes, Inc. to subsequently work for Addison at America's Home Place.   Mr. Rogers non-compete case is pending.   Mr. Rogers has also joined the FLSA case listed under item 1 above.   *Likely Exposure*: Attorney Fees plus settlement costs.

5. **CASE NO:  SU-19-CV-1441; Filed on May 31, 2019 IN THE SUPERIOR COURT OF MUSCOGEE COUNTY, STATE OF GEORGIA Ragland easement disagreement.** *Tiger Creek Development, Inc. vs. David Ragland*.   Lot that is the subject of this litigation has been transferred to Grayhawk Homes, Inc.   Mr. Ragland is entitled to a 30' easement across his property but has not, to date, acknowledged a definitive location to the easement be defined, thus preventing successor owners from

building a permanent structure without Mr. Ragland claiming his easement is underneath the building.   Case is scheduled for a court hearing on November 21, 2019.   *Likely Exposure*: Attorney Fees only.

6. **CASE NO:  SU-19-CV-2509; Filed on May 31, 2019 IN THE SUPERIOR COURT OF MUSCOGEE COUNTY, STATE OF GEORGIA Vincent retaining wall.** *Andrea Vincent (Plaintiff) vs. Grayhawk Homes, Inc. (Defendant)*.   Ms. Vincent purchased a completed speculative house which had a 4-foot retaining wall in the back yard to provide a more level yard from the wall for the house.   After closing, Ms. Vincent claimed the wall was defective because it was not plumb and has filed a negligent construction suit.   Coverage has been accepted by insurance and the case is pending. *Likely exposure*: Insurance deductible only.

**Threatened or Potential Litigation**

7. *Grayhawk Homes vs. Bryant Lake HOA* – **Bryant Lake unjust lien case**. This case has not been filed in court.   There is an escrow for $ 5,000 with an attorney in LaGrange, Georgia, which is the disputed amount.   HOA was being represented by a realtor, who placed a lien on a Grayhawk Homes, Inc. lot using the HOA authority for debris on lots. HOA is claiming damage to a lot owned by the realtor.   *Likely Exposure*: Attorney Fees only.

## **SECTION 3.7(ee)**
## **AGREEMENT TO PAY COSTS**

None

**SECTION 3.7(ff)**
**PERMITTED LIENS; BINDING AGREEMENTS**

None

## SECTION 3.8(a)
## INTELLECTUAL PROPERTY

(i) Registered trademarks, service marks, tradenames:  None

Domain names owned by Grayhawk Homes, Inc.:

| Go Daddy Domain Names: | Expiration Date |
|---|---|
| AUBURNALCUSTOMHOMEBUILDER.COM | 2021-05-03  UTC |
| AUBURNALHOMEBUILDER.COM | 2021-05-03  UTC |
| COLUMBUSGAHOMEBUILDER.COM | 2020-08-23  UTC |
| CUSTOMHOMESCOLUMBUSGA.COM | 2020-08-23  UTC |
| GRAYHAWK-HOMES.COM | 2019-11-30  UTC |
| GRAYHAWKCUSTOMHOMES.COM | 2021-02-07  UTC |
| GRAYHAWKHOMESAL.COM | 2019-11-30  UTC |
| GRAYHAWKHOMESCOLUMBUS.COM | 2019-11-30  UTC |
| GRAYHAWKHOMESFTBENNING.COM | 2019-11-30  UTC |
| GRAYHAWKHOMESGA.COM | 2019-11-30  UTC |
| GRAYHAWKHOMESINC.COM | 2023-11-30  UTC |
| GRAYHAWKHOMESINC.NET | 2019-11-30  UTC |
| GREYHAWKHOMESINC.COM | 2019-11-30  UTC |
| GREYHAWKHOMESINC.NET | 2019-11-30  UTC |
| HOMEBUILDERAUBURNAL.COM | 2021-05-03  UTC |
| HOMESTEADAUBURN.COM | 2021-06-10  UTC |
| HOMESTEADRES.COM | 2021-05-03  UTC |
| HOMESTEADRESIDENTIALHOMES.COM | 2021-05-03  UTC |
| HOMESTEADRESIDENTIALINC.COM | 2021-05-03  UTC |
| HOMESTEADRESIDENTIALUS.COM | 2021-05-03  UTC |
| WHYGRAYHAWK.COM | 2021-03-26  UTC |

## SECTION 3.8(a)
## INTELLECTUAL PROPERTY

Social Media Accounts:

**GRAYHAWK**
**Social Medias**

| Platform | Username |
|---|---|
| Facebook (Dave's) | dave@grayhawkhomesinc.com |
| Facebook Page (Columbus) | @GrayhawkHomes |
| Instagram: Grayhawk (Columbus) | @GrayhawkHomes |
| LinkedIn | n/a |
| YouTube | grayhawkhomes@gmail.com |
| Pinterest: Grayhawk (Columbus) | gary@raerealty.net |
| Twitter: Grayhawk (Columbus) | @grayhawkhomes |
| Yelp: Grayhawk (Columbus) | jlynch@grayhawkhomesinc.com |
| | |
| Facebook Page (Homestead) | @HomesteadAuburn |
| Instagram: Homestead | @HomesteadResidential |
| Pinterest: Homestead | kclouser@grayhawkhomesinc.com |

(ii)  Patents and pending patent applications:   None

(iii) Registered copyrights and pending applications to register copyrights:   See attached.

| Copyright Name | Filing Number | Registration Number |
|---|---|---|
| Aberdeen | 1-7978549797 | VA0001660892 |
| Alder | 1-7979238398 | VAu1-371-080 |
| Arbor | 1-7979238498 | VAu1-371-305 |
| Ashton | 1-7979238722 | VAu1-371-080 |
| Aspen | 1-7979238873 | Vau1-371-303 |
| Bailey | 1-797239110 | VAu1-371-375 |
| Bailey | | VAu001117485 |
| Bartlett | 1-7979270259 | Vau1-371-309 |
| Baywood | 1-7979270350 | Vau1-371-310 |
| Bedford | 1-7979270410 | VAu1-371-493 |
| Bedford | | VA0001660889 |
| Big Creek  -  Elevation C | 1-7979270470 | VAu001027112 |
| Birch | 1-7979270568 | VAu1-371-311 |
| Bonsai | 1-8015655082 | |
| Boston | 1-7979270658 | VAu1-371-313 |
| Boston II | 1-8015655120 | |
| Bradford | | VA0001660135 |
| Brentwood | 1-7979270715 | VAu1-371-321 |
| Brighton - Elevation A; Brighton - Elevation B; Brighton - Elevation C; Brighton - Elevation D | | VAu001027006 |
| Buckeye | 1-7979270755 | VAu1-371-316 |
| Cambridge | | VA0001669270 |
| Canterbury | | VAu001027029 |
| Canterbury | | VAu001027028 |
| Carolina - Elevation C | | VAu001033819 |
| Carolina with Bonus - Elevation C | | VAu001027014 |
| Cardinal | 1-8018789622 | |
| Charleston | 1-7979270794 | VAu1-371-502 |
| Chestnut | 1-7979270833 | VAu1-371-504 |
| Coventry | 1-7979270872 | VAu1-371-635 |
| Derby | 1-7979270951 | VA0001660121 |
| Derby II | 1-8015655179 | |
| Devon | 1-7979271029 | VA0001660885 |
| Devon II | 1-8015655218 | |
| Dudley | 1-8015759317 | |
| Elmwood | 1-7979271066 | VAu1-371-515 |
| Exeter - Elevation D | | VAu001026994 |
| Gable - Elevation C Gable - Elevation D Gable - Elevation E Gable - Elevation F Gable - Elevation G Gable - Elevation H | | VAu001027115 |

| Copyright Name | Filing Number | Registration Number |
|---|---|---|
| Grayrock - Elevation C Grayrock - Elevation D Grayrock - Elevation E Grayrock - Elevation F Grayrock - Elevation G Grayrock - Elevation H. | | VAu001026223 |
| Grouse | 1-8018789795 | |
| Grouse | 1-8018789795 | |
| Hampton | 1-7987368422 | VAu1-371-888 |
| Hampton - Elevation D | | VAu001027113 |
| Harrisburg | | |
| Hawthorne | 1-7987368461 | VAu1-371-748 |
| Hazlenut | 1-8015759364 | |
| Holley Brooke | 1-8015759401 | |
| Jasmine | 1-79787368501 | VAu001371738 |
| Kent | | VA0001660891 |
| Kingsbridge - Elevation E | | VAu001059723 |
| Kingsbridge - Elevation H | | VAu001058193 |
| Kodiak | 1-7987368540 | VAu1-371-722 |
| Laurel | 1-7987368580 | VAu1-371-752 |
| Longleaf | 1-7987368620 | VAu1-371-701 |
| Manchester | | VA0001660132 |
| Magnolia | 1-8015759490 | |
| Maryland | 1-7987368659 | VAu1-371-711 |
| Meade | 1-015759529 | |
| Meadow Creek | 1-7987368810 | VAu1-371-891 |
| Meadow Creek | | VAu001027024 |
| Mimoda | 1-8015759568 | |
| Montana | 1-7987368849 | VAu1-371-717 |
| Montrose | | VA0001669347 |
| Myrtle | | |
| Nottingham | 1-7987368889 | VAu1-371-894 |
| Nottingham | | VAu001054668 |
| Olive | 1-8015759607 | |
| Orile | 1-8018789924 | |
| Oriole | 1-8018789924 | |
| Osprey | 1-8018790023 | |
| Osprey | 1-8018790023 | |
| Oxford | | VA0001660306 |
| Poplar | 1-7987368928 | VAu1-371-720 |
| Prescott | | VA0001660126 |
| River Oak | 1-7987368967 | VAu1-371-718 |
| Rockwood - Elevation C | | VAu001026996 |
| Sandhurst | 1-7987369006 | VAu1-371-897 |
| Sandhurst | | VA0001660130 |
| Sandpiper | 1-8018790163 | |
| Sandpiper | 1-8018790163 | |
| Santa Fe - Elevation C | | VAu001026999 |

| Copyright Name | Filing Number | Registration Number |
|---|---|---|
| Sequoia - Elevation C | | VAu001027001 |
| Silverado - Elevation C | | VAu001027011 |
| Somerset | | VA0001669096 |
| Spruce | 1-7987369043 | VAu1-371-759 |
| St. Ives | | VA0001669353 |
| Stratford - Elevation H | | VAu001059720 |
| Sycamore | 1-7987369082 | Vau1-371-683 |
| Timberline | 1-8015759656 | |
| Truett | 1-7987369121 | VAu1-371-756 |
| Virginia - Elevation C | | VAu001026995 |
| Wakefield | | VAu001117482 |
| Walnt | 1-8015759693 | |
| Warbler | 1-8018790241 | |
| Warbler | 1-8018790241 | |
| Wellington | 1-7987369160 | VAu1-371-734 |
| Willow | 1-7987369199 | Vau1-371-700 |
| Windsor | | VA0001660843 |
| Wren | 1-8018815420 | |
| Wren | 1-8018815420 | |
| York - Elevation A; York - Elevation B; York - Elevation C; York - Elevation D; York - Elevation E; York - Elevation F | | VAu001027016 |

**SECTION 3.8(b)**
**INTELLECTUAL PROPERTY**

AutoCAD

Sage – Timberline

Builder  MT

### SECTION 3.9(a)
### PROPRIETARY / CUSTOM SOFTWARE

None

## SECTION 3.10(a)
## MATERIAL CONTRACTS

Section 0 of this Seller Disclosure Letter sets forth a complete and accurate list as of the date of this Agreement of the following contracts, agreements, commitments, arrangements or understandings of any kind, whether written or oral, to which a Seller is a party or by which a Seller or any of its assets is bound (collectively, the "Material Contracts"):

(i)     **any Real Property Lease or Third Party Lease and any agreement (or group of related agreements) for the lease of personal property from or to third parties providing for lease payments in excess of $25,000 per year;**

1. Lease between Landlord and Tenant, dated as of January 1, 2019.

(ii)    **any Takedown Contract;**

None

(iii)   **any agreement (or group of related agreements) for the purchase, sale or license of products by a Seller or for the furnishing or receipt of services by a Seller or client referrals to a Seller which involves a contractual value of more than $25,000 (based on projections set forth under such agreement);**

a) *Sales Contracts*: See Schedule 1.1(k) for listing
b) Development commitment between Grayhawk Homes Inc. and Jess House, dated November 8, 2019.
c) Development commitment between Grayhawk Homes. Inc. and Ellen Reeves dated November 8, 2019
d) Open Purchase orders – See Schedule 1.1(k) for listing
e) Vendor and Subcontractor Contracts
   1. 84 Lumber GH-HR
   2. A One Blinds GH-HR
   3. ABS Southeast GH-HR
   4. ACA Plumbing and Services, LLC GH-HR
   5. Air Controllers Heating and Air GH-HR
   6. Alex Vilchez Masonry GH-HR
   7. Alexander Contracting Company, Inc.
   8. Alexander Electric Company. GH-HR
   9. All Seasons Exteriors, LLC GH-HR
   10. All Terrain Grading & Septic
   11. AM Construction Services, LLC
   12. American Carpet Care
   13. Argos Ready Mix
   14. Atlanta Glass and Mirror GH-HR

15. Atlanta West Carpets GH-HR
16. Benton Clearing and Grading
17. Bernard Whitehurst dba BW Construction
18. BLDG & Earth Sciences
19. Blind Ambitions
20. BLV Concrete GH-HR
21. Botello Concrete GH-HR
22. Brand Vaughen Lumber GH-HR
23. Bruce Perry Construction
24. Builders First Source GH-HR
25. Carbajal Painting GH-HR
26. Cardens Tree Lawn Service
27. Carter Lumber GH-HR
28. Champion Water Systems, Inc.
29. Charles Brown Plumbing Co.
30. Cherokee Pumping GH-HR
31. Consolidated Pipe & Supply GH-HR
32. Criterium-Sollie Engineers GH-HR
33. Cumberland Materials GH-HR
34. David Layne Trucking GH-HR
35. Donaldson Backhoe & Septic
36. Dupree Plumbing Company, Inc.
37. Eagle Concrete Pumping GH-HR
38. ECA Painting GH-HR
39. Eddie Brown Grading
40. Elite Flooring GH-HR
41. EMC Engineering Services, Inc.
42. Fairburn Ready Mix GH-HR
43. Fantastic Cleaning GH-HR
44. Ferguson GH-HR
45. Fuentes Trim
46. G&M Construction, LLC
47. G&M Elite Carpentry
48. Garcia Bros Concrete GH-HR
49. Geotechnical & Environmental GH-HR
50. Giovani's Framing
51. GM Painting Services
52. Gordy Construction Company
53. Grassroots
54. Guillen Construction GH-HR
55. Haas Builders
56. Hamilton Masonry GH-HR
57. HD Supply- White Cap Construction
58. HLE Solutions GH-HR
59. Hobbs Smith & Assoc.
60. Hunters Drywall GH-HR

61. Imperial Mailbox Systems GH-HR
62. Installed Building Products GH-HR
63. Intown Designs
64. James Renfroe dba Renfroe Grading Contractor
65. K&J Remodeling GH-HR
66. Kirkland Lawn Service GH-HR
67. Livingston Excavation
68. Lucas Soil Evaluation
69. Martha Jo Pierce dba JNC Cleaning Service
70. Martinez Construction GH-HR
71. Master Plumbing
72. Matthews Concrete
73. Mayer Electric GH-HR
74. McBride-McGill
75. Medina Drywall & Painting GH-HR
76. Mendez Concrete
77. Meridian Brick GH-HR
78. Milgen Masonry GH-HR
79. Millwork Supply Company GH-HR
80. Nelson's Quality Roofing GH-HR
81. Nicole Nelson dba Professional Touch Cleaning
82. NM Construction Group
83. Northwest Exterminating GH-HR
84. Oconee Concrete GH-HR
85. P Five P Eleven Services
86. Precision Framing GH-HR
87. Precision Surveying GH-HR
88. R&R Sprinkler Service GH-HR
89. Red Hill Construction Service GH-HR
90. Rincon Concrete
91. River City Door
92. Rusco Plumbing GH-HR
93. SDD Construction GH-HR
94. Southeastern Energy Consultants GH-HR
95. Southern Tub Refinishing GH-HR
96. SRS Distributing dba Advanced Building Products
97. Stahlco Pumping GH-HR
98. Stonetop GH-HR
99. Suarez Framing
100. T. Marshall Paving Company
101. The Tub Master
102. Thompson Carriers GH-HR
103. Tony McGhee
104. Top Quality Drywall
105. Twin Oaks Environmental GH-HR
106. Ultimate Landscaping GH-HR

107.        Velasquez Fernando dba Drywall Finish
108.        Vertical Construction Group, LLC
109.        Wheelers Grading & Septic Tank GH-HR
110.        Woodwork Creations GH-HR
111.        Yard Accents GH-HR

       **(iv)** **any agreement concerning the establishment or operation of a partnership, joint venture, or limited liability company**

       1. None

       **(v)** **any agreement (or group of related agreements) under which a Seller has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) Indebtedness in excess of $50,000 (including capitalized lease obligations or capital expenditures);**

       1. Promissory Note between Grayhawk Homes, Inc and Southern States Bank, dated November 28, 2017 and renewed on January 3, 2019.
       2. Construction Loan Agreement and Credit Agreement between Grayhawk Homes, Inc. and Calumet Bank, dated November 5, 2018
       3. Amended and restated promissory note dated August 1, 2017 between Grayhawk Homes Inc. and Rainier Capital, LLC
       4. Amended and restated promissory noted dated August 30, 2017 between Homestead Residential, Inc. and Rainier Capital, LLC

All of the above have been or will be resolved by Closing with the exception of Southern States Bank.

       **(vi)** **any agreement for the disposition of any significant portion of the assets of a Seller or the Business (other than sales of Housing Units in the Ordinary Course of Business) or any agreement for the acquisition of the assets or business of any other entity (other than purchases of inventory in the Ordinary Course of Business);**

       1. None

       **(vii)** **any currently effective contract for the employment or engagement of any executive officer, employee, or other individual on an employment, consulting, or independent contractor basis that (A) is not terminable at will (for any lawful reason or for no reason) without penalty, severance obligation, notice, or other liability or (B) provides for the payment or acceleration of payment of cash or other compensation or payment or acceleration of any other benefits under any compensation or benefit plan, program, or agreement, upon the consummation of the transactions contemplated by this Agreement;**

1. None – All employees are employed at will

(viii)   **any currently effective contract for any bonus, incentive, commission, pension, profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, change-in-control, hospitalization, insurance, or other material plan or arrangement for the benefit of a Seller's current or former directors, officers, employees, or independent contractors;**

1. Bonus estimate based on 2019 revenues and profit projection amount of $ 60,000 as 11/14/19 for Amy Allen; Bonus estimate based on 1 ½% of net income over $ 5 million for Katherine Long in the amounts of $ 80,000.   Note that Steve Wasdin is no longer employed and therefore no bonus amount owed. These amounts are subject to MOU signed at Closing.

(ix)   **any agreement that grants any exclusive marketing, distribution, Intellectual Property, or other similar rights to any third party or otherwise purports to prohibit or limit, in any material respect, the right of a Seller or any of its Affiliates (including, in accordance with the terms of the contracts in effect on the date hereof, Buyer or any of its Affiliates after the Effective Time) to make, sell, market, advertise or distribute any products or services or use, transfer, license, distribute or enforce any of Seller's Intellectual Property;**

1. None

(x)   **any agreement containing exclusivity, non-compete or non-solicitation provision or that otherwise purports to limit in any material respect either the type of business or the geographic area in which a Seller or any Affiliates of such Seller (including, in accordance with the terms of the contracts in effect on the date hereof, Buyer or any of its Affiliates after the Closing Date) may engage in business;**

1. None

(xi)   **any agreement that grants a third party "most favored nation" status or purports to require a Seller or any of its Affiliates (including, in accordance with the terms of the contracts in effect on the date hereof, Buyer or any of its Affiliates after the Effective Time) to offer a third party the same or better price for a product or service if a Seller or such Affiliate offers a lower price for the same product or service to another third party;**

1. None

(xii)   **each agreement under which a Seller has advanced or loaned any other Person outstanding amounts in the aggregate for such Person exceeding $10,000;**

1. None

(xiii)   **each outstanding power of attorney with respect to a Seller;**

(1)      None

(xiv)   **each agreement that calls for performance over a period of more than three (3) months (other than those that are terminable at will or upon not more than 30-days' notice by a Seller without any liability or other obligation to such Seller), except for contracts for the sale of Housing Units in the Ordinary Course of Business and that conform to a Seller's standard form contract (as provided to Buyer prior to the date hereof);**

1. None

(xv)   **any development agreement with any Governmental Authority;**

1. None

(xvi)   **any agreement related to the Real Property or other real property granting a Seller a direct or indirect right of first offer or right of first refusal or where a Seller has granted such rights to a third party;**

1. None

(xvii)   **any contract of surety, guarantee or indemnity;**

1. Release for Guarantee related to Fifth Amendment to Loan Agreement between Grayhawk Homes, Inc, Grayhawk Homes of Atlanta, Inc. Grayhawk Townhomes, Inc, Homestead Residential Inc. and Grayhawk Homes of South Caroline, Inc and Texas Capital Bank dated September 5, 2018 (effective August 31, 2018), expected 15 days after Closing.
2. Release for Guarantee, between Grayhawk Homes, Inc and Calumet Bank, dated November 5, 2018, expected 15 days after Closing.
3. Guarantee from David Erickson, related to Promissory Note between Grayhawk Homes, Inc and Southern States Bank, dated January 3, 2019.

(xviii)   **any contract requiring or related to any Business Collateral;**

1. Construction Loan Agreement between Grayhawk Homes, Inc. and Calumet Bank, dated November 5, 2018. To be released within 15 days of Closing.

2. Promissory Note between Grayhawk Homes, Inc and Southern States Bank, dated January 3, 2019.   To be released within 15 days of Closing.

(xix)   **all contracts providing payment to or by any Person or entity based upon the sales, purchases or profits, other than direct payments for goods and services;**

1. Rebate Agreements
   a) BC Advantage Builder
   b) Certainteed
   c) Delta Faucet
   d) Hardie Extension
   e) Maxim Lighting
   f) Natural Gas – Donahue Ridge
   g) Natural Gas – Links Crossing
   h) Ox Engineered Products, LLC
   i) Shaw Flooring  Program
   j) Sherwin Williams
   k) Weyerhaeuser – Col Auburn Market
   l) Weyerhaeuser – SC Market

(xx)   **any agreement with any contractor, subcontractor or other materialmen in connection with any work completed that remains unpaid or that has other obligations, covenants, indemnifications, representations or warranties which remain effective, being completed, or to be completed related to the Real Property; and**

1. See Section 3.10(a)(iii) of this Seller Disclosure Letter.

(xxi)   **any other agreements that are material to a Seller or the Business and not otherwise disclosed pursuant to this Section 3.10(a).**

1. The Assigned Contracts listed in Schedule 1.1(k) of the Agreement are incorporated  by reference.

## SECTION 3.11
## VENDORS AND SUPPLIERS

### 3.11 – 2018 PURCHASES FROM VENDORS >$50K

| Description | 2018 Purchases | Type |
|---|---|---|
| 84 Lumber Company | 2,690,710.50 | Supplier |
| All Seasons Exteriors, LLC. | 2,202,819.10 | Subcontractor |
| Elite Flooring & Design Inc. | 1,743,747.42 | Supplier |
| FERGUSON ENT., INC. | 1,298,817.07 | Supplier |
| Oconee Concrete Company, Inc. | 1,250,384.53 | Supplier |
| Alexander Electric Company, Inc. | 1,212,240.34 | Supplier |
| Air Controllers Heating & Cool | 1,160,339.23 | Subcontractor |
| GH Services Inc | 1,101,843.72 | Other |
| RAINIER CAPITAL | 1,000,000.00 | Other |
| RAINIER CAPITAL-INT ONLY | 953,690.00 | Other |
| Nelson's Quality Roofing LLC | 943,220.60 | Subcontractor |
| Millwork Supply Co Inc. | 918,612.62 | Subcontractor |
| Dupree Plumbing Company, Inc. | 669,990.02 | Subcontractor |
| StoneTop, Inc. | 595,835.03 | Subcontractor |
| Builders Firstsource-SE Group | 577,969.19 | Supplier |
| Atlanta West Carpets, Inc. | 558,905.23 | Subcontractor |
| REW CUMBERLAND MATERIALS, INC. | 557,386.45 | Supplier |
| Medina Drywall & Painting Inc. | 489,098.52 | Subcontractor |
| Rusco Plumbing Company | 469,955.00 | Subcontractor |
| Suarez Framing, LLC. | 467,880.65 | Subcontractor |
| SRS Roofing Supply | 465,687.44 | Supplier |
| Alex Vilchiz Masonry | 363,357.67 | Subcontractor |
| Matthews Concrete | 356,167.20 | Subcontractor |
| Grassroots | 355,126.03 | |

| | | Subcontractor |
|---|---|---|
| Meridian Brick & Masonry | 353,773.79 | Supplier |
| SDD Construction LLC | 313,437.29 | Subcontractor |
| Containers by Reaves, LLC. | 292,108.75 | Other |
| Garrett Creek Development | 288,000.00 | Other |
| All Terrain Grading & Septic | 276,127.50 | Subcontractor |
| Southern States Bank | 275,914.18 | Other |
| Southern States Bank | 275,914.18 | Supplier |
| Ultimate Landscaping | 274,871.50 | Subcontractor |
| Builders FirstSource Auburn | 247,629.65 | Supplier |
| Brand Vaughan Lumber Co. Inc. | 201,445.18 | Supplier |
| Atlanta Glass & Mirror | 186,674.51 | Subcontractor |
| EDDIE BROWN GRADING, LLC | 181,150.82 | Subcontractor |
| Guillen Construction | 176,762.47 | Subcontractor |
| Danny's Drywall LLC | 165,350.48 | Subcontractor |
| TIGER CREEK DEV | 162,750.00 | Other |
| Wheeler's Grading & Septic | 152,677.51 | Subcontractor |
| River City Door Company | 141,315.00 | Subcontractor |
| Fantastic Cleaning LLC | 136,603.38 | Subcontractor |
| Haas Builders LLC | 121,293.66 | Subcontractor |
| Columbus Quarry, LLC | 121,242.10 | Supplier |
| COLUMBUS CONSOLIDATED GOV'T | 120,915.84 | Other |
| Innovative Home Center | 118,988.04 | Subcontractor |
| DAVID LAYNE TRUCKING,LLC | 114,698.75 | Subcontractor |
| Hunters Drywall, LLC | 111,582.92 | Subcontractor |
| EMC INSURANCE COMPANIES | 109,517.65 | Other |
| Calumet Bank | 103,641.08 | Other |
| WOODWORK CREATIONS, LLC | 102,589.25 | Subcontractor |
| AUBURN WATER WORKS | 96,590.27 | Other |

| | | |
|---|---|---|
| Homestead Residential Inc | 92,068.92 | Other |
| MUSCOGEE COUNTY TAX | 75,947.48 | Other |
| Texas Capital Bank | 73,690.25 | Other |
| Long Grove Capital | 72,988.01 | Other |
| HUMANA EMP HP GEORGIA | 72,742.36 | Other |
| K & J Remodeling Inc | 72,652.00 | Subcontractor |
| GM Painting Services LLC | 66,839.53 | Subcontractor |
| Mendez Concrete Inc | 66,148.95 | Subcontractor |
| ECA PAINTING LLC | 64,510.10 | Subcontractor |
| CITY OF AUBURN | 63,648.30 | Other |
| Rincon Concrete Inc | 60,990.25 | Subcontractor |
| Grayhawk Homes of Iowa | 57,474.52 | Other |
| Tony McGhee | 53,316.60 | Subcontractor |
| Blind Ambitions LLC | 53,260.00 | Subcontractor |
| COLUMBUS WATER WORKS | 52,403.15 | Other |
| Intown Design Inc | 51,976.00 | Subcontractor |
| Keystone Concrete Foundations | 50,047.65 | Subcontractor |
| ABS Southeast, LLC. | 50,034.10 | Subcontractor |

Material increase in the price (excluding normal price fluctuations in the Ordinary Course of Business), quality and delivery terms and conditions on which such supplier or vendor will continue to make delivery of its products, nor has such a material change occurred since 12/31/2018.

## SECTION 3.12
## INSURANCE

| TYPE OF INSURANCE | LIMITS OF LIABILITY | CARRIER | POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE | PREMIUM |
|---|---|---|---|---|---|---|
| **Schedule 1.2 (j) (ii) Specified Excluded Contracts - Company Insurance** | | | | | | |
| **Insurance Information** | | | | | | |
| **Updated as of 11.06.19** | | | | | | |
| | | | | | | |
| | | | | | | |
| *General Liability* | $2,000,000  General Aggregate Limit | Employers Mutual Casualty Company | 4D9-03-03-20 | 3/24/2019 | 3/24/2020 | $   122,125.00 |
| *Greyhawk* | $1,000,000 Per Occurrence Limit | | | | | |
| | $1,000,000 Personal & Advertising Injury Limit | | | | | |
| | $500,000 Damage to Premises Rented to You | | | | | |
| | $10,000 Medical Expense Limit | | | | | |
| | | | | | | |
| | | | | | | |
| *General Liability* | $2,000,000  General Aggregate Limit | Employers Mutual Casualty Company | 4D9-46-41-20 | 3/24/2019 | 3/24/2020 | $   25,257.00 |
| *Homestead* | $1,000,000 Per Occurrence Limit | | | | | |
| | $1,000,000 Personal & Advertising Injury Limit | | | | | |
| | $500,000 Damage to Premises Rented to You | | | | | |
| | $10,000 Medical Expense Limit | | | | | |
| | | | | | | |
| | | | | | | |
| *Commerical Property* | $83,175 Personal Property of Business | Employers Mutual Casualty Company | 4A9-03-03-20 | 3/24/2019 | 3/24/2020 | $     805.00 |
| *Greyhawk* | $500 Deductible per Occurrence | | | | | |
| | | | | | | |
| | | | | | | |
| *Commerical Property* | $10,824 Personal Property of Business | Employers Mutual Casualty Company | 4A9-46-41-20 | 3/24/2019 | 3/24/2020 | $     269.00 |
| *Homestead* | $500 Deductible per Occurrence | | | | | |
| | | | | | | |
| | | | | | | |
| *Cybersolutions Declarations* | $335,000 Annual Aggregate | Employers Mutual Casualty Company | 4Q9-03-03-20 | 3/24/2019 | 3/24/2020 | $     109.00 |
| *Greyhawk* | | | | | | |
| | | | | | | |
| | | | | | | |
| *Business Auto* | $1,000,000 Covered Auto Liability | Employers Mutual Casualty Company | 4E9-03-03 | 3/24/2019 | 3/24/2020 | $    3,880.00 |
| *Greyhawk* | $5,000 Auto Medical Payments/ 2 covered | | | | | |
| | Uninsured and Underinsured Motorists | | | | | |
| | | | | | | |
| | | | | | | |
| *Business Auto* | $1,000,000 Covered Auto Liability | Employers Mutual Casualty Company | 4E9-46-41-20 | 3/24/2019 | 3/24/2020 | $     500.00 |
| *Homestead* | | | | | | |
| | | | | | | |
| | | | | | | |
| *Commerical Inland Marine* | $50,000 at any one residential jobsite | Great American Insurance Group | IMP 1049793 03 00 | 3/24/2019 | 3/24/2020 | $   40,755.00 |
| *Greyhawk* | $50,000 at any one "temporary" scaffolding and construction forms | | | | | |
| | $50,000 while in transit | | | | | |
| | $5,000,000 in any one "loss" including Optional Coverages | | | | | |
| | | | | | | |
| | | | | | | |
| *Commerical Inland Marine* | $500 Deductible | Employers Mutual Casualty Company | 4C9-46-41-20 | 03/24/19 | 3/24/2020 | $     165.00 |

**<u>SECTION 3.13</u>**
**LITIGATION**

<u>Section 3.7(w)</u> of this Seller Disclosure Letter is incorporated by reference.

