# EXHIBIT 2

# LAND PURCHASE AGREEMENT

THIS LAND PURCHASE AGREEMENT ("**Agreement**") made this 15th day of November, 2019 by and among ASH-GRAYHAWK, LLC, a Virginia limited liability company ("**AG**"), AMERICAN SOUTHERN HOMES HOLDINGS, LLC, a Delaware limited liability company ("**ASH**"), and DAVID B. ERICKSON, individually and on behalf of all Selling Entities ("**D. Erickson**"), and ROSE ANNE ERICKSON, individually and on behalf of all Selling Entities ("**R. Erickson**" and, together with D. Erickson, collectively, "**Erickson**"). AG, ASH, and Erickson are hereinafter sometimes referred to individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, AG, ASH, and D. Erickson and other parties have entered into an Asset Purchase Agreement ("**APA**") of even date pursuant to which AG and ASH (collectively, the "**Buyer**") have acquired the operating assets of 3 entities controlled by D. Erickson, namely Grayhawk Homes, Inc., a Georgia corporation, Homestead Residential, Inc., an Alabama corporation, and GH Services, Inc., a Georgia corporation (collectively, the "**Selling Entities**").

WHEREAS, the APA requires that D. Erickson and R. Erickson, the Selling Entities, and any other entity owned or controlled by Erickson for purchasing and developing residential land, including but not limited to Tiger Creek Development, Inc., Cusseta Road, LLC, Grey Rock Development, LLC, Windsong Bonacre, LLC, Erickson Investments, Inc., and Sage Development, Inc. (collectively, "**Seller**") will, after Closing under the APA, provide residential building lots ("**Lots**") to Buyer and that the Lots are currently comprised of (a) Lots that have been fully developed and finished ("**Finished Lots**") and that are listed on **Exhibit A** attached to this Agreement (sometimes referred to as the "**Phase A Lots**"), (b) Lots that are being developed and will be considered to be Finished Lots within 12 months after the date of this Agreement, that have an established purchase price agreed to by Seller and that are listed on **Exhibit B** attached to this Agreement (sometimes referred to as the "**Phase B Lots**"), and (c) real property or Lots that Seller either has purchased or has a right to purchase and that will be developed into Finished Lots, but for which a purchase price has not yet been determined, and that are listed on **Exhibit C** attached to this Agreement (sometimes referred to as the "**Phase C Lots**"). The list of Phase A Lots on Exhibit A, the list of Phase B Lots on Exhibit B and the list of Phase C Lots on Exhibit C may be amended and/or supplemented from time to time by agreement of the Parties, and any Lots reflected on such lists from time to time shall be subject to this Agreement and the terms of the APA.

WHEREAS, Seller may also develop Future Lots (as defined in Paragraph 14 below) and such Future Lots will also be subject to this Agreement.

WHEREAS, the Parties wish to enter into this Agreement to set forth the terms and conditions under which such Finished Lots shall be sold to Buyer, consistent with the APA.

NOW THEREFORE BE IT AGREED:

1.  The foregoing Recitals are hereby incorporated by reference. Capitalized terms not defined in this Agreement shall have the meanings attributed to them in the APA.

2.  The Parties anticipate there are approximately 1,600 Lots (plus any Future Lots) located in various cities, counties and states that will be subject to the provisions of this Agreement. The current number of Phase A Lots, Phase B Lots and Phase C Lots are shown on **Exhibit A**, **Exhibit B** and **Exhibit C**, respectively. The Parties recognize and agree that as of the date of this Agreement many of the communities containing Lots or real property to be developed into communities with Lots that are identified on **Exhibit B** and **Exhibit C** have not been fully entitled, approved for development or final platted and the number of Lots may in fact increase or decrease during the life of this Agreement.

3.  Buyer will have all ownership rights in the Finished Lots once purchased, including mineral and air rights.

4.  In accordance with the APA, Buyer will deposit with Seller as of the date of this Agreement, the sum of Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00) (the "**Deposit**") as deposit for the Finished Lots subject to this Agreement. The Deposit shall be credited to Buyer pro-rata as to only the Phase C Lots as follows:

    (a)  Until two-thirds (2/3) of the Phase C Lots have been purchased by Buyer, at the closing of each Phase C Lot purchase by Buyer, the Buyer will receive a credit against the purchase price of such Phase C Lot (the "**Initial Phase C Lot Credit**") calculated as follows:

    | | | |
    |---|---|---|
    | X | = | One-third (1/3) of the Deposit |
    | Y | = | Two-thirds (2/3) of the number of Phase C Lots currently listed on Exhibit C |
    | X divided by Y | = | Initial Phase C Lot Credit |

    (b)  After two-thirds (2/3) of the Phase C Lots have been purchased by Buyer, at the closing of each Phase C Lot purchase by Buyer, Buyer will receive a credit against the purchase price of such Phase C Lot (the "**Subsequent Phase C Lot Credit**") calculated as follows:

    | | | |
    |---|---|---|
    | X | = | Two-thirds (2/3) of the Deposit |
    | Y | = | One-third (1/3) of the number of Phase C Lots currently listed on Exhibit C |
    | X divided by Y | = | Subsequent Phase C Lot Credit |

5.  The number of Phase C Lots is fluid and **Exhibit C** will be amended from time to time by mutual agreement between the Parties as permitted per this Agreement.

6.  Seller is required to develop the Lots in accordance with this Agreement and to meet the requirement of the Takedown Schedule (defined below). Starting with the calendar quarter ending on December 31, 2019, Buyer agrees to purchase from Seller the number of Lots set forth on the Lot takedown schedule attached as **Schedule 1** to this Agreement (the "**Takedown Schedule**"). The number of Lots shown on the Takedown Schedule represents the

minimum number of Lot closings ("**Lot Takedowns**") that Buyer is required to complete, based on the availability of Finished Lots, during each calendar quarter; provided, however, that to the extent Buyer purchases more than the number of Lots shown on the Takedown Schedule during any calendar quarter, the excess number of Lots shall be credited toward the Lot Takedowns required for the subsequent calendar quarter or quarters.

7.     All Phase A Lots will be considered "Finished Lots" (i.e., all work necessary to make such Phase A Lot a Finished Lot have been completed by Seller) unless the Phase A Lot is marked on **Exhibit A** as either (a) "AS IS" (meaning that Seller is not required to finish building pads, clearing or grading of the Lots) or (b) "SEPTIC" (meaning that the Lots will not be connected to municipal sewer systems. For Lots marked "SEPTIC," if Seller is unable to obtain a septic tank permit or a permit for a septic field that will accommodate at least a 3 bedroom house, Buyer shall not be obligated to purchase such Lots.

8.     The base purchase price for the Phase A Lots (the "**Phase A Lot Purchase Price**") shall be the "WIP" amount shown on **Exhibit A**. Commencing on October 1, 2020, the Phase A Lot Purchase Price for all Phase A Lots not yet purchased by Buyer shall increase at an annual rate of 6% (or 1/2 of 1% for each month) of the original Phase A Lot Purchase Price (non-compounding). In addition, Buyer agrees to reimburse Seller for real property taxes applicable to the Phase A Lots that Seller has paid or that otherwise accrue from the date of this Agreement to the date of each Lot Takedown. All Phase A Lots that Buyer is obligated to purchase under this Agreement will be purchased no later than December 31, 2021.

9.     The base purchase price for the Phase B Lots (the "**Phase B Lot Purchase Price**") shall be the "current lot price good through 6/30/2020" amount shown on **Exhibit B**. Commencing on July 1, 2021, the Phase B Lot Purchase Price for all Phase B Lots not yet purchased by Buyer shall increase at an annual rate of 6% (or 1/2 of 1% for each month) of the original Phase B Lot Purchase Price (non-compounding). In addition, Buyer agrees to reimburse Seller for real property taxes applicable to the Phase B Lots that Seller has paid or that otherwise accrue from the date of this Agreement to the date of each Lot Takedown.

