```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
                      COLUMBUS DIVISION

AMERICAN SOUTHERN HOMES            *
HOLDINGS, LLC and ASH-GRAYHAWK,
LLC,                               *

     Plaintiffs,                   *
                                          CASE NO. 4:21-CV-95 (CDL)
vs.                                *

DAVID B. ERICKSON, et al.,         *

     Defendants.                   *
```

ORDER AND PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction ordering Defendants to specifically perform their contractual obligation to sell residential building lots pursuant to the schedule contained in the parties' contract.  Based upon the present record, the Court finds that Plaintiffs are substantially likely to succeed on the merits of their specific performance claim, that they will suffer irreparable injury without immediate injunctive relief, that the threatened injury to them outweighs any damage the injunction may cause to Defendants, and that the issuance of the injunction is not adverse to the public interest.  Accordingly, Plaintiffs' motion for a preliminary injunction (ECF No. 62) is granted to the extent described in the remainder of this Order.

BACKGROUND AND FACTUAL FINDINGS

Plaintiff ASH-Grayhawk, LLC ("ASH-GH") and its corporate parent, American Southern Homes Holdings, LLC ("ASHH") entered into a contract for the purchase of residential building lots pursuant to a schedule with Defendants David Erickson, his wife, and several associated corporate entities. The parties' relationship deteriorated, and Defendants purported to terminate the contract and refused to sell any more lots to Plaintiffs. When Plaintiffs first moved for a preliminary injunction, the Court denied the Plaintiffs' motion as premature because Defendants' time for performance had not yet expired. Order (Sept. 21, 2021), ECF No. 46. After the time for performance passed, Plaintiffs filed the current motion for a preliminary injunction for lots due December 31, 2021. Prior to the hearing on that motion for preliminary injunction, the time expired for Defendants to provide lots for the first quarter of 2022 with Defendants refusing to provide any lots pursuant to the contract schedule. Plaintiffs now seek preliminary injunctive relief directing Defendants to provide lots Plaintiffs claim are due for the last quarter of 2021 and the first quarter of 2022.

The Court makes the following factual findings based upon the present record. These findings are supported by the affidavits submitted by the parties. ASHH acquires, integrates, and operates homebuilding companies in the United States. 2d Am. Compl. ¶ 1,

2

ECF No. 71. ASHH is the indirect parent of ASH-Grayhawk, LLC ("ASH-GH"), a Columbus, Georgia homebuilding company. *Id.* ¶¶ 22-23. ASH-GH negotiated with David Erickson to acquire the assets of Grayhawk Homes, Inc. *Id.* ¶ 2. As part of this transaction, the parties entered into several contracts, including a Land Purchase Agreement ("Agreement") requiring Erickson to serve as a "land banker" for ASH-GH. *Id.* ¶ 3. Erickson served on ASHH's board as the interim CEO after the acquisition but resigned after he was not made the permanent CEO. *Id.* ¶¶ 6-8. Soon thereafter, Erickson announced his intention to compete in the homebuilding industry. *Id.* ¶ 10. Erickson's relationship with Plaintiffs swiftly deteriorated, and Defendants purported to terminate the Agreement and refused to sell any more lots to Plaintiffs.

Under the Agreement, Erickson, his wife Rose Anne, and the various LLC Defendants owned in whole or in part by the Ericksons agreed to develop land into roughly 1,600 finished lots that would be sold to ASH-GH according to a "Takedown Schedule." *Id.* ¶¶ 3, 77. The Agreement categorized lots as "finished" ("Phase A"), under development ("Phase B"), or as lots on "raw land" that Defendants agreed to develop ("Phase C"). Land Purchase Agreement 1, ECF No. 71-2. (hereinafter "Agreement"). The parties were required to "agree to the order in which specific Phase C Lots will be developed" during the "first full year after the Closing under the [Asset Purchase Agreement]." *Id.* § 10. The parties did

not, however, develop an order of Phase C lot development during the first full year after closing. The Takedown Schedule provided for a minimum purchase of each type of lot during each quarter of the year. If ASH-GH purchased more than the minimum number of a certain type of lot during a quarter, the Agreement provided that the excess lots would be "credited toward the Lot Takedowns required for the subsequent calendar quarter or quarters." *Id.* § 6. ASH-GH bought approximately 109 excess Phase B lots in prior quarters.

