IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

AMERICAN SOUTHERN HOMES          *
HOLDINGS, LLC and ASH-GRAYHAWK,
LLC,                             *

    Plaintiffs,                  *
                                  CASE NO. 4:21-CV-95 (CDL)
vs.                              *

DAVID B. ERICKSON, *et al.*,     *

    Defendants.                  *

_____

O R D E R

    Plaintiffs American Southern Homes Holdings, LLC ("ASHH") and ASH-Grayhawk, LLC ("ASH-GH," collectively with ASHH "ASH") purchased Defendant David Erickson's Columbus-based home development business in 2019. After Erickson indicated that he intended to pursue additional home development opportunities by himself, their business relationship soured. This lawsuit ensued, alleging a variety of claims and counterclaims. Presently pending are the parties' motions for summary judgment as to various claims. Those motions (ECF Nos. 171 & 173) are granted in part and denied in part as explained in the remainder of this Order.

SUMMARY JUDGMENT STANDARD

    Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

THE RELEVANT FACTUAL RECORD

## I.   **Background, the Transaction, and Related Contracts**

Beginning in 1993, Erickson formed several homebuilding companies to serve separate geographic markets: Grayhawk Homes primarily in the Columbus, Georgia market; Homestead Residential in the Auburn, Alabama area; GH Lot Holdings of Atlanta Corporation ("GH ATL") in Dallas, Georgia, a northwestern exurb of Atlanta; and GH Lot Holdings of South Carolina, Inc. ("GH SC") in the Charleston coastal South Carolina region.  Erickson also formed GH Services, Inc. to provide back-office support services to his homebuilding companies.

ASHH acquires and consolidates private homebuilders in the United States.  In spring 2019, ASHH representatives approached Erickson about acquiring Grayhawk Homes's homebuilding assets.  ASHH was primarily interested in the Columbus, Georgia and east

Alabama markets.  And between March and May 2019, Erickson told ASHH's CEO that he intended to wind up GH ATL and GH SC's operations.  This may explain the parties' sloppiness in failing to clearly describe their intentions as to how their purchase and related agreements would be affected by these operations. Predictably, this failure created some of the disputes presented by the pending motions.

In May 2019, Grayhawk Homes, Homestead Residential, ASHH, and American Southern Homes, LLC executed a non-binding letter of intent for ASH to purchase the operating assets of Grayhawk Homes and Homestead Residential from Erickson.  The letter specified that ASHH would form a new subsidiary that would acquire assets in the Columbus and Alabama markets only; the letter expressly excluded assets related to the South Carolina and Atlanta markets. Letter of Intent 2-3, ECF No. 173-7.  The letter also proposed a restrictive covenant prohibiting Erickson from competing with the homebuilding businesses of Grayhawk Homes and Homestead Residential within a "100-mile radius of any market [the new subsidiary] or ASH operates in at time of closing, with the additions of Atlanta, GA, Macon, GA, Dothan, AL and Montgomery, AL." *Id.* at 8.  The covenant did not mention Dallas, Georgia or South Carolina, which were more than 100 miles away and thus beyond the protected territory of the covenant.  ASHH formed ASH-GH in August 2019 to acquire and operate these homebuilding operations.

The parties completed the purchase on November 15, 2019 (hereinafter referred to as the "Transaction").  As part of the Transaction, the parties entered into several contracts.  Under the Asset Purchase Agreement ("APA"), ASH-GH purchased "residential lot acquisition, homebuilding and home sales" assets "in the Columbus, Georgia metropolitan area" owned by several Erickson-controlled entities.  APA Recitals A-C, ECF No. 71-1.  The Land Purchase Agreement ("LPA") provided that several other Erickson-controlled entities ("LPA Sellers") were to develop and sell various lots for ASH to purchase according to a pre-set schedule.  LPA 1, § 6, ECF No. 71-2.  The deal also included a Consulting Agreement with Erickson to act as ASH-GH's primary operations consultant for a certain period after the consummation of the deal.  That Agreement incorporated confidentiality obligations spelled out in Erickson's Employment Agreement.  Consulting Agreement § 7, ECF No. 71-5; Employment Agreement § 6, ECF No. 71-6.  The lawyer-heavy deal also produced two intellectual property contracts, the Copyright Assignment Agreement ("CAA") and Trademark Assignment Agreement ("TAA"), in which Erickson and other APA parties conveyed certain copyrights and trademarks to ASH-GH.  CAA Recitals A-C, ECF No. 71-4; TAA Recitals A-C, ECF No. 71-3.  Lastly, the parties entered into a Transition Services Agreement ("TSA") which required the APA parties to provide support services contemplated by the APA, including employee payroll and

managing building licenses.  TSA Background A-C, ECF No. 87-2; TSA
Service Schedule, ECF No. 87-2 at 11.  Since the deal was an asset
purchase and not a stock sale, Erickson's company, Grayhawk Homes,
survived the closing, but Erickson renamed it "GH Lot Holdings" to
comply with his contractual obligations related to the asset sale.

