IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
Columbus Division

AMERICAN SOUTHERN HOMES
HOLDINGS, LLC and ASH-
GRAYHAWK, LLC,

    Plaintiffs,

    v.                                      Case No: 4:21-cv-00095-CDL

DAVID B. ERICKSON, et al.,

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE SETTLEMENT COMMUNICATIONS

Pursuant to Federal Rules of Evidence 408 and 403, Plaintiffs American Southern Homes Holdings, LLC and ASH-Grayhawk, LLC ("ASH-GH") (collectively "ASH") respectfully ask the Court to preclude evidence of compromise negotiations between counsel for Plaintiffs and Defendants from being introduced at trial to prove or disprove the validity or amount of a claim or counterclaim, or to establish that Plaintiffs somehow failed to mitigate their damages. Such communications feature prominently on Defendants' exhibit list, including the following:

- **Spring 2021 Settlement Correspondence and Draft Term Sheets**: DX_0319; DX_0328; DX_0332; DX_0333; DX_0334; DX_0338; DX_0340; DX_0343; DX_0344; DX_0346; and any other substantially similar exhibits on Defendants' Exhibit List.

- **Post-Preliminary Injunction ("PI") Takedown Communications**: DX_0485; DX_0486; DX_0488; DX_0489; DX_0490; DX_0491; DX_0494; DX_0495; DX_0496; DX_0497; DX_0498; DX_0503; DX_0517; DX_0518; DX_0519; DX_0520; DX_0522;

DX_0532; DX_0554; DX_0555; DX_0556; DX_0557; DX_0983; DX_0984; DX_0985; DX_0986; DX_0987; DX_0988; DX_0989; DX_0990; DX_0991; DX_0992; and any other substantially similar exhibits on Defendants' Exhibit List.[1]

## I. BACKGROUND

Since early 2021, following Defendant David Erickson's abrupt resignation as interim CEO and director of ASHH, the parties have attempted to settle their disputes. After failing to avoid litigation altogether, the parties also negotiated to avoid further escalation of this litigation.

### A. The Parties Attempted to Settle Their Disputes Before Filing Suit.

In early 2021, the parties began negotiating the potential resolution of various disputes stemming from alleged breaches of the agreements executed as part of the November 2019 acquisition of the assets of Grayhawk Homes by ASH-GH (the "Acquisition"). The Parties' negotiations addressed many of the same issues as this litigation, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See, e.g.*, Dkt. 173-73 (DX_0319, 3/12/2021 E-mail from J. Kramer and term sheet [PLT373278, -79]); Dkt. 173-148 (DX_0346, 6/2/2021 E-mail from R. Twiss and term sheet [PLT370593, -94]).) These negotiations were memorialized in a series of draft term sheets, including term sheets exchanged on March 12; May 6; May 10; June 1; and June 2, 2021. (*Id.*; *see also* Dkt. 171-37 (DX_0333, 5/6/2021 E-mail from R. Quackenboss and term sheet [PLT360046, -48]); Dkt. 171-20 (DX_0334,

---

[1] For completeness, ASH has included documents subject to this motion on its Exhibit List for trial. ASH does not intend to introduce such evidence if this motion is granted.

5/10/2021 E-mail from J. Kramer and term sheet [PLT426313, -17]); Dkt. 173-146 (DX_0340, 6/1/2021 E-mails between R. Quackenboss, J. Kramer, and J. Schronce [DEF-090531, -32]).)

Each of the draft term sheets were prominently labeled as "For Settlement Purposes Only[,]" "Subject to FRE 408 and state-law equivalents[,]" or "Not Admissible in Evidence[.]" (*See, e.g.,* Dkt. 173-73 (DX_0319); Dkt. 171-20 (DX_0334); Dkt. 173-148 (DX_0346).) The draft term sheets outlined specific proposals for ▮▮▮▮▮▮▮▮▮▮ (*See, e.g.,* Dkt. 171-20 (DX_0334).) Several of the term sheets also contained comments and additions from the parties with respect to disputed items, including ▮▮▮▮▮▮▮▮▮▮ (*See* Dkt. 171-37 at 3 n.2 (DX_0333); Dkt. 171-20 at 3 (DX_0334).)

