**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

AMERICAN SOUTHERN HOMES )
HOLDINGS, LLC AND )
ASH-GRAYHAWK, LLC, )
                                )
            Plaintiffs,    ) Case No: 4:21cv95
                                )
        v.                      ) Columbus, Georgia
                                ) September 18, 2023
DAVID B. ERICKSON, ET AL,  )
                                )
            Defendants.    ) VOLUME I
_____ )

**TRANSCRIPT OF JURY TRIAL**
**BEFORE THE HONORABLE CLAY D. LAND**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 144)**

*LISA C. SNYDER, RPR, CRR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, FL 32301**
**(850)567-1374 * lisasnydercr@gmail.com**

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

```
 1   APPEARANCES:

 2

     For the Plaintiff:       Faegre Drinker Biddle & Reath, LLP
 3                            By:  JACOB A. KRAMER
                                   JESSICA R. MAZIARZ
 4                                 RACHEL ANNA BECK
                                   Attorneys at Law
 5                                 jake.kramer@faegredrinker.com
                                   jessica.maziarz@faegredrinker.com
 6                                 rachel.beck@faegredrinker.com
                             1500 K Street NW
 7                           Suite 1100
                             Washington, DC 20005
 8
                             By:  DAVID R. MERRITT
 9                                 JOSHUA TODD PETERSON
                                   Attorneys at Law
10                                 david.merritt@faegredrinker.com
                                   josh.peterson@faegredrinker.com
11                           2200 Wells Fargo Center
                             Minneapolis, MN 55402
12
                             Buchanan Law Firm, PC
13                           By:  JERRY A. BUCHANAN
                                   Attorney at Law
14                                 jab@thebuchananlawfirm.com
                             P.O. Box 2848
15                           The Corporate Center, Suite 614
                             233 12th Street
16                           Columbus, GA 31902

17   For the Defendant:       Hunton Andrews Kurth, LLP
                             By:  ROBERT T. QUACKENBOSS
18                                 Attorney at Law
                                   rquackenboss@huntonak.com
19                           2200 Pennsylvania Avenue NW
                             Washington, DC 20037
20
                                   MICHAEL R. SHEBELSKIE
21                                 KEVIN S. ELLIKER
                                   Attorneys at Law
22                                 mshebelskie@huntonak.com
                                   kelliker@huntonak.com
23                           Riverfront Plaza, East Tower
                             951 E. Byrd Street
24                           Richmond, VA 23219

25
```

(Jury voir dire, when transcribed, will be filed under seal and separate cover.)

(Jury panel out at 12:13 PM.)

(The jury trial resumed at 12:13 PM.)

THE COURT: Okay. Do y'all anticipate -- let them get out here.

MR. KRAMER: Sorry, Your Honor.

THE COURT: I spoke prematurely. They were still the courtroom. I am going to let them clear out of here and then I've got a question.

Does the plaintiff anticipate using depositions this afternoon? Are you going to get to your deposition testimony this afternoon?

MR. KRAMER: Not today, Your Honor.

THE COURT: Okay. We will take up your deposition dispute at the end of the day today, and hopefully get it resolved so that it will be resolved prior to tomorrow morning.

Okay. You may go. We will see you back here for your opening statement at 2 PM. I have got these other lawyers. I don't think they will mess with your stuff. They just -- I think you can leave your stuff there.

MR. KRAMER: Certain of that. But may I raise one issue, Your Honor?

THE COURT: Yes, sir.

MR. KRAMER: We heard the Court say at the pretrial

conference that there should be one corporate representative per side.  The plaintiffs, having invoked the rule prior to trial, I believe we have two sitting at the defense table, and I wanted to raise that because it would seem to be inappropriate.

THE COURT:  Who are the trial representatives from the defendant?

MR. SHEBELSKIE:  Amy Allen is the representative of the corporate defense.  She is an officer of several of those corporations.

Mr. Erickson has been sued as an individual.  The corporations are entitled to a representative, Your Honor.

THE COURT:  I hadn't researched it, but I think Mr. Erickson, obviously, is allowed to be at counsel table.  And you sued all of these corporate entities.

I am going to let her stay.  She can -- who exactly is she a corporate officer of?

MR. SHEBELSKIE:  She is a vice president of finance and secretary of about six of them.

THE COURT:  All right.  All right.  She can stay as their representative.

MR. SHEBELSKIE:  Thank you, Your Honor.

THE COURT:  We will see you back here at 2 o'clock.

MR. KRAMER:  Thank you, Your Honor.

THE COURT:  With opening statement.  30 minutes each side for opening.

1          (Pause in proceedings 12:16 PM.)

2          (Proceedings resumed at 1:59 PM.)

3              THE COURT:  Be seated.

4              Are we ready for the plaintiff?

5              MR. KRAMER:  Yes, Your Honor.

6              THE COURT:  Defendants ready, too?

7              MR. QUACKENBOSS:  Yes, Your Honor.

8              THE COURT:  We will bring the jury down.

9              I have a few more preliminary instructions and then

10   y'all will be recognized to give your opening statement.

11             We need to -- we have two juries.  We are a little

12   stretched thin, but we will do it.

13             Who is going to give the opening for the plaintiff?

14             MR. KRAMER:  That would be me, Your Honor.

15             THE COURT:  For the defendant?  Mr. Quackenboss?

16             MR. QUACKENBOSS:  Mr. Quackenboss.  Yep.

17             THE COURT:  All right.

18         (Pause in proceedings.)

19         (Jury in at 2:02.)

20             THE COURT:  Okay.  Ladies and gentlemen, looks like

21   everybody made it back.

22             Thank you for being on time and being punctual.  That

23   way we will get this case moving along as efficiently as we can.

24             Before I recognize the lawyers to give their opening

25   statements, I wanted to give you a few more instructions,

1   preliminarily, that may be helpful to you as you settle in as

2   the jury that's going to try this case.

3          You see all of these people in this courtroom and I

4   know it can be a little awesome for you to wonder what all of

5   these people are doing.  And I want to take a moment to explain

6   the role that everybody is going to play here in this trial.

7          First of all, seated here in front of me you probably

8   already met Mr. Gunn, or you will meet Mr. Gunn.  He is the

9   courtroom deputy clerk and he is going to assist with being the

10  custodian of all the exhibits, if there are any exhibits that

11  are admitted, and he is going to help take care of y'all the few

12  days that you will be here.

13         We have the court reporter here seated next to

14  Mr. Gunn, and she is trying to take down everything word for

15  word as it is spoken.  We may need a transcript of these

16  proceedings after it's all over, and she will be able to type

17  that up in case we need that.

18         I do want to caution you, however, that she will not

19  have certified transcripts available during the trial, so you

20  should not count on her to be providing you with any kind of

21  transcript of what somebody testified to.

22         When you begin your deliberations, you will have to

23  base your decisions on what you recall the witness having

24  testified to, and you will be unable to send a note down that

25  says, Judge Land, we saw that court reporter typing up what that

1  person said.  Can you send a transcript up for us to review?

2          We won't have it certified in time to do that, so I

3  don't want you to be lulled into a false sense of security

4  thinking that you will have that transcript available to you.

5  You will not.

6          This is one of my law clerks over here, and she will

7  assist me when I need it from time to time with legal research

8  and that type of thing.

9          Of course, we have the parties and the lawyers out

10  here.  The plaintiff, who has the burden of proof in the case,

11  they sit in the table in the front, so that's the lawyers and

12  the parties for the plaintiff seated there.

13          Obviously, their job is to represent their client and

14  assert the claims, to ask questions of witnesses, to call

15  witnesses, and to admit exhibits or proffer exhibits for

16  admission.

17          And seated behind them are the defendants and the

18  defendants' lawyers, and they obviously have the same duty to

19  represent their client as zealously as they can in this case.

20          You have already seen the court security officers.

21  They help escort the jury and provide security for us while the

22  trial is ongoing.

23          That leaves you and me.  Your role is the most

24  important, so I am going to leave that for last.

25          My role, during the trial, is to preside over the

1    trial and to make sure it proceeds in an orderly fashion.  And

2    the reason that's important is because I believe the more

3    orderly we can proceed, the more intelligible the evidence will

4    be for you and the easier it will be for you to understand the

5    evidence and what's happening in the courtroom.

6           So I will be here.  I will preside and orchestrate the

7    trial to make sure it moves forward in an orderly manner.  And I

8    will also do so following what's known as the Federal Rules of

9    Evidence.

10          We can't just throw evidence at you.  The parties

11   can't just say anything they want to.  The Court is controlled

12   by these federal rules of evidence which are designed to get you

13   the most reliable evidence that you can have to decide the case

14   that you have to decide.

15          The way the federal rules of evidence are enforced is

16   if a question was asked, or an exhibit is tendered, that a

17   lawyer for one parties does not believe it is consistent with

18   the federal rules of evidence, and they alert me to that, so I

19   can then make a ruling as to whether that evidence should or

20   should not be heard or seen by you.

21          The way they do that, and you have probably seen this

22   on TV, or I guess we call it streaming now.  Nobody watches TV

23   anymore, do they?  But you have seen shows where you see lawyers

24   jump up and object.  So you may see that during the trial from

25   time to time.  The lawyers, if they believe somebody is being

1  tendered or trying to be admitted that's inconsistent with the

2  federal rules of evidence, the way they alert me to that is to

3  say that they object to the evidence.

4        Then I will know that I need to make a ruling as to

5  whether or not that evidence should be heard by you or not.

6        Now, I may rule that it's admissible and that I agree

7  with -- well, if I agree with their objection, you will hear me

8  say it's sustained.  That means I agree with their objection.

9        So they have objected to something being admitted.

10 They don't think it should be admitted under the federal rules

11 of evidence.  And you hear me say, "sustained," that means you

12 will not hear that evidence because I found that it should not

13 come in under the federal rules of evidence.

14       If I disagree with their objection, I will typically

15 just say that their objection is overruled, and then you will be

16 able to hear the evidence or see the evidence if it's some type

17 of physical exhibit.

18       Most of these objections can be taken care of at the

19 moment they are made, or shortly thereafter, and I will rule

20 from the bench.  But, occasionally, there may be something

21 that's more complicated, they may require some additional

22 argument that you should not hear, and if that happens I will

23 excuse you to the jury room while that objection is decided.

24 But that should be kept to a minimum.

25       So that's my role is to -- and at the end of the case

1   I have got a further duty, and that will be to tell you what the

2   law is that you must apply in deciding this case.

3          Then that bring us to you, and you have got the most

4   important job of anybody here.  That's because you have to

5   decide this case when you render a verdict.

6          It will be up to you to listen to the evidence and to

7   listen to my instructions to you on the law.  And then at the

8   end of the case render a verdict that all 12 of you agree to.

9   It has to be unanimous as to who prevails, what claims they

10  prevail on, and what your final verdict is.

11         So that's your job.  You have got to -- you have got

12  to resolve these disputed facts.  You are the fact finder.  If

13  there is some fact that's in dispute, the party that's asserting

14  the claim has the burden of proving those facts to you, and

15  proving the claim to you, and you have to decide.  Not the judge

16  or anyone else.  You have got to decide whether the party

17  asserting the claim has proven that claim.

18         Now there is a burden of proof.  We don't just out of

19  thin air say, I decide this fact or not, or decide it this way

20  or that way.  The party that asserts the claim, that brings the

21  claim -- in this case it would be the plaintiffs on the claims

22  that they assert, and then it would be the defendant on any

23  counterclaims that he asserts -- but whoever has the burden of

24  proof, that burden of proof, in a civil case such as this one,

25  is that the claim must be proved by a preponderance of the

1    evidence.

2            You have probably heard in a criminal case that the

3    guilt of the defendant has got to be proved beyond a reasonable

4    doubt.  That is not the standard in a civil case.  The standard

5    in a civil case is lower than the standard for burden of proof

6    in a criminal case.

7            Preponderance of the evidence, which is the burden in

8    this civil case, simply means that the person asserting the

9    claim, or the parties asserting the claim, has to prove that

10   it's more likely true than not true.

11           That's what preponderance of the evidence means, and

12   that's the burden of the party asserting the claim in this type

13   of civil case.

14           Now you will be permitted to take notes if you wish to

15   do that.  You have got those note pads there in your chair.  I

16   want to make sure no one feels pressured to take notes.  Some

17   people are better note-takers than others.  But I will tell you

18   at the end of the trial that one juror's notes are entitled to

19   no greater weight than the recollection of the evidence by any

20   other juror.

21           And I also want to caution you about getting too

22   involved in taking notes and losing sight of what happens in the

23   courtroom.  Sometimes when we are taking notes, if we are not

24   trained transcriptionists, we will be taking a note on something

25   that happened three or four or five minutes ago and we may lose

1    sight of exactly what's happening in the courtroom at the time

2    you're taking that note.  So I want to urge you that if you do

3    take notes, to still try to make sure you pay attention to

4    what's happening at each moment during the trial.

5         You are the only persons who will decide the

6    credibility of witnesses.  They will come to this witness stand.

7    They will swear to tell the truth, and you have got to evaluate

8    their credibility.

9         You can evaluate that by listening to what they say,

10   but you can also evaluate that by watching how they say it, just

11   like you would in everyday life.  You can look at a witness's

12   body language.  You can look at how they answer questions.  You

13   can look at how they hesitate.  You can look at all of those

14   things in deciding whether you think that witness is credible or

15   not.  And if you have your nose in that notebook writing

16   something that happened five or ten minutes ago, and you are not

17   watching that witness as they testify, you may lose sight of

18   that.

19        It's up to you to evaluate that credibility.  You are

20   the sole judges of the credibility of any of these witnesses.

21        The way the case will proceed, as far as the order of

22   the trial, is the plaintiffs in the case have the burden of

23   proof.  They will go first.  They will give -- their lawyer will

24   give their opening statement, which is just a statement from the

25   lawyer as to what they think the evidence will show.  And then

 1    the defendants' lawyer will be able to give an opening statement

 2    on behalf of the defendant.

 3            What the lawyers say in the case is not evidence.  The

 4    evidence is sworn testimony and exhibits that may be admitted by

 5    me into evidence.  So if the evidence, through the testimony or

 6    through the exhibits, is different from what the lawyers say,

 7    then you have got to decide the case on the evidence and not

 8    what the lawyers say.

 9            But it is important for the lawyers to have that

10    opportunity to tell you what they think the case is about, and I

11    encourage you to give them your full attention during their

12    opening statements.

13            After the opening statements have been completed, the

14    plaintiffs will put up their evidence by starting to call

15    witnesses and put up exhibits.

16            When they have finished, they will rest their case and

17    then the defendant will have the opportunity to put up their

18    evidence in the case.

19            When all of the evidence has been admitted, at that

20    point the lawyers will come back to you and they will make

21    closing arguments, where they will argue to you what they think

22    the evidence has shown and why they think they have carried

23    their burden of proof and why they think the other side may not

24    have carried their burden of proof.

25            When that is done, I will instruct you on the law that

1    you must apply, and then you will go to the jury room and begin

2    your deliberations in hopes of reaching a verdict.

3        At this time, ladies and gentlemen, I am going to

4    recognize the lawyers to give their opening statements.

5        First of all for the plaintiffs, Mr. Kramer, you are

6    recognized at this time to give the opening statement for your

7    clients.

8        MR. KRAMER:  Thank you, Your Honor.

9        Members of the jury, my name is Jake Kramer.  We met

10    this morning.  Nice to see you again.

11        I am here on behalf of American Southern Homes, the

12    plaintiff in this case.

13        Thank you for being here.

14        Ladies and gentlemen, this is a case about the harm

15    caused by broken promises and broken contracts.  In particular,

16    promises made by the defendant, Mr. David Erickson, when he sold

17    his business, Grayhawk Homes, to ASH in 2019.

18        When he did that, he entered into a contract called

19    the Land Purchase Agreement, which is really the main event in

20    this case, in which he promised to sell -- to develop and sell

21    approximately 1600 finished building lots to ASH over a period

22    of more than seven years.

23        But after about two years, the evidence will show,

24    Mr. Erickson stopped doing that.  He stopped selling those lots

25    to ASH, which were meant to guarantee the future of the business

 1  that he was paid handsomely to acquire.

 2          Now, why did this happen?  Well, I think you're going

 3  to hear a lot of excuses in this case for why Mr. Erickson

 4  stopped selling those lots to ASH, and it will be up to you to

 5  evaluate those.  But what you won't hear is that my client, ASH,

 6  breached the Land Purchase Agreement.

 7          What the evidence will show is that for some people

 8  enough is just never enough.

 9          With that preview, let me show you some of the

10  evidence that we will put on during this trial so you can begin

11  to understand what happened here and begin to form your

12  conclusions.

13          As I said, I represent ASH.  Up on the screen you see

14  Lee Darnold.  He is the CEO of ASH.  He will be here to testify

15  in the next couple of days.

16          ASH, as the Judge told you this morning, is in the

17  homebuilding business.  ASH operates companies in Prescott,

18  Arizona, Huntsville, Alabama, and here in Columbus, with a

19  headquarters in Reston, Virginia.  And what ASH does is it

20  builds high-quality, affordable homes for first-time homebuyers.

21          ASH entered this market by buying Grayhawk Homes.  You

22  can see the logo underneath, maybe you have seen the signs in

23  the area, when it purchased Mr. Erickson's business in 2019.

24          Mr. Erickson is the defendant in this case, and there

25  is also a number of other defendants.  You heard the names this

1   morning.  These are all companies, the evidence will show, that

2   were formed to hold land.  The same land that Mr. Erickson

3   promised to develop and turn into a pipeline of 1600 finished

4   building lots over a period of more than seven years.  That's

5   why those companies are all defendants in this case.

6          You will also hear from members of Mr. Erickson's team

7   who are going to testify on his behalf.  That includes his wife,

8   Rose Anne Erickson, who is a realtor in the community, and as

9   part of the deal with ASH, when he sold his business, she stayed

10  on as the realtor for ASH-Grayhawk following the acquisition.

11         You will hear from four long-time employees of

12  Mr. Erickson, or some of them at least:  Amy Allen, who is

13  sitting at the table next to him; Kathy Long, Jason Betts, and

14  Judy Johnson.

15         You may also hear from Chuck McClure, who Mr. Erickson

16  employed in the process of developing lots.

17         Now what does that mean?  The evidence will show that

18  this process of developing lots starts with an empty field, or a

19  forest, or some tract of land -- trees, brush, rocks.  Needs to

20  be cleared away.  There is no infrastructure.  It's just raw

21  land.  That's the term you will hear throughout the course of

22  the case.  And it's developed into a subdivision, a

23  neighborhood.  That's what Mr. Erickson promised to do.  To

24  clear it.  To level it.  To put in streets.  To put in

25  utilities.  Cable TV, Internet, all of that stuff that people

1    use in their homes.

2           And then the deal was he was going to sell the

3    finished lots to ASH and ASH was going to build lots in the

4    community.

5           The acquisition occurred on November 15, 2019.  And

6    there were a number of contracts that the parties signed at the

7    time, and ASH is essentially here to enforce those contracts.

8           One was the Land Purchase Agreement.  That's the

9    agreement in which Mr. Erickson promised to give 1600 finished

10   lots over a period of more than seven years.

11          Another was the Asset Purchase Agreement.  That's a

12   contract whereby he sold the assets of the Grayhawk business to

13   ASH so it could continue on the business as it had been running

14   previously.

15          Trademark Assignment Agreement.  Of course, if you buy

16   the business, the logo comes with it, so Mr. Erickson promised

17   to sell the trademark as well and to stop using it.

18          And a Consulting Agreement.

19          Now, when Mr. Erickson sold his business, he got

20   involved with ASH, including as a consultant, and he agreed to

21   stay on and advise on operations here in Columbus.  And also,

22   very importantly, to help ASH find other homebuyers to acquire

23   and look at these deals and assist in that process.

