1              **UNITED STATES DISTRICT COURT**
              **MIDDLE DISTRICT OF GEORGIA**
2                   **COLUMBUS DIVISION**

3    AMERICAN SOUTHERN HOMES          )
     HOLDINGS, LLC AND                )
4    ASH-GRAYHAWK, LLC,               )
                                      )
5              Plaintiffs,            ) Case No: 4:21cv95
                                      )
6          v.                         ) Columbus, Georgia
                                      ) September 19, 2023
7    DAVID B. ERICKSON, ET AL,        )
                                      )
8              Defendants.            ) VOLUME II
     _____  )

9
                  **TRANSCRIPT OF JURY TRIAL**
10         **BEFORE THE HONORABLE CLAY D. LAND**
             **UNITED STATES DISTRICT JUDGE**
11              **(Pages 145 through 456)**

12

13

14

15

16

17

18

19

20

21              *LISA C. SNYDER, RPR, CRR*
           **Official United States Court Reporter**
22     **111 North Adams Street, Tallahassee, FL 32301**
           **(850)567-1374 * lisasnydercr@gmail.com**

23

24        *Proceedings reported by stenotype reporter.*
     *Transcript produced by Computer-Aided Transcription.*

25

APPEARANCES:

For the Plaintiff:          Faegre Drinker Biddle & Reath, LLP
                            By:  JACOB A. KRAMER
                                 JESSICA R. MAZIARZ
                                 RACHEL ANNA BECK
                                 Attorneys at Law
                                 jake.kramer@faegredrinker.com
                                 jessica.maziarz@faegredrinker.com
                                 rachel.beck@faegredrinker.com
                            1500 K Street NW
                            Suite 1100
                            Washington, DC 20005

                            By:  DAVID R. MERRITT
                                 JOSHUA TODD PETERSON
                                 Attorneys at Law
                                 david.merritt@faegredrinker.com
                                 josh.peterson@faegredrinker.com
                            2200 Wells Fargo Center
                            Minneapolis, MN 55402

                            Buchanan Law Firm, PC
                            By:  JERRY A. BUCHANAN
                                 Attorney at Law
                                 jab@thebuchananlawfirm.com
                            P.O. Box 2848
                            The Corporate Center, Suite 614
                            233 12th Street
                            Columbus, GA 31902

For the Defendant:          Hunton Andrews Kurth, LLP
                            By:  ROBERT T. QUACKENBOSS
                                 Attorney at Law
                                 rquackenboss@huntonak.com
                            2200 Pennsylvania Avenue NW
                            Washington, DC 20037

                                 MICHAEL R. SHEBELSKIE
                                 KEVIN S. ELLIKER
                                 Attorneys at Law
                                 mshebelskie@huntonak.com
                                 kelliker@huntonak.com
                            Riverfront Plaza, East Tower
                            951 E. Byrd Street
                            Richmond, VA 23219

1                          **P R O C E E D I N G S**

2           (Call to Order of the Court at 8:56 AM on Tuesday,

3     September 19, 2023.)

4                THE COURT:  Morning.  Be seated.

5                Is our air working this morning, Geoffrey?  It feels a

6     bit stuffy.  Notify whoever before that becomes a problem.

7                THE COURTROOM DEPUTY:  Yes, sir.

8                THE COURT:  All right.

9                Lawyers want to take something up before we bring the

10    jury down?

11               MR. KRAMER:  Yes.  Good morning, Your Honor.

12               THE COURT:  Morning.

13               MR. KRAMER:  Couple of preliminary issues to avoid

14    throwing a wrench in things today before we are presenting

15    evidence.

16               First of all, it looked like Juror Number 11, after we

17    talked about it midday yesterday, did some more sleeping.  At

18    the risk of running head-long into Judge Elliott's admonition, I

19    think she missed about 80 percent of the day.  We once again

20    suggest it's time to have her excused.

21               THE COURT:  What's the defendants' position?

22               MR. SHEBELSKIE:  Your Honor, we think that's premature

23    at best to do that --

24               THE COURT:  Y'all like sleeping jurors?  I mean, good

25    gosh, the lady was sitting here through at least 70 percent of

1  the trial sleeping.  And how can you possibly tell a juror that

2  they have got to decide this case on the evidence they have

3  heard during the trial when, you know for a fact that at least

4  on the first day of trial, during the plaintiff's perhaps most

5  important witness, she's sleeping?

6      MR. SHEBELSKIE:  Appreciate it, Your Honor, but I

7  think her constitutional right to serve as a juror should not be

8  lightly set aside.

9      THE COURT:  You got to be kidding me if you think

10  somebody has a constitutional right after being given the oath

11  to serve as a juror to come here and sleep through a jury trial.

12      MR. SHEBELSKIE:  I think, Your Honor, a warning to the

13  jury, this morning, to stay awake or they are at risk of being

14  dismissed if they don't.  I think the jury should at least be

15  cautioned before we --

16      THE COURT:  I'm dismissing her.

17      MR. SHEBELSKIE:  All right.

18      THE COURT:  If this is reversible error, so be it.  I

19  just cannot image that a juror has a constitutional right, after

20  being given the oath as a juror, explained the importance of

21  civic duty, jury duty, and then she sleeps through 75 percent of

22  the first day of trial, and yet there is a constitutional right

23  for her to continue to serve, or there is a requirement that the

24  Court tell the juror, You know you need to stay awake.  This is

25  important.

```
 1            Bring juror number --
 2            THE COURTROOM DEPUTY:  11.
 3            THE COURT:  -- 11 down.
 4            COURT SECURITY OFFICER:  Yes, Your Honor.
 5            MR. KRAMER:  We do have one more issue, Your Honor.
 6   We can do it before or after.
 7            THE COURT:  Is it related to this juror?
 8            MR. KRAMER:  No.
 9            THE COURT:  We will do it after I excuse her.
10            MR. KRAMER:  Yes, sir.
11            THE COURT:  What's her name again?
12            ███.
13            She should have been excused yesterday.
14            THE COURTROOM DEPUTY:  ███is the last name.
15            THE COURT:  ███████
16            THE COURTROOM DEPUTY:  Number 11.
17       (Juror entered the courtroom.)
18            THE COURT:  Ms. ███, you can stay right there for a
19   moment.
20            You were having a very hard time yesterday staying
21   awake.  Are you on some medication?  Are you working some night
22   shift?
23            A JUROR:  I work night shift.  I got off at
24   12 o'clock.
25            THE COURT:  Okay.
```

```
 1              Are you going to be doing that --
 2              A JUROR:  I didn't have to go to work yesterday at
 3    all, so I am good today.
 4              THE COURT:  You think it was because of the night
 5    shift?
 6              A JUROR:  I was supposed to have got off at 12
 7    o'clock, but I had got off at 1:30, went home, took a bath, went
 8    to sleep.
 9              THE COURT:  Okay.  I just noticed you were having a
10    hard time yesterday.  But you think for the rest of the week you
11    will be okay?
12              A JUROR:  Uh huh.  I am off for the rest of the week.
13              THE COURT:  Okay.  You can go back up there.
14              A JUROR:  I got off --
15              THE COURT:  I noticed it and I just wanted to check
16    with you.
17              You can go back.
18         (Juror exited the courtroom.)
19              THE COURT:  All right.
20              I still don't think she's got a constitutional right
21    to sleep through the trial, but given that I am going to give
22    her another chance and we will see how it goes.
23              MR. KRAMER:  Understood.  Your Honor.
24              THE COURT:  Okay.
25              MR. KRAMER:  Next issue has to do with some documents
```

```
 1   that we understand are going to come up today involving

 2   settlement communications between the parties.  And Mr. Merritt

 3   is going to address that for the Court.

 4            THE COURT:  All right.

 5            MR. MERRITT:  Good morning, Your Honor.

 6            In the parties' motions in limine there was a group of

 7   documents addressed:  2021 spring settlement correspondence.

 8            Your Honor's order suggested that the parties

 9   participate in negotiations to consider what redactions would be

10   appropriate.

11            The parties don't disagree that these are Rule 408

12   correspondence.  Unfortunately, the parties do disagree what

13   should be redacted.

14            For Your Honor's attention, plaintiffs' motion laid

15   out what would be appropriate for redaction, and we shared that

16   the documents could be redacted to only include efforts to reach

17   agreement on Phase C lot development which is relevant in this

18   case.

19            And we said that use of the draft term sheets for this

20   limited purpose would comport with Rule 408B, the exception.

21            Plaintiffs -- or I'm sorry.  Defendants quoted

22   plaintiffs' motion in their response and said that they agreed;

23   any risk of prejudice could be remedied by introducing redacted

24   versions of the draft terms sheets showing only the parties'

25   negotiations.
```

1                    At the end they said, accordingly, there is no live

2       dispute.

3                    We took them at their word that they agreed with our

4       position that these draft terms sheets could be used to show the

5       order Phase C lot develpoment and any delay related to the same.

6                    They have now tried to introduce these documents to

7       show Phase A lot, Phase B lot development, renegotiation of the

8       LPA terms, pricing related to the same.  That's expressly

9       excluded under Rule 408A.

10                   And if there is any doubt, defendants' opening

11      yesterday made clear that they are going to use these sheets for

12      the validity of the claims at issue.

13                   Mr. Quackenboss said, and I quote:  Everything in this

14      lawsuit is because the evidence will show they wanted a price

15      reduction.  They demanded a price reduction.  And when they

16      didn't get it they decided to sue him for everything they could

17      come up with.  ASH decided they couldn't afford the pricing

18      struck under the LPA and they had to take steps to get the price

19      reductions.

20                   That's these negotiations.  And they cannot be used

21      for that purpose.

22                   So our proposal -- we proposed redacted documents.

23      Have them here.  They have been rejected.  Defendants are here

24      with a significant amount of content that is not required to

25      show any argument of undue delay related to these issues.

1              THE COURT:  Well, one of the issues in the case, as I

2    understand it, is whether the parties reached agreement on the

3    Takedown Schedule.

4              Is that not one of the issues in the case?

5              MR. MERRITT:  It is, Your Honor.

6              THE COURT:  And y'all claim that Erickson was

7    unreasonable and wouldn't sit down and agree to a precise

8    schedule.

9              And he apparently claims that that's not true.  That

10   what y'all were trying to do is renegotiate the deal on the cost

11   of the lots to pay him less than what the contract provided for.

12   That's his contention, as I understand it.  And, therefore, he

13   did not breach that provision of the contract.

14             So even if these, theoretically, could be deemed to be

15   408 material, why would they not be admissible, not for purposes

16   of showing the acknowledgement of a claim or not, but for

17   purposes -- for the purpose of whether or not he breached the

18   contract by not agreeing to a Takedown Schedule?

19             MR. MERRITT:  Your Honor --

20             THE COURT:  He ought to be able to defend himself and

21   say, We never agreed to that Takedown Schedule but this is why.

22   And they were trying to strong-arm me, and not pay me what we

23   agreed to on the cost of the lots, and these -- this

24   correspondence shows that.

25             MR. MERRITT:  Sure.

1              And, Your Honor, that, to me, sounds like the validity

2     of the claims, which is expressly --

3              THE COURT:  But you -- you're tying his hands not to

4     be able to even defend himself on the main claim.

5              If his argument is, at least with regard to him

6     breaching the contract because he did not agree to a Takedown

7     Schedule, he ought to be able to defend himself and explain what

8     he did and why.

9              MR. MERRITT:  Sure.

10             And if this was only related to the Takedown Schedule,

11    that would be one thing.  But price --

12             THE COURT:  Mr. Quackenboss, what is the -- why is

13    this not 408 material?

14             MR. QUACKENBOSS:  Well, Your Honor, the Court's order

15    in particular --

16             THE COURT:  Don't tell me about the Court's order.  I

17    understand everybody is trying the case based on the Court's

18    order.

19             Tell me right now, today, why -- I can hear him.

20             Tell me right now today why this is not 408 material.

21             MR. QUACKENBOSS:  Because it excludes evidence about

22    whether there was undue delay on his part and he was

23    unreasonable in not agreeing to something which was a global

24    negotiation of an entire contract, not one bullet point.  The

25    plaintiffs pretend that this was a negotiation over a single

1    bullet point.  And Mr. Erickson's position is that it was never

2    that.  It was an entire renegotiation of a full contract.

3            THE COURT:  So what alleged breach is this in defense

4    to?

5            MR. QUACKENBOSS:  It is regarding the alleged breach

6    that -- well, they are now alleged breaches that he didn't sell

7    any lots at all, which we have to learn more from their

8    witnesses about.  But the alleged breach is whether he agreed to

9    agree to a Phase C lot order.

10           His position is that there was never an offer made

11   that could have been accepted because it was forever tied to --

12           THE COURT:  I understand all that.  And I have -- I

13   think I have ruled that there is a jury question on whether the

14   parties reached agreement on that essential term as to the order

15   of the lots.

16           As I understand the plaintiffs' theory is that he had

17   an obligation under the contract to reasonably agree -- they did

18   leave that open, but he had an obligation to reasonably agree to

19   the Takedown Schedule, and he just refused to work with them on

20   that.  As I understand it, that's the plaintiffs' claim with

21   regard to that.

22           So how is this evidence relevant to your defense to

23   that claim and is not yet 408 material?

24           MR. QUACKENBOSS:  It explains his motivation and his

25   reasons for -- he is being sued for not negotiating.  How the

```
 1    full negotiation developed --
 2            THE COURT:  That's the problem here.  I think that
 3    hits the nail on the head.  The claim is that he failed to
 4    reasonably, quote, negotiate.
 5            MR. MERRITT:  Respectfully, Your Honor, the claim is
 6    that he failed to deliver lots.
 7            THE COURT:  But you didn't put in your contract
 8    exactly when he had to deliver those lots.  You said in your
 9    contract -- whoever wrote that contract -- you said that the
10    parties, in effect, would get together and decide on how to do
11    that.
12            Isn't that true?
13            MR. MERRITT:  That is true.
14            THE COURT:  Okay.
15            And I bought that at summary judgment.  I don't know
16    if I am going to buy it at directed verdict, but I bought that
17    at summary judgment that, okay, there is enough evidence that
18    there was a meeting of the minds that they would reasonably get
19    together and reach a schedule -- a specific schedule, which that
20    would mean they would get together and they would negotiate
21    this.
22            And now you want to prevent them from putting into
23    evidence the negotiations so that the jury can decide whether
24    he, in good faith, reasonably sat down and tried to negotiate
25    that open term.
```

1           Now this is the problem, I guess, with me having found

2    that there is a jury question on that issue.  And I

3    presumably -- if I recall back, this is probably the defendants'

4    argument as to why that should be decided as a matter of law.

5           But certainly I can't say that it's a jury question

6    and the jury has got to decide whether he acted reasonably on

7    developing the schedule and then prevent him from putting up

8    evidence as to what he did to try to act reasonably to develop a

9    schedule.

10          MR. MERRITT:  Two points, Your Honor, if I may.

11          First, plaintiffs are not using settlement

12   correspondence to prove that point.

13          THE COURT:  I don't care whether you are using

14   settlement correspondence -- you cannot not use it for the

15   strategic, tactical purpose of preventing them from using it.

16          Your claim is -- if I am misunderstanding it, tell me.

17   But I understand part of your claim is that he was going to sell

18   these lots.  He had an obligation to provide these lots.  But as

19   to certain lots, y'all did not tie it down precisely in the

20   contract as to when he would deliver those lots.

21          Is that true?  Some of the lots?

22          MR. MERRITT:  For some of the lots that is true.

23          THE COURT:  But the contract and the meeting of the

24   minds, the agreement, was certainly that y'all would get

25   together and decide, within that first period of time -- a year

1   or whenever it was -- on what that precise schedule should be.

2           Is that true?

3           MR. MERRITT:  That is true.

4           THE COURT:  And you contend that he didn't do that.

5   That he just wouldn't even come to the table to work out a

6   schedule.

7           Is that true?

8           MR. MERRITT:  That is one of our contentions.

9           THE COURT:  Okay.

10          And you contend that his failure to do that was a

11  breach of the contract.  Correct?

12          MR. MERRITT:  We contend that his failure to deliver

13  lots was a breach of contract.

14          THE COURT:  Do you contend that his failure to deliver

15  lots was, in part, a result of his failure to sit down with

16  y'all and develop a schedule?

17          MR. MERRITT:  No, Your Honor, we don't.  Fundamentally

18  we -- our argument --

19          THE COURT:  I thought that was in the case from day

20  one.

21          MR. QUACKENBOSS:  Absolutely.  They have alleged that

22  as a specific breach.

23          THE COURT:  I think it's specifically been argued.

24          MR. KRAMER:  Sorry, Your Honor, if I may.

25          You are correct.  That is a second alleged breach of

1    the Land Purchase Agreement.  We don't contend that it resulted

2    in Mr. Erickson refusing to deliver lots at all.  It's just --

3              THE COURT:  But it is a breach that you allege?

4              MR. KRAMER:  It is a breach that we allege.

5              THE COURT:  So why should he not be permitted to

6    explain why he did not sit down -- why he should -- why should

7    he not be able to explain, from his perspective, why the

8    schedule was never agreed upon in defense of that claim of

9    breach?

10             I am assuming he's saying that he wanted there to be a

11   schedule so he would know what he would -- his obligation would

12   be.  And that y'all are the ones that failed to reasonably sit

13   down and work out the schedule because y'all didn't want to pay

14   him the amount that you had originally agreed to pay him.

15             And if that's his defense, he certainly ought to be

16   able to put up evidence that is relevant to that.  And I don't

17   know why these negotiations would not fall in that category.

18             I am going to permit it.

19             MR. KRAMER:  I understand, Your Honor.

20             THE COURT:  I am not going to -- I am not going to

21   permit the redacted.  I am going to allow them to put in -- the

22   portions that you seek to redact, I am not permitting them to be

23   redacted if the defendant does not want them to be redacted.

24             MR. KRAMER:  Understood, Your Honor.

25             THE COURT:  Okay.  All right.

1          Let me ask one other question while I have got you

2    down here, without the jury.  You're calling, apparently, one or

3    more of your own executives or employees by deposition; correct?

4          MR. KRAMER:  Yes, just one, Your Honor.

5          THE COURT:  Okay.  Just one.

6          And this person is a Rule 32.  What is the Rule 32

7    basis for not having this person live?

8          MR. KRAMER:  He is more than a hundred miles away from

9    the courthouse.  And we cited some cases in our notice of

10   unavailable witnesses, holding that under the circumstances it

11   would be appropriate to use deposition testimony.

12         THE COURT:  What is his position with the company?

13         MR. KRAMER:  He is the executive vice president of

14   finance.  And we have a very short deposition to read from him.

15   I don't remember the length off the top of my head.  I think

16   it's somewhere in the range of 20 to 30 minutes.  Very quick.

17         THE COURT:  Okay.

18         I read something that said it was going to be six

19   hours of deposition testimony.

20         MR. KRAMER:  Not for this gentleman.  And it won't be

21   six hours from our side.

22         THE COURT:  This is the only person you are calling by

23   deposition?

24         MR. KRAMER:  No.  He is the only current employee of

25   the company.

```
 1              THE COURT:  Okay.

 2              And the others, what's the Rule 32 basis for them?

 3              MR. KRAMER:  The same.  They are members of the Board

 4    of Directors.  Mr. Coleman, in addition, is indisposed for

 5    medical reasons.  But these are people who aren't employed by

 6    the company, they just are directors in the company.

 7              THE COURT:  Okay.

 8              So they are directors.  Presumably owners?

 9              MR. KRAMER:  Yes.

10              THE COURT:  Shareholders?

11              MR. KRAMER:  Shareholders.  That's right.  Directly or

12    indirectly.

13              THE COURT:  So your reading of Rule 32 is that if a

14    witness is more than a hundred miles from the courthouse, and

15    nevertheless is within your control, because they are either an

16    employee or owner, and you tell them, You don't have to come

17    live because you are more than a hundred miles, then that would

18    not constitute you procuring the absence of the witness from the

19    trial, which is the second prong of that provision of Rule 32?

20              As I understand Rule 32, it says you can -- you can

21    have them testify by deposition if they are farther than one

22    hundred miles if the party calling the witness did not procure

23    their absence.

24              Obviously, that, I think, is specifically designed

25    with a situation where you trick somebody into not coming.  But
```

 1    why would that not apply if a party tells their executive

 2    officer, You just stay home and stay beyond a hundred miles and

 3    you don't have to come live?

 4            MR. KRAMER:  Well, we anticipated that the Court might

 5    have questions like this and did some research and put it into

 6    our notice when we sent it.

 7            I don't have the cases off the top of my head, but

 8    they --

 9            THE COURT:  You think that procurement language does

10    not apply to this situation?

11            MR. KRAMER:  I do, Your Honor.  I do.

12            THE COURT:  So whenever a company has employees or

13    officers who are more than one hundred miles away they have, as

14    a matter of right, the right to not have them testify live at

15    trial?

16            MR. KRAMER:  That's right, Your Honor.

17            And, of course, we didn't take those depositions.  It

18    was the other side.  So we are somewhat limited in scope.  And

19    we have tried to make it as short as possible.

20            THE COURT:  Okay.

21            Well, you obviously know this by now, this is a pet

22    peeve of mine, but I am not going to plow new ground on the

23    procurement prong of Rule 32.

24            My view, if I were writing on a blank slate or on the

25    Court of Appeals, which I have never had any aspiration to be,

```
1    would be that if a party has an executive officer who has

2    material and relevant information, then they shouldn't be able

3    to tell them, Stay home as long as you are a hundred miles away.

4           The law clearly has a preference for live testimony,

5    and there is a reason for that.  It's not to satisfy me.  It's

6    so these jurors can decide this case based on the most reliable

7    evidence that exists.

8           But I am going to let you -- I am not going to hold

9    that you have procured his absence for purposes of Rule 32.  I

10   may do that in a future case, but not this one.

11          All right.  Let's bring them down.

12          COURT SECURITY OFFICER:  Yes, Your Honor.

13          THE COURT:  Sir, if they have got more questions of

14   you, come on back to the witness stand.

15          THE WITNESS:  Yes, sir.

16       (Jury in at 9:21.)

17          THE COURT:  Okay.  Ladies and gentlemen welcome back.

18          Thank you for being on time.

19          I want you to know we hadn't been down here just

20   wasting time.  I had some legal matters I had to take up to make

21   sure that the trial flows as smoothly as it can, and that's why

22   we are a little late this morning.  But we appreciate you being

23   on time.

24          Sir, if you would just go ahead and state your name

25   again for the record so it will be on our transcript.
```

```
 1              THE WITNESS:  Ryan Twiss.

 2              THE COURT:  I remind you that you are still under oath

 3   from yesterday.

 4              THE WITNESS:  Yes, Your Honor.

 5              THE COURT:  Mr. Kramer, you may proceed with your

 6   examination of the witness.

 7              MR. KRAMER:  Thank you, Your Honor.

 8                          RYAN TWISS,

 9   having been previously duly sworn by the Court, was further

10   examined and testified as follows:

11                   CONTINUED DIRECT EXAMINATION

12   BY MR. KRAMER:

13   Q.   Good morning.

14        Mr. Twiss, when we left off yesterday, I think we were

15   looking at Exhibit 257 which had just been admitted into

16   evidence.

17              MR. KRAMER:  If we could have that up, please.  Sorry.

18   Plaintiffs' Exhibit 256.  257.  Off to a rocky start already.

19              THE COURT:  That's 257.  Is that what you want?

20              MR. KRAMER:  That's it.  Thank you.

21   BY MR. KRAMER:

22   Q.   Mr. Twiss, can you remind us what that document is?

23   A.   Yes.

24        This is the June 22nd, 2020 LOI between American Southern

25   Homes and Prominence Holdings.
```

Direct Examination - Ryan Twiss

1    Q.    LOI stands for what again?

2    A.    Letter of Intent.

3    Q.    Okay.

4          Who signed this on behalf of ASH, June 2020?

5    A.    It would have been Greg Benson.

6    Q.    Who signed on behalf of Prominence?

7    A.    Brian Rone.

8    Q.    Who is Brian Rone?

9    A.    He is the owner of Prominence.

10   Q.    Okay.

11         Without bogging down in the document, do you recall the

12   purchase price premium that ASH offered Prominence in this LOI?

13   A.    It was 6 million.

14   Q.    Okay.

15         Was there an earn-out as well?

16   A.    There was.

17   Q.    High level, what's an earn-out?

18   A.    It's paying the premium on a deferment.  So just later on,

19   based on actually hitting his estimates.  Basically earning his

20   future payments.

21   Q.    What's estimated for future purposes?

22   A.    We give him -- he has a target earnings number that he

23   provides to us what his company is going to do, and if he hits

24   those targets, then he earns the premium, essentially.

25   Q.    What was the target earnings number?

Direct Examination - Ryan Twiss

1    A.    I believe it was 9.677 million.

2    Q.    Okay.

3          And did ASH also offer a salary to Mr. Rone to stay on?

4    A.    We did.

5    Q.    What was the salary?

6    A.    250,000.

7    Q.    Okay.

8          Now were these deal terms public information or non-public

9    information?

10   A.    Non-public.

11   Q.    How do you know?

12   A.    They would have only existed between us and Mr. Rone.

13   Q.    Was there an NDA in place?

14   A.    Yes, sir.

15   Q.    What does that stand for again?

16   A.    Non-disclosure agreement.

17   Q.    Okay.

18         Did the parties --

19            MR. KRAMER:  We can take that down.

20   BY MR. KRAMER:

21   Q.    Did the parties enter into a second Letter of Intent, or at

22   least negotiate one later on in 2020?

23   A.    We did discuss one in November of 2020.  Yes, sir.

24            MR. KRAMER:  Could I have exhibit 258 up for the

25   witness, please?

Direct Examination - Ryan Twiss

1    BY MR. KRAMER:

2    Q.    Do you recognize this document, Mr. Twiss?

3    A.    I do.

4    Q.    What is it?

5    A.    This is the November 2020, LOI between American Southern

6    Homes and Prominence.

7    Q.    Did you participate in putting this together?

8    A.    I did.

9    Q.    All right.

10          MR. KRAMER:  Your Honor, plaintiffs offer PX258 into

11   evidence.

12          MR. SHEBELSKIE:  No objection, Your Honor.

13          THE COURT:  Admitted.

14      (PLAINTIFFS EXHIBIT PX258:  Received in evidence.)

15   BY MR. KRAMER:

16   Q.    What was Mr. Erickson's position at the time this LOI was

17   negotiated?

18   A.    He was interim CEO.

19          MR. KRAMER:  If we could have -- if we could scroll

20   down to the signature lines, please, which are at the end of the

21   document.

22   BY MR. KRAMER:

23   Q.    Okay.

24      Who was supposed to sign this LOI?

25   A.    On behalf of ASH, it would have been Sean Coleman and

Direct Examination - Ryan Twiss

1    Mr. Erickson as CEO.

2    Q.   What was the purchase price premium in this LOI that

3    Mr. Erickson participated in negotiating?

4    A.   6 million.

5    Q.   Was there an earn-out again?

6    A.   There was.

7    Q.   What was the earnings target?

8    A.   9.677 million.

9    Q.   What salary did ASH offer to Mr. Rone?

10   A.   250,000.

11   Q.   Okay.

12        Were these deal terms non-public information?

13   A.   Yes, sir.

14   Q.   Any different reason than the one you gave before?

15   A.   No, sir.

16   Q.   Okay.

17        So when Mr. Erickson resigned as the CEO, on December 20, a

18   little bit later, was ASH still interested in pursuing

19   Prominence?

20   A.   Our focus was closing Dorn, but it was still an open target

21   for us.  Yes.

22   Q.   What was required at that point to close Dorn?

23   A.   We were still negotiating the agreements, the actual

24   documents for the closing.  So that was the big step still, was

25   getting that through with their attorneys.

Direct Examination - Ryan Twiss

```
1   Q.   How much of your time did that occupy?

2   A.   All of it.

3   Q.   Okay.

4        Are you aware of ASH ever giving Mr. Erickson permission to

5   use these deal terms for himself?

6   A.   I am not.

7   Q.   What is Surrey --

8            MR. KRAMER:  You can take that down.

9   BY MR. KRAMER:

10  Q.   What is Surrey Homes?

11  A.   Surrey Homes is a homebuilder in Florida.

12  Q.   Okay.

13       When Mr. Erickson was the interim CEO of ASH, was ASH

14  working on an acquisition of Surrey Homes?

15  A.   We were.

16  Q.   And what was the status of that transaction when

17  Mr. Erickson resigned on December 20?

18  A.   It was the same.  It was still an open target, but we were

19  focused on closing Dorn.

20  Q.   Did ASH give him permission to use any non-public

21  information relating to Surrey for himself?

22  A.   We did not.

23  Q.   Did he have access to that type of information?

24  A.   He did.

25  Q.   Why?
```

1   A.   He was CEO.  He had access to all of our data.

2   Q.   All right.

3        MR. KRAMER:  Could we have PX261, please?

4   BY MR. KRAMER:

5   Q.   Do you recognize this document?

6   A.   I do.

7   Q.   What is it?

8   A.   This is the confidential private placement memorandum for

9   American Southern Homes Holdings, dated December 2nd, 2020.

10  Q.   What is a private placement memorandum?

11  A.   The goal of this document is to get our investors to

12  reinvest with us.  So it basically, in this case, would have

13  given a target acquisition, which would have been Dorn, and told

14  them how we were going to use the funds, what their investment

15  would do, and try to convince them to invest with us again.

16  Q.   Did you participate in creating this?

17  A.   I did.

18  Q.   Did Mr. Erickson?

19  A.   He did.

20       MR. KRAMER:  Your Honor, plaintiffs offer PX261.

21       MR. SHEBELSKIE:  No objection, Your Honor.

22       THE COURT:  Admitted.

23       (PLAINTIFFS EXHIBIT PX261:  Received in evidence.)

24  BY MR. KRAMER:

25  Q.   So, Mr. Twiss, you said that investors had an opportunity

Direct Examination – Ryan Twiss

1   to invest at this point.  What would they get in return?

2   A.   Units or shares in ASH.

3   Q.   Okay.

4        Is that different from how ASH had funded other business

5   acquisitions?

6   A.   It is not.

7   Q.   Was that standard?

8   A.   It is.

9   Q.   So to whom did ASH send this document?

10  A.   Our investors.

11  Q.   Does this include Mr. Erickson?

12  A.   It does.

13  Q.   All right.

14       Did the investors themselves have any confidentiality

15  obligations?

16  A.   They do.

17  Q.   Based on what?

18  A.   This document and our operating agreement contains a

19  provision.

20  Q.   Okay.

21       When did ASH distribute this document?

22  A.   It would have been right around December 2nd.

23  Q.   Okay.

24       Does ASH contend that Mr. Erickson breached the

25  confidentiality terms in his consulting agreement in any way

Direct Examination - Ryan Twiss

1  related to this document?

2  A.   We do.

3  Q.   In what way?

4  A.   He used part of this document for his business plan for his

5  new venture.

6  Q.   All right.

7       Let's pivot away from the Consulting Agreement and start

8  talking about the Land Purchase Agreement.

9            MR. KRAMER:   I'd like 246E, which has been

10 preadmitted.

11 BY MR. KRAMER:

12 Q.   Okay.

13      You said that ASH terminated the Consulting Agreement in

14 April of 2021 yesterday.

15      Do I have that right?

16 A.   Yes.

17 Q.   Okay.

18      After ASH terminated the Consulting Agreement, did

19 Mr. Erickson continue to sell ASH lots ahead of schedule?

20 A.   For some time, yes.

21 Q.   Okay.

22      Did there come a time when he stopped doing that?

23 A.   There did.

24 Q.   And when was that?

25 A.   June of 2021.

Direct Examination – Ryan Twiss

1   Q.    Okay.

2         What was your reaction when Mr. Erickson informed the

3   company that he would no longer sell lots ahead of schedule?

4   A.    We were frustrated.  We didn't believe that was the deal we

5   had struck with Mr. Erickson, and we needed the lots to continue

6   to grow our business and sell homes on.

7   Q.    Just to be clear, ASH doesn't allege that was a breach of

8   the Land Purchase Agreement at this point.  Correct?

9   A.    We do not.

10  Q.    Were there other reasons that you were frustrated?

11  A.    Just seemed to be going backwards.

12  Q.    Was it different from prior practice?

13  A.    It's what we had been doing.  We were over a hundred lots

14  ahead at one point in time.  We had bought as many as we could.

15  Mr. Erickson had asked us to buy more.  So now taking that

16  ability away from us was quite frustrating and shocking.

17  Q.    Okay.

18        MR. KRAMER:  We have the Land Purchase Agreement up on

19  the screen.

20  BY MR. KRAMER:

21  Q.    Do you see that?

22  A.    Yes, sir.

23        MR. KRAMER:  Preadmitted.

24        Let's go to page 16.

25

1    BY MR. KRAMER:

2    Q.    What are we looking at here, Mr. Twiss?

3    A.    This is the Takedown Schedule for the Land Purchase

4    Agreement.

5    Q.    Okay.

6         And we are focused on the top -- the chart at the top of

7    the document at this point.

8         Did there come a time when Mr. Erickson flat out refused to

9    sell Phase C lots to ASH?

10   A.    There did.

11   Q.    What was the month and year?

12   A.    December of 2021.

13   Q.    Okay.

14        So if we look at the Takedown Schedule -- and I would like

15   to direct your attention to the column with the heading

16   "September 21."

17        Do you see that?

18   A.    I do.

19   Q.    Okay.

20        How many Phase C lots were owed under the Takedown Schedule

21   in the third quarter of 2021?

22   A.    15.

23   Q.    Was ASH able to purchase the full allotment of 15?

24   A.    We were.

25   Q.    Okay.

1      The next month -- the next quarter is December 2021.  Was

2  ASH able to purchase any Phase C lots from Mr. Erickson during

3  that quarter?

4  A.   No, sir.

5  Q.   Okay.

6      And what reason did Mr. Erickson give?

7  A.   He had terminated the LPA.

8  Q.   Did ASH respond by stating that Mr. Erickson was in

9  default?

10 A.   We did.  We responded and asked him to reconsider.

11 Q.   Did he reconsider?

12 A.   He did not.

13 Q.   Do you know how many Phase C lots had been finished and

14 were available at that point?

15 A.   I believe it was about 27.

16 Q.   Okay.

17          MR. KRAMER:  Let's go to the next chart on the

18 Takedown Schedule.

19 BY MR. KRAMER:

20 Q.   Do you see the column with the heading March 2022?

21 A.   I do.

22 Q.   Okay.

23      How many Phase C lots were owed under the Takedown Schedule

24 in the first quarter of 2022?

25 A.   15.

Direct Examination – Ryan Twiss

| | |
|---|---|
| 1 | Q.   Did ASH request 15 Phase C lots? |
| 2 | A.   We did. |
| 3 | Q.   Did Mr. Erickson deliver them? |
| 4 | A.   He did not. |
| 5 | Q.   Did ASH ask him to reconsider? |
| 6 | A.   We did. |
| 7 | Q.   And did he? |
| 8 | A.   He did not. |
| 9 | Q.   Okay. |
| 10 | So just to put a fine point on it, did Mr. Erickson deliver |
| 11 | 15 Phase C lots during the first quarter of 2022? |
| 12 | A.   He did not. |
| 13 | Q.   Since then has ASH been able to buy any Phase C lots from |
| 14 | Mr. Erickson on a timely basis? |
| 15 | A.   No, sir. |
| 16 | Q.   Okay. |
| 17 | Was ASH ultimately able to get those 27 Phase C lots from |
| 18 | Mr. Erickson? |
| 19 | A.   We were. |
| 20 | Q.   Okay. |
| 21 | In what month and year did that occur? |
| 22 | A.   If would have been, I believe, May of '22. |
| 23 | Q.   Since then has ASH been able to get any Phase C lots from |
| 24 | Mr. Erickson? |
| 25 | A.   We have not. |

Direct Examination - Ryan Twiss

1   Q.   Do you know if any Phase C lots at all have been finished

2   and made available to ASH since then?

3   A.   Mr. Erickson has not made any available to us.

4   Q.   Okay.

5        Has ASH tried to buy Phase C lots from Mr. Erickson since

6   then?

7   A.   Every quarter.

8   Q.   What has been the response?

9   A.   No.

10  Q.   Every quarter did ASH give Mr. Erickson an opportunity to

11  reconsider?

12  A.   We did.

13  Q.   Did he ever reconsider?

14  A.   He did not.

15  Q.   Okay.

16       When you say ASH gave him an opportunity to reconsider, how

17  many days did ASH give Mr. Erickson to fix it every quarter?

18  A.   15 days.

19  Q.   And why 15 days?

20  A.   It's what the contract requires.

21            MR. KRAMER:  I'd like to put up PX 840B, please, for

22  the witness.

23            It's not up on my screen.

24            THE COURTROOM DEPUTY:  You said for the witness?

25            MR. KRAMER:  Yes.

Direct Examination - Ryan Twiss

1          THE COURT:  That means up for everybody but the jury.

2          MR. KRAMER:  That's right.  Sorry.  Just to

3  authenticate and lay some foundation.

4          THE COURT:  Shouldn't be on the big screen.  It has

5  not been admitted yet.  He just wants to question the witness

6  about it to get it admitted.

7          MR. KRAMER:  Thank you, Your Honor.

8          THE COURT:  All right.

9          MR. KRAMER:  Okay.  Let's go to the next page.

10 BY MR. KRAMER:

11 Q.   All right.  Mr. Twiss, do you recognize this document?

12 A.   I do.

13 Q.   And what is it?

14 A.   This is a letter from Mr. Quackenboss to ASH's outside

15 counsel dated December 17, 2021, titled Response to ASH

16 Grayhawk's request.

17 Q.   Did you see this when it came in?

18 A.   I did.

19 Q.   Were you involved in responding?

20 A.   I was.

21         MR. KRAMER:  Plaintiffs offer PX 840B.

22         MR. SHEBELSKIE:  No objection, Judge.

23         THE COURT:  Admitted.

24     (PLAINTIFFS EXHIBIT PX840B:  Received in evidence.)

25

Direct Examination - Ryan Twiss

```
 1              MR. KRAMER:  Let's put up the letter up.

 2              THE COURT:  840.  You said A or B?

 3              MR. KRAMER:  B as in boy, Your Honor.

 4              THE COURT:  I thought you said A.  Maybe not.

 5              840B is admitted.

 6   BY MR. KRAMER:

 7   Q.   Okay.

 8        Mr. Twiss, this says -- and this is a letter to me.  Right?

 9   A.   Yes, sir.

10   Q.   And it says:  This is in response to ASH-Grayhawk's request

11   to take down lots on December 20.  The Land Purchase Agreement

12   is terminated and Mr. Erickson's obligations thereunder are

13   extinguished.  Accordingly, Mr. Erickson will not deliver any

14   further lots to ASH-Grayhawk.

15        Did I read that correctly?

16   A.   You did.

17   Q.   Did ASH respond to this letter?

18   A.   We did.

19   Q.   In what way did ASH respond?

20   A.   We invited Mr. Erickson to reconsider and sell the lots.

21   Told him our position.

22   Q.   All right.

23              MR. KRAMER:  Take that down and have 840C up, please

24   just for the witness.  Second page.

25
```

1    BY MR. KRAMER:

2    Q.    Okay.  Mr. Twiss, do you recognize this document?

3    A.    I do.

4    Q.    What is it?

5    A.    It's our response the previous letter.  It's a letter from

6    ASH's --

7              MR. KRAMER:  We lost it.

8              THE WITNESS:  So this is a letter from ASH's outside

9    counsel to Mr. Quackenboss dated December 30, 2021, titled

10   Notice of Default Land Purchase Agreement.

11   BY MR. KRAMER:

12   Q.    Did you read before it was sent to Mr. Quackenboss?

13   A.    Yes, sir.

14   Q.    Did you participate in putting it together?

15   A.    Yes, sir.

16             MR. KRAMER:  Plaintiffs offer PX 840C, not for the

17   truth of the matter asserted, but to demonstrate the giving of

18   notice under the LPA.

19             MR. SHEBELSKIE:  No objection with that qualification.

20             THE COURT:  Admitted for that purpose.

21        (PLAINTIFFS EXHIBIT PX840C:  Received in evidence.)

22             MR. KRAMER:  All right.

23   BY MR. KRAMER:

24   Q.    Mr. Twiss, what was the purpose of sending this letter?

25   A.    To let Mr. Erickson know that he was in default for failure

1    to deliver the Phase C lots.

2    Q.    Okay.

3          And what section of the LPA did ASH contend Mr. Erickson

4    had defaulted under?

5    A.    Section 6.

6                MR. KRAMER:  Take that down.

7                Can we have PX 785, please?

8    BY MR. KRAMER:

9    Q.    Okay.  Do you recognize this letter?

10   A.    I do.

11   Q.    What is it?

12   A.    This is a letter from ASH's outside counsel to

13   Mr. Quackenboss, dated July 26, 2023, Final Notice of Default

14   Land Purchase Agreement Q2 2023.

15   Q.    Did you receive this letter when it was sent?

16   A.    Yes, sir.

17               MR. KRAMER:  Plaintiffs offer PX785.

18               MR. SHEBELSKIE:  No objection, Your Honor.

19               THE COURT:  Admitted.

20         (PLAINTIFFS EXHIBIT PX785:  Received in evidence.)

21   BY MR. KRAMER:

22   Q.    What's the date of that document?

23   A.    July 26 of 2023.

24   Q.    What's the purpose of sending a letter like this?

25   A.    It was our final notice of default letting Mr. Erickson

1  know that he had missed his time to cure default again.

2  Q.   For which quarter?

3  A.   This was Q2 of 2023.

4  Q.   Okay.

5       Is this similar of other final notices of default that ASH

6  had sent?

7  A.   It would be.  Yes.

8            MR. KRAMER:  Let's move on and I would like to put up

9  for the witness PX 831.

10 BY MR. KRAMER:

11 Q.   Mr. Twiss, are you familiar with this document?

12 A.   Yes, sir.

13 Q.   This is a summary exhibit.

14      Did you participate in putting this together?

15 A.   Yes, sir.

16 Q.   And what does it summarize, without revealing the contents?

17 A.   It summarizes the lot takedowns on a neighborhood basis

18 through a period of time.

19 Q.   Okay.

20      Did you supervise the preparation of this summary exhibit?

21 A.   Yes, sir.

22 Q.   Did you check it to make sure it was accurate?

23 A.   Yes, sir.

24 Q.   Does it list the sources?

25 A.   It does.

1          MR. KRAMER:  If we could look at the sources.

2    BY MR. KRAMER:

3    Q.   Could you identify them, please?

4    A.   I can.

5          It's the Land Purchase Agreement using the schedule and the

6    exhibits thereto.

7          An Excel sheet for all exhibits to land banking agreement.

8          An Excel sheet ASH lot delivery chart 21-03-17 B4 discussed

9    with Dave and our status report.

10   Q.   What's the status report?

11   A.   It is an Excel sheet with thousands of data points on it.

12   It lists all of our lots historically and going forward that we

13   have under contract and the status of each one; closed homes,

14   et cetera.

15   Q.   Okay.

16        Where did the status report come from?

17   A.   The system.

18   Q.   What do you mean "the system"?

19   A.   It's a report we have built into our software that

20   generates when we run it.

21        MR. KRAMER:  Your Honor, plaintiffs offer PX831 as a

22   summary exhibit under Rule 1006.

23        MR. SHEBELSKIE:  No objection.

24        THE COURT:  Admitted.

25        (PLAINTIFFS EXHIBIT PX831:  Received in evidence.)

Direct Examination - Ryan Twiss

1          MR. KRAMER:  Okay.  Let's go to the second page.  Few

2    questions about this.  I would like to focus on the final box.

3          All right.

4    BY MR. KRAMER:

5    Q.   What's shown in the box that we have blown up for the jury

6    here?

7    A.   This is the number of Phase C lots that have not been able

8    to be purchased by ASH through the end of the year.

9    Q.   Where does that -- first of all, what's in the column with

10   the heading LPA total?

11   A.   That's the number of Phase C lots under the LPA.

12   Q.   And what is the revised lot count Q3 2021 column?

13   A.   That is accounting for the four lots we had already

14   purchased.  So it's the reduced number.

15   Q.   And then what appears to the right?

16   A.   That's a quarter-by-quarter approach for the Phase C lots

17   that weren't delivered.

18   Q.   Okay.

19         Did you say were delivered or were not delivered?

20   A.   Were not.

21   Q.   So by the end of this year, if Mr. Erickson doesn't deliver

22   any Phase C lots, how far behind will ASH be on the Takedown

23   Schedule?

24   A.   108 Phase C lots.

25   Q.   And how far behind is ASH right now?

1    A.    78.

2    Q.    Does this continue to the end of the LPA?

3    A.    Yes, sir.

4    Q.    Well, are you sure about that?  Does the LPA end in 2023?

5    A.    Oh, sorry.  This schedule does not.  No.

6    Q.    Okay.

7          So there are additional years where Phase C lots that would

8    be due that aren't reflected on this summary exhibit.  Correct?

9    A.    That's correct.

10   Q.    Okay.

11         And approximately --

12         MR. KRAMER:  If we could zoom out again --

13   BY MR. KRAMER:

14   Q.    Approximately how many Phase C lots are still owed under

15   the LPA?

16   A.    933.

17   Q.    Is that an approximation?  That sounds precise.

18   A.    It's based on the schedule, but it's approximately 900 to a

19   thousand.

20   Q.    Okay.

21         MR. KRAMER:  All right.  We can take that down.

22         So let's talk about another requirement under the LPA

23   which is the order of Phase C lot development.

24   BY MR. KRAMER:

25   Q.    Now, when the parties signed the Land Purchase Agreement at

1    the closing, had they agreed on the order in which Mr. Erickson

2    would develop each neighborhood that contained Phase C lots?

3    A.    We had not.

4    Q.    Okay.

5          Did the LPA give a deadline for the parties to agree?

6    A.    It did.

7    Q.    What was the deadline?

8    A.    One year from closing.

9    Q.    What was each party required to do?

10   A.    Agree to a schedule forward.

11              MR. KRAMER:  Let's have PX246E up.  Page 3.  This is

12   preadmitted.  It's the LPA again.

13   BY MR. KRAMER:

14   Q.    I'd like to direct your attention to Section 10.

15         All right.  It says here:  During the first full year after

16   closing -- sorry.  Let me read the whole sentence.

17         However, as to the Phase C lots, during the first full year

18   after closing, under the APA the parties shall agree to the

19   order in which specific Phase C lots will be developed.

20         Do you see that?

21   A.    I do.

22   Q.    Okay.

23         So who was obligated to act under this provision?

24   A.    ASH and Mr. Erickson.

25   Q.    Was it only ASH?

Direct Examination – Ryan Twiss

1  A.   No.  Mr. Erickson as well.

2  Q.   Okay.

3       Within the -- what is the order of Phase C lot development?

4       Can you explain what this means as a practical matter?

5  A.   Sure.

6       There are numerous Phase C lots subdivisions listed, so the

7  parties are supposed to agree to an order in which those

8  neighborhoods would be developed.

9  Q.   Okay.

10      Within the first 12 months of the LPA, were you involved in

11 any discussions about this subject?

12 A.   There were discussions.  Yes.

13 Q.   Okay.

14      Did Mr. Erickson ever make -- during that period, did he

15 make a proposal for the order in which he wanted to develop the

16 Phase C lots?

17 A.   He did not.

18 Q.   Did he ever make that kind of a proposal?

19 A.   He did not.

20 Q.   So did the parties agree, by November 15, 2020, on the

21 order of Phase C lot development?

22 A.   We did not.

23 Q.   What position did Mr. Erickson hold at the time?

24 A.   He was CEO.

25 Q.   Between the time he became the CEO --

1          MR. KRAMER:  Sorry?  I thought I heard you say

2    something.

3          MR. QUACKENBOSS:  I wasn't speaking to you, I promise.

4          MR. KRAMER:  Sorry.  It was loud.

5    BY MR. KRAMER:

6    Q.   Between the time Mr. Erickson became the CEO on

7    October 28th, and the expiration of the deadline, did he make

8    any effort, to your knowledge, to agree on the order of Phase C

9    lot development?

10   A.   Not to my knowledge.

11   Q.   Okay.

12        Are you aware of any discussions between ASH and

13   Mr. Erickson following November 15th, 2020?

14   A.   Yes, sir.

15   Q.   You mentioned an LPA committee.  Do you recall that?

16   A.   I do.

17   Q.   Remind us.  What was the LPA committee?

18   A.   That was a committee to remove conflicts of interest from

19   the decision to purchase lots from Mr. Erickson.

20   Q.   That's right.  You spoke about that yesterday, right?

21   A.   Yes, sir.

22   Q.   That was because he was the buyer -- he was the CEO of the

23   buying entity and he was also the person selling the land.

24   Right?

25   A.   That's correct.

Direct Examination – Ryan Twiss

1    Q.   Okay.

2         So did the LPA committee ask Mr. Erickson to address this

3    issue?

4    A.   It did.

5    Q.   Okay.

6         Were you involved?

7    A.   I was.

8    Q.   What did the LPA committee ask Mr. Erickson to do?

9    A.   Propose an order and update us on development status of the

10   lots he was already developing.

11   Q.   Did the LPA committee request any information?

12   A.   We did.

13   Q.   What type of information?

14   A.   The status of the lots under development and the order.

15   Q.   Oh, what do you mean the "lots under development"?

16   A.   Mr. Erickson the already been developing Phase C lots.

17   Q.   Were they finished?

18   A.   They were not finished.

19   Q.   Why was that information important for ASH to have?

20   A.   We just needed to know the order he was bringing lots to

21   us, essentially.  He had started developing, so we just needed

22   to know where he was in the process so we could plan for those

23   subdivisions first.

24   Q.   Okay.

25            MR. KRAMER:  Could I have PX75, please?

 1  BY MR. KRAMER:

 2  Q.   Do you recognize this document, Mr. Twiss?

 3  A.   I do.

 4  Q.   And can you identify it, please?

 5  A.   Yes.

 6       This is email from Mr. Erickson to Mr. Coleman, Mr. Scott,

 7  and Mr. McKay, cc-ing myself, Ms. Long and Ms. Allen.

 8       It's dated November 24, 2020.  And it is subject:  LPA

 9  Committee Response to DE, 20-11-24-2.0 with an attachment.

10  Q.   What's the -- is the attachment -- strike the question.

11            MR. KRAMER:  Let me pull up PX75A.  And I would like

12  to lay some foundation for this and then admit them both.

13  BY MR. KRAMER:

14  Q.   Do you recognize PX75A as the attachment?

15  A.   I do.

16  Q.   Okay.

17       Does this contain any language from Mr. Erickson?

18  A.   It does.

19  Q.   How can you tell?

20  A.   At the end of the paragraph there is writing in all caps.

21  That's Mr. Erickson response.

22            MR. KRAMER:  Plaintiffs offer PX75 and 75A,

23  Your Honor.

24            MR. SHEBELSKIE:  No objection.

25            THE COURT:  Both are admitted.

Direct Examination - Ryan Twiss

1          (PLAINTIFFS EXHIBITS PX75 AND PX75A:  Received in

2     evidence.) 75 and 75A

3               MR. KRAMER:  Thank you.

4     BY MR. KRAMER:

5     Q.   Let's focus on 75A.

6          All right.

7          So this is a -- first of all, this looks like a letter to

8     Mr. Erickson.

9          Is that right?

10    A.   Yes, sir.

11    Q.   Were you involved in preparing the letter itself?

12    A.   I was.

13    Q.   Okay.

14         And then I think you said he responded by putting all caps

15    at the end of the paragraphs?

16    A.   Yes, sir.

17              MR. KRAMER:  Let's go to number 3.

18    BY MR. KRAMER:

19    Q.   All right.

20         Can you read for the jury what the LPA requested?  Sorry.

21    What the committee requested from Mr. Erickson?

22    A.   Yes, sir.

23         Additionally, the LPA committee requests a status update on

24    the Phase C lots, development status under the LPA, and wishes

25    to discuss a development schedule for when these Phase C lots

Direct Examination - Ryan Twiss

1   will be brought on-line.

2   Q.   And then Mr. Erickson responds in all caps:  In process.

3   Kathy, myself and my staff met yesterday to try and get this

4   under control.

5        Do you see that?

6   A.   I do.

7   Q.   Okay.

8        After Mr. Erickson said that he was trying to get this

9   issue under control, did he come back with a proposal for the

10  order of Phase C lot development?

11  A.   He did not.

12  Q.   When did the parties revisit this issue?

13  A.   I believe it would have been March of '21.

14  Q.   What happened between December and March of 2021, at a high

15  level -- sorry.  December 2020 and March of 2021, at a high

16  level?

17  A.   Mr. Erickson had resigned as CEO.

18       The relationship had soured significantly.

19  Q.   Were you working on the Dorn acquisition as well?

20  A.   I was.

21  Q.   Okay.

22           MR. KRAMER:  Let's go to PX202.

23  BY MR. KRAMER:

24  Q.   All right.  Is this -- can you identify this, please?

25  A.   Yes.

Direct Examination - Ryan Twiss

1          It's an email from Mr. Erickson to myself, also copying

2    Mr. Smith, Mr. McClure and ASH's outside counsel, dated March 5,

3    2021.  The subject:  Re Land Purchase Agreement.

4    Q.   And at this point were the parties talking about the order

5    of Phase C lot development again?

6    A.   We were.

7    Q.   Who initiated that conversation?

8    A.   Mr. Erickson.

9    Q.   Okay.

10         And did you respond?

11   A.   I did.

12   Q.   How quickly?

13   A.   Almost immediately.

14   Q.   All right.

15         Did you prepare a response to this email?

16   A.   I did.

17   Q.   All right.

18             MR. KRAMER:  Could we have PX200, please?

19             THE COURT:  Did you intend to tender 202?

20             MR. KRAMER:  I am so sorry.  I missed that.  Yes.

21   Could I offer PX202 into evidence.

22             MR. SHEBELSKIE:  No objection.

23             THE COURT:  Admitted.

24        (PLAINTIFFS EXHIBIT PX202:  Received in evidence.)

25             MR. KRAMER:  Thank you.

Direct Examination - Ryan Twiss

1              Okay.  Let's take a look at PX200.

2   BY MR. KRAMER:

3   Q.   Can you identify this please, Mr. Twiss?

4   A.   It's an email from Mr. Erickson to myself and Ms. Allen

5   dated March 16; 2021, titled:  ASH-GH Lot Holdings lot agreement

6   resolution.

7   Q.   Is there an attachment?

8   A.   There is.

9        There is a letter GH Lot Holdings.dox and an Excel sheet

10  ASH lot delivery chart.

11          MR. KRAMER:  Could we take a look, for the witness,

12  200A?  And my question will be:

13  BY MR. KRAMER:

14  Q.   Is this one of the attachments?

15  A.   It is.

16  Q.   Can you just identify the document for the record, please?

17  A.   It's a letter from Mr. Erickson to myself.

18  Q.   What's the date?

19  A.   March 6, 2021.

20          MR. KRAMER:  If we can look at PX200B, please.

21          THE COURT:  200A is not admitted.

22          MR. KRAMER:  That's correct.

23  BY MR. KRAMER:

24  Q.   Is this the second attachment, Mr. Twiss?

25  A.   It is.

Direct Examination - Ryan Twiss

1          MR. KRAMER:  All right.  At this point, Your Honor,

2   plaintiffs offer PX200, 200A and 200B.

3          MR. SHEBELSKIE:  No objection.

4          THE COURT:  They are admitted.

5      (PLAINTIFFS EXHIBITS PX200, 200A AND 200B:  Received in

6   evidence.)

7          MR. KRAMER:  Thank you.

8   BY MR. KRAMER:

9   Q.   Let's stay on 200B.

10       What is it, Mr. Twiss?

11  A.   This is the attachment showing the status of the

12  neighborhoods -- Phase C neighborhoods that Mr. Erickson had

13  already started developing.

14  Q.   Is this the information that ASH had been asking for?

15  A.   Part of it, yes.

16  Q.   Okay.  Does it include all of the Phase C neighborhoods?

17  A.   It does not.

18  Q.   Do you know why the other Phase C neighborhoods don't show

19  up on here?

20         MR. SHEBELSKIE:  Objection.  Lack of foundation and

21  hearsay, Your Honor.  This is not his letter.

22         THE COURT:  What's the question?

23         MR. KRAMER:  I will withdraw the question, Your Honor.

24         THE COURT:  All right.

25

Direct Examination – Ryan Twiss

1   BY MR. KRAMER:

2   Q.   Is this a proposal on the order of Phase C lot development

3   for all of the Phase C neighborhoods?

4   A.   It is not.

5   Q.   Were there other Phase C neighborhoods that weren't yet

6   under development?

7   A.   Yes.

8   Q.   Okay.

9        Okay.  What's the first column here?

10  A.   The first column is the name of the subdivision.  That's an

11  identifier.

12  Q.   And what is the third column?

13  A.   The number of lots that are being developed in that

14  subdivision at this time.

15            MR. KRAMER:  Could we have the next page, please?

16  BY MR. KRAMER:

17  Q.   Is this a continuation of the chart?

18  A.   Yes, sir.

19  Q.   All right.

20       What is the -- high level -- what is the status column?

21  What kind of information is in there?

22  A.   It's the development status, so where in the development

23  process these lots are.

24  Q.   And what is the final column?

25  A.   Delivery date.  It's Mr. Erickson's estimate on when those

1    lots will be finished and available for ASH to purchase.

2    Q.   As of today, how many of these lots, if any, have been

3    finished and made available?

4    A.   Zero.

5            MR. KRAMER:  Let's go to PX197.

6    BY MR. KRAMER:

7    Q.   Can you identify this document?

8    A.   I can.

9        It's an email from myself to Mr. Erickson and Ms. Allen,

10   dated March 18, 2021.  Response:  ASH GH Lot Holdings lot

11   agreement resolution.

12   Q.   Okay.

13       Are there attachments?

14   A.   There are two attachments:  PDF ASH-GH response package to

15   DR 21-03-18 and ASH lot deliver chart 21-03-17B3.

16           MR. KRAMER:  Let's take a look at those real quick.

17           Could I have 197A up, please?

18   BY MR. KRAMER:

19   Q.   What do we have here?

20   A.   This is the first attachment.

21       It's a letter to Mr. Erickson from myself.

22   Q.   From you?

23   A.   Yes, sir.

24           MR. KRAMER:  And can we have PX197B, please?

25

1    BY MR. KRAMER:

2    Q.   Is this the second attachment?

3    A.   It is.

4            MR. KRAMER:  Your Honor, plaintiffs offer PX197, 197A

5    and 197B.

6            MR. SHEBELSKIE:  No objection.

7            THE COURT:  They are all admitted.

8        (PLAINTIFFS EXHIBITS PX197, 197A AND 197B:  Received in

9    evidence.)

10   BY MR. KRAMER:

11   Q.   Okay.  Let's stay on 197B.

12       What is this document, Mr. Twiss?

13   A.   This is our proposal for the development order for the

14   Phase C lots.

15   Q.   Does it include all of the Phase C subdivisions?

16   A.   It does.

17   Q.   Are some of the subdivisions on the list the ones that were

18   included in the information you had just gotten from

19   Mr. Erickson?

20   A.   They are.

21   Q.   Can you tell which ones?

22   A.   I can.

23   Q.   How?

24   A.   Looking at the status and delivery date columns.

25   Q.   Okay.

1     So what is the first column here?

2  A.   It's the development order.  So it's putting an order to

3  the actual neighborhoods themselves.

4  Q.   All right.

5     And who proposed the order?

6  A.   I did.

7  Q.   And how did you -- how did you come up with the proposal

8  for the first five neighborhoods?

9  A.   I used information Mr. Erickson had given us as to the

10  current status and his anticipated delivery date and put those

11  into -- just order of when they were going to deliver.

12  Q.   Okay.

13     So what did you change in this spreadsheet that

14  Mr. Erickson had provided?

15  A.   The order.  He had them just listed.  I put them in the

16  actual order he had said they were going to be finished, so --

17  Q.   Sorry.  I cut you off.

18  A.   I just put them in the order they were going to be finished

19  based on his information.

20  Q.   So you adopted his order?

21  A.   Yes, sir.

22  Q.   Why do you have, in number 2, for example, several

23  different subdivisions being developed at the same time as

24  number 2?

25  A.   Mr. Erickson was already developing those, so it was just a

1    way to adopt them and put them in the same grouping of lots.

2        Also, for our purposes, it's better to have multiple

3    neighborhoods to buy from.  So if you three or four on the

4    ground delivering late spring of 2021, it was easy to group them

5    together and say, Here they are.

6    Q.    Okay.

7        Did Mr. Erickson respond to this proposal from ASH in March

8    2021?

9    A.    He did not.

10   Q.    Did ASH ask him to respond?

11   A.    We did.

12   Q.    Did he ever make a different proposal?

13   A.    He did not.

14   Q.    Did there come a time when the parties discussed the

15   Phase C lot development order in person?

16   A.    There did.

17   Q.    Where was that?

18   A.    It was in June of '21.

19        It would have been at Mr. Quackenboss' offices in DC.

20   Q.    Who from ASH was in the meeting that day?

21   A.    I was there, Mr. Darnold was there and our outside counsel

22   was there.

23   Q.    That was me, right?

24   A.    Yes, sir.

25   Q.    Did the parties come to an agreement in principle as to the

Direct Examination – Ryan Twiss

1    order of Phase C lot development at that meeting?

2    A.    We did.

3    Q.    What was the agreement, in principle?

4    A.    The March 18th list, which is the one in front of me.

5    Q.    Did Mr. Erickson agree to use the proposal that you had

6    already made?

7    A.    He did.

8    Q.    Did that agreement include, for example, how many lots were

9    being purchased at particular times?

10   A.    It did not.

11   Q.    Why not?

12   A.    It wasn't required.

13   Q.    What was required, in your view?

14   A.    An order of development.

15   Q.    Okay.

16          MR. KRAMER:  We can take that down.

17          Let's go to PX467.

18   BY MR. KRAMER:

19   Q.    Do you recognize this document?

20   A.    I do.

21   Q.    What is it?

22   A.    It's a letter from ASH's outside counsel to

23   Mr. Quackenboss, dated June 21, 2021, titled Notice of Default

24   Land Purchase Agreement.

25   Q.    Were you involved in preparing this letter?

Direct Examination - Ryan Twiss

1   A.    I was.

2              MR. KRAMER:  Plaintiffs offer PX467, Your Honor.

3              MR. SHEBELSKIE:  No objection.

4              THE COURT:  Admitted.

5         (PLAINTIFFS EXHIBIT PX467:  Received in evidence.)

6   BY MR. KRAMER:

7   Q.    What's the date of this default notice?

8   A.    June 21, 2021.

9   Q.    What prompted ASH to send this default notice?

10  A.    Mr. Erickson had sent his own.

11  Q.    He had sent his own what?

12  A.    Default notice.

13  Q.    On what basis?

14  A.    Failure to set a Phase C lot schedule.

15  Q.    What was the significance of receiving a notice like that

16  from Mr. Erickson?

17  A.    Catastrophic.  The future of the business is those lots.

18  Q.    Was ASH still interested in purchasing Phase C lots from

19  Mr. Erickson at the time?

20  A.    Absolutely.

21  Q.    So how long did it take ASH to respond with its own default

22  notice?

23  A.    Same day.

24             MR. KRAMER:  Turning to the second page.  Sorry.

25  Let's go back to the first page.

Direct Examination – Ryan Twiss

1    BY MR. KRAMER:

2    Q.   Does the third paragraph refer to the order of Phase C lot

3    development?

4    A.   It does.

5    Q.   It says, part way down:  Please consider this letter to

6    constitute a formal notice of default by the seller, as that

7    term is defined in the LPA, as a result of the failure to agree

8    on the order in which specific Phase C lots will be developed.

9         Do you see that?

10   A.   Yes, sir.

11   Q.   You said there had been an agreement in principle at that

12   meeting in Washington, DC.

13        After the meeting, was Mr. Erickson willing to implement --

14   did he indicate he was willing to implement the Phase C order

15   that had been agreed upon in principle?

16   A.   He did not.

17   Q.   Okay.

18        Next sentence says:  Pursuant to Section 35 of the LPA, the

19   company requests that seller cure this default with 15 days.

20        So essentially what was ASH asking him to do here?

21   A.   Set an order of Phase C lot development.

22   Q.   Then it ends:  The parties, each having given a notice of

23   default on this issue, we respectfully suggest that adopting the

24   schedule already deemed acceptable in principle during our rent

25   discussions would be a reasonable and efficient way to cure.

Direct Examination - Ryan Twiss

1     Do you see that?

2  A.   I do.

3  Q.   Okay.

4     Did Mr. Erickson respond to the suggestion that the parties

5  simply adopt the agreement in principle?

6  A.   He did not.

7  Q.   Did he respond at all to this request to fix the default?

8  A.   Eventually, yes.

9  Q.   Okay.

10     How long -- you said ASH had 15 days -- excuse me.  That

11  Mr. Erickson had 15 days to cure under the LPA.

12     Do I have that right?

13  A.   You do.

14  Q.   How long does ASH have to cure a default under the LPA?

15  A.   45 days.

16  Q.   Okay.

17       MR. KRAMER:  Let's take a look at PX700 for the

18  witness, please.

19  BY MR. KRAMER:

20  Q.   Do you recognize this document, Mr. Twiss?

21  A.   I do.

22  Q.   What is it?

23  A.   It's a letter from ASH's outside counsel to Mr. Quackenboss

24  dated July 12, 2021, Final Notice of Default Land Purchase

25  Agreement.

Direct Examination - Ryan Twiss

1          MR. KRAMER:  Plaintiffs offer PX700.

2          MR. SHEBELSKIE:  No objection.

3          THE COURT:  Admitted.

4      (PLAINTIFFS EXHIBIT PX700:  Received in evidence.)

5  BY MR. KRAMER:

6  Q.   Okay.

7      Did ASH send this letter after the 15-day period for

8  Mr. Erickson to fix the default had expired?

9  A.   Yes, sir.

10  Q.   What was the purpose of sending this letter?

11  A.   Letting Mr. Erickson know he was in default.

12  Q.   All right.

13          MR. KRAMER:  Can we go to footnote 2 on the first

14  page?

15  BY MR. KRAMER:

16  Q.   All right.  It says here:  The company requested that your

17  clients agree on the order in which specific Phase C lots will

18  be developed within 15 days pursuant to Sections 10 and 35 of

19  the LPA.  To that end, the company proposed that the parties

20  implement the schedule already deemed acceptable in principle

21  during recent discussions.  We have had no response.

22      Do you see that?

23  A.   I do.

24  Q.   Okay.

25      Did ASH ultimately receive a response from Mr. Erickson?

1    A.    We did.

2    Q.    When?

3    A.    After he waited the 45 days and responded.

4    Q.    And what did he do at that point?

5    A.    He terminated the LPA.

6    Q.    Okay.

7          ASH had already given him a final notice of default at that

8    point.  Correct?

9    A.    Yes, sir.

10   Q.    And then he terminated the LPA?

11   A.    Yes, sir.

12   Q.    Or tried to.

13         What reason did he give?

14   A.    That we failed to set a Phase C lot order.

15   Q.    What was your reaction to that?

16   A.    Shocked.

17   Q.    Why?

18   A.    We had already declared Mr. Erickson in default.  We had

19   asked him to cure.  We had tried everything to get him to agree

20   with an order.

21   Q.    Okay.

22              MR. KRAMER:  Could I have PX31, please, for the

23   witness?

24   BY MR. KRAMER:

25   Q.    Do you recognize this document?

Direct Examination - Ryan Twiss

1    A.    I do.

2    Q.    What is it?

3    A.    This is a letter from Mr. Quackenboss to ASH's outside

4    counsel, dated August 6, 2021, re: Termination of Land Purchase

5    Agreement.

6    Q.    Is this the letter that Mr. Erickson sent to ASH after he

7    waited 45 days without responding to the proposal?

8    A.    Yes, sir.

9              MR. KRAMER:  We can take that down.

10             I would like to move to a related subject.

11   BY MR. KRAMER:

12   Q.    Fair to say ASH has suffered harm as a result of its

13   inability to purchase Phase C lots?

14   A.    Yes, sir.

15   Q.    Has ASH done anything to try and mitigate that harm or

16   lessen that harm?

17   A.    We have.

18   Q.    What generally has ASH tried to do?

19   A.    We have tried to find other lots.

20   Q.    Where?

21   A.    In Georgia and Alabama.  We have looked all over the place.

22   We have gone to Hogansville, Macon, Warner Robbins, Perry.  Over

23   to have Auburn, Smith's Station, Phenix City, Opelika.  And

24   locally, of course.

25   Q.    Why did ASH look far and wide outside of Muscogee County?

Direct Examination - Ryan Twiss

1    A.   We weren't having any luck here, so we started to look

2    elsewhere.  We needed to keep building homes.  We needed to keep

3    our people employed.  We were still trying to do our best.

4              MR. KRAMER:  Could I have PX832 for the witness,

5    please?

6    BY MR. KRAMER:

7    Q.   This is a summary exhibit.

8         Do you recognize this, Mr. Twiss?

9    A.   Yes, sir.

10   Q.   Did you supervise the preparation of this exhibit?

11   A.   Yes, sir.

12   Q.   Did you check it for accuracy?

13   A.   Yes, sir.

14   Q.   Did you supply the information summarized in this exhibit?

15   A.   Yes, sir.

16   Q.   What is the source of the information in this exhibit?

17   A.   The status report.

18   Q.   And what is that again?

19   A.   That's the report from the system containing all of the

20   information about all the lots, homes that have closed, homes

21   that are going to close, et cetera.

22   Q.   All the lots?  How many are we talking about, roughly?

23   A.   Thousands.

24             MR. KRAMER:  Plaintiffs offer PX832 as a summary

25   exhibit pursuant to Rule 1006.

Direct Examination – Ryan Twiss

1          MR. SHEBELSKIE:  No objection.

2          THE COURT:  Admitted.

3       (PLAINTIFFS EXHIBIT PX832:  Received in evidence.)

4          MR. KRAMER:  Thank you.

5          We can put that up for the jury.

6   BY MR. KRAMER:

7   Q.   Were you personally involved in trying to find lots outside

8   of Columbus or in Muscogee County?

9   A.   Yes, sir.

10  Q.   Did ASH find some lots in Alabama?

11  A.   We did.

12  Q.   Where?

13  A.   Auburn, Opelika and Phenix City.

14  Q.   And did ASH find any lots in Georgia, outside of Muscogee

15  County?

16  A.   We did.

17  Q.   Where?

18  A.   Perry.

19  Q.   Roughly how far away is Perry?

20  A.   About an hour and a half.

21  Q.   Is that near Warner Robbins?

22  A.   It is.

23  Q.   How many lots did ASH find in Perry?

24  A.   52.

25  Q.   In what subdivision?

Direct Examination - Ryan Twiss

1    A.    Ivy Glenn.

2    Q.    Okay.

3          We can see it on this exhibit, but to total it up, how many

4    lots has ASH been able to find to help mitigate its damages?

5    A.    116.

6    Q.    And do you know -- the information contained in this

7    exhibit, does it go up to a certain date?

8    A.    It does.  I believe that was June 30th of this year.

9    Q.    The end of June of this year?

10   A.    Yes, sir.

11   Q.    So at that point how many lots had ASH purchased?

12   A.    116.

13   Q.    How many houses had ASH started on those lots?

14   A.    55.

15   Q.    How many houses had ASH closed on those lots?

16   A.    35.

17   Q.    Were these mitigation lots the same as the lots -- the

18   Phase C lots owed under the LPA, or were they different in some

19   way?

20   A.    They were different.

21   Q.    Could you explain?

22   A.    The majority of the Phase C lots would have been in

23   Muscogee County.  These were not.

24         The LPA had standards and requirements for the lots for how

25   they were prepared and developed.  These lots had been sitting

Direct Examination - Ryan Twiss

1    there for some time.  A lot of these lots were in existing

2    neighborhoods that had never been finished being built out.

3    They had been sitting on the ground for a long time.

4        One subdivision -- the developer never put Internet in, so

5    we ran into all sorts of issues -- unfinished roads.  Lots of

6    work just needed to be done to even turn these lots into being

7    ready to be build.

8    Q.   Would you characterize these as second choice lots?

9    A.   Very much so.

10   Q.   Why?

11   A.   They had been waiting for someone to buy them for some time

12   in most parts.

13   Q.   Why did ASH buy second choice lots?

14   A.   We were trying to keep our business.  We were trying to

15   keep our employees employed.

16   Q.   Were there thinking -- beyond what's shown on this page,

17   were there other transactions, raw land, lots that ASH explored

18   but wasn't able to close for one reason or another?

19   A.   There was.

20   Q.   Okay.

21       And what are some of the reasons that those other attempts

22   to buy land or lots to mitigate the harm didn't work out?

23   A.   Sometimes the seller took a different offer.  Sometimes --

24   a couple of them had some entitlement issues that I ran into.

25   Just not enough time to get projects through entitlement.  The

Direct Examination - Ryan Twiss

1    seller, I believe, in one case having sewer issues.

2              MR. KRAMER:  We can take that down.  I would like to

3    move to another subject.

4    BY MR. KRAMER:

5    Q.   Are you familiar with GH Lot Holdings of Atlanta, formerly

6    known as Grayhawk Homes of Atlanta?

7    A.   I am.

8    Q.   What is that?

9    A.   It was Mr. Erickson's homebuilding entity in Atlanta.

10   Q.   And are you familiar with GH Lot Holdings of

11   South Carolina?

12   A.   I am.

13   Q.   Was that company previously known by another name?

14   A.   It was.

15   Q.   What name?

16   A.   It was Grayhawk Homes of South Carolina.

17   Q.   And who owns or operates that entity?

18   A.   Mr. Erickson.

19   Q.   Are GH Lot Holdings of Atlanta and GH Lot Holdings of South

20   Carolina defendants in this case?

21   A.   Yes, sir.

22   Q.   What does ASH allege they did?

23   A.   They used our trademark.  They used our logo and name.

24   Q.   Okay.

25              MR. KRAMER:  Let's put up PX --

Direct Examination - Ryan Twiss

1  BY MR. KRAMER:

2  Q.   Well, when did you become aware of these companies using

3  the Grayhawk trademark after the acquisition of Grayhawk Homes?

4  A.   I would say I became specifically aware about January of

5  2021.

6  Q.   And what prompted you -- or how did you find that out?

7  A.   I actually found it on MLS listings.

8  Q.   I'm sorry.  What did you say?

9  A.   MLS listings.

10      So real estate website listing homes in Dallas, Georgia and

11 South Carolina using the Grayhawk logo.

12 Q.   What is the MLS?

13 A.   It's Multiple Listing Service.  It's a real estate page

14 that lists homes for sale.

15 Q.   Okay.

16      MR. KRAMER:  Let me have up PX246, please.

17 BY MR. KRAMER:

18 Q.   Do you recognize this document?

19 A.   Yes, sir.

20 Q.   What is it?

21 A.   This is the trademark agreement signed by the parties on

22 November 15, 2019.

23 Q.   What's your understanding of this agreement?

24 A.   Part of the acquisition was we had purchased the logo and

25 the trademark of Grayhawk Homes and Mr. Erickson was assigning

Direct Examination – Ryan Twiss

1   to us as part of the purchase.

2   Q.   Does this agreement say the geographic scope of the

3   assignment?

4   A.   It does.

5   Q.   What is it?

6   A.   Worldwide.

7   Q.   Worldwide?

8   A.   Yes, sir.

9   Q.   What's an assignment?

10  A.   It's giving us the rights to it.  It's -- so everything

11  Mr. Erickson has he is assigning over to us, essentially.

12  Q.   All right.

13          MR. KRAMER:  We can take that down.

14          THE COURT:  Tender that or not?

15          MR. KRAMER:  It's preadmitted, Your Honor.

16          THE COURT:  It's already been admitted in advance?

17          MR. KRAMER:  Yes.

18          THE COURT:  All right.

19  BY MR. KRAMER:

20  Q.   So big picture, Mr. Twiss, why did it matter to ASH that

21  Mr. Erickson stop using the logo for Grayhawk Homes?

22  A.   Once we were using the name, and we have purchased it, it's

23  our only way to protect our reputation that we have purchased.

24  It's the only way to protect ourselves, is to make sure no one

25  else is using it.

Direct Examination - Ryan Twiss

1    Q.    Did ASH have any control over what Mr. Erickson was doing

2    in Atlanta or South Carolina?

3    A.    We did not.

4              MR. KRAMER:  I would like to put up PX34, please.

5    BY MR. KRAMER:

6    Q.    Do you recognize this document?

7    A.    I do.

8    Q.    Can you identify it, please?

9    A.    This is a certificate of amendment name change from the

10   State of Georgia, Secretary of State, for Grayhawk Homes of

11   Atlanta, changing the name to GH Lot Holdings of Atlanta

12   Corporation.

13   Q.    And how did you become familiar with this document?

14   A.    I pulled it off the Georgia State's website.

15             MR. KRAMER:  Plaintiffs offer PX34.

16             MR. SHEBELSKIE:  No objection.

17             THE COURT:  Admitted.

18       (PLAINTIFFS EXHIBIT PX34:  Received in evidence.)

19   BY MR. KRAMER:

20   Q.    Let's put that up.

21       You said this is a Certificate of Amendment name change.

22   Right?

23   A.    Yes, sir.

24   Q.    So what company was changing its name here?

25   A.    Grayhawk Homes of Atlanta, Inc.

Direct Examination - Ryan Twiss

1    Q.   What name did Grayhawk Homes of Atlanta adopt?

2    A.   GH Lot Holdings of Atlanta Corporation.

3    Q.   Does it identify when the papers were filed to change the

4    name?

5    A.   It does.

6    Q.   What does it say?

7    A.   January 19, 2021.

8            MR. KRAMER:  Let's take that down.

9            Take a look at PX74.

10   BY MR. KRAMER:

11   Q.   Do you recognize this document, Mr. Twiss?

12   A.   I do.

13   Q.   What is it?

14   A.   This is an Articles of Amendment to change the name for

15   Grayhawk Homes of South Carolina.  It's dated February 3, 2021.

16   Q.   Have you seen this document before?

17   A.   I have.

18   Q.   Okay.

19       Is this information publicly available?

20   A.   Yes, sir.

21   Q.   Have you found it on the Secretary of State's website?

22   A.   Yes, sir.

23           MR. KRAMER:  Plaintiffs offer PX74.

24           MR. SHEBELSKIE:  No objection.

25           THE COURT:  Admitted.

Direct Examination - Ryan Twiss

```
 1          (PLAINTIFFS EXHIBIT PX74:  Received in evidence.)
 2    BY MR. KRAMER:
 3    Q.   All right.
 4         What was the name change here?
 5    A.   It was Grayhawk Homes of South Carolina, Inc.  And it was
 6    changing to -- I can't see it on the form, but I believe it was
 7    GH Lot Holdings of South Carolina, Inc.
 8    Q.   Okay.
 9         And what is the date that that name change occurred?
10    A.   February 2, 2021.
11    Q.   All right.
12              MR. KRAMER:  Let me have PX 33, please.
13    BY MR. KRAMER:
14    Q.   Do you recognize this document, Mr. Twiss?
15    A.   Yes, sir.
16    Q.   What is it?
17    A.   This is a Certificate of Amendment name change for the
18    State of Georgia for Grayhawk Homes, Inc.
19    Q.   Okay.
20         Have you seen it before?
21    A.   Yes, sir.
22    Q.   When?
23    A.   When I pulled it off the website for Georgia?
24              MR. KRAMER:  Plaintiffs offer PX33, Your Honor.
25              MR. SHEBELSKIE:  No objection.
```

Direct Examination – Ryan Twiss

```
 1            THE COURT:  Admitted.

 2        (PLAINTIFFS EXHIBIT PX33:  Received in evidence.)

 3            MR. KRAMER:  Thank you.

 4   BY MR. KRAMER:

 5   Q.   What's the new name -- first of all, what's Grayhawk Homes,

 6   Inc.?

 7   A.   That's Mr. Erickson's company that we purchased the assets

 8   from.

 9   Q.   Okay.

10        And do you recall in the APA what the deadline was for

11   Grayhawk Homes, Inc. to change its name?

12   A.   Ten business days.

13   Q.   Does this indicate when the papers were filed to change the

14   name?

15   A.   It does.

16   Q.   When?

17   A.   December 31st of 2019.

18   Q.   Is that more than ten business days after the acquisition?

19   A.   Yes, sir.

20            MR. KRAMER:  We can take that down.

21            We are almost done here.

22   BY MR. KRAMER:

23   Q.   Did you see any evidence that Mr. Erickson's continued use

24   of the Grayhawk name and logo caused any customer confusion?

25   A.   Yes, sir.
```

Direct Examination - Ryan Twiss

1    Q.    Generally, what did you see?

2    A.    There was bad reviews online from owners in South Carolina.

3    Our warranty department dealt with people constantly sending

4    requests in for homes in Dallas and South Carolina.

5              MR. KRAMER:   Let's have PX398, please.

6    BY MR. KRAMER:

7    Q.    All right.  Do you recognize this document, Mr. Twiss?

8    A.    I do.

9    Q.    What is it, generally?

10   A.    It's a review from Yelp from a homeowner in South Carolina

11   for Grayhawk.

12   Q.    Did you find this online?

13   A.    I did.

14   Q.    Who made the screenshot of this review?

15   A.    I did.

16   Q.    And when did you find this?

17   A.    January of '21.

18   Q.    Okay.

19         Same question, as to the name change certificates we just

20   looked at, how long ago did you pull those up and find them?

21   A.    It would have been some time in 2021.

22   Q.    Okay.

23              MR. KRAMER:   Back to this exhibit.  Plaintiffs offer

24   PX 398.

25              MR. SHEBELSKIE:   No objection.  But I think it was

Direct Examination - Ryan Twiss

1    admitted yesterday.

2            THE COURT:  Admitted.

3            (PLAINTIFFS EXHIBIT PX398:  Received in evidence.)

4    BY MR. KRAMER:

5    Q.    What's the date of the review on here, Mr. Twiss?

6    A.    January 11, 2020.

7    Q.    And what company is being reviewed here?

8    A.    Grayhawk Homes, Inc.

9    Q.    So did ASH-Grayhawk own Grayhawk Homes at this point?

10   A.    We did.

11   Q.    How many stars does the customer give Grayhawk Homes?

12   A.    One.

13   Q.    Was this intended, do you think, for ASH-Grayhawk?

14   A.    I do not.

15   Q.    How can you tell?

16   A.    It's for a home in Bluffton, South Carolina.

17   Q.    How do you know that wasn't an ASH-Grayhawk home?

18   A.    We've never built in South Carolina.

19   Q.    Who builds in South Carolina?

20   A.    Mr. Erickson.

21   Q.    Is he mentioned, personally, in this review?

22   A.    He is.

23   Q.    What effect does a one-star review have on your business

24   here in Columbus?

25   A.    It has the potential to deter homebuyers.  If they are

Direct Examination - Ryan Twiss

1    looking up the homebuilders to see what the reviews are, it

2    could scare someone away.

3            MR. KRAMER:  We can take that down.

4    BY MR. KRAMER:

5    Q.   You mentioned some warranty-related confusion.

6         But, first, who is Judy Johnson?

7    A.   She was in the warranty department for Grayhawk.

8    Q.   Did she ever send you warranty requests for homes that were

9    not built by ASH-Grayhawk?

10   A.   She did.

11   Q.   Okay.

12        Did ASH-Grayhawk ever build homes in South Carolina?

13   A.   We did not.

14   Q.   Did ASH-Grayhawk ever build homes in the Atlanta area?

15   A.   We did not.

16           MR. KRAMER:  Can I have PX180, please?

17   BY MR. KRAMER:

18   Q.   Could you identify this email, please?

19   A.   It's an email from Judy Johnson to myself and Mr. Sasso and

20   Ms. Long, dated July 14, 2021, subject:  SE warranty.

21           MR. KRAMER:  Your Honor, plaintiffs offer PX180.

22           MR. SHEBELSKIE:  Your Honor, I may have a hearsay

23   objection.  It depends on the purpose of its admission.

24           MR. KRAMER:  The purpose of the document is offered to

25   show consumer confusion rather than for the truth of the matter

1    asserted, which is a recognized basis for admission of evidence

2    like this.

3             MR. SHEBELSKIE:  Well, Your Honor, the document

4    recounts out-of-court statements by third parties.  That's

5    classic hearsay.

6             THE COURT:  He says he is not seeking to admit it for

7    the truth of what's in it.

8             Scroll down so I can see what other purpose you are

9    admitting it for.

10            MR. KRAMER:  Just one page, Your Honor.

11            THE COURT:  Okay.

12            MR. SHEBELSKIE:  Your Honor, this is not an email from

13   a third party.  This is Judy Johnson recounting what she says

14   that she got in an email from somebody else.  This is not from a

15   consumer.

16            MR. KRAMER:  We are not offering this to prove that

17   what the consumer said is correct, merely as documentation of

18   consumer confusion.

19            MR. SHEBELSKIE:  But it's a hearsay statement of what

20   the out-of-court declarant says this out-of-court email says.

21   If they have the email from the consumer, I am fine with putting

22   it in, but not what Judy Johnson says the email says.

23            THE COURT:  Let me read this, please.

24        (Pause in proceedings.)

25            THE COURT:  So this 3-18-2021 message you are not

1    seeking to have that admitted for the truth of what's stated

2    there, but simply that someone made those complaints.

3            MR. KRAMER:  That's right.  Simply that someone

4    confused one Grayhawk for another.

5            MR. SHEBELSKIE:  But, Your Honor, this message, on its

6    face, doesn't say it's an email.  Doesn't say someone was

7    confused about ownership.  Without the actual email.  This is

8    Judy Johnson's recitation that has no connection to any issue in

9    the case.

10            MR. KRAMER:  I think she --

11            THE COURT:  Well, it was sent to this gentleman, this

12    witness, as I understand it.  Judy Johnson is saying:  Here is

13    an email that was sent to GH warranty.

14            MR. SHEBELSKIE:  Your Honor, she is not forwarding an

15    email --

16            THE COURT:  What is that below there?  That's not an

17    email?

18            MR. SHEBELSKIE:  No.  That's Judy Johnson's --

19            THE COURT:  You are saying the 3-18-2021 is Judy

20    Johnson's note and not an email?

21            MR. SHEBELSKIE:  We don't know.  It's clearly not --

22            THE COURT:  Is he testifying as to what it is?

23            MR. KRAMER:  No.  He is just testifying that

24    ASH-Grayhawk didn't build this house.  That would be my

25    question.

Direct Examination - Ryan Twiss

 1           THE COURT:  Well, you are seeking to admit this.  What

 2  does he understand this is?

 3           MR. KRAMER:  A warranty inquiry from a customer in

 4  South Carolina.

 5           THE COURT:  All right.

 6           I will admit it for that purpose.

 7           Objection is overruled.

 8           MR. SHEBELSKIE:  Thank you, Judge.

 9           THE COURT:  180.

10      (PLAINTIFFS EXHIBIT PX180:  Received in evidence.)

11  BY MR. KRAMER:

12  Q.   Okay.

13      Mr. Twiss, did ASH-Grayhawk build a home at 119 Waters Edge

14  Lane, in Monks Corner, South Carolina?

15  A.   No, sir.

16  Q.   What was Ms. Johnson's function in the warranty department

17  at Grayhawk?

18  A.   I believe she received all of the warranty complaints.

19  Q.   Okay.

20           MR. KRAMER:  Our next exhibit -- we can take that

21  down -- is PX 270.  Just for the witness, please.

22  BY MR. KRAMER:

23  Q.   Mr. Twiss, do you recognize this email?

24  A.   I do.

25  Q.   Would you identify it, please?

1  A.   It's an email from Ms. Johnson to myself dated August 5,

2  2021, subject:  92 White Spruce Court, Dallas, Georgia, 30157.

3  Cynthia Williams.

4       MR. KRAMER:  Plaintiffs offer PX270 into evidence,

5  Your Honor.

6       MR. SHEBELSKIE:  As long as it's admitted not for the

7  truth, Your Honor.

8       MR. KRAMER:  That's fine.

9       MR. SHEBELSKIE:  No objection with that qualification.

10       THE COURT:  It's admitted not for the truth of what's

11  stated in it, but the fact that it was sent.

12       (PLAINTIFFS EXHIBIT PX270:  Received in evidence.)

13       MR. KRAMER:  Let's put that up.

14  BY MR. KRAMER:

15  Q.   What's the date of the first email in the chain here,

16  Mr. Twiss, from Cindy Williams?

17  A.   August 5th.

18  Q.   Of what year?

19  A.   2021.

20  Q.   When was this forwarded to you?

21  A.   August 5th of 2021.

22  Q.   Do you remember receiving this?

23  A.   I do.

24  Q.   What does the -- did ASH-Grayhawk build a home at 92 White

25  Spruce Court in Dallas, Georgia?

Direct Examination – Ryan Twiss

1    A.    We did not.

2            MR. KRAMER:  We can take that down.

3            THE COURT:  Where is the -- is that the entire

4    document?

5            MR. KRAMER:  Let's pull it back up.

6            No.  It continues, Your Honor.  There is the second

7    page.

8            THE COURT:  Ladies and gentlemen, I want to make sure

9    you understand what you see in this document, and I think in the

10   previous one that I admitted, that there were certain complaints

11   about a particular home.  This is not being admitted for the

12   truth of those complaints.  In other words, whether those things

13   actually happened or were legitimate complaints.

14           It's simply being admitted to show that this was sent

15   to this recipient relating to a home in this location.  That's

16   the purpose for which I have admitted it.

17           Go ahead.

18           MR. KRAMER:  Thank you, Your Honor.

19           We can take that down.

20   BY MR. KRAMER:

21   Q.    Mr. Twiss, did the use of the Grayhawk name and logo after

22   closing have an impact on ASH-Grayhawk here in Columbus?

23   A.    It did.

24           MR. SHEBELSKIE:  Your Honor -- I will wait until the

25   next question, Your Honor.

Direct Examination - Ryan Twiss

1    BY MR. KRAMER:

2    Q.   What kind of impact did it have?

3         MR. SHEBELSKIE:  Now I am going to object, Your Honor.

4    There are no damages claims associated with this.

5         MR. KRAMER:  Okay.  We've heard this in opening, we

6    heard it again, we are seeking damages, Your Honor, to be

7    awarded by the Court.  Not by the jury.  So that's not true.

8         MR. SHEBELSKIE:  Inaccurate, Your Honor.

9              In their initial disclosures, as you know we went

10   through this, they said any damages would be relied on by their

11   expert.  And their expert, as you know, has not disclosed any

12   damages, just a disgorgement theory.  And now they are trying to

13   backdoor -- get it back -- what they have stipulated throughout

14   the course of two years they have no damages on.

15         MR. KRAMER:  Your Honor, this is not -- I am not

16   offering evidence of monetary damages here or actual damages.  I

17   am offering evidence of harm from trademark infringement, and we

18   are seeking disgorgement to be decided by the Court as an

19   equitable remedy.  And that is because, in trademark cases, it's

20   difficult to quantify the damages.

21         THE COURT:  All right.  What is the jury going to have

22   to decide with regard to the issue of harm caused by the

23   trademark infringement?  Anything?

24         MR. KRAMER:  Well, if the plaintiffs will stipulate

25   that if any infringement caused harm, then nothing.  But as part

 1   of our claim we intend to prove --

 2          THE COURT:  What I am asking you is not what I have

 3   got to decide.  I am asking what is it the jury has to decide

 4   with regard to harm caused by trademark infringement?  Anything?

 5          MR. KRAMER:  Liability, Your Honor.

 6          THE COURT:  So they will be asked a question on the

 7   verdict form as to whether they find that there has been any

 8   harm due to trademark infringement?

 9          MR. KRAMER:  I don't know if that will be a specific

10   question in the verdict form, but --

11          THE COURT:  The question I have got, just to get to

12   the bottom of it --

13          MR. KRAMER:  Sure.

14          THE COURT:  -- is if this is an issue solely for me to

15   decide, as the Court, then there is no reason for the jury to

16   hear it.

17          They can be excused and you can put up this evidence

18   that I have got to decide the issue on outside their presence.

19          But if there is some issue they have got to decide

20   with regard to this, then they need to hear it.

21          MR. KRAMER:  I guess my concern, Your Honor, is I just

22   don't want to see -- well, I guess that would be a reasonable

23   way to proceed.  I just don't want to be accused later of not

24   proving infringement because there hasn't been proof of harm to

25   justify the equitable remedy that we seek.  And we can do that

1    outside the presence of the jury.

2         THE COURT:  As I understand it, the jury will have to

3    decide whether there has been infringement on the trademark or

4    violation of the contract with regard to the trademark.  And

5    then after they decide that, if they decide that in your favor,

6    the Court will decide what the remedy should be for that.

7         MR. KRAMER:  That's right.

8         THE COURT:  Okay.  All right.  So there is no need to

9    present to the jury what the actual damage is.  You can present

10   that to me and I can decide that.

11        MR. KRAMER:  Okay.  I just want to be clear.  I am not

12   trying to prove any actual damages or any dollar values here.  I

13   am drawing a distinction between harm and damages.  But I hear

14   you, Your Honor, and that makes sense to me.

15        MR. SHEBELSKIE:  Thank you, Judge.

16        THE COURT:  All right.

17        Ladies and gentlemen, there are some claims where you

18   have to decide them and there are certain aspects of the claim

19   that I have to decide.  As far as whether there was an

20   infringement on the trademark, you need to -- you will need to

21   decide that issue in your verdict form.  That's one of the

22   issues you will have to decide.

23        Then if you decide there was, then I will have to

24   decide, for that particular claim -- not for these other claims,

25   but just for that particular claim -- I will have to decide what

Direct Examination - Ryan Twiss

1    the remedy for that is.

2         So I think it would be good for y'all to take a break

3    at this time -- 15-minute break in the jury room -- and I can

4    hear this other evidence that is relevant only to my

5    determination.

6         When you go to the jury room, don't discuss the case

7    among yourselves.

8         You can leave those jury pads there in your chair, if

9    you like.  They will be secure when you come back.

10        We will be in recess -- the jury will be in recess for

11   15 minutes.

12        You may go.

13      (Jury out at 10:37.)

14        THE COURT:  All right.

15        I am a little confused, to tell you the truth, but I

16   just want to make sure we don't commit some error here.

17        Are you saying that the jury does not even have to

18   find infringement plus harm?  And then the Court, if they find

19   infringement plus harm, the Court decides the remedy?  Or are

20   you saying they only have to find infringement?

21        What I don't want to happen is defendants' lawyers to

22   come in here at directed verdict, or whatever stage, and say,

23   The jury needed to find that there was an infringement that

24   caused harm and they didn't hear any evidence on that.  And they

25   didn't hear any evidence on it because he led me to believe that

Direct Examination - Ryan Twiss

1    that's for me to decide.

2            So I am -- I just want to make sure that we don't have

3    some inadvertent error injected into this case, which would be

4    stupid since we have a jury right here that could hear it if

5    there is evidence of it.

6            MR. SHEBELSKIE:  Your Honor, I can address that and I

7    can put the Court's mind to rest on that.  That is not our

8    position, and won't be our position.  This jury is going to

9    decide liability whether or not there has been consumer

10   confusion -- whatever the standards for liability are in the

11   trademark world.  The remedy they seek is disgorgement, which is

12   the decision for the Court.

13           THE COURT:  They don't have to -- this jury does not

14   have to decide that there was infringement that caused harm?

15           MR. SHEBELSKIE:  Correct.

16           THE COURT:  If they -- if they find infringement, then

17   it's for me to decide what the remedy should be?

18           MR. SHEBELSKIE:  Yes, sir.

19           THE COURT:  Okay.

20           Go ahead and put up whatever -- ask whatever questions

21   you have of this witness on that issue.  And it will be in the

22   record and I will hear it and the jury doesn't need to hear it.

23           MR. KRAMER:  Okay.

24           Happy to proceed with that understanding, Your Honor.

25           THE COURT:  You will need to remind me at the end of

Direct Examination - Ryan Twiss

1    the jury verdict that that's a loose end that I will need to

2    decide, depending on what they find.

3              MR. KRAMER:  We will do so.

4    BY MR. KRAMER:

5    Q.   Mr. Twiss, big picture, what impact, or harm, did the use

6    of the ASH name and logo by -- sorry -- did the use of the

7    Grayhawk name and logo after closing have on ASH-Grayhawk here

8    in Columbus?

9    A.   Reputational harm.  It was hurting our reputation in the

10   market with people thinking we had built homes that we hadn't.

11   Q.   Okay.

12        What types of complaints did you become aware of?

13   A.   People were generally unhappy with the service they were

14   receiving.  As I was told, it was --

15             MR. SHEBELSKIE:  Objection, Your Honor.  Hearsay.  He

16   was told.  By whom?  It is out-of-court testimony he is talking

17   about.

18             THE COURT:  Sustained.

19             MR. KRAMER:  Understood.

20   BY MR. KRAMER:

21   Q.   What impact does it have on ASH-Grayhawk when a customer

22   makes a warranty complaint about a house built by Mr. Erickson?

23   A.   It's reputationally harmful.  We have to deal with it.  We

24   have to try to dissuade them of that notion that we are the same

25   people.  Usually they called back, or wrote back, and were

Direct Examination – Ryan Twiss

1    unhappy with the service they were receiving.  We had to, again,

2    tell them it still wasn't us.

3    Q.    Are you aware of any instance where a customer called the

4    warranty department because they were happy about their house?

5    A.    I am not.

6    Q.    Okay.

7          Did ASH ultimately decide to change the brand here in the

8    Columbus market?

9    A.    We did.

10   Q.    To what?

11   A.    Evermore Homes.

12   Q.    Okay.

13         And what is Evermore Homes?

14   A.    Evermore Homes originally started as a building entity

15   brand here in Columbus for lots that weren't related to

16   Mr. Erickson.

17   Q.    Why did ASH start using a different name for lots that were

18   not built by Mr. Erickson?

19   A.    Trying to start a new reputation.

20   Q.    Just to make one thing clear:  Was that a litigation

21   strategy?

22   A.    It was not.

23   Q.    Okay.

24         Did ASH ultimately change other parts of the company name,

25   or did ASH change to the Evermore name in other parts of the

Direct Examination - Ryan Twiss

1    country?

2    A.    We did.

3    Q.    And when did that happen?

4    A.    Just this year.

5    Q.    Okay.

6          So how long before -- how much time passed between the

7    point when ASH began to use the Evermore brand in Columbus and

8    the more recent transition company-wide?

9    A.    I would say at least a year and a half.

10   Q.    How does ASH now use the Evermore name here in Georgia and

11   in Alabama?

12   A.    We are using it everywhere now.

13              MR. KRAMER:  Okay.

14              That's all I have, Your Honor.

15              THE COURT:  Okay.

16              Do you have any other questions of this witness in

17   front of the jury?

18              MR. KRAMER:  About four more questions.

19              THE COURT:  All right.

20              Why don't we go ahead and cross-examine him now on

21   this issue of damages, or harm, based on the trademark

22   infringement.

23              MR. KRAMER:  Okay.

24              THE COURT:  And when we bring the jury down you can

25   ask those last four questions and he can do his cross.

1      Cross him now on the issues that are for my

2  consideration.

3          MR. SHEBELSKIE:  Just a moment, Your Honor.

4              CROSS-EXAMINATION

5  BY MR. SHEBELSKIE:

6  Q.   Mr. Twiss, directed to the name change, it is true, is it

7  not, that even today the ASH-Grayhawk name is being used in the

8  Columbus metropolitan area.  Isn't that right?

9  A.   I am not aware if all the signs have been changed out or

10 not.

11 Q.   In fact, if you get in your car and you drive around to all

12 your different neighborhoods today you will see sign after sign

13 that still says "ASH-Grayhawk".  Correct?

14 A.   I'm not aware.  I haven't done that.

15 Q.   Okay.  Then I will ask someone who did.

16      If you go online, on the Multiple Listing Service -- you

17 know what a Multiple Listing Service is?

18 A.   I do.

19 Q.   That's where people go -- if they are looking to buy a

20 house they can go online and find out what houses are for sale.

21 Right?

22 A.   Yes, sir.

23 Q.   If we went on the MLS listing today and looked at homes in

24 the Columbus market and Auburn, we'd see home after home still

25 being listed for sale by ASH-Grayhawk.  Correct?

1    A.    That's entirely possible.  We didn't move the lots that had

2    already been purchased and had homes on them from Grayhawk to

3    Evermore.

4    Q.    Well, then when you got ready to testify at trial today

5    about the fact that ASH-Grayhawk's name is no longer being used

6    did you ask someone whether or not the real estate listings are

7    still using ASH-Grayhawk?

8    A.    I would imagine they are, because we did not sell the lots

9    between our entities.  So the lots that already had a home on

10   them would have stayed as ASH-Grayhawk and not be marketed as

11   Evermore.

12   Q.    All rights.

13         I want to ask about this name change.

14            MR. SHEBELSKIE:  Let's pull up Defendants' Exhibit

15   538, please.

16   BY MR. SHEBELSKIE:

17   Q.    Mr. Twiss, we have put on the screen Defendant's Exhibit

18   538, which is a press release from American Southern Homes on

19   July 13, 2023.

20         Do you see that?

21   A.    I do.

22   Q.    This is the press release the company just issued before

23   trial announcing the re-branding of the names to ASH-Evermore.

24   Correct?

25   A.    It appears to be, yes.

Cross-Examination - Ryan Twiss

1  Q.    If we look at the date we can see July 13, 2023.  Correct?

2  A.    Yes.

3  Q.    And below that we see a date line of Reston, Virginia.

4  That's the headquarters for this holding company.  Correct?

5  A.    Yes, sir.

6  Q.    This is a press release issued by the holding company just

7  barely two months ago.  Right?

8  A.    Yes, sir.

9  Q.    And in this press release, if you look at the bottom line

10  of this first page of it, it says:  American Southern Homes is

11  now Evermore Homes unifying four builder brands operating in

12  Arizona, Alabama and Georgia.  Correct?

13  A.    Yes, sir.

14  Q.    Now, Mr. Erickson never did any business in Arizona; did

15  he?

16  A.    Not that I am aware.

17  Q.    And the ASH-Grayhawk name has never been used in Arizona.

18  Right?

19  A.    Correct.

20  Q.    And the corporate headquarters, up in Reston, Virginia,

21  changing that company's name to ASH-Evermore -- I mean, to

22  Evermore.  Correct?

23  A.    Correct.

24  Q.    And Mr. Erickson never did any business or caused consumer

25  confusion up in Reston, Virginia.  Right?

Cross-Examination - Ryan Twiss

1  A.    As far as I am aware.

2  Q.    And Reston, Virginia is outside of Washington, DC.  Right?

3  A.    It is.

4  Q.    All right.

5       MR. SHEBELSKIE:  Let's turn to the second page of the

6  exhibit, please.

7       I would like to direct your attention to the bottom

8  paragraph on this page.

9       Let's highlight that, Mr. Walters, if you would.

10      MR. KRAMER:  Objection, Your Honor.  Are we going to

11  put this in evidence or just read from it?

12      MR. SHEBELSKIE:  Well, I will move to admit it into

13  evidence, Your Honor.  538.

14      THE COURT:  Any objection?  He has tendered 538 into

15  evidence for the Court, not for the jury.

16      MR. KRAMER:  Yes.  Hearsay.  It's a press release.

17  Not issued by Mr. Twiss, but issued by the company.  And now we

18  are looking at a statement from Lee Darnold who is our next

19  witness.

20      MR. SHEBELSKIE:  This is a party admission,

21  Your Honor.  It's a press release by ASH Holdings Company with a

22  quote from its president and chairman -- or CEO, rather.

23      THE COURT:  Overruled.

24      Again, this exhibit is admitted, but, Mr. Clerk, it

25  does not need to be downloaded into the digital file that will

1    go out with the jury.

2              THE COURTROOM DEPUTY:  Yes, sir.

3              THE COURT:  So it needs to be physically segregated.

4              Go ahead.

5    BY MR. SHEBELSKIE:

6    Q.   Now, Mr. Darnold, as he just heard, he is the CEO of your

7    company.  Right?

8    A.   Correct.

9    Q.   In this press release he gives, as stated here, the

10   rationale for the transition of the name change.  Right?

11   A.   That's what it says.

12   Q.   Right.

13        And that rationale has nothing to do with consumer

14   confusion associated with the name ASH-Grayhawk.  Does it?

15   A.   This is a press release.  I have no part of this.

16   Q.   Well, you're the chief legal counsel for the company,

17   aren't you?

18   A.   I am general counsel, yes.

19   Q.   Did you let the company issue a press release with a false

20   statement in it?

21   A.   I did not see this until it was released.

22   Q.   Did you take any action to send the press release?

23   A.   I did not.

24   Q.   Did you take any action to issue another press release

25   saying the company's prior press release was mistaken?

Cross-Examination - Ryan Twiss

1    A.    I did not.

2    Q.    All right.

3          And with respect to the people who called warranty -- made

4    warranty claims, you said caused confusion, did you call any of

5    them to find out whether, in fact, they were confused?

6    A.    No.

7    Q.    Did you instruct anyone to do that?

8    A.    I instructed them to let them know Mr. Erickson built their

9    home and how to reach him.

10   Q.    Why was it that these people were calling ASH-Grayhawk, or

11   contacting them for these warranty claims?

12              MR. KRAMER:  Objection.  Calls for speculation.

13              MR. SHEBELSKIE:  Your Honor, I guess that would be my

14   point.

15              THE COURT:  I don't know if it's speculation or not.

16   If he doesn't know, then he doesn't know.

17              MR. KRAMER:  He is being asked to testify about other

18   people's reasons for doing things.  And I thought I heard an

19   objection along the same lines --

20              MR. SHEBELSKIE:  He put on evidence that these --

21              THE COURT:  The objection before was hearsay.

22              The speculation objection is overruled because he

23   hasn't said whether he knows for sure what they were complaining

24   about, or whether he would be just speculating about it.  He

25   can't guess.  But...

Cross-Examination – Ryan Twiss

1          THE WITNESS:  I don't know.

2          THE COURT:  Okay.  He doesn't know.

3    BY MR. SHEBELSKIE:

4    Q.   Did you undertake any effort to find out the answer to that

5    question?

6    A.   I did not.

7    Q.   Did you conduct any consumer surveys to find out whether

8    people in the Columbus market have confusion associated with the

9    name ASH-Grayhawk?

10   A.   I have not.

11   Q.   Did you, or anyone in your company, make any effort to

12   ascertain whether or not there was any actual consumer

13   confusion?

14   A.   I did not.

15   Q.   Did anyone else in the company?

16   A.   I am not aware of any.

17   Q.   All right.

18          THE COURT:  Is confusion not a jury issue?

19          MR. SHEBELSKIE:  Well, it is, but he's talking about

20   reputational harm.  Let me restate the question.

21          THE COURT:  At this time I am concerned we have gone

22   down -- y'all have led me down this road that I am not that

23   comfortable with, because now you are asking this witness

24   questions that could go to issues that the jury needs to

25   decide --

1           MR. SHEBELSKIE:  I will withdraw that question.

2           THE COURT:  -- on this claim.  And y'all have both

3    suggested to me that we ought to excuse the jury for this phase

4    of the trial.

5           MR. SHEBELSKIE:  I will withdraw that question,

6    Your Honor.

7           And I have no further questions.

8           THE COURT:  All right.

9           Any redirect on this issue?

10          MR. KRAMER:  Two quick questions, Your Honor.

11                    REDIRECT EXAMINATION

12   BY MR. KRAMER:

13   Q.   Just to level set here, Mr. Twiss, how long ago was it that

14   ASH started using the Evermore brand in this market?

15   A.   End of 2021.

16   Q.   And what did it use the Evermore brand for?

17   A.   Lots that Mr. Erickson hadn't sold us.  So new

18   neighborhoods -- our mitigation lots.  We were trying to stem

19   the tide of harm.

20   Q.   Okay.

21        What did ASH -- what brand did ASH continue it use, if any,

22   for the lots purchased from Mr. Erickson?

23   A.   We continued to use Grayhawk.

24          MR. KRAMER:  Okay.  That's all I have, Your Honor.

25          THE COURT:  All right.

```
 1              I just want to make sure everybody understands that
 2    the jury will be deciding the likelihood of confusion.  So any
 3    of those questions need to be asked when the jury is in the box.
 4    Y'all are on notice to make sure that happens.
 5              MR. KRAMER:  One piece of housekeeping, Your Honor.
 6              I forgot to offer PX31 into evidence.
 7              THE COURT:  All right.
 8              PX31.  Is there any objection?
 9              MR. KRAMER:  August 6th termination letter.
10              MR. SHEBELSKIE:  2021?
11              MR. KRAMER:  Yes.
12              MR. SHEBELSKIE:  No objection, Your Honor.
13              THE COURT:  That's admitted.
14         (PLAINTIFFS EXHIBIT PX31:  Received in evidence.)
15              THE COURT:  We will take 15 minutes.
16              What was the exhibit number of the one I admitted
17    that's not going to the jury?  538?
18              MR. SHEBELSKIE:  Yes, sir.
19              THE COURT:  Okay.
20              We will be in recess for 15 minutes.
21         (Recess taken 10:54.)
22         (Resumed at 11:09.)
23              THE COURT:  Be seated.  Bring them down.
24              I got an old charge book here that has the charge on
25    trademark infringement, but they don't make these books anymore.
```

 1   It's all online.  And I like the book.  It's easier to look it

 2   up.

 3             MR. KRAMER:  I prefer the books, too, Your Honor.

 4             THE COURT:  This is a little out-of-date.  We will be

 5   using the online version for the charge, so y'all don't be

 6   concerned that we won't have the current charge.

 7        (Jury in at 11:10.)

 8             THE COURT:  Okay.  Ladies and gentlemen, that took a

 9   little longer than I thought, but we will now move on with the

10   examination.

11             MR. KRAMER:  Okay.

12             Just a few more questions, Mr. Twiss.

13                  <u>CONTINUED DIRECT EXAMINATION</u>

14   BY MR. KRAMER:

15   Q.   How long has this litigation been going on?

16   A.   Over two years.

17   Q.   Has the cost of litigation impacted ASH?

18   A.   It has.

19   Q.   How so?

20   A.   It's cost us money and time and effort and diverted our

21   attentions.

22   Q.   What kind -- without giving dollar valves -- what kind of

23   costs has ASH incurred expenses?

24   A.   Expenses, court fees, travel costs.  All sorts of those

25   types costs.

```
 1   Q.    Has ASH done anything to address those costs?

 2   A.    We have.  We have raised additional capital.

 3   Q.    What does that mean?

 4   A.    We went to our investors for -- we asked to raise money

 5   this year.

 6              MR. KRAMER:  Okay.  Those are all of my questions,

 7   Your Honor.

 8              THE COURT:  Cross-examination?

 9              MR. SHEBELSKIE:  Please, Your Honor.

10              If it please the Court?

11              THE COURT:  Yes, sir.

12              MR. SHEBELSKIE:  Thank you.

13                        CROSS-EXAMINATION

14   BY MR. SHEBELSKIE:

15   Q.    Good morning, Mr. Twiss.

16   A.    Good morning.

17   Q.    I'd like to start with really clarifying who the plaintiffs

18   are.

19        We have ASH and --

20              THE COURTROOM DEPUTY:  Can you put on the lapel mic?

21              THE COURT:  He is going to want you to put on the

22   lapel mic if you are not going to stay behind that microphone.

23              MR. SHEBELSKIE:  All right.

24        (Pause in proceedings.)

25   BY MR. SHEBELSKIE:
```

Cross-Examination – Ryan Twiss

1   Q.   Mr. Twiss, there are actually two plaintiffs in this

2   lawsuit.   Correct?

3   A.   Yes, sir.

4   Q.   All right.

5        Now, one is the holding company.   Right?

6   A.   Yes, sir.

7   Q.   And that's American Southern Homes Holdings.   Right?

8   A.   Yes, sir.

9   Q.   Now that holding company owns another plaintiff in this

10  lawsuit.   Right?

11  A.   Indirectly.   Yes, sir.

12  Q.   What do you mean by "indirectly"?

13  A.   It's not the owner directly.

14  Q.   Oh.   So now the other company, plaintiff, is what you

15  called ASH-Grayhawk.   Right?

16  A.   Yes, sir.

17  Q.   And so American Southern Homes Holdings doesn't actually

18  directly own ASH-Grayhawk.   Right?

19  A.   That's correct.

20  Q.   Now, let me ask you some questions about these two

21  different plaintiffs.

22       First, you're employed by American Southern Homes Holdings.

23  You're employed by the holding company.   Right?

24  A.   My technical employment is with American Southern Homes.

25  Q.   All right.

1          So you are not employed by the holding company?

2    A.   It has no employees.

3    Q.   All right.

4          So the plaintiff holding company that has sued

5    Mr. Erickson and his companies, has zero employees.  Correct?

6    A.   That's correct.

7    Q.   Well, who controls this holding company?

8    A.   The Board of Directors.

9    Q.   Board of Directors.

10         And we have heard some names in your testimony.

11         One name we heard was Marshall Coleman.  Is he on the Board

12   of Directors?

13   A.   Yes, sir.

14   Q.   We have got a Marshall Coleman.

15         And you mentioned -- I don't write very well.  I will get

16   this written up cleaner later -- a Marshall Coleman.  He is on

17   the board.  Right?

18   A.   Yes, sir.

19   Q.   And you mentioned another name yesterday, a Sean Coleman?

20         Is he on the board?

21   A.   Yes, sir.

22   Q.   He is Marshall Coleman's son?

23   A.   Yes, sir.

24   Q.   All right.  Sean Coleman.

25         Now, you are not -- are you on the board?

Cross-Examination - Ryan Twiss

1    A.    I am not, no, sir.

2    Q.    So you work for some other company over here called -- what

3    was that company called?

4    A.    American Southern Homes.

5    Q.    American Southern Homes.  All right.  You work for them.  I

6    will put your name there for now.

7          Another name you mentioned yesterday was Mr. Pehrkon.

8    Stephen Pehrkon.  Which one of these companies does he work for?

9    A.    He is employed by American Southern Homes.

10   Q.    So Mr. Pehrkon is over here underneath American Southern

11   Homes.

12         Now we have three companies in the mix.  American Southern

13   Homes, the company you work for, it's not a plaintiff in this

14   lawsuit.  Is it?

15   A.    No, sir.

16   Q.    All right.

17         Now this holding company that you mentioned, and has sued

18   my client, where is its offices here in Columbus?

19   A.    Our offices aren't in Columbus.

20   Q.    Oh.  Where are the offices of this holding company?

21   A.    Reston, Virginia.

22   Q.    That's a suburb of Washington, DC?

23   A.    It is outside.  Yes.

24   Q.    And this holding company doesn't actually itself build any

25   houses, does it, because it has no employees.  Right?

1    A.    That's correct.

2    Q.    All right.

3          And this Marshall Coleman that you mentioned, who is on the

4    board, he is not a homebuilder.  Is he?

5    A.    No, sir.

6    Q.    I'm sorry?

7    A.    No, sir.

8    Q.    He works for a company called Commonwealth Principles.

9    Right?

10   A.    I do not believe he works for them, no, sir.

11   Q.    He used to, didn't he?

12   A.    I believe it's an entity that he invested in our holding

13   company with.

14   Q.    So Mr. Coleman owns a company called Commonwealth

15   Principles, right?

16   A.    That would be my understanding.

17   Q.    And Commonwealth Principles is a private merchant bank

18   which makes opportunitistic investments in diverse industry.

19          Is that an accurate characterization?

20   A.    I don't know.

21   Q.    Well, let me see if I can help refresh your recollection.

22          MR. SHEBELSKIE:  Let's put on the screen, for the

23   witness, Defendants' Exhibit 264.

24          MR. KRAMER:  Objection, Your Honor.  This is improper

25   refreshing.  The witness didn't say he doesn't remember

1    something.  And he hasn't asked whether whatever this is is

2    going to help.  This is just impeachment with a document about

3    something the witness doesn't know.

4            MR. SHEBELSKIE:  Well, Your Honor, I will put it in

5    substantively.  I won't use it for refreshing.

6    BY MR. SHEBELSKIE:

7    Q.    Defendants' Exhibit 264 is a copy of that December 2nd,

8    2020 private placement memorandum that you testified about this

9    morning.

10           Do you recognize that?

11   A.    Yes, sir.

12   Q.    All right.

13           And you testified that this was the document that ASH

14   Holdings prepared to solicit money from people, right?

15   A.    Yes, sir.

16   Q.    And in this document, that your company sent out to solicit

17   money, you give a biography of Marshall Coleman.  Don't you?

18   A.    There is.  Yes, sir.

19           MR. SHEBELSKIE:  Yeah.  Let's look at that biography.

20   Let's put it on the screen.

21           THE COURT:  It's been admitted?

22           MR. SHEBELSKIE:  It was admitted as a plaintiffs'

23   exhibit, Your Honor.

24           THE COURT:  What number was it admitted as?

25           MR. SHEBELSKIE:  If you bear with me just a minute I

Cross-Examination – Ryan Twiss

1    will find that for you.

2              Plaintiffs' 261.

3              THE COURT:  So this document, that you are questioning

4    him about now on the screen, has already been admitted as

5    Plaintiffs' 261?

6              MR. SHEBELSKIE:  Yes, sir, Your Honor.

7              THE COURT:  All right.  Then it can be shown to the

8    jury.

9              MR. SHEBELSKIE:  Yes.  Show this to the jury now.

10              Let's go to the front page.

11   BY MR. SHEBELSKIE:

12   Q.  This is the confidential private placement memorandum you

13   told the jury about this morning.  Right?

14   A.  Yes, sir.

15              MR. SHEBELSKIE:  And now let's go to page 25 of the

16   exhibit.  Keep scrolling down to 25th page of the exhibit,

17   please.

18              All right.  Stop there.

19              Now we are on the 25th page of the exhibit has A1 at

20   the bottom.

21   BY MR. SHEBELSKIE:

22   Q.  Do you see that, Mr. Twiss?

23   A.  Yes, sir.

24   Q.  Here is the biography of Marshall Coleman that you were

25   just describing.  Right?

1    A.    Yes.

2    Q.    And very first paragraph says that:  Since 1994 Mr. Coleman

3    has been a chairman of Commonwealth Principles, LLC, a private

4    merchant bank, which makes opportunitistic investments in

5    diverse industries including homebuilding.

6          Correct?

7    A.    Yes, sir.

8    Q.    And that's what your company put in this confidential

9    memorandum that you sent out to investors to raise millions of

10   dollars, right?

11   A.    Yes, sir.

12   Q.    So that's an accurate statement?

13   A.    Yes, sir.

14   Q.    All right.

15         Now this other director that you mentioned, Sean Coleman --

16   where does Marshall Coleman live, by the way?

17   A.    Virginia.

18   Q.    Washington, DC?

19   A.    The Reston, Virginia area.

20   Q.    Sean Coleman is not a homebuilder, is he?

21   A.    No, sir.

22   Q.    He is an investment banker, right?

23   A.    I do believe so, yes.

24   Q.    Does he live in the Columbus area?

25   A.    He does not.

1    Q.    Where does he live?

2    A.    I believe in Philadelphia.

3    Q.    All right.

4          You -- your headquarters are up in that Washington, DC

5    suburb, Reston?

6    A.    Reston, Virginia.  Yes, sir.

7    Q.    Where does Mr. Pehrkon work?

8    A.    Reston, Virginia.

9    Q.    All of y'all are in the Reston area.

10          Let's now talk about ASH-Grayhawk.

11          Who is the president of ASH-Grayhawk?

12    A.    It is Dave Jennings.

13    Q.    I'm sorry?

14    A.    Dave Jennings.

15    Q.    How long has he been the president?

16    A.    A few months.

17    Q.    Where does he live?

18    A.    In the Columbus area.

19    Q.    Okay.

20          It's this ASH-Grayhawk company, down here in Columbus, that

21    actually buys land and builds houses?

22    A.    That's correct.

23    Q.    All right.

24          Now, you have also mentioned some names from the past for

25    these two companies.  I want to make sure the jury understands

1    where these people fit in.

2         You mentioned Mr. Benson.  Now was he the acting CEO of

3    the -- one of these companies back in 2019 and 2020?

4    A.   Yes, sir.

5    Q.   Which company was he the acting CEO for?

6    A.   American Southern Homes Holdings.

7    Q.   Holdings.

8         So American Southern Homes Holdings, in addition to a Board

9    of Directors, has a CEO, right?

10   A.   Yes, sir.

11   Q.   All right.

12        And in 2019, 2020 that was a Greg Benson.  Correct?

13   A.   Yes, sir.

14   Q.   All right.

15        And who is the current CEO?

16   A.   Lee Darnold.

17   Q.   Lee Darnold.  All right.

18        And is Mr. Darnold down here in Columbus, or is he

19   operating outside of the Washington, DC area?

20   A.   He is in Reston, Virginia.

21   Q.   All right.

22        Now, you said Mr. Jennings is the current president of

23   ASH-Grayhawk.

24        Who was the president of ASH-Grayhawk back in 2019 when

25   this Land Purchase Agreement was negotiated?

Cross-Examination - Ryan Twiss

1   A.    Mr. Recker.

2   Q.    Recker.  Is that R-e-c-k-e-r?

3   A.    I do believe so.

4   Q.    Chris Recker?

5   A.    Yes.

6   Q.    So we have got a Chris Recker here, and he was the

7   president back in 2019.

8        Did someone replace him as president of ASH-Grayhawk in

9   2020?

10  A.    I believe so, yes.

11  Q.    Is that Ken Thirtyacres?

12  A.    Correct.

13  Q.    All right.

14       So back in 2019 and 2020, the presidents of the actual

15  homebuilding company was first Chris Recker and then Ken

16  Thirtyacres?

17  A.    That's correct.

18  Q.    All right.

19       That's very helpful.  Thank you.  Get all of these names

20  lined up.

21       Now, with the benefit of that orientation for the jury, I

22  would like to ask you this, would you agree with this statement:

23  That the holding company, ASH-Holdings, is a roll-up, an entity

24  that acquires and integrates homebuilders with a land light

25  strategy focused on an exit event?

1    A.    Yes, sir.

2    Q.    You would agree with that?

3    A.    Yes, sir.

4    Q.    And what is this "exit event" that ASH-Holdings is focused

5    on?

6    A.    That hasn't been determined yet.  It's a number of

7    opportunities.

8    Q.    But exiting from what?  Explain that to the jury.

9    A.    So what we have been discussing as a company is an exit

10   event at some point.  It could be an IPO.  It could be

11   continuing to operate but getting our investors their capital

12   back.  It could be selling to a private homebuilder or a public

13   homebuilder.  But the decision hasn't been made.  It's something

14   that's going to be determined in the future.

15   Q.    In your answer you gave this acronym I-p-o.  Explain to the

16   jury what an IPO -- first, what does it mean?

17   A.    Initial Public Offering.

18   Q.    Initial Public Offering.

19         Initial Public Offering of what?

20   A.    Stock.

21   Q.    Of stock.

22         To whom?  The public?

23   A.    Yes, sir.

24   Q.    On Wall Street?

25   A.    Yes, sir.

1    Q.   Stock on Wall Street.

2         And you are familiar with the acronym SPAC?

3    A.   Yes, sir.

4    Q.   I will write that down, too.

5         Please tell the jury what the letters SPAC stand for?

6    A.   Special Purpose Acquisition Company.

7    Q.   Now a Special Purpose Acquisition Company has nothing to do

8    with homebuilding, right?

9    A.   No, sir.

10   Q.   What is a Special Purpose Acquisition Company?

11   A.   It's a type of company that you can go public with.

12   Q.   It's a type of company that you can do an Initial Public

13   Offering through?

14   A.   Yes, sir.

15   Q.   So it's a way on Wall Street to accomplish selling shares,

16   right?

17   A.   Yes, sir.

18   Q.   All right.

19        And this Initial Public Offering and Special Purpose

20   Acquisition Company, that's part of the exit strategy that

21   holding company is focused on?

22   A.   It's an opportunity that would be considered if it was ever

23   appropriate.

24   Q.   And, in fact, if we went back in time in 2020, the company

25   was -- or actually, at one point, hoping to do one of these IPOs

1  or SPACs as soon as 2022, isn't that correct?

2  A.   Sorry?

3  Q.   At one point the holding company was hoping to do one of

4  these SPAC exit strategies as early as 2022?

5  A.   Not sure on the date of 2022, but there was one that had

6  approached us at some point.  Yes.

7        MR. SHEBELSKIE:  Well, I would like to show the

8  witness Defendants' 457.

9  BY MR. SHEBELSKIE:

10 Q.   Do you have that on your screen?

11       MR. SHEBELSKIE:  Hopefully that's just for the

12 witness, right?  Yeah.  At this point.

13 BY MR. SHEBELSKIE:

14 Q.   Now you see on your screen a text message from a

15 Mr. Sean Coleman?

16 A.   I do.

17 Q.   And he is that Board of Directors member, right, of the

18 holding company?

19 A.   He is.

20 Q.   And he is sending that text to Commonwealth Principles as

21 far as Merchant Bank?

22 A.   That's what it says.

23       MR. SHEBELSKIE:  Your Honor, we move to admit

24 Defendants' 457.

25       MR. KRAMER:  Objection, Your Honor.  Lack of

1    foundation.  Lack of personal knowledge.  Hearsay.

2         MR. SHEBELSKIE:  This is a party admission,

3    Your Honor, produced by the plaintiff to which they have no

4    authenticity objection.  And this is a communication from one

5    board of director member to the other.

6         MR. KRAMER:  I am sure Mr. Shebelskie is familiar with

7    the concept of personal knowledge.  And this witness isn't on

8    the text, so it's not an authenticity objection.  And it's

9    hearsay.  These are two individuals, a father and son, who

10    aren't here, texting one another.  I don't know how this witness

11    could possibly testify about it.

12         MR. SHEBELSKIE:  This is a party admission.

13         THE COURT:  He is not a party -- Mr. Coleman is not a

14    party.  You need to establish some foundation that he is

15    speaking on behalf of a party, not just that he is speaking

16    individually, and that foundation has not been established yet.

17         MR. SHEBELSKIE:  All right, Your Honor.  We will get

18    to that with another witness then.

19         THE COURT:  Objection is sustained at this time.

20    BY MR. SHEBELSKIE:

21    Q.   Looking at this document, this communication, Mr. Twiss,

22    does that refresh your recollection that these board of director

23    members were, in fact, looking at maybe doing one of these exit

24    strategies in 2022 --

25         MR. KRAMER:  Objection, Your Honor.  He hasn't

Cross-Examination - Ryan Twiss

1    testified that he has forgotten anything.  This is just improper

2    effort to --

3              THE COURT:  Sustained.

4    BY MR. SHEBELSKIE:

5    Q.   Mr. Twiss, when were you hired to work for the company?

6    A.   I was hired in February of 2020.

7    Q.   And since February of 2020, has the company, the holding

8    company, ever looked at pursuing these exit strategies?

9    A.   There was one point in time we did.  Yes, sir.

10   Q.   We will leave it there for now.

11        All right.  With the benefit of that, let's turn to what

12   your lawyer called the main event:  The schedule for the Phase C

13   lots.

14        Are you with me?

15   A.   Yes, sir.

16   Q.   All right.

17             MR. SHEBELSKIE:  And to do that let's put the Land

18   Purchase Agreement up on the screen.  Plaintiffs' Exhibit 246E.

19   BY MR. SHEBELSKIE:

20   Q.   Do you recognize that on the screen as the front page of

21   the Land Purchase Agreement?

22   A.   Yes, sir.

23             THE COURT:  That's already been admitted?

24             MR. SHEBELSKIE:  Yes, sir.  Preadmitted, in fact, by

25   agreement.

1           THE COURT:  Go ahead.

2           MR. SHEBELSKIE:  I would like to have you look at

3    Section 10 of the agreement, and that would appear on page 3.

4    Let's blow up Section 10 there.  Enlarge that.  And let's take

5    the second sentence that starts, however, as the Phase C lots

6    during the first full year after the closing, et cetera.

7    Highlight that whole sentence.

8           Let's do a little timeline here.

9    BY MR. SHEBELSKIE:

10   Q.   You testified the Land Purchase Agreement was signed

11   effective November 15, 2019.  Correct?

12   A.   Yes, sir.

13   Q.   So we will put November 15, 2019.

14        And the parties, as we see here in Section 10, had a year,

15   a full year, to come up with an agreement on how these Phase C

16   lots would be sold.  Correct?

17   A.   Yes, sir.

18   Q.   So the year ran to November 15 of 2020, right?

19   A.   That's correct.

20   Q.   All right.

21        Now, I would like you to tell me the date in this year

22   where either of the ASH companies proposed to Mr. Erickson a

23   schedule for the order of the Phase C lots.  Just give me the

24   dates.  I will write it in.

25   A.   Both parties had discussions at the time, and neither

1    party, Mr. Erickson nor ASH, ever put a full schedule together

2    in that year.

3    Q.   Answer my question.  Did ASH ever propose a schedule for

4    the Phase C lots in the first year?

5    A.   We did not.

6    Q.   Yes or no?

7    A.   We did not because we needed more information from

8    Mr. Erickson.

9    Q.   All right.

10        So on ASH side, no proposal ever made on the order for all

11   the Phase C lots in the first year.

12        Is that an accurate statement?

13   A.   Yes, sir.

14   Q.   All right.

15        I want to talk about Mr. Erickson's side of the timeline in

16   a minute, but I first want to make something clear.  When were

17   you hired to work for the ASH companies?

18   A.   February of 2020.

19   Q.   I don't know where that would be, you know, technically.  I

20   will just put it there.  February of 2020.

21        Now you testified yesterday that when you got employed one

22   of your jobs was to make sure ASH complied with its contracts,

23   right?

24   A.   Yes, sir.

25   Q.   And that was, in fact, part of your responsibility.  Yes?

1  A.   Yes, sir.

2  Q.   And you told the jury you spent hundreds of hours reading

3  those contracts to make sure ASH would comply, correct?

4  A.   Yes, sir.

5  Q.   So when you got hired, February of '20, that's about nine

6  months left.  Right?

7  A.   Yes, sir.

8  Q.   Did you make any effort in the nine months that you were

9  responsible for ASH to comply with this one-year deadline to

10  develop a schedule for the Phase C lot orders?  Yes or no?

11  A.   Yes.  We were having discussions with Mr. Erickson through

12  Mr. Benson.

13  Q.   Discussions?

14  A.   Yes, sir.

15  Q.   Now the LPA requires more than discussions, doesn't it?

16  A.   Yes, sir.

17  Q.   It requires an agreement?

18  A.   Yes, sir.

19  Q.   It takes two parties to agree?

20  A.   Yes, sir.

21  Q.   Yes.

22       And my question is, once you became in charge of ensuring

23  ASH complied with this deadline, in this entire nine months, did

24  you ever send a written proposal to Mr. Erickson for the order

25  of the Phase C lots?

1    A.    I never had enough information.  No.

2    Q.    All right.  So no -- again, nothing there.

3          Now, let's turn to the Dave Erickson side of that timeline.

4          The fact of the matter is, the president of ASH-Grayhawk --

5    the CEO, rather, of the holding company, Mr. Benson, he wasn't

6    quite ready to discuss the Phase C lots before he was fired.

7    Isn't that correct?

8    A.    I don't know.

9    Q.    Let's do this in two steps then.

10         The Board of Directors fired Mr. Benson on October 28th of

11   2020?

12   A.    That's correct.

13   Q.    October 28th.

14         That's just like two and a half weeks before the end of the

15   deadline, right?

16   A.    Yes, sir.

17   Q.    Now, when Mr. Benson was fired, he was just poised to

18   initiate discussions on the Phase C schedule, right?

19   A.    That's correct.

20   Q.    And so he was fired before he was ready to even begin those

21   discussions, right?

22   A.    The discussions had already been happening.

23   Q.    Well, now here is the thing, Mr. Twiss, I would like you to

24   look at Defendants' Exhibit 317.

25         Defendant Exhibit 317 is an email exchange between you and

Cross-Examination - Ryan Twiss

1    Mr. Erickson in March of 2021, correct?

2    A.    Yes, sir.

3    Q.    You testified earlier today that Mr. Erickson reached out

4    to the company in March of 2021 to see about getting the Phase C

5    schedule, right?

6    A.    Yes, sir.

7    Q.    And we are going to be talking about 2021, a little bit

8    now, but I still want to focus on what you said about 2020 in

9    this email exchange.

10           And you remember getting these emails and having this

11   exchange with Mr. Erickson?

12   A.    Yes, sir.

13           MR. SHEBELSKIE:  Your Honor, I would move for

14   admission of Defendants' Exhibit 317.

15           THE COURT:  Any objection?

16           MR. KRAMER:  None.  I think this was just admitted

17   during direct.

18           THE COURT:  What number was it admitted as?  Do you

19   have that?

20           MR. KRAMER:  I will in a moment.

21           THE COURT:  I will admit it, but there is no reason to

22   have duplicate exhibits.

23           Has D317 already been admitted?

24           MR. SHEBELSKIE:  Plaintiffs 202, Your Honor.

25           THE COURT:  Plaintiffs 202 then is what you're

1  questioning the witness about, which has already been admitted.

2       MR. SHEBELSKIE:  All right.

3       Let's go down on the first page to the second email on

4  that page.  Right there.

5  BY MR. SHEBELSKIE:

6  Q.  So, Mr. Twiss, this is an email on March 5, 2021, to

7  Mr. Erickson and others.  Correct?

8  A.  Yes, sir.

9  Q.  And this was your response to Mr. Erickson's inquiry in

10 March of that year about getting the Phase C schedule, right?

11 A.  Yes, sir.

12 Q.  What I particularly want to ask you about is the second

13 sentence of your email, you wrote:  ASH was poised to initiate

14 discussions under Section 10 of the LPA before Greg and Ken were

15 removed in October.

16      Correct?

17 A.  Yes, sir.

18 Q.  That's what you wrote to Mr. Erickson?

19 A.  Yes, sir.

20 Q.  And that was the truth, right?

21 A.  Yes, sir.

22 Q.  All right.

23      So ASH was only poised to begin these discussions when the

24 board lowered the hammer and fired them, right?

25      That's what you wrote in your email?

1    A.    Yes, sir.   That's what I wrote.

2    Q.    All right.

3        You were asked by your lawyer about this time period that

4    was left between October 28 and November 15th.   The Board of

5    Directors hired Mr. Erickson to become the new CEO on

6    October 28th, correct?

7    A.    Yes, sir.

8    Q.    And your lawyer asked you whether, in that two-and-a-half

9    weeks, Mr. Erickson, as the holding company's CEO, ever sort of

10   proposed a Phase C order to himself and got it resolved for the

11   company, right?

12   A.    Yes, sir.

13   Q.    But the fact of the matter is, the Board of Directors

14   wouldn't let Mr. Erickson, as CEO, come up with the Phase C

15   schedule in that two-and-a-half weeks.   Isn't that correct?

16   A.    As the seller he could have, yes.

17   Q.    I'm sorry?

18   A.    As the seller he could have, yes.

19   Q.    I didn't hear you.

20   A.    I said, as the seller he could have.

21   Q.    Oh, you mean, as the seller he could have proposed a

22   schedule, right?

23   A.    Yes, sir.

24   Q.    But as buyer on ASH's side he could not have accepted it,

25   right?

Cross-Examination - Ryan Twiss

1    A.   He could not have accepted it.  Yes, sir.

2    Q.   And, in fact, the Board of Directors passed a resolution to

3    make sure Mr. Erickson could not act on the holding company's

4    behalf on the Phase C lots, right?

5    A.   Yes, sir.

6    Q.   And, in fact, we saw a part of that resolution this

7    morning.  I want to show the jury the rest.

8              MR. SHEBELSKIE:  This was admitted as Plaintiff's 220,

9    Your Honor.

10             THE COURT:  Exhibit 220 or page 220?

11             MR. SHEBELSKIE:  Plaintiffs' 220.  Previously

12   admitted.

13             THE COURT:  All right.  It's on the screen.

14             MR. SHEBELSKIE:  All right.

15   BY MR. SHEBELSKIE:

16   Q.   Now, Mr. Twiss, what we see here on the screen, as

17   Plaintiffs' Exhibit 220, this is that resolution the Board of

18   Directors enacted when they fired Mr. Benson and hired

19   Mr. Erickson, right?

20   A.   Yes, sir.

21   Q.   And what I would like to ask you about starts on the second

22   page of this resolution, at the bottom of the second page,

23   section Roman Numeral IV, Formation of Committee.

24        Do you see that on the screen now?

25   A.   Yes, sir.

1    Q.   All right.

2         And if you go to the last paragraph of this page, under

3    this statement it says:  The board wishes --

4             MR. SHEBELSKIE:  Let's highlight that last whereas

5    clause, Mr. Walters.

6    BY MR. SHEBELSKIE:

7    Q.   The board wishes to form a committee comprised of

8    disinterested directors to ensure that any and all LPA

9    transactions are handled with arm's length and in compliance

10   with the terms of the LPA.

11        Do you see that?

12   A.   Yes, sir.

13   Q.   That's the committee you told the jury about this morning?

14   A.   Yes, sir.

15   Q.   And it had three directors on it?

16   A.   Yes, sir.

17   Q.   And Mr. Sean Coleman was one?

18   A.   Yes, sir.

19   Q.   I forget the name of the other two.

20   A.   Mr. Cumbie and Mr. Scott.

21   Q.   Thank you.

22        So that committee that was formed of those three directors,

23   they were to be the ones on behalf of the holding company that's

24   starting October 28th that had the authority to deal with the

25   Phase C lot issue?

1    A.    That's correct.

2    Q.    If you look at the next page of this resolution --

3              MR. SHEBELSKIE:  Go to page 3, please.  The third

4    paragraph down.  The one that starts, now therefore be it

5    resolved.

6    BY MR. SHEBELSKIE:

7    Q.    "Be it resolved" meaning this is what the board has

8    decided, right?  They have resolved on this, correct?

9    A.    Yes, sir.

10   Q.    All right.

11         That Erickson, as interim CEO of the company, shall have no

12   authority to act on behalf of the company or its direct or

13   indirect subsidiaries to approve or authorize any LPA

14   transactions or to authorize or direct any other person to

15   approve or authorize any LPA transactions.

16         Did I read that right?

17   A.    Yes, sir.

18   Q.    And so when Mr. Erickson became the CEO, the board

19   prevented him from having any dealings, controlling anything on

20   behalf of the ASH companies for the Phase C lots, right?

21   A.    Anything with the LPA.  Yes, sir.

22   Q.    Anything with the LPA.  Right.

23         And that resolution, that handcuff on Mr. Erickson,

24   remained in place the whole time he was CEO of the holding

25   company, correct?

1    A.   That's correct.

2    Q.   So the whole time he was CEO of the holding company, it was

3    the land committee, comprised of these three directors, who were

4    supposed to deal with the Phase C schedule on behalf of the

5    companies?

6    A.   Yes, sir.

7    Q.   All right.

8         Continuing:  As this deadline approached with no agreement

9    on the Phase C lots, did you, as the person responsible for the

10   company's compliance with the contracts, ever get an amendment

11   to the Land Purchase Agreement to extend this one-year deadline?

12   A.   There was not an amendment.  No, sir.

13   Q.   Did you propose one to Mr. Erickson?

14   A.   We did not.

15   Q.   So you let the one-year deadline under Section 10 expire on

16   your watch?

17   A.   It did expire on my watch.  Yes, sir.

18   Q.   But let's pick up with the land committee.

19        The land committee was formed on October 28th, correct?

20   A.   Yes, sir.

21   Q.   So the land committee still had two-and-a-half weeks left

22   to do something to comply with that deadline, right?

23   A.   Yes, sir.

24   Q.   But the fact of the matter, Mr. Twiss, is that the land

25   committee didn't even bother to meet for the first time until

1    November 24, 2020.  Isn't that correct?

2    A.    I don't recall the first date.

3    Q.    All right.

4         MR. SHEBELSKIE:  Let me show you Defendants' Exhibit

5    257.  And I believe this was previously admitted as a

6    plaintiffs' exhibit.

7         Mr. Elliker, can you check on that?

8         Your Honor, we will just deal with Defendants' Exhibit

9    257.

10        THE COURT:  What defense exhibit is this?

11        MR. SHEBELSKIE:  257.

12        THE COURT:  All right.

13   BY MR. SHEBELSKIE:

14   Q.    Do you see, Mr. Twiss, that this is a document -- an email

15   from Mr. Coleman to Mr. Erickson on November 24th, 2020?

16   A.    Yes, sir.

17   Q.    And you were copied on this email.  Yes?

18   A.    Yes, sir.

19   Q.    The subject of the email is the land committee meeting,

20   right?

21   A.    Yes, sir.

22        MR. SHEBELSKIE:  Your Honor, we move for the admission

23   of Defendants' 257.

24        MR. KRAMER:  No objection.

25        THE COURT:  Admitted.

1        (DEFENDANTS EXHIBIT 257:  Received in evidence.)

2            MR. SHEBELSKIE:  Let's put that on the screen for the

3    jury.  And let's look at the email -- cover email.

4    BY MR. SHEBELSKIE:

5    Q.   We see it's from Sean Coleman to Dave Erickson with a copy

6    to you on November 24, 2020.

7        Do you see that, sir?

8    A.   Yes, sir.

9    Q.   And it says there is a letter attached this time.

10   Apparently the first email didn't have the letter attached,

11   right?

12   A.   Yes, sir.

13   Q.   Let's look at the letter, which is the next page of the

14   exhibit.  This is the actual letter that was sent by the email.

15       And here Mr. Coleman writes, in the very first sentence:

16   The lot purchase agreement committee had its first meeting on

17   November 23, 2020.

18       Do you see that?

19   A.   Yes, sir.

20   Q.   All right.

21       So with the benefit of that statement, does that now show

22   us that the land purchase committee didn't have its first

23   meeting until November 23 after the deadline had already passed?

24   A.   Yes, sir.

25   Q.   Now, you told the jury that after the land committee had

1    its initial meeting, that it made a request for information from

2    Mr. Erickson about the status of the lots?

3    A.    Yes, sir.

4    Q.    And what it asked for Mr. Erickson to provide was a status

5    of the lots and not an actual Phase C schedule, correct?

6    A.    I can't see the language on here.

7                MR. SHEBELSKIE:  Let's pull up Plaintiffs' Exhibit 75.

8    75A, I think that was admitted.  75 is what we have on the

9    screen here.  This was an email from David Erickson to

10   Mr. Coleman and had an attached letter.

11   BY MR. SHEBELSKIE:

12   Q.    As you described earlier, Mr. Erickson took that letter

13   that we just saw that the board sent, typed in responses in

14   capital, and sent it back?

15   A.    Yes, sir.

16   Q.    And he sent that response back promptly to the land

17   committee, didn't he?

18   A.    I don't see the date of the email.

19               MR. SHEBELSKIE:  Let's scroll up to the first page and

20   we can see the date of the email.  Plaintiffs' Exhibit 75, I'm

21   sorry, which is the email transmittal.

22               Let's blow that up so the jury can see the date and

23   time.

24   BY MR. SHEBELSKIE:

25   Q.    So Mr. Coleman sends an email to Mr. Erickson on November

1    24th asking for information about the Phase C lots.  And that

2    very day Mr. Erickson responds with the requested information.

3    Isn't that a fact?

4    A.   Yes, sir.

5    Q.   And then the committee then got this information on

6    November 24th, the same day it asked for it from Mr. Erickson.

7    Did the committee ever then propose a Phase C schedule at any

8    time in the rest of November of 2020?  Yes or no?

9    A.   Looking at the letter, as I understood it, Mr. Erickson

10   said he would be back in touch with information, from what I

11   remember.  He didn't give the information at this time.

12   Q.   I see.

13        You were expecting -- the land committee was expecting some

14   further information?

15   A.   Yes, sir.

16   Q.   All right.

17             MR. SHEBELSKIE:  Let's look at Defendants' Exhibit

18   260.

19             Now Defendants' Exhibit 260 is an email from a Chuck

20   McClure to Sean Coleman on November 25, 2020.

21   BY MR. SHEBELSKIE:

22   Q.   Do you see that?

23   A.   I see that.

24   Q.   And do you recognize Chuck McClure as being at the time a

25   gentleman who worked for Mr. Erickson?

1  A.    I do.

2  Q.    You recognize that name, right?

3  A.    Yes, sir.

4  Q.    And you know then that Mr. McClure emailed Mr. Coleman on

5  November 25, right?

6  A.    I see that in front of me.

7  Q.    And he provided the information you were waiting for,

8  right?

9         MR. KRAMER:  Objection, Your Honor.  First of all, the

10 witness -- there hasn't been any foundation established that the

11 witness has personal knowledge.

12        Second -- well, I will stop there.  But I have another

13 objection.

14        MR. SHEBELSKIE:  Let me ask the witness.

15 BY MR. SHEBELSKIE:

16 Q.    Mr. Twiss, have you seen this email before?

17 A.    I don't recall it at this time.

18 Q.    Oh, so you came here to testify, as the general counsel of

19 the holding company, accusing Mr. Erickson of not acting

20 reasonably, negotiating reasonably, for the Phase C schedule,

21 and you weren't even aware of this email?

22        MR. KRAMER:  Objection.  Argumentative.  And this

23 email does not propose a Phase C lot schedule.

24        THE COURT:  That wasn't the question.  The question is

25 whether or not, either at the time or in preparation for his

1  testimony, he ever saw this email.  That's the preliminary

2  question.

3          THE WITNESS:  I did not see this during preparation.

4  I can't remember if I saw it at the time or not.

5          MR. SHEBELSKIE:  Then I won't ask you about it.

6          THE COURT:  All right.  Move on.

7          MR. SHEBELSKIE:  All right.

8  BY MR. SHEBELSKIE:

9  Q.  Now, you mentioned -- that's 2021.  Let's go to 2021.

10  2021.  You said --

11          MR. SHEBELSKIE:  What did I do?

12          THE COURTROOM DEPUTY:  The batteries have died.  I'm

13  sorry.

14      (Pause in proceedings.)

15  BY MR. SHEBELSKIE:

16  Q.  Now, you said that Mr. Erickson reached out to ASH in March

17  of 2021 to kick-start discussions about the Phase C schedule,

18  right?

19  A.  Yes, sir.

20          MR. SHEBELSKIE:  Let's pull this up.  This is

21  Plaintiffs' Exhibit 202, Your Honor.  It's been previously

22  admitted.

23          THE COURT:  All right.

24          MR. SHEBELSKIE:  Let's scroll down to the bottom of

25  the document.  It's an email chain of three emails.  Go to the

 1    second page.

 2            All right.  We are at the bottom of the second page.

 3    This is the email from Dave Erickson to Greg Benson on March 4

 4    of 2021 at 7:28 in the morning.

 5    BY MR. SHEBELSKIE:

 6    Q.    Do you see that?

 7    A.    Yes, sir.

 8    Q.    And Mr. Benson was -- had come back as acting CEO for the

 9    holding companies after Mr. Erickson resigned?

10    A.    He was back.  I don't believe he was CEO.

11    Q.    He was back working for the holding company?

12    A.    Yes, sir.

13    Q.    And so Dave Erickson -- this is the reach-out communication

14    from him?

15    A.    Yes, sir.

16    Q.    All right.

17          Now between -- so that was March 4.

18          Between January and March, had the land committee ever

19    proposed a schedule to Mr. Erickson for the Phase C lots?

20    A.    It had not.

21    Q.    Now when Mr. Erickson sent this email to Mr. Benson,

22    Mr. Benson forwarded it to you, correct?

23    A.    Yes, sir.

24            MR. SHEBELSKIE:  Let's scroll up on the document so

25    the jury can see that email.  Stop.  Go back down.  All right.

Cross-Examination – Ryan Twiss

1    BY MR. SHEBELSKIE:

2    Q.    So upon receiving this email, Mr. Benson, as we see here in

3    the middle of page 2, forwards it to you and a Mr. Pehrkon,

4    correct?

5    A.    Yes, sir.

6    Q.    And to a Mr. Kramer.  This is Jake Kramer, your lawyer here

7    today, right?

8    A.    Yes, sir.

9    Q.    And, of course, includes himself, Mr. Benson, on it.

10         Now, in March of 2021, was Mr. Pehrkon on the land

11   committee?

12   A.    He was not.

13   Q.    Were you on the land committee?

14   A.    I was not.

15   Q.    Was Mr. Kramer on the land committee?

16   A.    He was not.

17   Q.    Let's pause there and see then.  You said -- what was going

18   on between January and March 4.

19              MR. SHEBELSKIE:  For that I would like to pull up

20   Defendants' Exhibit 307, Your Honor.

21   BY MR. SHEBELSKIE:

22   Q.    Do you have that on your screen, Mr. Twiss?

23   A.    Yes, sir.

24   Q.    Do you see that Defendants' Exhibit 307 are the minutes of

25   a special meeting of the holding company's Board of Directors on

1    January 22nd, 2021?

2    A.   Yes, sir.

3    Q.   And you were in attendance at that meeting, correct?

4    A.   Yes, sir.

5            MR. SHEBELSKIE:  Your Honor.  We move for the

6    admission of Defendants' Exhibit 307.

7            MR. KRAMER:  No objection.

8            THE COURT:  Admitted.

9        (DEFENDANTS EXHIBIT 307:  Received in evidence.)

10   BY MR. SHEBELSKIE:

11   Q.   I need to spend a little time with this document,

12   Mr. Twiss, because it's very important.

13       All right.  We see at the top of this document that these

14   minutes -- this was the minutes of a special meeting of the

15   Board, right?

16   A.   Yes, sir.

17   Q.   If we go down to the first --

18           MR. KRAMER:  Oh, objection, Your Honor.  I am so

19   sorry.  I think this exhibit is going to move into an area

20   that's been excluded from evidence by the Court, and I'd like

21   that not to happen in front of the jury.

22           MR. SHEBELSKIE:  I don't think it has.  We included

23   the redactions you wanted.

24           MR. KRAMER:  I can't see the entire document, but I

25   know that what's coming --

```
 1              THE COURT:  Show him the entire document and make sure
 2   he is satisfied that what was properly redacted has been
 3   redacted.
 4              MR. KRAMER:  That's fine.  Thank you.
 5              THE COURT:  Are you satisfied?
 6              MR. KRAMER:  Yes, sir.
 7              THE COURT:  All right.
 8              Ladies and gentlemen, sometimes on an exhibit there
 9   are portions that are not admissible and they can be redacted,
10   which apparently happened on this particular document.
11              Why don't you go to the bottom of the document so the
12   jury will see what was redacted.
13              MR. SHEBELSKIE:  Yes.  Let's scroll down, Mr. Walters.
14   On the first page you will see there is some text at the bottom
15   of the first page redacted.
16              Scroll down to the next page.  There is more,
17   Your Honor.  Right there.
18              Top of the second page a couple of lines.
19              THE COURT:  Go ahead.
20              MR. SHEBELSKIE:  Your Honor, we did move for the
21   admission?
22              THE COURT:  Yes.  I think it was admitted.
23              MR. SHEBELSKIE:  Is my mic messing up again?
24              THE COURTROOM DEPUTY:  It's muted, I believe.
25   BY MR. SHEBELSKIE:
```

Cross-Examination - Ryan Twiss

1  Q.   Let's go back to the top of the document.

2       The first heading, "Directors present" in bold there, do

3  you see that?

4  A.   Yes, sir.

5  Q.   That tells us, if we look at it, that seven of the eight

6  members of the Board of Directors were in attendance at this

7  special meeting, right?

8  A.   Yes, sir.

9  Q.   All right.

10       They were participating by telephone, right?

11  A.   Yes, sir.

12  Q.   But there were some other people present at that special

13  meeting in person, right?

14  A.   Yes, sir.

15  Q.   And if you look at the second paragraph, we will see who

16  was present in person; it was Mr. Benson, Mr. Pehrkon, yourself,

17  and Mr. Kramer, right?

18  A.   Yes, sir.

19  Q.   Those are the four folks to whom Mr. Benson forwarded

20  Dave's email, on March 4th, seeking to kickstart those Phase C

21  discussions, right?

22  A.   That's correct.

23  Q.   All right.  Now let's see what was discussed at this

24  special meeting.

25       Let's turn to page 2 of the exhibit and let's continue down

1    to 2020 financial update.  Let's look at that last paragraph.

2    Starting with, Mr. Pehrkon discussed that Grayhawk's margins are

3    propped up by low cost lots.

4         Do you see that?

5    A.   Yes, sir.

6    Q.   Mr. Pehrkon at the time was vice president of finance at

7    the company?

8    A.   Yes, sir.

9    Q.   When he is talking about Grayhawk there he is talking about

10   ASH-Grayhawk, the company here in Columbus that actually builds

11   the houses?

12   A.   Yes, sir.

13   Q.   When he says "margins," there, he is talking about profit

14   margins?

15   A.   Probably gross margins.

16   Q.   All right.  Well, gross margins.

17        It's a measure of profitability.

18   A.   It would be for profit, but yes.

19   Q.   All right.

20        So gross margins are propped up by low lot costs.

21        Do you see that?

22   A.   Yes, sir.

23   Q.   And so what Mr. Pehrkon is telling all of these folks at

24   the special meeting is that as of the beginning of 2020 the

25   company's gross margins are being propped up because the lots

Cross-Examination - Ryan Twiss

1   you have been buying so far under the LPA have low lot prices,

2   correct?

3   A.    For Grayhawk.  Yes.

4   Q.    Yeah.  For Grayhawk.

5         And he is discussing that the margins Grayhawk has, because

6   of the low lot costs so far, make its profit margins higher than

7   this other company y'all own, Stone Ridge, right?

8   A.    That's correct.

9   Q.    And then he talks about what's going to happen in 2020.

10        The sentence goes on:  The expectations -- he talks about

11  discussed that Grayhawk's margins are propped up by low lot

12  costs -- and the expectations that these will normalize over

13  2021 as the company moves towards the Phase C lots under the

14  Land Purchase Agreement, correct?

15  A.    Correct.

16  Q.    And when he says "normalize," you understand that to mean

17  those higher profit margins are going to go back down in 2021?

18  A.    Yes, sir.

19  Q.    And they are going to go back down in 2021 because, later

20  in 2021, that's when the Phase C lots were supposed to start

21  being bought, right?

22  A.    Yes, sir.

23  Q.    Up in 2020, the ASH company here was buying the A, B lots,

24  right?

25  A.    That's correct.

1  Q.   And those are the lots that had the low prices, right?

2  A.   It's hard to say.

3  Q.   But that's what primarily had been bought in 2020, right?

4  A.   It had been.

5  Q.   Yeah.

6       And so Mr. Pehrkon is raising a flag here letting all of

7  y'all know that in 2021 the gross profit margins are going to

8  start going down when the Phase C lot obligation starts kicking

9  in, right?

10 A.   I wouldn't characterize it as raising a flag.  He was

11 talking about comparable companies and just saying he expected

12 to see them level out to be equal.

13 Q.   And then he raised a real red flag about 2022, didn't he?

14 A.   I don't see it.

15 Q.   Let's go to the next page, second paragraph.  Mr. Coleman

16 now is discussing the issue, isn't he?

17      Do you see that second paragraph?

18 A.   I see it.

19 Q.   Mr. Sean Coleman discussed the role Dave Erickson will play

20 in terms of dilution of margins.  Do you see that phrase,

21 "dilution of margins"?

22 A.   Yes, sir.

23 Q.   That means depression of the profit margins, right?

24 A.   The margins we are talking about, yes, sir.

25 Q.   The profit margins will be diluted, going down, getting

1    smaller?

2    A.    Yes, sir.

3    Q.    So Mr. Coleman discusses the role that Dave Erickson is

4    going to play in this decrease in profit margins.

5         Now he goes on the next thing and says:  Expected 300 to

6    350 basis points in 2022.

7         Explain to the jury what a basis point is in this context.

8    A.    Just essentially it's for 3 to 3 1/2 percent.

9    Q.    So your profit margins, Mr. Coleman is telling you, are

10   going to be down 3 to 3 1/2 percent in 2022 because of some role

11   Mr. Erickson is going to play, right?

12   A.    Yes, sir.

13   Q.    And then he goes on to explain what that role is, doesn't

14   he?

15   A.    Yes, sir.

16   Q.    He says:  Because Mr. Erickson controls the development of

17   the land and the lack of fixed prices for Phase C lots under the

18   LPA.

19        Do you see that?

20   A.    Yes, sir.

21   Q.    Now you understand that the Land Purchase Agreement did not

22   have a set price for these Phase C lots, right?

23   A.    Yes, sir.

24   Q.    It's not like when you go buy a house and you sign a

25   contract that says, I am going to buy a house for $175,000 and

1    the price is in the contract.

2         There weren't prices for the Phase C lots, correct?

3    A.    Just a formula.

4    Q.    There was a formula, but no prices?

5    A.    Correct.

6    Q.    And that formula had variables depending on how much it

7    cost to develop the lot?

8    A.    Correct.

9    Q.    And Mr. Coleman was telling the group that come 2022 that's

10   when y'all would be buying almost all Phase C lots, right?

11   A.    It would start to shift to more of them, but not all.

12   Q.    Start to transition and eventually become just Phase C

13   lots, right?

14   A.    Correct.

15   Q.    Yeah.

16        And Mr. Coleman is telling the group here, our profit

17   margins are probably going to go down 3 to 3 1/2 percent once we

18   start buying all these Phase C lots starting in 2022.  Correct?

19   A.    Yes, sir.

20   Q.    All right.

21        And so, Mr. Twiss, you folks had this special meeting,

22   concoct a scheme to do something about those Phase C lot prices,

23   isn't this right?

24   A.    No, sir.

25   Q.    Mr. Twiss, isn't it true that you all decided you needed to

1    renegotiate the Land Purchase Agreement to lower the prices for

2    the Phase C lots?

3    A.   No, sir.  Not true at all.

4    Q.   And isn't it true you wanted to remove Mr. Erickson from

5    the development of the Phase C lots?

6    A.   No, sir.

7    Q.   I'm sorry?

8    A.   No, sir.

9    Q.   Well, let's see.

10        As part of this desire you all came up with a plan to

11   accuse Mr. Erickson of all kinds of wrongdoings, and assert

12   millions of dollars of claims against him, to try to browbeat

13   him into amending the Land Purchase Agreement.  Isn't that

14   right?

15   A.   No, sir.

16   Q.   That's precisely what y'all did after this January 22nd

17   special meeting, isn't it?

18   A.   No, sir.

19   Q.   Well, no, sir, you did it in three steps.  The first step

20   was you had Mr. Kramer there send a letter to Dave Erickson not

21   two weeks after this January 22nd meeting.  Isn't it right?

22   A.   I would have to see it to know the date of the letter.

23            MR. SHEBELSKIE:  All right.  Let's pull up Defendants'

24   Exhibit 312.

25            Your Honor, Defendants' Exhibit 312 is another

1   document that the parties agreed on certain redactions because

2   of a prior ruling from Your Honor.  I believe that has been

3   shared with the plaintiffs' counsel already.

4           MR. KRAMER:  Your Honor, objection.  I have no idea

5   what's been redacted on here.  Defendants emailed it to me while

6   I was standing at the podium, or just before.  I don't know

7   exactly -- and I asked what was there and they said they were

8   just going to make up their minds about what to redact.  So

9   we've got a little confusion in the courthouse.

10          MR. SHEBELSKIE:  No, Your Honor.

11          THE COURT:  All right.  Well, do you have this exhibit

12   unredacted so that he can look at the unredacted version and

13   compare it with the redacted?

14          MR. SHEBELSKIE:  I do.  May I hand it to him,

15   Your Honor?

16          THE COURT:  Yes.

17          MR. KRAMER:  Thank you.  Let me just take a quick

18   look.

19      (Pause in proceedings.)

20          MR. KRAMER:  Is this what's redacted, Mr. Shebelskie,

21   the boxes in red?

22          MR. SHEBELSKIE:  No.  The boxes in black on the

23   screen.  You wanted to see a full copy.

24          MR. KRAMER:  Okay.

25      (Pause in proceedings.)

Cross-Examination - Ryan Twiss

1          THE COURT:  312, which should be on your screen,

2    should be the exhibit with the redactions.

3          MR. KRAMER:  Your Honor, we have to have notice of

4    what's going on here and I haven't had any so I don't know how

5    to answer this question.

6          MR. SHEBELSKIE:  Your Honor, you ruled on this this

7    morning.

8          MR. KRAMER:  Well, defendants have changed the

9    redactions today during the course of court and I really don't

10   know --

11         THE COURT:  All right.  He objects to 312 in that he

12   has not had an opportunity to determine whether those redactions

13   should be made or not.

14         MR. SHEBELSKIE:  Then I would propose, Your Honor,

15   during the lunch break he can look at those redactions and we

16   can resume with this document after lunch.

17         THE COURT:  All right.

18         MR. KRAMER:  That will be fine.

19   BY MR. SHEBELSKIE:

20   Q.   To pick up with the chronology, Mr. Twiss, Mr. Kramer did

21   send Mr. Erickson a letter on February 2nd, 2021, correct?

22   A.   I don't know until we get back to that document.

23   Q.   General counsel for the corporation, you are testifying you

24   don't know what letters you have sent on -- had your lawyer send

25   to Mr. Erickson?

1    A.   I am testifying that I don't remember if it was

2    February 2nd there was a letter sent or not.

3              THE COURT:  You can use the exhibit to refresh his

4    recollection.

5              MR. SHEBELSKIE:  That's true.

6              THE COURT:  I am not admitting it yet.

7              MR. SHEBELSKIE:  Let's put this exhibit back on the

8    screen just for the witness.

9    BY MR. SHEBELSKIE:

10   Q.   Do you see Defense Exhibit 312 on your screen, Mr. Twiss?

11   A.   Yes, sir.

12   Q.   With the benefit of seeing the document, does that refresh

13   your recollection of the date Mr. Kramer sent a letter?

14   A.   Yes.

15   Q.   What was that date?

16   A.   February 2nd, 2021.

17   Q.   Thank you, sir.

18        All right.

19        Then as the second step in this plan you bought time in

20   response to Mr. -- hold on.  Let me put this on the calendar

21   here.

22        We have the January 22 special meeting, right, that we

23   testified about earlier?

24   A.   Yes, sir.

25   Q.   And then we know on February 2nd Mr. Kramer sends a letter

Cross-Examination – Ryan Twiss

1   to Mr. Erickson, right?

2   A.   Yes, sir.

3   Q.   At your direction?

4   A.   Yes, sir.

5   Q.   All right.

6        Then it just happened that Mr. Erickson, on March 4th, not

7   having heard anything from the land committee, sends in an email

8   to Mr. Benson asking about what's the status of this Phase C

9   schedule, right?

10  A.   I do believe that was the date of the letter or his email.

11  Yes, sir.

12  Q.   And we saw that Mr. Benson forwarded that letter to the

13  three of all who were at that special meeting:  Mr. Twiss,

14  Mr. Pehrkon, and Mr. Kramer, right?

15  A.   That's correct.

16  Q.   All right.

17       Now, in response to Mr. Erickson, you did not actually

18  propose a Phase C schedule, did you?

19  A.   I requested information from Mr. Erickson.

20  Q.   All right.

21       MR. SHEBELSKIE:  Let's look at that, if we could.

22  Let's pull up Plaintiffs' Exhibit 197.  Previously admitted,

23  Your Honor.

24  BY MR. SHEBELSKIE:

25  Q.   This is the email -- the exhibit that started off with that

1   email from Mr. Erickson in -- on March 4th, kicking off --

2   seeking status of the Phase C discussions, right?

3   A.   Yes, sir.

4   Q.   And then you replied instead of Mr. Benson, right?

5   A.   Yes, sir.

6         MR. SHEBELSKIE:  Let's go down and see your response.

7   Let's go to the bottom of the first page.

8         Actually, I may have pulled up the wrong document.

9   Was it 317?  Let's scroll to the bottom of the page here, bottom

10  of the exhibit.

11        Okay.  I see which one this is.  Let's go back up to

12  the top of that page.

13  BY MR. SHEBELSKIE:

14  Q.   You had requested information, you said.

15        Mr. Erickson provided you information about the status of

16  the neighborhoods, right?

17  A.   Yes, sir.

18  Q.   And then once you got that information from Mr. Erickson

19  you then responded back to him, right?

20  A.   Correct.

21  Q.   And what we see here on the screen as Plaintiffs' Exhibit

22  197 is your response back then to Mr. Erickson once he gave you

23  the information?

24  A.   Yes, sir.

25  Q.   And you did not propose a full Phase C schedule order in

1  your response, correct?

2  A.    The attachment did.  Yes, sir.

3  Q.    The attachment did, you said.

4        Well, look at this then.  Let's look at your email.

5        You start off by saying:  Please find attached

6  ASH-Grayhawk, LLC's response to your letter and a proposal for

7  the general framework of the development order.

8        Do you see that?

9  A.    Yes, sir.

10 Q.    What you were giving Mr. Erickson here was just a general

11 framework, correct?

12 A.    It was a general order of the lots, yes.

13 Q.    That's not what you wrote there.  You wrote "general

14 framework."  Right?

15 A.    I assumed we would have more discussions about it and

16 Mr. Erickson would have a response.

17 Q.    Let's scroll down now.  This was the cover email, correct?

18 A.    Yes, sir.

19        MR. SHEBELSKIE:  Let's now look at the actual letter

20 or the attachment itself.  Let's scroll down.  That would be

21 197A, would be the letter.

22 BY MR. SHEBELSKIE:

23 Q.    This is now the letter that came with the email, right?

24 A.    Yes, sir.

25 Q.    This is 197A.  In the first paragraph you say:

1    ASH-Grayhawk welcomes the conversation around paragraph 10.

2        Correct?

3    A.    Yes, sir.

4    Q.    And setting the development schedule for Phase C lots,

5    correct?

6    A.    Yes, sir.

7    Q.    So in this letter that you are sending to Mr. Erickson, you

8    are not actually saying, This is the Phase C schedule.  You are

9    saying, Let's have a conversation and set that schedule,

10   correct?

11   A.    I said:  Grayhawk proposes the development order as

12   attached hereto.

13   Q.    So you now say, Well, you got to look at Exhibit A to see

14   this development order?

15   A.    It would have been attached to this letter, yes, sir.

16            MR. SHEBELSKIE:  Let's look at the attachment.  That's

17   197B.

18   BY MR. SHEBELSKIE:

19   Q.    197B, sir, that's the attachment, right?

20   A.    The attachment to the email, yes, sir.

21   Q.    Right.

22        And it still needed things to be discussed, right?

23   A.    There were questions for Mr. Erickson, but this was the

24   overall order we proposed.

25   Q.    If you look down on that, neighborhoods, order 7, 8 or 9,

1   you still had:  Need to discuss phasing.  Need to discuss

2   phasing.  Need to discuss phasing.  Need to discuss phasing.

3        Correct?

4   A.   That's correct.

5   Q.   So this general framework that you sent him still had

6   things that needed discussion, correct?

7   A.   Not around the order.

8   Q.   All right.  Still needed discussions of some things.  You

9   wrote it there, right?

10  A.   Not about the order.

11  Q.   And so you say you were expecting a response from

12  Mr. Erickson on this, right?

13  A.   Yes, sir.

14  Q.   And you say the parties got together in Washington, DC on

15  June 2nd, 2021, to discuss it, right?

16  A.   Yes, sir.  At Mr. Quackenboss's office.

17  Q.   And that's where you say an agreement, in principle, came

18  up?

19  A.   Yes, sir.

20  Q.   Uh-huh.

21       Now, would you agree with me that before June 2nd, 2021, no

22  agreement then had yet been reached on the Phase C development

23  order?

24  A.   Correct.  Mr. Erickson never agreed.

25  Q.   And no final agreement was reached during the June 2nd

1    meeting, correct?

2    A.    Just agreement in principle.

3    Q.    An agreement in principle.  We're going to explore that.

4    But was there any agreement signed in writing on June 2nd?

5    A.    No, sir.

6    Q.    All right.

7          Now, had anything happened --

8              MR. SHEBELSKIE:  Let me put June 2nd on the calendar.

9    June 2nd.  This is the DC meeting.

10   BY MR. SHEBELSKIE:

11   Q.    Had ASH done anything with respect to Mr. Erickson between

12   your March general framework proposal and June 2nd?  Had there

13   been any communications between them?

14   A.    The parties were continuing to talk, yes.

15   Q.    Well, not just talked.  Y'all threatened Mr. Erickson with

16   litigation.

17   A.    We sent a draft complaint at one point, yes.

18             MR. SHEBELSKIE:  Let's pull up Defendants' Exhibit

19   326.

20   BY MR. SHEBELSKIE:

21   Q.    Do you see on the screen, Mr. Twiss, an email from

22   Mr. Kramer to Mr. Erickson with a copy to you on April 8th,

23   2021?

24   A.    Yes, sir.

25   Q.    And the subject matter of this email is, Arbitration and

1  Consulting Agreement, correct?

2  A.   Yes, sir.

3  Q.   And this is that draft complaint that you were just

4  referring to, right?  This transmitted the draft complaint?

5  A.   It would have, yes, sir.

6  Q.   If you scroll down to the next page of the exhibit, sir, do

7  you see that there is actually a letter from Mr. Kramer

8  transmitting the draft complaint?

9  A.   I do.

10          MR. SHEBELSKIE:  Your Honor, we move for the admission

11  of Defendants' 326.

12          THE COURT:  Any objection?

13          MR. KRAMER:  Just one moment, Your Honor.

14      (Pause in proceedings.)

15          MR. KRAMER:  Yes.  Objection as to -- no objection to

16  the email.  No objection to the letter.  Looks like the draft

17  complaint is attached.  Part of a settlement discussion.  And

18  it's also treading ground that was already resolved at summary

19  judgment, which we thought was in the past.

20          MR. SHEBELSKIE:  The draft complaint, Your Honor, is

21  not a settlement discussion.  It is a demand, assertion of

22  claims in litigation, and it's the document that you ruled on

23  this morning on the redaction issue.

24          MR. KRAMER:  It's certainly not.  But that was --

25  okay.

1              Again, Your Honor, I haven't had any notice of this.

2      If there is a redaction, I don't know what it is, but passing

3      that --

4              THE COURT:  Is there any redaction on any of the

5      exhibit?

6              MR. SHEBELSKIE:  No, sir, Your Honor.  Your ruling

7      this morning was that we would decide what we wanted to redact

8      on this topic.

9              THE COURT:  I am going to admit 326 over objection.

10             It's admitted.

11         (DEFENDANTS EXHIBIT 326:  Received in evidence.)

12     BY MR. SHEBELSKIE:

13     Q.   All right.

14          Let's look at the letter from --

15             MR. SHEBELSKIE:  Let's go back then, since the jury is

16     now seeing it for the first time.  Let's go to the first page of

17     the exhibit.

18     BY MR. SHEBELSKIE:

19     Q.   We see here an exhibit from Mr. Kramer to Mr. Erickson on

20     April 8, 2021, right?

21     A.   Yes, sir.

22     Q.   I will put that on the calendar.

23          So April -- let me get the date again.  April 8.

24          On April 8, Mr. Erickson received from Mr. Kramer this

25     draft complaint, correct?

1   A.    That's correct.

2   Q.    All right.  Now let's scroll to the next page.

3         This is the letter transmitting the draft complaint,

4   correct, sir?

5   A.    That's correct.

6   Q.    All right.

7         And if you look at the third paragraph, you wrote --

8   Mr. Kramer writes:  In addition, the company terminates the

9   consulting agreement for cause as that term is defined therein.

10        Correct?

11  A.    Yes, sir.

12  Q.    So on this letter of April 8, Mr. Kramer sends a complaint

13  against Mr. Erickson and terminates the Consulting Agreement,

14  right?

15  A.    That was part of it, yes, sir.

16  Q.    Both of those things were done with your knowledge and

17  approval, correct?

18  A.    Yes, sir.

19             MR. SHEBELSKIE:  And now let's look at the complaint.

20  Scroll to the next page.  "Complaint and demand for

21  arbitration."  Let's scroll and look at the top of the page.

22  BY MR. SHEBELSKIE:

23  Q.    These two ASH companies have drafted this complaint against

24  Mr. Erickson and a whole bunch of his companies listed there:

25  GH Lot Holdings, GH Lot Holdings of Atlanta, GH Lot Holdings of

1    South Carolina, Grayhawk Homes, et cetera, et cetera.  Right?

2    A.    Yes, sir.

3    Q.    And the complaint is pretty long, isn't it?

4    A.    It is.

5    Q.    I have a hard copy here in my hand.  64 pages.  You

6    wouldn't dispute that, would you?

7    A.    I believe you.

8         MR. SHEBELSKIE:  In fact, let's go to the last page of

9    the exhibit -- that's easy enough done, I suppose,

10   Mr. Walters -- so, the jury can see how long this complaint is.

11   BY MR. SHEBELSKIE:

12   Q.    So 64 pages, right?

13   A.    Yes.

14   Q.    Signed by Mr. Kramer?

15   A.    Yes, sir.

16   Q.    One of the guys who was at that special meeting on

17   January 2nd?

18   A.    He was there, yes, sir.

19   Q.    Yeah.

20        In this 64-page complaint there were a whole bunch of

21   charges leveled against Mr. Erickson and his company, right?

22   A.    Yes, sir.

23   Q.    You charge him with breaching the Land Purchase Agreement?

24   A.    Yes, sir.

25   Q.    Violating trademarks?

Cross-Examination - Ryan Twiss

1   A.   Yes, sir.

2   Q.   Copyrights?

3   A.   Yes, sir.

4   Q.   Let's see what else.  Breaches of the copyright assignment

5   agreement, copyright infringement, trademark, unfair

6   competition, violations of Georgia Uniform Deceptive Acts,

7   Trademark Infringement Acts of Georgia and South Carolina.

8   Right?

9   A.   Yes, sir.

10  Q.   And you have four pages worth of things you are demanding

11  from him in this complaint, right?

12       I will show you.

13       MR. SHEBELSKIE:  Let's go to page 61 of the exhibit,

14  Mr. Walters.  You see on page -- go to the top, please.  Top on

15  the page.  We are on the top of page 61 of the complaint.

16  BY MR. SHEBELSKIE:

17  Q.   You see this section Roman Numeral V:  Prayer for relief.

18  Right?

19  A.   Yes, sir.

20  Q.   That's legal language, "prayer for relief," but what it

21  means, in simple terms, is this is what starts -- what ASH is

22  demanding of Mr. Erickson, correct?

23  A.   This is what we were asking the arbiter to award in this

24  case.

25  Q.   And it goes on -- things you were asking for go on for four

1    pages, right?

2          MR. SHEBELSKIE:  Let's scroll through that.

3    BY MR. SHEBELSKIE:

4    Q.  61, 62.  You're asking for money damages on page 62, right?

5    F, G, H, I.

6          MR. SHEBELSKIE:  Keep scrolling.  Page 63.  Scroll

7    through the things that you are asking, demanding, be awarded

8    against him.  Stop there.

9    BY MR. SHEBELSKIE:

10   Q.  You are asking for damages in P.  You want those damages

11   trebled.  Multiply it three times.

12        And you want attorneys' fees all against Mr. Erickson and

13   his companies, right?

14   A.  At this time, yes, that's alleged.

15   Q.  All right.

16        Of course, it took awhile to draft this complaint after the

17   January 22nd special meeting, didn't it?  I mean, it's not

18   something somebody wrote overnight.

19        THE COURT:  Mr. Shebelskie, that's irrelevant.

20        Move on.

21        MR. SHEBELSKIE:  All right.

22   BY MR. SHEBELSKIE:

23   Q.  And then you followed up this complaint with the terms it

24   would take for Mr. Erickson to resolve all of these disputes,

25   correct?

1   A.   I believe so, yes.

2   Q.   In fact, you were the one who sent that term sheet, right?

3   A.   I don't have it in front of me.

4   Q.   All right.

5        MR. SHEBELSKIE:  Let's pull up Defendant's Exhibit

6   328.

7   BY MR. SHEBELSKIE:

8   Q.   This is an email from you to Mr. Erickson on April 13th,

9   2021, correct?

10  A.   That's correct.

11  Q.   And the attachment to this was this term sheet that you

12  would demand he comply with to make these disputes go away,

13  correct?

14  A.   It was a settlement discussion that we were having for

15  global issues, including Mr. Erickson's own issues.

16  Q.   All right.  When you say Mr. Erickson's own issues, you

17  mean the Phase C lots?

18  A.   I do not.

19  Q.   Let's pull up --

20       MR. SHEBELSKIE:  Your Honor, I move for the admission

21  of Defendants' Exhibit 328.

22       MR. KRAMER:  Object under Rule 408.  Again, I haven't

23  seen what defendants are now redacting, Your Honor.

24       MR. SHEBELSKIE:  Your Honor, this is the same group of

25  documents you ruled on this morning.

1          THE COURT:  Ladies and gentlemen, we are going to take

2     your lunch break at this time.

3          I will address this in your absence, and then when you

4     come back we will be ready to present exhibits that shall be

5     admitted for your consideration.

6          It's about 20 till 1.  So since I am going to have to

7     take up some matters in the courtroom, and the staff needs to

8     eat lunch, too, why don't you come back at 2 o'clock.

9          We will start back in here at 2 PM.

10          Do not discuss the case during your break.  Don't

11     allow anybody to discuss it with you.  Don't do any independent

12     investigation during that break.  Just enjoy your lunch.

13          We will see you back at 2 PM.  You may go.

14      (Jury out at 12:37.)

15          THE COURT:  You may go back to the table, sir.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  All right.

18          Well, it's been my experience that good lawyers are

19     not interested in just winning the battle, they want to win the

20     entire war.  And the war is not won if you get reversed on

21     appeal and have to spend all of this money coming back and

22     retrying a case.  So most good lawyers do not try to inject

23     anything into a trial that has the likelihood of error.

24          When it was presented to me earlier this morning that

25     these materials are not 408 materials, I thought the argument

1   was based upon the argument that they are relevant to the lot C

2   scheduling and the failure of the parties to agree on a schedule

3   for the C lots.

4           These documents are about some global settlement

5   regarding every claim that was possibly asserted from the

6   beginning of time.  Far broader than the lot C schedule.  And no

7   attempt made to narrowly tailor this to that particular issue.

8           In fact, counsel has just jumped on the Court's

9   general ruling earlier that indicated that these documents were

10  likely admissible and seeks to win the battle.

11          So I want to nail down here, once and for all, why

12  this material, that covers all of these claims, including claims

13  that have previously been litigated and disposed of, are not 408

14  material.

15          MR. SHEBELSKIE:  Yes, Your Honor.

16          THE COURT:  I think the witness has said that this

17  doesn't relate just to the C lot schedule.  These discussions

18  and terms relate to settling the claims that are asserted in the

19  arbitration complaint.  How is that not classic 408?  And how is

20  the Eleventh Circuit Court of Appeals not going to look at it

21  and say, This is classic 408?  And even if you win a Defendants'

22  verdict, send it back down here for this case to be retried

23  again?

24          Mr. Shebelskie?

25          MR. SHEBELSKIE:  Thank you, Judge.

1          If I may ask the Court to look at the second page of

2    Defendants' Exhibit 328.

3          THE COURT:  All right.

4          MR. SHEBELSKIE:  Now, you see first there is a bullet

5    point:  Over all.  And then second bullet point:  Lot Purchase

6    Agreement.

7          If you first look, Your Honor, under the Lot Purchase

8    Agreement, second bullet point:  Parties to negotiate and

9    memorialize a development schedule for remaining Phase C lots.

10         And what becomes significant, Your Honor, is upfront

11    over on -- up top, the "overall," section:  Nothing is agreed

12    until everything is agreed.

13         THE COURT:  Classic language supporting the conclusion

14    that this is 408 material.

15         But go right ahead.

16         MR. SHEBELSKIE:  The point, Your Honor, is that the

17    agreement, the negotiation, and memorialization, the

18    finalization of a Phase C schedule, ASH made conditioned on

19    settlement of all of these other disputes.  And that remained

20    its demand up until the time it filed its lawsuit.

21         THE COURT:  So what?  Explain to me why that falls

22    into an exception for 408.

23         MR. SHEBELSKIE:  Because they are contending that

24    Mr. Erickson unreasonably delayed a negotiation and resolution

25    of the Phase C order, when they are the ones who told him they

1   would not finalize and memorialize a Phase C schedule unless he

2   agreed to a settlement on all of these other matters.

3          MR. KRAMER:  Categorically false, Your Honor.

4          THE COURT:  They sent him that email that had the

5   order set out that you just introduced previously.

6          MR. SHEBELSKIE:  Yes.  They sent -- Mr. Twiss sends

7   his email.  Then not two weeks later they send, Here is the

8   settlement -- they send the complaint and then send him this

9   term sheet saying, We won't agree to the Phase C schedule unless

10  we have a global settlement.  And that explains why there was no

11  settlement reached in this matter.

12         They tried to make Mr. Erickson's contractual

13  obligation to negotiate in good faith conditioned on resolution

14  of this whole smorgasbord of complaints.

15         That is -- so, it's not being admitted for the truth

16  or validity of any of these other claims, but to explain the

17  reason why -- counter their assertion of undue delay on

18  Mr. Erickson's part in responding and agreeing to a Phase C

19  schedule.

20         THE COURT:  Mr. Erickson is going to testify that he

21  did not respond to that previous email, in part, because he had

22  received this arbitration complaint and, as he understood it,

23  they would not agree to his acceptance of the schedule unless

24  they settled all of these other claims.

25         MR. SHEBELSKIE:  Absolutely.  And not just that he

 1    understood it.  He understood it because they put that in black

 2    and white in this communication -- this term sheet Mr. Twiss

 3    sent him.

 4              THE COURT:  So you are introducing this to show that

 5    his delay in responding to the previous schedule is because he

 6    was threatened with this litigation and these demands were made

 7    with regard to all of these other claims.

 8              MR. SHEBELSKIE:  Not just that he was threatened with

 9    litigation, but he was told, You must settle all of this as the

10    price of admission to getting an agreement on Phase C.

11              MR. KRAMER:  I don't know how counsel can tell the

12    Court what he just said, Your Honor.

13              THE COURT:  Well, he says that's what Mr. Erickson is

14    going to testify to is what he said.

15              MR. KRAMER:  He is representing what was contained in

16    the term sheets.

17              Let me read it.

18              May 6.  ASH.  LPA creates two-way obligation to agree

19    on development order, which is not, and should not, be

20    contingent on agreement to other terms, including LPA changes.

21    ASH request a response to its March 18 proposal.

22              Categorically false what you were just told,

23    Your Honor.  It's right here in black and white.

24              THE COURT:  What is that in?

25              MR. KRAMER:  This is a term sheet from May 6, 2021.

1          MR. SHEBELSKIE:  We are not on that term sheet yet.

2     This is now April.  We are going to get to that, Your Honor.

3          Look at the bottom of this term sheet, Exhibit 318 we

4     are talking about:  Locking in a sales price comes with a

5     commitment from ASH to purchase all Phase C lots in accordance

6     with the takedown.

7          They, in this term sheet, said they would not commit

8     to the Phase C schedule unless there was locked in sales prices.

9     We heard from that January 22nd meeting discussion their concern

10    was the prices of the Phase C lots were going to be too

11    expensive.  They needed to reduce the prices of those.

12         In this very term sheet that we are looking at that

13    they said requires a global resolution, they say -- they link

14    their condition -- their contractual requirement to buy the

15    Phase C lots on getting sales price relief.

16         It explains why they -- Mr. Erickson did not agree to

17    the March proposal, because they are the ones who raise all

18    these demands and expressly said, There is no resolution on

19    Phase C unless you agree to a price reduction and resolve all of

20    our other --

21         THE COURT:  All right.  Mr. Kramer, what's your

22    response to that argument?

23         MR. KRAMER:  Also not true.

24         THE COURT:  Not if it's true or not.  I mean, the jury

25    is going to decide whether it's true or not.  The jury is going

1    to look at that document and listen to Mr. Erickson, and the

2    other witnesses, look at your document that you got, and y'all

3    are going to argue to them what's true and they are going to

4    decide what's true or not.

5            MR. KRAMER:  That's right.  What's being presented is

6    a fantasy and the evidence will demonstrate that.

7            What Mr. Shebelskie just said is that -- look, let's

8    level-set here.

9            The only claim is with respect to the Phase C lot

10   development order that Mr. Erickson breached by not agreeing.

11   That's it.  ASH isn't accused of breaching anything.  What his

12   motivations are, what his intent is, has absolutely no relevance

13   to a breach of contract case.  It's not an element that's been

14   proven.  It's not whether ASH is a good actor or a bad actor.

15   It's whether Mr. Erickson complied with the contract.

16           THE COURT:  What he apparently is going to contend is

17   that ASH impeded him from agreeing to the schedule by making it

18   conditioned upon all of these other claims being -- and

19   conditions.

20           MR. KRAMER:  I don't know where that comes from.

21           THE COURT:  It comes from this letter.  It comes from

22   your demand letter and then it comes from the term sheet.

23           MR. KRAMER:  But it doesn't say that.  What the term

24   sheet says is, please, we do not regard the agreement on the

25   development order as contingent on agreement to other terms.  I

 1    mean, it's black and white.

 2           Mr. Erickson's response -- let me tell you who made it

 3    contingent, Your Honor.  Mr. Erickson's response:  Erickson is

 4    willing to provide a response as the negotiations' progress, but

 5    does not plan to reach an interim agreement on schedule without

 6    an agreement on other points.  As ASH has stated repeatedly,

 7    nothing is agreed until everything is agreed.

 8           This is an alternate reality, Your Honor.  And we are

 9    way down the rabbit hole on Rule 408, about to get into a

10    complaint that was sent in advance of litigation in a

11    pre-litigation effort to settle disputes with Mr. Erickson based

12    on misstatements about what ASH's position was and it is black

13    and white.

14           THE COURT:  The problem, first of all, is with the

15    contract that did not specify what it meant to include an order

16    of lots -- the lot order.

17           The more I am listening to this, the more persuasive

18    the argument that the defendants made at summary judgment, which

19    was there is no meeting of the minds on this.  It's not an

20    enforceable agreement because this is an essential term that

21    can't be enforced.

22           What I suggested, and ruled, I think, at summary

23    judgment was that notwithstanding the language there was a clear

24    agreement to agree on a schedule within the first year.  But

25    there is no contractual language to say what that means.

1           So I expected there to be evidence as to what the

2    meeting of the minds of the parties was as to that particular

3    term.  And I thought that evidence was going to be that the

4    parties would reasonably attempt to agree to a schedule.

5           MR. KRAMER:  There will be such evidence.

6           THE COURT:  And on that issue, Mr. Erickson should be

7    able to tell this jury on whether he reasonably acted in a way

8    to try to reach agreement on that schedule.  He should be able

9    to tell the jury as to why he didn't agree to it.

10          And that is, from his perspective, he got bombarded

11   with all of these other claims for everything else in the world,

12   and how could he be expected to agree to the schedule in that

13   environment.  And that the delay in him reaching agreement on it

14   was due to all this, which y'all threw on him.

15          MR. KRAMER:  Well --

16          THE COURT:  And evidence that would otherwise be 408

17   evidence can be admitted for that particular purpose.

18          MR. KRAMER:  It sounds to me, Your Honor --

19          THE COURT:  And that's -- I'm not saying he is going

20   to carry the day on it.  They may think he's a liar, like you

21   think they're lying.  But that's a factual question for the jury

22   to resolve.  It's not a question for me to say they can't hear

23   his evidence.

24          MR. KRAMER:  Okay.

25          THE COURT:  And decide whether it's credible or not.

1                But it --

2                MR. KRAMER:  We're about to open Pandora's box.

3                THE COURT:  Yes, we are.  Well, I don't know if we are

4    getting ready to open Pandora's box, but we're getting ready to

5    allow evidence that would otherwise be 40B into evidence, but

6    40B expressly provides for the evidence to be admitted for that

7    purpose.

8                MR. KRAMER:  With respect to show --

9                THE COURT:  His undue delay in responding to the

10   development order.

11               MR. KRAMER:  I understand, Your Honor.

12               The baseline premise to which I am responding -- I

13   apologize if I had gotten hot under the collar here -- is the

14   notion that there was -- that resolution of all of these issues

15   that came up long before the lawsuit was filed at the settlement

16   stage was contingent on an agreement --

17               THE COURT:  No.  I understand.  Your argument is --

18   and you have got evidence that you pointed to to support your

19   argument.  Your argument is that when he contends -- they put

20   him on the stand and he contends that he delayed responding to

21   the settlement order because you sent him this demand, and he

22   wanted to get that all resolved first, then you're going to

23   point to the provisions in the actual document that say, no,

24   that says the exact opposite, and a reasonable person would have

25   known that the order of development had nothing to do with it.

 1    But that's for the jury to decide whether it's BS or not.

 2              MR. KRAMER:  Okay.

 3              THE COURT:  I think it's admissible for the purpose --

 4    for that limited purpose of showing his delay in responding to

 5    the obligation to develop a scheduling order.

 6              Is that the only purpose for which you are seeking to

 7    introduce it?

 8              MR. SHEBELSKIE:  The only purpose, Your Honor.  And

 9    I'm glad -- you can instruct the jury.

10              THE COURT:  I can give the jury a limiting instruction

11    on that, if you want, but 408, specifically, contemplates that

12    this type evidence can be introduced for that purpose.

13              You just --

14              MR. KRAMER:  Fine.

15              THE COURT:  -- you just -- you think it's so

16    unbelievable, which may be true, but that's an argument to be

17    made to the jury.

18              MR. KRAMER:  Understood.  As to the term sheets that

19    went back and forth between the parties, but does that --

20              THE COURT:  I do not know.  I do not know why the full

21    complaint -- you get into all this.  Good God, they spent hours

22    writing a 61-page complaint to him.  How is all of that

23    admissible?

24              MR. KRAMER:  That's right where I was headed,

25    Your Honor.  I don't know how that takes us to March through --

1              THE COURT:  Yes, sir.

2              MR. SHEBELSKIE:  Your Honor, they opened the door on

3       this.  They said there was an agreement in principle on

4       June 2nd, and that they were meeting on June 2nd to come up with

5       an agreement.  They were meeting on June 2nd to resolve, to

6       discuss, all of those demands made in that draft complaint.

7              THE COURT:  Okay.

8              MR. SHEBELSKIE:  So you have to --

9              THE COURT:  I am going to admit it all.

10             MR. KRAMER:  Your Honor, that's --

11             THE COURT:  Somebody -- maybe you got your silver

12      bullet for the Eleventh Circuit if it doesn't go well, but I am

13      going to admit it.

14             If you want me to give a limiting instruction as to

15      the purpose of it, I will do that.  Prepare some language over

16      the break.  Show it to counsel.  And I will give a limited

17      instruction that that's the purpose for which these are

18      admitted, and there should be no inference from any of this

19      evidence otherwise.

20             MR. KRAMER:  Yes, Your Honor.

21             Last thing, just so we are on square terms here and we

22      don't have to -- I don't have to hop up in front of the jury --

23      I am not sure how the argument that ASH was trying to

24      renegotiate the LPA fits in here.  That's pure settlement

25      discussion as well.  I mean, that's not something that was

1    treated in the complaint.  That is a side discussion on issues

2    that are pure 408 issues having to do with -- coming up with a

3    creative solution to resolve the disputes between the parties by

4    coming up with a new version of the LPA.

5              And I really don't understand.  And part of the

6    problem here is we didn't get any kind of proffer, or preview on

7    how this evidence was going to be offered and for what reason

8    under Rule 408, so we are reacting in realtime, but I don't

9    understand how that comes in.

10             THE COURT:  Well, my understanding of it -- and I

11   haven't seen all of it yet either, so we will let Mr. Shebelskie

12   tell us about it, what he intends to do.  But my understanding

13   was that the defendant was going to introduce evidence that --

14   unrelated to the breach regarding the scheduling of the ordering

15   of the lots.  That they were going to introduce evidence with

16   regard to the providing of lots, or the takedown of lots, that

17   ASH changed the deal from the contract and tried to get Erickson

18   paid less for the lots than he thought they had contractually

19   agreed to because the costs were going up and expected to go up

20   in 2022 -- whatever the next year was.  And that that was part

21   of the reason that Erickson was not providing lots is because

22   ASH was not sticking to its deal as to the cost and the price.

23             MR. KRAMER:  But doesn't that go directly to the

24   validity of the claims, that he was not providing lots in breach

25   of the contract and not for undue delay?

 1                THE COURT:  Correct.

 2                MR. KRAMER:  Right.  So that would seem to be not --

 3                THE COURT:  I think that -- I think that -- that goes

 4     to that claim.  Not the undue delay claim.  But, if you --

 5                Do you have evidence that he, as the lawyer, provided

 6     a demand that increased the cost above what the contract

 7     provided, or is there evidence -- other evidence on that point?

 8                MR. SHEBELSKIE:  I think it's the opposite,

 9     Your Honor.  They were demanding a change to the Land Purchase

10     Agreement that would lower the price.

11                THE COURT:  Lower the price that would go to Erickson?

12                MR. SHEBELSKIE:  Yes, sir.

13                THE COURT:  Yeah.

14                And if that was done in an attempt to settle their

15     disputes, why is that not 408?

16                MR. SHEBELSKIE:  Because, Your Honor, the point that

17     you just made when you had ruled on it, that the issue is they

18     would not agree to the Phase C schedule unless there was

19     resolution of their demand to renegotiate and lower the price.

20                THE COURT:  He says in one of the sheets it expressly

21     states the opposite of that.

22                MR. SHEBELSKIE:  Well, then if he thinks that's what

23     it says, he can introduce that on redirect.

24                I am showing that in April -- and we will show in June

25     as well -- that ASH said, No.  Nothing will get resolved on the

1    Phase C lot order unless you give in to our concessions on these

2    other points, including renegotiating to lower the price and

3    resolution of all these other disputes we've raised.

4         THE COURT:  And Mr. Erickson is going to testify that

5    that was his understanding based upon this correspondence from

6    counsel that they claim is 408?

7         MR. SHEBELSKIE:  Absolutely, Your Honor.

8         You can't threaten -- you can't try --

9         THE COURT:  I am going to admit it.  I am

10   uncomfortable, not because I am uncomfortable that that is

11   error, but just because any time you tread on 408 material I am

12   cautious about whether it should be admitted.  But I think here

13   there is an exception for it to be admitted on this issue of

14   undue delay.

15        MR. SHEBELSKIE:  Your Honor, we're glad with the

16   limiting instruction that you proposed --

17        THE COURT:  Well, I am going to let counsel come up

18   with a limiting instruction and y'all share it among yourselves.

19   And then if there is agreement, I will give it.  If not, I will

20   come up with my own.  But I am going to let counsel take a first

21   stab at it.

22        MR. KRAMER:  Your Honor, thank you for hearing our

23   argument Your Honor, and our objections.

24        THE COURT:  Your objections are preserved.

25   Absolutely.  I don't try to prevent anybody from placing their

```
1    objections on the record in case they need it on appeal.

2              Your objections are in the record and preserved.

3              MR. KRAMER:  We shall do our best to craft a limiting

4    instruction, recognizing our position is that that's not going

5    to be sufficient to cure the prejudice.

6              THE COURT:  Correct.  I understand that you do not

7    believe a limiting instruction could correct the clear error

8    that the Court is about to commit.  That would be your argument

9    on appeal, so you might as well just go ahead and tell me.  It

10   doesn't bother me.

11             MR. KRAMER:  I hope not, Your Honor.

12             THE COURT:  Okay.  Well, I don't blame you for raising

13   the issue at all.  I just want to make sure we're all clear

14   about what's being ruled upon and how.

15             MR. KRAMER:  Yes, sir.

16             THE COURT:  And you will have great opportunity to use

17   those exhibits to cross-examine or question the credibility of

18   whatever other witnesses.

19             MR. KRAMER:  Thank you, Your Honor.

20             THE COURT:  Okay.

21             We will be in recess until 2 o'clock.

22        (Recess taken 1:02.)

23        (Resume at 2:00.)

24             THE COURT:  Be seated.

25             Anybody have a limiting instruction they would like me
```

1    to consider, or you haven't had time to do that?

2              MR. KRAMER:  Not quite there yet, Your Honor.  If we

3    could ask for the Court's indulgence.

4              THE COURT:  Okay.  I don't need to get it immediately,

5    but some time before the end of the case.

6              Let me just -- we had a lot of discussion before we

7    broke, and I want to make sure that I accurately have summarized

8    the defendants' position on this issue so I make sure I have the

9    correct understanding.  Perhaps this was explained effectively

10   in previous briefing and I just didn't get it, but this is what

11   I understand the defendants' position today.

12             That the contract imposed a duty on the parties to

13   develop a lot schedule for the C lots within one year.

14             Defendants' take the position this is an unenforceable

15   agreement.  I had previously ruled it is an enforceable

16   agreement, but that it requires the parties to work in good

17   faith to develop the schedule based upon the Georgia law

18   principle that implicit in all contracts is a duty of good faith

19   in the performance of the contractual duty.

20             The defendants contend that when the plaintiffs hit

21   him with the lawsuit and all the settlement demands, that they

22   made the performance of this contractual obligation contingent

23   on resolving all of their disputes globally and him accepting a

24   lower price for his lots.  And when he was hit with this, the

25   defendant did not believe that the plaintiffs were operating in

1    good faith, so he delayed his efforts to reach an agreement on

2    the order of the lots.

3             Have I accurately stated the defendants' position in

4    regard to these issues?

5             If not, explain how I have not accurately stated it.

6             MR. QUACKENBOSS:  Well, Your Honor's use of the word

7    "delay," I simply don't want to suggest, or assume, that there

8    is an intentionality in there necessarily, but a delay.  But

9    that is certainly a cause, and certainly a reason, but delay is

10   not necessarily an intentional one.

11            THE COURT:  I understand that.

12            You realize "delay," is the phrase used in Rule 408,

13   or maybe you don't.

14            I guess my overriding point is, which I am not sure

15   that I fully appreciated until now, is the defendants' position

16   is that part of the reason that they did not reach an agreement

17   on the order of the lots is that:  Number one, there wasn't much

18   discussion at all in that first eight or nine months.

19            And then once he became president, he felt he was

20   handcuffed and he couldn't agree with himself.

21            And then the next year -- during that next year, is

22   when this threat of litigation was made, and he interpreted that

23   to mean that they were taking the position that every -- all

24   these disputes which they were putting on him, which he

25   disagreed with, they wanted some kind of legal remedy for that,

1  and resolution for that.  And he thought that was all tied

2  together to provide the lots and they were offering less money,

3  is what he contends.

4        And so at that point he did not believe they were

5  operating in good faith in regard to their obligations, and so

6  there is nothing more that he thought he could to do to comply

7  with the obligation to the contract.

8        MR. QUACKENBOSS:  Correct.

9        THE COURT:  Of course, the plaintiff disputes that and

10  the plaintiffs will put on evidence that that is erroneous.

11        But I think, given that undertanding of the

12  defendants' position and the defense, that these communications,

13  as I previously indicated, are admissible, and they are

14  admissible 408 evidence.

15        Okay.  Bring the jury in.

16     (Jury in at 2:07.)

17        THE COURT:  Come on in, ladies and gentlemen.

18        All right.

19        You may continue your examination of the witness.

20        MR. SHEBELSKIE:  Thank you, Judge.

21        Let me first make sure my mic is on.

22        THE COURTROOM DEPUTY:  Thank you.

23                    CONTINUED CROSS-EXAMINATION

24        MR. SHEBELSKIE:  I would like to have on the screen

25  for the witness only at this point Defense Exhibit 328.

1    BY MR. SHEBELSKIE:

2    Q.   Mr. Twiss, on the screen is Exhibit 328.  Your letter to

3    Mr. Erickson -- email to Mr. Erickson on April 13th, 2021,

4    transmitting a term sheet, correct?

5    A.   That's correct.

6    Q.   And this term sheet was, in fact, sent by you, right?

7    A.    Correct.

8         MR. SHEBELSKIE:  Your Honor, I move for the admission

9    of Defendants' 328.

10        THE COURT:  It's admitted over objection.

11        (DEFENDANTS EXHIBIT 328:  Received in evidence.)

12        MR. SHEBELSKIE:  Show that on the screen for the jury.

13   BY MR. SHEBELSKIE:

14   Q.   This letter, this term sheet, that you sent on April 13th

15   was just a few days after that draft complaint you sent to

16   Mr. Erickson, correct?

17   A.   That would be correct.

18   Q.   And in this transmittal, what you term a "term sheet," in

19   the body of the transmittal, you attached a proposed term sheet

20   for potential global settlement, correct?

21   A.   A revised version.  Yes.

22        MR. SHEBELSKIE:  Let's look at the terms of the term

23   sheet, if we could.  Go to the first page.  Three things I want

24   to note to you.

25        THE COURT:  What number is this, again?

```
 1              MR. SHEBELSKIE:  328, Your Honor.
 2              THE COURT:  328.  All right.  Go ahead.
 3    BY MR. SHEBELSKIE:
 4    Q.   All right.
 5         First bullet point you wrote that:  Nothing is agreed until
 6    everything is agreed.  Correct?
 7    A.   Yes, sir.
 8    Q.   That was ASH's position?
 9    A.   For global settlement.  Yes, sir.
10    Q.   The second point was:  Any settlement has to be approved by
11    the board and members.  Correct?
12    A.   Correct.
13    Q.   And you mentioned yesterday the members are the investors,
14    the owners of the company?
15    A.   Correct.
16    Q.   All right.
17         And then you had underneath that, under the lot purchase
18    agreement, a variety of things that had to be resolved.
19         The second bullet point was:  Parties to negotiate and
20    memorialize a development schedule for remaining Phase C lots.
21         Right?
22    A.   That's correct.
23    Q.   And going down further on this page we see in the last
24    black bullet point there:  Lot pricing is that -- one of the
25    terms that had to be worked out in y'all's view was pricing on
```

1    the Phase C lots.  Correct?

2    A.    Correct.

3    Q.    And then, in addition -- we don't need to go over it in

4    great detail, but scroll through -- you had terms that had to be

5    agreed to on all of those other disputes that had been raised in

6    the draft complaint.  Correct?

7    A.    There would be more there, including probably

8    Mr. Erickson's --

9    Q.    There are a bunch of disputes that had to be worked out?

10   A.    Yeah, with Mr. Erickson.  His own complaints.

11   Q.    Now, I take it there was no global settlement between

12   April 13th and the June 2nd meeting, right?

13   A.    That's correct.

14   Q.    And so that was the purpose of the June 2nd meeting in DC,

15   to see if the parties could get a global settlement on all of

16   these issues, right?

17   A.    That's correct.

18   Q.    And no global settlement was reached at that meeting,

19   correct?

20   A.    We did not reach one.  No, sir.

21   Q.    All right.

22          You had new term sheets for that June 2nd meeting, correct?

23   A.    That's correct.

24   Q.    All right.

25          MR. SHEBELSKIE:  I would like, Your Honor, to have

1  shown to the witness Defendants' Exhibit 346.

2  BY MR. SHEBELSKIE:

3  Q.   Mr. Twiss, do you see -- we have on the screen for you --

4  an email from you to a J. Schronce on June 2nd, 2021?

5  A.   I do.

6  Q.   Yeah.  With a copy to Mr. Kramer, correct?

7  A.   That's correct.

8  Q.   And do you recognize the name J. Schronce as a lawyer at

9  the firm of Hunton, Andrews, Kurth?

10  A.   Yes.  One of Mr. Erickson's counsel.

11  Q.   One of the lawyers representing Mr. Erickson?

12  A.   Yes, sir.

13  Q.   And this was a transmittal from you on the morning of the

14  June 2nd meeting with new term sheets, correct?

15  A.   My recollection is that we were sitting at the table, and I

16  think Mr. Schronce was having an issue getting the document, so

17  I was able to send it to him.

18  Q.   So what you sent to him were the term sheets that you were

19  discussing in that meeting?

20  A.   Correct.

21         MR. SHEBELSKIE:  Your Honor, I move for the admission

22  of Defendants' 346.

23         THE COURT:  Admitted over objection.

24      (DEFENDANTS EXHIBIT 346:  Received in evidence.)

25

1    BY MR. SHEBELSKIE:

2    Q.    So now the jury can see that here is an email from you,

3    Mr. Twiss, to Mr. Schronce during the June 2nd meeting.  And I

4    would now like to direct our attention to the second page of the

5    exhibit entitled:  Key terms for global settlement.

6         Do you see that on the screen, sir?

7    A.    I do.

8    Q.    And the bullet point that you first put in the document was

9    that:  The proposal is tentative and contingent upon reaching

10   agreement on all other issues in dispute.  Nothing is agreed

11   until everything is agreed.

12        You wrote that, right?

13   A.    It was written.  Yes.

14   Q.    And you sent that to Mr. Erickson's lawyer in that June 2nd

15   meeting?

16   A.    Yes.

17   Q.    All right.

18        If we scroll down you see there is all these topics under

19   the lot purchase agreement, A lots, B lots.  And let's go down

20   to and Roman Numeral III, C lots.  Starts at the bottom of page

21   1 and carries over to page 2.

22        The first was:  Parties to finalize a development schedule

23   for remaining Phase C lots.  Reconciling the Erickson proposal

24   with ASH waterfall.

25        Do you see that?

1    A.    I do.

2    Q.    Now that's a new term, I think, in this case:  ASH

3    Waterfall.

4          What is the ASH waterfall?

5    A.    The ASH Waterfall is a document that shows lots coming --

6    basically homes being started on lots on a

7    neighborhood-by-neighborhood level.

8    Q.    All right.

9          Was that your March proposal that you discussed?

10   A.    The development schedule was the March 18th.  Yes.

11   Q.    Where was the waterfall?

12   A.    The waterfall wasn't part of the order that was required.

13   Q.    And then continuing on with what these terms were, looking

14   at capital F, you propose there to:  Provide certainty and avoid

15   disputes, ASH will take down all lots developed at its

16   direction.

17         That was one of the things you were demanding, correct?

18   A.    Not demanding.  A concession to Mr. Erickson.  We didn't

19   want to do it.

20   Q.    And you said:  The ROFO process is no longer necessary for

21   Phase C lots.

22         What is the ROFO process?

23   A.    It's the way Phase C lots were to work under the original

24   LPA.  This was a discussion, at Mr. Erickson's behest, to

25   renegotiate a completely new LPA.  He didn't want to develop the

 1    lots anymore.  He was increasing prices.  I saw here what the
 2    development costs was going to be shifted to prime plus
 3    2.75 percent, instead of the 6 percent carry.  So it was at
 4    Mr. Erickson's direction trying to get him out of development,
 5    get away from the existing LPA, which required a ROFO.
 6         Mr. Erickson would present a lot to us.  If it met certain
 7    price thresholds, we were obligated to buy it.  If the price
 8    threshhold was not met, it was exceeded, we did not have to buy
 9    it.  We were actually trying to give Mr. Erickson certainty that
10    we would buy all the lots.
11    Q.   That's because, if we look at capital E:  For all other
12    unfinished lots -- let me pause you there.
13         As of June 2021, there would have been a lot of unfinished
14    Phase C lots, right?
15    A.   Correct.
16    Q.   -- ASH will appoint a development manager to oversee
17    development of lots.  The development manager would assume some
18    oversight and lot maintenance.
19         So your proposal was to appoint a development manager to
20    take over the role of Mr. Erickson?
21    A.   Mr. Erickson's request, yes, he wanted to be out of
22    development and we were trying to appease him.
23    Q.   And at the end of the June 2nd meeting there was no
24    resolution on all these issues, correct?
25    A.   We did not reach resolution and negotiations broke down

1  when we would not buy Mr. Erickson's shares back.

2  Q.   Following the meeting, Mr. Kramer sent another email

3  recapping the settlement term sheet, correct?

4  A.   Yes, sir.

5           MR. SHEBELSKIE:  Let me pull up that for you, please.

6  Defendants' Exhibit 33434.

7  BY MR. SHEBELSKIE:

8  Q.   Do you see, Mr. Twiss, that -- this is an email from

9  Mr. Kramer to Mr. Quackenboss and Mr. Schronce on June 2nd,

10 2021.

11 A.   Yes, sir.

12 Q.   And that email was sent at 5:17 PM, after the conclusion of

13 the meeting on June 2?

14 A.   Yes, sir.

15           MR. SHEBELSKIE:  Your Honor, I would like to now move

16 for the admission of Defense Exhibit 344.

17           THE COURT:  344?

18           MR. SHEBELSKIE:  Yes, sir.

19           THE COURT:  Admitted over objection.

20      (DEFENDANTS EXHIBIT 344:  Received in evidence.)

21 BY MR. SHEBELSKIE:

22 Q.   All right.

23      And, Mr. Twiss, if we look town at the second page of this

24 exhibit now we will see a term sheet.

25      Key terms for settlement.  This was the term sheet sent

1     after the end of the settlement meeting.  Again, it contained,

2     in that very first bullet point:  The proposal is tentative and

3     contingent upon reaching agreement on all other issues in

4     dispute.  Nothing is agreed until everything is agreed.

5          Correct?

6     A.   Yes.  Because this was an amendment and restated agreement.

7     Q.   Is there anywhere in Mr. Kramer's letter, after the

8     June 2nd meeting, that mentions this so-called agreement in

9     principle on the Phase C lots?

10    A.   I would have to see the whole document.

11         Can I scroll?

12    Q.   Please scroll through it.  I think you can control -- I

13    can't -- well, see what I just did.

14         Can you scroll down the document?

15         And tell us when you want us to pause, Mr. Twiss.

16    A.   See Roman Numeral III-A, finalizing the development

17    schedule, reconciling it with the waterfall, this was a whole

18    new amended and restated LPA to give Mr. Erickson a lot of

19    things he wanted, including currently we had to buy lots -- and

20    we had offered to remain under the current LPA, we had to buy

21    lots based on just a pool of lots.  So if he had 300 developed,

22    we could choose 15 at random.

23    Q.   My question for you, Mr. Twiss, was:  Does the letter from

24    Mr. Kramer, after the June 2nd meeting, say an agreement in

25    principle was reached?  Does that phrase "agreement in

1    principle," appear in this document?

2    A.    That phrase does not.

3    Q.    And then you mention that what was discussed at the

4    June 2nd meeting was your March proposal?

5    A.    Yes, sir.

6    Q.    But actually another proposal had been sent between March

7    and June 2nd, wasn't there?  A different proposal?

8    A.    Are you talking about the term sheets?

9    Q.    No.  A proposal.

10    A.    I don't recall.

11    Q.    All right.

12          MR. SHEBELSKIE:  Let me show you Defendants' Exhibit

13    338, please.

14    BY MR. SHEBELSKIE:

15    Q.    We have that on your screen now, Mr. Twiss.  And do you see

16    that this is an email from Mr. Kramer to Mr. Quackenboss with a

17    copy to you, on March 28th, 2021?

18    A.    Yes, sir.

19    Q.    And you were copied on this and agree you received this,

20    right?

21    A.    Yes, sir.

22          MR. SHEBELSKIE:  Your Honor, we move for the admission

23    of Defendants' 338?

24          THE COURT:  Admitted over objection.

25          (DEFENDANTS EXHIBIT 338:  Received in evidence.)

1    BY MR. SHEBELSKIE:

2    Q.    Okay.  Let's put that on the screen so the jurors can see

3    it.

4         So this email, just five days or so, before the June 2nd

5    meeting, Mr. Kramer is sending to Mr. Quackenboss, with a copy

6    to you, the following email.  He writes:  Here is ASH's proposal

7    on the LPA, including development schedule, deposit, takedowns,

8    and excluded lots.

9         Do you see that?

10   A.    I do.

11   Q.    And he attaches then what ASH's proposal is on the LPA,

12   correct?

13   A.    He does.

14   Q.    And part of that proposal encompassed the Phase C lot

15   neighborhoods, right?

16   A.    If I see it.  Yes.

17             MR. SHEBELSKIE:  Let's look at the second page or the

18   attachment.  It says it is produced in native format.

19             Let's scroll to the next page.  All right.

20   Mr. Walters, can that be twisted around to a landscape

21   orientation so we can read it?

22   BY MR. SHEBELSKIE:

23   Q.    All right.

24        So what we see here in the proposal is there is the

25   discussion of the C lot neighborhoods, right?

1    A.    A portion of them.  This is a proposal based on our ongoing

2    discussions with Mr. Erickson and his attempt to renegotiate an

3    LPA.  So this was back to shifting development responsibilty

4    from Mr. Erickson to ourselves and completely tearing up the

5    agreement and starting over.

6    Q.    The list here of the C lot neighborhoods are not all of the

7    C lot neighborhoods, correct?

8    A.    It was changing the entire structure.  Mr. Erickson had

9    wanted to renegotiate the LPA.  He didn't want to live by it

10   anymore, so this was an attempt to do that for him.

11   Q.    Well, the Upland Park, for example, is a Phase C

12   neighborhood and that's missing from Mr. Kramer's proposal,

13   correct?

14   A.    That is correct.

15   Q.    And there are a bunch of other Phase C neighborhoods in

16   that part of the South and East Columbus that don't appear on

17   this chart, correct?

18   A.    They do not.

19   Q.    All right.

20         Let's pick up with the chronology.

21         We know the June 2 meeting ends without a global

22   resolution, correct?

23   A.    Yes, sir.

24   Q.    And then what happened next is that ASH sued Mr. Erickson,

25   right?

```
 1   A.   At some point after that meeting.  I don't know if that was
 2   the exact next step.
 3   Q.   It was June 14th, wasn't it?
 4   A.   I believe that's correct, yes.
 5   Q.   Yeah.
 6        ASH lawsuit.  Not two weeks after the June 2 meeting,
 7   right?
 8   A.   That would be correct.
 9   Q.   All right.
10        Now, you have testified about some correspondence back and
11   forth between Mr. Erickson and ASH in December of 2021.  You
12   remember that exchange?
13   A.   Yes, sir.
14   Q.   All right.
15        And do you remember yesterday's opening statement your
16   lawyer said that after that letter came from Mr. Erickson in
17   December that "ASH didn't just run to court".  Do you remember
18   him saying that?
19   A.   I believe that was in reference to the December 2020
20   letter, sir.
21   Q.   You sure?
22   A.   I can't say for certain.
23   Q.   In any event, when those letters came in December of 2021,
24   ASH didn't need to run to court because it had gone to court six
25   months earlier.  Isn't that true?
```

1    A.    Which letters, to be clear, are we referring to?

2    Q.    The ones in December of 2021.

3    A.    Mr. Erickson's resignation as CEO?

4    Q.    No, sir.

5    A.    Mr. Erickson terminating the LPA?

6    Q.    All the subsequent letters you went over -- yes.  The one

7    terminating the LPA in December of 2021.

8    A.    To be clear, the letters I remember we talked about were

9    the December 20 of Mr. Erickson resigning as CEO, resigning from

10   the board.  We went over those in great detail.

11   Q.    Okay.

12         The termination letter by him was December of 2020?

13   A.    The termination of the LPA was December 2021.

14   Q.    That's the one I am asking about.

15         You didn't run to court after that letter in December of

16   '21 because you had already sued him, right?

17   A.    Correct.  We did not go to court after that letter.

18   Q.    All right.

19         Now I am going to change topics.  I now want to talk about

20   this name change business.

21         You, or your company, complained that the South Carolina

22   and Atlanta companies did not change their names -- legally

23   change their names ten days after the Asset Purchase Agreement

24   was entered into.

25         Do I understand your contention correctly?

A.    Yes, sir.

Q.    All right.

But isn't it a fact that the Asset Purchase Agreement did
not require those two companies to change their names?

A.    The Asset Purchase Agreement says what it says.  I don't
have it in front of me.

Q.    Well, aren't you familiar with it?  As the lawyer
responsible for making assurance compliance with contracts, you
are not familiar with these provisions?

MR. KRAMER:  Objection.  Call for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question?

MR. SHEBELSKIE:  Well, let's just cut to the chase
here.  Let's pull the APA and look at it so the jurors can see.

It this is Plaintiffs' Exhibit 246.

THE COURT:  It's already been admitted?

MR. SHEBELSKIE:  Yes, sir.  Preadmitted.

We see on the screen Plaintiffs' Exhibit 246.  And I
would like to look at Section 6.8 of the Asset Purchase
Agreement, which is on page 46 of the document, I believe.

MR. SHEBELSKIE:  6.8.  Let's blow up 6.8 and highlight
that first sentence.

All right.  6.8 of the Asset Purchase Agreement
provides that:  As soon as practicable, but in any event within
10 business days after closing, seller will, and if applicable,

1    will cause each of its affiliates to amend the documents and

2    change the names.

3    BY MR. SHEBELSKIE:

4    Q.    Right?

5    A.    Yes, sir.

6    Q.    That capital A on affiliates means that affiliates is a

7    specially defined term in this contract, right?

8    A.    Yes, sir.

9    Q.    As a contracting lawyer you know that's how we lawyers do

10   that?

11   A.    Yes, sir.

12   Q.    So we need to look at the definition of affiliate, correct?

13   A.    Yes, sir.

14   Q.    Let's look at that now.  That will appear in Section 12.1A

15   of the contract, which is on page 62.

16        All right.  We have that page 62 of the agreement on the

17   screen now, Mr. Twiss.

18        Do you see that this part of the contract, Article 12,

19   contains definitions?

20   A.    Yes, sir.

21   Q.    All right.

22        And the very first definition provided in 12.1A is of

23   affiliate; correct?

24   A.    Yes, sir.

25   Q.    And here the contract says that an affiliate means:  With

```
 1   respect to any party, a person or party, which has overlapping

 2   or common ownership and is engaged in some aspect of the

 3   business.

 4        Right?

 5   A.   Yes, sir.

 6   Q.   All right.

 7        Now, business has a capital B, which means that's a

 8   specially defined term, right?

 9   A.   Yes, sir.

10   Q.   So let's see where we can find the contract's definition of

11   business to see what it means to be engaged in the business.

12        For that we need to look at Section 12.2 of the contract,

13   which is on page 68 -- this is a big contract.  At the bottom of

14   this page 66 we see Section 12.2 entitled:  Index of Other

15   Defined Terms.

16        Do you see that, Mr. Twiss?

17   A.   Yes, sir.

18             MR. SHEBELSKIE:  If we blow that up we can look at

19   where we are supposed to find these definitions.

20   BY MR. SHEBELSKIE:

21   Q.   You see the definition of business is found in the recitals

22   of the agreement, right?

23   A.   Yes.

24   Q.   And recitals are clauses that come at the very beginning of

25   the contract, right?
```

1    A.    That's correct.

2    Q.    So let's look at the very beginning of the contract and the

3    recitals to see what business means.

4              MR. SHEBELSKIE:  Let's go to page 1 of the agreement.

5    BY MR. SHEBELSKIE:

6    Q.    Here on page 1 we see the recitals and we see recital A.

7              MR. SHEBELSKIE:  Can we blow that up?

8    BY MR. SHEBELSKIE:

9    Q.    You see that the definition is the:  Business of

10   residential lot acquisition homebuilding and home sales in

11   Columbus, Georgia metropolitan area, plus some portions of

12   Alabama.

13        So this definition of business does not include the

14   portions of South Carolina, correct?

15   A.    Correct.

16   Q.    Or Dallas, Georgia, which is north of Atlanta, correct?

17   A.    Correct.

18   Q.    All right.

19        So that's the name change provision.

20        Now one other thing I wanted to ask you on this topic, you

21   were asked this morning about the Trademark Assignment

22   Agreement, and I think you said it was global worldwide?

23   A.    Yes, sir.

24   Q.    Let me ask you some questions about that.

25        For that I want to look at the Trademark Assignment

1    Agreement.  And that's Plaintiffs' Exhibit 246F.

2              MR. SHEBELSKIE:  And that was preadmitted, Your Honor.

3    BY MR. SHEBELSKIE:

4    Q.   Here is the Trademark Assignment Agreement.  And two points

5    I would like to make clear on this:  The South Carolina

6    corporation and the Atlanta corporation, that you have referred

7    to, aren't parties to this Trademark Assignment Agreement,

8    correct?

9    A.   Correct.

10   Q.   All right.

11        Now, to be fair, it does say at the bottom -- there is a

12   Schedule 1.  Do you see that?

13             MR. SHEBELSKIE:  I'm sorry.  It was the bottom of the

14   screen not bottom of the page.  Let's scroll back up to

15   Recital B.

16   BY MR. SHEBELSKIE:

17   Q.   So in addition to the assignment of the trademarks owned by

18   the other companies that are party to this agreement, it does

19   say the assignment does include anything else that's listed on

20   Schedule 1, correct?

21   A.   Correct.

22   Q.   All right.

23        So let's look at Schedule 1 to see if it lists the

24   trademarks of the South Carolina and Atlanta companies.

25             MR. SHEBELSKIE:  So could we scroll down to Schedule 1

1    and see what trademarks are listed there?  After the signature

2    pages.  There is Schedule 1.  Let's scroll to the top of that

3    page.  It's page 7 of the exhibit.  What trademarks are

4    listed -- wait.  Let's stop there.

5    BY MR. SHEBELSKIE:

6    Q.    Registered trademarks, none.

7          You know what a registered trademark is, don't you?

8    A.    Yes, sir.

9    Q.    What is that?

10   A.    Registered with the US Patent Office.

11   Q.    By the way, has ASH ever registered to the US Patent Office

12   Grayhawk's logo?

13   A.    I don't believe we have.

14   Q.    Have you even tried?

15   A.    I do not believe so.

16   Q.    It also says:  Common law trademarks.  And none of those

17   are assigned, too, correct?

18   A.    Correct.

19   Q.    All right.  That's the Trademark Assignment Agreement.

20         And then the last series of questions on this name

21   business.  You showed the jury three documents.  There were some

22   emails from a homebuyer in South Carolina who had a warranty

23   issue, a Yelp review from a South Carolina customer, and then

24   some emails from a homebuyer up in Dallas.

25         You remember those three documents?

1  A.    Yes, sir.

2  Q.    Did you contact any of those homebuyers, talk to them and

3  figure out what their complaint was?

4  A.    I did not.

5  Q.    Did you call and talk to them and see if, in fact, they

6  were confused in some way, confusing ASH-Grayhawk with those

7  other companies?

8  A.    I did not talk to them.  No.

9  Q.    Did you have someone else do it?

10 A.    We referred them back to Mr. Erickson who built their home.

11 Q.    I meant for purposes of this lawsuit, has anyone talked to

12 those people to see if they had actual confusion?

13 A.    We didn't talk to them, no.

14 Q.    Even if you didn't talk to those three homebuyers, has ASH

15 done any type of survey to find out whether any folks in

16 South Carolina or Atlanta, Dallas, or Columbus, have any

17 confusion about these names and logos?

18 A.    We did not.

19 Q.    All right.  Then that's that topic.

20      I now want to move to this topic about confidentiality and

21 such.

22      Now, as I understand it, part of this claim is that you

23 think Mr. Erickson breached confidentiality restrictions for

24 talking with three companies after he stepped down as

25 chairman -- CEO:  Prominence Homes, Miramonte and Surrey.

1          Do I have those three names right?

2     A.    That's correct.

3     Q.    And I heard you testify this morning to the jury that when

4     Mr. Erickson stepped down y'all weren't actually in talks with

5     those three companies.  You were focused on this acquisition of

6     the Dorn company.  Right?

7     A.    Correct.

8     Q.    But you told the jury that those three companies, even

9     though you weren't talking to them, were still a target.

10         Did I get that quote right?

11    A.    Open to opportunity.  Yes, sir.

12    Q.    Uh-huh.  So the Dorn transaction was over and done by the

13    end of January 2021?

14    A.    That's correct.

15    Q.    And now here in September of 2023 it's well over

16    two-and-a-half years later, right?

17    A.    That's correct.

18    Q.    In those two-and-a-half years since the Dorn transaction

19    was over, has ASH engaged in any negotiations with Prominence

20    Homes?

21    A.    We have not.

22    Q.    Or with Miramonte?

23    A.    We have not.

24    Q.    Or with Surrey?

25    A.    We have not.

```
 1   Q.   All right.
 2        Before Mr. Erickson talked to those three companies
 3   following his resignation, he told ASH he was going to talk to
 4   them, didn't he?
 5   A.   Before his resignation?
 6   Q.   No.  After his resignation.
 7   A.   I do believe we became aware at some point, yes.
 8   Q.   Do you know -- you mentioned yesterday in testimony about a
 9   broker called Tony Avala, correct?
10   A.   I know who he is.  Yes, sir.
11   Q.   Remind the jury what Mr. Avala is.  What does he broker?
12   A.   He helps sell homebuilders.
13   Q.   He brings home companies together to see if one would like
14   to sell to the other or buy the other?
15   A.   Correct.
16   Q.   So he is brokering acquisition transactions?
17   A.   Yes, sir.
18   Q.   And ASH had a contract with Mr. Avala's company, correct?
19   A.   At one point, yes, sir.
20   Q.   I would like to show you Defendants' Exhibit 12.
21        Mr. Avala's company is called Builder Adviser Group, right?
22   A.   That's correct.
23   Q.   Goes by the name BAG?
24   A.   Yes, sir.
25   Q.   What we have on the screen here is the contract between
```

1  American Southern Homes Holdings and Builder Adviser Group,

2  correct?

3  A.   That's correct.

4       MR. SHEBELSKIE:  Your Honor, I move for the admission

5  of Defendants' Exhibit 12.

6       THE COURT:  Any objection?

7       MR. KRAMER:  No, Your Honor.

8       THE COURT:  Admitted.

9       (DEFENDANTS EXHIBIT 12:  Received in evidence.)

10 BY MR. SHEBELSKIE:

11 Q.   Thank you.

12      So the jury now sees on the screen this contract between

13 American Southern Homes and Mr. Avala's brokerage Builder

14 Adviser Group, right?

15 A.   Yes, sir.

16 Q.   All right.

17      And do you know that after Mr. Erickson stepped down as the

18 CEO, and before talking to Prominence and Miramonte and Surrey,

19 Mr. Erickson told your agent, Mr. Avala, he was going to do

20 that?

21 A.   I am aware he did tell them.

22 Q.   And Mr. Avala told y'all?

23 A.   Don't recall the exact order, but I know we became aware.

24 Q.   From Mr. Avala?

25 A.   From Mr. Erickson himself.

 1    Q.   Oh, Mr. Erickson told you he was going to talk to these

 2    people?

 3    A.   I believe, as we just discussed.

 4    Q.   Let's look at Defendants' Exhibit 278.

 5         Do you have that on the screen, Mr. Twiss?

 6    A.   I do.

 7    Q.   Defendants' Exhibit 271 [sic] is two emails, do you see?

 8    One is from Mr. Erickson to Marshall and Sean Coleman on

 9    December 21st, 2020.  Right?

10    A.   Yes, sir.

11    Q.   And then Mr. Coleman forwards that email to you, correct?

12    A.   And Mr. Pehrkon.  Yes, sir.

13    Q.   To you and Mr. Pehrkon.  Right?

14         MR. SHEBELSKIE:  Your Honor, I move for the admission

15    of Defendants' Exhibit 278.

16         THE COURT:  Any objection?

17         MR. KRAMER:  No, Your Honor.

18         THE COURT:  Admitted.

19    (DEFENDANTS EXHIBIT 278:  Received in evidence.)

20    BY MR. SHEBELSKIE:

21    Q.   Now we see on the screen Exhibit 278.  We've got the two

22    emails highlighted.  We have the one from Mr. Erickson to

23    Marshall Coleman and Sean Coleman on December 20th, 2021.  And

24    then Mr. Coleman forwards it to you that very same day,

25    Mr. Twiss, to you and Mr. Pehrkon, correct?

1    A.    Yes, sir.

2    Q.    To be clear, Marshall Coleman, at this time he is the

3    chairman of the board of the holding company, right?

4    A.    That's correct.

5    Q.    He is the top official?

6    A.    He is the chairman.  Yes, sir.

7    Q.    All right.  And let's look at what -- this is sent by

8    Mr. Erickson.  Is that the day after he resigns, or the day of?

9    A.    I believe it's the day after.

10   Q.    The day after.

11        So the day after Mr. Erickson resigns he sends to the

12   chairman this letter and he discusses Miramonte, Prominence and

13   Surrey.  Correct?

14   A.    Yes, sir.

15   Q.    All right.

16        And let's look at what he says in paragraph 3 of this

17   letter on the non-disclosure agreement signed by ASH.

18        He says:  At this point I consider all of these deals to be

19   dormant and not exclusive to ASH.

20        Correct?

21   A.    That's his opinion.  Yes, sir.

22   Q.    All right.

23        When Mr. Erickson sent this letter to the chairman, and

24   that you as the general counsel received, did Mr. Coleman

25   respond to Mr. Erickson and say, You are wrong.  These deals are

1    not dormant.  They are exclusive to ASH and you can't talk to

2    them?

3    A.    We did not.

4    Q.    And to be clear, Mr. Coleman didn't do that, right?

5    A.    Correct.

6    Q.    His son, the investment banker, Sean Coleman, didn't do

7    that, right?

8    A.    Correct.

9    Q.    You, the general counsel of the company, didn't do that,

10   right?

11   A.    Corporate counsel at the time.  Yes, sir.

12   Q.    All right.

13         And Mr. Pehrkon, as the vice president of finance, didn't

14   do it?

15   A.    Correct.

16   Q.    Did anyone from ASH tell Mr. Erickson that he was wrong and

17   that he should not talk to those companies?

18   A.    We did not.

19   Q.    Since we are talking about these non-disclosure agreements,

20   you showed several of them to the jury yesterday -- I think it

21   was yesterday -- ASH does not treat the non-disclosure agreement

22   itself as confidential, does it?

23   A.    It was our document.  Yes, sir.

24   Q.    My question is, do you treat it as confidential?

25   A.    In the sense that we share it with parties to be signed,

1    yes, we do distribute to somebody.

2    Q.    You distribute these non-disclosure agreements to people

3    hoping they will sign it, but they have no obligation to sign

4    it?

5    A.    That would be correct.

6    Q.    And they can take the non-disclosure agreement you send

7    them, refuse to sign it, and do what they want with it?

8    A.    I suppose they could.

9    Q.    And, in fact, ASH sent one of these unsigned

10   non-confidential non-disclosure agreements to Mr. Erickson back

11   in 2019, didn't it?

12   A.    That's possible.  I was not part of the company at the

13   time.

14   Q.    Then we will let Mr. Erickson describe that.

15         And, you know -- now you are a lawyer, corporate lawyer, so

16   you have probably drafted non-disclosure agreements fairly

17   frequently, right?

18   A.    Yes, sir.

19   Q.    Who drafted the non-disclosure agreement at ASH that now

20   you are claiming is a confidential document?

21   A.    It would have been outside counsel before I got there.

22   Q.    Which outside counsel?

23   A.    I would assume someone at Bryan Cave Leighton.

24   Q.    The firm Mr. Kramer used to work at?

25   A.    That firm.  Yes, sir.

1    Q.    Where did that law firm get the confidential NDA document?

2    A.    I can't speak to that.

3    Q.    You used to work in a law firm, right?

4    A.    Yes, sir.

5    Q.    When you were in the law firm, did you ever draft contracts

6    and agreement?

7    A.    I did.

8    Q.    Did you always start from scratch or did you borrow forms

9    and use others as a starting point?

10    A.    I used other stuff we had done as a starting point.

11    Q.    Right.

12          And so this non-disclosure agreement, now that we have

13    learned was drafted by this outside law firm, do you know what

14    other forms or other documents they took to copy and create the

15    one you are now claiming to be your confidential document?

16    A.    I would not know.

17    Q.    And you do know that you could go on the Internet, right,

18    and find forms for non-disclosure agreements, correct?

19    A.    I do.

20    Q.    And, in fact, you know that on the Internet right now there

21    is a non-disclosure agreement that is virtually 100 percent a

22    carbon copy of the ASH one, correct?

23    A.    I know that's the contention.  I have never pulled it up

24    myself.

25    Q.    You know that your deposition was taken in this case about

 1   a year ago?

 2   A.    They showed me one, but I did not pull it and find it

 3   myself, so I don't know if it's still there or not.

 4   Q.    Let me make sure I understand your testimony.

 5         In your deposition, last October was it?

 6   A.    Yes, sir.

 7   Q.    Last October, almost a year ago, you were shown a

 8   non-disclosure agreement and it was represented to you that this

 9   could be found on the Internet, right?

10   A.    That is correct.

11   Q.    And you even were given the web address where it could be

12   found, right?

13   A.    I believe that was on the document, yes, sir.

14   Q.    Yeah.

15         And so you are telling the jury, having been told almost a

16   year ago that the supposedly confidential ASH document is out

17   there on the Internet, you didn't even bother to look at it over

18   the last year?

19   A.    I did not visit that website.  No, sir.

20   Q.    Well, just so we are clear about this, did you ask somebody

21   else to visit the website to see whether or not it's there?

22   A.    No, sir.

23   Q.    Did ASH take any steps to contact the person or the company

24   who put it on the website to figure out what the heck it's doing

25   there?

1    A.    No, sir.

2    Q.    So this document you want this jury to treat as your

3    confidential document you have been told is out there on the

4    Internet for a year and y'all have done nothing about it?

5    A.    The document online does not say "ASH," on it.

6    Q.    But the text of it is almost 100 percent the same, isn't

7    it?

8    A.    I remember there are similarities.  I would not say a

9    hundred percent.

10   Q.    We will get another witness to talk about that then.

11         Then I think maybe the last topic, Mr. Darnold -- I was

12   looking at the other outside.  Mr. Twiss, I apologize -- is this

13   Dorn deal.

14         You said that -- testified yesterday, that ASH had been

15   negotiating a transaction, buyout, with Dorn starting sometime

16   in the first half of 2020?

17   A.    Yes, sir.

18   Q.    Yeah.

19         And the wheels fell off those negotiations in September of

20   2020, right?

21   A.    Mr. Grounds did pull back from the LOI.  Yes, sir.

22   Q.    And on behalf of ASH, Mr. Benson was negotiating that

23   transaction at the time, right?

24   A.    Mr. Benson and Mr. Erickson, yes, sir.

25   Q.    All right.

1    And did you tell the jury yesterday that Mr. Erickson told

2    Mr. Benson that Mr. Grounds, at Dorn, didn't want to negotiate

3    any further?

4    A.    He said it was not about money to Mr. Grounds.  That

5    increasing the offer wouldn't have mattered.  It was family.  It

6    was personal.  So he was not going through with the sale of his

7    company.

8    Q.    The fact of the matter is that Mr. Benson pulled out of the

9    transaction because he didn't like Dorn?

10   A.    That's not my understanding at all.

11   Q.    Well, on that then let me show you Defendants' Exhibit 251.

12        MR. SHEBELSKIE:  I believe it's 251.  Let me check my

13   notebook.  No.  It's not 251.  I apologize, sir.

14        Defendants' Exhibit 214.

15   BY MR. SHEBELSKIE:

16   Q.    Now Exhibit 214, as you see on your screen, is an email

17   exchange between Mr. Grounds and Mr. Benson, correct?

18   A.    It appears to be.  Yes, sir.

19   Q.    On October 10th of 2020.

20   A.    I see that.

21   Q.    And I would like to direct your attention to the middle

22   email there from Mr. Benson to Mr. Grounds.  Do you see that?

23   A.    I see it.

24   Q.    And there Mr. Benson is talking to Mr. Grounds, right?

25   A.    He is.

1    Q.   At that point, the wheels have fallen off the transaction,

2    as you said, in September, right?

3    A.   Mr. Grounds had decided not to sell his company at that

4    time.  Yes.

5    Q.   Right.

6         And Mr. Benson told Mr. Grounds that he just didn't like

7    the company, right?

8              MR. KRAMER:  Objection, Your Honor.  Counsel misread.

9    It says:  I didn't just like the company.  I gained a lot of

10   perspective, too.

11             He said he did like the company.  That's misleading.

12             THE COURT:  The jury can read what it -- you haven't

13   admitted it yet?

14             MR. SHEBELSKIE:  I haven't admitted it yet, no.  I am

15   just asking --

16             MR. KRAMER:  Object on that basis as well.

17             MR. SHEBELSKIE:  I am just asking Mr. Benson whether

18   this document refreshes your recollection -- Mr. Twiss, whether

19   this document refreshes your recollection about Mr. Benson's

20   views of Dorn.

21             THE COURT:  Is there an objection to admitting the

22   document so the jury can see what he is stating?

23             MR. KRAMER:  No.  Let's let the jury see it,

24   Your Honor.

25             THE COURT:  All right.  Exhibit 214 is admitted.

1          (DEFENDANTS EXHIBIT 214:  Received in evidence.)

2              THE COURT:  Give them a moment to read the first

3    couple of lines so they can see what it says.

4          (Pause in proceedings.)

5              MR. SHEBELSKIE:  Ready?

6              THE COURT:  You may continue.

7    BY MR. SHEBELSKIE:

8    Q.   Let's walk through this chronologically.  Let's start at

9    the bottom of the email exchange.

10          Mr. Grounds is sending an email to Mr. Benson, correct?

11    A.   Yes, sir.

12    Q.   On October 10th, 2020, right?

13    A.   Yes, sir.

14    Q.   And he writes to Mr. Benson:  Thanks for taking a strong

15    look at Dorn Homes.

16          Right?

17    A.   Yes, sir.

18    Q.   And then he goes:  Even though our deal didn't come

19    together, I sincerely thank you and your team for making the

20    effort to work together.

21          Correct?

22    A.   Yes, sir.

23    Q.   So it wasn't just Mr. Erickson who told Mr. Benson that the

24    Dorn deal -- that Dorn didn't want to pursue it, right?

25    Mr. Dorn himself is acknowledging to Mr. Benson the deal is off,

1    right?

2    A.    After the fact.  Yes.

3    Q.    I just want to make clear, were you trying to suggest to

4    the jury that what Mr. Erickson told Mr. Benson wasn't true

5    about Dorn's desire not to negotiate further?

6    A.    Sorry.  Can you repeat the question?

7              MR. SHEBELSKIE:  Yeah.  Maybe that was too long.

8    BY MR. SHEBELSKIE:

9    Q.    I just want to make sure -- is it your contention that

10   Mr. Erickson misrepresented Dorn's views about not wanting to

11   negotiate further?

12   A.    No.  I have not contended that.

13   Q.    That's what I wanted to clarify, so thank you.

14         Then as you explained further, after Mr. Erickson became

15   CEO he got a new Letter of Intent which Dorn signed, correct?

16   A.    That's correct.

17   Q.    And the company, ASH, was certainly happy he did that,

18   right?

19   A.    Correct.

20   Q.    And the board members were very happy, right?

21   A.    That's correct.

22   Q.    And as you just testified, the board was so happy it

23   actually issued a Private Placement Memorandum to raise millions

24   of dollars to execute the transaction that Mr. Erickson brought

25   back to life?

```
 1    A.    That's correct.

 2    Q.    And then ultimately the board did approve that transaction,

 3    right?

 4    A.    At that January 22nd meeting.  Yes, sir.

 5    Q.    Right.

 6          As you said, a new Letter of Intent was signed, but the

 7    company, ASH, was free to renegotiate those terms if it thought

 8    the price was not good enough, right?

 9    A.    That's correct.

10    Q.    The Board of Directors didn't have to approve the

11    transaction if they thought the new deal was too expensive,

12    right?

13    A.    That's correct.

14    Q.    And, in fact, they approved the Dorn transaction on the

15    terms Mr. Erickson brought to the table in late January, right?

16    A.    January 22nd.  Yes, sir.

17    Q.    That was after Mr. Erickson had resigned as CEO?

18    A.    That's correct.

19    Q.    So the Board of Directors owed no favors to Dave Erickson

20    at that point, right?

21    A.    That's correct.

22    Q.    So on their own the Board thought this deal was a good deal

23    for the company?

24    A.    Yes, sir.

25    Q.    And since the Dorn transaction closed in January of 2020,
```

1  after Mr. Erickson left, has ASH Holdings successfully acquired

2  any other company?

3  A.   We have not closed on any transaction.  No.

4       MR. SHEBELSKIE:  That concludes my cross, Your Honor.

5       THE COURT:  Redirect?

6       MR. KRAMER:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8  BY MR. KRAMER:

9  Q.   Okay.  I know this has taken a long time, I just want to

10  straighten a few things out.

11       MR. KRAMER:  Could I have DX214, the document we were

12  just looking at, up on the screen?

13  BY MR. KRAMER:

14  Q.   I believe Mr. Shebelskie just showed you this and suggested

15  that it meant that Greg Benson didn't like the Dorn transaction.

16       Do you remember that?

17  A.   I do.

18  Q.   What did he actually say?

19  A.   He said:  I didn't just like the company.  I gained a lot

20  of perspective.

21       He loved the company.

22  Q.   How do you know that?

23  A.   Talked to him.  We closed the transaction with Mr. Benson

24  back in charge.

25  Q.   And Mr. Shebelskie was asking about if the Board was happy

Redirect Examination – Ryan Twiss

1    that the Dorn transaction was negotiated and then complimented

2    Mr. Erickson.

3         Do you recall that?

4    A.    I do.

5    Q.    Was the board happy when he quit on December 20, 2020?

6    A.    They were not.

7    Q.    Was the board happy that the management team had to finish

8    doing that without his leadership?

9    A.    They were not.

10   Q.    Mr. Shebelskie also said that Mr. Benson was fired when

11   Mr. Erickson took over.

12        Do you remember that?

13   A.    I do.

14   Q.    Okay.

15        Was Mr. Benson fired as a consultant to ASH when the Board

16   took over?

17   A.    He was actually just removed as CEO.

18   Q.    Okay.

19        So he wasn't fired then?

20   A.    He wasn't fired.

21   Q.    Was he later fired?

22   A.    He was later -- Mr. Erickson terminated the consulting

23   agreement.

24   Q.    Who fired Mr. Benson after Mr. Erickson took over?

25   A.    Mr. Erickson.

Redirect Examination – Ryan Twiss

1    Q.    You were also asked some questions about Marshall Coleman.

2    I think the phrase connected to him was something about a

3    merchant bank.

4          Do you remember that?

5    A.    I do.

6    Q.    What's Mr. Coleman's background?

7    A.    He was the Attorney General for Virginia.  He was -- he is

8    a lawyer.  He was general counsel for NVR.  He was in the

9    military.  He's done a lot of things.

10   Q.    Was he ever the Republican candidate for governor in the

11   State of Virginia?

12   A.    He was.

13   Q.    How many times?

14   A.    Twice.

15   Q.    So he's not just a merchant banker?

16              THE COURT:  General counsel for who?  NPR.

17              THE WITNESS:  NVR.  Sorry, Your Honor.

18              THE COURT:  NVR.

19   BY MR. KRAMER:

20   Q.    NVR.  What is NVR?

21   A.    They are a homebuilding company.

22   Q.    Oh, that's right.  Mr. Shebelskie suggested he is not a

23   homebuilder.

24          Do you remember that?

25   A.    I do.

Redirect Examination - Ryan Twiss

1   Q.   What did Mr. Coleman do with NVR?

2   A.   He was general counsel.

3   Q.   Is NVR a big company?

4   A.   They were one of the biggest homebuilders.

5   Q.   Are they a public company?

6   A.   They are.

7   Q.   Has Mr. Coleman taken other companies public?

8   A.   He has.

9   Q.   Other homebuilding companies?

10  A.   He has.

11  Q.   How old is he now?

12  A.   I believe him to be in his 80's.

13  Q.   How is he doing health wise?

14  A.   He is recovering.  He had a very tragic accident and broke

15  his neck.

16  Q.   When Mr. Erickson was negotiating his -- or trying to

17  negotiate his salary as the interim CEO, or the permanent CEO of

18  ASH, did he talk directly to Mr. Coleman?

19  A.   He spoke mostly with Mr. Sean Coleman.

20  Q.   Okay.

21       Does Sean Coleman work with his father?

22  A.   He does.

23  Q.   That's Marshall Coleman's son; correct?

24  A.   Yes.

25  Q.   And does he work with Mr. Marshall Coleman on Commonwealth

Redirect Examination - Ryan Twiss

1    Principles?

2    A.    He does.

3    Q.    Mr. Coleman, you said, was the chairman of ASH, which I

4    think the phrase was the "top official".  Right?

5    A.    That's correct.

6    Q.    Again, what does the chairman of the board actually do?

7    What's the authority?

8    A.    He presides over the Board meetings.  He calls the meetings

9    to order and he dismisses the meeting.

10   Q.    Can he make decisions for the company?

11   A.    He cannot.

12   Q.    Okay.

13        What has to happen to make a decision for the company?

14   A.    The Board has to authorize it.

15   Q.    Was he in his 80's when Mr. Erickson was calling him up and

16   asking -- talking to him about potentially acquiring other

17   builders?

18   A.    I do believe so.

19   Q.    Had he had any health problems around that time?

20   A.    I believe he was in the hospital.  I think he was

21   recovering from a surgery at some point -- knee or hip.

22   Something like that.

23   Q.    Had he -- I am not --

24        Okay.  Let's go back to the order of Phase C lot

25   development.

1    Now, that first year in the timeline I think you said that

2    ASH needed some information from Mr. Erickson, right?

3    A.    That's correct.

4    Q.    Okay.  What type of information was ASH waiting for?

5    A.    Mr. Erickson to propose a schedule.  Mr. Erickson to

6    provide the development status.  He had started developing lots

7    already.  Mr. Erickson's big contention at the time was trying

8    to take lots away from ASH, and for the benefit of his own

9    pocket he wanted a conservation easement.  He didn't want to

10   give us the lots we had purchased or signed up to buy.

11   Q.    What do you mean a conservation easement?  What's that?

12   A.    It would allow Mr. Erickson to take the lots he was

13   supposed to sell ASH, give them to a conservation easement,

14   which means no one could ever build on them or develop them, and

15   he would get a tax write-off for it.

16   Q.    Personal tax write-off?

17   A.    Personal tax write-off.

18   Q.    Actually we don't know what kind of tax write-off, do we?

19   A.    I believe it was for him personally.  It was part of a lot

20   of things Mr. Erickson sent to us.

21   Q.    Did he offer to replace the lots that he wanted to donate

22   to get a tax write-off?

23   A.    We asked him to.  He would never commit to doing that.  He

24   would never do it.

25   Q.    Now, I don't want to retread ground, but remember the LPA

 1  committee sent that letter to Mr. Erickson in November of 2020?

 2  A.   I do.

 3  Q.   He was the CEO at that time, right?

 4  A.   Yes, sir.

 5  Q.   Do you recall him responding and saying:  I have this under

 6  control?

 7  A.   I do.

 8  Q.   Okay.

 9       Was it under control?

10  A.   It was not.

11  Q.   Did anything happen after that?

12  A.   It did not.

13  Q.   Did Mr. Shebelskie show you anything that Mr. Erickson did

14  to provide the information you needed between when Mr. Erickson

15  said he had it under control and March 2021?

16           MR. SHEBELSKIE:  Your Honor, I object to that.  I

17  attempted to show the witness and he objected to the admission

18  of the document.

19           THE COURT:  That happened so long ago I don't

20  remember.

21           Go ahead and ask the question again.

22           MR. KRAMER:  Can we just show the witness -- well, can

23  we just show the witness DX260?

24           THE COURT:  DX260?

25           MR. KRAMER:  Uh huh.

1          THE COURT:  Somebody -- has this not been admitted or

2    it has been?

3          MR. KRAMER:  It has not been admitted.

4          I will offer DX260, despite my prior objections, so

5    the jury can see it.

6          MR. SHEBELSKIE:  Oh, admit it.  Please.

7          THE COURT:  Any objection?

8          MR. SHEBELSKIE:  No, sir.

9          THE COURT:  All right.  It's admitted.

10         (PLAINTIFFS EXHIBIT DX260:  Received in evidence.)

11   BY MR. KRAMER:

12   Q.    This is an email from Mr. McClure.  Who is he?

13   A.    He was Mr. Erickson's development assistant person.

14   Q.    Okay.

15         And it says:  Attached is a PDF with all invoices paid by

16   Tiger Creek Development since September 1, 2019 for Section 17

17   of Garrett Pines.

18         Do you see that?

19   A.    I do.

20   Q.    So what's going on here?

21   A.    Mr. Erickson had presented the Garrett Pines Section 17, so

22   those are 42 Phase C lots that ASH has now purchased.

23         He was asking for to us commit under the procedures of the

24   LPA to a price on the lots.  And part of that is he had to show

25   us a backup for the development cost.  So he is simply sending

1    the invoices for those lots.

2    Q.    So how many lots are we talking about here, roughly?

3    A.    42.

4    Q.    42?

5          Okay.  Are there any lots referenced in this email?

6    A.    He references the second phase of Garrett Pines, but they

7    weren't even under development at the time.

8              MR. KRAMER:  Let's scroll through this document

9    slowly, and we will all take a look at what Mr. Erickson sent.

10             All right.  Second page.

11   BY MR. KRAMER:

12   Q.    That's a receipt, right?

13   A.    Yes, sir.

14   Q.    Next page.  Another receipt?

15   A.    Yes, sir.

16             MR. KRAMER:  Keep going.  Next page.

17             Let's just keep scrolling.

18   BY MR. KRAMER:

19   Q.    Mr. Twiss, tell me when you see something that's not a

20   receipt or an invoice.

21        (Pause in proceedings.)

22             MR. KRAMER:  Maybe we can speed it up and go all the

23   way to the end here.  Well, let's keep scrolling, but I think we

24   have got the point.

25             Sorry.  This would be faster if we had a paper copy.

1  BY MR. KRAMER:

2  Q.   While we are scrolling here, Mr. Twiss, did you see several

3  hundred thousand dollars in invoices from Eddie Brown Grading?

4  A.   Yes, sir.

5  Q.   What kind of company is that?

6  A.   It's a development company owned, in part, by Mr. Erickson.

7  Q.   Were these receipts being submitted for reimbursement as

8  part of the development costs?

9  A.   They would have been paid as part of the lot price.  Yes,

10  sir.

11  Q.   Does that mean he would effectively be paid twice?

12  A.   Correct.

13         MR. KRAMER:  Is that the end?  I think we are at the

14  end.

15  BY MR. KRAMER:

16  Q.   So what does this have to do the order of Phase C lot

17  development?

18  A.   Nothing.

19  Q.   Is there a proposal in here?

20  A.   There is not.

21  Q.   Okay.

22       You said -- we looked at -- when we were looking at DX307,

23  you said there was a proposal related to reduction 300 to 350

24  basis points on the profit that ASH was earning.

25       Do you remember that?  We were comparing the profitability

Redirect Examination - Ryan Twiss

1   of Stone Ridge and Grayhawk.

2   A.   Yes.

3   Q.   And Mr. Pehrkon said it will normalize by about 300 to 350

4   basis points, right?

5   A.   Yes, sir.

6   Q.   So what -- how do we translate basis points to percentage?

7   A.   A hundred basis points is one percent.

8   Q.   So we are talking 3 to 3 1/2 percent?

9   A.   Yes, sir.

10  Q.   What's the general margin that ASH earns on the sale of a

11  house?

12  A.   At that time it was probably around 19 to 20 percent.

13  Q.   So that's a relatively minor decrease, right?

14  A.   We expected it.  We weren't surprised.  It wasn't a cause

15  for alarm.

16  Q.   If that prediction were to come true, ASH would still be

17  earning profits, right?

18  A.   We would be very happy.

19  Q.   You were asked about the January 22nd special meeting of

20  the ASH Board of Directors.

21       Do you remember that?

22  A.   I do.

23  Q.   Okay.

24       Did you attend that meeting?

25  A.   I did.

Redirect Examination - Ryan Twiss

1    Q.   Were other members of the Board there?

2    A.   Yes, sir.

3    Q.   Did Mr. Coleman preside?

4    A.   He did.

5    Q.   At that meeting was there a scheme hatched to accuse Mr.

6    Erickson of wrongdoing, to browbeat him into renegotiating the

7    LPA?

8    A.   No, sir.

9    Q.   Who proposed renegotiating the LPA?

10   A.   Mr. Erickson.

11   Q.   Who proposed appointing a development manager so

12   Mr. Erickson wouldn't have to develop anymore?

13   A.   Mr. Erickson.

14   Q.   All right.  I guess that was step one.

15        Step two was the letter that was sent to Mr. Erickson I

16   believe during Mr. Shebelskie's cross.

17        Do you recall that?

18   A.   I do.

19   Q.   Was that part of a conspiracy to browbeat Mr. Erickson?

20   A.   No, sir.

21   Q.   Okay.

22        Did that letter raise confidentiality concerns?

23   A.   It did.

24   Q.   Did that letter raise issues having to do with Dorn Homes?

25   A.   I believe it did.  Yes, sir.

1   Q.   And at that point was ASH aware that Mr. Erickson had

2   attempted to acquire Prominence Homes?

3   A.   Yes, sir.

4   Q.   At that point was ASH aware that Mr. Erickson had tried to

5   recruit away Mr. Darnold?

6   A.   Yes, sir.

7   Q.   Was the purpose of that letter to browbeat Mr. Erickson?

8   A.   It's never been the purpose, no, sir.

9   Q.   What was the purpose?

10  A.   The purpose was to find a resolution.  Mr. Erickson had

11  raised his own litany of complaints and was asking for things

12  from the company, and we were trying to appease him and get back

13  to business.

14  Q.   Okay.

15           MR. KRAMER:  Let's go to the term sheets.  In

16  particular I want to go to Defense Exhibit 328.  This is the one

17  Mr. Shebelskie showed you.  This is the cover -- let's go to the

18  third page.

19  BY MR. KRAMER:

20  Q.   Okay.  Do you see at the top it says:  Nothing is agreed

21  until everything is agreed?

22  A.   I do.

23  Q.   What does that mean?

24  A.   It was dealing with the global settlement of all our

25  issues, including Mr. Erickson's.

Redirect Examination - Ryan Twiss

1   Q.   What's a global settlement?

2   A.   It's resolving everything at issue between the parties.  So

3   things that aren't even here today were being discussed.

4   Q.   Had Mr. Erickson raised concerns?

5   A.   He had.

6   Q.   Had ASH raised concerns?

7   A.   We had.

8   Q.   Were there a number of different negotiation points to

9   resolve?

10   A.   Many.

11   Q.   Okay.

12        A little bit further down -- this is ASH's proposal,

13   correct?

14   A.   Yes.

15   Q.   Okay.

16        MR. KRAMER:  A little bit further down, there it is,

17   under lot purchase agreement.  Right there.

18   BY MR. KRAMER:

19   Q.   It says:  Parties to negotiate and memorialize a

20   development schedule for remaining Phase C lots.

21        Do you see that?

22   A.   I do.

23   Q.   Okay.  Let's take a look at Mr. Erickson's response.

24        MR. KRAMER:  How about DX333.  Can I have the second

25   page?  There we go.  If we blow it up right here.

Redirect Examination - Ryan Twiss

1    BY MR. KRAMER:

2    Q.    So what did -- does this version contain Mr. Erickson's

3    response to ASH's proposal?

4    A.    To our proposal, yes.

5    Q.    Okay.

6          What's ASH offering to do here in Item 1A?

7    A.    We are offering to do a new whole new LPA at Mr. Erickson's

8    request.

9    Q.    Did he give a reason for that request?

10   A.    He was unhappy with what he had struck.

11   Q.    In what way?

12   A.    He wanted more commitments from ASH than were required

13   under the agreement.

14   Q.    Can you give me an example?

15   A.    The pricing formula under the LPA allowed Mr. Erickson to

16   develop lots.  If the price exceeded, we didn't have to buy the

17   lot and Mr. Erickson would be stuck holding land that he

18   couldn't sell to us.  He did not like that.  He wanted us to

19   agree before we ever got into everything that we would buy every

20   lot he developed whether we knew the price or not.  So this was

21   a way to get past that and come up with a new solution.

22              MR. KRAMER:  Your Honor, I apologize.  I got ahead of

23   myself.  I need to offer Defense Exhibit 333 into evidence.

24              MR. SHEBELSKIE:  No objection.

25              MR. KRAMER:  I guess over my own objection.

Redirect Examination - Ryan Twiss

1          THE COURT:  D333?

2          MR. KRAMER:  Yes, sir.

3          THE COURT:  Admitted.

4      (PLAINTIFFS EXHIBIT D333:  Received in evidence.)

5          MR. KRAMER:  Can we go to the next page?  One more.

6   BY MR. KRAMER:

7   Q.   Okay.  Let me make one thing -- let me ask you one very

8   important question:  Did ASH make agreement on the Phase C lot

9   development order contingent on Mr. Erickson agreeing on

10  anything else?

11  A.   No, sir.

12  Q.   What does it say right here in Mr. Erickson's response to

13  ASH's proposal for the parties to negotiate and memorialize a

14  development schedule for remaining Phase C lots?

15  A.   Mr. Erickson's response was:  Agreed in principle.  Subject

16  to resolution of other points.

17  Q.   All right.

18       And there is a little footnote at the end of ASH's

19  proposal, right?  Footnote 2?

20  A.   Yes, sir.

21          MR. KRAMER:  Can we blow up Footnote 2 at the bottom?

22          All right.

23  BY MR. KRAMER:

24  Q.   This is an ASH NTD.  What's an NTD?

25  A.   Note to draft.

Redirect Examination - Ryan Twiss

1  Q.   What's that?

2  A.   It's a legal term.  Just meaning a note to the draft for

3  the next person to read.

4  Q.   Okay.

5       So what does ASH write here?

6  A.   We wrote:  LPA creates two-way obligation to agree on

7  development order, which is not, and should not, be contingent

8  on agreement to other terms, including LPA changes.  ASH

9  requests a response to its March 18 proposal.

10  Q.   Did ASH ever change that position?

11  A.   We did not.

12  Q.   Mr. Erickson's response:  Erickson is willing to provide a

13  response as the negotiations progress, but does not plan to

14  reach an interim agreement on schedule without an agreement on

15  other points.  As ASH has stated repeatedly, nothing is agreed

16  until everything is agreed.

17       Who refused to agree?

18  A.   Mr. Erickson.

19  Q.   Did you subsequently ask him to agree to the March 18

20  proposal that you made for the entire order of Phase C lot

21  development?

22  A.   We did.

23  Q.   And do you remember that being discussed at the -- well

24  before we get there.

25            MR. KRAMER:  Let's go to Defense Exhibit 338.  Last

Redirect Examination - Ryan Twiss

1    page of the document.

2    BY MR. KRAMER:

3    Q.    Remember you were shown this on cross-examination?

4    A.    Yes, sir.

5    Q.    I don't think you got a chance to explain.  What's going on

6    here?  Is this a different proposed order of Phase C lot

7    development on May 28, 2021?

8    A.    It's not -- it's a whole new LPA.  It's a subsection of

9    what Mr. Erickson had already basically developed, or was almost

10   finished with developing.  Actually at this time I think most of

11   it should have been developed completely already.  And it was a

12   whole new negotiation.

13        You will see we talk about here proposed takedown

14   obligations.  So that's going to eight lots per community per

15   quarter, versus -- we had only been obligated to have 15 lots in

16   a quarter from Phase C.  So we were increasing our obligations.

17        Here we are actually increasing the deposit, trying to get

18   Erickson more money to offset his development costs.  We were

19   trying to get to an agreement.  We were trying to get creative.

20   We were trying to come up with new ways to get Mr. Erickson

21   money and get lots from him.  All we wanted was the lots.

22   Q.    Did ASH have money to buy the lots?

23   A.    We did.

24   Q.    Was there any issue with affording the lots?

25   A.    There was not.

1          MR. KRAMER:  Let's go to DX340, which you were shown

2    on cross.

3    BY MR. KRAMER:

4    Q.   This is a June 1st, 2021 email from Mr. Quackenboss, right?

5    A.   Yes, sir.

6    Q.   And what does he say here?

7    A.   Jake, see attached set of proposal for resolution on all

8    issues.

9    Q.   All right.

10         MR. KRAMER:  Defendants offer DX340, if it hasn't

11   already been admitted.

12         MR. SHEBELSKIE:  I think you mean plaintiffs.

13         MR. KRAMER:  Plaintiffs.

14         MR. SHEBELSKIE:  No objection.

15         THE COURT:  Is it plaintiffs or defendants' 340?

16         MR. KRAMER:  It's Defendants' 340.  That's what got me

17   twisted.  Thank you.

18         THE COURT:  Admitted.

19     (PLAINTIFFS EXHIBIT DX340:  Received in evidence.)

20   BY MR. KRAMER:

21   Q.   So this is a proposal from to ASH, right?

22   A.   Yes, sir.

23         MR. KRAMER:  Let's go to the term sheet.

24   BY MR. KRAMER:

25   Q.   What is the first bullet point in this proposal?

1   A.   Nothing is agreed until everything is agreed, including the

2   terms of a settlement agreement with mutual general release of

3   claims.

4   Q.   Again, that's coming from Mr. Erickson?

5   A.   Yes, sir.

6   Q.   All right.

7        What's the second bullet point?

8   A.   The parties will negotiate and agree to an amended and

9   restated LPA in connection with any agreement.

10  Q.   And who wanted to do that?

11  A.   Mr. Erickson.

12  Q.   Was ASH concerned about living with the terms of the LPA?

13  A.   No.  We actually offered Mr. Erickson to just go back to

14  the LPA.

15  Q.   And what did he say?

16  A.   No.  He wanted to renegotiate.

17  Q.   Why was -- what was -- was there any issue with obtaining

18  lots from Mr. Erickson at this point?

19  A.   There was.

20  Q.   What was the issue?

21  A.   He was holding the lots from us.  He was not willing to

22  sell us lots unless we bought his shares back in the company.

23  Q.   Bought his shares back in the company?

24  A.   That's correct.

25  Q.   Okay.  Let's talk about that.

1      The second section here is entitled:  Buyout.

2          MR. KRAMER:  Why don't we pull that up?

3  BY MR. KRAMER:

4  Q.   What is Mr. Erickson proposing here?

5  A.   He is proposing that we buy back his shares at $340 per

6  unit.

7  Q.   Wow.  How much were they worth when he got them?

8  A.   This is -- so when he got them they were worth a thousand.

9  We had this ten-to-one stock split, so he owns more units, they

10  have a lower value.  So comparably these would have been a

11  thousand and thirty-four hundred.

12      In this case they were a hundred dollars when he got them,

13  and now he is saying they are worth $340.

14  Q.   So if we are comparing apples to apples values, they were a

15  hundred dollars a unit when he got them, and now he is asking

16  for $340, right?

17  A.   That's correct.

18  Q.   How much time had passed?

19  A.   Not even two years.

20  Q.   So that's a 340-percent return?

21  A.   Yes, sir.

22  Q.   Okay.

23      What was the most recent valuation of the shares at this

24  point?

25  A.   $140.

Redirect Examination - Ryan Twiss

1   Q.    Do you have any idea where this very large number came

2   from?

3   A.    I don't.

4   Q.    Had ASH shared and disclosed to Mr. Erickson that it had a

5   Letter of Intent with a SPAC at this point?

6   A.    We did.

7   Q.    Did you regard that as -- we are talking June 2021 now, or

8   June 2021.  Did you regard the SPAC as a realistic possibility

9   for the company at that point?

10  A.    No.  And we told Mr. Erickson that.

11  Q.    What was the reason that you didn't regard it as a

12  realistic possibilty?

13  A.    It wasn't serious.  We weren't ready.  Mr. Erickson wasn't

14  selling us lots.  We didn't have the pipeline needed for

15  somebody to even consider us.  The LOI had strings attached to

16  it.  We had to take several steps that weren't going to come to

17  fruition in time.  They had multiple LOIs with several different

18  parties.  We were just one.  And, in fact, they hadn't even

19  talked to us in six months.

20  Q.    Six months?

21  A.    I believe that's about the timeframe.

22  Q.    Did that SPAC subsequently do a deal with a different

23  company?

24  A.    They did.  They went into hangar space.

25  Q.    Do you recall roughly how long that was after June 2021?

Redirect Examination - Ryan Twiss

1   A.   I don't.  They had a time commitment where they had to buy

2   someone before they lost their funding.  I want to say it was

3   later that year.

4   Q.   As far as you were concerned, they had already moved on

5   from ASH?

6   A.   Correct.

7   Q.   Did you try to tell Mr. Erickson that?

8   A.   We did.

9   Q.   What did he ask for?

10  A.   $340 per share.

11  Q.   Has ASH considered seriously a SPAC transaction since then?

12  A.   No, sir.

13  Q.   Why not?

14  A.   We know we are not ready.

15  Q.   What does that mean?

16  A.   It means, one, we are in this discussion -- this litigation

17  with Mr. Erickson, which has desimated our business.  No one is

18  interested in buying us.  We have no ability to go public.  We

19  don't have a stable business in one-third of our company.

20  Q.   We already talked during your direct about all the money

21  that ASH paid Mr. Erickson for his business.  How much was he

22  asking to be paid here, in total, in the second sub bullet?

23  A.   $30,501,940.

24          MR. KRAMER:  Let's go to DX344.

25

1    BY MR. KRAMER:

2    Q.   This is a June 2nd, 2021 email from me, right?

3    A.   Yes, sir.

4    Q.   Okay.

5         And when did this email go out?

6    A.   5:17 PM on June 2nd.

7    Q.   What happened that day?

8    A.   We had a settlement negotiation at Mr. Quackenboss' office

9    in DC.

10   Q.   What happened after ASH informed Mr. Erickson that it

11   wouldn't pay him $340 a unit to buy out his shares?

12   A.   He left and stopped negotiating.

13   Q.   Did you stay to negotiate with his lawyers?

14   A.   I did.

15   Q.   But Mr. Erickson never came back?

16   A.   Correct.

17   Q.   Did he seem angry when he left?

18   A.   He did.

19            MR. KRAMER:  Let's look at the term sheet that's

20   attached.

21   BY MR. KRAMER:

22   Q.   Do you see key terms for -- what is this?

23        Was this term sheet proposed unilaterally by ASH?

24   A.   No, sir.

25   Q.   Where did this come from?

Redirect Examination – Ryan Twiss

1    A.    This was a result of our discussions that day.

2    Q.    With whom?

3    A.    Mr. Erickson and Mr. Quackenboss.

4    Q.    And were those discussions before or after Mr. Erickson

5    took off?

6    A.    Both.

7    Q.    Okay.

8          So what was -- what were you trying to do here in putting

9    this term sheet together?

10   A.    We had felt we were pretty close at different points during

11   the day, so we were still trying to drive towards a resolution

12   with Mr. Erickson where we could appease him and get back to

13   just business.

14   Q.    You have -- how long have you been working as a corporate

15   counsel, general counsel, for ASH now?

16   A.    Little over -- well over three years.  Three-and-a-half

17   years.

18   Q.    Have you settled disputes on behalf of the company?

19   A.    I have.

20   Q.    Have you ever tried harder to settle a dispute than you

21   have with Mr. Erickson?

22   A.    No, sir.

23   Q.    Is it even close?

24   A.    No, sir.

25          MR. KRAMER:  If we scroll down.

1  BY MR. KRAMER:

2  Q.   What are the highlighted parts, if you can recall?  Are

3  those open items?

4  A.   Open items.

5  Q.   Okay.

6       MR. KRAMER:  Let's go to 3A.

7  BY MR. KRAMER:

8  Q.   It says:  Parties to finalize a development schedule for

9  reaching Phase C lots reconciling Erickson proposal with ASH

10 Waterfall.

11      Do you see that?

12 A.   I do.

13 Q.   Does that mean that there was no agreement in principle on

14 the order of Phase C lot development that day?

15 A.   It does not.

16 Q.   Explain, please.

17 A.   When it came up, Mr. Erickson was fine with the March 18th

18 proposal.  He didn't really seem concerned about the order.  He

19 didn't want to talk about it.  He was fine with whatever.

20      His only concern was getting more from ASH, including the

21 buyout.  That was his big button.

22 Q.   What's the Waterfall and what's the Erickson proposal?

23 A.   The Erickson proposal and the Waterfall, that's going back

24 to buying more land from Mr. Erickson.  Instead of just a

25 15-per-quarter obligation out of a pool of lots, we were trying

Redirect Examination – Ryan Twiss

1   to come up with a way to give him more money.  We were trying to

2   buy lots quicker, faster.  So we would have gone and looked at

3   it neighborhood by neighborhood and said, we will have an

4   obligation in this neighborhood once it's active of this.  And

5   we will have -- we were trying to look at our own absorption to

6   tell him, This is how fast we will buy a neighborhood versus the

7   overall order.

8   Q.   What does "absorption" mean?

9   A.   Just how many homes sell in that neighborhood.

10  Q.   Okay.

11          MR. KRAMER:  Let's take a look at 3C.

12  BY MR. KRAMER:

13  Q.   You see here it says:  Lots that are partially developed as

14  of May 31st, 2021, shall be completed by Erickson.

15          Do you see that?

16  A.   I do.

17  Q.   What lots are we talking about here?

18  A.   Those would have been those Phase C lots that he had given

19  the development status on.

20  Q.   Those were the ones almost ready at that point, right?

21  A.   That's correct.

22  Q.   And did he finish them between that point and today?

23  A.   He has not.

24  Q.   So what was the proposal here as to the lots that were

25  almost finished?

1   A.   He was going to finish developing them.

2   Q.   Okay.

3        What about the rest of the Phase C lots?  What was the

4   proposal as to the rest of the Phase C lots?

5   A.   We were going to take on development.

6   Q.   ASH was going to take it over?

7   A.   Begrudgingly.

8   Q.   Okay.  Why do you say begrudgingly?

9   A.   We didn't want to.  We would prefer Mr. Erickson to have

10  developed them for us.  Again, we were trying to be creative and

11  come up with a way to get back to business.

12        MR. KRAMER:  Let's go down to F.  Few perhaps down.

13  Actually E and F.

14  BY MR. KRAMER:

15  Q.   E says:  For all other unfinished lots, ASH will appoint a

16  development manager to oversee the development of lots.

17       Is that what you were just describing?

18  A.   Yes, sir.

19  Q.   What's a development manager?

20  A.   It would be someone who would be in the field watching the

21  dirt be moved and developed and making sure people were showing

22  up and doing what they were supposed to be doing.

23  Q.   Was ASH in the development business at this point?

24  A.   We were not.

25  Q.   Who promised to develop these lots?

1    A.    Mr. Erickson.

2    Q.    F:  To provide certainty and avoid disputes over a

3    satisfaction of LPA standards, ASH will take down all lots

4    developed at its direction.  As a result, the ROFO process is no

5    longer necessary for C lots.

6          What was the agreement here?

7    A.    We would buy the lots that we developed.  At this time we

8    had had some engineers go out and do surveys of Mr. Erickson's

9    lots.  He was not developing them to the standards of the

10   contract.  That's what the report showed.  He disagreed with the

11   report so we were trying to get away from more disputes with

12   Mr. Erickson in saying we will take on development.  We will buy

13   the lots that we have developed.  There won't be disputes over

14   it.

15   Q.    So how many unfinished lots are we talking about here?  Is

16   it close to a thousand?

17   A.    I think the unfinished lots would have been a subset of

18   that thousand.  I would say there is maybe 250 that he was

19   working on developing, and the balance would be unfinished.

20   Q.    Okay.

21         And then negotiations broke down after that, correct?

22   A.    Yes, sir.

23   Q.    In your view, what was the issue that caused the

24   negotiations to break down?

25   A.    We would not buy Mr. Erickson's shares at $340 per unit.

Redirect Examination - Ryan Twiss

1              MR. KRAMER:  We can take that down.

2    BY MR. KRAMER:

3    Q.    After this meeting, you were asked on cross, did ASH file a

4    lawsuit two weeks later.

5          Do you remember that?

6    A.    Yes.

7    Q.    That's true, right?  That happened?

8    A.    Yes, sir.

9    Q.    Okay.  What's a standstill agreement?

10   A.    It's basically an agreement not to pursue something

11   further.

12   Q.    Okay.

13         Had ASH and Mr. Erickson entered into a standstill

14   agreement to avoid suing each other in the run-up to this

15   meeting?

16   A.    We had.

17   Q.    Did we try -- did ASH try to extend that standstill

18   agreement after the meeting?

19   A.    We did.

20   Q.    What was Mr. Erickson's response?

21   A.    No.  Sue me.

22   Q.    So was ASH concerned that Mr. Erickson might sue ASH?

23   A.    Actually we were.  We were very concerned.  And we proposed

24   extending the standstill agreement for that reason, so it wasn't

25   a race to the courthouse between the parties.

Redirect Examination - Ryan Twiss

1   Q.   Did Mr. Erickson agree?

2   A.   He did not.

3   Q.   You were asked about letters in December of 2021 that I

4   showed in my opening statement, and I said:  ASH didn't run to

5   court.  Right?  Do you remember that?

6   A.   I do.

7   Q.   And Mr. Shebelskie pointed out that ASH had already sued

8   Mr. Erickson at that point, right?

9   A.   Correct.

10        MR. KRAMER:  Your Honor, I am about to go into an area

11  that is subject to an in-limine ruling.  I think the door has

12  been opened, but I would be happy to address it at sidebar.

13        THE COURT:  Go ahead and ask him the question.  I

14  think the door has been opened, but if it has not been, they can

15  raise an objection.

16  BY MR. KRAMER:

17  Q.   For what reason would ASH have run to court after

18  Mr. Erickson flat-out refused to sell any Phase C lots at the

19  end of December 2021?

20  A.   We wanted a preliminary injunction against Mr. Erickson

21  forcing him to sell us lots.

22  Q.   What is a preliminary injunction?

23  A.   It's an order by the Court that would require Mr. Erickson

24  to comply with the contract and sell the lots he owed us.

25  Q.   Did ASH seek a preliminary injunction?

Redirect Examination - Ryan Twiss

1   A.   We did.

2   Q.   When?

3   A.   At that time we filed after he defaulted and terminated the

4   LPA.

5   Q.   Okay.

6        Was that preliminary injunction granted?

7   A.   It was.  That's why Mr. Erickson sold us lots.

8   Q.   So how many lots did the Court order Mr. Erickson to sell?

9   A.   I believe it was 29.

10  Q.   What kind of lots were those?

11  A.   Phase C lots.

12  Q.   Do you know where the 29 number came from?

13  A.   That was defense counsel -- 29 would have been the defense

14  counsel's representation for how many lots Mr. Erickson had

15  available that were Phase C.

16  Q.   How many lots were actually available?

17  A.   27.

18  Q.   You were asked about -- moving on to a different topic.

19       You were asked about Section 6.8 of the APA.  Right?

20  A.   Yes, sir.

21  Q.   Does ASH contend that there has been a breach of the APA in

22  this case?

23  A.   We do not.

24  Q.   Was Grayhawk Homes, Inc., a party to the APA?

25  A.   Yes, sir.

Redirect Examination – Ryan Twiss

1   Q.   Did Grayhawk Homes, Inc., change its name to GH Lot

2   Holdings within ten business days of closing?

3   A.   It did not.

4   Q.   Does ASH accuse the companies formerly known as Grayhawk of

5   Atlanta and South Carolina of trademark infringement in this

6   case?

7   A.   Yes, sir.

8   Q.   Based on what?

9   A.   Using the logo and the name Grayhawk.

10  Q.   You were asked about Prominence, Miramonte and Surrey, and

11  Mr. Shebelskie pointed out that the Dorn transaction closed at

12  the end of January 2021, right?

13  A.   Yes, sir.

14  Q.   Okay.

15       What was happening at around that time after the

16  transaction closed?

17  A.   Well, one, we were integrating Dorn so we were working on

18  getting that builder onto our platforms and procedures.  And

19  also Mr. Erickson was agitating, demanding to be bought out.  He

20  was raising claims with us.  So we had our hands full.

21            MR. KRAMER:  Okay.

22            Those are my questions.

23            Thank you, Your Honor.

24            THE COURT:  Any recross?

25            MR. SHEBELSKIE:  No, Your Honor.

```
 1               THE COURT:  All right, sir.

 2          You may step back to your table.

 3               THE WITNESS:  Thank you, Your Honor.

 4               THE COURT:  Ladies and gentlemen, we are going to take

 5     a 15-minute break at this time.

 6               You will go to the jury room.  Do not discuss the case

 7     during the break.

 8               We will be in recess for 15 minutes.

 9          (Jury out at 3:35.)

10          (Recess taken 3:36.)

11          (Resumed at 3:51.)

12               THE COURT:  Be seated.  Bring the jury down.

13               MR. KRAMER:  Your Honor, while the jury is coming

14     down, I wanted to let you know we are going to play a short

15     video now from Mr. Coleman.

16               No objections.  No need to rule on anything.

17               THE COURT:  I don't need a transcript then.

18               MR. KRAMER:  Thank you.

19               THE COURT:  This is Mr. Coleman, Sr.?

20               MR. KRAMER:  Yes, sir.

21               THE COURT:  You say he ran several times for governor.

22     I take it he didn't win?

23               MR. KRAMER:  Correct.

24          (Jury in at 3:52 PM.)

25               THE COURT:  Okay.
```

1           Mr. Kramer, plaintiffs may call their next witness.

2           MR. KRAMER:  Thank you, Your Honor.

3           At this point plaintiffs call Mr. Marshall Coleman,

4      who is appearing by video today.

5           THE COURT:  All right.

6           Ladies and gentlemen, sometimes when a witness is not

7      available to testify live at trial their testimony can be

8      presented by video deposition testimony where they are

9      questioned before trial.  The lawyers are present.  The witness

10     is sworn to tell the truth.  And the lawyers can ask -- each

11     side can ask questions of the witness.

12          You should accept this type of testimony just as if

13     the person was testifying here live in the court.  It is a

14     proper proceeding and the witness has sworn to tell the truth.

15          It will be played on your screens as a video

16     deposition.

17          All right.  You may play the video.

18          (The videotaped deposition of Marshall Coleman was

19     published to the jury at 3:54 PM.)

20          MR. KRAMER:  The end, Your Honor.

21          THE COURT:  All right.

22          Who is your next witness?

23          MR. KRAMER:  Mr. Lee Darnold.  I am going to collect

24     him.

25          THE COURT:  If you would come forward to the witness

 1   stand.  Straight ahead by this lamp.  Come right here.  Raise

 2   your right hand and take this oath.

 3               **LEE DARNOLD, PLAINTIFFS WITNESS, DULY SWORN**

 4               THE COURT:  Be seated, sir.

 5               Once you are situated, tell the jury your name and

 6   spell it for the court reporter.

 7               THE WITNESS:  My name is Lee Darnold.  D-a-r-n-o-l-d.

 8               THE COURT:  All right.  You may proceed, Mr. Kramer.

 9                         <u>DIRECT EXAMINATION</u>

10   BY MR. KRAMER:

11   Q.   Good afternoon, Mr. Darnold.

12   A.   Hello.

13   Q.   What's your current position?

14   A.   I am the CEO of American Southern Homes.

15   Q.   Has ASH recently changed its name?

16   A.   It has.  Our marketing name is Evermore Homes.

17   Q.   Shall we stick with ASH to avoid confusion today?

18   A.   Yes.  That's fine.

19   Q.   Okay.

20        How would you describe ASH's business?

21   A.   We are a homebuilder.  So we build homes for families,

22   primarily, in all price ranges in multiple states.

23   Q.   And how does ASH go about building this business?

24   A.   We generally buy small homebuilders in different markets

25   and we put them together into one company operating in one

Direct Examination - Lee Darnold

1    platform.

2    Q.    Does that generate any efficiencies?

3    A.    It does.

4    Q.    Can you describe?

5    A.    Yes.

6          The homebuilders that operate in multiple markets do things

7    different ways, so what we try to do is give them the same

8    platform.  Give them efficiencies.  Help them buy materials

9    together.

10         When one builder has a best practice, we will share it with

11   the other builders.  But generally trying to make a bigger

12   company out of smaller homebuilding companies.

13   Q.    What type of homes does ASH build?

14   A.    We build luxury homes in Huntsville.

15         We build homes for active adults -- people over the age of

16   55 -- in Arizona.

17         And we build for first-time starter homes in Columbus.

18         And that's really where we are -- we are taking the company

19   into more first-time starter homes for families.

20   Q.    You said ASH brings the builders onto a platform.  What

21   does that mean?

22   A.    By "platform," I mean that each of the builders uses the

23   same software.  They describe their business the same way.  They

24   have the same titles, pay bands, financial reporting.  We try to

25   make it where we can train them very efficiently because -- you

1    can put a training manual together because they all do the same

2    things.

3    Q.   Let's talk about your background.

4         Where are you from originally?

5    A.   I am from Fort Worth, Texas.

6    Q.   Did you go to college?

7    A.   I did.

8    Q.   Where?

9    A.   Texas Tech University in Lubbock, Texas.

10   Q.   What did you study there?

11   A.   Business.

12   Q.   When did you graduate?

13   A.   1993.

14   Q.   Did you go to school to continue a family tradition?

15   A.   No.  I was the first in my family to go to college.

16   Q.   Did you work while you were in college?

17   A.   I did.  I had to pay for college.

18   Q.   What did you do?

19   A.   I was a commercial janitor in the evenings.

20        I built museum exhibits for a children's museum.

21        And I helped a local contractor build houses.

22   Q.   Do you have any graduate degrees?

23   A.   I do.

24   Q.   What do you have?

25   A.   I have a master of business administration from the

1    University of Texas, in Austin.

2    Q.    When did you graduate?

3    A.    2002.

4    Q.    Did you work while you were obtaining your MBA?

5    A.    I did.

6    Q.    What did you do?

7    A.    I worked for Nokia mobile phones and was a business unit

8    manager for the Americas.

9    Q.    What made you go back to school for an MBA?

10    A.    I had risen to a level within the company where continuing

11    education made sense.  Most of the people at my level, or above,

12    had done continuing business education.

13    Q.    Nokia is not homebuilding business; right?

14    A.    No.  Mobile phones.

15    Q.    When did you get into homebuilding?

16    A.    2005.

17    Q.    So how long have you been in homebuilding?

18    A.    18 years.

19    Q.    And how many different homebuilding companies have you

20    worked for during that period?

21    A.    This is my sixth.

22    Q.    Okay.  And did they all have a similar structure?

23    A.    Similar, yes.  Yes.

24              MR. KRAMER:  Could we put up our first slide, please?

25              This is a demonstrative exhibit, Your Honor.

1              THE COURT:  Okay.

2              MR. KRAMER:  Okay.  I am clicking but nothing is

3    happening.

4              There we go.  Okay.

5    BY MR. KRAMER:

6    Q.   Mr. Darnold, this is an organizational chart.

7         Could you explain what this shows?

8    A.   Yes.

9         Most homebuilders operate at a local market level, which

10   means you will have a division president in Dallas and a

11   division president in Atlanta and a division president in, for

12   example, Columbus.

13        At the bottom you will see that each division president

14   will have what are called functional experts, which is a leader

15   of purchasing, land, accounting, sales and marketing, and

16   construction.

17   Q.   What's at the next level up from division president?

18   A.   Well, at the very large homebuilders you will have a

19   regional president that is over multiple division presidents.

20   But the idea is always to have your local division president run

21   their business in their market.

22   Q.   Okay.

23        What's above the regional president level?

24   A.   Many large builders will have a chief operating officer

25   that is responsible for all of the operations and results of the

Direct Examination - Lee Darnold

1  company.

2  Q.   What's at the top?

3  A.   The chief executive.

4  Q.   All right.

5       What was your first role in the homebuilding business?

6  A.   I came in to homebuilding as the vice president of sales

7  and marketing.  Primarily marketing.

8  Q.   At what company?

9  A.   At Centex Homes.  They recruited me out of Nokia in 2005.

10 Q.   Do you see the red circle on the slide?

11 A.   Yes.

12 Q.   Is that what you were doing there?

13 A.   Yes, it is.

14 Q.   Where did you live at Centex?

15 A.   In Dallas, Texas.

16 Q.   What were your responsibilities there?

17 A.   Strategy for the company.  I looked at where we would buy

18 land, what product we would put in our communities.  Did all of

19 the newspaper ads, radio ads, really anything marketing and

20 support of the sales team.

21 Q.   How long did you serve as the VP of marketing and strategy?

22 A.   For about two years.

23 Q.   What did you do next?

24 A.   Next I went to do my own company.  Basically, a marketing

25 consulting firm.

1    Q.    What year was that?

2    A.    2007.

3    Q.    What was going on in the market at that point?

4    A.    It was the beginning of the homebuilder crash.  If you

5    remember all the banks got in trouble in late 2007 and 2008.

6    Q.    So what made you leave Centex?

7    A.    Well, I was essentially the last person at my level, and so

8    as they started looking at layoffs across the industry, we went

9    from 330 employees to 84 in about an 18-month period.

10   Q.    What type of -- well, were you offered a chance to stay?

11   A.    I was, as a marketing manager level reporting to a sales

12   VP.

13   Q.    Were you willing to take a step down?

14   A.    I didn't want to, because I had had a different role where

15   I had some authority, and that would have been more of a -- like

16   an ad agency person for a sales person.

17   Q.    So you became an independent consultant for a little while.

18   Did you get back into homebuilding?

19   A.    I did.  I had a homebuilding client or two and eventually

20   was asked to come be the national head of sales and marketing

21   for a top five homebuilder.

22   Q.    Which one?

23   A.    NVR.

24   Q.    What is NVR?

25   A.    NVR has brands called Ryan Homes and NV Homes.  And they

Direct Examination - Lee Darnold

1    build primarily entry-level homes in markets from Chicago down

2    to Florida and back up to New York.

3    Q.    What was your role there?

4    A.    I was the national head of sales and marketing.

5    Q.    Is that the equivalent of the chief marketing officer?

6    A.    Yes, it is.

7    Q.    Did you relocate for that job?

8    A.    I did.  I relocated to Reston, Virginia.

9    Q.    And how long did you hold that position?

10   A.    Two years.

11   Q.    And then what?

12   A.    I was recruited by a company called Orleans Homes, that had

13   been in bankruptcy and had just come out of bankruptcy, and I

14   was recruited to help them grow again.

15   Q.    Did you move for that job?

16   A.    I did.  To Philadelphia, Pennsylvania.

17   Q.    What did you do there?

18   A.    There I was recruited first as the chief marketing officer.

19   Q.    Did that role change?  You said "first."

20   A.    Yes.  Within about 90 days I became the chief operating

21   officer.

22   Q.    Okay.

23   A.    We just integrated both of those two roles together.

24   Q.    Is that circled on the screen now?

25   A.    Yes.

Direct Examination - Lee Darnold

1  Q.   Did you take on extra duties as the COO?

2  A.   Yes.  All the division presidents of the company reported

3  to me, and I was responsible for everything but the finance and

4  accounting and legal.

5  Q.   Where did you go next?

6  A.   From NVR I was recruited to -- we started working to sell

7  that company and Toll Brothers recruited me.

8  Q.   What's Toll Brothers?

9  A.   Toll Brothers is a luxury homebuilder based in

10  Philadelphia.  It's also a top five homebuilder.

11  Q.   What was your job there?

12  A.   National VP of Operations at the corporate office.

13  Q.   How does that compare to the COO job?

14  A.   It was similar, but at a much larger company, and I worked

15  for the COO at Toll Brothers.

16  Q.   And what did you do next?

17  A.   From there I was recruited by Pulte to be a division

18  president.

19  Q.   What is Pulte?

20  A.   Pulte is another top five homebuilder.

21  Q.   Can you spell that for the court reporter?

22  A.   P-u-l-t-e.

23  Q.   P-u-l-t-e.  Thank you.

24       Were you a division president?

25  A.   Yes.  I had never been a division president in my career,

Direct Examination - Lee Darnold

1    so I had -- if you look at the red circles we are showing, I had

2    moved from a functional divisional role all the way to chief

3    operating officer.  And so a few of my mentors had come from

4    Pulte and suggested I go back and get the division president

5    experience to have more credibility.

6    Q.    So what did you do there?

7    A.    I was division president for a thousand-home-a-year

8    division in San Antonio, Texas.

9          It also allowed me to get my boys back to Texas because

10   they were getting ready for college.

11   Q.    What, if anything, did you learn about land in that role?

12   A.    Well, I learned that land is everything for a division

13   president.  I probably spent -- well, I was in charge of

14   everything for the division.  I spent probably 50 percent of my

15   time trying to find land.

16   Q.    How long did you stay with Pulte?

17   A.    Two years.

18   Q.    What did you do next?

19   A.    Next I went back to my consulting for about a year.

20   Q.    Why did you leave?

21   A.    I got into -- I was frustrated at Pulte.  We had an issue

22   where my team had had the highest quality results in 30 years as

23   a division, but they -- instead of rewarding my construction

24   team, they raised the goal another two points and said we hadn't

25   achieved it.

Direct Examination - Lee Darnold

1    Q.    So you left?

2    A.    I did.

3    Q.    And you were a consultant for awhile.

4          Then what?

5    A.    Then I was regional president for a company called View

6    Homes.

7    Q.    Okay.  Was that in San Antonio as well?

8    A.    It was.

9    Q.    What did you do there?  What was that job like?

10   A.    I had responsibility for all of Texas and New Mexico.  We

11   had four divisions:  San Antonio, Laredo, El Paso and Las

12   Cruces.  And we did about 1200 units a year in Texas.  1200

13   houses a year.

14   Q.    How long were you the regional president there?

15   A.    Until I came to ASH.

16   Q.    What year was that?

17   A.    2018 to 2021.

18   Q.    Okay.

19         And did you move for the job with ASH?

20   A.    No.  I had -- my youngest was still in high school, so I

21   negotiated with the ASH team to commute the whole first year so

22   he could finish high school.

23   Q.    And then what?

24   A.    Then my wife and I moved.  He went to college and my wife

25   and I moved to Reston.

Direct Examination - Lee Darnold

```
 1   Q.   Okay.
 2        So what was your job title when you started at ASH?
 3   A.   It was called chief integration officer.
 4   Q.   Did that last long?
 5   A.   No.  I became COO in around 60 days.
 6   Q.   All right.  As chief integration officer, what were you
 7   doing?
 8   A.   Essentially what the VP of Ops or COO did.  I was traveling
 9   around to divisions and trying to help them improve their
10   operations.
11   Q.   Okay.
12        So when did you -- was there any event at the company that
13   caused you to become the COO?
14   A.   No.  The COO at the time was a man named Greg Benson, and
15   Greg asked me to become COO, and it just gave me increasing
16   responsibility.
17   Q.   Were you promoted again after that?
18   A.   Yes.
19   Q.   To what?
20   A.   To president and COO.
21   Q.   So who was the leader of ASH when you were the president
22   and COO?
23   A.   Mr. Benson had chosen to retire, and so I became, as
24   president and COO, the senior leader of the company.
25   Q.   How was working with Mr. Benson?
```

Direct Examination - Lee Darnold

```
 1   A.   He was a very nice guy.  Very qualified.  He had started
 2   his career at NVR where I had spent some time, so we had a
 3   similar language.
 4   Q.   Were you eventually promoted to CEO of ASH?
 5   A.   Yes, I was.
 6   Q.   Okay.
 7        Are you currently the CEO?
 8   A.   Yes.
 9   Q.   Do you hold any other positions with the company?
10   A.   I am also a board member.
11   Q.   In terms of size, how does ASH compare to your prior
12   employers like NVR and Pulte?
13   A.   Much, much smaller.  NVR is about -- when I was there, it
14   was about 10,000 houses annually in 17 states.  And Pulte was
15   around 30,000 houses annually in 27 divisions.
16   Q.   So what was appealing for you about going to work for ASH?
17   A.   Well, when I would meet with people at those companies,
18   those large homebuilders, they had a lot of stories about how
19   they had started the company, or had been a big part of growing
20   the company.  So I found it intriguing to think about going back
21   in time to when that builder started.  And with ASH I was able
22   to come in and say, We are going to start growing this and I get
23   to have that founder's story, as it were.
24   Q.   So you worked for a number of different companies at all
25   different levels.  Why did you move around so much?
```

Direct Examination - Lee Darnold

1   A.   Well, I had been a business unit manager at Nokia mobile

2   phones, which meant I was effectively a COO of a piece of their

3   business.

4       When I came into homebuilding, I came in based on sales and

5   marketing background.  And so I spent time -- to earn

6   credibility in homebuilding you have to run an operation.  And

7   to run an operation you have to start moving around and learning

8   different things.  So I went from VP of marketing.  I added

9   sales.  From sales I added purchasing.  From purchasing I

10  started growing into full operations.  And it was just a way to

11  get back to what I loved, which was running multiple functions

12  and trying to drive the business.

13          MR. KRAMER:  Your Honor, at this point plaintiffs

14  offer Mr. Darnold as an expert in managing and operating

15  homebuilding companies.

16          MR. SHEBELSKIE:  Oh, no objection, Your Honor.

17          THE COURT:  All right.  Sir, you may give opinion

18  testimony on that subject matter.

19          Go ahead.

20  BY MR. KRAMER:

21  Q.   So, in your role for ASH, do you ever travel to Columbus?

22  A.   I do.

23  Q.   How frequently?

24  A.   I try to get there every quarter or three months.

25  Q.   What's a quarter?

Direct Examination - Lee Darnold

1   A.    Three months.

2   Q.    Do you also travel to the other locations?

3   A.    I do.  I try to get to every division every three months.

4   Q.    Where are the other two divisions?

5   A.    Huntsville, Alabama, and Prescott, Arizona -- Northern

6   Arizona.

7   Q.    When you are on the road, do you visit building sites?

8   A.    I try every time to go see our communities.

9   Q.    Do you always succeed?

10  A.    Not always.  I sometimes get locked in the office, but I

11  try to.

12  Q.    Why do you do that?

13  A.    It's easy to look at reports from an office far away, but

14  you really need to get on the ground in the models, see the

15  people building the homes, talk to customers, just make sure

16  that what you are reading in reports is verified on the ground.

17  Q.    What are the demographics of ASH's customer base in

18  Arizona?

19  A.    What we call in the industry active adult.  People that are

20  55 plus.  Empty nesters moving into retirement.  Many of them

21  retired.

22  Q.    How about in Huntsville, Alabama?

23  A.    In Huntsville, the builder that we bought was a -- what we

24  call a higher-end or multiple move-up builder, so they were in

25  the 500 to 650,000 range.  We are working hard to move them down

1    market to first-time buyers.

2    Q.    What are the demographics of the customer base here in

3    Columbus, from your perspective?

4    A.    It's what I hope our whole company will focus on, which is,

5    you know, families, first time, first house.

6         When I first got in the industry I had been in mobile

7    phones, which after 18 months you kind of throw away.  With

8    homes, you know, homes are the American dream.  So putting

9    families in homes is always what has motivated me.

10        We sell to military, police, teachers.  Just the first

11   house they have ever had and that chance to start building

12   equity.

13   Q.    Okay.

14        So you said ASH acquires homebuilders.  What's the

15   advantage of buying a company instead of starting from scratch

16   and building it from the ground up?

17   A.    Homebuilding takes a long time.  From first entering a

18   market until you first actually close a home with a buyer can be

19   three years.  And so if you go into a market -- let's say I put

20   a division president into a market and say, Get started, it's

21   going to be a long time and a frustrating process for them to

22   build that company.

23        So we buy these builders because they have an established

24   business.  They are already selling, starting and closing homes.

25   They have a customer base.  And there is some scale there.

Direct Examination - Lee Darnold

1    Q.   What size of a company is ASH typically looking for?

2    A.   Really we are -- where we found opportunity is kind of in

3    the 200 to 400 houses on an annual basis.

4    Q.   Was that the goal from the beginning of ASH at least as far

5    as you know?

6    A.   As far as I understand it, yes.  To be in not so much

7    smaller markets.  I call them the next tier markets, which are

8    the markets that are close to big urban areas, and where now,

9    especially after COVID, people can live there and commute into

10   the office maybe two days a week but actually not live in the

11   Atlanta area or the Nashville or Dallas area, but be in these

12   smaller markets that sometimes the bigger builders have not

13   gotten to.

14   Q.   You said you were a member of the Board at ASH.  Do any of

15   the other members of the Board at ASH have homebuilding

16   experience?

17   A.   Yes.  We are in Reston because a couple of our -- I told

18   you NVR was there.  A couple of our members had worked with NVR.

19   Steve Cumbie was one of the early founders of the NVR.

20        Michael Scott is in the development business and sells lots

21   to homebuilders.

22        Marshall Coleman, who was our chairman, was the early lead

23   attorney for NVR.

24   Q.   Is he still the chairman?

25   A.   No, he is not.

1    Q.    Has he had some medical issues lately?

2    A.    Yes.

3    Q.    Okay.

4          Was Mr. Coleman something called a non-executive chairman?

5    A.    He was.

6          So when you start a company, you are usually going out to

7    people and asking them to invest in your company.  And

8    Mr. Coleman had been the former Attorney General of Virginia.

9    He had a very broad network and knew a lot of people.  So he

10   went out as non-executive chairman and said, I am going to start

11   this.  Do you want to invest in it?

12         So for that sort of first two or three years you are really

13   focused on trying to find investors, and that's what he was very

14   good at.

15   Q.    Okay.

16         Let's hit some -- define some terms that we haven't gotten

17   to yet in the case.

18         What's a spec home?

19   A.    A spec home is short for speculative home.  You can call it

20   inventory as well.  It just means we have started a house

21   without a buyer for that house.

22   Q.    Okay.

23         What's a presale?

24   A.    Presale is a house we start where we already have a buyer.

25   So someone got to pick their lot, pick their finishes, the

1  cabinets, all of those things, and we start a home for them.

2  Q.   What's a custom home?

3  A.   A custom home is a house where the buyer gets to design the

4  house.  Has a lot more liberty in how it's going to look, what

5  the rooms look like.  They design it in partnership with the

6  builder.

7  Q.   Does ASH build custom homes?

8  A.   We don't.

9  Q.   What does ASH build?

10  A.   We are a production homebuilder.

11  Q.   What does that mean?

12  A.   It means that we try to use the same plans in all of our

13  communities, if we can.

14      We try to build as many homes as we can that our vendors

15  and trades have already built so that we can drive for

16  efficiency, because efficiency drives down the cost for our

17  homebuyers.

18  Q.   What are trades again?

19  A.   Trades are the people that actually build the house.  We

20  are actually what's called a general contractor.  So our

21  superintendents don't build the house.  They supervise the

22  trades that actually do build the house.  So the trades are the

23  plumber, the concrete guys, the framers, roofers.

24  Q.   And roughly how many trades does ASH work with in this

25  area?

Direct Examination - Lee Darnold

1    A.    The last year I looked at we had 81 trades in the Columbus

2    area.

3    Q.    Are you familiar with the term "land banker"?

4    A.    Yes.

5    Q.    What does that mean?

6    A.    So land is a very expensive proposition.  You buy the land

7    and you have to start developing the land.  So a land banker

8    says to the homebuilder, I will work with you to develop a

9    community, and then you will just pay me a fee for the lots that

10   you buy from me.  And so rather than the builder being the

11   developer of those communities, the land banker will be the one

12   that funds that operation.

13   Q.    And who, if anyone, was supposed to be the land banker and

14   developer for ASH-Grayhawk?

15   A.    Mr. Erickson.

16   Q.    What does "grading" mean?

17   A.    Grading is when you take any kind of undulations in the

18   land, like little hills or ditches, and you smooth it out.  You

19   take from high points and low points and kind of make the whole

20   site flat.

21   Q.    What's the difference between horizontal and vertical

22   construction?

23   A.    That's a term that's sometimes used.  If you think about

24   it, the developer is working with land which is horizontal, so

25   everything they are doing is streets and gutters and curbs.  As

Direct Examination - Lee Darnold

1    you look at it, it's on the horizon.

2        The homebuilder is going vertical.  We are the ones that go

3    up from the ground.

4    Q.    In your opinion what's the most important factor in buying

5    land for a homebuilding company?

6    A.    Location.

7    Q.    Why is that?  Can you be more specific?

8    A.    Yes.  When a buyer, especially a first-time buyer, is

9    looking to build a home, it's generally triggered by some kind

10   of family event; they got married, they had their first child,

11   they want a back yard for their kid to play in.  So that's

12   basically what they are looking for.

13       So when they are looking to bring their kids into their

14   first house, school is -- the school that that child will go to

15   is of paramount importance.  And they generally have a job, or

16   two people in the house have a job, and so they want to make

17   sure they are on the corridors where they can get to work

18   easily.

19       If you find a location that's in the best school you can,

20   closest to people's work, that's a great location.  That's where

21   they are going to want to buy a house.  So the very first

22   consideration for a homebuyer is location.

23   Q.    Do you have a general rule about commuting?

24   A.    Yes.  So I was taught by a mentor early on that you want to

25   be within two turns of a major freeway.  So if you take a

Direct Examination – Lee Darnold

1  freeway to work, I don't want you to have to turn more than

2  twice to be in your community.  If you have to direct people too

3  many different ways, you are not very successful and it's a hard

4  commute for them.

5  Q.  What are the other factors, after location, when it comes

6  to selecting land?

7  A.  The topography or how the ground looks.  You don't want to

8  buy a community that is on the side of a mountain.  You don't

9  want to buy communities that have a lot of rock or floodplain

10  ponds.  So you are trying to find -- you think about a piece of

11  farmland, farms are sometimes good because they are already

12  flat.  There is not a lot of vegetation that you have to move.

13  There is not a lot of pond or rocks on the land.  And so what we

14  want is just flat, open space to put lots on.

15  Q.  So when it comes to building houses in a particular

16  community, does the number of available lots in the community

17  factor into the decision?

18  A.  Yes.

19  Q.  Could you explain?

20  A.  We generally try -- and everybody builder has a little

21  different view of this -- we generally try to own about three to

22  five years of lots.  So if we feel like we can sell say 36

23  houses a year in a community, we will try to buy around a

24  hundred lots.

25      On the other side, you don't want a community that's too

Direct Examination - Lee Darnold

1  big, because you don't know, a thousand lots could take 15 years

2  to begin.  You have no idea what the market will be in 15 years.

3  So kind of a hundred to 200 lots is a manageable level of risk

4  for how we look at it.

5      It's just based on how many homes a month we think we can

6  sell in that community.

7  Q.  When you say a hundred to two hundred in a community, do

8  you mean in the entire market or a particular subdivision?

9  A.  A community for me is a neighborhood or a subdivision.

10  Q.  Okay.

11     Have you seen different development approaches at different

12  homebuilders you have worked for?

13  A.  Yeah.  One of the really cool things about my career is I

14  have worked at America's luxury homebuilder, which was Toll

15  Brothers.  At America's most -- what's prominently known as the

16  most efficient homebuilder, which is NVR.  And then Pulte, which

17  is known in the industry as the best developer of talent.  So

18  while we all do the same basic thing, there are some different

19  approaches.

20  Q.  What approach does ASH take to accessing land?

21  A.  ASH takes what's called a "land light strategy."  And

22  that's the same strategy NVR uses, which is to say we try not to

23  own a lot of land.  We try to focus on the homebuilding process.

24  So we will look for developers to give us lots that we can then

25  build homes on.

Direct Examination - Lee Darnold

1    That makes us a very effective homebuilder in the long run,

2    but it also takes some of the risk out of our business because

3    we don't have all the cash that's needed to build the lots.

4    Q.  From the developer or land banker's perspective, what's the

5    upside?

6    A.  The upside for the developer, of us buying finished lots

7    from them, is that they get to focus their business on sourcing

8    the land, putting in streets, infrasture, working with the

9    cities.  All the complexity of that part of the business they

10   focus on.  And we can focus on the complexities of just going

11   vertical and building houses.

12       So the benefit to them of a contract with us is that they

13   know what they are going to sell those lots for and they know if

14   they have somebody that's going to buy those lots:

15       The biggest fear of a developer is not having a homebuilder

16   to buy the lots.

17   Q.  How about from ASH's perspective, why enter into long-term

18   agreements with a developer or land banker?

19   A.  It's a little bit of the same, but on the reverse side,

20   which is, we have a visibility into lots that we can build on.

21   Homebuilders can't operate without a lot.  You have to have a

22   house to build on.  I have never seen a house in the air.  So we

23   have to know we have a land supply ahead, and having a developer

24   do it means the work and the capability and the relationships

25   that they have, they manage.  And the ones that we have are with

1    customers and trades and building houses.

2    Q.    Okay.  Does ASH take on risks in these long-term

3    arrangements?

4    A.    We do.

5    Q.    Can you explain?

6    A.    Well, there is risk -- a proper arrangement with a

7    developer tries to balance out the risk.  So for the developer

8    they are afraid that in the future the market will rise really

9    quickly and that they set too low a price for their lots.

10        We are afraid that the market in the future will get

11   cheaper and we paid too much for the lots.

12        So what we try to do is have an understanding and a

13   contract that says, maybe you could have made X percent and we

14   could have made Y, but let's both settle on Z, which is good for

15   both of us.  So the risk you manage is mitigated by knowing that

16   I will buy the lots.  The risk I have is managed by knowing that

17   you are going to give me lot supply.

18   Q.    Okay.  Let's talk about lot development.

19        Are you familiar with the timeline that's up on the screen?

20   A.    Yes.

21   Q.    Did you help put this together?

22   A.    I did.

23   Q.    Big picture, what's the first step in the process for

24   developing a lot?

25   A.    Well, the first step is actually to find the land in the

1    first place.  But let's assume that we have a land parcel that

2    we are looking at, we will try to work with the land seller on a

3    Letter of Intent, which is simply to say, If you sold us this

4    land, this is roughly what we would pay you and roughly what the

5    terms of that would be.  And we work to get them to sign it and

6    for us to sign it so we can say, We've got the foundation for an

7    agreement.

8    Q.   Does the timeline you are describing include work before

9    the Letter of Intent stage?

10   A.   It doesn't.  It takes a long time to get in the flow of a

11   land seller inviting you to even hear about the deal, or to bid

12   on the deal.  So there is a whole lot of expertise and

13   relationships and time and energy that goes to getting to this

14   stage.

15        Because what this stage, effectively, means is of all the

16   homebuilders in the market that land seller has said, I am going

17   to try to work out terms with you as a builder.

18   Q.   Okay.

19        Big picture, from -- and we will get through the

20   timeline -- but from the start of development process to closing

21   on a house, how much time are we talking about, generally?

22   A.   It varies, nationally, but if we said two to three years

23   that's a good timeframe.

24   Q.   Okay.

25        What's the next step?

1  A.  Well, we have here one month so that's -- we have a Letter

2  of Intent.  And what that's doing is saying, Here is the basic

3  terms.  Then we try to get what's called a purchase agreement,

4  which is really a contract.  That's going to really define all

5  of these various elements.

6       They are going to sell us this for this much on this date.

7  Here is the parcel that we are getting.  Here is a

8  representation they are making of how the soil is, or any

9  testing they have done.  So it's a point at which both companies

10  are really getting into the nitty-gritty of what that contract

11  will look like.

12  Q.  And what's next step after that?

13  A.  Well, then we are going to go in and title -- entitlement

14  is effectively going into a city and saying, Farmer John and I

15  have an agreement to buy his land, and this is what we would

16  like to do with that land.  We would like to put 200 houses

17  here.  We would like to put roads here.  Sewer here.  Really

18  work with city staff, town council, local neighborhoods and say,

19  Here is what we are trying to do.  Can we please have permission

20  to do this?  That's the entitlement part.

21       The term that you see there, due diligence, is really us

22  having an amount of time to look at the deal and say, Is the

23  soil safe or has somebody buried a bunch of stuff in it?  Do we

24  understand from our engineers what's really going to happen

25  here?  So due diligence is saying, I am going to take a deeper

1   look at this land deal and see if it will work.

2      And the entitlement is saying, if it does work for us will

3   the city or the municipality let us actually do what we intend

4   to do.

5   Q.   So that's eight months, right?

6   A.   That's an average timeframe.

7   Q.   What's next?

8   A.   Then you have got to go in and do the development.  This is

9   an average as well.  But this nine months to complete

10  development, what that means is we have this farm, let's say,

11  and now we are going to go in and we are going to scrape the

12  land.  We are going to grade it.  We are going to put in streets

13  and sewer and water and electric and all the things you have do

14  to get to the point where we can start to build a house.  We

15  call that development, and that varies but, generally, around

16  nine months.

17  Q.   All right.  Have you just been describing the horizontal

18  part of the process?

19  A.   Yes.

20     Many builders will do this part as well as the

21  construction, but the developer generally does this part.  And

22  this is the horizontal development.

23  Q.   What's after that?  Then do we go vertical?

24  A.   Yeah.  So we finally get to the point where we can go to

25  the city and pull a permit with an address and with boundaries

Direct Examination - Lee Darnold

1    where we can actually start a house.  And we buy the lots from

2    the developer and we start a model home and we take about four

3    months to build that home and decorate it.  We want to make sure

4    it has furniture and has all the things that would be attractive

5    to a homebuyer.

6    Q.   What's the next step after that?

7    A.   Well, we are either going to -- when the model home is

8    finished, and people can actually tour it, they will either

9    write a contract to build their pre-sell home or we may start

10   some additional homes as speculative or inventory homes.

11        We put between three and six months.  Sometimes we can

12   start the speculative homes with the model, but generally we

13   will not have a presale until they can see the model, so that

14   just adds time.

15   Q.   Just to make sure we are clear, what part of this timeline

16   was Mr. Erickson supposed to handle for ASH?

17   A.   Well, we had a contract with him, so from three all the way

18   to 20.

19   Q.   Are you referring to the --

20   A.   The lines at the bottom.  All the way up to build a model

21   home he was supposed to sell us lots on which we could start

22   building.

23   Q.   Are you familiar with the price that ASH paid to acquire

24   Grayhawk Homes?

25   A.   Yes.

1    Q.   Part of that was a premium, correct?

2    A.   Right.

3    Q.   And how much of that has been paid to date?

4    A.   6.4 million.

5    Q.   And I believe, correct me if I'm wrong -- well, let me ask

6    a different way.

7         How much of that, if any, was paid in units or shares in

8    ASH?

9    A.   I believe -- 6 million, I believe.

10   Q.   Do you know how much those units are worth now,

11   approximately?

12   A.   We haven't done a valuation recently, but I would guess

13   around 7.9 million.

14   Q.   How recently did ASH do a valuation?

15   A.   We did a valuation -- the last one I know of was in

16   November of 2020.

17   Q.   Was there a recent valuation in connection with the capital

18   raised?

19   A.   Oh, I'm sorry.  Yes.  Yes.  There was.

20        We recently raised $10 million for the company, and we

21   raised it at I believe $132 a share.

22   Q.   So the premium is that payment for lots or something else?

23   A.   No.

24        So when you buy a homebuilding company, the first thing you

25   do is you try to buy the company.  So, in this case, Grayhawk,

Direct Examination - Lee Darnold

1    we bought the assets of the company, which was all the homes

2    they were building at the time, lots they owned on their books

3    at the time.  That was around $17.4 million or so.

4        And then the premium is in addition to the book value --

5    here is some other money that's above that.  But it did not

6    include the future lots.  It included a contract to buy

7    approximately 1600 future lots.

8    Q.  So why pay millions of dollars just for the right to buy

9    lots in the future?

10        MR. SHEBELSKIE:  Your Honor, I am going to object at

11    this point.  The testimony has gone past subject matter of

12    expert testimony.  We are now talking about fact testimony about

13    the reasons the parties entered into this transaction.  And he

14    is not a factual witness.  He was not involved in transactions

15    and didn't come to the company until '21.

16        MR. KRAMER:  He is a fact witness, Your Honor.  He is

17    a non-retained expert.  He is the CEO of the company.  And I am

18    just finishing up with this particular --

19        THE COURT:  Overruled.

20        MR. KRAMER:  Okay.

21    BY MR. KRAMER:

22    Q.  Okay.

23        So why pay millions of dollars just for the right to buy

24    land in the future?

25    A.  It takes -- I mentioned earlier, it takes a long time to

1    get an operation going.  When you buy a homebuilder, you get

2    construction people, generally land people, accounting.  You

3    don't have to put the whole team together, and then you don't

4    have to take the time it takes for a team to work together.  You

5    already have the land relationships.  You have a pathway to the

6    next three or four years and what that will look like.  So it's

7    worth a price, in this case millions of dollars in premium, to

8    have the ability to go buy those lots in the future.

9    Q.    Is Mr. Erickson holding a deposit from ASH as well?

10   A.    Yes, he is.

11   Q.    How much money?

12   A.    $2.5 million.

13   Q.    And what was the purpose of the deposit?

14   A.    That was to give him some surety that we would buy future

15   lots.  The idea being, if we didn't buy the future lots, he

16   would keep that deposit.

17   Q.    What does surety mean?

18   A.    To be assured.  It was a guarantee against the purchase of

19   those lots.

20   Q.    How was that supposed to be returned?

21   A.    There was a formula that was in the contract we had with

22   Mr. Erickson, what was called the lot purchase agreement, for

23   how that deposit would be returned over time.  So, generally, as

24   we bought more of the lots, that deposit was to shrink.

25   Q.    Has any of it been returned?

Direct Examination - Lee Darnold

1    A.    No.

2    Q.    Has ASH asked Mr. Erickson to return the money?

3    A.    Yes, we have.

4    Q.    What was the response?

5    A.    No.

6    Q.    When you joined the company in -- what -- was February of

7    2021?

8    A.    It was.  It was the day we bought our third homebuilder.

9    Q.    Dorn Homes?

10   A.    Dorn Homes in Arizona.

11   Q.    When you joined the company, was Mr. Erickson still selling

12   lots to ASH at that point?

13   A.    He was.

14   Q.    Okay.

15         Were there any concerns about the lot pipeline at that

16   point?

17   A.    Not when I first started.

18   Q.    Did concerns develop soon after?

19   A.    Around April of '21 we started to hear discussions from

20   Mr. Erickson that he would not sell future lots.

21   Q.    Okay.

22         Are you familiar with the LPA Takedown Schedule?

23   A.    Yes.

24   Q.    When you joined the company, was ASH ahead?  Behind?  Right

25   on track?  What was the situation?

1    A.    Around that time we were about 133 lots ahead of the

2    required schedule.

3    Q.    And did there come a time when Mr. Erickson did, in fact,

4    refuse to sell any further lots ahead of schedule?

5    A.    Yes.

6    Q.    Did that surprise you?

7    A.    It did.

8    Q.    Why?

9    A.    Well, I mentioned earlier I have literally had some kind of

10    management capacity over all of the top 20 markets in the

11    United States, and I have never once, not once, run into a

12    developer that didn't want to sell lots as fast as the builder

13    would take them.

14    Q.    In your opinion, what's the reason for a developer to sell

15    the lots as fast as the builder will take them?

16    A.    Well, there is many reasons; one is, it reduces risks

17    because there is no chance that the economy will have a sudden

18    shift and their lots will be worthless.

19         It reduces risks that there is no chance that the builder

20    will have something to happen to it and won't buy those lots.

21         It lets them re-deploy.  The cash that they had in those

22    lots can now be used for something else.  So you want to put

23    that money to work as fast as you can.  Those are the major

24    ones.

25    Q.    In your first year with ASH, did there come a time when

Direct Examination - Lee Darnold

1   Mr. Erickson just refused to sell anymore lots to ASH?

2   A.   Yes.

3   Q.   When was that?

4   A.   Ultimately, in December of 2021.

5   Q.   Okay.

6            MR. KRAMER:  We can take down the slides.

7   BY MR. KRAMER:

8   Q.   Under the LPA, are you familiar with the requirement to

9   agree on the order of Phase C lot development?

10  A.   Yes.

11  Q.   Do you know if Mr. Erickson ever proposed an order of

12  Phase C lot development during your tenure with ASH?

13  A.   Not to my knowledge.

14  Q.   Are you aware of ASH proposing an order of Phase C lot

15  development?

16  A.   Yes.

17  Q.   How, if at all, did Mr. Erickson respond?

18  A.   He did not.

19  Q.   What did he do instead?

20  A.   He proceeded to attempt to terminate the LPA and sell us no

21  more lots.

22  Q.   Do you understand the LPA to have been effectively

23  terminated?

24  A.   No.

25  Q.   Who proposed the Phase C lot development order to

1  Mr. Erickson?

2  A.   Mr. Twiss, Ryan Twiss, our general counsel, asked for a

3  general development timeline on these C lots that Mr. Erickson

4  had.  And once he got that timeline, Mr. Twiss proposed a

5  development order.

6  Q.   Did that development order encompass all of the remaining

7  phase C lots?

8  A.   I believe so.  Yes.

9  Q.   Did the parties ever meet in person to discuss the Phase C

10  lot development order?

11  A.   We did.

12  Q.   Did you attend that meeting?

13  A.   I did.

14  Q.   Where did it take place?

15  A.   It was at Mr. Erickson's law firm's office in Washington,

16  DC.

17  Q.   Do you remember the date?

18  A.   June 2nd, 2021.

19  Q.   Do you recall the parties discussing Mr. Twiss' proposal

20  for the order of Phase C lot development?

21  A.   Yes.

22  Q.   Did Mr. Erickson object to the proposal at that meeting?

23  A.   No.

24  Q.   When you came out of that meeting, did you believe there

25  was an agreement in principle on the order of Phase C lot

Direct Examination - Lee Darnold

1   development?

2   A.   Yes, I did.

3   Q.   Leading up to that meeting, did you communicate with

4   members of the ASH Board?

5   A.   I did.

6   Q.   Did you talk to Sean Coleman before the meeting?

7   A.   I did.  I texted him.

8   Q.   Okay.

9            MR. KRAMER:  Let's take a look at DX342 for the

10  witness.  We can blow it up a little bit.

11  BY MR. KRAMER:

12  Q.   Mr. Darnold, do you recognize this as a text that you sent

13  to Mr. Coleman?

14  A.   Yes.

15  Q.   What was the date?

16  A.   January 1st, the day before our in-person meeting.

17  Q.   All right.

18           THE COURTROOM DEPUTY:  Plaintiffs offer DX342 into

19  evidence.

20           MR. SHEBELSKIE:  No objection.

21           THE COURT:  Admitted.

22      (PLAINTIFFS EXHIBIT DX342:  Received in evidence.)

23  BY MR. KRAMER:

24  Q.   Can you read the text to the jury, sir?

25           THE COURT:  Put it up on the screen.  Go ahead.

1              THE WITNESS:  I wrote to Sean Coleman:  You are having

2    an impact.  Marshall is good with the no negotiation strategy

3    for Erickson and is asking if we can do SK without a SPAC.  He

4    is still going hard on SPAC readiness, but acknowledging more

5    and more that it is unlikely.

6    BY MR. KRAMER:

7    Q.   Let's break that down.

8         What was the no negotiation strategy for Erickson that you

9    were referring to here?

10   A.   That was referring to a specific item Mr. Erickson had

11   requested that had nothing to do with the lot purchase

12   agreement.

13   Q.   What did he want?

14   A.   He wanted us to pay him -- give him cash for all of his

15   shares.

16   Q.   And what was the no negotiation strategy?

17   A.   We had determined, as a Board, that we would not be buying

18   his shares back and giving him cash.

19   Q.   How much had he asked for before that determination was

20   made?

21   A.   He asked for $340 per share.

22   Q.   So when you say "buy his shares out," what does that mean

23   as a practical matter?

24   A.   It effectively means we would write him a check for his

25   shares in his requested amount of $340 per share.

Direct Examination - Lee Darnold

1   Q.   Had ASH explored trying to buy him out at a lower price

2   before that point?

3   A.   I believe there had been some discussions around a certain

4   price point around that 140 range.

5   Q.   Okay.

6        140?

7   A.   Yes.

8   Q.   Where did that number come from?

9   A.   That came from a Board meeting in November of 2020 where

10  the Board had set the per-share price for ASH.

11  Q.   And who -- was Mr. Erickson involved in that process?

12  A.   He was a member of the Board and at that meeting, and he

13  was also at the time interim CEO.

14  Q.   So going into the meeting, what was the view of

15  Mr. Erickson's demand for $340 a share?

16  A.   Not fathomable.

17  Q.   Why not?

18  A.   There was no situation where $340 represented the value of

19  a share of our homebuilding company.

20  Q.   Did you intend to negotiate other points at this meeting?

21  A.   Yes.

22  Q.   Did you negotiate other points?

23  A.   We did.  Our intent was always around getting more lots and

24  getting lack to the Lot Purchase Agreement.

25  Q.   Let me be really clear about this.  Did you try to reduce

1   the price that ASH was paying Mr. Erickson for lots?

2   A.   To reduce the price?  No.  No.

3   Q.   What did you do with the price?

4   A.   At that meeting?

5   Q.   Yes.

6   A.   In almost every way we offered to pay slightly more than

7   the contract said for his lots.

8   Q.   Why?

9   A.   I needed lots.

10       In 2021, if you put a model home, or a spec down on the

11  ground, you could generally sell it.  There was a very short

12  supply of houses available.  There still is.  If you watch the

13  news, it's hard to find a house.

14  Q.   Back to your text message.  It says that -- there is a

15  reference to a SPAC here.  And --

16       First of all, can you tell us what that is?  A SPAC?

17  A.   Yeah.  A SPAC is a Special Purpose Acquisition Company.

18  Q.   And did the no negotiation strategy relate to the SPAC in

19  any way?

20  A.   Yes.  They were tied together.

21  Q.   Could you explain?

22  A.   Mr. Erickson indicated, at that meeting on June 1st,

23  that -- or June 2nd -- that he -- we had told him we were

24  talking to a SPAC, and he indicated that we knew the company was

25  worth way more than we were saying because the SPAC was going to

1    pay a lot more than we were worth.

2    Q.   Did you agree that the SPAC was going to pay a lot more

3    than ASH was worth at that point?

4    A.   I did not.

5    Q.   At that point, going into that meeting -- and let me be

6    really clear about this -- did you believe that a SPAC was

7    poised to buy ASH at a big number?

8    A.   No, not at all.

9    Q.   Can you explain?

10   A.   Well, we had not heard from that SPAC company -- the

11   company that was a SPAC had not communicated with us for weeks

12   at the management level.

13       We had put some information about our company into a data

14   room that they did not access.  So we had had no conversations

15   with them and they had not inquired about our company.

16   Q.   Did you tell Mr. Erickson at the meeting that you didn't

17   think that the SPAC thing was going to happen?

18   A.   Yes, I did.

19       I also mentioned that that SPAC had to find a company to

20   buy by the end of the year, and that if they were interested in

21   us they would be already in due diligence and talking to us

22   around four hours a day to understand our company.  We had not

23   talked to them in weeks.

24   Q.   What kind of arrangement, if anything, did ASH have with

25   the SPAC?

Direct Examination - Lee Darnold

1   A.   We had an arrangement to dialogue over whether or not they

2   would be interested in buying our company.

3   Q.   Was there a Letter of Intent?

4   A.   There was.

5   Q.   Was ASH able to speak to other SPACs?

6   A.   No.  We were required to only talk to them.

7   Q.   Was the SPAC able to talk to other companies to buy?

8   A.   It was very one-sided.  They could talk to anybody.

9   Q.   Okay.

10       Did you know whether or not they were talking to other

11  companies?

12  A.   We didn't know officially.  We knew that the SPAC had to

13  buy a company by the end of the year.  When they did buy a

14  company, they would immediately be a public company, and so

15  because they hadn't interacted with us, we suspected they had

16  found another target.

17  Q.   Did they ultimately find another target?

18  A.   In August they put out a press release saying they had

19  bought another company in another industry two months later.

20  Q.   August 2021?

21  A.   Yes.

22  Q.   Did that confirm your views?

23  A.   It certainly did.

24  Q.   Your text to Sean Coleman also references SK.  What's that?

25  A.   SK is a homebuilding company that we were looking to try

1    and acquire.

2    Q.    Why?

3    A.    Our goal, as a company, is to grow.  And you grow through

4    acquisition or some other strategies.  SK looked like a very

5    good potential acquisition for us.

6    Q.    At that point, did you think that ASH had the financial

7    resources of cash sufficient to buy SK?

8    A.    Yes.  Every indication was that we would be able to buy SK.

9    Q.    Did you believe at the same time ASH could continue buying

10   lots from Mr. Erickson?

11   A.    Yes.  We had carved out capital to buy every lot we could

12   get from Mr. Erickson.

13   Q.    How do you react to the suggestion that ASH wanted out of

14   the LPA so it didn't have to buy anymore lots?

15   A.    It makes no sense.

16   Q.    Why not?

17   A.    We wanted lots.  Our business -- what I do every day is --

18   to sell, start, and close homes.  And the only way to do that is

19   to have lots.

20   Q.    Since the SPAC deal went away in 2021, has ASH explored a

21   SPAC deal again?

22   A.    No.

23   Q.    Are there any current plans to do a deal with a SPAC?

24   A.    No.

25   Q.    Do you know why not?

1   A.   We are too small, first of all.

2        And SPACs -- at the time, a SPAC was a company that would

3   go public and raise cash before they were a company.  They

4   effectively were a public company that would then go try to buy

5   a company.

6        Over the last, say, 12 months that whole concept of the

7   SPAC has fallen out of favor and those deals aren't really

8   happening as much anymore.

9   Q.   Fallen out of favor with whom?

10  A.   With the people that would have to invest in them.

11  Q.   You said ASH wasn't big enough.  Does ASH have a goal for

12  how big it wants the company to be?

13  A.   We say around 2000 closings annually.

14  Q.   Why is that?

15  A.   Well, there are 19 -- 19 the last time I looked, public

16  home builders in American, the smallest of which is around a

17  billion three in revenue.  So around 2000 homes at a $450,000

18  sales price is where we would be a billion.  And you have to

19  have a certain size to go public.  Going public is very

20  expensive.

21  Q.   What does that mean, to go public?

22  A.   To go public means, instead of having the private owners we

23  do today, we would go to a market and say, Does anyone want to

24  buy shares in our company.  And offer to the broad public.

25  Q.   You said the goal is 2,000.  How many houses is ASH closing

Direct Examination - Lee Darnold

 1  a year at this point?

 2  A.   350.

 3  Q.   How long do you think it will take to reach the goal of

 4  2000?

 5  A.   Our business plan right now is for about five years.

 6  Q.   Okay.

 7       Would adding a builder like SK help achieve that goal?

 8  A.   It would.

 9  Q.   Has ASH explored other ways to achieve that goal?

10  A.   Yes.

11       When the interest rates shifted buying, homebuilders became

12  a little bit more difficult.  And so our strategy, that we have

13  control of, is to try to grow from the current businesses that

14  we do own.  The first, and most obvious, is to just sell more in

15  the current communities we own.

16  Q.   You refer to the interest rates shifting there.  What did

17  you mean?

18  A.   Well, in 2022 the federal government raised the price of

19  getting -- raised the mortgage rates.  You have probably seen it

20  in the news.  What it effectively means, and what it is doing

21  right now, is making mortgage rates much, much higher than they

22  were in early 2022.

23       So in 2021 we were talking about, at the meeting earlier,

24  rates were around 3 percent.

25       I checked yesterday, I think they are 7.3 percent, which

Direct Examination - Lee Darnold

1    means it costs more than double for our homebuyers to buy a

2    house.

3    Q.    What did the low rate -- what impact did that have on

4    acquiring a homebuilder?

5    A.    Well, it meant the buyer could either buy more house for

6    their monthly payment or they could have a lower monthly

7    payment.

8    Q.    How about from ASH's perspective when it comes to buying

9    other companies?

10   A.    Well, the interest rates matter when you go and try to do

11   business deals.  So it makes it more expensive for us.

12   Q.    All right.

13         You said ASH is trying to grow the size of existing

14   divisions.  Do I have that right?

15   A.    Right.

16   Q.    Okay.

17         What's one way to do that?

18   A.    The most obvious, and one that a lot of national builders

19   have done, is to grow from the operation they have today.  So an

20   example would be, we have a business in Columbus.  Let's go look

21   for other cities in Georgia that we can grow into.

22   Q.    Such as?

23   A.    The primary target is Atlanta.

24   Q.    How would ASH move into the Atlanta market?

25   A.    Because we have the base of operations in Columbus, we have

Direct Examination – Lee Darnold

1   got purchasing people, construction people, accounting, land, a

2   division president.  We can now go buy a couple of communities

3   closer to Atlanta, and you hire construction people in Atlanta

4   and sales people, and now you can serve those communities from

5   your base back in Columbus.

6   Q.    Do you have a term for that strategy?

7   A.    The term I have used is rotation, which is -- I use the

8   analogy of Columbus would be a hub, and just like a wheel you

9   would rotate into Atlanta.

10  Q.    Does that mean you would abandon Columbus?

11  A.    No.  Columbus would be the base of operation.

12  Q.    Has ASH considered rotating into new markets from other

13  divisions?

14  A.    Yes.

15        From Huntsville we would look at Nashville, Tennessee and

16  Birmingham.  And from Prescott, Arizona, which is north of

17  Phoenix, we would look at Phoenix and Tucson.

18  Q.    Does that mean you would abandon Huntsville or Prescott?

19  A.    No.

20        As a matter of fact, we actually have communities south of

21  Tuscon that we operate out of the hub of Northern Arizona.

22  Q.    What is your reaction to the suggestion that ASH wants out

23  of Columbus?

24  A.    It makes no sense.

25  Q.    Why not?

1  A.    Well, I have invested a lot recently in Columbus.  We -- in

2  2021, we signed a lease for a new office space in Columbus that

3  was three times bigger than the one we had.  It was a five-year

4  lease.

5       In the last 90 days I have moved -- a person who worked for

6  me at two of my previous companies has agreed to move his family

7  from Colorado to Columbus, Georgia.  And he has lived here for

8  three months.  So I have made the investment in a new division

9  president.

10 Q.    How is the Columbus division doing?

11 A.    It's our best division right now from all of the

12 performance categories.  They are selling well.  They have good

13 margins.  They have great customer service scores, in the

14 94 percent, which is better than the national average.

15      I gave them the Division of the Year award last quarter.

16 And the best construction person in that company is in Columbus

17 and our best sales person.

18 Q.    Okay.

19      How do you react to the suggestion that ASH just flips

20 homebuilders like slapping a new paint of coat [sic] on a house

21 and selling it?

22 A.    The term "flip," to me means you buy something, you don't

23 add value, and you sell it as quickly as you can.  We bought our

24 first homebuilder in 2017.  Our second one in 2019.  The one I

25 joined for was 2021.  And I just outlined a 5-year plan before

Direct Examination - Lee Darnold

1   we think we have an opportunity to go public.  So 11 years is

2   not a flip.

3   Q.    Okay.

4         All right.  Let's talk about 2021 when you joined the

5   company.  What was the relationship with Mr. Erickson at that

6   point?

7   A.    I would say it was strained.

8   Q.    Did you speak with Mr. Erickson in 2020 when you decided to

9   join ASH?

10  A.    I did.

11  Q.    What did he say?

12  A.    The last conversation we had he said, That's a mistake.

13  They are not good people.  You will regret it.

14  Q.    Do you regret it?

15  A.    No, I don't.  Maybe today, but not generally.

16  Q.    You mean today because you are testifying?

17  A.    Because I am testifying in court.  Right.

18        No.  I love my job.

19  Q.    Has ASH suffered any harm during your tenure because it

20  couldn't buy lots from Mr. Erickson?

21  A.    Absolutely.

22  Q.    So 2021, what's the state of the homebuilding market in the

23  Columbus market?

24  A.    I have used the word "frenzied."  When we would start a

25  home as a speculative home, it would sell very quickly.  Our

1   buyers were sticking with their contracts.  We were raising

2   prices.  It had really taken off across the country.  2021 was

3   one of the best years in homebuilding history really.

4   Q.   Do you know what factors caused that?

5   A.   Generally, the pandemic of 2020 when people were locked in

6   their homes two things happened:  One, they couldn't go out and

7   buy homes.  But, two, they realized how important their home was

8   to them.  And, I guess, three they started realizing they could

9   work from home.  And so all of that pent-up demand, we were

10  already, as an industry, under-building.  We were building too

11  few homes, generally, before the pandemic.  So when people came

12  out of the pandemic they started buying houses like crazy.

13  Q.   Okay.  Let's talk about --

14        MR. KRAMER:  Let me have my slide up, please, Teri.

15  Can you advance me a couple of slides, please?  Sorry.

16  BY MR. KRAMER:

17  Q.   What's a Phase A lot?

18  A.   In the agreement with Mr. Erickson.  We categorize all of

19  his land into three types.  The Phase A lots were those that

20  were already finished.  He had done the bulk of his developer

21  work.

22  Q.   By the summer of 2021, how many of the Phase A lots had ASH

23  purchased?

24  A.   All of them.

25  Q.   What's a Phase B lot?

Direct Examination - Lee Darnold

1  A.   A Phase B lot were lots that at the time of the contract

2  Mr. Erickson was either -- was generally in the process of

3  developing.

4  Q.   And in the summer of 2021, where was ASH on the Takedown

5  Schedule?

6  A.   We were ahead of schedule.

7  Q.   At that point, who was the largest land banker in the

8  Columbus market, as far as you know?

9  A.   Mr. Erickson.

10 Q.   Are you aware of any other land bankers of comparable size?

11 A.   Not of comparable size.

12 Q.   When you started with the company, how did ASH-Grayhawk

13 compare to other homebuilders in the market here from a size

14 perspective?

15 A.   We were the biggest.

16 Q.   Is that important in the homebuilding industry?

17 A.   It is.

18 Q.   Why?

19 A.   Well, when you are bigger -- we talked about trades

20 earlier.  So the trades will work with you mostly on cost.  If

21 you give them some predictability, and you give them your

22 business, you can negotiate more on the cost, because they get

23 more homes and they can plan their crews better.

24 Q.   Does size have any impact on supply?

25 A.   It does because it -- you might have seen, especially in

Direct Examination - Lee Darnold

1    2020, but going into 2021, you saw a lot of news about a supply

2    chain issue which was basically we couldn't get appliances.  In

3    some situations we were waiting a year for appliances, 16 weeks

4    for windows.  So you had to order all your supplies way in

5    advance.  And if you were a big builder, the suppliers worked

6    hard to get you your supplies.

7    Q.    Okay.

8          Phase C lots, where was ASH on the schedule as of the

9    summer of 2021?

10   A.    Slightly ahead of schedule.

11   Q.    Okay.

12         Let's talk about size of the company over time.

13         In 2020, how many houses did ASH close on?

14   A.    266 houses.

15   Q.    And what's a closing again?

16   A.    That is when a buyer gets their keys and gets to move in.

17   Q.    In 2021, at the beginning of the year, what was the

18   projection?

19   A.    My predecessor had projected 278 homes.

20   Q.    Did you participate in revising that projection?

21   A.    I did.  When my role expanded, I went to all the divisions

22   and tried to give back to the Board my perspective on what unit

23   count we could do in every division.

24   Q.    Where did you land on Grayhawk?

25   A.    For Grayhawk, at 225.

Direct Examination - Lee Darnold

1   Q.   How did the year end?

2   A.   229.

3   Q.   How about in 2022, what was the projection?

4   A.   230.

5   Q.   How did the year end?

6   A.   63.

7   Q.   And in 2023, what was the projection?

8   A.   185.

9   Q.   Where are we now?

10  A.   We anticipate doing about 110.

11  Q.   How many actual closings have there been to this point in

12  the year?

13  A.   65.

14  Q.   All right.

15       So what are some of the factors that cause the projections

16  to go down?

17  A.   It was almost entirely lots.

18  Q.   What do you mean?

19  A.   Well, I mentioned earlier you have to have a lot to start a

20  house.  And we didn't have lots.

21  Q.   Okay.

22       Were there some other factors as well -- well, let me ask a

23  more specific question.

24       You mentioned that the interest rates are higher now,

25  right?

Direct Examination - Lee Darnold

1    A.    Right.

2    Q.    How is the Columbus division doing selling what houses are

3    available to you?

4    A.    We are still selling strong in Columbus.  Some of our

5    markets have been hit by the interest rates, but in Columbus we

6    had a very affordable product.  We have a very efficient team

7    today and we are still selling.

8    Q.    Okay.

9            MR. KRAMER:  Let's take that slide down.  And I would

10    like to put up, for the witness, Plaintiffs' Exhibit 190F.

11            THE COURT:  How much longer do you have with this

12    witness, Mr. Kramer?

13            MR. KRAMER:  I think less than an hour, Your Honor.

14    Maybe 45 minutes or so.

15            THE COURT:  This would be a good time to break?

16            MR. KRAMER:  It would.

17            THE COURT:  All right.

18            Ladies and gentlemen, it's almost 5:30.  We are going

19    to take a break for the evening.

20            I once again caution you not to discuss the case with

21    anyone during your break.  Don't let anybody discuss it with

22    you.  Don't do any independent research.  Don't go on the

23    Internet and Google any of these names and terms that you have

24    heard.  You have got to decide the case solely on the evidence

25    you hear during the trial and can't be influenced by anything

Direct Examination - Lee Darnold

```
 1    beyond this trial.
 2            Leave your note pads there in your chair.  They will
 3    be protected while you are gone.
 4            We will see you tomorrow morning at 9 AM.
 5            Have a good evening.
 6        (Jury out at 5:26.)
 7            THE COURT:  Sir, you can step down.
 8            Mr. Kramer, where do we stand based upon what you were
 9    anticipating at the beginning as far as our pace?
10            MR. KRAMER:  At this point, Your Honor, my hope
11    remains to finish our case at some point on Thursday at the
12    latest.
13            THE COURT:  Okay.  All right.
14            Let me just ask you a question with regard to your
15    presentation of damages.
16            How many -- how many lots do you claim have -- are
17    owed up until the date of trial that have not been provided?
18            MR. KRAMER:  78, Your Honor.
19            THE COURT:  78?  And what is the average profit per
20    lot?  What would your damages be on those 78 lots?
21            MR. KRAMER:  I don't have that number off the top of
22    my head, Your Honor.
23            THE COURT:  Is your expert going to break it down in
24    that way?  Or is he or she just going to cumulatively have it
25    all go out into the future?  Are you planning on breaking it
```

 1  down so that the damages to the time of trial and then the

 2  damages going forward?

 3          MR. KRAMER:  Well, I was hoping not to do that, but we

 4  could.

 5          THE COURT:  I'm not suggesting what you should or

 6  shouldn't do.  I'm just -- I'm trying to anticipate if the Court

 7  of Appeals were to find that there had not been an effective

 8  sufficiently prompt termination that there would be some way

 9  to --

10          MR. KRAMER:  Avoid a retrial.

11          THE COURT:  Correct.

12          MR. KRAMER:  Yes.  I support that, Your Honor.

13          THE COURT:  I would just ask you to give some

14  consideration to those issues just going forward.

15          How many lots are there in the future that he has not

16  yet -- well, future lots under the contract that you claim

17  were --

18          MR. KRAMER:  I believe it's roughly 860.

19          THE COURT:  Okay.

20          MR. KRAMER:  Doing math in my head, which is always

21  perilous.

22          We could break it down on that basis, Your Honor.

23          THE COURT:  Well, I mean, I won't decide it -- I will

24  have to decide it at directed verdict.  But it's not clear,

25  under the law, when you sue for anticipatory repudiation of the

1    contract, how promptly you must indicate that you were

2    terminating the contract and going to pursue damages for, in

3    effect, the value of the entire contract.  There is uncertainty

4    about that question.  And there is uncertainty on other issues,

5    too.

6            I mean, there is uncertainty as to whether you may be

7    able to prove and convince this jury that you are entitled to

8    $40 million.  But if you don't prevail on that issue, you're

9    looking at something significantly different.  Which, in most

10   cases, where there is so much uncertainty and each side, because

11   of that certainty -- uncertainty -- has so much at stake, that

12   unless you are just a real gambler, I can't understand how

13   business people can't figure out how to add some certainty to

14   the situation by resolving it yourselves.

15           I mean, this is a situation where, potentially, you

16   could get -- Mr. Erickson may have to pay over $40 million.

17   That's a possibility.  I'm sure his lawyers have advised him as

18   to what they think the chance of that is.

19           But it's also a situation where, if the Court were to

20   decide you didn't properly terminate the contract upon being

21   notified of anticipatory breach, that you may be entitled to

22   damages, at most, on 85 lots, or whatever the number is, whether

23   you then would be able to sue again for future breaches, there

24   is a question about that.

25           I just would think that this being that kind of a

1    dispute, with that much at stake on each side, there would be

2    some chance to discuss that before you have these 12 folks make

3    this decision.

4            I mean, if you are up there at $40 million, or

5    whatever, and he, obviously, has no choice, seems to me.  So,

6    you know, if that's where you are.

7            But as far as what you have already paid him, have you

8    paid him that in -- I know you have paid him that in units of

9    the shares in the company.  Has the rest of that been paid in

10   cash, or through -- is it being through a note or he has got

11   that in his pocket?

12           MR. KRAMER:  In his pocket, plus the deposit.

13           THE COURT:  Okay.

14           Well, he has probably got less of it in his pocket now

15   paying all of these lawyers sitting back there at his table,

16   which is just going to continue, even regardless of who wins.

17   It's going to continue at the Court of Appeals.

18           I'm sure the company, if the right number could be

19   agreed upon, would jump at the opportunity of buying his shares

20   from him and just be done with each other altogether, I would

21   think, if you could reach the right number.  But I am assuming

22   y'all did all that before you came in here on Monday.

23           MR. KRAMER:  That's right.  We have had a mediator

24   engaged for years and we have worked with him on and off.

25           THE COURT:  Sometimes presenting your case, and

1    looking over at 12 strangers that are going to be deciding, you

2    know, the issues, sometimes that just drives it home as to how

3    much you are willing to risk on both sides.  And I am not

4    suggesting how it's going to come down one way or the other.

5    All I am suggesting is that there is uncertainty here, both on

6    the facts and the law, quite frankly.

7              MR. KRAMER:  Very much understand, Your Honor.

8              THE COURT:  Okay.  All right.

9              Well, I'm here to deliver this case to the jury, or to

10   assist y'all in getting it to the jury, but it wouldn't hurt my

11   feelings if somebody could sit down and resolve the matter

12   before then.  But if not, everybody has a right to a jury trial.

13   That's the greatness of our system.  And we will proceed

14   tomorrow.

15             MR. KRAMER:  Thank you, Your Honor.

16             THE COURT:  We will see you all at 9 AM.

17      (Proceedings concluded at 5:36 PM on Tuesday, September 19,

18   2023.)

19                          * * * * * * * *

20             I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
21   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
22   transcript.

23   /s/ Lisa C. Snyder                    10/4/2023

24   Lisa C. Snyder, RPR, CRR                  Date
     Official U.S Court Reporter

25

1                       <u>**I N D E X**</u>

2    <u>PLAINTIFFS' WITNESSES</u>                              <u>PAGE</u>

3    <u>RYAN TWISS</u>
     Cont. Direct Examination By Mr. Kramer          164
4    Cross-Examination By Mr. Shebelskie             235
     Redirect Examination By Mr. Kramer              242
5    Cont. Direct Examination By Mr. Kramer          244
     Cross-Examination By Mr. Shebelskie             245
6    Cont. Cross-Examination Mr. Shebelskie          323
     Redirect Examination By Mr. Kramer              360
7
     <u>LEE DARNOLD</u>
8    Direct Examination By Mr. Kramer                395

9    <u>OTHER RECORD MADE</u>                                 <u>PAGE</u>

10   Videotaped Deposition of Marshall Coleman       394

11
                        <u>**E X H I B I T S**</u>
12
     <u>PLAINTIFFS' EXHIBITS</u>              <u>OFFERED</u>   <u>RECEIVED</u>
13
     PX258                               167       167
14
     PX261                               170       170
15
     PX840B                              178       178
16
     PX840C                              180       180
17
     PX785                               181       181
18
     PX831                               183       183
19
     PX75 AND PX75A                      191       191
20
     PX202                               193       193
21
     PX200, 200A AND 200B                195       195
22
     PX197, 197A AND 197B                198       198
23
     PX467                               202       202
24
     PX700                               205       205
25

```
 1   PLAINTIFFS' EXHIBITS              OFFERED    RECEIVED

 2   PX832                              209        209

 3   PX34                               215        215

 4   PX74                               217        217

 5   PX33                               218        218

 6   PX398                              220        220

 7   PX180                              224        224

 8   PX270                              225        225

 9   DX260                              367        367

10   D333                               375        375

11   DX340                              378        378

12   DX342                              431        431

13   PX31                               243        243

14
     DEFENDANTS' EXHIBITS             OFFERED    RECEIVED
15
     257                                273        273
16
     307                                280        280
17
     326                                299        299
18
     328                                324        324
19
     346                                327        327
20
     344                                331        331
21
     338                                333        333
22
     12                                 347        347
23
     214                                357        357
24
     278                                348        348
25
```