1

2                    **UNITED STATES DISTRICT COURT**
                     **MIDDLE DISTRICT OF GEORGIA**
3                         **COLUMBUS DIVISION**

4    AMERICAN SOUTHERN HOMES          )
     HOLDINGS, LLC AND                )
5    ASH-GRAYHAWK, LLC,               )
                                      )
6              Plaintiff,             ) Case No: 4:21cv95
                                      )
7          v.                         ) Columbus, Georgia
                                      ) September 20, 2023
8    DAVID B. ERICKSON, ET AL,        )
                                      ) VOLUME III
9              Defendants.            )
     _____ )

10

11                 **TRANSCRIPT OF JURY TRIAL**
              **BEFORE THE HONORABLE CLAY D. LAND**
                 **UNITED STATES DISTRICT JUDGE**
12                **(Pages 457 through 741)**

13

14

15

16

17

18

19

20

21

22                    *LISA C. SNYDER, RPR, CRR*
               **Official United States Court Reporter**
23        **111 North Adams Street, Tallahassee, FL 32301**
              **(850)567-1374 * lisasnydercr@gmail.com**

24

25            *Proceedings reported by stenotype reporter.*
       *Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

```
For the Plaintiff:        Faegre Drinker Biddle & Reath, LLP
                          By:  JACOB A. KRAMER
                               JESSICA R. MAZIARZ
                               RACHEL ANNA BECK
                               Attorneys at Law
                               jake.kramer@faegredrinker.com
                               jessica.maziarz@faegredrinker.com
                               rachel.beck@faegredrinker.com
                          1500 K Street NW
                          Suite 1100
                          Washington, DC 20005

                          By:  DAVID R. MERRITT
                               JOSHUA TODD PETERSON
                               Attorneys at Law
                               david.merritt@faegredrinker.com
                               josh.peterson@faegredrinker.com
                          2200 Wells Fargo Center
                          Minneapolis, MN 55402

                          Buchanan Law Firm, PC
                          By:  JERRY A. BUCHANAN
                               Attorney at Law
                               jab@thebuchananlawfirm.com
                          P.O. Box 2848
                          The Corporate Center, Suite 614
                          233 12th Street
                          Columbus, GA 31902

For the Defendant:        Hunton Andrews Kurth, LLP
                          By:  ROBERT T. QUACKENBOSS
                               Attorney at Law
                               rquackenboss@huntonak.com
                          2200 Pennsylvania Avenue NW
                          Washington, DC 20037

                               MICHAEL R. SHEBELSKIE
                               KEVIN S. ELLIKER
                               Attorneys at Law
                               mshebelskie@huntonak.com
                               kelliker@huntonak.com
                          Riverfront Plaza, East Tower
                          951 E. Byrd Street
                          Richmond, VA 23219
```

1               **P R O C E E D I N G S**

2          (Call to Order of the Court at 8:55 AM on Wednesday,

3     September 20, 2023.)

4               THE COURT:  Please be seated.

5               I just wanted to take up something with the lawyers

6     before we start this morning.

7               I want to make sure there is no confusion related to

8     any of the orders on the motions in limine.

9               I have often expressed my frustration with broad

10    motions in limine because they ask the Court to rule on things

11    when the record may be different than it is at trial.  And it's

12    a way for lawyers to try to cabin things in because lawyers like

13    to have everything canned prior to trial, but trials don't often

14    work out in practice the way they look like they may work out a

15    month before at the pretrial stage.

16              But I made a ruling with regard to the ordering

17    specific performance with regard to the selling of lots --

18    providing of lots under the Land Purchase Agreement -- by

19    granting a preliminary injunction.  And in the motion in limine

20    order, I indicated that, as a general matter, that would not be

21    admissible.

22              That has changed.  I think the context now -- and

23    yesterday evidence was admitted as to the preliminary injunction

24    requiring the selling of certain lots, and counsel indicated

25    that defense had opened the door.  Defense counsel did not

1    object to that.  And I agreed.

2          But I just want to make it clear on the record so

3    somebody later on doesn't come in and say, Well, the judge let

4    this all in contrary to his pretrial order.

5          My understanding now of the context of the case is the

6    plaintiffs contend that Mr. Erickson, and the parties to the

7    LPA, first of all, breached that agreement by failing in good

8    faith to reach a schedule with regard to the C lots and then

9    continued to breach the agreement when he terminated the

10   agreement, when he said, Okay, this is over.  I'm not providing

11   anything under this agreement.

12         And it's my understanding that the plaintiffs contend

13   that that was an anticipatory breach or a repudiation; not only

14   a breach for past, but a breach where he was indicating he was

15   not going to perform in the future.  And so that would be an

16   anticipatory repudiation or anticipatory breach.

17         Mr. Erickson, as I understand it, is going to contend

18   that he was somehow prevented from performing because the

19   plaintiffs were not acting in good faith with regard to coming

20   up with a schedule.

21         I think that's going to be a jury question.

22         The plaintiffs then brought their action, first of

23   all, seeking specific performance.  The plaintiffs did not

24   terminate the contract.  They chose to, at that point in time,

25   try to enforce the contract by seeking, first of all, the

 1    preliminary injunction and specific performance.  The Court did

 2    order some specific performance to maintain the status quo while

 3    the case was pending.

 4          As that process continued, plaintiffs determined

 5    before trial that this wasn't going to work, that they had lost

 6    trust in Mr. Erickson.  And having a continuing relationship

 7    where he was going to produce lots pursuant to a specific

 8    performance wasn't going to work, that it was infeasible, didn't

 9    trust him anymore and just wasn't going to happen.

10          So, at that point, even though that would be a remedy

11    for an anticipatory breach, at that point plaintiffs determined

12    that the contract should be terminated and sued for damages

13    based upon the anticipatory breach.

14          Defendants contend that you waive that right to sue

15    for damages because you waited too long.

16          Assuming that that undue delay is a jury question -- I

17    am assuming that for the moment and haven't ruled on any motion

18    for directed verdict -- but assuming that it's a jury question

19    as to whether there was an undue delay on behalf of the

20    plaintiffs to seek that particular remedy, which I think the

21    law -- there are principles of contract law that set out the

22    standard for that and undue delay.  Assuming it ends up being a

23    question for the jury, then it's clear to me that the jury needs

24    to know what was happening and what the plaintiffs were doing

25    between the time of the breach and the time they decided to

1    pursue the damages as opposed to specific performance.

2           So that necessarily means that they need to know, I

3    think, that the plaintiffs were pursuing, first of all, specific

4    performance, and they did get some specific performance.  But

5    then they didn't believe that was going to provide a full and

6    adequate remedy, and so that's when they next changed to damages

7    for anything in the future.

8           And I think the jury can consider all of those facts

9    in deciding whether there was undue delay.  So I think that's

10   one of the other reasons that the fact that there was an order

11   for specific performance is relevant, and the defendants have

12   opened the door for that to be admitted.  In addition to the

13   fact that the defendants put in all this evidence about the

14   settlement negotiations or alleged settlement negotiations.

15          Now, as to the extent of the evidence that will be

16   permitted with regard to the selling of lots pursuant to the

17   Court's specific performance order, preliminary injunction,

18   there does not need to be any reference that the Court has

19   determined that there was a breach because there has not been.

20   It was just a preliminary finding.

21          So any questions to any witnesses about the Court's

22   ordering of a preliminary injunction needs to be explained and

23   couched in terms of, this was done to just maintain the status

24   quo until the issue could be finally decided.  And there should

25   not be any suggestion that the Court concluded, by issuing the

1    preliminary injunction order, that Mr. Erickson, or any of the

2    defendants, breached any contract, because there was no final

3    determination of that.

4         The only thing the Court determined was there was a

5    likelihood of success on the merits.  So I just want to make

6    sure that when you walk that line you don't give any implication

7    that the Court has found in favor of the plaintiffs on the

8    merits with regard to the breach of the contract.  And it just

9    needs to be that in order to maintain the status quo until the

10   case could be decided it was determined that Mr. Erickson would

11   supply certain lots, which he did.

12        I think the jury needs to know all of that in light of

13   the defendants' argument that there was undue delay in seeking

14   this other remedy.  Otherwise, they are just kind of -- they

15   don't know why you waited.  And they may not buy that.  They may

16   say that it's still undue if it ends up being a jury question.

17   But...

18        MR. QUACKENBOSS:  Your Honor, may I ask two clarifying

19   points about Your Honor's comments?  It raises two additional

20   questions.

21        Number one, the Court had also granted the plaintiffs'

22   motion in limine regarding what they characterized as that

23   second batch, that second category of settlement communications.

24        What those are is the correspondence record since the

25   Court's preliminary injunction order of Mr. Erickson's quarterly

1  offers, and, in fact, the plaintiffs' quarterly demands to take

2  down more lots quarter after quarter after quarter.  And they

3  bought them all the way up to the most recent quarter.

4         And we believe Mr. Erickson, in light of the Court's

5  comment, has no way to defend himself to say on this undue delay

6  that --

7         THE COURT:  So he sold those lots even -- not in

8  compliance with the Court's preliminary injunction, but just

9  after the Court issued the first preliminary injunction he

10  decided to supply them every quarter thereafter?

11         MR. QUACKENBOSS:  Correct.  And he has been -- he has

12  been delivering B lots.  He has practically exhausted his

13  arsenal of B lots -- his supply of B lots.  And he has begun

14  developing C lots and fully intends to continue doing so.  He is

15  somewhat behind the schedule, and -- but --

16         THE COURT:  Well, you know, I don't see how he can be

17  prevented from introducing that evidence if there is a

18  contention that he continued to breach the LPA and if there is a

19  contention that plaintiffs acted reasonably in changing horses

20  with regard to the remedy.

21         Yes, sir?

22         MR. KRAMER:  If I may, Your Honor, good morning.

23         So this is the other Rule 408 motion that Your Honor

24  granted, I believe, in a written opinion.

25         THE COURT:  Right.

1          MR. KRAMER:  And the thrust of the ruling was that

2    happened because the Court had entered a preliminary injunction,

3    and the parties were negotiating to avoid another.

4          Now, we have very narrowly tailored our case to

5    address the fact that Mr. Erickson has not developed or

6    delivered any Phase C lots during that entire period since the

7    preliminary injunction was entered.

8          What Mr. Quackenboss is talking about are Phase B

9    lots, which aren't even a subject of our damages claim.  And the

10   motion that the Court granted, which we maintain should be

11   upheld, is that's out of bounds, under Rule 408, because it

12   was -- it was a negotiation to avoid another run back to Court

13   for a preliminary injunction.  And we -- our allegation of

14   breach relates entirely to the Phase C lots.

15         THE COURT:  None of those lots that Mr. Quackenboss

16   was just describing were C lots?

17         MR. KRAMER:  Correct.  They were B lots.  All B lots.

18         THE COURT:  And you are not claiming that he breached

19   the agreement by not providing B lots?

20         MR. KRAMER:  Nope.  Not at all, Your Honor.

21         MR. QUACKENBOSS:  Well, Your Honor, the evidence is

22   that they have suffered catastrophic loss due to

23   Mr. Erickson's --

24         THE COURT:  But the only damage they are seeking, as I

25   understand it, is the profit that they lost on the C lots.

1          Is that correct, Mr. Kramer?

2          MR. KRAMER:  Yes, Your Honor.

3          THE COURT:  I mean, even though people have said, you

4    know, it's ruined our business, they are not seeking some

5    general damages, as I understand it, related to their business

6    going under or being impaired.  They are seeking damages solely

7    for the profits on the C lots.

8          MR. QUACKENBOSS:  But, Your Honor, there is also

9    evidence, I think, beginning with the Court's preliminary

10   injunction order, that B lots are completely equivalent to

11   C lots and that the differentiation plaintiffs are making is

12   pre-textual.  A B lot is no different whatsoever from a C lot.

13   They are in exactly the same subdivisions.  The only difference

14   is --

15         THE COURT:  So has he satisfied all of his

16   requirements for B lots, and the B lots are being offered as

17   substitutes for C lots?

18         MR. QUACKENBOSS:  That's exactly correct, since the

19   date of the Court's order when the Court ordered that some

20   B lots be turned over in lieu of the C lot.

21         THE COURT:  So under the contract, he owes no more

22   B lots?

23         MR. QUACKENBOSS:  There may be a few that he has not

24   delivered.  But out of the hundreds he has more than

25   substantially complied, if not completely complied, with the

1    number of B lots owed.

2              THE COURT:  So he has delivered more B lots than are

3    owed under the contract?

4              MR. KRAMER:  No.

5              MR. QUACKENBOSS:  The B lot -- the B lot obligation is

6    now over, and the B lot to buy and the B lot obligation to

7    deliver.  And --

8              THE COURT:  Now, just simplify it for me.  The

9    contract says you got to deliver so many B lots.

10             MR. QUACKENBOSS:  Right.

11             THE COURT:  Has he delivered all of those?

12             MR. QUACKENBOSS:  He has not.

13             THE COURT:  Okay.  Well, that defeats your argument

14   that if he had delivered all of the B lots, and he was now

15   delivering lots in excess of what he was required, and they were

16   somehow denominated B lots, then presumably he could contend,

17   Okay, those are really C lots now because I fulfilled all my

18   obligations with regard to B lots.

19             MR. QUACKENBOSS:  We believe he is entitled to make

20   that argument because they are entirely equivalent.  Same

21   quality.  The only difference is --

22             THE COURT:  Well, then they would have a claim that he

23   has breached the contract with regard to the B lots.

24             MR. QUACKENBOSS:  Until very recently, that's what

25   they had been alleging.  It is at trial, and slightly before,

1  that they have pivoted to suggest that it is only a C lot

2  breach.

3  THE COURT:  Well, I am not going to prevent him from

4  coming in and testifying, or you putting up evidence, that he

5  has not breached the agreement because he provided C lots.  I

6  mean, that's not just a legal question for me to decide.  The

7  jury can resolve that.  They can say, No, that's bull.  Those

8  were not C lots.  So I am not going to prevent him from doing

9  that.

10  MR. QUACKENBOSS:  The evidence will further show,

11  Judge, that --

12  THE COURT:  I mean, I know the plaintiff says these

13  are clearly not C lots.  But the defendant is going to come in,

14  I guess, and testify and try to convince the jury that they are

15  C lots.  So that's a clear, legal -- I mean, a clear, factual

16  dispute that the jury is going to have to decide.

17  MR. QUACKENBOSS:  That's right.

18  THE COURT:  Now, the question is why should you be

19  able to get into this 408 evidence for him to testify to that?

20  MR. QUACKENBOSS:  Well, and again, Your Honor, we

21  don't believe that is settlement communication.  The fact that,

22  as I understand plaintiffs' theory, there is no writing he could

23  have created to affect an offer of the B lots because it came

24  after the preliminary injunction order that would have permitted

25  him to simply deliver and offer the B lots.

1          If anything he would have offered, after that point,

2    is now protected in a bubble because of the preliminary

3    injunction order, how can the man defend himself by saying --

4          THE COURT:  Well, that's the problem, Mr. Kramer.  The

5    preliminary injunction order, that all goes to whether or

6    not -- in part, to whether or not you exercised -- whether you

7    failed to exercise appropriate -- well, whether there was undue

8    delay -- let me get this straight -- whether there was undue

9    delay on your part in terminating the contract as opposed to

10   seeking enforcement of the contract.

11         And I think this evidence of what happened in that

12   interim is relevant to that issue.  And I am concerned about

13   just letting some of it in and then him not being able to

14   explain his position.

15         MR. KRAMER:  I understand, Your Honor, and I think the

16   context of the Court's prior ruling and the reason --

17         THE COURT:  The context of the Court's prior ruling, I

18   think it was all of those rulings were made when I thought you

19   were pursuing specific performance, but maybe not.  Maybe it was

20   made afterwards.

21         MR. KRAMER:  I believe this one came in a written

22   opinion following the pretrial conference.

23         But regardless, Your Honor, the reason this evidence

24   is being offered, and the reason it was excluded under Rule 408,

25   is defendants are using this to allege that plaintiffs failed to

 1   mitigate their damages, which would be -- goes directly to the

 2   validity of a defense in the claim and is not permissible under

 3   Rule 408.  That's the B lots are the same as C lots.

 4           The situation we find ourselves in is that --

 5           THE COURT:  Well, I don't think it's admissible for

 6   mitigation purposes.

 7           My question is whether it's admissible for this

 8   argument that there was undue delay and whether or not he was

 9   prevented from performing.

10           MR. KRAMER:  Okay.  To that point -- I am glad we are

11   getting on square terms with this before there is a witness on

12   the stand.  Thank you for the opportunity to address it.

13           Two points:  The B lots are almost gone.  By the end

14   of this year, if Mr. Erickson had continued, no more B lots.

15   There is only 38 left.  That's why we focused on the C lots.

16           And as to the election on specific performance, you

17   know I just want -- I just want to be clear, plaintiffs'

18   position throughout the case is that Section 35C in the contract

19   permits plaintiffs to seek both specific performance and lost

20   profits --

21           THE COURT:  No, I understand that.

22           MR. KRAMER:  -- in the alternative, which would trump

23   common law principle regarding -- that we have been talking

24   about here about anticipatory repudiation and undue delay.  I

25   understand that that may be a question that goes to the jury.

1          But, you know, when the Court required us to elect

2    between specific performance and lost profits we thought we were

3    proceeding under the terms of the Section 35C, and that we

4    wouldn't be back here, you know, with someone trying to get the

5    "lawyer of the year award," as it was phrased at the pretrial

6    conference, by arguing that that election is actually precluded

7    as a matter of law.

8          So, it's -- we find ourselves in a difficult position

9    here.  And that's why we have just focused on the Phase C lots

10   that Mr. Erickson undisputedly failed to deliver at the

11   beginning the end of 2021, until the Court ordered him to do so,

12   whereupon he provided the remaining 27, not 29.

13         And for years, he hasn't been developing lots that

14   could have been delivered in just a few months.

15         So that's the theory of the case.  It has nothing to

16   do with B lots.  And we don't say that --

17         THE COURT:  Well, let me just -- let me make my

18   observation with regard to your belief that the contract trumps

19   the common law.

20         MR. KRAMER:  Okay.

21         THE COURT:  My understanding is that the contract

22   would allow you to pursue damages connected to a breach of the

23   contract or to pursue specific performance.  But I don't think

24   that answers the question of what happens when you terminate the

25   contract.

1    In other words, under the law, as I understand it, you

2    can proceed as if the contract is in full force and effect.  And

3    you can sue for specific enforcement of that contract --

4    specific performance of that contract.  But you can only do that

5    if the contract is in full force and effect because you are

6    seeking to enforce an existing contract.

7    And the same thing with damages.  You can sue -- there

8    is a contract that is enforceable that has been breached and you

9    are seeking damages associated with that.

10    And you may be able to seek specific performance of

11    the contract and damages that are not necessarily covered.  In

12    other words, the specific performance does not make you whole.

13    You may be able to seek damages in addition to that if you are

14    seeking to enforce the contract.

15    Your other option under, as I understand it,

16    established common law is you can say, Okay, at this point, you

17    have got future obligations and you have repudiated those.  You

18    have indicated to us that you are not going to perform this

19    contract in the future.  It doesn't have anything to do with

20    past.  It has to do -- you have indicated this contract is not

21    going to be performed by you.

22    Now, in that situation, you can sue on the contract to

23    have it specifically performed.  And you could seek perhaps

24    consequential damages in addition to that, and your contract

25    allows you to do that.  Or you can sue -- you can take the

1   position that, based upon your anticipatory repudiation, the

2   contract is terminated.  And you should get the value of the

3   entire contract.

4        And once -- and if it's terminated then you get the

5   profits.  You get damages now for everything that had to be

6   performed in the future.  But you only get that, the full value

7   of that future performance.  You are not suing then on the

8   contract.  You are then saying the contract has been terminated

9   by his anticipatory repudiation of the performance.  And so at

10  that point, that's not only a different remedy, but that's a

11  different theory.

12        MR. KRAMER:  Understand, Your Honor.

13        THE COURT:  And my understanding is that's the choice

14  that was made prior to trial as opposed to, We wanted specific

15  performance plus consequential damages, but the choice was made.

16  He repudiated performance of the contract and so we now want the

17  full value of the contract, including all future performance,

18  which would include future profits.

19        And I am not -- I don't think that your contract --

20  once you terminate the contract and have -- and are not suing on

21  the contract, then those provisions on the contract -- in the

22  contract -- don't apply as to the remedy.  The remedy is then

23  the remedy for anticipatory repudiation.

24        MR. KRAMER:  Understand, Your Honor.

25        Three quick points.

```
1              THE COURT:  Yes, sir.

2              MR. KRAMER:  The contract deviates from those

3     principles in the following way:  Section 35B in the contract

4     gives the plaintiff the opportunity to terminate the contract

5     and seek lost profits.

6              Section 35C, which is what we have proceeded under,

7     traveled under during the course of this case, gives the

8     plaintiff a different set of options, which is to keep the

9     contract in place, and pursue such other rights or remedies as

10    are available in law or in equity, including but not limited to

11    obtaining specific performance, to compel the seller to improve

12    and/or sell the lots to buyer, and recovering all monetary

13    damages and lost profits arising from seller's default.

14             THE COURT:  But I don't read that to mean all future

15    lost profits.  I read that to mean other damages that are not

16    anticipatory repudiation damages.

17             And the way -- what I understood y'all to be doing

18    before trial is decided to proceed under 35B, is what I

19    understood the election to be prior to trial is 35B.

20             MR. KRAMER:  Okay.  Got it, Your Honor.  Got it.

21             THE COURT:  I interpreted 35C to be, Okay, we are

22    going to seek specific performance.  And in addition to that, we

23    are seeking damages for the breach, but not seeking damages that

24    are equal to the entire value of the contract.

25             MR. KRAMER:  Understood.
```

1          THE COURT:  To do that you got to take the position

2    that he repudiated all performance of it, and the contract is no

3    longer in force and effect.  And so you get the value of

4    everything that you could have gotten.

5          MR. KRAMER:  That's very helpful to understand.

6          THE COURT:  Well, that could be wrong, but that's my

7    position.  And the Court of Appeals will decide whether that's

8    right or wrong, but that's my impression of it.  And so I think

9    those common law principles about undue delay are still

10    applicable.

11          MR. KRAMER:  That was my final point, Your Honor.

12          THE COURT:  And I think as a jury -- well, I haven't

13    ruled on any motion for directed verdict.  But assuming there is

14    a jury question on it, all of this stuff that happened in

15    between, even if it may have related in some way to settlement

16    discussions, may be relevant on that issue.

17          MR. KRAMER:  Understand, Your Honor.  And that -- you

18    know, there is no question that the contract -- that

19    Mr. Erickson is no longer required to perform under the contract

20    as a result of this election.  We have already given evidence

21    that the most recent breach was in July of this year.  So --

22          THE COURT:  Really, what I wanted to do -- I didn't

23    want to get bogged down in this.  What I wanted to do is put you

24    on notice that I'm giving you the opportunity to put up evidence

25    as to why you waited.

```
1              MR. KRAMER:  Okay.  Thank you.

2              THE COURT:  So that in the final analysis, if it's a

3    jury question where they have got to decide whether there was

4    undue delay, you have an opportunity to explain.

5              MR. KRAMER:  Understood, Your Honor.

6              THE COURT:  And then defendant has the right to give

7    his explanation.  So I think those other set of discussions are

8    likely going to be admissible.

9              MR. QUACKENBOSS:  Thank you, Your Honor.

10             THE COURT:  And then at the end of the day, there are

11   remedies, if those rulings are erroneous at the end of the day,

12   but that's my best call.

13             MR. KRAMER:  Which I am sure we all hope to avoid.

14             THE COURT:  Let me ask you this -- go ahead.

15             MR. KRAMER:  For the avoidance of doubt, what is off

16   limits, though, is to argue that offering these Phase B lots was

17   a mitigation of damages, right?  That's the one part.

18             THE COURT:  Correct.  I don't think that goes to

19   mitigation of damages.

20             MR. QUACKENBOSS:  And, Your Honor, we will not argue.

21   We understand the Court's order that we may not argue mitigation

22   of damages.  But we do intend to argue that his delivery of

23   lots, indeed, their demand for continued delivery of lots, was

24   in complete compliance, and he met the minimum requirements

25   since the day of the preliminary injunction.
```

1          So it's a question of whether there was a breach and

2    if so, when it occurred.

3          THE COURT:  Okay.  Well, that may be evidence that the

4    jury can consider in determining whether there was a breach or

5    anticipatory repudiation of the contract.

6          MR. QUACKENBOSS:  And, Your Honor, one other

7    clarifying point regarding your comments on the preliminary

8    injunction order.  Another portion of the Court's preliminary

9    injunction order I think is very important regarding the scope

10   of evidence here.  The Court also determined that Mr. Erickson

11   did not have an obligation to sell lots at this accelerated pace

12   but was required only to meet the quarterly minimum under the

13   contract.  The evidence we're hearing --

14         THE COURT:  Well, my findings in that regard should

15   not be admissible.  The contract will decide those issues.  The

16   only thing I am saying is admissible about my order is that he

17   did -- he was ordered to provide these lots, whatever they were,

18   to maintain the status quo.  And then he did comply, but the

19   jury does not need to hear my other findings other than what

20   I -- there was a preliminary injunction that, to maintain the

21   status quo, these lots were delivered.

22         MR. QUACKENBOSS:  Very well.  Thank you.

23         THE COURT:  All right.  Refresh my recollection.

24   Ms. Erickson is no longer a party, correct?

25         MR. QUACKENBOSS:  Correct.

1           THE COURT:  And did I -- how did that come to be?

2           MR. QUACKENBOSS:  We filed a motion to dismiss based

3    on failure to state a claim.  In fact, the contract, which she

4    signed --

5           THE COURT:  Did I grant the motion to dismiss?

6           MR. QUACKENBOSS:  Yes, sir.

7           THE COURT:  And I ruled that the -- that the LPA

8    contract, she did not sign it in her individual capacity?

9           MR. QUACKENBOSS:  She did sign it, but it had no

10   obligations for her in her individual capacity.

11          THE COURT:  Okay.  Because she is listed as a party in

12   her individual capacity, but there was nothing in the contract

13   that put an obligation on her to do anything?

14          MR. QUACKENBOSS:  Correct.  And that was the basis of

15   the Court's order, and she should not be listed at this time any

16   longer as a party.

17          THE COURT:  Correct.  She is not.  I was looking back

18   at the LPA and she was a party to the LPA.

19          MR. QUACKENBOSS:  Correct.

20          THE COURT:  But my ruling was that you convinced me

21   that she didn't assume any responsibilities under the contract,

22   and she did not guarantee performance?

23          MR. QUACKENBOSS:  That's right.

24          THE COURT:  But Mr. Erickson, in his individual

25   capacity, is still a party to the contract, correct?

1            MR. QUACKENBOSS:  He did sign it individually, but

2     there was no guarantee -- no individual guarantee.

3            THE COURT:  With regard to Mr. Erickson --

4            MR. QUACKENBOSS:  Mr. Erickson.

5            THE COURT:  -- he is -- at this stage, he is a party

6     to the LPA in his individual personal capacity?

7            MR. QUACKENBOSS:  That's correct.

8            THE COURT:  If there is a judgment in favor of the

9     plaintiffs on the LPA, and they find Mr. Erickson breached, then

10    that judgment will be against not just his companies but him in

11    his personal capacity?

12           MR. QUACKENBOSS:  Well, our position would be only

13    with regard to the assets he owns and is responsible for under

14    the contract.  He is an individual party of the contract because

15    he owns some of the lots that are subject --

16           THE COURT:  Well, we will get into that later, but it

17    seems to me that the current status is that he is -- he is an

18    individual party.  He is not just a party in his represented

19    capacity.  Plaintiffs' allegation is that he individually

20    breached that contract, or repudiated performance of the

21    contract, and so the damages they seek flowing from that breach

22    or repudiation they are seeking them against him individually is

23    my understanding.

24           Is that correct?

25           MR. QUACKENBOSS:  That's their allegation.

1          MR. KRAMER:  That's correct, Your Honor.

2          THE COURT:  Okay.  Let's bring the jury down.  Bring

3     your witness up.

4          Since the jury charges were submitted prior to this --

5     prior to the change of theory, we don't have any proposed jury

6     instruction on anticipatory repudiation, undue delay, all of

7     that.  I don't believe we have any proposed charges with regard

8     to that.  We are figuring it out, but if you want to submit any

9     supplemental charges on those issues, it may be helpful.

10         MR. KRAMER:  Will do, Your Honor.

11         Just as point of order, how do you intend -- do you

12     intend to have a charge conference?

13         THE COURT:  Yes.

14         MR. KRAMER:  Okay.

15         THE COURT:  Some time after plaintiff has rested.

16     After I've ruled on motions for directed verdict, and after we

17     get into defendants' case enough to where I understand all of

18     the issues that are going to be presented for the jury, we will

19     take time to have a charge conference.

20         MR. KRAMER:  Thank you, Your Honor.

21       (Jury in at 9:32.)

22         THE COURT:  Okay.  Ladies and gentlemen, welcome back.

23         I apologize for us getting started late, but there

24     were some law matters that I needed to take up with the lawyers

25     to try to facilitate today, and they just took longer than I

Direct Examination - Lee Darnold

1    anticipated, but we are now ready to go.

2           You may continue your examination of the witness,

3    Mr. Kramer.

4           MR. KRAMER:  Thank you, Your Honor.

5                        LEE DARNOLD,

6    having been previously duly sworn by the Court, was further

7    examined and testified as follows:

8                      DIRECT EXAMINATION

9    BY MR. KRAMER:

10   Q.   Mr. Darnold, good morning to you.

11          MR. KRAMER:  Ms. McClintok, could we have PX 190P up

12   on the screen, please, for the witness?

13   BY MR. KRAMER:

14   Q.   Mr. Darnold, when we left off yesterday, we were talking

15   about the projections for closing at Grayhawk and the actual

16   number of closings over the last few years.

17          Do you recall that?

18   A.   Yes, I do.

19   Q.   Before we show this to the jury, do you recognize this

20   document?

21   A.   I do.

22   Q.   What is it?

23   A.   It's a memo that I wrote to the Board when I first got into

24   a broader, all division position.

25   Q.   Okay.  So you created this?

Direct Examination - Lee Darnold

1  A.   I did.

2         MR. KRAMER:  Your Honor, plaintiffs offer PX 190F.

3         THE COURT:  Any objection?

4         MR. SHEBELSKIE:  No, Your Honor.

5         THE COURT:  Admitted.

6      (PLAINTIFFS EXHIBIT PX190F:  Received in evidence.)

7  BY MR. KRAMER:

8  Q.   Okay.  Mr. Darnold, this document that you created, can you

9  explain, high level, what the purpose was?

10 A.   The purpose was I had taken a position running the company,

11 essentially, and so I wanted to make sure that I communicated to

12 the Board right up front where the company was.

13 Q.   Okay.  And what did you write in the beginning here in the

14 "Summary" section?

15 A.   I said:  In late April, I conducted a general review of the

16 Stone Ridge and Grayhawk operations for the first time.  The

17 review consisted of a general meeting with local management

18 teams as well as operational reviews of current and future land

19 deals, as well as the 2021 business plan that was being

20 proposed.  These meetings were followed by a drive of major

21 communities as well as one-on-one time with key leaders in each

22 business.

23 Q.   Okay.  Thank you.

24        MR. KRAMER:  We can take a look at another part of the

25 document.

Direct Examination - Lee Darnold

1    BY MR. KRAMER:

2    Q.    Does this document show the revised closing projection for

3    2021 that you talked about yesterday?

4    A.    Yes.

5    Q.    Okay.

6              MR. KRAMER:    Can we put that first chart up on the

7    screen?

8    BY MR. KRAMER:

9    Q.    All right.    Do you see that revised projection there for

10   Grayhawk Homes?

11   A.    Yes, it's 225.

12   Q.    And do you recall what the prior projection was before you

13   revised it to 225?

14   A.    278.

15   Q.    Okay.

16         So what caused you to make this change in how many houses

17   the company anticipated selling in 2021?

18   A.    I was hearing of the rumblings with Mr. Erickson beginning

19   to talk about not selling lots, and so I wanted to make sure we

20   only projected what we had visibility to -- what we knew we

21   could close.

22   Q.    Okay.

23         At the bottom of the memo, the very bottom of the page,

24   there is a section two with the heading "Land Pipeline."

25         Do you see that?

Direct Examination - Lee Darnold

1    A.    Yes.

2    Q.    Okay.  Can you just read that, please?

3    A.    It says:  Grayhawk's closings number assumes that no

4    additional lots are sold to ASH and that we can only close lots

5    that are presently on our books.  Grayhawk can close homes in

6    2021 that start as late as August, but we assume we only have

7    lots to start through May.  Unfortunately, no projects were

8    acquired that can deliver lots not controlled by the previous

9    owner of Grayhawk.

10   Q.    Who is the previous owner of Grayhawk?

11   A.    Mr. Erickson.

12   Q.    So what were you trying to convey here?

13   A.    I was trying to convey that if I don't have lots, I can't

14   do the previous 278 projection.

15   Q.    Okay.

16         Was this in the midst of negotiations with Mr. Erickson to

17   settle disputes with the company?

18   A.    It was.

19   Q.    Looking at the following page, does it show how many home

20   sales Grayhawk actually closed in 2021?

21   A.    It -- it had the forecast.  We actually closed 229.

22   Q.    Thank you.

23         What was the projection at this point for 2022?

24   A.    230.

25   Q.    And what was the projection for 2023?

Direct Examination - Lee Darnold

```
1    A.    185.

2    Q.    All right.

3          There are some notes underneath this chart with asterisks

4    in front.

5          Do you see those?

6    A.    Yes.

7    Q.    Okay.

8          What is the note with two asterisks that appears next --

9    well, what is that -- what number does that relate to on the

10   chart?

11   A.    That relates to the 230 closings for 2022.

12   Q.    Okay.

13         And what does it say?

14   A.    It says:  If agreement with Erickson not reached, we have

15   75 closings available.

16   Q.    Okay.

17         Was the company still trying to reach an agreement at this

18   point?

19   A.    Yes.

20   Q.    So how many -- so the projection was 230, and how many

21   closings were there in 2022?

22   A.    66.

23   Q.    All right.

24         What was the projection for 2023, according to this memo?

25   A.    185 houses.
```

Direct Examination - Lee Darnold

1    Q.    All right.

2         Looking at the -- there's three asterisks after that

3    number.  If we look at the note, what does it say?

4    A.    Assumes only Erickson lots.  We will increase lot count

5    through other sources.

6    Q.    And why did you put that note there?

7    A.    The 185 was what we could do if we had Erickson's lots, and

8    I had hoped that we could find other land sources.

9    Q.    And underneath the chart, there is a sentence that begins:

10   Note, 2023 growth can accelerate as we look for opportunities to

11   grow organically, new markets or new operations, and as we

12   continue to target acquisitions that make sense in this frenzied

13   market.

14        Do you see that?

15   A.    I do.

16   Q.    What did you mean by "frenzied market"?

17   A.    Well, it's -- it was the worst possible time to go look for

18   new sources of land.

19        It was a -- it was a very constricted market.  There

20   weren't just lots sitting around.  Any builder that had

21   opportunity to buy lots was trying to buy them.  And so I had

22   low expectations that I would be able to just hop into the

23   market and find land sitting there.

24   Q.    Okay.

25        What's the projection for this year, 2023, at the Grayhawk

Direct Examination - Lee Darnold

1  division?

2  A.    110.

3  Q.    Okay.

4       And how many closings so far this year?

5  A.    64.

6  Q.    What caused the decrease in closings at ASH-Grayhawk over

7  the last couple of years in your opinion?

8  A.    Mr. Erickson not delivering lots to us.

9  Q.    Anything else?

10 A.    No.

11 Q.    How has, if at all -- how, if at all, has Mr. Erickson's

12 refusal to deliver lots affected relationships between

13 Grayhawk's and the skilled trades with -- with whom it works?

14       MR. SHEBELSKIE:  Objection, Your Honor.  Irrelevant to

15 a contract claim.

16       THE COURT:  Is the objection relevance?

17       MR. SHEBELSKIE:  Yes, sir.

18       THE COURT:  Overruled.

19       THE WITNESS:  It's been highly detrimental.  It's

20 impacted our trades dramatically.

21 BY MR. KRAMER:

22 Q.    Can you explain?

23 A.    Well, trades, these are -- these are small business owners,

24 generally.  They get up in the morning and they look for where

25 they are going to drive crews to to build houses.  When they

Direct Examination - Lee Darnold

1    don't have houses to build, they have no business.  Many of them

2    going from house to house, hoping to be paid quickly, and they

3    need stability.  And so when we go to our trades and say, Hey,

4    we don't -- we don't know if we actually have a job for you,

5    they tend to look for work elsewhere.  They can't sit around

6    waiting for us.

7    Q.    Have any trades moved on from Grayhawk?

8    A.    A substantial number have, yes.

9    Q.    Can you explain?

10   A.    We have had -- I did review of our trades that we had when

11   we purchased the company and the trades that remain today, and

12   it's about 50 percent changeover.

13   Q.    Any particular trades come to mind?

14   A.    Yes.  Our plumbers, our framers, our lumber suppliers, our

15   concrete company, painters.  The list goes on, but the most

16   substantial ones have shifted, yes.

17   Q.    You mentioned -- well, has there been impact on suppliers

18   to ASH-Grayhawk?

19   A.    Yes.  I talked earlier about the supply chain issues, which

20   meant there weren't a lot of materials to buy.  And so what

21   happens is if you take a company like 84 Lumber, they're

22   looking -- when lumber is not available, they're looking at who

23   they're going to ship lumber to.  And if I don't have orders,

24   they're not holding that lumber for me, so they're shipping it

25   to other builders.

Direct Examination - Lee Darnold

1          So if you do have the ability to finally get them to ship

2    you a restricted product, they charge a very high price.

3    Q.   Has there been an impact on relationships with realtors?

4    A.   Yes, there has.

5    Q.   Could you explain?

6    A.   Well, one impact was --

7          MR. SHEBELSKIE:  Your Honor, I renew my objection on

8    relevance grounds.

9          THE COURT:  Well, I allowed him to go into this

10   briefly, but the plaintiffs, as I understand it, are not seeking

11   damages related to this.  So --

12         MR. KRAMER:  That's correct.

13         THE COURT:  It would not be relevant to the damage

14   claims.  So the objection is sustained.  Let's move on.

15         MR. KRAMER:  Thank you, Your Honor.

16   BY MR. KRAMER:

17   Q.   Well, let's talk about the people at Grayhawk.  Have there

18   been any layoffs at ASH-Grayhawk?

19   A.   Yes, there have.

20   Q.   Could you explain?

21   A.   We -- I mentioned earlier we're trying to build a platform

22   for this company so we held onto the people -- we brought over

23   32 employees with the purchase from Mr. Erickson, and we worked

24   very hard to hold them as long as we could.  But in

25   April of 2022, we did have to lay off five people.  And then

Direct Examination - Lee Darnold

1   again in September we laid off another three, or about

2   25 percent of our staff.

3   Q.   Okay.

4        I think you mentioned at the beginning of your testimony

5   that you have held some town halls.  What's the purpose of that?

6        Well, first of all, what's a town hall?

7   A.   A town hall.  So we work really hard to get good engagement

8   with our employees, so we send out surveys every quarter.  One

9   of the things that came back was that communication could be

10  better.  So I started flying to the divisions, bringing all the

11  employees in and just -- a town hall is updating them on

12  business matters and then answering questions that they have.

13  Q.   I think you testified --

14       Well, how many people overall have been laid off over time

15  at ASH-Grayhawk?

16  A.   About 25 percent of the staff there.

17  Q.   Which is how many?

18  A.   Eight.

19  Q.   Okay.

20       How many people at ASH-Grayhawk are still around who were

21  there when ASH bought the company?

22  A.   We had four people that were employees under Mr. Erickson:

23  Tina in purchasing; Kevin, who's an area construction manager;

24  Kristen, who works in the office; and Robert, who is the one I

25  told you was getting 94 customer SAT scores.

Direct Examination - Lee Darnold

1    Q.    Okay.

2          And have you personally been involved in these layoffs?

3    A.    Yes, I have.

4    Q.    And can you explain?

5    A.    Well, my job as the CEO of the company is to give people

6    predictability for their future careers.  I understand, having

7    been through it myself at Centex, what happens the night they

8    lose their job and go home and tell their family.  So what

9    happens is a lot of frustration for the employees and difficulty

10   for us.

11   Q.    Okay.

12         Let's move to another subject.

13         Do you have -- have you been involved in ASH-Grayhawk's

14   efforts to secure lots, to mitigate or reduce the harm from the

15   inability to buy Phase C lots from Mr. Erickson?

16   A.    I have been involved in the sense that I've been directing

17   employees to look for lots and I've been listening to the deals

18   that they come back with and assessing them.

19   Q.    Okay.

20         And has ASH-Grayhawk been able to secure any mitigation

21   lots in Columbus or Muscogee County?

22   A.    No.

23   Q.    Has ASH-Grayhawk been able to find any mitigation lots at

24   all?

25   A.    Yes.

Direct Examination - Lee Darnold

1    Q.    Where are those lots located?

2    A.    In Auburn, Perry, Warner Robins.

3    Q.    Okay.

4              MR. KRAMER:  Could we have PX 832 up, please?

5    BY MR. KRAMER:

6    Q.    Do you recognize this -- I will let you put your glasses

7    on.

8    A.    Yes, I do.

9    Q.    Do you recognize this document?

10   A.    Yes.

11   Q.    All right.

12        Does this reflect the mitigation lots that ASH-Grayhawk has

13   been able to buy?

14   A.    It does.

15   Q.    All right.

16        So you said there are some lots in the Auburn area.  How

17   many has ASH been able to find?

18   A.    Let's see here.  28, and if you put in Opelika, another 18.

19   Q.    Okay.

20        And where are the mitigation lots in Georgia?

21   A.    In Perry.

22   Q.    So how do these lots compare from location perspective to

23   the lots that -- the Phase C lots that Mr. Erickson promised to

24   deliver?

25   A.    They are inferior.

Direct Examination - Lee Darnold

1   Q.   All right.

2        There is a demonstrative exhibit up on the screen.

3        Do you see blue pin for Fort Benning or what is now

4   Fort Moore?

5   A.   Yes.

6   Q.   Okay.

7        Do you see some white pins appearing on the map?

8   A.   Yes.

9   Q.   What are they located?  Or what subdivisions are these?

10  A.   Auburn Farms and Southern Oaks.

11  Q.   And where are these subdivisions located?

12  A.   In Auburn and just outside of Columbus.

13  Q.   Okay.  Another group of white pins just came up.  What are

14  these white pins?

15  A.   These are the lots that Mr. Erickson contracted to sell us.

16  Q.   The Phase C lots?

17  A.   Yes.

18  Q.   Where are they located?

19  A.   They are in Muscogee County and in Columbus where we want

20  to be.

21  Q.   All right.

22       Are there any white pins in Georgia outside of Muscogee

23  County and Columbus?

24  A.   No.

25  Q.   From a quality perspective, how do the Phase C lots compare

1   to the mitigation lots in your view?

2   A.   Our mitigation lots, two of the deals have sold less than

3   one a month.  The other deal is right at one a month.  But the

4   one that's doing one a month is way out in Perry.  It's hard to

5   get trades to go out for one house at a time.

6   Q.   Okay.

7        Earlier you mentioned that ASH has changed its name to

8   Evermore on a company-wide basis.

9   A.   Right.

10  Q.   What was the reason for that change?

11  A.   Well --

12       MR. SHEBELSKIE:  Your Honor, this was the matter of

13  testimony taken yesterday before you.

14       MR. KRAMER:  We're not -- we're not going to get into

15  harm here.  This is about consumer confusion.

16       THE COURT:  All right.  Go ahead.

17       MR. KRAMER:  I will caution you, Mr. Darnold, I'm not

18  asking you about any harm caused here.  Okay?

19       THE WITNESS:  Okay.

20  BY MR. KRAMER:

21  Q.   All right.

22       So what was the reason for changing the name company-wide?

23  A.   The reason to change it company-wide, were we were

24  noticing, as we bought the three homebuilders, that each builder

25  acted as a -- as their own sort of unit, and we wanted a

Direct Examination - Lee Darnold

1    cohesive team.  We were also writing training manuals and trying

2    to build a sense of culture where everybody felt like they were

3    part of the Evermore team.

4         The other thing it really helped with was when there was a

5    best practice and we said, Dorn Homes did this, people sort of

6    pushed it away.  But when we said, Evermore Homes in Arizona is

7    doing this, people could grasp it.

8         The primary reason, though, is when you go to market in our

9    business you are going to market online.  And so it's hard to

10   maintain three different websites.  It's hard to buy search

11   engine optimization and other marketing for each brand.  It's

12   better to just put one brand out to the market.

13   Q.   Okay.

14        So when -- when was the rollout company-wide?

15   A.   July.

16   Q.   Okay.

17        How long ago did ASH begin to use the Evermore name in the

18   Columbus area?

19   A.   I believe it was towards the end of '21 when we started

20   buying mitigation lots.

21   Q.   Okay.

22        And what -- with that admonition I just gave you, what was

23   the reason for making that change earlier here in the Columbus

24   area?

25   A.   We knew eventually we would go to a unified brand, and we

Direct Examination - Lee Darnold

1    figured when we bought our new deals, we would just go ahead and

2    put that Evermore name on them.

3    Q.    Why?

4    A.    We wanted to make sure that we could control that brand and

5    that everything that was launched from that point forward,

6    everyone involved knew that it was us.

7    Q.    Okay.

8         Did ASH continue to use the Grayhawk brand for some purpose

9    since that time?

10   A.    We did, yes, especially in Columbus.

11   Q.    For what purpose?

12   A.    For the purpose of continuity.  That realtors knew the

13   Grayhawk brand.  People at Fort Benning, Moore, knew the

14   Grayhawk brand.  Trades knew that brand.

15   Q.    And for what lots did ASH use the Grayhawk brand as

16   compared to the Evermore brand?

17   A.    Any lots we bought from Mr. Erickson were Grayhawk.

18   Q.    Lots from other sources?

19   A.    Lots from other sources went to Evermore.

20            MR. KRAMER:  You can take that down.

21            Could I have PX 246E up on the screen, which is the

22   LPA?  And it's been preadmitted.  I would like to look at

23   Section 11.

24   BY MR. KRAMER:

25   Q.    All right.

Direct Examination - Lee Darnold

1          Do you see that at the bottom of page 3?

2    A.    Yes.

3    Q.    Section 11?

4          Mr. Darnold, was there a formula for calculating the price

5    of Phase C lots under the LPA?

6    A.    Yes, there was.

7    Q.    And what's the first component of the formula?

8    A.    The land basis.  So the land itself was the first portion

9    of it.

10   Q.    Was there anything -- what's the second portion relating to

11   the basis?

12   A.    The second portion is that -- to compensate Mr. Erickson

13   for holding that land we gave him an interest rate on the land

14   that would accrue every year.

15   Q.    What was the rate?

16   A.    6 percent a year.

17   Q.    What was the next component of the price for Phase C lots?

18   A.    Development costs.

19   Q.    And were those reimbursed at the time ASH was to take down

20   the lot?

21   A.    Yes.

22   Q.    Okay.  What was the next component?

23   A.    Reimbursement of taxes.

24   Q.    Okay.

25         And what was the final component?

1    A.    $3,000 for every lot that Mr. Erickson developed.

2    Q.    And what's the purpose of that fee?

3    A.    It's a fee for managing the development of those lots.

4    Q.    So if you put those components together, is that the price

5    for a Phase C lot?

6    A.    It is.

7    Q.    That's -- I think the defined term here is the Phase C

8    purchase price, correct?

9    A.    That's right.

10   Q.    Okay.

11            MR. KRAMER:  Let's take a look at Section 12.

12   BY MR. KRAMER:

13   Q.    All right.

14       There is a reference in Section 12 to the term "estimated

15   market value."  What does that mean?

16   A.    That is to be what the parties believe a home sold in the

17   future would be -- would be priced at.  What we would charge a

18   customer.

19   Q.    Was there a process for the parties to determine the

20   estimated market value?  And by "the parties," I mean

21   Mr. Erickson on one hand and ASH on the other hand.

22   A.    There was not.

23   Q.    So under the LPA, if Mr. Erickson offered lots to ASH at a

24   Phase C purchase price that was equal to or less than 20 percent

25   of the estimated market value of the ultimate house, what option

Direct Examination - Lee Darnold

1    did ASH have?

2    A.    If it was more than 20 percent, we could not buy the lot.

3    Q.    Well, hold on.  If it was 20 percent or less?

4    A.    Oh, if it was 20 percent or less, we had to buy the lot.

5    Q.    No choice?

6    A.    No choice.

7    Q.    Okay.

8        So what happened if it was -- if the lot cost more than

9    20 percent of what ASH expected or the parties expected a house

10   to sell for on that lot?

11   A.    Then ASH could decline to purchase that lot.

12   Q.    If ASH said no, what options did Mr. Erickson have?

13   A.    He could sell the lot at 20 percent, or he could sell the

14   lot to us at 20 percent, knowing that we would true it up later.

15   If we were wrong, we could true it up to 20 percent, or he could

16   refuse to sell us the lot and attempt to sell it to someone

17   else.

18   Q.    Okay.

19       What does "true up" mean?

20   A.    A true up means that if we think the price will be 300,000,

21   and he thinks it's 400,000, if it sells for 350, we will true up

22   what we pay him to 20 percent of the final price.  It's just

23   designed for fairness because it's hard to determine future

24   prices.

25   Q.    So let's say he took the other option, which was to go to

Direct Examination - Lee Darnold

1    the market with the lots, right?  How long did he have to try

2    and sell the lots to a third party?

3    A.    120 days.

4    Q.    And what happened if he didn't find a buyer in 120 days?

5    A.    He would have to come back to us and present a price and

6    allow us the opportunity to buy the lots.

7    Q.    Is there a term for that process?

8    A.    It's called a "ROFO," a Right Of First Offer.  If someone

9    makes an offer before he accepts it he has to come to us and

10    give us the same offer.

11    Q.    And did you identify any problems with that process?

12    A.    Well, it -- the way it's written, it could just get into a

13    back and forth over a long period of time that if there was no

14    one on the market he'd come back to us.  We would still be

15    debating the final price and he could go again, come back -- it

16    could be detrimental to both sides.

17    Q.    Okay.

18         Did there come a time when the parties discussed changing

19    that structure with the negotiations over estimated market price

20    and the ROFO loop?

21    A.    Yes.

22         During negotiations we tried to figure out a way to help

23    take some of this complexity out and make it simple.

24    Q.    Okay.

25              MR. KRAMER:  Could I have DX328, which was admitted

Direct Examination - Lee Darnold

```
 1   yesterday?  Page 3.
 2   BY MR. KRAMER:
 3   Q.   Focusing on the section at the bottom that begins with "lot
 4   pricing," do you see that Mr. Darnold?
 5   A.   Yes.
 6   Q.   Okay.
 7        What's Option 1 here?
 8   A.   This was a proposal from us to him that said Option 1 is
 9   you can just continue to follow the contract you had already
10   agreed to.
11   Q.   That's the LPA, correct?
12   A.   That's right.
13   Q.   And what's the standard ROFO process?
14   A.   That's what I talked about where if it was over 20 percent
15   of what we thought it could sell for, he could go to market,
16   come back, and we would have the opportunity to buy it.
17   Q.   Okay.
18        Let me be really clear about this.  Was -- did there ever
19   come a time when ASH was not willing to live by the terms of the
20   LPA?
21   A.   No.
22   Q.   Who requested that they change?
23   A.   Mr. Erickson.
24   Q.   Okay.
25        What was Option 2?
```

Direct Examination – Lee Darnold

1  A.   Option 2, we came back with based on his feedback that he

2  didn't believe the parties could go through such complexity in

3  Option 1.  So we tried to simplify it and make it better for

4  him.

5  Q.   How did you try to simplify it?

6  A.   We tried to say rather than having this, if it's 20 percent

7  or more we can walk away, let's just give you more than you were

8  making on every lot and we would be required to take it.  And

9  there would be no more ROFO.  There would be no more worry as we

10 went through the process.

11 Q.   Okay.

12      Let's –– let's break that down.  It says here that the

13 average in 2020 was 14.24 percent.

14      Do you see that?

15 A.   Right.

16 Q.   What does that that mean?

17 A.   That means what we sold the house for and what his lots

18 cost.  His lots cost 14 percent of what we sold all of those

19 houses for.  So he got 14 percent of the total sales price.

20 Q.   Okay.

21 A.   He got the prices that were in the contract, and that wound

22 up being 14 percent.

23 Q.   All right.

24      So how did ASH's offer here compare to what Mr. Erickson

25 had been making previously?

Direct Examination - Lee Darnold

```
 1   A.   Our offer was 3.3 percent higher.

 2   Q.   What was ASH's offer?

 3   A.   Our offer was 17 1/2 percent on every lot, and we would

 4   have to take the lot.

 5   Q.   Was there a true up involved as well?

 6   A.   There was.  If we paid him 17 1/2 of what we thought the

 7   house would cost, and the market went up, he would also get the

 8   17 1/2 percent of all that it went up.  So he could be trued up.

 9   You notice it's a true up.  We also didn't put in a true down.

10   We made it stable for him and he had upside.

11   Q.   What do you mean it was "stable for him and he had upside?"

12   A.   It was 17 1/2, and if we sold the house for a lot less, he

13   still got what we paid him.

14   Q.   What if you sold the house for more than anticipated?

15   A.   He made even more.

16   Q.   And what was the state of the housing market when ASH made

17   this offer in April of 2021?

18   A.   In April of 2021, the market was frenzied, as I said

19   earlier.

20   Q.   Were -- house prices, were they going up?

21   A.   They were going up, so it was likely he would make more as

22   a consequence of them going up.

23   Q.   Why was the market so frenzied at that point?

24   A.   Primarily because there weren't a lot of houses for sale.

25   After the pandemic the market just went crazy.  People got out
```

1    of their houses and started buying.  And so pretty much

2    nationwide, 2021 was the best year we have seen in homebuilding

3    in a long time.

4    Q.    Okay.

5          I think you said also -- on top of the pricing, did you

6    also say that ASH was offering to guarantee to buy all of the

7    Phase C lots?

8    A.    Yes.

9          What this did was it said, if you want to choose Option 2,

10   when you go and develop these lots, we are going to buy them.

11   And if they sell for a lot more, you are going to get -- you're

12   going to get more as well.  But it was designed to take away --

13   he had expressed fear that we might choose not to buy a bunch of

14   the lots.

15         On our side we were afraid that the lots he developed could

16   be very, very expensive.  And so what we said was, We'll just

17   take that risk and we'll buy these lots and we'll give you

18   17 1/2 percent, which is more than you made in 2020, and you

19   don't have that fear.

20   Q.    Okay.

21         So there is a note after here behind something called an

22   "NTD."  Do you see that?

23   A.    Yes.

24   Q.    That's a note to draft, right?

25   A.    Yes.

Direct Examination - Lee Darnold

1  Q.   And that's something that ASH put into this term sheet,

2  right?

3  A.   I believe so.

4  Q.   Can you read it?

5  A.   It says:  Locking in a sales price comes with a commitment

6  from ASH to purchase all such Phase C lots in accordance with

7  the Takedown Schedule or sooner and gives Mr. Erickson

8  certainty.

9  Q.   Okay.

10     So under -- let's be really clear.  Under this proposal

11 could ASH refuse to buy any Phase C lot because it was too

12 expensive?

13 A.   No.

14 Q.   Did this have an impact on the ROFO loop that you described

15 previously?

16 A.   Yes.

17     It took it away completely because we would buy the lots.

18 He would never have to try to sell them to someone else.

19 Q.   Okay.

20        MR. KRAMER:  If we can scroll and see what the final

21 sentence in this note says, please.

22 BY MR. KRAMER:

23 Q.   I will read it.  It says:  Without such provision,

24 development costs could outprice ASH and the market, leaving

25 Mr. Erickson with developed lots stuck in the ROFO process.

Direct Examination - Lee Darnold

1    Do you see that?

2  A.    Yes.

3  Q.    Okay.

4    What does that mean?

5  A.    It means that we were taking away the risk that he had

6  expressed fear of; that was, we wouldn't buy lots if they

7  started coming in more expensively.  And so we just said, We'll

8  buy them.  And we gave him a higher price to buy them.

9    So the two things he had always expressed was concern about

10  how we'd work together in the future, and he wanted more money.

11 Q.    Okay.

12    If Mr. Erickson had accepted this proposal, would there be

13  any need for the parties to negotiate estimated market value and

14  figure out the 20 percent and then later apply that?

15 A.    The only need would be the first price we paid.  It would

16  settle that.  But then he would have a true up, so he had -- he

17  knew it would be 17 1/2.

18 Q.    Okay.

19    What risk, if any, was ASH taking when it made this offer?

20 A.    We took all the risk, basically.  If the market had

21  completely collapsed, and we weren't able to sell homes, we

22  still had to buy the lots.

23    If the market went up, we would give a bigger portion of

24  the profits back to Mr. Erickson.

25    Normally, when you do deals that go as long as this the

Direct Examination - Lee Darnold

1  builder has some potential to make more over years if the market

2  is rising over the years.  In this case, we just clipped that

3  off and kept it at 17 1/2 percent for him.

4  Q.  Okay.

5     So let me be -- let me be really clear.  Was ASH demanding

6  that Mr. Erickson reduce the price of lots that he was selling?

7  A.  No.

8  Q.  What was ASH really doing?

9  A.  In every respect, we were listening to him and trying to

10  address his concerns.  And his concerns were more money and

11  certainty.

12  Q.  Okay.

13     Last thing I want to ask you about.  Let's go all the way

14  back in time to the point when you became an employee of ASH.

15  Okay?

16  A.  Yeah.

17  Q.  So we are at the end -- right at the December 20,

18  January 2021 period?

19  A.  Right.

20  Q.  Okay.

21     Where were you working at the time?

22  A.  I worked for a builder called View Homes out of Colorado.

23  Q.  And what was your position?  Remind us.  You told us

24  yesterday.

25  A.  I was regional president over four divisions.

Direct Examination - Lee Darnold

1   Q.   Okay.

2        And how many houses were you selling in those divisions?

3   A.   1200.

4   Q.   Okay.

5        Were you out in the market looking for a new job?

6   A.   No.

7   Q.   Do you know someone named -- well, let me ask you this:

8   How did you become -- how did you get in touch with ASH in the

9   first place?

10  A.   The person that had recruited me to View Homes was a man

11  named Tom Carpitella.  He called me to check on something we

12  were recruiting for and said, How are you doing?  And I said,

13  I'm really, really frustrated.  And he said, Would you be

14  interested in looking for something else?  And I said, I might.

15  What do you have?

16  Q.   Okay.

17       And what did he do next?  Who did he put you in touch with?

18  A.   He put me in touch with Steve Pehrkon, an employee of ASH.

19  Q.   All right.

20       Had you posted your resume' or gone out into the public to

21  advertise that you were looking for a new job?

22  A.   No, I had not.

23  Q.   Okay.

24       And what -- what attracted you to this opportunity that

25  Mr. Carpitella mentioned?

Direct Examination - Lee Darnold

1   A.   Well, it was -- it reminded me of the stories I used to

2   hear around NVR of the early days where they were small and they

3   had gone out and bought builders and put those builders

4   together.  And I thought, Okay, this could be my opportunity to

5   put everything I've learned at all of these different builders

6   to work and essentially be part of building something that we

7   could be proud of as a company.

8   Q.   And what is the situation -- how large is NVR today?

9   A.   NVR today is 17,000 houses.

10  Q.   NVR eventually turned into a public company, correct?

11  A.   From its early days, yes.  It was public when I was there.

12  Q.   Okay.

13       Was your hope, in the event that ASH were to go public, to

14  remain as the CEO or to remain as the leader?

15  A.   Yes.  I was hoping to do so, yes.

16  Q.   Okay.

17       Does a homebuilding company just go away when it goes

18  public?

19  A.   No, it grows.

20  Q.   So who was your first contact at ASH?

21  A.   Steve Pehrkon.

22  Q.   Did you speak -- when you were in this early process, did

23  you speak with anyone other than Steve Pehrkon about coming to

24  go work for ASH?

25  A.   After I spoke to Steven, he asked me to speak to

1    Marshall Coleman and Sean Coleman, two of our Board members.

2    Q.    Okay.

3          Did you speak to Mr. Erickson?

4    A.    I did.

5    Q.    Okay.

6          And what position did he hold at the time?

7    A.    He was interim CEO and a Board member.

8    Q.    All right.

9          Do you remember Mr. Erickson contacting you initially?

10   A.    Yes.

11   Q.    Okay.

12          MR. KRAMER:  Your Honor, at this point, I would like

13   to play PX 771, which is an audio recording of a voice-mail

14   that's been preadmitted by stipulation.

15          THE COURT:  All right.

16          MR. KRAMER:  So on the screen is what we have marked

17   as Exhibit PX 771, which shows the date and time of the

18   voice-mail.

19   BY MR. KRAMER:

20   Q.    Can you just tell us what that is, Mr. Darnold?

21   A.    Yes.  It's December 11th of 2020, and the time is 2:59.

22   Q.    PM?

23   A.    PM.

24          MR. KRAMER:  Okay.  Let's play the audio.

25          (Audio played.)

Direct Examination - Lee Darnold

1   BY MR. KRAMER:

2   Q.   Okay.  Do you recall receiving that voice-mail from

3   Mr. Erickson?

4   A.   I do.

5   Q.   Had you ever met Mr. Erickson before he left you that

6   voice-mail?

7   A.   No, I had not.

8   Q.   Had you ever heard of him?

9   A.   Only from Mr. Carpitella explaining that he was currently

10  running ASH.

11  Q.   Did you subsequently have a conversation with Mr. Erickson?

12  A.   I did.

13  Q.   And what do you remember about that?

14  A.   He started talking to me about American Southern Homes,

15  asked me some questions, and told me what he thought I might be

16  able to do at the company.

17  Q.   Okay.  What type of role did he discuss with you?

18  A.   He said he thought I would be a good fit for potentially a

19  purchasing director or sales director role.

20  Q.   What was your reaction to that?

21  A.   I told him that I had already been the national head of

22  sales and marketing at a much bigger company, and I was

23  currently regional president, so I didn't understand why we were

24  talking about those roles.  I had been interviewing for the COO

25  role.

Direct Examination - Lee Darnold

1    Q.    So that would have been a step down?

2    A.    Yes, it would.

3    Q.    Okay.

4          And how did he respond?

5    A.    He said, Well, Lee, you've got to understand what we are

6    going to do with ASH is going to be way bigger than NVR, and

7    this will be a great opportunity for you.

8    Q.    Okay.

9          So how did you feel coming away from that conversation?

10   A.    I felt like that was a naive thing to say.  It had taken

11   NVR 35 years to get to their size.

12   Q.    Well, how did you feel about the fact that the position he

13   discussed with you was a step down from what you thought you

14   were interviewing for?

15   A.    I did tell him I had interviewed for a C-level position,

16   and so I felt confused about what was going on.

17   Q.    What's a C-level position?

18   A.    COO or CEO.

19   Q.    Okay.

20         So what did you do next?

21   A.    I wrote an email to the two Board members that I had met

22   with and I said, I continue to remain interested, but this is

23   what he offered me and I am not interested in that.

24         MR. KRAMER:  All right.  Could we have PX 8718 up for

25   the witness, please?

Direct Examination - Lee Darnold

1    BY MR. KRAMER:

2    Q.    Okay.

3          Mr. Darnold, do you recognize as email that you wrote?

4    A.    Yes.

5              MR. KRAMER:  Plaintiffs offer PX 718, Your Honor.

6              THE COURT:  Any objection?

7              MR. SHEBELSKIE:  No, sir.

8              THE COURT:  It's admitted.

9          (PLAINTIFFS EXHIBIT PX718:  Received in evidence.)

10   BY MR. KRAMER:

11   Q.    Okay.  What's the date of this email?

12   A.    December 12, the next day.

13   Q.    Who did you send it to?

14   A.    I sent to Mr. Coleman and -- well, the Mr. Colemans.  Both

15   were Board members.

16   Q.    What do you write?

17   A.    I said:  I wanted to thank you both for our call earlier

18   this week.  I really enjoyed talking with you both about the

19   company and about politics -- Mr. Coleman is a -- was a

20   politician -- Dave Erickson called me yesterday and we had a

21   brief discussion.  He followed up today asking if I would be

22   interested in a director of purchasing or a sales leadership

23   type role.  I told him those roles are not a fit, but that I

24   would be more than happy to help you source someone from my

25   network.

Direct Examination - Lee Darnold

1   Q.   Okay.

2        Did you say you were still interested in working for ASH?

3   A.   Yes.  At the bottom I said:  I remain very interested in a

4   C-level role with American Southern Homes.

5   Q.   Why did you send this email to the Colemans?

6   A.   My conversations with Mr. Pehrkon and with

7   Mr. Marshall Coleman and Sean Coleman had been around a C-level

8   position that could have a broader impact on the company, and so

9   I wanted them to know that I had been confused by the offer.

10  Q.   After you sent this email did you keep on talking to ASH

11  about a potential position?

12  A.   Yes, I did.

13  Q.   Okay.

14       Did Mr. Erickson continue to call you?

15  A.   Yes, he did.

16  Q.   Okay.

17       Did you become aware that about a week later Mr. Erickson

18  left ASH and resigned as the -- as its interim CEO?

19  A.   Yes.  On the 20th of December he resigned.

20  Q.   Do you recall him contacting you two days later?

21  A.   Yes.

22  Q.   And that was on December 22nd, correct?

23  A.   I believe so, yes.

24  Q.   All right.

25           MR. KRAMER:  At this point, I would like to play

1    PX 772, which is a December 22nd, 2020 voice-mail.

2            (Audio played.)

3    BY MR. KRAMER:

4    Q.   Do you remember that voice-mail from December 22nd?

5    A.   I do.

6    Q.   Did you return the call?

7    A.   I did.

8    Q.   And what did you discuss with Mr. Erickson?

9    A.   He told me that he had left American Southern Homes and was

10   going to start his own company and asked if I would be

11   interested in talking about what he was going to do.

12   Q.   Okay.

13        Did he identify any particular -- or what did he say his

14   company was going to do?

15   A.   It was going to go and effectively do what -- what ASH was

16   trying to do.  He was going to go buy smaller builders and try

17   to put them together.  He told me he had been talking to a

18   builder in Austin and asked if I had any experience in Austin.

19   Q.   Did he use the word "Prominence Homes," or the name

20   Prominence Homes?

21   A.   I believe he -- I honestly don't remember.  I know that he

22   said he had a builder he had heard about recently in Austin.

23   Q.   Okay.

24        Did he tell you when he had resigned?

25   A.   He didn't tell me when.  He just said he had left.

Direct Examination - Lee Darnold

1    Q.    Okay.

2         Did he -- did you discuss -- or did he discuss with you

3    taking on a role with his new company?

4    A.    Yes.

5    Q.    What type of role?

6    A.    We discussed the COO role.

7    Q.    And what was your reaction to Mr. Erickson suggesting that

8    you become the COO of his new company?

9    A.    I talked to him.  Wanted to see what he was trying to do.

10   I was confused because I had been told that he was one of the

11   larger shareholders of American Southern Homes.  So I honestly

12   just didn't know what he was doing.

13   Q.    Okay.

14        Did it feel like a job interview?

15   A.    Absolutely.

16   Q.    Did you tell him "no" outright?

17   A.    I did not.

18   Q.    Why not?

19   A.    Well, I have learned in this business, as big as it is,

20   that people that you interact with, it's your network.  And my

21   network is very broad in homebuilding.  And when times are tough

22   I can pick up the phone and call people I have worked with all

23   over the country, see how things are going, ask for advice.  And

24   so I always, always talk to people that are especially trying to

25   start a business because I have a heart for entrepreneurs,

1    people that are running their own company.

2    Q.    After you had this call with Mr. Erickson, did he send you

3    anything in writing?

4    A.    He did.

5    Q.    What did he send you?

6    A.    He sent me the first draft of a business plan.

7            MR. KRAMER:    Could we have PX 160, please, for the

8    witness?  Let's stay on the first page.

9    BY MR. KRAMER:

10   Q.    Can you identify this email?

11   A.    Yes.  This is the email he sent that had an attachment of

12   the business plan.

13   Q.    What was the date of the email?

14   A.    December 23rd.

15   Q.    All right.

16           MR. KRAMER:    And just for the witness, can we put up

17   PX 160A, please?

18   BY MR. KRAMER:

19   Q.    All right.  Do you recognize PX 160A?

20   A.    I do.

21   Q.    Is that the attachment?

22   A.    It is.

23           MR. KRAMER:    Your Honor, plaintiffs offer PX 160 and

24   160A.

25           MR. SHEBELSKIE:    No objection, Judge.

1          THE COURT:  They're admitted.

2          (PLAINTIFFS EXHIBITS PX160 AND PX160A:  Received in

3      evidence.)

4          MR. KRAMER:  Okay.  Let's put that up.

5      BY MR. KRAMER:

6      Q.   Okay.

7          Mr. Darnold, did you subsequently discuss this business

8      plan with Mr. Erickson?

9      A.   We never went into any real detail.  Over the next few

10     weeks I was interviewing with ASH.  I was talking with my

11     current employer about my future.  And so I received this and

12     gave some cursory comments, but we didn't -- we didn't dive very

13     deeply into it.

14     Q.   What was your reaction when you read this?

15          MR. SHEBELSKIE:  Objection, Your Honorer.  Irrelevant.

16          THE COURT:  Overruled.

17          THE WITNESS:  My reaction was that it looked exactly

18     like what American Southern Homes was doing.

19     BY MR. KRAMER:

20     Q.   What, if anything, stood out?

21     A.   The strategy overall was to go buy small and midsize

22     builders with the purpose of gaining market share, driving for

23     higher degrees of efficiency, better capitalization.  Those

24     are -- those are literally the things I say to investors.

25     Q.   Okay.

Direct Examination - Lee Darnold

1          MR. KRAMER:  Could we see page 3, please?

2    BY MR. KRAMER:

3    Q.   All right.

4         And the second bullet, it says here:  Multiple target

5    builder businesses have been identified.  Letters of Intent

6    (LOI) are expected to be generated by January 31, 2021.

7         Do you see that?

8    A.   I do.

9    Q.   Okay.  Did that stand out to you?

10   A.   It did for two reasons.

11   Q.   Why?

12   A.   Well, one is if a man had just left a position as CEO, how

13   did he already have builders identified.

14   Q.   Two?

15   A.   And two, that he thought that several builders from the

16   time he was talking to me until about four weeks later,

17   including holidays, could actually get to the LOI point.

18   Q.   How long does it typically take to get to the LOI point?

19   A.   Well, if it's a good builder, you're competing with other

20   builders and so it's going to take awhile for him to choose you.

21   Once they choose you, there is a lot that goes into an LOI.

22   Q.   Okay.

23        The next bullet says:  Key staff members are being

24   identified to help company evaluations and prepare new staff new

25   co-executive positions.

Direct Examination - Lee Darnold

1        Do you see that?

2   A.   I do.

3   Q.   Okay.

4        The first is chief executive acquisition coordinator

5   David Erickson, right?

6   A.   Right.

7   Q.   Okay.

8        Were you discussing one of these positions with

9   Mr. Erickson at the time?

10  A.   Yes.  The chief operating officer.

11  Q.   How did that compare to the role that Mr. Erickson offered

12  you when he was still with ASH?

13  A.   I was pleased to see he was giving me a promotion.

14  Q.   Are you -- you said there were similarities to the ASH

15  business model.  High level, what were the similarities?

16  A.   The similarities were to go out and raise capital and then

17  to go talk to builders that might be for sale, to buy those

18  builders, put them together into one platform, and help them

19  operate more efficiently and grow into a larger company.

20  Q.   Okay.

21       You said you only -- you may have given some cursory

22  feedback, but not much, to Mr. Erickson.

23       Why didn't you give him more feedback on this business

24  plan?

25  A.   He was a shareholder of American Southern Homes with whom I

Direct Examination - Lee Darnold

1   was still interviewing.

2   Q.   Why was that an issue?

3   A.   I didn't know what the situation was.

4   Q.   Okay.

5        Did you speak to Mr. Erickson again after the business

6   plan?

7   A.   I believe so.  We had several communications after this.

8   Q.   Did you send you any voice-mails?

9   A.   He did.

10  Q.   Or excuse me.  Did he leave you voice-mails?

11  A.   He left me voice-mails, yes.

12  Q.   Did he send you any text messages?

13  A.   Yes, he did.

14           MR. KRAMER:  At this point, I would like to play

15  PX 773, which is a voice-mail from December 28, 2020.  That's

16  been preadmitted.

17           (Audio played.)

18  BY MR. KRAMER:

19  Q.   What did you understand Mr. Erickson to mean by "philosophy

20  discussions"?

21  A.   He -- there's a couple of philosophies we were discussing.

22  One was what I would call, "the set it and forget it"

23  philosophy.  He believed you could buy homebuilders, integrate

24  some aspects of the homebuilder, but not all.  And our -- our

25  goal at ASH was to buy homebuilders, have them share best

Direct Examination - Lee Darnold

1    practices, help them all get better and build one company.

2    Q.    Okay.

3          Did he have a term for what you called the "set it and

4    forget it" philosophy?

5    A.    "Do no harm."

6    Q.    Were you interested in that approach?

7    A.    No.

8    Q.    Why not?

9    A.    It doesn't work.  In the long-run reports, training,

10   titles, salaries, what you call something -- do you call it a

11   sale, a start, close -- you have to settle on so many aspects of

12   the business to run it in multiple cities.

13   Q.    What's your basis for saying that it doesn't work?

14   A.    Experience.

15   Q.    Did Mr. Erickson call you again --

16   A.    He did.

17   Q.    -- and leave a voice-mail?

18   A.    Yes.

19         MR. KRAMER:  I would like to play PX 774, which is

20   from December 30, 2020, right before New Year's Eve.

21         (Audio played.)

22   BY MR. KRAMER:

23   Q.    Did Mr. Erickson -- did you call Mr. Erickson back right

24   away?

25   A.    No.

1    Q.    Okay.

2        Did he call you again?

3    A.    Yes.

4            MR. KRAMER:  I would like to play a voice-mail from

5    January 2nd, 2021, PX 775.

6            (Audio played.)

7    BY MR. KRAMER:

8    Q.    What did you understand Mr. Erickson to mean when he said

9    he wanted to "be more aggressive about you and I getting

10   together"?

11   A.    I was still in discussions with ASH and with View Homes,

12   who was still looking to have me maybe move to Colorado, and so

13   the best way I can put it is I was unsure of how to engage him.

14   As I understood it, he was a Board member, large shareholder of

15   ASH, and I was in the interview process.  So my hope was to get

16   to the end of the interview process as quickly as possible and

17   then call him.

18   Q.    Did you think he was trying to recruit you to work for him?

19   A.    Oh, yes.

20   Q.    Did you call him back?

21   A.    I believe so.

22   Q.    All right.

23        And what did you tell him at this point in early January?

24   A.    I said I was going to go out to Colorado for a discussion

25   with the CEO of that homebuilding company to see about my

1    future.

2    Q.    All right.

3          When did that conversation happen?   Sometime in earlier

4    January?

5    A.    I believe so.

6    Q.    Okay.

7             MR. KRAMER:   Let's play another voice-mail from --

8    PX 776, also preadmitted, from January 16th, 2021.

9             (Audio played.)

10   BY MR. KRAMER:

11   Q.    Okay.

12         Mr. Darnold, January 16th, 2021, what was the status of

13   your recruitment by ASH at this point?

14   A.    I was expecting an offer letter at any time.

15   Q.    When did you begin to work for ASH?

16   A.    On February 1st of 2021, the day that we closed the deal

17   with Dorn Homes.

18   Q.    Okay.

19         Did you tell Mr. Erickson that you had accepted a position

20   with ASH?

21   A.    Very shortly after I accepted it and had communicated to

22   View Homes.

23   Q.    Okay.

24         And what was his reaction when you told him that?

25   A.    He said that that was a mistake.   They weren't good people.

Cross-Examination - Lee Darnold

1    And I would regret it.

2    Q.    And, again, do you regret it?

3    A.    No, I don't.

4              MR. KRAMER:  Those are my questions, Your Honor.

5              THE COURT:  Cross-examination?

6              MR. SHEBELSKIE:  Yes, sir.

7                        CROSS-EXAMINATION

8    BY MR. SHEBELSKIE:

9    Q.    Good morning, Mr. Darnold.

10   A.    Good morning.

11   Q.    I would like to start with one of the slides you showed the

12   jury yesterday.

13             MR. SHEBELSKIE:  This would be Mr. Darnold's

14   demonstrative exhibit page 4, if we can have that on the screen,

15   please.

16   BY MR. SHEBELSKIE:

17   Q.    Do you see on the screen, Mr. Darnold, your demonstrative

18   exhibit entitled, Summer of 2021 Lot Purchase Status?

19   A.    Yes.

20   Q.    And did I understand your testimony to be that what you've

21   done here is look at the summer of 2021 where Mr. Erickson and

22   his companies stood on the delivery of lots under the

23   Land Purchase Agreement?

24   A.    Yes.

25   Q.    All right.

Cross-Examination - Lee Darnold

1  A.   Well, this is -- this is a demonstrative of what we had

2  purchased at that point.

3  Q.   The number of lots that --

4  A.   Not what he had delivered, yeah.

5  Q.   Had purchased.

6       And had -- so at that point, Mr. Erickson had delivered and

7  y'all had purchased all the Phase A lots, right?

8  A.   Yes.

9  Q.   And in the summer of '21, he had delivered, and you had

10 purchased, 133 more Phase B lots that had been required in the

11 Land Purchase Agreement as of that point?

12 A.   That's right.

13 Q.   And likewise in the summer of 2021, he had delivered four

14 Phase C lots above the amounts required at that point under the

15 Land Purchase Agreement; is that correct?

16 A.   That's correct.

17 Q.   All right.

18      And he had had no obligation to deliver lots ahead of the

19 schedule, correct?

20 A.   No obligation in the contract other than what he had been

21 doing prior to this, which was to deliver ahead of schedule,

22 which is also standard practice in the industry.

23 Q.   Just so we're clear then, that when ASH company sued

24 Mr. Erickson, his companies in the summer of 2021, he was 137

25 lots ahead of the required schedule.  Is that correct?

Cross-Examination - Lee Darnold

1   A.   I believe that's correct on the B and A lots.  "Summer" is

2   a broad term.

3   Q.   Well, I am just looking at your chart.  That's the term you

4   used, sir.

5   A.   Right.

6   Q.   What date in the summer is this?

7   A.   There may have been some point in the summer where he was

8   already behind on C lots.

9   Q.   Well, but you didn't put that on your chart, did you?

10  A.   No.  We put what we had purchased from Mr. Erickson so we

11  could be clear.

12  Q.   All right.

13       Now, has ASH -- either the ASH companies terminated the

14  Land Purchase Agreement?

15  A.   Has it as of now?

16  Q.   Yes.

17  A.   We held him in breach.

18  Q.   No.  My question, though, is has ASH companies terminated

19  the Land Purchase Agreement?

20       MR. KRAMER:  Objection, to the extent it calls for a

21  legal conclusion about the effect of decisions made during the

22  course of this case.

23       THE COURT:  He can testify as to what he understands

24  to have been the position of the company.  But it's a legal

25  conclusion that was made by your attorneys, and you left that to

Cross-Examination - Lee Darnold

1    them, and you can so testify.

2           THE WITNESS:  My understanding was Mr. Erickson

3    stopped selling lots, so we notified him he was in breach of the

4    contract.

5    BY MR. SHEBELSKIE:

6    Q.   Now, when the ASH companies sued Mr. Erickson and his

7    companies in the summer of 2021, did the company still want to

8    provide them the lots?

9    A.   Absolutely.

10   Q.   And over the last two years since you sued -- well, let's

11   back up for a little bit.

12          Under the Land Purchase Agreement, ASH-Grayhawk is to make

13   a request every quarter for lots, is that correct?

14   A.   That's correct.

15   Q.   All right.

16          And since the lawsuit was filed over two years ago, in

17   every ensuing quarter, did ASH-Grayhawk send a request for lots

18   for that particular quarter?

19   A.   Yes.

20   Q.   For both B lots and C lots?

21   A.   Yes.

22   Q.   And under the Land Purchase Agreement, there is a deadline,

23   right, for ASH-Grayhawk to make that request for a particular

24   quarter?

25   A.   Yes, there is.

1  Q.   And if I -- do I recall correctly that deadline is ten days

2  before the end of the quarter?

3  A.   I believe so.

4  Q.   All right.

5       And so the quarter that we are in now, in September this

6  year, the third quarter of 2023, that quarter will end

7  September 30th, correct?

8  A.   Correct.

9  Q.   And so today, September 20th, is the ten-day deadline.  How

10  many lots is ASH-Grayhawk requesting for this quarter?

11  A.   I'm not aware.

12  Q.   Has it requested any?

13  A.   I'm not aware.

14  Q.   And during the time that the lawsuit has been pending, are

15  you aware that ASH-Grayhawk has also filed against the

16  properties that Mr. Erickson and his company owns something

17  called a notice of lis pendens?

18           MR. KRAMER:  Objection, Your Honor.  Relevance.

19           MR. SHEBELSKIE:  The relevance goes to the issues we

20  discussed this morning, Your Honor, that they have applied a

21  lis pendens to prevent Mr. Erickson from otherwise disposing of

22  these lots, which shows their decision to require a performance

23  for the last 2 1/2 years.

24           THE COURT:  Overruled.

25

1    BY MR. SHEBELSKIE:

2    Q.    So let me restate my question.  Maybe you got distracted

3    with our colloquy there.

4          When ASH-Grayhawk and the holding company filed this

5    lawsuit, you are aware they filed what's called a notice of

6    lis pendens against Mr. Erickson's properties, right?

7    A.    Yes.

8    Q.    And do you understand that a notice of lis pendens is a

9    legal filing that would effectively prevent Mr. Erickson and his

10   companies from selling those lots while the lawsuit was pending?

11   A.    It would notify anyone that wanted to buy them that there

12   was a proceeding.

13   Q.    And is that notice of lis pendens, to your knowledge, still

14   on file and applicable to Mr. Erickson's and his company's

15   properties?

16   A.    It is.

17   Q.    All right.

18         And so we are clear, over the course the lawsuit, as you

19   said, every quarter ASH-Grayhawk would make a demand for B lots,

20   right?

21   A.    We would -- we would make a request for B lots.

22   Q.    Right.  I didn't mean to suggest --

23   A.    Right.

24   Q.    I will rephrase that.

25         Each quarter ASH-Grayhawk would make a request for B lots,

1   right?

2   A.   Yes.

3   Q.   And B lots have been delivered over the course of the

4   litigation, correct?

5   A.   It had been delivered to the point of litigation.  I

6   believe we did receive some after we started litigation.

7   Q.   I mean, for example, is it not true that, for example, in

8   the first quarter of this year, so January through

9   March of 2023, ASH-Grayhawk requested, and Mr. Erickson's

10  companies delivered, 30 B lots?

11  A.   Yes.

12  Q.   All right.

13       And in the second quarter of this year, so that would be

14  April, May and June of 2023, ASH-Grayhawk requested, and

15  Mr. Erickson's companies delivered, 30 B lots?  Everything that

16  was requested?

17  A.   I'm not familiar with the second quarter request.

18  Q.   If you are not familiar, I will ask someone else who is.

19       Now, I want to ask you about testimony you started off with

20  this morning about the number of closings.  And maybe the best

21  way to do that is to put up another demonstrative exhibit you

22  showed the jury yesterday.

23       MR. SHEBELSKIE:  This would be Mr. Darnold's

24  demonstrative page 5, please.

25

Cross-Examination – Lee Darnold

1    BY MR. SHEBELSKIE:

2    Q.    There was an exhibit you showed the jury this morning.  You

3    had your projection memo, but you repeated the information here

4    in this demonstrative you showed the jury yesterday, right?

5    A.    Yes.

6    Q.    Okay.

7          And so the first thing I want to make sure we are straight

8    on here is that under the Land Purchase Agreement Mr. Erickson

9    and his companies don't have any responsibility or obligations

10   with respect to the number of closings ASH-Grayhawk makes a

11   year, right?

12   A.    They do have responsibility.  They have to give us lots for

13   us to have closings.

14   Q.    You get a lot.  Whether you close on it is a function of

15   whether you have a buyer for the lot?

16   A.    That's right.

17   Q.    All right.

18         In other words, the LPA doesn't mention anything about

19   closings, does it?

20   A.    No, it doesn't.

21   Q.    All right.

22         And in addition, under the LPA, if you look at all the

23   quarterly requirements and add them up, as Mr. Twiss told us a

24   couple of days ago, that's -- Mr. Erickson and his companies are

25   to deliver 180 lots per year?

Cross-Examination – Lee Darnold

1    A.   That's correct.  The minimum is 180.

2    Q.   Right.  So on your projections, before you got involved,

3    you said ASH-Grayhawk was projecting for 2021 to have 278

4    closings, correct?  Do I read your chart right?

5    A.   That's right.  That's what my predecessor had forecast.

6    Q.   And who was your predecessor?

7    A.   Mr. Benson.

8    Q.   Okay.

9         And then when you got involved.  You looked at the

10   situation and you reduced the projected closings to 225,

11   correct?

12   A.   That's correct.

13   Q.   And both of those projections, the original and the

14   reduced, are greater than 180 lots required to be delivered in

15   2021, correct?

16   A.   That's correct.

17   Q.   And if we look down at your chart for 2021, the actual

18   closings ASH-Grayhawk was 229, which actually is 49 lots more --

19   49 closings more than the 180-lot minimum requirement?

20   A.   That's correct.

21   Q.   All right.

22        Then we look at projected closings that you did for 2022

23   and 2023.  Both of those projections are greater than the lot

24   requirements under the Land Purchase Agreement, right?

25   A.   That's correct.

Cross-Examination – Lee Darnold

1   Q.   All right.

2        And in addition, if we look at the difference -- well, let

3   me back up here.

4        I understood the company's position in this lawsuit to be

5   that Mr. Erickson and his company is 78 lots behind on Phase C

6   delivery, right?

7   A.   I believe so.

8   Q.   All right.

9        And the difference between your projected closing for 2022

10  and the actual closings in 2022 is more than 78 lots, right?

11  A.   Yes.  There is a reason for that.

12  Q.   All right.

13       Well, let's see if we can explore what that reason is.

14            MR. SHEBELSKIE:  I would like to see if we can pull up

15  Defendants' Exhibit 995.

16  BY MR. SHEBELSKIE:

17  Q.   Defendants' Exhibit 995, do you see, sir, is a copy of the

18  consolidated financial statements for the American Southern

19  Homes Holdings and its subsidiaries?

20  A.   Yes.

21  Q.   And are these financial statements prepared in the ordinary

22  course of the company's business?

23  A.   They are.

24  Q.   All right.

25       And reviewed and approved by the auditors?

Cross-Examination - Lee Darnold

1    A.   Yes.  Everything we do is audited.

2              MR. SHEBELSKIE:  So let's first look at page 14 of

3    this exhibit, please.

4              Sorry, Your Honor.  Move to admit Defendants'

5    Exhibit 995 at this time.

6              MR. KRAMER:  No objection, Your Honor.

7              THE COURT:  It's admitted.

8         (DEFENDANTS EXHIBIT 995:  Received in evidence.)

9              MR. SHEBELSKIE:  All right.

10             And let's go to page 14.

11   BY MR. SHEBELSKIE:

12   Q.   Do you see that on the screen, sir?  It starts:  Notes to

13   consolidated financial statements, and there is a section

14   entitled "Goodwill"?

15   A.   Yes.

16   Q.   All right.

17        What I would like to point out here is this section that I

18   have circled in red.  That reads:  Due to deteriorating market

19   and industry conditions, higher interest rates experienced over

20   the course of 2022, and the rise and inflationary spending

21   impacted margins unfavorable on both the revenue and cost sides,

22   operating cash flow projections were lowered, and earnings

23   forecasts were revised downward.  Correct?

24   A.   Yes.

25   Q.   All right.

Cross-Examination - Lee Darnold

1      Now, who receives these financial statements when they are
2  prepared?
3  A.   The investors in the company.
4  Q.   All right.
5      So here ASH's management is describing to its owners the
6  financial circumstances the company faced in 2022, right?
7  A.   That's right.
8  Q.   All right.
9      And as a result of that, the company wrote down a loss on
10 both the Dorn company subsidiary and the Grayhawk one, right?
11 A.   Can you repeat the question?
12 Q.   Yes.
13     The earnings forecasts were revised downward, and
14 management determined recoverability of goodwill at both Dorn
15 and Grayhawk was unlikely, correct?
16 A.   Yes.  That was a reflection of goodwill, not exactly
17 reflecting the previous paragraph.
18 Q.   Well, we'll get to that in a moment.  We're just talking
19 right now about what's written here.
20     And Mr. Erickson had nothing to do with the impairment of
21 goodwill at Dorn, did he?
22 A.   At Dorn?  No, he did not.
23 Q.   All right.
24     And collectively, the company wrote off -- recognized a
25 loss of $10,922,501 because of the impact on goodwill due to the

Cross-Examination – Lee Darnold

1   deteriorating market conditions, right?

2   A.   We accelerated their write down of goodwill.

3   Q.   All right.

4   A.   We did not write down the business.  We wrote down the

5   goodwill.  It's an accounting term.

6        MR. SHEBELSKIE:  Now, let's go to another document.

7   The 2023 financial statements.  Let's pull up Defendants'

8   Exhibit 998.

9   BY MR. SHEBELSKIE:

10  Q.   Do you see on the screen, sir, that this is an annual

11  meeting, a report, from May of this year to the investor/owners

12  of ASH?

13  A.   Yes.

14  Q.   And this document was sent to the investor/owners of the

15  ASH companies?

16  A.   Yes, it was.

17  Q.   And this was prepared in the regular course of the

18  company's business?

19  A.   Yes.

20       MR. SHEBELSKIE:  All right.  Your Honor, I would like

21  to admit Defendants' Exhibit 998.

22       MR. KRAMER:  No objection.

23       THE COURT:  Admitted.

24     (DEFENDANTS EXHIBIT 998:  Received in evidence.)

25

1    BY MR. SHEBELSKIE:

2    Q.   All right.

3        First, could you tell the jury -- they see it now on the

4    screen -- this annual meeting; what is -- what is the annual

5    meeting that's referenced here on the first page of the exhibit?

6    A.   The company is required in our charter documents to do an

7    annual meeting each year with all of the investors in the

8    company.

9    Q.   All right.

10        MR. SHEBELSKIE:  And I would like to have you look, if

11    I could, at page 15 of this report to the investors.  If we

12    could please scroll to that.

13    BY MR. SHEBELSKIE:

14    Q.   All right.

15        We now have on the screen page 15 of the annual report

16    entitled "2022 Gross Margin."

17        Do you see that?

18    A.   I do.

19    Q.   And as used here, what's the gross margin that this page

20    concerns?

21    A.   Basically, the difference between what you sell a house for

22    and the expenses that go into that house.

23    Q.   All right.  And if we look at 2021, the gross margin was,

24    for the companies, 16.6 percent, right?

25    A.   That's right.

1  Q.   And then when you got into 2022, your gross margins had

2  fallen to 15.1 percent, right?

3  A.   That's right.

4  Q.   Does that translate to less profitability?

5  A.   It's a percentage.  It depends on how many units and what

6  the price of the house was.  It's a percent of the house.  So if

7  you sold houses for a million dollars, it would be better.  But

8  the point that you are trying to make that it's less on that

9  basis, yes.

10 Q.   Yeah.  And then let's see how things have fared in 2023.

11         MR. SHEBELSKIE:  Let's go to page 24 of the exhibit.

12 BY MR. SHEBELSKIE:

13 Q.   Here we see on this page entitled, 2023 Goal:  Reset for

14 Future Growth and Break Even.  Do you see the line, three up

15 from the bottom, Contribution Margins?

16 A.   Yes.

17 Q.   Okay.

18      And we see -- again, for 2022, we see again that

19 15.1 percent number we just looked at, right?

20 A.   That's right.

21 Q.   And here now for 2023, there was a projected figure for

22 2023 of your profit margin going down to 12.9 percent, right?

23 A.   That's right.

24 Q.   All right.

25      And that's on a company-wide basis, right?

Cross-Examination - Lee Darnold

1    A.    That's right.  This is for the company.

2    Q.    Right.

3          So that's a reflection of deteriorated profitability

4    conditions that you're experiencing at Grayhawk and Dorn and

5    Huntsville, right?

6    A.    That's -- that's not -- the 15.1 percent, just to

7    understand, is from primarily sales that happened in 2021.  It

8    takes awhile to build houses.  So you see the closings that

9    happened in '23 come from '22.

10         Were the margins down in this?  Yes.  But there is more

11   than just deteriorating market conditions.  It also has to do

12   with we kept employees in the platform and there were fewer

13   closings to spread those costs across.  So there's a lot that

14   contributes to contribution margin.

15   Q.    Another thing I want to ask you about in this document

16   appears on page 14 of the exhibit.

17              MR. SHEBELSKIE:  Can we please go to that?

18   BY MR. SHEBELSKIE:

19   Q.    We are now looking on page 14 of the exhibit entitled, 2022

20   Adjusted Homebuilding EBITDA.  What is EBITDA?

21   A.    Earnings Before Income Taxes, Depreciation and

22   Amortization.

23   Q.    Why does the company track EBITDA?

24   A.    EBITDA is generally a measure of -- it's basically

25   operating profit.  It's how is the business doing before you get

1    into all the taxation and the interest you paid, how you

2    depreciate -- which are all accounting terms.

3    Q.   All right.

4         And underneath that there's a box called, Entity noise in

5    2022 financial statements.

6         What was meant by "entity noise"?

7    A.   When you go to assess a home builder you generally do it on

8    EBITDA.  And then there's a whole lot of accounting rows

9    underneath that, that are really not a measure of what happened

10   with your house you sold and what you made on the house, but are

11   costs that you undertake.

12   Q.   Okay.

13        And we saw earlier today, just a few minutes ago, about the

14   goodwill impairment, correct?

15   A.   Yes.

16   Q.   And then another one -- the second one was intangible

17   amortization.  What is that?

18   A.   Well, goodwill impairment, just so you are aware, is us

19   writing down the premium paid for a business.  We paid

20   Mr. Erickson 10 million in premium.  So when you impair

21   goodwill, you are writing that impairment down.  It's a

22   placeholder for extra money you gave a builder, or someone you

23   bought from, beyond what their company was worth.  So that's

24   what that one is.

25        Intangible amortization is just an accounting

1  classification for things like trademarks, or other things, that
2  are just not a -- not a stick and brick and concrete and a roof.
3  Q.   All right.
4      And this third one, Spec Homes Impairment, that was a
5  deduction or loss of 3.3 million associated with that.  What was
6  that?
7  A.   Those were homes that we had at one sale price, and then we
8  had to reduce, primarily in Arizona and Huntsville.  And then
9  also from the mitigation lots I mentioned earlier, we had to
10  write some of those down because I had mentioned they were not
11  performing.
12  Q.   And fourth one, Anderson Farms Impairment, there is a
13  deduction of loss of 8.4 million associated with that.
14      What is that?
15  A.   That's a land deal in Huntsville that was 415 lots.  We
16  assessed where the price points in that particular part of
17  Huntsville would be and we marked those lots to market.  The
18  whole idea of this presentation is to show that we are going to
19  count 2023 as our basis year going forward and try to grow our
20  business again from there.
21  Q.   And then the last one on this page, Walked from projects
22  with 1600 lots.  And that's associated with a $1.9 million loss
23  in 2022.  What was that?
24  A.   When a developer comes into a contract with us to buy lots
25  we put a deposit down.  And when that developer -- when that

Cross-Examination – Lee Darnold

1  project no longer works, we say to the developer, We can't go

2  forward, and we get the deposit back.  Generally, developers

3  will give you the deposit back when you have stopped buying lots

4  from them.

5  Q.  And was that -- where did that take place?  Here in

6  Columbus with Mr. Erickson?

7  A.  Primarily in Arizona and then Huntsville.

8  Q.  All right.

9      Now, you talked about impacts on trades and such.  I'd like

10  to show you Defendants' Exhibit 521.

11      Do you recognize 521, sir, as a letter that ASH-Grayhawk

12  sent to its -- the trade partners you described in

13  October 3rd, 2022?

14  A.  Possibly.  I have to see it first.

15  Q.  Oh, it's not on your screen yet?

16  A.  No, sir.

17  Q.  I'm sorry.  It was on mine.  That's why I asked.

18      MR. SHEBELSKIE:  Let's make the document smaller so

19  Mr. Darnold can see the signature lines.

20      (Interruption)

21      THE COURT:  Okay.  Ladies and gentlemen, this would be

22  a good time for to you take a midmorning break.  We will break

23  for 15 minutes.

24      Go to the jury room.  Do not discuss the case during

25  the break.

Cross-Examination - Lee Darnold

1           We will be in recess for 15 minutes and hopefully get

2    this problem fixed during that break.

3           (Jury out at 10:55.)

4           (Recess taken 10:56.)

5           (Resumed at 11:11.)

6           THE COURT:  Bring the jury down.

7           Mr. Elliker?

8           MR. ELLIKER:  Your Honor, there is an issue I think we

9    should take up quickly.

10          THE COURT:  Oh, my gosh.  We are going to be here till

11   Thanksgiving, but go ahead.

12          MR. ELLIKER:  Your Honor, we only realized during the

13   break that throughout the morning session, the plaintiffs have

14   had one of their expert witnesses, who hasn't testified yet,

15   sitting in the courtroom.  We think that's a violation of the

16   Court's rule on witnesses and to notify the plaintiffs.

17          MR. KRAMER:  He is an expert, Your Honor.  The rule

18   doesn't apply to experts never in any Court I've ever been in.

19          MR. ELLIKER:  That wasn't a -- there is no exception.

20          THE COURT:  Well, I think generally the rule applies

21   to all witnesses unless there is some exception.  I have made

22   exception in the past for expert witnesses to facilitate their

23   testimony, particularly if they were going to give testimony

24   based on evidence that was previously presented.

25          MR. KRAMER:  Well, we certainly didn't mean to --

Cross-Examination – Lee Darnold

 1            THE COURT:  I am not going to find any sanction or

 2   anything like that.

 3            MR. KRAMER:  We can move him out.

 4            THE COURT:  Is it really necessary for he or her to be

 5   here?

 6            MR. KRAMER:  No.

 7            THE COURT:  Okay.

 8            We will just sequester for the rest of the trial.

 9            MR. KRAMER:  Okay.

10            Thank you, Your Honor.

11            THE COURT:  All right.  If there is anybody that's

12   going to be a witness in the case, you should -- other than the

13   party representatives, you should be in the witness room and not

14   in the courtroom.

15            Bring them down.

16         (Jury in at 11:13.)

17            THE COURT:  All right.

18            You may continue your examination of the witness.

19            MR. SHEBELSKIE:  Thank you, Judge.

20   BY MR. SHEBELSKIE:

21   Q.   Mr. Darnold, I hope during our break we've had the

22   technical issue resolved so you now have on your screen

23   Defendants' Exhibit 521.

24         Do you have that?

25   A.   I do.

Cross-Examination - Lee Darnold

1   Q.   Do you see this is a letter on ASH-Grayhawk and Evermore

2   stationery from Maria Harding on October --

3   A.   Yes.

4   Q.   And Maria Harding was ASH's director of purchasing at the

5   time?

6   A.   She was.

7   Q.   And she is sending this to the various contractors and

8   tradesman you deal with to build homes, right?

9   A.   Right.

10        MR. SHEBELSKIE:  Your Honor, I would move for

11   admission of 521.

12        MR. KRAMER:  No objection.

13        THE COURT:  Admitted.

14   (DEFENDANTS EXHIBIT 521:  Received in evidence.)

15   BY MR. SHEBELSKIE:

16   Q.   All right.  We now have on the screen for the jury

17   Defendants' 521, the letter to your trade partners.

18        And just so we're clear, did this go to all of ASH

19   Evermore's contractors and subs and home trades in the Columbus

20   area?

21   A.   Yes.  And across the company.

22   Q.   And across -- so this was company-wide?

23   A.   The basic message was.  Everybody wrote their own letter.

24   Q.   I see.  So you sent one in Arizona and one in Huntsville,

25   too?

Cross-Examination – Lee Darnold

1   A.   That's right.  That's right.

2   Q.   All right.

3        MR. SHEBELSKIE:  And I'd like to look at the first

4   paragraph.  Maybe we can enlarge that and bold it.

5   BY MR. SHEBELSKIE:

6   Q.   What ASH told all of its customers -- I mean suppliers or

7   vendors around the country, was that:  I'm sure you are all

8   aware that there has been a slowdown in the housing market these

9   past few months.

10       That was -- you are writing -- this was written in

11  October of '22, right?

12  A.   That's right.

13  Q.   And then you -- ASH goes on to tell all of its trade

14  partners why.  It says:  Rising interest rates and inflation

15  have driven down sales which directly impacts our ability to

16  continue to start homes.  Correct?

17  A.   That's right.

18  Q.   And that statement was true when told to all of your trade

19  partners, right?

20  A.   Yes.

21  Q.   All right.

22       And so the ability to start homes in 2022 was directly a

23  result of rising interest rates and inflation which drove down

24  sales, correct?

25  A.   Yes.  And also if you didn't have lots, you couldn't start

Cross-Examination – Lee Darnold

1    them.

2    Q.    Earlier this morning you told the jury, when asked was

3    there anything else that drove down the number of closings other

4    than Mr. Erickson's failure to deliver lots, you said, and I

5    quote, "Nothing else."

6    A.    You are conflating closings with profit.  This is about

7    making our homes more affordable for our buyers.  And it's my

8    job always to make the houses as cheaply as I can for our

9    buyers.

10   Q.    Well, what's written here is "ability to continue to start

11   homes."  Not profits.  You're talking about here the ability to

12   start homes, right?

13   A.    That's right.  Specifically, the mitigated lots that we

14   bought did not make the money we were hoping to make, so we were

15   trying to make those affordable to start them selling again.

16   Q.    All right.

17         And I want to look at the next sentence here, too.  Make

18   sure we understand what you are saying here.

19         Our team is working hard to reinvigorate rate sales by

20   reducing pricing, locking rates and increasing incentives to

21   buyers.

22         Do you see that sentence?

23   A.    Yes, I do.

24   Q.    All right.  So explain to the jury what this sentence is

25   referring to.

Cross-Examination - Lee Darnold

1    A.    My main point to our trades was that as interest rates go

2    up, the price to our buyer, the monthly payment goes up, and our

3    job is to get them as affordable as possible.

4         As I mentioned earlier, there was a supply chain issue the

5    prior year, and we are letting our trades know that when

6    everybody was paying you anything you wanted before, the market

7    has now changed and we need you to reduce prices.

8         I send out these letters out every six months to keep our

9    trades from raising prices.

10   Q.    When you're talking here about reinvigorating sales, you're

11   talking about reinvigorating home sales?

12   A.    Yes.

13   Q.    And by reducing pricing, you mean reducing the prices of

14   the homes that you are selling?

15   A.    To the end user, yes, the buyer.

16   Q.    And then locking rates, this is sort of to kind of create

17   incentive to help customers buy your houses?

18   A.    Yes.  Part of what this is tied to is for me to get a

19   consumer a 5-percent rate when the market is at 7 I have to

20   spent about $25,000.  In order to do that, I need us all to pull

21   together to get them to the correct interest rate.  Interest

22   rates are very expensive to buy down.

23   Q.    And you write:  In order to help reinvigorate sales, the

24   company is giving -- or is increasing incentives to buyers.

25        Now, what's that?

1  A.    That's, again, trying to make the home more affordable,

2  particularly by buying down rates, so they can have as close to

3  the same payment as they would have had in prior times.

4  Q.    What do you mean "buying down rates"?

5  A.    An interest rate was around 7 percent at this time, and we

6  were trying to get it closer to 4, 4.9 or 5, as many builders

7  across the country did.  Interest rate buy downs take money that

8  could go into the house.  I have to find a way to get that to

9  the consumer.

10 Q.    All right.

11        So it is ASH that pays for this buy down of rates?

12 A.    It is.  We pay for it out of profit.

13 Q.    All right.

14        So these incentives reduce your profit?

15 A.    They can, but I am asking here the trades to help us.

16 Q.    Okay.

17        And then that's the next paragraph.  I want to look at

18 that.  The second paragraph here:  We call upon all trade

19 partners to assist us with the goal of reducing the cost of our

20 homes by 20 percent on new starts.

21        Do you see that?

22 A.    Yes.

23 Q.    So you were asking your trade partners to reduce their

24 prices to you by 20 percent?

25 A.    That's right.

Cross-Examination - Lee Darnold

1    Q.   And how was that received by your trade partners?

2    A.   They generally did the best they could.  This is a starting

3    point with them.  My job every day is to get the trades to sell

4    their products to us at the same quality as cheaply as possible.

5    I have written letters like this in up markets, down markets.

6    Because they are constantly writing letters to us, saying they

7    need more money.  That's just business.

8    Q.   And you told the jury about the number of employees that

9    you laid off.  I think it was in 2022, you said.

10        Over the past two years, how many of the ASH-Grayhawk

11   employees have quit?

12   A.   I am not completely aware of that number.  My guess is -- I

13   won't guess.  I don't know.  I haven't looked at that number.

14   Q.   Well, give us your best estimate.

15   A.   I couldn't say.

16   Q.   Can't say at all?

17   A.   I am going to guess 30 percent --

18   Q.   All right.

19   A.   -- have left.

20   Q.   Now, let's go back to the question of the lots.

21        As you testified, since the lawsuit has been filed, you

22   have bought B lots, correct?  Your company.  Not you personally.

23   A.   Yes, the company.  Yes.

24   Q.   Are B lots and C lots the same?

25   A.   They are not.

Cross-Examination - Lee Darnold

1    Q.   Does the company receive the same profit margins on homes

2    built on B and C lots?

3    A.   The profit margins on homes within C and within B are

4    different.  Every location, every buyer, we have a different

5    margin.

6    Q.   All right.

7         So if we are looking at a -- give us an example of a Phase

8    B lot neighborhood.

9    A.   If we looked at Garrett Pines.

10   Q.   All right.

11        And then what's a Phase C lot neighborhood?

12   A.   We looked over at Auburn Farms.

13   Q.   All right.

14        And so what you are saying is that the profit margin you

15   might get on that first neighborhood is different than the

16   profit margin you get on the second neighborhood?

17   A.   Yes.  We don't generally price to a margin.  We price to

18   the market, and then we try to drive to make the highest profit

19   we can.

20   Q.   Because the selling prices you might command in one

21   neighborhood, based on its location, would differ from the

22   prices you might demand in another neighborhood, based on its

23   location?

24   A.   And based on product, yes.

25   Q.   And based on product.  A number of factors?

Cross-Examination - Lee Darnold

1    A.    That's right.

2    Q.    So are you saying, then, we couldn't look at that Phase A

3    neighborhood that you referred to and say, Well, that's the

4    profits we get over here; therefore, we are going to get the

5    same profits over in this Phase C neighborhood?

6    A.    We can generalize.  There is a basic model in homebuilding

7    of the percentage you pay for land, what you try to have your

8    house cost, what you want your profit to be, what your overhead

9    is, and how many employees you carry.  So we, generally, were

10   looking at all communities.  We try to make all of those

11   variables work together to deliver that average profit.

12   Q.    And before I go on, there was one thing I meant to ask you

13   about those incentives to help reduce prices.

14       Am I right that the company has also recently announced

15   that you're coming up with a new set of building plans that you

16   will be using for your products?

17   A.    Yes.  We are trying to introduce entry-level product in

18   Huntsville and Arizona.

19   Q.    All right.  Now, let's go back to the lots.

20       How many vacant lots does ASH-Grayhawk currently have?

21   A.    On our books or in control?

22   Q.    Both?

23   A.    We have about 3,000 lots across the country.

24   Q.    Sorry.  Maybe I misspoke or maybe you misheard.

25       I was asking specifically about ASH-Grayhawk here in

1    Columbus.

2    A.    How many lots do we have on our books currently?  I believe

3    100.

4    Q.    How many do you have here owned by ASH-Grayhawk business in

5    Columbus of lots that you own but you haven't started building

6    houses on yet?

7    A.    In Columbus?

8    Q.    No, I meant for this company that's based here in Columbus,

9    so whether it's Auburn or Columbus or any other county.

10   A.    I haven't checked that.  Our forecast, going into next

11   year, was somewhere around 100.

12   Q.    Okay.  Maybe I'm not being -- I'm not asking about

13   forecast.  I am saying right here, if you drove around all the

14   communities in which ASH-Grayhawk builds houses, would we see

15   vacant lots that you own on which you haven't started houses?

16   A.    Vacant lots that we own on which we haven't started houses?

17   Yes, you would.

18   Q.    All right.  And how many of those?

19   A.    I don't have that number in front of me.  The reason I was

20   referring to the forecast is I have to have lots to forecast

21   closings, and so those numbers are directly tied.

22   Q.    Right.  It's a fact, isn't it, sir, that of the many B lots

23   that ASH-Grayhawk has bought from Mr. Erickson over the last

24   year y'all have not broken ground on a significant percentage of

25   those?

Cross-Examination – Lee Darnold

1    A.   It could be a fact, yes.

2    Q.   Yeah.

3         In fact, like Auburn Links, that's one of the Phase B

4    neighborhoods, right?

5    A.   Yes.

6    Q.   Of the 12 lots in that neighborhood, that ASH-Grayhawk

7    bought in October of 2022, y'all still haven't begun to build on

8    eight of them.  Isn't that a fact?

9    A.   That's normal homebuilding.

10   Q.   So that's correct, then?

11   A.   Sure.  That's correct.

12   Q.   All right.

13        And likewise with Roosevelt Heights, y'all bought 12 lots

14   in that neighborhood in March of 2023 and haven't started work

15   on eight of those lots, correct?

16   A.   I can't verify that, but that could be correct.

17   Q.   All right.  You wouldn't disagree with that?

18   A.   I wouldn't disagree.  I have 415 lots in Huntsville I own

19   and haven't started there either.

20   Q.   All right.

21        And as you testified, ASH's business model is to be land

22   light, correct?

23   A.   That is our attempt.

24   Q.   Yeah.

25        ASH wants to limit the holding, the number of lots it holds

Cross-Examination - Lee Darnold

 1    and the raw land -- limit the raw land it owns to the greatest

 2    extent possible.  Correct?

 3    A.    That's right.

 4    Q.    Yeah.  And that's not just aspiration.  That's actually

 5    official company policy, isn't it?

 6    A.    That's right.  It's policy for builders across the country

 7    not to hold lots any longer than they have to.

 8    Q.    Right.  And in that respect, I would like to you look at

 9    Defendants' Exhibit 642.

10          Is that 642 on the screen?

11    A.    It says 642 in the top left.

12    Q.    I don't see that on my screen.

13    A.    Really small top left.

14          MR. SHEBELSKIE:  Scroll down, Mr. Walters, and see if

15    this is the document, in fact, that I want.

16          Here we go.  Yes.

17    BY MR. SHEBELSKIE:

18    Q.    Do you see that on 642 there is a copy of a policy -- of

19    ASH policy number 1102-2020?

20    A.    Yes, I do.

21    Q.    All right.  And, do you recognize this as one of the

22    official policies of the ASH companies?

23    A.    I don't, actually.  This would -- I don't recognize this

24    document.  I wasn't at the company, and this policy is -- that

25    document is not a current policy.

1  Q.   All right.

2  A.   I think this was while Mr. Erickson was CEO -- interim CEO.

3  Q.   And you nonetheless agree that the goal of ASH-Grayhawk

4  still is to be land light and to limit the holding of finished

5  lots and raw land to the greatest extent possible?

6  A.   Absolutely.

7  Q.   All right.  Then we don't need to document.

8       Why is it that ASH's goal is to limit the number of

9  finished lots it owns to the greatest extent possible?

10 A.   Because when you have a lot that you own, that's cash that

11 you paid for the lot.  And if it's not working towards a house

12 being built, it's not put to work.  It's the same problem

13 developers have when they don't sell their lots.

14 Q.   It cost money to buy a lot and to hold it, right?

15 A.   It does.

16 Q.   And you don't want to spend money to buy lots if you are

17 not ready to build on them?

18 A.   You try not to.  Sometimes you have to especially when the

19 market is disrupted.

20 Q.   Right.  For the 78 C lots, that you say Mr. Erickson is

21 behind on, if you y'all bought those lots, how much would y'all

22 have had to pay for the 78?

23 A.   Each lot had a different price that would be negotiated and

24 assigned to it based on how much development cost, how much the

25 land cost, so I can't say a general price.

Cross-Examination - Lee Darnold

1  Q.   Do you have an average of what you have paid Mr. Erickson

2  for these lots over the last two years?

3  A.   It's about 50 to $60,000.

4  Q.   All right.

5       So if we took somewhere, either 50 or $60,000, and

6  multiplied it by 78, that's the amount of additional money y'all

7  would have to -- to put on the books -- to pay to get these

8  lots?

9  A.   If we bought all of them at one time?

10 Q.   Yes.

11 A.   Yes.

12 Q.   Uh-huh.  And when you buy properties like these mitigation

13 properties, that you were describing, what type of analysis does

14 the company do to see whether or not it's a good investment to

15 buy these properties?

16 A.   We generally do a market study by a company called

17 John Burns where we ask them to assess the local market.  We do

18 a competitive study and see how many homes are selling and for

19 how much in other people's communities.  And we try to assess

20 how many buyers there might be in that area, and can that area

21 take on another community and still sell.

22      The average communities are selling nationwide at 2.3 per

23 month.  And so we also have to take into account that if a

24 seller sees that we are looking for those lots, and wants us to

25 buy 45, standard practice is to say, Okay, if it's two a month,

 1  as it is nationwide, then I am going to hold these lots for some

 2  time.  Does that make financial sense?  And then we will buy

 3  them.

 4          MR. SHEBELSKIE:  Let me show you

 5  Defendants' Exhibit 593, please.

 6  BY MR. SHEBELSKIE:

 7  Q.  On the screen, sir, is Exhibit 593 entitled, Comparative

 8  Market Analysis.

 9      Is this an example of one of the comparative market

10  analyses you described the company does when it's deciding to

11  buy one of these mitigation properties?

12  A.  It's an example of one that a builder could do.  I don't

13  know if this is one of ours.

14  Q.  All.  Right.  Well, if you see in the lower --

15          MR. SHEBELSKIE:  If you scroll down to the bottom.

16  BY MR. SHEBELSKIE:

17  Q.  Do you see this was prepared by Century 21 Premier Real

18  Estate?

19  A.  Yes.  That's a real estate firm.  I'm just saying I don't

20  know if that is our document or if this was prepared for another

21  market.

22  Q.  Fair enough.

23  A.  I am not familiar with Roni Braun.

24  Q.  Fair enough.  I just want you -- make sure I understand

25  because we'll have another witness talk about this.  This is

Cross-Examination - Lee Darnold

1  type of comparative market analysis that y'all -- the company

2  regularly engages when it decides to buy a property?

3  A.   This would be one aspect of the market analysis we do.

4  This would reflect re-sell homes sales over the period of time.

5  Yes.

6  Q.   All right.

7        MR. SHEBELSKIE:  And now let's look at

8  Defendants' Exhibit 979.

9  BY MR. SHEBELSKIE:

10  Q.   You mentioned the company ASH uses for these types of

11  analysis is called John Burns?

12  A.   Yes.

13  Q.   And you see this is a report from the John Burns company

14  that you were describing?

15  A.   Yes.

16  Q.   Okay.  And this is a, Pricing and Absorption Analysis for

17  Phase 2 of Villages at Huntcliff.

18  A.   Yes.

19        MR. SHEBELSKIE:  Your Honor, I move for the admission

20  of Defendants' Exhibit 979.

21        MR. KRAMER:  Objection, Your Honor, hearsay.  This

22  isn't a document prepared by ASH.

23        MR. SHEBELSKIE:  It's not being offered for the truth

24  of any conclusions reached in it, Your Honor.  It's offered to

25  show the type of analysis the company regularly uses when

1    deciding whether to buy property and determine the value.

2            MR. KRAMER:  I don't think we have that foundation

3    yet, Your Honor, that that is the type of analysis that the

4    company regularly uses.

5            MR. SHEBELSKIE:  He just testified that they regularly

6    hire John Burns for that purpose.

7            THE WITNESS:  Yes, this is a -- this is a consultant

8    we use, and Mac Viers was our employee.

9            MR. KRAMER:  Okay.  Objection withdrawn.  Sorry to

10   interrupt.

11           THE COURT:  It's admitted.

12       (DEFENDANTS EXHIBIT 979:  Received in evidence.)

13           THE WITNESS:  This is a market study --

14           MR. SHEBELSKIE:  Hold on just a second.  Let's put it

15   up on the screen.

16   BY MR. SHEBELSKIE:

17   Q.   All right.

18       So now that you jury can see it.  This is a report from

19   John Burns Real Estate Consulting, to your employee Mac Viers,

20   pricing absorption analysis.

21       With that benefit, Mr. Darnold, can you explain to the jury

22   what this document is and what your company uses it for?

23   A.   This document is our request to John Burns to say, Hey,

24   this community in Hogansville, can you please take a look at it,

25   and tell us what your thoughts are?

1      They conduct this research from California.

2  Q.   What their thoughts are on what?

3  A.   They are -- we ask them to do the competitive market

4  assessment, to tell us what they think the pricing could be,

5  give us some sort of third-party validation of what could happen

6  in a community.

7  Q.   I see.

8      So when y'all went about to buy these mitigation properties

9  that you described, to decide whether or not it was worthwhile,

10  made sense to buy them, did y'all just say, Well, what prices

11  were we getting on homes in Auburn Links, for example, in 2020

12  and 2021, and base your investment decision on that?

13  A.   We use a combination of factors.  I can tell you there's as

14  many deals that Burns said we should have that I haven't as

15  there are that they said we should buy that I did.

16  Q.   Appreciate that.

17  A.   If not, they would be the CEO, and we would just buy what

18  they said.  There are many factors.

19  Q.   No.  My question is, when you were making these decisions

20  to, say, buy the mitigation lots, did y'all just look at the

21  historic sale prices y'all had received in 2020 and 2021 and

22  say, We'll make a decision to buy a particular mitigation lot

23  just based on, you know, what sales we had back in 2020?

24  A.   No.  That would be a factor, but that's not the only

25  factor.

1    Q.    All right.

2    A.    There -- there are factors -- I can explain, if you'd like

3    me to, how many factors there are.  But this is just one aspect.

4    This is designed for a local team talking to us at the home

5    office to say, It's not just my opinion this will work.  Here is

6    what we think from Burns.  And then we spend time arguing over

7    what will really happens in that particular community.

8    Q.    Well, give -- give the jury some sense complexity and the

9    many factors that, in the real world, when you are making

10   business decisions to buy properties, that y'all undertake.

11   A.    Distance to the community.  What the specific community

12   looks like.  What municipality it's in.  Does the

13   municipality -- are they friendly municipality towards

14   homebuilders?  Do they have enough inspectors to make sure the

15   house can be built?  Are they on the commuting corridor within

16   two turns?  What school district are they in?  What price point

17   do we think we could develop at?  Is this going to be profitable

18   enough?  When is the timeframe the lots will be delivered?  Are

19   the lots going to be delivered as we suspect?  Is this the right

20   developer to deliver them?  Do we have the site work guys, and

21   are there vendors that can build it?

22        The list is very long.  I can continue you if you'd like.

23   Q.    I think that gives us a sense of what we need.

24        All right.  Mr. Darnold, I am going to shift gears and

25   cover a different topic.  This one will be brief.

Cross-Examination - Lee Darnold

1   A.    Okay.

2   Q.    Talking about the June 2nd, 2021 meeting in Washington, DC.

3   You said you attended that meeting, right?

4   A.    I did.  I was at their law firm's offices in DC.

5   Q.    All right.

6         And you testified that coming out of that meeting you

7   thought there was an agreement in principle on the order of the

8   Phase C lots, right?

9   A.    That's right.

10  Q.    All right.

11        What I am curious to know, Mr. Darnold, did you submit that

12  supposed agreement in principle to the Board of Directors for

13  their vote on whether to adopt it or not?

14  A.    I did not present it to the Board of Directors.  I am not

15  sure if Mr. Twiss may have.

16  Q.    All right.  Are you aware of his doing that?

17  A.    No.  That's not a requirement of our operating agreement

18  with the Board.  The CEO makes the decisions on how to allocate

19  capital, and they are working overall on the business plan, what

20  were the financial results.  They will be informed of strategy

21  and will be informed of timing.  But they don't -- I don't send

22  every document that I work on to the Board.

23  Q.    And are you aware of any resolution of the Board approving

24  any Phase C lot order?

25  A.    There would be no resolution from the Board approving a

Cross-Examination - Lee Darnold

1    Phase C lot order.  That's not in the normal course of business

2    or the way we describe our relationship.

3    Q.    And was the agreement in principle you say that was reached

4    there submitted to the member investors who own ASH Holdings for

5    them to vote on whether to approve it or not?

6    A.    Our agreement is the member investors get quarterly

7    financials and an annual update.  So that would not have been in

8    the normal course of business.

9    Q.    Okay.  That concludes that topic.

10        Another topic:  I want to make sure I understand the

11    president's of ASH-Grayhawk -- you mentioned David Jennings is

12    now the current president of ASH-Grayhawk, is that right?

13    A.    I didn't mention his name, but that is his name.

14    Q.    I'm sorry?

15    A.    That is his name.  I didn't mention it.

16    Q.    Oh, I'm sorry.

17    A.    I said a person who had worked with me at two prior

18    companies.

19    Q.    Is that Mr. Jennings then?

20    A.    That is.

21    Q.    Okay.

22        And when did he become president of ASH-Grayhawk?

23    A.    I believe he started in -- his final start date was June, I

24    believe.

25    Q.    June of this year?

Cross-Examination - Lee Darnold

1  A.    May or June of this year, yes.

2  Q.    All right.  And where does he live?

3  A.    He told me.  I don't know the area.  It's just north of our

4  offices in Columbus.

5  Q.    Okay.

6  A.    He bought a house in 30 days and moved out there.  He was

7  very excited.

8  Q.    Before that, the president was Brian Nanney?

9  A.    No.  Brian Nanney is the regional president or the VP of

10 operations nationally, so he had stepped in to help in Columbus.

11 Q.    I see.

12       Let's start from the beginning then.

13       The first president -- when you joined ASH, who was the

14 president of ASH-Grayhawk at that time?

15 A.    When I joined the company, they had hired a man named

16 Steve Sasso who was preceded by several people earlier -- from

17 the time we bought the company until Steve Sasso, I think there

18 had been three.

19 Q.    All right.

20       And how long was Mr. Sasso president?

21 A.    Let's see.  I believe he left a year after I started.

22 Q.    All right.  So that would have been early 2022?

23 A.    Yeah, I think April of '22.

24 Q.    All right.

25       Was he fired, or did he leave on his own?

Cross-Examination - Lee Darnold

1  A.    He was fired.

2  Q.    And why was he fired?

3  A.    Mr. Sasso was going through some personal things.  Because

4  of HIPAA, I am not at liberty to disclose.

5  Q.    I won't -- I won't ask you.

6       And then who was the next president after Mr. Sasso?

7  A.    We asked the Huntsville division president, Scott James, to

8  run both markets until we had a conclusion as to whether or not

9  he would have lots, and then we could hire somebody.

10 Q.    And how long was Mr. James serving president or

11 co-president?

12 A.    He was there until probably February of this year, 2023.

13 Q.    And then who replaced him?

14 A.    Mr. Nanney stepped in until we could locate a different

15 division president.

16 Q.    And now it's Mr. Jennings?

17 A.    Now it's Mr. Jennings.  That's right.

18 Q.    Okay.  Thank you.

19       And how many employees are -- work for ASH-Grayhawk right

20 now?

21 A.    It's between 17 and 20.  I don't know the exact number.

22 Q.    Okay.

23       Now, the -- the last topic I want to ask you about are the

24 voice-mails that were played with you and Mr. Erickson.

25       To make sure I understand the chronology right, you spoke

1  with Mr. Erickson -- let me get the date.  You had a call with

2  him -- on or about December 11th, 2020, was your first call with

3  him?

4  A.   Yes.

5  Q.   All right.

6      And that's the call in which he offered you a position that

7  you didn't like and didn't accept, right?

8  A.   That's when he suggested that there were two positions he

9  was thinking of me for at ASH.

10 Q.   All right.  And then you did not talk to him again before

11 he left the CEO's position at ASH, correct?

12 A.   I believe that's correct, yes.

13 Q.   Okay.

14     And you showed us an email that you had sent to

15 Mr. Marshall and Sean Coleman, saying you continued to be

16 interested in working at ASH.  But you didn't copy Mr. Erickson

17 on that email, did you?

18 A.   I did not.

19 Q.   All right.

20     And you played a lot of these voice-mails that he had left

21 you.  And just to confirm, you did call him back on several

22 occasions and talked with him, right?

23 A.   Yes, I did.

24 Q.   All right.

25     And do I understand that you never told him not to call

1    you?

2    A.    I did not.

3    Q.    All right.

4         And then you said that at some point you resumed your

5    discussions with ASH about possible employment?

6    A.    They were always ongoing.  From the time I talked to

7    Mr. Erickson we continued to dialogue.  The response to my email

8    to Mr. Coleman -- both Colemans -- was, Please don't disengage

9    from us.  That's not we are looking at you for.

10   Q.    Now, did you tell the folks at ASH, with whom you were

11   still talking you said, that Mr. Erickson, you know, was calling

12   you and you were in a dialogue with him?

13   A.    I don't believe I did.

14   Q.    I see.

15        And in addition to your voice -- your phone conversations

16   you had with him in January -- or December and over January, you

17   also exchanged text messages with him, didn't you?

18   A.    I did.

19   Q.    Yeah.

20        MR. SHEBELSKIE:  And let's put that on the screen.

21   This is Plaintiffs' Exhibit 719.

22   BY MR. SHEBELSKIE:

23   Q.    We have here on the screen for you to look at, Mr. Darnold,

24   Plaintiffs' Exhibit 719, which is a print-out of text messages

25   between you and Mr. Erickson, correct?

```
 1   A.   Yes.

 2             MR. SHEBELSKIE:  Your Honor, I move for the admission

 3   of Plaintiffs' Exhibit 719.

 4             MR. KRAMER:  Your Honor, no objection.  I do ask,

 5   however, that to the extent this is showed to the jury, we keep

 6   it to the January 2021 timeframe because it starts to get into

 7   mid-litigation Rule 408 discussions.

 8             MR. SHEBELSKIE:  I'm fine to do that for now,

 9   Your Honor, with this witness.

10             THE COURT:  All right.  Well, it's admitted with that

11   limitation.

12             MR. KRAMER:  Could we have it redacted?

13             MR. SHEBELSKIE:  Let's scroll up, Mr. Walters, so we

14   stop at January 25.

15             MR. KRAMER:  Could we have the exhibit redacted?

16             THE COURT:  It's admitted.  From what point do you

17   seek reaction?

18             MR. KRAMER:  Starting in August of 2021.

19             THE COURT:  Do you intend to ask this witness about

20   anything starting August 2021?

21             MR. SHEBELSKIE:  No, sir.

22             THE COURT:  All right.  It's admitted with anything

23   post-August 2021 redacted.  And the parties are going to have to

24   redact it before Mr. Gunn downloads it into the digital system,

25   but it's admitted with that limitation.
```

1        MR. KRAMER:  Thank you, Your Honor.

2        MR. SHEBELSKIE:  All right.

3        THE COURT:  What number is that again?

4        MR. SHEBELSKIE:  That's Plaintiffs' 719, Judge.

5     (PLAINTIFFS EXHIBIT 719:  Received in evidence.)

6        THE COURT:  All right.  Go ahead.

7  BY MR. SHEBELSKIE:

8  Q.   All right.  Do you see on the screen then, Mr. Darnold, the

9  series of text messages you had with Mr. Erickson in

10  January of 2021?

11  A.   I do.

12  Q.   And you told us you got -- your first day work was

13  February 1st at ASH, but you had actually been hired some time

14  in late January, right?

15  A.   Yes.  I believe the 22nd is when I got the offer letter.

16  Q.   All right.

17        And when you got the offer letter, did you tell

18  Mr. Erickson you had gotten the offer and had accepted it?

19  A.   No.  I did not because I hadn't told my current employer.

20  I always speak to the people I work for first because this is a

21  very small industry as big as it is.  I certainly didn't want

22  this man in Denver, who I had worked for for two years, to hear

23  from someone else.

24  Q.   Okay.  That's fair enough.

25        And after you told your then present employer that you were

Cross-Examination - Lee Darnold

1    leaving, did you eventually tell Mr. Erickson?

2    A.   I did.

3    Q.   And would that have been around January 25, 2021?

4    A.   I don't know the exact date.  I probably, at this point,

5    was still going through the background checks and everything

6    with ASH.  So I was waiting for final confirmation that I had

7    the job.

8    Q.   All right.

9         Well, let me ask you about your last two emails -- text

10   messages with him.

11        Second from the bottom on the page, you sent him one

12   January 25, 2021.  You said:  Thank you for your wisdom.  That's

13   what -- you are thanking Mr. Erickson for his wisdom, right?

14   A.   His wisdom in saying, Don't mention my name.  Serious

15   resentment floating around.

16   Q.   All right.

17        And he's talking about ASH there?

18   A.   He is.

19   Q.   All right.

20        And what was the very last message Mr. Erickson then texted

21   to you?

22   A.   He said, I am a supporter of ASH.  Not sure the leadership

23   believes that.  Even bigger supporter of my old staff, most of

24   whom are really good people.

25             MR. SHEBELSKIE:  Thank you, Mr. Darnold.

 1          No further questions, Your Honor.

 2          THE COURT:  Redirect?

 3          MR. KRAMER:  Just a little bit, Your Honor.

 4                  REDIRECT EXAMINATION

 5   BY MR. KRAMER:

 6   Q.   Okay.

 7        Mr. Darnold, Mr. Shebelskie asked you about some Phase B

 8   lots that Mr. Erickson has sold to ASH.

 9        Do you recall that?

10   A.   Yes.

11   Q.   Okay.

12        Are you aware that the Court entered a preliminary

13   injunction to preserve the status quo in this case in early

14   2022?

15   A.   Yes, I am.

16   Q.   Okay.

17        Before that had Mr. Erickson been selling Phase B lots to

18   ASH in the fourth quarter of 2021 or the second quarter of --

19   excuse me -- the final quarter of 2021 or the first quarter of

20   2022?

21   A.   No, he had not.

22   Q.   Is that part of the reason that ASH sought a preliminary

23   injunction?

24   A.   Yes.  We wanted lots.

25   Q.   Okay.

Redirect Examination - Lee Darnold

1    And Mr. Erickson, what type of lots was he ordered to sell

2    to ASH?

3    A.   He was ordered to sell basically the next lots in that

4    quarterly take.  We sought to take as many as we could of what

5    he was obligated to sell us.

6    Q.   Okay.

7    And that ended up being 27 Phase C --

8    A.   27 Cs, right.

9    Q.   -- lots and two Phase B lots, correct?

10   A.   I don't remember exactly.  I'm sorry.

11   Q.   All right.

12   Has he made any Phase C lots available to ASH since that

13   time?

14   A.   No, he has not.

15   Q.   Okay.

16   And did the parties have any discussion of -- well, let me

17   move to a slightly different topic.

18   Are you aware that for some time, including when that

19   preliminary injunction was entered, that ASH has sought specific

20   performance in this case to enforce the Land Purchase Agreement

21   with Mr. Erickson?

22   A.   Yes.  Our goal was always to get lots.

23   Q.   Okay.

24   And are you also aware that recently before this trial, ASH

25   elected to stop seeking specific performance with Mr. Erickson?

Redirect Examination - Lee Darnold

1   A.   Yes.

2   Q.   Okay.

3        And so as a practical matter, does that mean that ASH is no

4   longer seeking to force Mr. Erickson to work with ASH over a

5   long period of time?

6   A.   Yes.

7   Q.   Okay.

8        Putting aside the legal issues that you have discussed with

9   your counsel, what are some of the business reasons that ASH

10  finally decided that it was no longer interested in trying to

11  work with Mr. Erickson?

12  A.   The business reasons were that after two years -- my first

13  two-and-a-half years in the role, after multiple attempts and

14  our honest efforts to hear him and respond and help him get back

15  to selling us lots, we could never come to a reasonable

16  negotiation.  Over multiple discussions, I gave more money for

17  lots and he would not agree to sell us lots.

18       And so I finally got to the point, when looking at the two

19  options of, can I work with this man for five years and trust

20  that he'll deliver lots, or would I rather say, Let's just cut

21  this clean and go for damages, and that's the decision the

22  company made.

23  Q.   Okay.

24       Has the relationship with Mr. Erickson gotten better or

25  worse over the course of this litigation?

Redirect Examination - Lee Darnold

1    A.    I would say it's gotten worse over the course of this

2    litigation.

3    Q.    Has that been an evolving situation?

4    A.    It has.  Each time you try to -- am I allowed to say

5    "settle"?  Each time you try to work with them --

6    Q.    Let's not get into settlement talks during --

7    A.    Each time you try to move forward with the opposing party,

8    and find out there's no way to, the relationship naturally

9    deteriorates.  I wouldn't say personally between of two of us,

10   but as businesses, yes.

11   Q.    Okay.

12        Slightly different topic:  Mr. Shebelskie asked you about

13   the reduction from 230 to 63 closings in 2022.

14        Do you recall that?

15   A.    I do.

16   Q.    And you were going to give a reason for that but I don't

17   think you got a chance.  What did you want to say?

18   A.    Well, the prior year's 200 were sold the year before.  So

19   one thing you have to understand in our business is I know right

20   now some of my closings for '23, because those homes have

21   recently started, and so when we finish the 200 -- it's

22   confusing because we are talking about 2021 and no lots.  It

23   just helps to remember that so many homes had already been

24   started before he stopped selling lots, that those trickle in

25   over time.

1    And so by the time we got to the 63 of 2022, those were

2    homes we couldn't sell in 2021 because we did not have lot

3    visibility.

4    Q.    Okay.

5          You were also asked about impairment of goodwill.

6          Do you recall that?

7    A.    Yes.

8    Q.    You said that's an accounting term?

9    A.    Yes.

10   Q.    What's the ramifications of an impairment like that on the

11   business?

12   A.    It has no real impact on the business.  So what happens

13   when we -- when we gave Mr. Erickson $27 million to purchase his

14   business, and agreed to give him, up to now, another 24 million

15   to buy his lots, so something like $50 million, the amount we

16   paid over the value of his company, which is a term called "book

17   value" was 10 million.  We've called that the premium.

18         That premium has to be booked on our books as goodwill

19   because it isn't a real asset.  It's just cash we gave

20   Mr. Erickson.

21         And so what we try to do is expense down some of that every

22   year over time.  And we simply concluded at that time that with

23   no agreement with Mr. Erickson we could not keep the goodwill on

24   our books, because it's supposed to be the value of the

25   relationship in the company.

Redirect Examination - Lee Darnold

1    Once this relationship, and the value of that name, began

2    to deteriorate, we are required, under accounting rules and

3    especially with auditors, to go ahead and write that off.

4    That's what we meant.

5    Q.    Okay.

6          Thank you for that.

7          Mr. Shebelskie also showed you a letter that went to trade

8    partners asking for some cost reduction.

9          Do you recall that?

10   A.    Yes.

11   Q.    Okay.  Did that letter mean that ASH-Grayhawk had a surplus

12   of lots here in Columbus?

13   A.    No, it didn't.

14   Q.    Okay.

15         Did ASH-Grayhawk have enough lots here in Columbus at the

16   time?

17   A.    No, we did not.  It really comes down to in 2021, when the

18   market was in such a frenzy, vendors came for price increases

19   constantly.  Some of them real -- fuel, and other things.  Some

20   of them because of what it cost them to buy materials.  But then

21   when the market shifted, and people were paying less for houses

22   because of interest rates, we had to get some of that increase

23   back.  And that's just -- that's just business.  And they were

24   not surprised to get the letter, and they acquiesced as much as

25   they could.

Redirect Examination - Lee Darnold

1   Q.   You were also asked about -- I think you said about

2   30 percent of the employees at Grayhawk have resigned or quit.

3   A.   Yes.

4   Q.   Do you recall that?

5   A.   Yes.

6   Q.   Has the division here in Columbus faced any difficulties

7   retaining employees over the last couple of years?

8   A.   We have.  We have had two big problems on the employee

9   side.  One is, when you do one layoff people -- I can go do a

10  town hall and say, Hey, this is what we are facing.  And people

11  can say, Okay, it wasn't me, and they can keep working.

12      When you do the second one, that's where people say, Okay,

13  is there going to be third and a fourth?  And so they just start

14  looking for other things.

15      We had one amazing lady decide to go be a teacher.  We had

16  one leave and go work for Mr. Erickson.  We had just a lot of

17  very different opportunities for them.  Very few of them went to

18  home builders.  So the one comfort I had was, as confusing as it

19  was to what our future would be, they didn't choose to leave us

20  and go work for another builder.  They went into other places.

21  Q.   Do you know if any of those employees have been rehired

22  after they quit?

23  A.   We do try -- all employees that resign to go to another

24  industry are eligible for rehire.  I believe one -- Kristen, who

25  is working in our office, did resign to go be a teacher also.

Redirect Examination - Lee Darnold

1    And we worked hard to keep her, and she stayed.  Fantastic

2    employee.

3    Q.    You were asked about some Phase B lots on which the company

4    hasn't yet broken down -- broken ground.  And you said that's

5    normal homebuilding.  But you didn't get a chance to explain.

6         What did you mean?

7    A.    I think it's just a misunderstanding of how the industry

8    works.  You don't -- you don't -- there is one company, NVR,

9    that literally buys a lot and then starts a home the next day.

10   They've had 40-year relationships.

11        Most homebuilders are asked to buy lots ahead of when they

12   need them.  And most developers agreements will say, Hey,

13   Evermore Homes has to buy 15 upfront and nine a quarter as we

14   go.

15        Most communities are doing two or three houses a month.

16   And you always have -- ideally, I would say, When I sell it I'll

17   call you up and you give me a lot, but no developer let's you do

18   that.  So we're always buying some number ahead.

19        I like to try to never have more than six months ahead, but

20   I don't always succeed at that.

21   Q.    You were also asked about the former division presidents of

22   ASH-Grayhawk.  And when you talked about Sasso leaving you

23   referenced something called HIPAA.

24   A.    Yes.

25   Q.    Very narrow question, does that relate to medical privacy?

1   A.   Yeah.  It's -- it's basically the federal law that says I

2   can't discuss employees' health matters.  Suffice to say,

3   something impacted his performance.

4   Q.   Okay.

5        Last question, have there been any issues with retaining

6   division presidents at ASH-Grayhawk over the last couple of

7   years?

8   A.   Yes.  The -- a division president, when I go and try to

9   recruit them -- so I will say David Jennings.  David had worked

10  with me as a VP of finance at Orleans.  Then he moved over to

11  View when I went there to be their CFO.  When I'm recruiting him

12  and saying, Move your family, the first question is, How big is

13  the division.  And my response is, Somewhere around 100 homes.

14  You don't move your family for 100 homes.  My division in

15  San Antonio was 1,000 a year, and that -- that feels like a

16  career.

17       The other big problem with Columbus for us is when you move

18  as a division president you also have the thought it's a new

19  company; what if it doesn't work out?  Who will I go work for?

20  Well, if I was to leave in Dallas, Texas, there is 30 other

21  builders that can hire me.

22       In Columbus, if it didn't work out for Mr. Jennings, he

23  doesn't have another builder.  He's moving his family.  One of

24  his sons has special needs.  He can't be moved often.

25       So I go in to sell to the division president the future of

Recross-Examination – Lee Darnold

1    the company.  And without lots, there is nothing to sell.  And

2    so as a consequence, in the early days of ASH, the division

3    presidents we got, and recruited in for Grayhawk, were the

4    people that were available to move their families to do 100

5    units.  And so I wouldn't call them the exact person I would

6    have hired.

7    Q.   All right.

8         My second to last question:  The lots -- the future of

9    Grayhawk at this point, am I correct that the company is not

10   factoring in actually obtaining lots from Mr. Erickson going

11   forward?

12   A.   Yes.

13        We are looking at a business plan for next year that only

14   includes those mitigated lots or the lots already on our books.

15             MR. KRAMER:  Thank you.

16             Your Honor, those are my questions.

17             THE COURT:  Any recross?

18             MR. SHEBELSKIE:  Three questions, Your Honor.

19             THE COURT:  All right.

20                       RECROSS-EXAMINATION

21   BY MR. SHEBELSKIE:

22   Q.   Mr. Darnold, y'all just told jury that you don't want the

23   lots -- Phase C lots anymore.  But are you aware that the

24   company refused to remove that lis pendens that's holding up

25   Mr. Erickson's right to use the lots?

Recross-Examination - Lee Darnold

1   A.   Yes, I am aware of that.

2   Q.   Okay.

3   A.   We are holding it up until we get our deposit back.  The

4   $2.5 million deposit is a claim against lots.  It was a deposit

5   for lots he is not delivering.  We are keeping our claim until

6   we get the money back.

7   Q.   To be clear about this, too, this lawsuit has now been

8   pending for over two years, right?

9   A.   That's right.

10  Q.   And you waited until Mr. Erickson delivered all the

11  Phase -- basically delivered all the Phase B lots before you had

12  this decision we don't want anymore lots?

13  A.   No.  We waited until recently when we had determined, over

14  two years, that Mr. Erickson is not willing to negotiate.

15  Q.   And you said you tried to be reasonable and get him to do

16  things.  Have you ever dropped your $48 million demand against

17  him in this lawsuit?

18  A.   I am not familiar with what you are saying.  $48 million

19  demand?

20  Q.   You sued him for $48 million.  Are you aware of that?

21  A.   Oh, we are aware of what we are saying the damages are,

22  yes.

23  Q.   Yeah.

24       And that has been since day one of this lawsuit when you

25  said you've tried to cooperate with him and be reasonable?

Direct Examination - David Erickson

1    A.   Yes, when he would not cooperate, we moved forward.

2            MR. SHEBELSKIE:  No further questions.

3            THE COURT:  All right, sir.  You may step down.  And

4    now that you have testified you can remain in the courtroom if

5    you wish.

6            THE WITNESS:  Thank you, very much.

7            THE COURT:  Call your next witness for the plaintiff.

8            MR. KRAMER:  Time for lunch, Your Honor?

9            THE COURT:  Not yet.

10           MR. KRAMER:  Okay.  The plaintiff calls

11   Mr. David Erickson.

12           **DAVID ERICKSON, PLAINTIFFS WITNESS, DULY SWORN**

13           THE COURT:  Stop right there.  Raise your right hand.

14   Take the oath, please.

15           Be seated, sir.  And I think they know you by now, but

16   go ahead for the record and tell your jury your name.  And spell

17   it for the court reporter.

18           THE WITNESS:  My name is David B. Erickson.  I

19   commonly go by Dave Erickson.

20           THE COURT:  All right.

21           Mr. Kramer?

22                        DIRECT EXAMINATION

23   BY MR. KRAMER:

24   Q.   Okay.  Mr. Erickson, you are a defendant in this case in

25   your individual capacity, right?

Direct Examination - David Erickson

1    A.    That's correct.

2    Q.    Am I right that you have a degree from the

3    University of Washington?

4    A.    That's correct.

5    Q.    And you also studied sports management at the

6    US Sports Academy?

7    A.    United States Sports Academy.

8    Q.    Okay.

9          You were born in Alaska, correct?

10   A.    Correct.

11   Q.    And you grew up in the Pacific Northwest?

12   A.    I grew up in a number of northern states from Alaska to

13   Wisconsin, all the way over to Seattle.

14   Q.    And you've been in the home construction and development

15   business since 1992, correct?

16   A.    Yes.

17   Q.    You founded your first homebuilding company in 1997, right?

18   A.    That's incorrect.

19   Q.    Was your first homebuilding company called Pinnacle Homes?

20   A.    No.

21   Q.    You founded Pinnacle Homes in 1997, correct?

22   A.    That sounds correct, yes.

23   Q.    And you had to change the name of that business in the

24   2000's because of the bad reputation of another business that

25   had a similar name, right?

Direct Examination - David Erickson

1    A.    Because of how they were treating soldiers at Fort Benning.

2    Q.    So is that a yes?

3    A.    You can call it what you want, but I told you the answer.

4    Q.    Is the answer yes?

5    A.    They were -- that particular company you are referring to

6    was mistreating soldiers at Fort Benning.

7    Q.    That's not what I asked, sir.

8          I'm asking did you change the name of your business because

9    that company you were referring to had a bad reputation in

10   Columbus?

11   A.    You can draw the line however you want.

12   Q.    Well, is the answer yes or no?

13   A.    They had a bad reputation on Fort Benning.

14   Q.    Okay.

15         And did you change the name of your company because of that

16   bad reputation?

17   A.    We changed the name of the company, at least in part,

18   because of what they were causing with the soldiers being in

19   Fort Benning.

20   Q.    Did they have a good reputation?

21   A.    They had a poor reputation with soldiers on Fort Benning.

22   Q.    Okay.

23         And you believed that people were confusing your Pinnacle

24   Homes with the business that had the bad reputation, right?

25   A.    They were not confusing.  They were clarifying, whenever

1    they were looking for a house, particularly if they came from a

2    military background on Fort Benning.

3    Q.    So you changed the name to Grayhawk Homes in 2000, right?

4    Excuse me -- 2007, right?

5    A.    That's more accurate, yes.

6    Q.    That's because the Pinnacle name in Columbus, Georgia was a

7    very bad name to have, right?

8    A.    Negative.  Absolutely not.

9    Q.    Okay.

10          MR. KRAMER:  Could we play clip EV70, please?

11    BY MR. KRAMER:

12    Q.    Do you remember you were deposed in this case,

13    Mr. Erickson?

14    A.    I was.

15    Q.    Did you swear to tell the truth in your deposition?

16    A.    I did.

17    Q.    Same as you did today?

18    A.    One more time.

19    Q.    Same oath you took today?

20    A.    Yes.

21          (Videotape recording played).

22    BY MR. KRAMER:

23    Q.    Okay.  That was the testimony at your deposition, right?

24    A.    It was.

25    Q.    So you, in 2012, purchased a homebuilding company in Iowa,

Direct Examination - David Erickson

1    right?

2    A.    I did.

3    Q.    Okay.  Let's talk about the acquisition of Grayhawk Homes.

4    A.    May I correct that?  I think that purchase was in 2011.

5    Q.    Okay.

6         Let's talk about the purchase of Grayhawk Homes by ASH.

7    You started to talk to ASH about that transaction in the spring

8    of 2019, correct?

9    A.    Correct.

10   Q.    And you later signed the Asset Purchase Agreement on behalf

11   of Grayhawk Homes and the other sellers, right?

12   A.    As part of the sale to ASH?

13   Q.    Yes.

14   A.    That's correct.

15   Q.    And after the closing, you joined ASH's Board of Directors,

16   right?

17   A.    That's correct.

18   Q.    And you agreed to serve as a consultant for ASH as well,

19   right?

20   A.    I did.

21   Q.    And you signed a consulting agreement?

22   A.    Say again.

23   Q.    You signed a consulting agreement?

24   A.    I did.

25   Q.    And you signed an employment agreement as well?

Direct Examination - David Erickson

1    A.    We did.

2    Q.    And the Transition Services Agreement as well?

3    A.    That was part of the package, yes, sir.

4    Q.    And Land Purchase Agreement as well?

5    A.    Part of that package.

6    Q.    And finally, a Trademark Assignment Agreement, right?  You

7    signed that?

8    A.    Yes, trademark assignment.

9    Q.    Okay.

10        In the summer of 2020, Greg Benson was the CEO of ASH,

11   wasn't he?

12   A.    Summer of 2020, yes.

13   Q.    Okay.

14        And ultimately, in the fall of 2020, you wanted to replace

15   Mr. Benson as the CEO, didn't you?

16   A.    That's incorrect.

17   Q.    Okay.

18        MR. KRAMER:  Let's take a look at PX 61.

19   BY MR. KRAMER:

20   Q.    Mr. Erickson, do you recognize this as an email that you

21   sent to Marshall Coleman and Sean Coleman on September 30, 2020?

22   A.    I recognize this is a cover letter with attachment.

23   Q.    Okay.  Is it an email?

24   A.    It is from an email, yes, sir.

25   Q.    Okay.

Direct Examination - David Erickson

```
 1              MR. KRAMER:  Plaintiffs offer PX 61.

 2              THE COURT:  Including the attachments?

 3              MR. KRAMER:  Yes.

 4              THE COURT:  Any objection?

 5              MR. QUACKENBOSS:  No objection, Your Honor.

 6              THE COURT:  It's admitted.

 7         (PLAINTIFFS EXHIBIT PX61:  Received in evidence.)

 8              MR. KRAMER:  All right.  Let's go to the attachment

 9    and the first paragraph.

10    BY MR. KRAMER:

11    Q.   Okay.

12         Is this -- you wrote this, correct, Mr. Erickson?

13    A.   I did.

14    Q.   And you wrote here:  We have clearly tipped our hand that

15    Greg Benson is not our long-term CEO manager.  With Matt Zaist

16    foot dragging on a decision, the board needs to get started on a

17    search for the next CEO leader.  Probably not the final guy, but

18    at least a good leader with a similar vision of why and how to

19    grow the company.

20         Is that what you wrote and sent to Marshall Coleman on

21    September 20, 2020?

22    A.   I did.

23    Q.   Less than a month later you became the temporary CEO of

24    ASH, right?

25    A.   I was asked to do so by Marshall Coleman, yes.
```

Direct Examination - David Erickson

 1            MR. KRAMER:  Let's go down to section 3.  Oops, sorry.

 2   Numbered paragraph 3.  Oh, sorry.  There it is.

 3   BY MR. KRAMER:

 4   Q.   This paragraph has the heading "CEO Management of ASH

 5   Vision."

 6        Do you see that?

 7   A.   I do.

 8   Q.   Okay.

 9        And you wrote here:  From conversations I have had with CEO

10   Benson and Chairman Coleman, I know there has been great

11   dissatisfaction with the performance of CFO Pehrkon.  Acting as

12   consultant, I pushed on CEO to resolve this problem from

13   December to March, at which point I gave up on the issue because

14   it was apparent that CEO was not going to act and somewhat shut

15   me down in these discussions.

16        Is that what you wrote to Mr. Coleman on

17   September 30, 2020?

18   A.   I did.

19   Q.   Okay.

20        In the next bullet you write here:  If CEO knows there is a

21   real problem in CFO position, but is choosing not to make

22   changes, it calls into question the leadership ability to make

23   the tough call on staffing.

24        Is that what you wrote?

25   A.   I did.

Direct Examination - David Erickson

```
 1   Q.   Okay.
 2        And less than a month later, Mr. Benson was removed as CEO
 3   of ASH, correct?
 4   A.   By the Board, yes.
 5   Q.   You were on the Board, weren't you?
 6   A.   I was.  I was not part of the vote.
 7   Q.   Okay.  Is that because you became the interim CEO,
 8   replacing him?
 9   A.   I was never told why, but I don't think that was the
10   reason.
11   Q.   When you became the interim CEO, you appointed Kathy Long
12   as the interim manager of ASH-Grayhawk, correct?
13   A.   I asked her if she would take the position.  She accepted
14   verbally, and it was endorsed by the Board with Sean Coleman
15   being the de facto company leader.  I am not sure what title he
16   was given to do.  But Sean Coleman was in charge of the company
17   technically.
18   Q.   So you don't agree that you appointed Kathy Long?
19   A.   I asked her to accept -- I asked her to take the position
20   and she accepted.  I passed it on to Sean Coleman and then he
21   authenticated with the Board from there.
22   Q.   Okay.
23        Do you remember you were deposed twice in this case, right,
24   once individually?  You were deposed --
25   A.   Twice.
```

Direct Examination - David Erickson

```
 1   Q.   -- twice.
 2        Once individually and once as a representative of
 3   companies?
 4   A.   That's correct.
 5   Q.   Okay.
 6            MR. KRAMER:  Could I have Mr. Erickson's 30(b)(6)
 7   deposition at page 199, please, up on the screen, line 5.
 8   BY MR. KRAMER:
 9   Q.   Let me read this for you, Mr. Erickson.
10        Question:  At this point, were you managing the affairs of
11   ASH-Grayhawk?
12        Answer:  Specifically, no, but as the interim CEO, I had
13   responsibilities for it.
14        Question:  And did you rely on Ms. Long to help?
15        Answer:  Yes.  My apologies -- upon Ken Thirtyacre.  He was
16   just about to dump that upon Ken Thirtyacre being removed from
17   office.  I appointed Kathy Long to step into his shoes, his
18   responsibilities on an interim basis.
19        Were those the questions you were asked and answers you
20   gave at your deposition?
21   A.   They are.
22   Q.   Okay.
23        Kathy Long is a personal --
24            MR. QUACKENBOSS:  Your Honor, I would object simply to
25   more of the deposition transcript that is being shown to the
```

1    jury than that which has been presented to Mr. Erickson.  So if

2    it could be clipped and redacted simply to cover the parts he is

3    being questioned about.

4            THE COURT:  Well, it can taken down.  You are finished

5    with it?

6            MR. KRAMER:  All done.

7            THE COURT:  Did you have something you wanted to add?

8            THE WITNESS:  Not necessary, Your Honor.

9            THE COURT:  Okay.  Go ahead.

10   BY MR. KRAMER:

11   Q.   Kathy Long is a personal friend of yours, correct?

12   A.   I consider her a friend, yes.

13   Q.   When you were the interim CEO, you were paid $2,000 per

14   day, correct?

15   A.   That's correct.

16   Q.   So that's $520,000 her year, $10,000 per week, right?

17   A.   That's correct.

18   Q.   And you believe that is a relatively modest salary, right?

19   A.   It's all a matter of relativity.

20           MR. KRAMER:  Okay.  Let's have PX 796R, please.

21   BY MR. KRAMER:

22   Q.   All right.

23       On the second page here, Mr. Erickson, do you see an email

24   that you wrote to members of the ASH board dated December 5,

25   2020?

1              THE WITNESS:  Can you enlarge -- there you go.  Thank

2    you.

3              I do.

4    BY MR. KRAMER:

5    Q.   Okay.  At this point, you wrote here, "David, I have a --

6              MR. KRAMER:  Oh, sorry.

7              Defendant's [sic] offer 796R into evidence.

8              THE COURT:  Any objection?

9              MR. QUACKENBOSS:  No objection, Your Honor.

10             THE COURT:  It's admitted.

11        (PLAINTIFFS EXHIBIT 796R:  Received in evidence.)

12   BY MR. KRAMER:

13   Q.   You say here:  David, I have a text message to you to

14   discuss your perspective on different routes to consider on the

15   subject.  Sent two emails with some supporting charts.

16        That's what you wrote, correct?

17   A.   I did.

18   Q.   And the subject of this line -- of this email is:  CEO

19   bonus program, idea outline.

20        Do I have that right?

21   A.   Correct.

22   Q.   So at this point, you were negotiating a bonus for yourself

23   in the event you that became the permanent CEO of ASH, right?

24   A.   Yes.  In proper context, it was suggested when I became the

25   interim CEO.  It was originally requested to become the CEO.  I

Direct Examination - David Erickson

1    demurred and said, I don't fully understand the job, when it was

2    being presented to me.  I accepted as an interim role with the

3    caveat that when I felt more comfortable with the full scope of

4    the job, that I would tell them when I was prepared to go

5    forward.

6        When that happened, Marshall Coleman said, Good enough.  We

7    will take that under advertisement.  Please help put together a

8    package.

9        This was actually, I believe, the second package I put

10   together per his request.

11   Q.   And those packages showed how much you wanted to be paid,

12   right?

13   A.   A proposal yes, sir.

14   Q.   And did you have that conversation with anyone other than

15   Mr. Coleman, who can't be here this week?

16   A.   Clarify what you are referring to by "conversation"?

17   Q.   The one you just described in which you turned down the

18   opportunity to be the permanent CEO right off the bat.

19   A.   The only conversation I recall with Mr. Coleman on the

20   night he called me, asking me to become the CEO -- I believe

21   there were some email traffic that supports this further on

22   where I make a comment of accepting in the short term as the

23   interim, per their request, and consider the CEO role once I

24   fully understood what the job was.

25   Q.   Okay.

Direct Examination - David Erickson

```
 1        So your testimony is that ASH wanted you to be the

 2   permanent CEO from the outset, but you demurred because you

 3   didn't think you were ready?

 4   A.   Because I didn't fully understand what the job entailed

 5   because the only part of the CEO role for ASH was the Grayhawk

 6   role and the acquisition of targets.  I didn't fully understand

 7   the daily practices that are going on in Reston, Virginia,

 8   what's going on in Huntsville, and maybe any other things that

 9   were related to the job.  I had never been a CEO for a company

10   in that structure.

11   Q.   Okay.

12        Isn't it true that after some period of weeks, after you

13   became the interim CEO, that's when you began to pursue a

14   discussion about the possibility of being the permanent CEO?

15   A.   That's correct.  And it's pretty much parallel to what I

16   just told you over the last three minutes.

17   Q.   Okay.

18             MR. KRAMER:  Let's go to the attachment to this email

19   if we scroll down.

20   BY MR. KRAMER:

21   Q.   Okay.

22        Second to last paragraph, this is something you created,

23   right?

24   A.   This is a document I prepared, yes.

25   Q.   You wrote here, in connection with the $520,000 salary:
```

1    Much like the Zaist discussion, I would like to peg my salary at

2    a relatively modest level of $520,000 as with my current

3    consulting rate and put the real money into longer-term stock

4    participation.

5         Those were your words, correct?

6    A.    That's what I wrote, correct.

7              MR. KRAMER:  Let's have PX 712 up, please.

8    BY MR. KRAMER:

9    Q.    Okay.

10        Do you recognize this as an email that you sent to Sean

11   Coleman on November 26, 2020 at 10:06 PM?

12   A.    I have seen this email, and it has my heading on it.  So

13   I'm assuming I wrote it, yes.

14             MR. KRAMER:  Okay.  Plaintiffs offer PX 712.

15             THE COURT:  Any objection?

16             MR. QUACKENBOSS:  No objection.

17             THE COURT:  It's admitted.

18        (PLAINTIFFS EXHIBIT PX712:  Received in evidence.)

19   BY MR. KRAMER:

20   Q.    So, Mr. Erickson, you send this email -- the subject line

21   is, ASH performance bonus, right?

22        That's what this says?

23   A.    Yes, sir.

24   Q.    Okay.

25        So you sent this email about -- were you referring to a

Direct Examination - David Erickson

 1    performance bonus for yourself as the permanent CEO?  Do I have

 2    that right?

 3    A.    It was in that context of conversations, yes.

 4    Q.    Okay.

 5          And you sent this at 10:06 PM on Thanksgiving Day, is that

 6    right?

 7    A.    That's correct.  Notice the fact that I am working at

 8    10 o'clock at night.

 9    Q.    On Thanksgiving Day.  I do.

10          All right.  So this was about the terms of your service if

11    you were made permanent CEO of ASH?

12    A.    This was a proposal, yes.  Or it's an outline of a

13    proposal.

14    Q.    Got it.

15          And here again, if we go down to the list, you propose a

16    salary of $520,000 per year, right?

17    A.    It does.

18    Q.    And then you propose 12 weeks set aside for away from work

19    vacation.

20          Do I have that right?

21    A.    Yes.  I would highlight "away from work/vacation."

22    Q.    Right.  Because it's your testimony that you could work

23    full time when you are on a vacation fishing in Alaska, right?

24    A.    If I am away from the office I fully intended to be

25    available whenever and however necessary.

Direct Examination - David Erickson

1   Q.   Okay.

2        And finally, you propose in number 4, a bonus program

3   involving restricted stock in ASH.  Do you see where it says

4   "restricted stock"?

5   A.   Yes, sir.

6   Q.   Okay.

7        And in particular, you say --

8            MR. KRAMER:  Well, let's go to the chart.  Can I have

9   page 4?

10  BY MR. KRAMER:

11  Q.   Is this a -- here we have a slightly different version of

12  the document with a photograph of a piece of paper on it.  If we

13  could blow that up, my question to you is going to be simply:

14  Is that your handwriting on the piece of paper?  We will get

15  there in just a moment.

16  A.   Well, from what I can see, I would confirm that, but it

17  would be nice if it was a lot bigger.

18  Q.   Coming up.

19       Okay.

20       So, Mr. Erickson, you -- what you were proposing for a

21  bonus was 5 percent of estimated IPO value after capital and

22  interest return, correct?

23  A.   Where do you see that?

24  Q.   Well, it's -- isn't that what you are proposing in here.

25  A.   Oh, I'm sorry.  Yes.  It's on the text above it.  I see

1    that.

2    Q.    Got ahead of myself.

3         All right.  And you thought that the 5 percent of estimated

4    IPO value after capital and interest were returned was going to

5    be $18.4 million.

6         Do I have that right?

7    A.    Can I see the image again?

8         Based on the information I was aware of in the industry,

9    and that was supported by Tony Avala, who is very knowledgeable

10   about this type of thing, that would be a reasonable

11   expectation.  Yes, sir.

12   Q.    Okay.  And ASH --

13              MR. KRAMER:  We can take that down.

14   BY MR. KRAMER:

15   Q.    ASH also sent you something called a "strawman proposal"

16   later on, right?

17   A.    I think that was a format for something that Sean Coleman

18   sent a week or so later.

19   Q.    Okay.

20        But you thought that the strawman proposal from ASH wasn't

21   enough money and the bonus was modest, correct?

22   A.    In very broad context, I will agree with that, but it would

23   be nice to see the document.

24   Q.    Let me have -- well, after you received the strawman, you

25   proposed -- you made a second proposal to ASH on

Direct Examination - David Erickson

1    December 15th, 2020, correct?

2    A.   Isn't that what we looked at earlier?  Wasn't the second

3    proposal the first one you started with in December?

4    Q.   I don't believe so.

5    A.   Then we need to compare those to make sure we are not

6    talking about two different things.

7    Q.   Do you remember making a second proposal?

8    A.   I did make a second proposal, and I thought that's what you

9    just highlighted when we started this conversation.

10   Q.   Would it refresh your recollection to see a copy?

11   A.   I would like to see both of them if you are talking about

12   two different things.

13            MR. KRAMER:  Let's put up 264 for just the witness.

14   BY MR. KRAMER:

15   Q.   Does this refresh your recollection that you sent a

16   proposal for your compensation on December 15th, 2020?

17   A.   Then I am confused what the previous one was in

18   December 5th or 6th.

19   Q.   I'm sorry but that's not my question.

20        My question here is:  Does this refresh your recollection

21   that you sent a second proposal on December 15th, 2020?

22   A.   I know I sent two proposals to ASH.  One was late November,

23   and another one was early December.  This is a little out of

24   context.  I am not sure if it's a -- additional comments to the

25   second proposal.  It's on -- I am a little confused without

603
Direct Examination - David Erickson

 1    seeing all the pieces here.  There is a lot of moving parts of

 2    documents.

 3    Q.    Okay.

 4          Well, do you -- did you send an email to ASH on

 5    December 15th, 2020 with the subject line, "CEO Bonus Package"?

 6    A.    I did.

 7    Q.    Okay.

 8          And the very next day you were informed that you would not

 9    become the permanent CEO of ASH, correct?

10    A.    Let me finish reading this email, please.

11              MR. KRAMER:  We can take that down.

12    BY MR. KRAMER:

13    Q.    You don't need to read the email.  My question is about the

14    next day.

15          You were informed on December 16th, 2020, that you would

16    not become the permanent CEO of ASH, correct?

17    A.    2020?

18    Q.    Yes, sir.

19    A.    December 16th.  That's correct.

20    Q.    Okay.

21              MR. KRAMER:  Could we have PX 798?

22    BY MR. KRAMER:

23    Q.    Is this the letter that you sent to Mr. Coleman on

24    December 16th, 2020?

25    A.    That's correct.

```
 1            MR. KRAMER:  Plaintiffs offer PX 798.

 2            THE COURT:  Any objection?

 3            MR. QUACKENBOSS:  No objection.

 4            THE COURT:  Admitted.

 5         (PLAINTIFFS EXHIBIT PX798:  Received in evidence.)

 6    BY MR. KRAMER:

 7    Q.   Okay.

 8         So this is -- this letter was sent on the day that ASH

 9    informed you that you were not going to be the permanent CEO,

10    right?

11    A.   It is the same day.  That's correct.

12    Q.   Okay.

13         And you wrote here:  I shall continue to serve as interim

14    CEO between now and February 28th unless informed to discontinue

15    sooner.

16         That's what you wrote, correct?

17    A.   That is correct.

18    Q.   Okay.  And then you say underneath:  I am disappointed in

19    the decision to end my role as CEO, but fully understand the

20    thinking involved.

21         Do you see that?

22    A.   Correct.  And for proper context --

23    Q.   Well, let me -- you will have a chance, Mr. Erickson.

24            MR. QUACKENBOSS:  Your Honor --

25            THE COURT:  He can explain his answer.  Go ahead and
```

1    explain.

2              MR. QUACKENBOSS:  Thank you.

3              THE WITNESS:  For proper context, this letter, memo,

4    was written to parallel the verbal conversation I had with

5    Marshall Coleman and Sean Coleman where we touched on the same

6    points and trying to be professional about things, documenting

7    verbal conversations wherever reasonable to try to make sure we

8    understand what we were doing and avoid misunderstandings.

9    BY MR. KRAMER:

10   Q.   Okay.

11        So when you wrote you "fully understand the thinking

12   involved", that was a true statement?

13   A.   Everything I wrote here is, you know, accurate to my

14   knowledge at the time, yes.

15   Q.   Okay.

16        True or false, you were not the interim CEO until

17   February 28th?

18   A.   There is a succeeding letter where that is correct.

19              MR. KRAMER:  Okay.  Let me have PX 82, please.

20   BY MR. KRAMER:

21   Q.   Do you recognize this as an email that you sent to

22   Marshall Coleman also on December 16th, 2020?

23   A.   I did send this email.  I would like to read it for a

24   moment, please.

25   Q.   Sure.

Direct Examination - David Erickson

```
 1          (Pause in proceedings.)

 2               THE WITNESS:  Go ahead.

 3               MR. KRAMER:  Plaintiffs offer PX 82.

 4               THE COURT:  Any objection?

 5               MR. QUACKENBOSS:  No objection.

 6               THE COURT:  Admitted.

 7          (PLAINTIFFS EXHIBIT PX82:  Received in evidence.)

 8               MR. KRAMER:  Thank you.

 9    BY MR. KRAMER:

10    Q.   You wrote here, in the first full paragraph:  However, I

11    suspect Dave Grounds is not going to take this news very well.

12         That's what you wrote?

13    A.   I did.

14    Q.   Dave Grounds was the president and owner of Dorn Homes in

15    Arizona at the time, correct?

16    A.   That is correct.

17    Q.   And ASH was negotiating to acquire Dorn Homes as of

18    December 16, 2020, right?

19    A.   Yes, with the intention of the closing happening

20    approximately December 30th.

21    Q.   But ASH ended -- ASH did end up closing the Dorn deal after

22    you left the company, right?

23    A.   I became aware of that, yes.

24    Q.   Okay.  So --

25               MR. KRAMER:  And we can take that down.
```

1    BY MR. KRAMER:

2    Q.   You said on December 16th that you would stay on as interim

3    CEO until February 2021, but then you resigned four days later

4    on December 20th.  Right?

5    A.   That's taken a little out of context.

6    Q.   Okay.

7          MR. KRAMER:  Pull up that deposition transcript,

8    page 202.  If we could blow up lines 13 through 20, please.

9    BY MR. KRAMER:

10   Q.   All right.  Let me read this.

11        Question:  Okay.  You did ultimately resign as the interim

12   CEO, though, correct?

13        Answer:  At a later time.

14        Question:  That was on December 20, 2020, right?

15        Answer:  Sounds correct.

16        Question:  Okay.  And you resigned from the Board the same

17   day, right?

18        Answer:  That would be correct.

19        Were those the questions you were asked and answers you

20   gave?

21   A.   They are from the deposition.

22   Q.   All right.

23        MR. KRAMER:  Let's take a look at PX 93A.

24        This is has already been admitted.  You can put that

25   up on the screen.

1            THE WITNESS:  Ah, we have the letter.
2    BY MR. KRAMER:
3    Q.   This is the letter you sent to Marshall Coleman on the day
4    you resigned, December 20, 2020, correct?
5    A.   That's correct.
6    Q.   At the very bottom you write:  Clearly, the Board of ASH
7    does not have confidence in my filling the role of CEO for ASH.
8    As such, I am resigning effective immediately as interim CEO for
9    ASH.
10        That's the reason you gave for your resignation, correct?
11   A.   That's correct.  There is another sentence right behind
12   that.  Are you going to cover that?
13   Q.   So what you said here is:  The Board of ASH does not have
14   confidence in my filling the role of CEO -- of ASH CEO.
15        That's what you said, right?
16   A.   That's what the sentence says, yes, sir.
17   Q.   Okay.
18        But you have testified that that's not a true statement,
19   haven't you?
20   A.   I'm sorry?
21            MR. KRAMER:  Can we play EV3, please.
22            MR. QUACKENBOSS:  Your Honor, I am not sure what there
23   is to impeach at this point.  Use of the deposition is pure -- a
24   little preplanned and fluid.  I don't think Mr. Erickson's said
25   anything about this that merits another -- another videotape.

1          MR. KRAMER:  Your Honor, the defendant is an adverse

2    party.  His deposition can be used for any purpose.  So I do

3    intend to show clips regardless of whether they meet the

4    requirements for impeachment pursuant to the rule.

5          THE COURT:  Overruled.

6          Go back to that letter.

7          MR. KRAMER:  Certainly.

8          THE COURT:  Go back to the letter first.  I believe

9    the witness wanted the subsequent sentence written to fully

10   explain the preceding sentence.  So...

11         MR. KRAMER:  Okay.

12         THE WITNESS:  That is correct, Your Honor.

13         THE COURT:  Show the jury and ask him about the

14   entire -- that section of the letter, and then you can go to

15   your deposition.

16         MR. KRAMER:  Okay.

17         Can we blow that up so we have the entire paragraph

18   from one page to the next?

19   BY MR. KRAMER:

20   Q.  All right.

21       The next sentence, Mr. Erickson, reads:  I will continue

22   with Stone Ridge and Grayhawk Homes oversight as consultant to

23   ASH, per my current consulting agreement, until such time as the

24   Board feels my services are no longer necessary on a full-time

25   basis.

Direct Examination - David Erickson

```
 1        Did I read that correctly?
 2   A.   You did.
 3   Q.   Okay.
 4        So you were still bound by a consulting agreement at the
 5   time you resigned as the CEO, correct?
 6   A.   That's correct.
 7   Q.   Okay.  Thank you.
 8   A.   May I supplement that?
 9   Q.   I think you will get a chance to do that when your counsel
10   comes up.
11           THE COURT:  Go ahead.  Apparently, there is something
12   you want to explain.
13           Go ahead.
14           THE WITNESS:  Well, I think it's important to
15   emphasize I was working very hard not to leave ASH hanging.
16   They needed a manager to help straighten out Grayhawk, to keep
17   Stone Ridge in Huntsville stabilized.  They had taken
18   responsibility for finishing up the Dorn transaction.  That's
19   their right.  I wanted to make sure, in making a change to my
20   appointment as CEO and being on the Board, that I did not hurt
21   ASH in the process.  I was running out my duties and doing it
22   properly.  Trying to be professional.
23           MR. KRAMER:  Okay.
24   BY MR. KRAMER:
25   Q.   Back to your statement that, The board of ASH does not have
```

 1    confidence in my filling the role of CEO for ASH.

 2         You've testified that that was not a true statement,

 3    correct?

 4    A.    There may be some differences in words, but, you know,

 5    bottom line, for whatever reason, the Board decided I wasn't

 6    appropriate to be the CEO.  They have that right for whatever

 7    reason they choose.

 8    Q.    You had no idea what the Board lacked or didn't lack,

 9    right?

10    A.    Say, again, the last part of it.

11    Q.    You -- it refers to a lack in confidence, but your

12    testimony is you had no idea what the Board lacked or didn't

13    lack, isn't it?

14    A.    That's true.

15    Q.    Okay.

16         Let's keep going to the -- back to the letter.

17         All right.  In the -- on the second page, there is a

18    paragraph that begins, In the past year.

19         Do you see that?

20    A.    Yes, sir.

21    Q.    Okay.  What you right here is:  In the past year, I have

22    developed ambitions to do more things in the homebuilding and

23    development business and feel that my Board responsibilities

24    with ASH are likely to constitute a conflict of interest with

25    those goals and possibilities.

Direct Examination - David Erickson

1       Correct?  That's what you wrote?

2  A.   Yes, sir.

3  Q.   And what you wanted to do at the time was significant land

4  development deals across the United States, right?

5  A.   That was my principle thinking at this time of the writing.

6  Q.   Your claim is that on December 20, 2020 when you resigned,

7  you didn't yet have clear knowledge of what you would be doing

8  next after you resigned, right?

9  A.   That's correct.

10 Q.   So earlier you testified that you entered into an

11 employment agreement and a consulting agreement when you sold

12 your company to ASH.

13      Do you recall that?

14 A.   Yes, sir.

15 Q.   And you understood that under those agreements you were

16 prohibited from using ASH's confidential information for any

17 purpose aside from the purposes of ASH, right?

18 A.   There were a number of different definitions embedded in

19 those agreements.  That would be correct.

20 Q.   I want to talk about Dorn Homes again for a minute.

21      You started working with ASH to acquire Dorn pretty soon

22 after the Grayhawk acquisition, right?

23 A.   Yes.

24      I initiated the conversations and basically helped put it

25 into play for discussion with my friend David Grounds who ran

Direct Examination - David Erickson

1   Dorn Homes.

2   Q.   Right.

3        And so you are aware that Dorn and ASH had entered into a

4   nondisclosure agreement or NDA?

5   A.   I was aware of that.

6   Q.   Okay.

7        And that's typically the first step in negotiations for a

8   potential acquisition of the homebuilding company, right?

9   A.   Very common, yes.

10  Q.   Okay.

11       In January 2020, you went to Arizona with Greg Benson to

12  meet Dave Grounds, correct?

13  A.   Yes, sir.

14  Q.   And you were acting on behalf of ASH on that trip, right?

15  A.   Under my consulting capacity, that's correct.

16  Q.   Okay.

17       And while you were acting on behalf of ASH you sought

18  Dorn's financials, right?

19  A.   I had known of Dorn's financials for many years, but, yes,

20  I certainly saw the updated version at that time, yes.

21  Q.   Okay.

22       And you know that ASH entered into at least one Letter of

23  Intent with Dorn, right?

24  A.   That's correct.

25  Q.   And you remember that Dorn withdrew from the potential deal

1    with ASH in September of 2020, right?

2    A.    I am.

3    Q.    And after Dorn withdrew, and before you became the interim

4    CEO of ASH, you tried to get Dorn under contract yourself and

5    then offer it to ASH, right?

6    A.    I did that with specific context that I was doing it on

7    behalf of the Board, and it would be offered to the Board.

8    Q.    Okay.

9          MR. KRAMER:  Let's have PX 268, please.

10   BY MR. KRAMER:

11   Q.    Focusing on the second email down in the chain.  This is an

12   email dated --

13         MR. KRAMER:  Let's scroll up just a little bit.

14   Sorry.  There we go.

15   BY MR. KRAMER:

16   Q.    There is an email here from Dave Grounds to John Wicken and

17   you dated October 7, 2020, correct?

18   A.    Correct on the contacts and the date.

19   Q.    Okay.

20         And then the email chain continues, and eventually, you

21   fall off at the very top, right?

22         There is an email on October 8 and another one October 9,

23   but you are not copied on the one at the top on October 9?

24   A.    Correct.

25         MR. KRAMER:  Plaintiffs offer PX 29.  We can redact

Direct Examination – David Erickson

1   the top if the defendants would like.

2           THE COURT:  Any objection?

3           MR. QUACKENBOSS:  No objection.

4           THE COURT:  Do the defendants want the top email

5   that's he not copied on redacted?

6           MR. QUACKENBOSS:  Yes, please, with that redaction.

7           THE COURT:  Okay.  Plaintiffs' counsel will make sure

8   that happens.  Admitted with that redaction.

9        (PLAINTIFFS EXHIBIT PX29:  Received in evidence.)

10           MR. KRAMER:  Thank you.

11  BY MR. KRAMER:

12  Q.   Okay.

13       So let's go back to the first email here on October 7.

14  This is the one from David Grounds to John Wicken and

15  Dave Erickson.

16       Do you see that?

17  A.   Yes, sir.

18  Q.   And what Mr. Grounds writes here on October 7:  Meet

19  Dave Erickson.  He is considering investing with Dorn Homes.  He

20  is an old friend and colleague from my NAHB Builder 20 group.

21  He would like to connect with you if possible.

22       Did I read that correctly?

23  A.   That's what he wrote.

24  Q.   So Mr. Wicker [sic] is a contact of Mr. Grounds at

25  Wells Fargo Bank?

Direct Examination - David Erickson

1    A.    Wicken.  And I believe Mr. Wicken is Dave Grounds'

2    Wells Fargo contact.  I think he was in California, but I am not

3    sure.

4    Q.    Okay.

5          You asked Dave Grounds to send this email to give

6    permission to Wells Fargo for them to disclose financial

7    information to you, right?

8    A.    Yes.  It's common practice that you should ask permission

9    to talk to somebody's banker, especially if you are asking to

10   talk about things that might be considered confidential

11   information.  Again, trying to be professional and cross the T's

12   wherever practical.

13   Q.    And you did that on October 7?

14   A.    Yes, sir.

15              MR. KRAMER:  Let's have PX 85.

16              THE WITNESS:  May I make an observation on this email?

17              THE COURT:  Yes.

18              THE WITNESS:  I would like to emphasize, particularly

19   for the jury, that's Dave Grounds' words, not mine, on that

20   paragraph there.

21   BY MR. KRAMER:

22   Q.    Fair enough.

23          Okay.

24          PX 85, this is an email from you to Marshall Coleman with

25   the subject, Pursuit of Dorn Homes release, dated October 8,

1   2020.

2        Do you see that?

3   A.   Correct.

4   Q.   So this is the next morning, right?

5   A.   Yes.

6        MR. KRAMER:  Okay.  And if we could pull up 85A just

7   for the witness.

8   BY MR. KRAMER:

9   Q.   This is the attachment to the email, which is a letter you

10  prepared and sent to Mr. Coleman, right?

11  A.   It is.

12       MR. KRAMER:  Plaintiffs offer 85 and 85A.

13       MR. QUACKENBOSS:  No objection.

14       THE COURT:  Admitted.

15    (PLAINTIFFS EXHIBIT 85 AND 85A:  Received in evidence.)

16       MR. KRAMER:  Let's go back to 85.

17  BY MR. KRAMER:

18  Q.   And the text of your email to Mr. Coleman on October 8th

19  is, As we have discussed, this is a release to pursue Dorn and

20  confirms no conflicts with ASH in the process."

21       Did I read that correctly?

22  A.   That's what I wrote, yes, sir.

23  Q.   Okay.

24       MR. KRAMER:  Let's look at the letter, starting on the

25  third paragraph.

Direct Examination - David Erickson

1   BY MR. KRAMER:

2   Q.   All right.   You write here, The purpose for this letter is

3   to disclose my interest in pursuing Dorn myself and ensure there

4   are no misunderstandings on my status quo in doing so.

5        Did I read that correctly?

6   A.   Not about status quo.   It says, On my status in doing so.

7   Q.   I apologize.   Thank you.

8        Otherwise correct?

9   A.   That's what it says.

10  Q.   All right.

11       So hadn't you -- hadn't you already started pursuing Dorn

12  the day before when you sent -- when you were connected to the

13  bankers at Wells Fargo?

14  A.   There had been ongoing conversation with Dave Grounds since

15  the day that the deal broke off between Dave Grounds and

16  Greg Benson all the way back in September.   I was not in any

17  capacity working on my individual capacity.

18       From my perspective, I was trying to preserve the Dorn

19  transaction for the best interest of the parties.   As a Board

20  member, I have a -- I think the term is "fiduciary

21  responsibility" to make sure the Board has first access to this.

22  Q.   Okay.

23  A.   And in all contexts throughout this I am acting in the best

24  interest of the deal and the Board.

25       Later on, we will see when the Board -- and if the Board

Direct Examination - David Erickson

1    said, No, we don't want that deal, I was prepared to disclose, I

2    think this is a deal worth doing.  If the Board doesn't want it,

3    I would like to pursue it.

4    Q.   Okay.

5         So you were not acting in your individual capacity in any

6    way?

7    A.   That was not my intent at any time in this discussion.

8    Q.   Weren't you were going to charge a 2 percent commission to

9    the company?

10   A.   Marshall had brought that concept up many months before.

11   Q.   Okay.

12        MR. KRAMER:  Let's take a look.  In the second -- if

13   we keep going down in the second numbered paragraph.

14   BY MR. KRAMER:

15   Q.   It says, I intend to fully manage this deal like a broker

16   and if successful, would offer --

17        MR. KRAMER:  Oops, sorry.  Second numbered paragraph.

18   BY MR. KRAMER:

19   Q.   I intend to fully manage this deal like a broker, and if

20   successful, would offer the Dorn package to ASH with a broker

21   commission 2 percent of the book plus premium total.

22        Those were your words, correct?

23   A.   That's what I wrote.  I would ask that you read the

24   beginning of this email as well or this letter.

25   Q.   Okay.

Direct Examination - David Erickson

1      You will have a chance for your counsel to read other parts

2  into the record.

3  A.   It would be nice if the jury had it in some context when

4  you're trying to abuse it.

5           THE COURT:  What part of it do you think needs to be

6  in context, Mr. Erickson?  What part are you requesting him to

7  read?

8           THE WITNESS:  In the opening one or two sentences,

9  Your Honor, there is a comment that restates that verbal

10 conversation already happened with Marshall.  This letter was

11 intended to simply document what Marshall and I had already

12 talked about.

13 BY MR. KRAMER:

14 Q.   And, again, that's Marshall Coleman and no one else, right?

15 A.   Marshall Coleman, chairman of the Board, who I am having my

16 communication with on behalf of the Board.

17 Q.   Okay.  All right.

18      So, in any event, what you were doing was asking for

19 additional compensation in the event that ASH accepted the deal

20 you were offering, right?

21 A.   Yes.  Consistent upon what Marshall Coleman had brought up

22 at the time of the ASH transaction like a month before so.  And

23 in the context of the verbal conversation we had had in the

24 probably hour or so before I actually wrote this.

25 Q.   Okay.

1          So that was also Marshall Coleman's idea and not yours?

2    A.   It was a mutual discussion between Marshall and I.  He had

3    verbally blessed it in that verbal conversation.  Again, I am

4    circling back to try to make sure there is some transparency so

5    that there wasn't a misunderstanding down the road.

6    Q.   Got it.

7              MR. KRAMER:  Let's go to the end of the letter.

8    BY MR. KRAMER:

9    Q.   You write here, In conclusion, I'm asking for clarity to

10   pursue a purchase deal of Dorn individually and a waiver of any

11   potential conflicts that could be interpreted from my various

12   relations with ASH.  That release is signatured at the end of

13   this letter.

14        That's what you wrote, correct?

15   A.   That's what I wrote.  This paragraph is out of context for

16   the full detail.

17   Q.   Okay.

18        Let's take a look -- is there additional context that you

19   would like to provide that you haven't already provided?

20   A.   Yeah.  Somewhere in this chain here it specifically says

21   that I will be offering it to the Board --

22   Q.   Uh-huh.

23   A.   -- for discussion.

24   Q.   Okay.

25        Well, that was the 2 percent commission, right?  If you

Direct Examination - David Erickson

1    sold it to ASH?

2    A.    We talked about that.  I agree.

3    Q.    Okay.

4              MR. KRAMER:  Let's take a look at the release that you

5    signatured on.  It carries over from one page to the next.

6    BY MR. KRAMER:

7    Q.    Is this the release that you sent to ASH, Mr. Erickson?

8    A.    It is.

9    Q.    Okay.  And there is a blank spot for Mr. Coleman's

10   signature, correct?

11   A.    It is.

12   Q.    Okay.

13         So at this point when you didn't -- Mr. Coleman refused to

14   sign the release, didn't he?

15   A.    In the end he did not sign it.  He also did not refuse to

16   sign it.

17   Q.    Okay.

18         Well, he wouldn't even discuss it with you, right?

19   A.    He -- well, after I had sent this, and then I had a verbal

20   conversation, his discussion was very one-sided, and it had

21   nothing to do about signing it.

22   Q.    Okay.

23         He had what you describe as a "meltdown" when he got this

24   letter, isn't that right?

25   A.    He was somewhat irrational in his conversation, yes.

Direct Examination - David Erickson

1   Q.   Okay.

2        But you went ahead anyway and continued your efforts to

3   purchase Dorn, right?

4   A.   Exactly along the lines of this letter and this intent to

5   release the document -- what we had already talked about

6   verbally -- yes, I continued to try to do that.

7   Q.   The one that Mr. Coleman would not sign?

8   A.   The one that Mr. Coleman did not sign.  "Would not" and

9   "did not" are not necessarily the same thing.

10  Q.   Oh, what's the difference?

11  A.   He never refused to sign it.  He just didn't.  But he had

12  already given me his blessing.

13  Q.   I see.  You were just asking again in writing?

14  A.   Just trying to get it in writing.

15  Q.   Okay.

16       And he wouldn't do that, right?

17  A.   He did not sign it.

18  Q.   And the very next day you got on a plane and flew to

19  Arizona to explore Dorn, right?

20  A.   I did.

21  Q.   Okay.

22       In fact, you booked that flight on October 5th already,

23  right?

24  A.   It had been contemplated for this to happen.  I could have

25  easily canceled the flight if I had been -- if I had decided it

Direct Examination - David Erickson

1    was not the appropriate thing to do.

2    Q.    You were acting in ASH's best interest.  That's your

3    testimony?

4    A.    Again?

5    Q.    Your testimony is you were acting in Ash's best interest?

6    A.    As a Board member, I have a responsibility to act in the

7    best interest of the Board.  And so in the end, the Board was

8    going to have first opportunity of anything that came out of

9    this.

10   Q.    As long as they paid 2 of the overall purchase price to

11   you, right?

12   A.    That was the proposal.

13          THE COURT:  You moving on to something else?

14          MR. KRAMER:  Yes, Your Honor.

15          THE COURT:  All right.  We are going to take our lunch

16   break at this time, ladies and gentlemen.  It's about 10 till 1,

17   so we will break until 2 PM.

18          If you will be back by 2 so we can get started in the

19   courtroom at 2.

20          Do not discuss the case with anyone during your break.

21          Enjoy your lunch.

22   (Jury out at 12:53.)

23   (Recess taken 12:53.)

24   (Resumed at 1:59.)

25          THE COURT:  Please be seated.

Direct Examination - David Erickson

1        Bring the jury down.

2        COURT SECURITY OFFICER:  Yes, Your Honor.

3        THE COURT:  Mr. Erickson, you may come back to the

4   witness stand.

5        I am assuming y'all are going to want to call Mr.

6   Erickson in your case-in-chief as opposed to questioning him

7   after this examination.

8        MR. QUACKENBOSS:  I expect that to be true.  We will

9   need to see the way the rest of this goes but that's the

10  intention.  Yes, sir.

11       THE COURT:  You can't do both.  If you are going to do

12  it now it needs to not be much beyond the scope of his

13  examination.

14       MR. QUACKENBOSS:  Understood.

15     (Jury in at 2:01.)

16       THE COURT:  All right.

17       Welcome, back ladies and gentlemen.

18       Mr. Kramer, you may continue with your examination.

19       MR. KRAMER:  Thank you, Your Honor.

20              CONTINUED DIRECT EXAMINATION

21  BY MR. KRAMER:

22  Q.   Mr. Erickson, I would like to talk about the point when you

23  resigned as the interim CEO of American Southern Homes.

24       At that point, am I correct that you had not yet decided to

25  try to acquire homebuilding companies yourself?

Direct Examination - David Erickson

1    A.    Correct.

2    Q.    And you sought the advice of counsel, yes or no, at around

3    that time?

4    A.    Among others, yes.

5            MR. KRAMER:  Bring up PX83.

6            While that's coming up, I am going to hand a copy of

7    this document to the witness, if it's all right with you,

8    Your Honor, because we are going to come back to it.

9            THE COURT:  Okay.  Has it already been admitted?

10           MR. KRAMER:  Not just yet, Your Honor.

11           THE COURT:  Okay.

12           MR. KRAMER:  Sorry.  I got the document mixed up.

13           I will be back with the document in a minute.

14           THE COURT:  All right.  Go ahead.

15           MR. KRAMER:  Okay.  Can we have PX83?  Not yet

16    admitted.  Just for the witness.

17           Okay.  Sorry for the delay.  Technical issues

18    resolved.

19           Thank you, Teri.

20           Okay.  Let's get set here.

21    BY MR. KRAMER:

22    Q.    Mr. Erickson, do you recognize PX 83 as an email that you

23    sent on December 21, 2020, the day after you resigned?

24    A.    I do.

25           MR. KRAMER:  Okay.  Plaintiffs offer PX 38,

Direct Examination - David Erickson

```
1    Your Honor.

2              THE COURT:  Any objection?

3              MR. QUACKENBOSS:  It's already admitted, I believe.

4              MR. KRAMER:  Excellent.  Then we will put it up on the

5    screen.

6              THE COURT:  What's it admitted as?  P83?

7              MR. QUACKENBOSS:  The witness discussed it yesterday.

8              THE COURT:  That's all right.  It's admitted as PX 83.

9    If there are two of them in the record so be it.

10             Go ahead.

11        (PLAINTIFFS EXHIBIT PX83:  Received in evidence.)

12             MR. KRAMER:  Thank you, Your Honor.

13   BY MR. KRAMER:

14   Q.   This is an email that you sent to Marshall Coleman and

15   Sean Coleman the day after you resign, correct?

16   A.   It is.

17   Q.   Okay.

18        Let's take a look at the third paragraph.

19        Do you see that?

20   A.   I do.

21   Q.   So it says here at the beginning:  Non-disclosure

22   agreements, NDA, signed by ASH.  I provide this information just

23   for knowledge.  At this point I consider all of these deals to

24   be dormant and not exclusive to ASH.

25        And then there is a list of six companies underneath.
```

Direct Examination - David Erickson

1      Is that right?

2  A.    That is correct.

3  Q.    And your testimony is that as of December 21, 2020, when

4  you sent this email, you still had no intention to pursue any of

5  these homebuilders on your own account, correct?

6  A.    That's correct.  But I'd like to put some context to this

7  letter.

8      If you notice at the top it was labeled "clean up issues".

9  Basically I am no longer in the CEO role.  I am making sure

10  there are no loose ends floating around.  It isn't just the

11  subject.  There are others above it related to properly cleaning

12  up my desk, make sure ASH has full knowledge of all my CEO

13  things that we had touched while I was administering the job.

14  Q.    Got it.  Let's talk about these.

15      The first -- in paragraph three, at least, the first thing

16  you say is:  Miramonte Homes.  Flagstaff and Tuscon, Arizona.

17  Mostly a land-based builder.  Builder Adviser Group Tony Avala

18  as broker.  Broadcasting widely.

19      Did I read that correctly?

20  A.    That's what it says.

21  Q.    Okay.

22      You are familiar with the definition of confidential

23  information in your Consulting Agreement, correct?

24  A.    Broadly, yes.

25  Q.    You know it refers to non-public information, right?

Direct Examination - David Erickson

1   A.   That's correct.

2   Q.   Number two is:  Prominence Homes.  Austin, Texas.  Builder

3   Adviser Group as broker.  Broadcasting widely.  Has been in the

4   works since April in one form or another.  Started under Benson.

5        Did I get that right?

6   A.   That's what it says.

7   Q.   Okay.  And, again, you are careful to write here it was

8   "broadcasting widely".  Right?

9   A.   That's correct.

10  Q.   The day after you met with your lawyer, or was it the same

11  day?

12  A.   I think my previous conversation about --

13  Q.   Yeah.

14  A.   Well, as I said, among others I spoke with my attorney.

15  And other industry contacts about where I think I might go in

16  the future.  But I think you may be re -- mischaracterizing

17  "broadcast widely."

18  Q.   Okay.  Number three is:  Surrey Homes.  Orlando, Florida.

19  Builder Advisory Group, Avala as broker.  Unclear on

20  distribution of knowledge.  Benson was working this early and

21  late 2021.  And LOI proposal was circulated in September '21.

22       Did I read that correctly?

23  A.   Correct.

24  Q.   So you are referring to an LOI proposal circulated by ASH,

25  right?

Direct Examination - David Erickson

 1  A.    Yes.

 2  Q.    Okay.

 3        And this one you did not write was "broadcasting widely".

 4  Did you?

 5  A.    You talking about Surrey?

 6  Q.    Yes.

 7  A.    I say, I am unclear on this distribution.

 8  Q.    Okay.

 9        You didn't receive a response to this email, did you?

10  A.    I did not.

11  Q.    In some capacity you had been involved with all of these

12  potential ASH acquisitions during your time as interim CEO,

13  right?  You were cleaning off your desk?

14  A.    I would recharacterize that as I was involved in all of

15  them to some degree.  And I had signed a non-disclosure

16  agreement on behalf of ASH to at least be in the discussion of

17  them in one form or another.

18  Q.    Okay.

19        And each of these companies had entered into non-disclosure

20  agreements with ASH.  Is that consistent with what you just

21  said?

22  A.    That would be correct.

23  Q.    Okay.

24        So you learned information about each of these companies,

25  in particular Miramonte, Prominence, and Surrey while you were

Direct Examination – David Erickson

1   with ASH under NDAs, right?

2   A.   That would be correct, especially if you put it in the

3   context that there is a broker that is representing all of these

4   companies not necessarily exclusively to ASH.

5   Q.   You later used some of the information you learned during

6   your time with ASH for your own purposes, didn't you?

7   A.   Will you restate that again.

8   Q.   You later used some of the information you learned about

9   these companies during your time at ASH for yourself, right?

10  A.   That's not correct.

11         MR. KRAMER:  Let's go to PX71.

12  BY MR. KRAMER:

13  Q.   Do you recognize this, Mr. Erickson, as an email from me

14  dated December 22nd, 2020, and there is an attachment, too,

15  right?

16  A.   I do.

17         MR. KRAMER:  Can we scroll down to the attachment?

18  BY MR. KRAMER:

19  Q.   Is that the attachment?

20  A.   I assume so.

21         MR. KRAMER:  Okay.  Plaintiffs offer PX 714.

22         THE COURT:  Any objection.

23         MR. QUACKENBOSS:  No objection.

24         THE COURT:  Admitted.

25      (PLAINTIFFS EXHIBIT PX714:  Received in evidence.)

Direct Examination - David Erickson

1   BY MR. KRAMER:

2   Q.   All right.

3        This is a letter in which ASH says:  ASH appreciates your

4   contributions as a consultant and your willingness to continue

5   in that role.  For the time being, however, ASH respectfully

6   instructs you that you refrain from providing any further

7   consulting services unless and until such services are

8   specifically requested by ASH.  For the avoidance of doubt, this

9   letter is not intended to serve as a notice of termination of

10  the Consulting Agreement.

11       Do you see that?

12  A.   I do.

13  Q.   Isn't it true that you sent an NDA to Prominence Homes the

14  very next day?

15  A.   I am unclear of the timing.

16  Q.   Isn't it true that you sent a NDA to Miramonte homes as

17  well?

18  A.   Again I'm unclear of the timing.

19  Q.   This is December 22nd.

20  A.   I need to clarify when that NDA went out.

21  Q.   How much time did you spend with your attorneys preparing

22  to testify to today?

23  A.   Excuse me, sir?

24  Q.   How much time did you spend with your attorneys preparing

25  to testify today?

Direct Examination - David Erickson

1    A.   I have done some preparation before.  But, like I said, I

2    would like to confirm the document and the date on it before I

3    gave you a specific answer.

4    Q.   Okay.  And then I am asking another question which is, how

5    much time did you spend with your attorneys preparing to testify

6    today?

7            MR. QUACKENBOSS:  Your Honor, I object.  This is a

8    little bit over the top regarding harassment and encroachment on

9    privilege potentially.

10           MR. KRAMER:  Whoa.  I don't even how to respond,

11   Your Honor.  It's just, how much time.

12           THE COURT:  Irrelevant.

13           Move on.

14           MR. KRAMER:  Okay.

15           THE COURT:  I don't think he asserted that objection

16   but it's irrelevant.

17   BY MR. KRAMER:

18   Q.   Isn't it true that within three days of resigning from ASH

19   you were already attempting to enter into NDAs with three

20   different companies ASH had been working to acquire?

21   A.   That sounds consistent, I agree.

22           MR. KRAMER:  Can I have PX 72, please?

23   BY MR. KRAMER:

24   Q.   Do you recognize -- this has already been admitted so we

25   can put this up on the screen.

1      Okay.  This is an email from you to Marshall Coleman and

2  others dated December 31st, 2020.  New Year's Eve, correct?

3  A.    It is.

4  Q.    And there is a letter attached, right?

5  A.    There is attachment, yes.

6  Q.    Okay.  Let's take a look at the letter.

7      Actually before we do, it says:  A continued speedy

8  recovery to you, Marshall, and a Happy New Year to all.

9      What was going on with Marshall Coleman at this point?

10 A.    Some time in November, or so, Marshall had had a hip

11 replacement -- maybe two -- and a knee replacement.  So he had

12 three surgeries in the couple of months ahead of time.  I knew

13 he was recovering from those, in general.

14     I had not spoken to him for a week, or so, at this time, so

15 I basically just being courteous to him and wishing him a speedy

16 recovery and New Year.

17 Q.    Okay.  Let's look at the letter attached.

18     This is your letter and it has the date December 30, 2020,

19 right?

20 A.    December 30th.

21 Q.    Okay.  On the first -- at the beginning of the letter you

22 write:  Dear Marshall, as I have disclosed previously I have

23 developed ambitions to do more things in the homebuilding and

24 development business with my emphasis being in areas well

25 outside of the Columbus, Georgia market region so as to avoid

Direct Examination - David Erickson

1    any competing activities with ASH-Grayhawk.

2        Did I read that correctly?

3    A.    You do.

4    Q.    You had a non-compete agreement in the Columbus region,

5    correct?

6    A.    I do.

7    Q.    And then you go on in the second paragraph to say:

8    Specifically, I am intending to purchase one or more

9    homebuilding companies in the near term for my own investments.

10   If that step should go well I may consider doing additional

11   purchases in the future.

12       Do you see that?

13   A.    I do.

14   Q.    Now, you can take a look at the whole letter in like,

15   Mr. Erickson, but you didn't inform ASH in this letter that had

16   already tried to acquire three homebuilding companies that ASH

17   had been trying to acquire, did you?

18   A.    I had not tried to acquire anybody in the intervening days.

19   Q.    Didn't you testify that you had sent NDAs out within three

20   days of resigning?

21   A.    None disclosure has nothing to do with an acquisition.

22   Q.    I'm sorry.  Didn't you testify before lunch that that's the

23   first step in the process of acquiring a homebuilder?

24   A.    True.  But that doesn't make them mutually exclusive.

25   Q.    Let's go to another document, which is PX 118.

Direct Examination - David Erickson

```
 1              MR. KRAMER:  This is the document I'd like to hand up,

 2    if Your Honor would permit me to approach.

 3              THE COURT:  All right.  Do you also have it digitally?

 4              MR. KRAMER:  Yes.

 5              THE COURT:  PX 118?

 6    BY MR. KRAMER:

 7    Q.   Okay.  Mr. Erickson, do you recognize this exchange between

 8    you and Tony Avala on December 30, 2020?

 9    A.   I do.

10              MR. KRAMER:  Plaintiffs offer PX 118, Your Honor.

11              THE COURT:  Any objection?

12              MR. QUACKENBOSS:  No objection.

13              THE COURT:  Admitted.

14         (PLAINTIFFS EXHIBIT PX118:  Received in evidence.)

15    BY MR. KRAMER:

16    Q.   All right.

17         So on December 30, 2020 -- this is just to get oriented --

18    this is the date of the letter we just reviewed, which you

19    emailed to Mr. Coleman on December 31st, right?

20    A.   It was 30th or 31st.  I don't remember which day.

21    Q.   What you write here is:  Tony, I need, we need, to get a

22    clear written waive off from ASH on various companies ASH has

23    had an opportunity at, specifically Prominence in Texas,

24    Miramonte in Arizona, Surrey in Florida, others I may not

25    specifically know.
```

1       Did I read that correctly?

2   A.   Correct.

3   Q.   Okay.

4        You didn't ask ASH directly because you knew the answer

5   would be no, right?

6   A.   Logical.

7            MR. KRAMER:  Can we play clip EV20?

8            MR. QUACKENBOSS:  Your Honor, I don't think there is

9   anything, again, to play a video over.  I am not even sure I

10  heard his answer.

11           THE WITNESS:  It would be logical.

12           MR. KRAMER:  Your Honor, it's different from the

13  answer that he gave at his deposition and he is a party

14  opponent.

15           THE COURT:  All right.  Go ahead.

16           Overruled.

17           (Except of video deposition played for the jury.)

18  BY MR. KRAMER:

19  Q.   So, at this point, Mr. Erickson you certainly didn't have

20  written permission to ASH to pursue Prominence, Miramonte or

21  Surrey, did you?

22  A.   I did not.

23           MR. KRAMER:  Can we have PX 125?

24  BY MR. KRAMER:

25  Q.   This is another email from you to Tony Avala and the top is

Direct Examination - David Erickson

 1   dated January 4th, 2021, right?

 2   A.   It is.

 3           MR. KRAMER:  Plaintiffs offer PX 125, Your Honor.

 4           THE COURT:  Any objection?

 5           MR. QUACKENBOSS:  No objection.

 6           THE COURT:  Admitted.

 7       (PLAINTIFFS EXHIBIT PX125:  Received in evidence.)

 8   BY MR. KRAMER:

 9   Q.   Okay.  Let's look at the bottom email.

10       This is January 4th, 2021, and you are emailing Tony Avala.

11       Do I have that right?

12   A.   Correct.  At 7 PM.

13   Q.   Okay.

14       And you write:  Tony, you still owe me a clear response

15   clarifying that ASH is not interested in pursuing anything in

16   your orbit of offered builders currently, specifically by name

17   if possible.

18       That was a true statement as of January 4th, 2021, correct?

19   A.   Correct.

20   Q.   You had already sent Prominence an NDA plus a term sheet by

21   January 4th, right?

22   A.   I believe that's accurate.

23   Q.   Okay.  Let's talk a little --

24           MR. KRAMER:  We can take that down.

25

1    BY MR. KRAMER:

2    Q.   Let's talk more about Prominence Homes.  You met the owner

3    of Prominence, Brian Rome, in 2020, right?

4    A.   Yes.

5    Q.   And you met Mr. Rome in your capacity as a consultant for

6    ASH, right?

7    A.   I did.

8    Q.   And when you were the interim CEO ASH was in discussions

9    with Prominence about acquiring the company, true?

10   A.   We touched on it very briefly.

11        MR. KRAMER:  Let's have PX102, please.

12   BY MR. KRAMER:

13   Q.   Do you recognize this, Mr. Erickson, as a November 23rd,

14   2020 email from Zach Legge at Builder Adviser Group to Tony

15   Avala, you, and Brian Rome?

16   A.   I do.

17        MR. KRAMER:  Plaintiffs offer PX 214.

18        THE COURT:  PX 102 or 214?

19        MR. KRAMER:  Sorry.  102.

20        THE COURT:  Any objection?

21        MR. QUACKENBOSS:  No objection.

22        THE COURT:  Admitted.

23        (PLAINTIFFS EXHIBIT PX102:  Received in evidence.)

24   BY MR. KRAMER:

25   Q.   In this email Mr. Legge was sending you financial and

Direct Examination - David Erickson

1    budget projections for Prominence, right?

2    A.    That's what it is.

3    Q.    This is at the time when you were the interim CEO of ASH,

4    right?

5    A.    That's correct.

6             MR. KRAMER:  May I have PX 214, please?

7    BY MR. KRAMER:

8    Q.    Do you recognize this email as one that you sent to

9    Ryan Twiss on November 25, 2020?

10   A.    May I read the full context, please?

11   Q.    Sure.

12        (Pause in proceedings.)

13            THE WITNESS:  Proceed.

14   BY MR. KRAMER:

15   Q.    Do you recognize this as an email that you sent to

16   Ryan Twiss on November 25th, 2020?

17   A.    I do.

18            MR. KRAMER:  Plaintiffs offer PX 214.

19            THE COURT:  Any objection?

20            MR. QUACKENBOSS:  No objection.

21            THE COURT:  Admitted.

22        (PLAINTIFFS EXHIBIT PX214:  Received in evidence.)

23   BY MR. KRAMER:

24   Q.    In this email you write:  Brian, as we discussed on the

25   phone we are two weeks into restarting the LOI discussions on

1    Prominence but things are going slow.

2        Did I read that correctly?

3    A.    Yep.

4    Q.    And then you write:  As we speak I am still working for a

5    good set of balance sheet information.

6        Right?

7    A.    Correct.

8    Q.    You were asking for additional financials from Prominence,

9    right?

10   A.    I was looking for something -- I need some tangible

11   information if it's going to proceed past beyond a, Hey you.

12   Q.    Okay.

13       Fair to say that you were in talks with Mr. Rome about ASH

14   acquiring Prominence at this point?

15   A.    Tony Avala had brought it to my attention that he wanted to

16   bring it back to us, ASH, collectively, for discussion.  That a

17   deal that Brian Rome had supposedly struck with David Weekly

18   Homes, a public company, was not going as they wanted so they

19   wanted to try a new direction.

20           MR. KRAMER:  May I have Mr. Erickson's individual

21   transcript, page 295, lines 11 through 14, please?

22   BY MR. KRAMER:

23   Q.    Do you see here, Mr. Erickson, at your deposition you were

24   asked:

25       Question:  So fair to say that as of November 5, 2020, you

1  and Brian Rome were in talks about ASH acquiring Prominence.

2      Answer:  Well, we were kicking it around.

3      Is that the question you were asked and the answer you gave

4  at your deposition?

5  A.   It is.

6      And emphasis the kicking around.

7  Q.   You resigned just a few weeks later on December 20, right?

8  A.   That's correct.  I think that's a month later.

9  Q.   After your resignation you immediately began to explore

10 acquiring Prominence on your own, right?

11 A.   I inquired about it.

12 Q.   I'm sorry?

13 A.   I should restate that.  It came up in conversation with

14 Tony Avala when I was inquiring about potential builders in

15 general.

16 Q.   On what date?

17 A.   Well, it was after I resigned from ASH as the CEO.

18 Q.   Okay.

19     Was it before or after you sent the email to Mr. Avala on

20 December 30th, asking for a clear written waive off from ASH?

21 A.   I had talked to Tony prior to that.

22 Q.   Okay.

23         MR. KRAMER:  Let's take a look at PX 107.

24 BY MR. KRAMER:

25 Q.   Do you recognize this as an email that you sent to

Direct Examination - David Erickson

1    Brian Rome and Tony Avala on December 23rd?

2    A.   On the 23rd.  Yes.

3           MR. KRAMER:  Can we have PX 107A?

4    BY MR. KRAMER:

5    Q.   Is this the attachment to the email?

6    A.   I assume so.

7    Q.   Okay.

8           MR. KRAMER:  Plaintiffs offer PX 107 and 107A

9    Your Honor.

10          THE COURT:  Any objection?

11          MR. QUACKENBOSS:  No, sir.

12          THE COURT:  Admitted.

13      (PLAINTIFFS EXHIBIT PX107 AND 107A:  Received in evidence.)

14   BY MR. KRAMER:

15   Q.   Brian Rome was the lead for Prominence when you, as the

16   interim CEO, were working to acquire Prominence for ASH, right?

17   A.   Restate your question, please.

18   Q.   Was Brian Rome the principal when ASH was trying to acquire

19   Prominence?

20   A.   That's correct.

21   Q.   Including while you were the interim CEO?

22   A.   Yes.

23   Q.   In the email you write here, on December 23rd, 2020 at 9:33

24   AM:  Brian, I received permission through Tony yesterday to

25   proceed with further discussions without creating a conflict

Direct Examination - David Erickson

1    with ASH.

2        Did I read that correctly?

3    A.    Yes.  And we have now put it in proper context.

4    Q.    What proper context is that?

5    A.    Well, I had reached out to Tony Avala, among others,

6    brokers, saying, Hey, I am just nosing around.  What options are

7    available.

8        He said, I got Prominence and I have got some others.  You

9    are welcome to follow them if you want.

10   Q.    You resigned three days earlier.  How long did it take to

11   have that conversation with Mr. Avala?

12   A.    In terms of days?

13   Q.    Yes.

14   A.    I don't remember specifically.

15   Q.    And Prominence is, I think, one of the builders in that

16   December 30 email when you asked Mr. Avala for a clear written

17   waive off from ASH, right?

18   A.    It would have been in the group.

19   Q.    Okay.

20       And at this point you hadn't asked -- at this point, I mean

21   December 23rd -- you hadn't asked ASH for permission to pursue

22   Prominence Homes, had you?

23   A.    No.  I had asked Tony to clarify that ASH was not pursuing

24   them.  And with this email we have, at a minimum, verbal

25   conversation that ASH is not pursuing any of those prospects.

Direct Examination - David Erickson

1  Effectively saying, We're busy with Dorn.  We are not handling

2  anything else on your portfolio, Tony.

3  Q.    Okay.

4        I'm sorry.  Who said that to Tony Avala?  What's your

5  testimony?

6  A.    Tony, by my memory, had communications directly with

7  Marshall.  And also some conversation with Sean Coleman,

8  including dinner, where he confirmed that information on two

9  different occasions verbally.

10 Q.    And that happened before December 23rd?

11 A.    No.  The phone call with Marshall as I recall was before

12 the 23rd.  Or the 23rd.

13       The Sean in person part I think happened a few days after

14 that.

15 Q.    None of that is in writing, is it?

16 A.    Excuse me?

17 Q.    None of that is in writing, is it?

18 A.    I know there is an email from Tony telling me, I have

19 confirmed this with Marshall.  And I had asked him to try to get

20 it in writing if possible.

21 Q.    Let's take a look at the attachment, the NDA, that you sent

22 to Prominence.  107A.  Is this your handwriting at the top of

23 107A, Mr. Erickson?

24 A.    It is.

25 Q.    It says it's entered into between Prominence Holdings on

1  the one hand and David Erickson on the other, right?

2  A.   Correct.

3  Q.   Okay.  And you sent this out the day after ASH sent the

4  December 22nd letter instructing you to stand down as a

5  consultant, right?

6  A.   Correct.

7  Q.   Turn to page 3 of the NDA, at the bottom.  Do you see a

8  section called, Right to Injunctive Relief?

9  A.   I do.

10  Q.   Okay.

11       It says:  ASH agrees that in the event of a breach or a

12  threatened breach, et cetera.

13       Do you see that, the reference to ASH?

14  A.   I do.

15       I acknowledged I do.

16  Q.   Does it appear later in the paragraph on the next page:

17  ASH shall not be required to post a bond?

18  A.   Acknowledged.

19  Q.   Does "acknowledge" mean yes?

20  A.   Yes.  I see it.

21  Q.   Okay.

22       If we go down to page four there is a section that says:

23  Governing law.

24       Right?

25  A.   It does.

Direct Examination - David Erickson

1   Q.   It refers to the state of Virginia, right?

2   A.   It does.

3   Q.   As of December 2020, you never had any business in the

4   state of Virginia, right?

5   A.   Not that I recall.

6   Q.   That's where ASH's headquarters is located, right?

7   A.   That's correct.

8   Q.   Now, I asked you about this document during your

9   deposition, right?  Do you remember that?  You won't admit that

10  these references to ASH and Virginia are hold-overs copied from

11  an ASH version of the agreement.

12       Do I have that right?

13  A.   I have no information to confirm that.

14  Q.   You also can't -- you also say that you can't remember if

15  you created this document, right?

16  A.   That was my testimony and remains the same.

17           MR. KRAMER:  Let's take a look at PX 804.

18  BY MR. KRAMER:

19  Q.   This is an email from you to Brian Rome dated January 2nd,

20  2021, right?

21  A.   Correct.

22  Q.   There is an attachment which is a term sheet for Prominence

23  Homes, right?

24  A.   It is.

25           MR. KRAMER:  Plaintiffs offer PX 804.

1          THE COURT:  Any objection?

2          MR. QUACKENBOSS:  No objection.

3          THE COURT:  Admitted.

4      (PLAINTIFFS EXHIBIT PX804:  Received in evidence.)

5  BY MR. KRAMER:

6  Q.   So, Mr. Erickson, you sent this to Prominence less than two

7  weeks after you resigned from ASH, right?

8  A.   That's correct.

9  Q.   You don't recall receiving any new information from

10 Prominence during that two-week period, right?

11 A.   I don't recall specifically, no.

12 Q.   Okay.

13          MR. KRAMER:  Let's take a look at the attachment, page

14 three.

15 BY MR. KRAMER:

16 Q.   I would like to direct your attention to the purchase price

17 section.  There is a reference to a purchase price premium of

18 $6 million.

19      Do you see that?

20 A.   I do.

21          MR. KRAMER:  Let's go to page 4, Section 3.  This

22 section is called the Premium.

23 BY MR. KRAMER:

24 Q.   And there is another reference to the $6 million, correct?

25 A.   That's correct.

Direct Examination - David Erickson

```
1    Q.    All right.
2          Then there is a payment schedule and Section D says --
3    well, in Section D there is a reference to --
4    A.    D as in dog?
5    Q.    I'm sorry.  D as in dog.  There is a reference to
6    $9.677 million.
7          Do you see that?
8    A.    I do.
9    Q.    Is that an earnings target related to a proposed earn out?
10   A.    Yes.
11   Q.    If we go to page 5, Section 6, the section called,
12   Employment arrangements, right?
13         Do you see the reference with $250,000 annual salary?
14   A.    I do.
15   Q.    Is that a salary being offered to Brian Rome?
16   A.    It is.
17   Q.    Those were the terms you were discussing with Prominence
18   after your departure from ASH, right?
19   A.    That would be accurate.
20   Q.    Okay.
21         Those are the same terms that ASH had discussed with
22   Prominence, aren't they?
23   A.    I would have to look at the ASH document to confirm that.
24             MR. KRAMER:  Let's look at 257, which is already in
25   evidence.
```

Direct Examination – David Erickson

```
 1   BY MR. KRAMER:

 2   Q.   Do you recognize this as a Letter of Intent between ASH and

 3   Prominence dated June 22nd, 2020?

 4   A.   Confirm the date.  And it is the format that ASH was using,

 5   correct.

 6          MR. KRAMER:  Let's take a look at the last page of the

 7   document.  Page 10.

 8   BY MR. KRAMER:

 9   Q.   Okay.  Who signed this one?

10   A.   Greg Benson.

11   Q.   Okay.

12        So this is before you became interim CEO, correct?

13   A.   Yes.  June 26, 2020.

14          MR. KRAMER:  Let's go back to page 3.

15          Page 3, Section 1.6.

16   BY MR. KRAMER:

17   Q.   Do you see a reference to a $6 million premium?

18   A.   Make I take a moment and look at this page more broadly?

19   Q.   You may.

20   A.   Can you reduce it back to full page?

21        Okay.

22   Q.   Do you see the $6 million premium in here?

23   A.   Yeah.  1.6.  Correct.

24   Q.   Section 1.6?

25   A.   1.6.  Period.
```

```
 1   Q.   All right.
 2              MR. KRAMER:  Let's go to page 4, Section 3.
 3   BY MR. KRAMER:
 4   Q.   Do you see the heading, Earn out?
 5   A.   Correct.
 6   Q.   Do you see $9.677 million earnings target?
 7   A.   Yes.  I see that.
 8   Q.   That's the same number in your LOI, right?
 9   A.   It was.
10   Q.   Okay.
11              MR. KRAMER:  Finally let's go to page 7, the section
12   entitled, Executive employment agreements.
13   BY MR. KRAMER:
14   Q.   Do you see once, again, an offer of a $250,000 salary to
15   Brian Rome?
16   A.   I do.
17   Q.   Same salary as in your LOI?
18   A.   That's the same number that was there, yes.
19              THE COURTROOM DEPUTY:  Let's have PX 99, please.
20   BY MR. KRAMER:
21   Q.   PX 99 is an email from Brian Rome to you dated
22   February 1st, 2021.
23        Do you see that?
24   A.   Along with Tony Avala and people on his staff.
25   Q.   Correct.
```

Direct Examination - David Erickson

1       And the subject line is:  Prominence Homes due diligence

2  list and there is an attachment, right?

3  A.   That's correct.

4           MR. KRAMER:  Can we go to PX 99A.

5  BY MR. KRAMER:

6  Q.   Is this the attachment?

7  A.   I would assume so.

8           MR. KRAMER:  Plaintiffs offer PX 99 and 99A.

9           THE COURT:  Any objection?

10          MR. QUACKENBOSS:  No objection.

11          THE COURT:  They are admitted.

12       (PLAINTIFFS EXHIBITS PX99 AND 99A:  Received in evidence.)

13  BY MR. KRAMER:

14  Q.   Let's stay on this due diligence list.

15       Mr. Rome sent this document back to you with his

16  handwritten comments, right?

17  A.   That's correct.

18  Q.   I asked you about this document at your deposition as well,

19  right?

20  A.   You did.

21  Q.   Am I right that you will not admit that this document was

22  created by ASH and adapted for use by you?

23  A.   I cannot confirm that.

24  Q.   I'm sorry, you can't confirm that it was created by ASH and

25  adapted for use by you, or you can't confirm that I asked you

Direct Examination - David Erickson

1    that in your deposition?

2    A.   I know you asked it at the deposition.

3         It's the created by me part I don't remember for sure.

4    Q.   So you think you might have created this?

5    A.   I don't have a clear memory of that.

6    Q.   Okay.

7              MR. KRAMER:  Let's go to PX 86.  This is already in

8    evidence.  This is a November 4, 2020 email from Steve Pehrkon

9    at ASH to you, copying Ryan Twiss.

10   BY MR. KRAMER:

11   Q.   Do you see that?

12   A.   Confirm.

13   Q.   Subject:  Dorn priority diligence list?

14   A.   Okay.

15   Q.   Okay.

16             THE COURTROOM DEPUTY:  Let's look at the attachment,

17   which is 86A -- PX 86A.  This is the attachment.  Can we put

18   that next to 99A, please?

19   BY MR. KRAMER:

20   Q.   So the version on the left, Mr. Erickson, is something that

21   Mr. Pehrkon sent to you while you were with ASH, right?

22        We just saw that in the email.

23   A.   Correct.

24   Q.   Okay.

25        And your testimony is that there are substantial

Direct Examination - David Erickson

1   differences between the one on the left and the one on the

2   right, right?

3   A.   Well, there are.

4   Q.   Okay.

5        You testified about this at your deposition, right?

6   A.   I did.

7   Q.   Okay.

8            MR. KRAMER:   Let's take a look at that.

9            Can you play the next clip, Teri?

10           MR. QUACKENBOSS:   What is the page and line, please?

11           MR. KRAMER:   Sure.   This is 318 to 319.

12           (Reporter asked for clarification)

13           MR. KRAMER:   318-14 to 319-11.

14           (Excerpt of video deposition played for the jury.)

15   BY MR. KRAMER:

16   Q.   Was that your testimony at your deposition?

17   A.   It looks like me on the screen.

18           MR. KRAMER:   Let's go back to the documents side by

19   side.   All right.

20           In the ASH version, on the left, if we can blow up

21   items 2 through 5, the headings; 2 is sales; 3 is land and

22   inventory; 4 is insurance; and, 5 is human resources.

23   BY MR. KRAMER:

24   Q.   Right?

25   A.   Yep.   That's what they say.

1          MR. KRAMER:  Let's blow up items 3 through 6 on the

2   other side.  3 through 6, sales, land and inventory, insurance,

3   human resources.

4   BY MR. KRAMER:

5   Q.   Right?  Same order?  Is that right?

6   A.   They are in the same order.  But there is clearly

7   differences in them that are substantial.  Look at how many are

8   under number two.  Look at how many of them are under number --

9   I am looking -- on the left versus right.  Two versus three,

10  three versus four, four versus five.  Pick it.  There are

11  substantial differences in them.

12      Just because you hit the same bullet points in a due

13  diligence list -- it's like looking at two different restaurant

14  menus for breakfast.  They are both going to have eggs,

15  pancakes, and bacon.

16  Q.   Let's look at more.

17          MR. KRAMER:  Can we go to human resources?  5A.

18          5A, in both forms says:  Employee org chart for all

19  employees and individual contractors who are supplied with

20  year-end 1099 forms.  Please clearly identify 1099 contractors.

21  BY MR. KRAMER:

22  Q.   They are identical, correct?

23  A.   That would be accurate.

24  Q.   Is that your testimony that that's a coincidence?

25  A.   Well, they are clearly written the same.  And they are both

1    clearly on each document.

2              MR. KRAMER:  Let's look at item B under human

3    resources.

4              Actually let's highlight 5B through 5G.  Both sides.

5    Let's do human resources A through C.

6    BY MR. KRAMER:

7    Q.   In the human resources Section, item A, item B, and item C

8    are all identical, aren't they?

9    A.   The wording is the same.  I agree.

10   Q.   Okay.

11             MR. KRAMER:  We can take that down.

12   BY MR. KRAMER:

13   Q.   You did not ultimately acquire Prominence Homes though,

14   right?

15   A.   That's correct.

16   Q.   Let's talk about Miramonte Homes.  That's another one of

17   the builders mentioned in that December 30 email to Tony Avala

18   in which you said you still need a clear waive off from ASH,

19   right?

20   A.   That's what I was requesting and he committed to try to do

21   for me.

22   Q.   You still didn't have that as of December 30, or you

23   wouldn't have asked, right?

24   A.   Correct.

25   Q.   You learned of the opportunity to acquire Miramonte when

Direct Examination - David Erickson

1  you were the interim CEO of ASH.  Am I right?

2  A.   Yes.  That's correct.

3  Q.   Chris Kemmerly is in charge at Miramonte homes.  Do I have

4  that right?

5  A.   He is the president and the owner.

6  Q.   And you first met him when you were working with ASH,

7  right?

8  A.   I did.  Had dinner with him.

9  Q.   You reviewed financials for Miramonte Homes while you

10  worked for ASH, didn't you?

11  A.   Only some sketch information that was sent by Tony Avala in

12  the process of brokering it.

13  Q.   Were those preliminary financials?

14  A.   They were incomplete.  They were kind of broad-based

15  information.  But they weren't anything close to being

16  financials.

17  Q.   Did they contain any financial information?

18  A.   They had basic points of projected revenue and income,

19  things like that.

20  Q.   Was that information provided under an NDA?

21  A.   I'm sure we had an NDA.

22  Q.   Okay.  And you met with Mr. Kemmerly in person in

23  December 2020, just during the final few days of your tenure as

24  the interim CEO of ASH, right?

25  A.   What day are you alleging?

Direct Examination - David Erickson

1    Q.   Well, did you go meet with Mr. Kemmerly in December of 2020

2    in Arizona?

3    A.   Yeah.  As I said, we had dinner with him.

4    Q.   Right.

5         While you were the CEO of ASH?

6    A.   That's correct.

7    Q.   And ASH never gave you permission to pursue an acquisition

8    of Miramonte after you left the company, right?

9    A.   ASH did not give me permission after I left.  That would be

10   a correct statement.

11   Q.   Okay.

12        MR. KRAMER:  Let's go to PX 807.

13   BY MR. KRAMER:

14   Q.   Do you recognize this as an email that you sent to

15   Mr. Kemmerly on December 23rd, 2020 at 9:21 AM?

16   A.   That's correct.

17   Q.   And the subject line is:  NDA Erickson Miramonte.

18        Correct?

19   A.   That's correct.

20   Q.   There is an attachment?

21   A.   There is an attachment there.

22   Q.   Is it that the same --

23   A.   I would like to note the same lead off from Tony Avala.

24   Q.   Okay.

25        MR. KRAMER:  Plaintiffs offer -- before we get there,

Direct Examination – David Erickson

1    plaintiffs offer PX 807.

2           THE COURT:  807.  Any objection?

3           MR. QUACKENBOSS:  No, sir.

4           THE COURT:  Admitted.

5        (PLAINTIFFS EXHIBIT PX807:  Received in evidence.)

6    BY MR. KRAMER:

7    Q.  Let's go back to the cover email you write:  Chris, I got a

8    greenlight from Tony last night to pursue Miramonte without a

9    conflict of interest with ASH.

10       Do I have that right?

11   A.  I do.

12   Q.  Same Tony you emailed on December 30th asking for a

13   clear -- or a waive off and then again on January 4th seeking a

14   clear response from ASH, right?

15   A.  Same Tony Avala.  That's correct.

16   Q.  Okay.

17       So this email is basically the same as what you sent to

18   Prominence a little later in the day, isn't it?

19   A.  That's correct.

20   Q.  And there is another confidentiality agreement attached?

21   A.  That's correct.

22   Q.  Is it similar to the confidentiality agreement that you

23   sent to Prominence?

24   A.  Yes.

25   Q.  Does it refer to ASH a few times?

1    A.    Same document.  You allege the same thing in your

2    deposition.

3    Q.    Okay.

4          Does it refer to the state of Virginia?

5    A.    It does.

6    Q.    Okay.

7          You sent Mr. Kemmerly a term sheet about a week later on

8    January 1, 2021.  New Year's Day, right?

9    A.    I know a term sheet followed this.  I cannot confirm date.

10           MR. KRAMER:  Let's have PX 171.

11    BY MR. KRAMER:

12    Q.    Is this an email you sent to Mr. Kemmerly on New Year's

13    Day, at 2:13 PM, 2021?

14    A.    Correct.

15           MR. KRAMER:  Can we see PX 171A.

16    BY MR. KRAMER:

17    Q.    Is this the attachment?

18    A.    It would be a logical assumption.

19           MR. KRAMER:  Plaintiffs offer PX 171 and 171A.

20           THE COURT:  Any objection?

21           MR. QUACKENBOSS:  No objection.

22           THE COURT:  Admitted.

23        (PLAINTIFFS EXHIBITS PX171 AND 171A:  Received in

24    evidence.)

25

Direct Examination – David Erickson

1          MR. KRAMER:  Let's go to PX 168.

2    BY MR. KRAMER:

3    Q.   Is this another email from you to Mr. Kemmerly dated

4    January 26, 2021?

5    A.   It is.

6          MR. KRAMER:  Can we see 168?

7    BY MR. KRAMER:

8    Q.   Is this the attachment?

9    A.   It is.

10         MR. KRAMER:  Let's stay on the attachment.

11         First, plaintiffs offer 168 and 168A into evidence.

12         THE COURT:  Any objection?

13         MR. QUACKENBOSS:  No, sir.

14         THE COURT:  They are admitted.

15    (PLAINTIFFS EXHIBITS PX168 AND 168A:  Received in

16    evidence.)

17    BY MR. KRAMER:

18    Q.   This is a purchase term sheet with Miramonte dated

19    January 8, 2021.  Am I right, Mr. Erickson?

20    A.   That's correct.

21    Q.   So this was executed by January 9th, right?  Want to see

22    the signature lines?

23    A.   Hold it.  There is a disconnect.  Wasn't the previous one

24    at the end of January?  The 26th?

25    Q.   I am not sure I am following.

Direct Examination - David Erickson

1  A.   Can go to the previous example you had up?

2  Q.   Sure.  168.

3  A.   I think it was an email.

4  Q.   Okay.

5  A.   January 26th.

6  Q.   Okay.

7       Let's stay on the email.  The subject line is:  Miramonte

8  LOI.

9       Right?

10  A.   Yes, sir.

11  Q.   What you write here is:  Chris, you were correct.  We will

12  get the APA started from this.

13       Right?

14  A.   Right.

15  Q.   APA, does that for Asset Purchase Agreement?

16  A.   It is.

17  Q.   So January 26, 2021, you are talking about putting an Asset

18  Purchase Agreement together to buy Miramonte Homes?

19  A.   That's the intent, yes.

20  Q.   The basis for an Asset Purchase Agreement is typically the

21  terms of the LOI, right?

22  A.   Restate the question again, please.

23  Q.   In a homebuilder acquisition don't the parties typically

24  use the terms negotiated in the LOI as the basis for the terms

25  that appear in the final Asset Purchase Agreement, the purchase

Direct Examination - David Erickson

1   contract?

2   A.   That's the basis for it, yes.  That would be the common

3   theme.

4              MR. KRAMER:  Let's go back to the LOI, which is 168A.

5              Let's scroll down to the signature line please.  Okay.

6   BY MR. KRAMER:

7   Q.   Was this term sheet -- okay.  The term sheet is January --

8   what's the date the term sheet was signed?

9   A.   It shows here the 9th of January.

10  Q.   Okay.

11       So by January 9th you had an executed term sheet with

12  Miramonte Homes, right?

13  A.   We had an agreement based on an outline from this LOI.

14  That's correct.

15  Q.   I think you testified earlier, that's while ASH was busy

16  with Dorn, right?

17  A.   That was what was related to me by Tony Avala.

18  Q.   Okay.

19       You did not acquire Miramonte homes, though, did you?

20  A.   We did not.

21  Q.   By the way, your company -- did you form a company called

22  Grand Oak Builders after you left ASH?

23  A.   We did.

24  Q.   Didn't Miramonte pull out of the deal with you?

25  A.   Well, yes.  They exited the deal in April and we separated

Direct Examination - David Erickson

1    ways.

2    Q.    They did the deal with someone else you mean?

3    A.    We discontinued pursuing a deal together in April, as I

4    recall.

5    Q.    Your testimony is that was a mutual decision?

6    A.    It was Chris' request, but in the end it was a mutual

7    decision.

8    Q.    So he pulled out of the deal, right?

9    A.    Yes.

10   Q.    Okay.

11         Last of the three, Surrey Homes.  That is a builder based

12   in Orlando area, right?

13   A.    It is.

14   Q.    That's another one on the list, in your December 30 email

15   when you say you still need a clear waive off from ASH?

16   A.    Again, Tony had agreed he was going to try to get a written

17   confirmation of that for me.  He had already given me a verbal

18   confirmation that he did not have any restrictions on

19   representing those people.

20   Q.    During your time with ASH, you were involved in discussions

21   about ASH acquiring Surrey, right?

22   A.    While I was with ASH, yes.

23   Q.    You went to visit Surrey with Greg Benson just a few months

24   after the Grayhawk acquisition, right?

25   A.    It was in the spring.  Yeah.

Direct Examination - David Erickson

1   Q.    That was your first contact with Surrey, wasn't it?

2   A.    It was.

3   Q.    Okay.

4         MR. KRAMER:  PX 726, please.

5   BY MR. KRAMER:

6   Q.    Okay.  Mr. Erickson, do you recognize this as an email from

7   you to Christian Swann of Surrey Homes on December 23rd, 2020,

8   at 11:32 AM?

9   A.    That's correct.

10  Q.    And is the same NDA that you sent to Prominence and

11  Miramonte attached?

12  A.    That's correct.

13  Q.    This is the same day that you sent those NDAs to Prominence

14  and Miramonte?

15  A.    Correct.

16  Q.    In fact, you sent all three of those emails in about a

17  two-hour window, didn't you, in the morning on December 23rd?

18  A.    That's approximately correct.

19  Q.    In this email you write:  Christian, as the winds of change

20  have occurred I find myself a free agent to pursue building and

21  development opportunities.  Please find attached the new NDA for

22  myself and Surrey Homes.

23        Are those your words?

24  A.    It is.

25  Q.    And then you go on to write:  I am putting together a

Direct Examination - David Erickson

1  company to assemble homebuilders and would like to relook at

2  Surrey as one of our first targets.

3      Did I read that correctly?

4  A.  It is.

5  Q.  Was that a true statement as of December 23rd, 2020?

6  A.  Depending how you interpret it.  But, yes, I wrote it.

7  It's true.

8  Q.  Do you interpret it different from how you wrote it?

9  A.  I think you're going to make a different representation of

10 what assemble is, but continue.

11 Q.  Is there an NDA attached?

12 A.  There is.

13 Q.  Does it refer to ASH three times?

14 A.  It is the same format you have reviewed in the past.  Yes.

15 Q.  Does it refer to the state of Virginia in the choice of law

16 section?

17 A.  It does.

18 Q.  So that's three NDAs.  And they all refer to ASH, right?

19 A.  They both have -- all -- all three of those have it in

20 there.  That's correct?

21 Q.  Isn't it true that you used a form that you obtained from

22 ASH to create the NDAs that you sent to these three companies?

23 A.  As I have testified in the past, I cannot confirm the

24 origin.

25 Q.  Was anyone else working with you between December 20 and

1    December 23rd to prepare these documents?

2    A.    They were two other people in my office, along with others

3    who have been there in the past.

4    Q.    Who were the two other people in your office at that time?

5    A.    Principally Chuck McClure and Amy Allen.

6    Q.    Did one of those people copy an NDA from ASH and give it to

7    you?

8    A.    I cannot confirm that.

9    Q.    Okay.

10         MR. KRAMER:  Can we see PX 319?

11   BY MR. KRAMER:

12   Q.    This is an email from you to Dave Grounds and others at

13   Dorn Homes dated December 19, 2019.

14         Do you see that?

15   A.    I do.

16   Q.    And attached to the email is a document with the title:

17   NDA confidentiality agreement ASH specific.

18         Do you see that?

19   A.    I do.

20         MR. KRAMER:  Can we see 391A?

21   BY MR. KRAMER:

22   Q.    Is this a version of the NDA we have been reviewing?

23   A.    It looks similar.

24   Q.    Okay.

25         MR. KRAMER:  Plaintiffs offer PX 391 and 3911A?

 1            MR. QUACKENBOSS:  No objection.

 2            THE COURT:  Admitted.

 3       (PLAINTIFFS EXHIBIT PX391 AND 391A:  Received in evidence.)

 4  BY MR. KRAMER:

 5  Q.   Okay.  So let's go back to the email.

 6       This similar NDA, you sent this personally to Dave Grounds,

 7  Ellen Carpenter, Chuck Riekena and Greg Benson the day before

 8  you resigned as interim CEO of ASH, didn't you?

 9  A.   No.

10  Q.   Oh, sorry.  I got my year wrong.  You sent this to them on

11  December 19, 2019, a year and a day before you resigned from

12  ASH, right?

13  A.   That would be accurate.

14  Q.   Okay.

15  A.   Can you leave this up for just a moment?

16  Q.   Sure.

17       (Pause in proceedings.)

18            THE WITNESS:  Thank you.

19  BY MR. KRAMER:

20  Q.   Let's switch topics now and we can talk about something

21  else.

22       You are familiar with Mr. Darnold, right?  You heard his

23  testimony this morning?

24  A.   Lee Darnold?

25  Q.   Yes.

Direct Examination - David Erickson

1    A.    Yes.

2    Q.    You became aware of him for the first time during your

3    tenure as the interim CEO of ASH, right?

4    A.    Correct.

5            MR. KRAMER:   Could we have PX 715.

6    BY MR. KRAMER:

7    Q.    Is this an email from Steve Pehrkon to Sean Coleman,

8    Marshall Coleman, you, and Thomas Carpitella dated December 8,

9    2020?

10   A.    It is.

11           MR. KRAMER:   Plaintiffs offer PX 715.

12           MR. QUACKENBOSS:   No objection.

13           THE COURT:   Admitted.

14       (PLAINTIFFS EXHIBIT PX715:   Received in evidence.)

15   BY MR. KRAMER:

16   Q.    Let's go to the first email at the bottom of the page.

17       All right.   Do you see an email from Mr. Carpitella to

18   Steve Pehrkon?

19   A.    I see that.

20   Q.    Was Mr. Carpitella a recruiter who was working with ASH?

21   A.    I was not aware of that.

22   Q.    Okay.

23       He writes here:  Steve, I tried you a few times these last

24   few weeks.   I know you are slammed.   I wanted to pass this

25   candidate over to you who is relo back to Reston for the right

Direct Examination - David Erickson

1   group.

2       Do you see that?

3   A.   I do.

4   Q.   Do you understand relo to meet relocation?

5   A.   Common terminology.

6   Q.   Then he writes, in bold:  Please 100 percent confidential

7   as I know this candidate is not actively looking to make a

8   change, but he and I have a great relationship and he would

9   100 percent be highly interested in ASH's biz model.  Check him

10  out.  By far one of the best executives I've ever worked with in

11  the industry.  Could be a phenomenal addition to the corporate

12  team.

13      Did I read that correctly?

14  A.   That's what it says.

15  Q.   This email was forwarded to you on December 8, right?

16  A.   At the chain of the top, that's correct.

17  Q.   This email is referring to Lee Darnold, isn't it?

18  A.   I need to see the chain at the top, please.

19          MR. KRAMER:  Sure.  Take down the call out.  Look at

20  the top.

21          THE WITNESS:  Lee Darnold is not in the subject.

22          He is not in the lead paragraph.

23  BY MR. KRAMER:

24  Q.   Okay.  Let's read the first sentence:  I had a chance to

25  speak with Lee this afternoon and think you guys should do the

1    same.

2        Do you know if that's Lee Darnold?

3    A.   This would be the first email I was even aware of him.

4    "Lee".  That's all I see.

5    Q.   Okay.  Well, Lee Darnold, as you now know, worked as NVR,

6    Toll and Pulte, and was the regional president for View Homes as

7    of the beginning of the December 2020, right?

8    A.   That's what it says.

9    Q.   Do you remember reading the part of the email where it

10   says, This is 100 percent confidential?

11   A.   I do not.

12   Q.   Okay.

13       So, you were the interim CEO of ASH when Mr. Pehrkon sent

14   you this information, right?

15   A.   That's correct.

16   Q.   Prior to receiving this you had never met or even heard of

17   Mr. Darnold, right?

18   A.   That's correct.

19   Q.   He was interviewing for a chief operating officer job with

20   ASH, wasn't he?

21   A.   There is a disconnect here.  May I see that whole page

22   again, please?

23            MR. KRAMER:  You may.

24            THE WITNESS:  That's all I need.

25            Go ahead.  Your question again please.

1    BY MR. KRAMER:

2    Q.    Mr. Darnold was interviewing for a COO, or chief operating

3    officer job with ASH, right?

4    A.    I eventually talked with him in that general range.

5          I am not clear it has anything to do with this email.

6    Q.    All right.  When you talked to him you offered him a job in

7    sales leadership or as director of purchasing instead of COO,

8    right?

9    A.    So this would be several days in the future.

10   Q.    Uh-huh.

11   A.    Other than that, your statement would be accurate.

12   Q.    Okay.

13         That's a step down from jobs that Mr. Darnold had held at

14   the time, right?

15   A.    At the time I spoke with him, he was in Texas.  And he was

16   the president -- the division president for -- I remember it

17   being just the San Antonio operation.

18         MR. KRAMER:  Can we take a look at EV49, please.  Page

19   and line 236-20 through 237-10.

20         (Excerpt of video deposition for the jury.)

21         MR. KRAMER:  We can take that down.

22   BY MR. KRAMER:

23   Q.    In December 2020, when you spoke to Mr. Darnold and offered

24   him a step down, you were trying to be appointed as the

25   permanent CEO of ASH, right?

Direct Examination - David Erickson

1    A.    December -- that would be -- yeah.  It was under

2    discussion.

3    Q.    Okay.  And then you sent your letter of resignation about

4    12 days later on December 20, 2020, right?

5    A.    Accurate.

6    Q.    Then two days later, after you resigned, you called

7    Mr. Darnold to discuss potentially coming to work for you,

8    right?

9    A.    I contacted him primarily to discuss the South Texas

10   market.

11   Q.    All right.

12        So that first voice-mail you left, that we heard this

13   morning on December 22, 2020, is it your testimony that it was

14   not your intent to recruit him when you left that voice-mail?

15   A.    That's correct.

16   Q.    Is it also your testimony that as of December 2020, you had

17   not already -- excuse me.  December 22nd.  Is it also your

18   testimony that you not already decided to form a new business

19   venture when you left that voice-mail?

20   A.    The wording of your sentence is not consistent with what I

21   am intending to do.  So I cannot confirm that.

22          MR. KRAMER:  Let's play clip EV51.  Page and line

23   242-21 through 243-1.

24          (Interruption)

25

1    BY MR. KRAMER:

2    Q.    The question was:

3          Had you already decided to form a new venture?

4          Answer:  No.

5          Is that the question you were asked and the answer you gave

6    at your deposition?

7    A.    What date are we talking about?

8    Q.    December 22nd, 2020.

9    A.    The question is, have I decided to form a new venture?

10   Q.    Yes.

11   A.    I know I was looking at possibilities.  I don't remember

12   what date I specifically decided to actually execute a new

13   venture.

14          MR. KRAMER:  Let's pull up the transcript, page 242 of

15   Mr. Erickson's individual deposition.

16          I am going to start with -- you can see at lines 11

17   through 14 there is a reference to the December 22nd, 2020

18   voice-mail.  Start at line 17.

19          Question:  When you left that voice-mail were you

20   attempting to recruit Mr. Darnold to work with you?

21          Answer:  That was not my intent.

22          Question:  Had you already decided to form a new

23   venture.

24          Answer:  No.

25          Is that -- are those questions you were asked and the

Direct Examination - David Erickson

1  answer you gave at your deposition?

2  A.   It's from the deposition.  I will assume it's from the

3  pages of your deposition -- of the deposition.

4  Q.   Okay.

5       On December 23rd, you sent Mr. Darnold a draft business

6  plan for NewCo, right?

7  A.   I did.  He had requested it and I sent him a copy.

8          MR. KRAMER:  Let's have PX 801 up, please.

9  BY MR. KRAMER:

10  Q.   Do you see there is an email from you to Mr. Darnold on

11  December 23rd, 2020 at 2:54 PM?

12  A.   I do.

13  Q.   Subject line:  NewCo business plan?

14  A.   That's what it says.

15  Q.   Let's scroll down -- before we do that and make sure

16  Mr. Erickson gets a chance to look at the next page.

17       Is the business plan attached?

18  A.   Continue.

19          MR. KRAMER:  Plaintiffs offer PX 801.

20          THE COURT:  Any objection?

21          MR. QUACKENBOSS:  No, sir.

22          THE COURT:  Admitted.

23       (PLAINTIFFS EXHIBIT PX801:  Received in evidence.)

24  BY MR. KRAMER:

25  Q.   If we turn back to the attachment.  Here is the email,

Direct Examination - David Erickson

1    December 23rd, 2020, you sent it to Lee and say:  Call me if you

2    have feedback.

3         Right?

4    A.   I do.

5    Q.   Let's take a look at the business plan.

6         Is this a draft you prepared?

7    A.   Yes.  It's my original work.

8    Q.   What did you mean to convey when you wrote "draft" at the

9    top?

10   A.   I had been in conversation with several people, and kind of

11   kicking around ideas of what I thought might be worth pursuing

12   as my new direction and they had said, Dave, put it in writing.

13   Make it something tangible so that they could provide better

14   feedback and suggestions.

15   Q.   Who suggested that to you?

16   A.   I had talked to two of my friends who are bankers, and at

17   least two people in the homebuilding industry in various

18   capacities.

19   Q.   Your testimony is -- I think you already said this is your

20   original work -- is it your testimony that you didn't copy any

21   of this from a Private Placement Memorandum that ASH distributed

22   for Dorn Homes?

23   A.   The question is I didn't copy.  That's correct.

24   Q.   Okay.

25        Do you take issue with the wording of the question?

Direct Examination - David Erickson

```
 1   A.   I wanted to make sure I remembered exactly what the
 2   beginning of the sentence was.  This is my original work.
 3   Q.   Doesn't it have some similarities to language in the Dorn
 4   PPM?
 5   A.   I would have to look at the Dorn PPM to confirm that.
 6   Q.   Bottom line, though, your testimony is you didn't copy any
 7   language from the PPM, or any other ASH document, to create this
 8   business plan, right?
 9   A.   I did not.
10   Q.   Your testimony is -- I think you said at your deposition
11   you wrote this whole document free form out of the top of your
12   head.
13        Do I have that right?
14   A.   I remember saying that.  And I was about to say the same
15   answer.  I wrote it free form sitting at my desk.  It took me
16   about two hours to knock it out.
17   Q.   Did you -- the Dorn PPM was distributed in the middle of
18   December 2020, right?
19   A.   Probably more like early December.
20   Q.   Do you have a copy on your desk?
21   A.   No.
22   Q.   You certainly received a copy though when you were the CEO
23   at ASH, right?
24   A.   I did.  I held it for a five minutes, reviewed, and said,
25   Send it.
```

Direct Examination - David Erickson

1    Q.    You didn't write any of the language in the dorm PPM?

2    A.    I had no signature participation at all.

3    Q.    Okay.

4            MR. KRAMER:  Let's go to PX 261.

5    BY MR. KRAMER:

6    Q.    Is this the Dorn PPM?

7    A.    You asked me a question?

8    Q.    Yes.  I'm sorry.

9            Is PX261 the Dorn PPM that was prepared while you were the

10   CEO of ASH?

11   A.    It appears to be the coversheet.  Yes.

12           MR. KRAMER:  Plaintiffs offer PX 261.

13           MR. QUACKENBOSS:  No objection.

14           THE COURT:  Admitted.

15       (PLAINTIFFS EXHIBIT PX261:  Received in evidence.)

16   BY MR. KRAMER:

17   Q.    It's dated December 2, 2020.  Right?

18   A.    It is.

19   Q.    And you were the CEO of ASH at the time?  The interim CEO?

20   A.    I was.

21   Q.    Okay.

22           MR. KRAMER:  Let's take a look at this side by side

23   with the business plan.  Like page 2 of the business plan, which

24   is PX 801, and page 5 of the PPM which is PX 261.

25

Direct Examination - David Erickson

1    BY MR. KRAMER:

2    Q.   The business plan, bottom half of page 2, you see a series

3    of bullets?

4    A.   I do.

5         MR. KRAMER:   And above the bullets if we can have the

6    intro as well please, Teri.

7    BY MR. KRAMER:

8    Q.   The introduction here says, in your business plan:   NewCo

9    Homes intends to take advantage of these market factors with a

10   strategic plan that includes, and then there is a series of

11   bullets.

12        Right?

13   A.   That's correct.

14   Q.   Okay.

15        MR. KRAMER:   And let's put that side-by-side with page

16   6 of the PPM, which is on the right.   We are on page 5 so we

17   need to go to page 6.   And let's put them side-by-side.

18   BY MR. KRAMER:

19   Q.   Do you see the section of the PPM there is a list of

20   bullets and on top it says:   To take advantage of these market

21   factors the key elements of the company's strategic plan

22   include.

23        Do you see that?

24   A.   That's correct.

25   Q.   Wouldn't you agree that's very similar to what appears in

Direct Examination - David Erickson

1   your business plan?

2   A.   Yes.  Except for the fact it's probably very similar to

3   every business plan that would focus on any business.  The

4   format of an elemental business plan is a pretty fundamental.

5   Q.   They use the same words over top of a list of bullets in

6   every business plan?

7   A.   You are talking talk about what market.  What resources

8   does it take?  How you are going to fund it?  And what your

9   plans are down the road.  That's the essence of any

10  freshman-level business class.

11  Q.   Okay.

12       The first bullet in your business plan says:  Focus on

13  markets that are growth oriented with consistent job growth and

14  demographics favorable to continued new home construction.

15       Right?

16  A.   That's what it says.  Yes.

17  Q.   Let's compare that to the first bullet in the PPM.

18       It says:  Focus on the Southern US area that is business

19  friendly, characterized by strong job growth, and as a result

20  has a dynamic and growing housing market.

21       Would you agree these are similar?

22  A.   In very broad context, yes.

23  Q.   Okay.

24           MR. KRAMER:  Let's look at the third bullet on both

25  sides.

1    BY MR. KRAMER:

2    Q.    Both bullets begin with the words "implement post

3    acquisition".  Right?

4    A.    They do.

5    Q.    Is that a coincidence?

6    A.    Apparently.

7    Q.    Okay.

8         The version of your business plan says:  Implement post

9    acquisition changes and improvement only as necessary to

10   properly oversee each local building operation.

11        And then the ASH version says:  Implement post acquisition

12   operational improvements or best practices to increase the

13   profitablity and overall value of the acquired company.

14   A.    Seems to me like they are going different directions.

15   Q.    It does, but the first few words are exactly the same,

16   aren't they?

17   A.    Okay.  You get three words.

18            MR. KRAMER:  So let's look at the final bullet in your

19   business plan.  Compare it to the final bullet in ASH's

20   confidential PPM.

21   BY MR. KRAMER:

22   Q.    You write:  Capitalize -- they both begin with capitalize,

23   right?  Last bullet?  Same first word?

24   A.    Okay.

25   Q.    Do you agree?

1   A.   That's what they say.  I agree.

2   Q.   You write:  Capitalize on the significant value delta

3   between private small scale builders and large builders.

4        And then in parenthesis:  Small single market builders

5   routinely trade at significant discounts from large multi-market

6   and publicly traded builder.

7        Did I read that correctly, from your business plan?

8   A.   You do.

9   Q.   Then the ASH side says: Capitalize on significant arbitrage

10  between small and large builders that exist in the industry.

11       And then in parenthesis:  Because small single market

12  builders trade at material discounts to larger, multi-market and

13  public homebuilders.

14       Did I read that correctly?

15  A.   You do.

16  Q.   Very similar aren't they?

17  A.   It is.  It just occurred to me Marshall Coleman said those

18  words to me at least six times in my conversations with me

19  during 2020.

20  Q.   Marshall Coleman?  You just remembered that sitting here

21  today?

22  A.    I did.  Just as you were speaking, now I remember

23  Marshall -- Marshall loved to talk about this stuff.  This was

24  elemental to his thinking about the world.  So it was in

25  conversations he and I were having all the time about markets.

Direct Examination - David Erickson

1    He was an IPO -- he really liked IPOs.

2    Q.    Marshall Coleman wasn't involved in writing the PPM for the

3    Dorn transaction, was he?

4    A.    I have no knowledge of that.

5    Q.    Didn't you already testify he was in the hospital getting

6    hip surgery?

7    A.    In November, December.  Yes, I said that.

8    Q.    Okay.

9    A.    My point of which is, if it comes up in conversation it

10   doesn't mean I copied it from anything else.  And as I said, I

11   will restate, I sat at my desk and I wrote this freeform.

12   Q.    Okay.

13         So your testimony is this is a coincidence.

14         Do I have it right?

15   A.    Apparently.

16   Q.    Okay.

17             MR. KRAMER:  We can take that down.

18   BY MR. KRAMER:

19   Q.    Now, ASH was in the business of acquiring and operating and

20   integrating homebuilders, right?

21   A.    That's broadly what their business statement was.

22   Q.    Before you joined ASH as a consultant, as a Board member,

23   and later as CEO, you had acquired only one other homebuilding

24   company, right?

25   A.    I had acquired a company that was in Iowa.  I had made

 1   inquiries to purchase several others, as I stated previously.

 2   Q.   And you incorporated Grand Oak Builders, your new company,

 3   in early 2021?

 4   A.   That's correct.

 5   Q.   Grand Oak Builders is in the business of acquiring

 6   homebuilders, right?

 7   A.   Grand Oak Builders is a holding company that I am using for

 8   my investment in companies in the homebuilding industry.

 9   Q.   Okay.  Do you have any outside investors?

10   A.   I do not.

11           MR. KRAMER:  Could we have PX 801 back up?  This is

12   your business plan.  I would like to look at page 4.

13           Can we highlight the part that says, Key staff members

14   with a list underneath.  There we go.

15   BY MR. KRAMER:

16   Q.   Okay.  So this is your business plan, right?  And you

17   wrote:  Key staff members are being identified to help company

18   evaluations and prepare the staff, NewCo executive positions.

19           Do I have that right?

20   A.   That's what it says.

21   Q.   You identify yourself as chief executive and acquisition

22   coordinator, right?

23   A.   Yes, sir.

24   Q.   And then, B is chief operating officer, right?

25   A.   That's what it says.

Direct Examination - David Erickson

1   Q.   So when you sent this to Lee Darnold, is it your testimony

2   that you were not contacting him about the possibility of

3   serving as the COO of your new venture?

4   A.   That was not my intent.  I was calling about the South

5   Texas market.

6   Q.   Is that because you were trying to acquire Prominence Homes

7   already?

8   A.   I was inquiring about Prominence Homes.

9   Q.   On December 23rd -- 22nd?

10  A.   Yeah.  I think you already had it on the 22nd.

11  Q.   You state you continued to call Mr. Darnold after you sent

12  him your business plan, right?

13  A.   We talked more than once.  That's for sure.

14  Q.   And your testimony is you were just trying to develop

15  information that he was volunteering, right?

16  A.   That was the principle purpose of all of those

17  conversations.

18  Q.   Was there another purpose?

19  A.   I was trying to develop information in South Texas, along

20  with several others.  I have another friend in San Antonio.  I

21  spoke to him as well.  And I was also speaking to the bankers in

22  the Austin market in particular.

23  Q.   And we listened to all of those voice-mails this morning,

24  and we listened to Mr. Darnold's testify.  Is it still your

25  testimony that you weren't trying to get him to come work for

Direct Examination - David Erickson

1    you?

2    A.    I had inquired about what this current status was in the

3    form of conversation.  Beyond that I was not recruiting him to

4    be an employee.

5    Q.    You called him quite a few times, didn't you?

6    A.    I sent him several text messages.  I think we only talked

7    maybe three times.

8    Q.    You left him a number of voice-mails.  We heard them this

9    morning, right?

10   A.    Yeah.  I was trying to continue the conversation because,

11   again, I was trying to perfect my understanding of the

12   South Texas market.  And he had previously said, I think more

13   than once, you know, Call me any time.

14   Q.    All right.

15        We listened to that voice-mail this morning dated

16   January 2, 2021, in which you said you wanted to, Be more

17   aggressive about you and I getting together.

18        Do you remember that?

19   A.    Correct.

20   Q.    Okay.  You weren't talking to him about working together.

21   You said that?  That wasn't your purpose?

22   A.    With that specific conversation, I was already headed to

23   that market area and I wanted to get together with him and sit

24   down and kick around what the market subtilties were.

25   Q.    Oh.  So you meant get together to have a conversation?

Direct Examination - David Erickson

1    A.    That was the intent.

2    Q.    Is it your testimony that he was lying this morning?

3    A.    I heard some things I did not agree with.

4    Q.    So he told you near the end of January that he had accepted

5    a job with ASH, right?

6    A.    He did.  By phone.

7    Q.    And you claim that you didn't even know he was looking for

8    a job, right, and you were surprised by that?

9    A.    Well, I knew from December that he was looking to leave

10   View Homes.

11              MR. KRAMER:  Let's play EV61, please.  Page and line

12   255-16 through 256-10.

13              (Excerpt of video deposition played for the jury.)

14   BY MR. KRAMER:

15   Q.    You did interview Mr. Darnold for a job when you were with

16   ASH, right?

17   A.    I had a phone conversation where I flushed out that he

18   was -- he had conditions that precluded his consideration for

19   COO.

20   Q.    What type of conditions did he have that precluded his --

21   what were the conditions you just referred to?

22   A.    I was looking for a COO with the potential for my becoming

23   the CEO.  And he specifically said he was not willing to leave

24   Texas, which was fundamental to taking the job that I was

25   looking for a COO for.

 1  Q.   Bottom line though, your testimony here is that you never

 2  tried to recruit Mr. Darnold to come work for you following your

 3  departure from ASH.

 4       Is that right?

 5  A.   I did not.

 6  Q.   Let's change topics.

 7       When you sold Grayhawk Homes to ASH the process began with

 8  a Letter of Intent, right?

 9  A.   There were several conversations before a Letter of Intent.

10  Q.   Fair.  But there was a Letter of Intent by the end of May

11  in 2019, right?

12  A.   Somewhere in that time period.  Yes.

13            MR. KRAMER:  Let's have PX 91.

14  BY MR. KRAMER:

15  Q.   Do you recognize this as an email from Steve Pehrkon to you

16  dated June 2, 2019?

17  A.   I do.

18            MR. KRAMER:  Can we take a look at 91A?

19  BY MR. KRAMER:

20  Q.   This is the Letter of Intent attached to the email?

21  A.   Looks as I recall.  Yes.

22            MR. KRAMER:  Plaintiffs offer PX 91 and 91A.

23            THE COURT:  Any objection?

24            MR. QUACKENBOSS:  No objection.

25            THE COURT:  Admitted.

1         (PLAINTIFFS EXHIBIT PX91 AND 91A:  Received in evidence.)

2    BY MR. KRAMER:

3    Q.   So isn't it true that the intent, at this point, was for

4    you to provide a land pipeline to ASH following an acquisition?

5    A.   Conceptually that was always on the table, yes.

6    Q.   That was the intent, wasn't it?  I'm not sure what you mean

7    by "conceptually that was always on the table."

8    A.   A Letter of Intent is a format.  It outlines the broad

9    structure of how the deal is intended to go.  They often go

10   different directions.  At this point in time, yes.  ASH -- the

11   Grayhawk transaction was too big for ASH to handle an outright

12   transaction.  They were looking to do a purchase and future

13   delivery of lots.  You can characterize that however you want.

14   Q.   Well, the Letter of Intent refers to a land pipeline,

15   right?

16   A.   Yes.

17   Q.   And it also, if we look at paragraph 1 at the top of page

18   7, it refers to the fact that the goal is for ASH-Grayhawk, or

19   NewCo, as it were, to stay land light and take down only enough

20   lots to cover starts in the next two quarters.

21        Right?

22   A.   Yes.

23   Q.   Okay.

24        MR. KRAMER:  Let's put up 246E.

25        THE WITNESS:  I would like to note, for the record,

1    obviously they didn't follow that plan.

2              MR. KRAMER:  Noted.

3    BY MR. KRAMER:

4    Q.   PX 246E.  This is the Land Purchase Agreement, right?

5    A.   It is.

6    Q.   You signed this when you were -- on the closing date

7    November 15, 2019, right?

8    A.   Correct.

9    Q.   And you signed it individually and on behalf of all the

10   sellers, right?

11   A.   I did.

12   Q.   And those sellers are all companies that you either own or

13   control, right?

14   A.   Or have management responsibilities for.

15   Q.   Okay.

16        And that includes Tiger Creek Development.  Right?

17   A.   Correct.

18   Q.   Cusseta Road, LLC?

19   A.   Cusseta Road.

20   Q.   Grey Rock Development, LLC?

21        Windsong Bonacre LLC?

22   A.   Correct.

23   Q.   Erickson Investment Inc.

24   A.   Correct.

25   Q.   And Sage Development, Inc.

Direct Examination - David Erickson

1          Right?

2   A.    Correct.

3   Q.    You used those companies to purchase and develop

4   residential land, right?

5   A.    Some of it has some other things, but primarily they are

6   intended for residential land development.

7   Q.    You are familiar with the difference between Phase A,

8   Phase B, and Phase C lots at least as stated in this agreement,

9   right?

10  A.    I am.

11  Q.    These were all types of lots that -- well, phase A lots

12  were already fully developed and finished at the time of the

13  deal.  Right?

14  A.    They were.

15  Q.    Phase B lots were being developed and would be finished

16  within 12 months of the acquisition, right?

17  A.    That's not correct.

18          MR. KRAMER:  Let's take a look at the third whereas

19  paragraph.

20  BY MR. KRAMER:

21  Q.    You see the definition of Phase B lots starting about the

22  middle of the paragraph, on item B:  Lots that are being

23  developed and will be considered to be finished lots within

24  12 months after the date of this agreement, and that have an

25  established purchase price agreed to by seller and that are

Direct Examination - David Erickson

1   listed on Exhibit B attached to this agreement.

2       What's your quarrel with 12 months?  Is it that they were

3   not finished within 12 months?

4   A.   The statement is relatively accurate.  The reality is on

5   the B list probably 90 percent of those were already fully

6   developed finished lots with a fixed price.  There was only one

7   segment of the B list that had unfinished lots but they had a

8   defined price and so they went into the B category.

9       I remembered it slightly differently, but I won't quarrel,

10  obviously, with the written text.  My recall and what's here are

11  not in conflict.

12          MR. KRAMER:  Let's go to page 16.

13  BY MR. KRAMER:

14  Q.   This is the Takedown Schedule, correct?

15  A.   It is.

16          MR. KRAMER:  Can we have the first chart.

17  BY MR. KRAMER:

18  Q.   Phase C lots, just for completion, those were not developed

19  at all at the time of closing, right?  They were future lots to

20  be developed.

21  A.   They were future delivery based on a formula.  That's

22  correct.

23  Q.   By when were the first 15 Phase C lots due under the

24  Takedown Schedule?

25  A.   They were intended for September of 2021.

Direct Examination - David Erickson

1    Q.    Okay.

2         Is that the quarter ending at the end of September 2021 as

3    far as you know?

4    A.    Each of these would be for the quarter ending?

5    Q.    Okay.  Isn't it true that the Phase C lots entered what you

6    referred to as a dormant status in 2021?

7    A.    Correct.

8    Q.    That means you stopped developing them at that point,

9    correct?

10   A.    I stopped completion of them.  If they were partially

11   developed, and were in a vulnerable situation, I took them to a

12   stabilized state before I finished them.

13        It's dangerous to have semi-finished subdivisions and leave

14   it that way for very long.  You end up causing more damage than

15   you do by stopping.

16   Q.    At that point you had 27 Phase C lots finished, right?

17   A.    That sounds accurate.

18   Q.    Okay.

19        And you sold all of those to ASH-Grayhawk after the Court

20   you to do so, correct?

21   A.    That's correct.

22   Q.    Those were the last Phase C lots that you sold to ASH,

23   right?

24   A.    That would be correct.

25   Q.    Just back to the Takedown Schedule here.  By the end of

Direct Examination - David Erickson

1    December 2021, you did sell 15 Phase C to ASH, right?

2    A.    I thought we had four in that quarter.

3    Q.    There were four ahead and then 11 sold that quarter, right?

4    A.    That sounds right.

5    Q.    And by that time you were no longer selling lots ahead of

6    schedule to ASH, right?

7    A.    Correct.

8    Q.    By the end of 2021 in the last quarter you refused to sell

9    any Phase C to lots to ASH, right?

10   A.    That's correct.

11   Q.    And there are no more finished Phase C lots as of today,

12   are there?

13   A.    There are not principally because ASH has blocked me from

14   being able to do so.

15   Q.    Did ASH block you in 2021?

16   A.    They had already filed a lis pendens, so effectively they

17   had.

18   Q.    Did you make any effort to develop -- to take the lots out

19   of dormant status in 2021?

20   A.    I was continuing to push them along it a stable status.

21   Separately, to your question, I was continuously working to find

22   common ground with ASH to resolve the issues and continue with a

23   Land Purchase Agreement.

24   Q.    Isn't it true that it wasn't until about two or three weeks

25   ago that you asked ASH to release the lis pendens so you could

Direct Examination - David Erickson

 1  finish and deliver some Phase C lots right before trial?

 2  A.   That would be an accurate statement because I was trying to

 3  complete a group of lots for the third quarter of 2023 delivery

 4  requirement.

 5  Q.   Okay.  But by that point it had been years since you had

 6  delivered Phase C lots on time, right?

 7  A.   That would be accurate.

 8  Q.   Isn't it true that the Phase C lots in Charleston Place,

 9  North Ivy Park, Auburn Farms, and Southern Oaks could have been

10  completed in just three months?

11  A.   With the permission of the local government jurisdictions

12  that would be an accurate statement.  That was not a guaranteed

13  timeline.

14  Q.   Got it.  But it was a rough timeline, wasn't it?

15  A.   Given cooperation from the local governments, that was

16  possible.

17  Q.   Okay.

18       Do you agree it's generally bad for a homebuilder if

19  production slows or stops entirely, right?

20  A.   Well, homebuilders are in the business of building homes.

21  So if they stop it's probably not good for them.  I agree.

22  Q.   They can lose critical trades to other builders if that

23  happens, right?

24  A.   Well, now we are getting into business practices which I

25  would hate to characterize that broadly.

Direct Examination - David Erickson

1    Q.   Isn't it true that in your experience there is no guarantee

2    that once a builder loses their critical labor trades they will

3    get them back?

4    A.   That's always a potential problem in the homebuilding

5    industry.

6    Q.   It's important not to lose the trades, right?

7    A.   It doesn't mean you can't get them back.

8    Q.   Okay.  Could we have -- just one moment please.

9         We will come back to that.

10        MR. KRAMER:  Your Honor, is this a good time for a

11   midafternoon break?

12        THE COURT:  How much longer do you have with this

13   witness?

14        MR. KRAMER:  I will certainly be done today so I think

15   an hour or so, max.

16        THE COURT:  Okay.

17        Ladies and gentlemen, we will take a 15-minute break

18   at this time.

19        Go to the jury room and take your break.

20        Do not discuss the case during the break.

21     (Jury out at 3:40.)

22        THE COURT:  You can go back to the table if you wish.

23        Mr. Kramer, this is just going incredibly slow.  You

24   spent almost two hours on a claim for which you are seeking

25   nominal damages.

1          As I understand it, your use of confidential

2    information -- are you seeking any actual damages?  This

3    business about he stole a -- he copied an NDA agreement, and

4    copied these terms.  And then you went into all of this about it

5    looked like he was trying to poach a business opportunity, which

6    is not even a claim, as I understand it, under the complaint.

7          I mean, we have just -- you are not claiming -- there

8    is no claim here for usurpation of a business opportunity, is

9    there?

10          MR. KRAMER:  No.

11          THE COURT:  And this business about everything he did

12    with regard to Dorn, and all that, that was establishing the

13    foundation for the breach of confidentiality claim.

14          MR. KRAMER:  Yes, Your Honor.  Plus credibility.

15          THE COURT:  And you are seeking -- you are unable to

16    prove any damages with regard to that?  Any actual damages?

17          MR. KRAMER:  We had actual damages, Your Honor, but we

18    are not seeking them at trial.  That's right.

19          THE COURT:  You are just seeking nominal damages?

20          MR. KRAMER:  That's right.

21          THE COURT:  We need to move this thing along.  It took

22    you all afternoon to get to what I think is the heart of the

23    matter.

24          MR. KRAMER:  Okay.

25          THE COURT:  And I know you are going to play all of

```
 1    these -- how long in total are the video depositions that you

 2    are going to play?

 3              MR. KRAMER:  I am pleased to report that we have

 4    abandoned several of them.  And I think we have somewhere

 5    between an hour and a half to two hours total.

 6              So I plan to rest tomorrow.

 7              THE COURT:  Okay.

 8              How many experts do you have?  Just one?  Or two?

 9              MR. KRAMER:  I think it's just going to be one.

10              THE COURT:  Okay.

11              All right.  I have been patient, but it seems like you

12    spent a lot of time on this claim for nominal damages.  Maybe

13    you did that because you wanted to set the foundation that he is

14    a bad guy as opposed to supporting your claim for nominal

15    damages, but it seemed like it was an inordinate amount of time

16    on those issues.

17              MR. KRAMER:  I will move it along, Your Honor.

18              THE COURT:  All right.  Very good.

19              Does the defendant have any feeling at this time as to

20    whether you are going to want to question Mr. Erickson at the

21    conclusion of Mr. Kramer's?

22              MR. QUACKENBOSS:  No yet, Your Honor.  But as you

23    pointed out we haven't really gotten to the dispute.

24              THE COURT:  Okay.

25              Just so we don't have a break to discuss it my
```

1    position is that as long as you don't exceed the scope of

2    Mr. Kramer's examination, which I can't imagine you would

3    because we have covered everything in the world, then I will let

4    you question him after he finishes.

5              If you want to bring him back in your case then you

6    can do that.  But you can't do both.

7              MR. QUACKENBOSS:  Understood.  Thank you.

8              THE COURT:  If you bring him back in your case that's

9    going to give Mr. Kramer an opportunity to cross-examine with

10   the restriction being that I am just going to try to avoid

11   duplication.  But I am not going to rule that he can't ask him

12   any questions if you call him back in your case.

13             So you are correct, he may get two bites at the apple,

14   or two partial bites at the apple, if that affects our strategy

15   at all.

16             MR. QUACKENBOSS:  But that cross would be limited --

17             THE COURT:  To your direct at that time, yes, sir.

18             And I will try to restrict it to information that is

19   not duplicative that he has not already asked him about.  But

20   based on the length of all this, my recollection is only so

21   good, so I'm assuming that there would probably be some

22   duplication.  The only way to avoid duplication -- and I am not

23   trying to put you in a box -- the only way to truly avoid

24   duplication is for you to question him when Mr. Kramer finishes.

25             I understand there may be reasons you don't want to do

1    that.

2            All right.  We will be in recess now for about 12

3    minutes.

4        (Recess taken 3:45.)

5        (Resumed at 3:59.)

6            THE COURT:  Be seated.  Bring them down.

7            Yes, sir.  Come back to the stand, Mr. Erickson.

8            MR. KRAMER:  This is going to be very quick,

9    Your Honor.

10       (Jury in at 4:00.)

11           THE COURT:  All right.  Mr. Kramer.  You may continue.

12           MR. KRAMER:  Thank you, Your Honor.

13                   CONTINUED DIRECT EXAMINATION

14   BY MR. KRAMER:

15   Q.   Mr. Erickson, isn't it true that in August of 2020 you

16   tried to terminate the Land Purchase Agreement?

17   A.   No.

18   Q.   What's untrue about that statement?

19   A.   2020.

20   Q.   Sorry.  Isn't it true that in August of 2021 you tried to

21   terminated the Land Purchase Agreement?

22   A.   I think that would have been the end of your notice period,

23   so that sounds correct.

24   Q.   End of the 45 days?

25   A.   Yes, sir.

```
 1   Q.    Okay.

 2         And the basis for that was the -- well, let me ask you

 3   this:  After you tried to terminate the LPA, you spoke to

 4   Larry Wood of Roscoe Plumbing about ASH-Grayhawk, right?

 5   A.    Can you give me a time date to confirm that?

 6   Q.    August 18, 2021.

 7   A.    Yeah.  I spoke to him in that time period, yes.

 8   Q.    You told him that you terminated the LPA and wouldn't be

 9   selling any more lots to ASH-Grayhawk, right?

10   A.    I told him the first part of that.  Not absolutely certain

11   about the second part.

12   Q.    Roscoe Plumbing, his company, is a major subcontractor for

13   ASH-Grayhawk, true?

14   A.    He was at the time one of the plumbers.  I know that.

15   Q.    You also spoke to JD Mercer of Air Controllers Heating and

16   Cooling around the same time, right?

17   A.    I did.

18   Q.    That's another subcontractor for ASH-Grayhawk, right?

19   A.    He was doing a substantial part of their heating and air.

20   I don't know how much of it.

21   Q.    You also told him that you wouldn't be selling more lots to

22   ASH-Grayhawk, correct?

23   A.    I told him the Land Purchase Agreement had been canceled.

24   Q.    Okay.

25              MR. KRAMER:  I would like to bring up PX 161.
```

BY MR. KRAMER:

Q.   While we are here, Mr. Erickson, who is Malinda Smallwood?

A.   She was our primary listing realtor in the Dallas, Georgia market.

Q.   That's near Atlanta, Georgia, correct?

A.   It's north of Atlanta a ways.

Q.   What's the name of the company that you operate, or used to operate in the that area?

A.   It was Grayhawk Homes of Atlanta Incorporated, and changed the name to GH Lot Holdings of Atlanta.

Q.   GH stands for Grayhawk, right?

A.   It's a placeholder.

Q.   Okay.

     Do you recall instructing Ms. Smallwood to remove the Grayhawk name wherever it's displayed in February of 2021?

A.   I recall something like that, yes.

Q.   Why did you wait so long to give that instruction?

A.   Well, clearly ASH was desiring it to happen very quickly so I re-enforced it to make sure we got that accomplished.

          MR. KRAMER:  Sorry.  The document I was looking for was?

          THE COURT:  161.

          MR. KRAMER:  PX 161.  There it is.

BY MR. KRAMER:

Q.   Is this an email from you to Ms. Smallwood dated

 1  February 18, 2021?

 2  A.    It is.

 3            MR. KRAMER:  Plaintiffs offer PX 161.

 4            THE COURT:  Any objection?

 5            MR. QUACKENBOSS:  No objection.

 6            THE COURT:  Admitted.

 7        (PLAINTIFFS EXHIBIT PX161:  Received in evidence.)

 8  BY MR. KRAMER:

 9  Q.    Is this an email, now that this is up, you write to

10  Ms. Smallwood, February 18, 2021:  Remove the Grayhawk name

11  where it's displayed.  On contract houses just use your Remax

12  sign and under contract.

13        Do you see that?

14  A.    I do.

15  Q.    Did you give that instruction because prior to this point

16  the signs had displayed the Grayhawk name and logo.

17  A.    No.  I was validating to make sure we followed that pattern

18  as I wrote here.

19  Q.    But the signs being used -- some of the signs being used in

20  Dallas, Georgia had the Grayhawk name and logo on them, didn't

21  they?

22  A.    To my knowledge, basically we weren't using our signs

23  anyhow.  This was simply to validate that we are going to use

24  your realtor signs as our primary selling methods, and no more

25  than that.

1    Q.   This was the first time you gave her that instruction,

2    wasn't it?

3    A.   I can't validate that.

4         MR. KRAMER:   Okay.  I think I may be done, Your Honor,

5    if I could check with my colleague quickly.

6    BY MR. KRAMER:

7    Q.   One last thing.  When we left off, before the break, you

8    were talking about trades.  And I asked you if builders can lose

9    critical trades to other builders if production slows or stops.

10   Do you recall that question?  Your answer was --

11   A.   You have rephrased it but I got your question.

12   Q.   I think your answer was:  Now we are getting into business

13   practices I would hate to characterize broadly.

14        Did I get that about right?

15   A.   Yes.

16        MR. KRAMER:   I am handing the witness a document which

17   hasn't marked as a trial exhibit.  It's PLT346701.

18   BY MR. KRAMER:

19   Q.   Mr. Erickson, do you see this email from you to Mr. Benson

20   dated October 10, 2019?

21   A.   It is.

22   Q.   Okay.

23        Did you write to Mr. Benson that day:  If we slow down, or,

24   worse yet, stop building for a few weeks to let contracts get in

25   front of specs we will lose several of our critical labor trades

```
 1   as they drift off to other builders.  Not sure we will get them
 2   back when we start up again.
 3        Are those your words?
 4   A.   That's my writing.  Correct.
 5             MR. KRAMER:  Okay.
 6             Those are my questions, Your Honor.
 7             THE COURT:  All right.
 8             Mr. Quackenboss, you have the right to either question
 9   Mr. Erickson at this time or in your case-in-chief.
10             What's your choice?
11             MR. QUACKENBOSS:  We will reserve for our
12   case-in-chief where we will tell his entire story.
13             Thank you, Judge.
14             THE COURT:  Sir, you may step down.
15             Call your next witness for the plaintiffs.
16             MR. KRAMER:  Plaintiffs call Kristen Richardson,
17   Your Honor.
18             Mr. Merritt will be handling this witness.
19             THE COURT:  Come to the witness stand, please,
20   straight ahead by this lamp.
21             Stop right there for a moment, raise your right hand,
22   and take this oath.
23        KRISTEN RICHARDSON, PLAINTIFFS WITNESS, DULY SWORN
24             THE COURT:  Once you get situated tell the jury your
25   name and spell it for the court reporter.
```

1          THE WITNESS:  My name is Kristen Richardson.

2    K-r-i-s-t-e-n, R-i-c-h-a-r-d-s-o-n.

3          THE COURT:  Sir, you may proceed.

4                    DIRECT EXAMINATION

5    BY MR. MERRITT:

6    Q.    Good afternoon, Ms. Richardson.

7          Thank you for being here.

8          Let's talk about your background.

9          Where are you originally from?

10   A.    Columbus, Phenix City area.

11   Q.    Do you still live in the area?

12   A.    Yes.

13   Q.    How long have you lived here?

14   A.    32 years -- my whole life.

15   Q.    Do you work in Columbus?

16   A.    Yes.

17   Q.    How long have you worked in Columbus?

18   A.    8 years.

19   Q.    Who is your employer?

20   A.    Evermore Homes.

21   Q.    Was Evermore Homes previously called ASH-Grayhawk?

22   A.    Yes.

23   Q.    And what's your current position at Evermore Homes?

24   A.    Starts coordinator.

25   Q.    What does a starts coordinator do?

Direct Examination – Kristen Richardson

1    A.    I handle all the permitting for our lots.  Keep up with the

2    prereleases and the job releases that go into production.

3    Q.    Okay.

4          And when did you start working at Evermore Homes?

5    A.    2018.

6    Q.    Okay.  Was it called Evermore Homes in 2018?

7    A.    No.

8    Q.    What was it called then?

9    A.    Grayhawk Homes, Inc.

10   Q.    Was that February 2018.

11   A.    Yes.

12   Q.    Let's start there.  What was your position in Grayhawk

13   Homes, Inc. in February 2018?

14   A.    It was account manager support.

15   Q.    What did you do as account manager support?

16   A.    I did the AP for the Grayhawk Homes of Iowa, South

17   Carolina, and Atlanta companies .

18   Q.    You say AP?

19   A.    Yes.

20   Q.    What does AP mean?

21   A.    Accounts payable.

22   Q.    Okay.

23         And supporting Atlanta, South Carolina and Iowa?

24   A.    Yes.

25   Q.    And were you working out of Columbus, Georgia at that time?

Direct Examination - Kristen Richardson

1   A.   Yes.

2   Q.   Who was your boss at Grayhawk Homes, Inc.?

3   A.   Amy Allen.

4   Q.   Did you change jobs at some point?

5   A.   Yes.

6   Q.   What was your next job at Grayhawk Homes, Inc.?

7   A.   The next one was warranty coordinator.

8   Q.   When did you start that job?

9   A.   March of 2019.

10  Q.   How long were you in that role?

11  A.   Until June of '21.

12  Q.   What's the job of a warranty coordinator?

13  A.   They receive all the phone call, emails for any warranty

14  requests.  And then at that point the coordinator would disburse

15  them out to the warranty manager and then log those activities.

16  That way they could keep up with the role -- what was going on

17  with each warranty request.

18  Q.   Those would be warranty requests from homebuyers about

19  their homes?

20  A.   Yes.

21  Q.   Would homebuyers contact you directly?

22  A.   Yes.

23  Q.   Would they contact you by phone or by email?

24  A.   Both.

25  Q.   Let's start with email.  What was the email address

Direct Examination – Kristen Richardson

1   attached to the warranty account?

2   A.   Warranty@grayhawkhomes.com.

3   Q.   While you were the production warranty coordinator, did you

4   have responsibility for monitoring and responding to emails that

5   came in through warranty@grayhawkhomes.com?

6   A.   Yes.

7   Q.   After November 15, 2019, did any homebuyers ever call or

8   email you about houses built in Atlanta?

9   A.   Yes.

10  Q.   After November 15, 2019, did any homebuyers ever call or

11  email you about houses built in South Carolina?

12  A.   Yes.

13  Q.   Were you able to assist the homebuyers in Atlanta or South

14  Carolina?

15  A.   No.

16  Q.   Why is that?

17  A.   Because those companies were owned by David Erickson.

18  Q.   And what companies are you referring to?

19  A.   Grayhawk Homes of South Carolina, Inc. and Grayhawk Homes

20  of Atlanta, Inc.

21  Q.   Just to be clear, did ASH-Grayhawk build homes in South

22  Carolina or the Atlanta area at that time?

23  A.   No.

24  Q.   What did you do when one of Mr. Erickson's customers called

25  for warranty support?

Direct Examination - Kristen Richardson

1   A.   I would refer them to the area manager or admin for those

2   areas.

3   Q.   Let's take a look at couple of emails.

4        MR. MERRITT:  Please display for the witness PX 277.

5   BY MR. MERRITT:

6   Q.   Ms. Richardson, do you recognize the June 14, 2021 email in

7   front of you?

8   A.   Yes.

9   Q.   Who was the recipient of this email?

10  A.   The warranty@grayhawkhomes.com.

11  Q.   All right.  Who responded to it?

12  A.   Myself.

13  Q.   And on June 14, 2021, were you responsible for responding

14  to emails that came into the warranty@grayhawkhomes.com email

15  account?

16  A.   Yes.

17       MR. MERRITT:  Plaintiffs offer PX 277 into evidence.

18       MR. ELLIKER:  No objection.

19       THE COURT:  It's admitted.

20   (PLAINTIFFS EXHIBIT PX277:  Received in evidence.)

21  BY MR. MERRITT:

22  Q.   This email came in on June 14, 2021, from Steve Haygood.

23       Who was Steven Haygood?

24  A.   He was the build-on-your-land sales manager.

25  Q.   What is the build-on-your-lad own sales manager?

Direct Examination - Kristen Richardson

1    A.    He pretty much handled anybody who was wanting to build a

2    house on their own land, one of the Grayhawk Homes' homes, and

3    he managed it and made sure it was built.  Got with the --

4    handled everything dealing with that home.

5    Q.    Did Mr. Haygood work out of the Columbus, Georgia office?

6    A.    Yes.

7    Q.    The subject line of this email says:  Luther Arnette and

8    WE.

9          Is that right?

10   A.    Yes.

11   Q.    Mr. Haygood says:  Somebody left a message on behalf of him

12   asking if we would call him about a 30-day warranty notice they

13   sent him.

14         Did I read that correctly?

15   A.    Yes.

16   Q.    Do you know who Luther Arnette and WE is?

17   A.    A homeowner.

18   Q.    Where is Mr. Arnette located, if you know?

19   A.    WE stands for Waters Edge.  That was located in the South

20   Carolina.

21   Q.    How do you know that is Waters Edge?

22   A.    From doing AP and also doing the warranty.

23   Q.    Okay.

24         Did ASH-Grayhawk build Mr. Arnette's home in South

25   Carolina?

Direct Examination – Kristen Richardson

1   A.   No.

2   Q.   So you respond to Mr. Haygood, and say:  This is GH Lot

3   Holdings of South Carolina, and that you would let him know they

4   need to contact Amy and Dave.

5        Who are Amy and Dave?

6   A.   Dave Erickson and Amy Allen.

7   Q.   Why did you say that Mr. Arnette needed to call Amy Allen

8   and David Erickson?

9   A.   Because Dave was the owner of those companies, Grayhawk of

10  South Carolina, and we didn't handle the warranty.

11       MR. KRAMER:  We can set that one aside and please

12  display PX 279.

13  BY MR. MERRITT:

14  Q.   All right.  Ms. Richardson, do you recognize this email

15  from November of 2020 in PX279?

16  A.   Yes.

17  Q.   Who was the recipient of this email?

18  A.   The warranty@grayhawkhomes.com.

19  Q.   Who is to it?

20  A.   Myself.

21       MR. MERRITT:  We offer PX 279 into evidence.

22       MR. ELLIKER:  No objection, Your Honor.

23       THE COURT:  Admitted.

24  (PLAINTIFFS EXHIBIT PX279:  Received in evidence.)

25

Direct Examination – Kristen Richardson

1  BY MR. MERRITT:

2  Q.   This email is from somebody named Zach Baharri (Phonetic).

3       Is that correct?

4  A.   Yes.

5  Q.   Mr. Baharri wrote:  I just closed on my home at 822

6  Pineway, Dallas, Georgia, 3057 [sic], lot 66, on November 20,

7  2020.

8       Did I read that correctly?

9  A.   Yes.

10  Q.   Do you know whether the house located 822 Pineway, Dallas,

11  Georgia, that was closed on November 20, 2020, was built by

12  ASH-Grayhawk?

13  A.   No, it wasn't.

14  Q.   How do you know that?

15  A.   The Dallas, Georgia address was a Grayhawk Homes of Atlanta

16  home that was built.

17  Q.   Were you able to service this person's warranty?

18  A.   No.

19  Q.   Why is that?

20  A.   We had to forward it to -- or I had to forward it to

21  Sean, who was the area manager superintendent for Grayhawk Homes

22  of Atlanta, for him to handle.

23  Q.   And is that Sean Viela?

24  A.   Yes.

25            MR. KRAMER:  We can set that one aside.

1          Please display PX 275.

2    BY MR. MERRITT:

3    Q.   Ms. Richardson, do you recognize this email from October 5,

4    2020?

5    A.   Yes.

6    Q.   Who was the recipient?

7    A.   The warranty@grayhawkhomes.com.

8    Q.   Did you respond to this email?

9    A.   Yes, I did.

10          MR. MERRITT:  I would like to offer PX 275 into

11   evidence, please.

12          MR. ELLIKER:  No objection.

13          THE COURT:  Admitted.

14       (PLAINTIFFS EXHIBIT PX275:  Received in evidence.)

15   BY MR. MERRITT:

16   Q.   Ms. Richardson, this email from a Sydney Harris and she

17   said she is looking to speak to someone about scheduling an

18   11-month warranty inspection for a house located at 576 Pineway,

19   Dallas, Georgia 3057.

20          Did I read that correctly?

21   A.   Yes.

22   Q.   Do you know whether this house was built by ASH-Grayhawk?

23   A.   No, it wasn't.

24   Q.   How do you know that?

25   A.   The address in Dallas, Georgia.  And Grayhawk Homes of

Direct Examination – Kristen Richardson

```
 1   Atlanta was building houses in Dallas, Georgia.

 2   Q.   Just like the last one, you forwarded this email to

 3   Mr. Viela?

 4   A.   Yes.

 5           MR. MERRITT:  Please display PX 276.

 6           We will be looking at the middle of this page,

 7   Ms. Richardson.

 8   BY MR. MERRITT:

 9   Q.   Do you recognize this chain of emails displayed in PX 276

10   from July of 2020?

11   A.   Yes.

12   Q.   Did you receive this middle email to K. Richardson at

13   grayhawkhomes.com on July 1, 2020?

14   A.   Yes.

15   Q.   Did you respond on July 1, 2020?

16   A.   Yes.

17   Q.   All right.

18           MR. MERRITT:  I would like to offer PX 276 into

19   evidence.

20           MR. ELLIKER:  No objection, Your Honor.

21           THE COURT:  Admitted.

22       (PLAINTIFFS EXHIBIT PX276:  Received in evidence.)

23   BY MR. MERRITT:

24   Q.   Ms. Richardson, who sent you this email?

25   A.   Alyssa at Rose Anne's office.
```

Direct Examination - Kristen Richardson

1    Q.   Let's take a step back.

2         Who is Alyssa?

3    A.   Rose Anne's assistant.

4    Q.   And Rose Anne, are you referring to Rose Anne Erickson?

5    A.   Yes.

6    Q.   Who is Ms. Erickson?

7    A.   Dave's wife.

8    Q.   Why was Ms. Alyssa Gordy emailing you from Ms. Erickson's

9    office?

10   A.   She knew I was the warranty coordinator.  So I am assuming

11   she sent it to me for me to handle and didn't send it to the

12   warranty@grayhawkhomes.com.

13   Q.   If you scroll down, what was the purpose of this email?  It

14   looks like it's coming from Jenkins Plumbing.

15        What is Jenkins Plumbing?

16   A.   Jenkins Plumbing was a vendor that was used in South

17   Carolina to build the homes.  And this looks like an insurance

18   claim for damages for installation for a tub overflow, or faulty

19   installation.

20   Q.   To be clear, did Grayhawk Homes build this home in South

21   Carolina -- I'm sorry.  Did ASH-Grayhawk build this home in

22   South Carolina?

23   A.   No.

24   Q.   But did ASH-Grayhawk receive an insurance demand for it?

25   A.   Yes.

Direct Examination - Kristen Richardson

1          MR. MERRITT:  We can that aside.

2          Please display PX 278.

3    BY MR. MERRITT:

4    Q.    Do you recognize a chain of emails from November 24, 2020

5    in PX 278?

6    A.    Yes.

7    Q.    Who was the recipient of this chain of emails?

8    A.    Warranty@grayhawkhomes.com.

9    Q.    And did you respond to this email?

10   A.    Yes.

11   Q.    All right.

12          MR. MERRITT:  I'd like to offer PX 278 into evidence.

13          MR. ELLIKER:  No objection.

14          THE COURT:  Admitted.

15      (PLAINTIFFS EXHIBIT PX278:  Received in evidence.)

16   BY MR. MERRITT:

17   Q.    It looks like Ms. Darlene Schlott sent an email to

18   warranty@grayhawkhomes.com abut a house located at 544 Pineway,

19   Dallas, Georgia.

20          Is that correct?

21   A.    Yes.

22   Q.    Did ASH-Grayhawk build the house at 544 Pineway, Dallas,

23   Georgia?

24   A.    No.

25   Q.    Once again, how do you know that?

Direct Examination – Kristen Richardson

1   A.   Dallas, Georgia was a location of Grayhawk Homes of Atlanta

2   owned by David Erickson.

3   Q.   Did ASH-Grayhawk build that house?

4   A.   No.

5   Q.   Ms. Richardson, you testified that you received phone calls

6   from customers in South Carolina and Atlanta.  Is that right?

7   A.   Yes.

8   Q.   Did ASH-Grayhawk build homes in Dallas, Georgia or South

9   Carolina this time?

10  A.   No.

11  Q.   So were you able to help those customers?

12  A.   No.

13  Q.   After Mr. Erickson sold Grayhawk Homes to ASH did he meet

14  with employees in Columbus?

15  A.   Yes, he did.

16  Q.   Were you at that meeting?

17  A.   Yes.

18  Q.   What did Mr. Erickson say at that meeting?

19  A.   He let us know that he would be selling lots to American

20  Southern Homes and that we didn't need to be worried about our

21  jobs.  Many of us were.  It's a big change.  But he promised us

22  that he would sell us lots for a few years.

23       So that was the comfort of knowing that we had lots coming

24  to be able to build the houses to make sure that we had a job in

25  the future.

Direct Examination - Kristen Richardson

1   Q.   Did he mention that he would still be around?

2   A.   Yes.

3   Q.   And was that ultimately true?

4            MR. ELLIKER:  Objection.  Relevance.

5            MR. MERRITT:  Your Honor, it's relevant to -- we heard

6   testimony earlier that Mr. Erickson was a big supporter of his

7   staff at Grayhawk Homes --

8            THE COURT:  Overruled.  She can answer the question if

9   she knows.

10           THE WITNESS:  Can you repeat the question?

11  BY MR. MERRITT:

12  Q.   Yes, ma'am.

13       You mentioned that Mr. Erickson said that he was going to

14  sell lots and that he would still be around.

15       Was that ultimately true?

16  A.   Yes.

17  Q.   I'm sorry.  Was what Mr. Erickson said ultimately true?

18  A.   Yes.

19  Q.   What part of that was true, Ms. Richardson?

20  A.   Well, I mean, he sold lots to us for awhile and then

21  eventually it seemed like we weren't getting anything.  That

22  played a big part on a lot of us that were employed because that

23  was our livelihood.  That's how we paid our bills.  And we were

24  told that lots were going to be sold to American Southern Homes.

25  And then before too long it was like we didn't have any lots at

1    all.

2        So you have people who are worried and concerned, what are

3    we going to do.  At that point it was during COVID, a little

4    after COVID, so, of course, you know, you don't especially want

5    to be concerned about that at that time.

6        So I mean it was very hard.  It was very rough not knowing

7    from day-to-day if we were going to have land to build on

8    because of the lots that he promised to sell.

9    Q.   Did any of your co-workers lose their jobs?

10   A.   Yes.

11            MR. MERRITT:  No further questions.

12            THE COURT:  Cross-examination?

13            MR. ELLIKER:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15   BY MR. ELLIKER:

16   Q.   Hi, Ms. Richardson.  My name is Kevin Elliker.  I have a

17   few questions for you.

18        First, you said you started working at Grayhawk in 2018.

19        Is that right?

20   A.   Correct.

21   Q.   And when did you become the production -- or, I'm sorry.

22   When did you start working on warranty claims?  Was that before

23   or after Mr. Erickson sold his business to ASH?

24   A.   It was before.

25   Q.   Okay.

Cross-Examination - Kristen Richardson

1    So when a homeowner or a buyer wanted, or was getting a

2    warranty, what instructions were they given about that warranty

3    in terms of, I have a problem.  What do I do next?

4    A.   If it was a homeowner that owned a home from Grayhawk Homes

5    of Atlanta, Grayhawk Homes of South Carolina, and at that time

6    there was Iowa, that we would forward -- or I, myself, would

7    forward that information to that superintendent or area manager

8    for them to handle the warranty.

9    Q.   That's what you would do.  How would you get that

10   information in the first place?  That's my question.

11   A.   Well, I would get emails or phone calls.  Primarily we

12   wanted emails.  That way we would have the documentation to

13   forward out.

14   Q.   And that's because the customers, when they got the

15   warranty information, were told, This is the email that you

16   should use if you have a warranty issue.

17        Is that right?

18   A.   Correct.

19   Q.   I mean, I saw on some of the email -- we looked at the

20   exhibits -- that the email address is

21   warranty@grayhawkhomes.com.

22        Is that right?

23   A.   Correct.

24   Q.   Is that the email address that was used when Mr. Erickson

25   owned the company?

Cross-Examination - Kristen Richardson

1    A.    No.

2    Q.    What was the email address then?

3    A.    It was grayhawkhomesinc.com.

4    Q.    Was it warranty at --

5    A.    It was warranty@grayhawkhomesinc.com.

6    Q.    Okay.

7          The same question, I guess, then for phone calls.  When

8    they were -- if they were going to call with a warranty claim

9    were they given the number for the office here in Columbus?

10   A.    They were given the number, yes.

11   Q.    Okay.

12         After -- so make sure I have it right.  If I bought a home

13   from Mr. Erickson before ASH bought the company, and I had

14   warranty package information about a claim I had -- a leaky

15   window, or something.  It might say, here is the email address

16   you should use, or here is the phone number.

17         Is that right?

18   A.    Correct.

19   Q.    Would it also be possible for me to go to the Grayhawk

20   website and fill in information on a form?

21   A.    Yes.  But at that time we didn't use that form.

22   Q.    Okay.  And so then I would pick up the phone and call a

23   phone number and maybe I would get you, and then you would take

24   that information and pass it on to the right person.  Is that

25   right?

Cross-Examination - Kristen Richardson

1    A.    Correct.

2    Q.    Did ASH change the phone number after they bought the

3    company?

4    A.    No.

5    Q.    So is it possible that someone who bought a home from

6    Mr. Erickson before would call for a warranty claim after he

7    sold the business?

8    A.    Could be.

9    Q.    In fact, didn't that happen?

10   A.    Yes.

11   Q.    And people who bought homes from Mr. Erickson, when he

12   owned the company, would email in.  And those people might have

13   emailed after he sold the company but their warranty came, their

14   paperwork said this is the email address you were supposed to

15   use, right?

16   A.    Correct.

17   Q.    All right.

18         MR. ELLIKER:  Mr. Walters, let me ask you to pull up

19   Plaintiffs' Exhibit 275.  This was the exhibit -- one of the

20   homes, I think, in Dallas here.

21         Scroll down to the bottom of this message here.

22   BY MR. ELLIKER:

23   Q.    So here, this is a homeowner in the Dallas, Georgia area,

24   who is sending an email to warranty@grayhawkhomes.com.

25         Right?

Cross-Examination - Kristen Richardson

1   A.    Uh-huh.

2   Q.    And the homeowners are asking about an 11-month warranty

3   inspection.  Do you see that?

4   A.    Yes.

5   Q.    Now am I correct to understand that's 11-months after they

6   purchased the home?

7   A.    Yes.

8   Q.    So if someone is scheduling their 11-month warranty

9   inspection, in October of 2020, then maybe that closing on that

10  house is roughly November 2019.

11        Does that sound about right, possibly?

12  A.    Possibly.

13  Q.    Okay.

14        Now, when they get the warranty information is that

15  information that they would have been given ahead of the actual

16  closing, like, when they are under contract at some point before

17  closing?

18  A.    They would have been given that information prior to

19  closing at an NHO.

20  Q.    So somebody on an 11-month closing, who is purchasing their

21  home in November 2019, in all likelihood would have gotten the

22  information saying, Here is who you call when you have a

23  warranty issue.  Here is where you email, before they closed on

24  a house in that month, right?

25  A.    Yes.

Cross-Examination - Kristen Richardson

1    Q.    Do you remember what month are Mr. Erickson sold his

2    business to ASH?

3    A.    November 15 of 2019.

4    Q.    So is it possible that this a consumer like this would have

5    actually been someone who bought a home from Mr. Erickson?

6    A.    Yes.  If it was prior to that.

7    Q.    Okay.

8         When Mr. Erickson sold the company, are you -- you knew

9    that there was an arrangement between ASH and Mr. Erickson's

10   companies for there to be transition services between one to the

11   next.

12        Does that sound right?

13   A.    Yes.

14   Q.    In fact, there was a Transition Services Agreement between

15   Mr. Erickson and ASH for a period of time after the transaction,

16   right?

17   A.    I guess.  Yeah.

18   Q.    Well, in your job -- did you know it was part of your job

19   for awhile to provide support services to Mr. Erickson's

20   companies even after ASH bought the Grayhawk companies?

21   A.    Well, no.  I never did because we always sent the

22   warranties to those companies to handle their own warranties.

23   We didn't handle them here in Columbus.

24   Q.    I understand.

25        I guess my question is, there was a period of time where

Cross-Examination - Kristen Richardson

1   ASH-Grayhawk, in Columbus, was providing support services

2   through forwarding these emails, just like you did before,

3   forwarding these emails along, and the same kinds of services

4   that were being done in South Carolina and Atlanta from the

5   Columbus office, right?

6   A.    Uh-huh.

7   Q.    Okay.

8         And, in fact, after the transaction people who came from

9   the ASH side to run the business in Columbus told employees,

10  that had come over from Mr. Erickson's business, that even

11  though a new company has bought this it's going to be business

12  as usual, right?

13  A.    Yes.

14  Q.    And business as usual, when you were the warranty

15  coordinator for Mr. Erickson, was to take the claims that came

16  in, to your Columbus email, and forward those off to South

17  Carolina and Atlanta.  That was business as usual?

18  A.    Yes.

19  Q.    I have one last question for you.

20        At the start of this lawsuit ASH told Mr. Erickson, and the

21  defendants, that if we wanted to talk to you, Ms. Richardson,

22  that we would have to go through Mr. Kramer and his law firm.

23        My question is, are they your lawyers?

24  A.    Yes.  No.  They are American Southern Home lawyers.

25             MR. ELLIKER:  Thank you, Your Honor.

 1                   That's all the questions I have.

 2                   THE COURT:  Any redirect?

 3                   MR. MERRITT:  No, Your Honor.

 4                   THE COURT:  Ma'am, you may step down.

 5                   You are excused.

 6                   Call your next witness for the plaintiffs.

 7                   MR. KRAMER:  Next witness, Your Honor, is Anthony

 8    Dezinna, an employee of a company formerly known as Grayhawk

 9    Homes of South Carolina.  He is by video.

10                   THE COURT:  Are there any objections to this during

11    this deposition?

12                   MR. ELLIKER:  No, Your Honor.  We were able to resolve

13    them.

14                   THE COURT:  All right.  You may play the deposition

15    when you are ready.

16                   About how long is this deposition?

17                   MR. KRAMER:  This is by far the longest remaining

18    video at 45 minutes.

19                   THE COURT:  Okay.  It's going to be an hour and a half

20    at that rate.  Can we speed up the pace?

21                   MR. KRAMER:  We have been plagued with technical

22    difficulties, Your Honor.

23                   THE COURT:  Give her a minute.  There is something on

24    there that lets you play at lower speeds and faster speeds -- I

25    don't know about that -- but on a phone you can play it at lower

1    speeds and faster speeds.

2          Is this system running remotely through your system at

3    your law firm?

4          MS. MCCLINTOCK:  Yes, sir.

5          THE COURT:  It's got to go all the way to Washington,

6    DC and back, or Reston, Virginia.

7      (Pause in proceedings.)

8          THE COURT:  Why don't you start playing and see if it

9    improves.

10       Ladies and gentlemen, these technical people,

11    paralegals they got the hardest jobs.

12       Do you have anything else this afternoon?

13       MR. KRAMER:  Yes, we have --

14       THE COURT:  Another video or another real person?

15       MR. KRAMER:  We do have a real person.  We just need

16    five minutes to get him here and we will be ready to roll,

17    Your Honor.

18       THE COURT:  Let's do that.

19       MR. KRAMER:  Apologies for the issues here.

20      (Pause in proceedings.)

21       THE COURT:  Do y'all have this deposition by chance

22    downloaded in your system?

23       MR. SHEBELSKIE:  Not the edited version, Your Honor.

24       MR. ELLIKER:  We don't, but Mr. Walters is willing to

25    help.  I am sure it's not something he can help with, but if

```
 1    there is any issue he can, he is willing to.

 2              MR. KRAMER:  Your Honor, could I approach to just chat

 3    at sidebar?  Do you mind?

 4              THE COURT:  Sir.

 5              MR. KRAMER:  Can I approach to chat at the bench?  Do

 6    you mind?

 7              THE COURT:  Yes.

 8         (Following conference held at sidebar at 4:41 PM.)

 9              MR. KRAMER:  Very sorry for this, Your Honor.

10              I had planned to end the day, but what we are doing

11    right now is to go get Mr. Weibel, who is an expert witness.  I

12    think the direct is close to an hour.  But, honestly, if I

13    wasn't trying to fill time right now I probably would send them

14    home.  I don't want to finish the day early.  I just honestly

15    want to fill time and not waste anybody's time.  But I don't

16    think otherwise I would put him on as a witness in a strategic

17    retreat to the truth.

18              THE COURT:  You mean, you wouldn't call him at all?

19              MR. KRAMER:  I wouldn't call him at all.

20              THE COURT:  Okay.  Well, let's not do that.

21              MR. KRAMER:  All right.  I don't want to waste

22    anybody's time.

23              THE COURT:  Let's not do that.

24              Let's give her a few more minutes and see.  You think

25    this would last till -- you think this would last 40 minutes?
```

1          MR. KRAMER:  45 minutes.

2          THE COURT:  Okay.  Let's give her about 5 or 10 more

3    minutes.

4          MR. KRAMER:  Can we take a break and take the pressure

5    off so people aren't staring at her and I will send Mr. Weibel

6    home?

7          MR. SHEBELSKIE:  Yeah.

8          MR. KRAMER:  I am so sorry about this.  Thanks for

9    being accommodating.

10       (Sidebar concluded at 4:43 PM.)

11          THE COURT:  Ladies and gentlemen, I would like to try

12   to get this video deposition played this afternoon because the

13   more we can get done today the quicker we get the trial

14   completed.  So I am going to ask you to go to the jury room for

15   about 10 minutes and try to take the pressure off this

16   situation.  And hopefully we can get this fixed in the next few

17   minutes and then we will play it for 45 minutes.  You may be

18   here until about 5:40 this afternoon.  But we will try to get it

19   done today.

20          Go to the jury room and we will see if we can't get

21   this technical problem fixed.

22       (Jury out at 4:43.)

23          THE COURT:  Okay.  Let's see if it can't be fixed.

24          MR. KRAMER:  Thank you, Your Honor.

25          THE COURT:  We will be in recess awaiting the answer.

1          (Pause in proceedings.)

2          (Resumed at 4:57.)

3          THE COURT:  All right.  I understand we have not fixed

4    the problem.  How -- at this rate, or speed, how long will this

5    deposition take to play?

6          MS. MCCLINTOCK:  About 45 minutes, Your Honor.

7          THE COURT:  It's not going to.

8          MS. MCCLINTOCK:  It will be a 45-minute clip.

9          THE COURT:  Regardless of whether it's --

10         MS. MCCLINTOCK:  Yes, sir.  The whole clip is the

11   designations sliced together in one video.

12         THE COURT:  I understand that.  But it seems like this

13   would be faster if it weren't coming through so slow, but...

14         MS. MCCLINTOCK:  Well, just the -- I mean, we edited

15   the video from a 4-hour video using just the designations and

16   that amount of time, just editing the clips, is about 45 minutes

17   to include all of the designated text.

18         THE COURT:  I understand that.  But that's if the

19   person is speaking at a natural --

20         MS. MCCLINTOCK:  So it does seem to be working.  We

21   have it down to my local computer.

22         THE COURT:  Is it already fully downloaded or --

23         MS. MCCLINTOCK:  It's fully downloaded.

24         THE COURT:  So we think we are ready to go?

25         MS. MCCLINTOCK:  Let me play it for the moment here.

```
 1                THE COURT:  Let's it and see how to goes.

 2                Are we ready?  You don't sound completely confident.

 3                MS. MCCLINTOCK:  I am trying to get the correct screen

 4      to show and then we will be ready.

 5                MR. KRAMER:  Thanks so much for the Court's indulgence

 6      Your, Honor.

 7                THE COURT:  It's their indulgence that I'm worried

 8      about.

 9                MR. KRAMER:  I know.  Likewise.

10                MS. MCCLINTOCK:  It was our computer.  I apologize.

11                THE COURT:  Yet more evidence in support of my case

12      against video depositions.

13                MR. KRAMER:  Understood.

14                MS. MCCLINTOCK:  I apologize.

15                ms.mc:  I'm not blaming you, ma'am.

16                MR. KRAMER:  I will take that and I am fully

17      convinced, Your Honor.

18                THE COURT:  We ready?

19                Okay.  Let's bring the jury down.  Can we just start

20      with the first question and leave out all the preliminary?

21      Everybody acknowledges that the person was sworn in?  Can we

22      just go to the first question?

23                MR. KRAMER:  You bet.

24                THE COURT:  You have no idea.  She is the one that's

25      going to have to --
```

```
 1              MR. KRAMER:  I have nothing but confidence in
 2   Ms. McClintock.
 3              MS. MCCLINTOCK:  We're ready.
 4              THE COURT:  We are going to bring the jury down.
 5              You probably need to back it up to his first question.
 6         (Jury in at 5:01.)
 7              THE COURT:  Okay, ladies and gentlemen, they think
 8   they have got to fixed.
 9              Put on the record who this person is Mr. Kramer.
10              MR. KRAMER:  Yes.  This is Anthony Dezinna, formerly
11   of Grayhawk Homes of Atlanta.
12              Thank you, again, for everyone's patience.
13              South Carolina.
14              THE COURT:  He has been sworn at the deposition to
15   tell the truth.
16              Go ahead.  You may play it.
17              MS. MCCLINTOCK:  It did just work.
18              THE COURT:  Is there -- is it something connecting
19   with us?
20              MS. MCCLINTOCK:  There we go.
21              THE COURT:  Back it up to the beginning.
22         (The videotaped deposition of Anthony Dezinna was published
23   to the jury at 5:03 PM.)
24              THE COURT:  That's it.
25              MR. KRAMER:  That's all we have.
```

1          THE COURT:  Ladies and gentlemen, that's going to

2     conclude our day.  We are making good progress, but I think to

3     continue making that progress we may need to go tomorrow until

4     about 6:30 or so.

5          If that creates a great hardship for somebody let

6     Mr. Gunn know in the morning.  But the more we get done tomorrow

7     the closer we get to the finish line.

8          My plan would be for to us go to 6:30 tomorrow, unless

9     that's going to conflict with somebody's plans, and those plans

10    can't be altered.  So think about that this evening and let

11    Mr. Gunn know in the morning if going to 6:30 tomorrow is a

12    problem.

13         In the meantime, do not discuss the case with anyone.

14    Don't let anybody discuss with you.  Don't do any independent

15    investigation.

16         We will see you back here in the morning at 9 AM.

17         Have a good evening.

18     (Jury out at 5:50.)

19         THE COURT:  Okay.  Mr. Kramer, what do you have left

20    for us tomorrow?

21         MR. KRAMER:  Tomorrow, I have Mr. David Duffus, who is

22    your damages expert.

23         I have three very short videos; 10 minutes, 20

24    minutes, 20 minutes, which we will work very hard to make

25    accessible.

```
 1              THE COURT:  All right.

 2              MR. KRAMER:  And I believe that will do it for us,

 3    Your Honor.

 4              THE COURT:  Okay.  And defendants are going to call

 5    Mr. Erickson.

 6              How many witnesses do you have?  Do you know at this

 7    point?

 8              MR. QUACKENBOSS:  In total?

 9              THE COURT:  Yes.

10              MR. QUACKENBOSS:  I believe we will have five

11    in-person witnesses and a couple -- two or three videos.  Kevin?

12    I don't recall.

13              MR. ELLIKER:  Your Honor, to the extent we have any --

14    we're not going to -- if we replay any testimony from witnesses

15    the plaintiffs played videos for we are trying our best to make

16    it as short as possible just to have only the small snippet.  So

17    I suspect that for -- I will say neither of the two videos that

18    we have watched so far we will not play any testimony from those

19    two.

20              I understand that one of the videos that the

21    plaintiffs plan to play is from Mr. Benson, but they have cut

22    that back so much that we are going to need to play some of the

23    testimony that we want for that.

24              It may be four, but I don't -- we are still working

25    through that.
```

1      Last night the plaintiffs, I think to their credit

2 trying to shorten their case, told us there are two videos

3 originally they were going to play they are not going to play at

4 all now.

5      So we are in the course of prying to figure that out.

6      THE COURT:  How long are your witnesses, other than

7 Mr. Erickson?  I mean --

8      MR. QUACKENBOSS:  I correct myself, Your Honor.  I

9 believe we have six in-person witnesses.  I would project if we

10 were starting middle of the day tomorrow we have a good chance

11 of wrapping up Tuesday.

12      THE COURT:  Tuesday?

13      MR. QUACKENBOSS:  Yeah.

14      THE COURT:  You are going to wrap up -- I am going to

15 rush you to finish your case, since you go last I'm not going to

16 penalize but, but surely you will be finished by Tuesday.

17      I mean, I understand Mr. Erickson, and I understand

18 some of the other folks that may testify, but I just can't

19 imagine how it would take until Tuesday if you started your case

20 tomorrow after lunch.

21      MR. QUACKENBOSS:  Your Honor --

22      THE COURT:  All right.  We will play it by ear.

23      Okay.  Like I say, I am going to allow to you present

24 your defense.  I am not going to cut you short because we are

25 getting toward the end of the week.  But I am assuming everybody

1    realizes it's in your best interest to present your evidence,

2    but to also do it in a streamlined manner.

3              Y'all have been watching the jury as well as I have so

4    you know with any jury they don't want to hear the same thing

5    over and over again.

6              MR. QUACKENBOSS:  I think we have a good chance of not

7    going into Tuesday but...

8              THE COURT:  Okay.

9              MR. QUACKENBOSS:  Yeah.

10             THE COURT:  All right.

11             Well, we'll probably go until 6:30 then on Friday

12   also, so y'all need to make preparations for that.  I don't quit

13   at 1 PM on Friday afternoon.  So y'all just need to make sure if

14   that's the case -- if you think it's likely to go that long,

15   then we will be here a full day tomorrow and on Friday.  I don't

16   want to get to a situation where you don't have witnesses.  And

17   I don't want to get to a situation where you just call in

18   somebody as a filler.

19             I appreciate your candor this afternoon, Mr. Kramer,

20   that that witness was just going to be nothing more than a

21   filler.  I would rather you tell me that.

22             MR. KRAMER:  Yes, sir.

23             THE COURT:  Everybody needs to have witnesses lined up

24   to go until 6:30 tomorrow and 6:30 on Friday.

25             MS. BECK:  Your Honor, one housekeeping matter.  We do

 1    want to introduce the videos that corresponded with the

 2    Marshall Coleman deposition testimony that was played

 3    yesterday -- the exhibits.  Apologies.  I think we have a

 4    stipulation on Marshall Coleman.

 5              MR. ELLIKER:  Yes, Your Honor.

 6              Ms. Beck and I conferred.  I think there is three

 7    exhibits that we agree can be admitted that were referenced in

 8    Marshall Coleman's deposition.

 9              THE COURT:  Are you prepared to designate what those

10    are now?  Go ahead and take care of it?

11              MS. BECK:  Yes, Your Honor.

12              THE COURT:  Okay.  Tell me those numbers.

13              MS. BECK:  We've got PX 85, PX 85A, and PX 207.

14              THE COURT:  All right.  They are all admitted without

15    objection.

16         (PLAINTIFFS EXHIBITS PX85, 85A AND 207:  Received in

17    evidence.)

18              MS. BECK:  And then with respect to Mr. Dezinna's

19    testimony -- Kevin, I don't know if you are ready to do that

20    yet.

21              MR. ELLIKER:  I will say I don't expect there to be an

22    issue, but that was a housekeeping item we didn't get to with

23    the course of the day.  We should have that tomorrow morning.

24              THE COURT:  We will take that issue up at 5 until 9 in

25    the morning.

 1          All right.  Y'all have a good evening.

 2          We will see you in the morning.

 3     (Proceedings concluded at 5:56 PM on Wednesday, September

 4  20, 2023.)

 5                    * * * * * * * *

 6          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
 7  Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
 8  transcript.

 9  /s/ Lisa C. Snyder                    10/5/2023

10  Lisa C. Snyder, RPR, CRR              Date
    Official U.S Court Reporter
11                    **I N D E X**

12  PLAINTIFFS' WITNESSES                              PAGE

13  LEE DARNOLD
    Direct Examination By Mr. Kramer                   481
14  Cross-Examination By Mr. Shebelskie                525
    Redirect Examination By Mr. Kramer                 573
15  Recross-Examination By Mr. Shebelskie              582

16  DAVID ERICKSON
    Direct Examination By Mr. Kramer                   584
17  Cont. Direct Examination By Mr. Kramer             625
    Cont. Direct Examination By Mr. Kramer             700
18
    KRISTEN RICHARDSON
19  Direct Examination By Mr. Merritt                  706
    Cross-Examination By Mr. Elliker                   720
20
    ANTHONY DEZINNA (By video)
21

22                  **E X H I B I T S**

23  PLAINTIFFS' EXHIBITS                  OFFERED   RECEIVED

24  PX29                                    615       615

25  PX61                                    590       590

```
 1   PLAINTIFFS' EXHIBITS                  OFFERED    RECEIVED

 2   PX82                                    606        606

 3   PX83                                    627        627

 4   85 AND 85A                              617        617

 5   PX85, 85A AND 207                       738        738

 6   PX91 AND 91A                            689        689

 7   PX99 AND 99A                            652        652

 8   PX102                                   639        639

 9   PX107 AND 107A                          643        643

10   PX118                                   636        636

11   PX125                                   638        638

12   PX160 AND PX160A                        518        518

13   PX161                                   703        703

14   PX168 AND 168A                          661        661

15   PX171 AND 171A                          660        660

16   PX190F                                  482        482

17   PX214                                   640        640

18   PX261                                   678        678

19   PX275                                   714        714

20   PX276                                   715        715

21   PX277                                   710        710

22   PX278                                   717        717

23   PX279                                   712        712

24   PX391 AND 391A                          668        668

25   PX712                                   598        598
```

| | | OFFERED | RECEIVED |
|---|---|---|---|
| 1 | PLAINTIFFS' EXHIBITS | | |
| 2 | PX714 | 631 | 631 |
| 3 | PX715 | 669 | 669 |
| 4 | PX718 | 513 | 513 |
| 5 | 719 | 571 | 571 |
| 6 | 796R | 595 | 595 |
| 7 | PX798 | 604 | 604 |
| 8 | PX801 | 675 | 675 |
| 9 | PX804 | 648 | 648 |
| 10 | PX807 | 659 | 659 |
| 11 | DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
| 12 | 521 | 546 | 546 |
| 13 | 979 | 561 | 561 |
| 14 | 995 | 535 | 535 |
| 15 | 998 | 537 | 537 |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |