**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

```
AMERICAN SOUTHERN HOMES        )
HOLDINGS, LLC AND              )
ASH-GRAYHAWK, LLC,             )
                               )
            Plaintiff,         ) Case No: 4:21cv95
                               )
        v.                     ) Columbus, Georgia
                               ) September 21, 2023
DAVID B. ERICKSON, ET AL,      )
                               )
            Defendants.        ) VOLUME IV
_____ )
```

**TRANSCRIPT OF JURY TRIAL**
**BEFORE THE HONORABLE CLAY D. LAND**
**UNITED STATES DISTRICT JUDGE**
**(Pages 742 through 1036)**

*LISA C. SNYDER, RPR, CRR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, FL 32301**
**(850)567-1374 * lisasnydercr@gmail.com**

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For the Plaintiff:      Faegre Drinker Biddle & Reath, LLP
                     By:  JACOB A. KRAMER
                           JESSICA R. MAZIARZ
                           RACHEL ANNA BECK
                           Attorneys at Law
                           jake.kramer@faegredrinker.com
                           jessica.maziarz@faegredrinker.com
                           rachel.beck@faegredrinker.com
                     1500 K Street NW
                     Suite 1100
                     Washington, DC 20005

                     By:  DAVID R. MERRITT
                           JOSHUA TODD PETERSON
                           Attorneys at Law
                           david.merritt@faegredrinker.com
                           josh.peterson@faegredrinker.com
                     2200 Wells Fargo Center
                     Minneapolis, MN 55402

                     Buchanan Law Firm, PC
                     By:  JERRY A. BUCHANAN
                         Attorney at Law
                         jab@thebuchananlawfirm.com
                     P.O. Box 2848
                     The Corporate Center, Suite 614
                     233 12th Street
                     Columbus, GA 31902

For the Defendant:      Hunton Andrews Kurth, LLP
                     By:  ROBERT T. QUACKENBOSS
                         Attorney at Law
                         rquackenboss@huntonak.com
                     2200 Pennsylvania Avenue NW
                     Washington, DC 20037

                         MICHAEL R. SHEBELSKIE
                         KEVIN S. ELLIKER
                         Attorneys at Law
                         mshebelskie@huntonak.com
                         kelliker@huntonak.com
                     Riverfront Plaza, East Tower
                     951 E. Byrd Street
                     Richmond, VA 23219

**P R O C E E D I N G S**

1
2    (Call to Order of the Court at 8:54 AM on Thursday,
3    September 21, 2023.)
4                THE COURT:  Good morning.
5                All right.  You want to take up those deposition
6    exhibits that were, I guess, used during the deposition
7    yesterday afternoon?
8                MR. KRAMER:  Yes, Your Honor.  I believe --
9                THE COURT:  Tender those.  Do we have a number?
10               MR. KRAMER:  Yes, Your Honor.  We will have that in
11   just a moment.  Mr. Merritt is going to address that.  We are in
12   agreement so we can put them right in.
13               THE COURT:  Okay.
14               MR. MERRITT:  Your Honor, it's Plaintiffs' Exhibit --
15               THE COURT:  All right.  So the record is clear, let's
16   state the name of the deposition.
17               MR. MERRITT:  Your Honor, it's the deposition of
18   Anthony Dezinna.
19               THE COURT:  Okay.
20               MR. MERRITT:  That's Plaintiffs' Exhibit 176.
21               Plaintiffs' Exhibit 124F.
22               Plaintiffs' Exhibit 179.
23               Plaintiffs' Exhibit 181.
24               Plaintiffs' Exhibit 182.
25               Plaintiffs' Exhibit 183.

1            And Plaintiffs' Exhibit 187.

2            THE COURT:  Okay.  Any objection to any of those

3    exhibits?

4            MR. ELLIKER:  No objection, Your Honor.

5            THE COURT:  They are all admitted.

6        (PLAINTIFFS EXHIBITS 176, 124F, 179, 181-183, 187:

7    Received in evidence.)

8            THE COURT:  Is our lone juror that we are waiting on

9    here yet?

10            One of them got a parking ticket yesterday and was not

11    very happy about the situation.  Hope he is not boycotting.

12            THE COURTROOM DEPUTY:  He was parked in a law

13    enforcement parking space.

14            THE COURT:  Well, a footnote to that is those spaces

15    are rarely occupied, so I can sort of understand the

16    frustration.  Those ones out front --

17            THE COURTROOM DEPUTY:  No.  Probation parks there now.

18            THE COURT:  I am sympathetic to the citizen.

19            MR. KRAMER:  Your Honor, while we are waiting, just in

20    terms of order of march today, we are going to start off with a

21    short deposition.  Then we are going to put on Mr. Duffus, who

22    is our damages expert and he is going to address, in large part

23    in the first part of his testimony, the damages that go to the

24    jury.

25            And then we have got some trademark disgorgement

1    testimony and prejudgment interest testimony on the deposit,

2    which I think goes to the Court.  So what we were thinking is --

3              THE COURT:  What was the second one?

4              MR. KRAMER:  Prejudgment interest on the return of the

5    deposit, the $2.5 million deposit, which the -- I don't think

6    the jury would be asked to calculate.

7              So what we were thinking is we could play the

8    deposition.  Do the direct of Mr. Duffus on the part that goes

9    to the jury.  Then excuse the jury and we ought to be about up

10   to the midmorning break at that point anyway.  So trying to be

11   efficient.

12             And then we will have two very short deposition videos

13   and we will be done.

14             THE COURT:  Okay.  So there is going to be some

15   testimony from him that will be presented just for me?

16             MR. KRAMER:  That's right, Your Honor.  Just the

17   disgorgement damages for trademark infringement.

18             THE COURT:  Okay.  All right.  We will hear that.  We

19   will play it by ear.  That sounds like a reasonable plan.  We

20   will see how it goes.

21             MR. KRAMER:  Okay.  Thank you.

22             THE COURT:  Are they all here?

23             COURT SECURITY OFFICER:  Yes, Your Honor.

24             THE COURT:  Let's bring them down.

25             COURT SECURITY OFFICER:  Yes, Your Honor.

1          (Jury in at 9:00.)

2          THE COURT:  Good morning, ladies and gentlemen.

3   Welcome back.  We are ready to proceed.

4          Call your next witness for the plaintiffs, Mr. Kramer.

5          MR. KRAMER:  Thank you, Your Honor.

6          Plaintiffs call, by video deposition testimony,

7   Mr. Chuck McClure.

8          THE COURT:  All right.  You may play that deposition.

9      (The videotaped deposition of Chuck McClure was published

10  to the jury at 9:02 AM)

11         MR. KRAMER:  The end, Your Honor.

12         THE COURT:  All right.  Want to go ahead and take care

13  of those exhibits that were referenced?

14         MR. KRAMER:  Mr. Merritt will address that.

15         MR. MERRITT:  Your Honor, the only exhibit is McClure

16  30 which is DX0317.

17         THE COURT:  What -- what number is that going to have?

18  D what?

19         MR. MERRITT:  Pardon me?

20         THE COURT:  D what?

21         MR. MERRITT:  DX.  It's a defendants' exhibit.

22         THE COURT:  DX?

23         MR. MERRITT:  317.

24         THE COURT:  317.

25         Any objections?

```
 1              MR. ELLIKER:  No, Your Honor.

 2              THE COURT:  Exhibit admitted.

 3         (DEFENDANTS EXHIBIT DX317:  Received in evidence.)

 4              THE COURT:  All right.  What do you have next,

 5    Mr. Kramer?

 6              MR. KRAMER:  Thank you, Your Honor.

 7              Plaintiffs call Mr. David Duffus.  He's a damages

 8    expert.

 9              THE COURT:  All right.

10              MR. KRAMER:  And Ms. Agnew will be handling this

11    witness.

12              THE COURT:  Okay.

13              Sir, come to the witness stand straight ahead by this

14    lamp.  Stop right there for a moment, raise your right hand and

15    take the oath.

16         DAVID DUFFUS, PLAINTIFFS WITNESS, DULY SWORN

17              THE COURT:  Please be seated, sir.

18              THE WITNESS:  Thank you.

19              THE COURT:  Once you're situated, tell the jury your

20    name and spell it for the court reporter.

21              THE WITNESS:  My name David, middle initial M, as in

22    Michael.  Last name is Duffus, D-U-F, as in Frank, F, as in

23    Frank, U, S, as in Sam.

24              THE COURT:  All right, Ms. Agnew.

25              MS. AGNEW:  Good morning, Mr. Duffus.
```

1           My name Allison Agnew, on behalf of ASH.

2           MS. AGNEW:  Teri, can you put the cover slide up,

3    please?

4                        DIRECT EXAMINATION

5    BY MS. AGNEW:

6    Q.    Good morning, Mr. Duffus.

7    A.    Good morning.

8    Q.    Have you been retained to provide expert opinions in this

9    case?

10   A.    I have.

11   Q.    Have you reached an opinion regarding the damages that

12   plaintiffs have suffered?  That's ASH in this case.

13   A.    I have.

14   Q.    We will discuss your opinions in a few minutes but I just

15   want to first discuss some of your qualifications.

16         Where are you currently employed?

17   A.    I am employed by a firm by the name of HKA Global, LLC.

18   Q.    And what is your current position at HKA?

19   A.    I am a partner with the firm.

20   Q.    Do you work in a particular group at HKA?

21   A.    I do.  I am in what's known as our forensic accounting and

22   commercial damages practice.

23   Q.    And what is your area of expertise at HKA?

24   A.    Sure.  So I primarily work with clients that are in dispute

25   situations, like this, to either do economic damage analysis, so

Direct Examination - David Duffus

1    to quantify things like lost profits, or to value businesses or
2    business interest.  There is a little bit of forensic accounting
3    work that I do as well but it's a smaller portion of my
4    practice.
5    Q.    Okay.  Outside of your work with HKA, have you served on
6    any advisory boards or councils or committees and things like
7    that?
8    A.    I have.  So I have been very fortunate, over the course of
9    my career, to be very involved with the American Institute of
10   Certified Public Accountants.  So I am a CPA so I have an
11   opportunity to be involved in that organization and have been
12   very involved over the years in their forensic and valuation
13   service section, where for a period of time I chaired what's
14   known as Economic Damages Task Force.  And I participated in a
15   number of other initiatives that AICPA puts forward in a damages
16   and forensic accounting area.
17   Q.    And did you go to college?
18   A.    I'm sorry?
19   Q.    Did you go to college?
20   A.    I did.
21   Q.    Where did you go to college?
22   A.    I went and received my undergraduate degree from the
23   University of Pittsburgh.  And while I was there, I had a dual
24   major in economics and political science.  I also received my
25   master's in business administration, or MBA, from the University

751
Direct Examination - David Duffus

1    of Pittsburgh as well where I concentrated in accounting and

2    finance.

3    Q.    Have you received any professional certifications or other

4    credentials?

5    A.    I have.  So I mentioned a few minutes ago that I'm a

6    certified public accountant licensed in the Commonwealth of

7    Pennsylvania.  I have what's known as the accredited in business

8    valuation credential, which is a credential that's offered by

9    the American Institute of CPAs.

10        I am also certified in financial forensics by the AICPA and

11    I am a certified fraud examiner, which is a credential offered

12    by an organization called the Association of Certified Fraud

13    Examiners.

14    Q.    Where did you work first after you graduated from college?

15    A.    Sure.  So I -- when I graduated from college I first

16    started in commercial banking.  I worked for a bank -- a

17    regional bank called Meridian Bank where I was a credit analyst

18    and did loan underwriting in a variety of different industries

19    including real estate, real estate development.

20        I left that position to go get my MBA at Pitt and once I

21    graduated I joined at the time -- what at the time was one of

22    the big six accounting firms called Coopers & Lybrand, later

23    became PricewaterhouseCoopers.  And between the two firms I

24    spent about 9 years in total working in their forensic and

25    dispute practices.

Direct Examination - David Duffus

1    Q.    Where did you work after that?

2    A.    Sure.  I left PWC in 2001 and I joined a small regional

3    firm called Sisterson & Co. where I worked for about 18 months.

4        And then I had my own practice for about a year before I

5    joined a firm by the name of Parente Randolph that through

6    various mergers in the accounting business became known as

7    Baker Tilly.

8        I was with that firm for about 17 years, the last 15 as a

9    partner, and then I joined HKA in October of 2020.

10   Q.    Can you describe the type of projects you work on at HKA

11   now?

12   A.    Sure.  So as I mentioned a few minutes ago, I primarily

13   work with clients that are in dispute-related situations.  And

14   so that involves the quantification of damages, again the

15   valuation of businesses or ownership interest in businesses and,

16   again, some forensic accounting-related the work.

17   Q.    Have you -- at HKA, have you been retained by clients in

18   the real estate or homebuilding industries?

19   A.    I have.

20   Q.    And have you been retained by clients involved in

21   litigation involving intellectual property disputes?

22   A.    I have.

23   Q.    Have you previously been retained as an expert in

24   litigation or arbitration?

25   A.    I have.

Direct Examination - David Duffus

1    Q.    Okay.  And have you previously testified at deposition or

2    at trial as an expert?

3    A.    I have.

4    Q.    Can you describe your prior experience as an expert as it

5    relates to this matter that we are here for?

6    A.    Sure.  So, again, as I mentioned, when I first got out of

7    college, I spent time in commercial banking, and among other

8    things did loan underwriting analyses for real estate developers

9    and home builders.  So that's where I first got exposure to --

10   to the industry on the lending side of things.

11        Since I have been in consulting, I have had an opportunity

12   to work on many real estate-related products -- projects, I

13   should say, including those involving homebuilders.

14   Q.    Have you authored any publication regarding the estimation

15   of lost profit and damages?

16   A.    I have.

17   Q.    Can you describe what those are briefly?

18   A.    Sure.  So in my role with the AICPA over the years I have

19   had an opportunity to contribute to a number of what we call

20   practice aids that provide technical guidance to folks who do

21   the kind of work that I do.  And so I was a coauthor of two

22   volumes of a treatise called Attaining Reasonable Certainty in

23   Economic Damage Calculations where I specifically wrote chapters

24   related to using what we call management supplied information,

25   so things like financial projections, for instance.  And I was

Direct Examination - David Duffus

1  also involved in looking -- or writing a chapter that evaluated

2  what we do as experts to evaluate lost revenues and growth rates

3  associated with lost revenues.

4      I had the opportunity to contribute to another practice aid

5  that dealt with the topic called Time Value of Money in

6  Discounting, which I know is something we will talk a little bit

7  about here.  So, again, I was a contributing author to that

8  chapter.

9      In the last 18 months, or so, I also had an opportunity to

10 contribute a chapter to a new book, or actually the second

11 edition of a book, that addressed lost profits damages for new

12 businesses.

13 Q.  So you have written a chapter in a book about lost profits

14 for new business; is that right?

15 A.  That's correct.

16 Q.  And does the resume' attached to the expert reports in this

17 case have additional information about your professional

18 experience?

19 A.  It does.

20      MS. AGNEW:  At this time, the plaintiffs offer

21 David Duffus as an expert in economic damages and lost profits.

22      MR. SHEBELSKIE:  No objection, Your Honor.

23      THE COURT:  All right.  He may give opinion testimony

24 on that subject matter.

25

1    BY MS. AGNEW:

2    Q.    Were you retained by counsel for American Southern Homes

3    Holdings and Ash-Grayhawk in this matter?

4    A.    I was.

5    Q.    Okay.  Were you paid for your time in this matter?

6    A.    Well, my firm was.

7    Q.    How much were you -- how much was your firm paid?

8    A.    So my billing rate, I believe, was $540 an hour.

9    Q.    Are these fees contingent upon -- connected to the outcome

10   of this litigation?

11   A.    No, it is not.

12   Q.    Can you briefly describe your assignment in this matter?

13   A.    Sure.  It was really to do two things:  One was to analyze

14   the damages that were sustained by ASH-Grayhawk and ASH.  So I

15   guess I will refer to ASHH as ASH.  I presume maybe that's how

16   everyone's been doing it.  Then it was also to respond to the

17   expert report put forward by the defendants' expert and an

18   individual named Charles Foster.

19   Q.    And what materials did you review in the course of

20   completing your assignment?

21   A.    I have reviewed a variety of documents.  I mean, I guess at

22   its heart there are contracts and another agreements that are at

23   issue, and so I certainly reviewed those agreements and

24   contracts.

25         There is voluminous other data and documents that have been

Direct Examination - David Duffus

1  produced by the parties, correspondence and things of that

2  nature, pleadings.

3      As an accountant, I looked at financial reports and

4  financial data, things like profit and loss statements, balance

5  sheets, projections, board reports.  As part of my scope, as I

6  mentioned, I looked at the expert report of Mr. Foster, as well

7  as his testimony.  And I consulted back with the professional

8  literature, including some of the AICPA guides that I had an

9  opportunity to help coauthor.

10  Q.   And did this include a review of historical data, actual

11  data about sales and takedowns that ASH-Grayhawk has done over

12  the course of the past few years?

13  A.   Yes.

14  Q.   Did you meet with anyone at ASH -- we will use ASH because

15  that's probably easier for us and the court reporter.

16  A.   Sure.

17  Q.   Did you meet with anyone at ASH while completing your

18  assignment for this case?

19  A.   I did.

20  Q.   Who did you speak with?

21  A.   So I spoke with a number of individuals.  I spoke with Ryan

22  Twiss.  I spoke with Stephen Pehrkon.  And I spoke with

23  Kerry Cassini.

24  Q.   And Mr. Twiss is sitting here.

25      Who is Ms. Cassini?

1  A.   I don't recall her exact title as I sit here, but she is

2  in -- in the financial function, if you will, the financial

3  planning and analysis function at ASH.

4  Q.   Can you explain, at a high level, your opinion as to

5  Plaintiffs' damages as a result with respect to the LPA claim?

6  A.   Certainly.

7       So it's my opinion, which I rendered to a reasonable degree

8  of certainty, that damages for lost profits are $48,759,006.

9  Q.   So we are going to break this number down a bit.

10      At a high level, can you generally explain how someone goes

11  about calculating lost profits?  What does that mean?

12  A.   Yeah.  So, generally we follow a standard framework.  That

13  framework is the parts -- or at least the pieces may be slightly

14  different based on the facts and circumstances of a particular

15  case, but generally that framework is designed to identify lost

16  revenues, the cost that would be associated with generating

17  those revenues, which yield what we call incremental profits.

18  We consider a concept called mitigation.  And after we do that,

19  that yields lost profits.

20      To the extent we are dealing with lost profits that extend

21  out into the future, then we need to consider time, value and

22  money, a concept I talked about a little bit earlier.  And that

23  gives us lost profits on a discounted basis.

24  Q.   And when we are doing a lost profits calculation, are we

25  looking at a but-for world in -- in the future, or what is it we

Direct Examination - David Duffus

1    are actually looking at when we are calculating these numbers?

2    A.    Yeah.    We refer to it as the but-for versus the actual.    So

3    the first part of that framework, for instance when we quantify

4    lost revenues, is to identify revenues that would have been

5    generated but-for what we would call a bad act.    And then that

6    gets compared against the actual revenues that were earned, with

7    that difference yielding lost revenues.

8    Q.    Okay.

9         And so I just want to walk through these numbers a little

10   bit.    There's -- there's a lot of them.    I know we sort of

11   talked through the first steps.

12        So the first step -- what's the first step in calculating

13   lost revenues and how much are the total lost revenues here?

14   A.    So the -- the total is approximately $374 million.    And the

15   first step is really to identify what the but-for is.

16   Q.    Okay.

17        And then -- and then what's the second step?    What do we do

18   next?

19   A.    In terms of the framework?

20   Q.    Yes.    Yes.

21   A.    Then we evaluate the cost that would be incurred to

22   generate those lost revenues.    As it's presented here, we have

23   done a shortcut, if you will, by looking at incremental margin,

24   so basically the incremental profit that would be generated, and

25   I have done that based on a historical percentage.

Direct Examination - David Duffus

1    Q.    Okay.

2          And what profit margin did you apply here?

3    A.    It ranges by year and by damage model, but between 19.4

4    percent and 22.2 percent.

5    Q.    Okay.

6          After calculating -- so we have lost revenues.  We have the

7    profit margins.

8          What comes next?

9    A.    You can multiple the two and that gives you the incremental

10   profit.

11   Q.    And what is that here?

12   A.    It's $76.2 million.

13   Q.    Okay.

14         You mentioned mitigation, which we will talk about in a

15   little bit, but just briefly, how much -- by how much did ASH

16   mitigate its damages in this case?

17   A.    $5.68 million.  So that serves as a reduction to the

18   incremental profits to get lost profit.

19   Q.    Okay.

20         So we subtract that $5.68 million from the incremental

21   profits; is that right?

22   A.    That's correct.

23   Q.    And then what do we do after that?

24   A.    After we subtract that, we have a lost profits figure.  For

25   purposes of the calculation that I put forward in this case, we

Direct Examination – David Duffus

1  have got damages that extend out into the future, so we have to

2  consider that -- a basic concept, again, time, value, money,

3  that recognizes that a dollar today is worth more than a dollar

4  you might receive a year, or two years, or five years in the

5  future.  And so we apply a concept called present value to bring

6  those future amounts back to current value today.

7  Q.    Okay.

8        And what is the discount rate generally that you used in

9  this case?

10 A.    11.9 percent.

11 Q.    And I promise we will -- we'll get back to more on that.

12       What are the total discounted lost profits for the LPA

13 claim here?

14 A.    So approximately $48.76 million.

15 Q.    Okay.

16       We will break each -- we will go through each of these

17 steps a little more.

18       Can you -- let's turn to the first component of the lost

19 profit sort of equation that we have, which is lost revenues.

20       How do you evaluate lost revenues?

21 A.    Well, we start with really how the business was intended to

22 work.  And so first step in that is to identify what the

23 population of lots that would have been sold under the LPA, you

24 know, what that is, and how they would have been taken down over

25 time.

Direct Examination - David Duffus

1   Q.   And then what do we do next?

2   A.   ASH's business was not just to acquire lots, but it was

3   actually to build houses on those lots.  So we need to

4   understand what the selling price of those houses that would

5   have been built on those lots would be.  So we estimate what

6   that is.

7   Q.   Okay.

8        And then what are the last two components?  I think you

9   mentioned four.

10  A.   Sure.

11       Again, we have a damage model that extends out into the

12  future, so one of the things that we need to consider is what's

13  the growth rate?  Would selling prices increase over time?  And

14  so we make some estimations, or I made estimations about what

15  that growth rate is.  And as part of my analysis I also

16  considered the time to actually build and sell a home on a lot.

17  Q.   Okay.

18       Turning to sort of Item Number 1 here, the number of lots,

19  we have heard a lot about lots and a lot about the LPA.  How did

20  you determine the number of lots that we are going to use for

21  the damages lost profits calculation?

22  A.   So in the LPA there were schedules attached which showed

23  what we call "takedowns."  So it basically showed how the lots

24  were expected to be purchased by ASH over time.

25       And you can see, I think on the screen, that there was a

Direct Examination - David Duffus

 1  breakdown in terms of A lots, B lots and C lots.  And so the

 2  first step was really to consult the schedule to understand what

 3  the parties contemplated in terms of the take down on lots.

 4  Q.    Okay.  And how does the takedown schedule factor into the

 5  analysis of lost profits here?

 6  A.    Well, it factors directly in because I used the takedown

 7  schedule, the expectation of how the lots would be acquired by

 8  ASH, to inform my calculation then of the lost lots and

 9  ultimately the lost revenue.

10  Q.    You mentioned the Phase A, Phase B, Phase C, lots and the

11  takedown schedule.

12        Does the -- the Phase A, Phase B, and Phase C lots in the

13  takedown schedule, is there a difference by the community that

14  those lots might be in for your purposes?

15  A.    I certainly considered that those lots would be in

16  different communities, but there are lots, for instance,

17  B lots and C lots, that were actually in the same communities.

18  Q.    Did you make any adjustments to the lot takedown schedule

19  for purposes of your lost profits analysis?

20  A.    Only to recognize actual lots that were taken down over

21  time.  So I start with a lot takedown -- there we go, the slide

22  that shows it right.

23        So I start with the expected universe of lots that are set

24  out in the takedown schedule.  And then I considered -- and that

25  takedown schedule was really set back in 2019, so there was

1    activity after 2019.  We have got a column here that shows

2    activity through March 1 of 2022.

3         That actually happens to be the date of my first report in

4    this case.  So by that time, 444 lots had been taken down so I

5    reduced the universe of lost lots for that.

6         Subsequent to that report another 125 lots were taken down.

7    So again, I considered that, which left me with 971 lots, at

8    least as of the time I did my last report.

9    Q.    Okay.

10        And how many of those lots are Phase C lots?

11   A.    933.

12   Q.    Okay.

13        And do you believe that 933 is a reasonable estimate of the

14   number of Phase C lots that are left for purposes of the damages

15   calculation?

16   A.    I do.

17   Q.    Why is that?

18   A.    Well, in arriving at that number, I not only considered the

19   original universe of C lots that were identified in the LPA, but

20   I also looked at -- and we talked about some of the documents

21   and information that I considered -- I considered responses that

22   the defendants provided to the plaintiffs in connection with

23   interrogatories or questions that were submitted as part of the

24   discovery process.

25        And so my universe of Phase C lots that ultimately informs

Direct Examination - David Duffus

1    the damage calculation was reasonableness tested, if you will,

2    against what the defendants said the population was.

3        So looking at their data, looking at the data from the LPA,

4    looking at the calculation that we are showing here, I believe I

5    have got a reasonable population or universe of lots remaining.

6    Q.    And fair to say that you have updated the number of lots at

7    issue as time has progressed and as the situation has changed,

8    right?

9    A.    It has.  I mean, that's why, for instance, we have got

10   additional lot takedowns after my initial report.

11   Q.    And did you -- in doing this analysis, did you account for

12   a potential increase or a potential decrease in the number of

13   lots that are left?

14   A.    That's certainly a provision in the LPA.  I think there

15   are -- there is language that indicates that the universe could

16   increase or decrease.  It's something I considered.

17       But as I mentioned, I -- what I ultimately did is

18   reconciled what I calculated back to what the defendant said the

19   population of the lots was.

20   Q.    Okay.

21       Have you reviewed information about -- we have just been

22   talking about takedowns -- have you reviewed information about

23   the number of lots that ASH-Grayhawk has taken down

24   historically?

25   A.    I have.

Direct Examination - David Duffus

1  Q.   Okay.

2       How many lots did ASH-Grayhawk take down prior to 2022?

3  A.   So in 2020, which would be the first full year of the

4  combined company, it was 266 lots that were taken down.

5       In 2021, it was 229 lots.

6  Q.   Okay.

7       How do these actual takedown figures compare to what we see

8  in the lot takedown schedule, which is what you are using to

9  project the lot takedowns into the future?

10 A.   I think ultimately, at least up to the point that the

11 disputes flared in this case, ASH-Grayhawk was actually taking

12 down lots more quickly that was on the takedown schedule.

13      Now, certainly, when I look at my lost profits analysis --

14 and again we -- I think we have got the table up on the

15 screen -- we can see, for instance, for 2024, I'm assuming based

16 on the takedown schedule there will be 60 lots taken down, so

17 clearly a fraction of what was historically taken down.

18 Q.   Okay.

19      And you just mentioned it, right, the calculation looks at

20 60 to 180 lots per quarter in the future.

21      What does that tell you about the assumptions that you have

22 made here for your lost profits calculation?

23 A.   Yeah.  And just to be clear, it's 60 to 100 per year.

24 Q.   Yes.  Thank you.

25 A.   That's fine.  I just want to be clear with my testimony.

Direct Examination - David Duffus

1        Well, I mean, I think it's a reasonable assumption in terms

2   of the expected takedowns into the future, because, I mean, even

3   at 180 lots a year, you can see that it's, you know, roughly 50

4   lots lower than what was achieved in 2021, and 80 plus or minus

5   lots lower than what was achieved in 2020.

6   Q.    Earlier you mentioned the defendants' expert Mr. Charles

7   Foster.  Have you reviewed Mr. Foster's expert reports and

8   deposition testimony in this matter?

9   A.    I have.

10  Q.    How does your analysis of these lots compare to

11  Mr. Foster's analysis?

12  A.    Well, he -- I mean, to be upfront about it, he has

13  criticized my universe of Phase C lots and has suggested that

14  the number ought to be lower.

15  Q.    And do you agree with -- with his criticisms of your

16  opinion?

17  A.    I do not.

18  Q.    Can you explain why not?

19  A.    Well, it's really for a number of reasons.  First of all,

20  it's really a function of, again, going back to what the

21  universe was identified to be in the LPA.  It's based on the

22  reasonableness analysis that I have done in terms of what the

23  defendants disclosed in their responses to interrogatories.

24        So, for instance, there's been two responses, at least that

25  I recall, one where the C lot universe was identified at 941 and

1  another where is it was identified at 954.  So, you know, again,

2  I believe my estimate, in light of what the defendants have

3  disclosed, is reasonable.

4      But beyond that, the rationale that Mr. Foster has

5  provided, some of the numbers that he has relied on, in my mind

6  don't make sense.

7      For instance, he suggested that my numbers should be

8  10 percent lower for what he calls "ghost lots".  But his

9  analysis of the, quote, ghost lots, assumes lots went away when,

10  in fact, they were reclassified from B lots to A lots.  So the

11  lots didn't go away, it was just a function of how they were

12  classified in the universe of A, B or C lots.

13  Q.  Are you aware that Mr. Foster, the defendants' expert, has

14  also criticized your opinion for assuming that ASH will buy all

15  of the lots in the takedown schedule?

16  A.  Yes.

17  Q.  And how would you respond to that criticism?

18  A.  Well, I mean, I am not a lawyer, but there's an agreement

19  in place between the parties that specified what was supposed to

20  be taken down with some potential variability in those numbers.

21  So I guess it effectively assumes that ASH would breach the

22  contract.  I just don't think that's a reasonable assumption.

23  Q.  Okay.

24      So we have been talking about lots.  After you identify the

25  universe of lots that go into this calculation, what did you do?

Direct Examination - David Duffus

1   A.   Well, what I did then was to identify a selling price.  So,

2   again, when ASH acquires a lot, the whole intention and the

3   whole business is to build a house on that lot.  So we need to

4   figure out, as I said a little bit earlier, what the selling

5   price of a home on that lot or the lots would be.

6        And so what I did is I started with a figure for 2022,

7   which is the first year in my damage model, and then I project

8   selling prices going forward.

9   Q.   Okay.

10       And what is the selling price that you are using for the

11  year 2022?

12  A.   It's $350,510.

13  Q.   Okay.

14       And do you know what the sort of top range is that we get

15  to in the future?

16  A.   Oh, it's -- well, actually, I see the number there.

17  $431,083.

18  Q.   At a high level, can you describe how you went about

19  calculating the average selling price figure?

20  A.   Sure.

21       So I actually started with a projection model that ASH

22  personnel put together.  I mentioned a little bit earlier

23  Kerry Cassini.  I understand she was the author of that model.

24  And so I evaluated the model that they put together.  And that

25  model, among other things, had an estimated selling price for

Direct Examination - David Duffus

1    lots in 2022 of $350,510.

2    Q.   Okay.

3        Let's talk about that projection model.  I think we will be

4    hearing about it a lot.

5        Can you explain, generally, what the projection model is?

6    A.   It was actually a very robust model, in my opinion, in that

7    it looked at how ASH expected to build out the various

8    communities where the lots at issue in this case were located.

9        It looked at not just how it expected to build out those

10   communities but what home types would be built within each

11   community.  So all the way from townhomes up to I think some of

12   the homes were actually luxury homes.  So there was a -- there

13   was a whole component that looked at the mix of homes that would

14   be built, the selling prices that would go with that, the costs

15   associated with that as well, and then ultimately the profits

16   that ASH expected to generate both on a community basis and on

17   an overall basis.

18   Q.   Okay.

19       And did you use this -- who created the projection model,

20   if you know?

21   A.   I believe it was Ms. Cassini.  Now maybe there were others

22   who assisted her in that, but I think she was the primary driver

23   behind it.

24   Q.   And Ms. Cassini works at ASH; is that right?

25   A.   That's correct.

Direct Examination – David Duffus

1   Q.   Did you use the projection model that was prepared by ASH

2   in your analysis?

3   A.   It was a starting point in my analysis.  I mean, certainly

4   it helped to inform me about ASH's expectations.

5   Q.   Okay.

6        And why did you decide to use this projection model as a

7   starting point?

8   A.   Well, for a number of reason.  I mean, first of all, again,

9   it was something that ASH developed as part of trying to

10  understand what its expectations were on the development of the

11  lots at issue.  And, again, it was a very robust model that

12  looked at things community-by-community.

13       But over and above that, I did my own independent testing

14  and analysis on that model to make a determination as to whether

15  I thought it was reliable for me to rely on and I reached a

16  conclusion that it was.

17       So from that I then used that as a starting point for my

18  analysis.

19  Q.   Very briefly, can you talk about what you did to test the

20  assumptions in that model to determine that it was something

21  that you could rely on?

22  A.   Sure.

23       So I broadly followed a framework that was actually set out

24  in the professional literature related to the work that I do as

25  a CPA damage expert.  And so there are a number of steps that

Direct Examination - David Duffus

1  are really identified in that literature as kind of best

2  practices, if you will, for CPA experts to follow.

3      I started with actually an interview of Ms. Cassini to

4  develop an understanding of the projection model itself and

5  really, frankly, her expertise to do that.  I wanted to make

6  sure she was the right person to have developed that model.  I

7  didn't want to have somebody who didn't know what they were

8  doing put it together.  So I want to make sure that I evaluate

9  that she's got the right expertise to do it, which I concluded

10 that she does, based on her work experience.  And then also,

11 through that discussion, understood how the model was

12 constructed.

13 Q.   Okay.

14     Did you look at other documents and data related to this

15 projection model?

16 A.   I did.

17 Q.   And what types of other information did you examine?

18 A.   Well, I started with historical financial statements.  So

19 we can see a little bit earlier that ASH-Grayhawk, after the

20 November 2019 acquisition of Mr. Erickson's companies, actually

21 sold lots or purchased lots, at least, and sold homes; 266 lots

22 in 2020, 229 lots in 2029 [sic].

23     So I looked at their historical financial information to

24 evaluate whether what was built into the projection model was

25 consistent with what they historically had generated out of

Direct Examination - David Duffus

1  their financial performance.

2  Q.   And have you continued to update your calculations with new

3  data as time has past?  I believe you mentioned your first

4  report was from March of 2022.  So have you continued to update

5  your opinions in your analysis?

6  A.   I have.

7  Q.   We are going to go back now -- I know we are skipping

8  around a little bit.

9  A.   That's fine.

10  Q.   We are going to go back to the selling price we were

11  talking about.

12      What is the selling price that you used for 2022 again?

13  A.   $350,510.

14  Q.   Okay.

15      Did you do anything to test the reasonableness of that

16  average sales price amount?

17  A.   I did.

18  Q.   Okay.

19      And what did you do?

20  A.   Well, I looked at that number against various other data

21  sources that I had.  So I touched on, a moment ago, actual sales

22  that were made, actual financial data that exists for

23  ASH-Grayhawk, historically.  So, for instance, from 2022, I can

24  see that the average selling price of a home for ASH-Grayhawk

25  was $385,704.

Direct Examination - David Duffus

1          If I look back to 2021 that number is $303,837.  There were

2    21 homes that were actually presold in 2021 and the average

3    selling price on those presales was approximately 315,000.

4          Beyond looking at just actual financial data for ASH, I

5    also looked at other data.  There is information, for instance,

6    that the federal government provides, U.S. Census Bureau data,

7    where I could see that in 2020 the average selling price of a

8    home in the United States was $391,900, and that the median, or

9    kind of the point where 50 percent of the sales are above, 50

10   percent of the sales are below, that that was $336,900.

11   Q.   And in looking at the numbers on the chart that we just

12   discussed it looks like actual sales prices in 2021 were

13   slightly lower than the average sales price assumption of

14   $350,510.

15         Can you explain why that is?

16   A.   Well, I think based on my analysis of the financial data,

17   and the projection model, it largely has to do with the initial

18   mix of homes that were sold and how those homes were rolled out.

19         I think in 2021 the mix tended toward lower -- lower priced

20   homes.

21   Q.   Does the data in the ASH projection model include, let's

22   call it, actual historical data about the sale of homes that

23   were on Phase C lots?

24   A.   I believe there were some Phase C lots in here, a

25   relatively limited number, although this data also reflects

Direct Examination - David Duffus

1    sales of lots in communities where Phase C lots exists.  So in

2    other words, B lots -- primarily B lots, I think, that were

3    ultimately sold, so it would reflect selling prices in the same

4    communities where the C lots existed.

5    Q.   We have covered that.  We will skip right on ahead.

6         Okay.

7         So we mentioned earlier that there are four components --

8    we had the boxes on the screen -- for calculating lost revenues.

9         What's the third component?

10   A.   It's to identify a growth rate to apply to the selling

11   price of the homes out into the future.

12   Q.   Okay.

13        And what's the purpose of applying this growth rate?

14   What's a growth rate here?

15   A.   So I used a growth rate of 3 percent.  And really it's

16   designed to reflect, I think, just basic reality that prices

17   tend to increase over time.

18   Q.   And what growth rate did you use here?

19   A.   3 percent.

20   Q.   And what -- what assumptions and what data is that

21   3 percent growth rate based on?

22   A.   Sure.

23        So, again, I looked at multiple data sources to assess the

24   reasonableness of the assumption that I use.  So I started with

25   an evaluation of the projection model itself.  So the projection

Direct Examination - David Duffus

1   model had growth rates in between 2 1/2 and 4 percent over time.

2   So that was -- was one number or range of numbers that I

3   considered.

4        I also consulted, as I did with the selling price

5   information, ASH's -- ASH-Grayhawk's actual experience with

6   respect to its selling prices.  So I could see, for instance,

7   that between 2020 and 2021 the price of -- average selling price

8   of its homes increased by almost 13 percent.

9        I can see that in 2020 to 2021 their projection was about

10  16 percent.  So a little bit -- actual performance was a little

11  bit lower.

12       And then again I went and I looked at data from the federal

13  government, Census Bureau data.  Actually I looked at -- at I

14  think it was 8 years' worth of data to ultimately evaluate

15  trends in selling prices, both nationally as well as what they

16  call the southern region in the United States.

17       So as we can see on the table, the national growth rate and

18  the average price of a home was 4.4 percent and in the southern

19  region it was 6 percent.

20  Q.   Has your opinion regarding the 3 percent growth rate

21  changed since you first issued your opinions in this case?

22  A.   No.

23  Q.   Can you explain why not?

24  A.   Well, I think it's really a function of the testing that I

25  have done here.  So we can see, for instance, that historically

Direct Examination – David Duffus

1    ASH has experienced significantly higher growth rates, or a

2    higher growth rate, than what's assumed in the model.  And I

3    think when you look at the national data -- and the reason I

4    considered an 8-year period is that, generally, you know, in my

5    profession we tend to look at things in 5-year windows because

6    it kind of captures economic cycles, the ups and the downs in

7    markets and whatnot.

8        Actually looking at 8 years of data, I think gives me a

9    broader trend to look at and I can see that, again, my

10   assumption is reasonable, in my opinion, in light of overall

11   trends in national data over time.

12   Q.   We spoke earlier about the defendants' damages expert

13   Mr. Foster.  Does Mr. Foster offer an opinion on a different

14   average selling price that we should use here?

15   A.   No, he does not.

16   Q.   Does Mr. Foster offer an opinion about a different growth

17   rate that we should use for this analysis?

18   A.   No, he did not.

19   Q.   We also discussed earlier the time that it takes to sell

20   homes on those lost lots.  As you said, it's ASH's business to

21   build homes, not just buy the lots.

22       How did you account for this in your analysis?

23   A.   So I have assumed that there is a 6-month time lag, if you

24   will, between when ASH takes down a lot.  In that six months it

25   will build that home, and at the end of 6 months will actually

Direct Examination - David Duffus

1   sell that home to -- to a homebuyer.

2   Q.   How does it 6-month assumption compare to the assumptions

3   in Mr. Foster's analysis, the defendants' expert?

4   A.   He's -- in his most recent report he has suggested now that

5   it should be 9 months not 6 months.

6   Q.   And how do you respond to that?

7   A.   Well, I disagree with it.  I think 6 months is reasonable.

8   Q.   Okay.

9        And at the time -- if that time is less than 6 months, or

10  longer than 6 months, what is the impact on your lost profits

11  calculation?

12  A.   Well, really what it would do is extend the lost profit

13  calculation out because, again, we are dealing with a finite

14  universe of lots.

15       As I touched on a bit early, I am not assuming that ASH is

16  going to breach the contract.  I am assuming they will buy all

17  of those lots.  So to the extent there is some slowdown in terms

18  of the -- the time period between when the lots are taken down

19  and when a home is actually built and sold, it just extends the

20  damage period out into the future.

21  Q.   But it wouldn't change the total number of lost lots on

22  which we are calculating lost profits, right?

23  A.   No, it does not.

24  Q.   Okay.

25       All right.  We're back -- we're back to the next step.

Direct Examination - David Duffus

1        So after we have evaluated lost revenues, as we see here in
2   the green, what comes next?  What did you do next?
3   A.   So then I considered incremental profit.  And, again,
4   incremental profit is a shortcut, if you will, for considering
5   the costs that would be incurred to actually build and sell
6   homes.
7   Q.   Okay.
8        And these would be costs that we subtract from the
9   revenues, right?
10  A.   That's correct.  When you do a lost profits analysis -- and
11  it's called lost profits for a reason -- it's not lost revenue.
12  You have to consider the cost that would be incurred to actually
13  build the homes.
14  Q.   Okay.  And what sources of information did you look at in
15  order to determine what the costs that we need to subtract are?
16  A.   So there were a number of sources that I consulted:  ASH
17  and ASH-Grayhawk's historical financial statements.  There are
18  schedules that are attached to those financial statements that
19  are prepared by their outside accounting firm that specifically
20  show the components of their cost.
21       I looked at the projection model.  As I mentioned earlier,
22  the projection model had very detailed information with respect
23  to not just selling price but the cost that ASH would incur to
24  actually build homes.
25       There were also a number reports that ASH maintains in the

1    normal course of business -- not sure of the exact title.  I

2    call it gross margin report.  Basically it's a -- or the

3    contributions margins report that, again, looks at selling

4    prices and looks at the costs associated with those homes.

5        And then lastly, I would just add that I -- after

6    evaluating that information I met with ASH management to talk

7    about the costs as well.

8    Q.   Okay.

9        Let's talk about the type of costs that we are talking

10   about.  What categories or types of expenses and costs are we

11   subtracting here?

12   A.   Sure.

13       So some I think are probably pretty evident, right?  We

14   talked about buying lots, so there's a cost to buy the lots.  So

15   the first item that's considered is what's the lot cost.

16       There is direct construction cost to build a home.  So you

17   have got the lumber, the shingles, the siding, you know, the

18   concrete, whatever it may be that goes into it.  The labor of

19   the guys that are actually out there building the house.  So

20   that needs to be accounted for as well.

21       There is what I call indirect costs.  So if you have ever

22   seen a construction site, there's job trailers that are out

23   there where the folks who are overseeing the site work.  There

24   are things like permits and other fees and expenses that are

25   incurred.  Those indirect costs are accounted for as well.

Direct Examination - David Duffus

1    When a builder builds a home they provide a warranty.  And
2  so we have included a component in there for any potential
3  warranty claims if the builder has to come back and fix
4  something that wasn't right the first time that they built it.
5      And there is interest costs.  So ASH finances the
6  construction of the homes and they incur interest when they pay
7  their bank loan.  So we have included that.
8      And then there's what we call rollover costs and closing
9  costs.  So costs that you have to pay to a real estate agent for
10 selling the home, the title company for doing the title work,
11 et cetera.
12 Q.   Okay.
13     We have talked about a lot of -- a lot of different costs.
14 Are there any categories of costs that you did not include in
15 this list that we have to subtract?
16 A.   Yes.
17 Q.   Okay.  And what are those costs?
18 A.   They are what we would call overhead costs.
19 Q.   Can you explain briefly what an -- what an overhead cost
20 is?
21 A.   Sure.
22     Maybe the easiest way to think about it is -- and this
23 won't capture everything that might be considered to be
24 overhead, but ASH has an office and they pay rent on that
25 office.  That's an overhead cost.

Direct Examination - David Duffus

1          ASH has executives that help to run the business, their

2     CEO, their general counsel, their accounting or finance folks

3     like Ms. Cassini, their salaries are considered overhead cost.

4          There's, you know, other expenses that may go with

5     actually -- paying the outside accountant, for instance, in

6     terms of running the business and having financial statements

7     prepared.  That would be overhead cost.

8     Q.   And so you said that we do not include those overhead costs

9     in the amount that we are subtracting for the costs.

10         Why don't we include overhead costs?

11    A.   So when we do a lost profits analysis -- and I think our

12    kind of overall summary slide shows this, and actually your

13    title here shows it, really what we are trying to evaluate is

14    what we call incremental profits or incremental expense.  So

15    what are those expenses that directly relate to the construction

16    of a home?

17         I think it's pretty easy to understand that if you are

18    going to build a home, you are going to have to incur the cost

19    for the lumber, the shingles, the guys who are out there

20    pounding nails and wiring the home and doing the dry wall and

21    everything that's needed.

22         But costs that are in overhead -- and maybe rent's a good

23    example, right?  The rent on ASH's office space, that rent

24    doesn't go up just because they build one more home.  It's not

25    like their landlord comes to them and says, Well, geez, you guys

Direct Examination - David Duffus

1   just built another home, so let me increase your rent by, you

2   know, X dollars or X percent.  It's a fixed cost that stays

3   fixed throughout a certain term.  So it's not incremental and it

4   shouldn't be deducted as a component of lost profits.

5   Q.   Okay.

6        So after we identify all of the costs that we need to

7   subtract, what did you do?

8   A.   Well, from that I identified an incremental profit margin.

9   So revenue minus expense equals incremental profit.  I've

10  calculated that margin as percentage of revenue.  And for

11  purposes of my analysis starting in 2020, I used 19.4 percent.

12  Q.   And what did you do to test the reasonableness of that

13  19.4 percent?

14  A.   So, again, I looked at historical financial information,

15  historical performance information for ASH-Grayhawk, so I could

16  see.  And my 19.4 percent was exactly on what ASH achieved in

17  2022.

18       I was able to look at what they budgeted for 2022.  They

19  had actually budgeted a slightly higher number.  So what I am

20  using is high -- is lower, I should say, than their budget.

21       We can see in 2021 their actual incremental margin was

22  20.57 percent.

23       And then I also consulted public data, so data on other

24  home builders, and I could see that margins for similar home

25  builders was between 22.2 and 22.8 percent.

1      So, again, my assumption is lower than what the public data

2  suggest.

3  Q.   And how do the margins that you used compare to the margins

4  that Mr. Foster, the defendants' expert, has used here?

5  A.   Well, he has used exactly this same margin with one

6  adjustment, and that is, he argues that overhead costs ought to

7  be also added to that number.

8  Q.   Okay.

9      And I believe we discussed earlier after we apply this

10  profit margin that leaves us with incremental lost profits of

11  $76.2 million; is that right?

12  A.   That's correct.

13  Q.   Okay.

14      Have you calculated the average incremental lost profits on

15  a per-lot basis, so by each lot?

16  A.   I have.

17  Q.   And how did you calculate that?

18  A.   So in my analysis -- and I think you had a slide up a

19  little bit earlier that showed the expected home closings, the

20  lost revenue, and, ultimately, the incremental profit.  So the

21  most straightforward way to do that is you can take the

22  incremental profit number for any given year and you can divide

23  it by the number of home closings in that particular year and

24  that will give you the incremental profit number in any -- per

25  home in any given year.

Direct Examination - David Duffus

1    Q.    Okay.

2         We talked about how sales prices go up over time.  So does

3    this average lost profits per lot number also vary over time in

4    the same way?

5    A.    It does.

6    Q.    Okay.

7         What was that amount for 2022?  So the average lost profits

8    per lot for 2022?

9    A.    I am going off my memory, so if I don't have it hundred

10   percent precise I will stand corrected.  I believe it's $67,880.

11   Q.    Okay.

12        And do you know what that amount is for 2023?

13   A.    I believe it's $69,650.

14   Q.    Okay.

15        And we discussed how that number varies over time.

16        Do you have a rough sense of what that number looks like in

17   the future beyond where we sit here today in 2023?

18   A.    Yeah.

19        So, the number in 2025, I believe -- or no, 2024 I think is

20   where we are.  But it's 72,800.  And by the end of my damage

21   model it goes up to about $95,500.

22   Q.    Okay.

23        So we've sort of talked about the plus side of the

24   equation.  We've talked about revenues.  We've talked about

25   costs.  Is there anything else that we need to take into account

Direct Examination - David Duffus

1    after we have our incremental profit number?

2    A.    Yes.   It's the concept of mitigation.

3    Q.    Okay.   Let's talk about that.

4          Can you explain what mitigation is?   What does mitigation

5    mean?

6    A.    Sure.

7          So I will talk about it in the context of, you know, being

8    a damage expert and what my professional guidance is, and that

9    guidance really reflects a couple of concepts; one, is that the

10   plaintiff does have to take reasonable steps to reduce their

11   damages.

12         So they -- the theory is that if somebody has been damaged

13   they can't just sit back and allow those damages to accrue if

14   there are reasonable efforts that could be taken to reduce the

15   damage amount.

16         It also reflects, though, that there is a burden that

17   exists on the part of the defendant to demonstrate that the

18   plaintiff didn't follow reasonable steps to mitigate the

19   damages.   So needing to identify what the plaintiff should have

20   done if they didn't reasonably mitigate those losses.

21   Q.    Okay.

22         Just briefly, what did ASH do to mitigate its damages here?

23   A.    It bought lots in other communities from other developers

24   or landowners.

25   Q.    Okay.

Direct Examination - David Duffus

```
 1        And did you account for those mitigation lots, we can call

 2   them, in your analysis here?

 3   A.    I did.

 4   Q.    Okay.

 5        And how do you go about doing that?

 6   A.    Well, I actually did it by evaluating actual purchases of

 7   lots that ASH made in other communities in looking at either the

 8   actual performance or the financial projections that went with

 9   the purchase of those lots in other communities.

10        MS. AGNEW:  Teri, can you possibly advance the slide?

11   I think my clicker might be dead, but we will get there.

12        Thank you.

13        Maybe one more.

14        I think it's working again.  Great.  Thanks so much.

15   BY MS. AGNEW:

16   Q.    Okay.  Great.

17        So we were talking about the mitigation that you

18   considered.  How many lots has ASH-Grayhawk taken down,

19   purchased, in order to mitigate its damages?

20   A.    116.

21   Q.    Okay.

22        And do you know how many homes have been started, so

23   construction on those homes has started on those lots?

24   A.    55.

25   Q.    Okay.
```

Direct Examination - David Duffus

1      And do you know how many homes have been sold on those

2  mitigation lots?

3  A.    35.

4  Q.    Okay.

5      And what dollar amount of incremental profits has

6  ASH-Grayhawk earned from the sale of those homes on those lots?

7  A.    It's about $5.4 million.

8  Q.    Okay.

9      And we were talking earlier about how we have to subtract

10  costs.  Do we also subtract mitigation from -- from our total

11  number?

12  A.    We do.

13  Q.    When you accounted for mitigation -- we have talked about

14  this a little bit -- what type of opportunity that ASH-Grayhawk

15  had did you consider?

16  A.    Well, I considered actual property that was acquired.  So

17  these various communities that are identified on the slide

18  that's up right now represents locations where ASH actually

19  purchased -- or ASH-Grayhawk actually purchased lots.

20  Q.    Okay.

21      And did you account for mitigation opportunities that might

22  arise in the future beyond where we sit today?

23  A.    I have not.

24  Q.    Okay.

25      And why not?  Can you explain why not?

Direct Examination - David Duffus

1    A.    Yeah.  I think fundamentally it's -- it's because it would

2    require me to first speculate where ASH would acquire lots,

3    right?  So what is that mitigation?  What communities were

4    available?  When would they buy those lots?

5         There are many, I think, open questions that would really

6    require speculation that would really yield an unreasonable

7    result.  So that would be the biggest thing, is just trying to,

8    you know, kind of be a soothsayer, if you will, trying to figure

9    out what they might do in 2026 to mitigate.

10   Q.    Are you aware today of any mitigation opportunities that

11   ASH-Grayhawk is considering that you have not included in your

12   analysis?

13   A.    I am unaware of any.

14   Q.    Okay.

15        We are back -- back to where we started.  Let's talk

16   next -- we talked earlier a couple of times about present value

17   and the time value of money.  Can we talk about discounting?

18        Why is it necessary to discount to present value as we have

19   been talking about?

20   A.    Sure.

21        So it really is rooted in the fundamental recognition that

22   a dollar today is worth more than a dollar received out into the

23   future.  So if we were to give a plaintiff the full value, if

24   they will, of a claim that's out into the future, and we assume

25   that over time they could invest that money and earn a return on

Direct Examination - David Duffus

1   it, they would essentially get a windfall, if you carried it out

2   into the future, that would be over and above what they would

3   have generated at that time.  So we discount to present value to

4   kind of account for that concept to -- to not only recognize the

5   time value of money, but also to bake into the analysis some

6   assessment as well about the risk and uncertainty of generating

7   those profits into the future.

8   Q.   Okay.

9        And did you use a specific date when we apply the discount

10  and when the discount starts?

11  A.   Yes.

12  Q.   What's that date?

13  A.   January 1 of 2024.

14  Q.   Okay.

15       And why did you use that date?

16  A.   Well, it really is a reflection of here we are close to the

17  end of September of 2023.  Obviously not the same as January 1,

18  but it also reflects that there could be some time between when

19  an award ultimately may be made and payment may be made.  So

20  really recognizing all of that for ease of calculation we used

21  January 1 of 2024.

22  Q.   And what discount rate did you use to apply to the lost

23  profits here?

24  A.   11.9 percent.

25  Q.   And how did you decide to use that 11.9 percent figure?

Direct Examination - David Duffus

1    A.    I based it on what we call ASH's weighted average cost to

2    capital or WACC.  So the WACC really is a finance term that

3    really just tries to understand how a particular entity would

4    fund its operations.  There are a variety of different ways

5    operations can be funded.

6         They can get bank loans, for instance.  And we know when we

7    look at the historical financials that ASH gets bank loans.

8         They could also have equity.  So individual investors who

9    think about the stock market, who buy shares in a company,

10   that's an equity investment.  And those equity investments are

11   also used to help fund the operation.

12        So we look at the mix of that debt and equity in a company

13   and how they will fund their operations to come up with an

14   overall cost of capital.  Basically, the cost of paying the

15   borrowers or the equity investors their return that they

16   require.

17   Q.    And have you changed or updated your discount rate over the

18   course of this litigation?

19   A.    Yes.

20   Q.    Okay.

21        And how so?

22   A.    It's actually gone up.

23   Q.    Okay.

24        And what -- if the discount rate goes up, what is the

25   impact on the overall lost profits analysis?

Direct Examination - David Duffus

1    A.    It reduces the damages.

2    Q.    Okay.  How does the discount rate you used here compare to

3    what Mr. Foster, the defendants' expert, has done in this case?

4    A.    My number is lower.

5    Q.    After you determined what the discount rate was, did you

6    use a particular convention to apply that rate?

7    A.    I did.  I used something called the midyear convention.

8    Q.    Okay.

9          And that brings us back to where we started.

10         So after accounting for mitigation and discounting, what is

11   your estimate of the total lost profit damages with respect to

12   the Land Purchase Agreement here?

13   A.    It's approximately $48.76 million.  To be precise

14   $48,759,006.

15             MS. AGNEW:  Thank you, Mr. Duffus.

16             Your Honor, at this time we can transition into the

17   other segments, if that works for you.

18             THE COURT:  Ladies and gentlemen, there are certain

19   things the Court has to decide that you don't have to decide.

20   Why don't we go ahead and the cross-examination for the issues

21   the jury has to resolve at this time.  And then when we take a

22   break and I will hear from the witness outside the presence of

23   the jury on those issues.

24             Go ahead and cross-examine him on the issues that the

25   jury has to decide.

1          MR. SHEBELSKIE:  All right.  Thank you, Judge.

2          THE COURT:  Ladies and gentlemen, just so it's clear,

3   you will ultimately have to decide the damages, if any, caused

4   by the alleged failure of the defendants to provide the lots the

5   plaintiffs claim they should have provided.

6          So with regard to the claims involving the use of the

7   trademarks, and the trade name, those types of damages, I have

8   to decide those.  So all of this testimony you have heard you

9   will need to consider in your verdict.

10         Go ahead.

11         MR. SHEBELSKIE:  Thank you.

12                       CROSS-EXAMINATION

13  BY MR. SHEBELSKIE:

14  Q.   Good morning, Mr. Duffus.

15  A.   Good morning.

16  Q.   I would like to start with a couple of preliminaries.  You

17  told the jury that your hourly rate is $540 an hour.

18         What have been the total fees incurred by your firm for

19  your firm's work on this engagement?

20  A.   I don't know precisely.  I would say plus or minus about

21  250,000.

22  Q.   And has anyone at your firm helped you on this work that

23  has cost about a quarter of a million dollars?

24  A.   Yes.

25  Q.   And who is that?

Cross-Examination - David Duffus

1   A.   So I had a number of staff that worked with me.  Primarily

2   Tyler Donnelly.  D-O-N-N-L-E-Y, I believe.  I could have that

3   wrong.  Maybe two L's.

4        Ben Sternberg also worked with me on it.

5        I believe Tasha Dunn was also a staff person that we used.

6        Typically, when we do our work we go through what we call a

7   peer review or a concurring partner review.  I am sure I did

8   that.  I don't remember which of my partners I had do it.

9   Q.   Okay.  Anybody else?

10  A.   That's what I know off the top of my head.

11  Q.   All right.

12       Now two general points about your damage calculation that

13  the jury just heard.

14       First, am I right that that is a damage calculation for the

15  ASH-Grayhawk plaintiff, correct, the entity that sells the

16  houses?

17  A.   Well, I mean ASH-Grayhawk certainly was going to be the

18  purchaser and developer and homebuilder on those lots.  I can't

19  speak to how, from a corporate structure standpoint, any damage

20  award might ultimately flow up.

21  Q.   All right.

22       And, second, you have given a dollar figure but have you

23  attempted to allocate your damage calculation among the various

24  defendants?

25  A.   I have not.

Cross-Examination – David Duffus

1    Q.    All right.  So we got that established.  Now let's go into

2    your calculation itself.

3         I heard you say a number of variables go into the model,

4    correct?

5    A.    Yeah.

6    Q.    One input is the number of lots, correct?

7    A.    That's correct.

8    Q.    That's the foundation for the rest of the model, right?

9    A.    That's correct.

10   Q.    All right.

11        Then you talked about, number two, the number of lots ASH

12   would buy.  You concluded that ASH would buy every lot, Phase C

13   lot that's created, correct?

14   A.    That's correct.

15   Q.    Also a critical step in the analysis, right?

16   A.    It's a step in the analysis, sure.

17   Q.    It has to be reliable and accurate, correct?

18   A.    I do my calculation to a reasonable degree of certainty, so

19   it's important.

20   Q.    Yeah.

21        Then, the third thing I heard you testify about was the

22   sales price for the houses, right?

23   A.    That's correct.

24   Q.    Then, of course, you need to know the cost to build the

25   house, right?

Cross-Examination - David Duffus

1    A.    You do.

2    Q.    Yeah.

3          And you had that list of expenses under costs.  One is the

4    cost for the lots, right?

5    A.    Correct.

6    Q.    All right.  Cost for the lots.

7          And then you had a list of these other costs, I will just

8    call them the building costs, okay?

9          Got to know those too, right?

10   A.    Yes.

11   Q.    And then I heard you say you got to discount the number, so

12   you need a discount rate.

13         Correct, sir?

14   A.    Well, there is a step on mitigation before that.

15   Q.    Oh.  You are absolutely right, sir.

16         Mitigation in between cost and the discount rate.

17         Have I got them all down?

18   A.    I mean, there is more in the way of cost than what you have

19   listed, but broad strokes, yes.

20   Q.    Yeah.

21         And for your calculation to be reliable, every one of these

22   steps itself has to be reliable, correct?

23   A.    I think so.  I think that's why I have done the testing and

24   analysis that I have done to establish the reasonableness of the

25   assumptions that I have applied.

Cross-Examination – David Duffus

1    Q.   All right.

2        Well, then, let's start with number one, the number of

3    lots.

4            MR. SHEBELSKIE:  All right.

5            Now, just so we can orient the jury here, Mr. Walters,

6    could you pull up Mr. Duffus's PowerPoint presentation here and

7    go to page 12?

8    BY MR. SHEBELSKIE:

9    Q.   Do I understand, sir, that for purposes of your

10   calculations today your model assumes there will be made,

11   developed, 975 Phase C lots?

12   A.   No.  It assumes 933 C lots are subject to damages.

13   Q.   Right.

14   A.   The number out in the far right column.

15   Q.   That's the number remaining to be developed and delivered?

16   A.   Correct.  Those are the -- that's the number of lots

17   subject to damages.

18   Q.   Right.

19       My question, though, was:  The universe of lot figures,

20   that's the universe of lots, Phase C lots created and delivered

21   in the past, plus those not yet delivered in the future?

22   A.   It's actually the universe identified in the LPA.

23   Q.   All right.  So 975 on the LPA.

24       And then you say you take down -- you reduce that number by

25   15 for something discussed in an initial report; is that

Cross-Examination – David Duffus

1    correct?

2    A.    Those are the -- yeah, those are the number of lots that

3    were taken down between the LPA date and my initial report.

4    Q.    All right.

5          And this is your initial expert report of March 1st, 2022?

6    A.    Correct.

7    Q.    And so as of your initial report, your calculation would be

8    down to 960?

9    A.    That's correct.

10   Q.    All right.

11         So now we get 960 with your initial report.

12         And then since your initial report last -- a year ago

13   March -- you say another 27 Phase C lots have been developed and

14   delivered, correct?

15         So we would take off 27 from the 960, right?

16   A.    That's correct.

17   Q.    All right.  So this would -- that gets us down to 933 lots?

18   A.    That's correct.

19   Q.    Because we are taking off another 27 since the initial

20   report.

21         All right.  Now you showed the jury -- let's go look at

22   Step 1.

23         Just so we are clear now, you, yourself, did not do any

24   independent determination of how many lots could be built on

25   these Phase C neighborhoods, correct?

1    A.    I mean, I relied on what was in the LPA and what was

2    disclosed in the defendants' interrogatory responses.  I mean, I

3    am not an engineer.

4    Q.    That's my point.

5          Did you -- do you know what factors go in to how many lots

6    could be built on these Phase C neighborhoods from an

7    engineering perspective?

8    A.    I am not an engineer.

9    Q.    Did you visit these properties to make any assessment about

10    the number of lots that could be built on these properties?

11    A.    That would be outside of my expertise as an accountant.

12    Q.    So the answer is no?

13    A.    Yeah, I can't do it.  I am not an engineer.

14    Q.    Have you visited these properties?

15    A.    I have not.

16    Q.    All right.  Do you know where they are?

17    A.    I know they are out -- out around this area in Columbus,

18    Georgia.

19    Q.    I mean, if we looked at a list of these properties, would

20    you know whether they are in Alabama or Georgia?

21    A.    I might.  I would have to see some of addresses on them.

22    But I know they are generally in this, you know, region or area.

23    I mean, they are not -- it's not like they are in Tennessee, for

24    instance.

25    Q.    Do you know whether they are in Auburn versus Columbus?

Cross-Examination – David Duffus

 1    A.    There might have been some in Auburn.

 2    Q.    Do you think the housing market and prices in Auburn are

 3    the same as in Columbus?

 4    A.    It's my understanding that they are subject to the same

 5    factors.

 6    Q.    All right.

 7          So you, yourself, did not do an engineering assessment to

 8    determine the number of lots that can be built in the Phase C

 9    neighborhoods and wouldn't have the expertise to do it yourself,

10    correct?

11    A.    I am a damages expert.  Not an engineer.

12    Q.    All right.

13          So the 975 you took from the Land Purchase Agreement,

14    correct?

15    A.    That was my starting point, the LPA.

16    Q.    All right.  And you showed the jury, very briefly on the

17    screen, Schedule 1 to the Land Purchase Agreement, correct?

18    A.    Correct.

19              MR. SHEBELSKIE:  Let's put that up on the screen so

20    that jury can study it in a little more detail.  This would be

21    Plaintiffs' Exhibit 246E.  Please go to page 16 of the exhibits,

22    Mr. Walters.

23    BY MR. SHEBELSKIE:

24    Q.    Okay.  We now have on the screen Schedule 1 to the Land

25    Purchase Agreement.

Cross-Examination – David Duffus

1      That's what you had shown to the jury, correct?

2   A.   That's correct.

3   Q.   All right.

4      And you showed the jury here this top part of the schedule,

5   but I want to go down to the bottom of the schedule where this

6   schedule has the total number of Phase C lots.

7           MR. SHEBELSKIE:  Can we zoom in on that, Mr. Walters?

8   BY MR. SHEBELSKIE:

9   Q.   We see here what this schedule says for the Phase C lots.

10  It's showing only 693 lots.  Isn't that accurate, sir?

11  A.   Yes, because it doesn't carry it out all the way to the

12  end.  I think if you look at the note below it indicates the

13  Phase C lots will continue to be purchased, or continue until

14  all lots are purchased, so it extends beyond year 7.

15  Q.   I understand that, sir.

16     But you cannot look at this Schedule 1 and bridge the gap

17  between 693 and 975, can you, sir?

18  A.   I think there are other schedules within the LPA that allow

19  you to do that.

20  Q.   All right.

21     Well, I'm just relying on the one you showed the jury, sir.

22     Now --

23  A.   That was a demonstrative of the LPA.  It wasn't intended to

24  be every lot.

25  Q.   All right.

Cross-Examination – David Duffus

1      So on Schedule 1 -- let's get a different color to

2  distinguish.  Schedule 1 -- what was that number, sir? 693.

3      All right.  So then moving on, if we look at your initial

4  report, then we would see that your damage calculations as of

5  last March were based on assumptions of 960 Phase C lots?

6  A.   That's correct.

7           MR. SHEBELSKIE:  Well, let's pull up then,

8  Mr. Walters, on the screen, Defense Exhibit 462, which is a copy

9  of your opening report, Mr. Duffus.

10 BY MR. SHEBELSKIE:

11 Q.   Do you see on the screen this is a copy of your opening

12 report dated March 1st, 2022?

13 A.   It appears to be.

14           MR. SHEBELSKIE:  Your Honor, I may not put this into

15 evidence but I would like to show the jury.

16           THE COURT:  If you are going to show the jury, it

17 needs to be in evidence.

18           MR. SHEBELSKIE:  All right.  Then we will put it in

19 evidence.

20           MS. AGNEW:  Well, it's an expert report.  It's not

21 evidence for the jury to see.  I am fine if they can look at it,

22 but it would not be admitted into evidence under the rules.

23           MR. SHEBELSKIE:  We will use it as a demonstrative,

24 Your Honor.

25           THE COURT:  Demonstrative?  I mean, there is no doubt

Cross-Examination – David Duffus

| | |
|---|---|
| 1 | that you can use the report, his own report, to impeach him, if |
| 2 | that's what you are attempting to do. |
| 3 | MR. SHEBELSKIE:  Yes.  But I don't believe -- |
| 4 | THE COURT:  If you want to impeach him with it, then |
| 5 | you need to go to the designated portions of the report if you |
| 6 | want to put those up for the jury to see -- |
| 7 | MR. SHEBELSKIE:  I will do that, sir. |
| 8 | THE COURT:  -- while you are doing that, then that |
| 9 | would be appropriate. |
| 10 | MR. SHEBELSKIE:  Okay.  I will do that, sir. |
| 11 | MS. AGNEW:  Okay.  We have no objection to showing it |
| 12 | for impeachment only, but -- |
| 13 | THE COURT:  I am not going to admit the entire report |
| 14 | but you can use the report to -- for impeachment purposes. |
| 15 | MR. SHEBELSKIE:  Yes, sir.  Thank you. |
| 16 | THE COURT:  Go ahead. |
| 17 | MR. SHEBELSKIE:  Okay.  Mr. Walters, can you scroll |
| 18 | down to page 14 of this report? |
| 19 | Two more pages, please. |
| 20 | BY MR. SHEBELSKIE: |
| 21 | Q.   Now do you see here, Mr. Duffus, this is page 14 of your |
| 22 | report? |
| 23 | A.   I do. |
| 24 | MR. SHEBELSKIE:  All right.  Your Honor, I would like |
| 25 | to show the jury this page for purposes of impeachment. |

Cross-Examination – David Duffus

```
 1              THE COURT:  They are looking at it.

 2              MR. SHEBELSKIE:  All right.

 3              THE COURT:  They already got it.

 4              MR. SHEBELSKIE:  All right.

 5    BY MR. SHEBELSKIE:

 6    Q.   So here we see, at the top of this page, the 960 figure,

 7    correct?

 8    A.   Correct.

 9    Q.   All right.

10         But for purposes of the damage calculation you did in March

11    you actually deducted lots from that, correct?

12    A.   There were adjustments that were made.  I think you can see

13    here there is a reference to something called the updated land

14    banking agreement.  So, yeah, there were adjustments that were

15    made --

16    Q.   All right.

17    A.   -- plus the takedowns.

18    Q.   Let's scroll to the next page.

19         Here is your summary of the Phase C lost lots as of last

20    March.

21         And you used for your calculation then 953 lots, correct?

22    A.   I may have.  I don't recall as I sit here if I used that

23    number.  I have since updated it so I don't recall exactly.

24    Q.   All right.  So we see 953 on page 14 of your report there.

25         Now, you also had attached to this report a chart that
```

Cross-Examination – David Duffus

1   summarized your calculations, right, Exhibit 4 to your report?

2   A.   You would have to show it to me.  I don't recall.

3   Q.   Yes, sir.  I will.  I may need my magnifying glass.  Let's

4   go to page 76 of the report.

5        All right.

6        Now, Exhibit 4 to your report was your summary at that

7   time, last March, of the lost profits, correct?

8   A.   You will have to -- I'm sorry, if you would blow it up for

9   me --

10  Q.   Sure, let's do that.

11  A.   -- I would appreciate it.

12       It appears to be, yes.

13  Q.   All right.  And in your chart then you see the Phase C lot

14  line right there on the left marked, and the total number of

15  lots in your calculation at that time --

16            MR. SHEBELSKIE:  Can you enlarge that, Mr. Walters.

17  BY MR. SHEBELSKIE:

18  Q.   -- do you see is 955 lots?

19  A.   I do.

20  Q.   All right.  So on page 14 of your report you used 953.  On

21  Exhibit 4 you used 955, right?

22  A.   It looks like that's the number, yeah.

23  Q.   All right.  Why the discrepancy between page 14 of your

24  report and Exhibit 4 of your report?

25  A.   I don't know as I sit here.

1    Q.   Well, did you create this model that used -- that came up

2    with the numbers we see here on Exhibit 4 of your initial

3    report?

4    A.   I did.

5    Q.   All right.

6        Well, did you -- is this an error due to input, you know, a

7    mistake in data input, or is it a flaw in the model's algorithm

8    and formulas that are used to compute these numbers, or can you

9    tell us?

10   A.   I mean, look, I can see that the total is 1,096 so my guess

11   is it has -- I am guessing because I don't recall -- it has to

12   do with a mix between B and C lots.

13   Q.   All right.

14       Well, if you don't know, I don't want you to guess.

15       Then you told us the next step you did, since your initial

16   report, was you deducted 27 more Phase C lots, right?

17   A.   That's correct.

18   Q.   All right.  But then if we look at your second report --

19       MR. SHEBELSKIE:  Let's pull that up, Mr. Walters.

20   That's Defense Exhibit 484.

21   BY MR. SHEBELSKIE:

22   Q.   We have on the screen, do you see that, Mr. Duffus, your

23   second report the rebuttal report, dated May 10, 2022?

24   A.   I see that.

25       MR. SHEBELSKIE:  Your Honor, I would like to show one

Cross-Examination – David Duffus

1    page of this to the jury and the witness for impeachment.  And

2    that's page 30 of his second report.

3            Mr. Walters, can you pull that up?

4            THE COURT:  All right.

5    BY MR. SHEBELSKIE:

6    Q.   Here on page 30 of your report, you talk about how you are

7    following the approach and methodology set forth in your

8    original report, correct?

9    A.   That's correct.

10   Q.   All right.  But you are making an adjustment in the number

11   of Phase C lots.

12           There's 27 Phase C lots you are removing, right?

13   A.   Correct, for additional takedowns.

14   Q.   All right.  And then you are also removing 2 B lots?

15   A.   That's correct, for additional takedowns.

16   Q.   All right.

17           And that's how you get to the 933.  But if we subtract 27

18   from 953 -- let's do that.  Always afraid to do math in my head.

19   27 -- what is that going to get us to?  953 minus 27 --

20   A.   76.  I can't read your handwriting.

21   Q.   I know, it's sloppy.

22           926, right?  Not 933, right?

23           Can you explain to the jury the discrepancies then in these

24   numbers from your report to what you have testified today in

25   court?

Cross-Examination – David Duffus

1  A.   Certainly.

2       I don't think there is any discrepancy.  As I think I

3  testified in my direct, my analysis has been ongoing.  There has

4  been additional takedowns, additional work that's been done.

5  And as I sit here today, it's my opinion that there is 933 lots

6  subject to the lost profits damages.

7  Q.   All right.  Let's go to the second factor.

8       This would be the number of lots ASH buys, correct?

9  A.   Correct.

10  Q.   You said -- I believe your testimony was if ASH did not buy

11  every C lot that was developed, that would be the breach of the

12  Land Purchase Agreement, correct?

13       More or less that's what you said?

14  A.   Well, I think I was responding to an assumption that --

15  that ASH did not perform its obligations.

16  Q.   All right.

17       Are you aware of the provisions of the Land Purchase

18  Agreement that have been referred to as the ROFO, or Right of

19  First Offer provisions?

20  A.   I am.

21  Q.   Are you aware that those provisions allow ASH not to buy

22  Phase C lots if the price of the lots exceeds a certain

23  standard?

24  A.   I think it gives them the option not to if it exceeds a

25  certain standard.

Cross-Examination - David Duffus

1   Q.   And did your model take into account the ROFO provisions
2   and how they may interact with purchase decisions?
3   A.   Yes.
4   Q.   I'm sorry?
5   A.   Yes.
6   Q.   All right.  And how did you model that?
7   A.   Well, I had discussions with ASH management.  I reviewed
8   contemporaneous documentation about -- or that contained
9   information about their intentions surrounding a lot.  And so
10  while I have certainly considered that provision, my analysis is
11  really premised on an assumption because it has to be an
12  assumption, but an assumption that they would buy all lots that
13  were available to them.
14  Q.   All right.
15       Then related to that, let's go back to your report, your
16  initial report, Defense Exhibit 462, and in, particular page 15
17  of the report.
18       MR. SHEBELSKIE:  Let's blow up the -- enlarge the
19  chart, Table 4.
20  BY MR. SHEBELSKIE:
21  Q.   All right.  This is your calculation at that time of the
22  number of Phase C lots, correct?
23  A.   Well, it's the calculation of all the lots.
24  Q.   I want to focus on the Phase C column in particular.
25       Now, for purposes of your analysis here today, did you

Cross-Examination – David Duffus

1    assume that all the lots in these Phase C neighborhoods would be

2    developed at the same time and made available to ASH?

3    A.    No.    I mean, I think there is an underlying assumption in

4    the projection model that they be developed at differing points

5    in time.

6    Q.    All right.

7        And you mean there would be a schedule for the development?

8    A.    I don't know.    I mean, I understand that there -- that

9    that's an item that's in dispute.    I guess what I would say is,

10   I mean, I don't think there was an expectation that 953 lots, or

11   whatever the number was, would be developed at all once and

12   turned over all at once.

13   Q.    All right.

14       So your model then has to decide which of these

15   neighborhoods, these Phase C neighborhoods, would be developed

16   first, then which would be second, which would be third,

17   et cetera, correct?

18   A.    The underlying pricing information in the projection model,

19   I think, as I testified a little bit earlier, reflects a rollout

20   over time.

21   Q.    All right.

22       And which neighborhood in your model is developed first?

23   A.    I would have to go back and see.    I know, for instance, and

24   I think you had up a little bit earlier, 27 C lots that were

25   ultimately turned over.    I know those were in Garrett Pines.    So

Cross-Examination - David Duffus

1   clearly that would be, you know, underdevelopment.  I would have

2   to go back and look and see what the rollout was.  I don't

3   recall as I sit here.

4   Q.   Well, where did you get the rollout -- whatever the order

5   of sequence of neighborhoods is, in your model, where did you

6   get that sequence, since there was no agreement among the

7   parties on a Phase C development schedule?

8   A.   The projection model looks at how ASH expected to build out

9   over time.

10   Q.   Did you do a projection based on what Mr. Erickson's

11   companies project the rollout would be over time?

12   A.   I don't recall that I have seen that.

13   Q.   All right.

14       Now that we got that, do you have any understanding, then,

15   of how the rollout of these Phase C lots, whatever order that

16   you used in your model, how does that affect the ROFO pricing

17   model under the -- ROFO pricing provisions under the Land

18   Purchase Agreement?  Or do you have any understanding of that at

19   all?

20   A.   I understand what that provision is.  I don't understand

21   your question.

22   Q.   All right.  Fair enough.

23       Do you understand that the cost of the lots affects -- has

24   a determination on whether or not the ROFO provision kicks in?

25   A.   It's one component of that provision.

Cross-Examination – David Duffus

1   Q.   Right.

2        So in order to know whether or not ASH would exercise its

3   ROFO rights, you would need to know, among other things, the

4   sales prices for the lots, right?  The cost of the lots?

5   Because the cost of the lots affects that, right?

6   A.   Again, it's a component of the calculation.

7   Q.   Yeah.

8   A.   There are other elements to it.

9   Q.   Yeah, that's one component.

10        So let me ask you, how did you determine what the cost

11   would be for the lots used in your model?  How did you determine

12   that input that affects the ROFO decision, and, of course, the

13   cost that you would end up deducting from the sales prices?

14   A.   I have used the historical cost among other measures.  So

15   going back to the schedules we looked at earlier, historical

16   cost is a percentage of historical revenue, specifically for the

17   ASH-Grayhawk division.

18   Q.   All right.

19        So you looked at the prices ASH had paid for lots in 2020

20   and 2021?

21   A.   As a percentage of revenue, yes.

22   Q.   And do you realize that most of those lots and, in fact,

23   all but two of them, were Phase A and Phase B lots?

24   A.   I would have to go back and look.  I mean, I know the

25   majority of the lots at the outset were A and B; A being lots

Cross-Examination – David Duffus

1    that were fully developed at the transaction date, B lots being

2    those that were already in process, C being undeveloped lots.

3    So it makes sense they would be A and B lots.

4    Q.    Right.

5          And, in fact, I think you testified on direct that there

6    was only a relatively minor number of C lots purchased by ASH in

7    the first two years, correct?

8    A.    I think we looked at 27 that were in Garrett Pines, which

9    was one of the adjustments that I made.  There may have been a

10   small number as well beyond that.

11   Q.    Would it surprise you to learn that in 2020, in 2021 there

12   were only, in fact, two C lots ever bought by ASH?

13   A.    Wouldn't surprise me.

14   Q.    All right.  So this historical data that you are relying on

15   to determine the cost of the lots is primarily A and B lots,

16   correct?

17   A.    Those would be the lots purchased, sure.

18   Q.    All right.  These are A and B lot prices.

19         Now, do you realize, sir, that there is a completely

20   different pricing formula under the Land Purchase Agreement for

21   A and B lots versus C lots?

22   A.    I would have to go back and look.  I mean, I think at their

23   root they all deal with the development cost therein with some

24   potential escalators and also cost for things like taxes and

25   other expenses incurred.

1    Q.    Don't you know, sir, under the Land Purchase Agreement,

2    prices are specified, locked in, for the A and B lots; whereas,

3    the C lots have no prices but instead are based on a formula?

4    A.    I think that's what I just testified.

5    Q.    All right.  Did you use the formula for the Phase C lots to

6    compute the lot cost used in your model?

7    A.    No.  Again, I used lot cost as a percentage of revenue to

8    determine or evaluate what it would be going forward.  And

9    that's based on historical information.

10   Q.    All right.

11         Then the sales prices that you used, they were the sales

12   prices ASH received on homes that sold in 2020 and 2021 and some

13   part of 2022?

14   A.    I think all of 2022, yes.

15   Q.    All right.  That's right.  You've updated it now for all of

16   2022, correct?

17   A.    Right.  I have continued to update my analysis to bring

18   things up as close to date of trial as possible.

19   Q.    All right.

20         Let's go back and look at your list of the Phase C

21   neighborhoods and the number of what you call lost lots, at

22   least as of -- it's not the number I am interested in so much as

23   just the communities.

24         Let's focus on the bottom part of the chart here, the ones

25   Beach North Parkway, Belvedere Parkway, Buena Vista Road, McKee

1    Road, Garrett Pines, Auburn Farms, Joseph Stephens, Hodges

2    Drive, Upland Way.

3        Do you see those?  They constitute the bulk of the lost

4    Phase C lots, correct?

5    A.   Yes.

6    Q.   All right.  Now in 2020, 2021 or 2022 had ASH sold any

7    homes in those Phase C communities?

8    A.   I would have to go back and look at the schedule.  I don't

9    recall.

10   Q.   Don't you know, sir, that, in fact, there were no Phase A

11   and Phase B lots in those communities?  They are solely Phase C

12   communities?

13   A.   Well, I can only see what my schedule shows, which is there

14   were no Phase B.  I don't know if there were any Phase A.

15   Q.   Do you also see North Ivey Park, according to your chart,

16   is solely a Phase B community?

17   A.   It looks like it's -- at least there is 50 Phase C lots.

18   Again, I can't see if there is Phase A lots there.

19   Q.   And do you know, for example, that one of the communities

20   in which ASH sold many houses in 2021 was Auburn Links?  Are you

21   familiar with that neighborhood?

22   A.   I have heard it, yeah.

23   Q.   You have heard -- have you visited?

24   A.   I haven't visited any.

25   Q.   Okay.

1       So do you know that Auburn Links community, for example, is

2   a golf course community outside of Auburn, Alabama?

3   A.   I haven't visited.  I don't know.

4   Q.   All right.

5       Do you think that the Auburn Links golf course community is

6   comparable for lots and homes that would be built in any of

7   these Phase C neighborhoods?

8   A.   It can be.

9   Q.   Not it can be.  Is it, sir?

10  A.   It is.  I mean, I am using selling prices historically as a

11  proxy for what was projected in the model.

12  Q.   Do you know where Beach North Parkway and Belvedere Park

13  are?

14  A.   No, I don't.

15  Q.   Do you know where Buena Vista Road is?

16  A.   I don't.

17  Q.   Do you know where Upland Way, Hodges Drive, Joseph

18  Stephens, Auburn Farms are?  Any of these communities?

19  A.   I believe Auburn Farms is in Auburn, Alabama as well.  But

20  beyond that, again, I would have to look at the addresses.

21  Q.   Well, to do this analysis to determine sales prices did you

22  obtain, I don't know, a real estate appraisal from realtors for

23  prices of homes in these Phase C neighborhoods?

24  A.   Again, I relied on the projection model in the ASH -- the

25  experts who were developing and selling the homes, what they

Cross-Examination – David Duffus

1   expected the prices to be.

2   Q.   Well, did you prepare any type of comparative market

3   analysis for any of these Phase C communities to come up with

4   the price for sales of homes in these communities?

5   A.   I guess the way I can answer that is to say, again, I

6   looked at pricing in the projection model as my starting point.

7   I validated that against historical information.  I validated it

8   against national information.  And that's my reasonableness

9   check.  And I think it is a reasonableness check of the

10  appropriateness of the average selling price that I have used.

11  Q.   Do you know what a comparative market analysis is in real

12  estate?

13  A.   I do, yes.

14  Q.   All right.

15       Do you know what an absorption analysis is?

16  A.   I do.

17  Q.   Do you know what a pricing analysis is?

18  A.   I do.

19  Q.   Do you know that companies in the real world hire

20  professionals to do those types of analyses to determine sales

21  price and profitability they may make on real estate

22  transactions?

23  A.   They might -- may hire firms to do that, sure.

24  Q.   Do you know, in fact, that ASH regularly uses that in its

25  business to make these kind of investment decisions?

Cross-Examination - David Duffus

1    A.    They may.

2    Q.    You didn't ask?

3    A.    Well, again, I sat down and talked through them about the

4    projection model.  It's a very robust model.  Now whether they

5    used data from third-party consultants like that to feed into

6    it, I don't recall.  But, certainly, we talked through all the

7    assumptions to rollout in the price.

8    Q.    So you sat down and talked to these people and you don't

9    know what analyses they did, or didn't do, or experts they did,

10   or didn't, hire to come up with the sales prices and the

11   projections?

12   A.    I didn't say that.

13   Q.    Well, what are they?  Tell us.  What analyses did these

14   folks at ASH use to come up with the sales prices on which you

15   have relied for your opinions to the jury?

16   A.    Again, I went through a very robust model with them.  I

17   don't have my notes in front of me from the discussion that took

18   place 18 or 20 months ago, but certainly I talked through them

19   about the basis and support for it and, again, validated it

20   against actual financial performance.

21   Q.    All right.

22         So if you can't -- that's all you can tell us today, then,

23   on this topic?

24   A.    I think I have given you a pretty complete answer.

25         Again, it's not a memory test for me to go back 20 months

Cross-Examination – David Duffus

1    to say what I discussed in a specific conversation.

2        What I will say is they gave me information, which I

3    validated against their historical performance, against

4    third-party data, including from the federal government, and I

5    am comfortable that the selling prices that I am using are

6    reasonable and supportable.

7    Q.    Well, you mentioned that federal government thing.  And if

8    I understand it right, what you said you relied on was the

9    United States Census Bureau's average and median selling prices

10   for homes in the United States.

11   A.    Correct.

12   Q.    So homes from the Hamptons in Long Island, to beachfront

13   homes in Hawaii, to Pacific Palisade homes in California, all of

14   that goes into the mix to come up with the average price?

15   A.    As does Columbus, Georgia and Auburn, Alabama and other

16   communities throughout the United States.  It is broad data.

17   Q.    Let me ask you this:  If you were selling your house would

18   you price -- use as a sales price the average median sales price

19   in the United States?

20   A.    No.  I would use what I used in this case, which is actual

21   data on homes sold in this marketplace.

22   Q.    All right.

23       Then another fact component that you rely on are building

24   costs, correct?

25   A.    Correct.

Cross-Examination – David Duffus

1  Q.   And I think you have testified that you did not include

2  overhead?

3  A.   That's correct.

4  Q.   All right.  So no overhead.

5       MR. SHEBELSKIE:  Let's pull up the chart, your list of

6  the costs you did include.  So, Mr. Walters, if we can go to

7  Mr. Duffus's --

8       THE COURT:  Mr. Shebelskie, we have been down here

9  about two hours this morning.  Would this be a good place to

10 take a break?

11      MR. SHEBELSKIE:  We can, or I probably have five

12 minutes.

13      THE COURT:  Okay.  Five minutes.

14      MR. SHEBELSKIE:  If we can pull that Power (sic)

15 presentation of Mr. Duffus and go to page 18.

16 BY MR. SHEBELSKIE:

17 Q.   Here we go.  Categories of cost.  We have talked about the

18 lot cost.  We have talked about the overhead that's not here.  I

19 want to ask you about one other category.

20      Have you included in your model the various types of

21 incentives that ASH adopted in 2022 for homebuyers?

22 A.   I have seen the incentives.  I can't recall if this served

23 as revenue.  I would have to look at financials.  It may have

24 served as revenue reductions which would go into the average

25 cost of a home.  I don't recall exactly, but it is something we

```
 1    evaluated.

 2    Q.   All right.

 3         In any event, it's not a cost you have listed here on

 4    page 18 of your presentation, correct?

 5    A.   Right, because it may have gone into adjusting the selling

 6    price.

 7              MR. SHEBELSKIE:  Your Honor, I pass the witness.

 8              THE COURT:  Mr. Agnew, do you have any redirect?

 9              MS. AGNEW:  Yes, Your Honor.

10              THE COURT:  Go ahead and do that now before we take a

11    break.

12                         REDIRECT EXAMINATION

13    BY MS. AGNEW:

14    Q.   Mr. Duffus, Mr. Shebelskie asked you whether or not you

15    were a civil engineer.

16         You said you are not a civil engineer; is that right?

17    A.   That is correct.

18    Q.   But you are a CPA?

19    A.   I am.

20    Q.   And we discussed earlier all of the qualifications you have

21    as a CPA and someone who regularly does lost profits

22    calculation; is that right?

23    A.   That's correct.

24    Q.   And you have a lot of experience in doing lost profits

25    calculations; is that right?
```

Redirect Examination - David Duffus

1    A.    I do.

2    Q.    Okay.  And your opinion in this case is about lost profits

3    and damages, right?

4    A.    Yes.

5    Q.    And it's not about lots, it's not lot development and

6    specifics of how and when lots get developed, right?

7    A.    That's correct.

8    Q.    Okay.

9          You regularly -- I believe you testified earlier that you

10   regularly perform lost profits analyses for clients; is that

11   right?

12   A.    I do.

13   Q.    Okay.

14         And do you do that work for clients in the homebuilding

15   business?

16   A.    I have.

17   Q.    Okay.

18         And other clients in the real estate business more

19   generally?

20   A.    I have, yes.

21   Q.    You walked through with Mr. Shebelskie the LPA takedown

22   schedule and we discussed the number of lots that factor into

23   your analysis and how you arrived at the number of 933 Phase C

24   lots.

25         Do you recall that?

Redirect Examination – David Duffus

```
 1   A.    I do.
 2           MS. AGNEW:  Okay.  Teri, can we pull up PX 246E.
 3   BY MS. AGNEW:
 4   Q.    And I believe you and Mr. Shebelskie discussed various
 5   schedules at the back of the LPA.
 6         Do you recall that?
 7   A.    I think he showed me -- I don't know if it was the actual
 8   schedule or if -- maybe it was the actual schedule, but it was
 9   the one that was in the PowerPoints we looked at a little bit
10   earlier on the takedowns over time.
11   Q.    Okay.
12         Let's look the some of the other schedules.
13           MS. AGNEW:  Teri, can you turn to PX 246E 24?
14           And can we blow up the bottom Exhibit C, future ROFO
15   lots.  It's a little bit hard to read.
16   BY MS. AGNEW:
17   Q.    Do you see this, Mr. Duffus, on your screen?
18   A.    I do.
19   Q.    Have you viewed this schedule before?
20   A.    Yes.  In fact, that's what I was referring to when I was
21   questioned about the numbers -- the C lot numbers on the earlier
22   schedule.
23   Q.    Okay.
24         And I believe, if I can read the number correctly, at the
25   bottom of that estimated lots column, that says 964.
```

Redirect Examination - David Duffus

1     Do you see that?

2   A.   I do.

3   Q.   Okay.  So that would be 964 Phase C lots?

4   A.   That's correct.

5   Q.   And is this the number of Phase C lots that Mr. Erickson,

6   the defendants, promised to sell ASH-Grayhawk?

7   A.   That's my understanding, yes.

8   Q.   And 964 is approximately 960 lots and that's the number

9   that you used in your first opinion; is that right?

10  A.   It is.  I think there were some adjustments post the LPA

11  that ultimately allowed me to get to 960.

12  Q.   Okay.

13       And then how did you get from the 960 lots in your first

14  report to the 933 lots that we discussed earlier?

15  A.   It's the reduction for the 27 Garrett Pines lots that were

16  highlighted in one of the, I guess, excerpts from my second

17  report.

18  Q.   Okay.

19       And in arriving at that 933 lot number, did you look at

20  other documents and data outside of the takedown schedule?

21  A.   I did.

22  Q.   Okay.

23       What are those?

24  A.   Well, I talked a little bit earlier in my direct testimony

25  about interrogatory answers.  So there were interrogatory

1    answers submitted by the defendants that identified the numbers

2    changed over time.  They actually went up, I think, between

3    responses.  The first response was at 941.  The second was at

4    954.  So that was certainly a piece of information that I looked

5    at, in addition to what we can see here in other contemporaneous

6    documents that showed what the adjustments and ultimate

7    takedowns were.

8    Q.    Okay.

9          So you used information that the defendants and

10   Mr. Erickson provided to arrive at that number of 933 Phase C

11   lots?

12   A.    That's correct.

13   Q.    Okay.

14         You also spoke with Mr. Shebelskie about the ROFO

15   provision.  Just very briefly, what is a ROFO?

16   A.    So it stands for Right of First Offer.  So the ROFO is the

17   first letter of each, you know, part of that phrase.

18   Q.    Okay.

19         And we discussed earlier how you factored lot costs in your

20   analysis.  So the amount that ASH-Grayhawk would have to pay in

21   order to buy a lot; is that right?

22   A.    That's correct.

23   Q.    Okay.

24         Have you considered that right of first offer provision in

25   determining the lot costs in your model?

Redirect Examination – David Duffus

1    A.    I have.

2    Q.    Okay.

3          And how did you factor that provision in?

4    A.    Well, it's certainly part of the LPA and so I read it,

5    understood that, at least as it relates to the C lots, there

6    were provisions that would allow for adjustments, I think, in

7    terms of what was paid, or at least what ASH might be committed

8    to take down and pay.

9          But, again, I think a lot of my analysis was really based

10   on the historical experience.  So there were lots that have

11   already been developed, the costs are already in, and we can see

12   what was actually incurred over time.

13   Q.    Okay.

14         Have you seen any evidence that the right of first offer,

15   the ROFO, would be triggered in this case?

16   A.    Such that ASH wouldn't buy the lots?

17   Q.    Correct.

18   A.    No, I haven't seen evidence on that.

19   Q.    And you haven't speculated on whether or not that right of

20   first offer may or may not be triggered in the future; is that

21   right?

22   A.    I mean, I haven't speculated on it but I think -- and I

23   will go back to I think what was part of my response to the

24   cross-examination, and that is that information that I have

25   seen, the discussions that I have had with ASH management,

Redirect Examination - David Duffus

1  suggest that they wanted all of the lots they could get.  So I

2  mean to assume, for instance, that the ROFO would be triggered

3  and ASH would not want the lots is kind of inconsistent with the

4  information and data that I have seen.

5  Q.    Okay.

6        We also talked a little bit, when you spoke with

7  Mr. Shebelskie, about the order of Phase C lot development and

8  where those Phase C lots are located.

9        Is the model that you used based on the takedown schedule?

10  A.    No.  I mean, the takedown schedule that we have used is

11  really what we would call the minimum takedowns, so just the

12  minimum number of lots that ASH was required to take down every

13  quarter or every year.  The projection model kind of worked at a

14  different pace, if you will.

15  Q.    And I believe you testified that the projection model had a

16  relatively minor number of Phase C lots in it.

17        Do you recall that?

18  A.    In the sense of actual, historical?

19  Q.    Yes.

20  A.    -- yes.

21  Q.    And why is that?  Why are there so few Phase C lots in the

22  model?

23  A.    Well, I mean, there are Phase C lots projected in the model

24  in terms of future sales, but, again -- and I think this came

25  out in the cross-examination and I do agree with it -- A lots

Redirect Examination – David Duffus

1   were fully developed at the time of the transaction.  So it

2   makes sense that they would be the first ones that would

3   actually -- on which homes would be developed.

4        B's were already partially developed.  And so, again, it

5   makes sense that that development would be completed and they

6   would be sold ahead of the C lots.

7        So the C lots bring up the tail and would be developed at a

8   later date.

9   Q.   Okay.

10       And you also mentioned that there aren't many Phase C lots

11  in the actual historical data.

12       Why is that?

13  A.   Well, for just the reason I mentioned, that, I mean, the

14  A's were completed.  The B's were close to being completed.  So

15  it makes sense that they would be the ones sold.

16  Q.   And Mr. Erickson, the defendants, have not sold Phase C to

17  ASH-Grayhawk and that would be why there are not actual Phase C

18  lots in the model, right?

19  A.   Yeah.  I think with the exception of 27 Garrett Pines lots

20  that have now, you know, been delivered.

21  Q.   Okay.

22       We also spoke both in terms of lot costs and the sales

23  prices of the home that the actual data, as we have been

24  discussing, has mostly A and B lots and not as many C lots.

25       Is there anything wrong with using sales prices or lot

Redirect Examination – David Duffus

1   costs from A and B lots to project what they might be for

2   Phase C lots?

3   A.   No.

4   Q.   Okay.

5        Can you explain why not?

6   A.   Well, I think the implication is that there is some magic,

7   if you will, to an A lot versus a B lot versus a C lot.

8        My read of the agreement, and understanding, is that the

9   only magic, so to speak, between an A or a B or a C lot is just

10  the state of development.  In other words, a C lot can be

11  identical to an A or a B lot, it hasn't been developed yet.

12  Q.   And I believe Mr. Shebelskie walked through your different

13  reports over time.

14       Is it fair to say that your opinions have changed over time

15  as facts and things in the real world have shifted over time

16  since March of 2022?

17  A.   I would say my opinions broadly haven't changed but the

18  numbers have just because we are continuously updating things as

19  additional lots are taken down, as things change in the market.

20  I think you asked me a little bit earlier about whether my

21  discount rate went up.  I mean, it did because it's reflecting

22  changes in the market.  Interest rates have gone up and that's a

23  component of a discount rate, so that's influenced the

24  calculation.  But overall opinions remain the same.

25            MS. AGNEW:  Thank you.  No further questions.

Recross-Examination - David Duffus

```
 1            THE COURT:  Any recross?  Two questions, Your Honor.
 2                      RECROSS-EXAMINATION
 3  BY MR. SHEBELSKIE:
 4  Q.    Mr. Duffus, we just saw on the screen that schedule lot
 5  count of 964 lots, Phase C lots, right?
 6  A.    From the LPA?  Yes.
 7  Q.    LPA.  All right.
 8        How did you get from the 964 to 975 you used in your
 9  opinions here today?
10  A.    I would have to go back and look.  It may very well have
11  been due to -- I think we looked at a schedule earlier that
12  there were adjustments subsequent to the LPA.
13  Q.    Have you ever seen a projection for Mr. Erickson's company
14  that increased the number of Phase C lots projected to be built?
15  A.    Yes.
16  Q.    All right.  And what date was that?
17  A.    It was in his interrogatory answers.
18  Q.    All right.  Then we will look at that with Mr. Erickson.
19        Thank you.
20            MR. SHEBELSKIE:  Thank you, Your Honor.
21            THE COURT:  Any redirect?
22            MS. AGNEW:  No.
23            THE COURT:  Okay.  Ladies and gentlemen, I think the
24  way we can make the most efficient use of our time is for me to
25  go ahead and let you take an early lunch.  And then during that
```

 1    lunch break, I can hear the evidence that I need to hear on the

 2    trademark claim and then you won't be sitting up there in the

 3    jury room wasting your time while I am doing that.  So we need

 4    to take a little longer than normal.  It's 11:15.  If you can be

 5    back here by 12:45.  That will be about an hour and a half.  Be

 6    back here and ready to go at 12:45.

 7            Do not discuss the case during your break.

 8            You may go.  Enjoy your lunch.

 9        (Jury out at 11:15.)

10            THE COURT:  Okay.  I am sure staff and lawyers need a

11    break as well.  We will take ten minutes and we will come back

12    and handle the examination of the witness on the other claims.

13    And then after we finish that, whatever remains for lunch.

14            We will be in recess for ten minutes.

15        (Recess taken 11:15.)

16        (Resumed at 11:27.)

17            THE COURT:  Please be seated.  Bring the witness back.

18            He didn't go to lunch, did he?

19            MR. KRAMER:  No, sir.

20            MS. AGNEW:  No, sir.

21            THE COURT:  All right.

22            Sir, if you will come back to the witness stand.

23            Let me put on the record, we are resuming the

24    testimony of Mr. Duffus, the plaintiffs' expert, outside the

25    presence of the jury for purposes of providing testimony on

1    Plaintiffs' claim related to trade name, trademark infringement,

2    and the issue of disgorgement of profits, which is for the Court

3    to decide and not the jury.

4           You may proceed with your examination on those issues.

5           Ms. Agnew.

6           MS. AGNEW:  Thank you.

7                       REDIRECT EXAMINATION

8    BY MS. AGNEW:

9    Q.   Thank you, Mr. Duffus, for resuming.  We will cover two

10   topics, one will be the trademark infringement claim as well as

11   the LPA deposits.

12          MS. AGNEW:  Teri, can you put up slide 25, please.

13   BY MS. AGNEW:

14   Q.   So let's turn to your opinion about trademark infringement

15   claim in this case.

16          At a high level, can you explain your opinion in this case?

17   A.   Yes.  It's my opinion that the damages in the form of

18   disgorgement associated with the trademark claim are $2,562,166.

19   Q.   Okay.  Let's talk a little bit about the methodology that

20   you used for calculating disgorgement.

21          What is the first few steps in the methodology that you

22   used to calculate the profits to be disgorged?

23   A.   So it starts with what I understand to be the plaintiffs'

24   burden when quantifying disgorgement damages in a trademark

25   infringement case.  And that is to first identify the homes in

Redirect Examination - David Duffus

1  this case that were sold by the defendant using the infringing

2  trademarks and trade names.

3      Now it's not just the homes that you need to identify, but

4  we also need to identify the selling price that ultimately leads

5  to the revenue related to the sale of those homes.  And with the

6  selling price, with the universe of homes, then I calculated the

7  gross revenues.

8  Q.   Okay.

9      So let's go with step 1, which is identifying the universe

10 of homes.

11     How did you do that?

12 A.   There were schedules, or a schedule, submitted in

13 connection with interrogatory answers that identified 34 homes

14 that were sold with the infringing trademarks and trade name.

15 Q.   Did you apply any date limitations when identifying that

16 universe of 34 homes?

17 A.   Well, it certainly started after November 15 of 2019, so

18 the closing date of the transaction between ASH and Grayhawk the

19 original transaction.

20     And then that carried forward.  And I think, based on my

21 analysis and the scheduling, it may have extended around July 31

22 of 2021.

23 Q.   Did you use the contract sales date?  The permit date?

24 What date did you use to isolate those 34 homes?

25 A.   I did it based on the contract date.

Redirect Examination - David Duffus

1    Q.   And why did you choose to use the sales contract date?

2    A.   Well, in my opinion the contract day is most reflective of

3    when, you know, a potential buyer would have been exposed to the

4    trademarks and trade names in making the ultimate purchase

5    decision.

6    Q.   And how does your use of the sales contract date compare to

7    what the defendants' expert, Mr. Foster, did?

8    A.   I believe Mr. Foster has used the permit date, so basically

9    the date that a permit was issued on a particular lot, which in

10   many cases is much earlier than the contract date.  And I think

11   it is also a date that doesn't reflect when a consumer would

12   actually be looking at materials related to the purchase of a

13   home.

14   Q.   And then you mentioned that the second step is determining

15   the selling prices of those 34 homes that are at issue.

16        How did you go about doing that?

17   A.   So we did have for many of those 34 homes actual selling

18   price information produced by the defendants.  In some instances

19   we didn't have the selling price so we went to public -- sorry

20   about that -- publicly available data from sources like Zillow,

21   for instance, or Realtor.com, that gave us historical -- the

22   historical selling price.

23   Q.   And so after we have the universe of homes and selling

24   prices, what comes next?

25   A.   Then you multiply them together to come up with a gross

 1    revenue.  And you can add up -- you get the individual revenue

 2    by home and all of them added together give you the gross

 3    revenue.

 4             MS. AGNEW:  Teri, can you pull you Plaintiffs' Exhibit

 5    837, please?

 6    BY MS. AGNEW:

 7    Q.   Mr. Duffus, do you see Plaintiffs' Exhibit 837 in front of

 8    you?

 9    A.   I do.

10    Q.   Okay.  And do you recognize this chart?

11    A.   It appears to be the schedule, or one of the schedules,

12    that's been attached to various versions of my expert report.

13    Q.   And did you and your team help prepare this chart?

14    A.   Yes.

15    Q.   Okay.

16         And do you see at the bottom there are several sources

17    listed?

18    A.   I do.

19    Q.   Okay.

20         Are you generally familiar with the sources that are

21    identified at the bottom?

22    A.   I do.

23             MS. AGNEW:  Plaintiffs' offer Exhibit 37 [sic] into

24    evidence as a summary exhibit under Rule 1006.

25             MR. SHEBELSKIE:  837, Your Honor.

Redirect Examination – David Duffus

1              No objection.

2              MS. AGNEW:  Oh, I'm sorry, 837.

3              THE COURT:  Admitted.

4         (PLAINTIFFS EXHIBIT 837:  Received in evidence.)

5              MR. SHEBELSKIE:  Thank you.

6              THE COURT:  But it will not go out with the jury,

7    correct?

8              MR. KRAMER:  Correct.

9              THE COURT:  So Mr. Gunn, you need to note that when

10   you download it in your system.

11             THE COURTROOM DEPUTY:  Okay.

12             MS. AGNEW:  Thank you, Mr. Gunn.

13   BY MS. AGNEW:

14   Q.   Looking down here --

15             MS. AGNEW:  And, actually, Teri, if we can switch back

16   to the slides.  That slide 27.  Perfect.  Thank you.

17   BY MS. AGNEW:

18   Q.   Looking at this chart, Mr. Duffus, what is the total amount

19   of gross revenues that the defendants earned from the infringing

20   sales?

21   A.   $14,655,605.

22   Q.   So after you calculate the revenues, what comes next in the

23   methodology that you used?

24             THE COURT:  505 or 605?  What was the last?  605.

25   Okay.  Go ahead.

1          THE WITNESS:  Can you repeat that?

2    BY MS. AGNEW:

3    Q.   Yes.

4         After calculating the total gross revenues, what comes next

5    in the methodology?

6    A.   So it's my understanding, then, that the burden shifts to

7    the defendant to identify a number of other factors that go into

8    the calculation of the damages.  The first is to identify the

9    costs and expenses that should be deducted from the revenues

10   subject to disgorgement.

11        It also -- or the burden also rests with the defendant to

12   identify any other factors, non-infringing factors, that relate

13   to, or what may have actually driven those sales.  So what I

14   would call an apportionment that could segregate out infringing

15   versus non-infringing activity.

16        And then based on that, you ultimately quantify the profits

17   that are subject to disgorgement.

18   Q.   And you mentioned that those first two steps, quantifying

19   costs and apportionment, are defendants' burden; is that right?

20   A.   That's my understanding, yes.

21   Q.   Did the defendants in this case quantify the costs and

22   expenses that need to be deducted from the infringing revenues?

23   A.   They did.

24   Q.   Did the defendants apportion the profits they earned to

25   non-infringing uses?

Redirect Examination - David Duffus

1    A.    No.

2    Q.    After the defendants identified the costs, what type of

3    costs did you deduct from revenues here?

4    A.    So it's very similar so my lost profits analysis in that

5    the costs that are deducted are those incremental expenses that

6    go with building and selling the homes.

7    Q.    And are there any costs or expenses that you did not

8    include in the deductions?

9    A.    Yes.

10   Q.    And what are those?

11   A.    Again, it would generally be the overhead expenses.  So

12   similar again to my lost profits analysis.  We don't deduct

13   overhead.

14   Q.    So we will go back to the summary chart.

15         What is the total amount of costs to be deducted?

16   A.    It's $12,093,439.

17   Q.    Okay.  And based on this analysis, what is the total amount

18   of profits that may be disgorged for the plaintiffs' trademark

19   infringement claim?

20   A.    $2,562,166.

21   Q.    And let me go back.  I see that there are 34 rows on this

22   summary chart.

23         What does each row in the chart represent?

24   A.    An individual home sale.

25   Q.    Okay.

Redirect Examination - David Duffus

1    And why did you present your analysis on an individual home

2  basis?

3  A.   Well, I understand that there is some dispute as to whether

4  the trademarks or trade names could be used for a period of

5  time, and so in my mind the best way to present the information

6  would be -- or it was on an individual home basis with the sales

7  dates identified, so that if it's determined that some sales

8  shouldn't be in the population it's easy enough to pull them out

9  and recalculate the numbers.

10  Q.   Okay.  We will move on now to our last topic, which is the

11  LPA deposit.

12        THE COURT:  Let me just ask you, I understand the

13  burden shifting and all that under the law and your assumptions

14  based upon that.  But in essence your opinion would be that with

15  regard to these 34 homes, the profit on those homes was

16  $2,562,166, not taking into account overhead?

17        THE WITNESS:  That's correct.

18        THE COURT:  So in essence that would be -- if the

19  Court were to disgorge those profits, the Court would have to

20  make a finding that all of those profits are attributable to the

21  trademark infringement?

22        THE WITNESS:  That's correct.

23        THE COURT:  That's your opinion because you have not

24  seen any evidence from the defendant to show what amount of

25  those profits were attributable to something other than that

Redirect Examination – David Duffus

1    trademark infringement.

2            THE WITNESS:  That's correct, Your Honor.

3            THE COURT:  Okay.  Of course, if the defendant came in

4    and presented convincing evidence that none of those profits are

5    due to trademark infringement, because the trademark

6    infringement was minimal, if you were asked to assume that, then

7    your opinion would be different?

8            THE WITNESS:  I would have to evaluate the basis --

9            THE COURT:  You have not considered the factor -- you

10   have not seen any evidence that any of those profits are

11   attributable to something other than that infringement?

12           THE WITNESS:  That's correct, Your Honor.

13           THE COURT:  Go ahead.

14   BY MS. AGNEW:

15   Q.   One further question on that point.  If there were evidence

16   of apportionment, would that be subtracted from the 2 million

17   profits number, or would that be subtracted from the

18   $14.6 million gross revenue figure?

19   A.   Well, I mean, I think what it would do is reduce the

20   revenue number.  And I would add, I think, again, I would still

21   have to evaluate what would be put forward with respect to

22   apportionment to understand whether I agreed or disagreed with

23   that.

24   Q.   Okay.

25           THE COURT:  Are these -- these 34 homes that were

1    selected, are they homes that were sold by the entity from

2    South Carolina and Atlanta, or how did these -- how were these

3    34 homes chosen?

4            THE WITNESS:  They were -- I took the list from what

5    was in interrogatory answers, interrogatories that were

6    submitted regarding homes sold using materials containing the

7    trademark and trade names.

8            THE COURT:  Homes sold obviously not by ASH?

9            THE WITNESS:  Correct.

10           THE COURT:  Homes sold by who?

11           THE WITNESS:  It would have been by one of

12   Mr. Erickson's entities.  I don't recall as I sit here which one

13   or what was disclosed.

14           THE COURT:  Okay.  So, these are the homes, after the

15   date that he assigned his trademarks and trade name, these are

16   any homes that would have been sold by any of his entities?

17           THE WITNESS:  Correct.

18           THE COURT:  Not ASH entities, but Erickson entities.

19           THE WITNESS:  That's correct, Your Honor.

20           THE COURT:  That were sold after that date?

21           THE WITNESS:  That's correct, Your Honor.

22           THE COURT:  And you made no assessment as to whether

23   the marketing of that home used any of the trade names or

24   trademarks.  You just looked at the fact his entity sold these

25   homes after he assigned the trademark, or not?  Did you look,

1    for example, whether these 34 homes were marketed as

2    Grayhawk Homes?

3          THE WITNESS:  I think that was the interrogatory

4    response, that they were.  I could stand corrected.  But I

5    think, pursuant to a specific request to identify the homes that

6    were sold using materials with the trademark and trade names,

7    the defendants' interrogatory answers identify these 34 homes.

8          THE COURT:  That was your assumption in reaching your

9    opinions that these 34 homes were sold using the trade name or

10   trademarks Grayhawk?

11         THE WITNESS:  That's correct.

12         THE COURT:  Okay.  Go ahead.

13   BY MS. AGNEW:

14   Q.   Just one more question.  We talked about whether --

15   evaluating whether the marketing of the homes used the

16   infringing materials.

17        Was that baked into the interrogatory responses that you

18   relied on?

19   A.   Yes.

20         THE COURT:  All right.  Let's go to the next issue.

21   BY MS. AGNEW:

22   Q.   Okay.  On your final opinion, Mr. Duffus, can you explain,

23   at a high level, your opinion regarding the LPA deposit?

24   A.   Certainly.

25        So there is, under the LPA, a deposit that ASH made, it was

Redirect Examination – David Duffus

1   $2.5, million, that was supposed to be refunded over time when C

2   lots were sold.

3        There was a request back in, I believe, 2021 -- July of

4   2021 -- a request to get that deposit back.  So my calculation

5   here, and my opinion is, to a reasonable degree of certainty,

6   that ASH -- actually, can we go back to the earlier slide, just

7   so I have the number in front of me?

8        ASH or the interest, if you will, on that deposit --

9             THE COURT:  The first slide that shows the amount of

10  interest, is that what you wanted to go back to?

11            THE WITNESS:  Yes, Your Honor.

12       So the amount of interest on that $2.5 million deposit up

13  through December 31 of 2023 is $422,907.

14  BY MS. AGNEW:

15  Q.   And has the LPA deposit been returned to ASH?

16  A.   No, it has not.

17  Q.   Okay.

18            THE COURT:  Just so I'm clear, the plaintiffs are

19  going to ask the jury to return $2.5 million in damages based

20  upon a breach or a repudiation of the LPA, correct?

21            MS. AGNEW:  Yes.

22            THE COURT:  The only thing that the Court would be

23  deciding, if they awarded 2.5 million for that, is what the

24  pre-adjustment interest on that amount is, correct?

25            MS. AGNEW:  Yes, that's correct, Your Honor.

Redirect Examination - David Duffus

1                THE COURT:  All right.  Go ahead.

2    BY MS. AGNEW:

3    Q.   Okay.

4         So we spoke about the total number of interest being

5    $422,907.

6         How did you calculate that amount?

7    A.   So there were a number of components to the calculation.

8    The first was to understand what we call the principle amount,

9    so the deposit balance itself, $2.5 million.

10        The second was to then apply an interest rate to that.  The

11   interest rate that we used was the statutory rate in the state

12   of Georgia, 7 percent.

13        I have calculated it monthly and you can see that the

14   calculation starts in August of 2021, so the month following

15   when the request was made to return the deposit.  And then I

16   have run the calculation out through December of 2023.

17        So what that shows me is a monthly interest, $14,583.  And

18   if the number is carried out through the entire time period,

19   August 2021 through December of 2023, the number is $422,907.

20   Q.   And have you also calculated how much interest accrues each

21   day?

22   A.   I have.

23   Q.   And what is that amount?

24   A.   $486.10.

25                THE COURT:  The interest rate was in the contract, or

Redirect Examination – David Duffus

1    you used a market interest rate?

2            THE WITNESS:  I used the Georgia statutory rate of

3    7 percent.

4            MS. AGNEW:  No further questions.

5            THE COURT:  For that period of time, what percent was

6    the Georgia statutory rate?

7            THE WITNESS:  7 percent.

8            THE COURT:  And for that period of time, how did that

9    interest rate, generally, compare to market interest rates,

10   short-term market interest rates?

11           THE WITNESS:  I would believe that -- like, if we

12   took, for instance, Your Honor, let's say a treasury bond rate

13   as a measure of a short-term rate, I'm certain it would be lower

14   than 7 percent.

15           THE COURT:  What period of time was this again?

16           THE WITNESS:  August of 2021.

17           THE COURT:  To what date?

18           THE WITNESS:  Well, we projected through December 31

19   of 2023.

20           THE COURT:  Short-term rates currently are around 4 or

21   5 percent?

22           THE WITNESS:  That would be my estimate, yes.

23           THE COURT:  But in the early part of 2021, they were

24   lower than that?

25           THE WITNESS:  Yes.

1          THE COURT:  And you used this Georgia statutory

2    interest rate because you understood that's what the proper rate

3    is under the law that applies in this case?

4          THE WITNESS:  That's correct.

5          THE COURT:  Not based on your expertise, but that's

6    what your assumption is?

7          THE WITNESS:  I consulted with counsel on the

8    appropriate rate to use.

9          THE COURT:  All right.  Is that rate mandated under

10   Georgia law for prejudgment interest?

11         MS. AGNEW:  Yes, Your Honor.  It's a statutory rate.

12         THE COURT:  But it specifically applies to prejudgment

13   interest on fixed claims.

14         MS. AGNEW:  Yes, that's correct.

15         THE COURT:  Okay.  We will look at that at the

16   appropriate time.

17         Cross-examination?

18         MR. SHEBELSKIE:  Yes, sir.

19                         CROSS-EXAMINATION

20         MR. SHEBELSKIE:  Your Honor, I would like to first

21   address the Court's question about where the sales came from.

22         To show the Court and to refresh the witness's

23   recollection, can we --

24         THE COURT:  Cross-examination him however you want.

25         MR. SHEBELSKIE:  Okay.

1          Let's put up Defense Exhibit 462, which is

2   Mr. Duffus's opening report.

3          While he is pulling that up, Your Honor, I will start

4   with something else.  Actually I need to pull them both up.  We

5   will have to wait.  I apologize.

6          All right.  We have pulled up on the screen Defense

7   Exhibit 462.

8          Now we have 462, Your Honor, Mr. Duffus's opening

9   report.  And I would like to go to page 33 of his report, which

10  looks like page 35 of the exhibit.

11  BY MR. SHEBELSKIE:

12  Q.   All right.  Here, Mr. Duffus, do you see Section 4.1.5,

13  which is your intellectual property infringement section?

14  A.   I do.

15  Q.   All right.  Let's look down at paragraph 89 where you

16  state, in the second sentence of paragraph 89:  As such, a

17  starting point for my analysis is the revenues received by

18  Mr. Erickson from the sale of homes using the infringing plans.

19       And then you go on to refer to Defendants' responses and

20  objections to Plaintiffs' First Interrogatories to the

21  Defendants' -- and you have a footnote 85.

22       Do you see that?

23  A.   I do.

24  Q.   Okay.

25          MR. SHEBELSKIE:  If you scroll up the screen,

Cross-Examination - David Duffus

1   Mr. Walters, we will see footnote 85.

2   BY MR. SHEBELSKIE:

3   Q.   We see footnote 85 is referring to Addendum A to the

4   Defendants' -- answers to Plaintiffs' first set of

5   interrogatories, dated January 3, 2022.

6        So that's the source of the sales data for your

7   disgorgement profits, correct?

8   A.   It is not.

9   Q.   Well, if you go to -- let's pull up the exhibit, the

10  reference interrogatory answers.

11       MR. SHEBELSKIE:  Pull up Defense Exhibit 427.  These

12  are Defendants' responses to Plaintiffs' first set of

13  interrogatories.

14  BY MR. SHEBELSKIE:

15  Q.   Do you see that, sir?

16  A.   I do.

17  Q.   All right.

18       And if we look at interrogatory 3, please, which is on page

19  6, interrogatory 3 asks the defendant to:  Identify all

20  residential home sales, sold or offered for sale by any

21  defendant in Georgia, Alabama or South Carolina, since

22  November 15, 2019.  And to state the applicable information.

23       MR. SHEBELSKIE:  All right.  And let's scroll up and

24  look at the answer.

25       Go down to the bottom of the page rather.  Stop right

1    there.  Scroll up.

2    BY MR. SHEBELSKIE:

3    Q.   The bottom of the interrogatory answer refers to a list of

4    addresses of homes sold or offered for sale since November 15th,

5    2019 in Addendum A to the responses.

6         Do you see that, sir?

7    A.   I do.

8    Q.   And then we will look at Addendum A to the interrogatory

9    answers.

10        MR. SHEBELSKIE:  Let's scroll down past, I think, it's

11   page 18.

12   BY MR. SHEBELSKIE:

13   Q.   Page 18 has Addendum A, list of residences, correct?

14   A.   It does.

15   Q.   All right.  And is that the list that you used for your

16   testimony here today?

17   A.   I am confused because the footnote reference in my report

18   was addressing the copyright claim, which I understand is no

19   longer in.  So I'd have to look at the section on my report that

20   references the trademark claim to see if it's the same source.

21   Q.   All right.

22        Let's go -- anyway, just so we confirm, this Addendum A on

23   Exhibit 427, that's the interrogatory answer you are referencing

24   in footnote 85 of your report that we were looking at?

25   A.   Well, but footnote 85 pertained to the copyright claim, not

 1    the trademark claim.  So, again, I would have to go back and see

 2    what the appropriate reference was.

 3            THE COURT:  To get to the point, are these the 34

 4    homes that are on this list, or you don't know?

 5            THE WITNESS:  I would have to compare them to my

 6    exhibit, Your Honor.  They may be.  That's why I would like to

 7    look at the footnote and my report that pertains to the

 8    trademark claim to confirm that.

 9            MR. SHEBELSKIE:  All right.  Let's pull up your

10    report.  That's Defense Exhibit 462.  And we will go to page 35

11    of the report.  It's the 37th page of the exhibit.  So scroll

12    down two more pages.

13    BY MR. SHEBELSKIE:

14    Q.   All right.  You see at paragraph 94, this begins your

15    discussion of the trademarks, correct?

16    A.   It looks like it does starting on paragraph 37.

17    Q.   37 or 94?

18    A.   I'm sorry.  I'm going blind here.  94.  I'm sorry.

19    Q.   All right.

20            And then in paragraph 95 you identify where you got the

21    home sales from, correct?

22    A.   Yes.  Addendum A, yes.

23    Q.   So that's Addendum A to the interrogatory answer we were

24    just looking at?

25    A.   Yes.

Cross-Examination – David Duffus

1    Q.   All right.  And that interrogatory answer -- interrogatory,

2    rather, asked the defendants to list:  Any and all residential

3    home sales sold or offered for sale in Georgia, Alabama or

4    South Carolina since November 15, 2019.

5         Correct?

6    A.   I would have to go back and see the wording.

7    Q.   All right.  Let's go back and look at it.

8              MR. SHEBELSKIE:  Let's pull up Defense Exhibit 427 and

9    go to page 6 of that exhibit, please.  And here is where we see

10   interrogatory 3.

11   BY MR. SHEBELSKIE:

12   Q.   Do you see that, sir?

13   A.   I do.

14   Q.   And this is the interrogatory to which Addendum A relates,

15   correct?

16   A.   It appears so.

17   Q.   All right.  And the interrogatory asks simply for the --

18   identify any and all residential homes sold or offered for sale

19   by defendants in Georgia, Alabama, or South Carolina since

20   November 15, 2019.

21        Correct?

22   A.   I see that, yes.

23   Q.   All right.

24        So the answer to the Judge's question earlier today was to

25   compile the list of 34 homes, that you have used for your

1    trademark opinion here, you just took out the 34 sales that

2    postdated November 15, 2019, in Georgia and South Carolina,

3    correct?

4    A.    Because I understand they represent the home sales where

5    the infringing marks were used.

6    Q.    All right.  So that's that.

7         Now, let me ask you about the 34 that are on your list.

8              MR. SHEBELSKIE:  That was admitted, Your Honor, as

9    Plaintiffs' Exhibit 837 but I have a version where I have lines

10   numbered for ease of reading it.

11             Mr. Walters, can you pull up Mr. Duffus's chart of 34

12   homes?

13             This is -- was also exhibit -- it's Plaintiffs'

14   Exhibit 837.  It was also Exhibit 4 to Mr. Duffus's rebuttal

15   report.

16             What I have done, Your Honor, is put numbers on the

17   left-hand side so we can refer to specific lines -- identified

18   lines easier as we go through this.

19   BY MR. SHEBELSKIE:

20   Q.    All right.

21        The first point I want to make, Mr. Duffus, is that you

22   have combined on this chart sales in South Carolina and

23   Dallas, Georgia, right?

24   A.    That's correct.

25   Q.    Right.

```
 1          MR. SHEBELSKIE:  And if we, Mr. Walters, turn to the
 2   second page of this I have highlighted in yellow the home sales
 3   in South Carolina.
 4   BY MR. SHEBELSKIE:
 5   Q.   Do you see that?
 6   A.   I do.
 7          MR. SHEBELSKIE:  All right.  And, Your Honor for the
 8   record, that would be lines 2 through 9 and lines 29 through 34.
 9   BY MR. SHEBELSKIE:
10   Q.   Now, do you understand, Mr. Duffus, that the 14 sales in
11   South Carolina were sold by the South Carolina entity?
12   A.   I would have to go back and look at the documents.  I don't
13   recall who sold it.
14   Q.   All right.
15        You have no opinion sitting here today who sold these
16   14 South Carolina properties?
17   A.   As I sit here, I would have to look at the sales agreement
18   or other documents.
19   Q.   All right.
20        In any event, the 14 South Carolina properties, have you
21   computed a separate profit for those 14 sales?
22   A.   Well, I mean, it can be inferred -- I haven't done it
23   separately, but you can infer it from the document.
24   Q.   Right.
25        And I did it, and your profit figure from your profit
```

1    column for these 14 South Carolina sales total 1,474,462.

2        Would you spot me that?

3    A.   I will agree that your calculation is correct.  I haven't

4    checked it.  I'll give you that.

5    Q.   All right.

6        And if my calculation is right, that would mean the balance

7    of $1,087,704 is associated with the Dallas, Georgia sales,

8    correct?

9    A.   It would seem the math would work that way.

10   Q.   All right.

11       Now, couple of things about -- four things about the South

12   Carolina sales.

13       If you look at line 9, you will see there a sale with the

14   address of 4009 Berberis Lane?

15   A.   I do.

16   Q.   And the sales price was $409,200.

17       Do you see that?

18   A.   I do.

19   Q.   You have no cost associated with that property, correct?

20   A.   That is correct.

21   Q.   And, therefore, your profit figure is also for this house

22   $409,200, a hundred percent profit margin; right?

23   A.   Well, a hundred percent based on the calculation.

24   Q.   Yes.

25       And, of course, there would have been cost to build this

1    house, right?

2    A.    Correct.  We just didn't receive the documentation to

3    demonstrate what it was.

4    Q.    And what documentation did you need for purposes of your

5    methodology?

6    A.    I believe -- and I could stand corrected -- we got, or we

7    received cost reports that showed us the cost per home.  And for

8    whatever reason a cost report for Berberis -- this particular

9    property, Berberis Lane, was not provided.

10   Q.    To be clear, these are cost reports generated by the

11   defendants?

12   A.    That's correct.

13   Q.    All right.

14         And you note in your footnote, you are up front about this,

15   footnote 2, that you have not identified a cost report for

16   Berberis Lane, right?

17   A.    That's correct.

18   Q.    All right.

19         I would like to show you Defendants' Exhibit 886.

20         Have you seen Defendants' 886 before, sir?

21   A.    I don't know.  I have seen cost reports before and closing

22   statements but I don't -- I don't know if I saw this one before.

23   Q.    All right.

24         But you see that this is -- the first page of it is a HUD

25   settlement statement for the property location identified as

 1   4009 Berberis Lane?

 2   A.   I see that.

 3          MR. SHEBELSKIE:  Scroll down, please, Mr. Walters, to

 4   the fourth page of the exhibit.

 5   BY MR. SHEBELSKIE:

 6   Q.   And do you see here, beginning on the fourth page of the

 7   exhibit, a job cost journal for this property dated February 24,

 8   2022?

 9          Do you see that, sir?

10   A.   You would have to go back up.  It references lot

11   242 Poplar Grove Landing?  Is that the same as Berberis Lane?

12   Q.   Yeah.  Let's go up and see.

13          Do you see under -- we are now on the first page of the

14   exhibit.  Do you see under box G, where the address is located,

15   it has the reference to lot 242?

16   A.   I see that.

17   Q.   All right.

18          So let's go back down to page 4 of the report, or the

19   document rather, and we see the beginning of this cost

20   journal -- is the cost reports -- is the format, the type of

21   document you used and relied on for the costs associated with

22   the other 14 -- 13 South Carolina properties?

23   A.   I think it's a similar report for all of the properties

24   that I have seen.

25   Q.   All right.

Cross-Examination – David Duffus

1   A.   All of the defendants' properties I should say.

2   Q.   All right.

3        MR. SHEBELSKIE:  If you scroll down, please,

4   Mr. Walters, to the last page of the exhibit.

5   BY MR. SHEBELSKIE:

6   Q.   Do you see that the total cost on this cost report for

7   4009 Berberis Lane is $390,227.40?

8   A.   That's what it says.

9   Q.   So using your methodology that you had used for the other

10  properties on your chart you would deduct this $309,227.40,

11  correct?

12  A.   I'd have to make sure that there is no categories that come

13  out.  But, I mean, if there is a cost report cost should be

14  applied against it.

15       MR. SHEBELSKIE:  Your Honor, we move for the admission

16  of Defendants' 886.

17       MS. AGNEW:  No objection.

18       THE COURT:  Admitted.

19    (DEFENDANTS EXHIBIT 886:  Received in evidence.)

20       MR. SHEBELSKIE:  All right.  Mr. Walters, could we go

21  back to the yellow highlighted chart, please, for Mr. Duffus?

22  Scroll to page two.

23  BY MR. SHEBELSKIE:

24  Q.   Now, three things about the South Carolina properties.  You

25  said you included all home sales in South Carolina where the

1    sales contract was dated after November 15, 2019.  Correct?

2    A.    I think those are the dates that are on the exhibit, yes.

3    Q.    Yeah.

4          Now, are you aware that under the Asset Purchase Agreement

5    Mr. Erickson's companies were allowed to continue to use the

6    Grayhawk name for eight months after the closing?

7    A.    I think there is a -- well, I will answer that I understand

8    that's a legal issue that's in dispute.

9          I understand there is some point that's been -- the parties

10   are disputing on how long it can be used and where.  But I

11   understand that there is a provision with a time around that.

12   Q.    I am not asking you to opine on the legal issues.

13   A.    Fair enough.

14   Q.    So eight months after the closing of the ASH transaction

15   here would be July 15, 2020, correct?

16   A.    That sounds right.

17   Q.    Now, in compiling your list of the 14 homes in

18   South Carolina, did you include sales contracts that were

19   entered into before July 15, 2020?

20   A.    Yes.

21   Q.    How much were those?

22   A.    Geez, I've never counted them up.

23   Q.    If you have not, I will ask someone else.

24         In compiling this list of 14 South Carolina sales, did you

25   include sales contracts that were entered after the

1    South Carolina entity the changed its name to remove of the

2    Grayhawk name?

3    A.    I don't know what date that occurred.

4    Q.    Well, you did review the sales contracts as part of your

5    work on this case, right?

6    A.    Correct.

7    Q.    When you were reviewing the sales contracts for purposes of

8    compiling this chart did you exclude sales contracts that were

9    signed under the name of GH lots of South Carolina?

10   A.    I would have to go back and look.

11         Again, I'm using the population of 34 and the sales

12   contracts that go with it, irrespective of name.

13   Q.    All right.

14         Did -- one other point.

15         You relied on the sales listed in that Addendum A to the

16   interrogatory answer we saw a few moments ago, correct?

17   A.    Can you say that again?  I am not sure I quite followed

18   that.

19   Q.    Yeah.  We saw that you pulled this list of 14 lots, sales,

20   from South Carolina from the Addendum A to the interrogatory

21   answer we saw just a moment ago, right?

22   A.    Just the 14 lots?  Yes.

23   Q.    Yeah.

24   A.    I mean, all 34 from that addendum.

25   Q.    Yeah.

1    Did you include the lot sales that were listed in

2    Addendum B to those interrogatory answers?

3    A.    I would have to go see what Addendum B shows.

4    Q.    Okay.

5         MR. SHEBELSKIE:  Let's pull back up the interrogatory

6    answer, which is Defendants' Exhibit 427.

7         Scroll down to interrogatory 3 on page 6.

8    BY MR. SHEBELSKIE:

9    Q.    All right.  This was the interrogatory we saw before, to

10   which Addendum A relates, correct?

11   A.    I believe so.

12   Q.    And let's scroll down to interrogatory 4, which is on

13   page 7 of the interrogatory answer.

14        Do you see, Mr. Duffus, that interrogatory 4 asks the

15   defendants to:  Identify any and all land or lots sold or

16   offered for sale by any -- and it says -- in Georgia or Alabama.

17        Do you see that?

18   A.    I do.

19   Q.    All right.

20        And if you scroll -- since November 15, 2019, right?

21   A.    Correct.

22   Q.    And if you scroll down at the bottom of the answer do you

23   see that there is a reference to an Addendum B for the response,

24   correct?

25   A.    Correct.

Cross-Examination – David Duffus

```
 1          MR. SHEBELSKIE:  And then we can look at Addendum B.
 2   Scroll down to that, Mr. Walters, after the signed page on the
 3   interrogatory answer.  I think it's page 20.  Addendum B, lots
 4   sold.
 5   BY MR. SHEBELSKIE:
 6   Q.   And you see listed there lots sold in Dallas, Georgia at
 7   the top of the chart.  And at the bottom of the chart sales in
 8   South Carolina, Hollywood, Johns Island, Okatie and Bluffton.
 9          Do you see that?
10   A.   I do.
11   Q.   Why did you exclude those sales from your calculation?
12   A.   I would have to compare them one-for-one.  I mean, I know,
13   for instance, there were sales in Dallas.  I don't know if these
14   were -- you showed me a schedule where you pulled 14 out, and
15   there were other sales in Dallas.  I'd have to see if these
16   carry over.
17          But, I mean, basically my analysis, again, is based on
18   these schedules, and I think in consultation with counsel as
19   well as to what should, or shouldn't be, in, pursuant to the
20   legal arguments that could be made in the case.
21   Q.   Do you understand that Addendum B lists lots that were sold
22   without houses on them, whereas Addendum A includes sales of
23   lots with houses.
24          Do you understand that distinction?
25   A.   It appears that that could be.  This is characterized as
```

1    lots sold.  I'd have to see how Addendum A was characterized.

2    Q.   Did you compute any profit or loss on the sales listed on

3    Addendum B?

4    A.   Again, I would have to compare it back to my schedule.  If

5    it's not on the schedule, no, it wouldn't be part of the

6    trademark damages.

7         MR. SHEBELSKIE:  Likewise, let's go back to the

8    highlighted version of Mr. Duffus' report.  The highlighted

9    entries concern the Dallas, Georgia sales.

10   BY MR. SHEBELSKIE:

11   Q.   And you see that's line 1 and then lines 10 through 28?

12   A.   Correct.

13   Q.   All right.

14        Same three questions with respect to these Dallas, Georgia

15   sales.  Did you include in this list sales contracts that were

16   entered into before July 15th, 2020?

17   A.   Before -- oh, before July 15th, 2020?  It appears that

18   there were, yes.

19   Q.   Okay.

20        Did you include in these calculations -- these grouping of

21   sales, contracts that were signed by the Georgia company after

22   it had changed its name to GH Lots of Georgia and the stopped

23   using the Grayhawk name?

24   A.   Again, I would have to go back and look at what was on the

25   sales contracts.

Cross-Examination – David Duffus

1    Q.    All right.

2          Do you have any recollection of actually excluding --

3    making that kind of decision to exclude sales after the company

4    the changed its name?

5    A.    I don't have a recollection of that.

6    Q.    Okay.

7          And then finally, sir, the properties in Dallas, that you

8    have listed here, are sales of lots that had homes on them,

9    correct?

10   A.    I think they reflect home sales as, among other things,

11   reflected by the plan name, the type of home that was sold on

12   the lot.

13   Q.    So you did not include in your calculation of profits or

14   losses for the Georgia entity sales of lots that did not have

15   houses on them, correct?

16   A.    Again, I would want to compare that back to what was on

17   Addendum B, but these would ultimately be home sales.

18            MR. SHEBELSKIE:  All right.

19            No further questions.

20            THE COURT:  Any redirect?

21            MS. AGNEW:  Yes, Your Honor.

22            MR. SHEBELSKIE:  Your Honor, just a housekeeping

23   matter.

24            Would it assist the Court to mark as Court Exhibit 2

25   the highlighted version that differentiates Georgia from South

1    Carolina?

2            THE COURT:  You mean the one that you just highlighted

3    with the numbers?

4            MR. SHEBELSKIE:  Yes, sir.

5            THE COURT:  Yes.  That would be helpful to have as a

6    separate exhibit.

7            MR. SHEBELSKIE:  I think we had previously marked

8    Court Exhibit 1 in a prior session.  So I think this would be --

9            THE COURT:  It's not my exhibit.  It's defendant's

10    exhibit.

11            MR. SHEBELSKIE:  All right.  I will find out what the

12    next number is in the sequence, Your Honor.

13            THE COURT:  All right.

14            Yes.  Redirect.

15                        REDIRECT EXAMINATION

16    BY MS. AGNEW:

17    Q.    Just a few questions, Mr. Duffus.

18        We spoke about the defendants' interrogatory responses that

19    you used to identify the universe of 34 homes.

20        Did you also, without getting into the substance, did you

21    also have conversations with counsel about the legal

22    determinations of what constitutes trademark infringement?

23    A.    Correct.  I think I mentioned that I consulted with counsel

24    as well.

25    Q.    So you did not make legal determinations as to which

Redirect Examination – David Duffus

1  particular homes constituted the trademark infringement.  Is

2  that right?

3  A.    That's correct.  That's beyond my expertise.

4  Q.    So the decision of whether or not to exclude certain homes

5  from the calculation would rely on a legal determination that

6  you did not make?

7  A.    Certainly.

8  Q.    I believe Mr. Shebelskie asked you about the Asset Purchase

9  Agreement, and he said that it authorized the defendants to use

10 the Grayhawk logo.

11     Do you know one way or another whether the APA authorizes

12 the use of the logo as opposed just the word "Grayhawk?"

13 A.    I would have to go back and look.  I don't recall as I sit

14 here.

15 Q.    And, again, whether or not it relates to the logo or the

16 word "Grayhawk," is a legal determination that you did not make.

17 Is that right?

18 A.    That's correct.

19 Q.    Okay.

20     We also discussed Addendum B to the interrogatory

21 responses, and I won't put it up on the screen, but did

22 Addendum B show home sales, or homes that were sold, or did

23 those relate only to land?

24 A.    It looks like it pertains to lot sales.

25 Q.    Okay.

Redirect Examination - David Duffus

```
 1            MS. AGNEW:  If we can put the summary exhibit chart

 2   back up.  We can use Plaintiffs' Exhibit 837.  If we zoom in

 3   sort of towards the middle there is a row for 323 Maple View

 4   Court.

 5   BY MS. AGNEW:

 6   Q.   Do you see that?

 7   A.   I'm sorry.  Which one is it?

 8   Q.   323 Maple View Court.  That's lot 84, in the Timberland

 9   Subdivision.  Sort of right in the middle.

10   A.   I see that.  Yes.

11            MS. AGNEW:  Thank you, Teri.

12   BY MS. AGNEW:

13   Q.   That's one of the homes that you have included in your

14   calculation here, is that right?

15   A.   That's right.

16   Q.   Okay.

17            MS. AGNEW:  Teri, can you pull up Plaintiffs'

18   Exhibit 406, which has already been admitted into evidence.

19            This is a listing agreement for -- if you look right

20   under item number 1, 323 Maple View Court, lot 82.

21   BY MS. AGNEW:

22   Q.   Do you see that, Mr. Duffus?

23   A.   I see that.

24            MS. AGNEW:  Can you scroll, Teri, to page 11?  Can you

25   blow up the image of the house?
```

1   BY MS. AGNEW:

2   Q.   Mr. Duffus, do you see where it says -- next to where it

3   says, ATL Hawthorn, and you see the word "Grayhawk," in a very

4   faint logo?

5   A.   I do.

6           MS. AGNEW:  Teri, can you also scroll to page 38?

7   BY MS. AGNEW:

8   Q.   This is another version of the home.

9       Do you also see next to ATL Hawthorn the "Grayhawk," word

10  and logo?

11  A.   I do.

12          MS. AGNEW:  No further questions.

13          THE COURT:  Any recross?

14          MR. SHEBELSKIE:  No recross, Your Honor.

15          The highlighted charts that we used on

16  cross-examination would be marked as Defendants' Exhibit 1046

17  and we ask for its admission.

18          THE COURT:  10 what?

19          MR. SHEBELSKIE:  1046.

20          THE COURT:  Admitted.

21          MS. AGNEW:  Thank you.

22      (DEFENDANTS EXHIBIT 1046:  Received in evidence.)

23          MS. AGNEW:  But not for the jury.

24          MR. SHEBELSKIE:  Not for the jury.

25          THE COURT:  All right.

1        This is what I need from the lawyers:  At the time

2   that you -- at the time of closing argument -- I will pick that

3   deadline because I want to get this all decided and not have

4   delays -- at the time of closing argument I need a brief from

5   each side on this particular -- these claims.  Just a brief on

6   your damages and any brief by defendants as to their contention

7   regarding the amount of these damages, if any, which will be

8   based on the entire evidentiary record.  So what defendants

9   would contend should be deducted.

10        Okay.  Sir, you are excused.

11        THE WITNESS:  Thank you, Your Honor.

12        THE COURT:  All right.  The jury is coming back at

13   12:45.  It's 12:20.  I guess I will make them wait a little bit.

14   I hate to do that because pretty soon they are not going to be

15   compliant with my direction on being punctual because we are not

16   punctual, but I don't want anybody to pass out this afternoon.

17        We will come back at 12:55.

18        Enjoy your lunch.

19   (Recess taken 12:21.)

20   (Resumed at 12:55.)

21        THE COURT:  Be seated.

22        Bring them down.

23   (Jury in at 12:56.)

24        THE COURT:  Okay.  Ladies and gentlemen, you should be

25   well rested for the rest of the day.  Welcome back.

1              Call your next witness, Mr. Kramer.

2              MR. KRAMER:  Thank you, Your Honor.  Plaintiffs call

3    Stephen Pehrkon by video.

4              THE COURT:  Stephen Pehrkon by video.

5              MR. KRAMER:  P-e-h-r-k-o-n.

6              THE COURT:  Okay.

7         (The videotaped deposition of Stephen Pehrkon was published

8    to the jury at 12:58 PM.)

9         (The jury trial resumed at 1:16 PM.)

10             MR. KRAMER:  That's the end, Your Honor.

11             THE COURT:  All right.  What do you have next?

12             MR. KRAMER:  One final, very short, video.

13             Mr. Greg Benson.

14             THE COURT:  Greg Benson.

15             MR. KRAMER:  Would you like to do exhibits after we

16   finish the next one?

17             THE COURT:  Let's take up the exhibits that were

18   identified in that recent video.

19             MR. MERRITT:  Your Honor.  PX 769.

20             PX 1233.

21             And PX 1207.

22             THE COURT:  Any objection to those exhibits?

23             MR. ELLIKER:  Your Honor, could we circle back to

24   this?  I don't think we actually conferred on any of the

25   exhibits in this video before -- up until the ones that we have

1    already discussed this morning.

2              THE COURT:  Okay.  We can do that.  I mean --

3              MR. ELLIKER:  I don't expect there to be --

4              THE COURT:  We will take them up at the end of this

5    deposition.  We will need to take them before the plaintiff

6    rests.

7              MR. ELLIKER:  I intend do it right now, Your Honor.

8              THE COURT:  State the name, again, of this next

9    witness.

10             MR. KRAMER:  Yes, sir.  Greg Benson.

11             THE COURT:  All right.  Mr. Benson.

12        (The videotaped deposition of Greg Benson was published to

13   the jury at 1:17 PM)

14             MR. KRAMER:  That's the end, Your Honor.

15             THE COURT:  Okay.

16             What about those exhibits?

17             MR. KRAMER:  Mr. Merritt.

18             MR. MERRITT:  Yes, Your Honor, we have come to

19   agreement.  Once again those are:  PX 769, PX 233, PX 207.

20             And one additional exhibit from Mr. Benson is PX 2057.

21             THE COURT:  Any objection to any of those?

22             MR. ELLIKER:  No, Your Honor.

23             THE COURT:  They are all admitted.

24        (PLAINTIFFS EXHIBITS PX769, 233, 207, 2057:  Received in

25   evidence.)

```
 1              THE COURT:  Mr. Kramer, what do you have next?

 2              MR. KRAMER:  Plaintiff rest its case at this point,

 3   Your Honor.

 4              THE COURT:  All right, ladies and gentlemen, the

 5   plaintiffs have rested their case so that's the evidence they

 6   intend to put up.

 7              The defendant now has the opportunity to put up their

 8   evidence.

 9              Do you have a witness to call?

10              MR. SHEBELSKIE:  We do, Your Honor.

11              We do have a Rule 50 motion and I wonder if the Court

12   would let us preserve our --

13              THE COURT:  I think the best way to handle that is you

14   preserved your making of that motion based on what the record is

15   at this point in time, but we will go ahead and let you call

16   witnesses.  And then we take our next break I will hear argument

17   on that motion.

18              MR. SHEBELSKIE:  Perfect.  Thank you, Your Honor.

19              THE COURT:  All right.

20              MR. SHEBELSKIE:  At this time we will play our

21   designations from Mr. Benson's deposition.

22              THE COURT:  All right.

23          (The videotaped deposition of Greg Benson was published to

24   the jury at 1:22 PM.)

25              MR. ELLIKER:  Your Honor, we are going to liven it up
```

```
 1   with a live witness next, but before we do that the defendants
 2   would seek the admission of Defense Exhibits 188 and 110, which
 3   were both played in the video.
 4           MR. MERRITT:  No objection.
 5           THE COURT:  Admitted.
 6        (DEFENDANTS EXHIBITS 188, 110:  Received in evidence.)
 7           MR. ELLIKER:  Thank you.
 8           THE COURT:  Who is your next witness?
 9           MR. SHEBELSKIE:  Amy Allen, Your Honor.
10           THE COURT:  All right.
11           Raise your right hand and take the oath.
12        AMY ALLEN, DEFENDANTS WITNESS, DULY SWORN
13           THE COURT:  State your name and spell your name for
14   the court reporter.
15           THE WITNESS:  My name Amy Meeks Allen, A-m-y,
16   M-e-e-k-s, A-l-l-e-n.
17           THE COURT:  Mr. Shebelskie.
18           MR. SHEBELSKIE:  Thank you, Judge.
19                   DIRECT EXAMINATION
20   BY MR. SHEBELSKIE:
21   Q.   Ms. Allen, do you live here in the Columbus area?
22   A.   I do.  I live in Midland.
23   Q.   How long have you lived in the area, ma'am?
24   A.   I have lived in Columbus -- in the Columbus area my whole
25   live, except for nine years I lived in Statesboro, Georgia.
```

Direct Examination - Amy Allen

1    Q.   Briefly, what is your educational background?

2    A.   I graduated locally from Columbus High in 1985.

3         I attended Columbus Tech for 10 years.  Graduated in '87,

4    with a degree in accounting.

5         (Interruption)

6    Q.   Can you repeat that last -- maybe it was drowned out by the

7    siren.

8    A.   I'm sorry.

9         I graduated Columbus Tech in '87 with a degree in

10   accounting.

11   Q.   Have you, Mrs. Allen, worked for any of David Erickson's

12   companies?

13   A.   Yes.

14   Q.   What year -- did you -- what was the first of his companies

15   you worked for and starting in what year?

16   A.   In 2009, I started to work for Grayhawk Homes.

17   Q.   And what were you are hired to do, ma'am?

18   A.   I was hired in the accounting department to do accounts

19   payable.

20   Q.   Is that paying bills?

21   A.   Yes.

22   Q.   All right.

23        Were you subsequently promoted?

24   A.   Yes.  In about six months, or so, I was promoted to the

25   office manager.

Direct Examination - Amy Allen

1    Q.   All right.

2         Were you employed by Grayhawk Homes starting in 2009, all

3    the way up to 2019, when ASH bought the business?

4    A.   In 2018, we switched entities.  We opened up a new company

5    called GH Services, which was simply a servicing company.  The

6    employees that were doing work for all of his entities were now

7    employed through that company.  It was a suggestion from our

8    accounting firm just to make things easier to account for.

9    Q.   Did your duties change when the entity that technically

10   employed you changed in 2018?

11   A.   They did not.

12   Q.   If you can speak up a little bit, Ms. Allen, I think it

13   would help the court reporter.

14        Were you still the vice president and office manager for

15   Mr. Erickson's Columbus-based businesses when ASH bought them?

16   A.   Yes, I was.

17   Q.   Did you play any role in that transaction, the negotiations

18   with ASH, helping Mr. Erickson?

19   A.   Yes.  I did not do the negotiating.  I did the due

20   diligence work, which was providing all the financial

21   information, all the employee information, insurance, all the

22   information about the company.  We would share all of these

23   documents with ASH and then they reviewed the information and

24   asked questions.  They were trying to learn about your company.

25   Q.   And who, from ASH, were the people you were dealing with

1    during this due diligence process in the negotiations?

2    A.    I dealt with Greg Benson and Stephen Pehrkon.

3    Q.    And was Mr. Erickson's businesses represented by counsel

4    during those negotiations?

5    A.    Yes.  Our attorney was Jim Sack.

6    Q.    Was ASH represented by counsel during those negotiations?

7    A.    Yes.  That was Mr. Kramer.

8    Q.    Now, after ASH bought the Columbus businesses of

9    Mr. Erickson, in November of 2019, did you go to work for

10   ASH-Grayhawk after that?

11   A.    I did.

12   Q.    Can you tell us how that came about?

13   A.    So, like I said, I did the due diligence with them and they

14   had made it clear that they wanted me to come and work for them.

15   And really, after due diligence, I was -- you know, I was a

16   little hesitant.

17        Due diligence is a very hard, long process.  And while I

18   liked Stephen and Greg, it was just a long process.  We were

19   kind of burned out on each other, I guess, or I was burned out

20   on them.  A lot of work.

21        And they had kind of indicated to me that they really

22   needed me to come to work, and if I didn't it would kind of

23   jeopardize the deal.

24        So hesitantly, and on the day of closing, I signed an

25   employment agreement with them.

Direct Examination - Amy Allen

1    Q.   And what was your job at ASH-Grayhawk then after you signed

2    that employment agreement?

3    A.   I was the finance HR and office manager.

4    Q.   In Columbus?

5    A.   In Columbus.

6    Q.   All right.

7         Did you help set up ASH's -- ASH-Grayhawk's operations in

8    Columbus?

9    A.   Yes, I did.

10   Q.   And how long did you work for ASH-Grayhawk?

11   A.   I worked for them from November the 15th, until, I think it

12   was March the 15th of 2020.

13   Q.   So that's approximately four months.

14        Why did you leave after only four months?

15   A.   I was used to working in an environment where you had a lot

16   of support and you could make decisions easily, we worked as a

17   team, and I just didn't feel like the environment was that any

18   longer.

19        There was a lot of red tape.  You couldn't get anything

20   accomplished without going through Mr. Pehrkon or Mr. Benson,

21   who weren't very responsive, to be frank.

22   Q.   Did you go back to work for Mr. Erickson then?

23   A.   I did.

24   Q.   How did that come about?

25   A.   I had been scrolling through Indeed looking for a job

1  because I was leaving regardless.

2  Q.   Can I stop you right there.  You were scrolling through

3  Indeed.  Can you tell the jury what that is, for who may not

4  know it?

5  A.   Indeed is just an online employer market, really.  People

6  post job openings.

7  Q.   All right.  So pick up.  You were scrolling through

8  Indeed --

9  A.   Like Monster.com or whatever.

10     So I was scrolling through and I saw that Mr. Erickson had

11  posted a job.  And so I gave him a call and we talked and

12  decided it would be beneficial to go back to work for him.

13  Q.   Now did you tell anyone at ASH-Grayhawk that you were going

14  back to work for Mr. Erickson before you left the company?

15  A.   I did.  I immediately let Mr. Benson know that -- I had the

16  employment agreement and it was pretty clear that I could leave

17  and I could go back to work for Mr. Erickson.

18     I did give Greg a call, or Mr. Benson a call, and let him

19  know and he told me that that was fine.  That he would rather me

20  go back to work for Dave so that we could all continue to work

21  together instead of go somewhere else.  So he gave me his

22  blessing.

23  Q.   So you went back to work for Mr. Erickson's companies in

24  March of 2020?

25  A.   Yes.

Direct Examination - Amy Allen

1    Q.    All right.

2          Do you still work for his companies?

3    A.    Yes, I do.

4    Q.    What are your current positions at his companies?

5    A.    I am the VP of finance for GH Lot Holdings.

6          I am the VP of administration for Grand Oak Builders.

7          And then I am the secretary and treasurer of many of his

8    other entities.

9    Q.    Can you tell the jury what your duties and responsibilities

10   are as vice president of finance for those operations?

11   A.    Sure.

12         Basically, I oversee all of the finances.  I have some

13   people that work for me that prepare financial statements, pay

14   bills, and I oversee those at the end of the year.  Responsible

15   for getting information for tax returns.  Dealing with bankers

16   for all of our loans.

17   Q.    Do you have responsibility for the companies' general

18   ledger?

19   A.    That's correct.

20   Q.    And can you tell the members of the jury, who may not

21   otherwise know, what a general ledger is?

22   A.    A general ledger is simply a statement.  It's your

23   company's finances.

24   Q.    All right.

25         I want to jump to the main event, so to speak, about the

1  Land Purchase Agreement and ask you some questions about that.

2          MR. SHEBELSKIE:  Can you we put on the screen, please,

3  Plaintiffs' Exhibit 246E, which is the Land Purchase Agreement

4  previously admitted.

5  BY MR. SHEBELSKIE:

6  Q.   Do you have that agreement on the screen?

7  A.   Yes, sir.

8  Q.   Ms. Allen?

9  A.   Yes, sir.

10  Q.   I would like to direct your attention to Exhibits B and C

11  of the agreement, which is page 24 of the exhibit.

12          Do you see on the screen page 24, which has Exhibit A --

13  Exhibit B, rather, and Exhibit C?

14  A.   Yes.

15  Q.   All right.

16          Now I want to ask you some questions about Exhibit C, which

17  is the Phase C lots.

18          MR. SHEBELSKIE:  Maybe we can enlarge that, please.

19  BY MR. SHEBELSKIE:

20  Q.   All right.

21          Now, are you aware, Ms. Allen, that the Land Purchase

22  Agreement did not contain a schedule for the order of these

23  Phase C neighborhoods?

24  A.   Yes, I'm aware.

25  Q.   And what is your understanding of the business reason why

Direct Examination - Amy Allen

1    the sellers, under this Land Purchase Agreement -- well, let me

2    ask you one preceding question.

3        Do you further understand that under Section 10 of the

4    Land Purchase Agreement the parties were to come to an agreement

5    on that schedule?

6    A.    Yes.

7    Q.    All right.

8        Now can you tell us, as a vice president of finance and the

9    officer of these companies, from your perspective, why did you,

10   sellers, need to have a schedule for these Phase C lots?

11   A.    Sure.

12       So as you can see, there is 12 subdivisions listed here, or

13   12 parcels of land.  To develop each of these parcels takes an

14   incredible amount of money.  Millions and millions of dollars.

15       You have got to, you know, clear the land, grade the land,

16   put in sewer, streets -- lots of money -- power, sewer, all of

17   these things.

18       To do 12 of them at one time you couldn't do it.  I mean,

19   you are not going to be able to get enough bank financing to do

20   12 subdivisions at one time.  Not to mention there is not enough

21   contractors in Columbus, Georgia to do 12 subdivisions at one

22   time.

23       The cost of carry would be enormous.

24       Not to mention that if you develop 12 you would have,

25   according to this, 964 lots.  That take down process would be

Direct Examination - Amy Allen

1    very long.

2        And with the ROFO agreement not pricing -- the price would

3    never increase once it was agreed upon.

4    Q.    Let me stop you there and break that up.

5        First you said that the carrying costs to -- that would be

6    incurred if you develop all of these neighborhoods at the same

7    time would be great.  What do you mean by "carrying costs"?

8    A.    The interest.

9    Q.    The interest on the bank loans?

10   A.    The interest on the bank loans.  Or even, if it's not a

11   bank loan, it's somebody's money, right?

12   Q.    And you refer to the ROFO process.  Is that the Right of

13   First Offer?

14   A.    Yes.

15   Q.    So let me pause you there and establish this fact; under

16   this Land Purchase Agreement there were A, B and C lots, right?

17   A.    Yes.

18   Q.    Did the Land Purchase Agreement specify prices for the

19   A and B lots?

20   A.    Yes, it did.

21   Q.    Did it specify prices for the C lots?

22   A.    No, it did not.

23   Q.    What's your understanding as to why it didn't?

24   A.    Because those development costs were unidentified at the

25   time of closing.

Direct Examination - Amy Allen

1   Q.   All right.

2        And so now explain to the jury what you mean by if you

3   developed all 12 neighborhoods at the same time that the ROFO

4   process would have a detrimental affect on the sellers.

5        Explain that.

6   A.   Sure.

7        So the form for this ROFO -- we don't have that -- it's all

8   of the cost of development.  And so obviously the project is

9   completed.  You have all of your cost and we are going to divide

10  it over the number of lots that we ended up with.  And that's

11  your lost cost.

12       Once we -- both parties agree that it's finished and done

13  that's the price of the lots.  There is no component in there

14  for that price to inflate as we still accrue interest.

15  Q.   So let's put this in context.

16       If all of these 12 neighborhoods had been developed at the

17  same time in, say, 2020, if there had been enough manpower and

18  money to do that, would the prices for those lots then have been

19  set in 2020, even if ASH had decided not to buy them until 2027

20  or 2029?

21  A.   Correct.

22  Q.   And there would have been no inflation in the prices for

23  that 7 years; is that right?

24  A.   That's correct.

25  Q.   Now the land purchase agreement doesn't have a schedule or

Direct Examination - Amy Allen

1  require an agreement on the schedule for the A and B lots.  Is

2  that right?

3  A.    That's correct.

4  Q.    What's your understanding as to why a schedule for those

5  two groupings of lots was unnecessary?

6  A.    With the A lots, those lots were -- at the time of closing

7  those lots were owned by Grayhawk Homes and they were ready to

8  be built on.  You could build on them the next day.  And they

9  had a set price.  All the cost had been identified.  They were

10  ready to roll.

11      The B lots also had a set price and most of those were very

12  near completion.  They were close enough that prices had been

13  set.

14  Q.    Speaking of the A lots, approximately, when were those lots

15  developed?

16  A.    The A lots?

17  Q.    Yes, ma'am.

18  A.    They would have been developed a year or so ahead.

19  Q.    All right.  They --

20  A.    At the most.

21  Q.    Were they based on development cost then incurred before

22  2020?

23  A.    Yes.

24  Q.    And speaking of the A lots, who owned the A lots?

25  A.    Grayhawk Homes.

Direct Examination - Amy Allen

1    Q.    Who owned the B lots?

2    A.    Other development companies.

3    Q.    Explain if you would.

4    A.    Sure.

5         It's the normal practice that when we would develop a piece

6    of land we would put it in -- we would start it in one of our

7    development companies.  We like to keep the profit from

8    development separate from building.  Plus the liability

9    separate.

10        So let's say one of our entities, Tiger Creek Development,

11   had a piece of land.  Let's just say Charleston Place.  They had

12   Charleston Place.  They would take on all the loans, all the

13   expenses, develop the property, and then they would sell the

14   lots over to Grayhawk Homes.

15   Q.    Now let's look at Exhibit C again.

16        There is a column on the right entitled "Related Party

17   Owned By".  Do you see that column?

18   A.    Yes.

19   Q.    All right.  So tell us what that column represents, what

20   information is there.

21   A.    Sure.  That's the development company that owns that piece

22   of property.

23   Q.    All right.

24        So looking at the first four, Tiger Creek Development, who

25   owns -- well, me start -- does David Erickson own that company?

Direct Examination - Amy Allen

1    A.    He does not.

2    Q.    Who owns it?

3    A.    Rose Anne Erickson.

4    Q.    His wife?

5    A.    Yes.

6    Q.    The next entry under that is D. Erickson.

7          That's Dave Erickson?

8    A.    Yes.

9    Q.    And that neighborhood that he owns in his own name is McKee

10   Road?

11   A.    That's correct.

12   Q.    Are those the only Phase C lots he owns in his own name,

13   according to this?

14   A.    In his own name, yes.

15   Q.    Yes.  All right.

16         And then beneath you see another entry for Tiger Creek.

17   And then there is a Cusseta Road.

18         Who owns Cusseta Road?

19   A.    Rose Anne Erickson.

20   Q.    And then underneath that we see Grey Rock Development.

21         Who owns Grey Rock Development?

22   A.    Mr. Erickson owns one percent and Rose Anne Erickson owns a

23   percentage and then there are other partners.

24   Q.    All right.

25         And we see under two more Tiger Creeks and then a

Direct Examination - Amy Allen

```
 1   Windsong Bon [sic], LLC.  Who owns that?
 2   A.   Windsong Bonacre was a company owned by Ms. Erickson.
 3        I will disclose that one lot was sold to Tiger Creek
 4   Development and that's where it sits now.  Windsong was actually
 5   closed out.  And we did notify ASH of have.
 6   Q.   Let's be clear about that.  The lot that Windsong owned at
 7   the time of this chart you said it was sold to the Tiger Creek
 8   entity?
 9   A.   Yes.
10   Q.   Was ASH-Grayhawk told about that?
11   A.   Yes.
12   Q.   Did they object to it?
13   A.   No.
14   Q.   So right now does Windsong Bonacre own any Phase C lots?
15   A.   No.
16   Q.   Is it in business at all?
17   A.   No.
18   Q.   The last entry on this list is Erickson Investments.
19        Does Mr. Erickson own that company?
20   A.   He does.  100 percent.
21   Q.   All right.
22        In addition to the names that we see on this list here,
23   other defendants who the ASH companies have sued in this case,
24   one is Sage Development.  Are you aware of that company?
25   A.   Yes.
```

Direct Examination - Amy Allen

1   Q.   Does Sage Development own any Phase C lots?

2   A.   They do not.

3   Q.   Another defendant whom ASH companies have sued is

4   GH Lot Holdings.

5        Are you familiar with that company?

6   A.   Yes.

7   Q.   Does that company own any of the Phase C lots?

8   A.   They do not.

9   Q.   All right.

10       Another part of this chart for Phase C lots -- the middle

11  column, estimated lots, with 964 under that.

12       Do you see that?

13  A.   Yes.

14  Q.   All right.

15       So let's be clear about this.  At the time the Land

16  Purchase Agreement was signed in November of 2019, were there

17  964 lots in existence on these properties?

18  A.   No.

19  Q.   All right.

20       Now let me show you page 2 of the Land Purchase Agreement,

21  Section 5.

22            MR. SHEBELSKIE:  Could we please look at that?

23  BY MR. SHEBELSKIE:

24  Q.   All right, ma'am, we have that on your screen now.

25       Section 5 provides that the number of Phase C lots is

1    fluid.

2        Do you see that?

3    A.    Yes.

4    Q.    Why was the number of Phase C lots, as the time this

5    contract was signed, fluid?

6        MR. PETERSON:  Objection.  Lacks foundation.

7    BY MR. SHEBELSKIE:

8    Q.    Do you know, ma'am, why it was fluid?

9    A.    Sure.

10       The number on the Exhibit C those are estimates.  Until you

11   have a final plat of a subdivision you don't know how many lots

12   are going to be there.  You may lose a lot because of an

13   easement.  You might lose a lot because of a detention pond

14   requirement.  You just don't know.  That was the best estimate

15   at the time of closing.

16   Q.    All right.

17       Then based on your experience, working with these

18   development companies for a couple of decades, or so I guess, in

19   your experience have y'all had occasions where you estimated a

20   number of lots you thought you might be able to put in a

21   subdivision only to find that final number is less?

22   A.    Yes.

23   Q.    So sometimes that is 10 percent less than your estimate?

24   A.    Yes.

25   Q.    All right.

888

Direct Examination - Amy Allen

1          Now, once this contract was signed, and the, what's called,

2    we have heard it in the trial, the take down requests where

3    ASH-Grayhawk was on a quarterly basis making the requests for

4    the lots it wanted to take down that quarter.

5          Are you familiar with that process?

6    A.    Yes.

7    Q.    All right.

8          Did you play a role in it?

9    A.    Yes.

10   Q.    Could you describe for the jury what role you played in the

11   quarterly take down process once this contract was -- after this

12   contract was signed?

13   A.    Sure.

14         So prior -- we will do it prior to the lawsuit and after

15   the lawsuit.

16   Q.    Yes.

17         So in the beginning, before the lawsuit, how did it go?

18   A.    So Mr. Pehrkon, or Mr. Twiss, would email myself and the

19   attorneys a list that showed the lots that they want to take

20   down.

21   Q.    Let me stop you right there.  You said the "attorneys."

22   Which attorneys?

23   A.    Closing attorney.

24   Q.    The closing attorney?

25   A.    That would be the attorney hired by them to complete the

1    transaction.

2    Q.    This would be ASH-Grayhawk's attorney hired to do the real

3    estate closing?

4    A.    Correct.

5    Q.    All right.  I want to make that clear.

6          So the email would come to you and their closing attorneys?

7    A.    Yes.

8          It would give us a list of lots that they wish to purchase.

9          I would simply go to the agreement, make sure that the

10   pricing was right, make sure the lot hadn't already been

11   purchased, make sure it was available, and make sure there was

12   no taxes that needed to be added to the price.  So agreed on the

13   price.

14         And then the attorney would do the closing.  It was that

15   simple.

16         And then after the fact, after the lawsuit, everything --

17   Q.    Let me stop you right there before you talk about after the

18   lawsuit.

19         So when the request came in, when there was a request on --

20   if there was a request under the A and B lots the prices were

21   already preset, right?

22   A.    Correct.

23   Q.    Had there been a C lot developed a request would come in

24   and would that set, then, the price for the C lots for that

25   neighborhood?

 1    A.   So the way that process worked was once the C lots were

 2    completed we would send the packet out with the form and it had

 3    a price and they had to approve that price at that point.

 4    Q.   If they approved the price, they being ASH-Grayhawk?

 5    A.   Yes.

 6    Q.   If they approved the price at that point would that price

 7    then govern all the future lots in that neighborhood?

 8    A.   Correct.

 9    Q.   Even if they didn't draw down any more seven years later?

10    A.   Correct.

11    Q.   Now, let's stick with the pre-lawsuit period.

12         Let's start for 2020, the four quarters of 2020, and then

13    the first two of '21.  That's six quarters, right?

14    A.   Uh-huh.

15              THE COURT:  When did you leave ASH and start with --

16    go back to Erickson?

17              THE WITNESS:  March of 2020.

18              THE COURT:  March of 2020.

19              Go ahead.

20    BY MR. SHEBELSKIE:

21    Q.   Let's pick it up when you went back to Grayhawk in March of

22    2020 -- well, for the whole period.

23         During that period, before the lawsuit, did ASH-Grayhawk

24    make requests for lots each quarter?

25    A.   Yes.

Direct Examination - Amy Allen

1  Q.   Did the Grayhawk companies comply with each of those

2  requests?

3  A.   Yes.

4  Q.   And in those quarterly requests that were made before the

5  lawsuit did ASH-Grayhawk regularly ask for more lots than the

6  minimums that were specified in the Land Purchase Agreement?

7  A.   Yes.

8  Q.   All right.

9       In any of those quarters before the lawsuit was filed, in

10 which ASH-Grayhawk asked for extra lots above the contract

11 requirement, did the Grayhawk companies ever refuse to provide

12 them those extra lots?

13 A.   No.

14 Q.   Let's pick up with the quarters after the lawsuit was filed

15 in June of 2021.   Okay?

16 A.   Okay.

17 Q.   All right.

18      Did ASH-Grayhawk continue to make requests for lots each

19 quarter after the lawsuit was filed?

20 A.   Yes.

21 Q.   All right.   Explain then how, if it did, the take down

22 process change once the lawsuit was filed?

23 A.   Same process, but the request came from -- I think it went

24 from Mr. Kramer to Mr. Quackenboss to us.

25 Q.   All right.

Direct Examination - Amy Allen

 1        Once it got to you, did you then have the same role of

 2   verifying the availability and pricing of the lots and giving

 3   the information to the closing attorneys?

 4   A.   That's correct.

 5   Q.   All right.

 6        Now the lawsuit was filed on June 14, 2021, did -- the end

 7   of that quarter would have been June 30th, correct?

 8        You have to answer yes or no, ma'am.

 9   A.   Yes.

10   Q.   All right.

11        Did ASH-Grayhawk make a request for lots in that quarter,

12   the one ending June 30th, of 2021?

13   A.   Yes.

14   Q.   And in each subsequent quarter, since the lawsuit was

15   filed, has ASH-Grayhawk, or did ASH-Grayhawk continue to make

16   quarterly requests for lots under the Land Purchase Agreement?

17   A.   Yes.

18   Q.   Did they, in those requests, ask for Phase B lots?

19   A.   Yes.

20   Q.   Has the Grayhawk companies delivered all the Phase B lots

21   that ASH-Grayhawk has requested since the lawsuit was filed?

22   A.   Yes.

23   Q.   Did the quarterly take down requests, that ASH-Grayhawk

24   made after the lawsuit was filed, also ask for Phase C lots?

25   A.   Yes.

Direct Examination - Amy Allen

1  Q.   And how many Phase C lots has Grayhawk companies provided

2  since the lawsuit was filed?

3  A.   I believe that number to be 42.

4  Q.   All right.

5       Are there any finished full-developed Phase C lots that

6  have not been delivered?

7  A.   No.

8  Q.   Now that's only 42 that have been provided since the

9  lawsuit you said, right?

10  A.   Yes.

11  Q.   Is there anything preventing the final development of the

12  remaining Phase C lots in the neighborhoods?

13  A.   Yes.

14  Q.   Could you tell the jury what it is that is preventing the

15  finalization of the Phase C lots in neighborhoods?

16  A.   Sure.

17       There is a lis pendens which has been placed on all of the

18  property owned by Mr. Erickson, and what that lis pendens does

19  is it --

20  Q.   Ma'am, let me stop you there for a second.

21       Placed by whom?

22  A.   By ASH.

23  Q.   Now, so what does ASH-Grayhawk lis pendens, against

24  Mr. Erickson's properties -- how does that interfere with his

25  ability to develop those properties into finished Phase C lots?

1    A.    I'm sorry.

2          So what a lis pendens does is it --

3          MR. PETERSON:  Objection.  She is about to state a

4    legal conclusion and an improper opinion.

5    BY MR. SHEBELSKIE:

6    Q.    Ma'am, what's your understanding, as the vice president of

7    the companies, as to how the lis pendens is interfering with

8    y'all's ability to finalize the Phase C lots?

9          MR. PETERSON:  Objection.  Lacks foundation.

10         THE COURT:  Overruled.

11         THE WITNESS:  So the final stage in development is we

12   have to deed the streets over to the city.  And because of this

13   lis pendens we can't deed the streets because there is not clear

14   title.

15   BY MR. SHEBELSKIE:

16   Q.    Deed the streets to who?

17   A.    To the city of Columbus, or Auburn, or whatever

18   municipality.

19   Q.    All right.

20         Now, in the past two years, while the lawsuit was been

21   pending, have other companies or people contacted y'all to see

22   if y'all can sell the properties to them?

23   A.    Yes.

24   Q.    How frequently does that happen?

25   A.    I have a call I can think of one company in particular

 1   about every two months -- six weeks, two months.

 2   Q.   All right.

 3        And have you been able to sell any of this land to other

 4   people during the pendency of the lawsuit and the pendency of

 5   the lis pendens?

 6   A.   No.

 7   Q.   Now you stated that each quarter, since the lawsuit was

 8   filed, ASH-Grayhawk would make a request for A -- I'm sorry --

 9   for B and C lots, but you weren't able to deliver all the C lots

10   they requested, correct?

11   A.   That's correct.

12   Q.   All right.

13        Did ASH-Grayhawk then send default notices each quarter

14   when your companies weren't able to deliver the requested

15   C lots?

16   A.   Yes, they do.

17   Q.   And then when you couldn't do that they then filed some

18   sort of notice of default -- serve a notice of default on you?

19   A.   Yes.

20   Q.   I am going to ask you a little bit about that.

21            MR. SHEBELSKIE:  If you could, Mr. Walters, again pull

22   up the Land Purchase Agreement, PX 246E.  I would like you to

23   look in particular at page 12 of the agreement, Section 35.

24   BY MR. SHEBELSKIE:

25   Q.   We have on the screen, Ms. Allen, Section 35.

Direct Examination - Amy Allen

1            Do you see that?

2    A.    Yes.

3    Q.    And do you see that in this agreement it says:  If the

4    seller shall default any of the terms the buyer -- and buyer

5    ASH-Grayhawk, right?

6    A.    Yes.

7    Q.    All right -- may at buyer's election, and then it has three

8    provisions:  A, it could waive the default, or B, terminate this

9    agreement by written notice to seller.

10           Do you see that?

11   A.    Yes.

12   Q.    Or going down to here, or C, give written notice to seller

13   of default.

14           Do you see those three options that is given to

15   ASH-Grayhawk under Section 35 of the Land Purchase Agreement?

16   A.    Yes.

17   Q.    All right.

18           Now, for each of these quarters, after the lawsuit was

19   filed, did ASH-Grayhawk ever give a written notice of

20   termination of the Land Purchase Agreement to y'all's companies?

21   A.    No.

22   Q.    Were all the notices that they gave on the quarterly

23   defaults since the lawsuit all under 35C?

24              MR. PETERSON:  Objection.  Lacks foundation.

25              THE COURT:  Overruled.

Direct Examination - Amy Allen

1          THE WITNESS:  Will you repeat the question?

2    BY MR. SHEBELSKIE:

3    Q.   Did they give written notices of default each quarter?

4    A.   Yes.

5    Q.   All right.

6         Now the current quarter that we are in, the third quarter

7    of 2023, ends on September 30th, right?

8    A.   Yes.

9    Q.   And did ASH -- ASH-Grayhawk give any request for a take

10   down by the September 20th deadline in this particular quarter?

11   A.   No, they have not.

12   Q.   Was that the first quarter since filing the lawsuit they

13   did not submit a quarterly request for lots?

14   A.   That is correct.

15   Q.   All right.

16        Now I want to shift gears a little bit, Ms. Allen, and ask

17   you about another thing.

18        In this lawsuit, over the last couple of days, we have

19   heard several of the ASH company witnesses say that Mr. Erickson

20   received $50 million from ASH under this Land Purchase

21   Agreement.

22        You keep the company's books and records, right?

23   A.   Correct.

24   Q.   So tell us, has David Erickson received $50 million in his

25   personal pocket pursuant to this Land Purchase Agreement?

1    A.    He has not.

2    Q.    Can you explain to the jury why not and what he actually

3    did receive, personally?

4    A.    So, just for clarification, are you asking about the

5    closing of the company --

6    Q.    Yes.  Let's break that down.

7          At the closing in November 2019 --

8    A.    Right.

9    Q.    -- what did Mr. Erickson receive then?

10   A.    So I don't have numbers in front of me so I am going to

11   talk in generality.

12         The money that he received, or the money that was exchanged

13   at closing, ASH was purchasing the assets of the company.  So

14   they were purchasing land and what we call "sticks and bricks."

15   That's the houses that are in production being built.  Those are

16   the things that they were buying.

17         All of those items had loans on them from some source.  It

18   was not just cash in his pocket.  Those loans had to be paid.

19         The cash that Mr. Erickson was receiving was -- you've

20   heard them talk about the premium.  The premium was the money

21   that was the actual, this is what you are getting for your

22   company.

23         So far that number was $10 million.  He has received

24   6.4 million, of which a good portion is in ASH stock which he

25   hasn't gotten anything out of that as of now.

1    Q.    All right.

2          Now that was at closing?

3    A.    That was at closing.

4    Q.    Now after closing there were a number of A and B lots sold

5    and some C lots sold, too, right?

6    A.    Correct.

7    Q.    And we have heard testimony from the ASH witnesses that

8    they paid approximately $25 million to buy those lots since this

9    contract went in place.

10         You heard that testimony?

11   A.    Yes, I did.

12   Q.    Did that $25 million go into Mr. Erickson's pocket?

13   A.    No.  There again, it went to pay off the loans and regain

14   his capital that he had invested.  I mean, it's not just, Here's

15   cash.

16   Q.    Now under the Land Purchase Agreement the prices for the

17   A and B lots, that were set in the contract, did that give

18   Mr. Erickson any profit?

19   A.    No, it did not.

20   Q.    Explain that.  What do those prices reflect if no profit to

21   Mr. Erickson?

22   A.    Those prices were set.  At the time -- so the A lots had a

23   price.  Grayhawk Homes had bought those lots from the

24   development company.

25         When Dave sold those lots, or Mr. Erickson sold those lots

Direct Examination - Amy Allen

1    across he sold them at cost.  And he did that because he was

2    building the homes and so he was seeing the profit on that side

3    of the business.

4         So when he sold to ASH he sold -- he kept them at that

5    price, knowing that he was receiving the premium is where he

6    would get his money.

7    Q.   Now you say a premium would be the way he would make a

8    profit.  What are you referring to and how much is it?

9    A.   The premium was $10 million.

10   Q.   All right.  At closing?

11   A.   At closing.

12   Q.   Okay.

13        So he was selling the lots at cost because he got that

14   money at the closing?

15   A.   Correct.

16   Q.   And is there a management fee associated with the A, B and

17   C lots when they are sold?

18   A.   There is a management fee that is added to the price of the

19   C lots.  It's a $3,000 fee per lot, which, if we are lucky,

20   would cover overhead.

21   Q.   All right.

22        I am going to switch topics again.  We heard some testimony

23   from the video clip deposition of Mr. Benson that preceded you

24   about a Transition Services Agreement.

25        Are you familiar with that?

 1    A.    Yes.

 2          MR. SHEBELSKIE:  I would like to show the witness

 3    Plaintiffs' Exhibit 246G, which has been previously admitted by

 4    stipulation.

 5    BY MR. SHEBELSKIE:

 6    Q.    Mrs. Allen, do you see on your screen the Transition

 7    Services Agreement of November 15, 2019, between ASH-Grayhawk

 8    and Grayhawk Homes and two other of Mr. Erickson's companies?

 9    A.    Yes, I do.

10    Q.    All right.

11          Now, as part of your work, for four months at ASH-Grayhawk,

12    and then similarly since you've been back at Mr. Erickson's

13    companies, are you familiar with the work that has been done

14    pursuant to this Transition Services Agreement?

15    A.    Yes, I am.

16    Q.    Explain to the jury, first, what this Transition Services

17    Agreement is.

18    A.    Okay.

19          The Transition Services Agreement was -- it was so that

20    both parties could conduct business as usual, the day after

21    closing, so everybody could just continue on.

22          For Mr. Erickson's side that meant support with accounting

23    services.  He still had Grayhawk Homes of Atlanta and

24    South Carolina that were winding up.  They were completing homes

25    and winding those businesses up.

Direct Examination - Amy Allen

1      So he, obviously, didn't want to hire a whole new staff to

2  take care of that stuff.  So they were providing estimating

3  services, CAD services, decorating services, all of the things

4  that you need to complete the office part of building a house.

5  Q.   All right.

6      Let me stop you right there.

7  A.   Sure.

8  Q.   Several things.

9      So you identified a list of services that were being

10  provided to Mr. Erickson's remaining companies.

11      Who was providing those services to Mr. Erickson's

12  companies?

13  A.   The employees of ASH-Grayhawk.

14  Q.   And you listed services that were provided.  I want to talk

15  about each of them briefly.

16      You said in the beginning ASH-Grayhawk was providing

17  accounting services for Mr. Erickson's remaining companies.

18      Is that right?

19  A.   Yes.

20  Q.   And what sort of accounting services are you talking about?

21  A.   They were paying the bills.  They were balancing the

22  checkbooks.  They were -- that was at the end of the year so

23  they were gathering things for tax returns.  All financial

24  matters.

25  Q.   Okay.

Direct Examination - Amy Allen

1    Were those support services, including the accounting one

2    that you just described, provided by ASH-Grayhawk employees to

3    the Atlanta and South Carolina corporation owned by

4    Mr. Erickson?

5    A.    Yes.

6    Q.    You said another service that ASH-Grayhawk employees

7    provided to Mr. Erickson's companies was estimating the

8    purchases.

9        Can you explain to the jury what they are?

10   A.    Sure.

11       Purchasing department, they are the ones who go out and

12   solicit prices for all the materials that go in a home.

13       The estimators are the ones taking the drawings, estimating

14   how many bricks go on a house, how many shingles.  So those two

15   departments kind of work together.

16       They were providing those services for Atlanta and

17   South Carolina.

18   Q.    All right.

19       Now, as part of this estimating and function support that

20   ASH-Grayhawk was providing did they ever generate, in that

21   connection, documentation that had the Grayhawk name and logo on

22   it?

23   A.    Yes, they did.

24   Q.    Explain, ma'am.

25   A.    So the estimators, after they estimated a home, they would

1  release what's called purchase orders to all the trades to

2  perform the work.  And this is how the trades got paid.  They

3  would turn in their purchase orders and sign off they had done

4  it.

5      Those purchase orders had the Grayhawk of Atlanta or

6  South Carolina -- had the hawk and the logo on there.

7  Q.  You said another service that ASH-Grayhawk provided to the

8  Atlanta and South Carolina companies was decorating.

9      Can you explain what that was.

10 A.  That mostly had to do with speculative homes and some --

11 Q.  What's a spec home?

12 A.  A spec home is a home being built that doesn't have a buyer

13 yet.  So we are going to start this house and pretty it up and

14 hopefully we will find an end buyer.  So the decorator is

15 picking out all the finishes for that home -- the carpet, paint,

16 windows, front door.

17 Q.  Another service you said that the ASH-Grayhawk companies

18 provided, pursuant to this Transition Services Agreement, was

19 something you called CAD, C-a-d?

20 A.  Yes.

21 Q.  What does CAD stand for?

22 A.  That is Computer Aided Drawing -- drafting.  That is the

23 person who is drawing the plans for the house.

24 Q.  And was there an ASH-Grayhawk employee who was preparing

25 plans after November 15, 2019 for the Atlanta and South Carolina

1  company?

2  A.    Yes.

3  Q.    And did those plans, created by ASH-Grayhawk, include the

4  Grayhawk name and logo on the plans for South Carolina and

5  Atlanta?

6  A.    Yes, they did.

7  Q.    All right.

8       Were presentation flyers created by the ASH-Grayhawk

9  employees for the South Carolina and Atlanta companies?

10  A.    Yes.

11  Q.    What's a presentation flyer in this context?

12  A.    A presentation flyer is a small picture of a home -- inside

13  of a home that shows, like, what -- here is the living room,

14  here is the dining room, here is the bedrooms.  Just a nice

15  little flyer for a potential homebuyer.

16  Q.    Maybe made available to people touring the house or talking

17  with realtors?

18  A.    Sure.  Yes.

19  Q.    Did the ASH-Grayhawk employees put the Grayhawk name and

20  logo on those presentations flyers they were making for the

21  Atlanta and South Carolina companies?

22  A.    Did they?

23  Q.    Yes.

24  A.    Yes, they did.

25  Q.    All right.

1    Now, how long did this Transition Services Agreement remain
2  in place?
3  A.   Until March of 2021.
4  Q.   All right.
5    Now, how long was it originally set to last?  Do you
6  remember that?
7  A.   I don't recall that.  I think for one year.  I don't
8  recall.
9  Q.   Was there a subsequent amendment to it?
10 A.   Yes.  It was amended twice.
11 Q.   All right.
12   In addition to the Transition Services Agreement, was there
13 also a Warranty Services Agreement between ASH-Grayhawk and
14 Mr. Erickson's companies?
15 A.   Yes.
16 Q.   Can you explain to the jury briefly what the Warranty
17 Services Agreement concerned?
18 A.   The Warranty Services Agreement was that -- so, obviously,
19 all of the homes that we sold prior to the sale of the company
20 had a warranty.  And we put money in escrow, I believe, to cover
21 the cost of those items.  And the Warranty Services Agreement
22 allowed their employees to take care of those warranty needs for
23 us.
24 Q.   All right.
25   And when the Grayhawk customers bought houses before 2019,

Direct Examination - Amy Allen

1  and even afterwards, were they given contact information of who

2  to contact if they had a warranty claim?

3  A.    Yes.

4  Q.    Were they given a phone number?

5  A.    They were given the office phone number.  Yes.

6  Q.    The office where?

7  A.    In Columbus.

8  Q.    When ASH-Grayhawk took over Mr. Erickson's Columbus

9  business you were there for the first four months, right?

10  A.    Correct.

11  Q.    Did they ever change that phone number once they took over

12  the office?

13  A.    They did not.

14  Q.    And then since you left the company do you still, at least

15  as long as the Transition Services Agreement was up and running,

16  do you still interact with ASH employees -- let me -- let's not

17  perfectly phrased.

18      Was there a website also provided to homebuyers to contact

19  if they had a warranty claim?

20  A.    Yes, there was.

21  Q.    And what was that web address?

22  A.    It was warranty@grayhawkhomesinc.com.

23  Q.    And who got control and took ownership, so to speak, of

24  that website after ASH bought Mr. Erickson's companies?

25  A.    ASH-Grayhawk.

Direct Examination - Amy Allen

1    Q.    To your knowledge, did ASH-Grayhawk ever change that web

2    address?

3    A.    I know that they changed it to warranty@grayhawkhomes.

4    They dropped the Inc. and had the Inc. redirected to Grayhawk

5    Homes.

6    Q.    All right.  So if, say, buyers of Mr. Erickson's homes

7    before 2019, used the email address that they had been given

8    before November 15, 2019, would those emails still get routed

9    through ASH-Grayhawk?

10   A.    Yes.

11   Q.    To your knowledge did Mr. Erickson ever try to get

12   ASH-Grayhawk to change that website configuration?

13   A.    Yes.

14          MR. SHEBELSKIE:  I would like to show you, please,

15   ma'am Defendants' Exhibit 139.

16   BY MR. SHEBELSKIE:

17   Q.    You have on your screen, Mrs. Allen, Defendants'

18   Exhibit 139.  An email exchange, the last one being from

19   Mr. Erickson to Greg Benson with a copy to you.

20          Do you see that?

21   A.    Yes.

22   Q.    And do you remember receiving this email and the subject

23   matter of it?

24   A.    Yes.

25          MR. SHEBELSKIE:  Your Honor, I would move for the

Direct Examination - Amy Allen

1    admission of Defendants' Exhibit 139.

2            THE COURT:  Any objection?

3            MR. PETERSON:  To hearsay on the statements that

4    aren't from Mr. Erickson.

5            MR. SHEBELSKIE:  Well.  I don't think they are being

6    offered for the truth.

7            MR. PETERSON:  With that stipulation, no objection.

8            THE COURT:  All right.  Admitted.

9        (DEFENDANTS EXHIBIT 139:  Received in evidence.)

10            MR. SHEBELSKIE:  Let's put that on the screen for the

11    jury.

12            The jury now sees what we were just talking about.

13    The top email is from Mr. Erickson to Greg Benson in January of

14    2020.

15    BY MR. SHEBELSKIE:

16    Q.  Do you see the subject line is:  New website address and

17    new logo.

18        Do you see that?

19    A.  Yes.

20    Q.  Explain to the jury what's going on here, what Mr. Erickson

21    is asking about concerning trying to get -- concerning the

22    matter of new website address and new logo.

23    A.  ASH, I believe, was changing some stuff with their logo.  I

24    think they were changing up some colors.  And the website they

25    were dropping the I-n-c.

Direct Examination - Amy Allen

1    Q.    All right.

2          And was Mr. Erickson in communication with Mr. Benson all

3    about this?

4    A.    Yes.

5    Q.    To your knowledge.    Thank you.

6          Now, picking back up with the Warranty Services Agreement,

7    what was -- was ASH-Grayhawk, pursuant to that agreement,

8    supposed to provide some sort of warranty support after

9    November 15, 2019?

10   A.    Yes.

11   Q.    For Mr. Erickson's companies?

12   A.    Yes.

13   Q.    And what warranty support services was ASH-Grayhawk

14   supposed to provide?

15   A.    They were supposed to provide -- in the Columbus area they

16   would have actually provided the support, phone calls, all that.

17   Plus they would support actually making the repairs.

18         In Atlanta and South Carolina, for the TSA, they would have

19   simply fielded the phone calls, website, and forwarded it to the

20   proper location.

21   Q.    Okay.

22         Were you in court yesterday when Ms. Richardson testified?

23   She was one of the warranty coordinators, or something for

24   ASH-Grayhawk?

25   A.    Yes.

Direct Examination - Amy Allen

1    Q.   She testified about she would receive some emails or phone

2    calls from Grayhawk customers -- Mr. Erickson's customers --

3    making warranty requests?

4    A.   Yes.

5    Q.   Was that part of the work ASH-Grayhawk agreed to do

6    pursuant to the Warranty Services Agreement?

7    A.   Yes.

8    Q.   All right.

9            MR. SHEBELSKIE:  You can take the exhibit off the

10   screen, Mr. Walters.

11   BY MR. SHEBELSKIE:

12   Q.   Are you aware, Ms. Allen, that in this lawsuit ASH-Grayhawk

13   has sued two of Mr. Erickson's companies, GH Lot Holdings of

14   South Carolina and GH Lot Holdings of Atlanta, for trademark

15   infringement?

16   A.   Yes.

17   Q.   Do you understand that ASH-Grayhawk complains about those

18   companies' use of the Grayhawk name and logo after ASH bought

19   the Columbus-based businesses?

20   A.   Yes.

21   Q.   All right.

22           With that understanding, let me ask you this:  During the

23   four months after ASH bought those businesses, when you were

24   working for ASH-Grayhawk setting up the Columbus office, did

25   anyone from ASH-Grayhawk tell you to make sure the Atlanta and

Direct Examination - Amy Allen

1  South Carolina companies weren't using the Grayhawk name or

2  logo?

3  A.    No.

4  Q.    Did anyone from ASH-Grayhawk, or ASH the holding company,

5  tell you, since you were setting up the office, to make sure the

6  employees didn't use the Grayhawk name and logo on any documents

7  or materials they were creating for the Atlanta or

8  South Carolina companies?

9  A.    No.

10  Q.    What about after you left ASH-Grayhawk, in March of 2020,

11  and went back to work for Mr. Erickson, did the ASH-Grayhawk

12  employees continue to use the Grayhawk name and logo on

13  documents they were creating for the South Carolina and Atlanta

14  companies?

15  A.    Yes, they did.

16  Q.    Did anyone at ASH-Grayhawk, or ASH-Holdings, ever tell you,

17  when you were working for the company ASH-Grayhawk for those

18  four months, that it violated their copyrights to be putting the

19  name and logo on documents for Atlanta or South Carolina?

20  A.    No.

21  Q.    Did anyone from ASH-Grayhawk tell you they thought that

22  would confuse consumers in South Carolina or Atlanta?

23  A.    No.

24  Q.    Did you ever hear anyone from ASH-Grayhawk, from any of

25  your higher-ups, ever complain about the fact that the Grayhawk

1   name and logo was being put on documents by the Atlanta and

2   South Carolina companies by their employees?

3   A.   No.

4   Q.   You have also heard testimony in this trial about the fact

5   that the Atlanta and South Carolina companies did not legally

6   change their names ten days -- ten business days, or whatever,

7   after the closing.

8        You heard that testimony?

9   A.   Yes.

10  Q.   While you were at ASH-Grayhawk, for those first four months

11  setting up the office, did anyone from the company -- the

12  president or the chairman or whoever -- ever tell you to make

13  sure those Atlanta and South Carolina companies changed their

14  names?

15  A.   No.

16  Q.   Y'all were continuing to create documents during those four

17  months with those companies' names.  Did anyone suggest that was

18  a violation of that term of the Asset Purchase Agreement?

19  A.   No.

20  Q.   After you left the company ASH-Grayhawk and went back to

21  Mr. Erickson's companies in March of '20, for the rest of

22  2020 -- all right -- from March of 2020 to December of 2020, did

23  ASH Holdings, or ASH-Grayhawk, ever contact y'all to tell y'all

24  you needed to change the names of the Atlanta or South Carolina

25  companies?

914
Direct Examination - Amy Allen

1    A.    No.

2    Q.    Did you ever hear a complaint from ASH Holdings, or

3    ASH-Grayhawk, about the use of the Grayhawk name and logo by

4    Atlanta and South Carolina until after that January 22nd, 2021,

5    special Board meeting we heard testimony about?

6    A.    No.

7    Q.    I want to continue with the warranty issue and show you a

8    couple of the documents that plaintiffs introduced and ask you a

9    little about those.

10        Okay?

11   A.    Okay.

12   Q.    The first one was Plaintiffs' Exhibit 270?

13             MR. SHEBELSKIE:  Your Honor, this has been previously

14   admitted.

15             Put on that screen, please, Mr. Walters.

16             Plaintiffs' 270.

17             THE COURT:  How much longer do you have with this

18   witness?

19             MR. SHEBELSKIE:  Could be a bit longer, Your Honor.

20             THE COURT:  All right.

21             Ladies and gentlemen, we are going to take a 15-minute

22   break at this time.  You will go to the jury room.  Do not

23   discuss the case.

24        (Jury out and recess taken at 2:50.)

25        (Resumed at 3:04.)

```
 1              THE COURT:  Be seated.  Bring them down.
 2              MR. SHEBELSKIE:  Your Honor, I have a question about
 3    Ms. Allen's testimony.
 4              Part of her testimony concerns the subject matter of
 5    the trademark disgorgement and so would it be appropriate to do
 6    the -- complete the direct on the matters that are for the jury
 7    and then, like we did with Mr. Duffus, have the cross of her?
 8              THE COURT:  I think so.
 9              MR. SHEBELSKIE:  Okay.
10         (Jury in at 3:07.)
11              THE COURT:  All right.  You may continue.
12              MR. SHEBELSKIE:  Thank you.
13    BY MR. SHEBELSKIE:
14    Q.   Ms. Allen, before the break I was about to ask you about
15    Plaintiffs' Exhibit 270.
16              MR. SHEBELSKIE:  Can we please have that on the
17    screen?  That's been previously admitted Your Honor.
18    BY MR. SHEBELSKIE:
19    Q.   Ms. Allen, do you see on your screen Plaintiffs'
20    Exhibit 270, which plaintiffs admitted.
21         It was an email from a Cindy Williams with a warranty
22    question, or concern, on 92 White Spruce Court in Dallas,
23    Georgia?
24    A.   Yes.
25    Q.   Did you check the company records and do you know one way
```

1    or the other whether Grayhawk Homes of Atlanta, in fact, sold

2    92 White Spruce Court to Ms. Williams?

3    A.    Yes.

4    Q.    In what year did Grayhawk Homes of Atlanta sell that house

5    to Ms. Williams?

6    A.    In 2018.

7    Q.    Let me show you another document plaintiffs introduced.

8         This is Plaintiffs' Exhibit 398.

9              MR. SHEBELSKIE:  Put that on the screen.

10   BY MR. SHEBELSKIE:

11   Q.    Plaintiffs' Exhibit 398 is this Yelp review that one of

12   their witnesses discussed.

13        Were you in court during that testimony?

14   A.    Yes, I was.

15   Q.    All right.

16        Now, I want to direct your attention to the commentary

17   apparently from the person making the Yelp review.

18        Do you see this email address of PODBarker@gmail.com?

19   A.    Yes.

20   Q.    Did you check the company's records to see if y'all had any

21   sales contract or related documentation that contained that

22   email address?

23   A.    Yes.

24   Q.    Did you find a sale to a buyer who used that email address?

25   A.    Yes.

Direct Examination - Amy Allen

1    Q.   And when did that the closing on that house take place?

2    A.   Let me think.  I think 2019.

3    Q.   All right.

4         You discussed the Transition Services Agreement and what

5    Mr. Erickson's companies got out of it.

6         What did Gray ASH Hawk [sic] get out of the Transition

7    Services Agreement?

8    A.   I'm glad you asked because it was a two-way document.

9         They were providing services for us, but we were also

10   providing services for them.

11        In order to build a house the builder has to have a

12   contractor license to pull a permit.  Nobody within the ASH

13   organization had a contractor license in the state of Georgia,

14   or Alabama, that could pull these permits.  So they were using

15   Mr. Erickson's credentials to pull their permits.

16   Q.   All right.

17        I am going to shift gears now and ask you about the

18   South --

19   A.   Can I say one more thing?

20   Q.   I'm sorry.  Had you finished?

21   A.   No.

22   Q.   I'm sorry.  Excuse me, ma'am.

23   A.   So, actually, that's why that Transition Services Agreement

24   kept getting extended was because they didn't have anybody that

25   could actually pull those permits.

1    You also, in the city of Columbus, have to have a builder's

2  license to have a business license if you are a builder.

3  Q.    I see.

4    Now have you finished?

5  A.    I'm finished.

6  Q.    All right.  Let me ask you some questions about the

7  South Carolina companies so that we can understand what it did

8  after the transaction with ASH and its current status.

9    First, what state was that company incorporated it?

10  A.    South Carolina.

11  Q.    And does the company still conduct any business?

12  A.    It does not.

13  Q.    What was the company's business when it was in operation?

14  A.    They purchased lots from third party -- from third party

15  developers and built homes.

16  Q.    And what state did it do business in?

17  A.    South Carolina.

18  Q.    Did ever do business in Georgia?

19  A.    They did not.

20  Q.    Did it ever own any land in Georgia?

21  A.    They did not.

22  Q.    Did the company have an office?

23  A.    Yes, they did.

24  Q.    Where was at that?

25  A.    It was in North Charleston, South Carolina.

Direct Examination - Amy Allen

1    Q.    Is the office still open?

2    A.    It is not.

3    Q.    When did it close?

4    A.    That office closed, I believe, in December of 2019.

5    Q.    Did the company ever have any offices in Georgia?

6    A.    They did not.

7    Q.    At the time of the ASH transaction, in November of '19,

8    approximately, how many employees did the South Carolina company

9    have?

10   A.    They had four employees.

11   Q.    And do you remember their names?

12   A.    They had Melissa Lee, Anthony Dezinna, and they had two

13   superintendents.  One of them's name was Lester Fordiss.  I

14   don't recall the other one.

15   Q.    Where did those employees work?

16   A.    In South Carolina.

17   Q.    Do they still work for the company?

18   A.    They do not.

19   Q.    Does the South Carolina company have any employees now?

20   A.    They do not.

21   Q.    Did it ever have any employees in Georgia?

22   A.    They did not.

23   Q.    How was the South Carolina company doing when ASH bought

24   Mr. Erickson's Columbus-based businesses?

25   A.    They were not doing well.  They were not profitable.

Direct Examination - Amy Allen

1    Q.   All right.

2         And what was the -- did y'all have a plan for those

3    companies when ASH bought Mr. Erickson's Columbus-based

4    businesses?

5    A.   Yes.

6         The plan was that they would buy no more land.  They would

7    build out the land that they had with homes, or sell the

8    remaining lots whichever they could.

9    Q.   Did the South Carolina company stick to that plan?

10   A.   Yes, they did.

11   Q.   Did they buy any more properties after ASH bought the

12   Columbus-based businesses?

13   A.   They did not.

14   Q.   At the time of the ASH transaction, did you have any

15   thought about how long it might take to wind down the

16   South Carolina's companies operations?

17   A.   Well, we hoped that it wouldn't take any more than a year

18   but along came COVID and delayed everything -- delayed it.

19   Q.   When did, despite the COVID, did the South Carolina company

20   sell-off its last properties?

21   A.   I believe its last one was sold in -- towards the end of

22   2021.

23   Q.   All right.

24        Let me ask you about the Atlanta company that was really

25   based in Dallas.  Dallas, Georgia, that is.

1      Does that company still conduct any business?

2   A.   They do not.

3   Q.   All right.  When it was in business, what did it do?

4   A.   They purchased lots from developers and built homes.

5   Q.   And what area did it buy properties and sell homes?

6   A.   Dallas, Georgia.

7   Q.   All right.

8      Did it ever do any business in the Columbus metropolitan

9   area?

10  A.   No.

11  Q.   Or in Alabama?

12  A.   No.

13  Q.   Did it ever build any homes outside of the Dallas, Georgia

14  area?

15  A.   No.

16  Q.   Did it have an office?

17  A.   It did.

18  Q.   What was it and where?

19  A.   They had an office that was inside of a model home that was

20  in one of the three neighborhoods that we built in.

21  Q.   All right.

22      Does it -- is that model home office still owned by the

23  company?

24  A.   It was owned by the company.

25  Q.   Is it still owned by the company?

Direct Examination - Amy Allen

1    A.    It is not.

2    Q.    When did it close?

3    A.    Oh, goodness.  I believe that office closed in 2020.

4    Q.    Did the company ever have an office anywhere else?

5    A.    It did not.

6    Q.    How many employees did the company have at the time of the

7    ASH transaction?

8    A.    That would be two.

9    Q.    And where did they work?

10   A.    They worked in Dallas, Georgia and out of the model home.

11   Q.    And does the company have any employees now?

12   A.    They do not.

13   Q.    Now, at the time of the ASH transaction was there an

14   expected plan for that company?

15   A.    It was the same as South Carolina.  They were not doing

16   well so we were closing it up.  We planned to do it as quickly

17   as possible.  Sell the -- build and sell the homes and whatever

18   lots we could and be out of there.

19   Q.    All right.

20         Did, in fact, the company do that then after the ASH

21   transaction?

22   A.    Yes.

23   Q.    Did it buy any additional properties?

24   A.    It did not.

25   Q.    Did it, in fact, build homes on all of the lots it owned at

Direct Examination - Amy Allen

1   the time of the ASH transaction?

2   A.   It did not.

3   Q.   Explain that.

4   A.   We ended up selling off some of the lots and taking a loss

5   on the lots.

6   Q.   Without building a house?

7   A.   I'm sorry?

8   Q.   Without building houses on them?

9   A.   Correct.

10  Q.   All right.

11       Now I am going to ask you about another company that's been

12  sued on the trademark infringement claims, GH Lot Holdings.

13       Are you aware that the ASH companies, or ASH-Grayhawk, has

14  sued that company also for trademark infringement?

15  A.   Yes.

16  Q.   Are you familiar with that company?

17  A.   Yes.

18  Q.   What was that company's business?

19  A.   They bought lots and built homes.

20  Q.   All right.

21       Did they buy lots and build homes in South Carolina?

22  A.   They did not.

23  Q.   Or Dallas, Georgia?

24  A.   They did not.

25  Q.   All right.

Direct Examination - Amy Allen

1        Is that company still in operation?

2    A.   It is.

3    Q.   All right.

4        Does it own or control either the South Carolina or the

5    Atlanta corporation?

6    A.   No.  Each entity was a separate corporation.

7    Q.   Okay.

8        Did GH Lot Holdings have anything to do with the use of the

9    Grayhawk name and logo by the South Carolina or Atlanta

10   companies?

11   A.   No.

12   Q.   Changing topics -- shifting gears to another topic very

13   briefly.

14       Are you aware that Mr. Erickson had a Consulting Agreement

15   with the ASH companies?

16   A.   Yes.

17   Q.   Are you aware that agreement was terminated by the ASH

18   companies?

19   A.   Yes.

20   Q.   As the person in charge of keeping the books and records,

21   have you done an accounting of how much is owed under the

22   Consulting Agreement if the jury were to find that that

23   agreement were improperly terminated?

24   A.   Yes.

25   Q.   And what amounts are those?

Direct Examination - Amy Allen

1    A.    That amount is $34,000 in fees.  And I don't recall the

2    number that they owe for insurance.  It's five thousand and some

3    odd dollars for health insurance.

4    Q.    Shifting gears to another topic.

5          I would like to show you Defendants' Exhibit 975.

6          Do you have that on the screen, ma'am?

7    A.    Yes.

8    Q.    Do you see this is a form, confidentiality

9    non-circumvention, non-disclosure agreement?

10   A.    Correct.

11   Q.    Have you seen this document before?

12   A.    Yes, I have.

13   Q.    Were you asked to go online and visit an Internet site of

14   WSIMG.com to verify that this document is on the Internet at

15   that website?

16   A.    Yes.

17   Q.    Did you do that?

18   A.    Yes, I did.

19   Q.    On about when did you do that?

20   A.    Around the first of September.

21   Q.    Did you verify that this document is there?

22   A.    Yes.

23         MR. SHEBELSKIE:  Your Honor, we move for the admission

24   of Defendants' 975.

25         MR. PETERSON:  Object to lack of personal knowledge.

1          MR. SHEBELSKIE:  She is testifying that --

2          THE COURT:  Overruled.

3          MR. SHEBELSKIE:  Thank you, Judge.

4          THE COURT:  Admitted.

5      (DEFENDANTS EXHIBIT 975:  Received in evidence.)

6  BY MR. SHEBELSKIE:

7  Q.   Let's show this to the jury then.

8       The jury can now see, ma'am, this confidentiality

9  non-circumvention, non-disclosure agreement.

10      Is this the copy of the document that you found on or about

11 September 1st on Internet WSIMG.com?

12 A.   Yes, it is.

13 Q.   Thank you, ma'am.

14      Now, another topic.  Shifting gears.

15      I would like to show this witness Defendants' Exhibit 200.

16      Do you see, Ms. Allen -- we have this on your screen --

17 this is an email from Mr. Thirtyacre's email account at Grayhawk

18 Homes to your address at DBEDevelopment.com?

19 A.   Yes.

20 Q.   Now let me set the stage for this.

21      Mr. Erickson became interim CEO of ASH-Holdings on or about

22 October 28th, 2020.  Is that correct?

23 A.   That's correct.

24 Q.   Now, when he became the CEO did he ask you to do anything

25 regarding Ken Thirtyacre's emails?

1   A.    Yes, he did.

2   Q.    Let me stop you there.

3         Remind the jury who Ken Thirtyacre is.

4   A.    Ken Thirtyacre was the -- I think his title was division

5   president at ASH-Grayhawk.  And he was relieved of his duties.

6   When Mr. Erickson became CEO he was asked to release

7   Mr. Thirtyacre.

8   Q.    And then what did Mr. Benson [sic] ask you to do with

9   respect to Mr. Thirtyacre's email account at ASH-Grayhawk?

10  A.    Mr. Erickson asked me to look through Mr. Thirtyacre's

11  email.  There was a possible harassment complaint coming against

12  Mr. Thirtyacre and he wanted to preserve any information that

13  was in his email.

14        So he asked me to go through it and anything that I saw

15  that was kind of weird, or whatever, just to email it to myself

16  so we would have a copy of it.

17  Q.    And is the email that we see as Defendants' Exhibit 200 one

18  of the emails you found on Mr. Thirtyacre's email account at

19  ASH-Grayhawk and that you emailed to yourself as you described?

20  A.    Yes, it is.

21        MR. SHEBELSKIE:  Your Honor, at this time, we move for

22  the admission of Defendants' Exhibit 200.

23        MR. PETERSON:  Your Honor, we object to hearsay and

24  lack of foundation.  This witness just apparently forwarded this

25  to herself.  She is not even on this chain.

1          MR. SHEBELSKIE:  Well, that's not true.  The top email

2    was from Mr. Thirtyacre's email account to her and she described

3    how she got it.

4          THE COURT:  It's clearly hearsay, but sustained.

5          MR. SHEBELSKIE:  All right.

6          Thank you, Judge.

7    BY MR. SHEBELSKIE:

8    Q.   One final question then, Ms. Allen, you have worked for

9    Mr. Erickson for many years now.

10       Tell the jury what it's like to work for him.

11         MR. PETERSON:  Objection.  Improper character

12   evidence.

13         THE COURT:  Overruled.

14         MR. SHEBELSKIE:  Thank you, Judge.

15         THE WITNESS:  As I told you earlier, I came to work

16   for Mr. Erickson in 2009.

17         I didn't know what to expect.  Never worked in that

18   business before so I was a little nervous.

19         When I started at the company I quickly realized it

20   was like a family environment.  I really enjoyed the people I

21   worked with.  I have always thought Mr. Erickson treated his

22   employees fantastic.  Not only monetarily, but he genuinely

23   cares about us.

24         Just a short story:  I know the first -- I started in

25   August of 2009.  In December, or actually in November, he went

1    to give out Christmas bonuses.  I had been there, what, a couple

2    of months.  You would have never expected anything.  And I got a

3    very nice, generous Christmas bonus.  Who would have ever

4    thought that?

5         Throughout the years I have seen him, you know, do

6    things with hospice, my kids little league teams.  I just think

7    he's a great person.  He cares about his employees.

8         I enjoy working with him.  I would call him a friend.

9    I can't really say anything else.  I can't say anything

10   negative.

11        MR. SHEBELSKIE:  Your Honor, the remaining testimony I

12   have for Ms. Allen concern matters for the Court.

13        THE COURT:  All right.  Cross-examination?

14        MR. KRAMER:  Mr. Peterson will be handling this

15   witness, Your Honor.

16        THE COURT:  All right.

17                        CROSS-EXAMINATION

18   BY MR. PETERSON:

19   Q.  Good afternoon, Ms. Allen.  My name is Josh Peterson.  I am

20   going to ask you a couple of questions on behalf of the

21   plaintiffs and hopefully get you out of here pretty quick.

22        Okay?

23   A.  Sure.

24   Q.  All right.

25        So, first of all, I want to start with three background

Cross-Examination - Amy Allen

 1    questions.
 2         First of all, number one, isn't it true that Mr. Erickson
 3    promised to continue selling lots to ASH-Grayhawk after he sold
 4    the company to ASH?
 5    A.    There was an agreement for him to do so, yes.
 6    Q.    Number two, isn't it also true that he stopped supplying
 7    lots to ASH-Grayhawk in December of 2021?
 8    A.    Yes.
 9    Q.    Number three, you can't build houses without a lot, can
10    you?
11    A.    No.
12    Q.    Okay.
13         On direct examination you discussed issues involving a
14    lis pendens.
15         Do you remember that?
16    A.    Yes.
17    Q.    You are aware that Mr. Erickson has actually requested that
18    the plaintiffs remove the lis pendens three different times for
19    three separate issues, correct?
20    A.    I am aware that it has been -- we have asked you.  I am not
21    aware of how many times.
22    Q.    Other than the most recent one, which we will discuss, the
23    plaintiffs have consented every single time, haven't they?
24    A.    I am not aware.
25    Q.    Okay.

Cross-Examination – Amy Allen

1      So you are not aware of whether the defendant requested

2  that ASH remove the lis pendens for the Carlton PUD property.

3  You are not aware of that?

4  A.   I am that one.  Yes.

5  Q.   You are aware that the plaintiffs consented to that

6  release, correct?

7  A.   Yes.

8  Q.   Are you aware of the request related to the Cocoa Lakes

9  lots?

10  A.   I am not.

11  Q.   What about the right-of-way for the State of Georgia

12  Highway Department.  Do you remember that one?

13  A.   That one, yes.

14  Q.   You are aware that the plaintiffs consented to the release

15  of the lis pendens for that as well, correct?

16  A.   Yes.

17  Q.   You are aware that approximately two weeks ago,

18  Mr. Erickson's personal lawyer sent a request, for the very

19  first time, to release the lis pendens to continue development

20  of Phase C lots.  Isn't that correct?

21  A.   I believe that was for Charleston Place.

22  Q.   Yes.  But you recall that?

23  A.   That's correct.

24  Q.   In Charleston Place those are Phase C lots, correct?

25  A.   They are.

Cross-Examination – Amy Allen

1   Q.   That is the very first time that Mr. Erickson, or any

2   defendant, has requested a release of the lis pendens related to

3   the development of Phase C lots.  Isn't that true?

4   A.   That is correct.

5   Q.   Okay.

6        We will get back to that.

7        On direct examination you also testified about the lot take

8   down requests.

9        Do you recall that?

10  A.   Yes.

11  Q.   Now, the way this worked is that ASH would make a request

12  every quarter for certain lots that were to be delivered under

13  the Takedown Schedule in the Land Purchase Agreement, or LPA for

14  short.  Right?

15  A.   Correct.

16  Q.   And you said that you saw those and you would assess them,

17  essentially, and sort of help deliver the lots.  Is that true?

18  A.   I would check the request, make sure the pricing was

19  correct, which a lot of times it wasn't.

20  Q.   But then the idea was you would help get those lots

21  delivered to the extent Mr. Erickson was going to actually

22  deliver them, true?

23  A.   Correct.

24  Q.   You are aware that for every quarter, since December of

25  2021, ASH has made requests for Phase C lots, correct?

1    A.    Correct.

2    Q.    And for every quarter, absent the ones that the Court

3    ordered him to deliver, Mr. Erickson has refused to deliver

4    those lots, true?

5    A.    They have not been delivered.  That is correct.

6    Q.    The most recent notice was just this summer, in July of

7    2023, correct?

8    A.    I don't know that date for sure.

9    Q.    Let me back up one second.

10        After these take down notices were sent, ASH also sent a

11   notice of default related to the failure to deliver lots,

12   correct?

13   A.    C lots.  Correct.

14   Q.    Yes.  Just C lots.  Right.  We are not talking about B

15   lots, right.  Okay.

16        You are aware that in August, late August of this year, ASH

17   notified the defendants that they no longer were requesting the

18   delivery of Phase C lots, correct?

19   A.    I am not aware of that.

20   Q.    You are not aware that ASH, for the reasons that I am about

21   to state, stopped requesting Phase C lots.  ASH said:  The

22   practical difficulties of relying on defendants to develop and

23   deliver approximately one thousand Phase C lots over a period of

24   years without defendants' cooperation, including the myriad

25   issues likely to arise, even if defendants are ordered to supply

1   lots on a quarterly basis, in accordance with the LPA Takedown

2   Schedule.

3        That was the first reason that ASH gave for no longer

4   wanting to deal with Mr. Erickson, isn't it?

5   A.   I have no idea what you are reading from.

6   Q.   Okay.

7        So you have never seen --

8   A.   The document you are talking about.

9   Q.   So you have never seen the notice from ASH notifying

10  Mr. Erickson that they were no longer seeking delivery of

11  Phase C lots?

12  A.   I am not familiar with that, no.

13  Q.   But you are familiar with Mr. Lomax's letter, that he sent

14  seven days later, requesting the release of the lis pendens.

15       Is that true?

16  A.   I am aware that he sent one.  I am not sure if I was copied

17  on that or not.

18  Q.   Have you seen it?

19  A.   Not that I recall.

20  Q.   Okay.

21       Are you familiar with the company Ranier Capital?

22  A.   Ranier Capital?  Yes.

23  Q.   Whose company is that?

24  A.   It is owned by the Ericksons.

25  Q.   On direct examination do you recall being asked questions

1    about loans that were paid off in connection with the payments

2    from ASH to the defendants at the time of the acquisition?

3        Do you recall that?

4    A.    Yes.

5    Q.    And you agree that one of the payments was a $15 million

6    payment to Ranier Capital.   True?

7    A.    Yes.

8    Q.    So, effectively, Mr. Erickson -- the loan that Mr. Erickson

9    was paying off was a loan made to his own company, Ranier

10   Capital?   True?

11   A.    That's true, but that doesn't mean Ranier Capital didn't

12   have a loan for that money.

13   Q.    On direct examination you also testified about a separate

14   warranty agreement.

15       Do you recall that?

16   A.    Yes.

17   Q.    Have you seen a separate warranty agreement?

18   A.    I believe there was one with closing.

19   Q.    Okay.

20       So your testimony is that there is a separate document that

21   is just a warranty agreement that was signed in connection with

22   the acquisition?

23   A.    The best I recall, yes.

24   Q.    Okay.

25       On direct examination you testified that the TSA required

1   ASH employees to forward emails concerning warranty requests.

2       Is that true?

3   A.   I would say that would be business as usual, yes.

4   Q.   So that was your interpretation of the Transition Services

5   Agreement?  The TSA?

6   A.   Yes.  That was stated to us numerous times by Mr. Benson.

7   Q.   I just want to make sure I clarify.

8       Are you relying on the statement from Mr. Benson, or are

9   you relying on the language in the TSA?

10  A.   Well, at the time I worked for Mr. Benson, so I would have

11  been relying on what he was telling me.

12  Q.   Okay.

13           MR. PETERSON:  Let's go to DX975, please.

14  BY MR. PETERSON:

15  Q.   Do you recognize this as the non-disclosure agreement that

16  you were asked about during direct examination, correct?

17  A.   That's correct.

18  Q.   You were asked by someone to locate this document on the

19  Internet.  Is that true?

20  A.   That's correct.

21  Q.   And when you were asked to do that you were given a

22  specific URL and you typed it into your web browser, I assume,

23  correct?

24  A.   Correct.

25  Q.   So you didn't Google -- use Google, or some other search

1  engine, to try to find this document?

2  A.   No.

3  Q.   You found it at a very specific web address that had a

4  bunch of letters and numbers, true?

5  A.   Correct.

6  Q.   You have no idea who put this on the Internet, do you?

7  A.   I do not.

8  Q.   Okay.

9       On direct you also mentioned a transfer of lots from

10  Windsong -- the Windsong company it Tiger Creek.

11       Do you remember that?

12  A.   I do.

13  Q.   I think you testified that you informed ASH?

14  A.   I did.

15  Q.   Was it you in particular?

16  A.   I informed Mr. Benson, yes.

17  Q.   You told Mr. Benson.  About what time did you tell him?

18  A.   I don't have a date.

19  Q.   Okay.

20       Was it before or after Mr. Erickson became interim CEO?

21  A.   It was before.

22  Q.   Okay.

23       Did you do that in writing?

24  A.   I believe I did.

25  Q.   Okay.

Cross-Examination – Amy Allen

1          On direct you also testified about your work history with

2     Mr. Erickson, true?

3     A.   Yes.

4     Q.   And you started working with Mr. Erickson in 2009?

5     A.   Correct.

6     Q.   And you have been working with him, for him, since then,

7     other than your short stent with ASH-Grayhawk.

8          Is that true?

9     A.   Correct.

10    Q.   You were promoted by Mr. Erickson six months after you

11    started, right?

12    A.   Correct.

13    Q.   And you were promoted again to vice president of finance,

14    right?

15    A.   Correct.

16    Q.   When was that?

17    A.   I don't know the date.

18    Q.   Okay.

19         And after Mr. Erickson sold Grayhawk Homes you began

20    working for ASH-Grayhawk, correct?

21    A.   Correct.

22    Q.   That was in November of 2019?

23    A.   Yes.

24    Q.   Okay.

25         And you left ASH-Grayhawk on March 15th, 2020, true?

1    A.    Correct.

2    Q.    At that point you would have went back to work for

3    Mr. Erickson, correct?

4    A.    Right.

5    Q.    And Mr. Erickson, at this point, where was his office?  Was

6    it in the same building as ASH's office?

7    A.    It was in the same complex.  It was not in the same

8    building.

9    Q.    You regularly worked with him still, right?  With -- sorry.

10   That was not a fair question.

11        At that time period, when you worked for ASH-Grayhawk, you

12   provided services to Mr. Erickson under the Transition Services

13   Agreement, right?

14   A.    Correct.

15   Q.    So you would have been in regular contact with him, true?

16   A.    Yes.

17   Q.    Okay.

18        And your testimony is that you found your -- the job

19   posting online, on Indeed.com, or LinkedIn.

20        Is that true?

21   A.    That is correct.

22   Q.    And it's not that he just asked you to come back and work

23   for him?

24             THE COURT:  You need to answer verbally.

25             THE WITNESS:  No.

 1                   THE COURT:  To them.

 2                   THE WITNESS:  No.

 3    BY MR. PETERSON:

 4    Q.   When you went to GH Lot Holdings -- that was the company

 5    that you went to work for after you worked at ASH-Grayhawk, is

 6    that true?

 7    A.   Correct.

 8    Q.   And when you went to work there, there were only three

 9    employees, right?

10    A.   There was only one other employee.

11    Q.   Yeah.  I was counting Mr. Erickson.  So it was Mr.

12    Erickson, you, and Chuck McClure?

13    A.   Correct.

14    Q.   Okay.

15         You were here yesterday during Mr. Erickson's testimony,

16    correct?

17    A.   Yes.

18    Q.   And you heard him -- you heard him being asked questions

19    about the NDA that referenced ASH in three places.

20         Do you remember that?

21    A.   Yes.

22    Q.   You heard him testify that he couldn't recall who created

23    that NDA, correct?

24    A.   Correct.

25    Q.   You know Mr. Erickson does his own typing and creates his

1  own letters, don't you?

2  A.   Most of the time, yes.

3  Q.   You're also the vice president of finance for Grand Oak

4  Builders.  Is that true?

5  A.   That is not true.

6  Q.   Vice president of administration?

7  A.   That's correct.

8  Q.   Okay.

9       That's another company that's owned by Mr. Erickson, right?

10 A.   That's correct.

11 Q.   You have access to Mr. Erickson's email account?

12 A.   Yes.

13 Q.   You text Mr. Erickson?

14 A.   Yes.

15 Q.   You consider him a personal friend?

16 A.   Yes.

17 Q.   And you are aware that Mr. Erickson has described you as

18 his right-hand person, true?

19 A.   I am aware that he sent Marshall Coleman an email that said

20 that, yes.

21 Q.   Okay.

22      In fact, you have been sitting through this entire trial

23 next to Mr. Erickson and his team.  True?

24 A.   Yes.

25 Q.   You have been here representing his companies, correct?

1    A.    Correct.

2    Q.    The TSA -- I am going to return there very briefly.  When

3    you worked for ASH-Grayhawk you did accounting work for

4    Mr. Erickson under the TSA, right?

5    A.    My staff did.

6    Q.    That included Mr. Erickson's personal accounting, correct?

7    A.    It did.

8    Q.    So you are aware of Mr. Erickson's personal finances, true?

9    A.    True.

10   Q.    On direct examination you discussed a number of different

11   services that were provided by ASH-Grayhawk, including

12   estimating, CAD work, I think purchasing, all of those were

13   services that were provided under the TSA to Mr. Erickson,

14   correct?

15   A.    Correct.

16   Q.    I think you talked a little bit about the timeline on

17   direct examination, but that was -- those services were provided

18   for more than 12 months by ASH-Grayhawk, right?

19   A.    They were, yes.

20   Q.    And you are aware that Mr. Erickson has not paid

21   ASH-Grayhawk a dime for any one of those services, correct?

22   A.    I am aware.  I am aware also that he challenged those and

23   never got an answer back on them.

24   Q.    On direct you also testified about plans that were sent

25   from ASH-Grayhawk to, I think it was, GH Lot Holdings of Atlanta

Cross-Examination - Amy Allen

1  and South Carolina.

2       Do you recall that?

3  A.   Yes.

4  Q.   Those plans were created by an individual by the name of

5  Jason Betts, right?

6  A.   To my knowledge, yes.

7  Q.   Mr. Betts is another employee that used to work for

8  Mr. Erickson.  Isn't that true?

9  A.   He worked for GH Lot Holdings -- I mean, Grayhawk Homes, or

10  actually GH Services is who he worked for.

11  Q.   Right.  Before the acquisition, Mr. Betts worked for

12  Mr. Erickson's company, right?

13  A.   Correct.

14  Q.   And then after the acquisition he worked for the

15  ASH-Grayhawk company, right?

16  A.   Correct.

17  Q.   You also testified about the -- I think Mr. Shebelskie

18  asked you a number of questions about did ASH ever tell you not

19  to use this or that logo, or this or that trademark.

20       Do you recall those questions?

21  A.   Yes.

22  Q.   Are you aware of any obligation in the Trademark Assignment

23  Agreement or any of the acquisition-related documents, that

24  requires ASH to notify any of the defendants if they are

25  infringing on their trademark rights?

1   A.    I am not aware of that.

2   Q.    Okay.

3   A.    But I would also think they would advise their employees

4   not to, if they were doing it.

5   Q.    You're not aware, though, if Mr. Betts, say, was just

6   creating plans and sending them without review from somebody

7   else, are you?

8   A.    I would think they were reviewed by his manager.

9   Q.    But you don't know that, do you?

10  A.    No.

11  Q.    Okay.

12        On direct examination you also discussed the schedule that

13  showed the 964 C lots.

14        Do you recall that?

15  A.    Yes.

16  Q.    Now you're not contending that ASH has ever asked for all

17  964 lots right from the start, are you?

18  A.    They have never asked -- they have never done a schedule,

19  so no.  The answer would be no.

20  Q.    Well, isn't it true that ASH requested 15 lots every

21  quarter since December of 2021?

22  A.    They requested lots.  They didn't request lots in a

23  specific neighborhood.

24  Q.    Are you aware -- you have been here for trial so you are

25  aware that Mr. Twiss sent an order, a schedule, in March of

1    2021, aren't you?

2    A.    I am aware there was a discussion but never an agreement.

3    Q.    Sure.  But I think your testimony was that ASH never told

4    you the order that they wanted the lots.  Wasn't that your

5    testimony?

6    A.    No.  My testimony was that when you sent a request for

7    C lots you didn't request certain lots.

8    Q.    Okay.

9          So let's set this straight then.  So ASH sends an email in

10   March of 2021, that has an order of C lots that ASH would like.

11         You are aware of that communication, right?

12   A.    Vaguely.  It wasn't sent to me, so...

13   Q.    But you have seen it here.  We all saw it.  It was a

14   spreadsheet, right?

15   A.    Yes.

16   Q.    Okay.

17         So ASH, at that point, informed the defendants of the order

18   that ASH would like the C lots delivered in, right?

19   A.    They made a suggestion.

20   Q.    I think the reason that you are kind of quarreling here is

21   that Mr. Erickson never agreed to that order.  Is that true?

22   A.    I don't think either party really ever agreed.  I have

23   never seen an agreement in writing.

24   Q.    Were you at the settlement conference?

25   A.    No.

Cross-Examination - Amy Allen

1    If they agreed we probably wouldn't be here today.

2  Q.  You're saying if the two parties agreed we wouldn't be

3  here.  Okay.

4    But you do know that ASH sent its proposal on March 18th,

5  right?

6  A.  I don't know the date.

7  Q.  But around March of 2021 they sent that order, right, and

8  then we have already discussed that they sent those take down

9  requests every single quarter, starting in December of -- well,

10  every single quarter since the acquisition, right?

11  A.  Yes.

12  Q.  Okay.

13    You agree that Mr. Erickson has sent -- has sold

14  Phase C lots in the Garrett Pines subdivision to ASH, right?

15  A.  Correct.

16  Q.  Okay.

17    And those were sold to ASH -- 15 of them were sold to ASH

18  in 2021, right?  September of 2021?

19  A.  I believe that's correct.

20  Q.  And then another 27 were sold after he was ordered by the

21  Court to sell them, right?

22  A.  Correct.

23  Q.  That's the 42 number you discussed on direct examination?

24  A.  Correct.

25  Q.  Okay.

Cross-Examination - Amy Allen

1    There are no other Phase C lots that are completed at this

2   time, are there?

3   A.    There are not.

4   Q.    And the defendants have stopped work on those lots, right?

5   A.    That is correct.

6   Q.    The only thing that the defendants do is erosion control on

7   those lots, basically to maintain them to make sure that they

8   are safe in the status that they are in, right?

9   A.    That's correct.

10  Q.    You were here for Mr. Twiss's testimony a couple of days

11  ago, correct?

12  A.    Yes.

13  Q.    And you heard the testimony about Mr. Erickson submitting

14  development costs to ASH-Grayhawk, right?

15  A.    Yes.

16  Q.    And I think we all remember the scrolling exercise.  It

17  was, like, five minutes of a very slow-loading document.

18    Do you remember that?

19  A.    Yes.

20  Q.    And Mr. Twiss testified that there were hundreds of

21  thousands of dollars for a company called Eddie Brown Grading,

22  correct?

23  A.    Correct.

24  Q.    You are aware -- you can confirm for us that Mr. Erickson

25  owns 60 percent of that company, true?

1    A.    Correct.

2    Q.    I think on direct examination you testified that builders'

3    licenses in the state of Georgia are held by individuals.

4          Is that true?

5    A.    Builder license?

6    Q.    Yes.

7    A.    Are by individuals and then that individual assigns them to

8    a company.

9    Q.    Right.

10         The license is assigned by submitting a form to the state.

11   Is that true?

12   A.    It's by having the credentials and then sending your form

13   in and then being granted the license.

14   Q.    You agree that at the time of the acquisition Mr. Erickson

15   held a business license.  That would have been in 2019?

16   A.    A business license?

17   Q.    Sorry.  A builders license?

18   A.    Yes.

19   Q.    Okay.

20   A.    Yes to both.

21   Q.    He did not transfer that license to ASH-Grayhawk until

22   years after the acquisition, correct?

23   A.    He did not transfer his license until they provided him the

24   paperwork to do so.

25   Q.    Okay.

1    But you agree that he didn't transfer his license until

2  years after the acquisition, correct, regardless of whose fault

3  it is?

4  A.   That's correct.

5          MR. PETERSON:  So then let's look at PX 203C.

6  BY MR. PETERSON:

7  Q.   You recognize this as the form that Mr. Erickson filled out

8  to transfer that builder's license, right?

9  A.   I actually -- that's not my handwriting.

10 Q.   Oh, I wasn't asking if you filled it out.

11 A.   I do recognize -- I mean, I recognize that that's what the

12 form is for.

13 Q.   You notarized this document, didn't you?

14 A.   I don't know.  I don't see that.

15         MR. PETERSON:  Let's keep scrolling down.  There you

16 go.  On the bottom of page 2 here you can see.

17         THE WITNESS:  Yes.

18 BY MR. PETERSON:

19 Q.   That's notarizing this document?

20 A.   That's me.

21         MR. PETERSON:  Plaintiffs offer PX 203C.

22         MR. SHEBELSKIE:  No objection.

23         THE COURT:  What number?

24         MR. PETERSON:  PX 203C.

25         THE COURT:  Admitted.

1              (PLAINTIFFS EXHIBIT PX203C:  Received in evidence.)

2                   MR. PETERSON:  Can we have PX 246G?

3    BY MR. PETERSON:

4    Q.   You recognize this, Ms. Allen, as the Transition Services

5    Agreement, true?

6    A.   Yes.

7                   MR. PETERSON:  If we could go to page 10 of this

8    document.  If we blow up the table here.

9    BY MR. PETERSON:

10   Q.   You have seen this schedule before?

11   A.   I have.

12   Q.   And there are six columns in this chart.

13        Do you see that?

14   A.   Yes.

15   Q.   The first one is blank, right?

16        The second one has the service to be provided, right?

17   A.   Yes.

18   Q.   The third one has the by who, right?

19   A.   Yes.

20   Q.   The fourth one has invoice payment, scheduled payment, due

21   when, right?

22   A.   Yeah.

23   Q.   And then end date of service is the next column, right?

24   A.   Yes.

25   Q.   And then other condition/notes.  That's the final column,

1    right?

2    A.    Correct.

3    Q.    The fourth row down says, Builder's license new permits

4    issued.

5          Do you see that?

6    A.    Yes.

7    Q.    Who is responsible for that?

8    A.    Seller.

9    Q.    The seller here would be Mr. Erickson, correct?

10   A.    Correct.

11            MR. PETERSON:  We can be done with that.  I am not

12   really sure what that means, but yeah.

13   BY MR. PETERSON:

14   Q.    Oh, sorry.  Builders license new permits issued.  Okay.

15         The end date of service there you see that it says 60 days,

16   right?

17   A.    Yes.

18   Q.    And then the other condition/note says:  Will fill out as

19   contractor and ASH as owner.  See R to get all applications and

20   apply for testing.

21         Do you see that?

22   A.    I do.  And that meant that Chris Recker was supposed to get

23   his licensing to be able to pull permits.

24   Q.    Okay.

25         So your testimony is that Chris Recker -- Chris Recker

1    worked for the buyer though, right?

2    A.   He did.  And he was trying to get his credentials

3    transferred over to ASH to be the person that could pull

4    permits.

5    Q.   Right.  The idea was Mr. Erickson was going to transfer his

6    license first and then Mr. Recker would transfer his license as

7    a replacement afterwards?

8    A.   That was really not the plan.

9    Q.   Okay.

10        Let's talk a little bit about the use of the Grayhawk name

11   and trademark.

12        Do you recall sending emails, in 2021, instructing folks to

13   stop using the Grayhawk logo in connection with Mr. Erickson's

14   companies, correct.

15   A.   I do.

16            MR. PETERSON:  Let's take a look at PX 116, please.

17   BY MR. PETERSON:

18   Q.   Do you recognize this as an email from yourself to an

19   individual named Kristen McMillan.

20        Do you see that?

21   A.   Yes.

22   Q.   And the date on is 1-30-2021.

23        Do you see that?

24   A.   Yes.

25            MR. PETERSON:  Plaintiff's offer PX 116.

1          MR. SHEBELSKIE:  No objection.

2          THE COURT:  Admitted.

3      (PLAINTIFFS EXHIBIT PX116:  Received in evidence.)

4  BY MR. PETERSON:

5  Q.   Starting at the bottom of this chain, there is an email

6  here from Kristen McMillan to a Grayhawk Homes Inc. address.  It

7  says:  Hey there.  I sent an AGM invoice and PO and it is coming

8  back undeliverable to svile@grayhawkhomesinc.com.  Is there

9  another email I should be using?  Thanks.

10      Did I read that correctly?

11  A.   Yes.

12  Q.   If we go up to her next email.

13      She says:  Please see below.  I didn't realize that both

14  were undeliverable.

15      Do you see that?

16  A.   I do.

17  Q.   And then you respond, you say --

18  A.   Hold on.  Hold on.  Show the whole document.  Okay.

19  Q.   And then to blow up your next response you say:  We changed

20  email addresses in March.  Sorry.  No Grayhawk Homes work.

21  Please send invoices to ATLadmin@DBEDevelopment.com and/or

22  Phillip@DBEDevelopment.com.  Sean no longer works with Grayhawk.

23  Sorry for the confusion.

24      Did I read that correctly?

25  A.   You did.

1  Q.   If we go up to the next email.  Let's skip all the way to

2  the top.

3       In this email you say:  That is a different company than

4  Grayhawk Homes of Atlanta.  I know, confusing.  ASH-Grayhawk

5  email would go to grayhawkhomes.com.  Note ours used to have

6  Inc. in the address.  For clarity with ASH billing contact

7  April@grayhawkhomes.com.  ASH bought the Columbus location in

8  2019.

9       Did I read that correctly?

10 A.   You did.

11           MR. PETERSON:  Let's go to PX 162, please.

12 BY MR. PETERSON:

13 Q.   Do you recognize this as an email from yourself to

14 Malinda Smallwood, dated February 18, 2021?

15 A.   Yes.

16           MR. PETERSON:  Plaintiffs offer PX 162.

17           MR. SHEBELSKIE:  No objection.

18           THE COURT:  Admitted.

19      (PLAINTIFFS EXHIBIT PX162:  Received in evidence.)

20 BY MR. PETERSON:

21 Q.   You write here:  The homes or lots that are listed in the

22 MLS need to be listed for sale by GH Lot Holdings of Atlanta,

23 Inc.  There has been a name change from Grayhawk of Atlanta to

24 this.  No marketing material that has the Grayhawk logo or the

25 Grayhawk Homes of Atlanta is to be used for anything, with two

1  exclamation marks.

2      Did I read that correctly?

3  A.   You did.

4          MR. PETERSON:  Let's look at PX 38, please.

5  BY MR. PETERSON:

6  Q.   This is an email from yourself to Melissa Lee and others

7  dated April 12, 2021.

8      Do you see that?

9  A.   Yes.

10 Q.   It looks like this is some of the employees of Grayhawk

11 Homes of South Carolina?

12 A.   Correct.

13         MR. PETERSON:  Plaintiffs offer PX 38.

14         MR. SHEBELSKIE:  No objection.

15         THE COURT:  Admitted.

16     (PLAINTIFFS EXHIBIT PX38:  Received in evidence.)

17 BY MR. PETERSON:

18 Q.   You say here:  This is a reminder to not use the Grayhawk

19 logo or terminology any in your business activities.  Once

20 again, make sure that all marketing materials, listings,

21 et cetera, are GH Lot Holdings of Atlanta and of South Carolina.

22 If you have yourself listed as employed by Grayhawk on any

23 social media please change that as well.

24     Did I read that correctly?

25 A.   You did.

1    Q.   You aware that Mr. Erickson had himself listed as a

2    Grayhawk Homes, Inc. CEO and president at this time on his

3    LinkedIn profile, right?

4    A.   I don't manage his LinkedIn profile.  So, no, I would not

5    know that.

6    Q.   Did you say you looked at a job on LinkedIn jobs?

7    A.   No.  I said Indeed.

8    Q.   All right.

9         Did anyone from ASH-Grayhawk ever tell you it was okay to

10   use the Grayhawk logo in MLS listings for houses in Atlanta or

11   South Carolina?

12   A.   No.

13   Q.   Okay.

14        Let's talk a little bit about your pay from Mr. Erickson.

15        Mr. Erickson's companies currently pay you 150,000 a year.

16   Is that true?

17   A.   That is true.

18   Q.   Is that still accurate?  I know it was accurate during your

19   deposition.  Is that accurate now?

20   A.   It is not.

21   Q.   Has it gone up?

22   A.   Yes.

23   Q.   What is it now?

24             THE COURT:  You need to answer the question.

25             THE WITNESS:  175,000.

Cross-Examination - Amy Allen

1    BY MR. PETERSON:

2    Q.   He also periodically pays you bonuses, doesn't he?

3    A.   Periodically, yes.

4    Q.   It's not on a schedule, right?  It's not like every

5    January 1st I get a bonus, right?

6    A.   No.

7    Q.   It's more like when Mr. Erickson feels generous he provides

8    you a bonus, right?

9    A.   I wouldn't say that.  I would say it's when something has

10   been accomplished.

11   Q.   Okay.

12        You were deposed in this case on August 16th of 2022,

13   right?

14   A.   I assume.  If you say that's the date, yeah.

15   Q.   Around August 22 --

16   A.   It seems like it was 20 years ago, so...

17   Q.   Okay.

18        Some time last year you were deposed.  And you swore to

19   telling the truth at that deposition, right?

20   A.   Correct.

21   Q.   And you did so, right?

22   A.   Yes.

23   Q.   And two weeks before that deposition you were paid a

24   $10,000 bonus by Mr. Erickson, were you not?

25   A.   I was.

1    Q.   Did he pay you a bonus before you came to trial?

2    A.   No.

3    Q.   At the very least I assume he is paying you as you sit at

4    counsel table, right?

5    A.   Yes.

6    Q.   And this isn't your day job, is it, sitting in court?

7    A.   I'm a company -- I am working for the company.

8           MR. PETERSON:  Okay.  No further questions.

9           Thanks, Ms. Allen.

10          THE COURT:  Any redirect?

11          MR. SHEBELSKIE:  Just three matters, Your Honor.

12                      REDIRECT EXAMINATION

13   BY MR. SHEBELSKIE:

14   Q.   Let's clarify just a couple of things, Ms. Allen.

15        Counsel told you that two weeks ago, or so, they said they

16   no longer -- his clients no longer wanted the properties.

17        Have they removed the lis pendens?

18   A.   They have not.

19   Q.   Then I want to clarify -- you were asked about Mr. Twiss's

20   email to Mr. Erickson in March of '21.

21        You received the quarterly take down requests though,

22   right?

23   A.   Correct.

24   Q.   In those quarterly take down requests, pursuant to the

25   Land Purchase Agreement, has ASH-Grayhawk, in those requests,

1    ever specified particular neighborhoods they want the

2    Phase C lots in?

3    A.    No.

4    Q.    Finally, that last email of April 2021, where you sent the

5    notice to folks not to use the Grayhawk name and logo, do you

6    recollect that in April of '21, that's when the ASH company sent

7    the big complaint to Mr. Erickson accusing him of violating

8    their trademarks?

9    A.    I do.

10            MR. SHEBELSKIE:  No further questions, Your Honor, on

11    this topic.

12            THE COURT:  Any recross?

13            MR. PETERSON:  Your Honor, one question.  Maybe two.

14                    RECROSS-EXAMINATION

15    BY MR. PETERSON:

16    Q.    Ms. Allen, I swear I am going to get you back to counsel

17    table.

18        You were just asked questions about the lis pendens still

19    being in place, correct?

20    A.    Correct.

21    Q.    You are aware that ASH and the -- I guess, ASH in

22    connection with the acquisition made a $2 1/2 million down

23    payment for lots that were to be delivered by Mr. Erickson,

24    correct?

25    A.    I am aware of that, yes.

1    Q.    And Mr. Erickson has not paid that money back, right?

2    A.    That is correct.

3    Q.    In fact, he has invested that money, has he not?

4    A.    I don't know -- I don't know the answer to that.

5    Q.    I thought you were his personal accountant.

6    A.    I am, but, I mean, he has -- how do you know what money is

7    what?  I mean...

8    Q.    Okay.  That's fair.

9          So you don't know that -- you are not aware of him putting

10   into a separate account, are you?

11   A.    No.

12   Q.    Okay.

13               MR. PETERSON:  Thank you, Ms. Allen.

14               THE WITNESS:  It's not required by the agreement.

15               THE COURT:  All right.  You may go back to your table.

16               We are going to take her testimony, that I am going to

17   hear on the claims that I have got to decide, at the end of the

18   day after the jury has been excused.

19               Call your next witness.

20               MR. QUACKENBOSS:  Your Honor, we will call Kathy Long.

21               THE COURT:  All right.

22               Ma'am, come to the witness stand, please.  Straight

23   ahead.

24               **KATHY LONG, DEFENDANTS WITNESS, DULY SWORN**

25               THE COURT:  State your name for the jury and spell

1    your last name for the court reporter.

2            THE WITNESS:  My name is Katherine Long,

3    K-a-t-h-e-r-i-n-e, L-o-n-g.

4            THE COURT:  Mr. Quackenboss?

5                    DIRECT EXAMINATION

6    BY MR. QUACKENBOSS:

7    Q.   Good afternoon, Ms. Long.  Thank you for being here this

8    afternoon.

9            Tell the jury a little about yourself, if you would.

10           Are you a resident of the Columbus area?

11   A.   I am.  Born and raised in Columbus, Georgia.

12           Went to high school here.  Went to Columbus State, or

13   Columbus College at the time.  General studies.  Columbus Tech

14   for drafting.  And I did Mable Bailey for interior decorating.

15           I was an interior decorator.  That was my first career in

16   the homebuilding business.  I married a builder.  Worked closely

17   with him in the business.  Worked with customers to begin with.

18   Just with decorating.  Then I went into the field.  Learned a

19   lot about the field at that point in time.

20           In '94, I took a position at Home Quarters.  I was the

21   contractor sales person.

22           And then in 2000, I took a job at Uniway.  I was the

23   showroom manager.  We had a cabinet and flooring supply and

24   install.  So I oversaw all of the installs for cabinetry and

25   flooring.

Direct Examination - Kathy Long

1      And in 2007, I applied for a job at Grayhawk Homes, Inc.

2   Interviewed, got the job.  And November 15, 2019, is when the

3   company was acquired by ASH.  And it was then ASH-Grayhawk and I

4   worked for ASH-Grayhawk until April 20th, 2022, when I --

5   Q.   Let me stop you there.  I am going to back up a bit and

6   fill out a couple of those points.

7      A little bit about experience in more detail.  I think with

8   regard to your relevant homebuilding experience, you mentioned

9   that, I think, your first husband was homebuilder?

10  A.   Yes.

11  Q.   And you did some work --

12  A.   He was a custom homebuilder.

13     When I first started there, with him, I was an interior

14  decorator and already had my interior decorating business.  I

15  worked with customers to begin with, with my husband's customers

16  in that building business.

17     And then I started working out in the field with him

18  learning more about construction, overseeing the jobs.

19     At that point, being a custom builder most of the people

20  had their own lots.  So I would go out there to the lots with

21  the homeowners and do placement of the home.  Talk about if

22  there needed to be a basement, a crawl space, things like that.

23  Q.   Did you pick up experience of valuating, purchasing lots in

24  that first experience?

25  A.   Yes, I did.

1    My experience with that -- like I said, a lot of customers

2  came with their own land so we had to find where to put it.  And

3  then some customers we helped find lots, whether it be large

4  estate lots, you know, 10, 20 acres, or a community in Columbus,

5  Harris County, in the Georgia area.

6  Q.    And I believe you said that -- so after that engagement

7  with your husband's company, and I guess your company, you were

8  at Home Quarters for a couple of years and then you did exactly

9  what there?

10 A.    That was contractor sales.  They started -- at the time

11 they didn't have a contractor sales division so they opened that

12 up and I met with contractors and homeowners as far as getting

13 all the materials for building a house, or the selections for

14 customers.  And I did that for a couple of years.

15 Q.    And then after Home Quarters what did you do?

16 A.    I wasn't to Uniway.  Showroom manager.  We were a catalog

17 sales.  Basically almost like what the Internet is now.  And we

18 also had a cabinet division.  We were a distributor for cabinets

19 and for flooring.  So we had a division that we installed

20 cabinets, flooring for builders and for customers --

21 individuals.

22 Q.    Okay.

23    And then after that I believe is when you became involved

24 with Mr. Erickson and Grayhawk.  Is that right?

25 A.    Correct.

Direct Examination - Kathy Long

1   Q.   Around 2007?

2   A.   July of 2007.  Correct.

3   Q.   And how did you -- how did you learn about that job

4   opportunity?

5   A.   There was -- it was actually a job he was running in the

6   paper.  I saw it.  I was aware of Grayhawk Homes and it

7   definitely interested me.  So I applied.

8       He reached out to me and interviewed.  I think we did two

9   interviews and then he hired me.  I started there as customer

10  coordinator, much like I did with decorating.  I met with all

11  the customers.  Made all their selections.  Made sure that what

12  we were building is what they intended or wanted us to build.

13      I did -- I was customer coordinator for a couple few years.

14      Then, as we were -- at that point in time we didn't have

15  the estimating or the purchasing system.  So I was ordering all

16  the materials for the house as far as the decorating portions:

17  The lights, the flooring, paint cabinets, and so on.

18      At some point in 2010 we hired another decorator and I was

19  promoted to director of design.

20      We had a CAD department.  I oversaw that.

21      And then worked with the decorator -- if there was any

22  questions from customers going through her meeting that I needed

23  to go in and talk to the customers about.  If there was any

24  issues or any problems I would talk to the customers about that.

25      Also would interact with the field to make certain what the

Direct Examination - Kathy Long

1  customers were wanting to have built was actually getting done

2  as contracted for.

3  Q.   Okay.

4      And I think I heard you say -- I am trying to catch up with

5  you here -- so your title when you first began at Grayhawk was?

6  A.   Customer coordinator.

7  Q.   Did you eventually become director of design?

8  A.   Director of design, roughly, 2010.

9  Q.   And in that capacity you oversaw which operations at

10 Grayhawk?

11 A.   CAD and decorating and permitting.

12 Q.   CAD, decorating and permitting.

13     I think you were in the process of telling the jury what

14 CAD was?  If not, would you explain?

15 A.   CAD was the Computer Aided Drafting Department.

16     Plans for every lot, every release, were done by the CAD

17 department.  Our CAD department, or Grayhawk Homes, Inc.'s CAD

18 department varied from -- we had as many as five at one time.

19 But usually we had one to two CAD operators.

20 Q.   Okay.

21     A name that's been introduced in this trial so far is

22 Jason Betts.  Was he one of the CAD staff members --

23 A.   Yes.

24 Q.   -- at Grayhawk?

25 A.   He was.  Jason came to Grayhawk 2011, I think.  And when he

1    came to us we had one other CAD person.  So we had two.  And

2    then over a period of time Jason was promoted to CAD manager and

3    he had a couple of people at one time under him.

4    Q.   And who worked in the decorating department?

5    A.   Decorating department -- the last one was Christy Crowe.

6         Do you need people prior to that?

7    Q.   No.  That's fine.  I think that will do for now.

8         Real quickly, there was also an estimating department.  Is

9    that correct?

10   A.   There is an estimating -- when I was director of design I

11   was not over the estimating department.

12   Q.   And there was an accounting function, correct?

13   A.   Yes.

14   Q.   Am I missing any significant other operations categories

15   here?

16   A.   Purchasing.  Purchasing was actually over estimating.

17   Q.   Is that about it; decorating, CAD, purchasing, accounting?

18   A.   In the office -- we had a warranty person in the office.

19   Q.   Warranty.  What about the homebuilding.  Is that production

20   --

21   A.   That was the production.  And we had -- most of those were

22   considered field people.

23   Q.   Okay.  All right.

24        The permitting function, would you say just a few words

25   about that to the jury?

1   A.   Our permitting function -- we had a person that ran our

2   permits.  When you go to get a permit in most counties, and

3   definitely in Muscogee, you have a plan.  And you have your

4   specifications, your site plan.  You take that downtown to apply

5   for the permit lot specific.

6        And the person that did that she was over the releases.  We

7   would give them to her.  So that was her permitting function

8   went through all of the jobs as they were being released.

9   Q.   Okay.

10       And did your responsibilities change?  Prior to the

11  acquisition in 2019, by ASH, did your responsibilities stay the

12  same or did they evolve?

13  A.   They stayed the same, initially.  And towards the end

14  they -- well, when I was made interim president for the few

15  months, and when ASH came back in, that's when my role was

16  changed to operation manager.

17  Q.   Okay.

18       Before the 2019 acquisition by ASH, Mr. Erickson expanded

19  his businesses into three other markets, correct?

20  A.   Correct.

21  Q.   Were you there to --

22  A.   Yes.

23  Q.   -- part of servicing those?

24  A.   Yes.  Iowa, Atlanta, and South Carolina.

25  Q.   Okay.

1     What did this staff at Grayhawk Homes do for Iowa, Atlanta

2    and South Carolina?

3    A.   What we referred to as the back office work.  You had field

4    people in all of those divisions with oversight management.

5         We would do the plans.  Our office in Columbus would do the

6    plans and sometimes we would do the decorating.

7         In Atlanta, we had an agent that did some of the decorating

8    for a brief period of time.  And we had something similar in

9    South Carolina.

10        But all of the selections were made from Columbus.  The

11    plans were done in Columbus.  And the estimating was done in

12    Columbus.

13    Q.   The estimating was not an operation that you oversaw, but

14    would you tell the jury, briefly, what that includes, to the

15    best of your knowledge?

16    A.   Yes.  The purchasing manager would have been the oversight

17    person for estimating.  The estimator gets the plans, which

18    there was a certain amount of plans that were already in the

19    computer system and the estimating system that would give you

20    all the lumber -- all the parts and pieces that were needed for

21    the house.

22        So the estimator would take -- pull in that standard plan

23    and go through the spec sheet and the decorator sheet and see

24    whatever changes were made.  Do all the colors.  Make sure that

25    he was ordering the proper quantity.  Any options that were

1    bought, that he had included all of those options in his

2    estimate.

3        The estimate basically was everything that you needed to

4    build a house.  And we did that prior to any -- doing anything

5    he is in the field.

6    Q.   Am I correct in understanding that all of that estimating

7    work for Iowa, Atlanta and South Carolina was done here in

8    Columbus?

9    A.   Correct.

10   Q.   So, again, who were the people in these other markets who

11   were there to receive these services, the CAD drawings and the

12   estimating services?

13   A.   Who worked in the different --

14   Q.   In the different Grayhawk Atlanta, Grayhawk South Carolina

15   businesses at those locations.

16   A.   Atlanta was Sean Vialet.

17       South Carolina was Anthony Dezinna.

18       And Iowa was Jason -- I cannot remember Jason's last name.

19       And I think -- I can't remember his last name.

20   Q.   Were there full staffs in those locations, or just a couple

21   of people?

22   A.   Atlanta had a person or two.

23       South Carolina -- South Carolina had a decent size office.

24   They had a manager, a person that answered the phone, couple of

25   superintendents.  And at one point they hired somebody that was

 1    doing the decorating.

 2    Q.    Are you familiar with the name Melissa Lee?

 3    A.    Yes.  She did the decorating.  Probably was the office

 4    manager in South Carolina.

 5    Q.    In South Carolina?

 6    A.    Uh-huh.

 7    Q.    Okay.

 8    A.    She ran permits as well.

 9    Q.    Ran permits as well?

10    A.    Uh-huh.

11          MR. QUACKENBOSS:  I would like to pull up PX 123E.

12    BY MR. QUACKENBOSS:

13    Q.    Ms. Long, take a look at PX 123E and tell me if you

14    recognize this document.

15    A.    It is a plan for South Carolina.

16    Q.    Okay.

17          And is it the type of plan prepared by the CAD department

18    at Grayhawk in Columbus under your supervision?

19    A.    Yes.

20          MR. QUACKENBOSS:  Your Honor, I move to enter PX 123E

21    into evidence.

22          MS. BECK:  No objection, Your Honor.

23          THE COURT:  Admitted.

24      (DEFENDANTS EXHIBIT PX123E:  Received in evidence.)

25

Direct Examination - Kathy Long

1  BY MR. QUACKENBOSS:

2  Q.    Just to give the jury an idea, would you -- does this

3  document have a name, for example?

4  A.    It does.

5  Q.    What is the name of it?

6  A.    SC Willow.

7  Q.    This is for a house plan called SC Willow elevations in the

8  South Carolina business, correct?

9  A.    Correct.

10 Q.    And it was prepared -- does the document tell us anywhere

11 who prepared it and when?

12 A.    If you look right below SC Willow it says, issued and then

13 drawn and then the initials JAB.  That would be Jason Betts.

14      And the dates that are next to it would have been the

15 revision -- the dates that it was done and the revision dates

16 thereafter.

17 Q.    Is this a representative sample of the kinds of floor plans

18 and building plans that the Columbus staff generated for other

19 homes in South Carolina as well?

20 A.    Yes, sir.

21 Q.    Can you estimate the number of plans that were developed in

22 a given month for the South Carolina market in Columbus?

23 A.    In a given month?

24 Q.    Uh-huh.

25 A.    I'm sure it depends on what month it was, but it wasn't a

1    ton.  Three or four maybe.

2    Q.    Okay.

3          And once Mr. Betts produced this plan, where was it sent?

4    A.    When Jason would produce the plan, for whatever division,

5    he would work with -- he would have probably sent this to either

6    Melissa Lee or to Anthony, just to make certain that what he was

7    drawing was what their intentions were.

8          At that point, it would be given to the estimating team in

9    a folder for them to begin estimating.

10   Q.    Who else, located in South Carolina, would end up reviewing

11   or seeing a building plan like this exhibit?

12   A.    Who else in South Carolina would see it?

13   Q.    Right.

14   A.    The customer would see it.

15   Q.    Okay.

16   A.    The building -- anybody that worked on the house that would

17   have used the plans would have seen the plans.

18   Q.    Vendors?

19   A.    Yes.  Yes.

20   Q.    Realtors?

21   A.    Yes.

22   Q.    Now this is not an example of a presentation flyer, is it?

23   A.    No.  This is an actual plan.  A presentation flyer doesn't

24   have all of the notes and has no dimensions as far as overall

25   dimensions.

1    Q.    Okay.

2              MR. QUACKENBOSS:  May we please pull up DX224?  For

3    the witness.  Excuse me.

4    BY MR. QUACKENBOSS:

5    Q.    Would you, Ms. Long, take a look at this email, just the

6    top of it, first, and tell me if you recognize this email, the

7    message portion of it, before we get to the attachment.

8         Are you cc'd on the portion of the email at the very top?

9    A.    Yes.

10   Q.    Okay.  Is it fair to say this is an email that you received

11   in around October 28, 2020?

12   A.    Yes -- no.  It looks like it was sent May 29, 2020.

13   Q.    At the very top?

14   A.    I'm sorry.  Yes.  It was 10-28-2020.

15   Q.    Okay.

16             MR. QUACKENBOSS:  And may we scroll down to see a

17   portion of the attachment?  Let's stop there.

18   BY MR. QUACKENBOSS:

19   Q.    So to confirm, this is an email and attachment you received

20   in October of 2020?

21   A.    Yes.

22             MR. QUACKENBOSS:  Your Honor, I move to admit DX224.

23             MS. BECK:  No objection, Your Honor.

24             THE COURT:  Admitted.

25        (DEFENDANTS EXHIBIT DX224:  Received in evidence.)

Direct Examination - Kathy Long

1   BY MR. QUACKENBOSS:

2   Q.   Ms. Long, is this a representative example of a building

3   plan produced for the Atlanta -- Grayhawk Atlanta business?

4   A.   Yes, it is.

5   Q.   Produced by the Columbus office as well?

6   A.   Yes.

7   Q.   Okay.

8        If we can focus on the upper right corner, the logo and

9   name.

10       Is this the name and logo that was prepared by the Columbus

11  office for the Atlanta operations?  Grayhawk Atlanta?

12  A.   Yes.

13            THE COURT:  Columbus office of who?

14            MR. QUACKENBOSS:  Columbus office.  At the moment I

15  am -- prior to the acquisition, the Columbus office of Mr.

16  Erickson.

17            THE COURT:  All right.  Go ahead.

18  BY MR. QUACKENBOSS:

19  Q.   Well, excuse me.  This particular copy, Ms. Long, if you

20  look at the date of it.

21  A.   Yes.

22  Q.   The last version of this was prepared by Mr. Betts in 2020,

23  correct?

24  A.   Correct.

25  Q.   That was post-acquisition, correct?

1    A.    Correct.

2    Q.    So the preparation of these building plans by Mr. Betts to

3    the operations in Atlanta continued after the acquisition,

4    correct?

5    A.    Yes, sir.

6    Q.    Okay.

7         Did anyone, after the acquisition in 2019, instruct you to

8    stop applying the Grayhawk of Atlanta name and logo to any

9    building plans?

10   A.    No, sir.

11   Q.    Did you have any conversations with anyone in ASH-Grayhawk

12   about whether to continue to apply these Grayhawk Atlanta and

13   Grayhawk South Carolina logos?

14   A.    I am sure I did.  I know when Chris Recker -- he was our

15   first division president -- when he came in, we had

16   conversations about what we were doing.

17        It was mentioned about the time that we had spent.  I don't

18   remember when I talked to him, but I know we wouldn't have done

19   anything unless we were told to continue -- unless we were told

20   that everything was to stay the same.

21        And Chris Recker had looked over the job documents, as we

22   were producing them, so he was aware of what we were doing.  And

23   we all -- we all kept up with our time and we all understood

24   this was what we were supposed to be doing.

25   Q.    Chris Recker was the first president of ASH-Grayhawk?

1   A.    Correct.

2   Q.    After the acquisition?

3   A.    Correct.

4   Q.    Did there come a time where you spoke to Mr. Recker about

5   the specific design of the title box within these building

6   plans?

7   A.    I can't recall a direct conversation I had with Mr. Recker

8   about that, as far as the logo.

9   Q.    What about the title box, generally?  Anyone else in

10  ASH-Grayhawk leadership?

11  A.    Nobody ever said anything about it.

12  Q.    Okay.

13       Did Mr. Erickson ever direct you with regard to applying

14  the Grayhawk of Atlanta or Grayhawk of South Carolina logo to

15  building plans after the acquisition?

16  A.    I don't remember a direct conversation about that with

17  Mr. Erickson.

18  Q.    Okay.

19       Let's discuss the leadership of ASH after the acquisition.

20  I think you said that Mr. Recker was the first president.

21       Who replaced him?

22  A.    Ken Thirtyacre.

23  Q.    After about how long, do you recall?

24  A.    Ken Thirtyacre started at the end of May.

25       Chris Recker, at the time of acquisition, November 15, was

1    already on board and had been on board for a couple of months.

2    So he worked until some time the end of May and Ken Thirtyacre

3    started.

4    Q.    So Mr. Recker was there six months, correct?

5    A.    Yes.

6    Q.    And then Mr. Thirtyacre took over?

7    A.    Correct.

8    Q.    What was Mr. Benson's involvement after the acquisition,

9    Mr. Greg Benson, in the management of the ASH-Grayhawk

10   operations?

11   A.    Mr. Benson came down initially.  He was the direct report

12   to the division president, which was Chris Recker.

13         Most of his interactions, if not all, would have been

14   through Chris Recker.

15   Q.    Did you have any interactions with Mr. Benson in your

16   capacity as director of design?

17   A.    There was some meetings that I was in that he was in, but

18   there was no direct involvement with Mr. Benson at that point.

19   Q.    When -- did there become direct involvement with

20   Mr. Benson?

21   A.    No.  We always had a division president that he would go

22   through.  There was times that we had meetings.  He was on the

23   phone.  Occasionally he was there that I would speak with him.

24   But as far as reporting to, or getting a lot of direct

25   information from him, I didn't get a lot of direct information

1    from him.

2    Q.    Did you -- within the first year of 2020, did you ever

3    become aware of a lot purchase strategy that ASH-Grayhawk had

4    for the Columbus area?

5    A.    I knew there was a -- a -- a lot take down.  I can't say I

6    ever knew exactly what the take down was as far as how many they

7    had to purchase or what the schedule was.

8    Q.    So Mr. Thirtyacre continued as president from May until the

9    end of calendar year 2020.  Is that right?

10   A.    Until end of October.

11   Q.    Did Mr. Thirtyacre ever express reservations to you with

12   regard to lots available from Mr. Erickson?

13   A.    His conversations with me as far as the lots --

14         MS. BECK:  Objection, Your Honor.  The witness is

15   about to give hearsay evidence.

16         MR. QUACKENBOSS:  Your Honor, Mr. Thirtyacre -- it's

17   party admission.  He was president of one of the plaintiffs.

18         MR. KRAMER:  Your Honor, could we approach to discuss

19   this subject, please?  It's about to get very sensitive.

20         THE COURT:  All right.

21      (Following conference held at sidebar at 4:33 PM.)

22         MR. KRAMER:  I believe Mr. Quackenboss is trying to

23   elicit testimony that Ken Thirtyacre referred to a neighborhood

24   as a "ghetto" in order to inflame the jury.  And we object in

25   advance under Rule 403.  That was in the email to which the

Direct Examination - Kathy Long

1    hearsay --

2              THE COURT:  It would be irrelevant.

3              MR. KRAMER:  It would be.  It certainly would.

4              THE COURT:  You're not going to try this case based on

5    that kind of nonsense?

6              MR. QUACKENBOSS:  No.  No, sir.

7              THE COURT:  No reference to ghetto.

8              The hearsay objection is overruled.

9              MR. QUACKENBOSS:  Okay.  Thank you.

10             MR. KRAMER:  Thank you, Your Honor.

11        (Sidebar concluded at 4:34 PM.)

12   BY MR. QUACKENBOSS:

13   Q.  Ms. Long, were there any particular neighborhoods,

14   particular lots that Mr. Thirtyacre -- simply tell us yes or no

15   please -- expressed reservations about purchasing from

16   Mr. Erickson?

17   A.  Yes.

18   Q.  Okay.

19       Simply tell us the neighborhoods or areas about which he

20   expressed reservations?

21   A.  River Brook.  There was a couple of lots in North Ivy Park.

22   Smith's Walk.  And I think that was it.

23   Q.  Did you hear any discussions about the possibility of

24   removing those areas from the list of lots that they would buy

25   from Mr. Erickson?

1    A.    I know he was not happy with River Brook.  And was wanting

2    to not purchase River Brook.

3    Q.    Did you have conversations with Mr. Benson, around the time

4    of the acquisition -- well, did you -- did you meet with

5    Mr. Benson around the time of the acquisition?

6    A.    I met, initially, Mr. Benson the 15th of November, 2019,

7    the day that they acquired Grayhawk, Inc.

8         The very next day Mr. Benson came in and did a meeting with

9    the entire staff and just explained -- because nobody knew that

10   the company was being acquired -- that the company had been

11   purchased, and it was a profitable company and that they had no

12   intentions of making any changes.  That everything was going to

13   continue to go the -- what made us successful and profitable we

14   would continue.

15   Q.    Did he talk about the potential of a sale of the company?

16   A.    It was talked about that they were repackaging to sell.

17   Q.    Did ASH-Grayhawk hire a director of land acquisition?

18   A.    Yes, they did.  Yes.

19   Q.    Okay.  Do you recall his name?

20   A.    Mack Veers.

21   Q.    Did he ever discuss with you ASH-Grayhawk's lot purchasing

22   decision making?

23   A.    He had a lot of frustration of just how hard it was, how

24   difficult it was to get the things -- the process going as far

25   as land -- them buying land.

981

Direct Examination - Kathy Long

1   Q.   Did he tell you with whom he was discussing this that

2   caused the frustration?

3   A.   There was a, I guess you call it a, land committee.  When

4   he purchased -- when he found land that he would have to submit

5   it to, and they would either give him the approval to purchase

6   or not.

7   Q.   Did he ultimately succeed in the position?

8           MS. BECK:  Objection, Your Honor.  Hearsay.  She

9   cannot testify to Mr. Veers' beliefs.

10          MR. QUACKENBOSS:  Testify to what?  I'm sorry.

11          MS. BECK:  What Mr. Veers -- for the truth of the

12  matter asserted or his beliefs.

13          THE COURT:  Ask the question again.

14  BY MR. QUACKENBOSS:

15  Q.   Do you believe Mr. Veers succeeded in his position as

16  director of land acquisition?

17  A.   He did purchase some land in Perry, Georgia.  And some in

18  the Hogansville.

19  Q.   Do you know -- do you know why he left?

20  A.   He told me that he was frustrated.

21          MS. BECK:  Objection, Your Honor.  Hearsay.

22          THE COURT:  Sustained.

23  BY MR. QUACKENBOSS:

24  Q.   Did you eventually become interim president of

25  ASH-Grayhawk?

1    A.    Yes, sir.

2    Q.    How did your responsibilities change at that point?

3    A.    At that point in time I was over -- it included the field.

4    Not accounting.  Accounting was always under ASH.  Basically, I

5    was -- I was put as interim president to make certain the

6    company kept going.  That we kept building.  That things kept

7    moving.

8    Q.    Do you recall ever working with a land committee that

9    ASH-Grayhawk -- excuse me.  That ASH put in place to manage lot

10   selection in Columbus?

11   A.    When I was made interim president, the end of October,

12   because Dave Erickson owned the lots that were being purchased,

13   and he was the interim CEO of ASH, they were going to create a

14   committee that would -- since Dave was the CEO -- that would be

15   the person that I would work with as far as acquiring lots.

16        I dealt with or talked to Sean Coleman.  That -- we talked

17   about it, but we never established anything.  Just -- it was

18   very short term.

19   Q.    Do you recall when the land committee was first

20   established?

21   A.    I don't know that the land committee was established as far

22   as with Mr. Coleman.  I don't know if they -- I don't know what

23   happened with that.  I know we talked about meeting, but I don't

24   know what ever transpired.

25   Q.    Do you recall how many times you had a conversation with

1    Mr. Sean Coleman about lot purchases?

2    A.    We spoke two or three times, total.

3    Q.    Did anyone at ASH, during your period as interim president,

4    direct you to work on a C lot order of development?

5    A.    In that interim time, I do not think so.

6    Q.    At any point, did anyone at ASH ask you to work on

7    developing a C lot order of development?

8    A.    There were times that I had to reach out to Mr. Erickson's

9    company to find out what the order of communities were -- when

10   they would be completed, the development would be completed.

11        There were several -- and I am almost certain that all the

12   raw land was on the C lots.  The raw land that he was developing

13   for the next phase, or a new neighborhood, I would have to find

14   out what the schedule was for that.  And I would send an email

15   to get that information usually to Chuck.

16   Q.    To whom would you deliver that information?

17   A.    That would be the division president.

18   Q.    Did you ever send any such information to someone at ASH?

19   A.    It wouldn't have come from me.

20        The division president would have been the one that would

21   have sent it.  So I would have gone over it with the division

22   president and the division president at that point would have

23   sent it to ASH.

24   Q.    Do you remember any requests for any information to

25   Mr. Erickson that was not quickly responded to?

1    A.   A request from Mr. Erickson?

2    Q.   No -- a request to Mr. Erickson for information to which he

3    did not quickly respond?

4    A.   I'm not aware.

5            MR. QUACKENBOSS:  Let's pull up DX266, please.

6    BY MR. QUACKENBOSS:

7    Q.   Do you recognize this email exchange?

8    A.   Yes.

9    Q.   Okay.  Is this an email exchange between you and

10   Chuck McClure?

11   A.   Yes, it is.

12           MR. QUACKENBOSS:  Your Honor, I move to admit DX266.

13           MS. BECK:  No objection, Your Honor.

14           THE COURT:  Admitted.

15        (DEFENDANTS EXHIBIT DX266:  Received in evidence.)

16   BY MR. QUACKENBOSS:

17   Q.   Ms. Long, at the bottom of this email string it looks like

18   December 3rd of 2020, you asked Mr. McClure:  What is the

19   timeline for the following communities or new phases;

20   Charleston Place, North Ivy Park and Auburn Farms.

21        Correct?

22   A.   Correct.

23   Q.   Do you recall whether someone asked you to obtain this

24   information?

25   A.   I would think so.

Direct Examination - Kathy Long

1    Q.    You were interim president at the time, correct?

2    A.    Yes.

3    Q.    You don't recall who asked you?

4    A.    I don't.  I don't.

5    Q.    Okay.

6              MR. QUACKENBOSS:  Let's look at DX338, please.

7    BY MR. QUACKENBOSS:

8    Q.    Ms. Long, do you recognize this email exchange?

9    A.    I do.

10   Q.    Is this an exchange on December 4 between you and

11   Chuck McClure?

12   A.    Correct.

13             MR. QUACKENBOSS:  Your Honor, I move to admit DX383.

14             MS. BECK:  No objection, Your Honor.

15             THE COURT:  Admitted.

16        (DEFENDANTS EXHIBIT DX383:  Received in evidence.)

17   BY MR. QUACKENBOSS:

18   Q.    Looking at the bottom portion of this email, can you tell

19   me what this response is?

20   A.    Yes.  Chuck is letting me know the order that's going -- or

21   what's going to be -- what they are doing, and the various

22   phases and/or new communities.

23   Q.    And this response to you was provided the morning after you

24   requested it?

25   A.    Yes.

1    Q.    Do you recall what you did with this information once you

2    received it?

3    A.    I don't.  I don't recall.

4    Q.    Do you ever hear Mr. Thirtyacre express concerns or

5    criticisms about the quality of Mr. Erickson's lot

6    development --

7    A.    Yes.

8    Q.    -- in any particular neighborhood or area?

9    A.    Garrett Creek, Garrett Pines, River Brook, North Ivy Park,

10   Smith's Walk.

11   Q.    Did you have a discussion with him about whether you agreed

12   with his concerns about lot development quality?

13   A.    We did have a discussion.  He is from Florida and the

14   majority of things in Florida are flat.  Our lots, in this area,

15   are not flat.  And we had a conversation about, We don't have

16   dead, flat lots in this area.

17   Q.    Did you have an impression about whether that impacted

18   Mr. Thirtyacre's criticism of the lot development here?

19   A.    I don't think it did.

20   Q.    Prior to the sale to ASH-Grayhawk, what was the pace of

21   Grayhawk Homes' construction starts of new homes per week?

22   A.    Five to seven a week.

23   Q.    Five to seven?

24   A.    Uh-huh.

25   Q.    Did that change at all based upon COVID or other events?

Direct Examination - Kathy Long

1   A.   After the acquisition, is that what you are asking?

2   Q.   Yes, ma'am?

3   A.   It did.  COVID hit us pretty hard in weird ways.  It

4   increased -- to begin with, it increased the building or the

5   desire for homes.  But then all of a sudden, with the supply

6   constraints and price increases, it dropped off pretty quickly.

7   Q.   Okay.

8        Were there any other developments that impacted

9   ASH-Grayhawk's ability to keep up with that pace of new starts

10  after the acquisition?

11  A.   I'm sorry.  I am not understanding your question.

12  Q.   Were there any other developments, internally, that

13  impacted ASH-Grayhawk's ability to build houses quickly?

14  A.   No.

15  Q.   Did they change their contracting practices during COVID?

16  A.   After COVID?  Yes.  Yes.  We did -- they added an

17  escalation charge, or a clause, that once somebody contracted

18  after -- they had to go through the paperwork, or go through the

19  billing, and if it came up more than what they -- the actual --

20  I don't remember exactly how the escalation clause went, but the

21  clause was put in there to where if the price increased by a

22  certain percentage the customer had to pay that escalation.

23  Q.   Did that reduce the pace of starts for a period?

24  A.   Yes.

25       We weren't getting ground-up contracts.  The contract --

1    the contracts started falling off because people didn't want to

2    contract and not know what their end price was going to be.

3    Q.    Did ASH-Grayhawk implement a new software system at some

4    point?

5    A.    MarkSystems-- the MarkSystem did -- I don't -- I am not

6    sure if it's up and running yet, but it was six months of

7    working trying to get the system going and there was releases

8    that they just couldn't get released fully because the system

9    just wasn't -- it just wasn't properly running.

10    Q.    Do you have an idea of the extent to which that interfered

11    with ASH-Grayhawk's ability to start new homes?

12    A.    There were several weeks that we couldn't do any starts.

13    Nothing could come out of the computer because of it.

14    Q.    How long did that problem with the MarkSystem last?

15    A.    I left October 20th, 2022, and there were still problems

16    with it.  And they started implementing the system summer of

17    '21.  End of summer of '21.

18    Q.    You say you left March of 2022.  Is that right?

19    A.    I left April of 2022.

20    Q.    April of 2022.  Why did you leave?

21    A.    It was -- it had become a very hostile environment.  The

22    changes -- it was just a lot of hostility.  Division

23    presidents -- I couldn't tell if it was the division president,

24    or if it was they were going by ASH.  It was just really -- it

25    was really rough and had gotten -- I couldn't take any more of

1    it.

2    Q.   Did there come a time when you became aware of a hostile

3    environment complaint against one of the ASH-Grayhawk

4    presidents?

5            MS. BECK:  Objection, Your Honor.  Could we please

6    approach?

7            THE COURT:  No.  Just tell me the basis for the

8    objection.

9            MR. KRAMER:  Relevance.

10           MS. BECK:  403 character evidence.  Yes.  Relevance.

11           THE COURT:  Sustained.

12           MR. QUACKENBOSS:  Your Honor, if I may, there have

13   been suggestions that Mr. Erickson somehow concocted,

14   manufactured, complaints about one of the division presidents at

15   ASH-Grayhawk.  The issue here is whether these --

16           THE COURT:  I haven't heard that evidence yet in this

17   trial.

18           MR. QUACKENBOSS:  Very well.

19           THE COURT:  Have you?

20           MR. QUACKENBOSS:  No.  Have not heard it.

21           THE COURT:  I haven't heard the evidence so that would

22   not be allowed to rebut something that hasn't been stated.

23           MR. QUACKENBOSS:  Very well.

24   BY MR. QUACKENBOSS:

25   Q.   Were you ever present for conversations about ASH-Grayhawk

1   changing its name to Evermore?

2   A.   Yes.

3   Q.   Please share that with the jury.

4   A.   There was -- Lee Darnold and some other people came down --

5   all from corporate -- came down.  Steve Sasso was our division

6   president.  And it was discussed about changing the name.

7        Steve Sasso told me that the --

8        MS. BECK:  Objection, Your Honor.  Hearsay.

9        MR. QUACKENBOSS:  Your Honor, there has been testimony

10  about the reason the company changed the name and these are

11  admissions of the leadership of the plaintiffs.

12       THE COURT:  Admission?

13       Overruled.

14  BY MR. QUACKENBOSS:

15  Q.   Please continue.

16  A.   I'm sorry can you reask the question?

17  BY MR. QUACKENBOSS:

18  Q.   Sure.  Please share with the jury conversations you

19  participated in about why ASH-Grayhawk changed its name to

20  Evermore.

21  A.   We had a meeting.  Some people from corporate came down.

22  Steve Sasso, as a division president, and I were in the meeting.

23  And Lee Darnold asked Steve Sasso why he wanted to change the

24  name.

25       And Steve felt like he was a new president.  It was -- a

1   new company name would give the employees just a sense of

2   ownership that they had a part of the company.

3       And I know Steve wanted to be in the beginning of

4   something.  So he was -- he was encouraging the name of

5   Evermore.

6       It then -- it was discussed by Lee Darnold that he didn't

7   know if it that was a great thing to do or not.  The reputation

8   was brought up and Ryan Twiss said that --

9           MS. BECK:  Objection, Your Honor. privilege.

10          THE COURT:  Overruled.

11          MR. QUACKENBOSS:  Please continue.

12          THE WITNESS:  Ryan Twiss had looked at the -- he was

13  having to do something with Stone Ridge, which is the Huntsville

14  division owned by ASH.  And there was a legal problem and he was

15  looking at their reputation at that point.  And he said their

16  reputation had been tainted.  And because he was looking at that

17  he looked at Grayhawk's and said Grayhawk's reputation was fine.

18          So I really don't know why, other than they just

19  wanted to change the name at the time, why we were changing the

20  name, or why they wanted to change the name.

21  BY MR. QUACKENBOSS:

22  Q.   In the course of your experience in homebuilding, you have

23  you had the opportunity to interact with a lot of homebuyers,

24  customers, correct?

25  A.   Correct.

1    Q.    In your experience, to what extent does the homebuilder

2    name or logo influence the homebuilding decision?

3    A.    I don't think it does.

4    Q.    What are the leading factors, in your view, that motivate a

5    homebuilder to choose a particular home?

6              MS. BECK:  Objection, Your Honor.  This is opinion

7    testimony.

8              THE COURT:  Overruled.

9              THE WITNESS:  Location.  Getting to know the builder,

10   maybe.  But usually most people -- location and price.

11   BY MR. QUACKENBOSS:

12   Q.    Are you aware of any incidents of confusion where

13   South Carolina customers of ASH-Grayhawk, or -- excuse me -- of

14   Grayhawk of South Carolina confused services with the Columbus

15   Grayhawk?

16   A.    No, sir.

17   Q.    Are you aware of any incidents where customers in the

18   Atlanta market confused services with those provided by

19   ASH-Grayhawk in Columbus?

20   A.    No, sir.

21             MR. QUACKENBOSS:  No further questions.

22             THE COURT:  All right.

23             Ladies and gentlemen, we are going to take about a

24   15-minute break and we will come back and finish the day.

25             Do not discuss the case during the break.

1          (Recess taken 4:55.)

2          (Resumed at 5:07.)

3                THE COURT:  Okay.  Bring the jury down.

4                Trying to keep up with my roster.

5                You are Ms. Beck or Ms. Maziarz?

6                MS. BECK:  Rachel Beck, Your Honor.

7                MR. KRAMER:  Just for identification, Your Honor,

8      Ms. Maziarz is right back here.

9                THE COURT:  Okay.  Yes.  I may or may not remember.

10          (Jury in at 5:10.)

11                THE COURT:  Okay.

12                Ms. Beck, you may cross-examine the witness.

13                MS. BECK:  Thank you, Your Honor.

14                          CROSS-EXAMINATION

15      BY MS. BECK:

16      Q.   Good morning, Ms. Long.  My name is Rachel Beck.

17                THE COURT:  It's evening.  It's not morning.

18                MS. BECK:  Excuse me.

19                I promise I will get you out of here quickly before

20      it's really the evening.

21      BY MS. BECK:

22      Q.   Ms. Long, before we get started I have three big questions

23      for you:  One, isn't it true that Mr. Erickson promised to

24      continue selling lots to ASH-Grayhawk after he sold the company

25      to ASH?

1  A.    That would be in the contract.  I don't know that I can

2  fairy answer that.

3  Q.    He didn't tell you that he was still going to supply the

4  company with lots after he sold the company?

5  A.    We knew that we were getting our lots from Dave Erickson

6  but I don't know what the actual -- I don't know the particulars

7  of it.

8  Q.    Isn't it also true that he stopped selling lots to

9  ASH-Grayhawk in December of 2021?

10  A.    I know he stopped selling lots.  I couldn't tell you

11  exactly when.

12  Q.    And you can't build houses without lots, can you?

13  A.    If you don't have a lot to built a house on -- yeah.  You

14  are right.

15  Q.    Okay.

16      Ms. Long, on direct you testified that you left

17  ASH-Grayhawk on April 20, 2021, is that right?

18  A.    No.  April 20 of 2022.

19  Q.    Of April 2022.

20      Thank you, ma'am.

21          MS. BECK:  Teri, could you please display for the

22  witness PX 7464?

23  BY MS. BECK:

24  Q.    Ms. Long, do you recognize this document?

25  A.    Yes.

Cross-Examination - Kathy Long

1    Q.    Does this reflect text thread between you and Mr. Erickson?

2    A.    It does.

3            MS. BECK:  Plaintiffs offer Exhibit PX 764 into

4    evidence.

5            THE COURT:  Any objection?

6            MR. QUACKENBOSS:  No objection.

7            THE COURT:  Admitted.

8       (PLAINTIFFS EXHIBIT PX764:  Received in evidence.)

9            MS. BECK:  Teri, please put up PX 764.09.

10   BY MS. BECK:

11   Q.    Ms. Long, do you recognize the very last text on this

12   thread as being dated Thursday April 21 at 11:03 AM?

13   A.    Yes.

14   Q.    Ms. Long, do you know if that was April 21 of 2022?

15   A.    I'm assuming it is just looking at the dates on the thread.

16   Q.    And are you saying that because it's directly below May 21

17   of 2021?

18   A.    Right.  Yeah.

19   Q.    So had it been about a year since you had texted with

20   Mr. Erickson when he sent this text on Thursday, April 21?

21   A.    That's what -- that's what it appears.  I am not looking at

22   my phone.  That what it appears I am looking at.

23   Q.    Thank you, ma'am.

24        That's the day after you resigned from ASH-Grayhawk?

25   A.    April 21st, 2022.  Yes.  You are right.

1          MS. BECK:  Teri, could you please go to the next page?

2     BY MS. BECK:

3     Q.   Ms. Long, is that a picture of a dead turkey?

4     A.   It is.

5     Q.   And below the dead turkey does it say:  Call me?

6     A.   It does.

7          MS. BECK:  Teri, could you please move to the next

8     slide?

9     BY MS. BECK:

10    Q.   Ms. Long, did you respond to Mr. Erickson's text on

11    April 22nd?

12    A.   It appears that I did.

13    Q.   And you say:  I'm sorry, Dave.  I'm not available to talked

14    to.

15         Correct?

16    A.   Correct.

17    Q.   And Mr. Erickson gives you a thumbs up emoji?

18    A.   Correct.

19    Q.   And then it appears he texts you a couple days later on

20    Sunday April 24th?

21    A.   Yes.

22    Q.   And he says:  Please call me when you get a few, Dave.

23    A.   Correct.

24    Q.   And then it appears he texts you again on Monday, April

25    25th, and he says:  Please call if you can, Dave.

1      Is that correct?

2    A.   Yes.

3    Q.   And then he texts you again on Monday, April 25 at 5:37 PM

4    saying:  If you have Kristen's mobile please forward.

5         Is that right?

6    A.   Yes.

7         MS. BECK:  Could we scroll down.

8    BY MS. BECK:

9    Q.   Then that same day he says:  Same with Jason.

10        Is that right?

11   A.   Correct.

12   Q.   All right.

13        And you respond with the number of Mr. Jason Betts and

14   Christy Crow; is that right?

15   A.   Correct.

16   Q.   And you write:  Do you want Christy Crowe-decorator's

17   number.

18        Is that right?

19   A.   Correct.

20   Q.   And Mr. Erickson says:  Yes, please.

21   A.   Correct.

22   Q.   Mr. Betts and Ms. Crowe had been let go from ASH-Grayhawk

23   earlier that day, right?

24   A.   Was that the 25th of April?

25   Q.   Yes, ma'am.

1   A.    Yes.

2   Q.    Okay.

3         All right.

4              MS. BECK:  Scrolling down to Tuesday, April 26.

5   BY MS. BECK:

6   Q.    Do you see where Mr. Erickson asks:  Available for lunch?

7   A.    Yes.

8   Q.    And you respond:  I'm sorry, Dave.  I am not available this

9   afternoon.  Still planning on tomorrow at Randy's at 2 PM.  Is

10  that still good?

11        Do you see that?

12  A.    I do.

13  Q.    And then he responds:  Call me.

14        Is that right?

15  A.    Correct.

16  Q.    Around this time did Mr. Erickson ever tell you not to put

17  things in writing?

18  A.    No.

19  Q.    And you refer to a "Randy" in this text message.  Are you

20  referring to Mr. Randy Lomax?

21  A.    Yes, ma'am.

22  Q.    And is that Mr. Erickson's attorney in this case?

23  A.    Randy is -- has been Dave's attorney on real estate

24  transactions.

25  Q.    On April 27th, 2022, you met with Mr. Lomax, correct?

1  A.    I don't remember what day it was, but I did meet with

2  Mr. Lomax.

3  Q.    Were you originally planning on meeting with Mr. Lomax with

4  Mr. Erickson there as well?

5  A.    No.

6  Q.    Okay.  Thank you.

7        Was anyone else at that meeting between you and Mr. Lomax?

8  A.    Mr. Quackenboss was there.

9  Q.    Okay.

10       Was Mr. Quackenboss your attorney at that time?

11 A.    No, ma'am.

12 Q.    Okay.

13       You were deposed in this case, right, Ms. Long?

14 A.    Correct.

15 Q.    And do you recall at your deposition being asked whether

16 you were asking Mr. Quackenboss for legal advice during this

17 meeting?

18 A.    Repeat the last thing you just said.

19 Q.    I will repeat the whole question.

20       At your deposition you were asked whether you were asking

21 Mr. Quackenboss for legal advice during this meeting and you

22 first said, No.

23       Right?

24 A.    Correct.

25 Q.    And later on in your deposition, when you were being

1     cross-examined by Mr. Quackenboss, he asked if you remembered

2     asking both him and Mr. Lomax questions.

3          Is that right?

4     A.   Yes.

5     Q.   Okay.

6          And then do you recall at your deposition that you were

7     instructed by counsel not to reveal any discussions that you had

8     with Mr. Quackenboss and Mr. Lomax at that meeting?

9     A.   I do.

10    Q.   Okay.

11            MS. BECK:  Could we please put up DX383?  This exhibit

12    was entered on direct.

13    BY MS. BECK:

14    Q.   Ms. Long, do you remember being asked about the various

15    communities on this email from Mr. McClure?

16    A.   Do I remember Chuck asking me?

17    Q.   No, ma'am.

18         Do you remember Mr. Quackenboss asking you, just a few

19    moments ago?

20    A.   Yes.

21    Q.   These aren't all Phase C lots, are they?

22    A.   I don't know that.

23    Q.   Okay.  So you --

24    A.   I'm not sure.

25    Q.   Some of them are Phase B lots, aren't they?

1    A.    I am not remembering exactly what A, B and C lots were, in

2    the way that they were phased.  Memory is telling me that C lots

3    were raw land.  And then the A and B were developed lots.

4    Q.    If you look down the list -- actually withdrawn.

5          Ms. Long, did there come a time -- let me rephrase.

6          There came a time when the regular supply of lots from

7    Mr. Erickson to ASH-Grayhawk stopped, right?

8    A.    Yes.

9    Q.    And where we started, if the company didn't have lots to

10   build on then you wouldn't have anything to sell, right?

11   A.    Correct.

12              MS. BECK:  Ms. Long, those are all of my questions.

13              THE COURT:  Any redirect?

14              MR. QUACKENBOSS:  No, sir.

15              THE COURT:  Ma'am, you may step down.

16              You are excused.

17              Call your next witness.

18              MR. ELLIKER:  Your Honor, we have a deposition video.

19              For the record, Mr. Jason Betts was on our witness

20   list.  He was previously identified as a designated witness, but

21   he was within the subpoena power of the Court.  Unfortunately,

22   this past week he has a medical condition issue that's prevented

23   him from testifying live.  We conferred with plaintiffs about

24   this.

25              Under Rule 32a4C --

```
 1              THE COURT:  How long is this deposition?
 2              MR. ELLIKER:  It's 38 minutes.  I will say it's the
 3      longest video that we have.
 4              THE COURT:  All right.  Start playing it.
 5              What's his name again?
 6              MR. ELLIKER:  Jason Betts, B-e-t-t-s.
 7        (The videotaped deposition of Jason Betts was published to
 8      the jury at 5:22 PM)
 9              MR. ELLIKER:  That's the conclusion of that video,
10      Your Honor.
11              THE COURT:  All right.
12              What do you have next?
13              MR. ELLIKER:  We have eight-and-a-half minute video.
14              THE COURT:  Play it.
15              MR. ELLIKER:  This is Stephen Pehrkon, who we saw
16      earlier this morning in plaintiffs' case.
17              THE COURT:  We got an eight-and-a half minute video,
18      ladies and gentlemen.
19        (The videotaped deposition of Stephen Pehrkon was published
20      to the jury at 6:02 PM)
21              THE COURT:  Okay.  Ladies and gentlemen, I think
22      that's enough for the day.
23              Thank you for hanging in there and paying attention.
24      We will start again in the morning at 9 AM.
25              Do not discuss the case with anyone during the break.
```

```
 1    Don't do any independent investigation.
 2              We will see you at 9 AM.
 3              Enjoy the rest of your evening.
 4         (Jury out at 6:10.)
 5              THE COURT:  Okay.  I hope in the next deposition that
 6    you all edit out questions that ask somebody something where
 7    they say, I don't know.  I mean...
 8              MR. ELLIKER:  I will tell you, Judge --
 9              THE COURT:  In any event, I would like to hear the
10    defendants' argument with regard to their Rule 50 motion.
11              MR. SHEBELSKIE:  Yes, sir, Your Honor.
12              THE COURT:  Let's focus on the trademark infringement
13    claims, which are about as weak as I have seen in a long time,
14    but make your full motion.
15              MR. SHEBELSKIE:  All right, sir.
16              I will start with the trademark infringement claims,
17    starting with Count 6, which is the breach of the Trademark
18    Assignment Agreement, asserted against GH Lots Holdings as the
19    sole defendant.
20              That entire claim should be dismissed.  The Trademark
21    Assignment Agreement has been admitted into evidence.  And there
22    has been no evidence that the assignment agreement was breached.
23              The assignment agreement itself effectuates the
24    assignment of GH Lot Holdings trademarks to the defendants.
25    And, indeed, if that is assignment were ineffective they
```

1    wouldn't have standing to bring the Lanham Act and other Georgia

2    statutory trademark claims.

3            As the evidence has shown, undisputedly, the

4    South Carolina entity and the Atlanta entity were not parties to

5    the Trademark Assignment Agreement.

6            The agreement did not include any marks of the Atlanta

7    and South Carolina companies in the list -- the scheduled list,

8    either registered or common law marks conveyed above and beyond

9    the marks of GH Lot Holdings.

10           So there is utterly no evidence that the

11   South Carolina companies or the Atlanta companies had any

12   obligations under that agreement.  And, therefore, none of the

13   actions that those two companies are alleged to have done to

14   continue to use the marks they had been using before the sale

15   violates the agreement.

16           Further, the argument has been made, I suppose by the

17   other side, that GH Lot Holdings, perhaps having assigned its

18   rights and its marks to the plaintiffs, maybe somehow breached

19   its assignment by subsequently violating the trademarks.

20           But there has been no evidence that GH Lot Holdings

21   has done anything to violate the rights of the plaintiffs with

22   respect to the assignments GH Lot Holdings gave.

23           And, furthermore, the assignment agreement doesn't

24   oppose any covenants on GH Lot Holdings other than to make a

25   conveyance.  There is no term or condition that concern

1    subsequent conduct by GH Lot Holdings.

2           The plaintiffs have stipulated, additionally,

3    Your Honor, that they have no damages for this claim.  And

4    disgorgement of profits is not a contractual remedy.

5           It is for all of these reasons we believe GH Lot

6    Holdings is entitled to judgment as a matter of law on Count 6.

7           The trademark infringement claims, Count 7, is under

8    the Federal Lanham Act.

9           And 8 and 9 are under the Georgia Unfair Competition

10   Statute and Deceptive Trade Practices Act.

11          All three of those counts suffer a fatal flaw, Your

12   Honor, and that is all three require competition between the

13   plaintiff and the defendants, whether you are talking the

14   federal act or the state acts.

15          And we have heard, indisputably, affirmative evidence

16   from the plaintiffs that the ASH-Grayhawk entity did not compete

17   in South Carolina.  Both Mr. Twiss and Mr. Darnold affirmatively

18   said ASH-Grayhawk did no business in South Carolina.

19          Likewise, both testified affirmatively that

20   ASH-Grayhawk did no business in Dallas.

21          Therefore, the absence of competition between the

22   plaintiff and defendants in a geographic market means there can

23   be no violation, as a matter of law, under the Lanham Act or

24   either Georgia act.

25          Additionally, Your Honor, the Georgia statutes, the

1    two counts under the Georgia act, cannot apply to the

2    South Carolina entity for the simple reason that the

3    South Carolina entity has never done business in Georgia.

4         There is no evidence put on by the plaintiffs that the

5    South Carolina company did anything other than build and sell

6    homes in South Carolina; therefore, the Georgia acts cannot

7    apply to it.

8         With respect to the Atlanta company, the Georgia

9    Deceptive Unfair Competition Statute requires, in addition to

10   actual competition, which is absent, an attempt to deceive and

11   mislead the public.

12        The plaintiffs have not put on any evidence that the

13   Atlanta entity continued to use the marks for whatever limited

14   period they did after November 15 with the intent to deceive and

15   mislead the public.

16        To the extent there is any evidence in plaintiffs'

17   case about the motives of the Atlanta company's continued use of

18   the marks, it is, at best, an innocent mistake, an oversight.

19   And more reasonably, I believe, something -- an activity that

20   was facilitated and promoted by the plaintiffs themselves under

21   the Transition Services Agreement.

22        And the other Georgia act, Your Honor, requires a

23   threat of future conduct -- the statute that allows only

24   injunctive relief.

25        Here, the evidence is that the Atlanta and

1  South Carolina companies are out of business.  They have sold

2  off their remaining lots that they owned at the time of the

3  ASH transaction.  And so not only has the conduct that

4  plaintiffs contend amounts to misappropriation of their marks

5  ceased, there is no threat that it could ever resume because

6  those companies are out of business.

7          For those reasons, Your Honor, we believe the

8  trademark -- the statutory trademark-based claims should be

9  dismissed as a matter of law.

10          If I might then, unless the Court has questions --

11          THE COURT:  What is the standard for disgorgement?

12  What type of violation is disgorgement allowed for?

13          MR. SHEBELSKIE:  Well, I believe, Your Honor, under

14  the Lanham Act, disgorgement, regardless of the violation --

15          THE COURT:  Does it require a willful violation?

16          MR. SHEBELSKIE:  It does not.  But it is an -- the

17  statute gives the Court discretion.  And so as an equitable

18  remedy the Court can -- it's not required, in other words, to

19  order disgorgement upon a technical violation.  So even if there

20  were a technical violation, or liability, the Court could still,

21  in its discretion, find that disgorgement is not appropriate for

22  a number of reasons.

23          And I would be glad to discuss those because if you

24  find here any violation that may have occurred it could only

25  have been an innocent one, and one that the plaintiffs

1   themselves never cared about, or could have caused them any

2   actual harm, given the lack of geographic competition.

3          So, in those circumstances, even if there were a

4   technical liability, we would strongly urge the Court to

5   exercise its discretion not to award disgorgement.

6          THE COURT:  Let me hear the plaintiffs' response to

7   the motion with regard to counts -- let me get the numbers --

8   6, 7, 8 and 9.

9          MR. MERRITT:  Yes, Your Honor.  Thank you.

10         So beginning with 7, 8 and 9, that defendants grouped

11  together -- that's the Lanham Act and the two Georgia state law

12  statutes -- their first premise is that the Lanham Act, and

13  these statutes, require competition.  That's legally incorrect.

14         Your Honor, you see trademark claims all the time

15  against parties that could do not complete.

16         What these statutes require is likelihood of consumer

17  confusion.  They require consumers to be confused as to the

18  source of what they are purchasing.  And we have that here and

19  we have it in spades.  And we have evidence of it.

20         So just at the outset I want to --

21         THE COURT:  You don't really have it in spades.

22  You've got these Yelp, and these emails, that -- it's unclear

23  whether those -- it looks like those were related to sales

24  before this sale of the business.  And so it would be reasonable

25  for those people to send their claims, or complaints, based on

1    documentation they received before this transaction with ASH.

2            Yet you want to use that to say, Oh, they are confused

3    without nailing down whether or not they sent it because they

4    had the previous information based on the previous sale, or

5    whether they sent it later on because of confusion.

6            MR. MERRITT:  Sure.  And I would like to address that

7    head on.

8            There's a mix of both --

9            THE COURT:  There's a mix.

10           MR. MERRITT:  -- in the documents.  And --

11           THE COURT:  And there is no actual damage.

12           MR. MERRITT:  Well, Your Honor, I will address the

13   first part first.  There's the mix.  Right.  So --

14           THE COURT:  I mean, the fact that they had Grayhawk on

15   some of these documents up there in Dallas and South Carolina,

16   there is no indication that that harmed competition, or any --

17   or you -- your client.

18           And there is certainly no evidence to support a

19   finding of willfulness.

20           MR. MERRITT:  Well --

21           THE COURT:  I guess, technically, they should have

22   quit using the Grayhawk name on the documentation up there, but

23   they were winding things down.  And there is plenty of evidence

24   that that was tolerated.

25           This is not the focus -- we've spent all this time on

1   this tangential stuff when the focus here is you claim the man

2   didn't provide you with lots, and you lost all this money and

3   your company was ruined because of that.  And we are spending

4   all this money about whether a little Grayhawk logo, up there in

5   South Carolina and Dallas, where folks probably hadn't heard of

6   Grayhawk Homes that much, whether or not that is a violation of

7   the Lanham Act.

8           But, go ahead.  Continue.

9           MR. MERRITT:  So --

10          THE COURT:  There is no damage.  Tell me the.

11          Damage.  Obviously, there is no damage because you are

12  seeking disgorgement of profits.  That ain't going to happen.

13          Whether as a matter of law, or me, as the fact finder,

14  I am not going to order disgorgement of profits based upon the

15  weakness of these claims, but...

16          MR. MERRITT:  Understood, Your Honor.

17          THE COURT:  Go ahead.

18          MR. MERRITT:  And the disgorgement of profits exists

19  in the Lanham Act because actual damages are very difficult to

20  prove in trademark infringement cases.

21          THE COURT:  But the evidence, as it existed at the

22  time you rested your case, I did not find it persuasive to show

23  the profits that they derived by using the Grayhawk Atlanta

24  logo.

25          MR. MERRITT:  That's not what the law requires,

1    Your Honor.

2           THE COURT:  Well, that's true.

3           The law requires you to come in and put in all of

4    their sales, and then they got to come in and they got to put in

5    how it should be reduced.

6           MR. MERRITT:  Correct.

7           THE COURT:  But the bottom line is -- go ahead.

8           I guess we can continue to listen to all this junk

9    tomorrow that clutters the main claim and then I can decide it

10   after that.

11          But, continue your argument.

12          MR. MERRITT:  Your Honor, I would like to get back to

13   the mixed evidence, because, you're right, some of the warranty

14   requests came in from consumers who had purchased homes

15   previously.  Some came in from consumers who purchased homes

16   after the transaction, and who were given an email address that

17   had Inc. in it, if that's the defendants' theory, but they sent

18   it to our people without that part of the address -- either it

19   went to the website or --

20          THE COURT:  So what?

21          MR. MERRITT:  They are under the impression they

22   purchased a home from a company they didn't purchase a home

23   from.  And we heard from Mr. Dezinna that the reputation was

24   going down the tubes but it didn't matter because they were

25   shutting the business down.

1          If we had --

2          THE COURT:  You think that that evidence shows that

3    they thought they were buying a home from ASH-Grayhawk and not

4    Grayhawk of Atlanta?

5          MR. MERRITT:  The evidence shows that they are the

6    same company.  And the evidence shows that the people who were

7    contacting Columbus, Georgia, over and over again knowingly,

8    associated them all as one; South Carolina, Atlanta, Columbus.

9    The same company.  There was no distinction.

10          And so the idea that these were three individual

11    companies operating under virtually the same name, if not the

12    same name, and that they were distinct, is untrue and that is

13    shown to be untrue by the evidence of how the consumers acted.

14          THE COURT:  But the picture is they were operating up

15    there under Grayhawk Atlanta, or whatever the logo was, before

16    y'all ever came on the scene.  And they continued to operate

17    during this transition period.  And they weren't -- I haven't

18    seen any evidence that suggested they were doing something

19    deceitful to try to associate themselves with the trade name in

20    order to sell more houses up there.

21          It just looks like, for whatever reason, in the

22    transition they didn't get around to changing it.  And that's

23    going to provide this claim for this huge disgorgement of

24    profits.  I just don't see it.

25          But go ahead.

1          MR. MERRITT:  Your Honor, Section 6.8 of the APA,

2  which houses the Trademark Assignment Agreement, anticipated

3  consumer confusion as a risk and required a transition.  They

4  didn't transition.  They transition in ten days.  They didn't

5  transition in 8 months.  That evidence is in the record.  They

6  didn't do it.

7          THE COURT:  But that was in the agreement because you

8  were concerned that there would be confusion that would cause

9  you injury and damage.  That's why that was in the agreement.

10          MR. MERRITT:  Correct.

11          THE COURT:  And there is none.  There is no injury or

12  damage.

13          MR. MERRITT:  Your Honor, the injury --

14          THE COURT:  Isn't that what all the cases say that,

15  you know, under circumstances you can still get disgorgement of

16  profits.  But if you just look at it common sense wise all that

17  was put in there so they wouldn't go use your stuff to damage

18  you.  And there is no evidence that they used your stuff and

19  damaged you.  None.

20          MR. MERRITT:  We had to change our name in Atlanta or

21  in Columbus.  Excuse me.

22          THE COURT:  Are you seeking any claim for compensatory

23  damages under any of those counts?

24          MR. MERRITT:  No, Your Honor.

25          THE COURT:  And that's because there is none.  You're

         good lawyers.  If there was some you would have found it, I can

         assure you.  This thing has litigated long and hard.  So I have

         to assume there is no damage.

                    MR. MERRITT:  The damages are difficult to prove.  The

         damage to the goodwill of the brand are difficult to prove.

         That's inherently true in this case, and virtually every other

         trademark case.  They are very difficult to prove.  You' right.

                    THE COURT:  What about the claim on the assignment

         agreement?  That claim is only against GH Lot Holdings, Inc.

                    How did that violate the assignment agreement?

                    MR. MERRITT:  Yes, Your Honor.  I just mentioned

         that --

                    THE COURT:  They did assign it to you, right?  They

         assigned the trade names and trademarks to you?

                    MR. MERRITT:  They did.  They assigned the worldwide

         rights and the common law rights and the Grayhawk name and the

         Grayhawk logo.

                    THE COURT:  How does that defendant breach the --

                    MR. MERRITT:  So we do have a claim against GH Lot

         Holdings owned and operated by Mr. Erickson.  And Section --

                    THE COURT:  How did that breach that contract?  The

         contract said you got to assign us the rights.  How did they

         breach --

                    MR. MERRITT:  So that contract is a part of the APA.

         And the APA's, paragraph 6.8, requires them to stop using the

1    names and they didn't.  That's in the simplist terms.

2            THE COURT:  What evidence was there, when the

3    plaintiff rested, that GH Lot Holdings, Inc. continued to use

4    the name -- the Grayhawk name in Atlanta or South Carolina?

5            MR. MERRITT:  GH Lot Holdings, Inc.'s principal, who

6    we have alleged is contributorily liable for infringement, has

7    continued to use the name.

8            THE COURT:  My question is -- there is no piercing of

9    the corporate veil claim here.  I haven't seen that in the case

10   yet.  I am surprised with everything else that is in the case

11   that's not been in the case.  But that's not in the case.  So I

12   am asking about the party to the contract.

13           What did they do that breached the contract?

14           MR. MERRITT:  Sure.  And the nuance here is that --

15           THE COURT:  I don't want nuance.  I want -- that's the

16   problem.  I want evidence.  Point to evidence that was

17   introduced in the case, before you rested, that shows the

18   breach.  What is it that shows that this defendant breached the

19   agreement.  I'm not talking about the Lanham Act claim.  I am

20   talking about your breach of contract claim under Count 6.

21           MR. MERRITT:  I understand.  Count 6.

22           Again, Your Honor, the APA houses the Trademark

23   Assignment Agreement.  Assigned worldwide rights.

24           Mr. Erickson is the signatory on behalf of GH Lot

25   Holdings.  And piercing the corporate veil is not required to

1    find Mr. Erickson personally liable.

2              THE COURT:  On the breach of contract claim?

3              MR. MERRITT:  Excuse me.  You are correct.  That's for

4    the infringement claims.

5              For the breach of contract claim it would be required.

6              THE COURT:  I think the breach of contract claim

7    requires you to show that the party to the contract breached the

8    claim.

9              MR. MERRITT:  Correct, Your Honor.

10              THE COURT:  Unless, you know, 500 years of contract

11    law is not applicable here for some reason.

12              My question is:  What did the party to the contract --

13    am I correct that the only party to the contract -- well, am I

14    correct that the only defendant to Count 6 is GH Lot Holdings,

15    Inc.?

16              MR. MERRITT:  You are correct.

17              THE COURT:  Because they are the party to the

18    contract?

19              MR. MERRITT:  Correct.

20              THE COURT:  My question is:  What evidence was there

21    in the record, at the time plaintiff rested, to show that GH Lot

22    Holdings Inc. did anything that breached the contract?

23              MR. MERRITT:  Without tying Mr. Erickson to the

24    company, Your Honor, I don't believe --

25              THE COURT:  With or without him.  I am just saying

1  that company did something.

2          MR. MERRITT:  I concede, Your Honor, without getting

3  to Mr. Erickson I don't believe that evidence is in the record.

4          THE COURT:  Okay.

5          So there is no evidence that GH Lot Holdings Inc.

6  breached the Trademark Assignment Agreement.

7          MR. MERRITT:  Not directly.  Yes.  That's right.

8          THE COURT:  Okay.  I am not blaming you.  You can't

9  make up evidence.  I am just trying to get to the bottom of

10  this.

11          MR. MERRITT:  Yep.  Nope.  I'm with you.  I'm

12  tracking.

13          THE COURT:  I'm going to grant judgment, as a matter

14  of law, as to Count 6.

15          With regard to these others claims, as a practical

16  matter, unless I grant disgorgement of profits, those claims are

17  of no value to you.  Are they?

18          MR. MERRITT:  Your Honor, injunctive relief is still

19  available.  The law does not require us to take Mr. Erickson at

20  his word --

21          THE COURT:  How can that be necessary if these

22  companies are out of business?

23          MR. MERRITT:  The law does not require us to take

24  Mr. Erickson at his word that he will not use this name.

25          THE COURT:  Okay.

1    Well, so you're concerned that in the future -- well,

2  if in the future, after this is over, he tries to use the name

3  then don't you have another claim against him?

4    MR. MERRITT:  We would have to be back in court.

5    Yes, Your Honor.

6    THE COURT:  All right.

7    Well, so your position -- first of all, you think

8  Mr. Shebelskie is just absolutely wrong on the fact that the

9  parties have to be competitors.  He is just making that up?

10    MR. MERRITT:  I think he is wrong that competition is

11  required.  And I think he is wrong that no competition existed

12  in the past, and if these picked up again under the same names

13  would exist in the future.

14    THE COURT:  All right.

15    I am not going to grant -- I am going to take it under

16  advisement with regard to Counts 7, 8 and 9.  And I will make a

17  decision, if I need to, I guess, after I hear all the evidence

18  and the jury verdict.

19    My concern about it is this:  I'm not going to give

20  you a law professor answer.  I'm going to give you a flat-out

21  common sense response, which is not good to do on the record all

22  the time because the Court of Appeals doesn't always like that.

23    Nevertheless, in my view these claims are

24  extraordinarily weak.  And they are not the heart of this case.

25  And we are spending a lot of time on them.  And I am going to

1    spend a lot of time trying to charge the jury on what all of

2    this means.

3                And they are going to spend a lot of time trying to

4    figure out what the law means, and these nuances, when they

5    ought to spending time on why didn't he provide the lots and

6    what that means.

7                My concern is that I'm inclined to find that they

8    fail, as a matter of law, but I am not sure that a good lawyer

9    won't be able to pick something apart there and say that I erred

10   in doing that because there was some evidence that should have

11   been presented to the jury.

12               But to present those weak claims, with the risk of it

13   clouding what I think are the claims that the jury ought to be

14   hearing, just doesn't seem to me to lead to -- I don't want to

15   say "justice" in that case -- this case.  That sounds too

16   dramatic.

17               But I can just tell you I'm going to do my best to

18   make sure they are not confused when we are crafting these jury

19   charges, but it's going to distract away from the main heart of

20   the case.  And when, in the end, I may have grant judgment as a

21   matter of law anyway, that's my concern.

22               As of this evening, it's late, I am not going to grant

23   judgment, as a matter of law, as to Counts 7, 8 and 9.  I may

24   reconsider that at some point.  But, I think Mr. Shebelskie has

25   made some fairly persuasive arguments with regard to that.

1          I am neither granting or denying it.  I will take it

2    under advisement and decide at a later point.

3          I think there are jury questions on the rest of this,

4    but, Mr. Shebelskie, if you want to make your record to make

5    sure you preserved your arguments, go ahead.

6          MR. SHEBELSKIE:  Thank you, Your Honor.

7          On Count One, the breach of the confidentiality

8    claims; Your Honor made a comment during plaintiffs'

9    case-in-chief -- I think it was following the examination of

10   Mr. Erickson -- the plaintiffs had conceived of this claim as

11   really an attempt at diversion of corporate opportunity with

12   respect to Prominence, Miramonte, and Surrey.

13         And the gist of their claim is that Mr. Erickson

14   learned, while a consultant or as CEO, that those three

15   companies were interested in being bought.

16         Now that is not confidential information of the ASH

17   companies as defined in his employment agreement's

18   confidentiality terms.

19         It is akin to saying, If you look up on the MLS

20   listings and see a house for sale and say, I'm interested in

21   that house and I know it's for sale, now that is -- the fact

22   that it's for sale is my confidential proprietary information.

23         The evidence in the plaintiffs' case was that all

24   three companies were being actively shopped by that broker,

25   Tony Avala, not just to ASH but to any other homebuilding

1    company who would be interested in pursuing buying them.

2            So the fact that these three companies were on the

3    market is not ASH confidential information.

4            And the undisputed evidence here, put in through their

5    own case, Your Honor, was that before -- that Mr. Erickson told

6    ASH that he was going to pursue these companies when he stepped

7    down as CEO.

8            He sent an email, or letters, to the chairman of the

9    Board of the company.  At least one of those was forwarded to

10   the general counsel, Mr. Twiss.  And neither Mr. Coleman nor

11   Mr. Twiss, having been told by Mr. Erickson that he considered

12   these companies to be in fair game, raised any objection about

13   it.

14           Likewise, Mr. Erickson was trying to be candid -- and

15   this evidence came out in their case-in-chief -- that he told

16   ASH's broker, Tony Avala, what he was going to do.  And asked

17   Mr. Avala to make sure it was okay with his client.  And

18   Mr. Erickson got assurances back from Mr. Avala that he had

19   gotten that kind of clearance.

20           So I don't see how the fact of the corporate

21   opportunity, so to speak, that these companies want to be

22   bought, is even within the ambit of the terms.

23           And in any event it's hard to see a breach with

24   respect to those three companies, given the way Mr. Erickson

25   proceeded in an attempt to be fully transparent that he was

1    reaching out to them.

2              THE COURT:  I think there is a jury question on that

3    count.  Move on.

4              MR. SHEBELSKIE:  All right.

5              Now, on the breach of the LPA, I know I might be

6    fighting against headwinds here, Your Honor, because we --

7              THE COURT:  For the record.

8              MR. SHEBELSKIE:  For the record.

9              So as stated in our bench briefs on this damages

10   question, Your Honor, we believe that the plaintiffs here made

11   an election -- made an election two years ago not to terminate

12   but rather to seek -- claim a partial breach, seek performance

13   of the contract, and then seek whatever damages might be

14   attendant to specific performance thereto.

15             THE COURT:  If you win that argument somebody ought to

16   do an interview of you, and your team, and say, This is one of

17   the best lawyering feats of all time.  But I am not buying it.

18             MR. SHEBELSKIE:  Okay.

19             THE COURT:  So jury question.

20             MR. SHEBELSKIE:  Well, that's our position on that.

21             There are two other points I would like to make on

22   this, Your Honor.

23             THE COURT:  All right.  Go ahead.

24             MR. SHEBELSKIE:  The plaintiffs have, at least with

25   respect to their damages -- actual damage claim as opposed to a

1    nominal damage claim on this, Your Honor -- has not presented

2    damages allocated to respected sellers.

3            They put on, through Mr. Duffus, just a generalized

4    damage figure of -- whatever it was -- $48 million.  But they

5    haven't attempted to allocate that according to the individual

6    LPA sellers that are defendants here.

7            As Mr. Duffus testified, his damage calculation

8    assumed a certain order of distribution of the lots, which he

9    didn't disclose, and the Land Purchase Agreement shows that not

10   every one of these defendants owns all of Phase C lots.

11           The ownership is allocated amongst various defendants.

12   Like Mr. Erickson, personally, only owns one of the

13   neighborhoods.  Most of the neighborhoods are owned by another

14   company, Tiger Creek, in which Mr. Erickson is not an owner.

15           So now what we are left with is no basis in the

16   plaintiffs' case to figure out this $48 million; how much of it,

17   if there were liability, would be attributable to Mr. Erickson,

18   versus Tiger Creek.

19           So the plaintiffs have failed in that essential

20   element of their case.

21           In addition, Your Honor, it's quite clear that the

22   Section 10 requirement for an agreement on the Phase C lot is a

23   material term.  I think that's now been clearly established.

24           It's also been established though, Your Honor, that

25   there has been no meeting of the minds on an agreement for the

1  Phase C lots.  And the agreement, in principle, that they are

2  trying to enforce now, is not one that is in writing that could

3  be enforced under the statute of fraud.

4         For all of those reasons, Your Honor, we think that

5  Count Two should be dismissed.

6         THE COURT:  Okay.

7         So your position would be they paid him for his

8  business.  And part of what they paid him for was to provide

9  lots, and he didn't provide them -- or assuming that he didn't

10 provide them, which I think everybody admits he didn't provide

11 them -- he gets to keep everything they paid him and yet they

12 don't get the lots.  And that's what everybody contemplated when

13 this transaction was done.  And that's the just result, that he

14 gets to keep everything they paid him.  And yet they were going

15 to -- they don't get the lots.  They just get the value of

16 having owned a company called Grayhawk Homes.

17        MR. SHEBELSKIE:  This is a consequence of their

18 failure of proof.  They decided at the last minute to abandon

19 their claim to seek the lots.  Had they pursued their original

20 course of action, and proven liability, they would have gotten

21 the lots.

22        Now having decided to throw in all their chips on

23 total breach they have to prove a total breach with these

24 damages, and allocate who did what -- who is liable for what

25 amounts.

1        And so I'm not saying, Your Honor, that there weren't

2   remedies they could have had that would have allowed them to get

3   their lots, had they proved liability.  But this is now -- they

4   did an about face on their election of remedies, assuming they

5   can do that.  Now they have to live and prove what a total

6   breach would require them to prove.

7        THE COURT:  Why would -- if it was a total breach by

8   all of the defendants to the contract then why would all of the

9   defendants not be jointly responsible for the entire contract,

10  which would be the lost profits on the lots they didn't get?

11        MR. SHEBELSKIE:  The Land Purchase Agreement --

12        THE COURT:  Didn't Mr. Erickson sign the contract

13  individually saying he would provide those lots?

14        MR. SHEBELSKIE:  His.  The ones he owns.

15        THE COURT:  He didn't say he would provide them from

16  this co-defendant subdivision and this one.  He said he would

17  provide the lots as set forth in the contract.

18        MR. SHEBELSKIE:  No, sir, Your Honor.

19        THE COURT:  He didn't promise to provide A lots,

20  B lots, and C lots as provided for in the contract?

21        MR. SHEBELSKIE:  The -- each signatory corporation --

22  he signed on behalf of the corporations.

23        THE COURT:  He signed individually.

24        MR. SHEBELSKIE:  And he signed individually because he

25  owned lots individually.

1        THE COURT:  I am not asking about why he signed.

2        Didn't he make an obligation in the contract to

3   provide the lots?

4        MR. SHEBELSKIE:  He made an obligation to provide the

5   lots -- he made a personal obligation to provide the lots he

6   personally owns.  It's like -- same situation --

7        THE COURT:  Is that what the contract says?  That his

8   liability is restricted to only providing the lots that he

9   personally owned?

10       MR. SHEBELSKIE:  I believe so, Your Honor.  And that

11  was how you read -- when you dismissed Mrs. Erickson, because

12  she signed it because she owned certain lots at the time, but

13  not the Phase C lots and so she had no obligation with respect

14  to them.

15       THE COURT:  Your argument is that each defendant is

16  only responsible for providing the lots that the plaintiffs show

17  they actually owned?

18       MR. SHEBELSKIE:  Correct.

19       THE COURT:  All right.

20       MR. SHEBELSKIE:  For those reasons we ask for a

21  judgment as a matter of law, Your Honor.

22       THE COURT:  Okay.  What's the plaintiffs' response to

23  this argument that the damages have to be allocated to the lots

24  that they owned?

25       MR. KRAMER:  Mr. Peterson has this one, Your Honor.

1    MR. PETERSON:  Your Honor, I want to start with the

2  LPA which defines sellers.  And it says:  Whereas the APA

3  requires that D. Erickson and R. Erickson, the selling entities,

4  and any other entity owned or controlled by Erickson for

5  purchasing and developing residential land, including, but not

6  limited to, Tiger Creek Development -- all of his companies --

7  and there is a definition that says, collectively seller.

8    Section 6, which is the heart of this claim, says:

9  Seller -- capital S -- Seller is required to develop the lots in

10  accordance with this agreement and to meet the requirement of

11  the Takedown Schedule defined below.

12    That has been our core claim in this case.  He is one

13  of those capital S sellers.

14    And further, Your Honor, you are absolutely right when

15  you said, Does the contract specifically say he is only required

16  for something?

17    The rule, the base rule, is that all of them are

18  jointly liable.  And this is a rule that's in -- I will give you

19  a couple of cases --

20    THE COURT:  Your position is that I misinterpreted the

21  contract when I ruled on the motion to dismiss Rose Anne

22  Erickson?

23    MR. PETERSON:  Your Honor, I think that --

24    THE COURT:  Let me ask you this --

25    MR. PETERSON:  I don't want to tell you you were

```
 1   wrong.

 2           THE COURT:  Is my ruling there -- would it be

 3   inconsistent with now holding them all jointly liable under the

 4   contract?

 5           MR. PETERSON:  No, Your Honor, because there are no

 6   Phase C -- she owns only Phase B lots.  So, no.

 7           Mr. Erickson does own 80 of them, I believe.

 8           But respectfully, Your Honor, I think that because the

 9   baseline rule was that everyone is jointly liable, and this

10   contract says, Here are the sellers.  He is one of the sellers.

11   In fact, we know that he controls all of these companies.  They

12   are his.  He was paid.  He pocketed the $50 million.  He

13   shouldn't be jointly liable for the breach of this contract.

14           THE COURT:  Do you agree that the lots that they were

15   responsible -- are all of the C lots, the thousand or whatever

16   there are, are those all specifically identified in the

17   contract?

18           MR. PETERSON:  Your Honor, there is a schedule to the

19   contract.

20           THE COURT:  I know.  But are all the lots -- was he

21   under any obligation to go out and buy additional lots to

22   supply, or they all are specifically in the contract?

23           MR. PETERSON:  He is not obligated --

24           THE COURT:  They are all specifically identified in

25   the contract?
```

1      MR. PETERSON:  Yes, Your Honor.

2      THE COURT:  But he doesn't own them all?

3      MR. PETERSON:  His companies own them all.

4      THE COURT:  I understand that.  But he personally

5  doesn't own them all?

6      MR. PETERSON:  That's what he says.

7      Actually, there is no evidence on that, I don't think,

8  in the record, yet, of whether he doesn't own them.

9      THE COURT:  Well, then why would he not only be

10  responsible for providing the ones that he owns?

11      MR. PETERSON:  Because he is -- it goes back to the

12  basic interpretation of the contract.

13      He is a capital S seller.

14      THE COURT:  But he can only do what he owns.  He can

15  only agree to provide what he controls or owns.

16      MR. PETERSON:  I think if it were a specific

17  performance situation, yes, because he would only have the 80

18  lots that he -- well, he hasn't developed them, but he would

19  have the 80 lots that he would have to --

20      THE COURT:  And he should only be liable for the

21  profit on the lots that he didn't provide.

22      MR. PETERSON:  Sorry, Your Honor.  I missed part of

23  that.

24      THE COURT:  If the specific performance remedy would

25  be ordering him to provide the lots that he owns, then it seems

1  to me that the damages remedy would be the damages caused by him

2  not providing the lots that he owns.

3          MR. PETERSON:  Your Honor, I think that if --

4          THE COURT:  Which would mean he would be responsible

5  for the profit -- future lost profits potentially on those lots

6  he didn't supply, and then the other defendants would be

7  responsible for the loss profits on the lots they didn't

8  provide.

9          MR. PETERSON:  I think that our -- I know our

10  interpretation is that he is responsible for providing all of

11  the lots in the Takedown Schedule, just like every other entity

12  is.  He can cause --

13          THE COURT:  Is there an obligation even if he didn't

14  own the lots?

15          MR. PETERSON:  He can cause all of these entities to

16  do it.  He controls all the entities.

17          THE COURT:  You put up evidence of that?

18          MR. PETERSON:  Yes.  He admitted it during direct

19  cross examination.

20          THE COURT:  You put up evidence that he could cause

21  all of these companies to supply the lots?

22          MR. PETERSON:  Yes.  He controls them all.

23          THE COURT:  Okay.

24          Well, I'm -- I am going to think about that issue a

25  little more.  But I am not granting or denying the motion with

1    regard to that particular issue.  I am going to take that under

2    advisement.

3           MR. PETERSON:  Your Honor, do you want the cites that

4    I was going to give you?  Just two cases.

5           THE COURT:  Are they the same two cases that you cited

6    to me in the motion to dismiss Rose Anne Erickson?

7           MR. PETERSON:  They might be.

8           THE COURT:  Give them to me again.

9           MR. PETERSON:  95FRD328.  That's a Southern --

10          THE COURT:  FRD is already assigned.  It's not overly

11   persuasive.  It's just a fellow district judge that wrote an

12   opinion.

13          But go ahead --

14          Give me something from the Eleventh Circuit Court of

15   Appeals.

16          MR. PETERSON:  I think Georgia law controls, but it's

17   11 -- or 111SE206.  That's a Georgia Court of Appeals case on

18   joint liability.

19          THE COURT:  That's ancient.  If it's 206 and not 2062d

20   that's an ancient case.  What's the date on that case?

21          MR. PETERSON:  Your Honor, it's 101 years old.

22          THE COURT:  You couldn't find anything more recent?  I

23   know if it's out there you would have found it.

24          MR. PETERSON:  Well, I got the restatement -- second

25   restatement of contracts.

 1          THE COURT:  That's even worse than an FRD opinion.

 2          Okay.  All right.

 3          I have granted the motion with regard to Count 6.

 4  That's no longer in the case.

 5          I have denied the motion with regard to count -- the

 6  other counts.  And I am taking under advisement the motion based

 7  upon the failure of the plaintiffs to present evidence to

 8  allocate the damages per defendant.  I hadn't ruled on that yay

 9  or nay.

10          So, we will continue tomorrow, I guess, just as if

11  this didn't happen.

12          And we will hear more evidence, I guess, on

13  disgorgement of profits which gets us back to Ms. Allen.  I got

14  to listen to her -- no offense -- without the jury present.

15          How long is that going to take?

16          MR. SHEBELSKIE:  I think 15, 20 minutes from us.

17          THE COURT:  Okay.  All right.

18          Well, we'll find the time during the day tomorrow to

19  do that.

20          How many more witnesses does the defendant have?

21          MR. QUACKENBOSS:  Your Honor, we have five more.  But

22  we have consolidated it a bit and expect that we can wrap

23  everything up by midday Monday at the latest.

24          THE COURT:  Yeah.  I think that would be at the

25  latest.

1    MR. QUACKENBOSS:  Yes.  One of them is Mr. Erickson,

2  of course, who we assume won't be a quickie.

3    THE COURT:  Right.  Okay.

4    Okay.  Well, we will see you -- do you have anything

5  you want to add, Mr. Kramer?

6    MR. KRAMER:  I just wanted to say, Your Honor, if you

7  would like to discuss ways to allocate damages we're available

8  to address that issue as well, as a practical matter, going past

9  the legal issues that were just presented.

10    THE COURT:  Well --

11    MR. KRAMER:  We do have per lot damages --

12    THE COURT:  I think that there is a non-frivolous

13  argument.  I haven't decided it for good, but I think there is a

14  non-frivolous argument that the lost future profit damages

15  should be based on the lots that that particular defendant owns.

16    MR. KRAMER:  That's right.  And we haven't suggested

17  frivolity here.  It's just, as a practical matter, if Your Honor

18  would like to go down that road further, I think we could find a

19  way to allocate the damages based on the evidence that's been

20  presented.

21    THE COURT:  It's not for me.  I am talking about for

22  the jury.

23    Y'all just have to decide how you are going to make

24  your presentation.

25    MR. KRAMER:  Got it.

1    THE COURT:  I mean, that's why he's paying you the big

2  bucks.  Figure out how you're going to present that to the jury.

3    I'm just saying that defendants' counsel makes a

4  fairly persuasive argument the more I think about it.

5    We will be adjourned until 9 AM.

6    Mr. Gunn and Madam Court Reporter we will be back here

7  at 8 o'clock for another case.

8    (Proceedings concluded at 6:57 PM on Thursday, September
   21, 2023.)

9    * * * * * * * *

10   I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
   Any redaction of personal data identifiers pursuant to the

11 Judicial Conference Policy on Privacy are noted within the
   transcript.

12 /s/ Lisa C. Snyder                    10/5/2023

13 Lisa C. Snyder, RPR, CRR              Date
   Official U.S Court Reporter

14                    **E X H I B I T S**

15 PLAINTIFFS' EXHIBITS              OFFERED    RECEIVED

16 PX38                               955        955

17 PX116                              953        953

18 PX162                              954        954

19 176, 124F, 179, 181-183, 187       745        745

20 PX203C                             950        950

21 PX764                              995        995

22 PX 769, 233, 207, 2057             869

23 PX769, 233, 207, 2057                         869

24 837                                835        835

25

1                   **I N D E X**

2    PLAINTIFFS' WITNESSES                      PAGE

3    CHUCK MCCLURE  (By video deposition)

4    DAVID DUFFUS

Direct Examination By Ms. Agnew         749
5    Cross-Examination By Mr. Shebelskie    792
Redirect Examination By Ms. Agnew      820
6    Recross-Examination By Mr. Shebelskie   829
Redirect Examination By Ms. Agnew      831
7    Cross-Examination Mr. Shebelskie     845
Redirect Examination By Ms. Agnew      863

8

9    STEVEN PEHRKON  (By video deposition)

10   GREG BENSON  (By video deposition)

11   DEFENDANTS' EXHIBITS        OFFERED   RECEIVED

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| PX123E | 970 | 970 |
| 139 | 909 | 909 |
| 188, 110 | 871 | 871 |
| DX224 | 973 | 973 |
| DX266 | 984 | 984 |
| DX317 | 748 | 748 |
| DX383 | 985 | 985 |
| 886 | 856 | 856 |
| 975 | 926 | 926 |
| 1046 | 866 | 866 |

22   DEFENDANTS' WITNESSES                 PAGE

23   GREG BENSON  (By video deposition)

24   AMY ALLEN

Direct Examination By Mr. Shebelskie   871
25   Cross-Examination By Mr. Peterson     929
Redirect Examination By Mr. Shebelskie 958

DEFENDANTS' WITNESSES                              PAGE

Recross-Examination By Mr. Peterson                959

KATHY LONG
Direct Examination By Mr. Quackenboss              961
Cross-Examination By Ms. Beck                      993

JASON BETTS  (By video deposition)

STEPHEN PEHRKON  (By video deposition)