## <u>SECTION 3.14(b)</u>

## VIOLATIONS OF ENVIRONMENTAL LAW

None

**SECTION 3.14(e)**
**ENVIRONMENTAL AUDIT, COMPLIANCE, COMMUNICATION**

None

## <u>SECTION 3.15(a)</u>
## EMPLOYEE BENEFIT PLANS

1. AFLAC
2. Humana:
    a. Dental
    b. Life- All employees provided with $10,000 life insurance policy
    c. Medical
    d. Vision

**<u>SECTION 3.15(g)</u>**
**COMPENSATORY AGREEMENT**

None

**<u>SECTION 3.15(m)</u>**
**EMPLOYEES ON COBRA**

None

## SECTION 3.16(b)
## ASSIGNED PERMITS

**Building permits**

See attached summary.

**Subdivisions requiring septic permits:**
1. Rocky Ridge
2. Shendoah Farms
3. Hornet Flats
4. Deerwood
5. Macon Road Lots
6. Ridgewood Estates
7. Autmon Park
8. Layfield Estates

Septic permits

- SEPTIC PERMIT - 1 Layfield Estates
- Septic Permit - 1A DW - Poplar Euro
- SEPTIC PERMIT - 2 Layfield Estates
- Septic Permit - 2 RR - Willow Euro
- SEPTIC PERMIT - 3 Layfield Estates
- Septic Permit - 3 RR - Hazelnut Tradl
- SEPTIC PERMIT - 4 LE
- SEPTIC PERMIT - 5 LE
- SEPTIC PERMIT - 6 LE
- SEPTIC PERMIT - 9A DW
- Septic Permit - 12 RR - Aspen
- Septic Permit - 14 HF - Devon II Euro
- Septic Permit - 16 HF - Derby II Tradl
- Septic Permit - 17 HF - Devon II Euro
- Septic Permit - 18 HF - Derby II Craftsman
- SEPTIC PERMIT - 19A DW
- SEPTIC PERMIT - 27 RR - Devon
- SEPTIC PERMIT - 40 RR - Holley Brooke Trad...
- SEPTIC PERMIT - 41 RR - Laurel Traditional
- SEPTIC PERMIT - 57 RR - Chestnut Craftsman
- Septic Permit - 104 MKE
- Septic Permit - 105 MKR - Hazelnut
- SPL 71 Septic Permit

**SELLER DISCLOSURE CHECKLIST**
**ITEM 3.16(B) – LIST OF PERMITS**
**NOVEMBER 14, 2019**

| St | Lot ID | Description | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Status |
|----|--------|-------------|-------------|------------------|-----------------|---------------|-------------|--------|
| AL | WT-00125 | Lot 125 Willow Trace | 4/23/19 | 5/3/19 | 5/13/19 | 2019576 | 6/4/19 | WIP |
| AL | WT-00126 | Lot 126 Willow Trace | 5/15/19 | 5/21/19 | 5/31/19 | 2019655 | 6/4/19 | WIP |
| AL | WT-00095 | Lot 95 Willow Trace | | | 11/21/18 | 20181514 | | WIP |
| AL | WT-00072 | Lot 72 Willow Trace | 12/28/19 | 12/18/18 | 12/20/19 | 20181621 | 12/28/18 | WIP |
| AL | WT-00133 | Lot 133 Willow Trace | 8/13/19 | 8/14/19 | 8/16/19 | 20191057 | 8/20/19 | WIP |
| AL | WT-00135 | Lot 135 Willow Trace | 8/15/19 | 8/16/19 | 8/20/19 | 20191067 | 8/22/19 | WIP |
| AL | WT-00134 | Lot 134 Willow Trace | 8/16/19 | 8/16/19 | 8/20/19 | 20191068 | 8/22/19 | WIP |
| AL | WT-00136 | Lot 136 Willow Trace | 8/15/19 | 8/21/19 | 8/26/19 | 20191100 | 8/26/19 | WIP |
| AL | WT-00137 | Lot 137 Willow Trace | 8/23/19 | 8/26/19 | 8/27/19 | 20191104 | 8/30/19 | WIP |
| AL | WT-00100 | LOT 100 WILLOW TRACE | 9/23/19 | 10/1/19 | 10/8/19 | 20191267 | 1/0/00 | Lot |
| AL | WT-00103 | LOT 103 WILLOW TRACE | 9/23/19 | 10/9/19 | 10/24/19 | 20191353 | 1/0/00 | Lot |
| AL | RR-00040 | Lot 40 Rocky Ridge | 1/0/00 | 8/3/18 | 8/14/18 | 18LEE-BLD00239 | 9/18/18 | WIP |
| AL | RR-00041 | Lot 41 Rocky Ridge | 8/27/18 | 8/3/18 | 8/14/18 | 18LEE-BLD00240 | 8/27/18 | WIP |
| AL | HF-00014 | Lot 14 Hornet Flats | 3/12/19 | 4/16/19 | 4/19/19 | 19LEE-BLD00134 | 4/23/19 | WIP |
| AL | RR-00027 | Lot 27 Rocky Ridge | 1/16/19 | 5/31/19 | 6/7/19 | 19LEE-BLD00196 | 6/7/19 | WIP |
| AL | RR-00057 | Lot 57 Rocky Ridge | 2/14/19 | 5/31/19 | 6/7/19 | 19LEE-BLD00197 | 6/10/19 | WIP |
| AL | SC-00002 | Lot 2 Smiths Crossing | 6/13/19 | | 7/30/19 | 19LEE-BLD00278 | 7/31/19 | WIP |
| AL | RR-00002 | Lot 2 Rocky Ridge | 6/12/19 | 8/21/19 | 8/27/19 | 19LEE-BLD00318 | 8/28/19 | WIP |
| AL | RR-00003 | Lot 3 Rocky Ridge | 6/11/19 | 8/21/19 | 8/27/19 | 19LEE-BLD00319 | 8/28/19 | WIP |
| AL | STO-00010 | Lot 10 Southern Oaks | 6/24/19 | 8/21/19 | 8/30/19 | 19LEE-BLD00325 | 9/3/19 | Lot |
| AL | HF-00017 | Lot 17 Hornet Flats | 8/13/19 | 9/5/19 | 9/12/19 | 19LEE-BLD00346 | 9/12/19 | Lot |
| AL | HF-00018 | Lot 18 Hornet Flats | 8/13/19 | 9/5/19 | 9/12/19 | 19LEE-BLD00347 | 9/12/19 | Lot |
| AL | HF-00016 | Lot 16 Hornet Flats | 8/13/19 | 9/5/19 | 9/12/19 | 19LEE-BLD00348 | 9/12/19 | Lot |
| AL | RR-00012 | Lot 12 Rocky Ridge | 8/30/19 | 9/6/19 | 9/16/19 | 19LEE-BLD00349 | 9/17/19 | Lot |
| AL | STO-00022 | Lot 22 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00411 | 1/0/00 | Lot |
| AL | STO-00023 | Lot 23 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00412 | 1/0/00 | Lot |
| AL | STO-00024 | Lot 24 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00413 | 1/0/00 | Lot |
| AL | STO-00025 | Lot 25 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00414 | 1/0/00 | Lot |
| AL | STO-00026 | Lot 26 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00415 | 1/0/00 | Lot |
| AL | STO-00037 | Lot 37 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00416 | 1/0/00 | Lot |
| AL | STO-00042 | Lot 42 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00417 | 1/0/00 | Lot |
| AL | STO-00065 | Lot 65 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00418 | 1/0/00 | Lot |
| AL | STO-00044 | Lot 44 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00419 | 1/0/00 | Lot |
| AL | STO-00043 | Lot 43 Southern Oaks | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00420 | 1/0/00 | Lot |
| AL | SPL-00071 | SPL00071  Sherfield | | | 10/29/19 | 19LEE-BLD00425 | | WIP |
| GA | SPL-00072 | Spot Lot 72  Powell | | | 7/30/19 | 2019-2747 | | Lot |
| AL | CCR-00108 | LOT 108 CEDAR CREEK | 3/20/19 | 5/13/19 | 5/23/19 | 8422-19 | 5/28/19 | WIP |
| HR | SWF-00067 | Lot 67 Stonewood Frms | 10/6/17 | 4/10/17 | 4/27/17 | BL-2017-01114 | 10/6/17 | WIP |
| HR | CR-00666 | Lot 666 Camden Ridge | 2/14/18 | 1/9/18 | 1/24/18 | BL-2018-04105 | 2/14/18 | WIP |
| HR | CR-00667 | Lot 667 Camden Ridge | 2/14/18 | 1/9/18 | 1/24/18 | BL-2018-04107 | 2/14/18 | WIP |
| AL | DR-00092 | Lot 92 Donahue Ridge | | | 2/1/19 | BL-2019-00173 | | WIP |
| AL | DR-00091 | Lot 91 Donahue Ridge | 1/18/19 | 1/24/19 | 2/6/19 | BL-2019-00333 | 2/6/19 | WIP |

| St | Lot ID | Description | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Status |
|----|--------|-------------|-------------|------------------|-----------------|---------------|-------------|--------|
| HR | AUP-00181 | Lot 181 Aub Clb-Th Pr | 3/6/19 | 3/21/19 | 3/27/19 | BL-2019-01183 | 3/28/19 | WIP |
| HR | AL-00357 | Lot 357 Asheton Lakes | 3/26/19 | 5/6/19 | 6/7/19 | BL-2019-01873 | 6/11/19 | WIP |
| AL | LC-00002 | Lot 2 Links Crossing | 8/30/19 | 5/17/19 | 6/13/19 | BL-2019-02016 | 6/13/19 | WIP |
| AL | LC-00022 | Lot 22 Links Crossing | 8/31/19 | 5/17/19 | 6/13/19 | BL-2019-02052 | 6/13/19 | WIP |
| AL | LC-00024 | Lot 24 Links Crossing | 9/13/19 | 5/17/19 | 6/13/19 | BL-2019-02053 | 6/21/19 | WIP |
| AL | LC-00023 | Lot 23 Links Crossing | 9/13/19 | 5/20/19 | 6/18/19 | BL-2019-02098 | 6/21/19 | WIP |
| AL | LC-00001 | Lot 1 Links Crossing | 9/13/19 | 5/23/19 | 6/13/19 | BL-2019-02127 | 6/21/19 | WIP |
| AL | LC-00025 | Lot 25 Links Crossing | 5/22/19 | 5/23/19 | 6/13/19 | BL-2019-02130 | 6/21/19 | WIP |
| HR | AUP-00185 | Lot 185 Aub Cln-Th Pr | 5/10/19 | 5/23/19 | 6/7/19 | BL-2019-02146 | 6/18/19 | WIP |
| HR | AUP-00186 | Lot 186 Ab Cl - Th Pr | 5/13/19 | 5/28/19 | 6/7/19 | BL-2019-02147 | 6/17/19 | WIP |
| HR | AUP-00153 | Lot 153 Ab Cl - Th Pr | 5/29/19 | 6/3/19 | 6/28/19 | BL-2019-02203 | 7/8/19 | WIP |
| HR | SWF-00061 | Lot 61 Stonewood Frms | 6/17/19 | 6/17/19 | 8/14/19 | BL-2019-02394 | 8/27/19 | WIP |
| HR | SWF-00062 | Lot 62 Stonewood Frms | 6/18/19 | 6/18/19 | 8/14/19 | BL-2019-02410 | 8/26/19 | WIP |
| AL | DR-00098 | Lot 98 Donahue Ridge | 7/15/19 | 7/17/19 | 8/29/19 | BL-2019-02822 | 1/0/00 | Lot |
| AL | DR-00099 | Lot 99 Donahue Ridge | 7/16/19 | 7/17/19 | 8/29/19 | BL-2019-02823 | 8/29/19 | WIP |
| AL | DR-00129 | Lot 129 Donahue Ridge | 7/12/19 | 7/17/19 | 8/19/19 | BL-2019-02833 | 8/20/19 | WIP |
| AL | DR-00132 | Lot 132 Donahue Ridge | 7/12/19 | 7/18/19 | 8/20/19 | BL-2019-02846 | 8/21/19 | WIP |
| AL | DR-00120 | Lot 120 Donahue Ridge | 7/17/19 | 7/18/19 | 8/9/19 | BL-2019-02847 | 8/13/19 | WIP |
| AL | DR-00130 | Lot 130 Donahue Ridge | 7/16/19 | 7/22/19 | 8/19/19 | BL-2019-02892 | 8/20/19 | WIP |
| AL | DR-00119 | Lot 119 Donahue Ridge | 7/18/19 | 7/29/19 | 8/13/19 | BL-2019-02988 | 8/14/19 | WIP |
| AL | DR-00131 | Lot 131 Donahue Ridge | 7/16/19 | 7/29/19 | 8/20/19 | BL-2019-02991 | 8/21/19 | WIP |
| AL | DR-00123 | Lot 123 Donahue Ridge | 8/7/19 | 8/21/19 | 8/29/19 | BL-2019-03170 | 8/29/19 | WIP |
| AL | DR-00122 | Lot 122 Donahue Ridge | 9/24/19 | 9/23/19 | 10/10/19 | BL-2019-03529 | 1/0/00 | Lot |
| AL | DR-00094 | Lot 94 Donahue Ridge | 4/25/18 | 4/16/18 | 4/25/18 | BL-2019-05267 | 4/25/18 | WIP |
| AL | CCR-00110 | LOT 110 CEDAR CREEK | 3/29/19 | 4/17/19 | 4/19/19 | BPRES-008233-2019 | 4/30/19 | WIP |
| AL | CCR-00112 | LOT 112 CEDAR CREEK | 4/4/19 | 4/15/19 | 5/6/19 | BPRES-008327-2019 | 5/23/19 | WIP |
| GA | RB-00074 | LOT 74 RIVERBROOK | 3/20/18 | 1/18/18 | 1/24/18 | RBLD-01-18-407 | 3/20/18 | WIP |
| GA | GCH-0008J | Lot 8J Garrtt Crk Hgh | 1/15/19 | 1/23/19 | 1/28/19 | RBLD-01-19-556 | 1/29/19 | WIP |
| GA | SO-0047D | Lot 47D Sable Oaks | 3/5/19 | 3/8/19 | 3/12/19 | RBLD-03-19-1584 | 3/13/19 | WIP |
| GA | LH-0043H | LOT 43H LEXINGTON HIL | 3/13/19 | 3/18/19 | 3/20/19 | RBLD-03-19-1800 | 3/26/19 | WIP |
| GA | WW-0042B | Lot 42B Wrenwood | 3/15/19 | 3/22/19 | 3/27/19 | RBLD-03-19-2000 | | Lot |
| GA | WW-0044B | Lot 44B Wrenwood | 4/2/19 | 3/22/19 | 3/27/19 | RBLD-03-19-2004 | 4/3/19 | WIP |
| GA | LH-0044H | LOT 44H LEXINGTON HIL | 3/29/19 | 4/3/19 | 4/5/19 | RBLD-04-19-2282 | 4/10/19 | WIP |
| GA | NGF-0021A | Lot 21A Nrth Grnt Fld | 4/16/19 | 4/26/19 | 5/1/19 | RBLD-04-19-2806 | 5/7/19 | WIP |
| GA | NGF-0022A | Lot 22A Nrth Grnt Fld | 4/16/19 | 4/26/19 | 5/1/19 | RBLD-04-19-2811 | 5/7/19 | WIP |
| GA | CP-00019 | Lot 19 Charleston Plc | 5/2/19 | 5/13/19 | 5/22/19 | RBLD-05-19-7910 | 5/23/19 | WIP |
| GA | GCL-0005I | LOT 5I Garrtt Crk Lak | 5/16/19 | 5/22/19 | 5/28/19 | RBLD-05-19-8022 | 6/4/19 | WIP |
| GA | GCL-0010I | LOT 10I Garrt Crk Lak | 5/17/19 | 5/28/19 | 5/31/19 | RBLD-05-19-8206 | 6/4/19 | WIP |
| GA | GCL-0009I | LOT 9I Garrtt Crk Lak | 5/17/19 | 5/28/19 | 5/31/19 | RBLD-05-19-8211 | 6/4/19 | WIP |
| GA | DW-0019A | Lot 19A Deerwood | 8/1/18 | 5/31/18 | 6/12/18 | RBLD-06-18-3638 | 9/9/18 | WIP |
| GA | DW-0009A | Lot 9A Deerwood | 10/1/18 | 6/18/18 | 6/26/18 | RBLD-06-18-4017 | 11/27/18 | WIP |
| GA | HH-00020 | LOT 20 HUNTER HILL | 5/19/19 | 6/18/19 | 6/24/19 | RBLD-06-19-8727 | 7/12/19 | WIP |
| GA | LH-0031D | Lot 31D Lexngtn Hills | 6/6/19 | 6/18/19 | 6/24/19 | RBLD-06-19-8729 | 7/2/19 | WIP |
| GA | NGF-0020B | Lot 20B Nrth Grnt Fld | 9/16/19 | 9/17/19 | 9/23/19 | RBLD-07-19-8993 | 9/25/19 | Lot |
| GA | GP-0041K | Lot 41K Garrett Pines | 6/25/19 | 7/2/19 | 7/3/19 | RBLD-07-19-9057 | 7/23/19 | WIP |
| GA | DW-0001A | Lot 1A Deerwood | 2/27/19 | 7/3/19 | 7/9/19 | RBLD-07-19-9118 | 7/15/19 | WIP |

| St | Lot ID | Description | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Status |
|----|--------|-------------|-------------|------------------|-----------------|---------------|-------------|--------|
| GA | LH-0022D | Lot 22D Lexngtn Hills | 6/27/19 | 7/3/19 | 7/9/19 | RBLD-07-19-9120 | 7/15/19 | WIP |
| GA | LH-0021D | Lot 21D Lexngtn Hills | 7/3/19 | 7/9/19 | 7/11/19 | RBLD-07-19-9182 | 7/16/19 | WIP |
| GA | LH-0019D | Lot 19D Lexngtn Hills | 7/3/19 | 7/9/19 | 7/11/19 | RBLD-07-19-9185 | 7/17/19 | WIP |
| GA | LH-0025D | Lot 25D Lexngtn Hills | 7/3/19 | 7/9/19 | 7/11/19 | RBLD-07-19-9186 | 7/24/19 | WIP |
| GA | NGF-0016B | Lot 16B Nrth Grnt Fld | 6/25/19 | 7/15/19 | 7/16/19 | RBLD-07-19-9329 | 7/24/19 | WIP |
| GA | LH-0047H | LOT 47H LEXINGTON HIL | 7/9/19 | 7/15/19 | 7/16/19 | RBLD-07-19-9331 | 7/22/19 | WIP |
| GA | LH-0045H | LOT 45H LEXINGTON HIL | 7/9/19 | 7/15/19 | 7/16/19 | RBLD-07-19-9333 | 7/17/19 | WIP |
| GA | CP-00016 | Lot 16 Charleston Plc | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9358 | 8/5/19 | WIP |
| GA | CP-00017 | Lot 17 Charleston Plc | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9359 | 7/31/19 | WIP |
| GA | CPB-00010 | Lot 10 Chrlst Plc Bl. | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9362 | 7/19/19 | WIP |
| GA | CPB-00069 | Lot 69 Chrlst Plc Bl. | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9366 | 7/28/19 | WIP |
| GA | CPB-00070 | Lot 70 Chrlst Plc Bl. | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9367 | 7/24/19 | WIP |
| GA | NGF-0034A | Lot 34A Nrth Grnt Fld | 7/9/19 | 7/17/19 | 7/23/19 | RBLD-07-19-9411 | 8/5/19 | WIP |
| GA | NGF-0035A | Lot 35A Nrth Grnt Fld | 7/9/19 | 7/17/19 | 7/23/19 | RBLD-07-19-9412 | 7/26/19 | WIP |
| GA | CPB-00068 | Lot 68 Chrlst Plc Bl. | 7/15/19 | 7/17/19 | 7/23/19 | RBLD-07-19-9417 | 7/30/19 | WIP |
| GA | GCH-0032M | Lot 32M Garrt Crk Hgh | 7/18/19 | 7/25/19 | 7/29/19 | RBLD-07-19-9640 | 7/30/19 | WIP |
| GA | LE-00005 | Layfield Estats Lot 5 | 7/24/19 | 7/30/19 | 8/5/19 | RBLD-07-19-9774 | 8/7/19 | WIP |
| GA | LE-00006 | Layfield Estats Lot 6 | 7/18/19 | 7/30/19 | 8/5/19 | RBLD-07-19-9775 | 8/6/19 | WIP |
| GA | CPB-00073 | Lot 73 Chrlst Plc Bl. | 8/14/19 | 8/15/19 | 8/20/19 | RBLD-08-19-10166 | 8/23/19 | WIP |
| GA | NGF-0023A | Lot 23A Nrth Grnt Fld | 8/12/19 | 8/15/19 | 8/20/19 | RBLD-08-19-10170 | 8/23/19 | WIP |
| GA | LH-0067H | Lot 67H Lexngtn Hills | 8/7/19 | 8/16/19 | 8/22/19 | RBLD-08-19-10255 | 8/22/19 | WIP |
| GA | GCL-0023I | Lot 23I Garrt Crk Lak | 8/21/19 | 8/23/19 | 8/27/19 | RBLD-08-19-10369 | 8/28/19 | WIP |
| GA | NGF-0041A | Lot 41A Nrth Grnt Fld | 8/27/19 | 8/27/19 | 8/30/19 | RBLD-08-19-10432 | 9/3/19 | Lot |
| GA | WW-0047B | Lot 47B Wrenwood | 6/25/19 | 8/5/19 | 8/7/19 | RBLD-08-19-9883 | 8/7/19 | WIP |
| GA | NGF-0021B | Lot 21B Nrth Grnt Fld | 7/30/19 | 8/5/19 | 8/7/19 | RBLD-08-19-9884 | 8/7/19 | WIP |
| GA | GCH-0026M | Lot 26M Garrt Crk Hgh | 7/24/19 | 8/5/19 | 8/7/19 | RBLD-08-19-9886 | 8/7/19 | WIP |
| GA | NGF-0024A | Lot 24A Nrth Grnt Fld | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9950 | 8/13/19 | WIP |
| GA | NGF-0025A | Lot 25A Nrth Grnt Fld | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9956 | 8/13/19 | WIP |
| GA | NGF-0026A | Lot 26A Nrth Grnt Fld | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9957 | 8/13/19 | WIP |
| GA | NGF-0027A | Lot 27A Nrth Grnt Fld | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9959 | 8/13/19 | WIP |
| GA | CPB-00072 | Lot 72 Chrlst Plc Bl. | 8/2/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9962 | 8/13/19 | WIP |
| GA | NGF-0042A | Lot 42A Nrth Grnt Fld | 8/28/19 | 8/30/19 | 9/4/19 | RBLD-09-1910526 | 9/5/19 | Lot |
| GA | MCC-05133 | 5133 McCaghren Dr | 8/28/19 | 9/4/19 | 9/6/19 | RBLD-09-19-10601 | 9/9/19 | Lot |
| GA | GCL-0024I | Lot 24I Garrt Crk Lak | 9/5/19 | 9/6/19 | 9/10/19 | RBLD-09-19-10673 | 9/11/19 | Lot |
| GA | GCH-0030M | Lot 30M Garrt Crk Hgh | 9/16/19 | 9/17/19 | 9/24/19 | RBLD-09-19-10928 | 9/26/19 | Lot |
| GA | GCH-0029M | Lot 29M Garrt Crk Hgh | 9/16/19 | 9/17/19 | 9/24/19 | RBLD-09-19-10930 | 9/25/19 | Lot |
| GA | NGF-0030A | Lot 30A Nrth Grnt Fld | 9/20/19 | 9/23/19 | 9/25/19 | RBLD-09-19-11014 | 9/25/19 | Lot |
| GA | NGF-0029A | Lot 29A Nrth Grnt Fld | 9/20/19 | 9/23/19 | 9/25/19 | RBLD-09-19-11020 | 9/25/19 | Lot |
| GA | MKR-00104 | Lot 104 McKee Road | 7/8/19 | 9/24/19 | 9/25/19 | RBLD-09-19-11042 | 9/26/19 | Lot |
| GA | LE-00001 | Layfield Estats Lot 1 | 9/26/19 | 9/27/19 | 10/4/19 | RBLD-10-19-11189 | 10/8/19 | Lot |
| GA | CP-00023 | 8800 Sullivans Drive | | | 10/9/19 | RBLD-10-19-11192 | | |
| GA | RH-55I | 5782 Sandy View Drive | | | 10/2/19 | RBLD-10-19-11192 | | |
| GA | RH-57I | 5794 Sandy View Drive | | | 10/2/19 | RBLD-10-19-11196 | | |
| GA | HL-0032C | Lot 32C Highland | 8/30/19 | 10/1/19 | 10/4/19 | RBLD-10-19-11197 | 10/8/19 | Lot |
| GA | RH-58I | 5800 Sandy View Drive | | | 10/2/19 | RBLD-10-19-11200 | | |
| GA | RH-56I | 5788 Sandy View Drive | | | 10/2/19 | RBLD-10-19-11202 | | |
| GA | MKR-00105 | Lot 105 McKee Road | 7/8/19 | | 10/15/19 | RBLD-10-19-11467 | | Lot |
| GA | LE-00003 | Layfield Estats Lot 3 | 1/0/00 | 10/9/19 | 1/0/00 | RBLD-10-19-11468 | 1/0/00 | Lot |

| St | Lot ID | Description | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Status |
|----|--------|-------------|-------------|------------------|-----------------|---------------|-------------|--------|
| GA | CPB-00002 | Lot 2 Chrlstn Plc Bl. | 10/19/18 | 11/13/18 | 11/20/18 | RBLD-11-18-7203 | 11/21/18 | WIP |
| GA | GCL-0014I | Lot 14I Garrt Crk lak | | | 11/4/19 | RBLD-11-19-11917 | | Lot |
| GA | CPB-00062 | 4859 Charleston Way | | | 11/4/19 | RBLD-11-19-11919 | | |
| GA | GCL-0130I | Lot 130I Garr Crk Lak | 12/19/19 | 12/5/18 | 12/13/18 | RBLD-12-18-7595 | 12/19/18 | WIP |
| GA | GCH-0010J | Lot 10J Garrt Crk Hgh | 12/28/18 | 12/11/18 | 12/20/18 | RBLD-12-18-7797 | 12/28/18 | WIP |