10.     Seller is required to develop the Lots in accordance with this Agreement and to satisfy the requirements of the Takedown Schedule. However, as to the Phase C Lots, during the first full year after the Closing under the APA, the Parties shall agree to the order in which specific Phase C Lots will be developed. In addition, the Parties may mutually agree to eliminate some of the Phase C Lots shown on **Exhibit C**.

11.     The base purchase price for the Phase C Lots (the "**Phase C Purchase Price**") shall be determined as follows:

(a)     The basis of each Phase C Lot will be the current basis shown on **Exhibit C** for each neighborhood.

(b)     Commencing on January 1, 2020, the basis of each Phase C Lot shall increase at the rate of 1/2 of 1% per month until Buyer purchases the Phase C Lot.

(c)     In addition, at the closing of the purchase of each Phase C Lot, Buyer shall (i) reimburse Seller and/or pay (as applicable) for real property taxes applicable to each Phase C

Lot that Seller has paid or that otherwise accrue from the date of this Agreement to the date of each Lot Takedown, (ii) reimburse Seller for the actual costs incurred by Seller to develop the Phase C Lot (and Seller shall promptly disclose such costs and supporting documentation to Buyer upon request) and (iii) pay Seller a $3,000 management fee.

12.     If Buyer and Seller determine that the Phase C Purchase Price (as calculated according to Paragraph 11 above) for the Phase C Lots in a particular phase of a Subdivision ("**Phase**") is equal to or less than twenty percent (20%) of the average appraised market sales price of a house in such Subdivision (the "**Estimated Market Value**"), then Buyer shall be obligated to purchase such Phase C Lots for the Phase C Purchase Price.

13.     If Buyer and Seller determine that the Phase C Purchase Price (as calculated according to Paragraph 11 above) for the Phase C Lots in a particular Phase exceeds 20% of the Estimated Market Value:

      (a)     Seller may elect to sell such Phase C Lots to Buyer for a price equal to or less than twenty percent (20%) of the Estimated Market Value (the "**Reduced Phase C Purchase Price**"), and Buyer shall be obligated to purchase such Phase C Lots for the Reduced Phase C Purchase Price, pursuant to the Takedown Schedule. In such event, once the actual sales price of the house, including options and upgrades (the "**Actual Market Value**") on such Phase C Lots is determined, at the closing of such house Buyer shall pay to Seller the difference (if any) between the Reduced Phase C Purchase Price and twenty percent (20%) of the Actual Market Value (the "**True-Up Payment**").

      (b)     If Seller does not elect to sell such Phase C Lots to Buyer for the Reduced Phase C Purchase Price, then Seller shall offer to sell such Phase C Lots (the "**Phase C ROFO Lots**") to Buyer by giving written notice to Buyer, in the form attached hereto as **Exhibit D** (the "**Phase C ROFO**"). Buyer shall have forty-five (45) days (the "**Review Period**") after receipt of the Phase C ROFO within which to give written notice to Seller of (A) its election to purchase the Phase C ROFO Lots for the price set forth in the Phase C ROFO or (B) its election not to purchase the Phase C ROFO Lots. For the avoidance of doubt, Buyer shall not be obligated to pay any True-Up Payment to Seller if it elects to purchase the Phase C ROFO Lots.

      (i)     If Buyer elects to purchase the Phase C ROFO Lots, such Lots shall be subject to the terms of this Agreement and the Takedown Schedule.

      (ii)     If Buyer does not elect to purchase the Phase C ROFO Lots during the Review Period, Seller may then accept any bona fide, arms-length offer (the "**Bona Fide Offer**") from an unrelated third party willing to purchase such Phase C ROFO Lots and who has demonstrated the financial capacity to perform under such offer (a "**Potential Purchaser**") and enter into a purchase and sale agreement with the Potential Purchaser for the Phase C ROFO Lots for monetary consideration (after deducting third party commissions) that is equal to or greater than the monetary consideration originally offered to Buyer and on terms and conditions not in any way more favorable to the purchaser than the terms and conditions originally offered to Buyer (the "**Third Party Agreement**").

(iii)    If Seller does not accept a Bona Fide Offer from a Potential Purchaser within one hundred twenty (120) days after Buyer elects not to purchase the Phase C ROFO Lots, or if the closing of the purchase of the Phase C ROFO Lots under a Third Party Agreement is not consummated, Seller must once again initiate the ROFO process described in this Paragraph 13(b).

14.    In the event Seller should acquire or develop and offer for sale additional land or lots in the States of Georgia or Alabama that are not Phase A, B, or C Lots (“**Future Lots**”):

(a)    Seller shall first offer to sell such Future Lots (the “**Future ROFO Lots**”) by giving written notice to Buyer, in the form attached hereto as **Exhibit E** (the “**Future ROFO**”).  Buyer shall have a forty-five (45) day Review Period after receipt of the Future ROFO within which to give written notice to Seller of (A) its election to purchase the Future ROFO Lots for the price and on the terms set forth in the Future ROFO or (B) its election not to purchase the Future ROFO Lots.  For the avoidance of doubt, Buyer shall not be obligated to pay any True-Up Payment to Seller if it elects to purchase the Future ROFO Lots.

(b)    If Buyer elects to purchase the Future ROFO Lots (the “**Accepted Future ROFO Lots**”) there shall be an additional period of forty-five (45) days (the “**Negotiation and Due Diligence Period**”), during which (i) the parties shall negotiate in good faith a purchase agreement for the Accepted Future ROFO Lots and (ii) Buyer may conduct normal due diligence, such as reviewing the condition of title of the Accepted Future ROFO Lots, investigating soil and environmental conditions, verifying the availability of utilities and other matters.

(c)    If Buyer does not elect to purchase the Future ROFO Lots, during either the Review Period or the Negotiation and Due Diligence Period, Seller may then accept a Bona Fide Offer from a Potential Purchaser and enter into a Third Party Agreement to sell the Future ROFO Lots for monetary consideration (after deducting third party commissions) that is equal to or greater than the monetary consideration originally offered to Buyer and on terms and conditions not in any way more favorable to the purchaser than the terms and conditions originally offered to Buyer.

(d)    If Seller does not accept a Bona Fide Offer from a Potential Purchaser within one hundred twenty (120) days after Buyer elects not to purchase the Future ROFO Lots, or if the closing of the purchase of the Future ROFO Lots under a Third Party Agreement is not consummated, Seller must once again initiate the ROFO process described in this Paragraph 14.

(e)    All Future Lots must be offered to Buyer in accordance with this Paragraph 14 for the period through and including one (1) year after Erickson is no longer an employee, director, owner, officer, or member of AG or ASH.

15.    Prior to closing as to any Finished Lot, Buyer will procure a title commitment from a national title company for an Owner’s title insurance policy (“**Commitment**”).  If the Commitment identifies one or more matters that could prevent Buyer from being able to obtain a building permit to construct a house on the Finished Lot or to obtain a certificate of occupancy for the house once completed, or convey such lot free of all liens and encumbrances or adverse

conditions of title (the "**Title Matters**"), Buyer shall provide Seller with written notice of the Title Matters (the "**Title Objection Notice**") and Seller shall have ten (10) days to cure and/or remove such Title Matters. If Seller is unable to cure and/or remove the Title Matters within that period, Buyer may elect, by written notice to Seller, to either (a) waive the Title Matters and proceed with the closing for the Finished Lot or (b) not proceed with the purchase of such affected Finished Lot.

16.     As to any Finished Lot conveyed under this Agreement, Seller shall provide to Buyer exclusive possession of such Finished Lot, and Seller shall have removed any and all personal property from such Finished Lot prior to conveyance.