The parties could terminate the Agreement in the event of default. Specifically, if ASH-GH defaulted "in any of the terms or provisions of [the] Agreement prior to the closing of any Lot Takedown" and failed to cure the default within 45 days after receiving written notice of default from Defendants, Defendants' "sole and exclusive remedy" would be to "terminate [the] Agreement" and retain the lot deposit as liquidated damages. *Id.* § 34. A similar provision allowed Plaintiffs, after providing notice and an opportunity to cure within fifteen days, to terminate the Agreement or "pursue such other rights or remedies as are available at law or in equity, including but not limited to obtaining specific performance to compel Seller to . . . sell the Lots to Buyer." *Id.* § 35.

Plaintiffs, relying upon Section 35, sought to compel Defendants' specific performance of the Agreement after Defendants

4

stated their intent to halt lot sales. Plaintiffs, however, did not send formal written notice as required by Section 35 prior to filing this action. Rather, Plaintiffs shared a draft of their complaint with Defendants and then sent Defendants a formal notice of default that Plaintiffs later expressly withdrew. Plaintiffs sent a formal written notice of default again after filing this action, waited until the time to cure had expired, and then filed a motion for preliminary injunctive relief. Plaintiffs repeated this process before filing the present motion.

## DISCUSSION AND CONCLUSIONS OF LAW

Plaintiffs seek a preliminary injunction compelling Defendants to sell lots in accordance with the Takedown Schedule. Preliminary injunctions are intended to "preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). A party seeking an injunction must show "(1) a substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (citations omitted). "Mandatory preliminary relief, which goes

well beyond simply maintaining the status quo[,] is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

**I.    Substantial Likelihood of Success on the Merits**

The first element for preliminary injunctive relief requires the Court to evaluate whether Plaintiffs will likely succeed on the merits of their breach of contract claim. It is largely undisputed that Defendants have not provided Plaintiffs with any lots that were due under the parties' Takedown Schedule for the last quarter of 2021 and the first quarter of 2022. Defendants maintain that they are excused from any performance of the Agreement because they have properly terminated it. They next argue that even if the Agreement was not terminated, they owe Plaintiffs no Phase B lots because prior to the termination they provided Plaintiffs with lots in excess of the number required by the Agreement, and they get credit for those excess lots under the Agreement. As to the Phase C lots that were owed for the last quarter of 2021 and the first quarter of 2022, Defendants maintain that an essential term of the contract relating to those lots was never reduced to writing, and thus they owe no Phase C lots based on a violation of the statute of frauds. The Court addresses each of these issues in turn from the perspective of whether they will

6

likely be resolved in a manner that will allow Plaintiffs ultimately to succeed on the merits.

## A. Defendants' purported termination of the Agreement

Defendants contend that they have no further obligation to deliver lots because they effectively terminated the Agreement. Section 34 of the Agreement permits Defendants to terminate the Agreement if Plaintiffs "shall default in any of the terms or provisions of [the] Agreement prior to the closing of any Lot Takedown, and shall fail to cure such default within forty-five (45) days following written notice thereof given by Seller to Buyer." Defendants argue that Plaintiffs defaulted by failing to agree on the order of Phase C Lot development within the requisite timeframe and by failing to provide Defendants with notice before filing suit.

The Court finds that Plaintiffs did not default by failing to agree on a specific order of Phase C Lot development within a year after closing. Defendants argue that Erickson tried to set an order of lot development in the first year and that Plaintiffs were unresponsive. But the present record indicates that Defendants did not give Plaintiffs adequate notice and an opportunity to cure within that timeframe. Instead, the present record demonstrates that the parties were trying to develop a schedule for the Phase C lots. Erickson's email to Plaintiffs during the first year after closing in which he expressed a desire

7

to work on the order of lot development with Plaintiffs does not amount to written notice that Plaintiffs were in default and needed to cure within 45 days. Neither party gave notice of default regarding the order of lot development until over a year after the closing. At that point, both parties exchanged notices of default and jointly prepared an order of lot development which would have the effect of curing any default. Ultimately, the parties produced a schedule to which they all agreed in principle. The fact that it was not finalized within the first year of the contract does not constitute a default authorizing termination of the contract under these circumstances.

Likewise, the Court does not find that Plaintiffs defaulted by failing to provide notice and an opportunity for Defendants to cure before filing this action. Section 35 of the Agreement allowed Plaintiffs to pursue "rights and remedies as are available at law or in equity," such as specific performance of the Agreement, if Defendants defaulted "in any terms or provisions of [the] Agreement" and failed to cure the default within 15 days following written notice by Plaintiffs. Defendants contend that this alleged failure to provide written notice constituted a default that triggered Defendants' right to terminate the Agreement pursuant to Section 34.