## II.  Post-Transaction Conflicts and Legal Actions

In  October  2020,  Erickson  replaced  Greg  Benson  as  ASHH's
interim CEO.  Erickson eventually sought to become its permanent
CEO, but ASHH denied his request on December 16, 2020.  Erickson
initially agreed to remain interim CEO until February 28, 2021,
but he soon changed his mind and resigned as an ASHH director and
as  interim  CEO  on  December  20,  2020.   He  explained  that  he
"developed ambitions to do more things in the home building and
development business and feel that my board responsibilities with
ASH are likely to constitute a conflict of interests with those
goals and possibilities."  Letter from D. Erickson to M. Coleman
2 (Dec. 20, 2020), ECF No. 87-6.  Erickson later expressed his
intent "to purchase one or more home building companies in the
near term for [his] own investments" and acknowledged that if "that
step should go well, [he] may consider doing additional purchases
in the future."  Letter from D. Erickson to M. Coleman 1 (Dec. 30,
2020), ECF No. 87-7.

Following through on his stated intentions, Erickson formed
a new homebuilding company, Grand Oak Builders, in February 2021.

Notwithstanding his new declaration of independence from ASH, Erickson remained a consultant for ASH-GH until ASH terminated his Consulting Agreement for what they believed to be good cause. Specifically, ASH claimed Erickson used confidential information obtained from ASH to further his Grand Oak Builders business, including business plans and acquisition targets. ASH also was concerned that the LPA Sellers were not satisfying the development and takedown requirements set by the LPA.

Plaintiffs initiated this action in June 2021. Their operative complaint asserts ten counts against Defendants: Erickson's breach of confidentiality obligations in the Employment and Consulting Agreements (Count 1); LPA Sellers' breach of the LPA (Count 2); Erickson's breach of non-compete obligations in the APA (Count 3); Erickson's, GH Lot Holdings's, GH ATL's, and GH SC's infringement of ASH-GH's copyrights (Counts 4 & 5); and Erickson's, GH Lot Holdings's, GH ATL's, and GH SC's infringements of ASH-GH's trademark rights (Counts 6-10). 2d Am. Compl. ¶¶ 203-289, ECF No. 71.

Defendants responded with seven counterclaims against Plaintiffs alleging that: (1) the APA's non-compete provision is unenforceable under Georgia law; (2) ASH-GH breached the APA by withholding a warranty deposit from GH Lot Services; (3) ASH-GH breached the APA by failing to perform a homebuilding contract for Ellen Reeves; (4) ASH breached the LPA; (5) ASH breached the

Consulting Agreement by purporting to terminate it for cause and failing to reimburse Erickson for certain expenses; (6) ASH-GH breached the TSA; and (7) in the event that the TSA is unenforceable, ASH-GH failed to pay Erickson and GH Lot Holdings for the value of services provided. Defs.' Answer to 2d Am. Compl. ¶¶ 98-155, ECF No. 87.  The parties move for summary judgment on each Count of the Second Amended Complaint and each Counterclaim. For ease of reference, the Court labels the counts in the operative complaint as "Counts" corresponding with their number as set out in the Second Amended Complaint and the counterclaims in the responsive pleadings as "Counterclaims" with their numbers as set out in the pleadings.[1]

DISCUSSION

Several of Plaintiffs' Counts and Defendants' Counterclaims are related factually and legally.  It therefore makes sense to discuss the parties' motions regarding these related Counts and Counterclaims together.

---

[1] Plaintiffs moved for summary judgment on Counterclaim 6, but the parties then stipulated to dismissing it in its entirety.  Stipulation of Dismissal of Defs.' 6th Countercl. ¶¶ 3,5, ECF No. 186.  The parties purported to dismiss this counterclaim under Federal Rule of Civil Procedure 41(a), but Rule 41(a) only permits the dismissal of an entire action, not individual claims.  *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023).  Nevertheless, Counterclaim 6 has clearly been abandoned, and thus summary judgment is granted in favor of Plaintiffs on Counterclaim 6.

## I.   Did Erickson Breach Enforceable Non-Compete Restrictions in the APA (Count 3 and Counterclaim 1)?

The APA included a non-compete provision that prohibited Erickson from "participat[ing] in a competitive homebuilding operation or business within 100 miles of the geographic markets of each Seller as of the Closing Date, which shall include Columbus, Georgia; Atlanta, Georgia; Macon, Georgia; Dothan, Alabama; and Montgomery, Alabama."  APA § 6.5(a).  The "Sellers" were Grayhawk Homes, Homestead Residential, and GH Services and did not include GH ATL or GH SC.  Thus, the territorial restriction of the covenant extended 100 miles from the Columbus, Georgia region and the Auburn, Alabama area, specifically including the cities of Columbus, Georgia; Atlanta, Georgia; Macon, Georgia; Dothan, Alabama; Auburn, Alabama; and Montgomery, Alabama. Neither Dallas, Georgia nor the Charleston, South Carolina areas are within the territorial restriction of the covenant.

ASH-GH nevertheless argues that Erickson breached this provision by developing lots and building houses in Dallas, Georgia and South Carolina through GH ATL and GH SC respectively, which Erikson operated from headquarters in Columbus, Georgia.  The Court rejects this construction of the covenant.  The competitive activity that the parties legitimately intended to restrict was the development of lots and building of homes within the protected territory.  The covenant did not prohibit Erickson from engaging

in such activities in Columbus, Georgia that involved real estate development beyond the designated geographic area defined in the covenant.   Under Defendants' argument, Erickson would be prohibited from developing lots in Hawaii or even Paris, France. Such restrictions would be overly broad and unenforceable.