### B. ASH Files Suit and Obtains Preliminary Injunctive Relief.

Ultimately, the Parties' efforts to settle their disputes were not successful. In June 2021, ASH filed the present lawsuit. At the center of ASH's claims for relief are Defendants' refusals to permit ASH-GH to take down finished lots as required by the LPA. (*See* Dkt. 15 at ¶¶ 3, 4, 18, 72-98, 166-190 (describing Erickson's agreement, and failure, "to serve as a 'land bank' for ASH-GH").) On July 14, 2021, ASH moved for a preliminary injunction "compelling [] Sellers to honor their contractual commitments . . . by (1) prohibiting them from blocking the purchase (or 'takedown') of developed building lots they have agreed to sell to ASH-GH, and (2) requiring them to continue delivering developed building lots pursuant to an agreed takedown schedule." (Dkt. 28 at 1.) On August 6, 2021, Defendants purported to terminate the LPA, based principally on ASH's alleged failure to establish an order of Phase C Lot development.

The parties fully briefed ASH's preliminary injunction motion and participated in a hearing on September 21, 2021. The same day, this Court denied ASH's motion, concluding that,

notwithstanding Defendants' purported termination, Defendants would not be in breach of the LPA unless and until they failed to deliver the required number of finished lots by September 30, 2021. (Dkt. 46 at 3-4.)  Accordingly, the Court found that Defendants' time for performance had not yet expired, and ASH's claim for specific performance was therefore premature.  (*Id*.)  The Court permitted ASH to renew its motion for a preliminary injunction if Defendants failed to perform as agreed, with the caveat that "any relief granted pursuant to such motion would be restricted to the quarter for which the time of performance had expired." (*Id*. at 4 n.1.)  The parties then negotiated a compromise to avoid a renewed preliminary injunction motion relating to Q3 2021.

In January 2022, ASH again moved for a preliminary injunction after Defendants refused to permit ASH to take down any finished Phase B or C Lots in Q4 2021, as required by the LPA. (Dkt. 62.)  The parties again fully briefed the motion, and the Court held another hearing.  By the time of the hearing, Defendants had also failed sell any Phase B or C lots to ASH-GH in Q1 2022. (Dkt. 108 at 2, 18.)  On April 29, 2022, the Court granted ASH's motion.  With respect to the merits of ASH's case, the Court concluded that ASH was substantially likely to succeed on its claim for breach of the LPA, because Defendants' purported termination was not effective or justified by any uncured default by ASH, and because section 10 of the LPA was not an unenforceable "agreement to agree" in violation of the statute of frauds.  (*Id*. at 6-11.)  In the end, the Court ordered Defendants to sell ASH 29 Phase C lots for Q4 2021 and Q1 2022, and it required ASH to post a $500,000 bond as security.  (*Id*. at 18-19.)  ASH subsequently took down 27 Phase C lots and 2 Phase B lots (because Sellers were unable to deliver all 29 of the Phase C lots).

      **C.**    **The Parties Negotiate Quarterly Lot Takedowns to Avoid Further Injunctions.**

Since this Court issued the preliminary injunction, the Parties have endeavored to avoid litigating yet another preliminary injunction motion.  At the end of each quarter, ASH has

requested to purchase from Defendants at least the minimum number of Phase B and Phase C lots due under the LPA Takedown Schedule.

Such negotiations began soon after the Court granted a preliminary injunction, in connection with Q2 2022.  On June 7, 2022, ASH asked to take down 15 Phase C Lots by the end of Q2 2022.  (Dkt. 193-49 (DX_0485, 6/7/2022 Letter from J. Kramer re: Q2 2022 Takedown [PLT436202]).)  Defendants maintained that there were no Phase C lots available.

As a compromise, Defendants offered to sell up to 64 "equivalent B Lots" from a partial list of Phase B Lots, but only if ASH were to "post an appropriate bond in accordance with [F.R.C.P.] 65(c)."  (Dkt. 173-131 (DX_0488, 6/17/2022 Letter from R. Quackenboss re: Q2 2022 Takedown [PLT436204]).)  ASH refused, explaining that (1) ASH had no obligation to "accelerate its takedowns of Phase B Lots" in lieu of Phase C Lots; (2) Defendants' list did not contain all the remaining Phase B Lots; and (3) the LPA does not require ASH to post a bond to buy lots.  (Dkt. 173-132 (DX_0490, 6/20/2022 Letter from J. Kramer re: Q2 2022 Takedown [PLT436209]).)