24          And in that contract, though, he agreed to keep

25   confidential any of the non-public information that ASH gave him

1    access to, which was quite a trove of information.

2            So these are the contracts that contain Mr. Erickson

3    promises, and you will see those throughout the course of the

4    trial.

5            What did Mr. Erickson get?  The evidence will show ASH

6    paid him $17.8 million for the book value of the company.

7    That's, essentially, how much are the assets of the company

8    worth, and that was 15.8 million in cash, and 2 million of that

9    was units or shares in American Southern Homes.  Those shares

10   are now worth more, the evidence will show.

11           He also received something called a "premium".  This

12   is the sweetener or the profit that goes on top of the value of

13   the company.  And he has been paid $6.4 million, essentially,

14   for the right to acquire those 1600 finished lots in the future.

15           About 4 million of that premium was paid in ASH units

16   which are now worth more.

17           So you put it together, factor in the value of the

18   units today, and we are talking about $26 million.

19           That's not all.

20           In the two years after this deal, ASH bought land from

21   Mr. Erickson, and in the process paid him another $25 million,

22   approximately.

23           So what did ASH get?  Well, I have told you about the

24   land pipeline.  ASH paid 6.4 million for the right to buy that

25   land for seven years, or more, until it was gone.  Cut off after

```
 1   two years.
 2            Lots.  That's the 25 million.  Supposed to be 1600
 3   lots.  So far fewer than 600.
 4            The business.  $17.8 million.  That's the book value.
 5   But, ladies and gentlemen, the evidence will show if you buy a
 6   homebuilding business in Columbus, and you are unable to buy
 7   finished lots in Muskegee County, because Mr. Erickson owns all
 8   of them, or nearly all of them, and won't sell them, it's not
 9   much of a business.  You can't build houses in the air.  You
10   need land.  You need lots.
11            So now one of these acquisitions -- there is two
12   pieces, one is the land, one is the people.  Don't have the land
13   and the people are essentially gone.  The people who worked at
14   Grayhawk at the time of the acquisition aren't around anymore
15   because there hasn't been houses to build to keep them busy and
16   employed.
17            And there has been reputational damage.  I told you
18   that Mr. Erickson promised not to use the Grayhawk name and logo
19   anymore.  Well, he carried on doing that, the evidence will
20   show, in Atlanta and in South Carolina, despite the promise to
21   stop after the acquisition.
22            So let me give you a little more background on how we
23   went from there to here.
24            First year after the acquisition I told you
25   Mr. Erickson was a consultant for ASH.  Well, he was also an
```

1    owner.  He owned $6 million in shares in the company at the

2    time.  And he was a member of the Board.  In fact, the evidence

3    will show he became a member of the executive committee of the

4    Board of Directors, the people who lead the company and make

5    decisions.  ASH placed a lot of trust in him.

6            During this first year he was selling lots and ASH was

7    buying lots.  In fact, the evidence will show Mr. Erickson

8    encouraged ASH to buy more than the minimum number of lots he

9    had agreed to sell, and ASH was happy to take down as many as it

10   could absorb.  "Take down," in the parlance of homebuilding,

11   means to buy a lot.  To take it down.

12           But then things went sideways.  The evidence will show

13   that after about a year Mr. Erickson pushed to become the

14   interim CEO of ASH, to become the leader of the entire company.

15   He was an investor.  He was a Board member.  He was on the

16   executive committee.  And the evidence will show he promised to

17   invest more in the company.  So he got that job and he removed

18   the people who were in charge when the company bought Grayhawk

19   from him.

20           He was supposed to do this on an interim basis for a

21   few months until ASH was able to find a permanent CEO who could

22   lead the company into the future, but almost -- just a week,

23   couple of weeks, very soon after he got this interim CEO job, he

24   started to push for the permanent job.  He wanted to be the

25   leader indefinitely.

1        ASH said, No.  Decided, Sorry, that's not what we

2   agreed.  We really appreciate you serving as interim CEO.  And

3   the evidence will show he was informed, We'd like you to keep on

4   keeping on in that role, but we're going to look for somebody

5   else to be the permanent CEO.

6        Well, the evidence will show that didn't go over very

7   well and Mr. Erickson lashed out.

8        He quit on December 20, 2020.  He resigned as the

9   interim CEO.  And by the end of 2021, he was done selling lots

10  to American Southern Homes and to ASH-Grayhawk here in Columbus.

11        Let me show you some of the evidence:  December 15th,

12  this is when some of the Board members at ASH got together,

13  looked at what Mr. Erickson was asking for in exchange for being

14  the permanent CEO, and made the decision that they weren't going

15  to support it and instead, We're going to do what everybody said

16  they were going to do, which was make Mr. Erickson temporary CEO

17  until they could find somebody else to lead the company into the

18  future.  So they let him know.

19        At first it went over well.  Here is a letter

20  Mr. Erickson sent the next day.  He says: I shall continue to

21  serve as interim CEO between now and February 28, unless

22  informed to discontinue sooner.  I am disappointed in the

23  decision to end my role as CEO, but fully understand the

24  thinking involved.

25        Okay.  Four days later, December 20, Mr. Erickson had

1    just promised to stay on as the interim CEO.  Now he says,

2    Clearly the Board of ASH does not have confidence in my filling

3    the role of CEO for ASH.  As such, I am resigning effective

4    immediately as interim CEO.

5            Four days after he promised to stay on.

6            Additionally, I am hereby resigning from the Board of

7    Directors for ASH effective immediately.  Obviously, I remain a

8    shareholding member of ASH.

9            And then he says something else:  In the past year I

10   have developed ambitions to do more things in the homebuilding

11   and development business, and feel that my Board

12   responsibilities with ASH are likely to constitute conflicts of

13   interest with those goals and possibilities.

14           He didn't say what he was up to, or what he had in

15   mind, but he said it would be a conflict of interest.  Remember

16   that.

17           That brings me to the first claim, which is breach of

18   the Consulting Agreement that Mr. Erickson signed when he sold

19   his company in which he promised to keep secret the non-public

20   information ASH gave him access to in this role.

21           Here it is.  As I said, he was working on operations

22   and acquisitions.  He was paid, on top of the money he had

23   already received, $48,000 a year to work 16 hours per month,

24   another $250 an hour on top of that, and $1500 for a travel day

25   if he got on a plane to go somewhere.

1            In exchange he promised not to use that non-public

2    information for himself.

3            There it is.  This is the confidentiality term in the

4    Consulting Agreement.  You will see this in the trial.  It says

5    right there in yellow:  Non-public proprietary and/or

6    confidential information relating to the business and affairs of

7    the company and/or ASH.

8            "Non-public," just means it's not public.

9            December 22nd.  Mr. Erickson has now quit as the CEO.

10    He has quit as a member of the Board.  ASH sends him a letter.

11    Asks him to refrain from providing any consulting services.

12            Now, it didn't cancel that agreement with the

13    confidentiality clause in it and it kept on paying Mr. Erickson,

14    but it just asks him to stand down under the circumstances.

15    Evidence will show that didn't go over very well.

16            Right after that Mr. Erickson went out on his own,

17    without telling ASH, and started trying to buy some of the same

18    companies that he had been working with ASH to try to buy, that

19    ASH was investigating, had confidential information from, and

20    had given him access to.

21            In the process he copied documents from ASH.  He used

22    the same deal terms that ASH had negotiated and offered them on

23    his own to these companies.

24            He copied a due diligence list that ASH had put

25    together.  What's due diligence?  That's the process of getting

1    enough information to understand whether it makes sense to buy a

2    business.

3            He tried to hire away Mr. Lee Darnold, who is now the

4    CEO of ASH whom he had interviewed just before he quit.  And in

5    the process, he sent Mr. Darnold a business plan for a new

6    venture called Grand Oak Builders that he was starting up, and

7    some of that business plan, the evidence will show, was copied

8    from a document used by ASH.

9            I'm just going to show you some examples now, in the

10   interest of time:  December 23rd, this is the day after

11   Mr. Erickson was told to stand down as a consultant, here is an

12   email:  NDA, that means non-disclosure agreement, Miramonte.

13   That's a company that ASH had been trying to acquire when

14   Mr. Erickson was the interim CEO.  9:21 AM, he sends an NDA on

15   December 23rd.  Here it is.

16           Actually the one on the left here is not the NDA

17   Mr. Erickson sent.  That's ASH's version of the document.  The

18   one on the right is the version he sent.  The evidence will show

19   it's essentially the same.  Aside from the handwriting and the

20   first paragraph he changed the name "ASH" to the name "Erickson"

21   and used it for himself.

22           Here is the page 3 of the NDA.  But Mr. Erickson made

23   some mistakes in his copy-and-paste operation, and you can see

24   he left the word "ASH" in the version he sent out to Miramonte.

25   Not once, but twice on page 3., and again on page 4.

1          Then 11 minutes later, he sent the same thing to a

2     company called Prominence Homes, which ASH had also been trying

3     to acquire while he was the CEO.

4          NDA:  Prominence.  Erickson.  Once again,

5     December 23rd, 9:33.

6          Two hours after that he sends it again to a company

7     called Surrey Homes in Florida that ASH had been trying to

8     acquire.  Same NDA.  It says "ASH" in it three different times.

9          Here is what he wrote to the owner:  As the winds of

10    change have occurred, I find myself a free agent to pursue

11    building and development opportunities.  Please find attached a

12    new NDA for myself and Surrey Homes.  I am putting together a

13    company to assemble homebuilders and would like to re-look at

14    Surrey as one of our first targets.

15         Same day he's trying to recruit Mr. Darnold, sends him

16    a copy of new business plan.  And as I said, the evidence will

17    show some of this is copied from a confidential document that

18    ASH gave to him.

19         Then a week later he sends another letter to ASH.  Now

20    remember, all he had said so far is "conflict of interest."

21         Now he gets specific:  I have developed ambitions to

22    do more things in the homebuilding and development business.

23    Specifically, I am intending to purchase one or more

24    homebuilding companies in the near term for my own investments.

25         That's what ASH does.  And this is a week after he had

already started sending ASH's documents out to three companies that ASH had tried to acquire.

Due diligence checklist.  He is still at it on February 2nd.  The version on the left is an ASH version that it gave him in the course of buying a company called Dorn Homes right before he quit.  The version on the right is something he sent to Prominence Homes on February 2nd.

Now you will hear Mr. Erickson testify, I think, that there are no similarities between these documents except they are written in the English language and they are bullets.  It will be up to you to decide, ladies and gentlemen.

That bring us to the main event:  Breach of the Land Purchase Agreement.

There is Mr. Erickson's signature at the end on behalf of himself, individually, and all of the sellers.  If you look at the language underneath, you can see all of those companies that he formed to own the land and hold the land that he promised to sell to ASH that are defendants in the case.

So, as I said, Mr. Erickson and these companies, they agreed to develop and sell these 1600 lots over a period of more than seven years.  It was the centerpiece of the acquisition. The evidence will show this is what ASH paid for.  This is why ASH came to Columbus to build houses for people in this community.  A pipeline of finished lots so there would be a future.  That was the $6.4 million premium, plus another

1    $25 million after the deal to buy land from Mr. Erickson.

2              And ASH -- the right -- what it says in the contract

3    was ASH gets to take down or buy these lots every quarter and

4    Mr. Erickson has to deliver them.  Let me show you.

5              Section 6.  This is what we say Mr. Erickson breached.

6    It's a long contract.  First sentence right there:  Seller is

7    required to develop the lots in accordance with this agreement

8    and to meet the requirement of the Takedown Schedule.

9              That's what Mr. Erickson failed to do.

10             Here is the Takedown Schedule.  I'm not going to spend

11   a lot of time on it.  It distinguishes between different types

12   of lots.

13             This case is really about Phase C lots, which were raw

14   land at the time of the acquisition and were supposed to be

15   ready to buy in about two years.

16             You can see right here every quarter starting -- a

17   quarter is just three months of the year -- starting by the end

18   of September 2021, ASH is supposed to get 15 Phase C lots a

19   quarter.

20             And at the bottom box it shows what the obligations

21   are for years one through seven until all of those lots are

22   purchased and gone.  That's what was promised.

23             December 17, 2021, Mr. Erickson, through his counsel,

24   writes a letter and he says:  This is in response to

25   ASH-Grayhawk's request to take down lots on December 20.  The

1    Land Purchase Agreement is terminated and Mr. Erickson's

2    obligations thereunder are extinguished.  Accordingly,

3    Mr. Erickson will not deliver any further lots to ASH-Grayhawk.

4            You are not going to see any evidence in this case

5    that Mr. Erickson effectively terminated the Land Purchase

6    Agreement.  This is an excuse, maybe the biggest one you will

7    hear.

8            But ASH didn't just run to court.  Here is a letter

9    December 30, 2021:  In your December 17 letter you stated that

10   Mr. Erickson will not deliver any further lots to ASH-Grayhawk.

11   Such refusal to deliver and sell lots is a breach of Section 6

12   of the LPA.

13           That's that sentence I showed you in which

14   Mr. Erickson promised to sell lots under the Takedown Schedule.

15           And ASH says:  We respectfully urge Mr. Erickson to

16   reconsider.

17           He does not, and that's why we are here, ladies and

18   gentlemen.

19           Here is the Takedown Schedule all the way through the

20   end.  In yellow you see how many lots Mr. Erickson was supposed

21   to supply every month.  I know it's hard to read.  We will blow

22   it up and show it to you again later on.

23           ASH alleges there was a second breach of the Takedown

24   Schedule.  Section 10:  Seller is required to -- well, I told

25   you this case is about Phase C lots.  The parties each agreed

1  that they would figure out the order in which specific Phase C

2  lots will be developed in the first year after the deal closed.

3  That didn't happen.

4        The evidence will show ASH tried to agree.

5  Mr. Erickson refused to negotiate.  And instead he waited and

6  tried to terminate the Land Purchase Agreement as an excuse to

7  not deliver lots.

8        The only question you will be asked at the end of this

9  case, ladies and gentlemen, about the order of Phase C lot

10  development, is whether Mr. Erickson breached.  There is no

11  claim that ASH is in breach of this provision.

12        What happens as a result of this?

13        Well, coming out of the pandemic, in late 2020 into

14  2021, the evidence will show the market was hot.  There were

15  people looking for houses in this area.  But ASH couldn't build

16  them.  Couldn't meet that demand.  There was a shortage.  But

17  you can't build houses without land.

18        ASH didn't have the lots that Mr. Erickson had

19  promised to supply.  Had to lay off employees because it had a

20  shrinking business without the land.

21        Harm in the area.  The skilled trades, the people who

22  actually build the houses, less work.

23        The people who supply the materials, fewer materials

24  to sell.

25        People looking for homes, fewer homes to buy.  And

realtors who make a living selling houses, fewer houses to sell.

You will hear from an expert witness, David Duffus, who has come in and looked at the financials and the situation and calculated the loss profits resulting from this refusal to sell land.  It's a big number.  It's almost a thousand lots that are owed over a seven-year period.  Starts at $374 million, but you take that down to profit margin, goes down some more, and then subtract mitigation efforts.

What's that?  Those are efforts by ASH to go out and try to reduce its damages, to try to avoid some of the harm.  And the evidence will show ASH did that, as best it could.  Couldn't find any finished lots in Muskegee County because Mr. Erickson owned them, or nearly all of them, but found some lots elsewhere.

So we take $5.68 million, off the number, that takes us down to 70.  And then we discount it to present value.  What does that mean?  A dollar today is worth more than a dollar tomorrow.  Comes out at $48.76 million.

Those are damages that ASH is looking for in this case because of Mr. Erickson's failure to keep his promise.

There is one more claim for trademark infringement.  This is the name and the logo that I mentioned already.

Mr. Erickson sold the worldwide rights to the trademarks at ASH-Grayhawk.  In the Asset Purchase Agreement he agreed to change the name of all of his companies that were

1    called Grayhawk Homes to something else within ten business days

2    after this deal closed or everybody sat down at the table and

3    signed the contracts.

4              There it is in the contract.

5              And the purpose of this, the evidence will show, is so

6    people don't get confused.  If they buy a house from Grayhawk

7    Homes in Atlanta, or Grayhawk Homes in South Carolina, they are

8    not confused and think that Grayhawk Homes in Columbus built the

9    house.

10             Here is some evidence:  When did Mr. Erickson change

11   the names of these companies?  The first Grayhawk Homes, Inc. at

12   the end of 2019, December 31st.  That's more than ten business

13   days after November 15th.

14             Grayhawk Homes of Atlanta, not until January 19, 2021.

15   That's more than a year.

16             Grayhawk Homes of South Carolina, not until

17   February 2nd, 2021.  Also more than a year.

18             Here is an example of what was being advertised by

19   Mr. Erickson at his Grayhawk Homes of Atlanta operation on

20   November 16, 2020, just about one year after he promised to

21   change the name in ten business days:  Grayhawk Homes of Atlanta

22   selling a house, and the logo is right there.  The only

23   difference is it says "of Atlanta" in little words underneath

24   the logo.

25             So Mr. Erickson kept using that name.  And, in fact,

1    here is some evidence.  This is an email he sent February 18th,

2    2021, when he finally gets around to telling his people in

3    Atlanta, Remove the Grayhawk name wherever it's displayed.  That

4    was supposed to happen at the end of November 2019.  Here it is

5    February 18, 2021.

6              Another broken promise, ladies and gentlemen.

7              What's the result?  Confusion.  Here is a YELP review

8    under the Grayhawk name.  That's on ASH's name.  One star.  And

9    how do we know that ASH didn't build this house?  It's in

10   Bluffton, South Carolina.  Doesn't build houses there.  ASH

11   doesn't builds houses in this area.  This a Grayhawk Homes of

12   South Carolina house producing this negative review for

13   ASH-Grayhawk here in Columbus.

14             In fact, given the impact of all this, ASH had to

15   change the name it was doing business under, here in the

16   Columbus area, from Grayhawk to Evermore Homes.  Eventually

17   rolled that out company-wide, but had to do it a year or two

18   sooner here.

19             So, ladies and gentlemen, these are the broken

20   promises:  Breach of the Consulting Agreement because

21   Mr. Erickson took non-public information, used it for himself

22   after he promised not to.

23             Breach of the Land Purchase Agreement, because he cut

24   off that pipeline of lots that was supposed to guarantee the

25   future of the business.

1          Breach of the Trademark Assignment Agreement, because

2     he continued to use the name and logo after he promised to stop.

3          At the end of this case I will come back and I will

4     ask you all to find Mr. Erickson liable on these three counts

5     and to award up to $48.76 million to my client, ASH, because of

6     the harm caused by the broken promises and the breached

7     contracts.

8          Thank you very much for your time and attention.

9          We look forward to presenting our evidence.

10         THE COURT:  Mr. Quackenboss, you are recognized to

11    give the opening statement on behalf of the defendants.

12         MR. QUACKENBOSS:  Thank you, Judge.

13         Good afternoon.

14         Ladies and gentlemen, my name is Bob Quackenboss, and

15    I am proud to represent Dave Erickson.  The actual Dave

16    Erickson.  Not the Dave Erickson that was just portrayed to you.

17         The actual Dave Erickson started, from scratch, a

18    homebuilding company here in Columbus.  Built it to be the

19    second largest homebuilding company in the region, and was

20    recognized as one of the leading homebuilding companies in the

21    country.

22         We are proud to defend this case on his behalf.

23         You met Mr. Erickson earlier today.

24         Amy Allen is also the vice president of finance of

25    some of his -- some of the companies that he began as part of

1    his homebuilding business.

2         Also at defense table, you met Mr. Shebelskie this

3    morning during the jury questioning.

4         Kevin Elliker.

5         And Grady Walters, is our tech support professional.

6         So let me dive right in and say that all of the

7    disputes that you just heard Mr. Kramer outline, the evidence

8    will show you, are attributable to one thing, and that is that

9    ASH, very shortly after it signed this Land Purchase Agreement

10   to buy Mr. Erickson's lots, decided the long-term commitment was

11   too expensive.