SECTION 3.16 (b)  Assigned Permits

| State | Lot ID | Description | Total WIP | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Closed Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| HR | AL-00357 | Lot 357 Asheton Lakes | 108,599.22 | 3/26/19 | 5/6/19 | 6/7/19 | BL-2019-01873 | 6/11/19 | | WIP |
| HR | AL-00358 | Lot 358 Asheton Lakes | 59,466.50 | | | | | | | Lot |
| HR | AL-00369 | Lot 369 Asheton Lakes | 60,469.00 | | | | | | | Lot |
| HR | AL-00370 | Lot 370 Asheton Lakes | 60,708.68 | | | | | | | Lot |
| HR | AL-00381 | Lot 381 Asheton Lakes | 60,708.68 | | | | | | | Lot |
| HR | AL-00427 | Lot 427 Asheton Lakes | 60,708.68 | | | | | | | Lot |
| AL | AP-0005A | Lot 5A Addtn Aumn Prk | 5,266.40 | | | | | | | Lot |
| HR | AUP-00129 | Lot 129 Ab Cl - Th Pr | 74,502.51 | | | | | | | Lot |
| HR | AUP-00130 | Lot 130 Ab Cl - Th Pr | 65,852.51 | | | | | | | Lot |
| HR | AUP-00131 | Lot 131 Ab Cl - Th Pr | 74,702.51 | | | | | | | Lot |
| HR | AUP-00134 | Lot 134 Ab Cl - Th Pr | 66,837.09 | | | | | | | Lot |
| HR | AUP-00135 | Lot 135 Abr Cl- Th Pr | 75,337.09 | | | | | | | Lot |
| HR | AUP-00136 | Lot 136 Aub Cl- Th Pr | 75,337.09 | | | | | | | Lot |
| HR | AUP-00137 | Lot 137 Ab Cl - Th Pr | 66,837.10 | | | | | | | Lot |
| HR | AUP-00140 | Lot 140 Ab Cl - Th Pr | 255,413.97 | 9/28/18 | 7/18/18 | 8/15/18 | | 9/28/18 | 10/25/18 | WIP |
| HR | AUP-00141 | Lot 141 - Ab Cl Th Pr | 76,619.50 | | | | | | | Lot |
| HR | AUP-00142 | Lot 142- Ab Cl- Th Pr | 75,987.04 | | | | | | | Lot |
| HR | AUP-00145 | Lot 145 - AU Cl Th Pr | 75,815.48 | | | | | | | Lot |
| HR | AUP-00148 | Lot 148 Ab Cl - Th Pr | 76,210.61 | | | | | | | Lot |
| HR | AUP-00149 | Lot 149 Ab Cl - Th Pr | 67,710.61 | 1/0/00 | 10/8/19 | 1/0/00 | | 1/0/00 | | Lot |
| HR | AUP-00150 | Lot 150 Ab Cl - Th Pr | 77,211.17 | 10/1/19 | 10/8/19 | 1/0/00 | | 1/0/00 | | Lot |
| HR | AUP-00151 | Lot 151 Ab Cl - Th Pr | 250,851.56 | | | | | | 9/16/19 | WIP |
| HR | AUP-00153 | Lot 153 Ab Cl - Th Pr | 90,192.55 | 5/29/19 | 6/3/19 | 6/28/19 | BL-2019-02203 | 7/8/19 | | WIP |
| HR | AUP-00168 | Lot 168 Ab Cl - Th Pr | 58,567.28 | | | | | | | Lot |
| HR | AUP-00181 | Lot 181 Aub Clb-Th Pr | 203,237.28 | 3/6/19 | 3/21/19 | 3/27/19 | BL-2019-01183 | 3/28/19 | | WIP |
| HR | AUP-00185 | Lot 185 Aub Cln-Th Pr | 117,723.70 | 5/10/19 | 5/23/19 | 6/7/19 | BL-2019-02146 | 6/18/19 | | WIP |
| HR | AUP-00186 | Lot 186 Ab Cl - Th Pr | 122,453.86 | 5/13/19 | 5/28/19 | 6/7/19 | BL-2019-02147 | 6/17/19 | | WIP |
| HR | AUP-00188 | Lot 188 Aub Cl- Th Pr | 53,111.48 | | | | | | | Lot |
| HR | AUP-00190 | Lot 190 Ab Cl - Th Pr | 53,337.48 | | | | | | | Lot |
| HR | AUP-00191 | Lot 191 Ab Cl - Th Pr | 62,503.39 | | | | | | | Lot |
| HR | AUP-00192 | Lot 192 Ab Cl - Th Pr | 50,707.51 | | | | | | | Lot |
| HR | AUP-00193 | Lot 193 Ab Cl - Th Pr | 57,108.22 | | | | | | | Lot |
| GA | BVH-0004B | Lot 4B Buen Vst Hghts | 5,685.87 | | | | | | | Lot |
| AL | CCC-0036A | LOT 36A CEDAR CREEK | 40,251.37 | | | | | | | Lot |
| AL | CCC-0037A | LOT 37A CEDAR CREEK | 39,999.37 | | | | | | | Lot |
| AL | CCC-0038A | LOT 38A CEDAR CREEK | 40,121.85 | | | | | | | Lot |
| AL | CCR-00108 | LOT 108 CEDAR CREEK | 128,960.38 | 3/20/19 | 5/13/19 | 5/23/19 | 8422-19 | 5/28/19 | | WIP |
| AL | CCR-00110 | LOT 110 CEDAR CREEK | 196,416.38 | 3/29/19 | 4/17/19 | 4/19/19 | BPRES-008233-2019 | 4/30/19 | | WIP |
| AL | CCR-00112 | LOT 112 CEDAR CREEK | 97,517.31 | 4/4/19 | 4/15/19 | 5/6/19 | BPRES-008327-2019 | 5/23/19 | | WIP |
| AL | CCR-00115 | LOT 115 CEDAR CREEK | 260,532.12 | | | | | | 9/20/19 | WIP |
| GA | CP-00012 | Lot 12 Charleston Plc | 1,129.65 | | | | | | | Lot |
| GA | CP-00016 | Lot 16 Charleston Plc | 13,504.95 | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9358 | 8/5/19 | | WIP |
| GA | CP-00017 | Lot 17 Charleston Plc | 5,580.60 | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9359 | 7/31/19 | | WIP |
| GA | CP-00018 | Lot 18 Charleston Plc | 161,289.40 | 4/30/19 | 5/10/19 | 5/13/19 | | 5/16/19 | | WIP |
| GA | CP-00019 | Lot 19 Charleston Plc | 143,636.27 | 5/2/19 | 5/13/19 | 5/22/19 | RBLD-05-19-7910 | 5/23/19 | | WIP |
| GA | CP-00023 | 8800 Sullivans Drive | | | | 10/9/19 | RBLD-10-19-11192 | | | |
| GA | CP-00026 | Lot 26 Charleston Plc | 146,697.56 | | | | | | 10/3/19 | WIP |
| GA | CP-00027 | Lot 27 Tiger Crk Rntl | 3,681.75 | | | | | | | Lot |
| GA | CP-00028 | Lot 28 Charleston Plc | 135,256.45 | | | | | | 9/27/19 | WIP |
| GA | CPB-00001 | Lot 1 Chrlstn Plc Blv | 556.46 | | | | | | | Lot |
| GA | CPB-00002 | Lot 2 Chrlstn Plc Bl. | 216,117.92 | 10/19/18 | 11/13/18 | 11/20/18 | RBLD-11-18-7203 | 11/21/18 | | WIP |
| GA | CPB-00009 | Lot 9 Chrlstn Plc Bl. | 193,188.60 | | | | | | 9/6/19 | WIP |
| GA | CPB-00010 | Lot 10 Chrlst Plc Bl. | 14,379.07 | 7/11/19 | 7/16/19 | 7/17/19 | RBLD-07-19-9362 | 7/19/19 | | WIP |
| GA | CPB-00011 | Lot 11 Chrlst Plc Bl. | 855.00 | | | | | | | Lot |
| GA | CPB-00062 | 4859 Charleston Way | | | | 11/4/19 | RBLD-11-19-11919 | | | |
| GA | CPB-00063 | Lot 63 Chrlst Plc Bl. | 221,261.28 | | | | | | 9/4/19 | WIP |
| GA | CPB-00064 | Lot 64 Chrlst Plc Bl. | 295.00 | | | | | | | Lot |

SECTION 3.16 (b)  Assigned Permits

| State | Lot ID | Description | Total WIP | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Closed Date | Status |
|-------|--------|-------------|-----------|-------------|------------------|-----------------|---------------|-------------|-------------|--------|
| GA | CPB-00065 | Lot 65 Christ Plc Bl. | 295.00 | | | | | | | Lot |
| GA | CPB-00068 | Lot 68 Christ Plc Bl. | 18,474.47 | 7/15/19 | 7/17/19 | 7/23/19 RBLD-07-19-9417 | | 7/30/19 | | WIP |
| GA | CPB-00069 | Lot 69 Christ Plc Bl. | 16,092.02 | 7/11/19 | 7/16/19 | 7/17/19 RBLD-07-19-9366 | | 7/28/19 | | WIP |
| GA | CPB-00070 | Lot 70 Christ Plc Bl. | 10,938.52 | 7/11/19 | 7/16/19 | 7/17/19 RBLD-07-19-9367 | | 7/24/19 | | WIP |
| GA | CPB-00071 | Lot 71 Christ Plc Bl. | 528.73 | | | | | | | Lot |
| GA | CPB-00072 | Lot 72 Christ Plc Bl. | 1,634.86 | 8/2/19 | 8/7/19 | 8/9/19 RBLD-08-19-9962 | | 8/13/19 | | WIP |
| GA | CPB-00073 | Lot 73 Christ Plc Bl. | 1,788.23 | 8/14/19 | 8/15/19 | 8/20/19 RBLD-08-19-10166 | | 8/23/19 | | WIP |
| HR | CR-00443 | Lot 443 Camden Ridge | 35,303.00 | | | | | | | Lot |
| HR | CR-00444 | Lot 444 Camden Ridge | 35,303.00 | | | | | | | Lot |
| HR | CR-00455 | Lot 455 Camden Ridge | 35,303.00 | | | | | | | Lot |
| HR | CR-00468 | Lot 468 Camden Ridge | 36,285.84 | | | | | | | Lot |
| HR | CR-00666 | Lot 666 Camden Ridge | 228,224.53 | 2/14/18 | 1/9/18 | 1/24/18 BL-2018-04105 | | 2/14/18 | | WIP |
| HR | CR-00667 | Lot 667 Camden Ridge | 238,900.02 | 2/14/18 | 1/9/18 | 1/24/18 BL-2018-04107 | | 2/14/18 | | WIP |
| HR | CR-00676 | Lot 676 Camden Ridge | 35,778.20 | | | | | | | Lot |
| AL | DR-00085 | Lot 85 Donahue Ridge | 37,834.55 | | | | | | | Lot |
| AL | DR-00086 | Lot 86 Donahue Ridge | 37,834.55 | | | | | | | Lot |
| AL | DR-00088 | Lot 88 Donahue Ridge | 40,334.55 | | | | | | | Lot |
| AL | DR-00089 | Lot 89 Donahue Ridge | 38,134.55 | | | | | | | Lot |
| AL | DR-00091 | Lot 91 Donahue Ridge | 178,079.64 | 1/18/19 | 1/24/19 | 2/6/19 BL-2019-00333 | | 2/6/19 | | WIP |
| AL | DR-00092 | Lot 92 Donahue Ridge | 183,589.26 | | | 2/1/19 BL-2019-00173 | | | | WIP |
| AL | DR-00094 | Lot 94 Donahue Ridge | 213,715.36 | 4/25/18 | 4/16/18 | 4/25/18 BL-2019-05267 | | 4/25/18 | | WIP |
| AL | DR-00098 | Lot 98 Donahue Ridge | 45,682.88 | 7/15/19 | 7/17/19 | 8/29/19 BL-2019-02822 | | 1/0/00 | | Lot |
| AL | DR-00099 | Lot 99 Donahue Ridge | 46,129.41 | 7/16/19 | 7/17/19 | 8/29/19 BL-2019-02823 | | 8/29/19 | | WIP |
| AL | DR-00100 | Lot 100 Donahue Ridge | 39,834.89 | | | | | | | Lot |
| AL | DR-00102 | Lot 102 Donahue Ridge | 39,834.89 | | | | | | | Lot |
| AL | DR-00103 | Lot 103 Donahue Ridge | 39,834.89 | | | | | | | Lot |
| AL | DR-00104 | Lot 104 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00106 | Lot 106 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00107 | Lot 107 Donahue Ridge | 153,103.10 | | | | | | 9/20/19 | WIP |
| AL | DR-00109 | Lot 109 Donahue Ridge | 171,953.41 | | | | | | 9/20/19 | WIP |
| AL | DR-00111 | Lot 111 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00112 | Lot 112 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00113 | Lot 113 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00114 | Lot 114 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00115 | Lot 115 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00116 | Lot 116 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00117 | Lot 117 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00118 | Lot 118 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00119 | Lot 119 Donahue Ridge | 60,569.89 | 7/18/19 | 7/29/19 | 8/13/19 BL-2019-02988 | | 8/14/19 | | WIP |
| AL | DR-00120 | Lot 120 Donahue Ridge | 70,891.67 | 7/17/19 | 7/18/19 | 8/9/19 BL-2019-02847 | | 8/13/19 | | WIP |
| AL | DR-00121 | Lot 121 Donahue Ridge | 39,828.13 | | | | | | | Lot |
| AL | DR-00122 | Lot 122 Donahue Ridge | 39,828.13 | 9/24/19 | 9/23/19 | 10/10/19 BL-2019-03529 | | 1/0/00 | | Lot |
| AL | DR-00123 | Lot 123 Donahue Ridge | 46,141.55 | 8/7/19 | 8/21/19 | 8/29/19 BL-2019-03170 | | 8/29/19 | | WIP |
| AL | DR-00124 | Lot 124 Donahue Ridge | 95,105.00 | 7/2/19 | 7/8/19 | 7/25/19 | | 7/29/19 | 10/17/19 | WIP |
| AL | DR-00125 | Lot 125 Donahue Ridge | 39,834.89 | | | | | | | Lot |
| AL | DR-00129 | Lot 129 Donahue Ridge | 46,811.50 | 7/12/19 | 7/17/19 | 8/19/19 BL-2019-02833 | | 8/20/19 | | WIP |
| AL | DR-00130 | Lot 130 Donahue Ridge | 46,865.76 | 7/16/19 | 7/22/19 | 8/19/19 BL-2019-02892 | | 8/20/19 | | WIP |
| AL | DR-00131 | Lot 131 Donahue Ridge | 46,451.28 | 7/16/19 | 7/29/19 | 8/20/19 BL-2019-02991 | | 8/21/19 | | WIP |
| AL | DR-00132 | Lot 132 Donahue Ridge | 47,137.56 | 7/12/19 | 7/18/19 | 8/20/19 BL-2019-02846 | | 8/21/19 | | WIP |
| GA | DW-0001A | Lot 1A Deerwood | 66,418.00 | 2/27/19 | 7/3/19 | 7/9/19 RBLD-07-19-9118 | | 7/15/19 | | WIP |
| GA | DW-0009A | Lot 9A Deerwood | 301,654.46 | 10/1/18 | 6/18/18 | 6/26/18 RBLD-06-18-4017 | | 11/27/18 | | WIP |
| GA | DW-0010A | Lot 10A Deerwood | 40,000.00 | | | | | | | Lot |
| GA | DW-0011A | Lot 11A Deerwood | 39,977.69 | | | | | | | Lot |
| GA | DW-0016A | Lot 16A Deerwood | 40,012.22 | | | | | | | Lot |
| GA | DW-0017A | Lot 17A Deerwood | 39,982.29 | | | | | | | Lot |
| GA | DW-0019A | Lot 19A Deerwood | 321,800.12 | 8/1/18 | 5/31/18 | 6/12/18 RBLD-06-18-3638 | | 9/9/18 | | WIP |
| GA | ESA-00040 | LOT 40 EAST SIDE ACRE | 20,744.83 | | | | | | | Lot |

SECTION 3.16 (b)  Assigned Permits

| State | Lot ID | Description | Total WIP | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Closed Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| GA | FC-00012 | Lot 12 Foggy Cedar | 17,825.43 | | | | | | | Lot |
| GA | FD-01401 | 1401 FOREST DRIVE | 5,840.95 | | | | | | | Lot |
| GA | GCH-0001M | Lot 1M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0002M | Lot 2M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0003M | Lot 3M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0008J | Lot 8J Garrtt Crk Hgh | 210,234.52 | 1/15/19 | 1/23/19 | 1/28/19 | RBLD-01-19-556 | 1/29/19 | | WIP |
| GA | GCH-0008M | Lot 8M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0010J | Lot 10J Garrtt Crk Hgh | 201,285.82 | 12/28/18 | 12/11/18 | 12/20/18 | RBLD-12-18-7797 | 12/28/18 | | WIP |
| GA | GCH-0012M | Lot 12M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0013M | Lot 13M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0015M | Lot 15M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0016M | Lot 16M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0020M | Lot 20M Garrtt Crk Hgh | 46,105.00 | | | | | | | Lot |
| GA | GCH-0021M | Lot 21M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0023M | Lot 23M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0024M | Lot 24M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0025M | Lot 25M Garrtt Crk Hgh | 49,388.11 | | | | | | | Lot |
| GA | GCH-0026M | Lot 26M Garrtt Crk Hgh | 49,256.63 | 7/24/19 | 8/5/19 | 8/7/19 | RBLD-08-19-9886 | 8/7/19 | | WIP |
| GA | GCH-0027M | Lot 27M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0028M | Lot 28M Garrtt Crk Hgh | 98,323.54 | 7/3/19 | 7/9/19 | 7/11/19 | RBLD-07-19-9181 | 7/16/19 | 10/24/19 | WIP |
| GA | GCH-0029M | Lot 29M Garrtt Crk Hgh | 46,000.00 | 9/16/19 | 9/17/19 | 9/24/19 | RBLD-09-19-10930 | 9/25/19 | | WIP |
| GA | GCH-0030M | Lot 30M Garrtt Crk Hgh | 46,000.00 | 9/16/19 | 9/17/19 | 9/24/19 | RBLD-09-19-10928 | 9/26/19 | | Lot |
| GA | GCH-0031M | Lot 31M Garrtt Crk Hgh | 46,000.00 | | | | | | | Lot |
| GA | GCH-0032M | Lot 32M Garrtt Crk Hgh | 48,864.65 | 7/18/19 | 7/25/19 | 7/29/19 | RBLD-07-19-9640 | 7/30/19 | | WIP |
| GA | GCL-0003I | LOT 3I Garrtt Crk Lak | 146,804.45 | | | | | | 9/3/19 | WIP |
| GA | GCL-0005I | LOT 5I Garrtt Crk Lak | 84,119.65 | 5/16/19 | 5/22/19 | 5/28/19 | RBLD-05-19-8022 | 6/4/19 | | WIP |
| GA | GCL-0009I | LOT 9I Garrtt Crk Lak | 38,083.49 | 5/17/19 | 5/28/19 | 5/31/19 | RBLD-05-19-8211 | 6/4/19 | | WIP |
| GA | GCL-0010I | LOT 10I Garrtt Crk Lak | 38,546.86 | 5/17/19 | 5/28/19 | 5/31/19 | RBLD-05-19-8206 | 6/4/19 | | WIP |
| GA | GCL-0012I | Lot 12I Garrt Crk Lak | 42,000.00 | | | | | | | Lot |
| GA | GCL-0014I | Lot 14I Garrt Crk lak | 42,000.00 | | | 11/4/19 | RBLD-11-19-11917 | | | Lot |
| GA | GCL-0023I | Lot 23I Garrt Crk Lak | 43,262.00 | 8/21/19 | 8/23/19 | 8/27/19 | RBLD-08-19-10369 | 8/28/19 | | WIP |
| GA | GCL-0024I | Lot 24I Garrt Crk Lak | 42,000.00 | 9/5/19 | 9/6/19 | 9/10/19 | RBLD-09-19-10673 | 9/11/19 | | Lot |
| GA | GCL-0077C | Lot 77C Garrt Crk Lak | 184,556.90 | | | | | | 9/16/19 | WIP |
| GA | GCL-0104I | Gar Crk Lak 4I Sec 11 | 46,127.21 | | | | | | | Lot |
| GA | GCL-0105I | Garrr Crk Lak 5 Sec 11 | 45,289.77 | | | | | | | Lot |
| GA | GCL-0128I | Lot 128I Garr Crk Lak | 184,945.19 | | | | | | 9/20/19 | WIP |
| GA | GCL-0130I | Lot 130I Garr Crk Lak | 182,186.98 | 12/19/18 | 12/5/18 | 12/13/18 | RBLD-12-18-7595 | 12/19/18 | | WIP |
| GA | GF-0003H | Lot 3H Granite Field | 44,973.98 | | | | | | | Lot |
| GA | GP-001FF | Lot 1FF Garrett Pines | 149,809.65 | | | | | | 9/4/19 | WIP |
| GA | GP-003FF | Lot 3FF Garrett Pines | 30,257.13 | | | | | | | Lot |
| GA | GP-0041K | Lot 41K Garrett Pines | 50,241.60 | 6/25/19 | 7/2/19 | 7/3/19 | RBLD-07-19-9057 | 7/23/19 | | WIP |
| AL | HF-00001 | Lot 1 Hornet Flats | 23,722.29 | | | | | | | Lot |
| AL | HF-00002 | Lot 2 Hornet Flats | 40,636.68 | | | | | | | Lot |
| AL | HF-00006 | Lot 6 Hornet Flats | 176,034.87 | | | | | | 9/27/19 | WIP |
| AL | HF-00008 | Lot 8 Hornet Flats | 156,331.91 | | | | | | 9/13/19 | WIP |
| AL | HF-00014 | Lot 14 Hornet Flats | 155,217.07 | 3/12/19 | 4/16/19 | 4/19/19 | 19LEE-BLD00134 | 4/23/19 | | WIP |
| AL | HF-00015 | Lot 15 Hornet Flats | 155,904.33 | | | | | | 9/3/19 | WIP |
| AL | HF-00016 | Lot 16 Hornet Flats | 24,097.28 | 8/13/19 | 9/5/19 | 9/12/19 | 19LEE-BLD00348 | 9/12/19 | | Lot |
| AL | HF-00017 | Lot 17 Hornet Flats | 24,097.28 | 8/13/19 | 9/5/19 | 9/12/19 | 19LEE-BLD00346 | 9/12/19 | | Lot |
| AL | HF-00018 | Lot 18 Hornet Flats | 24,102.28 | 8/13/19 | 9/5/19 | 9/12/19 | 19LEE-BLD00347 | 9/12/19 | | Lot |
| GA | HH-00020 | LOT 20 HUNTER HILL | 31,372.50 | 5/19/19 | 6/18/19 | 6/24/19 | RBLD-06-19-8727 | 7/12/19 | | WIP |
| GA | HL-0024C | LOT 24 C HIGHLAND | 1,561.39 | | | | | | | Lot |
| GA | HL-0032C | Lot 32C Highland | 3,353.93 | 8/30/19 | 10/1/19 | 10/4/19 | RBLD-10-19-11197 | 10/8/19 | | WIP |
| AL | LC-00001 | Lot 1 Links Crossing | 111,466.02 | 9/13/19 | 5/23/19 | 6/13/19 | BL-2019-02127 | 6/21/19 | | WIP |
| AL | LC-00002 | Lot 2 Links Crossing | 134,943.26 | 8/30/19 | 5/17/19 | 6/13/19 | BL-2019-02016 | 6/13/19 | | WIP |
| AL | LC-00003 | Lot 3 Links Crossing | 50,547.98 | | | | | | | Lot |
| AL | LC-00004 | Lot 4 Links Crossing | 50,000.00 | | | | | | | Lot |

SECTION 3.16 (b)  Assigned Permits

| State | Lot ID | Description | Total WIP | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Closed Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| AL | LC-00005 | Lot 5 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00006 | Lot 6 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00007 | Lot 7 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00008 | Lot 8 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00009 | Lot 9 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00010 | Lot 10 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00011 | Lot 11 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00012 | Lot 12 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00013 | Lot 13 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00014 | Lot 14 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00015 | Lot 15 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00016 | Lot 16 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00017 | Lot 17 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00018 | Lot 18 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00019 | Lot 19 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00020 | Lot 20 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00021 | Lot 21 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00022 | Lot 22 Links Crossing | 132,645.07 | 8/31/19 | 5/17/19 | 6/13/19 | BL-2019-02052 | 6/13/19 | | WIP |
| AL | LC-00023 | Lot 23 Links Crossing | 116,878.29 | 9/13/19 | 5/20/19 | 6/18/19 | BL-2019-02098 | 6/21/19 | | WIP |
| AL | LC-00024 | Lot 24 Links Crossing | 156,985.19 | 9/13/19 | 5/17/19 | 6/13/19 | BL-2019-02053 | 6/21/19 | | WIP |
| AL | LC-00025 | Lot 25 Links Crossing | 166,098.67 | 5/22/19 | 5/23/19 | 6/13/19 | BL-2019-02130 | 6/21/19 | | WIP |
| AL | LC-00026 | Lot 26 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00027 | Lot 27 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00028 | Lot 28 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00029 | Lot 29 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00030 | Lot 30 Links Crossing | 50,000.00 | | | | | | | Lot |
| AL | LC-00031 | Lot 31 Links Crossing | 50,000.00 | | | | | | | Lot |
| GA | LE-00001 | Layfield Estats Lot 1 | 33,984.24 | 9/26/19 | 9/27/19 | 10/4/19 | RBLD-10-19-11189 | 10/8/19 | | Lot |
| GA | LE-00002 | Layfield Estats Lot 2 | 33,984.24 | 1/0/00 | 1/0/00 | 1/0/00 | | 1/0/00 | | Lot |
| GA | LE-00003 | Layfield Estats Lot 3 | 33,984.24 | 1/0/00 | 10/9/19 | 1/0/00 | RBLD-10-19-11468 | 1/0/00 | | Lot |
| GA | LE-00004 | Layfield Estats Lot 4 | 33,984.24 | 9/17/19 | 9/17/19 | 9/24/19 | | 9/25/19 | | Lot |
| GA | LE-00005 | Layfield Estats Lot 5 | 38,295.86 | 7/24/19 | 7/30/19 | 8/5/19 | RBLD-07-19-9774 | 8/7/19 | | WIP |
| GA | LE-00006 | Layfield Estats Lot 6 | 38,623.99 | 7/18/19 | 7/30/19 | 8/5/19 | RBLD-07-19-9775 | 8/6/19 | | WIP |
| GA | LH-0001E | Lot 1E Lexingtn Hills | 118,537.37 | | | | | | 10/4/19 | WIP |
| GA | LH-0003E | Lot 3E Lexingtn Hills | 146,261.08 | | | | | | 9/11/19 | WIP |
| GA | LH-0013E | Lot 13E Lexngtn Hills | 123,532.74 | | | | | | 9/25/19 | WIP |
| GA | LH-0015E | LOT 15E LEXINGTON HIL | 132,338.58 | | | | | | 10/10/19 | WIP |
| GA | LH-0019D | Lot 19D Lexngtn Hills | 43,267.19 | 7/3/19 | 7/9/19 | 7/11/19 | RBLD-07-19-9185 | 7/17/19 | | WIP |
| GA | LH-0020D | Lot 20D Lexngtn Hills | 162,813.07 | | | | | | 9/3/19 | WIP |
| GA | LH-0021D | Lot 21D Lexngtn Hills | 48,559.01 | 7/3/19 | 7/9/19 | 7/11/19 | RBLD-07-19-9182 | 7/16/19 | | WIP |
| GA | LH-0022D | Lot 22D Lexngtn Hills | 78,443.57 | 6/27/19 | 7/3/19 | 7/9/19 | RBLD-07-19-9120 | 7/15/19 | | WIP |
| GA | LH-0025D | Lot 25D Lexngtn Hills | 42,627.45 | 7/3/19 | 7/9/19 | 7/11/19 | RBLD-07-19-9186 | 7/24/19 | | WIP |
| GA | LH-0028D | Lot 28D Lexngtn Hills | 151,132.08 | | | | | | 9/30/19 | WIP |
| GA | LH-0031D | Lot 31D Lexngtn Hills | 115,351.32 | 6/6/19 | 6/18/19 | 6/24/19 | RBLD-06-19-8729 | 7/2/19 | | WIP |
| GA | LH-0035C | LOT 35C LEXINGTON HIL | 70.00 | | | | | | | Lot |
| GA | LH-0043H | LOT 43H LEXINGTON HIL | 97,489.45 | 3/13/19 | 3/18/19 | 3/20/19 | RBLD-03-19-1800 | 3/26/19 | | WIP |
| GA | LH-0044H | LOT 44H LEXINGTON HIL | 103,868.01 | 3/29/19 | 4/3/19 | 4/5/19 | RBLD-04-19-2282 | 4/10/19 | | WIP |
| GA | LH-0045H | LOT 45H LEXINGTON HIL | 79,061.96 | 7/9/19 | 7/15/19 | 7/16/19 | RBLD-07-19-9333 | 7/17/19 | | WIP |
| GA | LH-0046H | LOT 46H LEXINGTON HIL | 113,274.63 | 5/31/19 | 6/5/19 | 6/7/19 | RBLD-06-19-8423 | 6/11/19 | 10/21/19 | WIP |
| GA | LH-0047H | LOT 47H LEXINGTON HIL | 81,330.42 | 7/9/19 | 7/15/19 | 7/16/19 | RBLD-07-19-9331 | 7/22/19 | | WIP |
| GA | LH-0066H | Lot 66H Lexngtn Hills | 70.00 | | | | | | | Lot |
| GA | LH-0067H | Lot 67H Lexngtn Hills | 1,214.00 | 8/7/19 | 8/16/19 | 8/22/19 | RBLD-08-19-10255 | 8/22/19 | | WIP |
| GA | LH-0068H | Lot 68H Lexngtn Hills | 4,366.81 | | | | | | | Lot |
| GA | LH-0072H | Lot 72H Lexngtn Hills | 550.00 | | | | | | | Lot |
| GA | MCC-05133 | 5133 McCaghren Dr | 14,541.09 | 8/28/19 | 9/4/19 | 9/6/19 | RBLD-09-19-10601 | 9/9/19 | | Lot |
| AL | MG-00023 | Lot 23 Magnolia Grdns | 27,198.80 | | | | | | | Lot |
| AL | MG-00024 | Lot 24 Magnolia Grdns | 27,198.80 | | | | | | | Lot |

SECTION 3.16 (b)  Assigned Permits

| State | Lot ID | Description | Total WIP | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Closed Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| AL | MG-00025 | Lot 25 Magnola Gardns | 27,198.80 | | | | | | | Lot |
| AL | MG-00026 | Lot 26 Magnola Grdns | 27,220.40 | | | | | | | Lot |
| GA | MKR-00104 | Lot 104 McKee Road | 41,060.00 | 7/8/19 | 9/24/19 | 9/25/19 | RBLD-09-19-11042 | 9/26/19 | | Lot |
| GA | MKR-00105 | Lot 105 McKee Road | 41,060.00 | 7/8/19 | | 10/15/19 | RBLD-10-19-11467 | | | Lot |
| GA | ML-0001F | Lot 1F Moonlake | 21,450.41 | | | | | | | Lot |
| GA | ML-0008F | Lot 8F Moonlake | 17,871.41 | | | | | | | Lot |
| GA | ML-0009F | Lot 9F Moonlake | 17,875.04 | | | | | | | Lot |
| GA | ML-0010F | Lot 10F Moonlake | 17,875.04 | | | | | | | Lot |
| GA | ML-0014E | Lot 14E Moonlake | 21,893.59 | | | | | | | Lot |
| GA | ML-0015E | Lot 15E Moonlake | 21,903.11 | | | | | | | Lot |
| GA | MR-00001 | Lot 1 Macon Rd | 41,302.55 | | | | | | | Lot |
| GA | MR-00002 | Lot 2 Macon Rd | 40,834.69 | | | | | | | Lot |
| GA | MR-00003 | Lot 3 Macon Rd | 40,768.23 | | | | | | | Lot |
| GA | MR-00004 | Lot 4 Macon Rd | 40,930.67 | | | | | | | Lot |
| GA | MR-00005 | Lot 5 Macon Rd | 41,013.34 | | | | | | | Lot |
| GA | MR-00006 | Lot 6 Macon Rd | 40,919.36 | | | | | | | Lot |
| GA | NGF-0016B | Lot 16B Nrth Grnt Fld | 87,204.25 | 6/25/19 | 7/15/19 | 7/16/19 | RBLD-07-19-9329 | 7/24/19 | | WIP |
| GA | NGF-0017B | Lot 17B Nrth Grnt Fld | 96,078.97 | 6/25/19 | 7/2/19 | 7/3/19 | | 7/12/19 | 10/17/19 | WIP |
| GA | NGF-0020B | Lot 20B Nrth Grnt Fld | 42,534.67 | 9/16/19 | 9/17/19 | 9/23/19 | RBLD-07-19-8993 | 9/25/19 | | Lot |
| GA | NGF-0021A | Lot 21A Nrth Grnt Fld | 58,959.23 | 4/16/19 | 4/26/19 | 5/1/19 | RBLD-04-19-2806 | 5/7/19 | | WIP |
| GA | NGF-0021B | Lot 21B Nrth Grnt Fld | 43,925.26 | 7/30/19 | 8/5/19 | 8/7/19 | RBLD-08-19-9884 | 8/7/19 | | WIP |
| GA | NGF-0022A | Lot 22A Nrth Grnt Fld | 58,568.02 | 4/16/19 | 4/26/19 | 5/1/19 | RBLD-04-19-2811 | 5/7/19 | | WIP |
| GA | NGF-0023A | Lot 23A Nrth Grnt Fld | 50,157.08 | 8/12/19 | 8/15/19 | 8/20/19 | RBLD-08-19-10170 | 8/23/19 | | WIP |
| GA | NGF-0024A | Lot 24A Nrth Grnt Fld | 50,292.56 | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9950 | 8/13/19 | | WIP |
| GA | NGF-0025A | Lot 25A Nrth Grnt Fld | 50,634.56 | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9956 | 8/13/19 | | WIP |
| GA | NGF-0026A | Lot 26A Nrth Grnt Fld | 50,434.95 | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9957 | 8/13/19 | | WIP |
| GA | NGF-0027A | Lot 27A Nrth Grnt Fld | 50,345.23 | 7/31/19 | 8/7/19 | 8/9/19 | RBLD-08-19-9959 | 8/13/19 | | WIP |
| GA | NGF-0028A | Lot 28A Nrth Grnt Fld | 41,294.92 | 4/24/19 | | | | | | Lot |
| GA | NGF-0029A | Lot 29A Nrth Grnt Fld | 41,118.88 | 9/20/19 | 9/23/19 | 9/25/19 | RBLD-09-19-11020 | 9/25/19 | | Lot |
| GA | NGF-0030A | Lot 30A Nrth Grnt Fld | 41,096.64 | 9/20/19 | 9/23/19 | 9/25/19 | RBLD-09-19-11014 | 9/25/19 | | Lot |
| GA | NGF-0034A | Lot 34A Nrth Grnt Fld | 47,639.70 | 7/9/19 | 7/17/19 | 7/23/19 | RBLD-07-19-9411 | 8/5/19 | | WIP |
| GA | NGF-0035A | Lot 35A Nrth Grnt Fld | 51,911.73 | 7/9/19 | 7/17/19 | 7/23/19 | RBLD-07-19-9412 | 7/26/19 | | WIP |
| GA | NGF-0036A | Lot 36A Nrth Grnt Fld | 173,654.13 | | | | | | 9/9/19 | WIP |
| GA | NGF-0041A | Lot 41A Nrth Grnt Fld | 41,096.00 | 8/27/19 | 8/27/19 | 8/30/19 | RBLD-08-19-10432 | 9/3/19 | | Lot |
| GA | NGF-0042A | Lot 42A Nrth Grnt Fld | 40,325.00 | 8/28/19 | 8/30/19 | 9/4/19 | RBLD-09-19-1910526 | 9/5/19 | | Lot |
| GA | NIP-0092C | Lot 92C North Ivy Prk | 255,814.77 | | | | | | 9/3/19 | WIP |
| GA | RB-00074 | LOT 74 RIVERBROOK | 252,773.49 | 3/20/18 | 1/18/18 | 1/24/18 | RBLD-01-18-407 | 3/20/18 | | WIP |
| GA | RB-01228 | 1228 Rockbridge Drive | 20,125.00 | | | | | | | Lot |
| GA | RB-01234 | 1234 Rockbridge Drive | 20,125.00 | | | | | | | Lot |
| GA | RB-01240 | 1240 Rockbridge | 20,125.00 | | | | | | | Lot |
| GA | RE-0030B | Lot 30B Ridgewd Esats | 40,468.46 | | | | | | | Lot |
| GA | REN-51DRM | Sable Oaks 51D renvtn | 3,091.61 | | | | | | | Lot |
| GA | RH-55I | 5782 Sandy View Drive | | | | 10/2/19 | RBLD-10-19-11192 | | | Lot |
| GA | RH-56I | 5788 Sandy View Drive | | | | 10/2/19 | RBLD-10-19-11202 | | | Lot |
| GA | RH-57I | 5794 Sandy View Drive | | | | 10/2/19 | RBLD-10-19-11196 | | | Lot |
| GA | RH-58I | 5800 Sandy View Drive | | | | 10/2/19 | RBLD-10-19-11200 | | | Lot |
| AL | RR-00002 | Lot 2 Rocky Ridge | 32,971.17 | 6/12/19 | 8/21/19 | 8/27/19 | 19LEE-BLD00318 | 8/28/19 | | WIP |
| AL | RR-00003 | Lot 3 Rocky Ridge | 32,671.17 | 6/11/19 | 8/21/19 | 8/27/19 | 19LEE-BLD00319 | 8/28/19 | | WIP |
| AL | RR-00012 | Lot 12 Rocky Ridge | 25,323.11 | 8/30/19 | 9/6/19 | 9/16/19 | 19LEE-BLD00349 | 9/17/19 | | Lot |
| AL | RR-00018 | Lot 18 Rocky Ridge | 29,717.17 | | | | | | | Lot |
| AL | RR-00019 | Lot 19 Rocky Ridge | 30,130.43 | | | | | | | Lot |
| AL | RR-00024 | Lot 24 Rocky Ridge | 28,678.47 | | | | | | | Lot |
| AL | RR-00025 | Lot 25 Rocky Ridge | 28,912.17 | | | | | | | Lot |
| AL | RR-00026 | Lot 26 Rocky Ridge | 29,360.31 | | | | | | | Lot |
| AL | RR-00027 | Lot 27 Rocky Ridge | 115,044.55 | 1/16/19 | 5/31/19 | 6/7/19 | 19LEE-BLD00196 | 6/7/19 | | WIP |
| AL | RR-00028 | Lot 28 Rocky Ridge | 29,119.45 | | | | | | | Lot |
| AL | RR-00030 | Lot 30 Rocky Ridge | 18,361.97 | | | | | | | Lot |