17.     As an inducement to Buyer to enter into this Agreement Seller makes the following representations and warranties that are true as of this date and shall remain true throughout the duration of this Agreement:

    (a)     Seller has full power, right and authority to enter into this Agreement and Seller is in good standing under all applicable laws, and Seller's performance under this Agreement does not violate any other obligations of Seller; and

    (b)     Except as disclosed in the APA, Seller has no knowledge and no written notice of any claims, demands, proceedings or investigations affecting the lots which are subject to this Agreement; and

    (c)     Seller or the entities controlled by Seller hold fee simple title to the Lots and such Lots are not subject to any other leases, options, purchase agreements, tenancies or other encumbrances (other than customary acquisition and development financing which shall be satisfied at the time of each closing); and

    (d)     Seller has not received any notices or does not have any knowledge of any change contemplated as to any law, ordinance or restriction that would prevent Buyer from building a residential dwelling on all such lots; and

    (e)     Seller has no knowledge that any of the Lots which are subject to this Agreement are under investigation for any federal or state environmental issues and none of the lots has hazardous substances in any form on such lots; and

    (f)     Seller has not made (other than disclosed in the APA) any commitments to any governmental authority (beyond normal and customary zoning proffers) as to the use of the Lots other than the construction of residential dwellings on such lots; and

    (g)     Seller has no knowledge of any special assessments, fees or mandatory contributions as to any of the lots which are subject to this Agreement.

18.     At the time of each closing under this Agreement, Seller shall convey fee simple title through a Special Warranty Deed (or equivalent document, depending on the state(s) in which the Finished Lots are located).

19.     At the time of each closing under this Agreement, Seller shall be responsible for warranty deed preparation and transfer taxes. Buyer shall reimburse Seller for accumulated and previously paid property taxes through such closing date as described in Paragraphs 8, 9, and 11(c) of this Agreement. Buyer shall be solely responsible for all other expenses related to the purchase and financing of lots under this Agreement.

20.     Prior to the closing for each Lot Takedown, Buyer shall have the right to investigate the condition of the Lots, and Seller shall have the obligation to provide access to all documents pertaining to the Lots if requested by Buyer. Buyer shall give Seller at least ten (10) business days' written notice of the intended Finished Lots to be purchased at such closing. Buyer may request and Seller shall cooperate if such request is made to do a "walk-through" as to the Finished Lots to be purchased and to the extent problems are identified as to the condition of the Finished Lot(s) Seller shall utilize commercially reasonable efforts to remediate such conditions in a timely manner and if not promptly cured by Seller, Buyer may postpone the purchase of the Finished Lots or waive any such condition but which will not alleviate Seller from its obligations per this Agreement.

21.     At the time of each closing, there shall be no condition affecting any Finished Lot to be purchased that would prohibit Buyer from obtaining a building permit to construct a house on such Finished Lot or from obtaining a certificate of occupancy for the house once completed.

22.     Subject to the Preliminary Plans as provided to Buyer, Seller agrees to complete the development of the Lots and the Subdivisions in accordance with this Agreement at its sole cost and expense as hereinafter provided:

(a)     The Seller shall develop the Lots with approximate dimensions of the Lots shown on the Preliminary Plat and Final Plat (as such terms are defined below); provided, however, if the Lots substantially conform with building pads which accommodate customary dimensions used on Seller's existing products then approval of the Preliminary Plans for the Lots by Buyer shall not be necessary. The Preliminary Plat for the Subdivision may hereinafter be referred to as the "**Preliminary Plat**". Upon completion of Lots, and compliance with the rules and regulations for approval of a platted subdivision established by the applicable municipality (the "**Municipality**") and receipt of final approval (and the expiration of any appeal period) from the Municipality, Seller shall record a final subdivision plat for the Lots (a "**Final Plat**") in the official records for the county in which the Lots are located. The Final Plat shall be in substantial conformity with the Preliminary Plat. Seller will work with Buyer, once Seller has provided a preliminary grading plan to Buyer, to minimize rear yard slopes on Lots as can be reasonably accommodated by Seller.

(b)     Seller agrees to complete all such improvements to the required engineering standards in the development of a Subdivision in a good and workmanlike manner.

(c)     Seller shall, at its expense, construct and install all utility lines necessary or required for the development of a Subdivision into the Lots. All utility lines shall be constructed and installed by Seller in accordance with applicable rules, laws and any other requirements of the applicable Municipality and utility companies which will be providing utility services to the Subdivision (the "**Utility Companies**"). All utility lines shall be located

underground, except for such equipment and facilities that the Municipality and the applicable Utility Companies providing services to the Subdivision, customarily install above ground such as electrical boxes, feed boxes, junction cabinets, head walls, storm inlets, berms, etc., or that are otherwise shown on the Preliminary Plat or Final Plat. As used herein, the term "utility lines" shall mean and refer to all lines, pipes, wiring, conduit, equipment, electrical boxes and other apparatus necessary or required in connection with providing any electrical, telephone, gas lines, cable television, water, sanitary sewer, storm sewer and drainage services on any portion of the Subdivision and the Lots to be developed therein.

(d)     All interior roadways within Subdivision shall be constructed by Seller at its cost and expense in a good and workmanlike manner in accordance with applicable rules and regulations of the Municipality and with the Preliminary Plat and Final Plat of the Subdivision. The interior roadways and/or street improvements shall include the grading, drainage and paving of streets proper width and the installation of curbs and gutters and curb cuts for driveways within the Subdivision as shown on the Preliminary Plat and the Final Plat.

(e)     Seller shall obtain at its sole cost and expense any re-subdivision of all or any portion of a Subdivision which is required to meet the requirements of the state and/or the Municipality.

(f)     Seller shall obtain all drainage letters, approvals, variances, licenses, permits and consents necessary from the Municipality, including without limitation, a storm water discharge permit from the state or any other controlling body, in connection with the development of the Lots and the Subdivision in which the Lots are located (collectively, the "**Permits**"), all at Seller's sole cost and expense.

(g)     The sanitary sewer system and water system shall be accepted by the Municipality and its agencies.

(h)     It is Seller's responsibility to pay all fees, post any bonds or letters of credit except for individual Lot bonds for completion of Buyer's purchased Lots until all such Lots are purchased by Buyer.

(i)     As to sidewalks required by the Preliminary Plat, only sidewalks fronting Lots owned by Buyer within the Subdivision, excluding sidewalks on the common area, if any, shall be the responsibility of Buyer once owned by Buyer. If sidewalks are required in the Subdivision, Buyer will build said sidewalks in conjunction with the construction of the related house on that lot. Buyer will not be responsible for installation of sidewalks fronting its Lots until home construction is completed.

(j)     Seller shall provide Buyer with copies of the proposed declaration of covenants, conditions and restrictions and related subdivision documents (the "**Project Documents**") for each community in which the Lots are located, and Buyer shall have the opportunity to timely provide reasonable comments to such Project Documents prior to Seller's execution and recording of them. Once Buyer has purchased Finished Lots in a community, Seller shall not make any changes to the Project Documents for such community without Buyer's prior written consent, such consent not to be unreasonably withheld, delayed or conditioned.

Seller agrees to submit each Subdivision to the rights and obligations arising under the Project Documents in a manner consistent with the most recent amendments thereto, if any. Seller will maintain architectural control for all homes to be built even after turnover of control to the residence. Buyer will not be subject to any assessments on Lots it owns. Only third-party purchasers will be assessed by any association on or after their closing on a home. All Project Documents will allow Buyer or a builder to place signage, monuments, and advertising in the right of ways, common areas and on Lots it owns which are subject to this Agreement, as well as conduct business and construction on its Lots. Seller will maintain majority vote in all neighborhoods and Lots for architectural control until all lots are purchased by Buyer.

    (k)    Notwithstanding any other terms in this Agreement, Buyer will not be required to purchase Lots with a building envelope within a flood plain. If a Lot is deemed to be partially in a floodplain by a mortgage company, Buyer may elect in its direction to (i) effect removal of the building envelope from FEMA flood insurance by executing a LOMA letter through FEMA, or (ii) elect not to purchase such Lot. In the event a flood elevation certificate states a lot is in or partially in a flood plain, and the Buyer elects not to purchase said lot, such election shall not constitute a breach of this Agreement. However, in such event, Seller is free to sell said lot to an unaffiliated third party without restriction.