Under Georgia law, "[c]ontracts which set forth the manner in which a party must exercise a remedy in the event of a default

8

must be strictly adhered to." *In re Colony Square Co.*, 843 F.2d 479, 481 (11th Cir. 1988) (per curiam). While Plaintiffs provided Defendants with a draft complaint well before filing this action, Plaintiffs also expressly withdrew any formal notice of default after sending this draft complaint and after sending a letter expressly invoking the Agreement's notice and cure provision. Plaintiffs did not renew their notice of default prior to filing this action, and the Agreement expressly requires Plaintiffs to follow the notice and cure provision prior to pursuing any remedies at law or in equity.

The Court finds, however, that it is substantially likely that Plaintiffs will succeed on the merits of their argument that they properly cured any default. Section 34 states that Plaintiffs must be given an opportunity to "cure" their alleged default but does not specify how Plaintiffs must cure their alleged default. Here, after Plaintiffs filed this action and Defendants provided their notice of default on June 24, 2021, Plaintiffs sent a notice of default on June 24, 2021 and waited over 15 days to file their motion for a preliminary injunction seeking specific performance of the contract. Plaintiffs provided written notice again and waited 15 days before filing the present motion. Under these circumstances, Plaintiffs likely cured any default that may have resulted from their failure to provide proper notice initially of their lawsuit. And it is therefore likely that their alleged

9

default would not authorize the termination of the contract by Defendants.

B. Statute of Frauds

Defendants argue that the Agreement's provision regarding Phase C lots is unenforceable under the statute of frauds. Under the Georgia statute of frauds, "[e]very essential element of the sale [of land] must be expressed in writing." *Edwards v. Sewell*, 656 S.E.2d 246, 249 (Ga. Ct. App. 2008). "If a contract fails to establish an essential term, and leaves the settling of that term to be agreed upon later by the parties to the contract, the contract is deemed an unenforceable 'agreement to agree.'" *Harmon v. Innomed Techs., Inc.*, 709 S.E.2d 888, 890 (Ga. Ct. App. 2011) (quoting *Hardnett v. Ogundele*, 661 S.E.2d 627, 629 (Ga. Ct. App. 2008)). Defendants contend that the Agreement language stating that the parties will "agree to the order in which specific Phase C Lots will be developed" during the "first full year after the Closing under the [Asset Purchase Agreement]" is an essential term of the Agreement and that the Agreement is unenforceable because the parties left this term vague and undefined.

The Court finds that Plaintiffs are substantially likely to succeed on the merits of their argument that the Agreement does not violate the statute of frauds. The Agreement here does contain the essential terms for performance. "Essential terms of a contract include the subject matter and purpose of the contract,

10

the identity of the parties, and the consideration." *Steele v. Steele*, 782 S.E.2d 433, 434 (Ga. 2016). Deferring agreement on a non-essential term will not invalidate an "otherwise valid contract." *Goobich v. Waters*, 640 S.E.2d 606, 609 (Ga. Ct. App. 2006). Here, the Agreement provided the names of the parties, the price of the lots, development guidelines for the lots, and a takedown schedule providing a minimum number of Phase C lots to be sold each quarter. Leaving the parties with flexibility to determine the precise order of development of the Phase C lots certainly does not void the parties' contractual obligation to provide the Phase C lots which the Agreement clearly contemplates. It is substantially likely that Plaintiffs will ultimately prevail on their position that the Agreement does not violate the statute of frauds.

    C.    <u>Obligations Regarding Phase B and Phase C Lots</u>

Defendants argue that even if they did not effectively terminate the contract, Plaintiffs are not entitled to any Phase B Lots for the December 2021 and March 2022 quarters because Plaintiffs purchased excess Phase B lots in previous quarters. Although the contract provides for 30 Phase B lots to be taken down for each quarter ending December 31, 2021 and March 31, 2022, Plaintiffs are currently 109 Phase B lots ahead of schedule due to prior purchases in excess of the minimum takedown requirement. And the Agreement provides that any prior excess lot sales shall

11

be "credited toward the Lot Takedowns required for the subsequent calendar quarter or quarters." As the quarters ending December 31, 2021, March 31, 2022, and June 30, 2022 only require 30 Phase B lots each, Defendants contend they would not be required to provide Phase B lots until the quarter ending September 30, 2022 when the previous excess takedowns are taken into account.