The Court finds that the covenant here is enforceable but only to the extent that it prevents Erickson from developing lots and building houses within the specified geographic area.  Because the covenant is enforceable, the Court grants summary judgment in Plaintiffs' favor as to Counterclaim 1 seeking to declare the covenant void.  But because Erickson did not breach the covenant, Erickson's motion for summary judgment as to Count 3 is granted.

## II.  Did ASH-GH Breach the APA's Warranty Holdback Provision (Counterclaim 2)?

Under the APA's Warranty Holdback provision, "Seller shall *deposit* with Buyer the Warranty Amount for the purposes of providing certain warranty services by Buyer after the Closing Date pursuant to the TSA."  APA § 2.3 (emphasis added).  Seller deposited $250,000 for this amount.  APA § 12.1(ss).  Defendants argue that ASH-GH breached the warranty holdback provision by failing to timely return the unused warranty amount.  The Court previously determined that "the term 'deposit' contemplated that the unused portion of the Warranty Amount was refundable when ASH-GH's obligation to provide warranty services ended."  *Am. S. Homes*

*Holdings, LLC v. Erickson*, No. 4:21-CV-95 (CDL), 2022 WL 3579874, at *2 (M.D. Ga. Aug. 19, 2022).   As explained in the Court's previous ruling, "The warranty provision, as a whole, indicates that Plaintiffs only held the money to provide required warranty services."   *Id.*   ASH-GH's obligation to provide such services has since terminated, and the Court's interpretation of the term "deposit" has not changed.[2]   Thus, the Court grants summary judgment in Defendants' favor as to Counterclaim 2.

### III. Did ASH-GH Breach the APA by Failing to Perform the Reeves Contract (Counterclaim 3)?

Before the Transaction, Grayhawk Homes agreed to build a home for Defendant Tiger Creek Development, Inc., for the benefit of Ellen Reeves, in the Auburn Farms Property.   Reeves Memo 1, ECF No. 95-4.   Under the APA, ASH-GH assumed certain Seller obligations, including assigned contracts and assumed liabilities. For "Assigned Contracts," ASH-GH assumed "[a]ll Retail Sales Contracts, all commitments and purchase orders received and accepted by Seller in the Ordinary Course of Business, all contracts related exclusively to the Business entered into by Seller in the Ordinary Course of Business," and "any other contracts of Seller related to the Business that are listed on

---

[2] Plaintiffs point to parol evidence to argue that the parties intended the deposit to be non-refundable, but "[p]arol evidence is only admissible when any ambiguity cannot be resolved through the application of the rules of contract construction."   *ESI Cos. v. Fulton County*, 609 S.E.2d 126, 129 (Ga. Ct. App. 2004) (citing O.C.G.A. § 13-2-2(1)).

Schedule 1.1(k)."  APA § 1.1(k); *see* APA Schedule 1.1(k), ECF No. 71-1 at 77.  The APA defined "Ordinary Course of Business" as "the ordinary course of conduct of the business of Seller, which is consistent in nature, scope and magnitude with past practices of Seller (including with respect to quantity and frequency) and is taken in the ordinary course of the normal, day-to-day operations." APA § 12.1(bb).

The Seller Disclosure Letter set forth all "<u>Material</u> <u>Contracts</u>," or "a complete and accurate list as of the date of this Agreement of the following contracts, agreements, commitments, arrangements or understandings of any kind, whether written or oral, to which a Seller is a party or by which a Seller or any of its assets is bound."  *Id.* § 3.10(a).  Seller also represented that it "has made available to Buyer a true, correct and complete copy of each written Assigned Contract and each written Material Contract (together with any and all amendments, supplements, or modifications thereto) and accurate descriptions of all material terms of all non-written Assigned Contract and each non-written Material Contract."  *Id.* § 3.10(b).  The Seller Disclosure Letter twice listed Grayhawk Homes' development commitment to build a house for Reeves.  Seller Disclosure Letter § 3.4(d), ECF No. 71-1 at 290; *id.* § 3.10(a)(iii)(c), ECF No. 71-1 at 330.

For assumed liabilities, ASH-GH assumed "all liabilities and obligations of Seller under the Assigned Contracts (including but not limited to customer deposits)," but only "to the extent that such liabilities and obligations . . . are not expanded by virtue of the assignment and assumption of such Assigned Contract pursuant to this Agreement as compared to the liabilities and obligations that would have been applicable absent such assignment and assumption" and "each of the liabilities of each Seller listed on Schedule 1.3(b)." APA § 1.3.

ASH-GH did not build a home for Reeves, but the Court finds it had no obligation to do so under the undisputed facts. First, there is no evidence that Erickson provided the Reeves memo to ASH-GH directly before closing, as required by the APA. *Id.* § 3.10(b). Further, although the Seller Disclosure Letter mentions the Reeves commitment twice, it does not mention Tiger Creek, for which the Reeves memo purported to build the Reeves home. *Compare* Seller Disclosure Letter § 3.10(a)(iii)(c), ECF No. 71-1 at 330, *with* Reeves Memo at 1. Thus, the Seller Disclosure Letter did not completely and accurately describe the Reeves memo. Moreover, ASH-GH could not have performed the Reeves contract because Erickson never developed the lots contemplated by the contract, and in fact, Erickson subsequently arranged for a third-party builder to construct Reeves a home in another development.