But recognizing Sellers' offer as an attempt to "compromise to avoid another motion for a preliminary injunction," ASH promised to not pursue injunctive relief for Q2 2022 if Defendants permitted ASH to take down 15 Phase B Lots.  (*Id*.)  Defendants agreed as to the number of lots but maintained their demand that ASH post another bond of nearly $400,000 in connection with any takedown.  (Dkt. 173-133 (DX_0494, 6/24/2022 Letter from R. Quackenboss re: Q2 2022 Takedown [PLT436213]); Dkt. 193-50 (DX_0495, 6/24-29/2022 E-mails between R. Quackenboss and J. Kramer re: Q2 2022 Takedown [PLT436216]).)  Defendants also demanded that ASH agree to a consent order memorializing the terms of the takedown and waive Defendants' default under the LPA for Q2 2022.  (*Id*.)

ASH declined to take on new obligations outside the LPA, which does not require posting a bond, and advised that Rule 65(c) would not apply under the circumstances. (Dkt. 173-134 (DX_0497, 7/1/2022 Letter from J. Kramer re: Q2 2022 Takedown [PLT436223]).) ASH added that the proposed bond "is roughly 45 percent of the total takedown price and bears no rational relationship to the potential damages Seller might incur if such lots are sold to ASH-GH for less than their current fair market value." (*Id.*) ASH also rejected Defendants' offer because it would have required ASH-GH to agree that delivery of Phase B lots satisfies the requirements of the Takedown Schedule, which is not the case. (*Id.*) Nevertheless, ASH reasserted its offer to purchase 15 Phase B Lots, with no strings attached. (*Id.*)

Defendants did not accept ASH's offer. In a July 6, 2022 letter, Defendants argued that, by refusing to accept their conditional offer, "Plaintiffs are failing to mitigate their alleged damages under the LPA, all of which flow from Plaintiffs' supposed lack of access to finished lots." (*See* Declaration of Jacob A. Kramer ("Kramer Decl.") Ex. 1 (7/6/2022 Letter from R. Quackenboss re: Q2 2022 Takedown [PLT436226]).)[2]  Ultimately, no takedown occurred in Q2 2022.

On September 16, 2022, ASH again informed Defendants of its desire to take down Phase B and C lots pursuant to the LPA Takedown Schedule.  (Dkt. 193-51 (DX_0517, 9/16/2022 Letter from J. Kramer re: Q3 2022 Takedown [PLT436251]) (requesting 4 Phase B lots and 30 Phase C lots—including the 15 Phase C lots Defendants failed to deliver in Q2 2022).)   Defendants responded on September 26, omitting their previous demand that ASH post a bond and offering to sell 6 Phase B lots and up to 64 Phase B lots in lieu of Phase C lots.  (Dkt. 193-52 (DX_0518, 9/26/2022 Letter from R. Quackenboss re: Q3 2022 Takedown [PLT436258]).)

---

[2]  Unless otherwise indicated (e.g., by a citation to the docket), exhibits to this motion are attached to the Declaration of Jacob A. Kramer filed contemporaneously herewith.

6

On September 27, ASH responded that it was "willing to take down more than the minimum number of Phase B lots for this quarter" and asked for a complete list of finished Phase B Lots. (Dkt. 193-53 (DX_0520, 9/27/2022 E-mail from J. Kramer re: Q3 2022 Takedown [PLT436261]).) The same day, Defendants provided a complete list of Phase B lots and repeated the offer to sell ASH up to 64 Phase B lots, "with 15 of those lots to be accepted in lieu of the 15 C lots that would have otherwise been due for the third quarter of 2022" and any additional Phase B lots credited towards future Phase B lot takedowns. (Dkt. 193-54 (DX_0519, 9/27/2022 E-mail from J. Schronce re: Q3 2022 Takedown [PLT436263]); *see also* Kramer Decl. Ex. 2 (DX_0985, 10/5/2022 E-mail from J. Schronce re: Q3 2022 Takedown [PLT436271]).)