12        Everything that is occurring in this lawsuit is

13   because, and the evidence will show, they wanted a price

14   reduction.  They demanded a price reduction.  And when they

15   didn't get it, they decided to sue him for everything they could

16   come up with in a kitchen sink complaint until he cried "uncle."

17   And that is why we are here today.

18        The LPA allegations you have heard about, failure to

19   sell lots, are because they were demanding a significant price

20   reduction.

21        These trademark claims; what you didn't hear yet is

22   that these trademark claims caused zero dollar damage to them.

23   They didn't lose a contract.  They didn't lose a customer.  They

24   didn't miss the opportunity to build a home.  Why?  Because they

25   didn't build homes in South Carolina or in Atlanta.

1          The evidence will show that these confidentiality

2    claims -- Mr. Erickson stealing information -- the evidence will

3    show you that these forms Mr. Kramer spoke of, a NDA,

4    non-disclosure agreement, a due diligence checklist, the

5    evidence will show you that you, and I, and you and I, can pull

6    these things down off the Internet any time we want to.  They

7    are publicly available.  They are easy to find.  And they are

8    the equivalent of a pretyped shopping list.

9          The companies that Mr. Erickson is accused of having

10   improperly pursued, the evidence is going to show you that he

11   went well out of his way to make sure that ASH's interest in

12   those companies were done.

13         He sent letters.  He called brokers.  He did

14   everything within reason, even though he didn't have to, the

15   evidence will show you, to make sure that he wasn't stepping on

16   ASH's toes.

17         And why wouldn't he step on ASH's toes?  Because you

18   will learn that he was the second largest shareholder in the

19   company.  Why would he be motivated to undo ASH-Grayhawk's

20   profits and ASH's success?

21         He did everything he could to steer clear of stepping

22   on these toes, the evidence will show.

23         So why have those claims been brought, these zero

24   damage claims?  The evidence is going to show you that those

25   claims were brought exactly at the time that ASH decided they

couldn't afford the pricing structure under the LPA and they had
to take steps to get the price reduction.

Now, with that background, let me back up a bit and
tell you more about ASH.

ASH is not a homebuilding company. ASH is a company
that buys and flips other homebuilding companies. And in this
instance, Grayhawk Homes, that Mr. Erickson started, the
evidence will show you it was the second company that ASH bought
in part of a project to roll together four or five other
homebuilding companies around the country, manage them for a
year or two, and then quickly flip them in a transaction with a
SPAC.

And a SPAC is a term for a relatively recent
fast-track method of selling your company to Wall Street. It's
a Special Purpose Acquisition Company.

The claims that ASH is asserting in this case, you
will learn and the evidence will show, are because they have to
get the prices down in order to improve their overall finances
so that they can be attractive and picked up by a SPAC.

When that didn't occur, when Mr. Erickson wouldn't
lower the price, the evidence will show you that they began to
bombard him with an avalanche of meritless claims.

They accused him of price fixing on the lots in
Columbus.

They accused him of breaching development quality

1    obligations on the lots in Columbus.

2         The evidence will show you he has been developing lots

3    for 35 years, successfully, and ASH says he doesn't know how to

4    develop a lot.

5         The evidence will also show you that the next

6    avalanche of claims, included suggesting he was violating his

7    non-compete agreements, that he was violating copyright law, and

8    infringing on their copyrights.  And that he was infringing on

9    their trademarks and that he was stealing their stuff, these

10   NDAs, and these forms that we can find on the Internet.

11        So we've got lots, we've got trademarks, and we've got

12   stealing the info.

13        This is what is left of the avalanche of claims that

14   ASH put together in the lawsuit and filed it in June of 2021,

15   and that Mr. Erickson has been defending at great expense and

16   great burden for the last two plus years.  This is what you are

17   here to decide.

18        The evidence is going to show you that every single

19   one of them is because ASH demanded a price reduction that was

20   unreasonable, and now that they can't get it, they want you, the

21   jury, to get them out of Columbus, to get them out of this

22   contract, to get them out of this seven-year obligation.

23        The evidence will show you that they are now turning

24   their backs on the contract, even though Mr. Erickson, the

25   evidence will show, is continuing to develop his lots and sell

1   them to them.

2          The evidence is going to show you, contrary to what

3   you just heard, that, yes, Mr. Erickson paused in delivering

4   lots when he felt he had the right to terminate the contract.

5   But that he very shortly after that began delivering lots and

6   they began buying them.  And they continued to buy them until

7   very recently, until they decided that they want this jury,

8   instead, to release them from the contract obligations so that

9   they have no further seven-year commitment.  And the evidence

10  will show that you they are very likely to leave Columbus in

11  pursuit of larger markets, improve the finances for a SPAC.

12         Now, let me show you a couple of things that ASH

13  thought about Mr. Erickson, and said about Mr. Erickson, before

14  they decided his lots were too expensive:  A first rate person.

15  One of the Board of Directors members of ASH referred to him as

16  a "first rate person."

17         A member of the Board:  "Yes, anything for you, if you

18  want to speak at an inconvenient hour of the day."

19         "Erickson is electric," which they said about him when

20  he negotiated -- in just his brief time as the interim CEO, he

21  negotiated for them another very successful purchase of a

22  homebuilding company.  And, you know what, it's the last one

23  they got.  The evidence is going to show you that ASH, which is

24  supposed to be rolling up companies for an exit event, hasn't

25  acquired another company in three years since Mr. Erickson

1    acquired Dorn Homes for them.

2         Same event, when he accomplished this from the

3    chairman of the Board, "U da man.  Erickson the man.  Future of

4    the company."

5         That's what they thought of him because they knew what

6    he is capable of.  They knew he struck a smart deal with them.

7    But they also knew that they couldn't afford it.  Why?  Because

8    the evidence is going to show you that when you are interested

9    in a SPAC, that it's like flipping a house.  You don't make a

10   long-term financial commitment.  You are only looking for

11   short-term commitments.  Slap on a coat of paint, put a for sale

12   sign in the yard.

13        And when the SPAC fell through, which you are going to

14   hear about, when the SPAC opportunity did not materialize they

15   knew that they needed to get out of this seven-year obligation.

16        Now, Mr. Kramer did talk about the Land Purchase

17   Agreement, and I do agree with him that it's the centerpiece of

18   this case, because, as I said before, the evidence will show you

19   the whole case is about getting out of the pricing obligations.

20        Section 10 is very important, and you will note

21   Section 10 is an obligation of the parties within the first year

22   of the contract to agree on an order in which Mr. Erickson will

23   develop his unfinished C lots.

24        That is a provision that Dave needed badly.  It's a

25   provision that he wanted, because it was the only way he could

manage the development process.  A thousand lots.  And he has

got to put in sewers.  And the evidence is going to show you he

has to negotiate with the city.  And you will hear that there

are utilities and paving roads and putting in curbs.  You know

what?  You need some advance notice and you need a plan.  But

ASH would not commit to a plan and an order of developing his

thousand lots over seven years.

They wouldn't commit before they signed the contract.

He was gracious enough to give them a year extension the first

year of the contract.  They still didn't do it.

And the evidence is going to show you that the only

one who was asking to do it in the first year was Dave Erickson

because he needed it, and you are going to understand why.

And the evidence will show you that ASH didn't do it

because long-term commitment is not what we need with a SPAC

opportunity.

And, so, the timeline that Mr. Kramer showed you here

omits the very important deadline -- perhaps the most important

date in the case, which you haven't heard about yet -- the

one-year deadline, November 15 of 2020, when ASH was supposed to

agree to an order of development.  Didn't happen.  And you will

be asked to decide whose fault that was and who -- which party

was motivated not to commit.

Now, regarding the change of names here, again, the

evidence will show you on a claim that caused ASH no damage, one

1  of the terms that was not highlighted in Mr. Kramer's slide

2  show, is that the obligation to change names within ten days,

3  within the time deadline, only applies to affiliates of the

4  sellers.

5           And I promise you, this is the only contract busy work

6  I am going to show you.

7           Those terms are defined this way:  That an affiliate

8  is a person or party which has overlapping or common ownership

9  and is engaged in some aspect of the business.

10          What's the business?  Right below.  It's the Columbus,

11  Georgia business that Mr. Erickson started.

12          The companies he started in South Carolina and in

13  Atlanta had no obligation to change their names at all.

14          Did he do it anyway?  Yes, because it made some sense

15  to rolling up his businesses.  The evidence will show you that

16  it certainly made sense.  But were they obligated to do it?  No.

17          Regarding the logos Mr. Kramer showed you on these

18  building plans; what you didn't hear is that the people who

19  applied the logos that ASH is upset about are the employees of

20  ASH itself.  These are the people who pushed out these logos --

21  the company name -- on all of the construction paperwork that

22  Mr. Erickson was using.

23          Was he trying to discontinue the name and the logos

24  over time?  Yes.  But the company knew about it all along.  Its

25  own local staff knew about it.  And they were doing it.  And

 1   nobody in ASH ever told them to stop.

 2         And, again, the evidence will show you they didn't

 3   lose a nickel over this claim that they have brought.

 4         So I want to conclude -- well, before I conclude, I

 5   will say Mr. Erickson has asserted a counterclaim.  His

 6   counterclaim is that ASH terminated his Consulting Agreement

 7   with them using as an excuse all of these reasons that they cite

 8   in the avalanche complaint that they filed.

 9         Claiming that he breached a non-compete.  Claiming

10   that he is violating trademark copyright infringement, price

11   fixing, poor lot quality.  All of these claims we will show you

12   are baseless, meritless and did not properly support a

13   cancellation, termination of the Consulting Agreement.

14         And as a result he has suffered some monetary damages

15   which we will lay out for you.

16         So to conclude, I want to share a text message that I

17   think best represents what's happening here in the trial.

18   Mr. Erickson was very eager to resolve these disputes, even

19   negotiating, talking about the price reduction that ASH was

20   demanding.

21         On June 2, 2021, the parties were set to meet for a

22   negotiation to resolve everything, and it was his sincere hope

23   that that could be accomplished.  Well, nothing was

24   accomplished.  Nothing was agreed to.  Principally because ASH

25   was conditioning everything -- resolving everything within their

claims on a reduction in the prices under the Land Purchase

Agreement.  And you will see that that effort at negotiating was

a complete waste of time.  Because just a day before ASH met

with Mr. Erickson, the company had approved a no-negotiation

strategy with Mr. Erickson.

No negotiation of the C lot order.  No commitment

about buying his lots over seven years until and unless he

commits to a price reduction.

Here is an email from Mr. Darnold, who you heard about

earlier, the CEO of ASH, to Sean Coleman, one of the Board

members:  You are having an impact.  Marshall -- who is the

chairman of the board at ASH, and you will hear about him in

this trial -- Marshall is good with the no-negotiation strategy

for Erickson and is asking if we can do SK -- another

acquisition -- without a SPAC.  He is still going hard on SPAC

readiness, but acknowledging more and more that it is unlikely.

So in June the chairman of the Board is acknowledging

that the SPAC opportunity is a lot further away than they had

hoped.  And about ten days later they sue Mr. Erickson with the

kitchen sink complaint.

And here is what's left of it, ladies and gentlemen,

and this is why we are here:  To resolve these three remaining

disputes.

We promise on behalf of Mr. Erickson to move as

quickly as we can, as efficiently.  We have great respect for

1    your time and commitment.

2            Thank you for your attention.

3            We look forward to you meeting Mr. Erickson and

4    meeting our witnesses.

5            Thank you.

6            THE COURT:  Plaintiffs may call their first witness.

7            MR. KRAMER:  Thank you, Your Honor.

8            Plaintiffs call Mr. Ryan Twiss.

9            THE COURT:  Sir, come to the witness stand, please.

10           Stop right there for a moment.  Raise your right hand

11   and take the oath.

12           **RYAN TWISS, PLAINTIFFS WITNESS, DULY SWORN**

13           THE COURT:  Be seated and tell the jury your name and

14   spell it for the court reporter.

15           THE WITNESS:  Yes, sir.

16           My name is Ryan Twiss, T-w-i-s-s.

17           THE COURT:  All right, Mr. Kramer.

18                       DIRECT EXAMINATION

19   BY MR. KRAMER:

20   Q.   Mr. Twiss, what's your position with American Southern

21   Homes?

22   A.   I am general counsel.

23   Q.   What does that mean?

24   A.   So I'm in-house attorney charged with corporate governance.

25   So I am making sure the company is doing things by the books,

1    following our agreements.

2         I am also in charge of negotiating contracts, land deals,

3    overall just guidance to the business.

4    Q.    Okay.

5         Mr. Twiss, is it true that ASH was no longer interested in

6    buying land from Mr. Erickson as of the middle of 2021?

7    A.    It is not true.

8    Q.    Okay.

9         Let's talk about your background.  Where are you from

10   originally?

11   A.    Raleigh, North Carolina.

12   Q.    Where did you go to college?

13   A.    University of North Carolina at Chapel Hill.

14   Q.    What did you study there?

15   A.    Economics and public policy.

16   Q.    Did you go to law school?

17   A.    I did.

18   Q.    Where?

19   A.    I went to Campbell Law School in Raleigh for a year, and

20   then two years at American University in DC.

21   Q.    Did you work while you were in law school?

22   A.    I did.

23   Q.    What did you do?

24   A.    I worked for a company called Red Zone Capital.  They were

25   a private equity company based in Virginia that invested in

1   companies.

2   Q.   And when did you graduate?

3   A.   I graduated in 2013.

4   Q.   What did you do immediately after that?

5   A.   I went into homebuilding.  So I worked as a legal intern

6   for a company called Comstock Homes.

7   Q.   What type of company was Comstock Homes?

8   A.   They were a homebuilder in Northern Virginia.  They had

9   also been in Raleigh and Atlanta at times.

10  Q.   Did you work there after you passed the bar?

11  A.   I did for a few more months.

12  Q.   Then what?

13  A.   I opened up a title shop for Stewart Title.  I was the

14  managing attorney of an office in Virginia.

15  Q.   What does it mean to open up a title shop?

16  A.   It means that they had -- they hadn't had an office in that

17  city, which was Ashburn, so I opened that location for them.  I

18  was just the first one to do it.

19  Q.   What type of work did you do there?

20  A.   So I did commercial and residential real estate.  So

21  handled the transactions and the underwriting of the

22  transactions.  So getting homeowners their keys, essentially.

23  Q.   What did you do after that?

24  A.   I went to work for a law firm.  It was called Kase and

25  Associates.

Direct Examination - Ryan Twiss

1   Q.   Let's be sure to keep our pace a little slower so the court

2   reporter can keep up.

3   A.   Yes, sir.

4   Q.   What did you do at Kase and Associates?

5   A.   A lot of the same work.  So we were an in-house law firm

6   for a title company.  So did residential transactions mostly,

7   cleared title, prepared deeds, documents for the transactions.

8   Q.   Did your job change while you were there?

9   A.   It did.

10  Q.   In what way?

11  A.   They started a new company that was called Prestige Title.

12  It was a partnership with PenFed Credit Union.  So I went and

13  opened that for them.

14  Q.   And how long did you stay there?

15  A.   A little over two years.

16  Q.   What did you do next?

17  A.   I came to American Southern Homes.

18  Q.   What year was that?

19  A.   That was February of 2020.

20  Q.   What kind of a company is American Southern Homes?

21  A.   So we are a homebuilding company.  We are in the business

22  of acquiring and consolidating homebuilders.  So we are looking

23  across most of the southern United States to find attractive

24  homebuilding companies and bring better operating procedures and

25  high quality homes to people.

1  Q.   What attracted you to the homebuilding business?

2  A.   Family.

3       So I grew up -- my family was in homebuilding.  It was what

4  I knew.  I had a grandfather who was a lawyer, and my parents

5  were both in homebuilding for my whole life.  I found a way to

6  combine both.

7  Q.   Is it true that ASH is not a homebuilding company?

8  A.   I don't see it that way.  No, sir.

9  Q.   Okay.

10      So what was your job when you got to ASH in 2020?

11 A.   In 2020, I was in charge of reviewing our documents, making

12 sure we were following our contracts, which included the

13 Grayhawk acquisition.

14      I was in charge of basically redoing some of our contracts

15 and making sure we were using common forms between the two

16 homebuilders we owned at the time.

17 Q.   Has your job changed?  I think you said you were the

18 corporate counsel when you started.

19 A.   I was corporate counsel when I started.  Yes.

20 Q.   What's your job there?

21 A.   I am general counsel.

22 Q.   When did that happen?

23 A.   That happened in January of '21.

24 Q.   Are there any other attorneys employed by ASH?

25 A.   There are not.

Direct Examination - Ryan Twiss

1  Q.   In addition to American Southern Homes Holdings, are you

2  general counsel for any other companies?

3  A.   I am.

4  Q.   Which companies?

5  A.   All of our subsidiaries.

6  Q.   Does that include ASH-Grayhawk here?

7  A.   Yes, sir.

8  Q.   What does the general counsel do?

9  A.   So I am in charge of -- a little more than corporate

10  counsel.  So I am now on the executive level in helping steer

11  the company in the directions and helping make business

12  decisions.

13      I am also more involved in corporate governance and the

14  Board meetings and the actions of that nature.

15      I am also in charge of acquisitions when we make them and

16  negotiating those.

17  Q.   So when you joined ASH in February of 2020, just to set the

18  timeline, what was Mr. Erickson's position with the company?

19  A.   In February of 2020, Mr. Erickson would have been an

20  investor member in ASH.  He would have been a Board member.  And

21  he was also a consultant.

22  Q.   Had ASH already acquired his company?

23  A.   Yes, sir.

24  Q.   Did you become familiar with the contracts that they

25  entered into?

Direct Examination - Ryan Twiss

1    A.    I did.

2    Q.    How?

3    A.    I read them at the time when I joined.  It was one of the

4    first tasks I was given was to familiarize myself with those

5    contracts.

6          And then also, through the course of this process for the

7    last few years, I have spent hundreds of hours reading them.

8    Q.    Okay.  Just want to define terms here.

9          What's a closing in the context of a home sale?

10   A.    In a home sale it's where the buyer is going to give money

11   to the homebuilder or seller, and that party is going to give

12   the keys across the table so the homebuyer can move in.

13   Q.    Okay.

14         What's a closing in the context of acquiring a company?

15   A.    Much of the same.  So that's where the assets are actually

16   going to transfer over to the purchaser.  And the purchaser is

17   giving the money back across the table to the seller.

18   Q.    Okay.

19         And when it comes to acquiring a homebuilder, what are the

20   components of a purchase price?

21   A.    So we look at it on book value and then at premium.

22   Q.    What's book value?

23   A.    Book value is going to be -- it's the amount of the assets

24   but --

25         (Interruption in proceedings.)

Direct Examination - Ryan Twiss

1    BY MR. KRAMER:

2    Q.    Let me ask that question again.

3          What's book value in this context?

4    A.    Book value is the value of the assets that are being

5    acquired at closing.

6    Q.    Okay.  What type of assets are we talking about?

7    A.    In this case, for homebuilding, it's the homes that are

8    already in motion.  It's lots that are being developed.  It's

9    the employees.  It's a lot of things.

10   Q.    What's a premium?

11   A.    Premium, it's on top of the book value, so it's not

12   necessarily tied to the book value.  It's the sweetener.  It's

13   something we evaluate.  It includes the premium for buying lots

14   later and the right to make future money.

15   Q.    Would you like a bottle of water?

16   A.    I would, please.

17              MR. KRAMER:  May I approach, Your Honor?

18              THE COURT:  Yes.

19   BY MR. KRAMER:

20   Q.    So what, if anything, does the premium have to do with the

21   future supply of land?

22   A.    It's vital to it.  It's one of the things we are paying

23   for.  It's not included in the book value.  So you have to find

24   a way to pay for that right.