Section 3.16(b)                                    Assigned Permits                                    5 of 7

SECTION 3.16 (b)  Assigned Permits

| State | Lot ID | Description | Total WIP | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Closed Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| AL | RR-00033 | Lot 33 Rocky Ridge | 20,517.33 | | | | | | | Lot |
| AL | RR-00040 | Lot 40 Rocky Ridge | 219,366.42 | 1/0/00 | 8/3/18 | 8/14/18 | 18LEE-BLD00239 | 9/18/18 | | WIP |
| AL | RR-00041 | Lot 41 Rocky Ridge | 207,466.07 | 8/27/18 | 8/3/18 | 8/14/18 | 18LEE-BLD00240 | 8/27/18 | | WIP |
| AL | RR-00057 | Lot 57 Rocky Ridge | 135,893.33 | 2/14/19 | 5/31/19 | 6/7/19 | 19LEE-BLD00197 | 6/10/19 | | WIP |
| AL | RR-00076 | Lot 76 Rocky Ridge | 29,672.10 | | | | | | | Lot |
| AL | RR-00083 | Lot 83 Rocky Ridge | 29,129.55 | | | | | | | Lot |
| AL | RR-00084 | Lot 84 Rocky Ridge | 28,678.48 | | | | | | | Lot |
| AL | RR-0016A | Lot 16A Rocky Ridge | 29,355.52 | | | | | | | Lot |
| AL | SC-00002 | Lot 2 Smiths Crossing | 68,116.71 | 6/13/19 | | 7/30/19 | 19LEE-BLD00278 | 7/31/19 | | WIP |
| AL | SF-00009 | LOT 9 SHENDOAH FARMS | 10,984.00 | | | | | | | Lot |
| AL | SF-00010 | LOT 10 SHENDOAH FARMS | 10,984.00 | | | | | | | Lot |
| AL | SF-00011 | LOT 11 SHENDOAH FARMS | 10,984.00 | | | | | | | Lot |
| AL | SM-0149A | Lot 149A Solamr Phs 3 | 33,912.31 | 1/0/00 | 1/0/00 | 1/0/00 | | 1/0/00 | | Lot |
| AL | SM-0155A | Lot 155A Solamr Phs 3 | 33,987.31 | | | | | | | Lot |
| AL | SM-0156A | Lot 156A Solamr Phs 3 | 34,137.31 | | | | | | | Lot |
| AL | SM-0157A | Lot 157A Solamr Phs 3 | 34,137.31 | | | | | | | Lot |
| AL | SM-147A1 | Lot 147A-1 Solm Phs 3 | 33,987.31 | 1/0/00 | 1/0/00 | 1/0/00 | | 1/0/00 | | Lot |
| AL | SM-148A1 | Lot 148A-1 Solm Phs 3 | 33,987.36 | 1/0/00 | 1/0/00 | 1/0/00 | | 1/0/00 | | Lot |
| GA | SO-0047D | Lot 47D Sable Oaks | 209,296.34 | 3/5/19 | 3/8/19 | 3/12/19 | RBLD-03-19-1584 | 3/13/19 | | WIP |
| GA | SP-0006D | LOT 6D SONOMA POINTE | 43,218.94 | | | | | | | Lot |
| GA | SP-0031A | Lot 31A Sonoma Point | 149,151.70 | | | | | | 9/17/19 | WIP |
| GA | SP-0032A | Lot 32A Sonoma Pointe | 159,506.81 | | | | | | 9/24/19 | WIP |
| GA | SPL-00061 | Spot Lot 61-Johnson | 275.00 | | | | | | | Lot |
| GA | SPL-00067 | Spot Lot 67 Hunt | 106,574.68 | | | | | | 9/23/19 | WIP |
| AL | SPL-00068 | Spot Lot 68 Perkinson | 87,428.42 | | | | | | 10/9/19 | WIP |
| AL | SPL-00070 | Spot Lot 70 Slate | 147,243.71 | | | | | | 9/6/19 | WIP |
| AL | SPL-00071 | SPL00071 Sherfield | | | | 10/29/19 | 19LEE-BLD00425 | | | WIP |
| GA | SPL-00072 | Spot Lot 72  Powell | 621.46 | | | 7/30/19 | 2019-2747 | | | Lot |
| GA | SPL-00073 | Spot Lot 73   Blum | 175.00 | | | | | | | Lot |
| GA | SPL-00074 | Spot Lot 74 Chiles | | | | | | | | Lot |
| AL | SPL-00075 | Spot Lot 75 Dowdell | | | | | | | | WIP |
| AL | SPL-00076 | Spot Lot 76  Cauley | | | | | | | | WIP |
| AL | SPL-00077 | Spot Lot 77 Lamar | | | | | | | | WIP |
| AL | SPL-00078 | Spot Lot 78 Hodge | | | | | | | | WIP |
| AL | SPL-00079 | SPOT LOT 79 - WELCH | | | | | | | | WIP |
| AL | SPL-00080 | Lot 80 Spt Lot - Howr | | | | | | | | WIP |
| GA | SRC-03006 | 3006 SLIPPERY ROCK CO | 27,812.20 | | | | | | | Lot |
| GA | SRC-03008 | 3008 SLIPPERY ROCK CO | 28,838.20 | | | | | | | Lot |
| AL | STO-00010 | Lot 10 Southern Oaks | 7,304.90 | 6/24/19 | 8/21/19 | 8/30/19 | 19LEE-BLD00325 | 9/3/19 | | Lot |
| AL | STO-00022 | Lot 22 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00411 | 1/0/00 | | Lot |
| AL | STO-00023 | Lot 23 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00412 | 1/0/00 | | Lot |
| AL | STO-00024 | Lot 24 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00413 | 1/0/00 | | Lot |
| AL | STO-00025 | Lot 25 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00414 | 1/0/00 | | Lot |
| AL | STO-00026 | Lot 26 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00415 | 1/0/00 | | Lot |
| AL | STO-00037 | Lot 37 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00416 | 1/0/00 | | Lot |
| AL | STO-00042 | Lot 42 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00417 | 1/0/00 | | Lot |
| AL | STO-00043 | Lot 43 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00420 | 1/0/00 | | Lot |
| AL | STO-00044 | Lot 44 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00419 | 1/0/00 | | Lot |
| AL | STO-00045 | Lot 45 Southern Oaks | | | | | | | | Lot |
| AL | STO-00055 | Lot 55 Southern Oaks | | 1/0/00 | 1/0/00 | 1/0/00 | | 1/0/00 | | Lot |
| AL | STO-00059 | Lot 59 Southern Oaks | | | | | | | | Lot |
| AL | STO-00065 | Lot 65 Southern Oaks | | 1/0/00 | 1/0/00 | 10/24/19 | 19LEE-BLD00418 | 1/0/00 | | Lot |
| HR | SWF-00061 | Lot 61 Stonewood Frms | 41,436.23 | 6/17/19 | 6/17/19 | 8/14/19 | BL-2019-02394 | 8/27/19 | | WIP |
| HR | SWF-00062 | Lot 62 Stonewood Frms | 40,971.55 | 6/18/19 | 6/18/19 | 8/14/19 | BL-2019-02410 | 8/26/19 | | WIP |
| HR | SWF-00067 | Lot 67 Stonewood Frms | 210,363.73 | 10/6/17 | 4/10/17 | 4/27/17 | BL-2017-01114 | 10/6/17 | | WIP |
| HR | SWF-00090 | Lot 90 Stonewood Frms | 27,123.40 | | | | | | | Lot |
| HR | SWF-00102 | Lot 102 Stonewd Frms | 33,004.48 | | | | | | | Lot |

**SECTION 3.16 (b)  Assigned Permits**

| State | Lot ID | Description | Total WIP | Pre-release | Permit Submittal | Permit Received | Permit Number | Job Release | Closed Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| GA | WSR-05012 | 5012 Warm Springs Rd | 28,292.70 | | | | | | | Lot |
| GA | WSR-05028 | 5028 Warm Springs Rd | 88,642.60 | | | | | | | Lot |
| AL | WT-00001 | Lot 1 WILLOW TRACE | 27,738.01 | | | | | | | Lot |
| AL | WT-00072 | Lot 72 Willow Trace | 133,595.17 | 12/28/19 | 12/18/18 | 12/20/19 | 20181621 | | 12/28/18 | WIP |
| AL | WT-00073 | LOT 73 WILLOW TRACE | 130,277.01 | | | | | | 9/20/19 | WIP |
| AL | WT-00095 | Lot 95 Willow Trace | 142,362.80 | | | 11/21/18 | 20181514 | | | WIP |
| AL | WT-00100 | LOT 100 WILLOW TRACE | 28,860.73 | 9/23/19 | 10/1/19 | 10/8/19 | 20191267 | 1/0/00 | | Lot |
| AL | WT-00103 | LOT 103 WILLOW TRACE | 30,084.74 | 9/23/19 | 10/9/19 | 10/24/19 | 20191353 | 1/0/00 | | Lot |
| AL | WT-00123 | Lot 123 Willow Trace | 128,089.99 | | | | | | | WIP |
| AL | WT-00124 | Lot 124 Willow Trace | 123,407.71 | | | | | | | WIP |
| AL | WT-00125 | Lot 125 Willow Trace | 111,256.27 | 4/23/19 | 5/3/19 | 5/13/19 | 2019576 | 6/4/19 | | WIP |
| AL | WT-00126 | Lot 126 Willow Trace | 99,901.89 | 5/15/19 | 5/21/19 | 5/31/19 | 2019655 | 6/4/19 | | WIP |
| AL | WT-00133 | Lot 133 Willow Trace | 34,449.37 | 8/13/19 | 8/14/19 | 8/16/19 | 20191057 | 8/20/19 | | WIP |
| AL | WT-00134 | Lot 134 Willow Trace | 35,163.57 | 8/16/19 | 8/16/19 | 8/20/19 | 20191068 | 8/22/19 | | WIP |
| AL | WT-00135 | Lot 135 Willow Trace | 35,160.05 | 8/15/19 | 8/16/19 | 8/20/19 | 20191067 | 8/22/19 | | WIP |
| AL | WT-00136 | Lot 136 Willow Trace | 34,809.73 | 8/15/19 | 8/21/19 | 8/26/19 | 20191100 | 8/26/19 | | WIP |
| AL | WT-00137 | Lot 137 Willow Trace | 36,609.02 | 8/23/19 | 8/26/19 | 8/27/19 | 20191104 | 8/30/19 | | WIP |
| AL | WT-00138 | Lot 138 Willow Trace | 95,822.84 | 6/21/19 | 6/26/19 | 7/1/19 | | 7/9/19 | 10/11/19 | WIP |
| AL | WT-00139 | Lot 139 Willow Trace | 77,667.96 | 6/27/19 | 6/28/19 | 7/1/19 | | 7/10/19 | | WIP |
| AL | WT-00140 | Lot 140 Willow Trace | 78,298.52 | 6/27/19 | 7/2/19 | 7/3/19 | 2019844 | 7/15/19 | 10/22/19 | WIP |
| AL | WT-00155 | LOT 155 WILLOW TRACE | 26,539.90 | | | | | | | Lot |
| GA | WW-0027A | Lot 27A Wrenwood | 201,738.58 | | | | | | 9/12/19 | WIP |
| GA | WW-0042B | Lot 42B Wrenwood | 55,512.99 | 3/15/19 | 3/22/19 | 3/27/19 | RBLD-03-19-2000 | | | Lot |
| GA | WW-0044B | Lot 44B Wrenwood | 181,972.21 | 4/2/19 | 3/22/19 | 3/27/19 | RBLD-03-19-2004 | 4/3/19 | | WIP |
| GA | WW-0047B | Lot 47B Wrenwood | 7,536.49 | 6/25/19 | 8/5/19 | 8/7/19 | RBLD-08-19-9883 | 8/7/19 | | WIP |

**PERMITTED,**

2701 Golf Mill Court       to add permit number

## <u>SECTION 3.17(a)</u>
## EMPLOYEE INFORMATION

See attached employee census indicating, by column.

# Seller Disclosure Letter
## Item 3.17(a) – Employee Matrix
### November 14, 2019

| Company | Name (Last, First) | Job Title | SG&A or Construction | exempt or non | Employment Contract? | Start Date | Starting Salary | Current Salary | Last Increase | Current Monthly Truck Allowance $ | Current Health Care Plan Type | company amount pd for hcare |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grayhawk Homes | Joiner, Alan | Warranty Superintendent | Construction | exempt | No | 8/20/18 | 52,000 | 52,000 | none | 667.00 | none | 0 AL |
| Grayhawk Homes | Callahan/Dan | Superintendent | | | | | | 58,000 | 10/7/19 | 667.00 | 1 | 265.44 GA |
| Grayhawk Homes | Deas/J. Devin | Superintendent | Construction | exempt | No | 7/17/17 | | 70,000 | 10/7/19 | 667.00 | none | 0 AL |
| Grayhawk Homes | Johnson/Judy | Permit Cordinator | | non | | 6/4/12 | | 35,700 | | 100.00 | none | 0 GA |
| Grayhawk Homes | Shiley/Jeffrey | Superintendent | Construction | exempt | No | 4/10/17 | 58,000 | 52,000 | | 667.00 | 3 | 259.8 GA |
| Grayhawk Homes | Weldon/Jimmy | Superintendent | Construction | exempt | No | 1/8/18 | 52,000 | 58,000 | 10/7/19 | 667.00 | 3 | 259.8 AL |
| Grayhawk Homes | Crow/Kristie | Decorator | SG&A | non | | 12/1/16 | 35,000 | 45,000 | | 667.00 | none | 0 GA |
| Grayhawk Homes | Gammon/Kevin | Superintendent | Construction | exempt | No | 9/25/17 | 45,000 | 58,000 | | 667.00 | none | 0 GA |
| Grayhawk Homes | Spitznagel/Marquett | Adm Assistant | SG&A | non | No | 3/19/18 | 32,000 | 35,000 | | 0.00 | 3 | 257.94 AL |
| Grayhawk Homes | Windham/Mark | Warranty Superintendent | Construction | exempt | No | 4/16/18 | 45,000 | 48,000 | | 667.00 | 3 | 257.94 AL |
| Grayhawk Homes | Berdeaux/Reuben | Superintendent | Construction | exempt | No | 8/6/18 | 52,000 | 52,000 | none | 400.00 | none | 0 AL |
| Grayhawk Homes | Kelley/Robert | Superintendent | Construction | exempt | No | 6/8/17 | 45,000 | 52,000 | | 667.00 | dental only | 0 AL |
| Grayhawk Homes | Spratlin/Russell | Superintendent | Construction | exempt | No | 10/29/18 | 58,000 | 58,000 | | 667.00 | 3 | 247.39 AL |
| Grayhawk Homes | Haygood/Steven | on your lot sales | SG&A | exempt | No | 9/15/14 | 52,000 | 54,600 | | 500.00 | 2 | 262.75 GA |
| Grayhawk Homes | Owenby/Timothy | Superintendent | Construction | exempt | No | 7/28/14 | 52,000 | 58,000 | 7/1/19 | 667.00 | 3 | 259.8 AL |
| Grayhawk Homes | Smith/Turnley | Superintendent | Construction | exempt | No | 1/2/19 | 58,000 | 58,000 | | 667.00 | 3 | 247.39 AL |
| Grayhawk Homes | Downing/Brian | Superintendent | Construction | exempt | No | 6/10/19 | 58,000 | 58,000 | | 667.00 | 3 | 247.39 GA |
| Grayhawk Homes | Moncus/Caleb | Superintendent | Construction | exempt | No | 9/3/19 | 36,000 | 40,000 | | 667.00 | not eligible | 0 AL |
| Grayhawk Homes | Recker/Chris | Division President | Construction | exempt | NO | 9/3/19 | 250,000 | 250,000 | | 0.00 | 2 | 274.55 GA |
| Grayhawk Homes | Conine/Roy | Superintendent | Construction | no | | 9/16/19 | 52,000 | 52,000 | none | 667.00 | not eligible | 0 GA |
| GH Services | Allen/Amy | VP Finance/Office Manager | SG&A | exempt | No | 8/29/09 | 32,000 | 84,000 | | 0.00 | 3 | 247.39 GA |
| GH Services | Clay/April | AP | SG&A | non | | 12/28/11 | | 36,000 | | 0.00 | 3 | 247.39 GA |
| GH Services | Morris/Dennis | Estimator | SG&A | exempt | No | 10/9/17 | 40,000 | 42,500 | | 0.00 | 3 | 247.36 GA |
| GH Services | Betts/Jason | CAD manager | SG&A | exempt | No | 7/28/14 | | 65,000 | 10/7/19 | 0.00 | 3 | 250.21 GA |
| GH Services | Leggett/James | Purchasing assistant | SG&A | non | No | 11/13/17 | 36,000 | 45,000 | | 0.00 | 3 | 247.39 GA |
| GH Services | Long/Katherine | Director of Design | SG&A | Exempt | No | 7/30/07 | | 80,000 | | 0.00 | 3 | 270.34 GA |
| GH Services | Richardson/Kristen | AP/Warranty | SG&A | non | No | 2/12/18 | 36,000 | 36,000 | none | 0.00 | 2 | 248.87 GA |
| GH Services | DiGiacomo/Phillip | Estimator | SG&A | non | No | 2/6/17 | 40,000 | 50,000 | | 0.00 | 3 | 247.69 GA |
| GH Services | Buss/Tina | | SG&A | non | No | 11/14/11 | | 60,000 | | 0.00 | | 0 GA |
| GH Services | Clapper/Tonya | Associate Accounting Mag | SG&A | exempt | No | 10/17/18 | 55,000 | 55,000 | none | 0.00 | 2 | 248.87 GA |
| GH Services | Jane/Jay | Estimating Manager | SG&A | exempt | No | 8/15/18 | 85,000 | 73,000 | | 0.00 | none | 0 GA |
| GH Services | Foster/Christopher | Cad operator | SG&A | non | No | 5/28/19 | 10 hr | 12.00 hr | 10/7/19 | | none | 0 GA |

| Company | Name (Last, First) | Job Title | Company phone | 2018 | | | 2019 | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Gross Salary | Gross Bonus | Total Compensation | Gross Salary | Gross Bonus | Total Compensation | |
| Grayhawk Homes | Joiner, Alan | Warranty Superintendent | yes | | | | 46,000 | 6,000 | 38,000 | |
| Grayhawk Homes | Callahan/Dan | Superintendent | yes | | | | 18,462 | 3,000 | 8,000 | Transferred to Columbus from Iowa |
| Grayhawk Homes | Deas/J. Devin | Superintendent | yes | | | | 52,231 | 23,000 | 52,923 | |
| Grayhawk Homes | Johnson/Judy | Permit Cordinator | no | 35,340 | 4,000 | 39,340 | 31,306 | 3,000 | 25,016 | |
| Grayhawk Homes | Shiley/Jeffrey | Superintendent | yes | 58,000 | 5,000 | 63,000 | 48,423 | 2,000 | 37,192 | |
| Grayhawk Homes | Weldon/Jimmy | Superintendent | yes | 48,800 | 9,000 | 57,800 | 45,662 | 12,000 | 41,400 | |
| Grayhawk Homes | Crow/Kristie | Decorator | no | 40,000 | 4,000 | 44,000 | 35,582 | 4,500 | 29,154 | |
| Grayhawk Homes | Gammon/Kevin | Superintendent | yes | 55,000 | 10,000 | 65,000 | 51,308 | 13,500 | 46,423 | |
| Grayhawk Homes | Spitznagel/Marquett | Adm Assistant | yes | 23,377 | 2,200 | 25,577 | 30,692 | 4,500 | 25,615 | |
| Grayhawk Homes | Windham/Mark | Warranty Superintendent | yes | 31,327 | 3,000 | 34,327 | 42,462 | 4,000 | 34,385 | Has obligation to US National Guard |
| Grayhawk Homes | Berdeaux/Reuben | Superintendent | yes | 18,400 | 2,500 | 20,900 | 42,300 | 7,500 | 35,500 | |
| Grayhawk Homes | Kelley/Robert | Superintendent | yes | 52,000 | 4,500 | 56,500 | 46,000 | 6,000 | 38,000 | |
| Grayhawk Homes | Spratlin/Russell | Superintendent | yes | | | | 50,862 | 13,500 | 43,200 | |
| Grayhawk Homes | Haygood/Steven | on your lot sales | yes | 54,600 | 3,500 | 58,100 | 48,300 | 4,500 | 38,700 | |
| Grayhawk Homes | Owenby/Timothy | Superintendent | yes | 18,800 | 2,000 | 20,800 | 47,687 | 13,500 | 43,923 | |
| Grayhawk Homes | Smith/Turnley | Superintendent | yes | - | - | - | 48,125 | 11,500 | 45,419 | |
| Grayhawk Homes | Downing/Brian | Superintendent | yes | | | | 23,423 | 3,000 | 12,269 | |
| Grayhawk Homes | Moncus/Caleb | Superintendent | yes | | | | 6,400 | 1,000 | 7,400 | |
| Grayhawk Homes | Recker/Chris | Division President | yes | | | | 36,038 | - | 36,038 | Has bonus agreement |
| Grayhawk Homes | Conine/Roy | Superintendent | yes | | | | 7,000 | 750 | 7,750 | |
| GH Services | Allen/Amy | VP Finance/Office Manager | no | 84,000 | 21,000 | 105,000 | 74,308 | 61,250 | 112,423 | Has bonus agreement based on global revenue |
| GH Services | Clay/April | AP | no | 36,000 | 4,000 | 40,000 | 31,846 | 4,500 | 26,539 | |
| GH Services | Morris/Dennis | Estimator | no | 42,062 | 5,000 | 47,062 | 37,596 | 3,000 | 29,789 | |
| GH Services | Betts/Jason | CAD manager | no | 56,861 | 5,000 | 61,861 | 50,561 | 6,000 | 40,677 | |
| GH Services | Leggett/James | Purchasing assistant | no | 37,526 | 4,000 | 41,526 | 34,752 | 3,000 | 26,921 | |
| GH Services | Long/Katherine | Director of Design | no | 79,385 | 1,000 | 80,385 | 70,769 | 11,862 | 60,215 | Has bonus agreement based on global net |
| GH Services | Richardson/Kristen | AP/Warranty | no | 30,184 | 3,000 | 33,184 | 30,704 | 4,500 | 25,950 | |
| GH Services | DiGiacomo/Phillip | Estimator | no | 49,038 | 5,000 | 54,038 | 44,231 | 3,000 | 34,692 | |
| GH Services | Buss/Tina | Estimator | no | 42,000 | 3,500 | 45,500 | 43,339 | 4,000 | 34,223 | |
| GH Services | Clapper/Tonya | Associate Accounting Mag | no | 8,462 | 1,000 | 9,462 | 47,702 | 5,500 | 53,202 | |
| GH Services | Jane/Jay | Estimating Manager | no | | | - | 24,227 | - | 24,227 | After 2 years increases to 3 weeks |
| GH Services | Foster/Christopher | Cad operator | no | | | - | 8,206 | 1,200 | 4,491 | hourly employee |

# SECTION 3.17 – ACCRUED PTO

**SCHEDULE 3.17 (a) – EE INFORMATION**

| Name (Last, First) | Vacation Accruals Gross amount | | ER Tax @7.65% | | Total Vacation Liabiltiy | |
|---|---|---|---|---|---|---|
| ix, xi, xii, xiii | | | | | | |
| Updated 11/15/19 | | | | | | |
| Subject to change if anyone takes time off before closing | | | | | | |
| Employer Tax Rate: | | | 0.0765 | | | |
| | $ | 1,302.50 | $ | 99.64 | $ | 1,402.14 |
| Joiner, Alan | $ | 713.17 | $ | 54.56 | $ | 767.73 |
| Callahan/Dan | $ | 1,745.76 | $ | 133.55 | $ | 1,879.31 |
| Deas/J. Devin | $ | 309.26 | $ | 23.66 | $ | 332.92 |
| Johnson/Judy | $ | 2,036.00 | $ | 155.75 | $ | 2,191.75 |
| Shiley/Jeffrey | $ | 1,488.23 | $ | 113.85 | $ | 1,602.08 |
| Weldon/Jimmy | $ | 888.39 | $ | 67.96 | $ | 956.35 |
| Crow/Kristie | $ | 2,801.38 | $ | 214.31 | $ | 3,015.69 |
| Gammon/Kevin | $ | 824.33 | $ | 63.06 | $ | 887.39 |
| Spitznagel/Marquett | $ | 365.13 | $ | 27.93 | $ | 393.06 |
| Windham/Mark | $ | 1,779.50 | $ | 136.13 | $ | 1,915.63 |
| Berdeaux/Reuben | $ | 2,104.90 | $ | 161.02 | $ | 2,265.92 |
| Kelley/Robert | $ | 551.35 | $ | 42.18 | $ | 593.53 |
| Spratlin/Russell | $ | 2,118.11 | $ | 162.04 | $ | 2,280.15 |
| Haygood/Steven | $ | 358.87 | $ | 27.45 | $ | 386.32 |
| Owenby/Timothy | $ | 511.26 | $ | 39.11 | $ | 550.37 |
| Smith/Turnley | $ | 764.47 | $ | 58.48 | $ | 822.95 |
| Downing/Brian | $ | 355.37 | $ | 27.19 | $ | 382.56 |
| Moncus/Caleb | $ | 1,130.99 | $ | 86.52 | $ | 1,217.51 |
| Recker/Chris | $ | 284.90 | $ | 21.79 | $ | 306.69 |
| Conine/Roy | $ | 1,611.16 | $ | 123.25 | $ | 1,734.41 |
| Allen/Amy | $ | 478.00 | $ | 36.57 | $ | 514.57 |
| Clay/April | $ | 222.99 | $ | 17.06 | $ | 240.05 |
| Morris/Dennis | $ | 899.69 | $ | 68.83 | $ | 968.52 |
| Betts/Jason | $ | 436.93 | $ | 33.43 | $ | 470.36 |
| Leggett/James | $ | 145.38 | $ | 11.12 | $ | 156.50 |
| Long/Katherine | $ | 176.22 | $ | 13.48 | $ | 189.70 |
| Richardson/Kristen | $ | 656.29 | $ | 50.21 | $ | 706.50 |
| DiGiacomo/Phillip | $ | 897.25 | $ | 68.64 | $ | 965.89 |
| Buss/Tina | $ | 522.98 | $ | 40.01 | $ | 562.99 |
| Clapper/Tonya | $ | - | $ | - | $ | - |
| Erickson/David | $ | 1,027.03 | $ | 78.57 | $ | 1,105.60 |
| Jane/Jay | $ | 107.46 | $ | 8.22 | $ | 115.68 |
| Foster/Christopher | $ | - | $ | - | $ | - |
| | $ | 29,615.25 | $2,265.57 | | $ | 31,880.82 |

**SECTION 3.18**
**RELATED PARTY TRANSACTIONS**

1. Section 3.7(t) of this Seller Disclosure Letter is incorporated by reference regarding land and lots under contract with related parties.