    23.    Subject to the Preliminary Plans and conditions set forth in this Agreement, on or before the closing of each Lot Takedown, Seller agrees to complete the Subdivision in which the Lots are located as hereinafter set forth in this Paragraph 23.

    (a)    The grading of each Lot to an elevation that provides a minimum 1.0% positive drainage to a dedicated outfall area (drainage swale at the rear or gutter at the front) so as not to pond or trap surface water on the lot. Concrete bottom swales can be designed at 0.5% positive drain.

    (b)    Final grading and paving and construction of internal roadways of the Subdivision for access to each Lot with paved and completed access to a main thoroughfare.

    (c)    Curb and gutter and curb cuts for driveways and asphalt binder completed for all roadways abutting the Lots or as required by the Municipality and electricity, telephone, cable, and water available for use. Gas utility will be provided if requested by Buyer and available only on as it pertains to each Subdivision and not on a Lot-by-Lot or Phase-by-Phase basis.

    (d)    Availability of all utilities as described herein or as platted to the Lots shall have been constructed and installed by Seller in accordance with applicable Municipality regulations, rules, and laws and to the requirements of the applicable utility companies.

    (e)    Development Specifications are as follows:

    (i)    A building pad of existing compacted material fill per ASTM standards shall be constructed except than no pad will be larger than the buildable area of each lot as defined by the Municipality's building code. Each Lot shall be graded to a uniform slope from the right-of-way to the front building line not to exceed twenty percent (20%).

(ii)     All Building pads shall be compacted to 95% of standard proctor. At Buyer's request, Seller shall provide Buyer with any soil reports in its possession evidencing compaction. Buyer is entitled to test any lot(s) for compaction utilizing a certified soils engineer of its choosing at its expense. In the event Buyer identifies a problem with compaction, Seller shall be responsible to correct the compaction for any Lots deemed questionable in such testing.

(iii)     The building pad elevation as measured form sideline to sideline shall be within +- 6 inches.

(f)     Property metal pins for the four corners of each Lot shall be in place.

(g)     All other slopes on the Lot will be mitigated to have even and consistent grades to the extent possible by topography with the goal of maximizing usable rear yards.

(h)     The Seller shall make reasonable efforts to obtain for each Lot any necessary drainage letters, approvals, variances, licenses, permits and consents from any relevant state and local government authority, including but not limited to necessary permits from the environmental authority for each Municipality. The responsibility to comply with those requirements for each Lot shall become Buyer's responsibility at the time Buyer acquires such Lot.

(i)     Seller shall have paid all fees, costs and assessments levied against the Lots, including, but not limited, to impact fees of any type and aid to construction costs except as otherwise provided in this Agreement.

(j)     The performance of any and all other duties and services, if any, necessary so that a building permit may be issued and the Lots will be ready for the construction thereon of single-family detached dwellings.

(k)     Seller shall maintain the adjacent property that Seller owns in accordance with ordinances of the Municipality.

(l)     Seller to develop and complete all Subdivision common areas for recreation, open space and/or drainage.

24.     The Seller hereby covenants and agrees to pay for and be   obligated for the costs of the development of the Lots and the Subdivision, in accordance with this Agreement.

25.     Time is of the essence under this Agreement and the knowing waiver by any Party as to performance shall not be deemed a waiver as to any other condition as to any other Lot under the Agreement.

26.     This Agreement shall be governed and interpreted under the laws of the State of Georgia and the Parties agree that any judicial action shall be brought exclusively in the U.S. District Court in Columbus, Georgia regardless of the location of the affected Lots, and the Parties consent to submit to the personal jurisdiction of that court in any action or proceeding arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement. In the event that the U.S. District Court in Columbus, Georgia lacks subject matter

jurisdiction, any such actions or proceedings may be initiated in a court of competent jurisdiction sitting in the State of Georgia. If a Georgia court does not have jurisdiction, then the action may be brought in a court where the property is located.

27.     No broker shall be entitled to a commission or fee in connection with this Agreement and each Party indemnifies and holds one another harmless as to any assertion of a commission alleged to have been authorized by the other Party.

28.     Seller may not assign its interests under this Agreement without the prior written consent of Buyer, such consent not to be unreasonably withheld, delayed or conditioned, other than to a parent, affiliate or subsidiary and then only so long as Seller remains in full control of such entity.

29.     Seller will not, in case of bankruptcy, liquidation, death or disability, subject the Lots to any other term, condition or indebtedness otherwise as stated in this Agreement, and this Agreement will be made prior and superior to any term under Seller's estate and binding upon its heirs, successors and assigns.

30.     Seller represents and warrants to Buyer that the list of plats, plans, drawings, designs, engineering materials and contracts relating to the Lots, set forth on **Schedule 2** attached to this Agreement, is true, correct and complete as of the date of this Agreement.

31.     Intentionally Omitted.

32.     Notwithstanding any contrary provision of this Agreement, the commencement of construction of the improvements to the Lots and the time for Seller's delivery of Finished Lots to Buyer for purchase shall be extended by a period of time equal to any period that progress in construction of the improvements is delayed due to any force majeure events such as strike, lockout, riot, act of war, act of violence, unseasonable or intemperate weather, fire or other casualty, material or labor shortage, act of God, interference by a third party, governmental regulations or controls, or unusual governmental approval delays.

33.     All risk of loss or damage to the Lots by casualty of any nature prior to the closing of a Lot Takedown shall be borne by Seller. In the event of any casualty affecting the Lots during the pendency of this Agreement, Seller shall be entitled to retain any applicable insurance proceeds, and Seller's obligations under this Agreement shall continue notwithstanding such casualty.

34.     If Buyer shall default in any of the terms or provisions of this Agreement prior to the closing of any Lot Takedown, and shall fail to cure such default within forty-five (45) days following written notice thereof given by Seller to Buyer, Seller's sole and exclusive remedy, after the expiration of the foregoing 45-day period, shall be to terminate this Agreement and to retain the Deposit (or any portion thereof not previously credited to Buyer), as liquidated damages. Seller and Buyer acknowledge that it would be extremely difficult if not impossible to ascertain Seller's actual damages and that the Deposit (or any portion thereof not previously credited to Buyer) is a reasonable forecast of just compensation to Seller resulting from Buyer's default. Upon termination of this Agreement by Seller as set forth in this Paragraph, (a) Seller shall be released from the Restrictive Covenants in Section 6.5 of the APA, as more fully set

forth therein, (b) Buyer agrees to allow Seller to use certain Intellectual Property, as more fully set forth in Section 6.6(j) of the APA, (c) Buyer shall have no further obligation to make Deferred Payments, as more fully set forth in Section 2.5(d) of the APA, (d) Seller shall have no further obligation to provide a ROFO to Buyer for Future Lots pursuant to Section 14 above, and (e) neither Party shall have any further obligation or liability hereunder, except indemnity obligations contained herein.

35. If Seller shall default in any of the terms or provisions of this Agreement or otherwise defaults hereunder, and fails to cure such default within fifteen (15) days following written notice thereof given by Buyer to Seller, Buyer may, at Buyer's election: (a) waive such default, in which case this Agreement shall remain in full force and effect; or (b) terminate this Agreement by written notice to Seller, whereupon (i) the Deposit (or any portion thereof not previously returned to Buyer) shall promptly be returned to Buyer by Seller, (ii) Buyer shall have no further obligation to make Deferred Payments, as more fully set forth in Section 2.5(d) of the APA, and (iii) Buyer shall be entitled to recover its monetary damages, including lost profits; or (c) give written notice to Seller of default, whereupon (i) the Deposit (or any portion thereof not previously returned to Buyer) shall promptly be returned to Buyer by Seller, (ii) Buyer shall have no further obligation to make Deferred Payments, as more fully set forth in Section 2.5(d) of the APA, and (iii) Buyer may pursue such other rights or remedies as are available at law or in equity, including but not limited to obtaining specific performance to compel Seller to improve and/or sell the Lots to Buyer and recovering all monetary damages and lost profits arising from Seller's default.