Plaintiffs argue that the Agreement, as a whole, demonstrates that prior excess lot sales were not intended to affect the minimum number of lots ASH-GH could purchase each quarter because the Agreement listed 429 Phase B lots while the Takedown Schedule only listed 412 Phase B lots. According to Plaintiffs, this means that ASH-GH would need to take down more than the minimum number of Phase B lots during some quarters to meet their purchase obligations under the Agreement. Plaintiffs also note that because all Phase B lots are completed and ready for purchase, there should be no issue with ASH-GH purchasing 30 Phase B lots in each quarter. Finally, Plaintiffs argue that the parties' course of performance before the present dispute established that ASH-GH could purchase more than the minimum number of lots each quarter.

The Court interprets the parties' Agreement to provide that ASH-GH's prior excess lot purchases should be credited towards the Phase B lot requirements for the quarters ending December 31, 2021 and March 31, 2022. The plain language of the Agreement states that prior excess lot sales shall be credited towards the minimum

12

takedown requirements for subsequent quarters.  While ASH-GH may be entitled to purchase 17 more Phase B lots than are listed on the Takedown Schedule, that does not mean ASH-GH may disregard the contractual provision that prior excess lot sales be credited towards the minimum number of required takedowns in subsequent quarters.  And, while the parties' course of performance may suggest that it was routine for ASH-GH to purchase more than the minimum takedown requirements of lots some quarters, Plaintiffs point to no contractual provision providing ASH-GH the right to purchase excess lots absent Defendants' consent.  The Court therefore finds that Plaintiffs are not entitled to preliminary injunctive relief requiring Defendants to sell to it any additional Phase B lots at this time.[1]

This finding, however, does not mean that Defendants are discharged from their obligation to provide Phase C lots.  Neither party maintains that the excess Phase B lots may be used to offset Phase C lot takedown obligations.  Under the Agreement, Defendants owed Plaintiffs 15 Phase C lots on December 31, 2021 and 15 Phase

---

[1] Plaintiffs maintain that the Court previously decided this issue in their favor in its Order denying Plaintiffs' first motion for a preliminary injunction.  Although the Court did state that "for the September 2021 quarter, Defendant is obligated under the contract, if it has not been effectively terminated, to provide 45 lots for sale to Plaintiffs," Order (Sept. 21, 2021), ECF No. 46, the Court did not determine at that time whether the minimum takedown requirement could be satisfied by excess lot sales in preceding quarters.  Now that this issue is directly presented to the Court, the Court finds that the Agreement authorizes the use of previous excess sales as credits toward the Phase B takedown requirements.

C lots on March 31, 2022. According to the present record, which was confirmed at the hearing on the pending motion, only 29 Phase C lots have been finally developed. Thus, Plaintiffs are owed those 29 Phase C lots.

In summary, the Court finds that there is a substantial likelihood that Plaintiffs will prevail on their claim for specific performance of Defendants' contractual obligation to provide Plaintiffs with the 29 Phase C lots that Defendants have finished developing. The next issue is whether Plaintiffs will suffer irreparable injury if the Court does not order Defendants to sell those lots to them expeditiously.

## II.  Irreparable Injury

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (citations omitted). "[T]he asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Defendants contend that Plaintiffs' injuries are not *per se* irreparable simply because Plaintiffs seek to buy land and argue that Plaintiffs' decline in business stems from Plaintiffs' reliance on Defendants' prior willingness to sell lots ahead of the Takedown Schedule. Thus, Defendants contend

14

that Plaintiffs' harm is self-imposed because Plaintiffs modeled their business on excess lot sales not mandated by the Agreement.

Plaintiffs' evidence, however, is not restricted to harm caused by their inability to buy lots in advance of the minimum required by the Takedown Schedule. Plaintiffs point to a drastic decline in homes they have been able to start in 2022, indicating that Plaintiffs are having trouble procuring even a minimal number of lots instead of just lots in advance of the Takedown Schedule. Further, Plaintiffs have presented evidence that the lots they seek to purchase are unique because they cannot procure a ready supply of lots of a similar quality elsewhere in a reasonable timeframe. For example, Plaintiffs have been able to secure lots 1-2 hours from Columbus, but these lots are not built to fit ASH-GH building plans. Plaintiffs state that they are negotiating to purchase land near Hogansville, Georgia, but do not expect to close on any homes on those lots for at least two years.