For all these reasons, the Court grants summary judgment in Plaintiffs' favor as to Counterclaim 3.

The Court acknowledges that Erickson sent the Reeves memo, for inclusion in the Seller Disclosure Letter, to a CPA group working with both Grayhawk Homes and ASH-GH about a week before closing the Transaction.  And it is undisputed that several ASH-GH executives knew about the Reeves memo, that ASH-GH employees met with Reeves to discuss additional options for her house, and that ASH-GH accepted a deposit from Reeves to pay for these options.  But this conduct does not establish waiver of Plaintiffs' right to receive the Reeves contract before performing; nor does it create a genuine factual dispute on this issue.

The Court rejects Defendants' argument that ASH-GH's performance of another contract that had not been received in its entirety prior to the closing establishes that such conduct was within the ordinary course of business and thus must be assumed. ASH-GH did build a home for Barbara and Jim Jess based upon Grayhawk Homes's memorialized commitment to build the Jess home in a pre-closing memorandum on November 8, 2019, which Erickson provided to the CPA group.  Erickson Decl. ¶ 6, ECF No. 191-2; Jess Memo 1, ECF No. 196.  Like the Reeves contract, the Jess contract referred to Grayhawk Homes's commitment to Tiger Creek for the benefits of the Jesses.  And like the Reeves home, the Seller Disclosure Letter twice referred to a development

commitment to build the Jess home and similarly omitted references to Tiger Creek. Seller Disclosure Letter § 3.4(d), ECF No 71-1 at 290; *id.* § 3.10(a)(iii)(b), ECF No. 71-1 at 330. But, unlike the Jess home, the subdivision in which the Reeves home was to be built was never developed. The Reeves contract stated that Grayhawk Homes would build the Reeves home "in conjunction with the development of Auburn Farms Subdivision," but it is undisputed that Grayhawk Homes never developed these lots. Reeves Memo at 1. It was certainly not contemplated by the parties that ASH-GH would assume a contract to build a home in a development that does not exist and where the contract could not be performed.

The Court grants summary judgment in favor of Plaintiffs as to Counterclaim 3.

## IV. Did LPA Sellers or ASH Breach the LPA (Count 2 and Counterclaim 4)?

The LPA required Erickson, his wife, Grayhawk Homes, Homestead Residential, GH Services, Tiger Creek, Cusseta Road LLC, Grey Rock Development, LLC, Windsong Bonacre, LLC, Erickson Investments, Inc., and Sage Development, Inc., as well as "any other entity owned or controlled by Erickson for purchasing and developing residential land" (collectively "LPA Sellers") to develop finished lots on which ASH-GH could build homes. LPA at 1. The LPA categorized lots as finished (Phase A), as under development (Phase B), or as lots on raw land that the LPA Sellers

14

agreed to develop (Phase C).  *Id.*  The LPA directed that "during the first full year after the Closing under the APA, the Parties shall agree to the order in which specific Phase C Lots will be developed."  *Id.* § 10.  LPA § 10's language makes it clear that all LPA parties shared the obligation to produce a Phase C lot development schedule.  It is undisputed that the LPA parties did not reach such an agreement within the first year after the APA's execution.  Both sides accuse the other of breaching LPA § 10.

Less than a month before the November 15, 2020 deadline to produce the Phase C lot development order, Erickson contacted ASH's then-CEO, Greg Benson, reminding him of the deadline.  Two weeks later, however, Erickson replaced Benson as ASHH's interim CEO, and company by-laws prohibited Erickson from making decisions on behalf of ASHH for which he had a financial conflict of interest.  Because Erickson had a financial interest in the LPA Sellers, ASHH established an LPA committee to approve related-party transactions.  After the Phase C lot deadline expired, the LPA committee asked Erickson for an update on its status, and Erickson respond that he and staff were working on it.  Although both sides exchanged communications and information to produce an agreement over the next few months, they never reached a formal agreement on a Phase C lot development order.  In March 2021, ASH proposed a general framework for a development order, but Erickson did not

respond to this proposal in writing nor propose a development order of his own.

In April 2021, both sides sent the other notices of default for failing to produce the development order.  These notices were subsequently withdrawn to facilitate a settlement.  During settlement discussions, the parties reached an agreement in principle, but the parties did not formalize this agreement in a final order of development.  ASH filed this lawsuit on June 14, 2021.  On June 21, 2021, LPA Sellers sent ASH a notice of default for failing to agree on a Phase C lot development order and for filing a lawsuit before issuing a notice of default against them. ASH responded the same day with a notice of default for failure to agree on a development order, and on June 24 sent another notice of default for LPA Sellers' refusal to sell finished lots as required by LPA § 6.  On July 12, 2021, after Erickson's cure period expired, ASH issued a final notice of default.  On August 6, 2021, LPA Sellers purported to terminate the LPA under LPA § 34 for failure to cure the defaults identified in their June 21 notice of default.

Plaintiffs argue that the parties reached an agreement in principle as to the order of development, thus the LPA Sellers could not terminate the LPA.  This agreement in principle provided that the parties would "finalize a development schedule for remaining Phase C lots, reconciling Erickson proposal with ASH

waterfall." Settlement Term Sheet III.A, ECF No. 182-33. Plaintiffs offer evidence that this language indicated that "the development *order* had been established, and all that remained to resolve was a *schedule* for delivering the lots." Darnold Decl. ¶ 20, ECF No. 197-5.