In response, ASH offered to take down 6 Phase B lots under the Takedown Schedule for Q3 2022, and to take down 30 additional Phase B lots ahead of schedule. (Dkt. 173-135 (DX_0522, 10/3/2022 E-mail from J. Kramer re: Q3 2022 Takedown [PLT436267]).) However, ASH did "not agree that taking down additional Phase B lots will cure Defendants' failure to make Phase C lots available on schedule." (*Id*.) ASH ultimately purchased 35 Phase B lots on October 29, 2022 (one lot was unusable and removed from the takedown).

ASH has requested and taken down additional Phase B lots in each of Q4 2022 (1 lot), Q1 2023 (30 lots), and Q2 2022 (30 lots), all according to the Takedown Schedule. (*See* Dkt. 200-11 (DX_0986, 12/14/2022 Letter from J. Kramer re: Q4 2022 Takedown [PLT441995]); Kramer Decl. Ex. 3 (DX_0988, 12/21/2022 Letter from J. Kramer re: Q4 2022 Takedown [PLT441999]); Kramer Decl. Ex. 4 (DX_0554, 3/8/2023 Letter from J. Kramer re: Q1 2023 Takedown [PLT442006]); Kramer Decl. Ex. 5 (DX_0556, 6/14/2023 Letter from J. Kramer re: Q2 2023 Takedown [PLT442009]).)

In each of those quarters, ASH also requested that Defendants deliver the 15 Phase C lots due under the Takedown Schedule for that quarter. (*Id.*) Defendants did not provide any Phase C lots in response to these requests, but rather repeated their offer to substitute additional "equivalent" Phase B lots in lieu of their Phase C lot obligations. (*See* Kramer Decl. Ex. 6 (DX_0987, 12/16/2022 Letter from R. Quackenboss re: Q4 2022 Takedown [PLT441997]); Kramer Decl. Ex. 7 (DX_0555, 3/21/2023 Letter from R. Quackenboss re: Q1 2023 Takedown [PLT442007]); Kramer Decl. Ex. 8 (DX_0557, 6/23/2023 Letter from R. Quackenboss re: Q2 2023 Takedown [PLT442012]).)

## II.     STANDARD

Evidence is "relevant" if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Under Federal Rule of Evidence 403, courts may exclude otherwise relevant evidence "if its probative value is substantially outweighed" by the danger of unfair prejudice, confusion, or misleading the jury.  Fed. R. Evid. 403.

Under Federal Rule of Evidence 408, evidence of "(1) furnishing, promising, or offering . . . valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim" is not admissible "to prove or disprove the validity or amount of a disputed claim[.]" Fed. R. Evidence 408(a).  In the Eleventh Circuit, statements fall under Rule 408 if "the statements or conduct were intended to be part of the negotiations toward compromise." *Blu-J, Inc. v. Kemper C.P.A. Grp.*, 916 F.2d 637, 642 (11th Cir. 1990) (quoting *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106 (5th Cir. 1981).  Rule 408 applies "even when a party seeks to admit its own settlement offer or statements made in settlement negotiations."  Fed. R. Evid. 408 advisory committee's note (2005 amend.).

8

Compromise evidence introduced for "another purpose, such as proving a witness's bias or prejudice, [or] negating a contention of undue delay," is not prohibited. Fed. R. Evid. 408(b).

Courts in this Circuit have held that compromise evidence used to prove or disprove mitigation of damages does not meet the "another purpose" exception and is barred by Rule 408. *Equal Emp. Opportunity Comm'n v. St. Joseph's/Candler Health Sys., Inc.*, No. CV420-112, 2022 WL 17978822, at *4 (S.D. Ga. Dec. 28, 2022) (stating that "the Eleventh Circuit does not appear to have addressed the issue" but siding with the Second and Sixth Circuits in concluding Rule 408 prohibits compromise evidence used to prove mitigation). "The goal of mitigation is the prevention of unnecessary economic loss, and therefore mitigation necessarily goes to the amount of the claim,' and, thus, use of [] settlement letters to prove mitigation of damages [i]s a purpose prohibited by Rule 408." *Sweetwater Invs., LLC v. Sweetwater Apartments Loan LLC*, No. 1:10-CV-223-WKW, 2011 WL 13362845, at *2 (M.D. Ala. Sept. 27, 2011) (quoting *Stockman v. Oakcrest Ctr., P.C.*, 480 F.3d 791, 798 (6th Cir. 2007)); *see also Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2nd Cir. 1992) ("Evidence that demonstrates a failure to mitigate damages goes to the 'amount' of the claim and thus, if the offer was made in the course of compromise negotiations, it is barred under the plain language of Rule 408.").