25   Q.    What right are you paying for?

Direct Examination - Ryan Twiss

1  A.   The right to purchase those lots later.  An exclusive

2  right.

3  Q.   How does that land pipeline rank in the various factors

4  considered in a homebuilding acquisition?

5  A.   It's the most important thing we look for.

6  Q.   Okay.

7       Do you know the closing date of the Grayhawk acquisition?

8  A.   I do.

9  Q.   What is it?

10 A.   November 15, 2019.

11 Q.   Following that acquisition, how many lots did ASH expect to

12 receive from Mr. Erickson over time?

13 A.   Approximately 1600.

14 Q.   Okay.

15      Over what period of time?

16 A.   Of the next seven years or longer.

17 Q.   Why might it be longer?

18 A.   There was a provision for future lots that could have come

19 into the agreement which would have allowed more than 1600 lots

20 even.

21 Q.   Okay.

22      Are you familiar with the Asset Purchase Agreement that

23 both parties showed in opening?

24 A.   Yes, sir.

25 Q.   What is that?

Direct Examination - Ryan Twiss

 1    A.    It's the framework of the documents.  It's a framework of

 2    the asset purchase.  It's the document that controls the

 3    acquisition of Mr. Erickson's assets.

 4    Q.    Okay.

 5          Now when ASH acquired the business from Mr. Erickson, did

 6    it pay him solely in cash?

 7    A.    No, sir.

 8    Q.    What were the components?

 9    A.    We paid cash and we also paid in shares in ASH.

10    Q.    Okay.

11          MR. KRAMER:  Could I have Exhibit PX685 up on the

12    screen, please?

13              This has been preadmitted, Your Honor.

14              Oh, I'm sorry.  We haven't gotten to preadmissions

15    yet.

16              Before we put that up on the screen for the jury, the

17    parties have agreed to preadmit certain documents.  This is one

18    of them.  May I hand up the list?

19              THE COURT:  Yes.

20              MR. KRAMER:  Thank you.

21              Shall I proceed, Your Honor?

22              THE COURT:  All right.  Let me just confirm that all

23    of the exhibits on this document list there is no objection to

24    them being admitted.  Is that correct?

25              MR. SHEBELSKIE:  That's correct, Your Honor.

Direct Examination – Ryan Twiss

1          THE COURT:  All right.

2          Rather than reading them all into the record, I am

3   just going to admit all of these exhibits that are on this

4   particular document list.  I guess when you refer to them, just

5   refer to them as being on this list as having been preadmitted.

6          MR. KRAMER:  Will do, Your Honor.  Thank you.

7          THE COURT:  Let's make this Court's Exhibit 1.  And

8   this is the list of all exhibits that had been admitted that are

9   being admitted by agreement of the parties.

10     (COURT EXHIBIT 1:  Received in evidence.)

11          THE COURT:  Ladies and gentlemen, just so you will

12   know, there are a list of a lot of documents that the parties

13   have reviewed before the trial and they have agreed that there

14   is no objection to those being admitted.  So rather than me

15   admitting them one by one when they are presented with a

16   witness, I am just admitting them all now since nobody objects

17   to them.

18          You will have all of these exhibits with you during

19   your deliberations.  And they will be referred to during the

20   questioning of certain witnesses.

21          Go ahead.

22          MR. KRAMER:  Thank you.

23          Okay.  Could we have now preadmitted Plaintiffs'

24   Exhibit 685 up, please?  In particular, let's go to the next

25   page, please.

Direct Examination - Ryan Twiss

1    BY MR. KRAMER:

2    Q.   Do you recognize this document, Mr. Twiss?

3    A.   Yes, sir.

4    Q.   What is this?

5    A.   This is the Asset Purchase Agreement we were discussing.

6    Q.   Okay.

7            MR. KRAMER:   Could we have page 16, please?

8            I want to focus on Section 2.5 here, which has the

9    heading Purchase Price Payment Methodology, and in particular

10   2.5B.

11   BY MR. KRAMER:

12   Q.   Do you see that there on your screen, Mr. Twiss, there is

13   the term "Estimated Book Value"?

14   A.   Yes, sir.

15   Q.   Okay.

16       It says "estimated," here.  Why is it necessary to estimate

17   the book value of Mr. Erickson's business?

18   A.   It was impossible on the day of closing to know the value.

19   Things were constantly changing every day.  So you use

20   historical financials and you look back to a date in time, and

21   then later it gets trued up.

22   Q.   Is that uncommon?

23   A.   It's not uncommon.

24   Q.   Do you know how much ASH paid Mr. Erickson for the

25   estimated book value at closing?

Direct Examination – Ryan Twiss

1    A.    I do.

2    Q.    How much?

3    A.    14.6 million.

4    Q.    Did the parties get around to finalizing the book value so

5    it was no longer estimated?

6    A.    We did.

7    Q.    Were you working at ASH at that time?

8    A.    I was.

9    Q.    And did that adjustment result in ASH paying more money to

10   Mr. Erickson?

11   A.    It did.

12   Q.    How much?

13   A.    Another 3.2 million.

14   Q.    Okay.

15        So what was the final amount of the book value paid to

16   Mr. Erickson?

17   A.    17.8 million.

18   Q.    Okay.

19             MR. KRAMER:  Let's take a look at 2.5C, please.  It

20   has the heading "note".

21   BY MR. KRAMER:

22   Q.    Do you see that?

23   A.    Yes, sir.

24   Q.    Do you know what note is being referred to here?

25   A.    I do.

Direct Examination - Ryan Twiss

1   Q.   What is it?

2   A.   At closing the banks weren't completely ready to lend money

3   to ASH, so Mr. Erickson offered to finance part of the

4   acquisition with a one-percent fee to himself.

5   Q.   What does that mean, to finance part of the acquisition?

6   A.   It means that he basically took a promissory note or a

7   promise to pay for $5 million.

8   Q.   Okay.

9        And did ASH repay that amount?

10  A.   We did.

11  Q.   Did ASH pay the one-percent fee on top?

12  A.   We did.

13          MR. KRAMER:   Finally, let's look at Section 2.5A,

14  which is the premium.

15  BY MR. KRAMER:

16  Q.   Okay.  What's the maximum amount of the premium that ASH

17  agreed to pay to Mr. Erickson?

18  A.   10 million.

19  Q.   How much of that has been paid to Mr. Erickson?

20  A.   6.4 million.

21  Q.   Was any part of that paid in stock or units?

22  A.   Yes, sir.

23  Q.   How much?

24  A.   4 million was.

25  Q.   So what does that mean, to give someone stock or units in a

Direct Examination - Ryan Twiss

1    company?

2    A.    It made Mr. Erickson an investor, so it gave him up-side.

3    As the company did well, he actually made more money than had we

4    paid pure cash.

5    Q.    Okay.

6         How much were the units worth at the time of the

7    transaction?

8    A.    A thousand dollars.

9    Q.    Do you know how much they are worth now?

10   A.    I do.

11   Q.    How do you know?

12   A.    We had a valuation done earlier this year by a third-party

13   company.

14   Q.    What was the conclusion?

15   A.    Ignoring the stock split that occurred, it would be $1,320

16   per unit.

17   Q.    So is that an apples to apples comparison?

18   A.    That's converting apples to apples, yes, sir.

19   Q.    Is there a difference between a share and a unit?

20   A.    There is not.

21   Q.    Two words for the same thing?

22   A.    Yes, sir.

23   Q.    There is a reference in here to an eight-percent coupon.

24   What is that?

25   A.    The money invested in ASH accrues a coupon at eight percent

Direct Examination - Ryan Twiss

1    per year.

2    Q.   Can you explain how that works as a practical matter?

3    A.   So the value of Mr. Erickson's investment, every year it

4    earns eight percent.  It's not paid out.  It's held in the

5    company as a liability that we owe him at a later date.

6    Q.   You said the units are now worth $1,320 on an apples to

7    apples basis.  Did that factor in the eight-percent interest

8    every year?

9    A.   No, sir.

10   Q.   Does that actually get paid out every year?

11   A.   It does not.

12   Q.   When does it get paid out?

13   A.   Whenever it is decided by the company to pay it out.  It's

14   held off right now.

15   Q.   Okay.

16        So if you put together the book valve at 17.8 million and

17   the premium at 6.4 million, what's the total amount that ASH

18   paid Mr. Erickson to acquire Grayhawk Homes?

19   A.   24.2 million.

20   Q.   And did Mr. Erickson invest some of that money in the

21   company?

22   A.   He did.

23   Q.   How much?

24   A.   He invested $2 million at closing.

25   Q.   Okay.

Direct Examination - Ryan Twiss

1      And what did he receive in exchange?

2   A.   Units in ASH.

3   Q.   Okay.

4   A.   2000.

5   Q.   So what's the total valve of the units at the time of

6   closing that Mr. Erickson received?

7   A.   He received 6 million.

8   Q.   Okay.

9        Did Mr. Erickson subsequently buy more units in the

10  company?

11  A.   Yes, sir.

12  Q.   When, approximately, was that?

13  A.   It would have been, I believe, around May of '20.

14  Q.   And does he still hold all of those units?

15  A.   He does.

16  Q.   So, approximately, how much of ASH does he currently own?

17  A.   About 13 percent.

18  Q.   So in what -- did there come a time when Mr. Erickson

19  stopped selling lots to ASH-Grayhawk?

20  A.   Yes, sir.

21  Q.   What year was that?

22  A.   That was in '21.

23  Q.   2021?

24  A.   Yes, sir.

25  Q.   Before that was he selling any lots to ASH?

1    A.    He was.

2    Q.    So between the closing date on November 15, 2019, and

3    today, roughly, how many lots has ASH been able to purchase from

4    Mr. Erickson?

5    A.    Just shy of about 600.

6    Q.    Okay.  And did ASH pay him for each of those lots?

7    A.    Yes, sir.

8    Q.    All right.

9          So how much did ASH pay him for those lots, if you add them

10   all together?

11   A.    Over 25 million.

12   Q.    So if we add it all up, how much has ASH paid

13   Mr. Erickson for his business plus the lots?

14   A.    Over $50 million.

15          MR. KRAMER:  Moving on, I would like to have

16   Plaintiffs' Exhibit 246 up, please.  This is another one that

17   was preadmitted.

18   BY MR. KRAMER:

19   Q.    Mr. Twiss, do you recognize this document?

20   A.    Yes, sir.  I do.

21   Q.    What is it?

22   A.    This is the Land Purchase Agreement.

23   Q.    Is there a shorthand name for this?

24   A.    LPA.

25   Q.    If I say "LPA," you know what I mean?

Direct Examination – Ryan Twiss

1    A.    Yes, sir.

2    Q.    So what's your understanding of the purpose of this

3    agreement?

4    A.    This was to -- this was the governing document to control

5    the purchase of the 1600 lots for the next seven years by ASH

6    from Mr. Erickson.

7    Q.    Does it say who -- well, let's take a look at the second

8    whereas paragraph here.  It's up on the screen.

9         Does it list any companies owned by Mr. Erickson or

10   Mrs. Erickson?

11   A.    It does.

12   Q.    What are those companies?

13   A.    So it is Tiger Creek Development, Inc.; Cusseta Road, LLC;

14   Grey Rock Development, LLC; Windsong Bonacre, LLC; Erickson

15   Investment, Inc.; and Sage Development, Inc.

16   Q.    Okay.  Are those companies all defendants in the case?

17   A.    Yes, sir.

18   Q.    Does the LPA distinguish between different types of lots?

19   A.    Yes, sir.

20   Q.    In what way?

21   A.    Development status at time of closing.

22   Q.    Can you explain what that means?

23   A.    I can.

24        So there are three type of lots.  There was Phase A lots,

25   and those lots were ready at closing to put a home on.

Direct Examination - Ryan Twiss

1          There were Phase B lots, which were going to be ready to

2     put a home on within 12 months of closing.

3          And then were Phase C lots, which were further off in the

4     future before they were ready for a home.

5     Q.    What does it mean to develop a lot?

6     A.    It means to take it from law land, field or forest, and

7     turn it into a subdivision with streets, utilities, so we have

8     individual lots we can come in and put homes on and create a

9     community.

10          MR. KRAMER:   Could I have page 24 of the document,

11    please?

12    BY MR. KRAMER:

13    Q.    Mr. Twiss, I just referred to page 24.  Do you see at the

14    bottom it says, PX246-E.024?

15    A.    Yes, sir.

16    Q.    Okay.

17          You with me if I give you -- when I say page 24, I mean

18    this particular page 24?

19    A.    Yes, sir.

20    Q.    Okay.

21          Let's take a look at the top box here, which is titled

22    "Exhibit B Future Option Lots".

23          All right.  What's shown here, Mr. Twiss?

24    A.    These are those Phase B lots I was just mentioning.  This

25    is an exhibit to the LPA showing those Phase B lots.

Direct Examination - Ryan Twiss

1    Q.   How many Phase B lots were listed in this exhibit?

2    A.   429.

3    Q.   All right.

4         In what -- do you see the first two columns of the chart?

5    A.   Yes, sir.

6    Q.   All right.

7         In what county and state were all the Phase B lots to be

8    found?

9    A.   So some were in Georgia, Muskegee.  Others were in Alabama

10   and Lee.  And there was one subdivision in Harris County,

11   Georgia.

12   Q.   Okay.

13        What's the final column here with the heading "Related

14   Party Owned By"?

15   A.   This is the -- what entity of Mr. Erickson's owned those

16   individual lots or that land.

17   Q.   Okay.

18        Let's take a look -- let's back off of Exhibit B and take a

19   look at the box underneath of it, the chart underneath of it,

20   Exhibit C.

21        Do you have that up on your screen?

22   A.   Yes, sir.

23   Q.   What's the header of this exhibit?

24   A.   This is Exhibit C, Future ROFO lots.

25   Q.   What lots are listed here?

1    A.    These are the Phase C lots from the agreement.

2    Q.    What county and state are the Phase C lots located?

3    A.    Primarily in Georgia and Muskegee, and then also a few

4    neighborhoods in Lee County, Alabama.

5    Q.    Okay.

6          What's the next column in the chart?

7    A.    The next column is "Subdivision".  So that is identifying

8    either -- in some instances it's a road.  Others it's the name

9    of the neighborhood from which those lots would be found.

10   Q.    Okay.

11         There is also a heading "Estimated Lots."  Do you see that?

12   A.    Yes, sir.

13   Q.    All right.  What's in that column?

14   A.    That is the estimate as of closing from Mr. Erickson as to

15   how many lots would be in each subdivision.

16   Q.    What's the total number of Phase C lots listed here?

17   A.    Appears to be 964.

18   Q.    The next column has the heading "Basis Per Lot."

19         Do you see that?

20   A.    Yes, sir.

21   Q.    What does that mean?

22   A.    That is Mr. Erickson's basis in each lot, so that is his --

23   what he paid for the land divided by the number of lots he

24   estimated were going to be in that neighborhood.

25   Q.    Okay.

1          Then again at the end there is a column with the header

2     "Related Party Owned By."

3          Do you see that?

4     A.    Yes, sir.

5     Q.    What's in that column?

6     A.    It's which of Mr. Erickson's entities owned that land or

7     those lots.

8     Q.    Okay.

9          Let's take a look at page 2 of the LPA, in particular

10    Section 2.

11         Can you read the first sentence to the jury, please?

12    A.    Yes, sir.

13         The parties anticipate there are approximately 1600 lots

14    plus any future lots located in various cities, counties, and

15    states that will be subject to the provisions of this agreement.

16    Q.    Of that 1600, approximately how many lots were not sold to

17    ASH?

18    A.    Approximately, a thousand.

19    Q.    Take a look at Section 6, which appears on page 2 and

20    carries over to page 3.

21         All right.  Mr. Twiss, could you just read the first

22    sentence in Section 6?

23    A.    Seller is required to develop the lots in accordance with

24    this agreement and to meet the requirement of the Takedown

25    Schedule defined below.

Direct Examination - Ryan Twiss

1    Q.    What is the Takedown Schedule?

2    A.    That is an exhibit.  It's the schedule that controls when

3    we buy lots from Mr. Erickson and how many.

4    Q.    Okay.

5          The next sentence says:  Starting with the calendar quarter

6    ending on December 31st, 2019, buyer agrees to purchase from

7    seller the number of lots set forth on the lot Takedown Schedule

8    attached as Schedule 1 to this agreement.

9          Do you see that?

10   A.    Yes, sir.

11   Q.    What's a calendar quarter?

12   A.    It's broken down into four per year, so it's January

13   through March, April through June, et cetera.

14   Q.    Does ASH contend in this case that Mr. Erickson breached

15   Section 6 of the Land Purchase Agreement?

16   A.    Yes, sir.

17   Q.    In what way?

18   A.    He failed to deliver Phase C lots on numerous quarters.

19   Q.    Okay.

20         In what month and year did Mr. Erickson fail to deliver the

21   Phase C lots?

22   A.    December of 2021.

23   Q.    Okay.  At that point, how much time had passed since the

24   acquisition?

25   A.    A little over two years.

Direct Examination – Ryan Twiss

1    Q.    So what impact, if any, has this refusal had on the

2    business of ASH-Grayhawk here in Columbus?

3    A.    It's been catastrophic.

4    Q.    Could you explain?

5    A.    We've had to lay off employees.  We have been unable to

6    grow the business.  We have significantly decreased the number

7    of homes we were building.  So we are not supplying the

8    community.  If we can't build houses, trades in the community

9    are losing their jobs, or at least having to find work

10   elsewhere.  Maybe travel further.  So it's been terrible for us.

11   Q.    Okay.

12         What was the situation in the housing market in December of

13   2021?

14   A.    It was great.

15   Q.    Is there any truth to the suggestion that ASH didn't want

16   to buy lots at that point?

17   A.    None.

18   Q.    Okay.

19         Let's take a look at the Takedown Schedule, which is page

20   16.  The header here is Schedule 1 to the LPA Takedown Schedule.

21         Is this what we have been referring to as the Takedown

22   Schedule?

23   A.    Yes, sir.

24   Q.    All right.

25         I am going to put -- I am not going to go through the whole

Direct Examination – Ryan Twiss

1  thing, but if we pull up the first chart, what is shown here,

2  generally?

3  A.    Generally, this is a quarterly obligation and it is showing

4  A, B and C lots.

5       So if each individual lot category had an obligation that

6  quarter, it's shown there in the appropriate column and row.

7  Q.    What do the numbers underneath -- well, let's pick December

8  2019.  What do the numbers underneath that column signify?

9  A.    So it says that by end of the quarter ending December 2019,

10  ASH should have purchased 25 Phase A lots.  And at the very

11  bottom it's summing.  If there had been B or C lots, it would

12  have been added to the bottom to get you to the final number.

13  Q.    Okay.

14       In what quarter was ASH supposed to start receiving Phase C

15  lots?

16  A.    September of 2021.

17  Q.    Okay.  Do you know why that didn't pick up until almost two

18  years after the closing date?

19  A.    The schedule was based on essentially purchasing at least

20  180 lots per year, so it was flowing through what was already

21  available, what was available next, and then to what was

22  available at the latest.

23  Q.    Did ASH start taking down Phase C lots in the third quarter

24  of 2021?

25  A.    We had actually purchased some ahead of time.

Direct Examination – Ryan Twiss

1   Q.   How many?

2   A.   Four.

3   Q.   And how many did ASH buy for the third quarter of 2021?

4   A.   We bought the balance.  The remaining 11.

5   Q.   11?  Okay.

6        How many lots was -- how many lots were owed under the

7   Takedown Schedule in the quarter ending December 2021?

8   A.   45 total.  15 Phase C.

9   Q.   Did ASH take down any of those lots in December of 2021?

10  A.   We did not.

11  Q.   Why not?

12  A.   Mr. Erickson said no.

13  Q.   Okay.

14       Let's back off of the first chart here and go down to the

15  one at the bottom.