2. Brokerage services with Rose Anne Erickson Realty, LLC.

3. GH Services, Inc. services provides management services to:
   a. Grayhawk Homes of Atlanta, Inc.
   b. Grayhawk Homes of Iowa, Inc.
   c. Grayhawk Homes of South Carolina, Inc.
   d. Grayhawk Townhomes, Inc.
   e. Eddie Brown Grading, LLC
   f. Blackmon Development
   g. Dave Personal
   h. Windsong Bonacre
   i. Tiger Creek Development
   j. Rainer Capital, LLC
   k. Sage Development
   l. Grey Rock Development
   m. Garrett Creek Development
   n. Carrollton Development
   o. Charleston Place HOA
   p. Erickson Investments
   q. Southern Oaks HOA
   r. Cash Magic
   s. Willis Plantation
   t. Cusseta Road
   u. North Brent Property
   v. Homestead Residential, Inc.
   w. Grayhawk Homes, Inc.

4. Eddie Brown Grading, LLC performed grading and lot preparation services. David Erickson is the majority member of Eddie Brown Grading, LLC. {Total paid to Eddie Brown Grading, LLC was $ 26,878 for the eight months ended 8/31/2019}

## SECTION 3.19

## BUSINESS COLLATERAL

None

## SECTION 3.20(b)
## HOME WARRANTY OBLIGATIONS

Home Owner's Manual

Quality Builders Warranty – Limited Warranty Agreement

List of Outstanding Home Warranty Obligations

Home Warranty Procedures

## <u>SECTION 3.20(c)</u>
## HISTORICAL WARRANTY EXPERIENCE

See attached regarding Warranty Experience from 2017 – November 8, 2019 for:
1. Grayhawk Homes, Inc.
2. Homestead Residential, Inc.

See attached regarding Warranty Salaries from 2017 – 2018 for:
1. Grayhawk Homes, Inc.
2. Homestead Residential, Inc.

GH Services, Inc. has no warranty experience.

```
Grayhawk Homes                                    Year to-date Ledger - Accrual                          11/09/2019  Page 1
                                                                                                      System Date: 11/09/2019
                                                                                                      System Time:  7:39 am


                                                                           Beginning                                    Ending
  Date        Jrn        Ref 1      Ref 2      Batch      Transaction Desc    Balance           Debit        Credit      Balance

GH   Grayhawk Homes (1/01/2017 - 12/31/2017)

GH-000-47050.00000   Warranty, Salaries and Wages
 1/05/2017                                     694        PR Post checks summary                5,230.78
 1/19/2017                                     694        PR Post checks summary                5,230.78
                                                               Total  1/31/17    154,585.75*   10,461.56*         .00*  154,585.75* !!

 2/02/2017                                     696        PR Post checks summary                5,230.78
 2/16/2017                                     697        PR Post checks summary                5,230.78
                                                               Total  2/28/17    154,585.75*   10,461.56*         .00*  154,585.75* !!

 3/02/2017                                     699        PR Post checks summary                5,230.78
 3/16/2017                                     701        PR Post checks summary                5,492.31
 3/30/2017                                     702        PR Post checks summary                5,492.31
                                                               Total  3/31/17    154,585.75*   16,215.40*         .00*  154,585.75* !!

 4/13/2017                                     706        PR Post checks summary                5,492.31
 4/26/2017                                     716        PR Post checks summary                5,500.00
 4/26/2017                                     720        PR Post checks summary                4,000.00
 4/26/2017                                     718        PR Void checks summary                4,000.00-
 4/27/2017                                     715        PR Post checks summary                5,492.31
                                                               Total  4/30/17    154,585.75*   16,484.62*         .00*  154,585.75* !!

 5/11/2017                                     722        PR Post checks summary                5,492.31
 5/25/2017                                     726        PR Post checks summary                5,492.31
                                                               Total  5/31/17    154,585.75*   10,984.62*         .00*  154,585.75* !!

 6/08/2017                                     728        PR Post checks summary                5,492.31
 6/22/2017                                     731        PR Post checks summary                5,492.31
                                                               Total  6/30/17    154,585.75*   10,984.62*         .00*  154,585.75* !!

 7/06/2017                                     734        PR Post checks summary                5,492.31
 7/20/2017                                     739        PR Post checks summary                5,396.40
 7/24/2017                                     741        PR Post checks summary                3,500.00
                                                               Total  7/31/17    154,585.75*   14,388.71*         .00*  154,585.75* !!

 8/03/2017                                     743        PR Post checks summary                3,473.08
 8/03/2017                                     744        PR Post checks summary                1,730.77
 8/17/2017                                     746        PR Post checks summary                5,203.85
 8/31/2017                                     747        PR Post checks summary                5,203.85
                                                               Total  8/31/17    154,585.75*   15,611.55*         .00*  154,585.75* !!

 9/14/2017                                     749        PR Post checks summary                5,203.85
 9/28/2017                                     750        PR Post checks summary                4,338.47
                                                               Total  9/30/17    154,585.75*    9,542.32*         .00*  154,585.75* !!

10/12/2017                                     752        PR Post checks summary                5,203.85
10/26/2017                                     755        PR Post checks summary                5,203.85
                                                               Total 10/31/17    154,585.75*   10,407.70*         .00*  154,585.75* !!

11/09/2017                                     758        PR Post checks summary                5,203.85
11/20/2017                                     760        PR Post checks summary                4,000.00
11/22/2017                                     759        PR Post checks summary                5,203.85
                                                               Total 11/30/17    154,585.75*   14,407.70*         .00*  154,585.75* !!

12/07/2017                                     761        PR Post checks summary                5,066.54
12/21/2017                                     763        PR Post checks summary                5,203.85
12/31/2017             JMG                     1726       RECLASS RBLAXTON WARRANTY             4,365.00
```

Grayhawk Homes

Year-to-date Ledger - Accrual

11/09/2019  Page 2
System Date: 11/09/2019
System Time:  7:39 am

| Date | Jrn | Ref 1 | Ref 2 | Batch | Transaction Desc | Beginning Balance | Debit | Credit | Ending Balance |
|------|-----|-------|-------|-------|------------------|-------------------|-------|--------|----------------|
| | | | | | Total 12/31/17 | 154,585.75* | 14,635.39* | .00* | 169,221.14* |
| | | | | | Total Account GH-000-47050.00000 - Warranty, Salaries and Wages | 154,585.75* | 154,585.75* | .00* | 169,221.14* !! |
| | | | | | Total Company GH - Grayhawk Homes | 154,585.75* | 154,585.75* | .00* | 169,221.14* |
| GRAND TOTALS | | | | | | 154,585.75* | 154,585.75* | .00* | 169,221.14* |

```
Grayhawk Homes                                    Year-to-Date Ledger - Accrual                         11/09/2019  Page 1
                                                                                                      System Date: 11/09/2019
                                                                                                      System Time:  7:36 am


                                                                         Beginning                                      Ending
   Date      Jrn        Ref 1      Ref 2     Batch     Transaction Desc     Balance          Debit          Credit     Balance

GH   Grayhawk Homes (1/01/2018 - 12/31/2018)

GH-000-40100.WARR0    GH Warranty Sal
  1/04/2018                                   765        PR Post checks summary             3,149.95
  1/18/2018                                   766        PR Post checks summary             3,373.08
                                                           Total  1/31/18       .00*        6,523.03*          .00*    6,523.03*

  2/01/2018                                   770        PR Post checks summary             3,373.08
  2/15/2018                                   771        PR Post checks summary             3,373.08
                                                           Total  2/28/18   6,523.03*       6,746.16*          .00*   13,269.19*

  3/01/2018                                   772        PR Post checks summary             3,373.08
  3/15/2018                                   773        PR Post checks summary             3,373.08
  3/29/2018                                   774        PR Post checks summary             3,373.08
                                                           Total  3/31/18  13,269.19*      10,119.24*          .00*   23,388.43*

  4/03/2018                                   775        PR Post checks summary             3,500.00
  4/12/2018                                   776        PR Post checks summary             3,373.08
  4/26/2018                                   777        PR Post checks summary             3,373.08
                                                           Total  4/30/18  23,388.43*      10,246.16*          .00*   33,634.59*

  5/10/2018                                   778        PR Post checks summary             3,373.08
  5/24/2018                                   779        PR Post checks summary             3,373.08
                                                           Total  5/31/18  33,634.59*       6,746.16*          .00*   40,380.75*

  6/07/2018                                   782        PR Post checks summary             3,373.08
  6/21/2018                                   783        PR Post checks summary             3,373.08
                                                           Total  6/30/18  40,380.75*       6,746.16*          .00*   47,126.91*

  7/05/2018                                   785        PR Post checks summary             3,373.08
  7/19/2018                                   786        PR Post checks summary             3,373.08
                                                           Total  7/31/18  47,126.91*       6,746.16*          .00*   53,873.07*

  8/02/2018                                   787        PR Post checks summary             3,373.08
  8/16/2018                                   787        PR Post checks summary             3,373.08
  8/30/2018                                   788        PR Post checks summary             4,373.08
                                                           Total  8/31/18  53,873.07*      11,119.24*          .00*   64,992.31*

  9/11/2018                                   790        PR Post checks summary             3,000.00
  9/13/2018                                   789        PR Post checks summary             5,373.08
  9/27/2018                                   791        PR Post checks summary             5,373.08
                                                           Total  9/30/18  64,992.31*      13,746.16*          .00*   78,738.47*

 10/11/2018                                   792        PR Post checks summary             5,373.08
 10/25/2018                                   793        PR Post checks summary             5,373.08
                                                           Total 10/31/18  78,738.47*      10,746.16*          .00*   89,484.63*

 11/08/2018                                   797        PR Post checks summary             5,373.08
 11/20/2018                                   799        PR Post checks summary             3,000.00
 11/21/2018                                   798        PR Post checks summary             5,373.08
                                                           Total 11/30/18  89,484.63*      13,746.16*          .00*  103,230.79*

 12/06/2018                                   800        PR Post checks summary             5,236.24
 12/19/2018                                   804        PR Post checks summary             5,373.08
 12/20/2018                                   802        PR Post checks summary             5,373.08
 12/20/2018                                   803        PR Void checks summary             5,373.08-
                                                           Total 12/31/18 103,230.79*      10,609.32*          .00*  113,840.11*

                                 Total Account GH-000-40100.WARR0 - GH Warranty Sal   .00*  113,840.11*          .00*  113,840.11*


GH-000-40150.WARR0    AU/OP Warranty Sal
  1/04/2018                                   765        PR Post checks summary             1,730.77
  1/18/2018                                   766        PR Post checks summary             1,730.77
                                                           Total  1/31/18       .00*        3,461.54*          .00*    3,461.54*
```

Grayhawk Homes                  Year-to-Date Ledger - Accrual             11/09/2019   Page 2
System Date: 11/09/2019
System Time:  7:36 am

| Date | Jrn | Ref 1 | Ref 2 | Batch | Transaction Desc | Beginning Balance | Debit | Credit | Ending Balance |
|------|-----|-------|-------|-------|------------------|-------------------|-------|--------|----------------|
| GH-000-40150.WARR0 | AU/OP Warranty Sal - Continued | | | | | | | | |
| 2/01/2018 | | | | 770 | PR Post checks summary | | 1,730.77 | | |
| 2/15/2018 | | | | 771 | PR Post checks summary | | 1,730.77 | | |
| | | | | | Total  2/28/18 | 3,461.54* | 3,461.54* | .00* | 6,923.08* |
| 3/01/2018 | | | | 772 | PR Post checks summary | | 1,730.77 | | |
| 3/15/2018 | | | | 773 | PR Post checks summary | | 1,730.77 | | |
| 3/29/2018 | | | | 774 | PR Post checks summary | | 1,730.77 | | |
| | | | | | Total  3/31/18 | 6,923.08* | 5,192.31* | .00* | 12,115.39* |
| 4/03/2018 | | | | 775 | PR Post checks summary | | 1,000.00 | | |
| 4/12/2018 | | | | 776 | PR Post checks summary | | 1,730.77 | | |
| 4/26/2018 | | | | 777 | PR Post checks summary | | 2,544.24 | | |
| | | | | | Total  4/30/18 | 12,115.39* | 5,275.01* | .00* | 17,390.40* |
| 5/10/2018 | | | | 778 | PR Post checks summary | | 1,557.69 | | |
| 5/24/2018 | | | | 779 | PR Post checks summary | | 1,557.69 | | |
| | | | | | Total  5/31/18 | 17,390.40* | 3,115.38* | .00* | 20,505.78* |
| 6/07/2018 | | | | 782 | PR Post checks summary | | 1,730.77 | | |
| 6/21/2018 | | | | 783 | PR Post checks summary | | 1,730.77 | | |
| | | | | | Total  6/30/18 | 20,505.78* | 3,461.54* | .00* | 23,967.32* |
| 7/05/2018 | | | | 785 | PR Post checks summary | | 1,730.77 | | |
| 7/19/2018 | | | | 786 | PR Post checks summary | | 1,846.16 | | |
| | | | | | Total  7/31/18 | 23,967.32* | 3,576.93* | .00* | 27,544.25* |
| 8/02/2018 | | | | 787 | PR Post checks summary | | 1,846.16 | | |
| 8/16/2018 | | | | 787 | PR Post checks summary | | 1,846.16 | | |
| 8/30/2018 | | | | 788 | PR Post checks summary | | 1,846.16 | | |
| | | | | | Total  8/31/18 | 27,544.25* | 5,538.48* | .00* | 33,082.73* |
| 9/11/2018 | | | | 790 | PR Post checks summary | | 2,000.00 | | |
| 9/13/2018 | | | | 789 | PR Post checks summary | | 1,846.16 | | |
| 9/27/2018 | | | | 791 | PR Post checks summary | | 1,846.16 | | |
| | | | | | Total  9/30/18 | 33,082.73* | 5,692.32* | .00* | 38,775.05* |
| 10/11/2018 | | | | 792 | PR Post checks summary | | 1,846.16 | | |
| 10/25/2018 | | | | 793 | PR Post checks summary | | 1,846.16 | | |
| | | | | | Total 10/31/18 | 38,775.05* | 3,692.32* | .00* | 42,467.37* |
| 11/08/2018 | | | | 797 | PR Post checks summary | | 1,846.16 | | |
| 11/20/2018 | | | | 799 | PR Post checks summary | | 1,000.00 | | |
| 11/21/2018 | | | | 798 | PR Post checks summary | | 1,846.16 | | |
| | | | | | Total 11/30/18 | 42,467.37* | 4,692.32* | .00* | 47,159.69* |
| 12/06/2018 | | | | 800 | PR Post checks summary | | 1,846.16 | | |
| 12/19/2018 | | | | 804 | PR Post checks summary | | 1,846.16 | | |
| 12/20/2018 | | | | 802 | PR Post checks summary | | 1,846.16 | | |
| 12/20/2018 | | | | 803 | PR Void checks summary | | 1,846.16- | | |
| | | | | | Total 12/31/18 | 47,159.69* | 3,692.32* | .00* | 50,852.01* |
| | | | | Total Account GH-000-40150.WARR0 - AU/OP Warranty Sal | | .00* | 50,852.01* | .00* | 50,852.01* |
| | | | | Total Company GH - Grayhawk Homes | | .00* | 164,692.12* | .00* | 164,692.12* |
| GRAND TOTALS | | | | | | .00* | 164,692.12* | .00* | 164,692.12* |

| Account | Accounting Date | Vendor | Transaction Desc | Debit |
|---------|-----------------|--------|------------------|------:|
| HR-000-46600.00000 | 1/13/2017 | L&YPAINT | EL5A - 11 MONTH | 100.00 |
| HR-000-46600.00000 | 1/13/2017 | L&YPAINT | EL5A - 11 MONTH PAINT TOUCH UP | 125.00 |
| HR-000-46600.00000 | 1/20/2017 | GH | ACCT: 9800 669976 7 | 70.00 |
| HR-000-46600.00000 | 1/20/2017 | GH | ACCT: 9800 669976 7 | 13.03 |
| HR-000-46600.00000 | 1/20/2017 | L&YPAINT | AUP159 - REPATCH CEILING | 350.00 |
| HR-000-46600.00000 | 1/31/2017 | BFS | CR INV 26766643 | (67.90) |
| HR-000-46600.00000 | 2/16/2017 | FTHOMAS | AUP187 - TUB REPAIR | 160.00 |
| HR-000-46600.00000 | 2/16/2017 | L&YPAINT | RG11  11 MONTH | 75.00 |
| HR-000-46600.00000 | 2/16/2017 | L&YPAINT | RG11  11 MONTH | 100.00 |
| HR-000-46600.00000 | 2/23/2017 | POWERHOUSE | EL21A - 11 MONTH | 75.00 |
| HR-000-46600.00000 | 2/23/2017 | POWERHOUSE | EL22A - 11 MONTH | 100.00 |
| HR-000-46600.00000 | 2/23/2017 | POWERHOUSE | AL405 - 11 MONTH | 100.00 |
| HR-000-46600.00000 | 2/23/2017 | POWERHOUSE | AL405 - 11 MONTH | 125.00 |
| HR-000-46600.00000 | 2/27/2017 | BFS | | 67.90 |
| HR-000-46600.00000 | 3/03/2017 | ELITEFLOOR | AUP187-TUB REPAIR | (160.00) |
| HR-000-46600.00000 | 3/11/2017 | POWERHOUSE | EL21A - 11 MONTH | 100.00 |
| HR-000-46600.00000 | 3/11/2017 | POWERHOUSE | EL22A - 11  MONTH | 150.00 |
| HR-000-46600.00000 | 3/24/2017 | GH | REIM LOWES | 48.09 |
| HR-000-46600.00000 | 4/20/2017 | GH | LOWES REIM CHARGE | 77.38 |
| HR-000-46600.00000 | 5/15/2017 | ATLGLASS | EL18A-REPLACE BATH GLASS | 950.00 |
| HR-000-46600.00000 | 5/25/2017 | STONETOP | EL36 TOP WAS DAMAGED | 560.63 |
| HR-000-46600.00000 | 5/25/2017 | GH | TOOLS SUPPLIES FOR JOBS | 50.73 |
| HR-000-46600.00000 | 7/19/2017 | GH | SUPPLIES FOR WARRANTY | 76.75 |
| HR-000-46600.00000 | 7/20/2017 | ELITEFLOOR | EL36A - WRONG TILE INSTALLED | (200.00) |
| HR-000-46600.00000 | 7/20/2017 | GLZ&SON | RG63 - ROOF REPAIR | (125.00) |
| HR-000-46600.00000 | 7/28/2017 | R&R | RG38A - SPRINKLER SYSTEM | 75.00 |
| HR-000-46600.00000 | 8/04/2017 | RVRCTYDOOR | AUP187 - TRIP CHARGE | 190.00 |
| HR-000-46600.00000 | 8/17/2017 | ATLGLASS | EL36A - SHOWER DOOR | 200.00 |
| HR-000-46600.00000 | 8/17/2017 | GH | SMALL TOOL SUPPLIES LOWES | 73.49 |
| HR-000-46600.00000 | 8/31/2017 | CRITERIUM | AL355 - RETAINING WALL | 320.00 |
| HR-000-46600.00000 | 9/21/2017 | GH | SMALL TOOLS  SUPPLIES | 71.38 |
| HR-000-46600.00000 | 9/28/2017 | HDSUPPLY | 4" PIPE W/SOCK ADS | 97.20 |
| HR-000-46600.00000 | 9/28/2017 | HDSUPPLY | 4" PIPE W/SOCK ADS | 7.78 |
| HR-000-46600.00000 | 9/28/2017 | NELQTYROOF | RG63 - REPAIR ROOF LEAK | 125.00 |
| HR-000-46600.00000 | 10/19/2017 | GH | SMALL TOOL SUPPLIES FOR JOBS | 18.38 |
| HR-000-46600.00000 | 12/14/2017 | ATLGLASS | EL38A - RE-INSTALL GLASS | 310.13 |
| HR-000-46600.00000 | 12/14/2017 | GH | LOWES REIM | 105.78 |
| HR-000-46600.00000 | 12/22/2017 | ATLGLASS | EL38A - REINSTALL SHOWER | 200.00 |
| | | | | 4,715.75 |

| Account | Accounting Date | Vendor | Transaction Desc | Debit |
|---|---|---|---|---|
| HR-000-46600.00000 | 1/19/2018 | GH | LOWES REIM TOOLS FOR JOBS | 45.57 |
| HR-000-46600.00000 | 3/05/2018 | CARBAJAL | RG82 - DRYWALL CEILINGS | 450.00 |
| HR-000-46600.00000 | 3/05/2018 | INTOWNDES | EL38A - RE-STAIN CABINET HOOD | 380.00 |
| HR-000-46600.00000 | 3/12/2018 | HDSUPPLY | AUP178 - 4" DRAIN PIPE | 88.00 |
| HR-000-46600.00000 | 3/12/2018 | HDSUPPLY | AUP178 - 4" DRAIN PIPE | 7.04 |
| HR-000-46600.00000 | 3/16/2018 | GHSVCS | HR LOWES SUPPLIES WARR | 37.43 |
| HR-000-46600.00000 | 3/23/2018 | ELITEFLOOR | EL38A/REINSTALL GLASS ENCLOSUR | (200.00) |
| HR-000-46600.00000 | 3/30/2018 | ELITEFLOOR | EL43A - REPAIR TILE | 210.00 |
| HR-000-46600.00000 | 3/30/2018 | ULTIMATE | AUP187 - FRENCH DRAIN INSTALL | 1,300.00 |
| HR-000-46600.00000 | 4/04/2018 | MERIDIAN | CR668 -  DRYSTACK | 141.70 |
| HR-000-46600.00000 | 4/04/2018 | OCONEE | RG63A - DRIVEWAY MATERIAL | 366.24 |
| HR-000-46600.00000 | 4/04/2018 | OCONEE | RG64A - DRIVEWAY MATERIAL | 366.24 |
| HR-000-46600.00000 | 4/20/2018 | AVMASONRY | CR668 - REPLACE STONE | 600.00 |
| HR-000-46600.00000 | 4/20/2018 | ELITEFLOOR | CR668 - REPLACE FLOORING | 150.00 |
| HR-000-46600.00000 | 4/20/2018 | RINCONCRET | RG64A - REPLACE DRIVEWAY | 450.00 |
| HR-000-46600.00000 | 4/20/2018 | RINCONCRET | RG63A - REPLACE DRIVEWAY | 450.00 |
| HR-000-46600.00000 | 5/10/2018 | CARBAJAL | | 325.00 |
| HR-000-46600.00000 | 5/10/2018 | PRECSURV | | 250.00 |
| HR-000-46600.00000 | 5/22/2018 | GHSVCS | REIM LOWES TOOL SUPPLIES | 50.01 |
| HR-000-46600.00000 | 5/31/2018 | ATLGLASS | | 400.00 |
| HR-000-46600.00000 | 5/31/2018 | ATLGLASS | (Rev) | (400.00) |
| HR-000-46600.00000 | 5/31/2018 | ATLGLASS | EL35A, RE-INSTALL SHOWER DOOR | 400.00 |
| HR-000-46600.00000 | 6/27/2018 | GHSVCS | SMALL TOOL FOR JOBS | 85.84 |
| HR-000-46600.00000 | 6/29/2018 | OCONEE | | 457.80 |
| HR-000-46600.00000 | 6/29/2018 | OCONEE | (Rev) | (457.80) |
| HR-000-46600.00000 | 6/29/2018 | OCONEE | RG84A - MONO SLAB | 457.80 |
| HR-000-46600.00000 | 7/06/2018 | GARCIA | | 450.00 |
| HR-000-46600.00000 | 7/06/2018 | ULTIMATE | | 800.00 |
| HR-000-46600.00000 | 7/06/2018 | ULTIMATE | (Rev) | (800.00) |
| HR-000-46600.00000 | 7/06/2018 | ULTIMATE | SWF93, SOD REPAIR | 800.00 |
| HR-000-46600.00000 | 7/06/2018 | GARCIA | (Rev) | (450.00) |
| HR-000-46600.00000 | 7/06/2018 | GARCIA | RG84A, REMOVE PAVERS | 450.00 |
| HR-000-46600.00000 | 7/31/2018 | GHSVCS | LOWES: SUPPLIES FOR HR JOB | 21.31 |
| HR-000-46600.00000 | 8/09/2018 | ATLGLASS | AL355, RE-INSTALL SHOWER | 100.00 |
| HR-000-46600.00000 | 8/09/2018 | CARBAJAL | AL355, REPAINT DOOR | 150.00 |
| HR-000-46600.00000 | 8/15/2018 | MERIDIAN | AUP178, RETAINING WALL BLOCK | 237.62 |
| HR-000-46600.00000 | 8/17/2018 | WOODCREAT | AUP178, REASSEMBLE RETAINING W | 3,100.00 |
| HR-000-46600.00000 | 8/27/2018 | TOENVIR | AUP178, FRENCH DRAINS | 95.92 |
| HR-000-46600.00000 | 8/30/2018 | GHSVCS | LOWES HR WARR TOOLS FOR JOBS | 125.45 |
| HR-000-46600.00000 | 9/06/2018 | ELITEFLOOR | AUP182, TILE REPAIR | (200.00) |
| HR-000-46600.00000 | 9/20/2018 | ULTIMATE | AUP164, REPLACE GRASS | 3,940.00 |
| HR-000-46600.00000 | 9/27/2018 | TOENVIR | AUP164, SILT FENCE | 90.47 |
| HR-000-46600.00000 | 9/28/2018 | GHSVCS | LOWES HR WARR SUPPLIES | 12.08 |
| HR-000-46600.00000 | 10/11/2018 | ATLGLASS | AUP182, RE-INSTALL SHOWER | 200.00 |
| HR-000-46600.00000 | 10/11/2018 | R&R | AUP178, REPLACERESET SPRINKLE | 156.00 |
| HR-000-46600.00000 | 10/11/2018 | R&R | AUP164, REPLACERESET SPRINKLE | 400.00 |
| HR-000-46600.00000 | 10/11/2018 | ULTIMATE | AUP178, REPAIR YARD | 200.00 |
| HR-000-46600.00000 | 10/22/2018 | 84LUM | AUP164, WINDOWS | 198.38 |
| HR-000-46600.00000 | 10/26/2018 | BRANDVAUGH | AUP139, REPLACE DOOR SLAB | 54.23 |
| HR-000-46600.00000 | 10/30/2018 | GHSVCS | LOWES SUPPLIES FOR  WARR JOBS | 39.38 |
| HR-000-46600.00000 | 12/14/2018 | BFSAUBURN | AUP139, EXTERIOR DR SLAB | 163.50 |
| HR-000-46600.00000 | 12/27/2018 | GHSVCS | HR LOWES: WARR SUPPLIES | 166.65 |
| | | | | 16,911.86 |

| Account | Accounting Date | Vendor | Transaction Desc | Debit |
|---|---|---|---|---|
| HR-000-46600.00000 | 1/03/2019 | INTOWNDES | RG12, REPLACE FRIG PANEL | 250.00 |
| HR-000-46600.00000 | 1/30/2019 | GHSVCS | LOWES: HR WARR TOOL JOBS | 30.67 |
| HR-000-46600.00000 | 2/27/2019 | GHSVCS | LOWES: HR WARR SUPPLIES | 27.15 |
| HR-000-46600.00000 | 4/04/2019 | ALEXELEC | AL 428 - TRIP CHARGEREPLACE B | 100.00 |
| HR-000-46600.00000 | 4/29/2019 | GHSVCS | LOWES: WARR SUPPLIES FOR JOBS | 22.67 |
| HR-000-46600.00000 | 5/23/2019 | AVMASONRY | SWF60, REPLACE STONE | 500.00 |
| HR-000-46600.00000 | 5/23/2019 | AVMASONRY | SWF60, REPLACE STONE | 200.00 |
| HR-000-46600.00000 | 5/23/2019 | SCONSVCS | SWF93, REPLACE ELBOW DOWNSPOUT | 200.00 |
| HR-000-46600.00000 | 5/28/2019 | GHSVCS | LOWES SUPPLIES FOR JOBS | 439.19 |
| HR-000-46600.00000 | 6/26/2019 | GHSVCS | LOWES WARR SUPPLIES FOR JOBS | 19.28 |
| HR-000-46600.00000 | 7/29/2019 | GHSVCS | HR WARR REIM LOWES SUPPLIES | 12.56 |
| HR-000-46600.00000 | 8/27/2019 | GHSVCS | HR WARR LOWES SUPPLIES | 18.62 |
| HR-000-46600.00000 | 9/05/2019 | K&JREMODEL | AL419, REGRADE AREA | 750.00 |
| HR-000-46600.00000 | 9/24/2019 | GHSVCS | LOWES HR WARR SUPPLIES | 33.49 |
| HR-000-46600.00000 | 9/26/2019 | ROS | CR668, REPLACE STONE | 1,611.24 |
| HR-000-46600.00000 | 9/26/2019 | MARTINEZ | CR668,FELT PAPER NOT LOT ENOUG | (332.25) |
| HR-000-46600.00000 | 11/07/2019 | PERFLAWNS | AL428, INSTALL FRENCH DRAIN | 700.00 |
| | | | | 4,582.62 |