36. The obligations of Seller and Buyer are contained in this Agreement and the APA. In the event of any conflict between this Agreement and the APA, this Agreement shall control.

IN WITNESS WHEREOF, the Parties have put their hands and seals on the date first above written.

[The balance of this page is intentionally left blank.]

ASH-GRAYHAWK, LLC,
a Virginia limited liability company


By: _____
Name:    Greg Benson
Title:    Chief Executive Officer



AMERICAN SOUTHERN HOMES
HOLDINGS, LLC, a Delaware
limited liability company




By: _____
Name:    J. Marshall Coleman
Title:    Authorized Officer


David Erickson, Individually and
on behalf of all Sellers


Rose Anne Erickson, Individually
and on behalf of all Sellers

ASH-GRAYHAWK, LLC,
a Virginia limited liability company


By: _____
Name:   Greg Benson
Title:   Chief Executive Officer

_____
David Erickson, Individually and
on behalf of all Selling Entities


AMERICAN SOUTHERN HOMES
HOLDINGS, LLC, a Delaware
limited liability company

_____
Rose Anne Erickson, Individually
and on behalf of all Selling Entities

By: _____
Name:   J. Marshall Coleman
Title:   Authorized Officer

<u>Schedule 1</u>

<u>Takedown Schedule</u>

## SCHEDULE 1 TO LPA TAKEDOWN SCHEDULE

| Takedowns | Dec-19 | Mar-20 | Jun-20 | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 |
|---|---|---|---|---|---|---|---|---|---|
| A Lots | 25 | 25 | 25 | 25 | 25 | 25 | 8 | | |
| B Lots | | | | 25 | 30 | 30 | 30 | 30 | 30 |
| C Lots | | | | | | | | 15 | 15 |
| Per Quarter | 25 | 25 | 25 | 50 | 55 | 55 | 38 | 45 | 45 |
| Annual | | | | | 180 | | | | 183 |

| GA | Muscogee | Villages at St. Mary's | | 8 | 12,000 | 15,000 | developed | | |
|---|---|---|---|---|---|---|---|---|---|
| GA | Muscogee | Eagle Pointe II | | 9 | 12,000 | 15,000 | developed | | |

| Takedowns | Mar-22 | Jun-22 | Sep-22 | Dec-22 | Mar-23 | Jun-23 | Sep-23 | Dec-23 |
|---|---|---|---|---|---|---|---|---|
| A Lots | | | | | | | | |
| B Lots | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| C Lots | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| Per Quarter | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Annual | | | | 180 | | | | 180 |

| Takedowns | Mar-24 | Jun-24 | Sep-24 | Dec-24 | Mar-25 | Jun-25 | Sep-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|
| A Lots | | | | | | | | |
| B Lots | 30 | 30 | 30 | 27 | | | | |
| C Lots | 15 | 15 | 15 | 18 | 45 | 45 | 45 | 45 |
| Per Quarter | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Annual | | | | 180 | | | | 180 |

| Takedowns | Mar-26 | Jun-26 | Sep-26 | Dec-26 | Mar-27 | Jun-27 | Sep-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|
| A Lots | | | | | | | | |
| B Lots | | | | | | | | |
| C Lots | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Per Quarter | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Annual | | | | 180 | | | | 180 |

| Takedowns | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| A Lots | 125 | 33 | 0 | 0 | 0 | 0 | 0 | 158 |
| B Lots | 55 | 120 | 120 | 117 | 0 | 0 | 0 | 412 |
| C Lots | 0 | 30 | 60 | 63 | 180 | 180 | 180 | 693 |
| Annual | 180 | 183 | 180 | 180 | 180 | 180 | 180 | 1263 |