In support of their contention that they will suffer irreparable harm, Plaintiffs also point to the loss of customer goodwill and a negative impact on their relationships with employees, realtors, and suppliers. "Although economic losses alone do not justify a preliminary injunction, 'the loss of customers and goodwill is an irreparable injury.'" *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (quoting *Ferrero v. Associated*

15

*Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). For example, Plaintiffs state that, after Erickson called two of ASH-GH's leading subcontractors and told them he would no longer sell lots to ASH-GH, these subcontractors left to work for other builders. Plaintiffs have presented evidence that trades are in short supply and it is nearly impossible to convince trades to return once they decide to work with another builder. Plaintiffs also point to evidence that real estate agents involved in cancelled pre-sale contracts, at least some of which were negotiated on behalf of ASH-GH by Rose Anne Erickson Realty, are directing customers away from ASH-GH. The Court finds that Plaintiffs have demonstrated that they will suffer irreparable injury absent preliminary injunctive relief.

### III. Comparative Injury and the Public Interest

Lastly, Plaintiffs have presented evidence that "the threatened injury to [them] outweighs whatever damage the proposed injunction may cause [Defendants]" and that "the injunction would not be adverse to the public interest." *Wreal*, 840 F.3d at 1247. As previously explained, the threatened harm to Plaintiffs is substantial. As to Defendants' concern that they will get bogged down with complaints about lot quality, the Court notes that Plaintiffs have expressly waived any challenge they have to December 2021 and March 2022 lot quality. Pl.'s Reply 9, ECF No. 89; Hearing, 4/27/2022. Quite frankly, it is difficult to

16

ascertain any substantial damage that Defendants are likely to suffer by the issuance of an injunction requiring them to sell 29 finished lots for a previously agreed upon fair market value as of the date that they were supposed to be delivered under the parties' contract.  As for any additional lost profits due to lot value appreciation, Defendants can be protected with appropriate security given by Plaintiffs.  The threatened harm to Plaintiffs absent preliminary injunctive relief clearly outweighs any harm to Defendants caused by the narrowly tailored injunction.

The Court further finds that the issuance of preliminary injunctive relief is not against the public interest.  The Court finds unpersuasive Defendants' argument that preliminary injunctive relief is inappropriate because it has the potential to place the Court in the role of "contract manager" for the parties.  While the Court certainly does not relish such a role, the Court observes that it is simply ordering performance of the parties' contractual obligations for the December 2021 and March 2022 quarters in order to temporarily maintain the status quo under the Agreement until the claims can be fully litigated.  Compliance with the Court's order will not create any undue burden on the parties given that the lots are fully developed, Plaintiffs have waived any claims regarding lot quality, and the only thing that remains to be done to consummate the sales is the signing of the appropriate paperwork to transfer ownership and the wire transfer

17

of funds as payment. Although the sales cannot be undone if it is later determined that the injunction should not have been issued, adequate security can be provided to protect Defendants in that circumstance. The issuance of the preliminary injunction here is not adverse to the public interest.

CONCLUSION AND PRELIMINARY INJUNCTION

Based upon the foregoing findings of fact and conclusions of law, Plaintiffs' second motion for a preliminary injunction (ECF No. 62) is granted to the extent described in this Order. Accordingly, the Court orders the following:

(1) Within 14 days of today's order, Defendants shall transfer ownership to Plaintiffs of 15 Phase C lots for the quarter ending December 31, 2021 and 14 Phase C lots for the quarter ending March 31, 2022 in exchange for the payment by Plaintiffs to Defendants of $1,774,860.00, which represents $60,770.00 per lot for the 15 lots and $61,665.00 per lot for the 14 lots and which are the per lot prices as of the date that the lots were supposed to be delivered under the parties' Agreement. This payment shall be made in full without any reduction of the previous deposit which represents liquidated damages under the parties' Agreement if it is later determined that the Agreement was properly terminated.

(2) Plaintiffs shall give security pursuant to Federal Rule of Civil Procedure 65(c) in the amount of $500,000.00 to pay for the costs and damages sustained by Defendants should it be found

18

that they have been wrongfully enjoined. Although the Court has determined the amount of the security, Plaintiffs shall present their proposal as to the issuer of the surety bond to Defendants for their approval. Plaintiffs shall be responsible for the payment of any surety bond premium.

IT IS SO ORDERED, this 29th day of April, 2022.

S/Clay D. Land<br>
CLAY D. LAND<br>
U.S. DISTRICT COURT JUDGE<br>
MIDDLE DISTRICT OF GEORGIA