The Court previously found that "Plaintiffs did not default by failing to agree on a specific order of Phase C Lot development within a year after closing" because the parties attempted to develop the schedule and "produced a schedule to which they all agreed in principle." *Am. S. Homes Holdings, LLC v. Erickson*, No. 4:21-CV-95 (CDL), 2022 WL 1296691, at *3 (M.D. Ga. Apr. 29, 2022). "The fact that it was not finalized within the first year of the contract does not constitute a default authorizing termination of the contract under these circumstances." *Id.* Thus, as the Court previously found, because ASH did not default or, if it did, cured such a default, LPA Sellers could not terminate the LPA under LPA § 34.[3] *In re Colony Square Co.*, 843 F.2d 479, 481 (11th Cir. 1988) (per curiam) ("Contracts which set forth the manner in which a party must exercise a remedy in the event of a default must be strictly adhered to."). Genuine fact disputes exist as to whether

---

[3] Nor did ASH breach the LPA by suing on June 14 before issuing the June 21 notice of default: as the Court previously noted, "[u]nder these circumstances, Plaintiffs likely cured any default that may have resulted from their failure to provide proper notice initially of their lawsuit. And it is therefore likely that their alleged default would not authorize the termination of the contract by Defendants." *Erickson*, 2022 WL 1296691, at *3.

LPA Sellers breached LPA § 10 by failing to agree to ASH's proposal or propose their own Phase C development order, and thus whether ASH may pursue the remedies under LPA § 35.  LPA § 35 (allowing ASH to pursue legal and equitable remedies to compensate it for uncured breaches by LPA Sellers).[4]

Plaintiffs also argue that LPA Sellers breached LPA §§ 6 and 14.  LPA § 6 provided that the LPA Sellers would develop and ASH would purchase the lots according to a **"Takedown Schedule"** attached to the LPA.  LPA § 6.  "The number of Lots shown on the Takedown Schedule represents the minimum number of Lot closings ("**Lot Takedowns**") that [ASH] is required to complete, based on the availability of Finished Lots, during each calendar quarter[.]" *Id.*  Any excess lots purchased ahead of schedule would "be credited toward the Lot Takedowns required for the subsequent calendar quarter or quarters."  *Id.*  Plaintiffs argue that LPA Sellers breached this section by failing to takedown additional fully developed lots that ASH-GH was ready and willing to purchase.

---

[4] Defendants argue, alternatively, that the LPA is unenforceable as to Phase C lots without an order of development because it is an essential but missing contract term, or imposed a condition precedent on performance as to C lots.  But the Court already determined that the LPA contained all essential terms. *Erickson*, 2022 WL 1296691, at *4. Further, LPA § 10 does not contain language creating conditions precedent, "such as 'on condition that,' 'if, and 'provided,' or by explicit statements that certain events are to be construed as conditions precedent," which Georgia law disfavors.  *Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*, 541 S.E.2d 435, 438 (Ga. Ct. App. 2000) (quoting *Fulton County v. Collum Props.*, 388 S.E.2d 916, 918 (Ga. Ct. App. 1989)). Thus, Defendants' alternative arguments on LPA § 10 fail.

Contrary to Plaintiffs' suggestion, LPA § 6 permits, but does not require, takedowns in excess of the Takedown schedule.  Thus, LPA Sellers are entitled to summary judgment as to this aspect of Count 2.

LPA § 14 requires that, if LPA Sellers "should acquire or develop and offer for sale additional land or lots in the States of Georgia or Alabama that are not Phase A, B, or C Lots," LPA Sellers must first offer these "Future Lots" to ASH.  LPA § 14. For purposes of this obligation, LPA Sellers include the named entities and "any other entity owned or controlled by Erickson for purchasing and developing residential land."  *Id.* at 1.  Plaintiffs contend that Defendant Carrollton Development and GH ATL, which are owned and controlled by Erickson, breached LPA § 14 because they failed to offer ASH lots that they owned in Carrollton and Dallas, Georgia.

But these lots fall outside LPA § 14 because GH ATL and Carrollton Development acquired them before the Transaction.  It is undisputed that the Carrollton property was acquired before the Transaction.  And Defendants point to evidence that GH ATL owned each of the contested Dallas lots before the Transaction, told ASH about them, but ASH did not purchase them.  Email from A. Allen to S. Pehrkon (July 11, 2019, 10:58:13 AM), ECF No. 173-8 (outlining a lot list for sale, including Dallas parcels).  Plaintiffs point to no evidence that any contested Dallas lots fall outside this

lot list.  Because Carrollton Development and GH ATL acquired the contested lots before the Transaction, they fall outside LPA § 14, so the Court grants summary judgment in Defendants' favor as to this aspect of Count 2.

In summary, the relevant contractual provisions do not require LPA Sellers to sell excess lots in advance of the Takedown Schedule; nor do they entitle Plaintiffs to a right of first refusal for the contested Carrollton or Dallas lots.  Therefore, the LPA Sellers did not breach LPA §§ 6 or 14, and Defendants are entitled to summary judgment as to those aspects of Count 2. Because LPA Sellers could not terminate the LPA under LPA § 34 and factual disputes exist as to ASH's remedies under LPA § 35 for a breach of LPA § 10, the Court denies summary judgment as to that aspect of Count 2 and grants summary judgment in Plaintiffs' favor as to Counterclaim 4.