### III.   ARGUMENT

#### A.   The Parties' Spring 2021 Settlement Correspondence Should be Excluded.

There is no serious question that Parties' Spring 2021 Settlement Correspondence should be excluded under Rule 408. Each draft term sheet exchanged between the Parties is prominently labeled "For Settlement Purposes Only[,]" "Subject to FRE 408[,]" or some variation. (*See, e.g.,* Dkt. 173-73 (DX_0319); Dkt. 171-20 (DX_0334); Dkt. 173-148 (DX_0346).) Such communications contain "the parties' attempts to reach a settlement before the initiation of suit" and fall squarely within the scope of Rule 408. *Specialized Transp. of Tampa Bay, Inc. v. Nestle*

9

*Waters N. Am., Inc.*, No. 8:06-CV-421-T-33EAJ, 2008 WL 4080205, at *2 (M.D. Fla. Aug. 28, 2008) (excluding pre-suit settlement communications clearly marked "for settlement purposes only"); *see also Coll. Park Holdings, LLC v. Racetrac Petroleum, Inc.*, 239 F. Supp. 2d 1334, 1343 (N.D. Ga. 2002) (same).

The contents of the draft term sheets similarly reveal that they were prepared in a spirit of compromise, proposing and discussing resolution of many of the Parties' claims on different terms than those specified in the Acquisition agreements, or which are being sought through this litigation. These offers are neither relevant to the present dispute nor probative of the relative strength of the Parties' positions. *See* Fed. R. Evid. 408 advisory committee's note (1972 proposed rule) (explaining that compromise evidence "is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position").

Accordingly, ASH respectfully asks the Court to exclude the Spring 2021 Settlement Correspondence from being used to prove or disprove the amount or validity of either Party's claims or counterclaims. To be clear, ASH does not seek to exclude the Spring 2021 Settlement Correspondence from being introduced to negate a contention of undue delay. *See* Fed. R. Evid. 408(b) (compromise evidence may be admitted "for another purpose, such as . . . negating a contention of undue delay"); *see also, e.g., Fears v. Keystone Petroleum Transp., LLC*, No. 1:10-CV-02789-HLM, 2014 WL 11531066, at *4 & n.9 (N.D. Ga. Apr. 22, 2014) (permitting introduction of settlement offers used "to rebut Defendants' claim that Plaintiffs and their counsel acted in bad faith, not to prove or disprove the validity [or amount] of Plaintiffs' claims.").

The Parties' summary judgment briefs each referenced certain of the draft term sheets as evidence that the other side had unduly delayed, hindered, or failed to participate in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See, e.g.,*

10

Dkt. 171-1 at 16-17; Dkt. 171-2 at ¶ 46; Dkt. 173-1 at 23-24; Dkt. 173-2 at ¶¶ 353-66.)  Use of the draft term sheets for this limited purpose would comport with Rule 408(b), and any risk of prejudice could be remedied by introducing redacted versions of the draft term sheets showing only ███████████████████████████████████████████████

### B.   The Parties' Post-PI Takedown Communications Should be Excluded.

The parties' Post-PI Takedown Communications should also be excluded under Rules 408 and 403(b).  The parties' continued their quarterly negotiations over lot takedowns for the purpose of avoiding additional preliminary injunction proceedings, and the probative value of these negotiations, if any, is outweighed by the danger of unfair prejudice.

**First**, with respect to Rule 408, the Parties' Post-PI Takedown Communications "were intended to be part of the negotiations toward compromise."  *Blu-J, Inc.*, 916 F.2d at 642. Defendants declined to sell lots to ASH in 2021, causing ASH to file its first motion for a preliminary injunction.  (Dkt. 46 at 4 n.1.)  As explained above, the parties avoided a renewed motion through compromise.  Then, Defendants refused to sell lots in December 2021, causing ASH to file a second PI motion addressing Q4 2021 and Q1 2022, which the Court granted.  (Dkt. 108.)  Having been through the process twice, the parties were able to "compromise to avoid another motion for a preliminary injunction[,]" at ASH's invitation.  (Dkt. 173-132 (DX_0490).)