16       Do you have that up on your screen?

17  A.   Yes, sir.

18  Q.   What does the bottom chart on the Takedown Schedule show?

19  A.   This is showing a cumulative approach for the seven-year

20  period that the schedule shows, showing 180 lots, approximately,

21  every year -- showing those lots flowing out.

22  Q.   Okay.

23       What's the total number of Phase C lots after year seven?

24  A.   693.

25  Q.   Okay.

1    So that's different from the 964 we looked at previously.

2   Right?

3   A.   Yes, sir.

4   Q.   Can you explain?

5   A.   It's two things: One, we anticipated always buying more

6   lots than required, and we historically had been, so the

7   schedule tracks that we would generally buy more than the 180.

8    It also, at the bottom, says C lots would continue until

9   all lots are purchased.  So in the event we were only buying

10  180, the schedule would have conditioned to roll.

11  Q.   Continued to roll in what way?  How many per year?

12  A.   180 per year.

13  Q.   Until what?

14  A.   Until we ran out of lots.

15  Q.   So what does it mean to take down or purchase a lot ahead

16  of schedule?

17  A.   It means that while we might not have an obligation to

18  purchase the lot we wanted to purchase ahead of time.  It's

19  important for us to do that and be able to grow the business.

20  If we were doing more than 180 homes in a year, which we were,

21  we had to buy more than 180 lots.

22  Q.   During your tenure with ASH, were there times when

23  Mr. Erickson was willing to sell lots ahead of schedule?

24  A.   Yes, sir.

25  Q.   Did ASH buy lots ahead of schedule?

Direct Examination - Ryan Twiss

1   A.   Yes, sir.

2   Q.   Let's take a look back on page 3 of the LPA, Section 10.

3        Okay.  Section 10 says:  Seller is required to develop the

4   lots in accordance with this agreement and to satisfy the

5   requirement of the Takedown Schedule.

6        Has Mr. Erickson satisfied the requirements of the Takedown

7   Schedule since December 2021?

8   A.   He has not.

9   Q.   Okay.

10       It goes on:  However, as to the Phase C lots during the

11  first full year after the closing under the APA the parties

12  shall agree to the order in which specific Phase C lots will be

13  developed.

14       Do you see that?

15  A.   Yes, sir.

16  Q.   Okay.

17       Does ASH contend, in this case, that Mr. Erickson breached

18  Section 10 by failing to agree on the order?

19  A.   Yes, sir.

20  Q.   And what's the contention?

21       What does ASH claim that Mr. Erickson did or didn't do?

22  A.   Mr. Erickson refused to agree to the schedule.

23  Q.   Did you personally attempt to work that out with him?

24  A.   I did.

25  Q.   What happened?

Direct Examination - Ryan Twiss

1    A.    He refused to agree to it.

2    Q.    Did Mr. Erickson ever propose an order of Phase C lot

3    development at any time?

4    A.    Not a complete order.  No.

5    Q.    Did you ever propose an order of Phase C lot development to

6    Mr. Erickson?

7    A.    I did.

8    Q.    What happened?

9    A.    He refused to discuss it.  He refused to adopt it.

10   Q.    Did there come a time when he did agree to it, at least in

11   principle?

12   A.    Yes, sir.

13   Q.    We will come back to that.

14         What did Mr. Erickson do instead of agreeing to the order

15   of Phase C lot development?

16   A.    He terminated the LPA.

17   Q.    What reason did he give for terminating the LPA?

18   A.    Failure to agree to a Phase C lot schedule.

19   Q.    Was that termination effective?

20   A.    It was not.

21   Q.    What's your basis for saying that?

22   A.    The Court has already ruled it was not effective.

23   Q.    What was your position in the fall of 2020 at ASH?

24   A.    I was corporate counsel.

25   Q.    Okay.

1       So that's before you became the general counsel?

2   A.   Yes, sir.

3   Q.   Let's focus on the fall of 2020.

4       As of September 2020, what position did Mr. Erickson hold

5   with ASH?

6   A.   Mr. Erickson would have been a member still, Board member,

7   consultant, and he was also an executive committee member.

8   Q.   When did he become a member of the Board?

9   A.   It would have been part of closing.

10  Q.   What does that mean?  What is the Board of ASH?

11  A.   So the Board of ASH is the individuals who guide the

12  company, essentially.  They are charged with making decisions

13  for the company.

14  Q.   Okay.

15      When did Mr. Erickson, if ever -- well, was Mr. Erickson a

16  consultant to ASH?

17  A.   He was.

18  Q.   When did he become a consultant?

19  A.   Same time as closing, so that would have been November of

20  2019.

21  Q.   So that's closing for the purchase of Grayhawk Homes?

22  A.   That's correct.

23  Q.   And what was, at a high level, Mr. Erickson's role as a

24  consultant?

25  A.   So he was involved in advising the company on future and

1    potential homebuilder acquisitions.

2         He was also in charge of responding to leadership and

3    giving guidance on the local operations here to ASH leadership.

4    Q.   Okay.

5              MR. KRAMER:  Could we have Exhibit 274A up for the

6    witness but not the jury?

7    BY MR. KRAMER:

8    Q.   Mr. Twiss, do you recognize this document?

9    A.   I do.

10   Q.   What is it?

11   A.   This is a letter from Greg Benson to the Grayhawk employees

12   dated July 11, 2020.

13   Q.   Did you see this letter when it came out?

14   A.   I did.

15             MR. KRAMER:  Your Honor, Plaintiffs offer Plaintiffs'

16   Exhibit 274A into evidence.

17             THE COURT:  Any objection?

18             MR. SHEBELSKIE:  No, sir.

19             THE COURT:  Admitted.

20        (PLAINTIFFS EXHIBIT 274A:  Received in evidence.)

21   BY MR. KRAMER:

22   Q.   What was the reason for this letter, if you know,

23   Mr. Twiss?

24   A.   There were some concerns that Mr. Erickson was giving

25   direction to employees directly instead of responding up through

1  the leadership channels.  So Mr. Benson was trying to throw his

2  support down to the president down here, Mr. Thirtyacre, and

3  just reinvigorate the team and provide support.

4  Q.   So before the acquisition, who did the employees take

5  direction from?

6  A.   Mr. Erickson.

7  Q.   And when it became ASH-Grayhawk who -- from whom were they

8  supposed to take direction?

9  A.   Originally it would have been Mr. Recker.

10      At this time it was Mr. Thirtyacre.

11  Q.   Why weren't employees supposed to take direction from

12  Mr. Erickson after he sold company?

13  A.   Because he had sold his company and was longer their boss.

14  Q.   Does that create any issues when the founder of the company

15  gives direction to employees?

16  A.   It creates conflicts.  Yes.

17  Q.   Okay.

18          MR. KRAMER:  Could I have Exhibit PX402 up for the

19  witness but not the jury, please?

20  BY MR. KRAMER:

21  Q.   Mr. Twiss, I want to direct your attention to the second

22  email down in the chain here.

23      Can you identify this, please?

24  A.   Yes.

25      This is an email from Mr. Erickson to Mr. Thirtyacre,

Direct Examination - Ryan Twiss

1  Mr. Benson, Mr. Scott, and myself, dated September 29 of 2020.

2  The subject being:  North Ivy lots and breach of Transition

3  Services Agreement.

4  Q.    Do you recall receiving this email?

5  A.    I do.

6         MR. KRAMER:  Your Honor, Plaintiffs offer PX402 into

7  evidence.

8         THE COURT:  Any objection?

9         MR. SHEBELSKIE:  No, sir.

10         THE COURT:  Admitted.

11      (PLAINTIFFS EXHIBIT 402:  Received in evidence.)

12  BY MR. KRAMER:

13  Q.    Okay.

14      Mr. Twiss, one of the recipients of this email is

15  Gregory Benson.

16      Do you see that?

17  A.    Yes, sir.

18  Q.    Who is Mr. Benson?

19  A.    He was interim CEO at the time.

20  Q.    What does "interim CEO," mean?

21  A.    It means he had not been made permanent CEO.

22  Q.    Okay.

23      Do you know why not?

24  A.    The Board at the time was trying to decide which direction

25  to go, so he was having negotiations with the Board about

Direct Examination - Ryan Twiss

1    becoming a permanent CEO, and they were also interviewing

2    potential candidates for CEO.

3    Q.    What kind of candidates?

4    A.    Just potential ones.

5    Q.    Okay.

6         If we go about down to paragraph 5 of this email from

7    Mr. Erickson it says:  If such slab preparation is repeated in

8    the future on any lots, we will be forced to declare a breach of

9    contract event.

10        Do you see that?

11   A.    I do.

12   Q.    Okay.

13        Do you remember Mr. Erickson threatening to declare a

14   breach of contract at this point?

15   A.    I do.

16   Q.    Were there other times when Mr. Erickson -- well, what

17   contract is he referring to here?

18   A.    He is referring to the Transitions Service Agreement here.

19   Q.    Did he also, at around this time, threaten to declare a

20   default under the Land Purchase Agreement?

21   A.    He did.

22   Q.    And what was the genesis of that dispute?

23   A.    Whether or not ASH had purchased the requisite amount of

24   Phase A lots.

25   Q.    Okay.

Direct Examination - Ryan Twiss

1          MR. KRAMER:  Could we have -- let's take this down,

2    and for the witness put up PX402 --

3          THE COURT:  Mr. Kramer, we need to take a break here

4    shortly whenever you get to a good stopping point.

5          MR. KRAMER:  This would be a fine time, Your Honor.

6          THE COURT:  All right.  Ladies and gentlemen, we are

7    going to take a break for 15 minutes.

8          You will go to the jury room.  Do not discuss the case

9    during the break.  Leave those note pads in your chair.  They

10   will be secure during your break.  Just make sure you come back

11   and sit in the same chair.

12         We will be in recess for 15 minutes.

13         I will stay here with the attorneys briefly.

14     (Jury out at 3:50.)

15         THE COURT:  All right.

16         We got at least one juror that's getting a good

17   afternoon siesta throughout a good bit of the testimony.  I am

18   inclined to go ahead and get rid of her, but I want to get

19   y'all's take on it.  It's the third juror on the front row.

20   Third from the left, ████████.

21         Anybody object to her being excused or y'all want to

22   give her more time?

23         MR. KRAMER:  No objection, Your Honor.

24         MR. SHEBELSKIE:  Your Honor, I think we ought to give

25   her some more time.  I mean, first day coming back from lunch,

1 not the most stimulating testimony.  I understand it.  I think

2 we should see how she fairs tomorrow.

3    THE COURT:  Okay.  All right.  I will give her more

4 time.

5    My predecessor, one time when the -- there was a

6 lawyer, I think the lawyer was from New York, and he asked

7 Judge Elliott if he could approach the bench.  And so

8 Judge Elliott waved him forward, although I don't think he was

9 very excited about doing so.  But he came forward and he told

10 Judge Elliott that throughout his examination that Juror 2 was

11 falling asleep and he wanted to know if Judge Elliott would wake

12 her up for him.  And Judge Elliott turned to him and said, You

13 put her to sleep.  You wake her up.

14    So I don't know who put her to sleep.  She probably

15 fell asleep in somebody's opening statement.  I haven't seen her

16 awake much of the entire day.

17    We will give her another chance.  Maybe she will get a

18 cup of Mr. Gunn's coffee up there and fall back to life.  Y'all

19 let me know when you want to excuse her.

20    We will be in recess for about ten more minutes.

21   (Recess taken 3:53.)

22   (Resumed at 4:06.)

23    THE COURT:  Bring the jury down.

24    COURT SECURITY OFFICER:  Yes, Your Honor.

25   (Jury in at 4:08.)

1          THE COURT:  Okay.  Mr. Kramer, you may continue with

2    your examination of the witness.

3          MR. KRAMER:  Thank you, Your Honor.

4                    CONTINUED DIRECT EXAMINATION

5    BY MR. KRAMER:

6    Q.   So, Mr. Twiss, when we left off we were talking about

7    threat of default under the LPA.

8          Do you recall that?

9    A.   Yes, sir.

10   Q.   Okay.

11         Before I get back to that, do you remember we went through

12   the LPA and looked at the companies listed there that are

13   defendants in the case?

14   A.   I do.

15   Q.   Do you know who owns those companies?

16   A.   Mr. Erickson.

17   Q.   Are there any other owners of those companies?

18   A.   Could be Rose Anne Erickson as well.

19   Q.   Okay.

20         Back to the default issue.

21         MR. KRAMER:  Could we have PX402A up for the witness,

22   please?

23   BY MR. KRAMER:

24   Q.   Mr. Twiss, this is a group of documents, and I want to ask

25   you about them one at a time before I offer them into evidence.

1    Could you just identify the first document in the series in

2    402A?

3    A.   Yes.

4    This is a letter from Mr. Erickson to Mr. Benson dated

5    October 1st of 2020, titled "Default Notice for Land Purchase

6    Agreement."

7    Q.   You are not listed as a recipient.  Do you remember this

8    letter when it came in?

9    A.   I do.

10   Q.   Okay.

11   Were you involved in responding to this letter?

12   A.   I was.

13   Q.   Okay.

14       MR. KRAMER:  Could we have page 2, please?

15   BY MR. KRAMER:

16   Q.   All right.  Could you just identify the second

17   communication?

18   A.   Yes.

19   This is an email from Mr. Benson to Mr. Erickson dated

20   October 5th of 2020, titled "Default on Takedowns."

21   Q.   Did you see this email around the time it was sent?

22   A.   I did.

23   Q.   Okay.

24       MR. KRAMER:  Could we have the third communication on

25   page 3?

1  BY MR. KRAMER:

2  Q.   Just identify that, please.

3  A.   It's a letter from Mr. Erickson to Mr. Benson dated

4  October 9, 2020, "Rebuttal to Land Purchase Agreement Default

5  Comments."

6  Q.   Okay.

7      Are you familiar with this communication?

8  A.   Yes, sir.

9  Q.   Do you remember seeing it when it came in?

10  A.   I do.

11  Q.   Were you involved in responding?

12  A.   I was.

13      MR. KRAMER:   Can we have page 6, which is the fourth

14  communication in the batch, please?

15  BY MR. KRAMER:

16  Q.   Do you remember seeing this one?

17  A.   I do.

18  Q.   Could you identify it for the record, please?

19  A.   It is a letter from ASH's outside counsel to Mr. Erickson,

20  dated October 13, 2020, titled "Default Notice and Land Purchase

21  Agreement."

22  Q.   Outside counsel?  That's me, right?

23  A.   Yes, sir.

24  Q.   Were you copied on this letter?

25  A.   I was.

1    Q.    Were you involved in putting it together?

2    A.    I was.

3    Q.    And on page 9, what's the final communication in the batch?

4    A.    This is a letter from Mr. Erickson to ASH's outside

5    counsel, erroneously dated October 1st, 2020.  No subject.

6    Q.    Why do you think it's erroneously dated?

7    A.    It's a response to the October 13th, 2020 letter.

8    Q.    Okay.

9          Do you remember when this one came in?

10   A.    I do.

11   Q.    Are you familiar with this document?

12   A.    Yes, sir.

13          MR. KRAMER:  Your Honor, Plaintiffs offer 402A into

14   evidence.  Plaintiffs Exhibit 402A.

15          THE COURT:  Any objection?

16          MR. SHEBELSKIE:  Objection to the second and fourth

17   communication in that package; the one from Mr. Benson and the

18   one from Mr. Kramer.  Those are hearsay.  If they are not being

19   admitted for the truth of the contents of those, but just the

20   fact that the communication occurred, that would be fine.  For

21   the substantive truth of the statements in it, that would be

22   hearsay.

23          MR. KRAMER:  We don't intend to offer them for the

24   truth of the statements in the letter, Your Honor.  I am

25   comfortable with that approach, if you are.

1              THE COURT:  What's the purpose?

2              MR. KRAMER:  To show Mr. Erickson giving notice of

3     default and ASH's response and how it was resolved.

4              THE COURT:  Okay.  Which pages are those?

5              MR. SHEBELSKIE:  I had it recorded as the second page,

6     which was the second communication, and the sixth page, which is

7     the fourth communication.

8              MR. KRAMER:  That's exactly right.

9              THE COURT:  Well, if I am going to instruct the jury

10    that those pages are not admitted for the purpose of the truth

11    of what's in them, just for the purpose that they were sent and

12    there was notice, I need some better description for the jury so

13    they can know which ones they are.

14             This is more than just a theoretical hypothetical

15    exercise.

16             I am going to admit 402A, which includes all of the

17    pages.

18             Now if you will pull up the two separate pages that I

19    have admitted not for the truth of what's in them so the jury

20    can see that.

21             MR. KRAMER:  Okay.  Start with page 2, please.

22             THE COURT:  Ladies and gentlemen, let me just explain

23    this briefly to you.

24             As a general rule, hearsay evidence is not admissible

25    under the federal rules of evidence.

1          Hearsay is a statement made by some third party,

2     typically, to someone else outside of court for the truth of

3     what is stated by that person.  In other words, if someone

4     outside of court, or if someone comes in and testifies that

5     somebody told me this or that, that would be hearsay evidence,

6     because it's a statement to the truth of what that person told

7     them and it's from a third party.

8          But there are exceptions to hearsay.  And if the

9     statement that's made is not offered for the proof of what was

10    said, the truth of what was said; in other words, it's not being

11    admitted to show that what that person said was true, but is

12    being admitted for the purpose of showing something else, such

13    as the statement was made so that it puts somebody on notice but

14    it's not for the truth of what was said in the statement, then

15    it's not hearsay.

16         And so these two documents, or pages, are being

17    admitted for that limited purpose, not for the truth of what's

18    in them, but the fact that they may have been sent and

19    transmitted and put somebody on notice.

20         I am going to let the lawyer put up here on the screen

21    the pages that are admitted for that limited purpose.

22         Mr. Kramer?

23         MR. KRAMER:  Yes, sir.  We have the first page up,

24    which is page 2 of the exhibit.  It's an October 5, 2020 email

25    sent to Mr. Erickson.

1             THE COURT:  That's not admitted for the truth of

2  what's stated in that email, but just the fact that it was sent.

3             What's the other one?

4             MR. KRAMER:  Page 6, Your Honor.

5             THE COURT:  Page 6.

6             Is that a letter or another email?

7             MR. KRAMER:  It is.  It's an October 13, 2020 letter

8  to Mr. Erickson.

9             THE COURT:  Again, that's a letter that is not being

10  admitted for the truth of what's stated in there, but just the

11  fact that it was sent and that this correspondence was sent to

12  Mr. Erickson on that date.

13             Go ahead.

14             MR. KRAMER:  Thank you, Your Honor.

15             Could we have page 1, please?

16  BY MR. KRAMER:

17  Q.   Back to page 1 of PX402A.

18       This is a letter from Mr. Erickson, correct?

19  A.   Yes, sir.

20  Q.   Okay.

21       And who is the recipient?

22  A.   Mr. Benson.

23  Q.   All right.

24       In the second paragraph he says:  In the Land Purchase

25  Agreement ASH is responsible for purchasing a minimum of 25 lots

1    per quarter from the A list of lots.  For the quarter ending

2    June 30, 2020, ASH was two lots short of the required pace of 25

3    lots per quarter.  For the recently completed quarter, ending

4    September 30, 2019, ASH is now short by 12 lots from the A list

5    lot requirement.

6        Do you see that?

7    A.    I do.

8    Q.    What's the A list?

9    A.    Those are the Phase A lots.

10   Q.    Okay.

11       What was the difference between Phase A lots and, for

12   example, Phase C lots, just to remind us?

13   A.    Just development status.  Phase A lots were ready to have a

14   home built at closing.  And Phase C weren't.