| Account | Accounting Date | Vendor | Transaction Desc | Debit |
|---------|-----------------|--------|------------------|-------|
| GH-000-46600.00000 | 1/04/2017 | BFS | SP26A EXTERIOR | 559.28 |
| GH-000-46600.00000 | 1/05/2017 | ALEXELEC | BL93 - REPLACE FLOOD LIGHT | 50.00 |
| GH-000-46600.00000 | 1/05/2017 | ALEXELEC | NIP8D - TRIP CHARGE,REHANG FAN | 150.00 |
| GH-000-46600.00000 | 1/05/2017 | ALEXELEC | SE31-REPLACE FLOOD LIGHT | 100.00 |
| GH-000-46600.00000 | 1/05/2017 | ALEXELEC | SE32-JETTED TUB OUTLET ADD | 125.00 |
| GH-000-46600.00000 | 1/05/2017 | ALEXELEC | GP13-REPLACE CEILING FANS | 75.00 |
| GH-000-46600.00000 | 1/05/2017 | ALEXELEC | GP13-PLEACE CEILING FAN | 75.00 |
| GH-000-46600.00000 | 1/05/2017 | CARBAJAL | SO53A - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/05/2017 | CARBAJAL | LAUREL HILL 106 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/05/2017 | MEDINA | SO19D - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 1/05/2017 | MEDINA | NGF54A - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 1/12/2017 | LOWES | ACCT: 9800 669976 7 | 273.47 |
| GH-000-46600.00000 | 1/12/2017 | CARBAJAL | NIP9E-11 MONTH PAINT TOUCH UP | 100.00 |
| GH-000-46600.00000 | 1/12/2017 | L&YPAINT | DR1 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/12/2017 | L&YPAINT | DR1 - 11 MONTH PAINT TOUCH | 125.00 |
| GH-000-46600.00000 | 1/12/2017 | MEDINA | NIP9E - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 1/12/2017 | MEDINA | GCL22H - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 1/19/2017 | AIRCONTH&C | NIP6E - MOVE AC UNIT | 175.00 |
| GH-000-46600.00000 | 1/19/2017 | CARBAJAL | GCL22H - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/19/2017 | CARBAJAL | GCL22H - TRIP CHARGE | 75.00 |
| GH-000-46600.00000 | 1/19/2017 | CARBAJAL | SP13D - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/19/2017 | DANNYSDRY | NIP95C-ROOD LEAK REPAIR DRYWAL | 100.00 |
| GH-000-46600.00000 | 1/19/2017 | FANCLEAN | NGF51A - TOUCH UP CLEAN | 50.00 |
| GH-000-46600.00000 | 1/19/2017 | L&YPAINT | RC2-26 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/19/2017 | L&YPAINT | RC2-26 - 11 MONTH | 125.00 |
| GH-000-46600.00000 | 1/19/2017 | L&YPAINT | DR52 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/19/2017 | L&YPAINT | DR52 - 11 MONTH | 125.00 |
| GH-000-46600.00000 | 1/19/2017 | L&YPAINT | BL2 - PAINT TRIP CHARGE | 200.00 |
| GH-000-46600.00000 | 1/19/2017 | MEDINA | NIP93C - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 1/19/2017 | MEDINA | NIP93C - TRIP CHARGE | 75.00 |
| GH-000-46600.00000 | 1/19/2017 | MEDINA | SP13D - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 1/25/2017 | BFS | 48" OAK TREADS | 173.99 |
| GH-000-46600.00000 | 1/26/2017 | CARBAJAL | GP17J - PAINT TOUCH UP | 100.00 |
| GH-000-46600.00000 | 1/26/2017 | CARBAJAL | LH22G - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 1/26/2017 | CARBAJAL | RC2-26 11 MONTH | 75.00 |
| GH-000-46600.00000 | 1/26/2017 | CARBAJAL | 105 LAUREL HILLS-11 MONTH | 75.00 |
| GH-000-46600.00000 | 1/26/2017 | GRASSROOTS | NGF51A - ADD'L SOD | 435.00 |
| GH-000-46600.00000 | 1/26/2017 | GRASSROOTS | NGF51A - EROSION CONTROL | 350.00 |
| GH-000-46600.00000 | 1/26/2017 | INTOWNDES | GP30BB - CABINET SHELF MISSING | 55.64 |
| GH-000-46600.00000 | 1/26/2017 | L&YPAINT | DR45 - 11 MONTH | 125.00 |
| GH-000-46600.00000 | 1/31/2017 | FERGUS | FLAT STONE ESTATES | 167.46 |
| GH-000-46600.00000 | 2/02/2017 | CARBAJAL | GP17J - TRIP CHARGE | 75.00 |
| GH-000-46600.00000 | 2/02/2017 | CARBAJAL | RE38 - TOUCH UP | 100.00 |
| GH-000-46600.00000 | 2/02/2017 | DUPREE | PLUMBING ROUGH | 375.00 |
| GH-000-46600.00000 | 2/02/2017 | GLZ&SON | DR51 - RESHINGLE | 75.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | SP13D - 11 MONTH | 135.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | LH8J - INT. TRIM L | 45.00 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | GCO22H - ADJUST BACK DOOR | 45.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | GP17J - CHANGE OUT SHOW MOLD | 45.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | PW19A - ADJUST DOORS | 45.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | NGF4A - 11 MONTH | 45.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | LH105 - 11 MONTH | 90.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | LH106 - 11 MONTH | 90.00 |
| GH-000-46600.00000 | 2/02/2017 | RUSCO | HOC4 - WHIRLPOOL MOTOR BAD | 350.00 |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | (Rev)SP13D - 11 MONTH | (135.00) |
| GH-000-46600.00000 | 2/02/2017 | MILLSUP | SP13D - 11 MONTH | 135.00 |
| GH-000-46600.00000 | 2/13/2017 | CARBAJAL | NIP95C PAINT TOUCH UP | 75.00 |
| GH-000-46600.00000 | 2/15/2017 | LOWES | ACCT:9800 669976 7 | 197.20 |
| GH-000-46600.00000 | 2/16/2017 | CARBAJAL | NIP93C - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 2/16/2017 | DUPREE | RE38 - PLUMBING TRIM | 125.00 |
| GH-000-46600.00000 | 2/16/2017 | L&YPAINT | SPL26 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 2/16/2017 | L&YPAINT | SPL26 - 11 MONTH | 200.00 |
| GH-000-46600.00000 | 2/16/2017 | L&YPAINT | DR43 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 2/16/2017 | L&YPAINT | DR43 - 11 MONTH | 200.00 |
| GH-000-46600.00000 | 2/16/2017 | MATTCONCRE | RB97 - DRIVEWAY LABOR | 50.00 |
| GH-000-46600.00000 | 2/16/2017 | MEDINA | NGF9D - REPAIR DRYWALL | 120.00 |
| GH-000-46600.00000 | 2/16/2017 | MEDINA | LH22G - 11 MONTH | 75.00 |
| GH-000-46600.00000 | 2/16/2017 | MEDINA | LH22G - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 2/16/2017 | MEDINA | SP8B - REPAIR DRYWALL | 175.00 |
| GH-000-46600.00000 | 2/16/2017 | MILLSUP | SO54A - 11 MONTH | 45.00 |
| GH-000-46600.00000 | 2/16/2017 | MILLSUP | LH22G - 11 MONTH | 45.00 |
| GH-000-46600.00000 | 2/16/2017 | POWERHOUSE | SP30A - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 2/16/2017 | POWERHOUSE | BL101 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 2/16/2017 | POWERHOUSE | BL97 - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 2/16/2017 | POWERHOUSE | GPC11A - REPAINT DOORS | 150.00 |
| GH-000-46600.00000 | 2/16/2017 | RUSCO | RC20 - STOPPER RING REPLACED | 100.00 |
| GH-000-46600.00000 | 2/28/2017 | BFS | PARIO DOOR | 509.57 |
| GH-000-46600.00000 | 3/02/2017 | DUPREE | SO21D - WATER LEAK | (175.00) |
| GH-000-46600.00000 | 3/02/2017 | ELITEFLOOR | RC237 11 MONTH | 150.00 |
| GH-000-46600.00000 | 3/02/2017 | ELITEFLOOR | NIP9E - REPLACE TILE | 600.00 |
| GH-000-46600.00000 | 3/02/2017 | ELITEFLOOR | HL9C - REPLACE TILE | 235.00 |
| GH-000-46600.00000 | 3/02/2017 | POWERHOUSE | SP18B - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/02/2017 | POWERHOUSE | RB99 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/02/2017 | POWERHOUSE | SO20D - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/02/2017 | POWERHOUSE | PW5B - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 3/02/2017 | POWERHOUSE | PW5B - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/02/2017 | QLTYROOF | DR51 - RESHINGLE | (75.00) |
| GH-000-46600.00000 | 3/09/2017 | FERGUS | HWY400 LOT 9-TUB REPALCED | (300.00) |
| GH-000-46600.00000 | 3/09/2017 | FERGUS | NIP93C - DEFECTIVE SHOWER PAN | (350.00) |
| GH-000-46600.00000 | 3/10/2017 | QLTYROOF | (Rev)DR51 - RESHINGLE | 75.00 |
| GH-000-46600.00000 | 3/11/2017 | DUPREE | SO32D-SHOWER PANS LEVELED | (200.00) |
| GH-000-46600.00000 | 3/11/2017 | FANCLEAN | BL107 - TOUCH UP CLEAN | 50.00 |
| GH-000-46600.00000 | 3/11/2017 | POWERHOUSE | 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/11/2017 | POWERHOUSE | FSE45 - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 3/11/2017 | POWERHOUSE | FSE45 - 11 MONTH | 100.00 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 3/11/2017 | POWERHOUSE | LH13J - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 3/11/2017 | POWERHOUSE | LH13J - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/11/2017 | POWERHOUSE | SO21D - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 3/11/2017 | POWERHOUSE | SO21D - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/14/2017 | LOWES | ACCT: 9800669976 7 | 129.78 |
| GH-000-46600.00000 | 3/16/2017 | POWERHOUSE | SPL39- TOUCH UP PAINT | 800.00 |
| GH-000-46600.00000 | 3/23/2017 | TOMAR | SHORT PAID HL12C | 3.00 |
| GH-000-46600.00000 | 3/23/2017 | ATLGLASS | SO32D-REINSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 3/23/2017 | GLZ&SON | NIP95C - ROOF LEAK | (100.00) |
| GH-000-46600.00000 | 3/23/2017 | MILLSUP | SP50D - REPLACE SHOE MOULD | 45.00 |
| GH-000-46600.00000 | 3/23/2017 | POWERHOUSE | GVP20 - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 3/23/2017 | POWERHOUSE | GVP20 - 11 MONTH | 100.00 |
| GH-000-46600.00000 | 3/29/2017 | FERGUS | GP17J-PAINT REPAIR | (100.00) |
| GH-000-46600.00000 | 3/30/2017 | INTOWNDES | SO21D - CABINET REPLACED | 175.00 |
| GH-000-46600.00000 | 3/30/2017 | MEDINA | 11 MONTH | 95.00 |
| GH-000-46600.00000 | 3/30/2017 | POWERHOUSE | SO16D - 11 MONTH | 95.00 |
| GH-000-46600.00000 | 3/30/2017 | POWERHOUSE | 11 MONTH | 100.00 |
| GH-000-46600.00000 | 4/05/2017 | FERGUS | BL115 - SHOWER | 261.36 |
| GH-000-46600.00000 | 4/05/2017 | FERGUS | NGF9D-BAD BED PAN | (120.00) |
| GH-000-46600.00000 | 4/05/2017 | FERGUS | GP17J-DEFECTIVE SHOWER PAN | (45.00) |
| GH-000-46600.00000 | 4/06/2017 | FERGUS | | 67.99 |
| GH-000-46600.00000 | 4/07/2017 | GRASSROOTS | GP11A-REPLACE SHRUBS | 150.00 |
| GH-000-46600.00000 | 4/07/2017 | INTOWNDES | SP50D - REPLACE CABINET DOOR | 72.25 |
| GH-000-46600.00000 | 4/13/2017 | DUPREE | SO32D - DEFECTIVE SHOWER PAN | 350.00 |
| GH-000-46600.00000 | 4/13/2017 | DUPREE | SP25A - DEFECETIVE SHOWER PAN | 350.00 |
| GH-000-46600.00000 | 4/13/2017 | DUPREE | BL115 - WRONG SHOWER PAN | 350.00 |
| GH-000-46600.00000 | 4/13/2017 | ELITEFLOOR | LH158H - 11 MONTH | 150.00 |
| GH-000-46600.00000 | 4/13/2017 | ELITEFLOOR | RE38 - REMOVE FLOORING | 3,532.50 |
| GH-000-46600.00000 | 4/13/2017 | WHEELER | FSE43 - FILL IN SETTLEMENT | 100.00 |
| GH-000-46600.00000 | 4/17/2017 | LOWES | ACCT: 9800 669976 7 | 125.69 |
| GH-000-46600.00000 | 4/19/2017 | FERGUS | GP17J-REPAIR TILE | (350.00) |
| GH-000-46600.00000 | 4/19/2017 | FERGUS | SO32D-REPLACE TILE | (250.00) |
| GH-000-46600.00000 | 4/20/2017 | FTHOMAS | GP12 - TUB REPAIR | 160.00 |
| GH-000-46600.00000 | 4/20/2017 | GRASSROOTS | HL2A- LAY NEW SOD | 300.00 |
| GH-000-46600.00000 | 4/20/2017 | R&R | XW51 - SPRINKLER SYSTEM | 112.89 |
| GH-000-46600.00000 | 4/27/2017 | CARBAJAL | NIP93C - PAINT TOUCH UP | 50.00 |
| GH-000-46600.00000 | 4/27/2017 | POWERHOUSE | SP50D - PAINT PORCH CEILING | 75.00 |
| GH-000-46600.00000 | 5/03/2017 | FERGUS | NGF50A | 261.36 |
| GH-000-46600.00000 | 5/03/2017 | FERGUS | SO32D-DEFECTIVE SHOWER PAN | (350.00) |
| GH-000-46600.00000 | 5/03/2017 | FERGUS | SP25A-DEFECTIVE SHOWER PAN | (350.00) |
| GH-000-46600.00000 | 5/03/2017 | FERGUS | CREDIT INV 3633331 | (261.36) |
| GH-000-46600.00000 | 5/03/2017 | FERGUS | SPL35 - WATER HEATER | 965.17 |
| GH-000-46600.00000 | 5/09/2017 | ULTIMATE | SE2-FILL IN LOW SPOTS | 100.00 |
| GH-000-46600.00000 | 5/16/2017 | LOWES | SMALL TOOLS/SUPPLES WARR JOBS | 186.29 |
| GH-000-46600.00000 | 5/18/2017 | ALLSEASONS | GPC13A - NAIL IN LINE SET | (125.00) |
| GH-000-46600.00000 | 5/18/2017 | NELQTYROOF | SO41D - REPAIR LEAKY ROOF | 125.00 |
| GH-000-46600.00000 | 5/24/2017 | FERGUS | NGF50A SHWR BSE WHIT | 261.36 |
| GH-000-46600.00000 | 5/24/2017 | FERGUS | SP25A - DEFECTIVE SHOWER PAN | (250.00) |

| | | | | |
|---|---|---|---|---:|
| GH-000-46600.00000 | 5/25/2017 | DANNYSDRY | SHEETROCK FINISH | 375.00 |
| GH-000-46600.00000 | 5/25/2017 | DANNYSDRY | SHEETROCK FINISH | 125.00 |
| GH-000-46600.00000 | 5/25/2017 | DUPREE | BL115 - REINSTALL SHOWER WAND | 125.00 |
| GH-000-46600.00000 | 5/25/2017 | ELITEFLOOR | CARPET SQ FT GP25J | 810.00 |
| GH-000-46600.00000 | 5/25/2017 | ELITEFLOOR | CARPET SQ FT SO24D | 225.00 |
| GH-000-46600.00000 | 5/25/2017 | ELITEFLOOR | WOOD FLR - HOC5 | 450.00 |
| GH-000-46600.00000 | 5/25/2017 | ELITEFLOOR | TILE - GP17J | 350.00 |
| GH-000-46600.00000 | 5/25/2017 | ELITEFLOOR | TILE - SO32D | 250.00 |
| GH-000-46600.00000 | 5/25/2017 | ELITEFLOOR | TILE - BL115 | 520.00 |
| GH-000-46600.00000 | 5/25/2017 | ELITEFLOOR | WOOD FLR BL191 | 320.00 |
| GH-000-46600.00000 | 5/25/2017 | GH | TOOLS SUPPLIES FOR JOBS | 50.73 |
| GH-000-46600.00000 | 5/25/2017 | GH | (Rev)TOOLS SUPPLIES FOR JOBS | (50.73) |
| GH-000-46600.00000 | 5/26/2017 | FERGUS | SO24D-DEFECTIVE SHOWER PAN | (350.00) |
| GH-000-46600.00000 | 5/31/2017 | FERGUS | CCV73 DISPOSAL | 52.94 |
| GH-000-46600.00000 | 5/31/2017 | FERGUS | CCV73 DISPOSAL | 0.49 |
| GH-000-46600.00000 | 6/01/2017 | ELITEFLOOR | GP12 - CARPET STRETCH | 100.00 |
| GH-000-46600.00000 | 6/02/2017 | MATTCONCRE | GPC12A - REPAIR CRACK | 250.00 |
| GH-000-46600.00000 | 6/06/2017 | FERGUS | SO24D - REPLACE SHOWER TILE | (300.00) |
| GH-000-46600.00000 | 6/08/2017 | FANCLEAN | AUP182 - PRESSURE WASH | 135.00 |
| GH-000-46600.00000 | 6/08/2017 | FANCLEAN | AUP182 - FINAL CLEAN | 100.00 |
| GH-000-46600.00000 | 6/08/2017 | FANCLEAN | AUP182 - TOUCH UP CLEAN | 100.00 |
| GH-000-46600.00000 | 6/08/2017 | FANCLEAN | (Rev)AUP182 - PRESSURE WASH | (135.00) |
| GH-000-46600.00000 | 6/08/2017 | FANCLEAN | (Rev)AUP182 - FINAL CLEAN | (100.00) |
| GH-000-46600.00000 | 6/08/2017 | FANCLEAN | (Rev)AUP182 - TOUCH UP CLEAN | (100.00) |
| GH-000-46600.00000 | 6/09/2017 | CARBAJAL | PAINT TOUCHUP | 100.00 |
| GH-000-46600.00000 | 6/09/2017 | FANCLEAN | GP18AA - TOUCH CLEAN | 50.00 |
| GH-000-46600.00000 | 6/09/2017 | FANCLEAN | RB90 - TOUCH CLEAN | 50.00 |
| GH-000-46600.00000 | 6/09/2017 | GRASSROOTS | NIP 78C,79C - FINAL GRADE | 800.00 |
| GH-000-46600.00000 | 6/09/2017 | GRASSROOTS | RB99 - LANDSCAPE PACK | 500.00 |
| GH-000-46600.00000 | 6/09/2017 | INTOWNDES | BL97 - TRIP CHARGE | 100.00 |
| GH-000-46600.00000 | 6/09/2017 | INTOWNDES | CABINETS | 125.00 |
| GH-000-46600.00000 | 6/13/2017 | LOWES | TOOLS SUPPLIES FOR JOBS | 106.52 |
| GH-000-46600.00000 | 6/15/2017 | FTHOMAS | SO45D - TUB REPAIR | 320.00 |
| GH-000-46600.00000 | 6/16/2017 | ATLGLASS | BLINDS - HOC2 | 518.00 |
| GH-000-46600.00000 | 6/16/2017 | ATLGLASS | SO24D, RE-INSTALL SHOWER DOOR | 100.00 |
| GH-000-46600.00000 | 6/16/2017 | DUPREE | REPLACE DEFECTIVE SHOWER PAN | 350.00 |
| GH-000-46600.00000 | 6/16/2017 | ELITEFLOOR | SO24D - REPLACE SHOWER TILE | 300.00 |
| GH-000-46600.00000 | 6/26/2017 | FERGUS | | 1,497.60 |
| GH-000-46600.00000 | 6/26/2017 | FERGUS | | 13.87 |
| GH-000-46600.00000 | 6/26/2017 | FERGUS | (Rev) | (1,497.60) |
| GH-000-46600.00000 | 6/26/2017 | FERGUS | SPL41-WATER HEATER | 1,497.60 |
| GH-000-46600.00000 | 6/26/2017 | FERGUS | (Rev) | (13.87) |
| GH-000-46600.00000 | 6/26/2017 | FERGUS | SPL41-WATER HEATER | 13.87 |
| GH-000-46600.00000 | 6/28/2017 | FERGUS | RC2-18 REPLACE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 6/28/2017 | FERGUS | RC2-18 REPLACE SHOWER PAN | (300.00) |
| GH-000-46600.00000 | 6/28/2017 | FERGUS | RC2-18 REPLACE SHOWER PAN | (350.00) |
| GH-000-46600.00000 | 6/28/2017 | FERGUS | WT99 REPLACE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 6/28/2017 | FERGUS | WT99 REPLACE SHOWER PAN | (350.00) |

| | | | | |
|---|---|---|---|---:|
| GH-000-46600.00000 | 6/28/2017 | FERGUS | WT99 REPLACE SHOWER PAN | (300.00) |
| GH-000-46600.00000 | 6/28/2017 | FERGUS | RC2-18 REPLACE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 6/29/2017 | GRASSROOTS | LH21F - BACKFILL RETAINING WAL | 300.00 |
| GH-000-46600.00000 | 7/10/2017 | HDSUPPLY | | 88.00 |
| GH-000-46600.00000 | 7/10/2017 | HDSUPPLY | (Rev) | (88.00) |
| GH-000-46600.00000 | 7/10/2017 | HDSUPPLY | ADS PIPE W/SOCK | 88.00 |
| GH-000-46600.00000 | 7/10/2017 | HDSUPPLY | ADS PIPE W/SOCK | 7.04 |
| GH-000-46600.00000 | 7/13/2017 | CARBAJAL | HOC7 - PAINT TOUCH UP | 75.00 |
| GH-000-46600.00000 | 7/13/2017 | GLZ&SON | RG63 - REPAIR ROOF LEAK | (125.00) |
| GH-000-46600.00000 | 7/13/2017 | GLZ&SON | (Rev)RG63 - REPAIR ROOF LEAK | 125.00 |
| GH-000-46600.00000 | 7/17/2017 | LOWES | WARR - TOOL SUPPLIES | 165.68 |
| GH-000-46600.00000 | 7/20/2017 | CARBAJAL | GPC13 - PAINT TOUCH UP | 3,500.00 |
| GH-000-46600.00000 | 7/27/2017 | FERGUS | SPL26 - SHOWER PAN DEFECTIVE | (325.00) |
| GH-000-46600.00000 | 7/27/2017 | FERGUS | SPL26 - SHOWER PAN DEFECTIVE | (200.00) |
| GH-000-46600.00000 | 7/27/2017 | FERGUS | SPL26 - SHOWER PAN DEFECTIVE | (400.00) |
| GH-000-46600.00000 | 7/28/2017 | EDDIEBG | LANDSCAPE PACK | 255.00 |
| GH-000-46600.00000 | 7/28/2017 | ALEXELEC | HL6B - ELECTRIC TRIM | 112.50 |
| GH-000-46600.00000 | 7/28/2017 | FANCLEAN | NIP11E - TOUCH UP CLEAN | 150.00 |
| GH-000-46600.00000 | 7/31/2017 | EDWARDS | GP10 - SERVICE CALL | 230.00 |
| GH-000-46600.00000 | 8/02/2017 | FERGUS | SO29D - SHOWER PAN REPAIR | (250.00) |
| GH-000-46600.00000 | 8/02/2017 | FERGUS | SO29D - SHOWER PAN REPAIR | (200.00) |
| GH-000-46600.00000 | 8/02/2017 | FERGUS | SO29D - SHOWER PAN REPAIR | (375.00) |
| GH-000-46600.00000 | 8/03/2017 | FERGUS | APPLIANCE PACK | 447.42 |
| GH-000-46600.00000 | 8/03/2017 | FERGUS | APPLIANCE PACK | 4.15 |
| GH-000-46600.00000 | 8/03/2017 | ALEXELEC | RC2-18, SERVICE CALL | 91.08 |
| GH-000-46600.00000 | 8/03/2017 | ALEXELEC | WW31A - TRIP CHARGE | 100.00 |
| GH-000-46600.00000 | 8/04/2017 | MILLSUP | RB97 - REPAIR SPLIT TRIM | 50.00 |
| GH-000-46600.00000 | 8/04/2017 | MILLSUP | SP26A - INSTALL TRIM | 75.00 |
| GH-000-46600.00000 | 8/04/2017 | RUSCO | SPL41 - REPLACE WATER HEATER | 150.00 |
| GH-000-46600.00000 | 8/08/2017 | FERGUS | WW31A - LIGHT FIXTURES | 47.55 |
| GH-000-46600.00000 | 8/08/2017 | FERGUS | CR INV 3689501 | (26.26) |
| GH-000-46600.00000 | 8/11/2017 | LOWES | SMALL TOOL & SUPPLES | 127.30 |
| GH-000-46600.00000 | 8/17/2017 | ADVENP | HOC7 - RE-WORK GUTTERS | 200.00 |
| GH-000-46600.00000 | 8/17/2017 | ALEXELEC | RE36 - REPLACE SMOKE DETECTOR | 100.00 |
| GH-000-46600.00000 | 8/17/2017 | ALEXELEC | PW6B - ELEC TROUBLE SHOOTING | 75.00 |
| GH-000-46600.00000 | 8/17/2017 | ALEXELEC | SPL42 - REPLACE BULB | 85.00 |
| GH-000-46600.00000 | 8/17/2017 | ATLGLASS | RC18 - REPLACE SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 8/17/2017 | ELITEFLOOR | RC18 - REPLACE TILE | 300.00 |
| GH-000-46600.00000 | 8/17/2017 | INTOWNDES | SO27D - CABINETRY TOUCH UP | 125.00 |
| GH-000-46600.00000 | 8/17/2017 | INTOWNDES | NIP5C - CABINETRY REPAIR | 250.00 |
| GH-000-46600.00000 | 8/22/2017 | FERGUS | XE39 - DEFECTIVE SHOWER PAN | (375.00) |
| GH-000-46600.00000 | 8/22/2017 | FERGUS | XE39 - DEFECTIVE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 8/22/2017 | FERGUS | XE39 - DEFECTIVE SHOWER PAN | (350.00) |
| GH-000-46600.00000 | 8/25/2017 | FERGUS | SO29D | 261.36 |
| GH-000-46600.00000 | 8/30/2017 | ELITEFLOOR | NIP1D - REPAIR FLOOR | (100.00) |
| GH-000-46600.00000 | 8/30/2017 | INTOWNDES | SO27D - TOUCH UP CABINTES | 200.00 |
| GH-000-46600.00000 | 8/30/2017 | INTOWNDES | NIP79C - KICK PLATE | 150.00 |
| GH-000-46600.00000 | 9/08/2017 | GRASSROOTS | RB99 - REPLACE SOD | 220.00 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 9/14/2017 | LOWES | TOOLS & SUPPLIES | 177.49 |
| GH-000-46600.00000 | 9/14/2017 | ALEXELEC | NGF5B - REPLACE SOCKET | 75.00 |
| GH-000-46600.00000 | 9/14/2017 | FTHOMAS | LH21G - TUB REPAIR | 160.00 |
| GH-000-46600.00000 | 9/28/2017 | NELQTYROOF | SO37D - ROOF REPAIR | 375.00 |
| GH-000-46600.00000 | 9/28/2017 | DANNYSDRY | WW48B - PATCH DRYWALL | 400.00 |
| GH-000-46600.00000 | 9/28/2017 | DUPREE | SO29D - REPLACE SHOWER PAN | 375.00 |
| GH-000-46600.00000 | 9/28/2017 | ELITEFLOOR | SO29D - REMOVE TILE | 350.00 |
| GH-000-46600.00000 | 9/28/2017 | INTOWNDES | XW40 - CABINETS | 150.00 |
| GH-000-46600.00000 | 10/02/2017 | SRSROOFING | SO37D - ROOFING MATERIAL | 15.40 |
| GH-000-46600.00000 | 10/02/2017 | SRSROOFING | SO37D - ROOFING MATERIAL | 0.16 |
| GH-000-46600.00000 | 10/04/2017 | FERGUS | LIGHT FIXTURES | 12.44 |
| GH-000-46600.00000 | 10/04/2017 | FERGUS | PLBG FXTRS #3 | 39.94 |
| GH-000-46600.00000 | 10/05/2017 | FERGUS | XW39 - PLBG FXTRS #1 | 261.36 |
| GH-000-46600.00000 | 10/09/2017 | CARBAJAL | HOC52 - PAINT DOOR SLABS | 75.00 |
| GH-000-46600.00000 | 10/09/2017 | FTHOMAS | LH64H - TUB REPAIR | 80.00 |
| GH-000-46600.00000 | 10/09/2017 | RUSCO | CCV73 - REPLACE GARAGE DISPOSA | 125.00 |
| GH-000-46600.00000 | 10/12/2017 | AIRCONTH&C | HL6B - RAISE A/C UNIT | 150.00 |
| GH-000-46600.00000 | 10/12/2017 | DANNYSDRY | LH24D - FIX ARCHES | 500.00 |
| GH-000-46600.00000 | 10/12/2017 | MILLSUP | H;11C - REPLACE CROWN | 75.00 |
| GH-000-46600.00000 | 10/16/2017 | LOWES | SMALL TOOL SUPPLIES FOR JOBS | 522.99 |
| GH-000-46600.00000 | 10/19/2017 | ALEXELEC | XW46 - SEPTIC SYSTEM WIRE | 235.00 |
| GH-000-46600.00000 | 10/19/2017 | ALEXELEC | RE36 - ELECTRIC TRIM | 100.00 |
| GH-000-46600.00000 | 10/19/2017 | DUPREE | XW39 - SHOWER PAN REPLACEMENT | 375.00 |
| GH-000-46600.00000 | 10/19/2017 | DUPREE | NIP1D - REINSTALL SINK | 100.00 |
| GH-000-46600.00000 | 10/23/2017 | | XW00039-WARRANTY | (300.00) |
| GH-000-46600.00000 | 10/30/2017 | FERGUS | SPL26 - SHOWER BASE | 261.36 |
| GH-000-46600.00000 | 10/30/2017 | FERGUS | WW36B - REPLACE DISHWASHER | 426.98 |
| GH-000-46600.00000 | 10/30/2017 | OCONEE | SPL26 - DRIVEWAY MAT | 226.80 |
| GH-000-46600.00000 | 11/01/2017 | 84LUM | SO37D-SOLAR BOARD ROOF DECKING | 15.18 |
| GH-000-46600.00000 | 11/01/2017 | 84LUM | NGF7B - FRAME 2ND DROP | 24.56 |
| GH-000-46600.00000 | 11/01/2017 | 84LUM | NGF7B -  BRICK MOULD | 35.42 |
| GH-000-46600.00000 | 11/01/2017 | 84LUM | NGF7B -  BRICK MOULD | 0.01 |
| GH-000-46600.00000 | 11/09/2017 | NELQTYROOF | SW139 - TRIM SHINGLES | 250.00 |
| GH-000-46600.00000 | 11/09/2017 | ATLGLASS | XW39 - REINSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 11/09/2017 | ATLGLASS | SPL26 - SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 11/09/2017 | DANNYSDRY | SPL39 - DRYWALL REPAIR | 250.00 |
| GH-000-46600.00000 | 11/09/2017 | FTHOMAS | GP5M - TUB REPAIR | 80.00 |
| GH-000-46600.00000 | 11/09/2017 | FTHOMAS | GP42J - TUB REPAIR | 80.00 |
| GH-000-46600.00000 | 11/09/2017 | FTHOMAS | SO23D - TUB REPAIR | 80.00 |
| GH-000-46600.00000 | 11/09/2017 | FTHOMAS | WW21A - TUB REPAIR | 80.00 |
| GH-000-46600.00000 | 11/09/2017 | RUSCO | RC18 - REPLACE SHOWER PAN | 350.00 |
| GH-000-46600.00000 | 11/09/2017 | RUSCO | RC18 - REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 11/09/2017 | HAASBUILD | SPL26 - TRIP CHARGE | 200.00 |
| GH-000-46600.00000 | 11/13/2017 | LOWES | TOOL SUPPLIES | 125.29 |
| GH-000-46600.00000 | 11/16/2017 | MATTCONCRE | SPL26 DRIVEWAY LABOR | 600.00 |
| GH-000-46600.00000 | 11/17/2017 | PPG | WARRANTY WORK | 19.73 |
| GH-000-46600.00000 | 11/17/2017 | PPG | NGF7B - PAINT | 20.24 |
| GH-000-46600.00000 | 12/05/2017 | FERGUS | GP2FF - TOILET SEAT SCRATCHED | (375.00) |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 12/05/2017 | FERGUS | GP2FF - SHOWER PAN REPAIR | (200.00) |
| GH-000-46600.00000 | 12/07/2017 | NELQTYROOF | NGF7B - REPLACE GARAGE LINERS | 300.00 |
| GH-000-46600.00000 | 12/07/2017 | FERGUS | PLMB1 - GP2FF | 261.36 |
| GH-000-46600.00000 | 12/08/2017 | 84LUM | WT122 - BOTTOM SASH | 54.00 |
| GH-000-46600.00000 | 12/11/2017 | ATLGLASS | SO29D - RE-INSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 12/11/2017 | RUSCO | SE33 - REPLACE BROKEN SEWER | 500.00 |
| GH-000-46600.00000 | 12/21/2017 | DUPREE | WW34A- TOILET BASE BROKEN | 100.00 |
| GH-000-46600.00000 | 12/21/2017 | FTHOMAS | SPL36 - OVERSPRAY TUB REPAIR | (173.40) |
| GH-000-46600.00000 | 12/21/2017 | FTHOMAS | LH12E - TUB REPAIR | 160.00 |
| GH-000-46600.00000 | 12/21/2017 | FTHOMAS | LH2E - TUB REPAIR | 240.00 |
| GH-000-46600.00000 | 12/21/2017 | FTHOMAS | NGF30B - TUB REPAIR | 240.00 |
| GH-000-46600.00000 | 12/29/2017 | ATLGLASS | GP2FF - RE-INSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 12/29/2017 | RUSCO | SPL26 - SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 12/29/2017 | LOWES | lowes | 465.06 |
| GH-000-46600.00000 | 12/29/2017 | LOWES | lowes | 1,712.33 |
| | | | | 42,704.83 |