C LOTS WILL CONTINUE UNTIL ALL LOTS ARE PUCHASED

Schedule 2

Schedule of Plats, Plans, Drawings, Designs, Engineering Materials and Contracts

Exhibit A

Phase A Lots

| | State | Job | Description | Not Pad Ready | SEPTIC FIELD | INITIAL PURCHASE PRICE* | WIP +SEPTIC AND PAD | Purchased at closing/ developed |
|---|---|---|---|---|---|---|---|---|
| **160** | | | | 82 | 33 | 6,531,867 | 6,926,367 | 786,668 |
| 1 | Ala | AL-00358 | Lot 358 Asheton Lakes | 2,500 | | 59,467 | 61,967 | |
| 2 | Ala | AL-00369 | Lot 369 Asheton Lakes | 2,500 | | 60,469 | 62,969 | |
| 3 | Ala | AL-00370 | Lot 370 Asheton Lakes | 2,500 | | 60,709 | 63,209 | |
| 4 | Ala | AL-00381 | Lot 381 Asheton Lakes | 2,500 | | 60,709 | 63,209 | |
| 5 | Ala | AL-00427 | Lot 427 Asheton Lakes | 2,500 | | 60,709 | 63,209 | |
| 6 | Ala | AP-0005A | Lot 5A Addtn Aumn Prk | 2,500 | 6,000 | 5,266 | 13,766 | |
| 7 | Ala | AUP-00129 | Lot 129 Ab Cl - Th Pr | 2,500 | | 74,503 | 77,003 | |
| 8 | GA | Muscogee | Villages at St. Mary's | | 8 | 12,000 | 15,000 | x   developed |
| 9 | GA | Muscogee | Eagle Pointe II | | 9 | 12,000 | 15,000 | x   developed |
| 10 | Ala | AUP-00130 | Lot 130 Ab Cl - Th Pr | 2,500 | | 65,853 | 68,353 | |
| 11 | Ala | AUP-00131 | Lot 131 Ab Cl - Th Pr | 2,500 | | 74,703 | 77,203 | |
| 12 | Ala | AUP-00134 | Lot 134 Ab Cl - Th Pr | 2,500 | | 66,837 | 69,337 | |
| 13 | Ala | AUP-00135 | Lot 135 Abr Cl- Th Pr | 2,500 | | 75,337 | 77,837 | |
| 14 | Ala | AUP-00136 | Lot 136 Aub Cl - Th Pr | 2,500 | | 75,337 | 77,837 | |
| 15 | Ala | AUP-00137 | Lot 137 Ab Cl - Th Pr | 2,500 | | 66,837 | 69,337 | |
| 14 | Ala | AUP-00141 | Lot 141 - Ab Cl Th Pr | 2,500 | | 76,620 | 79,120 | x |
| 15 | Ala | AUP-00142 | Lot 142- Ab Cl- Th Pr | 2,500 | | 75,987 | 78,487 | |
| 16 | Ala | AUP-00145 | Lot 145 - AU Cl Th Pr | 2,500 | | 75,815 | 78,315 | |
| 17 | Ala | AUP-00148 | Lot 148 Ab Cl - Th Pr | 2,500 | | 76,211 | 78,711 | x |
| 18 | Ala | AUP-00168 | Lot 168 Ab Cl - Th Pr | 2,500 | | 58,567 | 61,067 | |
| 19 | Ala | AUP-00188 | Lot 188 Aub Cl- Th Pr | 2,500 | | 53,111 | 55,611 | |
| 20 | Ala | AUP-00190 | Lot 190 Ab Cl - Th Pr | 2,500 | | 53,337 | 55,837 | |
| 21 | Ala | AUP-00191 | Lot 191 Ab Cl - Th Pr | 2,500 | | 62,503 | 65,003 | |
| 22 | Ala | AUP-00192 | Lot 192 Ab Cl - Th Pr | 2,500 | | 50,708 | 53,208 | |
| 23 | Ala | AUP-00193 | Lot 193 Ab Cl - Th Pr | 2,500 | | 57,108 | 59,608 | |
| 24 | GA | BVH-0004B | 4B Buen Vst Hghts | 2,500 | | 5,763 | 8,263 | |
| 25 | Ala | CCC-0036A | LOT 36A CEDAR CREEK | 2,500 | | 40,251 | 42,751 | |
| 26 | Ala | CCC-0037A | LOT 37A CEDAR CREEK | 2,500 | | 39,999 | 42,499 | |
| 27 | Ala | CCC-0038A | LOT 38A CEDAR CREEK | 2,500 | | 40,122 | 42,622 | |
| 28 | Ala | CR-00443 | Lot 443 Camden Ridge | 2,500 | | 35,303 | 37,803 | |
| 29 | Ala | CR-00444 | Lot 444 Camden Ridge | 2,500 | | 35,303 | 37,803 | |
| 30 | Ala | CR-00455 | Lot 455 Camden Ridge | 2,500 | | 35,303 | 37,803 | |
| 31 | Ala | CR-00468 | Lot 468 Camden Ridge | 2,500 | | 36,286 | 38,786 | |
| 32 | Ala | CR-00676 | Lot 676 Camden Ridge | 2,500 | | 35,778 | 38,278 | |
| 33 | Ala | DR-00085 | Lot 85 Donahue Ridge | | | 37,835 | 37,835 | x |
| 34 | Ala | DR-00086 | Lot 86 Donahue Ridge | | | 37,835 | 37,835 | |
| 35 | Ala | DR-00088 | Lot 88 Donahue Ridge | | | 40,335 | 40,335 | |
| 36 | Ala | DR-00089 | Lot 89 Donahue Ridge | | | 38,135 | 38,135 | |
| 37 | Ala | DR-00100 | Lot 100 Donahue Ridge | | | 39,835 | 39,835 | x |
| 38 | Ala | DR-00102 | Lot 102 Donahue Ridge | | | 39,835 | 39,835 | |
| 39 | Ala | DR-00103 | Lot 103 Donahue Ridge | | | 39,835 | 39,835 | |
| 40 | Ala | DR-00104 | Lot 104 Donahue Ridge | | | 39,828 | 39,828 | |
| 41 | Ala | DR-00106 | Lot 106 Donahue Ridge | | | 39,828 | 39,828 | |
| 42 | Ala | DR-00111 | Lot 111 Donahue Ridge | | | 39,828 | 39,828 | |
| 43 | Ala | DR-00112 | Lot 112 Donahue Ridge | | | 39,828 | 39,828 | |
| 44 | Ala | DR-00113 | Lot 113 Donahue Ridge | | | 39,828 | 39,828 | |
| 45 | Ala | DR-00114 | Lot 114 Donahue Ridge | | | 39,828 | 39,828 | |
| 46 | Ala | DR-00115 | Lot 115 Donahue Ridge | | | 39,828 | 39,828 | |
| 47 | Ala | DR-00116 | Lot 116 Donahue Ridge | | | 39,828 | 39,828 | |
| 48 | Ala | DR-00117 | Lot 117 Donahue Ridge | | | 39,828 | 39,828 | |
| 49 | Ala | DR-00118 | Lot 118 Donahue Ridge | | | 39,828 | 39,828 | |
| 50 | Ala | DR-00121 | Lot 121 Donahue Ridge | | | 39,828 | 39,828 | |
| 51 | Ala | DR-00125 | Lot 125 Donahue Ridge | | | 39,835 | 39,835 | x |
| 52 | GA | DW-0010A | 10A Deerwood | 2,500 | 6,000 | 40,574 | 49,074 | |
| 53 | GA | DW-0011A | 11A Deerwood | 2,500 | 6,000 | 40,521 | 49,021 | |
| 54 | GA | DW-0016A | 16A Deerwood | 2,500 | 6,000 | 40,603 | 49,103 | |
| 55 | GA | DW-0017A | 17A Deerwood | 2,500 | 6,000 | 40,532 | 49,032 | |
| 56 | GA | ESA-00040 | 40 EAST SIDE ACRE | 2,500 | | 20,825 | 23,325 | |
| 57 | GA | FC-00012 | 12 Foggy Cedar | 2,500 | | 17,825 | 20,325 | |
| 58 | GA | FD-01401 | FOREST DRIVE | 2,500 | | 6,014 | 8,514 | |
| 59 | GA | GCH-0001M | 1M Garrtt Crk Hgh | | | 46,658 | 46,658 | |
| 60 | GA | GCH-0002M | 2M Garrtt Crk Hgh | | | 46,653 | 46,653 | |

**Notes to purchase price:**
1. Price will increase by the cost of taxes
2. Escalator of 1/2 of 1% per month
     Beginning October 1 2020
3. All Exhibit A lots to be purchased
     No later than 12/31/2021
4. Pad and Septic status are information only

3 of 8 lots Villages at St Mary's

3 of 9 lots Eagle Pointe III

As of 11/6/2019

| | State | Job | Description | Not Pad Ready | SEPTIC FIELD | INITIAL PURCHASE PRICE* | WIP +SEPTIC AND PAD | Purchased at closing/ developed |
|---|---|---|---|---|---|---|---|---|
| 61 | GA | GCH-0008M | 8M Garrtt Crk Hgh | | | 46,590 | 46,590 | |
| 62 | GA | GCH-0012M | 12M Garrt Crk Hgh | | | 46,631 | 46,631 | |
| 63 | GA | GCH-0013M | 13M Garrt Crk Hgh | | | 46,606 | 46,606 | |
| 64 | GA | GCH-0015M | 15M Garrt Crk Hgh | | | 46,601 | 46,601 | |
| 65 | GA | GCH-0016M | 16M Garrt Crk Hgh | | | 46,598 | 46,598 | |
| 66 | GA | GCH-0020M | 20M Garrt Crk Hgh | | | 46,723 | 46,723 | |
| 67 | GA | GCH-0021M | 21M Garrt Crk Hgh | | | 46,621 | 46,621 | |
| 68 | GA | GCH-0023M | 23M Garrt Crk Hgh | | | 46,779 | 46,779 | x |
| 69 | GA | GCH-0024M | 24M Garrt Crk Hgh | | | 46,882 | 46,882 | |
| 70 | GA | GCH-0025M | 25M Garrt Crk Hgh | | | 51,096 | 51,096 | x |
| 71 | GA | GCH-0027M | 27M Garrt Crk Hgh | | | 47,739 | 47,739 | |
| 72 | GA | GCH-0031M | 31M Garrt Crk Hgh | | | 46,586 | 46,586 | |
| 73 | GA | GCL-0012I | 12I Garrt Crk Lak | | | 42,000 | 42,000 | x |
| 74 | GA | GCL-0014I | 14I Garrt Crk lak | | | 42,000 | 42,000 | x |
| 75 | GA | GCL-0104I | Crk Lak 4I Sec 11 | | | 47,017 | 47,017 | |
| 76 | GA | GCL-0105I | Crk Lak 5 Sec 11 | | | 45,906 | 45,906 | |
| 77 | GA | GF-0003H | 3H Granite Field | 2,500 | | 45,553 | 48,053 | |
| 78 | GA | GP-003FF | 3FF Garrett Pines | | | 30,865 | 30,865 | |
| 79 | Ala | HF-00001 | Lot 1 Hornet Flats | 2,500 | 6,000 | 23,722 | 32,222 | |
| 80 | Ala | HF-00002 | Lot 2 Hornet Flats | 2,500 | 6,000 | 23,722 | 32,222 | |
| 81 | GA | HL-0024C | 24 C HIGHLAND | | | 31,996 | 31,996 | x |
| 82 | Ala | LC-00003 | Lot 3 Links Crossing | | | 50,548 | 50,548 | |
| 83 | Ala | LC-00004 | Lot 4 Links Crossing | | | 50,000 | 50,000 | |
| 84 | Ala | LC-00005 | Lot 5 Links Crossing | | | 50,000 | 50,000 | |
| 85 | Ala | LC-00006 | Lot 6 Links Crossing | | | 50,000 | 50,000 | |
| 86 | Ala | LC-00007 | Lot 7 Links Crossing | | | 50,000 | 50,000 | |
| 87 | Ala | LC-00008 | Lot 8 Links Crossing | | | 50,000 | 50,000 | |
| 88 | Ala | LC-00009 | Lot 9 Links Crossing | | | 50,000 | 50,000 | |
| 89 | Ala | LC-00010 | Lot 10 Links Crossing | | | 50,000 | 50,000 | |
| 90 | Ala | LC-00011 | Lot 11 Links Crossing | | | 50,000 | 50,000 | |
| 91 | Ala | LC-00012 | Lot 12 Links Crossing | | | 50,000 | 50,000 | |
| 92 | Ala | LC-00013 | Lot 13 Links Crossing | | | 50,000 | 50,000 | |
| 93 | Ala | LC-00014 | Lot 14 Links Crossing | | | 50,000 | 50,000 | |
| 94 | Ala | LC-00015 | Lot 15 Links Crossing | | | 50,000 | 50,000 | |
| 95 | Ala | LC-00016 | Lot 16 Links Crossing | | | 50,000 | 50,000 | |
| 96 | Ala | LC-00017 | Lot 17 Links Crossing | | | 50,000 | 50,000 | |
| 97 | Ala | LC-00018 | Lot 18 Links Crossing | | | 50,000 | 50,000 | |
| 98 | Ala | LC-00019 | Lot 19 Links Crossing | | | 50,000 | 50,000 | |
| 99 | Ala | LC-00020 | Lot 20 Links Crossing | | | 50,000 | 50,000 | |
| 100 | Ala | LC-00021 | Lot 21 Links Crossing | | | 50,000 | 50,000 | |
| 101 | Ala | LC-00026 | Lot 26 Links Crossing | | | 50,000 | 50,000 | |
| 102 | Ala | LC-00027 | Lot 27 Links Crossing | | | 50,000 | 50,000 | |
| 103 | Ala | LC-00028 | Lot 28 Links Crossing | | | 50,000 | 50,000 | |
| 104 | Ala | LC-00029 | Lot 29 Links Crossing | | | 50,000 | 50,000 | |
| 105 | Ala | LC-00030 | Lot 30 Links Crossing | | | 50,000 | 50,000 | |
| 106 | Ala | LC-00031 | Lot 31 Links Crossing | | | 50,000 | 50,000 | x |