**V.  Did Erickson or ASH Breach the Consulting or Employment Agreements (Count 1 and Counterclaim 5)?**

ASH and Erickson each assert claims related to their Consulting Agreement.  That Agreement incorporates provisions from the Employment Agreement, which purportedly prevented Erikson from using confidential information that he learned during the pendency of his consulting and employment relationship; it also provided that Erickson would be reimbursed for certain costs while it was in effect.  ASH claims Erickson violated the Agreement's

confidentiality provisions; Erickson counterclaims that he has not been reimbursed for certain costs.  The Employment Agreement states that Erickson would not use confidential information except as necessary to carry out his duties set forth in that agreement and would not share that information with anyone except ASH employees or others who sign substantially similar confidentiality agreements.  Employment Agreement § 6.02.  But Erickson had no obligation to maintain confidentiality when confidential information "becomes publicly known or readily ascertainable by the public . . . through no wrongful act of" Erickson.  *Id.* § 6.03(a).

After Erickson resigned as ASHH's interim CEO and as an ASHH director to pursue future homebuilding opportunities, ASHH instructed Erickson to "refrain from providing any further consulting services" unless ASHH specifically requested them; at that time, ASHH did not terminate the Consulting Agreement.  Letter from J. Kramer to D. Erickson 1 (Dec. 22, 2020), ECF No. 181-25. In April 2021, however, ASHH terminated the Consulting Agreement, purportedly for cause because Erickson misappropriated non-public information from ASH "for personal gain" and thus breached his confidentiality obligations.  Letter from J. Kramer to D. Erickson 1 (Apr. 8, 2021), ECF No. 173-77.  Specifically, Plaintiffs contend that Erickson breached his confidentiality obligations by

plagiarizing ASHH's Non-Disclosure Agreement ("NDA") form, a price sheet for a target company, and a due diligence checklist.[5]

The Court finds that genuine fact disputes exist as to whether Erickson breached his confidentiality obligations.  Each document that Erickson allegedly plagiarized does resemble, and in places contains identical terms to, ones Erickson used in his subsequent homebuilding operations.  Erickson contends that the ASHH NDA is not a confidential document because it is similar to a publicly available NDA; and he also maintains that ASHH intended to share it with third parties.  Although Erickson's and ASHH's NDA use terms from the publicly available form NDA, ASHH's has some differences which it appears Erickson may have copied and disclosed.  *Compare* Erickson Prominence NDA, ECF No. 179-31, *and* ASHH Dorn Homes NDA, ECF No. 179-48, *with* Publicly Available Form NDA, ECF No. 191-29.  The price sheet for the target company, Prominence Homes, also contains similar premiums and an identical estimate, although it also has differences, including whether equity would form part of the consideration and the premium payout schedule.  *Compare* ASHH Prominence Price Sheet, ECF No. 179-25, *with* Erickson Prominence Price Sheet, ECF No. 179-32.  Similarly, Erickson's due diligence checklist seems to be based upon the ASHH checklist, notwithstanding that some differences exist.  *See*

---

[5] The Court summarily rejects Plaintiffs' other arguments that Erickson breached his confidentiality obligations, finding them unpersuasive.

Erickson Dep. 317:7-321:11, ECF No. 196-3.  *Compare* ASHH Due Diligence Checklist, ECF No. 179-36, *with* Erickson Due Diligence Checklist, ECF No. 179-35.  Because genuine fact disputes exist regarding the degree of similarity between the confidential documents and those used by Erickson, a jury must determine whether Erickson breached his confidentiality obligations, so the Court denies summary judgment as to Count 1 and that aspect of Counterclaim 5.[6]

Erickson also makes a claim for reimbursement of certain expenses in his Counterclaim.  Specifically, he contends that ASH breached the Consulting Agreement by failing to reimburse him for a trip to a potential acquisition and for a trip to interview an ASHH CEO candidate.  The Consulting Agreement provided that ASH-GH would reimburse Erickson for "all reasonable out-of-pocket expenses incurred by Erickson in providing the Consulting Services."  Consulting Agreement § 3.D.  It also required that

---

[6] Defendants argue that, even if Erickson breached the Consulting Agreement's confidentiality obligations, Plaintiffs have not shown that they suffered any damages as a result of the breach.  But the parties acknowledge in the Consulting Agreement that Erickson's misappropriation of confidential information "irreparably harm[s]" ASH.  Consulting Agreement § 5.  Plaintiffs also argue that even if Plaintiffs only received nominal damages for this breach, ASH would be entitled to costs, expenses, and attorneys' fees.  *Id.; see* O.C.G.A. § 13-6-6 ("In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action."); *King v. Brock*, 646 S.E.2d 206, 206 (Ga. 2007) (holding that "an award of nominal damages in a contract action is sufficient to confer 'prevailing party' status under a contractual fee-shifting provision").

"[a]ll such services shall be scheduled by mutual agreement as to time and location." *Id.* § 1.B. Thus, to be reimbursed, the services needed to be scheduled by mutual agreement and incurred in providing consulting services.