The Parties' Post-PI Takedown Communications were not part of "business as usual," but rather an effort to forge partial compromises of the Parties' disputes to avoid yet more PI proceedings.  *See McSweeney v. Kahn*, No. 4:05-CV-0132-HLM, 2008 WL 11333598, at *5 (N.D. Ga. June 26, 2008) (excluding inter-party e-mails as compromise negotiations after "[c]onsidering the e-mails as a whole" and rejecting argument that the e-mails were "merely 'unconditional promises' or statements made with no anticipation of litigation"); *Atmosphere Hosp. Mgmt., LLC v. Shiba Invs., Inc.*, 158 F. Supp. 3d 837, 845 (D.S.D. 2016) (reading a series of billing letters and

11

other correspondence together in concluding that the "communications describe the give-and-take that the parties made in order to reconcile their disputes" and excluding under Rule 408).

Indeed, Defendants steadfastly insisted in such correspondence that they had no obligation to sell lots to ASH-GH because the LPA had been terminated.  (*See also, e.g.,* Dkt. 173-131 (DX_0488) (demanding bond as condition of lot takedown); Dkt. 193-54 (DX_0519) (offering up to 64 Phase B lots, with 15 Phase B lots to be sold in satisfaction of Defendants' duty to provide Phase C lots).)  Under the circumstances, it makes little sense for Defendants to continue to sell lots to ASH while simultaneously asserting that they had terminated the LPA *except* as part of a compromise to limit the scope of litigation, particularly after the Court found that their purported termination of the LPA was ineffective (Dkt. 62, Opinion at 6-11).  *See Winchester Packaging, Inc. v. Mobil Chem. Co.*, 14 F.3d 316, 320 (7th Cir. 1994) (affirming exclusion of billing letters in which plaintiff offered an inducement to avoid "incur[ring] any additional legal costs").[3]

Because the Parties' Post-PI Takedown Communications were a part of compromise negotiations, they are not admissible to establish "the validity or amount" of either Parties' claims. Fed. R. Evid. 408(a).  This includes the question whether ASH failed to mitigate damages by, for example, declining to post a bond or to accept Phase B lots in lieu of Phase C lots.  *See Sweetwater Invs.*, 2011 WL 13362845 at *2 ("[U]se of [] settlement letters to prove mitigation of damages [i]s a purpose prohibited by Rule 408.").  The purpose of Rule 408 is to promote the compromise of disputes.  Fed. R. Evid. 408 advisory committee's note (1972 proposed rule).  Allowing Defendants to use compromise negotiations between the Parties to argue that ASH failed to mitigate its damages would undermine the public policy underlying the Rule.

---

[3]  In its June 2023 ruling on the Parties' cross-motions for summary judgment, the Court re-affirmed that Defendants' purported termination of the LPA was not effective and granted summary judgment for ASH on Defendants' Fourth Counterclaim.  (Dkt. 209 at 17-18, 20.)

12

ASH's concern over Defendants' intended use of these compromise negotiations is not hypothetical. Counsel for Defendants stated as much in their July 6, 2022 takedown letter, stating that, by rejecting Defendants' conditional offers, "Plaintiffs are failing to mitigate their alleged damages under the LPA, all of which flow from Plaintiffs' supposed lack of access to finished lots." (Kramer Decl. Ex. 1.) Throughout this litigation, Defendants have repeatedly used the Parties' negotiations over continued lot takedowns to argue that ASH failed to mitigate damages if it refused, in part or in whole, Defendants' strings-attached offers.

Most recently, in Defendants' July 21, 2023 Supplement to the Expert Report of Charles Bradley Foster, Defendants' damages expert argues that ASH's damages should be ▬▬▬▬ ▬▬▬▬▬▬▬▬ due to ASH's alleged failure to mitigate by declining Defendant's various strings-attached offers to sell B lots at an accelerated pace or in lieu of C lots. (Kramer Decl. Ex. 9 at ¶ 20 (DX_0996, Excerpts from July 21, 2023 Supp. to Expert Report of Charles Bradley Foster).) Foster's new calculation is based exclusively on the Parties' Post-PI Takedown Communications for Q2 2022 through the present. (*Id.* at n.19.)

**Second**, the Post-PI Takedown Communications should also be excluded under Rule 403(b), because any probative value is substantially outweighed by the risk of unfair prejudice.