15   Q.    Okay.

16       If we go to the second to the last paragraph.  All right.

17   Do you see where it says, in Mr. Erickson's letter:  Written

18   notice of such default is hereby provided by email as in

19   paragraph 34 of the Land Purchase Agreement?

20   A.    I do.

21   Q.    Okay.

22       And you remember receiving this letter, right?

23   A.    I do.

24   Q.    Were you surprised?

25   A.    Shocked.

1   Q.    Why?

2   A.    It would be catastrophic for us to be in default.  We have

3   obviously paid for the land, and that was how the business was

4   going to continue.

5         We also just disagreed.  We were ahead, in our minds.

6   Q.    Okay.

7         What was ASH's position when you received this letter?

8   A.    That we had actually purchased more than the required

9   minimum number of Phase A lots.

10  Q.    What's the basis for that?

11  A.    We purchased a number of lots at closing that Mr. Erickson

12  was not giving us credit for.

13  Q.    How many?  Do you recall?

14  A.    I believe it was 18.

15  Q.    Okay.

16        Did ASH attempt to explain the situation to Mr. Erickson?

17  A.    We did.

18  Q.    Okay.

19        And did he back down?

20  A.    He did not.

21        MR. KRAMER:  Could I have the final communication in

22  this package, please?

23  BY MR. KRAMER:

24  Q.    All right.

25        Mr. Erickson writes here -- sorry.  What did you say the

1    date of this letter was?

2    A.    It's not clear.  It's a response to the October 13 letter.

3    It's dated as October 1st, but it would be after October 13th.

4    Q.    Okay.

5         So he writes here:  In essence, your response and our

6    difference of opinion centers on the 18 lots purchased as part

7    of the original purchase package of Grayhawk Homes, Inc. assets.

8         We can argue perspectives repeatedly, but in the end the

9    two positions are clear and my counsel and I just plain disagree

10    with the position and actions executed by American Southern

11    Homes, LLC in this area.

12         Do you remember that response?

13    A.    I do.

14    Q.    Okay.

15         Did you believe that ASH was actually in default?

16    A.    I did not.

17    Q.    What did ASH do after Mr. Erickson sent this letter,

18    sometime after October 13h?

19    A.    We purchased the lots he was requesting us to purchase.

20    Q.    Why?

21    A.    We couldn't afford to be in default.  It meant the end of

22    our business.

23    Q.    What position did Mr. Erickson hold at the company at the

24    time?

25    A.    He would have been a member.  He would have been a Board

1    member.  He would have been an executive committee member.  He

2    would have been a consultant.

3    Q.    How many weeks later did he become the interim CEO?

4    A.    Probably about two.

5    Q.    Why was it important, if at all, to appease Mr. Erickson

6    here?

7    A.    He had made it clear to the company that he was going to be

8    investing more money.  We also needed the lots.  We needed to

9    continue our business.

10              MR. KRAMER:  Let's take that down.

11    BY MR. KRAMER:

12    Q.    Were there any other issues or disputes between Mr.

13    Erickson and ASH management in the fall of 2020?

14    A.    There were.

15    Q.    Okay.

16          Was there any issues related to the pace of lot takedowns?

17    A.    Yes.

18    Q.    Could you explain?

19    A.    Yes.

20          Mr. Erickson was constantly advising us to buy more lots.

21    To buy lots faster.  He didn't think we were doing things quick

22    enough.

23    Q.    What types of things?

24    A.    He didn't think we were building homes quick enough.  He

25    didn't think we were buying the lots quick enough.  He didn't

1    think we were closing enough homes.

2    Q.    Did the management team look into these allegations?

3    A.    We did.  We did some internal analysis.

4    Q.    Let me define my terms here.

5         Who was on the management team at the time at ASH?

6    A.    That would have been Mr. Pehrkon, Mr. Benson, and I was

7    there as well.

8    Q.    We talked about Mr. Benson.  He is the interim CEO at that

9    point.  Correct?

10   A.    Yes.

11   Q.    Who was Mr. Pehrkon?

12   A.    He is an executive vice president with the company focused

13   on homebuilder acquisitions.

14   Q.    Okay.

15        So what did you and the team conclude at that point?

16   A.    At that point, our analysis showed that we had actually

17   closed more homes.  We were building homes quicker.  And we had

18   purchased more lots.  So were basically ahead of schedule

19   compared to what Mr. Erickson had previously done.

20   Q.    Previously done when?

21   A.    We used comparable time periods.  So we looked at, I want

22   to say, it was the first nine months of 2019 versus the first

23   nine months of 2020.

24   Q.    You said there was some analysis done.

25              MR. KRAMER:  Let's take a look at PX403D, just for the

 1   witness.

 2            Your Honor, this is a spreadsheet, so we need to use

 3   the native file.

 4            THE COURT:  I don't know what that means.

 5            MR. KRAMER:  We need to use just a different -- just

 6   to show it in a different way.

 7            THE COURT:  You need us to do something or are you

 8   going to do that?

 9            MR. KRAMER:  Not at all.  We have it under control,

10   sir.

11   BY MR. KRAMER:

12   Q.   Mr. Twiss, do you recognize this document that's on your

13   screen?

14   A.   I do.

15   Q.   High level, without talking about the substance just yet,

16   what's in the first tab?

17   A.   So this is the summary of our analysis that we had

18   conducted that I was just referring to.

19   Q.   Okay.

20        And what's in the second tab?

21   A.   That is the backup data that created the data on the first

22   page.

23   Q.   Were you involved in putting this together?

24   A.   I was.

25   Q.   Okay.

1          MR. KRAMER:  Your Honor, plaintiffs offer PX403D into

2    evidence.

3          THE COURT:  Any objection?

4          MR. SHEBELSKIE:  No, sir.  If it can be produced.

5          MR. KRAMER:  It has been produced.

6          MR. SHEBELSKIE:  I know.  A copy that can go back to

7    the jury room.

8          MR. KRAMER:  Of course.

9          THE COURT:  It's admitted.

10         (PLAINTIFFS EXHIBIT PX403D:  Received in evidence.)

11   BY MR. KRAMER:

12   Q.   Okay.

13        So what's the name of the first tab of the spreadsheet,

14   Mr. Twiss?

15   A.   "Summary."

16   Q.   Okay.

17        And what was the purpose of creating this document?

18   A.   We were trying to analyze the claims Mr. Erickson had made

19   that we weren't starting enough homes, that we were building

20   slower.  That's what we were trying to do is just see what the

21   data showed.

22   Q.   What type of data did you use?

23   A.   All the homes in inventory.  So we looked at their start

24   date versus their CO date -- certificate of occupancy.

25        So we looked at that data to find out how long it was

1    taking each party to build a home.

2        We were trying to figure out who had started how many homes

3    in the same time period.  How many closings had occured.  How

4    many homes were sold.

5    Q.    Let's define some terms.

6        What's a start date?

7    A.    So a start date, in this exercise, was when the purchase

8    orders went out to the subcontractors.  So the home was actually

9    started because the order to build it was released to the subs.

10   Q.    What's a CO?

11   A.    Certificate of occupancy.  That's issued by the county or

12   the city that says the home is ready to be occupied.

13   Q.    Okay.

14       So what's on line 5 here?

15   A.    So that's Old Grayhawk average construction time for homes

16   started prior to October 1st of 2019.

17   Q.    Okay.

18       What's Old Grayhawk?

19   A.    That would have been Mr. Mr. Erickson's Grayhawk.

20   Q.    And what does the data show?

21   A.    It showed that the average construction time was 170 days.

22   Q.    What's on line 7?

23   A.    That is ASH-Grayhawk average construction time for homes

24   started October 1st 2019 and forward.

25   Q.    What does the data show?

A.    The average construction time was 122 days.

Q.    So is that faster or slower?

A.    Faster.

Q.    Why did you start this analysis?  Why did you use the October 1st, 2019 date as the cut-over point?

A.    Couple of things:  One was trying to have a comparable period.

      The other is we were trying to be fair to Mr. Erickson.  If he started a home right before he sold his company and we blew the schedule, it wouldn't be his fault that the home took too long to build.  It would be our fault.  So we wanted to be fair in homes that we inherited.  We wanted to make sure we were taking responsibilty for it if it missed its schedule.

Q.    How long after October 1st, 2019, did ASH acquire the company?

A.    About 45 days.

Q.    Okay.

      What is on line 13?

A.    So that is the -- it's a start list for Old Grayhawk, the first nine months of 2019, and it shows that Mr. Erickson had started 185 homes.

Q.    What's on line 14?

A.    It shows that ASH-Grayhawk in the same period, the first nine months of 2020, started 190 homes.

Q.    What's in lines 17 and 18?

1    A.    It's looking at closings.  So closed homes for the first

2    nine months of both years.  So for Old Grayhawk, the first nine

3    months of 2019 Mr. Erickson had closed 190 homes.

4         For ASH-Grayhawk, the first nine months of 2020 we closed

5    206 homes.

6    Q.    Okay.

7         So when ASH did this analysis, was it still the case that

8    it was able to buy lots ahead of schedule from Mr. Erickson?

9    A.    Yes, sir.

10              MR. KRAMER:  Let's take that down, please.

11   BY MR. KRAMER:

12   Q.    I want to talk about Dorn Homes.  Are you familiar with

13   Dorn Homes?

14   A.    Yes, sir.

15   Q.    All right.

16         What is it?

17   A.    It is a homebuilder in Prescott, Arizona that we purchased

18   January of '21.

19   Q.    Is this a company that ASH was exploring the purchase of in

20   September of 2020?

21   A.    That's correct.  We were.

22   Q.    And how did ASH initially get connected with Dorn Homes?

23   A.    Mr. Erickson introduced us.

24   Q.    Do you know what his connection was?

25   A.    He knew Mr. Grounds, who was the owner of Dorn Homes.  They

1  had been friends.  They worked in the same Builder 20 group.

2  Q.  What's a Builder 20 group?

3  A.  It's a group of builders, small private builders, and they

4  get together a couple of times and basically trade intel.

5  Q.  Okay.

6      Had ASH at this point entered into a non-disclosure

7  agreement with Dorn?

8  A.  We had.

9  Q.  What's a non-disclosure agreement?

10 A.  It's an agreement intended to protect both parties'

11 non-public, their private information.

12 Q.  So we call that an NDA sometimes?

13 A.  Yes, sir.

14 Q.  What's the role of an NDA?  What step is it in the process

15 of acquiring a homebuilder?

16 A.  Generally, it's the first step.

17 Q.  Is it unusual to have an NDA when exploring a process like

18 that?

19 A.  Not at all.

20 Q.  Okay.

21     So by September 2020, had ASH entered into a Letter of

22 Intent with Dorn?

23 A.  There had been one entered into.  Yes.

24 Q.  What's a Letter of Intent?

25 A.  It's a framework for a transaction.  It's a general

1   non-binding letter setting forth the terms of the deal that has

2   been struck.

3   Q.   Okay.

4        What types of terms?

5   A.   Purchase price, premium, closing date sometimes, the

6   diligence timeframe, employment agreements, compensation, things

7   like that.

8   Q.   Purchase price; does that include things like book value

9   plus premium?

10  A.   It would.

11  Q.   Okay.  What was -- you mentioned diligence.  What's that

12  mean?

13  A.   The process of investigating the underlying data they have

14  given us.  So at that point we are relying on preliminary

15  numbers.  We don't know a whole lot.  We have talked and we have

16  put an offer together, and then we are going to kick off an

17  investigation and analysis of their data.  So they are going to

18  give us more data, and they are going to give us more

19  information, and we are going to make sure it checks out and

20  proves what they have told us.

21  Q.   What's the purpose of doing that investigation?

22  A.   It's the only way you can go to closing.  You have to make

23  sure that what they have told you is correct.  That if they say

24  they have a thousand lots, they actually have a thousand lots

25  and they don't have 500 lots.  You have to make sure you know

1     what you are buying.

2     Q.    So in September of 2020, to set the timeframe, what was the

3     status of the negotiations between ASH and Dorn?

4     A.    Some point during September of 2020 they had fallen apart.

5     Q.    Do you know why?

6     A.    We were told at the time that Mr. Grounds was not

7     interested in selling his company any longer.

8     Q.    Who told you that?

9     A.    It came from Mr. Erickson.

10    Q.    Did ASH -- did the management team prepare a new offer to

11    send to Mr. Grounds in late September 2020?

12    A.    We did.

13    Q.    Were you involved?

14    A.    I was.

15    Q.    Did it increase the amount of money being offered?

16    A.    It did.

17    Q.    Did ASH convey that offer to Mr. Grounds?

18    A.    We did not.

19    Q.    Why not?

20    A.    Mr. Erickson had instructed us not to.  He said that

21    Mr. Grounds was not interested in selling his company anymore,

22    and more money wasn't going to fix it.  It was a family matter

23    for him.

24    Q.    Was this before or after he became the interim CEO?

25    A.    This was before.

1   Q.   By the end of October 2020, was Greg Benson still the

2   interim CEO of ASH?

3   A.   He was not.

4   Q.   Who was?

5   A.   Mr. Erickson.

6   Q.   Who did Mr. Erickson appoint to manage ASH-Grayhawk when he

7   became the interim CEO?

8   A.   He appointed Kathy Long as division manager.

9   Q.   Were you surprised by that?

10   A.   I was.

11   Q.   Why?

12   A.   She didn't have the experience to be the division manager.

13   It's not who we would have appointed.  But she had been a

14   long-time employee of Mr. Erickson's, so it made sense.

15   Q.   Do you know what her background was with Grayhawk?

16   A.   She had been a long-time employee.  I believe she had

17   started maybe in the design center.

18   Q.   Okay.

19         MR. KRAMER:  Let's have PX220 up, please, for the

20   witness.

21   BY MR. KRAMER:

22   Q.   Do you recognize this document, Mr. Twiss?

23   A.   I do.

24   Q.   What is it?

25   A.   It's a written consent of the Board of Directors of

1    American Southern Homes Holdings, LLC, dated October 28, 2020.

2    Q.    What is a written consent?

3    A.    So it is the Board of Directors taking action without

4    having a formal meeting.

5    Q.    Did you receive a copy of that after it was signed?

6    A.    I did.

7            MR. KRAMER:  Plaintiffs offer PX220 into evidence,

8    Your Honor.

9            MR. SHEBELSKIE:  No objection, Your Honor.

10            THE COURT:  Admitted.

11        (PLAINTIFFS EXHIBIT PX220:  Received in evidence.)

12            MR. KRAMER:  Thank you.

13            Could we have Section 1, and the first few whereas

14    clauses up, please?

15    BY MR. KRAMER:

16    Q.    All right.

17        What was the date of this consent of the Board of

18    Directors, Mr. Twiss?

19    A.    October 28, 2020.

20    Q.    What impact did this consent have on Mr. Benson?

21    A.    It removed Mr. Benson as interim CEO of American Southern

22    Homes Holdings.

23        It also removed him as manager of American Southern Homes,

24    LLC and ASH-Grayhawk LLC.

25            MR. KRAMER:  Let's go to page 2.  Actually not just

1  yet.  A couple of questions.

2  BY MR. KRAMER:

3  Q.   Were you involved in the board-level discussions that

4  resulted in this consent being executed?

5  A.   I was not.

6  Q.   Okay.

7       How did you learn about it?

8  A.   After -- well, I saw a copy of it, but also I learned that

9  this happened when Mr. Erickson called me the following morning.

10  Q.   Okay.

11       And what did he say?

12  A.   He let me know that Mr. Benson was out as CEO, and that the

13  Board had put him in charge, and he wanted to make sure that I

14  was going to stay with the company.

15  Q.   What was your reaction?

16  A.   I was shocked.  I had no idea it was coming, so it caught

17  me by surprise.  And I did tell Mr. Erickson I would stay.

18  Q.   Okay.

19       Let's go to the second page.  There is a heading "formation

20  of committee."

21       Obviously this refers to a committee or specifically an LPA

22  committee.

23       Do you know what that is?

24  A.   I do.

25  Q.   Did you work with that committee?

A.   I did.

Q.   What was the function of that committee?

A.   The committee was trying to basically remove conflicts of interest from Mr. Erickson the land developer, and Mr. Erickson CEO.

So the goal was that Mr. Erickson, land developer, would work with the LPA committee to establish buying lots to just control those purchases to make sure that Mr. Erickson wasn't buying more than needed to for himself, essentially.

Q.   Why was there a conflict of interest?

A.   Because he was both CEO of the company buying the lots and making the decision to buy lots and CEO of the company selling the lots.

Q.   Who was on the committee?

A.   It would have been Mr. Scott, Mr. Cumbie and Mr. Sean Coleman.

Q.   Okay.

Let's take a look at the next section that has the heading Erickson Consulting Agreement, on page 3.

Do you see that?

A.   I do.

Q.   Did Mr. Erickson still have that Consulting Agreement -- or did Mr. Erickson have a Consulting Agreement with ASH at that time?

A.   He did.

1   Q.   When he became the interim CEO, did he change from a

2   consultant to an employee?

3   A.   He did not.

4   Q.   Okay.

5        How much was he paid as the interim CEO?

6   A.   $2000 a day.

7   Q.   A day?

8   A.   Yes, sir.

9   Q.   How many days a week?

10  A.   Five.

11  Q.   All right.

12       So how much is that on an annual basis?

13  A.   $520,000.

14           MR. KRAMER:   Okay.   We can take that down.

15  BY MR. KRAMER:

16  Q.   Let me ask you this:   When Mr. Erickson became the interim

17  CEO, did the negotiations with Dorn Homes resume?

18  A.   Almost immediately.

19           MR. KRAMER:   Let's have a look at PX86, please.

20  BY MR. KRAMER:

21  Q.   All right.   Do you recognize this communication?

22  A.   I do.

23  Q.   All right.

24       Can you identify it?

25  A.   I can.

1          It's an email from Mr. Pehrkon to Mr. Erickson and myself,

2    titled Dorn Priority Diligence List, dated November 4th, 2020,

3    and it has an attachment which is the ASH Dorn priority

4    diligence list 2011 03.

5               MR. KRAMER:   Could you show Mr. Twiss PX86A?

6    BY MR. KRAMER:

7    Q.   Mr. Twiss, my question will be, is this the attachment?

8    A.   It is.

9    Q.   Do you recognize it?

10   A.   I do.

11   Q.   What is it?

12   A.   It's the diligence list for the Dorn acquisition with a

13   list of requests from Dorn.

14              MR. KRAMER:   Your Honor, plaintiffs offer PX86 and

15   PX86A into evidence.

16              MR. SHEBELSKIE:   No objection.

17              THE COURT:   They are admitted.

18       (PLAINTIFFS EXHIBITS PX86 and PX86A:   Received in

19   evidence.)

20              MR. KRAMER:   Thank you.

21   BY MR. KRAMER:

22   Q.   Okay.

23       So the date of this email was, I think you just said,

24   November 4, 2020.

25       Do I have that right?

```
 1    A.    That's correct.

 2    Q.    Okay.

 3          So how long had it been since Mr. Erickson became the

 4    interim CEO?

 5    A.    Just a few days.

 6    Q.    And what happened at around this time?

 7    A.    Went to LOI with Dorn again.

 8    Q.    LOI?

 9    A.    Yes, sir.

10    Q.    You said we went with LOI with Dorn again.  Is that right?

11    A.    Yes, sir.

12    Q.    Who prepared this due diligence checklist that was attached

13    to the email?

14    A.    Mr. Pehrkon.

15    Q.    And, again, what was his role at ASH?

16    A.    He was EVP, so executive vice president, focused on

17    homebuilder acquisitions.

18    Q.    What was the purpose of the due diligence list?

19    A.    We were discussing an acquisition with Dorn again.  It was

20    going to have a very quick closing date, so it was high priority

21    items that we needed almost immediately so that we could kick

22    off diligence and work towards a very quick closing.

23          MR. KRAMER:  Could we have 86A up on the screen,

24    please?

25          Thank you.
```

1  BY MR. KRAMER:

2  Q.   So is this the diligence list up on the screen?

3  A.   Yes, sir.

4  Q.   Okay.

5       Does ASH allege that Mr. Erickson later made improper use

6  of this document?