| Account | Accounting Date | Vendor | Transaction Desc | Debit |
|---|---|---|---|---|
| GH-000-46600.00000 | 1/05/2018 | DANNYSDRY | LH42H - DRYWALL REPAIR | 100.00 |
| GH-000-46600.00000 | 1/05/2018 | DUPREE | LH12E - REPAIR PLUMBING | 250.00 |
| GH-000-46600.00000 | 1/05/2018 | DUPREE | NGF27B - CLEAR SHOWER DRAIN | 550.00 |
| GH-000-46600.00000 | 1/09/2018 | 84LUM | HOC52 - LOCKOUT MATERIAL | 6.65 |
| GH-000-46600.00000 | 1/09/2018 | FERGUS | SPL36 - PLMB 3 | 173.40 |
| GH-000-46600.00000 | 1/09/2018 | FERGUS | GP17M - LIGHT | 9.34 |
| GH-000-46600.00000 | 1/11/2018 | DUPREE | GP2FF - SHOWER PAN REPAIR | 375.00 |
| GH-000-46600.00000 | 1/15/2018 | LOWES | SMALL TOOL FOR JOBS | 203.62 |
| GH-000-46600.00000 | 1/15/2018 | LOWES | (Rev)SMALL TOOL FOR JOBS | (203.62) |
| GH-000-46600.00000 | 1/15/2018 | LOWES | SMALL TOOL FOR WARR JOBS | 203.62 |
| GH-000-46600.00000 | 1/15/2018 | LOWES | (Rev)SMALL TOOL FOR WARR JOBS | (203.62) |
| GH-000-46600.00000 | 1/15/2018 | LOWES | SMALL TOOL FOR JOBS | 203.62 |
| GH-000-46600.00000 | 2/02/2018 | KIRKLAND | RE360 TREE STUMP REMOVAL | 300.00 |
| GH-000-46600.00000 | 2/02/2018 | RINCONCRET | TP63 - DRIVEWAY LABOR | 280.00 |
| GH-000-46600.00000 | 2/05/2018 | FERGUS | SHOWER BASE - NGF30B | 261.36 |
| GH-000-46600.00000 | 2/05/2018 | FERGUS | SHOWER BASE - NGF30B | 20.40 |
| GH-000-46600.00000 | 2/06/2018 | FERGUS | WT99 - SHOWER BASE | 261.36 |
| GH-000-46600.00000 | 2/06/2018 | FERGUS | WT99 - SHOWER BASE | 2.42 |
| GH-000-46600.00000 | 2/06/2018 | FERGUS | GP17M - LIGHT | 9.34 |
| GH-000-46600.00000 | 2/06/2018 | FERGUS | NGF30B - DEFECTIVE SHOWER  PAN | (350.00) |
| GH-000-46600.00000 | 2/06/2018 | FERGUS | NGF30B - DEFECTIVE SHOWER  PAN | (612.00) |
| GH-000-46600.00000 | 2/12/2018 | STHTUBREFI | NGF 30B - TUB REPAIR | 85.00 |
| GH-000-46600.00000 | 2/22/2018 | GHSVCS | TOOLS WARR JOBS LOWES | 47.61 |
| GH-000-46600.00000 | 3/07/2018 | FERGUS | B/C FOR SHOWER PANS | (2,646.00) |
| GH-000-46600.00000 | 3/08/2018 | FERGUS | WT99 - SHOWER PAN DEFECTIVE | (616.50) |
| GH-000-46600.00000 | 3/09/2018 | DUPREE | NGF30B - REPLACE SHOWER PAN | 350.00 |
| GH-000-46600.00000 | 3/09/2018 | GRASSROOTS | NGF26B - SEED, NEW GRASS, RAKE | 150.00 |
| GH-000-46600.00000 | 3/09/2018 | RUSCO | STO13 - REPLACE PIPE | 750.00 |
| GH-000-46600.00000 | 3/14/2018 | ZVENDOR | SO32D, WARRANTY REPAIR FLOOR | 413.00 |
| GH-000-46600.00000 | 3/15/2018 | DUPREE | GCL12D-WATER LEAK FIX DRYWALL | (200.00) |
| GH-000-46600.00000 | 3/15/2018 | SCONSVCS | RB90 - REPLACE GUTTER | 125.00 |
| GH-000-46600.00000 | 3/15/2018 | GHSVCS | HD SUPPLIES FOR WARR JOBS | 125.49 |
| GH-000-46600.00000 | 3/15/2018 | ZVENDOR | J LESTER  PW-8B VENT NOT INST | 500.00 |
| GH-000-46600.00000 | 3/23/2018 | ATLGLASS | WT99 - REPLACE SHOWER GLASS | 200.00 |
| GH-000-46600.00000 | 3/23/2018 | ELITEFLOOR | GP2FF - REPAIR SHOWER | 1,618.05 |
| GH-000-46600.00000 | 3/23/2018 | JPHUGHES | WT99 - PART NEED FOR WARRANTY | 41.05 |
| GH-000-46600.00000 | 3/27/2018 | FERGUS | GCH18 - LIGHT WARRANTY | 22.91 |
| GH-000-46600.00000 | 3/27/2018 | FERGUS | GCH18 - LIGHT WARRANTY | 11.34 |
| GH-000-46600.00000 | 3/29/2018 | ALEXELEC | LH23D - BULB REPLACEMENT | 90.00 |
| GH-000-46600.00000 | 3/29/2018 | ALEXELEC | GCH12J - TRIP TO CHGE BULBS | 85.00 |
| GH-000-46600.00000 | 3/29/2018 | DANNYSDRY | GCL12D - CEILING REPAIR | 200.00 |
| GH-000-46600.00000 | 3/29/2018 | DANNYSDRY | WW21A - CEILING REPAIR | 200.00 |
| GH-000-46600.00000 | 3/29/2018 | ELITEFLOOR | WT99 - REPLACE TILE | 300.00 |
| GH-000-46600.00000 | 3/29/2018 | ELITEFLOOR | GP13 - REPLACE TILE | 210.00 |
| GH-000-46600.00000 | 3/29/2018 | ULTIMATE | STO13 - LANDSCAPE PACK | 755.00 |
| GH-000-46600.00000 | 3/30/2018 | NELQTYROOF | NGF50A -REPAIR ROOF | 295.00 |
| GH-000-46600.00000 | 3/30/2018 | ELITEFLOOR | WT99 - SHOWER PAN MUD TILE | 616.50 |
| GH-000-46600.00000 | 4/03/2018 | FERGUS | HL17C - SHOWER PAN | 261.36 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 4/05/2018 | ALEXELEC | GCL49I - TRIP CHARGE | 90.00 |
| GH-000-46600.00000 | 4/05/2018 | DUPREE | GCL12D - WATER LEAK | (200.00) |
| GH-000-46600.00000 | 4/05/2018 | DUPREE | GCL12D - WATER LEAK | (200.00) |
| GH-000-46600.00000 | 4/06/2018 | FERGUS | PLBG FXTRS #1 | 261.36 |
| GH-000-46600.00000 | 4/06/2018 | FERGUS | CR INV# 3651118 | (261.36) |
| GH-000-46600.00000 | 4/12/2018 | NELQTYROOF | LH20F - MISSING DRYER VENT | 75.00 |
| GH-000-46600.00000 | 4/12/2018 | MILLSUP | HL2A - STAIR RAILING PLUGGED | 75.00 |
| GH-000-46600.00000 | 4/20/2018 | ATLGLASS | NGF29B - RE-INSTALL SHOWER DOO | 200.00 |
| GH-000-46600.00000 | 4/20/2018 | ATLGLASS | SO18D - RE-INSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 4/20/2018 | ELITEFLOOR | SO18D - TILE INSTALLED WRONG | (200.00) |
| GH-000-46600.00000 | 4/20/2018 | ELITEFLOOR | NGF29B - REPLACE TILE | 450.00 |
| GH-000-46600.00000 | 4/23/2018 | JPHUGHES | GP13A - PAINT FOR WALLS | 32.40 |
| GH-000-46600.00000 | 4/24/2018 | FERGUS | NGF28B - DEFECTIVE SHOWER PAN | (261.36) |
| GH-000-46600.00000 | 4/24/2018 | FERGUS | NGF28B - DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 4/24/2018 | FERGUS | GP33J - DEFECTIVE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 4/24/2018 | FERGUS | GP33J - DEFECTIVE SHOWER PAN | (357.27) |
| GH-000-46600.00000 | 4/26/2018 | DUPREE | | 400.00 |
| GH-000-46600.00000 | 4/26/2018 | DUPREE | | 400.00 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | | 597.80 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | | 266.10 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | | 175.00 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | | 181.00 |
| GH-000-46600.00000 | 4/26/2018 | SCONSVCS | | 80.00 |
| GH-000-46600.00000 | 4/26/2018 | NELQTYROOF | RB90 - REPLACE SHEETROCK | (300.00) |
| GH-000-46600.00000 | 4/26/2018 | DUPREE | (Rev) | (400.00) |
| GH-000-46600.00000 | 4/26/2018 | DUPREE | NGF29B - REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 4/26/2018 | DUPREE | SO18D - RE-SET PLUMBING TRIMS | 85.00 |
| GH-000-46600.00000 | 4/26/2018 | DUPREE | (Rev) | (400.00) |
| GH-000-46600.00000 | 4/26/2018 | DUPREE | NGF28B - REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | (Rev) | (597.80) |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | RC2-10 VINYL FLOOR | 597.80 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | (Rev) | (266.10) |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | RC2-10 VINYL FLOOR | 266.10 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | (Rev) | (175.00) |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | RC2-10 VINYL FLOOR | 175.00 |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | (Rev) | (181.00) |
| GH-000-46600.00000 | 4/26/2018 | ELITEFLOOR | NGF 8B VINYL FLOOR | 181.00 |
| GH-000-46600.00000 | 4/26/2018 | SCONSVCS | (Rev) | (80.00) |
| GH-000-46600.00000 | 4/26/2018 | SCONSVCS | GP 13M-REPLACE GUTTERS | 80.00 |
| GH-000-46600.00000 | 4/27/2018 | GHSVCS | LOWES TOOLS FOR JOBS | 196.47 |
| GH-000-46600.00000 | 4/30/2018 | FERGUS | | 261.36 |
| GH-000-46600.00000 | 5/02/2018 | SRSROOFING | | 265.68 |
| GH-000-46600.00000 | 5/02/2018 | SRSROOFING | (Rev) | (265.68) |
| GH-000-46600.00000 | 5/02/2018 | SRSROOFING | LANDMARK WEATHERED WOOD | 265.68 |
| GH-000-46600.00000 | 5/03/2018 | ATLGLASS | | 200.00 |
| GH-000-46600.00000 | 5/03/2018 | DANNYSDRY | | 300.00 |
| GH-000-46600.00000 | 5/03/2018 | ELITEFLOOR | | 350.00 |
| GH-000-46600.00000 | 5/03/2018 | ATLGLASS | (Rev) | (200.00) |
| GH-000-46600.00000 | 5/03/2018 | ATLGLASS | WT99 - REPLACE GLASS SHWR | 200.00 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 5/03/2018 | DANNYSDRY | (Rev) | (300.00) |
| GH-000-46600.00000 | 5/03/2018 | DANNYSDRY | REPLACE SHEETROCK IN FOYER | 300.00 |
| GH-000-46600.00000 | 5/03/2018 | ELITEFLOOR | (Rev) | (350.00) |
| GH-000-46600.00000 | 5/03/2018 | ELITEFLOOR | NGF28B - REPLACE TILE | 350.00 |
| GH-000-46600.00000 | 5/07/2018 | FERGUS | GP35J- DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 5/07/2018 | FERGUS | GP35J- DEFECTIVE SHOWER PAN | (261.36) |
| GH-000-46600.00000 | 5/07/2018 | FERGUS | GP35J- DEFECTIVE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 5/07/2018 | FERGUS | GP35J- DEFECTIVE SHOWER PAN | (483.00) |
| GH-000-46600.00000 | 5/10/2018 | ELITEFLOOR | | 300.00 |
| GH-000-46600.00000 | 5/10/2018 | NELQTYROOF | | 275.00 |
| GH-000-46600.00000 | 5/10/2018 | STHTUBREFI | | 85.00 |
| GH-000-46600.00000 | 5/10/2018 | ELITEFLOOR | SO18D - SHOWER TRIPPED | (85.00) |
| GH-000-46600.00000 | 5/10/2018 | ELITEFLOOR | GP42J - REPAIR FLOOR | (100.00) |
| GH-000-46600.00000 | 5/10/2018 | ELITEFLOOR | LH2E - REPAIR FLOOR | (100.00) |
| GH-000-46600.00000 | 5/10/2018 | ELITEFLOOR | (Rev) | (300.00) |
| GH-000-46600.00000 | 5/10/2018 | ELITEFLOOR | NGF25B - REPLACE WOOD FLOORING | 300.00 |
| GH-000-46600.00000 | 5/10/2018 | NELQTYROOF | (Rev) | (275.00) |
| GH-000-46600.00000 | 5/10/2018 | NELQTYROOF | GPC13A, REMOVE TRASH,SHINGLES | 275.00 |
| GH-000-46600.00000 | 5/10/2018 | STHTUBREFI | (Rev) | (85.00) |
| GH-000-46600.00000 | 5/10/2018 | STHTUBREFI | SO18D - TUB REPAIR | 85.00 |
| GH-000-46600.00000 | 5/16/2018 | FERGUS | GP33J - DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 5/16/2018 | FERGUS | GP33J - DEFECTIVE SHOWER PAN | (261.36) |
| GH-000-46600.00000 | 5/17/2018 | RUSCO | | 200.00 |
| GH-000-46600.00000 | 5/17/2018 | RUSCO | (Rev) | (200.00) |
| GH-000-46600.00000 | 5/17/2018 | RUSCO | TP31 - FIREPLACE REPAIR | 200.00 |
| GH-000-46600.00000 | 5/18/2018 | FERGUS | NGF28B, LIGHT FXTRS | 218.70 |
| GH-000-46600.00000 | 5/18/2018 | FERGUS | CR INV# 4025483 | (107.05) |
| GH-000-46600.00000 | 5/21/2018 | FERGUS | | 261.36 |
| GH-000-46600.00000 | 5/21/2018 | FERGUS | (Rev) | (261.36) |
| GH-000-46600.00000 | 5/21/2018 | FERGUS | GP33J SHOWER PAN | 261.36 |
| GH-000-46600.00000 | 5/23/2018 | GHSVCS | LOWES/SMALL TOOLS SUPPLIES | 94.97 |
| GH-000-46600.00000 | 5/24/2018 | DUPREE | | 100.00 |
| GH-000-46600.00000 | 5/24/2018 | DUPREE | | 400.00 |
| GH-000-46600.00000 | 5/24/2018 | GRASSROOTS | | 1,650.00 |
| GH-000-46600.00000 | 5/24/2018 | DUPREE | (Rev) | (100.00) |
| GH-000-46600.00000 | 5/24/2018 | DUPREE | LH2E INSTALL TOILET | 100.00 |
| GH-000-46600.00000 | 5/24/2018 | DUPREE | (Rev) | (400.00) |
| GH-000-46600.00000 | 5/24/2018 | DUPREE | GP33J - INSTALL SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 5/24/2018 | GRASSROOTS | (Rev) | (1,650.00) |
| GH-000-46600.00000 | 5/24/2018 | GRASSROOTS | XW70 - REPLACE SOD | 1,650.00 |
| GH-000-46600.00000 | 5/24/2018 | MERIDIAN | | 424.97 |
| GH-000-46600.00000 | 5/24/2018 | MERIDIAN | (Rev) | (424.97) |
| GH-000-46600.00000 | 5/24/2018 | MERIDIAN | RB90, BRICK, ANGLE IRON | 424.97 |
| GH-000-46600.00000 | 5/25/2018 | SRSROOFING | | 97.21 |
| GH-000-46600.00000 | 5/25/2018 | SRSROOFING | | 0.17 |
| GH-000-46600.00000 | 5/25/2018 | SRSROOFING | (Rev) | (97.21) |
| GH-000-46600.00000 | 5/25/2018 | SRSROOFING | RB90, ROOFING MATERIAL | 97.21 |
| GH-000-46600.00000 | 5/25/2018 | SRSROOFING | (Rev) | (0.17) |
| GH-000-46600.00000 | 5/25/2018 | SRSROOFING | RB90, ROOFING MATERIAL | 0.17 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 5/31/2018 | ATLGLASS | | 200.00 |
| GH-000-46600.00000 | 5/31/2018 | ATLGLASS | (Rev) | (200.00) |
| GH-000-46600.00000 | 5/31/2018 | ATLGLASS | GP33J, RE-INSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 6/06/2018 | FERGUS | | 11.86 |
| GH-000-46600.00000 | 6/06/2018 | FERGUS | (Rev) | (11.86) |
| GH-000-46600.00000 | 6/06/2018 | FERGUS | GP16J - PLBG FXTRS #3 | 11.86 |
| GH-000-46600.00000 | 6/07/2018 | AVMASONRY | | 1,200.00 |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | | 200.00 |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | | 357.27 |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | (Rev) | (200.00) |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | GCL12D-REPLACE DEMAGED FLOOR | 200.00 |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | (Rev) | (357.27) |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | REINSTALL TILE | 357.27 |
| GH-000-46600.00000 | 6/07/2018 | AVMASONRY | (Rev) | (1,200.00) |
| GH-000-46600.00000 | 6/07/2018 | AVMASONRY | RB90 - REPLACE BRICK | 1,200.00 |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | (Rev)REINSTALL TILE | (357.27) |
| GH-000-46600.00000 | 6/07/2018 | ELITEFLOOR | GP 33J - REINSTALL TILE | 357.27 |
| GH-000-46600.00000 | 6/11/2018 | IHC | FC130-DRILLED KITCHEN CABINETS | (675.00) |
| GH-000-46600.00000 | 6/11/2018 | IHC | FC140-CORBELS NOT INSTALLED | (330.00) |
| GH-000-46600.00000 | 6/11/2018 | IHC | NGF12A - CORBELS NOT INSTALLED | (225.00) |
| GH-000-46600.00000 | 6/13/2018 | 84LUM | | 40.00 |
| GH-000-46600.00000 | 6/13/2018 | FERGUS | | 261.36 |
| GH-000-46600.00000 | 6/13/2018 | FERGUS | | 18.87 |
| GH-000-46600.00000 | 6/13/2018 | 84LUM | (Rev) | (40.00) |
| GH-000-46600.00000 | 6/13/2018 | 84LUM | GCL81C - MAILBOX INSTALLATION | 40.00 |
| GH-000-46600.00000 | 6/13/2018 | FERGUS | (Rev) | (18.87) |
| GH-000-46600.00000 | 6/13/2018 | FERGUS | GCL11D PLUMBING 3 | 18.87 |
| GH-000-46600.00000 | 6/13/2018 | FERGUS | (Rev) | (261.36) |
| GH-000-46600.00000 | 6/13/2018 | FERGUS | GP35J, SHOWER PAN | 261.36 |
| GH-000-46600.00000 | 6/14/2018 | ALEXELEC | | 50.00 |
| GH-000-46600.00000 | 6/14/2018 | ALEXELEC | (Rev) | (50.00) |
| GH-000-46600.00000 | 6/14/2018 | ALEXELEC | GCL80C, REPLACE FLOOD LIGHT | 50.00 |
| GH-000-46600.00000 | 6/14/2018 | GMPAINTSVC | | 550.00 |
| GH-000-46600.00000 | 6/14/2018 | GMPAINTSVC | (Rev) | (550.00) |
| GH-000-46600.00000 | 6/14/2018 | GMPAINTSVC | HL6B, PAINT TOUCHUP | 550.00 |
| GH-000-46600.00000 | 6/18/2018 | CUMBERLAND | | 11.07 |
| GH-000-46600.00000 | 6/18/2018 | CUMBERLAND | (Rev) | (11.07) |
| GH-000-46600.00000 | 6/18/2018 | CUMBERLAND | EASYSAND 5  MIN MUD | 11.07 |
| GH-000-46600.00000 | 6/21/2018 | GRASSROOTS | | 650.00 |
| GH-000-46600.00000 | 6/21/2018 | GRASSROOTS | (Rev) | (650.00) |
| GH-000-46600.00000 | 6/21/2018 | GRASSROOTS | REPAIR SOD IN YARD | 650.00 |
| GH-000-46600.00000 | 6/21/2018 | MILLSUP | | 250.00 |
| GH-000-46600.00000 | 6/21/2018 | MILLSUP | (Rev) | (250.00) |
| GH-000-46600.00000 | 6/21/2018 | MILLSUP | DR1, STAIRS 11 MONTH | 250.00 |
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | | 100.00 |
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | | 90.00 |
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | (Rev) | (100.00) |
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | NGF8A, ADD GUTTERS | 100.00 |
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | (Rev) | (90.00) |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | ADD GUTTERS | 90.00 |
| GH-000-46600.00000 | 6/21/2018 | GRASSROOTS | (Rev)REPAIR SOD IN YARD | (650.00) |
| GH-000-46600.00000 | 6/21/2018 | GRASSROOTS | LH 8E - REPAIR SOD IN YARD | 650.00 |
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | (Rev)ADD GUTTERS | (90.00) |
| GH-000-46600.00000 | 6/21/2018 | SCONSVCS | SO 29D - ADD GUTTERS | 90.00 |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | NGF55A, DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | NGF55A, DEFECTIVE SHOWER PAN | (225.00) |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | WW31B, DEFECTIVE SHOWER PAN | (85.00) |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | NGF26B, DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | NGF26B, DEFECTIVE SHOWER PAN | (225.00) |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | | 65.57 |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | (Rev) | (65.57) |
| GH-000-46600.00000 | 6/26/2018 | FERGUS | GP26L, PLBG 3 | 65.57 |
| GH-000-46600.00000 | 6/27/2018 | GHSVCS | SMALL TOOL FOR WARR JOBS | 122.86 |
| GH-000-46600.00000 | 6/28/2018 | STHTUBREFI | | 150.00 |
| GH-000-46600.00000 | 6/28/2018 | STHTUBREFI | (Rev) | (150.00) |
| GH-000-46600.00000 | 7/09/2018 | DUPREE | | 400.00 |
| GH-000-46600.00000 | 7/09/2018 | DUPREE | (Rev) | (400.00) |
| GH-000-46600.00000 | 7/09/2018 | DUPREE | GP35J, RE-INSTALL SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 7/09/2018 | ELITEFLOOR | | 483.00 |
| GH-000-46600.00000 | 7/09/2018 | ELITEFLOOR | (Rev) | (483.00) |
| GH-000-46600.00000 | 7/09/2018 | ELITEFLOOR | GP35J, REPLACE TILE | 483.00 |
| GH-000-46600.00000 | 7/09/2018 | SCONSVCS | | 90.00 |
| GH-000-46600.00000 | 7/09/2018 | SCONSVCS | (Rev) | (90.00) |
| GH-000-46600.00000 | 7/09/2018 | SCONSVCS | SO37D, ADD GUTTERS | 90.00 |
| GH-000-46600.00000 | 7/09/2018 | DUPREE | LH10K, WATER LEAK | (365.70) |
| GH-000-46600.00000 | 7/10/2018 | FERGUS | NGF55A, DEFECTIVE SHOWER PAN | (438.01) |
| GH-000-46600.00000 | 7/10/2018 | FERGUS | NGF55A, DEFECTIVE SHOWER PAN | (261.36) |
| GH-000-46600.00000 | 7/10/2018 | FERGUS | NGF26B, DEFECTIVE SHOWER PAN | (261.36) |
| GH-000-46600.00000 | 7/10/2018 | FERGUS | NGF26B, DEFECTIVE SHOWER PAN | (432.49) |
| GH-000-46600.00000 | 7/12/2018 | ELITEFLOOR | SPL39, ROOF LEAK ONTO FLOOR | 227.00 |
| GH-000-46600.00000 | 7/12/2018 | SCONSVCS | GCH12J, REPLACE DOWNSPOUT | 115.00 |
| GH-000-46600.00000 | 7/16/2018 | 84LUM | RB90, LOCKOUT MATERIAL | 60.40 |
| GH-000-46600.00000 | 7/16/2018 | 84LUM | RB90, TRIP CHARGE SHUTTERS | 25.00 |
| GH-000-46600.00000 | 7/18/2018 | FERGUS | NGF55A, SHOWER PAN | 261.36 |
| GH-000-46600.00000 | 7/19/2018 | ATLGLASS | GP35J, RE-INSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 7/19/2018 | DUPREE | NGF55A, REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 7/19/2018 | ELITEFLOOR | STO13,RE-INSTALL SINK & TOILET | (150.00) |
| GH-000-46600.00000 | 7/19/2018 | ELITEFLOOR | STO13,RE-INSTALL SINK & TOILET | (67.54) |
| GH-000-46600.00000 | 7/26/2018 | RUSCO | STO13, TRIP CHARGE | 150.00 |
| GH-000-46600.00000 | 7/27/2018 | FERGUS | STO18, VICTORIAN PEDSTAL | 67.54 |
| GH-000-46600.00000 | 7/31/2018 | GHSVCS | LOWES CH FOR TOOLS FOR JOBS | 143.86 |
| GH-000-46600.00000 | 7/31/2018 | | DR1, STAIRS MILLS 6/21 | (250.00) |
| GH-000-46600.00000 | 8/02/2018 | ATLGLASS | NGF55A, REPLACE SHOWER DOOR | 225.00 |
| GH-000-46600.00000 | 8/02/2018 | ATLGLASS | NGF26B, REINSTALL SHOWER DOOR | 225.00 |
| GH-000-46600.00000 | 8/02/2018 | ELITEFLOOR | REPLACE CARPET, LH10K | 365.70 |
| GH-000-46600.00000 | 8/02/2018 | ELITEFLOOR | NGF55A, REPLACE TILE | 438.01 |
| GH-000-46600.00000 | 8/02/2018 | GRASSROOTS | GP26L, PALLETS OF SOD | 840.00 |
| GH-000-46600.00000 | 8/07/2018 | FERGUS | SO39D, LIGHT | 37.99 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 8/07/2018 | FERGUS | SO39D, LIGHT | 30.00 |
| GH-000-46600.00000 | 8/09/2018 | CARBAJAL | GCL11D, TRIP CHARGE, PAINT NEW | 100.00 |
| GH-000-46600.00000 | 8/09/2018 | STHTUBREFI | GP26L, TUB REPAIR | 100.00 |
| GH-000-46600.00000 | 8/14/2018 | FERGUS | GP26L, LIGHT | 13.66 |
| GH-000-46600.00000 | 8/16/2018 | ALEXELEC | SO39D, CK CEILING FAN | 85.00 |
| GH-000-46600.00000 | 8/16/2018 | ALEXELEC | GP26L, REPLACE DEFECTIVE FLUSH | 85.00 |
| GH-000-46600.00000 | 8/16/2018 | MILLSUP | STO13, REPLACE FLOORING | 100.70 |
| GH-000-46600.00000 | 8/28/2018 | FERGUS | SO37D, DEFECTIVE SHOWER PAN | (261.36) |
| GH-000-46600.00000 | 8/28/2018 | FERGUS | SO37D, DEFECTIVE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 8/28/2018 | FERGUS | SO37D, DEFECTIVE SHOWER PAN | (308.92) |
| GH-000-46600.00000 | 8/28/2018 | FERGUS | SO37D, DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 8/28/2018 | FERGUS | LH18, CHIME | 11.34 |
| GH-000-46600.00000 | 8/29/2018 | GHSVCS | LOWES CC MISC LOTS | 119.22 |
| GH-000-46600.00000 | 8/30/2018 | ALEXELEC | NGF49A, CK FLOOD LIGHTS | 100.00 |
| GH-000-46600.00000 | 8/30/2018 | ELITEFLOOR | SPL26, SHOWER TILE | 325.00 |
| GH-000-46600.00000 | 9/10/2018 | FERGUS | SO37D, SHOWER PAN | 261.36 |
| GH-000-46600.00000 | 9/14/2018 | DUPREE | SO37D, REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 9/20/2018 | ALEXELEC | LH19F, REPLACE DOOR CHIME | 85.00 |
| GH-000-46600.00000 | 9/20/2018 | ATLGLASS | GP42J, REPLACE BOTTOM TRACK SH | 175.00 |
| GH-000-46600.00000 | 9/27/2018 | ELITEFLOOR | SO37D, REINSTALL SHOWER PAN | 308.92 |
| GH-000-46600.00000 | 9/28/2018 | GHSVCS | LOWES - TOOLS/SUPPLIES | 95.13 |
| GH-000-46600.00000 | 10/04/2018 | AIRCONTH&C | WT68, REPAIR COPPER LINESET | 120.00 |
| GH-000-46600.00000 | 10/04/2018 | ATLGLASS | SO37D, REINSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 10/04/2018 | ELITEFLOOR | GPC1, TRIP CHARGE CABINET REPA | 200.00 |
| GH-000-46600.00000 | 10/18/2018 | STHTUBREFI | HOC10, TUB REPAIR | 85.00 |
| GH-000-46600.00000 | 10/19/2018 | ZVENDOR | BL191,DEFECTS IN CEMENT GARAGE | 500.00 |
| GH-000-46600.00000 | 10/29/2018 | 84LUM | NGF6A, REPLACE TOP SASH | 54.00 |
| GH-000-46600.00000 | 10/29/2018 | 84LUM | NGF6A, REPLACE TOP SASH | 52.00 |
| GH-000-46600.00000 | 10/30/2018 | GHSVCS | LOWES SUPPLIES WARR | 93.52 |
| GH-000-46600.00000 | 10/30/2018 | GHSVCS | CHASE: WARRANTY | 57.69 |
| GH-000-46600.00000 | 11/01/2018 | ALEXELEC | GP5M, RE-INSTALL FLOOD LIGHT | 85.00 |
| GH-000-46600.00000 | 11/01/2018 | ALEXELEC | HOC10, WATER HEATERFLOOD LIGH | 85.00 |
| GH-000-46600.00000 | 11/01/2018 | ALEXELEC | GP16J, BREAKER TRIPPING | 85.00 |
| GH-000-46600.00000 | 11/08/2018 | ELITEFLOOR | RC10, REPAIR VINYL FLOOR | 341.00 |
| GH-000-46600.00000 | 11/15/2018 | AJOINER | XW2,WW20A REIM FOR PAINT | 118.94 |
| GH-000-46600.00000 | 11/15/2018 | ELITEFLOOR | HL6B, CARPET REPAIR | 352.03 |
| GH-000-46600.00000 | 11/29/2018 | GHSVCS | LOWES: SMALL TOOLS FOR JOBS | 349.09 |
| GH-000-46600.00000 | 12/13/2018 | STHTUBREFI | GP29L, REPAIR SLIDING GLASS DO | 125.00 |
| GH-000-46600.00000 | 12/13/2018 | AIRCONTH&C | NGF27B, HVAC LEAK | (150.00) |
| GH-000-46600.00000 | 12/13/2018 | DUPREE | GCH22M, PLUMBING LEAK | (150.00) |
| GH-000-46600.00000 | 12/13/2018 | DUPREE | GP17M, PLUMBING LEAK | (150.00) |
| GH-000-46600.00000 | 12/17/2018 | 84LUM | RC2-18, WINDOWS | 54.00 |
| GH-000-46600.00000 | 12/17/2018 | 84LUM | RC2-18, WINDOWS | 52.00 |
| GH-000-46600.00000 | 12/17/2018 | ZVENDOR | GPC13B, RELEASE FOR ROOF LEAK | 250.00 |
| GH-000-46600.00000 | 12/20/2018 | ALLSEASONS | WW17A, REMOVE TRIM | 250.00 |
| GH-000-46600.00000 | 12/20/2018 | MEDINA | NGF27B, REPAIR CEILING | 150.00 |
| GH-000-46600.00000 | 12/20/2018 | MEDINA | GP17M, REPAIR DRYWALL | 150.00 |
| GH-000-46600.00000 | 12/20/2018 | MEDINA | GCH22M, REPAIR HOLES IN SHEETR | 150.00 |
| GH-000-46600.00000 | 12/20/2018 | MEDINA | NGF27B, REPAINT CEILING | 100.00 |