| | State | Job | Description | Not Pad Ready | SEPTIC FIELD | INITIAL PURCHASE PRICE* | WIP +SEPTIC AND PAD | Purchased at closing/developed |
|---|---|---|---|---|---|---|---|---|
| 107 | GA | LE-00002 | 2 Layfield Estates | | 6,000 | 36,157 | 42,157 | x |
| 108 | GA | LE-00003 | 3 Layfield Estates | | 6,000 | 35,840 | 41,840 | x |
| 109 | Ala | MG-00023 | Lot 23 Magnolia Grdns | 2,500 | | 27,199 | 29,699 | |
| 110 | Ala | MG-00024 | Lot 24 Magnolia Grdns | 2,500 | | 27,199 | 29,699 | |
| 111 | Ala | MG-00025 | Lot 25 Magnola Gardns | 2,500 | | 27,199 | 29,699 | |
| 112 | Ala | MG-00026 | Lot 26 Magnola Grdns | 2,500 | | 27,220 | 29,720 | |
| 113 | GA | ML-0001F | 1F Moonlake | | | 21,871 | 21,871 | |
| 114 | GA | ML-0008F | 8F Moonlake | | | 18,292 | 18,292 | |
| 115 | GA | ML-0009F | 9F Moonlake | | | 18,298 | 18,298 | |
| 116 | GA | ML-0010F | 10F Moonlake | | | 18,298 | 18,298 | |
| 117 | GA | ML-0014E | 14E Moonlake | | | 22,428 | 22,428 | |
| 118 | GA | ML-0015E | 15E Moonlake | | | 22,442 | 22,442 | |
| 119 | GA | MR-00001 | 1 Macon Rd | 2,500 | 6,000 | 41,789 | 50,289 | |
| 120 | GA | MR-00002 | 2 Macon Rd | 2,500 | 6,000 | 41,347 | 49,847 | |
| 121 | GA | MR-00003 | 3 Macon Rd | 2,500 | 6,000 | 41,247 | 49,747 | |
| 122 | GA | MR-00004 | 4 Macon Rd | 2,500 | 6,000 | 41,465 | 49,965 | |
| 123 | GA | MR-00005 | 5 Macon Rd | 2,500 | 6,000 | 41,615 | 50,115 | |
| 124 | GA | MR-00006 | 6 Macon Rd | 2,500 | 6,000 | 41,414 | 49,914 | |
| 125 | GA | RB-01228 | Rockbridge Drive | 2,500 | | 20,482 | 22,982 | |
| 126 | GA | RB-01234 | Rockbridge Drive | 2,500 | | 20,482 | 22,982 | |
| 127 | GA | RB-01240 | Rockbridge | 2,500 | | 20,482 | 22,982 | |
| 128 | GA | RE-0030B | 30B Ridgewd Esats | 2,500 | 6,000 | 40,598 | 49,098 | |
| 129 | Ala | RR-00018 | Lot 18 Rocky Ridge | 2,500 | 6,000 | 29,717 | 38,217 | |
| 130 | Ala | RR-00019 | Lot 19 Rocky Ridge | 2,500 | 6,000 | 30,130 | 38,630 | |
| 131 | Ala | RR-00024 | Lot 24 Rocky Ridge | 2,500 | 6,000 | 28,678 | 37,178 | |
| 132 | Ala | RR-00025 | Lot 25 Rocky Ridge | 2,500 | 6,000 | 28,912 | 37,412 | |
| 133 | Ala | RR-00026 | Lot 26 Rocky Ridge | 2,500 | 6,000 | 29,360 | 37,860 | |
| 134 | Ala | RR-00028 | Lot 28 Rocky Ridge | 2,500 | 6,000 | 29,119 | 37,619 | |
| 135 | Ala | RR-00030 | Lot 30 Rocky Ridge | 2,500 | 6,000 | 18,362 | 26,862 | |
| 136 | Ala | RR-00033 | Lot 33 Rocky Ridge | 2,500 | 6,000 | 20,517 | 29,017 | |
| 137 | Ala | RR-00076 | Lot 76 Rocky Ridge | 2,500 | 6,000 | 29,672 | 38,172 | |
| 138 | Ala | RR-00083 | Lot 83 Rocky Ridge | 2,500 | 6,000 | 29,130 | 37,630 | |
| 139 | Ala | RR-00084 | Lot 84 Rocky Ridge | 2,500 | 6,000 | 28,678 | 37,178 | |
| 140 | Ala | RR-0016A | Lot 16A Rocky Ridge | 2,500 | 6,000 | 29,356 | 37,856 | |
| 141 | Ala | SF-00009 | LOT 9 SHENDOAH FARMS | 2,500 | 6,000 | 10,984 | 19,484 | |
| 142 | Ala | SF-00010 | LOT 10 SHENDOAH FARMS | 2,500 | 6,000 | 10,984 | 19,484 | |
| 143 | Ala | SF-00011 | LOT 11 SHENDOAH FARMS | 2,500 | 6,000 | 10,984 | 19,484 | |
| 144 | Ala | SM-0149A | Lot 149A Solamr Phs 3 | 2,500 | | 34,062 | 36,562 | x |
| 145 | Ala | SM-0155A | Lot 155A Solamr Phs 3 | | | 33,987 | 33,987 | |
| 146 | Ala | SM-0156A | Lot 156A Solamr Phs 3 | | | 34,137 | 34,137 | |
| 147 | Ala | SM-0157A | Lot 157A Solamr Phs 3 | | | 34,137 | 34,137 | |
| 148 | Ala | SM-147A1 | Lot 147A-1 Solm Phs 3 | 2,500 | | 33,987 | 36,487 | x |
| 149 | Ala | SM-148A1 | Lot 148A-1 Solm Phs 3 | 2,500 | | 34,137 | 36,637 | x |
| 150 | GA | SP-0006D | 6D SONOMA POINTE | 2,500 | | 43,596 | 46,096 | |
| 151 | GA | SRC-03006 | SLIPPERY ROCK CO | 2,500 | | 28,038 | 30,538 | |
| 152 | GA | SRC-03008 | SLIPPERY ROCK CO | 2,500 | | 28,989 | 31,489 | |
| 153 | Ala | SWF-00090 | Lot 90 Stonewood Frms | 2,500 | | 27,123 | 29,623 | |
| 154 | Ala | SWF-00102 | Lot 102 Stonewd Frms | 2,500 | | 33,004 | 35,504 | |
| 155 | GA | WSR-05012 | Warm Springs Rd | 2,500 | | 28,836 | 31,336 | |
| 156 | GA | WSR-05028 | Warm Springs Rd | 2,500 | | 90,222 | 92,722 | |
| 157 | Ala | WT-00001 | Lot 1 WILLOW TRACE | | | 27,738 | 27,738 | x |
| 158 | Ala | WT-00155 | LOT 155 WILLOW TRACE | | | 26,540 | 26,540 | x |