It is undisputed that Erickson did not schedule the first trip with ASHH in advance and that Erickson conducted the second trip in his capacity as a member of the ASHH Board of Directors, not as a consultant. ASH did not breach the Consulting Agreement for failing to reimburse him for these expenses. The Court grants summary judgment in Plaintiffs' favor as to that aspect of Counterclaim 5.

## VI. Did Defendants Infringe Upon Plaintiffs' Intellectual Property Rights?

As part of the Transaction, Sellers conveyed to ASH-GH all intellectual property of Sellers, including copyrights and trademarks. Plaintiffs contend that Defendants infringed upon those copyrights and trademarks in its operations in the Dallas, Georgia and South Carolina geographic areas by (1) using copyrighted plans that ASH-GH purchased as part of the Transaction and (2) using the Grayhawk name, which Plaintiffs contend they purchased as a trademark. Counts 4 and 5 allege that Defendants infringed upon ASH-GH's copyrights and Counts 6-10 allege that Defendants infringed upon ASH-GH's trademarks and trade names.

A. Did Defendants Infringe Upon the CAA or ASH-GH's Copyrights (Counts 4 and 5)?

Before the Transaction, GH ATL and GH SC developed homebuilding plans for their operations in their respective markets. Plaintiffs contend that the use of these plans infringed on copyrighted plans that Plaintiffs owned, in violation of the CAA. Under the CAA, ASH-GH acquired registered copyrights included in Schedule 1 of the CAA. CAA Schedule 1, ECF No. 71-4 at 8; CAA Recital B, ECF No. 71-4 at 2. CAA Schedule 1 does not explicitly include the ATL or SC Plans. ASH-GH also acquired copyrighted plans used in the Columbus metropolitan area, which does not include the GH ATL and GH SC plans. So, Defendants did not violate the CAA when GH ATL and GH SC used plans created before the Transaction for markets outside of that area.

The current record demonstrates that differences exist between the alleged infringed plans and the GH ATL and GH SC infringing plans. Absent direct proof that an alleged infringer copied the copyright's protectable elements, plaintiffs must show that defendants "had access to the copyrighted work and that the works are substantially similar." *Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1321 (11th Cir. 2016) (internal quotation marks and citation omitted). It is undisputed that Erickson had access to the building plans he sold to ASH-GH through the CAA. "Substantial similarity exists only where an

average lay observer would recognize the alleged copy as having been appropriated from the protectable features of the copyrighted work." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1326 (11th Cir. 2012) (alteration adopted) (internal quotation marks and citation omitted). But because building plans are entitled only to "thin" copyright protection, "modest dissimilarities are more significant than they may be in other types" of protected works. *Id.* (internal quotation marks and citation omitted); *see also Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992) (affirming the district court's determination that although the protected and allegedly infringing "floor plans are visually similar and the layout is generally the same, the dissimilarities are significant" enough to fail to establish "the substantial similarity of the plans required to show copyright infringement").

Here, Defendants point to numerous dissimilarities between the alleged infringed plans and the GH ATL and GH SC plans. Betts Dep. 100:14-102:13, 182:5-183:12, 184:11-185:3, ECF No. 205-3 (describing, as the plan design manager, numerous differences between the plans, including a "40-point checklist" of changes); Long Dep. 58:24-60:22, ECF No. 182-3 (assessing "specialized" changes in the GH ATL and GH SC plans); Brant Decl. ¶¶ 3-4, ECF No. 173-164 (describing how Grayhawk Homes "modif[ed]" the GH SC plans to conform with "required modifications" for that market);

Recker Decl. ¶ 6, ECF No. 173-165 (stating that, as ASH-GH's President, he permitted ASH-GH staff to support Erickson's business in Dallas, Georgia and South Carolina using plans similar to those used in Columbus and Alabama); Vialet Dep. 32:21-33:9, 96:15-101:19, ECF No. 205-6 (comparing differences between a Columbus and Dallas plan); Erickson Dep. 347:15-349:11, ECF No. 205-4 (discussing "material difference[s] between" plans used by Grayhawk Homes and a similar plan used by GH ATL).  These dissimilarities establish a lack of infringement.  Because ASH-GH did not acquire the GH ATL or GH SC plans and extensive dissimilarities exist between those plans and the plans ASH-GH acquired, the Court grants summary judgment in Defendants' favor as to Plaintiffs' copyright claims (Counts 4 and 5).

> B.  Did Defendants Infringe Upon ASH-GH's Trademarks or Trade Names (Counts 6-10)?

The Court concludes that genuine fact disputes exist regarding whether GH ATL and GH SC infringed on ASH-GH's common law trademarks.  While the TAA lists no registered trademarks, Plaintiffs argue that ASH-GH possessed common law trademark rights to the Grayhawk name.  A party may violate a common law trademark if the adopted mark's similarity to the unregistered mark would cause a consumer to confuse the two marks.  *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010).  A reasonable factfinder could conclude that GH ATL's and GH SC's trademarks are sufficiently

similar to ASH-GH's trademark that their use could constitute trademark infringement: although the GH ATL and GH SC logos are not identical to the Grayhawk Homes logo, they exhibit substantial similarity. *See* Grayhawk & GH SC Logo Comparison 1, ECF No. 193-41 (Grayhawk Homes and GH SC logos); Erickson Decl. ¶ 9, ECF No. 173-3 (GH ATL logo).