As a matter of law, ASH had no obligation to continue to deal with Defendants to mitigate damages following Defendants' breaches of the LPA. Generally, a claimant alleging breach of contract has an obligation to make reasonable efforts to mitigate damages. *See Gen. Elec. Cap. Corp. v. Nucor Drilling, Inc.*, 551 F. Supp. 2d 1375, 1381 (M.D. Ga. 2008). The duty to mitigate does not, however, require the non-breaching plaintiff to take on additional obligations not created by the contract—or even to continue dealing with the defendant at all. *See Koby v. U.S.*, 53 Fed. Cl. 493, 497 & n.3 (2002) ("[C]ourts have been reluctant to require parties, under the duty to

13

mitigate, to deal further with the breaching party, especially if the breacher's alternative terms differ substantially from those of the original contract." (collecting cases)); *see also Wells Fargo Bank, N.A. v. Trotman*, 940 F. Supp. 2d 1359, 1369 (M.D. Ala. 2013) ("Defendant[s] cannot use the duty to mitigate as a *post hoc* vehicle for superimposing new advantageous terms on (and for eradicating disadvantageous terms from) their bargain." (quoting *Whitney Bank v. Point Clear Development, LLC*, 2012 WL 2277597, at *4 (S.D. Ala. June 18, 2012)); *Cain v. Grosshans & Petersen, Inc.*, 413 P.2d 98, 102 (Kan. 1966) ("[A]n innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement.").

Moreover, the attorney negotiations regarding the precise terms of ASH's lot takedowns are not necessary to establish the extent of mitigation, because the number and identity of lots taken down each quarter can easily be established by other means.

Meanwhile, introducing the Post-PI Takedown Communications would unfairly prejudice ASH, which had no obligation to accept lots on materially different terms than those agreed to in the LPA (e.g., by agreeing to post an extra-judicial bond or to accelerate takedowns of Phase B lots merely because Defendants failed to develop and deliver Phase C lots). Indeed, courts have concluded that settlement and compromise communications are "inherently prejudicial" because juries can misconstrue efforts to compromise as "an implicit admission of liability or a sign that [a party] thought they might lose[.]" *Stockman*, 480 F.3d at 799 (affirming exclusion of compromise communications under Rules 403(b) and 408).[4]

---

[4] As mentioned above, Rule 403(b) addresses the same relevance concerns implicated under Rule 408. Compromise offers and negotiations are often "irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position." Fed. R. Evid. 408 advisory committee's note (1972 proposed rule).

## IV.     CONCLUSION

For the foregoing reasons, ASH respectfully asks the Court to grant this motion and exclude documents consisting of compromise negotiations and correspondence between outside counsel from being introduced at trial to prove or disprove the validity or amount of a claim or counterclaim or to argue that ASH failed to mitigate damages.

Dated: August 3, 2023                                  Respectfully submitted,

/s/ Jacob A. Kramer

**FAEGRE DRINKER BIDDLE & REATH LLP**

Jacob A. Kramer (admitted *pro hac vice*)
Jessica R. Maziarz (admitted *pro hac vice*)
Rachel A. Beck (admitted *pro hac vice*)
1500 K Street NW, Suite 1100
Washington, D.C. 20005
Telephone: (202) 230-5289
E-mail:  jake.kramer@faegredrinker.com
E-mail:  jessica.maziarz@faegredrinker.com
E-mail:  rachel.beck@faegredrinker.com

David R. Merritt (admitted *pro hac vice*)
Drew M. Horwood (admitted *pro hac vice*)
2200 Wells Fargo Center, 90 South 7th Street
Minneapolis, Minnesota 55402
Telephone:  (612) 766-7000
E-mail:  david.merritt@faegredrinker.com
E-mail:  drew.horwood@faegredrinker.com

**BUCHANAN LAW FIRM, PC**

Jerry A. Buchanan (Ga. Bar No. 092200)
P.O. Box 2848
The Corporate Center, Suite 614
233 12th Street
Columbus, Georgia 31902
Telephone: (762) 208-6982
E-mail: jab@thebuchananlawfirm.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 3, 2023, I electronically filed the foregoing Memorandum in Support of Plaintiff's Motion in Limine to Exclude Settlement Communications with the Clerk of the Court using the CM/ECF system for filing and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter.

*/s/ Jacob A. Kramer*