7  A.   We do.

8  Q.   Okay.

9       So you said ASH entered into an LOI with Dorn.  Was it

10 around this time?

11 A.   It was.

12 Q.   Okay.

13      MR. KRAMER:  We can take that down and let's look at

14 PX63, please.

15 BY MR. KRAMER:

16 Q.   Could you identify this document?

17 A.   Yes.

18      So the top email is from Mr. Erickson to Mr. Coleman --

19 Mr. Marshall Coleman and Mr. Sean Coleman forwarding Dave

20 Grounds an executed copy of Dorn Homes, and the attachment is

21 ASH and DG executed LOI 2011 07.

22 Q.   Is there an attachment?  What is the attachment?

23 A.   The attachment would have been the executed LOI.  So it's

24 titled ASH and DG executed LOI 2011 07.

25 Q.   Are you familiar with the executed LOI?

```
 1   A.   I am.
 2          MR. KRAMER:  Your Honor, Plaintiffs offer PX63 into
 3   evidence.
 4          MR. SHEBELSKIE:  No objection, Your Honor.
 5          THE COURT:  Admitted.
 6      (PLAINTIFFS EXHIBIT PX63:  Received in evidence.)
 7          MR. KRAMER:  All right.  If we could have the next
 8   page up with the -- sorry, let's stick with this email here.
 9          Can you blow up the top email?
10   BY MR. KRAMER:
11   Q.   Mr. Erickson writes here on November 7th:  Marshall, please
12   see attached my first real accomplishment as CEO.  I will call
13   you shortly.
14          Do you see that?
15   A.   I do.
16   Q.   Is this the same Dave Erickson who had just told ASH that
17   Mr. Grounds was no longer willing to sell his company?
18   A.   It is.
19   Q.   Who is Marshall?
20   A.   He would have been chairman of the Board at the time.
21   Q.   The Board of?
22   A.   Directors for American Southern Homes Holdings.
23   Q.   What does the chairman of the Board do?  What's the
24   function of the chairman of the board at American Southern Homes
25   Holdings?
```

1  A.   He presides over the Board meetings.

2  Q.   Does he have any further function in that capacity?

3  A.   He does not.

4       MR. KRAMER:  Let's see the attachment, please.  Okay.

5  We are on page 3 here.  That's right.  Thank you.

6  BY MR. KRAMER:

7  Q.   Is this the LOI?

8  A.   It is.

9  Q.   Did you sign on behalf of ASH?

10 A.   I did.

11 Q.   What's the date?

12 A.   November 7, 2020.

13 Q.   All right.

14      So in the LOI, how much did ASH agree to pay to acquire

15 Dorn?

16 A.   I believe it was book value plus $20 million in premium.

17 Q.   All right.

18      Was any of that premium to be paid later?

19 A.   It was.

20 Q.   How much?

21 A.   I believe it was about 10 million.

22 Q.   Did ASH ultimately acquire the assets of Dorn Homes?

23 A.   We did.

24 Q.   Were these at least the purchase price terms for that

25 acquisition?

1    A.   They are.

2    Q.   Who negotiated them?

3    A.   Mr. Erickson.

4    Q.   How did this offer compare to the offer that Mr. Erickson

5    told the management team not to make in September?

6    A.   Substantially similar.

7    Q.   What do you mean "substantially similar"?

8    A.   The premium was the same.

9         We had had a stock component in our proposal that this one

10   did not reflect.

11   Q.   Did ASH ultimately acquire Dorn Homes?

12   A.   We did.

13   Q.   Was Mr. Erickson still the interim CEO at that point?

14   A.   He was not.

15   Q.   Okay.

16        He replaced Greg Benson, right?

17   A.   That's correct.

18   Q.   Did Mr. Grounds, the owner of Dorn Homes, ever express to

19   you any concerns he had about Mr. Benson's leadership?

20   A.   He did not.

21   Q.   How long did it take for Mr. -- how long did Mr. Erickson

22   remain as the interim CEO of ASH?

23   A.   Less than two months.

24   Q.   Do you recall the date on which he resigned?

25   A.   December 20th, 2020.

1    Q.    How did you find out about that?

2    A.    He sent a letter.

3    Q.    Did you see it after it came in?

4    A.    I did.

5          MR. KRAMER:  Could we have PX93A, please, for the

6    witness?

7    BY MR. KRAMER:

8    Q.    Could you just identify this document, please, Mr. Twiss?

9    A.    I can.

10         This is a letter from Mr. Erickson to Mr. Marshall Coleman

11    dated December 20, 2020.

12    Q.    And do you recall receiving this letter?

13    A.    Yes, sir.

14         MR. KRAMER:  Your Honor, plaintiffs offer PX39A into

15    evidence.

16         MR. SHEBELSKIE:  No objection.

17         THE COURT:  Admitted.

18    (PLAINTIFFS EXHIBIT PX93A:  Received in evidence.)

19    BY MR. KRAMER:

20    Q.    Okay.

21         In the second paragraph, Mr. Erickson writes:  As we

22    discussed and agreed this afternoon, yourself and other senior

23    staff members of ASH intend to take on the role of finishing the

24    Dorn Homes purchase in Prescott, Arizona.

25         Do you see that?

1    A.    I do.

2    Q.    Were you one of the senior staff members at ASH who took on

3    the role of finalizing that transaction?

4    A.    I was.

5    Q.    What work remained to be done at this point on December 20?

6    A.    We were still in the diligence process, and we were still

7    finalizing the documents that were going to control the actual

8    transaction.  So we were still negotiating those with

9    Mr. Grounds' counsel.

10   Q.    How long did it take until that deal closed?

11   A.    End of January 2021.

12   Q.    In the last paragraph in this letter, Mr. Erickson writes:

13   Clearly the Board of ASH does not have confidence in my filling

14   the role of CEO for ASH.  As such, I am resigning effectively

15   immediately as interim CEO for ASH.

16        Do you see that?

17   A.    I do.

18   Q.    Were you surprised by this development?

19   A.    I was.

20   Q.    Why?

21   A.    He had indicated previously that he would maintain interim

22   CEO until the end of February.

23   Q.    End of February of what year?

24   A.    2021.

25   Q.    Okay.

1      On the next page, if we could scroll down a bit, he writes:

2  Additionally, I am hereby resigning from the Board of Directors

3  for ASH effective immediately.  Obviously I remain a

4  shareholding member of ASH.

5      Do you see that?

6  A.   I do.

7  Q.   Okay.

8      Do you recall Mr. Erickson giving a reason for resigning

9  from the Board?

10  A.   I believe he said he thought it would present a conflict of

11  interest.

12  Q.   All right.  Let's look at the next paragraph.

13      He writes here:  In the past year I have developed

14  ambitions to do more things in the homebuilding and development

15  business, and feel that my Board responsibilities with ASH are

16  likely to constitute conflict of interest with those goals and

17  possibilities.

18      Do you see that?

19  A.   I do.

20  Q.   Okay.

21      When this letter came in, did you know what Mr. Erickson

22  planned to do next?

23  A.   I did not.

24  Q.   Okay.

25          MR. KRAMER:  Let's have -- let's take that down and

1    take a look at PX72, please.

2    BY MR. KRAMER:

3    Q.   Can you identify this document, please, Mr. Twiss?

4    A.   Yes.

5         It's an email from Mr. Erickson to Marshall Coleman and

6    cc-ing Mr. Kramer, Mr. Sack, Mr. Sean Coleman.

7         And it's titled Request for Clarification on ASH

8    Restrictions, dated December 31, 2020.

9    Q.   Is there an attachment?

10   A.   There is.

11   Q.   If we scroll down, can you identify the attachment?  Next

12   page.

13   A.   Yes.  This is a letter accompanying the email from

14   David Erickson to Mr. Coleman dated December 30th, 2020.

15   Q.   Okay.

16        And do you recall when these communications came in?

17   A.   I did.  I do.

18   Q.   Have you seen them?

19   A.   I have.

20        MR. KRAMER:  Your Honor, plaintiffs offer PX72 into

21   evidence.

22        MR. SHEBELSKIE:  No evidence.

23        THE COURT:  Admitted.

24   (PLAINTIFFS EXHIBIT PX72:  Received in evidence.)

25

1    BY MR. KRAMER:

2    Q.    Let's stay on the letter here.

3          This letter is dated December 30, 2020, correct?

4    A.    Yes, sir.

5    Q.    At this point, how long had it been since Mr. Erickson

6    resigned as the interim CEO?

7    A.    Ten days.

8    Q.    Second paragraph he writes:  Specifically -- well, he

9    writes in the first paragraph:  As I have disclosed previously,

10   I have developed ambitions to do more things in the homebuilding

11   and development business with my emphasis being in areas well

12   outside of the Columbus, Georgia market region so as to avoid

13   any competing activities with ASH-Grayhawk.

14         Do you see that?

15   A.    I do.

16   Q.    Then he writes:  Specifically, I am intending to purchase

17   one or more homebuilding companies in the near term for my own

18   investments.  And if that step should go well, I may consider

19   doing additional purchases in the future.

20         Do you see that?

21   A.    I do.

22   Q.    Did this cause any concerns for you when Mr. Erickson

23   announced his intentions on December 30, 2020?

24   A.    It did.

25   Q.    Did you previously know that he was going into the business

1    of acquiring homebuilders?

2    A.    We did not.

3    Q.    Okay.

4         What concerns did you have?

5    A.    Well, Mr. Erickson had been interim CEO and a consultant

6    and a Board member, so he had been party to conversations we

7    were having about potential targets, the terms of deals we had

8    been working on, the information we had received from those

9    builders.  Basically everything we had been working on to buy

10   more homebuilders, he was a part of.

11              MR. KRAMER:  Let's scroll down to the bottom.  Yes.

12   That's right.

13   BY MR. KRAMER:

14   Q.    At the bottom of the third paragraph there is a sentence:

15   Transparency by all will ensure that needless fights of

16   interpretation are avoided.

17         Do you see that?

18   A.    I do.

19   Q.    When he sent this letter, had Mr. Erickson disclosed that

20   he was attempting to acquire some of the same homebuilders he

21   had worked to acquire for ASH?

22   A.    He had not.

23              MR. KRAMER:  So let's take that down and take a look

24   at PX246A, which is preadmitted.

25   BY MR. KRAMER:

1  Q.   Do you recognize this document, Mr. Twiss?

2  A.   I do.

3  Q.   What is it?

4  A.   It is the Consulting Agreement between ASH-Grayhawk, LLC,

5  American Southern Homes Holdings, LLC, and Mr. Erickson.

6  Q.   When did Mr. Erickson -- what's the date of this agreement?

7  A.   November 15, 2019.

8  Q.   Is that the closing date of the Grayhawk acquisition?

9  A.   Yes, sir.

10  Q.   All right.

11      In the second paragraph it says -- sorry.  Fourth

12  paragraph, it says:  Whereas the company and ASH require, as a

13  condition of the companies' utilizing Erickson as a consultant,

14  that Erickson provide to the company, in addition to the

15  consulting services, the confidentiality and other protections

16  set forth therein.

17      Do you see that?

18  A.   I do.

19  Q.   Okay.

20      Are there confidentiality terms elsewhere in this

21  agreement?

22  A.   Yes, sir.

23  Q.   Does ASH allege, in this case, that Mr. Erickson breached

24  this agreement?

25  A.   We do.

1  Q.   Okay.

2       What's the "company" defined to mean in this agreement?

3  A.   It is ASH-Grayhawk LLC.

4  Q.   What is the term "ASH" defined to mean in this agreement?

5  A-s-h.

6  A.   American Southern Homes Holdings, LLC.

7  Q.   Is that the homebuilder acquisition company?

8  A.   It is.

9  Q.   All right.

10      Is that the company for which Mr. Erickson served on the

11 Board?

12 A.   It is.

13 Q.   That's the company for which he was the interim CEO?

14 A.   Yes, sir.

15 Q.   Okay.

16      What's the purpose for imposing confidentiality obligations

17 on someone in those types of positions?

18 A.   They are going to be privy to a ton of non-public

19 information, so you have to have that -- one, no one is going to

20 give you information if you are not protecting it, because it's

21 private to them and they are only sharing it because they know

22 you won't disclose it.  So it's the genesis of the business to

23 even have those.

24 Q.   Okay.

25      Just focusing on Section 1A, does that describe the

1    consulting service that Mr. Erickson agreed to provide?

2    A.    It does.

3    Q.    All right.

4         And does that -- high level, what type of consulting

5    services are we talking about here?

6    A.    So he was going to provide consulting services to ASH

7    leadership from the local perspective, so helping us analyze

8    land deals and giving us feedback, and just how to run the

9    business in Columbus.

10        And also at the American Southern Homes Holdings' level,

11    advice on future acquisitions, other homebuilders we might buy,

12    such as Dorn Homes he introduced us to.

13    Q.    Okay.

14        If we take a look at Section 1B, does that show

15    Mr. Erickson's compensation as a consultant for ASH and

16    ASH-Grayhawk?

17    A.    It deals with the amount of time he will devote in a

18    12-month period.  Yes.

19    Q.    Thank you for the correction.

20        How many hours per month -- well, how many hours in a

21    12-month period did Mr. Erickson agree to provide consulting

22    services?

23    A.    192 hours.

24    Q.    How does that break down on a monthly basis?

25    A.    16 hours per month.

1  Q.   And what was Mr. Erickson to be paid for that 16 hours per

2  month?

3  A.   $2,000 a day.

4  Q.   How much does that come out to on an annual basis?  Maybe

5  we can look at Section 3A.

6  A.   It's $48,000 a year.

7  Q.   Okay.

8       Is that reflected in Section 3A here?

9  A.   It is.

10  Q.   Okay.

11      What was he paid if he worked more than 16 hours in a

12  month?

13  A.   250 per hour.

14  Q.   Was there any compensation for travel days?

15  A.   He was paid $1500 for a travel day.

16  Q.   What's a travel day?

17  A.   Him traveling outside of -- traveling for work, so him

18  traveling to help advise.  An example would be he went to Austin

19  to help us advise us on a homebuilder acquisition.  Him

20  traveling to go to Austin would have been a travel day for him.

21  Q.   Okay.

22      Let's look at Section 2 and tell me, Mr. Twiss, what was

23  the term of this agreement?  How long was it supposed to last?

24  A.   Two years from the -- basically the start of it, when

25  the -- it would have been after the termination of the

1    employment agreement, it went two years from that date.

2    Q.   What's the employment agreement?

3    A.   It was another agreement that was part of the acquisition,

4    so it was signed on the same day, 11-15-2019.

5    Q.   Did Mr. Erickson sign that agreement, too?

6    A.   He did.

7    Q.   Did he serve as an employee of ASH?

8    A.   He did not.

9    Q.   Why not?

10   A.   He had already hired his replacement, so he immediately

11   became a consultant as of the day of closing.

12   Q.   But he still signed that employment agreement, right?

13   A.   Yes, sir.

14   Q.   Let's take a look at Section 7.  The heading is,

15   "confidentiality."

16        Do you see that?

17   A.   I do.

18   Q.   The first sentence says:  Erickson acknowledges that in the

19   performance of the consulting services under this agreement he

20   will receive or have access to certain non-public, proprietery,

21   and/or confidential information relating to the business and

22   affairs of the company and/or ASH.

23        Do you see that?

24   A.   I do.

25   Q.   What type of non-public information did Mr. Erickson have

1    access to?

2    A.   He had access to the homebuilders we were looking at.  The

3    data we had received from them.  The terms of the deals we were

4    putting together.  He had access to employment information, so

5    people we were considering hiring.  Anything -- not only our own

6    internal data that wasn't public, but other parties' internal

7    data that wasn't public.

8    Q.   Sorry.  Could you repeat that last part again?

9    A.   Sorry.

10        Not only our own internal data, but also data given to us

11   by other third parties that had all been private and non-public.

12   Q.   Why do you say that information was non-public?

13   A.   Because it would be their books and records.  It could be

14   our books and records.  All things that you are not going to

15   find anywhere outside of a confidentiality agreement before it's

16   given.

17   Q.   So had ASH entered into confidentiality agreements with

18   these companies?

19   A.   We had.

20   Q.   Okay.

21        There is also a reference in here, a little bit further

22   down in the paragraph, two lines down, to information concerning

23   personnel, compensation, recruiting and training.

24        Do you see that?

25   A.   I do.

1  Q.    Did Mr. Erickson have access to that type of information as

2  well?

3  A.    He did.

4  Q.    Can you give me an example?

5  A.    Mr. Darnold would be an example of that.  He had come to

6  ASH confidentially and we -- Mr. Erickson had actually

7  interviewed him in his role as interim CEO, and he came to know

8  him through that action.

9  Q.    Why do you say that Mr. Darnold came to ASH confidentially?

10  A.    He wasn't on the market looking for a job.

11         MR. SHEBELSKIE:  Objection.  Hearsay, Your Honor.

12  This would have to be information learned from a third party,

13  Mr. Darnold.

14         MR. KRAMER:  I don't think there is a statement in

15  there, Your Honor.

16         THE COURT:  If the only way he learned it is someone

17  else told him, it would be asking him to testify as to hearsay.

18         Sustained, unless you have got some other way to admit

19  it.

20         MR. KRAMER:  That's fine.  We can move on from that

21  for now.

22  BY MR. KRAMER:

23  Q.    So does ASH -- let's go to the employment agreement.

24  That's referenced in here, isn't it?  It says at the bottom:

25  Erickson agrees and acknowledges that such confidential

 1  information shall be subject to the terms and obligations

 2  described in Article 6 of the employment agreement?

 3  A.    It does.

 4  Q.    Okay.

 5            MR. KRAMER:  Let's have PX246C up, which has also been

 6  preadmitted.

 7  BY MR. KRAMER:

 8  Q.    Do you recognize this document, Mr. Twiss?

 9  A.    I do.

10  Q.    What is it?

11  A.    This is the employment agreement between ASH-Grayhawk, LLC,

12  American Southern Homes Holdings, LLC, and Mr. Erickson.

13  Q.    Are there confidentiality terms in this document?

14  A.    There are.

15            MR. KRAMER:  Could we have Section 6, please, which is

16  on page 5?

17  BY MR. KRAMER:

18  Q.    What's the heading of Section 6.00?

19  A.    "Confidential information."

20  Q.    All right.

21            MR. KRAMER:  Let's take a look at Section 6.02,

22  heading "Nondisclosure of Confidential Information".

23  BY MR. KRAMER:

24  Q.    Do you see that?

25  A.    I do.

1    Q.    All right.  I am not going to read the whole thing.  About

2    halfway down the page here you see the term "executive"?

3         Who was the executive?

4    A.    Mr. Erickson.

5    Q.    It says:  Executive agrees to keep the confidential

6    information confidential.  To use the confidential information

7    only in connection with the carrying out of duties and

8    responsibilities under this agreement.  Not to use the

9    confidential information after the termination of this agreement

10   for any reason.

11        And it goes on.

12        Do you see that?

13   A.    I do.

14   Q.    Okay.

15        Does ASH allege that Mr. Erickson broke this promise?

16   A.    We do.

17   Q.    In what way?

18   A.    He used confidential information after the termination of

19   this agreement for any reason.

20   Q.    Okay.

21        Returning to the Consulting Agreement, did ASH terminate

22   that agreement when Mr. Erickson resigned as the interim CEO?

23   A.    We did not.

24   Q.    Did it remain in place?

25   A.    It did.

1    Q.    Did ASH continue to pay Mr. Erickson consulting fees?

2    A.    We did.

3    Q.    Did there come a time when ASH terminated the agreement?

4    A.    There did.

5    Q.    Okay.

6          When was that?

7    A.    April of 2021.

8    Q.    Okay.

9          Prior to that time, before ASH terminated the agreement,

10   did you offer Mr. Erickson the opportunity to terminate it

11   mutually?

12   A.    I did.

13   Q.    What did he say?

14   A.    No.

15   Q.    Okay.

16         MR. KRAMER:  Let's go in the Consulting Agreement to

17   page 3.  In particular --

18   BY MR. KRAMER:

19   Q.    Well, what was the basis for the termination?  Was it a for

20   cause termination or a without cause termination?

21   A.    We terminated for-cause.

22   Q.    Okay.

23         MR. KRAMER:  Let me see the definition of "cause"

24   here.

25

1    BY MR. KRAMER:

2    Q.    All right.

3          "Cause," little Roman Numeral i:  Erickson's

4    misappropriation of any money, assets, or properties of the

5    company, resulting or intended to result directly or indirectly

6    in personal gain or enrichment to Erickson.

7          Do you see that?

8    A.    I do.

9    Q.    Okay.  Did ASH terminate for cause under the auspices of

10   this provision?

11   A.    We did.

12   Q.    What type of information does ASH allege that Mr. Erickson

13   used for personal gain?

14   A.    The identity of the builders that he attempted to acquire.

15   Mr. Darnold's identity attempting to hire him.  The non-public

16   information he used.

17   Q.    Little Roman Numeral v also refers to a breach of this

18   agreement.

19         Does ASH contend that the actions you just described were

20   also a breach of the Consulting Agreement confidentiality terms?

21   A.    We do.

22   Q.    And the employment agreement confidentiality terms?

23   A.    We do.

24   Q.    Okay.

25              MR. KRAMER:  We can take that down.

```
 1                 Let's get into specifics.
 2   BY MR. KRAMER:
 3   Q.    Are you familiar with Miramonte Homes?
 4   A.    I am.
 5   Q.    What is Miramonte Homes?
 6   A.    They are a homebuilder in Southern Arizona.
 7   Q.    When Mr. Erickson was the interim CEO, was he working on a
 8   potential acquisition of Miramonte for ASH?
 9   A.    He was.
10   Q.    And at the time he left, what was the status of that
11   transaction?
12   A.    We were focused on closing the Dorn transaction, but it was
13   still an open opportunity for us.
14   Q.    What does that mean, we were focused on the Dorn
15   transaction?
16   A.    We have to prioritize what we were doing, and our priority
17   was getting the Dorn acquisition closed and across the finish
18   line.
19   Q.    Did ASH have an NDA or non-disclosure agreement in place
20   with Miramonte when Mr. Erickson left?
21   A.    We did.
22   Q.    Are you familiar with that document?
23   A.    I am.
24         MR. KRAMER:  Can we have 217A up for the witness,
25   please?
```

1    BY MR. KRAMER:

2    Q.    Is this the NDA with Miramonte?

3    A.    It is.

4            MR. KRAMER:  Your Honor, plaintiffs offer PX217A into

5    evidence.

6            THE COURT:  Any objection?

7            MR. SHEBELSKIE:  No, sir.

8            THE COURT:  Admitted.

9        (PLAINTIFFS EXHIBIT PX217A:  Received in evidence.)

10   BY MR. KRAMER:

11   Q.    What's the date of --

12           MR. KRAMER:  Let's have it up on the screen.

13   BY MR. KRAMER:

14   Q.    Let me know what the date is of the agreement with

15   Miramonte.

16   A.    November 19, 2020.

17   Q.    Okay.

18           MR. KRAMER:  Can we scroll down to page 3?

19   BY MR. KRAMER:

20   Q.    My question, Mr. Twiss, is, who signed this non-disclosure

21   agreement on behalf of ASH?

22   A.    Mr. Erickson.

23   Q.    Do you see his signature?

24   A.    I do.

25   Q.    What was his position at the time?

1    A.    CEO.

2    Q.    Okay.

3          Are you aware of ASH ever giving Mr. Erickson permission to

4    pursue Miramonte Homes on his own?

5    A.    I am not.

6    Q.    Who is Tony Avala?

7    A.    He works for Builder Adviser Group.

8    Q.    What is Builder Advisory Group?

9    A.    They are a homebuilding broker.

10   Q.    What does that mean?  What does a homebuilding broker do?

11   A.    It means they help homebuilders sell.

12   Q.    Okay.

13             THE COURT:  Go ahead.

14             MR. KRAMER:  Okay.

15   BY MR. KRAMER:

16   Q.    Did you ever give Mr. Avala authority to give a green light

17   to Mr. Erickson to pursue Miramonte his own?

18   A.    I did not.

19   Q.    Are you aware of anyone at ASH ever doing that?

20   A.    I am not.

21   Q.    When Mr. Erickson was interim CEO, was he working on a

22   potential acquisition of Prominence Homes with ASH?

23   A.    He was.

24   Q.    What's Prominence Homes?

25   A.    They are a homebuilder in Austin, Texas.

1    Q.   Were you involved in that effort as well?

2    A.   I was.

3         MR. KRAMER:  Could I have PX257, please?  Page 1.

4    BY MR. KRAMER:

5    Q.   Do you recognize this document, Mr. Twiss?

6    A.   I do.

7    Q.   Could you identify it, please?

8    A.   It's a Letter of Intent between ASH and Prominence Homes,

9    LLC, dated June 22, 2020.

10        MR. KRAMER:  Your Honor, plaintiffs offer PX257 into

11   evidence.

12        THE COURT:  Any objection?

13        MR. SHEBELSKIE:  No, sir.

14        THE COURT:  Admitted.

15     (PLAINTIFFS EXHIBIT PX257:  Received in evidence.)

16   BY MR. KRAMER:

17   Q.   If we scroll down, Mr. Twiss, to page 10 --

18        THE COURT:  How much longer do you have with this

19   witness, Mr. Kramer?

20        MR. KRAMER:  I am not going to finish today,

21   Your Honor.

22        THE COURT:  Sir?

23        MR. KRAMER:  I am not going to finish today,

24   Your Honor.  I think about an hour or so.

25        THE COURT:  Would this be a good stopping point?

1          MR. KRAMER:  I can stop here.  Certainly.

2          THE COURT:  Okay.

3          Ladies and gentlemen, we're going to call it a day.

4   Y'all have been here a long time this morning, since 8:30 or

5   earlier, I know that.  I appreciate your patience.

6          We are going to start back in the morning at 9 AM.

7          You should not discuss the case with anyone during the

8   break this evening.

9          You should not do any kind of independent

10  investigation.  Don't let anybody discuss it with you.

11          Leave those note pads in your chair.  They will be

12  secure this evening -- well, I have got another jury coming

13  down, so why don't you take those note pads up to the jury room

14  and leave them up the jury room.  That's where you will assemble

15  in the morning before you come down here.

16          That's all I have got for you.

17          We will see you at 9 o'clock in the evening.

18          Enjoy your evening.

19      (Jury out at 5:07 PM.)

20          THE COURT:  I need to take up another matter with this

21  other jury that's out, but I want to resolve your deposition

22  issue before the evening, so I am going to ask y'all to -- I

23  would take the deposition issue up first, but I don't have any

24  confidence it's not going to take a lot of time to listen to

25  y'all bicker back and forth between each other.  So I am going

1  to ask y'all to stay, but move away from those tables so that

2  the lawyers in the other case can come forward and we can take

3  up a matter in the criminal case.

4         Before we go home this evening we will resolve the

5  deposition nonsense.

6      (Recess taken at 5:07 PM.)

7      (Resumed at 5:15 PM)

8         THE COURT:  Just have a seat out there in the gallery.

9         All right.  Whoever is going to speak on the

10 deposition issue, when you wish to speak, come to the lectern.

11        Who is going to speak first?

12        MR. ELLIKER:  Your Honor, Kevin Elliker on behalf of

13 Mr. Erickson.  I will make this very short.

14        The parties' designations and counter-designations

15 have been evolving, but I don't think anyone has added any new

16 designations since the Court's deadline.

17        The last changes were made by the plaintiffs on their

18 side.

19        THE COURT:  I am not going to get into all of this

20 minutia.  What I'm interested in is whether --

21        This is the problem with trial by deposition.  This

22 just wastes so much time, and there is no way that this

23 testimony would be as long as all of this deposition playing is

24 going to be.  But, generally, I try to allow the deposition

25 testimony to be presented as if the witness was testifying at

1   trial.

2          So if a party is going to present the testimony as

3   direct evidence; in other words, a witness that you would be

4   calling in direct, then the other side would play their

5   cross-examination during that same session.  The direct would be

6   put up and then the cross-examination would be put up.

7          Now the problem we get into, when you want to do this

8   by deposition, is you haven't thought it all out well enough

9   like you would with an in-person examination.  So if somebody

10  wants to put in a direct question here, and then somebody wants

11  to put in a cross here, and then somebody wants to put another

12  direct in here, and it just -- it's not the way -- the best way

13  to present it.

14         But my position is that if a party is putting part of

15  a deposition up in direct, as direct evidence, then we just play

16  the whole thing.  That's a waste of time, I think, for the most

17  part, but I know of no other way to handle it, other than you

18  put yours up in your case and you put yours up in your case.

19         So given that understanding of my approach, where is

20  the -- is there still a disagreement as to how this ought to be

21  handled?

22         MR. ELLIKER:  I would guess the disagreement,

23  Your Honor, would be whether that calls for one single video

24  prepared by plaintiffs followed by one single video prepared by

25  defendants, or if it's just one single video showing the

1    deposition excerpts in chronological order as they happened

2    during the deposition.

3            THE COURT:  Well, has the video that defendants -- for

4    example, the plaintiff is calling the witness, so yours would be

5    cross-examination.  Does that cover questions that were -- some

6    questions that were also asked in the plaintiffs' video?  Is

7    there going to be any duplication of questions?

8            MR. ELLIKER:  Not if the parties work together to have

9    everything that was designated, I don't think there would be a

10   need to have -- if we played one video --

11           THE COURT:  I take it part of your, quote,

12   cross-examination may be questions asked by the other attorneys.

13   Is that part of the problem?

14           MR. ELLIKER:  That's right, Your Honor.  In fact,

15   counter-designations that have been made may be the preceding

16   question before something one party did, or immediately after

17   it.  And that goes both ways in terms of the ways the parties

18   did counter-designations.

19           THE COURT:  I think the most straightforward way to

20   handle it for the jury would be to play the deposition as it's

21   taken.  Just -- I mean, none of this is optimal.  But it seems

22   like to me the best way that's going to make sense is figure out

23   each of your designations and play them in -- play the video

24   sequentially based upon those designations.

25           MR. ELLIKER:  That's the defendants' position.  I will

1    let Mr. Kramer address --

2              MR. KRAMER:  Your Honor, my problem is we have our

3    videos produced with defendants' counter-designations in them.

4    And then, just on Saturday, we were asked to essentially make

5    videos for the defense as well.

6              And we just don't have the resources here to do that.

7    And what --

8              THE COURT:  But what you prepared does have their

9    original counter designations?

10             MR. KRAMER:  Absolutely, Your Honor.

11             THE COURT:  So would it be played sequentially or just

12   at the end?

13             MR. KRAMER:  Sequentially.  Absolutely.  It's set up

14   sequentially.  I just --

15             THE COURT:  Is that correct?

16             MR. ELLIKER:  It's correct insofar as their counter

17   designations and our counter-designations are in one video they

18   have produced.  But the parties both made designations to the

19   same witnesses at the beginning.  So we had designations from

20   both sides and then counter-designations from both sides.  And

21   there is substantial overlap but they are not identical.

22             And so if the plaintiffs played only their video with

23   their designations and counter-designations, it would not

24   include -- it would include much of, but not all of, what the

25   defendants asked to designate and what the plaintiffs --

1          THE COURT:  Why did you wait until Saturday?

2          MR. ELLIKER:  Your Honor, there was a miscommunication

3    now close to about two weeks ago about who -- about what --

4    whether there would be one video or not.  And this may be on

5    defense counsel's fault, but in our practice we have been in

6    court where judges have asked the parties to have a deposition

7    video played one time and not to segment it between plaintiffs'

8    case and defense case.  That was the assumption that we made.

9    It turned out to be a bad assumption.

10         THE COURT:  So, Mr. Kramer, you thought they were

11   going to play another video from the same deposition in their

12   case?

13         MR. KRAMER:  Yes, Your Honor, I did.  And we --

14         THE COURT:  How can that make sense in anybody's

15   world?

16         MR. KRAMER:  Well, I mean, each party had designated

17   portions of the testimony and then counter-designations, so we

18   dutifully included defendants' counter-designations.

19         THE COURT:  So included their counter-designations

20   only in your video thinking they were going to, again, play the

21   same witness's video in your case and then you were going to

22   make counter-designations to that in their playing?

23         MR. KRAMER:  Yes, Your Honor.

24         Consistent with Rule 32, that's the approach we took.

25         It says in the rules that if somebody offers a

1    deposition, counters can be added.  And then if the other party

2    wishes to introduce additional portions of the deposition, they

3    are free to do so in their case.  So that is the approach we

4    took.  It was a miscommunication.  And I wish we weren't talking

5    about this.  I would just like to try my case without making

6    videos for the defense.

7              MR. ELLIKER:  Judge, I will just say our --

8              THE COURT:  At this point in time, has the defense got

9    a video prepared of its designations of this video deposition?

10             MR. ELLIKER:  We do not.

11             THE COURT:  So from your position there has to be a

12   new video prepared regardless?

13             MR. ELLIKER:  Your Honor, no matter what, someone is

14   going to have to make some videos, whether it's a revision --

15             THE COURT:  I don't understand why it took you until

16   Saturday to figure out -- did you think they were going to put

17   your parts in their video that are in addition to what you

18   counter-designated?

19             MR. ELLIKER:  We thought, Your Honor, that a

20   deponent's deposition would be played one time for the jury.

21   That's what we thought.

22             THE COURT:  Yeah, but you think that it was going to

23   be played from beginning to end without designations?

24             MR. ELLIKER:  No, Your Honor.

25             THE COURT:  What did you think was going to be played

1    on that video if you had not made any additional designations

2    until Saturday?

3            MR. ELLIKER:  We -- I want to be clear.

4            On the same day both parties made designations, those

5    designations were what -- if the other side didn't say anything,

6    we would say what this is this witness's testimony should be.

7    Then, within the time allotted, both parties then made

8    counter-designations to what each party originally designated.

9            THE COURT:  Does the video not include that?

10           MR. ELLIKER:  Our -- I believe, from what I understand

11   from Mr. Kramer, their video includes the plaintiffs'

12   designations and the defendants' counters to that.  We don't

13   have a video prepared that shows our designations with their

14   counters.

15           And the last point I will make, again, I will fall on

16   the sword and say that this was our mistake for misunderstanding

17   it, based on only playing one video one time, when we made our

18   counter-designations to what the plaintiffs put in their

19   original video, we did not include anything we had originally

20   designated because we assumed it would be included.

21           THE COURT:  Okay.  All right.

22           We are going to play, in the plaintiffs' case,

23   plaintiffs' video that shows their designations and the

24   defendants' counter-designations.

25           If the defendant wants to play a video in their case,

1   with their designations, and plaintiffs' counter-designations, I

2   will permit that.  And you will have a little while to prepare

3   it.

4           I mean, you will have all this army of lawyers and

5   support staff between now and the time that plaintiff rests to

6   prepare your video.

7           I don't know of any other way to do it.  I mean,

8   doesn't seem to be any other way to do it, unless you think I

9   should require the plaintiff to now take all of your

10  designations and then his counter-designations and put them in

11  his video.

12          MR. ELLIKER:  Judge --

13          THE COURT:  It's either that, or it's to proceed as I

14  have suggested and give you the right to put your designations

15  up in your case.  I think it's a waste of time.  And I think

16  it -- well, I don't know if it's a waste of time.  I hadn't read

17  the questions yet.  Hopefully they will not be the same

18  questions as in the plaintiffs' case.

19          MR. ELLIKER:  Well, we will do what the Court wants.

20          THE COURT:  I think that's the only way.

21          I mean, I don't want you to prevent you from putting

22  up additional evidence from the video depositions that you don't

23  think made it into the plaintiffs' version because of a

24  miscommunication.  But I think that the most efficient way to do

25  that is to do it in the manner that I have described.

1              I get all these notes.  People think I have got a mind

2         that can keep up with 15 different things at the same time.

3              So let me get back to this.  I just don't -- I mean,

4         it's either going to be the plaintiffs are going to have to

5         revise their video to include your stuff.  You are right in the

6         middle of their case.  Or you are going to be allowed to have

7         your own video, that you got a little while to prepare it,

8         before you start presenting your case.  And it seems to me that

9         the most efficient, fairest way to do that is going to be that

10        latter.  Is to just let y'all put what you want to put up in

11        your own cases.

12             MR. ELLIKER:  I understand.  Our goal and --

13             THE COURT:  That would be -- ought to be -- Rule 32

14        ought to be amended to prevent video depositions.  It's

15        horrible.  The only person that benefits from it are the lawyers

16        that get to go take all the video depositions and charge for it.

17        It's just -- it's a problem.

18             MR. ELLIKER:  I didn't even get to take any of the

19        depositions in the case, so I don't get anything out of it.

20             THE COURT:  All right.

21             These are your own witnesses.  You can't even bring

22        them here to trial live?  I understand what Rule 32 allows.  But

23        these are corporate executives.  These aren't people that are

24        evading subpoenas.  Everybody wants to do the videos so they can

25        get them in the can.  We don't want to have anything that can be

1  a little uncertain for the jury the way they used to try cases

2  in the old days.  Everything has to be canned.  You have to have

3  it perfectly in the can.

4          Anyway, I have ruled as to how we are going to do

5  this.

6          The next question is, because I didn't do all of your

7  handiwork for you to get it in the can by ruling on all of your

8  deposition objections in advance, because, quite frankly, I

9  started looking at them and saw several of them were nonsense, I

10  am going to be ruling when the deposition is being played on the

11  objections, and I need a transcript of exactly what's going to

12  be played in advance so I can follow along as the deposition is

13  being played.

14          MR. KRAMER:  Understood, Your Honor.

15          THE COURT:  All right.

16          MR. KRAMER:  Thank you.

17          THE COURT:  Everybody on the same page now?

18          MR. KRAMER:  Yes, Your Honor.

19          MR. ELLIKER:  We are.

20          THE COURT:  Okay.  All right.

21          Y'all can go.

22          I will see you at 9 o'clock in the morning.

23          (Proceeding adjourned at 5:29 PM.)

24

25

```
 1                        * * * * * * * *
             I certify that the foregoing is a correct transcript
 2     from the record of proceedings in the above-entitled matter.
       Any redaction of personal data identifiers pursuant to the
 3     Judicial Conference Policy on Privacy are noted within the
       transcript.
 4

 5     /s/ Lisa C. Snyder                    10/4/2023
       Lisa C. Snyder, RPR, CRR             Date
 6     Official U.S Court Reporter

 7     OTHER RECORD MADE                                    PAGE
       Opening Statements By Mr. Kramer                       14
 8     Opening Statements By Mr. Quackenboss                  33

 9                          I N D E X

10     PLAINTIFFS' WITNESSES              PAGE
       RYAN TWISS
11     Direct Examination By Mr. Kramer                      44
       Cont. Direct Examination By Mr. Kramer                81
12
                           E X H I B I T S
13
       COURT EXHIBIT                  OFFERED   RECEIVED
14     1                                54         54
       PLAINTIFFS' EXHIBITS
15
       PX39A                          112
16
       PX63                           109        109
17
       PX72                           115        115
18
       PX86 AND PX86A                 106        106
19
       PX93A                                     112
20
       PX217A                         130        130
21
       PX220                          102        102
22
       PX257                          132        132
23
       274A                            75         75
24
       402                             77         77
25
       PX403D                          94         94
```