| GH-000-46600.00000 | 12/20/2018 | MEDINA | LH12E, HOLES CUT IN AC LINE | 300.00 |
| GH-000-46600.00000 | 12/21/2018 | FERGUS | CREDIT TAKEN IN ERROR | 2,646.00 |
| GH-000-46600.00000 | 12/27/2018 | GHSVCS | LOWES: WARR SUPPLIES | 169.71 |
| GH-000-46600.00000 | 12/27/2018 | ECA PAINT | WW17A, WATER LEAK | 125.00 |
| GH-000-46600.00000 | 12/27/2018 | STHTUBREFI | NGF32A, TUB REPAIR | 85.00 |
| GH-000-46600.00000 | 12/27/2018 | AIRCONTH&C | LH12E, HOLES CUT TO FIND LEAK | (300.00) |
| GH-000-46600.00000 | 12/27/2018 | AIRCONTH&C | NGF27B, DAMAGE FROM A/C LEAK | (100.00) |
| | | | | 22,204.78 |

| Account | Accounting Date | Vendor | Transaction Desc | Debit |
|---|---|---|---|---|
| GH-000-46600.00000 | 1/03/2019 | ATLGLASS | GP16J, SCREW CAUSED LEAK | (150.00) |
| GH-000-46600.00000 | 1/03/2019 | FERGUS | SO54D, SHOWER ARM | 34.02 |
| GH-000-46600.00000 | 1/10/2019 | MEDINA | GP21J, REPAIR NAIL POPS | 300.00 |
| GH-000-46600.00000 | 1/10/2019 | MEDINA | GP16J, PATCH HOLES | 150.00 |
| GH-000-46600.00000 | 1/17/2019 | MEDINA | GCH22J, PATCH HOLES | 150.00 |
| GH-000-46600.00000 | 1/24/2019 | DUPREE | GCH22M,PLUMBING LEAK SHWRHEAD | (150.00) |
| GH-000-46600.00000 | 1/24/2019 | STHTUBREFI | SO54D, TUB REPAIR | 85.00 |
| GH-000-46600.00000 | 1/29/2019 | FERGUS | NGF30B. PLBG 3 | 34.02 |
| GH-000-46600.00000 | 1/30/2019 | GHSVCS | LOWES: WARR TOOLS SUPPLIES | 19.39 |
| GH-000-46600.00000 | 1/31/2019 | MEDINA | GCH22J, PATCH HOLES IN WALL | 150.00 |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (400.00) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (200.00) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (416.44) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (125.00) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | NGF26B, SHWR PAN | 261.36 |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | RC2-19, DEFECTIVE SHWR PAN | (400.00) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | RC2-19, DEFECTIVE SHWR PAN | (261.36) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | RC2-19, DEFECTIVE SHWR PAN | (200.00) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | RC2-19, DEFECTIVE SHWR PAN | (395.49) |
| GH-000-46600.00000 | 2/06/2019 | FERGUS | RC2-19, DEFECTIVE SHWR PAN | (105.64) |
| GH-000-46600.00000 | 2/07/2019 | ATLGLASS | NGF26B, REINSTALL SHWR | 200.00 |
| GH-000-46600.00000 | 2/07/2019 | ATLWCPT | NGF26B, CABINETS | 90.00 |
| GH-000-46600.00000 | 2/07/2019 | CARBAJAL | GCH22M, TRIP CHARGE | 150.00 |
| GH-000-46600.00000 | 2/07/2019 | MILLSUP | NGF26B, REPAIR SHOE MOLD | 125.00 |
| GH-000-46600.00000 | 2/07/2019 | DUPREE | GCH22J, LEAK AT SHOWER HEAD | (150.00) |
| GH-000-46600.00000 | 2/07/2019 | DUPREE | WW25A, WATER LEAK REPAIR | (150.00) |
| GH-000-46600.00000 | 2/07/2019 | DUPREE | GCH22M, PLUMBING LEAK | (150.00) |
| GH-000-46600.00000 | 2/07/2019 | RUSCO | NGF26B, REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 2/07/2019 | MEDINA | WW25A, REPAIR DRYWALL | 150.00 |
| GH-000-46600.00000 | 2/14/2019 | ATLGLASS | RC2-19, REINSTALL SHOWER PAN | 200.00 |
| GH-000-46600.00000 | 2/14/2019 | MILLSUP | RC2-19, REPAIR SHOE MOLD | 125.00 |
| GH-000-46600.00000 | 2/14/2019 | NELQTYROOF | NGF15A, SUBFLOOR REPAIR | 200.00 |
| GH-000-46600.00000 | 2/20/2019 | FERGUS | RC2-19,  GEL SHWR PAN | 261.36 |
| GH-000-46600.00000 | 2/20/2019 | FERGUS | RC2-19,  GEL SHWR PAN | 2.42 |
| GH-000-46600.00000 | 2/21/2019 | ELITEFLOOR | NGF26B, 11 MONTH, REPLACE TILE | 19.74 |
| GH-000-46600.00000 | 2/21/2019 | ELITEFLOOR | RC2-19, REINSTALL TILE | 395.49 |
| GH-000-46600.00000 | 2/21/2019 | RUSCO | GP9M, INSTALL KITCHEN FAUCET | 150.00 |
| GH-000-46600.00000 | 2/21/2019 | STHTUBREFI | HL6B, TUB REPAIR | 85.00 |
| GH-000-46600.00000 | 2/21/2019 | PPG | RC2-18, PAINT, ROLLER | 35.78 |
| GH-000-46600.00000 | 2/22/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (400.00) |
| GH-000-46600.00000 | 2/22/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (200.00) |
| GH-000-46600.00000 | 2/22/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (416.44) |
| GH-000-46600.00000 | 2/22/2019 | FERGUS | NGF26B, SHOWER PAN DEFECTIVE | (125.00) |
| GH-000-46600.00000 | 2/27/2019 | GHSVCS | LOWES:GH WARR SUPPLIES | 117.59 |
| GH-000-46600.00000 | 2/28/2019 | ALEXELEC | GP28BB, REPLACE CIRCIT BREAKER | 200.00 |
| GH-000-46600.00000 | 2/28/2019 | ATLGLASS | GP28BB, FIX SHWR DOOR | 85.00 |
| GH-000-46600.00000 | 2/28/2019 | CARBAJAL | WW25A, PAINT PATCHES | 150.00 |
| GH-000-46600.00000 | 2/28/2019 | CARBAJAL | HL6B, PAINT SHEETROCKTRIM | 150.00 |
| GH-000-46600.00000 | 3/05/2019 | FERGUS | NGF24B, PLBG 3 | 63.73 |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 3/07/2019 | RUSCO | RC2-19, REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 3/14/2019 | ELITEFLOOR | GP23J, REPLACE WOOD FLR | 150.00 |
| GH-000-46600.00000 | 3/18/2019 | FERGUS | SPL57, PLBG 3 | 63.73 |
| GH-000-46600.00000 | 3/21/2019 | RUSCO | SPL57, REPAIR HOT WATERS | 150.00 |
| GH-000-46600.00000 | 3/21/2019 | DUPREE | WW25A, PLUMBING LEAK | (150.00) |
| GH-000-46600.00000 | 3/21/2019 | DUPREE | SO49D, PLUMBING LINES CROSSED | (150.00) |
| GH-000-46600.00000 | 3/21/2019 | MEDINA | SO49D, REPAIR CEILING | 500.00 |
| GH-000-46600.00000 | 3/22/2019 | GHSVCS | LOWES: WARR SUPPLIES FOR JOBS | 82.71 |
| GH-000-46600.00000 | 3/25/2019 | FERGUS | CCR122 - PLBG 1 | 263.78 |
| GH-000-46600.00000 | 3/26/2019 | FERGUS | GP9M,  WARR - PLBG | 248.89 |
| GH-000-46600.00000 | 3/26/2019 | FERGUS | CR INV 4367334 GP9M | (248.89) |
| GH-000-46600.00000 | 3/28/2019 | ATLGLASS | CCR122, REPLACE SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 3/28/2019 | ELITEFLOOR | CCR122, REPAIR SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 3/28/2019 | ELITEFLOOR | DR87, REPAIR KITCHEN FLOOR | 242.31 |
| GH-000-46600.00000 | 3/28/2019 | MILLSUP | CCR122, REPAIR SHOE MOLD | 125.00 |
| GH-000-46600.00000 | 3/28/2019 | ULTIMATE | STO13, ADDED SOD | 290.00 |
| GH-000-46600.00000 | 4/04/2019 | GARCIA | CCC 35A - WTR MTR MVDREPOURED | 775.00 |
| GH-000-46600.00000 | 4/04/2019 | GORDYCNST | CC 35A - INSTALL NEW WTR SERVI | 5,250.00 |
| GH-000-46600.00000 | 4/05/2019 | ALEXELEC | SPL 54 - ACCESS WTR HTRON WKED | 225.00 |
| GH-000-46600.00000 | 4/11/2019 | ALEXELEC | SPL44, TRIP CHARGE | 100.00 |
| GH-000-46600.00000 | 4/15/2019 | 84LUM | NGF27B, REPLACE TOP SASH | 54.00 |
| GH-000-46600.00000 | 4/15/2019 | 84LUM | NGF27B, REPLACE TOP SASH | 52.00 |
| GH-000-46600.00000 | 4/25/2019 | RUSCO | SPL57, FIX WATER HEATER | 50.00 |
| GH-000-46600.00000 | 4/25/2019 | RUSCO | NGF43A, REINSTALL TOILETS | 200.00 |
| GH-000-46600.00000 | 4/29/2019 | GHSVCS | LOWE'S: WARR SUPPLIES FOR JOBS | 53.20 |
| GH-000-46600.00000 | 5/02/2019 | ELITEFLOOR | NGF46A, FLOOR REPLACED | (200.00) |
| GH-000-46600.00000 | 5/02/2019 | K&JREMODEL | GH9, RE-GRADE FOR DRAINAGE | 500.00 |
| GH-000-46600.00000 | 5/02/2019 | STHTUBREFI | SPL57, TUB REPAIR | 85.00 |
| GH-000-46600.00000 | 5/09/2019 | ELITEFLOOR | SPL57, SHWR LEAKING | (200.00) |
| GH-000-46600.00000 | 5/09/2019 | K&JREMODEL | CCC35A, ONE ROLL OF GRASS | 300.00 |
| GH-000-46600.00000 | 5/16/2019 | ADVENP | NGF47A, FIX TRIM | (125.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | CCR122, DEFECTIVE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | CCR122, DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | CCR122, DEFECTIVE SHOWER PAN | (125.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | CCR122, DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | CCR122, DEFECTIVE SHOWER PAN | (270.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | HOC52- DEFECTIVE SHOWER PAN | (400.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | HOC52- DEFECTIVE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | HOC52- DEFECTIVE SHOWER PAN | (426.99) |
| GH-000-46600.00000 | 5/21/2019 | FERGUS | HOC52- DEFECTIVE SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 5/22/2019 | FERGUS | HOC52, PLBG FXTRS 1 | 270.00 |
| GH-000-46600.00000 | 5/22/2019 | 84LUM | HOC51, WINDOWS | 100.00 |
| GH-000-46600.00000 | 5/22/2019 | FERGUS | HOC52, PLBG FXTRS 1 | 2.50 |
| GH-000-46600.00000 | 5/23/2019 | ATLGLASS | SPL57, RE-INSTALL SHWR DOOR | 200.00 |
| GH-000-46600.00000 | 5/23/2019 | ATLGLASS | HOC52, RE-INSTALL SHWR DOOR | 200.00 |
| GH-000-46600.00000 | 5/23/2019 | ELITEFLOOR | WW31B, REPLACE TILES | 250.00 |
| GH-000-46600.00000 | 5/23/2019 | NELQTYROOF | GH16, MOVE BOOT TO CENTER | 150.00 |
| GH-000-46600.00000 | 5/23/2019 | RUSCO | CCR122, REPLACE SHWR PAN | 400.00 |
| GH-000-46600.00000 | 5/23/2019 | ULTIMATE | GH9, BACK YARD REGRADED | (550.00) |
| GH-000-46600.00000 | 5/23/2019 | DUPREE | SO49D, HOLES CUT IN CEILING | (500.00) |

| | | | | |
|---|---|---|---|---|
| GH-000-46600.00000 | 5/28/2019 | GHSVCS | LOWES SUPPLIES FOR WARR JOBS | 51.52 |
| GH-000-46600.00000 | 5/30/2019 | RUSCO | SO17A, REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 5/31/2019 | FERGUS | SO19A, SHWR BASE | 270.00 |
| GH-000-46600.00000 | 6/06/2019 | MILLSUP | HOC52, LOCKOUT TRIM | 200.00 |
| GH-000-46600.00000 | 6/06/2019 | RUSCO | NGF4B, PLUMBING TRIM | 150.00 |
| GH-000-46600.00000 | 6/13/2019 | ELITEFLOOR | NGF12A, REPLACE SOAP DISH | 190.00 |
| GH-000-46600.00000 | 6/18/2019 | FERGUS | WW25A | 270.00 |
| GH-000-46600.00000 | 6/18/2019 | 84LUM | WW17A, WINDOWS | 54.00 |
| GH-000-46600.00000 | 6/18/2019 | 84LUM | WW17A, WINDOWS | 52.00 |
| GH-000-46600.00000 | 6/21/2019 | 84LUM | GCL81C, GLASS SLIDING DOOR | 554.86 |
| GH-000-46600.00000 | 6/26/2019 | GHSVCS | LOWES WARR TOOLS SUPPLIES | 47.12 |
| GH-000-46600.00000 | 6/27/2019 | ATLGLASS | SO17A, RE-INSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 6/27/2019 | ELITEFLOOR | NGF18D, REPLACE TILE | 493.25 |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | SO17A, REPLACE SHOWER | (400.00) |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | SO17A, REPLACE SHOWER | (270.00) |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | SO17A, REPLACE SHOWER | (200.00) |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | SO17A, REPLACE SHOWER | (639.27) |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | WW25A, REPLACE SHOWER | (400.00) |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | WW25A, REPLACE SHOWER | (270.00) |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | WW25A, REPLACE SHOWER | (640.00) |
| GH-000-46600.00000 | 7/01/2019 | FERGUS | WW25A, REPLACE SHOWER | (200.00) |
| GH-000-46600.00000 | 7/08/2019 | ELITEFLOOR | WW025A, REPLACE TILE | 640.00 |
| GH-000-46600.00000 | 7/08/2019 | RUSCO | WW25A, REPLACE SHOWER PAN | 400.00 |
| GH-000-46600.00000 | 7/11/2019 | ATLGLASS | HOC52, RE-INSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 7/11/2019 | ELITEFLOOR | GP33K, REPLACE HARDWOOD BOARDS | 348.86 |
| GH-000-46600.00000 | 7/18/2019 | ELITEFLOOR | GP26L, REPLACE TILE | 145.00 |
| GH-000-46600.00000 | 7/25/2019 | MEDINA | DR140,REPAIR SHEETROCK | 350.00 |
| GH-000-46600.00000 | 7/25/2019 | MEDINA | GP19, 11 MONTH WARRANTY | 150.00 |
| GH-000-46600.00000 | 7/25/2019 | MEDINA | SW77, 11 MONTH WARRANTY | 150.00 |
| GH-000-46600.00000 | 7/25/2019 | RUSCO | RB172, REPLACE TEMPERING VALVE | 200.00 |
| GH-000-46600.00000 | 7/25/2019 | RUSCO | GP31L, REPLACE TEMPERING VALVE | 200.00 |
| GH-000-46600.00000 | 7/25/2019 | RUSCO | LS4, REPLACE KITCHEN FAUCET | 125.00 |
| GH-000-46600.00000 | 7/29/2019 | GHSVCS | REIM LOWES WARR SUPPLIES JOBS | 45.72 |
| GH-000-46600.00000 | 7/29/2019 | FERGUS | LS4, DEFECTIVE FAUCET | 116.05 |
| GH-000-46600.00000 | 8/01/2019 | RUSCO | DR140, PIPE FITTING REPLACED | (350.00) |
| GH-000-46600.00000 | 8/01/2019 | AVMASONRY | NGF17A, RE-INSTALL STONE | 500.00 |
| GH-000-46600.00000 | 8/01/2019 | ELITEFLOOR | NGF13A, REPLACE TILE | 150.00 |
| GH-000-46600.00000 | 8/01/2019 | GMPAINTSVC | CPB5, PAINT SHOE MOLDING | 75.00 |
| GH-000-46600.00000 | 8/08/2019 | ATLGLASS | NGF13A, RE-INSTALL DOOR | 200.00 |
| GH-000-46600.00000 | 8/09/2019 | FERGUS | CPB66-WATER HEATER ELEMENT | 16.39 |
| GH-000-46600.00000 | 8/09/2019 | FERGUS | CPB66, WATER HEATER ELEMENT | 16.39 |
| GH-000-46600.00000 | 8/09/2019 | FERGUS | CPB66, WATER HEATER ELEMENT | 32.80 |
| GH-000-46600.00000 | 8/15/2019 | ULTIMATE | LH SOD,GRADING,REMOVE FENCE | 2,305.00 |
| GH-000-46600.00000 | 8/15/2019 | ULTIMATE | LH6E, REPAIR EROSION | 250.00 |
| GH-000-46600.00000 | 8/20/2019 | FERGUS | CPB8, WTR HEATER ELEMENT | 65.58 |
| GH-000-46600.00000 | 8/20/2019 | FERGUS | GH15, DISHWASHER LEAK | (300.00) |
| GH-000-46600.00000 | 8/20/2019 | FERGUS | CPB8, WTR HEATER ELEMENT | 1.21 |
| GH-000-46600.00000 | 8/22/2019 | RUSCO | CPB8, REPLACE WTR HEATER ELEME | 150.00 |
| GH-000-46600.00000 | 8/22/2019 | STHTUBREFI | DR75, REPAIR WINDOW | 150.00 |
| GH-000-46600.00000 | 8/23/2019 | MEDINA | CP4, REPAIR DRYWALL | 100.00 |

| | | | | |
|---|---|---|---|---:|
| GH-000-46600.00000 | 8/23/2019 | MEDINA | GP22J, PATCH DRYWALL | 125.00 |
| GH-000-46600.00000 | 8/26/2019 | FERGUS | CR INV# 4520343 | (116.05) |
| GH-000-46600.00000 | 8/27/2019 | FERGUS | 50 GAL ELEC WATER HEATER | 306.00 |
| GH-000-46600.00000 | 8/27/2019 | GHSVCS | LOWES GH WARR SUPPLIES | 63.82 |
| GH-000-46600.00000 | 9/04/2019 | FERGUS | (Rev)50 GAL ELEC WATER HEATER | (306.00) |
| GH-000-46600.00000 | 9/12/2019 | ALLSEASONS | HF12, REPLACE SIDING | 200.00 |
| GH-000-46600.00000 | 9/17/2019 | SRSROOFING | DR75, ROOFING MATERIAL | 68.21 |
| GH-000-46600.00000 | 9/17/2019 | SRSROOFING | DR75, ROOFING MATERIAL | 0.65 |
| GH-000-46600.00000 | 9/18/2019 | FERGUS | CP20, PLBG FXTRS | 84.74 |
| GH-000-46600.00000 | 9/19/2019 | ATLGLASS | WW25A, RE-INSTALL SHWR PAN | 200.00 |
| GH-000-46600.00000 | 9/19/2019 | RUSCO | DR95, RE-INSTALL SHOWER PAN | (438.60) |
| GH-000-46600.00000 | 9/19/2019 | RUSCO | DR95, RE-INSTALL SHOWER PAN | (200.00) |
| GH-000-46600.00000 | 9/20/2019 | 84LUM | HF23, TRIP CHARGE SHUTTERS INS | 30.00 |
| GH-000-46600.00000 | 9/24/2019 | GHSVCS | LOWES: WARR, SUPPLIES FOR JOBS | 51.32 |
| GH-000-46600.00000 | 9/26/2019 | ATLGLASS | DR95, REINSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 9/26/2019 | STHTUBREFI | WW40B, REPAIR WINDOW FLANGES | 350.00 |
| GH-000-46600.00000 | 10/03/2019 | ELITEFLOOR | DR95, REPLACE TILE | 438.60 |
| GH-000-46600.00000 | 10/03/2019 | NELQTYROOF | DR75, ROOFING LABOR | 300.00 |
| GH-000-46600.00000 | 10/10/2019 | RUSCO | NGF40A, REPAIR SEWER LINE | 500.00 |
| GH-000-46600.00000 | 10/10/2019 | STHTUBREFI | HF11, TUB REPAIR | 125.00 |
| GH-000-46600.00000 | 10/10/2019 | ELITEFLOOR | SPL59, RE-INSTALL SHOWER DOOR | (200.00) |
| GH-000-46600.00000 | 10/14/2019 | FERGUS | GP16M, PLBG FXTRS #3 | 116.05 |
| GH-000-46600.00000 | 10/17/2019 | GMPAINTSVC | CPB5, PAINT TOUCHUP | 100.00 |
| GH-000-46600.00000 | 10/17/2019 | RUSCO | CP20, PLUMBING TRIM | 150.00 |
| GH-000-46600.00000 | 10/17/2019 | RUSCO | GP16M, REPLACE KITCHEN SICK | 150.00 |
| GH-000-46600.00000 | 10/29/2019 | GHSVCS | LOWES: GH WARR FOR SUPPLIES | 240.80 |
| GH-000-46600.00000 | 10/31/2019 | ELITEFLOOR | NGF22B, 11 MONTH | 125.00 |
| GH-000-46600.00000 | 10/31/2019 | MEDINA | DR107, FIX DRYWALL | 175.00 |
| GH-000-46600.00000 | 11/07/2019 | ATLGLASS | SPL59; REINSTALL SHOWER DOOR | 200.00 |
| GH-000-46600.00000 | 11/07/2019 | MEDINA | GCL78C;REPAIR CEILING | 600.00 |
| GH-000-46600.00000 | 11/07/2019 | ULTIMATE | LH9E, REPLACE SOD | 800.00 |
| GH-000-46600.00000 | 11/07/2019 | ULTIMATE | LH8E, REPLACE SOD | 700.00 |
| | | | | 19,217.79 |

**SECTION 3.21**
**COVENANTS, CONDITIONS AND RESTRICTIONS**

None

**SECTION 3.22**
**RETAIL SALES CONTRACTS**

Schedule 1.1(k) (i) is incorporated by reference.

**SECTION 3.23**

**FINANCIAL ACCOUNTS OF EACH ASSOCIATION CONTROLLED BY SELLER**

None

## SECTION 8.2(v)
## OTHER PARTIES TO EXECUTE THE LAND PURCHASE AGREEMENT

1. Grayhawk Homes, Inc.

2. Tiger Creek Development, Inc.

3. Cusseta Road, LLC

4. Grey Rock Development, LLC

5. Windsong Bonacre, LLC

6. Erickson Investments, Inc.

7. Homestead Residential, Inc.

8. Sage Development, Inc.

<u>Exhibit A</u>

**AMENDMENT #1**
**TO**
**ASSET PURCHASE AGREEMENT**

STATE OF GEORGIA
COUNTY OF MUSCOGEE

    **THIS AMENDMENT #1 TO ASSET PURCHASE AGREEMENT** (the "Amendment") is made and entered into this <u>31st</u> day of August, 2020, by and between **ASH-GRAYHAWK, LLC**, a Virginia limited liability company ("Buyer"), and **GH LOT HOLDINGS, INC.**, formerly known as GRAYHAWK HOMES, INC., a Georgia corporation ("Grayhawk"), **HOMESTEAD RESIDENTIAL, INC.**, an Alabama corporation ("Homestead"), and **GH SERVICES, INC.**, a Georgia corporation ("GHS") (collectively with Grayhawk and Homestead "Seller").

<u>**RECITALS**</u>

    **WHEREAS**, on November 15, 2019, Seller and Buyer, together with David B. Erickson and Rose Anne Erickson, became parties to that certain Asset Purchase Agreement dated as of November 15, 2019 (the "Purchase Agreement"), pursuant to which Seller agreed to sell, assign and deliver to Buyer, and Buyer agreed to purchase and assume from Seller certain assets and liabilities;

    **WHEREAS**, the Purchase Agreement provided for Ten Million Dollars ($10,000,000) to be paid as premium;

    **WHEREAS**, up to Six Million Dollars ($6,000,000) of the premium was to be paid in the form of deferred payments, paid over a period of four (4) years after Closing (the "Deferred Payments Period");

    **WHEREAS**, the premium to be paid on January 30, 2021 for Year 1 of the Deferred Payments Period was to be Two Million Four Hundred Thousand Dollars ($2,400,000); and

    **WHEREAS**, Buyer and Seller after further discussion and negotiation, wish to increase the amount of premium, the amount of premium paid in deferred payments, and the amount of premium paid in Year 1 of the Deferred Payments Period.

<u>**AGREEMENT**</u>

    **NOW THEREFORE**, in consideration of the mutual agreements and covenants hereinafter set forth and which are set forth in the Purchase Agreement, Seller and Buyer hereby agree as follows:

<u>**SECTION 1**</u>

    (a)    Article II, PURCHASE PRICE AND CLOSING, is amended by deleting Section 2.1(b) in its entirety and replacing with the following:

    "2.1(b) up to Ten Million One Hundred Twenty Thousand Dollars ($10,120,000) payable as set forth in <u>Section 2.5</u> (the "<u>Premium</u>")."

(b)     Article II, PURCHASE PRICE AND CLOSING, is amended by deleting Section 2.5(a)(ii) in its entirety and replacing with the following:

"2.5(a)(ii) up to Six Million One Hundred Twenty Thousand Dollars ($6,120,000) of the Premium shall be payable by Buyer to Seller in the form of deferred payments (the "Deferred Payments") in accordance with Section 2.5(e)."

(c)     Article II, PURCHASE PRICE AND CLOSING, is amended by deleting Section 2.5(e) in its entirety and replacing with the following:

"2.5(e) *Deferred Payments*. The Deferred Payments of $6,120,000 will be made payable to Grayhawk Homes, Inc. on an installment basis over a period of approximately four (4) years after Closing (the "Deferred Payments Period"). Grayhawk Homes, Inc. shall receive, respectively, $2,520,000 in Year 1 (2020), $1,200,000 in Year 2 (2021), $1,200,000 in Year 3 (2022), $1,200,000 in Year 4 (2023). The obligation for Buyer to make the Deferred Payments shall accrue on December 31 of each such year, and the Deferred Payments will be made to Seller by January 30 of the following year. Buyer shall have the option, in its sole discretion, to make any of the Deferred Payments in cash, ASH Membership Interests, or a combination of both. If Buyer elects to make any portion of the Deferred Payments with ASH Membership Interests, the effective date of the issuance of such Units shall be January 1 of the year in which such Units are issued. The ASH Membership Interests shall, for purposes of the Deferred Payments, be valued at $1,000 per unit (proportionately adjusted to reflect any: (i) membership interest split, reverse split, or combination (ii) membership interest dividends; or (iii) membership interest exchanges). In the event that Buyer or Seller terminates the Land Purchase Agreement as a result of an uncured breach of the Land Purchase Agreement (as more fully set forth in Sections 34 and 35 therein), Buyer shall have no further obligation to make Deferred Payments."

(d)     Article II, PURCHASE PRICE AND CLOSING, is amended by the addition of Section 2.5(f) as follows:

"Section 2.5(f) *Deferred Payments in Year 1*. Buyer guarantees to Seller that a minimum of One Hundred Twenty Thousand Dollars ($120,000) of the Deferred Payments owed in Year 1 will be in the form of cash."

## SECTION 2

Seller and Buyer agree that the effective date of this Amendment is November 15, 2019

## SECTION 3

All other provisions set forth in the Purchase Agreement shall remain in full force and effect and are unaffected by this Amendment. Should there be any conflict between this Amendment and the Purchase Agreement, the terms of this Amendment shall control.

*[signature page to follow]*

IN WITNESS WHEREOF, the Parties have executed or caused to be executed this Amendment to the Asset Purchase Agreement by its duly authorized officers on the day and year first written above.

**ASH-GRAYHAWK, LLC**

By: _____

Gregory Benson, Chief Executive Officer

**GH LOT HOLDINGS, INC.**

By: _____

David B. Erickson, President

**HOMESTEAD RESIDENTIAL, INC.**

By: _____

David B. Erickson, President

**GH SERVICES, INC.**

By: _____

David B. Erickson, President

_____

David B. Erickson, individually

_____

Rose Anne Erickson, individually