Exhibit B

Phase B Lots

<u>Exhibit C</u>

<u>Phase C Lots</u>

## EXHIBT B - FUTURE OPTION LOTS    As of 10/11/19

| | State | County | Subdivision | Current Basis | Number of Lots | Basis $ per lot | INITIAL PURCHASE PRICE* | Current Status | Related Party Owned By |
|---|---|---|---|---|---|---|---|---|---|
| 1 | GA | Muscogee | Charleston Place | 1,410,060 | 43 | 32,792 | 42,000 | Developed | Tiger Creek Dev. |
| 2 | GA | Muscogee | lexington Hills | 569,320 | 31 | 18,365 | 32,000 | under development | Cusseta Road LLC |
| 3 | GA | Muscogee | Roosevelt Heights | 788,697 | 39 | 20,223 | 32,000 | Developed | Tiger Creek Dev. |
| 4 | AL | Lee | Souhern Oaks | 1,958,786 | 70 | 27,983 | 42,000 | Developed | Tiger Creek Dev. |
| 5 | AL | Lee | Auburn Links (Links Crossing) | | 69 | 50,000 | 50,000 | Different developer | Grayhawk Homes |
| 6 | GA | Muscogee | Garrett Creek | 2,906,000 | 36 | 80,722 | 55,000 | under development | Garr Creek Dev. |
| 7 | GA | Muscogee | North Ivy Park | 1,929,247 | 34 | 56,743 | 57,500 | under development | Grey Rock Dev. LLC |
| 8 | GA | Muscogee | Riverbrook | 2,956,675 | 43 | 68,760 | 55,000 | under development | Sage Dev. Inc. |
| 9 | GA | Muscogee | Villages at St. Mary's | | 8 | 12,000 | 12,000 | developed | Sage Dev. Inc. |
| 10 | GA | Muscogee | Eagle Pointe II | | 9 | 12,000 | 15,000 | developed | Sage Dev. Inc. |
| 11 | GA | Muscogee | Pinecrest | | 1 | 3,000 | 3,000 | Developed | Erickson Inv. Inc. |
| 12 | GA | Harris | Coca Lake | | 3 | | 145,000 | developed/lake front | Rose A Erickson |
| 13 | GA | Muscogee | Winall Drive | | 2 | | 3,000 | Developed | Tiger Creek Dev. |
| 14 | Ga | Muscogee | Beeman Court | | 1 | | 8,350 | Developed | Tiger Creek Dev. |
| 15 | Ga | Muscogee | Aldora Drive | | 1 | | 6,500 | developed | D. Erickson |
| 16 | AL | Lee | Smiths Walk | 1,571,382 | 39 | 40,292 | 41,000 | under development | Tiger Creek Dev. |
| | | | | | 429 | 35,240 | | | |

*For clarity taxes will be in addition and excalator of 6% annually will be prorated to closing
See Lot Purchase agreement paragraph 9

## EXHIBT C - FUTURE ROFO LOTS    As of 10/11/19

| | State | County | Subdivision | Current Basis | Estimated lots | Basis per lot | Apx acres | $ per acre | Status | Related Party Owned By | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 7,808,128 | | 124,250 | | | | | |
| 1 | GA | Muscogee | BeechNorth/Parkwest | 225,119 | 80 | 2,814 | 24 | 9,241 | Undeveloped | Tiger Creek Dev. | b lots |
| 2 | GA | Muscogee | Belvedere Park | 413,124 | 123 | 3,359 | 36 | 11,562 | Undeveloped | Tiger Creek Dev. | b lots |
| 3 | GA | Muscogee | Buena Vista Road | 17,397 | 30 | 580 | 11 | 1,611 | Undeveloped | Tiger Creek Dev. | b lots |
| 4 | GA | Muscogee | Charleston Place | 1,199,473 | 62 | 19,346 | N/A | N/A | Undeveloped | Tiger Creek Dev. | A+ |
| 5 | GA | Muscogee | Mckee Road | 1,470,653 | 80 | 18,383 | 143 | 10,284 | Undeveloped | D. Erickson | ?? |
| 6 | GA | Muscogee | Garrett Pines | 279,504 | 96 | 2,912 | 43 | 6,464 | Undeveloped | Tiger Creek Dev. | |
| 7 | GA | Muscogee | lexington Hills | 1,690,739 | 29 | 58,301 | N/A | N/A | undeveloped | Cusseta Road LLC | A but low end |
| 8 | GA | Muscogee | North Ivy Park | 315,650 | 50 | 6,313 | N/A | N/A | Undeveloped | Grey Rock Dev. LLC | A high end' |
| 9 | AL | Lee | Auburn Farms | 1,861,799 | 308 | 6,045 | 148 | 12,548 | Undeveloped | Tiger Creek Dev. | |
| 10 | AL | Lee | Souhern Oaks | 334,669 | 54 | 6,198 | N/A | N/A | Undeveloped | Tiger Creek Dev. | |
| 11 | GA | Muscogee | Hodges Drive | 45,000 | 12 | 3,750 | 2 acres townhomes | | Undeveloped | Windsong Bon, LLC | |
| 12 | GA | Muscogee | Upland Way Group/7pcs | 111,000 | 40 | 3,750 | | | Undeveloped | Erickson Inv. Inc. | |
| | | | | 7,964,128 | 964 | | | | | | |

1 of 1

<u>Exhibit D</u>

<u>Form of Right of First Offer – Phase C Lots</u>

[date]

[Buyer name and address]

Re:     Right of First Offer for Phase C Lots Pursuant to the Land Purchase Agreement dated November _____, 2019

Seller hereby delivers this Right of First Offer to Buyer:

1.     Number of Lots offered: _____

2.     Location(s): _____

3.     Legal Description(s): _____

4.     Purchase Price per Lot: _____

5.     Other Material Conditions: _____

6.     Deadline for Response (45 days): _____

[Seller signature]

TO BE COMPLETED BY BUYER:

Accepted: _____

Not Accepted: _____

Form of Right of First Offer – Future Lots

[date]

[Buyer name and address]

Re:    Right of First Offer for Future Lots Pursuant to the Land Purchase Agreement dated November _____, 2019

Seller hereby delivers this Right of First Offer to Buyer:

1.    Number of Lots offered: _____

2.    Location(s): _____

3.    Legal Description(s): _____

4.    Condition of Lots at time of purchase (e.g., raw or developed): _____

5.    Deposit Amount: _____

6.    Purchase Price per Lot: _____

7.    Nature of Transaction (e.g., bulk purchase or option contract with takedown schedule and estimated first purchase date): _____

8.    Closing Date/Requirements: _____

9.    Other Material Conditions: _____

10.    Deadline for Response (45 days): _____

[Seller signature]

TO BE COMPLETED BY BUYER:

Accepted: _____

Not Accepted: _____