The Court notes that geographic considerations weigh substantially in the confusion analysis. *Tana*, 611 F.3d at 780. For example, where the competing trademark holders "operate in discrete, remote areas, there is a smaller likelihood that there will be confusion." *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1565 (11th Cir. 1991). But here, GH ATL and GH SC used their trademarks in Dallas and South Carolina, which are located in close proximity to the APA's restricted area, which increases the likelihood of trademark confusion.

Furthermore, Plaintiffs point to evidence that some GH ATL and GH SC customers actually confused these entities with ASH-GH. Thirtyacre Decl. ¶ 9, ECF No. 197-4 (explaining that, as president of ASH-GH, he had received "calls from homeowners in the Atlanta area or in South Carolina regarding issues with houses built for them by Erickson through his other companies" in which the "confused" customers "believed that ASH-GH had built the homes they purchased from 'Grayhawk'"); *see Tana*, 611 F.3d at 779 (explaining that "actual confusion in the consuming public . . .

is the most persuasive evidence in assessing likelihood of confusion"). Thus, the Court denies summary judgment as to Plaintiffs' trademark claims (Counts 6-10).

## VII. Are Defendants Entitled to Quantum Meruit Damages for Performing the TSA (Counterclaim 7)?

Grayhawk Homes, Homestead Residential, and GH Services (collectively "TSA Seller") entered into the TSA with ASH-GH. TSA at 1. They entered the TSA as "a condition to the consummation of the transactions contemplated by the" APA. *Id.* at 1, Background B. Both TSA Seller and ASH-GH would provide services defined by a Service Schedule, which included employee payroll, managing building licenses, and an undefined "Grayhawk Services." TSA Service Schedule, ECF No. 87-2 at 11. In partial exchange for these services, the Services Schedule, as amended by the parties, provided that ASH-GH would use Erickson's builders and general contractor licenses for new permits issued in Georgia and Alabama until the termination of the TSA. TSA § 1.01(a) (explaining that the parties will provide the Services set out in the TSA Service Schedule, which includes ASH-GH's right to use TSA Seller's builders licenses); Amendment #1 to TSA § 1(a), ECF No. 87-2 at 13 (granting ASH-GH the right to use Erickson's contractor licenses); Amendment #2 to TSA § 1, ECF No. 87-2 at 16 (extending the TSA until March 31, 2021). The TSA also provided that the parties would provide "additional services to the other party, which are

not currently contemplated in the Services Schedule, at a price to be agreed upon after good faith negotiations between the parties." TSA § 1.01(b).

Defendants argue that, because the TSA omitted a material contract term—its scope of services—the TSA does not constitute a valid contract, and so they are entitled to quantum meruit relief for ASH-GH's use of Erickson's licenses. *See Watson v. Sierra Contracting Corp.*, 485 S.E.2d 563, 570 (Ga. Ct. App. 1997) ("Quantum meruit is not available when there is an express contract; however, if the contract is void, is repudiated, or can only be implied, then quantum meruit will allow a recovery if the work or service was accepted and if it had value to the recipient."); O.C.G.A. § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.").

A genuine fact dispute exists as to the scope of services contemplated by the TSA. The Services Schedule states that GH Services would provide pro-rata wind out services. TSA Service Schedule, ECF No. 87-2 at 11. And Defendants offer evidence that GH Services assisted GH ATL and GH SC as they wound down under that portion of the Services Schedule: for example, Defendants point to several ASH-GH executives who knew that ASH-GH employees

provided support services to GH ATL and GH SC, which suggests that ASH-GH understood the TSA to include support services to those entities. *See, e.g.*, Long Dep. at 56:19-61:3, 62:6-64:22, 179:18-183:22 (ASH-GH's interim President from October 30, 2020 until January 2021 describing ASH-GH's provision of support services to Erickson's homebuilding operations in Dallas and South Carolina). Plaintiffs, conversely, point out that the TSA includes an Entire Agreement provision and does not specifically refer to operations in Dallas or South Carolina, so they argue that the TSA unambiguously excluded support services to the homebuilding operations in those markets. TSA § 6.10 (stating that the TSA, "including the Services Schedule, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter").

Faced with these competing facts, a jury must decide whether the parties contemplated the TSA's scope of services to include ASH-GH providing support services to wind down GH ATL and GH SC and, therefore, whether Defendants are entitled to quantum meruit relief. *Brookhaven Landscape & Grading Co. v. J. F. Barton Contracting Co.*, 676 F.2d 516, 522-23 (11th Cir. 1982). Thus, the Court denies Plaintiffs' motion for summary judgment as to Counterclaim 7.

CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the cross-motions for summary judgment (ECF Nos. 171 & 173).  The Court grants summary judgment in Plaintiffs' favor as to Counterclaims 1, 3, 4, and 6 and Counterclaim 5 as it relates to Erickson's reimbursement requests.  The Court grants summary judgment in Defendants' favor as to Counts 3-5, Counterclaim 2, and Count 2 as it relates to LPA §§ 6 and 14.  The Court denies summary judgment as to Counts 1 and 6-10, Counterclaim 7, Count 2 as it relates to LPA § 10, and Counterclaim 5 as it relates to Erickson's confidentiality obligations.

IT IS SO ORDERED, this 15th day of June, 2023.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA