**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

```
AMERICAN SOUTHERN HOMES      )
HOLDINGS, LLC AND            )
ASH-GRAYHAWK, LLC,           )
                             )
            Plaintiff,       ) Case No: 4:21cv95
                             )
        v.                   ) Columbus, Georgia
                             ) September 22, 2023
DAVID B. ERICKSON, ET AL,    )
                             )
            Defendants.      ) VOLUME V
_____ )
```

**TRANSCRIPT OF JURY TRIAL**
**BEFORE THE HONORABLE CLAY D. LAND**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1037 through 1302)**

*LISA C. SNYDER, RPR, CRR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, FL 32301**
**(850)567-1374 * lisasnydercr@gmail.com**

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For the Plaintiff:        Faegre Drinker Biddle & Reath, LLP
                          By:  JACOB A. KRAMER
                               JESSICA R. MAZIARZ
                               RACHEL ANNA BECK
                               Attorneys at Law
                               jake.kramer@faegredrinker.com
                               jessica.maziarz@faegredrinker.com
                               rachel.beck@faegredrinker.com
                          1500 K Street NW
                          Suite 1100
                          Washington, DC 20005

                          By:  DAVID R. MERRITT
                               JOSHUA TODD PETERSON
                               Attorneys at Law
                               david.merritt@faegredrinker.com
                               josh.peterson@faegredrinker.com
                          2200 Wells Fargo Center
                          Minneapolis, MN 55402

                          Buchanan Law Firm, PC
                          By:  JERRY A. BUCHANAN
                               Attorney at Law
                               jab@thebuchananlawfirm.com
                          P.O. Box 2848
                          The Corporate Center, Suite 614
                          233 12th Street
                          Columbus, GA 31902

For the Defendant:        Hunton Andrews Kurth, LLP
                          By:  ROBERT T. QUACKENBOSS
                               Attorney at Law
                               rquackenboss@huntonak.com
                          2200 Pennsylvania Avenue NW
                          Washington, DC 20037

                               MICHAEL R. SHEBELSKIE
                               KEVIN S. ELLIKER
                               Attorneys at Law
                               mshebelskie@huntonak.com
                               kelliker@huntonak.com
                          Riverfront Plaza, East Tower
                          951 E. Byrd Street
                          Richmond, VA 23219

**P R O C E E D I N G S**

1    (Call to Order of the Court at 9:04 AM on Friday, September

22, 2023.)

THE COURT:  Please be seated.

Good morning.

Okay.  I wanted to take up a couple of things before
we bring the jury down.

I am positive that you saw my text only order that was
entered last evening with regard to counts -- really should have
been 7, 8, 9.  10 was previously voluntarily dismissed.

In any event, everybody should be aware of those
counts having been taken out of the case as a matter of law.

Something was mentioned during the Rule 50 motion, and
since it was so late in the day, and we had all been here so
long, I may have flipantly responded, or maybe not responded at
all, but I want to clarify, if that's the proper word, something
relating to something I've been concerned about since we began
the trial, really.

One thing that I have observed during the last
21 years, or so, of doing this is that many times cases at trial
are somewhat different than they appeared pretrial.  That can be
for various reasons.

It could be that the lawyers' arguments are more
focused at trial.  If could be that the judge's understanding of
those arguments is better at trial.  Or it could be that the

1  context of the trial makes the Court appreciate the various

2  positions and the consequences of certain rulings.

3          And I want to make it clear, at least at this stage,

4  so that no one is misled in the further presentation of the

5  case, or that there are no expectations that have been created,

6  that before going to trial -- I think it was at the pretrial

7  conference, or it may have been -- it was around that time -- I

8  did indicate to counsel that I did not believe under the law

9  that plaintiff could obtain future damages for lost profits and

10  specific performance of future obligations.

11          I think that's absolutely clear that you could not get

12  specific performance of selling the future lots and lost profits

13  associated with those future sales.

14          Now, defendants have seized on that and think that

15  there is a possibility in this case, apparently, that if the

16  jury does not find that Mr. -- that the plaintiffs timely

17  terminated the contract to pursue future damages that he then

18  walks, that he can't be held responsible for specific

19  performance, that there is going to be this great legal victory

20  where he has no obligation with regard to future damages and no

21  obligation with regard to the providing of future lots.

22          My view on that is this at this point in time:  That

23  if the jury were to come back with a verdict that indicated that

24  the plaintiffs have not timely terminated the contract, that

25  there was undue delay between the time of the repudiation --

1    anticipatory repudiation and their election to proceed with

2    terminating the contract, and pursuing the lost profit damages,

3    if the jury concludes that they have waived that, and makes a

4    factual finding of waiver, I do not think that necessarily will

5    preclude the Court, as a matter of equity, from nevertheless

6    granting a remedy of specific performance.

7         Now, I am not deciding that for certain right now.  If

8    that occurs, and the jury makes that determination, we will have

9    post-trial briefing on whether the Court can nevertheless order

10   specific performance under those circumstances, and everybody

11   will have a chance to be heard.

12        But I just want to make it clear that I have not

13   finally determined that specific performance is off the table as

14   a matter of law.

15        So I don't want anybody to get some delusion that -- I

16   mean, that could happen, but I am not at that point.  And I

17   think, when I indicated pretrial that the plaintiffs couldn't

18   pursue both, what I intended to mean was that you can't get

19   specific performance of a future obligation plus damages

20   associated with that not happening.  That's what I intended.

21        But I didn't intend that if the jury finds a factual

22   finding that says that damages have been waived that that means,

23   as a matter of law, you cannot nevertheless have the Court, as a

24   matter of equity, enforce the specific performance.  So I want

25   to make that clear.

1    The other thing that I wanted to clarify, based on the

2  defendants' motion for judgment as a matter of law, is this

3  issue of damages for breach of the LPA and whether they can be

4  awarded jointly as one sum or per defendant.

5    I have gone back, last evening, and reviewed my order

6  with regard to dismissing the claim against Rose Anne Erickson,

7  and I am convinced that the Court was correct in its rationale

8  in that order.  And the plaintiffs should have been on notice,

9  or should be on notice, that the Court is not going to

10  reconsider that rationale.  So you should review that order in

11  determining how you are going to present your damages as far as

12  what the jury is going to have to find with regard to the

13  individual defendants.

14    Now, I guess the question will be, was there

15  sufficient evidence when the plaintiff rested for the jury to be

16  able to allocate those damages to each individual defendant, and

17  I am reserving judgment on that.

18    I am curious as to the plaintiffs' position as to do

19  you believe there was evidence from your expert, and whatever

20  was admitted during his testimony, that would allow the jury on

21  a lot-by-lot basis to determine lost profits.  And if not, what

22  is your theory of allocation of the lost profits?

23    Is it going to be to take a proportion -- do a

24  proportion based on the percentage of lots that a particular

25  defendant owns?  What's the theory?

1        MR. KRAMER:  That is essentially -- the answer is yes,
2   to both questions, Your Honor.
3        THE COURT:  Okay.
4        MR. KRAMER:  So Mr. Duffus did give a per lot lost
5   profit number when he testified.
6        THE COURT:  Okay.
7        MR. KRAMER:  And we do intend, to the extent this goes
8   to the jury, to suggest allocation by percentage among the
9   different defendants that own land under the LPA.
10       Also, Your Honor was on the bench, so I am sure you
11  haven't had a chance to see it, but we submitted a short bench
12  brief on joint liability and this very issue for consideration
13  this morning.
14       THE COURT:  Okay.
15       I will look at it.  But I went back and looked at my
16  order last night.  I believe one of the old cases that was cited
17  yesterday was one I think that was cited before, and I believe I
18  have distinguished it in that order on Rose Anne Erickson.  And
19  I am not likely to revisit it.
20       MR. KRAMER:  Understood, Your Honor.
21       THE COURT:  If you have got something else, I will
22  look at it.
23       What I anticipate happening is the jury verdict form
24  is going to break it down.  It is going to give the jury an
25  opportunity to assess future lost profit damages per defendant.

```
1          MR. KRAMER:  So it would be liability and then

2    damages --

3          THE COURT:  I think -- I think the liability is

4    different.  I think that there could be a breach by all

5    defendants based on Mr. Erickson's conduct alone.

6          But then the question, as to damages, is what profits

7    were lost based on the lots that each defendant -- that each

8    defendant owned.

9          MR. KRAMER:  Understood, Your Honor.

10         THE COURT:  So I think that's how the verdict form is

11   going to be.  It's going to break down the -- it's going to say

12   the defendants' breach, and then it's going to say if you found

13   that they did, you find that the plaintiffs should be awarded

14   lost profits, future profits, and if so put the amounts with

15   regard to each defendant.

16         MR. KRAMER:  Okay.  Understood.

17         We did find a few more cases for you to look at,

18   Your Honor.

19         THE COURT:  Okay.

20         MR. KRAMER:  So the last thing I wanted to say --

21   actually, two related issues related to the text order from last

22   night.

23         Number one, will the Court give the jury an

24   instruction to explain why they won't hear anymore evidence

25   about trademark?  I fear that's going to come out in the witness
```

```
 1   testimony.
 2            THE COURT:  I think I can do -- I am assuming there
 3   will be no more witnesses testifying on those issues.  That
 4   would be irrelevant going forward.
 5            MR. KRAMER:  I think Mr. Erickson is going to testify
 6   today, and based on what we heard in opening, that might allege
 7   to be some sort of frivolous claim against him.  And that would
 8   get in front -- the Court explaining to the jury why that's no
 9   longer here.  And we just ask for a neutral explanation so they
10   can understand that that's being explained by the Court.
11            THE COURT:  I can explain that.  I think it will be
12   easy to explain, particulary since they already know that I have
13   been taking evidence outside their presence and it was
14   ultimately going to be a Court issue, at least part of it
15   anyway.  I don't have a problem informing them that's no longer
16   for their consideration.
17            MR. KRAMER:  Good.
18            THE COURT:  I am assuming today we are not going to
19   have a lot of testimony on that since it's no longer in the
20   case.
21            MR. KRAMER:  That's my hope, Your Honor, and
22   understanding.
23            On a related front, we have learned that defendants
24   have only one live witness today as a result of the order, so I
25   guess that's the good news from our perspective.
```

```
1              THE COURT:  That was not the reason the order was

2    issued.

3              MR. KRAMER:  Of course.

4              THE COURT:  But it's certainly a collateral benefit.

5              MR. KRAMER:  It certainly is.  And it seems like maybe

6    we can get this case finished today.  I don't know what the

7    intentions are of defendants.

8              THE COURT:  Well, we will see how the evidence goes.

9              I just want to make sure everyone understands that I

10   am not pushing these things for my purposes, because I will be

11   here next week regardless.

12             My focus in a jury trial, other than trying to get the

13   law right and that everybody gets a fair chance to be heard, is

14   on these 12 people who have been forced to come here and spend

15   their time.  And I just -- out of respect for that, I try to

16   move cases along so that they are here only as long as they need

17   to be.

18             But, certainly, after we see what -- when the

19   defendant rests, we will have to have a -- we will have to have

20   an opportunity to review my proposed jury charges and then we

21   will have to have a charge conference.

22             And if we have time to do closing arguments, we will

23   do that today.

24             MR. KRAMER:  Do you know how long the Court will allow

25   for closing arguments?
```

1          THE COURT:  One hour each side.

2          MR. KRAMER:  Okay.

3          MR. QUACKENBOSS:  Your Honor, I think Mr. Kramer is

4     aware that we had planned to present four additional witnesses,

5     including Ms. Allen today, on the trademark claims.

6          Our expert was unavailable to get here today, given

7     that schedule, and so he will arrive and be prepared to testify

8     on Monday morning.

9          THE COURT:  Okay.  That's a problem.

10          I would have thought the lawyers would have gotten a

11     clear impression from the beginning of this trial that I move

12     cases along.  And that my goal was to finish this case, at least

13     the evidence, this week, regardless of what happened with the

14     trademark claims.  And it's just shocking to me that

15     arrangements were not made to have this witness available.

16          MR. QUACKENBOSS:  Your Honor --

17          THE COURT:  I am going to make a decision.  I mean,

18     the worst thing in the world that could happen is for us to

19     finish with the evidence by early afternoon and send this jury

20     home and tell them, You got to come back Monday.  They are going

21     to sit here, after I kept them until 6:15 last night and told

22     them they could be here at 6:30 tonight.

23          MR. QUACKENBOSS:  Your Honor, the plaintiffs had three

24     full days of evidence.

25          THE COURT:  That's not the point, Mr. Quackenboss.

1    The point is not that I am cutting you short on presenting your

2    evidence.  The point is that it appears that you will not have

3    all of your witnesses available today.

4         It's not a matter of them having three days.  If you

5    need the three days, that's fine, because of how long it takes

6    you to present your evidence.  But that's not the point.

7         The point is that there is a chance that we will get

8    to early afternoon, or whenever, and we will have three more

9    hours to present evidence and you don't have your person here.

10   It's not that you are being cut short on presentation of

11   evidence.

12        All that's fine with you.  You are still -- you are

13   paid to be here and paid to work.  These 12 people do not want

14   to come back on Monday, unless it's necessary.

15        MR. QUACKENBOSS:  Your Honor, it was not lack of

16   effort to coordinate -- do our best to coordinate --

17        THE COURT:  Did you know before the trial started --

18   when I indicated my goal was going to be try this case in a

19   week, did you know before the trial started that your expert

20   witness would not be here this week?

21        MR. QUACKENBOSS:  We did not.  But as the week

22   unfolded, and based on plaintiffs' projections and what appeared

23   to be more than half a day of trademark evidence, we made a

24   pretty good assumption that we were not going to be able to have

25   both Mr. Erickson's testimony today and our expert witness

```
1   today.
2           THE COURT:  Well, we will go ahead and proceed with
3   the trial, and I will make a determination after the defendant
4   rests as to whether or not we will stop and come back on Monday.
5   But it's kind of surprising to me that you wouldn't have him
6   here.
7           Okay.  What else?
8           MR. QUACKENBOSS:  That's all from us.
9           THE COURT:  Let me ask another question.
10          I just continue to be perplexed as to why this case
11  can't be resolved.  These thousands of C lots that are out
12  there.  Are they still in various -- there are not a thousand
13  lots out there that a builder can buy to put a home on?  They
14  are in various stages, some of which is just raw land?
15          MR. QUACKENBOSS:  Some of it is completely raw land.
16  Some of it is developed to a point of maintenance.  The lots we
17  heard about in testimony yesterday, 45 lots, if we could get the
18  lis pendens lifted, are ready to be delivered once the city
19  takes possession.  Those are ready to go.
20          THE COURT:  Those lots are currently owned by these
21  defendants as specified in the LPA?
22          MR. QUACKENBOSS:  That's correct.
23          THE COURT:  So the carrying costs on all of that is
24  being borne by these defendants?
25          MR. QUACKENBOSS:  That's correct.
```

1          THE COURT:  The property taxes, any costs is a

2    continuous burden on the owner?

3          MR. QUACKENBOSS:  Yes.

4          THE COURT:  So it would seem the owner has obviously

5    got a strong incentive to get the lots developed and sold.

6          MR. QUACKENBOSS:  As he has done --

7          THE COURT:  Well, I don't want to hear that.  That's

8    disputed.

9          MR. QUACKENBOSS:  Well --

10         THE COURT:  He certainly, right now, does.  No

11   developer wants to be in a situation where they are just holding

12   on to land and lots with a carrying cost.

13         I am assuming if there is financing on it he is paying

14   interest on the financing.

15         MR. QUACKENBOSS:  That's -- that's correct.

16         There is --

17         THE COURT:  So if this case goes to verdict, and then

18   there is an appeal that lasts a year-and-a-half or two years,

19   then he continues to have all of those carrying costs, or those

20   defendants have those carrying costs.

21         MR. QUACKENBOSS:  It's definitely leverage, Your

22   Honor.  The question is how much.

23         THE COURT:  The plaintiffs obviously want to -- I

24   mean, your folks still want to build on those lots, Mr. Kramer?

25   I know they don't want to have anything to do with Mr. Erickson,

1    but they still want lots?

2              MR. KRAMER:  Well, yes --

3              THE COURT:  Or have things slowed down where now maybe

4    they don't really want lots?

5              MR. KRAMER:  No.  The business wants lots, Your Honor.

6    The issue is dealing with Mr. Erickson.

7              THE COURT:  Okay.  The business wants lots because

8    they think they can convert them into profit.

9              MR. KRAMER:  Sure.

10             THE COURT:  So you got those two situations and you

11   got business people on both sides.  Nothing can be -- a

12   compromise cannot be worked out because there are now personal

13   feelings on both sides that have gotten into the situation, or

14   what?

15             It seems like to me if business people sit down and

16   look at it objectively, with their objective lawyers, each side

17   has got potential downside.

18             I don't think the defendant is going to end up with

19   this total win.  He may win, because he may -- the jury may not

20   be convinced there is a breach.  But I don't think he is going

21   to be -- I don't think he is going to end up in a position where

22   he pays nothing and there is no specific performance to complete

23   his contractual obligation.

24             So I don't know if that's been in the back of the

25   defendants' mind that they are going to get this total victory

1    where he is in a better position than he was before he started.

2              MR. QUACKENBOSS:  No.  To the contrary.  It has not

3    been -- the expectation is that -- the expectation is that one

4    way or another it is quite possible that we are still in the

5    contract.

6              THE COURT:  Okay.  So, what's the problem?

7              MR. KRAMER:  The problems are many, Your Honor.

8              First of all --

9              THE COURT:  It's not just money?

10             MR. KRAMER:  It's not for lack of trying.

11             THE COURT:  It's not just money either.  Is that true?

12   I mean, let's say you get a judgment for future lost profits --

13             MR. KRAMER:  Yes, sir.

14             THE COURT:  -- against each of these defendants in

15   proportion to their ownership of the lots.  And let's suppose

16   these defendants -- the only assets they have got to pay that

17   judgment is the lots or the land.  And so then they say, Okay,

18   file your lien action on the land and recover whatever you can

19   recover off the land, and there is nothing else -- I'm putting

20   Mr. Erickson aside for a moment -- but these other defendants,

21   there is nothing else.

22             And then if there is financing on those lots --

23   somebody had a loan on the lots -- they come in in priority to

24   you, likely, so they got to be paid off.

25             And then you end up -- if it's damages, you end up

```
 1   with whatever the net is that you can get from the -- after
 2   having to wait to sell the land and having to wait for an
 3   appeal, you get the net of whatever the value of the property
 4   is.
 5           It would just seem that to get it worked out, even if
 6   it were some agreement such as a consent judgment of specific
 7   performance -- I mean, I know you don't want to get back in the
 8   contract -- y'all don't trust each other -- but if it were a
 9   consent order that ordered some type of specific performance,
10   and then his failure to comply would not subject him only to the
11   breach of contract, but it would subject him to violation of the
12   Court's consent order.  Maybe we are past all that.
13           But, quite frankly -- once I make all of my decisions,
14   then I am going to forget about it, because it's going to go to
15   the Court of Appeals and y'all are going to sit around for --
16   it's great for the lawyers, assuming these people continue to
17   have enough money to pay all of these people.
18           But, you know, at that point, it's sitting there dead
19   in the water for however long the appeal takes.  And I am
20   positive there is going to be some kind of appeal by somebody.
21           MR. KRAMER:  Understand all of that, Your Honor, and
22   appreciate the Court's openness to a consent judgment.  That's
23   something we have been talking about for -- and I don't want to
24   get into settlement discussions -- but that's something we have
25   been trying to suggest for years with no traction.
```

1    This business about Mr. Erickson is finishing the lots

2    again is a litigation tactic.  I got a letter from Mr. Lomax two

3    weeks before trial saying, Can you please lift the lis pendens

4    so we can deliver lots, after two years of trying to get lots.

5    Mr. Erickson testifying that they have been three months away

6    from being finished the whole time.  He's a very difficult man

7    to deal with.

8        THE COURT:  I get it.  I understand your position.

9    And I am sure they have a different position on it.  But it just

10   seems that this is a case where both sides could end up losing

11   through the litigation process.

12       MR. KRAMER:  I tell you what, Your Honor --

13       THE COURT:  I mean, you know, I just would think

14   these -- I would think for sure these defendants do not like

15   being in the position of having all of these -- hold the lots

16   and have those costs with the uncertainty of how long they are

17   going to have to do that.  I mean, at some point the costs are

18   going to eat up the value of the lots, it would seem to me.

19       MR. QUACKENBOSS:  I mean, there is no question,

20   Your Honor.  I think what stands in the way of resolution --

21   well, right now, it's all about cash, given their election.  So

22   it's just a negotiation about a dollar figure at the moment.

23       THE COURT:  Okay.  All right.

24       We will go ahead and proceed with the trial.

25       I mean, I am certainly -- I typically don't get

1    involved in encouraging parties to settle much at all, quite

2    frankly, because I think once we get to this stage, you know,

3    everybody has decided they want to have the jury trial.  But

4    this just seems to me fairly obvious to me that reasonable

5    people ought to be able to resolve it.  And if it continues down

6    the road of -- to the very end, regardless of the result, there

7    is going to be losers all the way around, potentially.  But, we

8    will proceed with the trial.

9            Bring the jury down.

10       (Jury in at 9:34.)

11           THE COURT:  Okay.

12           Ladies and gentlemen, welcome back.  And it's Friday.

13   I know y'all are glad this day is here.

14           I wanted to inform you of a couple of things before

15   the defendants call their next witness.

16           As you know, during the trial, as I have indicated to

17   you that with regard to the trademark claims and the trade name

18   claims under the law, there were certain aspects of those claims

19   that the Court decides and that jury does not decide.

20           And sometimes with regard to those types of claims

21   there is some decisions that the jury has to make and then the

22   Court has to make a determination based on those decisions.

23           I have determined that I do not need your help with

24   regard to those claims.  I determined that I can make that

25   determination without your assistance.  So those claims are no

1    longer in the case.  Those would be Count 6, the breach of the

2    Trademark Assignment Agreement.  Count 7, the Lanham Act trade

3    name claim.  Count 8, the trademark infringement claim under

4    Georgia law.  And Count 9, the false advertising claim.

5            All of those claims are now not for you to consider.

6    You have heard evidence about them, but going forward those

7    claims are not in the case and you won't have to make a

8    determination with regard to those claims.

9            The claims that remain for your decision are the

10   plaintiffs' Count 1, which is the breach of the Consulting

11   Agreement that plaintiffs bring against David Erickson.

12           Count 2, which is the breach of the Land Purchase

13   Agreement that the plaintiffs have brought against all of these

14   defendants claiming that they did not provide the lots that they

15   were required to provide, among other things.  That claim still

16   remains.

17           And count -- well, Counterclaim 5, by the defendant

18   Erickson against ASH Holdings and ASH-Grayhawk for breach of the

19   Consulting Agreement, where he claims that they breached the

20   Consulting Agreement, that claim is still in the case.

21           And defendants have a claim, GH Lot Holdings and

22   David Erickson against ASH-Grayhawk, for what is known as

23   quantum meruit, which I will explain at the end of the trial,

24   where they are seeking recovery for services that they provided

25   to the plaintiffs.

```
 1              So those two counterclaims and those two claims are
 2    what remain in the case for you to ultimately decide.
 3              All right.
 4              Call your next witness for the defendant.
 5              MR. ELLIKER:  Your Honor, we have our last video.
 6    It's four-and-a-half minutes.  It's testimony from Sean Coleman.
 7              THE COURT:  All right.  We will play that video.
 8              Sean Coleman?
 9              MR. ELLIKER:  Yes, Your Honor.
10       (The videotaped deposition of Sean Coleman was published to
11    the jury at 9:39 AM)
12              MR. ELLIKER:  Your Honor, that concludes the video.
13              Defendants move for admission of Defense Exhibit 236.
14              THE COURT:  236.  Any objection?
15              MR. KRAMER:  No objection.
16              THE COURT:  D236 is admitted.
17              Call your next witness.
18       (DEFENDANTS EXHIBIT 236:  Received in evidence.)
19              MR. QUACKENBOSS:  Judge, we will call David Erickson.
20              THE COURT:  Come back to the witness stand, and you
21    may have a seat.  I will remind you, you are still under oath
22    from the other day when you testified.
23              THE WITNESS:  Yes, Your Honor.
24              THE COURT:  Go ahead and state your name again so it
25    will show up on the record.
```

Direct Examination - David Erickson

```
 1                        DAVID ERICKSON,

 2   having been previously duly sworn by the Court, was further

 3   examined and testified as follows:

 4           THE WITNESS:  My name is David Erickson.

 5           David B. Erickson.  E-r-i-c-k-s-o-n.

 6           I commonly go by Dave.

 7           THE COURT:  Mr. Quackenboss?

 8                      DIRECT EXAMINATION

 9   BY MR. QUACKENBOSS:

10   Q.   Dave, good morning.  Let me get this microphone operating.

11           Dave, before we get started, how do you feel about being

12   able to finally tell your story to the jury?

13   A.   Somewhat liberating.  I have been waiting over two years to

14   say my side of the story.

15   Q.   Okay.

16           Well, let's give you a proper introduction to the jury.

17           You're a homebuilder, right, and you live in Columbus.

18   Tell the jury a little about your background.

19   A.   I am 65 years old.  I have lived in Columbus continuously

20   since 1981.

21           I am married to my wife, Rose Anne Erickson, who is in the

22   audience in the dark sweater, I think it is.  She is a realtor

23   and broker here in Columbus as well.  She wasn't born here, but

24   she's lived here pretty much continuously about 2, 3 years old.

25           So that's the opening gambit for ya.
```

Direct Examination - David Erickson

1    Q.    How about a little about your schooling?

2    A.    Okay.

3          My father was a research biologist, and so I lived in many

4    Northern states from Alaska to Wisconsin all the way over to the

5    Seattle area.  I went to high school in Seattle.

6          College, I graduated from the University of Washington with

7    a degree in wildlife.

8          Paid my way through college myself.  Worked as a busboy,

9    waiter.  Started working when I was 9 years old.

10         Was a professional photographer while I was in college.

11         And later on I did some freelance writing.

12         After I left college, I went into the Army for 12 years as

13   an officer and then some reserve time, and evolved into being a

14   homebuilder from there.

15   Q.    Is that what brought you to Columbus?

16   A.    Yeah.

17         I came to Columbus here, Fort Benning, with the Army

18   Marksmanship Unit and spent my entire career here at

19   Fort Benning.

20   Q.    You entered the homebuilding business in 1993?

21   A.    Yes.

22         When I left the Army in 1993, I went into the homebuilding

23   business.  That's correct.

24   Q.    Okay.

25         Before we go further in your professional history, tell the

Direct Examination - David Erickson

1   jury a little bit what you like to do when you are not working

2   in your free time.

3   A.    I like working.  I work a lot.  But I enjoy what I do and I

4   accomplish a lot for both myself and other people, I hope, in

5   the process.

6       Spend time with my wife.  I enjoy fishing.  I travel quite

7   a bit.  I follow NASCAR and Formula-1 racing.  And we all follow

8   various football teams from time to time, and I have a variety

9   of different teams I follow.  Mostly I follow interesting

10  characters and personalities more than individual teams.

11      Community-wise, I am involved in a number of things.  I am

12  a national representative for the National Association for

13  Homebuilders Organization.  I am a board member for the local

14  homebuilders, past president.

15      I am an adviser for the Jordan High School carpentry

16  program.

17      Worked with Columbus Tech on their carpentry department as

18  well.

19      And then we do a lot of support work for hospice.

20      The infantry museum and their Gold Star Family program.

21      And we did 12 years of support for St. Jude's Children's

22  Hospital.  Raised about $6 million.

23  Q.    Just say more about that, the St. Jude program, because

24  that involves building homes, right?

25  A.    Yeah.  My team and I had at Grayhawk built a dream home.

Direct Examination - David Erickson

1   St. Jude.  It's a raffle program that St. Jude does the legwork

2   of getting raffles out there, but we built the house.

3   Decorated.  Every one of them was very unique.  Takes a lot of

4   extra work to do it.  It's quite rewarding.

5   Q.   Okay.

6        And so you are the founder of Grayhawk Homes; correct?

7   A.   Yes.  I am the president and sole shareholder.

8   Q.   At the time you founded it.  You are no longer, correct?

9   A.   Yeah.

10       We sold the company in 2019.  I actually, got into the

11  homebuilding business while I was still in the Army doing fix-up

12  houses.  Most people talk about flipping.  That's where you

13  acquire and then you sell it.  I acquired, fixed them up and

14  held them on to them.  Gave them to a professional property

15  manager, and then they held on to them while I went off and did

16  my Army thing in between.  My schedule was quite variable in the

17  Army.

18       Then I went into homebuilding starting initially in '92.  I

19  was financing a small builder to work on building the houses and

20  I provided the organizational process to it, in terms of lots

21  and plans, and Rose Anne's input on where to build and what to

22  build, and the financing to do it.

23       And then I went and ran my own show beginning in '93 when I

24  decided I wanted to go in a different career direction.

25  Q.   And so where did you take your business from there?  Where

Direct Examination - David Erickson

1  did it go after 1993?

2  A.   Well, in '93 -- I had left the Army at the end of '92, and

3  basically went into home construction and residential

4  development.

5       And from standing start my first year I did 19 houses,

6  built and closed.  Entry-level houses off the end of Steam Mill

7  Road, which is East Columbus, if you are not from Columbus

8  proper.  And we were building 1132 square feet, three bedrooms,

9  two bath, no garage.  Entry-level, entry-level.  And extremely

10 well received.

11 Q.   And what was the next stage of your business growth?

12 A.   Well, we came out of the gate and we were doing real well.

13 I got support to do a development project in Roosevelt Heights,

14 which is off of Buena Vista Road out near where TV38 is.  That

15 was a development for larger lots.  Slightly different product

16 than what we were already doing.  I was diversifying a little

17 bit.

18      Second year we did 25 houses.

19      The third year we did 55 houses, with me and a smart

20 helper.  We were busy.  And it just kept going.

21      We were soon the number one builder in Columbus for many

22 years.

23 Q.   You mentioned Roosevelt Heights.  Was that a popular place

24 to build homes for homebuilders in 1994?

25 A.   It was a neglected corner of the market.  Most builders

Direct Examination - David Erickson

1    were working in smaller volume and they were picking the best 15

2    or 20 houses they could do that were going to make the most

3    money.  And I said, We're not serving the entry-level market.

4    We need to work on that.

5        That's where I had focused my energy, and we kept that

6    component continuously.

7        Effectively, I started at entry level of the market and we

8    kept going up market, but we expanded continuously.  We kept the

9    entry-level market the whole time.

10        We'll talk about that in a minute.

11   Q.   At some point you began developing land in addition to

12   building homes, correct?  When did that happen?

13   A.   Yeah.  The first project we developed was Roosevelt Heights

14   in '94.

15        Right behind that we came in '95 with Oak Crest, which is

16   also in the same area.  And we were very busy in that

17   Buena Vista, Steam Mill corridor for several years.

18        Then we broke out.  We did a project at Midland Chase,

19   which is up off of Warm Springs Road near Flat Rock Park, if you

20   know Columbus.  And started sequentially doing residential

21   development with homebuilding.  And that became a symbiotic

22   relationship that became our business model over time.  Wasn't

23   the plan, it was just how it evolved.

24   Q.   And so in the years leading up to your sale to ASH in 2019,

25   you were performing three functions with your companies,

Direct Examination - David Erickson

1  correct:  Purchasing land, developing land, building homes,

2  correct?

3  A.    Yes.

4  Q.    Very briefly run through -- we have had some testimony

5  about this -- what are the high points of developing land?  What

6  does that involve?

7  A.    Every market of the city has niches for homebuilding.  Some

8  of them are bigger niches than others.  Some are more profitable

9  than others.  But they all have a merit, as I just spoke a few

10  minutes ago.

11       With land you are looking at the piece of property, which

12  is physical characteristics:  Is it steep?  Is it flat?  Does it

13  have water support?  Does it have reasonable access?  Do you

14  have the right zoning to do it?  Is it properly priced for where

15  you can then take it into a final product, which is going to be

16  the finished lots?  Do you have a reasonable prospect that you

17  can do it in a financially intelligent way?  In the end the

18  banks are going to say whether you can do it or not.  If you

19  don't have bank support, you don't go anywhere.  It's that

20  simple.

21       Continue.

22  Q.    Then the developing is performed by contractors or --

23  A.    The next step in the process, once you have acquired --

24  decided this piece of property is worth doing -- then you take

25  ownership of it or do it as part of a contract.

Direct Examination - David Erickson

1    Then you get approval from the city for what's called a
2    preliminary plat, saying, We have this 20 acres.  We are going
3    to put 60 lots on it in this general arrangement, in terms of
4    road entrances, size of lots, things like that.
5        The city authorizes that, which is called a preliminary
6    plat, and then you would give it to your civil engineer.  They
7    would develop it into a full set of plans.  Quite extensive
8    effort.
9        And from there you get a general contractor to help you
10   grade the land, clear the land, like Amy talked about briefly.
11   And then you turn it into finished lots.
12       The last step of that is you give it to the city for free.
13   Here you go, City.  And then you have permission to use those
14   lots and develop product that people would end up living in.
15       And then the taxes off that support the maintenance of
16   those roads and the city services that go with that.
17   Q.   So prior to your 2019 sale of the company to ASH, do you
18   know, approximately, how many homes you built for the Columbus
19   community through Grayhawk?
20   A.   Yeah.  Regionally in Columbus it's about 4000 houses that
21   we built over time.  And about 6,000 lots completed.  There were
22   often partners involved where we build some lots.  We wouldn't
23   take all the lots.  We'd either sell them to a partner or we did
24   a few arm's length sales as well.
25       And then globally -- I got my fingerprints -- myself and my

Direct Examination - David Erickson

1   team.  This is a team event.  It doesn't happen with one person.

2        I've probably built 5500 houses across the United States

3   now.

4   Q.   In your view, did you make Grayhawk a success in Columbus?

5   A.   Yeah.

6   Q.   How so?  Why was it a success in your mind?

7        Well, you were able to build beautiful homes, correct, for

8   the community?

9   A.   Yeah, we were.

10       We were organized.  We were efficient.  We brought quality

11  housing, down market, where everybody got a chance at a good

12  quality house.  I'm really proud of that.

13  Q.   Okay.

14       Let's swing back to that, because Grayhawk was recognized

15  for its successes, right?  Builder Magazine list 86th in the

16  country, right?

17  A.   Yeah.

18       In fact, I looked it up last night.  We were actually 82nd

19  in the country in 2011, our buyer volume compared to others in

20  the country, which is a pretty good accomplishment for a small

21  market compared to California, Texas, Florida.  All of those

22  places.

23       We got a lot of Energy Star awards.  We really focused on

24  energy efficiency beginning in -- well, we got recognized

25  beginning around 2009, but we had been doing it for quite a few

Direct Examination – David Erickson

1    years.  We just decided to actually get some recognition for it.

2         We won a national Energy Star award from the EPA.

3         A lot of quality delivery standard awards in the industry.

4    Pretty well-regarded company.

5    Q.    What was the range of your profits at Grayhawk?

6    A.    Industry average tends to run around 7 percent of sales

7    price.  You can look at numbers here and there.  We were

8    consistently in the 12 to 15 percent range.  It varied depending

9    on the economic headwinds.  But the lowest I remember doing was

10   12 percent.  12 to 13 was pretty common.

11        I validate that because part of my participation with the

12   National Association of Homebuilders was through the Builder 20

13   program, which is a peer group where you pull together 20

14   builders that share business practices around the country.  They

15   are not competing with each other.  Very arm's length

16   conversations.  You are comparing financials and business

17   practices.  How you get better.  How you help customers.  How

18   you design houses.  Everything that goes into the business.

19        Through that program, we -- our group would be part of a

20   database of about 400 builders across the country.  Generally

21   the better builders.  And so you had real good optics on what

22   the industry was doing, how you compared, and benchmarking

23   yourself to your performance down the road.

24   Q.    At some point you expanded to other markets.  We have heard

25   about this, right?  You acquired a homebuilding company in Iowa,

Direct Examination - David Erickson

1    right?

2    A.    Yeah.

3        Beginning in -- started in 2010, an offshoot of the Builder

4    20 program, I had an opportunity to buy some lots in Des Moines,

5    Iowa.  Started off with just a small footprint operation leading

6    up to the possibility it could develop into a partnership.

7        Turned out the Board of Directors and those folks really

8    weren't interested in doing a partnership, but they liked to

9    seed me some lots, so we stayed for a little while.  And then

10   were offered the opportunity to buy the remnants of Rottlund

11   Homes, R-o-t-t-l-u-n-d, out of Minneapolis-St. Paul.

12       And I was -- there is a great story behind it, but we don't

13   have enough time for that.  I was offered the opportunity.  We

14   negotiated on a quick, quick basis.  I had six weeks to pull it

15   all together, do due diligence, say yes or no, and close.  All

16   cash.  Do it now.  Done.  And we took that opportunity and it

17   was really great.

18       We ran until 2019 quite efficiently doing 80 to a hundred

19   houses there every year.

20   Q.   And you also, we have heard, opened up operations in

21   Atlanta, South Carolina, correct?

22   A.    Yeah.  We began in Atlanta in 2015 and South Carolina in

23   2016.  Each of those ran for a few years.  The market conditions

24   changed shortly after we got going and I didn't have the right

25   people and the right circumstances, so I knew after about two

Direct Examination - David Erickson

1  years, you know, it was a loser.  We weren't going to make any

2  money there.  We were looking for an exit path.

3  Q.    But Iowa was quite successful, right?

4  A.    Iowa, we did great.

5  Q.    Okay.

6      And then did there come a time when you were approached by

7  American Southern Homes about the prospect of purchasing

8  Grayhawk?

9  A.    Yeah.  Tony Avala called.  I had some relationship with

10  Tony going back probably 2012.  He inquired whether we were for

11  sale.  I said, Yeah, we would consider it.  I had been kicking

12  it around quite a bit in that time period.

13      We talked briefly just to refamiliarize himself on what we

14  were doing.  Kind of bring him up-to-date.  And he said, Okay,

15  somebody will probably get back to you shortly.  And I got a

16  phone call a couple hours later that started the process.

17  Q.    And, again, clarify for the jury, Tony Avala is a -- what

18  does he do specifically?

19  A.    Tony Avala is a well-known mergers and acquisition broker

20  called M and A, specializing in the homebuilding industry.  He

21  is also somewhat related to the land development industry, but

22  primariliy homebuilding business.

23      And I had had some connection with him off and on since

24  2012.  So we were familiar with each other.

25  Q.    Did he have some additional relationship with ASH that you

Direct Examination - David Erickson

1    came to learn?

2    A.    Yes.

3        He and ASH basically had a working relationship as he being

4    the lead broker for acquisitions.  He was still representing

5    builders to other people as well, but ASH kind of had the inside

6    route for at least a few of them for conversation.  Let's say,

7    for lack of a better term, they get a two-week head start.  But

8    Tony represented a lot of different things.

9        And he was also effectively advising ASH on how to execute

10    their business model.

11    Q.    How did the first conversation with Mr. Avala go about

12    Grayhawk and ASH?

13    A.    It was pretty short.  Probably wasn't more than five

14    minutes.  Again, he knew -- I just refreshed him where we were.

15    We had some footprint up in Auburn.  How many houses we were

16    doing at the time, which was probably pushing 250.  Total dollar

17    volume was 60 million or so.  Rough profit numbers.  How many

18    lots in the future.  Those are the basic ingredients that

19    anybody would want to have.  He said, Thank you very much.  They

20    will be back to you.

21        Undoubtedly he was making a phone call, said, I got this

22    prospect for you.  I think you should call him.  They have to

23    make the decision whether to follow up or not.

24    Q.    Prior to Tony Avala's phone call to you, were you familiar

25    at all with American Southern Homes?

Direct Examination - David Erickson

1    A.    No, I was not.

2    Q.    And then what happened next?  Did you have a next

3    conversation with someone about --

4    A.    Yeah.

5          As I recall, Tony called around -- it was after lunch, 1 or

6    2 in the afternoon, Columbus time.  He was in California.  And I

7    got a phone call from Marshall Coleman, who would turn out to be

8    the chairman of American Southern Homes, and it was around 5

9    o'clock in the afternoon.  And it was probably a good 20,

10   30-minute conversation talking about who he was, which was a

11   two-time Attorney General for the State of Virginia.  And he had

12   ran for governor there as well.  And what his business concept

13   was.  He wanted to roll up homebuilders into a group and package

14   them in the right process to take them into an IPO or a SPAC,

15   which are related.  You talked previously about taking the

16   public company.  I was familiar with that.

17         And he was quite proud that he had a great investor base

18   and board of directors.  There was a legitimate billionaire as

19   his lead investor and board member.  Also a seasoned attorney --

20   the same person.

21         He had a former governor for Missouri on his board whose

22   father is a sitting senator in Washington currently.

23         He had a bunch of Wall Street people that had some pretty

24   serious pedigrees.  So if you know a little bit about finance,

25   it doesn't take much to figure out these guys got some chops.

Direct Examination – David Erickson

1    Q.   Were you comfortable with the plan he had shared with you

2    regarding possible sale of the company?

3    A.   Yeah.

4        He was transparent.  They were looking to acquire builders.

5    He was welcoming the opportunity to talk about Grayhawk.  And

6    they were going to do a number of builders over time until they

7    got proper scale to do an IPO.  And I was comfortable with that

8    idea.  I knew that was part of the plan, so wasn't opposed to

9    that.

10   Q.   As the conversations developed, what was it exactly among

11   your operations that ASH was interested in buying?

12   A.   Well, it was quickly discussed about Atlanta and

13   South Carolina.  I told him I was in the process of winding

14   those down, and that was probably the end of the conversation.

15   They just set those aside and forgot -- they were interested in

16   Columbus and Auburn, and they were interested in sooner than

17   later.  And we would have to work that out, but it was possible.

18       And a short while later we got a visit from Steve Pehrkon

19   and Greg Benson doing a drive around.  They go to the

20   neighborhoods, look at the houses we were building, the

21   subdivisions we were in, future land positions, understanding

22   our business plan, our business model.

23       After-hours we went into the office for a short bit just to

24   see the facility and get an understanding of what our physical

25   structure was like in the office.

Direct Examination - David Erickson

1    And then it continued to proceed from there to a Letter of

2    Intent eventually.

3    Q.    Did they express an interest in buying all of your

4    property?  All of your lots?

5    A.    Yes.

6         That was the attractive component to this.  I had had some

7    inquiries in recent time about buying pieces of Grayhawk, but

8    that business -- selling Grayhawk in pieces wasn't a very

9    attractive package to me for a variety of reasons.  And ASH was

10   saying, We want the whole thing, including all of these lots.

11   And so we were prepared to do that.

12        The challenge of that was it was financially a pretty big

13   hurdle, especially for a small start-up company, and so they had

14   to break it into pieces of buying the main company and we'll

15   take some lot delivery in the future.  And that was the essence

16   of how the deal evolved from there.

17   Q.    And so when did you begin negotiations?  Do you recall?

18   A.    Those phone calls started March of 2019.  I think a Letter

19   of Intent finally got done either late May or early June.

20        And at that point there's piles and piles of due diligence

21   information.  Amy touched on that yesterday.  Very, very tedious

22   due diligence process.

23        And eventually I said, Hey, we got to start focusing on

24   this contract -- which is called an Asset Purchase Agreement.

25   And they finally woke up and said, We got to work on that.  And

Direct Examination - David Erickson

1    that's when you get really into the negotiations.

2        The Letter of Intent is a format.  The Asset Purchase

3    Agreement is the contract.

4        You know, one bleeds into the other, but the contract is

5    what really matters.

6        So that was an ongoing process there from, let's say, June

7    all the way to October.  We closed November 15, but it's a

8    pretty tedious process to do the contract over that period.

9    Q.   You were primarily negotiating with Mr. Benson, is that

10   correct?

11   A.   Almost exclusively with Mr. Benson.  He was the face of ASH

12   in terms of representation, terms of the agreement, things like

13   that.

14   Q.   Okay.

15       And he was not local, correct?  He lives in --

16   A.   He's out of Virginia.

17       Most of this was done by phone calls, email exchanges.  And

18   there were some copies of documents going back and forth between

19   myself, and I had an attorney, Jim Sack, and Mr. Benson and his

20   attorney, Jake Kramer, who is represented here.

21   Q.   Okay.

22       One of the agreements you have entered, which we have heard

23   about, is the Land Purchase Agreement, correct?

24   A.   Yes.

25   Q.   How many lots were you contemplating selling to ASH under

Direct Examination - David Erickson

1    the Land Purchase Agreement?

2    A.   Well, the plan was they were going to buy all of our lots

3    and future lots.

4         And I think when you added it all up, it was about 1600 at

5    the time of the transaction, some of which had houses in

6    progress and things like that.  But they were broken up into A

7    lots, B lots, and C lots, under the heading of the Land Purchase

8    Agreement.  You've heard a fair bit about that.

9    Q.   And just real briefly, the difference between A, B and C

10   lots were what?

11   A.   Well, as Mr. Kramer pointed out yesterday, the wording in

12   there is a little different than I have in my memory, but

13   broadly, A lots are finished lots, known cost, under ownership

14   by Grayhawk Homes.

15        B lots are finished lots, known costs or a definable price,

16   under the development companies.

17        And then C lots are raw land, anticipated lots, with a

18   formula for what the price is going to become when they get

19   finished.

20   Q.   Now, there was a provision in the LPA requiring the parties

21   to agree on an order of C lot development; correct?

22   A.   Correct.  That's Section 10 of the LPA.

23   Q.   Tell the jury a bit about how that provision came to be in

24   the Land Purchase Agreement.

25   A.   Well, in the process of the negotiation the Land Purchase

Direct Examination - David Erickson

1  Agreement got pushed quite to the rear.  I don't know the exact

2  date, but probably late September or early October before it got

3  done, or got worked on seriously.  And, you know, proper

4  contract you say, Okay, how are these going to get delivered?  I

5  was pushing for some clarity to put it together.  And Mr. Benson

6  and I conversed on it several times.  I'd get brief

7  conversations.  He would get some information and then he would

8  say, Okay, and then he would kind of set it aside.  I was having

9  a very hard time engaging to get that done.

10       Finally he said, Well, how about we just agree on this in

11  the first year?  And everything else was seeming to come

12  together pretty well, so I accepted that position.

13            MR. QUACKENBOSS:  Let's take a look, please, at PX

14  246E, which has been admitted earlier.  And let's scroll down to

15  refresh the jury about Section 10 here, please.  If you can blow

16  up paragraph 10, please.

17  BY MR. QUACKENBOSS:

18  Q.  It says:  Seller is required to develop the lots, according

19  with this agreement, and to satisfy the requirements of the

20  Takedown Schedule.  However, as to the Phase C lots, during the

21  first full year after the closing under the APA the parties

22  shall agree to the order in which specific Phase C lots will be

23  developed.

24       Correct?

25  A.  That's what it reads.  That's correct.

Direct Examination - David Erickson

1  Q.   Why was it important to you to have an order in which you

2  would develop your thousand C lot properties?

3  A.   Yeah.  Roughly speaking, the C lots are 950 to a thousand.

4  We will just call it a thousand for easy discussion.

5       For a developer you got to have a plan.  There is too much

6  going on.  Too big to handle.  Certainly wouldn't do it all at

7  once.  You got to get banks involved.  You want to feed it in.

8  And working on the best interest of ASH, you need to feed it

9  into an orderly manner that works well for the business model.

10      But in the end you got to have a plan.

11      And I was also interested in trying to make sure we try to

12  integrate the better locations with the second tier locations so

13  they fit together orderly and move the whole package along.

14 Q.   And tell the jury just a little bit more about the

15 financial impact of not having that plan on the developer,

16 please.

17 A.   Well, for sure.  You know, the Takedown Schedule varies a

18 little bit, but it requires taking down, you know, in the early

19 days, 15 lots per quarter for the C lots.  We will probably talk

20 about that a little later.

21      You would never want to develop 150 lots of C lots and then

22 have them only absorb 15 at a time.  It's going to take you

23 two-and-a-half years to absorb those lots.  It's foolish.  It's

24 like in food, like preparing two month's worth of food and then

25 eating one day's worth at a time.  It's not going to work when

Direct Examination - David Erickson

1  it's done.

2      In this case the problem is carry costs.  The carry costs

3  of the banks to get it done for a long period of time will kill

4  you.  You have to feed it in, in manageable bites, so it works

5  well for the developer and for your customer, in this case

6  that's ASH.  You got to fit them together properly.

7  Q.   Am I correct then that as soon after development is

8  finished that a homebuilder can begin building the home the

9  better off?

10  A.   For sure.  It's in the developer's best interest to finish

11  the lots on the 31st of -- on the 25th of March, and on the 30th

12  of March they buy them and off they go building houses.  Best

13  for everybody.  They get minimum carry costs.  We get minimum

14  carry costs.  We are all better off.

15  Q.   If they sit there untaken for a period, your carry costs,

16  interest, taxes, maintenance, all continue to accrue, correct?

17  A.   Exactly.  The burden of carrying a product once it's

18  completed is a huge issue.

19  Q.   Under the Land Purchase Agreement, how did that impact the

20  purchase price that ASH would pay for a C lot?

21  A.   Well, the C lot was totally formula-driven.  It started

22  with the -- what's called the basis.  This is how much money is

23  in this piece of property.  And then from then on it was how

24  much did the engineers cost, how much does the developer cost,

25  the cost of utilities, all the things that go into that went

1    into a formula, and that's the price.  There was no profit for

2    me in a delivery of a C lot.

3        The only extra money in there was a $3,000 fixed price per

4    lot, which was intended to cover the carry costs of running an

5    office, my assistant, Chuck McClure.  I needed accounting

6    support and things like that to make that happen.  I made a

7    rough estimate that $3,000 a lot will get us in the right

8    ballpark.

9        The key factor is -- the way we were doing this with the C

10   lots it has nothing to do about profits.  There is no profit

11   component driven in there.

12           MR. QUACKENBOSS:  May we see the next page of the LPA

13   paragraph 13?  Highlight 13A and B, please.

14   BY MR. QUACKENBOSS:

15   Q.   Is this the pricing formula under the Land Purchase

16   Agreement?

17   A.   I don't think -- this is basically the maximum pricing

18   point that ASH is required to purchase, this 20-percent number.

19   Q.   This is the ROFO provision?

20   A.   It is.  It's not the pricing formula paragraphs.  But one

21   of the safety valves that they asked for was that ASH didn't

22   have to pay for a lot that was going to end up being 40 percent

23   of the sales price, which guaranteed that they would never be

24   able to make any money.  There was an upper limit, which is also

25   why it was important for us to have a C lot schedule, so that we

1    were developing something that was logical to fit into it.  And

2    there is some other paperwork where ASH and the developer agree

3    ahead of time, This has a high probability of working correctly.

4    Let's go get it done.

5    Q.   Am I correct in understanding, under 13A, that ASH had

6    something of an escape clause here from buying a C lot if there

7    is a -- if the price exceeds 20 percent of the estimated market

8    value.  Is that correct?

9    A.   Yes.

10        Historically, most of the lots we delivered over time were

11   delivered somewhere between 16 and 18 percent.  Let's just call

12   it 17 percent.  There are times when that gets challenged and

13   you get up in the 20 percent range.  House prices come down,

14   that percentage goes up, because your lot price doesn't change.

15        So ASH wanted a safety valve that they didn't have to pay

16   for an over-priced lot relative to the sale price.  That's not

17   an unreasonable request as long as it's properly balanced.

18   Q.   Okay.

19        MR. QUACKENBOSS:  Let's turn back to paragraph 10,

20   please, Section 10.

21   BY MR. QUACKENBOSS:

22   Q.   Now, this provision requiring the Phase C lot order.  Let's

23   look at the language a little more closely.

24        It says that the:  Parties shall agree to the order in

25   which specific Phase C lots will be developed.

Direct Examination - David Erickson

1    Did you and Mr. Benson discuss exactly how the parties were
2    to go about agreeing to this order?
3    A.   Well, it's to be done in the first year.  And we had
4    talked, in principle, that we were going to integrate some
5    better lots and some second tier lots together.  And beyond
6    that, a lot of loose ends that we were intending to work on
7    under that banner in terms of how many lots, how many locations,
8    you know, other provisions along the way.  It didn't get put
9    into that wording, but we had had those conversations and kind
10   of put it under that banner.
11   Q.   Did you discuss with Mr. Benson what would happen if the
12   parties did not agree to an order in the first year?
13   A.   It defaulted to the language of the LPA.
14   Q.   And did you tell Mr. Benson that you didn't feel you should
15   have to develop C lots until you had the order?
16   A.   Oh, yeah.  That was clear.  I mean, you need a plan in
17   order to execute.
18   Q.   What was his response to that?
19   A.   He acknowledged that we needed to have that plan and we
20   weren't obligated to push C lots forward unless we had a program
21   what to do.
22   Q.   So you were already developing C lots at the time, correct?
23   A.   Yes.  We had a number of projects that had momentum
24   already.  They were zoned.  They were with the civil engineer.
25   They were just about to break ground.  I mean, there is -- in a

Direct Examination - David Erickson

1   proper running organization there is a pipeline running.  We had

2   a long pipeline of things going.

3   Q.    Okay.

4         And so we have heard some testimony about the fact that you

5   may not have made a C lot proposal yourself.  Let me get this

6   straight.  You were the seller, correct?

7   A.    Correct.

8   Q.    Mr. Benson and ASH were the buyers of your lots, correct?

9   A.    Yes.

10  Q.    Did you know what their lot purchasing strategies were?

11  A.    I never got a comprehensive articulation of that.

12  Q.    Did you know what their budget was for purchasing C lots

13  over the subsequent seven years?

14  A.    No.

15  Q.    Did you know what their development and construction goals

16  were at that time?

17  A.    To be determined.

18  Q.    As the seller, did you feel it was your place to propose

19  what the buyer wanted to buy from you and when?

20  A.    No.

21        Normally a buyer would say, This is what I want.  Can you

22  do it this way?  We would get some meeting of the mind and we

23  execute.

24  Q.    So you also entered into a Consulting Agreement with ASH,

25  correct?

Direct Examination - David Erickson

1  A.    Correct.

2  Q.    Provided that you would consult for ASH locally with

3  Grayhawk and then also nationally.  Is that right?

4  A.    Well, it was worded for kind of a very broad consulting

5  role.  It was initially anticipated that it was going to be

6  consulting primarily for local ASH-Grayhawk, because that's

7  where my in-depth knowledge was, despite I had a lot of national

8  awareness.  And that's what I did for the first month or two.

9       And then Greg, somewhere around February or March, he asked

10 me to put a higher emphasis on the national perspective helping

11 to interface with builders around the country and work on a

12 broader scale.

13 Q.    Now, ASH paid you money for your business, correct?  We

14 heard about that yesterday through Ms. Allen.

15 A.    Yes.  Through the sale process.  Selling the assets and the

16 premium that went with it.

17 Q.    Was she correct that all of the sale price money did not go

18 into your pockets personally?

19 A.    Yes.

20 Q.    Where did much of it go?

21 A.    Well, we got bank financing and, you know, different

22 financial arrangements go in there.  In the end most of what ASH

23 is buying, they are buying a product.  They paid a premium.

24 That was $10 million.  Everything else -- they are buying this

25 to get that.  If they paid $250,000 for that house partially

1084
Direct Examination - David Erickson

1  developed, it's going to end up being a $350,000 house.  They

2  are buying two-thirds of a house that's two-thirds finished.

3  They are buying a $50,000 lot, they are getting a $50,000 lot.

4       Big numbers are getting thrown around here, but in the end

5  I am getting $10 million over about a four-year time period.

6  Q.   But largely they were buying your lots.  You had mortgages

7  on those lots, right?

8  A.   I had financing and invested capital in all of them.  Yeah.

9  Q.   So much of the sales price went to pay off those mortgages?

10 A.   Yes.

11 Q.   You were also paid in large part by being given stock in

12 ASH, correct?

13 A.   Yes.

14      The purchase arrangement that ASH was pushing very hard for

15 was to pay in either cash or stock, at their choice, with each

16 of the incremental payments along the way.

17 Q.   Okay.

18      And by the time your sale was complete, were you a large

19 percentage owner in American Southern Homes based on your stock?

20 A.   Yes.

21      Initially, I think I was a 13-percent owner, and then there

22 were some options that came into play that were available to

23 purchase -- warrants is what they are called, that I chose to

24 execute.  I ended up having about $8.6 million in stock by the

25 summer of 2020.  And I think I got up to about 18 percent

Direct Examination - David Erickson

1    shareholder of ASH at the peak.

2    Q.   So let me ask this:  As a significant shareholder in

3    American Southern Homes, is there any reason you would not want

4    ASH to succeed in business?

5    A.   On the contrary.  I was going, Go, Buddy, go.

6    Q.   Is there any reason you wouldn't want ASH or ASH-Grayhawk

7    to succeed?

8    A.   Same answer.  The business model makes sense.  Their

9    success ultimately becomes my success.  I will get a nick of all

10   that along the way.

11   Q.   Is there any reason, as a significant shareholder in ASH,

12   you would want to compete with them and take away opportunities

13   for them to grow?

14   A.   No.

15        As we will develop information here, I repeatedly tried to

16   make sure that I did not cause any problem to ASH in any way.

17   That's a later discussion.

18   Q.   So how did the closing go?  Closing means coming to the

19   table, finalizing the purchase.  How did that --

20   A.   Well, we wrestled it to the finish line.  You know, big

21   deals always have their challenges, so that was the case.  But

22   it was really frustrating, in the last ten days I was told that

23   they were $5 million short on the money they needed to close the

24   deal.  And so I was just rolling my eyes.  We had spent so

25   many -- six months here, and at the last minute all of these

1   high-powered people couldn't put their money together.

2       And so somewhat reluctantly I offered to finance $5 million

3   of the purchase price to get them across the finish line.  We

4   executed a note embedded in all that paperwork -- that's about

5   an inch-and-a-half thick -- to take care of that.  So we got it

6   done.

7   Q.   And in the first year of business -- so now the new company

8   is ASH-Grayhawk as of November 15, 2019.  Correct?

9   A.   Yes.  They adopted the name ASH, A-s-h, dash Grayhawk, as

10  the legal LLC, as the legal name, doing business as Grayhawk

11  Homes.

12  Q.   The plan is for you to develop and sell your lots over the

13  subsequent seven years or so, correct?

14  A.   Yeah.

15      The LPA run out would have an expectation of,

16  approximately, seven years.  A lots blending into B lots

17  blending into C lots.  And they overlap to some degree as well.

18          MR. QUACKENBOSS:  May we see on the LPA, please, page

19  16, the Takedown Schedule?

20  BY MR. QUACKENBOSS:

21  Q.   Okay.  So to be clear, we have heard testimony about as the

22  relationship developed you sold fewer lots to ASH.  But I would

23  like to be clear, how many lots were you obligated to sell to

24  ASH under this contract?

25  A.   This chart is a depiction of that.  We were required to

Direct Examination - David Erickson

1    deliver a certain quantity of lots for each quarter during any

2    particular quarter.

3        So starting off here you have December of 2019, we are

4    expected to deliver 25 lots for the end of that quarter coming

5    out the gate.

6        And if you move forward -- let's go all the way to

7    September of 2020, which would be 2-3 of 2020, you have got 25 A

8    lots and 25 B lots on the game now.

9        The principle being, they want to eat up the A lots under

10   the Grayhawk name as quick as possible, and then we are going to

11   phase in the B lots that are developer owned -- you don't want

12   to sit on them forever -- and basically finish off all the

13   existing lots and start working towards the pipeline and stuff

14   to follow.

15   Q.   Does it say anywhere in the Land Purchase Agreement that

16   you were obligated to sell more lots than the minimum per

17   quarter in this schedule?

18   A.   No.

19   Q.   Does it say anywhere in the Land Purchase Agreement that

20   you were obligated to meet some sort of industry practice about

21   accelerated lot sales and such?

22   A.   No.

23   Q.   In fact, ASH was not willing to commit to purchase more

24   lots than those listed in this minimum schedule either, were

25   they?

Direct Examination - David Erickson

1    MR. KRAMER:  Objection.  Leading.

2    THE COURT:  Overruled.

3    THE WITNESS:  That's correct.

4  BY MR. QUACKENBOSS:

5  Q.   But you did sell them lots at an accelerated pace, correct?

6  A.   We did.  Particularly probably by March of '20.  So the

7  second takedown, ASH was doing quite nicely and they were

8  looking to increase their pace.  They asked to purchase extra,

9  which was contemplated as a possibility, and we were

10  accommodating those extra requests.

11    And it continued that way for quite a number of quarters to

12  follow that.  We were well ahead.  Almost way ahead of the

13  minimum required to deliver.

14  Q.   In fact, under the Land Purchase Agreement, if you deliver

15  lots more than required in a quarter you get credit against

16  those owed in subsequent order -- in subsequent quarters,

17  correct?

18  A.   Yes.

19  Q.   Were you comfortable delivering lots at an accelerated pace

20  in 2020 as ASH requested?

21  A.   Sure.  Go, Baby, go.  It only became uncomfortable a little

22  later on when I couldn't get the C lot schedule.

23    We will talk further about that.

24  Q.   But at the moment -- at the time, you were developing lots

25  that were already under way at the time of the sale, correct?

Direct Examination - David Erickson

1    A.    Yeah.

2         I had some pipeline projects working and I was getting some

3    minor verbal endorsement to keep on going.  Now we are talking

4    about C lots.  But, yeah, we were more than happy to deliver as

5    much as we could as fast as possible.  It's in ASH's best

6    interest, and in the end it's in my best interest as well.

7    Q.    What were the developments -- what were the developments in

8    which the C lots appeared that you were developing at the time

9    of the sale?

10   A.    Well, the first one teed up was Garrett Pines.  At the time

11   of the sale we either had just gotten the building permit --

12   this is for subdivision development -- we had either just gotten

13   the permit to do that development, or we were imminent to do it

14   because it was fairly quick behind it.

15        So the first energy went into building Garrett Pines.  And,

16   again, that's just part of keeping that momentum going that we

17   already had in the works.

18   Q.    Okay.  Did ASH ultimately purchase those lots in Garrett

19   Pines?

20   A.    They did.

21        We were supposed to do some paperwork at the front end,

22   what I call agreement paperwork; this is what we are building.

23   They acknowledge it's coming.  And there is a mutual endorsement

24   to do that.

25        They foot-dragged it all the way along until it was

1    literally finished before they decided to sign it.  It's just

2    frustrating dealing with that.

3    Q.   So in 2020 who was leading ASH-Grayhawk at the local level

4    in Columbus?

5    A.   Initially, at the sale time Chris Recker had been hired.

6    That was a lead that came from a headhunter working for ASH, I

7    assume.  He had actually come on board working with me while I

8    was still a private company as Grayhawk Homes, Inc., with the

9    expectation that with the sale completed he would continue on as

10   the local division president for ASH.  So that's Chris Recker.

11   Q.   Okay.  And, how long did Mr. Recker --

12        (Pause in proceeding.)

13   BY MR. QUACKENBOSS:

14   Q.   Sorry.  If you answered I missed it.  How long did

15   Mr. Recker stick around?

16   A.   I didn't answer.

17        Chris Recker started with the sale on November 15.  I think

18   his last official day was April 1st of 2020, but it was in that

19   time period.  He went back to Atlanta in early 2020.

20   Q.   Few months?

21   A.   Yeah, few months.  Four months.

22   Q.   Who replaced him?

23   A.   Ken Thirtyacre.  T-h-i-r-t-y-a-c-r-e.

24   Q.   Okay.

25        All right.

Direct Examination - David Erickson

1    How did the -- we have talked about you were selling lots

2    at an accelerated pace.  How did the first year after selling

3    your company go, in your view?

4    A.    Well, financially ASH-Grayhawk did tremendously well.  I

5    think I saw the number.  They made $11 million that first year.

6    So they paid $4 million of the premium at the purchase and they

7    made $11 million the first year.  So financially that's a winner

8    for sure.

9        On the flip side of it, there were lots of bumps in the

10   road in terms of operational stuff.  We had problems as basic as

11   they were supposed to pay the balance of the premium -- the

12   true-up.  I think Amy talked about that yesterday.  That was

13   supposed to be completed by the middle of February.

14   February 15th.  I didn't get any answer on it.

15       I waited a week or two past the deadline and then I poked

16   Greg Benson and I said, Greg, we gotta take care of this.  And

17   then I had to do it again.  And I had to get kind of mean about

18   it and say, This needs to get fixed.

19       It took them three extra months to pay for the balance of

20   the company, so I was not happy about that.

21       We also had a required, what I call, an IRS document that

22   both parties are supposed to do saying this was the sale price

23   and allocate it -- it's a bookkeeping thing -- and they were

24   three months behind in doing.  That's an important document that

25   should get done smoothly.

Direct Examination - David Erickson

1    MR. QUACKENBOSS:  May we see DX150, please?

2    BY MR. QUACKENBOSS:

3    Q.   Dave, do you recognize this email exchange?

4    A.   Yes.  It starts at the bottom.

5    Q.   Tell me what it is, first, before we start talking about

6    it.

7    A.   Give me a moment to review it, please.

8         Basically this is an email to Marshall Coleman.

9    Q.   Just briefly, so I can admit the exhibit.

10   A.   This is effectively a demand letter to pay the balance of

11   the purchase price.

12        MR. QUACKENBOSS:  Your Honor, I move to admit DX150.

13        MR. KRAMER:  No objection.

14        THE COURT:  Admitted.

15        (DEFENDANTS EXHIBIT DX150:  Received in evidence.)

16   BY MR. QUACKENBOSS:

17   Q.   So, Dave, looking at the bottom portion of this email

18   exchange, is this an email from you to Marshall Coleman and

19   Greg Benson?

20   A.   It is.  With a copy to Jim Sack, my attorney at the sale,

21   and Amy Allen, my VP of finance.

22   Q.   And you write:  Marshall and Greg, I am writing for the

23   third time to express concern and demand for attention to the

24   post-closing adjustment statement.

25        So I want to make sure I understand, does this boil down to

Direct Examination - David Erickson

1  the purchase price they offered to pay you for your business?

2  A.    This is the balance of the purchase price.

3  Q.    Okay.

4  A.    As was stated yesterday, I think Mr. Darnold, you buy based

5  upon what you know.  On an ongoing operation you can never be

6  perfect as the date of closing.  You give it a little bit of

7  time for all the numbers to settle out.  You clean up the books.

8  Two parties agree on the number.  And you pay the difference

9  along the way.

10 Q.    Okay.

11       MR. QUACKENBOSS:  And scrolling to the top of the

12 email chain, please.

13 BY MR. QUACKENBOSS:

14 Q.    Recognizing that -- this was overdue based on the deadline,

15 correct?

16 A.    Yes.

17 Q.    Okay.

18       Is this Mr. Coleman's agreement to send you $700,000

19 tomorrow:  Sorry for the delay?

20 A.    Yeah.

21       At the lower section it was my suggestion -- I, quite

22 honestly, didn't realize the scale of the number.  And I thought

23 700 was a pretty good poke at it.  We will find out that's going

24 to be pretty light.

25       But, obviously, Marshall is responding and trying to do

Direct Examination - David Erickson

1   something about it after I poked at him three times.

2   Q.   Did anyone explain to you why this deadline was missed?

3   A.   I never got an explanation.

4          MR. QUACKENBOSS:  May we please see DX162?

5   BY MR. QUACKENBOSS:

6   Q.   Do you recognize this email exchange, Dave?

7   A.   This is a cover letter.  I think there is an attachment to

8   it.

9   Q.   Do you recognize it?

10  A.   I do.

11  Q.   Is this an email between you and Mr. Benson and Mr. Kramer

12  in this instance?

13  A.   It is.

14  Q.   Dated April 15.

15         MR. QUACKENBOSS:  Your Honor, I move to admit DX162.

16         MR. KRAMER:  No objection, Your Honor.

17         THE COURT:  Admitted.

18     (DEFENDANTS EXHIBIT DX162:  Received in evidence.)

19         MR. QUACKENBOSS:  Scroll down to the letter, please.

20  BY MR. QUACKENBOSS:

21  Q.   So this is a month later and you still have not gotten the

22  balance of your purchase price, correct?

23  A.   Correct.

24  Q.   And your calculation showed that it was about $3.5 million

25  owed to you?

Direct Examination - David Erickson

1   A.    It is.

2   Q.    Okay.

3        Did you ever eventually get the balance of your purchase

4   price paid?

5   A.    Yes.

6        You know, at my request Amy took the time to come up with

7   what we thought the number was.  And I am putting them on notice

8   at the bottom here, it says, you know, time to put up or shut

9   up.

10  Q.    Was there also IRS paperwork that was not developed on

11  time?

12  A.    Yeah.  I forget -- there is a very specific name for it.

13  Like I said, broadly speaking, it's the IRS paperwork.

14       With this calculation complete, the parties are supposed to

15  agree on certain classifications so that you can report it to

16  the IRS properly and make sure it goes smoothly.  If you don't

17  do that, you are almost guaranteed to trigger an audit, and

18  that's not good for anybody.  And that was also delayed by

19  roughly 90 days from when it was supposed to get done.

20  Q.    Okay.

21       What about -- did ASH-Grayhawk undertake to swap out

22  building license statuses with you after the closing?

23  A.    Yeah.

24       There was also a requirement under the Transition Services

25  Agreement, which I think was also talked about yesterday, that

Direct Examination - David Erickson

1    Chris Recker was supposed to take the initiative to acquire a

2    builder's license for ASH-Grayhawk in Columbus.

3         I was the interim.  I was the transition from the sale to

4    whenever that was happening.  And that was not happening.

5    Didn't appear it was even going forward at all.  So I was also

6    asking for somebody to start paying attention to that.

7         That would prove to be an ongoing problem later on.

8    Q.   And what we have heard about also is that the Phase C lot

9    order deadline was also missed in 2020, correct?

10   A.   Yeah.

11        Before it's all done, at the end of 2020, we are going to

12   have a big problem with getting the Phase C schedule

13   accomplished.

14   Q.   Okay.

15        And did you come to learn -- was there someone within ASH

16   who wasn't paying attention, or did you develop an opinion about

17   why these deadlines were being missed this year?

18             MR. KRAMER:  Objection.  Relevance.

19             THE COURT:  Overruled.

20             THE WITNESS:  Well, a piece of the problem, that I was

21   going to add to this discussion, is that Greg Benson is a great

22   guy.  Very knowledgeable.  I just couldn't get a decision out of

23   him.  Everything was maybe, maybe, maybe.  You can't run on

24   perfect answers.  You got to make the best decision you can,

25   based upon what you know, and move forward.

Direct Examination - David Erickson

1  I tried to help him in every way I could, and that was

2  a major part of our frustration on the C lot scheduling.  I

3  couldn't get him off square one to start a decision.

4  BY MR. QUACKENBOSS:

5  Q.  Did you eventually express some concerns to Mr. Benson

6  about his attentiveness?

7  A.  I was in a difficult position because I'm a Board member, a

8  major shareholder.  I'm a consultant.  And I'm trying to be

9  friendly.  You know, throwing my weight around doesn't

10  accomplish a thing.  I need to help Greg Benson be successful,

11  but I can't do it by being the big bad guy that he has to jump

12  whenever I stomp on his toe.

13  Why I didn't want to confront him too hard.  At the same

14  time I was trying to prod him in the direction where I thought

15  we might be able to get some progress for decisions and in the

16  end for the betterment of ASH.

17  MR. QUACKENBOSS:  May we see DX149, please?

18  BY MR. QUACKENBOSS:

19  Q.  Dave, is this an email exchange between you and Greg

20  Benson, July 31, 2020?

21  A.  It is.

22  Q.  Tell the jury briefly what the purpose of this email

23  exchange was.

24  A.  Under the banner of being a consultant for American

25  Southern Homes, and particularly his expanding my role to a more

1   broad, I was proactively offering some observations that I

2   thought I perceived were problems that needed some attention.

3   So I am trying to be his right-hand man and say, I think you

4   need to look at these spots for discussion.

5   Q.    Okay.

6            MR. QUACKENBOSS:  Your Honor, I move to admit DX149.

7            MR. KRAMER:  No objection.

8            THE COURT:  Admitted.

9        (DEFENDANTS EXHIBIT DX149:  Received in evidence.)

10           MR. QUACKENBOSS:  Let's scroll down to the very

11  bottom, please.

12  BY MR. QUACKENBOSS:

13  Q.    Now, Mr. Erickson, this is a version of the email exchange

14  that includes some responses embedded by Mr. Benson, correct?

15  A.    What we are looking at here is a response to my initial

16  email to him, which was fairly long.  There was a lot of bullet

17  points in this.

18  Q.    Okay.

19      Is the highlighted paragraph something that Mr. Benson

20  wrote at the end of his response?

21  A.    Yeah.

22      This is about the third paragraph -- at the end there is

23  about three or four different paragraphs here, and this is one

24  of the main bullet points towards the end of this email.

25  Q.    And does he write:  I know you are well-meaning in all of

Direct Examination – David Erickson

1    this.  In many ways you are the only person that has been

2    through what it takes to run a homebuilding company besides

3    Steve Cumbie.  I really want someone to talk to that

4    understands, but you need to learn to trust and support me as I

5    hoped I already had the trust with the Board, but now I don't.

6        I do not complain.  I do not promote myself.  I keep my

7    head down.  Will be first to admit my failures while not getting

8    credit for the successes.

9        I made a decision that if I was going to do this again it

10   had to be a hundred percent commitment.  I work on these issues

11   seven days a week.  No one works harder, but I can't even get an

12   employment agreement after three years while at the same time

13   being told to keep hiring more people.  Inexcusable.

14       The Board has been very gracious in supporting the company

15   financially and approving my major decisions, but something else

16   is starting to happen and I am not sure what it is.

17       I am willing to have someone take my place.  It won't be a

18   fight.  But I won't be used either.

19       Did I read that correctly?

20   A.   That's correct.

21   Q.   Did he tell you anything more about the Board not giving

22   him an employment agreement after three years?

23   A.   We didn't have a verbal conversation of it, but this is the

24   first time that I became aware that Greg and the Board had some

25   real challenges between them.  He was, obviously, extremely

Direct Examination - David Erickson

1   frustrated.  He thought he was doing well and was working longer

2   term, and they weren't helping him a whole lot towards securing

3   that.

4   Q.   Okay.

5        Mr. Benson is the gentleman you were supposed to be working

6   with to get your C lot order in 2020, correct?

7   A.   Effectively he is my only contact in that regard.

8   Q.   Did you, at some point, take your concerns above Mr. Benson

9   in the ASH leadership?

10  A.   It developed a little later in the summer that we had some

11  serious problems at ASH-Grayhawk that required Board-level

12  attention, and I brought that up to Chairman Marshall Coleman's

13  attention.

14  Q.   How did you bring that that Mr. Coleman's attention?

15  A.   I think I did it verbally, and then he asked me to follow

16  up with some -- an email or a letter.

17  Q.   Explain more about that.

18       What did you first tell him and how did that conversation

19  go where you first reported these concerns to Marshall Coleman?

20  A.   It was brought --

21            MR. KRAMER:  Objection.  Hearsay.

22            MR. QUACKENBOSS:  Your Honor, he is the chairman of

23  the Board.  It's an admission.  And I am asking Dave to talk

24  about the conversation with Marshall Coleman, the chairman of

25  the Board.

Direct Examination - David Erickson

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  It was brought to my attention that
 3    there was some serious employee harassment problem going on.
 4              MR. KRAMER:  Objection, Your Honor.  Relevance.
 5    Hearsay.  403.
 6              MR. QUACKENBOSS:  Your Honor --
 7              THE COURT:  Sustained.
 8    BY MR. QUACKENBOSS:
 9    Q.   Please keep your response limited to concerns about
10    Mr. Benson that you shared with Marshall Coleman.
11              THE COURT:  And related to the issues in this case.
12              THE WITNESS:  Okay.
13    BY MR. QUACKENBOSS:
14    Q.   Did Mr. Coleman eventually ask you to put in writing
15    concerns that he could share with the Board?
16    A.   I did.
17    Q.   And did you receive responses back from Marshall Coleman
18    and Sean Coleman about that?
19    A.   I did.
20              MR. QUACKENBOSS:  May we see PX61, please?  Excuse me.
21    PX62.
22    BY MR. QUACKENBOSS:
23    Q.   Is this your email exchange with Marshall and Sean Coleman
24    about the delivery of that letter expressing concerns?
25    A.   What you are looking at here from Sean Coleman and Marshall
```

1    at the top is the response to what I sent them.

2              MR. QUACKENBOSS:  Your Honor, I offer PX62 into

3    evidence.

4              MR. KRAMER:  No objection, Your Honor.

5              THE COURT:  Admitted.

6         (DEFENDANTS EXHIBIT PX62:  Received in evidence.)

7              THE COURT:  DX or PX?

8              MR. QUACKENBOSS:  PX.

9              THE COURT:  Okay.

10   BY MR. QUACKENBOSS:

11   Q.   At the bottom of the email you forward your letter to

12   Marshall and Sean Coleman with a note:  Call me if you want

13   additional details.

14       Am I correct that Sean Coleman responds:  Dave, extremely

15   thorough outline of the issues.  Quite disappointing to hear.

16   Good news is we have a chance to remediate before it's too late.

17       Correct?

18   A.   That's what it says.

19   Q.   Above him his father Marshall says:  Ditto.

20       Correct?

21   A.   Correct.

22   Q.   Did this lead to employment decisions regard to Mr. Benson

23   and Mr. Thirtyacre?

24   A.   It did.

25       The Board, in the end, decided to make some significant

Direct Examination - David Erickson

1  senior leadership changes, at least in part, because of my

2  letter.

3  Q.    Are you aware of whether an investigation was conducted?

4  A.    I am.

5  Q.    Mr. Benson was removed as CEO of ASH, correct?

6  A.    The conclusion of all that was yes.

7  Q.    Mr. Thirtyacre was removed as president of ASH-Grayhawk in

8  Columbus?

9  A.    Correct.

10  Q.    Did there come a time when you were asked to step in as

11  CEO?

12  A.    I was, by Mr. Marshall Coleman by phone.

13  Q.    And just say a little bit more about that conversation,

14  please.

15  A.    Approximately, the 23rd -- I am not quite sure of that

16  date -- I got a phone call in the evening, probably about 8:30

17  at night, and Marshall informed me that they were planning to

18  terminate Ken Thirtyacre as president of ASH-Grayhawk in

19  Columbus.  And that they were also going to ask Greg Benson to

20  step down from being the CEO function.

21      Marshall wanted me to be the new CEO.  I told him I was

22  very honored.  I didn't feel I understood the job of CEO well

23  enough to accept it on a permanent basis.

24      I did tell him I would accept it on an interim basis, at

25  minimum just to fill the void, and that when I understood the

1104

Direct Examination - David Erickson

 1   job properly I would reconsider my decision about interim versus

 2   CEO.

 3        And then he accepted that and said, Let's go with that plan

 4   then.  You will be interim CEO for the short term.  We will take

 5   it under advisement a little later.  And then he began the

 6   mechanisms that he has to do at the board level to make all that

 7   effective.

 8   Q.   So you became interim CEO of ASH, correct?

 9   A.   Correct.  On October 28th.

10   Q.   This is the holding company, American Southern Homes

11   Holdings?

12   A.   At the top of the leadership tree I am the interim CEO

13   helping to run the functions underneath it.

14   Q.   Okay.  And on what date did you become interim CEO of ASH?

15   A.   It was made official by board documentation on

16   October 28th.

17   Q.   Okay.

18        But at this point you still did not have a Phase C lots

19   order, correct, for Columbus?

20   A.   That's correct.

21   Q.   So you were the CEO.  Why didn't you fix that right away?

22   A.   Well, the basic premise is, as a Board member, and the CEO,

23   I can't deal with myself.  I can't say, Hey, I want to pay

24   $50,000 for that lot and then pay myself for it and I am using

25   company money to do it.  That doesn't happen.

1    I had made the suggestion a day or two prior to the 28th

2    that Mr. Twiss act as the intermediary to run the decision

3    through the cycle at the Board level.

4    They chose to take a route of forming a land -- I think it

5    was called a land committee -- to oversee arm's length

6    transactions between myself, as the developer in Columbus, and

7    myself, as the CEO, effectively the ultimate approving

8    authority.  That's an effective mechanism.

9    And if I recall, Sean Coleman was the chairman of that

10    committee, with Mr. Cumbie and Mr. Scott being the three people

11    who made the decision there.

12    Q.  So what did you do first when you became interim CEO in

13    late October of 2020?

14    A.  Again, that date was October 28th.  I was tasked by the

15    Board to go a couple doors down from my office -- I had a

16    working office close to the old office -- to go next door and

17    fire Ken Thirtyacre.  So I went there with the Board document

18    saying, You're relieved of duties effective immediately.

19    I took Amy with me, and I asked one or two of senior people

20    with ASH-Grayhawk to join me in the conference room where we met

21    Mr. Thirtyacre, and I informed him of the Board's decision.

22    This wasn't my decision.  This was the Board's decision.

23    He was pretty reasonable about it.

24    We asked him to take his immediate personal belongings and

25    leave the building and we would clean up the rest of the details

Direct Examination - David Erickson

1   in a day or two after.

2   Q.   Did you visit ASH's other operation in Huntsville?

3   A.   And then I made arrangements to go to Huntsville, because I

4   needed to see that operation.  I had never been there.  And talk

5   with their president there -- that's Scott James.  Understand

6   what they were doing.  And I gave him -- I gave him some broad

7   directions of what to do for the next couple of weeks.  I said,

8   Do your job the way you think is appropriate.  I will be

9   available by phone.  I will circle back in a month or two and we

10  will set some broader parameters of how to run the job in the

11  future.

12       Following that I had a Board meeting to chair up in

13  Virginia, so I immediately turned and went to Virginia to work

14  on that Board meeting.  And then the next order of business I

15  was making some phone calls.

16       I made a call back to my friend in Arizona, Dave Grounds,

17  and worked at reviving a conversation to buy Dorn Homes, which

18  has been percolating all summer with Mr. Benson and had not --

19  well, it had died.

20  Q.   We heard Sean Coleman earlier this morning.

21       Is the Dorn deal what he was referring to regarding

22  Mr. Benson not moving sufficiently to close an acquisition of

23  Dorn?

24  A.   Correct.

25  Q.   Okay.

Direct Examination - David Erickson

1    And so did you successfully negotiate an acquisition of

2   Dorn in 2020?

3   A.   Yes.

4    In early November I renewed the conversation with

5   Dave Grounds.  Established a format for a new Letter of Intent,

6   framework for how the deal is supposed to go, and he initialed

7   that and sent it back so we had a working document to build

8   from.

9   Q.   Okay.  Did the Board leaders of ASH respond positively to

10  that?

11  A.   Yes.

12   Mr. Coleman was -- he was ecstatic by any other term.  He

13  was really excited.  The Dorn transaction, once completed,

14  doubles the size of ASH Holdings at the time.  Stone Ridge plus

15  Grayhawk equals the same size as Dorn Homes.  It's double the

16  company size in one transaction.  A big accomplishment for the

17  company.

18       MR. QUACKENBOSS:  Let's see DX238, please.

19  BY MR. QUACKENBOSS:

20  Q.   Is this an email to you from Marshall Coleman?

21       MR. QUACKENBOSS:  If you could leave it there by the

22  highlight.

23  BY MR. QUACKENBOSS:

24  Q.   Is this an email exchange between you and Marshall Coleman

25  on November 7, 2020?

Direct Examination - David Erickson

1    A.    It is.

2          MR. QUACKENBOSS:  Your Honor, I move to admit DX238.

3          MR. KRAMER:  No objection.

4          THE COURT:  Admitted.

5          (DEFENDANTS EXHIBIT DX238:  Received in evidence.)

6    BY MR. QUACKENBOSS:

7    Q.   And Marshall Coleman is the Chairman of the Board.  His

8    reaction is:  U da man.  Congrats.

9          Correct?

10   A.   Yeah.  I don't think the jury has seen it yet.

11   Q.    I think they have.  Have they not?  I admitted it.

12         THE COURT:  There it is.

13         THE WITNESS:  To help the jury here, the bottom of it

14   is, I am receiving a copy from Ryan Twiss of the executed LOI.

15   So now we have an agreement of the minds of what we are trying

16   to do.

17         And if you look in the middle here, not -- just below

18   the highlighted, I am forwarding it to Marshall saying, Here is

19   my first real accomplishment in two weeks.

20         And above that Marshall is responding back with:  U da

21   man, which I thought was a pretty good sign.

22         MR. QUACKENBOSS:  Can we see DX239, please?

23   BY MR. QUACKENBOSS:

24   Q.    Is this an email exchange between you and Sean Coleman on

25   November 7?

1    A.    Yeah.    Separately, a couple of hours later, Sean responded

2    back endorsing that same principle.    He was quite happy.

3              MR. QUACKENBOSS:    Move to admit DX239.

4              MR. KRAMER:    No objection.

5              THE COURT:    Admitted.

6         (DEFENDANTS EXHIBIT DX239:    Received in evidence.)

7              THE WITNESS:    My apologies.    I was a step ahead of

8    myself.    I didn't see he didn't have it up yet.

9    BY MR. QUACKENBOSS:

10   Q.    His reaction is that your Dorn Letter of Intent is

11   excellent, correct?

12   A.    Yes, sir.

13   Q.    Did the Board at American Southern Homes Holdings

14   eventually approve and close the acquisition with Dorn under the

15   terms that you negotiated?

16   A.    They did.    They may have made minor evolutions of it, but I

17   had put the framework together, did all the due diligence,

18   packaged it all together.    I was intending to close it in

19   30 days -- correction.    My apologies.    I was intending to close

20   it in 60 days.    At least my intent with Dave Grounds was he was

21   real keen on trying to get it closed that year in 2020 because

22   of capital gains tax issues and things like that.

23   Q.    Did there become a time when you began to negotiate

24   regarding taking the CEO position permanently?

25   A.    Yes.

Direct Examination - David Erickson

1    Shortly behind the Dorn deal, I would say the 10th or 12th,

2  somewhere in that area, I understood the job well enough, all

3  the moving parts and all the players involved, I informed

4  Marshall that I was prepared to take the CEO role if he wanted

5  me to do so.  He verbally said, Yep, you're the man.  You keep

6  working on it and let's start a salary and bonus package

7  discussion.

8  Q.   What was the outcome of those negotiations?  Was it

9  successful?

10  A.   We went back and forth.  In the end it was not.  The Board

11  decided not to pick up the option to have myself as the CEO.

12  Q.   Okay.

13    Were you told exactly why they decided not to continue the

14  discussions about the permanent CEO position?

15  A.   I never got the substantive why.  The only thing Marshall

16  said -- and this was probably a three-minute conversation -- he

17  said, The votes just aren't there for the Board.

18    That has some implications given that politics of the Board

19  of American Southern Homes, but if they don't want me to be CEO,

20  that's their business.

21  Q.   How did you respond when you received that phone call?

22  A.   I took it matter of fact.  Was kind of expecting it based

23  upon how the negotiations had gone.  Didn't seem like they were

24  trying real hard for it to happen.  So I took on face value.  We

25  had a brief discussion about next steps and wished each other

Direct Examination - David Erickson

1   good day.  I think it was on a Saturday when he called me.

2   Q.   Okay.  And what happened next?

3   A.   So I documented that conversation.  I think that was

4   December 16th.  Documented that conversation about what we had

5   agreed to do.  And then I began to think -- well, I didn't have

6   any real direction.  At this point in time my energy and focus

7   of helping ASH personally was going to go away.

8        I had agreed to take direct responsibility of keeping

9   ASH-Grayhawk stable, and Stone Ridge stable, through the end of

10  February.  And ASH corporate was going to finish the Dorn deal

11  without my being involved.

12            MR. QUACKENBOSS:  May we see PX81A, please, which has

13  been admitted earlier in the trial.

14  BY MR. QUACKENBOSS:

15  Q.   Is this the letter you were just referring to sent

16  December 16?

17  A.   Yep.  Said more succinctly.

18  Q.   You state you will:  Continue to serve as interim CEO

19  between now and February 28 unless informed to discontinue

20  sooner.

21       Correct?

22  A.   Correct.

23  Q.   I am disappointed in the decision to end my role as CEO,

24  but fully understand the thinking involved.

25       Correct?

Direct Examination - David Erickson

1    A.    Yes.

2    Q.    Did you have any hard feelings about this?

3    A.    No.   Their business.   Not mine.

4    Q.    Okay.

5          So how were your thoughts evolving about what to do next?

6    A.    With this, my energy and focus of really helping ASH grow

7    was clearly being diluted, and I began to think personally about

8    where I wanted to go next with my time and energy.

9          So over a couple of days I started thinking about which

10   direction to go and decided that -- in the end I decided I was

11   going to primarily focus on development activities.

12         I have restricted covenants around the Columbus region for

13   non-compete purposes, so I needed to be mindful about that.   But

14   it's a big country.   There is lots of places to develop around

15   the United States.   And I decided that, primarily because of

16   land, but also because of some building implications to that, I

17   probably needed to become -- to step away from being a board

18   member of American Southern Homes, and even an interim CEO is

19   also a board member at American Southern Homes, I needed to step

20   back.

21         And I decided -- and I was -- I sent them this in a

22   follow-on letter on the 20th, which is going to be when I

23   documented this, that I would honor my commitment to finish out

24   American Southern Homes responsibilities in Columbus and

25   Huntsville, as a consultant.   Do exactly what I said I was going

Direct Examination - David Erickson

1    to do, but I was stepping away from the CEO role and the Board

2    of Directors role.

3              MR. QUACKENBOSS:  May we see PX 199, please?

4              THE COURT:  Mr. Quackenboss, let me know when you get

5    to a good stopping point.  We need to take a break at some

6    point.

7              MR. QUACKENBOSS:  Yes, sir.  I can do that I think

8    after we get done with this exhibit.

9              THE COURT:  All right.

10             MR. QUACKENBOSS:  PX 199, please.  Okay.

11   BY MR. QUACKENBOSS:

12   Q.   Is this an email conveying the letter you just referred to?

13   A.   It is.

14   Q.   To Marshall Coleman, Sean Coleman, and others on the Board?

15   A.   That's correct.

16   Q.   Okay.

17             MR. QUACKENBOSS:  Your Honor, I move to admit PX 199.

18             THE COURT:  Any objection?

19             MR. KRAMER:  None, Your Honor.

20             THE COURT:  Admitted.

21        (DEFENDANTS EXHIBIT PX199:  Received in evidence.)

22             MR. QUACKENBOSS:  If you will scroll down, please, to

23   the letter itself.

24             THE WITNESS:  I'd note that that cover letter also had

25   David Humphries on there, who is the other principal shareholder

Direct Examination - David Erickson

1    of ASH and he had --

2              MR. KRAMER:  Objection, Your Honor.  Can we keep this

3    to question and answer?  There is no question pending.

4              THE COURT:  Well, he can explain what he sees on the

5    screen, but...

6              MR. QUACKENBOSS:  Dave, go ahead.  Keep it brief.

7              THE WITNESS:  Fair enough.  I wanted to make sure that

8    there was an additional important party on that email chain.

9              So to the letter?

10   BY MR. QUACKENBOSS:

11   Q.   To the letter.

12   A.   To the letter, I am notifying them that I am -- I am going

13   to stay away from the Dorn transaction.  That is an ASH

14   responsibility to terminate -- to wrap-up.

15        That I will take responsibilities for managing Stone Ridge

16   and Grayhawk Homes under my consulting role.

17        And then down below it's going to talk about my resignation

18   from the Board and as interim CEO.

19   Q.   And at the bottom of the page you begin a paragraph that

20   says:  Clearly the Board of ASH does not have confidence in my

21   filling the role of CEO.  As such, I am resigning effective

22   immediately as interim CEO.  I will continue with Stone Ridge

23   and Grayhawk Homes oversight as a consultant to ASH per my

24   consulting agreement.

25        Correct?

Direct Examination - David Erickson

1   A.    Yes, sir.

2   Q.    And then at the bottom -- scroll down a little bit more --

3   you write:  In the past year I have developed ambitions to do

4   more things in the homebuilding and development business and

5   feel that my board responsibilities with ASH are likely to

6   constitute a conflict of interest with those goals and

7   possibilities.

8         Correct?

9   A.    That's correct.

10  Q.    Are you trying to hide the ball on anybody here that you

11  are thinking of going into business on your own?

12  A.    No.  Being very transparent.  Very open about what I am

13  doing.  And particularly with regard to the Board, I got to make

14  sure I have a fiduciary responsibilty that I am not in conflict

15  with ASH as a board member.

16            MR. QUACKENBOSS:  Great.

17            This is a good spot to break, Your Honor.

18            THE COURT:  Ladies and gentlemen, we will take a

19  15-minute break at this time.

20      (Jury out and recess taken 11:14.)

21      (Resumed at 11:30.)

22            THE COURT:  Bring the jury down.

23      (Jury in at 11:31.)

24            THE COURT:  All right.  Mr. Quackenboss, you may

25  continue.

Direct Examination - David Erickson

1    MR. QUACKENBOSS:  Thank you, Your Honor.

2  BY MR. QUACKENBOSS:

3  Q.   So, Dave, you have sent your resignation letter on

4  December 20.  Did you follow up with anything about further

5  transition issues?

6  A.   Yeah.  Somewhere in here I am also effectively cleaning my

7  desk.  I have been responsible for ASH for 60 days, or so.  I

8  have a responsibility to make sure whoever is taking over next

9  knows all the moving parts that are out there.  Dorn is clearly

10  known, so I send a letter to the board for what I call clean-up

11  issues.

12  Q.   Okay.

13    MR. QUACKENBOSS:  May we see PX 207A, please?

14  BY MR. QUACKENBOSS:

15  Q.   Okay.  Dave, is this a transition email titled:  ASH

16  clean-up items that you sent to Board members on December 21?

17  A.   Marshall Coleman and Sean Coleman.

18  Q.   Okay.

19    MR. QUACKENBOSS:  Your Honor, I move to admit PX207A.

20    MR. KRAMER:  No objection.

21    THE COURT:  Admitted.

22    (DEFENDANTS EXHIBIT PX207A:  Received in evidence.)

23  BY MR. QUACKENBOSS:

24  Q.   All right.

25    And this is the memo that came of your desk clean-up

1117

Direct Examination - David Erickson

1    issues.

2         Is that correct?

3    A.    Yeah.

4         These are some significant issues that are floating out

5    there I wanted to make sure that somebody knew about as I left

6    the stage and somebody else could pick it up as appropriate.

7    Q.    Okay.

8         The first item you address here is about Kathy Long serving

9    as interim president of ASH-Grayhawk in Columbus.  Tell the jury

10   about how that came about.

11   A.    You may have recall that on short notice Ken Thirtyacre was

12   dismissed by the Board, and instead of myself being the step in,

13   which I thought was going to be the answer, they asked me to

14   step all the way up to CEO.  So somebody has to run locally.  I

15   asked Kathy if she would take that role.  She accepted that at

16   least on the interim basis.  I gave her a bump in pay to -- for

17   the extra responsibility she was handling.  And the promise that

18   if it doesn't work out I will work very hard to make sure you

19   have your old job back because there is no reason you should

20   lose your job by filling the void.

21        That's basically what this paragraph is saying, and I want

22   to make sure that other people know that that was my promise

23   when we did this.

24            MR. QUACKENBOSS:  Next paragraph, please.  You can

25   scroll down.

1118

Direct Examination - David Erickson

```
 1   BY MR. QUACKENBOSS:

 2   Q.    In this paragraph here, paragraph two, you are letting them

 3   know that the licensure paperwork we talked about earlier is

 4   still not done.  Correct?

 5   A.    That is correct.

 6   Q.    In Columbus.

 7         Okay.  And then paragraph three, you title it:

 8   Non-disclosure agreements signed by ASH.

 9         What was your intention in drafting this paragraph to the

10   board members?

11   A.    Well, basically it is signaturing a non-disclosure

12   agreement.  I am binding ASH to protecting that information.

13   And also, in theory, it means that we have put our hand in the

14   air that says, We are slightly interested in this conversation.

15         I had already worked all of these to some degree, but I

16   didn't want anybody to think that something that they have on

17   their desk is not connected to a non-disclosure agreement, or if

18   they wanted to pick it up they need to get out there and get to

19   it, because it's not -- they're offered -- let me restate that.

20         They are being offered by a broker.  Those brokers are

21   going to take the first deal that comes up.  So don't let it sit

22   around forever if you are interested in pursuing it.

23   Q.    Okay.

24         You list for them the status of six companies, correct?

25   Let's just focus on the first three.
```

Direct Examination - David Erickson

1    With regard to Miramonte, you state that Tony Avala,

2  Builder Adviser Group, is representing them as a broker --

3  A.    That's correct.

4  Q.    -- correct.

5    And it's being broadcasted widely.  Is that correct?

6  A.    Yes.

7  Q.    Okay.

8    With regard to Prominence Homes in Austin, you also say

9  Mr. Avala is representing them as a broker, also broadcasting

10  widely.

11    Correct?

12  A.    Correct.

13  Q.    And, by the way, going up to the first paragraph of Section

14  3, in the second sentence, you say:  At this point I consider

15  all of these deals to be dormant and not exclusive to ASH.

16    Did you write that?

17  A.    I did.

18  Q.    And then the third one you address is Surrey.  Also Tony

19  Avala, Builder Adviser Group, as broker.  Unclear on

20  distribution of knowledge.

21    And you address a couple of others, but they are not

22  entirely relevant.

23    And again, your intention here with this note was to let

24  leadership know after you left this was the status of the

25  inquiries for acquisition that ASH had made?

1120
Direct Examination - David Erickson

1      MR. KRAMER:  Objection.  Leading.

2      THE COURT:  Overruled.

3      THE WITNESS:  Correct.  I'm trying to make sure

4  everybody has got the same information.

5  BY MR. QUACKENBOSS:

6  Q.    Okay.

7      Did you write anything to ASH -- or excuse me.  Did you

8  reach out to anyone at ASH to try to clarify any restrictions

9  you had on your ability to go into business on your own?

10  A.    In this timeframe, this is the end of December, one thing I

11  did is I made a personal phone call to Mr. Kramer's office

12  asking him for any assistance in clarifying any restrictions I

13  would have for my non-compete, non-disclosures -- there is a

14  bunch of things go on -- as a Board member, as a consultant, and

15  probably reconfirming what I have as a seller for Grayhawk

16  Homes.

17      Just trying to make sure that I wasn't missing something

18  that would be important.  My goal was to make sure I was doing

19  things professionally, correctly, and I didn't want to cause any

20  trouble for anybody in the process.

21  Q.    Again, was it your intention to compete with ASH-Holdings?

22  A.    No.  Basically with my letter, as we saw previously, I was

23  looking to do more things in the industry.  Maybe buy one or two

24  small builders.  Maybe do real estate development.  Takes a lot

25  of different directions.  Somebody gave me the right phone call,

1121

Direct Examination - David Erickson

1  I could wander off in a different direction.

2  Q.  Did you have a conversation about this with Mr. Kramer or

3  no conversation?

4  A.  Mr. Kramer never returned my phone call.

5      A few days later I will be writing a letter to Marshall

6  Coleman asking for the same assistance.  Eventually I am going

7  to get a letter back from Mr. Kramer stating -- providing a

8  response from on behalf of ASH.

9  Q.  Let's go one at a time here.

10          MR. QUACKENBOSS:  May I see DX291?

11          Your Honor, I have a correction.  This exhibit I

12  called PX207A.  It's actually just PX207.

13          THE COURT:  All right.  207 was admitted.  Not 207A.

14          MR. QUACKENBOSS:  May we see DX291?

15  BY MR. QUACKENBOSS:

16  Q.  Is this a copy of your letter to Marshall Coleman regarding

17  restrictions you may have on doing business?

18  A.  It is.  It's the letter I was referring to.  The second one

19  where I wrote a letter to the chairman trying to clarify.

20          MR. QUACKENBOSS:  Your Honor, I move to admit DX291.

21          MR. KRAMER:  No objection.

22          THE COURT:  Admitted.

23      (DEFENDANTS EXHIBIT DX291:  Received in evidence.)

24  BY MR. QUACKENBOSS:

25  Q.  Okay.

Direct Examination - David Erickson

1    Marshall Coleman is the chairman of the board, correct?

2    A.    He is.

3    Q.    And in the second paragraph here you say:  I am intending

4    to purchase one or more homebuilding companies in the near term

5    for my own investments.  If that step should go well, I may

6    consider doing additional purchases in the future.  So as to

7    avoid any confusion as to whether I am violating any

8    restrictions placed upon me as a result of my sale of Grayhawk

9    Homes, or through my participation with the American Southern

10   Homes board, I am addressing my contracted restrictions in this

11   area to ensure I am not mistaken in my interpretation.  Nothing

12   is to be accomplished by either party ignoring these

13   restrictions.  Transparency by all will ensure that needless

14   fights of interpretation are avoided.

15   Did I read that correctly?

16   A.    Yes, sir.

17   Q.    Okay.

18   And, again, at this point was it your intention to hide

19   from ASH what your intentions were?

20   A.    No.

21   I am trying to be as boldly transparent as I can possibly

22   be.

23   MR. QUACKENBOSS:  May we see DX29, please?

24   BY MR. QUACKENBOSS:

25   Q.    Is this an email exchange between -- at the top, an email

Direct Examination - David Erickson

1    exchange between you and Mr. Kramer?

2    A.    Mr. Kramer is sending me a response to this letter from the

3    30th.  That is correct.

4    Q.    It's dated January 5 of 2021, correct?

5    A.    Correct.

6    Q.    Okay.

7              MR. QUACKENBOSS:  Your Honor, I move to admit DX29.

8              THE COURT:  Any objection?

9              MR. KRAMER:  No objection, Your Honor.

10             THE COURT:  Admitted.

11        (DEFENDANTS EXHIBIT DX29:  Received in evidence.)

12             MR. QUACKENBOSS:  If you could scroll down to the body

13    of the letter, please.

14    BY MR. QUACKENBOSS:

15    Q.    In this letter, does Mr. Kramer offer an interpretation of

16    the scope of your restriction against competing with

17    ASH-Grayhawk?

18    A.    It does.  But then he added some more to it.

19    Q.    Did you agree with his interpretation of the scope of it?

20    A.    I do not and did not.

21    Q.    Did you draw any conclusions upon receiving this letter

22    with this interpretation?

23    A.    I was troubled by his response and wording and started to

24    put me a little bit on guard that something is going on here

25    that isn't right.

1124

Direct Examination - David Erickson

1    Q.    Did you get any response other than this letter to your
2    previous letter to Marshall Coleman explaining what you intended
3    to do?
4    A.    I don't specifically recall that.
5          The significance of this letter is that the non-compete
6    radius of a hundred miles is becoming a leapfrog.  We're going
7    to go a hundred miles and then measure another hundred miles.
8    So with the reclassification of this, Mr. Kramer is trying to
9    say my restriction is a 200-mile radius, not a hundred mile
10   radius.  That sucks up all of Georgia and all of Alabama, which
11   is a pretty healthy expansion.
12   Q.    In selling your home -- excuse me -- in selling your
13   company, Grayhawk, you agreed not to compete in the Columbus
14   region, correct?
15   A.    That was the intention.  And that's normally how it's
16   handled.
17   Q.    Okay.
18         And with regard to the prior exhibit, where you identified
19   those six or seven companies as not being exclusive to ASH, did
20   you ever receive any response to that email?
21   A.    I do not recall that.
22   Q.    Did you ever get a phone call from anyone saying, we
23   disagree that these are not exclusive to ASH?
24   A.    No.
25   Q.    Did there come a time when you talked about Mr. Avala

1125

Direct Examination - David Erickson

1  regarding your intentions to go into business on your own?

2  A.  I talked with Mr. Avala, yes.  Late December I started

3  making some phone calls just kind of looking for possibilities.

4  And I talked to more than one.  I talked to Avala, among other

5  people as well.  And he said, I have still got these deals

6  working with Miramonte, Prominence, Surrey.  If you are

7  interested, they are there to pursue.

8          MR. QUACKENBOSS:  May we see PX118, which was

9  previously admitted.

10 BY MR. QUACKENBOSS:

11 Q.  Is this an email exchange between you and Mr. Avala dated

12 December 30, 2020?

13 A.  It is.

14 Q.  At the bottom you write --

15         MR. QUACKENBOSS:  Your Honor, I move to admit PX118.

16         MR. KRAMER:  Your Honor, we have gone through about

17 four or five exhibits here that have already been admitted,

18 including this one.

19         MR. QUACKENBOSS:  I said this is one preadmitted.  My

20 error.  Excuse me.

21         May we show this to the jury if it's not already up?

22         THE COURT:  Yes.

23 BY MR. QUACKENBOSS:

24 Q.  All right.  You write:  Tony, I need/we need to get a clear

25 written waive-off from ASH on various companies ASH has had an

1   opportunity at.  Specifically, Prominence in Texas, Miramonte in

2   Arizona, Surrey in Florida, others I may not specifically know.

3   Alternatively, if you can get a clear statement such as ASH's

4   pursuing one written LOI at this time.  All other prospects are

5   not of interest to ASH at this time, that would do the trick.

6        Did you send this after you had a conversation with

7   Mr. Avala?

8   A.   Yes.

9        This is a written letter to what Tony and I had agreed

10  verbally already several days previously and he had already been

11  giving me some verbal feedback.

12          MR. KRAMER:  Objection, Your Honor.  Hearsay.  He

13  can't testify about what Mr. Avala said.

14          MR. QUACKENBOSS:  Your Honor, there is quite a bit

15  that Mr. Erickson did, based upon what Mr. Avala said, so it's

16  not being offered for the truth.  It's being offered for the

17  fact that Mr. Erickson heard and relied upon what Mr. Avala

18  represented.

19          MR. KRAMER:  That's the purpose of the hearsay rule,

20  Your Honor.  It is offered for the truth.

21          THE COURT:  You are suggesting it's offered not for

22  the truth of what's stated there, but just to show what

23  Mr. Erickson did in response to it?

24          MR. QUACKENBOSS:  It's to show that Mr. Avala made

25  these representations to him on which Mr. Erickson relied when

Direct Examination - David Erickson

1    he proceeded.

2              THE COURT:  It's not being offered for the proof of

3    what -- for the truth of what it says?

4              MR. QUACKENBOSS:  Absolutely.

5              THE COURT:  To show what Mr. Erickson did in response

6    to it?

7              MR. QUACKENBOSS:  That's correct.

8              THE COURT:  It's admissible for that limited purpose.

9              MR. QUACKENBOSS:  Thank you.

10   BY MR. QUACKENBOSS:

11   Q.   Did you feel like you needed written authorization from ASH

12   to do what you intended to do?

13   A.   No.

14        I didn't need authorization from ASH, period.  This is

15   simply trying to make sure that I have got clear documentation

16   so that if somebody wanted to challenge it in the future I made

17   my best effort to be very transparent.

18   Q.   And his response to you was:  Hi, Dave, I have requested

19   this in writing?

20   A.   Correct.

21             MR. QUACKENBOSS:  May we see DX300, please?

22   BY MR. QUACKENBOSS:

23   Q.   Is this the next email exchange you had with Mr. Avala on

24   January 4, '21?

25   A.   You can probably answer -- the previous one was on 30th, is

Direct Examination - David Erickson

1  that correct?

2  Q.    The previous one is below it.  Oh, excuse me.  You are

3  right.

4       Just confirm this is an email exchange between you and

5  Mr. Avala.

6  A.    It is.

7            MR. QUACKENBOSS:  Your Honor, I move to admit DX300.

8            MR. KRAMER:  Objection, Your Honor.  Hearsay.

9            MR. QUACKENBOSS:  Same explanation, Your Honor.  We

10  are simply presenting it to show what Mr. Avala represented.

11  Not for the truth.

12           MR. KRAMER:  It's actually double hearsay, Your Honor,

13  because he is attributing a statement to Marshall Coleman who

14  can't be here to testify.

15           THE COURT:  It's admissible if it's offered for the

16  purpose of showing what Mr. Erickson did in response to the

17  memo.

18           MR. QUACKENBOSS:  That's the only purpose.

19           THE COURT:  Okay.  I am going to admit it for that

20  purpose.

21           Put it up on the screen just so I can explain this to

22  the jury.

23           All right.  Ladies and gentlemen, you can see this

24  email from Mr. Avala to Mr. Erickson, there at the top, where he

25  says:  Hi, Dave, I confirmed with Marshall that ASH is not

1  pursuing Prominence nor Miramonte, et cetera.

2        This is admissible for the purpose of showing what

3  Mr. Erickson did in response to it.  In other words, what he did

4  when he got this.  It's admissible for that purpose.  But it's

5  not admissible for the purpose of proving that Mr. Avala

6  actually confirmed with Marshall that ASH is not pursuing

7  Prominence nor Miramonte.

8        In other words, it's not admissible for the truth of

9  what Mr. Avala has said in the email, but it's limited for the

10 purpose of showing that Mr. Erickson got it and what he did in

11 response to it -- what his actions were in response to it.

12       It's not hearsay unless it's been offered for the

13 purpose of proving the truth of what's stated in it.

14       If it's offered for some purpose other than proving

15 the truth of what's stated, it's not hearsay under the law.  So

16 I have admitted it for that limited purpose.

17    (DEFENDANTS EXHIBIT DX300:  Received in evidence.)

18       THE COURT:  Go ahead.

19       MR. QUACKENBOSS:  Thank you, Your Honor.

20 BY MR. QUACKENBOSS:

21 Q.   In this -- let me start with the email at the bottom which

22 is what you sent to him on January 4th:  Tony, you still owe me

23 a clear response clarifying that ASH is not interested in

24 pursuing anything in your orbit -- that's Mr. Avala's orbit?

25 A.   Correct.

1130

Direct Examination - David Erickson

```
 1   Q.   Okay.
 2        -- of offer to builders currently.  Specifically, by name,
 3   if possible.  At a minimum give me a statement from yourself or
 4   your phone call with Marshall to that effect.
 5        Had he told you he had had this conversation with Marshall?
 6   A.   He had.
 7   Q.   And then you say:  Don't need to get in a fight down the
 8   road because the other side decides that they should have, could
 9   have on something and puts me in a bad spot.
10        Correct?
11   A.   I do.
12   Q.   And then Mr. Avala's response to you the same day is:  Hi,
13   Dave.  I confirmed with Marshall that ASH is not pursuing
14   Prominence nor Miramonte.  As I mentioned during our call on
15   Saturday, I have dinner with Sean tomorrow and will confirm this
16   once again.  After our dinner I will email you.
17        Correct?
18   A.   Correct.
19   Q.   Okay.
20        MR. QUACKENBOSS:  May I see DX303?  This is the last
21   of the Tony Avala emails.
22   BY MR. QUACKENBOSS:
23   Q.   Dave, is this an email exchange between you and Tony Avala
24   a couple days later on January 6?
25   A.   It is.
```

Direct Examination - David Erickson

1   MR. QUACKENBOSS:  Your Honor, I offer DX303 into

2   evidence.

3   MR. KRAMER:  Same objection, Your Honor.

4   THE COURT:  Same ruling.  It's admitted for that

5   limited purpose.

6   (DEFENDANTS EXHIBIT DX303:  Received in evidence.)

7   BY MR. QUACKENBOSS:

8   Q.   All right.  Mr. Avala in the email below says:  Dave, I

9   spoke with Sean Coleman last night.

10   Again, Sean Coleman is also a member of the Board?

11   A.   He is a member of the Board and he is Mr. Coleman's son who

12   works in a Philadelphia investment house.

13   Q.   He confirmed that:  Your non-compete applies to Columbus,

14   Georgia and environs.

15   Correct?

16   A.   That's correct.

17   Q.   All right.

18   I told Sean that you're interested in pursuing Prominence

19   and possibly Miramonte.  He said ASH is not focusing on either

20   company.

21   A.   Correct.

22   Q.   Correct?

23   Okay.

24   Were you successful in acquiring any of the companies you

25   just discussed with Mr. Avala?

1132

1   A.   In the end, no.  I made a sincere effort on two, but they

2   didn't come to be.

3   Q.   Okay.  Let's turn the page -- you resigned on December 20.

4        As of January 21, who replaced you as CEO?

5   A.   Came to my attention that Greg Benson had come back in as

6   the CEO for American Southern Homes.

7   Q.   Did that surprise you?

8   A.   It did.

9   Q.   Why?

10  A.   Well, they removed him for a reason -- for a variety of

11  reasons.  I won't replay them.  But they purposely asked him to

12  step away, so I was surprised that he was brought back in.

13  Q.   So as we enter 2021 what was the status of the Columbus lot

14  sales and homebuilding?

15  A.   I still have a problem with my C lot schedule.  There is

16  some other minor problems with the LPA interpretations as well.

17  But, I don't -- I still don't have a plan for my C lots that I

18  am supposed to continue to deliver.

19  Q.   You are still delivering lots at this point.  Correct?

20  A.   Yes.  We had been delivering lots continuously.

21  Q.   In fact, you are ahead schedule, correct?

22  A.   Well ahead of schedule.

23  Q.   Ahead of the minimum, correct?

24  A.   Ahead of the minimum required.  Yes.

25  Q.   At the start of 2021, what was the status of your effort to

Direct Examination - David Erickson

1  go acquire other homebuilders?  What were you doing on this

2  effort?

3  A.   Well, I had -- I was starting on the two that I had

4  mentioned a few minutes ago.  Those didn't run their course for

5  several months before they finally expired.  But I was still

6  probing around looking for the right opportunities for both land

7  and homebuilder activities.  That's what I do, and I enjoy doing

8  it.  So I was going to keep looking for opportunities.

9  Q.   Did you write a business plan?

10  A.   Eventually I write a business plan as well.  That was

11  actually late -- it was in December.  I was in regular contact

12  with friends, some banker friends, industry colleagues, kind of

13  looking for opportunities and advice and input from them about

14  where opportunities are going, any ideas along the way.

15       And rather than just verbal, they were suggesting:  Dave,

16  sit down and put your thoughts on paper, you know.  One, for

17  yourself to help formulate your vision.  And, two, so you can

18  transmit it to other people so they can give you better input.

19  Q.   Okay.

20       Your business plan was admitted into evidence yesterday.

21  The jury took a look at it, so I will not reshow it to you at

22  the moment.

23            MR. QUACKENBOSS:  May I please see DX307, which has

24  been previously admitted.

25

Direct Examination – David Erickson

```
 1    BY MR. QUACKENBOSS:

 2    Q.   Do you recognize this, Dave?

 3    A.   This is a special meeting -- it looks like minutes from a

 4    special meeting from the Board of Directors from American

 5    Southern Homes.

 6    Q.   You were not present at this meeting, correct?

 7    A.   I was not.  I am no longer on the Board at this point.

 8    Q.   This was January 22.

 9              MR. QUACKENBOSS:  May we see the second page, please?

10              MR. KRAMER:  Objection, Your Honor.

11              The witness just testified he wasn't at the meeting.

12    How can he testify about the minutes?  He has no personal

13    knowledge or foundation.

14              MR. QUACKENBOSS:  It's admitted into evidence,

15    Your Honor.  I am going to have him comment on a section of it

16    that was previously read into evidence.

17              MR. KRAMER:  He is not an expert witness.

18              THE COURT:  Is his comment going to be based on his

19    personal knowledge as to the item that you are getting him to

20    comment on?

21              MR. QUACKENBOSS:  He has personal knowledge about --

22    about what became of the --

23              THE COURT:  He can review the document, and then if he

24    has personal knowledge and wishes to make some relevant

25    commentary about it, then that's permissible.
```

Direct Examination - David Erickson

1    MR. QUACKENBOSS:  Okay.

2    BY MR. QUACKENBOSS:

3    Q.   Dave, would you please review the next --

4          MR. QUACKENBOSS:  Go down one more page, please.  The

5    second paragraph on this page.

6    BY MR. QUACKENBOSS:

7    Q.   Would you please review that?

8    A.   I have.

9    Q.   Okay.

10   What is your comment regarding what you have read there?

11   Do you draw any conclusion from what you just read?

12   A.   Well, Mr. Coleman is making an observation in terms of the

13   profitability of current projects versus future projects.  They

14   are acquiring lots.

15         MR. KRAMER:  Objection, Your Honor.  He is just

16   explaining what's on the page.

17         THE COURT:  I don't think he has finished his answer.

18   He can -- this is already admitted into evidence.

19         MR. KRAMER:  Sorry, Your Honor.

20         THE COURT:  He can look at what's admitted into

21   evidence and if he has some explanation, based on his personal

22   knowledge, then he can testify to that.  But I didn't -- I

23   didn't hear the entire response.

24         Go ahead.

25         MR. QUACKENBOSS:  Go ahead and continue.

Direct Examination - David Erickson

1    THE WITNESS:  Thank you.

2    Effectively, ASH is building in 2020 and 2021 on lots

3    that were built and priced in 2018 and 2019.  So inherently, as

4    he has noted by the 300 to 350 basis points, you are going to

5    get a better delta in profitability, because one of your input

6    costs, which is land, is coming in at a lower price point

7    because it hasn't inflated over a couple of years, assuming

8    constant inflation.

9    And he is projecting forward with the C lots, Hey, we

10   are going to have to pay regular prices on C lots, or pretty

11   close to regular prices on C lots.  Our profit margins are going

12   to be pinched going into the future because of it.

13   BY MR. QUACKENBOSS:

14   Q.   And there are a thousand of them, correct?

15   A.   Yes, sir.

16   Q.   Okay.

17   So in January we have this special board meeting.  Did you

18   then receive a letter from Mr. Kramer on February 2?

19   A.   Oh, yeah.

20   Q.   May we --

21   A.   A letter on February 2.

22   MR. QUACKENBOSS:  May we see DX312, please?  Also

23   previously admitted.

24   And the majority of the first page is redacted, but

25   may we go to the second page, please?

Direct Examination - David Erickson

1        THE WITNESS:  Continue.

2   BY MR. QUACKENBOSS:

3   Q.    Does Mr. Kramer here make accusations of violation of

4   confidentiality obligations?

5   A.    Mr. Kramer makes a lot of accusations here, but

6   confidentiality is at the top here.

7   Q.    And on the next page are there allegations of non-compete

8   violations?

9   A.    Correct.

10  Q.    And then at the bottom of this page there is a paragraph

11  about Land Purchase Agreement, correct?

12  A.    It is.

13  Q.    And he writes:  Last, but certainly not least, ASH and

14  Mr. Erickson will need to resolve disputes under the Land

15  Purchase Agreement, including disputes related to Mr. Erickson's

16  obligation to deliver lots in a condition that complies with the

17  requirements of the LPA and the purchase price for such lots.

18  The issues under the LPA are too numerous to itemize in this

19  letter, but they will also need to be addressed and resolved in

20  our upcoming negotiating.

21        Had you previously heard anything about the lot quality

22  that you had been providing in Columbus?

23  A.    Generically, over my career, no.  But ASH had specifically

24  made a series of complaints in recent times that the lots

25  weren't perfect enough, and I was inflating prices, and several

Direct Examination - David Erickson

1    other accusations in that theme.

2    Q.    You had been developing lots for about 30 years at this

3    time, correct?

4    A.    An awful lot of them.

5              MR. QUACKENBOSS:  May we see PX201, please?

6    BY MR. QUACKENBOSS:

7    Q.    Dave, is this an email from Mr. Kramer to a Darr Smith?

8    A.    It is.

9    Q.    And Darr Smith is who with regard to you?

10   A.    Darr Smith is an attorney who is work withing me.

11   Q.    Okay.

12             MR. QUACKENBOSS:  Your Honor, I move to admit PX201.

13             MR. KRAMER:  We still object under Rule 408,

14   Your Honor, but I understand that's been resolved.

15             THE COURT:  All right.  It's admitted over objection.

16       (DEFENDANTS EXHIBIT PX201:  Received in evidence.)

17   BY MR. QUACKENBOSS:

18   Q.    Mr. Kramer sends this to your attorney, Darr Smith, with a

19   copy to Mr. Twiss.  Does he write:  As promised here is a draft

20   of a term sheet.  As we discussed on the phone the other day, we

21   focused on the LPA issues in hopes of making progress there so

22   we can move on to the remaining issues, and we welcome your

23   feedback.

24       Did I read that correctly?

25   A.    You do.

Direct Examination - David Erickson

1   Q.   Okay.

2        In that regard, please let us know when we can expect to

3   receive information about the reasons for the big increase in

4   development costs for Phase C lots.

5        Is that correct?

6   A.   Yes.

7   Q.   Is that consistent with the accusation of price inflation

8   that you had heard?

9   A.   That was the opening way it was stated to us before they

10  asked for backup.

11            MR. QUACKENBOSS:  May I please see PX 201A?

12  BY MR. QUACKENBOSS:

13  Q.   Dave, do you recognize this document?

14  A.   I do.

15  Q.   What is it, please?

16  A.   This is the attachment to the note we had just before with

17  the detailed terms that are being proposed by ASH related to

18  their allegations.

19  Q.   Okay.

20       And this is dated March 12, correct?

21  A.   It is.

22            MR. QUACKENBOSS:  Your Honor, I move to admit PX201A.

23            THE COURT:  Was this not already admitted over

24  objection?

25            MR. QUACKENBOSS:  I don't believe this term sheet was

Direct Examination - David Erickson

 1    admitted.

 2            THE COURT:  I remember discussion regarding these term

 3    sheets, and there was an objection to them based on 408 and I

 4    overruled the objection.

 5            Is this a different one?

 6            MR. QUACKENBOSS:  This is a March 12th, one,

 7    Your Honor.

 8            THE COURT:  All right.  It's admitted.

 9        (DEFENDANTS EXHIBIT PX201A:  Received in evidence.)

10            MR. QUACKENBOSS:  Thank you.

11            THE COURT:  Over objection.

12    BY MR. QUACKENBOSS:

13    Q.   So, Dave, as of March 12, regarding the first topic here, a

14    Lot Purchase Agreement in the second bubble, do I see that it

15    says:  Parties to negotiate and memorialize a development

16    schedule for remaining Phase C lots.

17        Correct?

18    A.   It does.

19    Q.   Does that indicate there has been no Phase C lot order

20    determined?

21    A.   As of this date, that's correct.

22    Q.   And the deadline passed four months earlier?

23    A.   Correct.

24    Q.   Above it, under "overall," it reads:  Nothing is agreed

25    until everything is agreed, including the terms of a settlement

1    agreement and execution of such agreement.

2        Correct?

3    A.   That is correct.

4    Q.   And:  Any settlement will need to be approved by the ASH

5    Board of Directors -- Board and members.

6        Correct?

7    A.   That is correct.

8    Q.   Okay.

9            MR. QUACKENBOSS:  Let's scroll down just another --

10   there we go.  The bullet point in the center of the page there.

11   BY MR. QUACKENBOSS:

12   Q.   All such Phase C lots to be priced at 17.5 percent of

13   estimated market value.

14       Correct?

15   A.   Correct.

16   Q.   Is the proposal here that the C lot pricing, ROFO -- the

17   escape clause -- be reduced to a 17.5 percent of estimated

18   market value for ASH?

19           MR. KRAMER:  Objection.  Leading and mischaracterizes

20   the evidence.

21           THE COURT:  Try not to lead the witness.

22           Restate the question.

23           MR. QUACKENBOSS:  Yes, sir.

24   BY MR. QUACKENBOSS:

25   Q.   Describe what's proposed here, please, in that paragraph.

Direct Examination - David Erickson

1    A.    This is a redefinition of a piece of the LPA going from the

2    20-percent maximum price to a 17.5-percent price.

3        That's what it says.

4    Q.    Okay.

5        We have heard some testimony that this proposal is made for

6    your benefit.  Is this something you would have proposed?

7    A.    No, I would not have.

8            MR. QUACKENBOSS:  Okay.  Scrolling down a little

9    further, please.  Next page.

10   BY MR. QUACKENBOSS:

11   Q.    The Atlanta and South Carolina issues, does the document

12   include, again, allegations of non-compete violations?

13       Yes or no?

14   A.    For sure, yes.

15   Q.    Okay.

16       Does the document include allegations of trade name and

17   logo violations?

18   A.    It does.

19   Q.    Does the document include allegations of copyright

20   infringement?

21   A.    It does.

22   Q.    In the next paragraph down here does it suggest that you

23   owe 3 to $5 million as a licensing fee for your use of Grayhawk

24   building plans in Atlanta?

25   A.    It does.

Direct Examination - David Erickson

1    Q.   And under the bullet point below licensing fee, does it

2    state that ASH will seek disgorgement of all of your profits

3    from Atlanta and South Carolina homebuilding?

4    A.   It does.

5    Q.   All right.

6         The next bullet point, does it suggest ASH will pursue

7    $150,000 per home built there?

8    A.   Per home.  Yes.

9    Q.   And does it repeat the confidentiality and information

10   rights allegations?

11             MR. KRAMER:  Objection.  Leading.

12             THE COURT:  Overruled.

13             THE WITNESS:  It does.

14   BY MR. QUACKENBOSS:

15   Q.   Okay.

16        And then it states under buy-out and separation:  ASH

17   remains willing to discuss a buy-out, including at a price above

18   par, subject to agreement on terms of global resolution.

19        Did -- this is regarding a buy-out of your shares in ASH?

20   A.   That is correct.  And that is what it says.

21   Q.   Is that something you had expressed an interest in?

22   A.   I had.

23   Q.   Why?  Without disclosing information we are told you are

24   not supposed to, please.

25   A.   Yeah.

Direct Examination - David Erickson

1    It's on the table.  I can't discuss the reason why.

2  Q.   Were you looking to separate yourself from American

3  Southern Homes?

4  A.   Yeah.  That was the intent.  It's -- clearly something had

5  soured badly from the ASH side and they were making life

6  difficult, so let's part ways.

7  Q.   Were you looking to make a windfall on the sale of your

8  shares in ASH?

9  A.   No.  But I was looking to get a fair price.  And this is

10  fair price plus you got to pay a fee to leave.

11  Q.   Going back to the very top of this document on the first

12  page, looking at the highlighted section under "overall":

13  Nothing is agreed until everything is agreed, including the

14  terms of a settlement agreement and execution of such agreement.

15    Was it your understanding that ASH was conditioning a C lot

16  negotiation on everything below it also being resolved?

17        MR. KRAMER:  Objection.  Leading again.

18        THE COURT:  Overruled.

19        THE WITNESS:  Absolutely.

20  BY MR. QUACKENBOSS:

21  Q.   Did that include the 3 to $5 million for copyright

22  infringement?

23  A.   If you read through that whole series there I collectively

24  have referred to them as extortion fees.  You pay the extortion

25  fees and we will give you a C schedule.

Direct Examination - David Erickson

```
1    Q.   At any point over the course of the subsequent negotiations

2    did anyone at ASH remove the payment of these extortion fees as

3    a condition to a global settlement?

4    A.   No.  I have tried, at least four different times, for a

5    purposeful settlement, and every time it was an all or nothing

6    deal and you will pay significant extortion fees.

7    Q.   Okay.

8             MR. QUACKENBOSS:  May we please see DX0322?

9    BY MR. QUACKENBOSS:

10   Q.   Meanwhile, six days later, you receive an email from

11   Mr. Twiss, correct?

12   A.   I do.

13            MR. QUACKENBOSS:  Your Honor, I move to admit DX0322.

14            MR. KRAMER:  It's already in, Your Honor.

15            MR. QUACKENBOSS:  Excuse me.

16            May we show it to the jury?

17            THE COURT:  Yes.

18   BY MR. QUACKENBOSS:

19   Q.   Is this a letter from Mr. Twiss offering a proposal for the

20   general framework of the development order?

21   A.   That's how he states it, yes.

22   Q.   May we go to the next page, please, or the attachment

23   attached here, or is that a separate --

24   A.   I believe it's separate.

25   Q.   Okay.
```

Direct Examination - David Erickson

1    Mr. Twiss, on the 18th, sends you a document purporting to

2 be a Phase C order proposal, correct?

3 A.   It's a document for discussion.

4 Q.   Okay.

5    And on the screen now is a letter from Mr. Twiss, correct?

6 A.   It is.

7 Q.   Okay.

8       MR. QUACKENBOSS:  Scroll down, please.  All the way to

9 the bottom, please.

10 BY MR. QUACKENBOSS:

11 Q.   Is this the proposal that he had made?

12 A.   Yes.

13    This is the tail-end of the letter he is sending.  It's

14 effectively a variation of a spreadsheet outlining his rough

15 concept of what he wants to do.

16 Q.   Okay.

17    No condition is written in this correspondence, right?

18 A.   Conditions for settlement?

19 Q.   Yes.

20 A.   No.

21 Q.   Okay.

22       MR. QUACKENBOSS:  May we please see PX 454A?

23 BY MR. QUACKENBOSS:

24 Q.   Is this a letter of April 8 to you, I believe, from

25 Mr. Kramer?

Direct Examination - David Erickson

1   A.    It is.

2   Q.    Okay.

3         And this is on April 8th, correct?

4   A.    It is.

5   Q.    Okay.

6             MR. QUACKENBOSS:  Your Honor, I move to admit

7   PX454B -- excuse me.  PX454A.

8             MR. KRAMER:  No objection, Your Honor.

9             THE COURT:  It's admitted.

10        (DEFENDANTS EXHIBIT PX454A:  Received in evidence.)

11  BY MR. QUACKENBOSS:

12  Q.    Okay.

13        Here is a letter from Mr. Kramer to you.  Am I correct in

14  the highlighted section Mr. Kramer states that:  ASH terminates

15  the Consulting Agreement for cause as that term is defined

16  therein?

17  A.    It does.

18  Q.    The bases for terminating the Consulting Agreement are set

19  forth in the attached complaint and include, but are not limited

20  to, misappropriation and use of assets of the company for

21  personal gain and breach of the non-competition obligation set

22  forth in the APA by building and selling homes within a hundred

23  miles of Atlanta, Georgia, and by operating a competitive

24  homebuilding operation headquartered in Columbus.

25        Correct?

1    A.    That's what it says.  Yes.

2    Q.    And ASH was always aware that you were operating a

3    homebuilding operation company in Dallas, Georgia, correct?

4    A.    They were.

5    Q.    Okay.

6    A.    That was part of our deal.  They had transparency of it

7    before the transaction ever happened.

8              MR. QUACKENBOSS:  So let's please look at PX201 --

9    excuse me.  PX454B.

10             MR. KRAMER:  Your Honor, I don't think this document

11   has been admitted, but counsel is writing about it on his easel.

12   Has it been offered?

13             THE COURT:  Has this not previously been admitted?

14             MR. SHEBELSKIE:  It was admitted as a defendant's

15   exhibit, Your Honor.

16             MR. KRAMER:  Oh, that's my confusion then.

17             THE COURT:  I recall seeing it.  I thought it was

18   admitted.

19             MR. KRAMER:  Different number.

20             THE COURT:  What are we going to refer to this as?

21             MR. QUACKENBOSS:  The draft complaint or you mean the

22   number -- the exhibit number?

23             THE COURT:  Yeah.  I mean, apparently we are

24   introducing things that have already been introduced into

25   evidence.

1           MR. QUACKENBOSS:  I believe it's been introduced as

2    this number.  Is that not correct?  Did we use a defendants'

3    number for this?

4           Give me just a moment.

5           Defendants' 326.

6           THE COURT:  All right.  Defendants' 326 has already

7    been admitted.

8    BY MR. QUACKENBOSS:

9    Q.   Okay.  Complaint demand for arbitration.

10          Let's just look at a couple of the sections in here.

11          MR. QUACKENBOSS:  May we see paragraph 198 on page 49?

12   BY MR. QUACKENBOSS:

13   Q.   Paragraph 198 states:  Erickson used and continues to use

14   ASH's confidential information for his own purposes not in

15   connection with any legitimate duty or responsibility to ASH,

16   including when he attempted to purchase Dorn Homes.  After

17   dissuading ASH from increasing its offer price, attempted to

18   purchase Texas based homebuilder Prominence.  Solicited an ASH

19   employee after interviewing the same employee during his tenure

20   with ASH.  And copied language from the Dorn Homes' PPM for use

21   in a draft business plan for his new enterprise.

22          Did I get that right?

23   A.   That's what it says.

24   Q.   If we look at page 50, paragraph 206:  Erickson's

25   developing and delivering lots to ASH-Grayhawk that do not

1   conform with the development standards contained in Sections 21

2   through 25 of the LPA.

3       Had you previously heard that before?

4   A.    Allegations of that, and they are now putting it in even a

5   bolder format.

6   Q.    Okay.

7       Also paragraph 208 on this page, please:  Erickson has

8   inflated the prices for Phase C ROFO lots above the actual cost

9   of development by over-paying an entity in which he has

10  ownership stake.

11  A.    That's what it says.

12  Q.    Page 51, please, paragraph 217:  Erickson has breached

13  non-compete provisions by building and selling homes in Dallas,

14  Georgia, which is less than a hundred miles from Atlanta, and by

15  operating homebuilding operations in Columbus, Georgia, which is

16  the headquarters for Grand Oak Builders.

17      Again, they knew you were building homes in Dallas, right?

18          MR. KRAMER:  Objection, Your Honor, he can't testify

19  what ASH knew.

20          MR. QUACKENBOSS:  Okay.

21          THE COURT:  Sustained, unless you can provide evidence

22  as to how he knew and what he knew.

23          MR. QUACKENBOSS:  Understood.  I will move on.

24          Page 53, please, paragraph 232.

25  BY MR. QUACKENBOSS:

Direct Examination - David Erickson

1    Q.   Erickson has infringed ASH's copyrights without

2    ASH-Grayhawk's authorization, duplicating, distributing,

3    displaying and using significant copyright, alternatively making

4    unauthorized derivative work, and so forth.  Correct?

5    A.   That's what it says.  Yep.

6    Q.   Is that the first -- excuse me.  That's probably not the

7    first.  The first you heard about it is in the --

8    A.   When we had the February 2nd letter where they allege that.

9    This is related to the Transition Services Agreement and the

10   permission to build in the Atlanta market or the Dallas market,

11   specifically, as called out in the Asset Purchasing Contract

12   giving permission to do so.

13          MR. QUACKENBOSS:  And then finally on page 58, please.

14   Count Ten, Deceptive Trade Practices Act.

15   BY MR. QUACKENBOSS:

16   Q.   You were being accused under the Georgia Uniform Deceptive

17   Trade Practices Act, correct?

18   A.   Yes.

19   Q.   Okay.

20          Over the time that you were attempting to negotiate the

21   Land Purchase Agreement, were any of these demands withdrawn by

22   ASH?

23   A.   Would you restate that question, please?

24   Q.   Over the course of your negotiations with ASH about the

25   Land Purchase Agreement, were any of these demands in this draft

Direct Examination - David Erickson

1  complaint withdrawn by them?

2  A.   Negative.

3  Q.   Just to confirm, on February 2, you get Mr. Kramer's letter

4  rolling out some of the claims against you.

5      Correct?

6          MR. KRAMER:  Objection.  Leading.

7          THE COURT:  Don't lead the witness.

8          THE WITNESS:  So on February 2 I get extortion letter

9  number one.

10         On March 12 I get extortion letter squared.

11         And now it's going to go to April 8th.  Now I get

12 extortion letter cubed.  Getting bigger and bigger.

13 BY MR. QUACKENBOSS:

14 Q.   In between what do you get here?

15 A.   I get a little schedule tucked there and say, Oh, just do

16 this schedule for us.

17 Q.   Yeah.

18     So ASH's lawyer, Mr. Twiss, is making a proposal to you

19 regarding C lot order while ASH's other lawyer, here, here and

20 here, is threatening to sue you over all of these claims that we

21 have just walked through.

22     Correct?

23         MR. KRAMER:  Objection, Your Honor.  Leading and

24 counsel is now testifying.

25         THE COURT:  Overruled.

Direct Examination - David Erickson

```
 1              THE WITNESS:  I will confirm that.  Call it a fun
 2    house of buzz saws.
 3    BY MR. QUACKENBOSS:
 4    Q.    Okay.  Then there is a negotiation meeting about all of
 5    this, correct?
 6    A.    As this evolves we are heading towards a meeting where I am
 7    trying to pull the parties together.  Let's have a sound
 8    conversation.  What's the issue?  Let's figure it out and try to
 9    get it resolved.  This is dumb.
10    Q.    Okay.
11          And when did that meeting occur?
12    A.    I believe it was June 2nd, 2021.
13    Q.    Okay.
14          And prior to February -- excuse me.  Prior to June 2nd, you
15    received a form of a proposal regarding the C lot schedule,
16    correct?
17    A.    Yes.  I think that was in late May.
18              MR. QUACKENBOSS:  May we see DX338, please?
19              THE WITNESS:  This is something different.  Wrong
20    document.
21              MR. QUACKENBOSS:  It is.  Was that not 338?
22              Here we go.  Okay.
23    BY MR. QUACKENBOSS:
24    Q.    Is this an email from Mr. Kramer to me on May 28, 2021?
25    A.    It is.
```

1154

Direct Examination - David Erickson

```
 1              MR. QUACKENBOSS:  Your Honor, I will move to admit --
 2              MR. ELLIKER:  It's already in.
 3              MR. QUACKENBOSS:  May we show it to the jury, please?
 4              THE COURT:  It's already admitted.  Yes.
 5    BY MR. QUACKENBOSS:
 6    Q.   Okay.  In this email, Mr. Kramer says:  Here is ASH's
 7    proposal on the LPA, including development schedule, deposit,
 8    takedowns, and excluded lots.  Sorry for the delay, but it took
 9    awhile to put this together.
10         Correct?
11    A.   Yes.
12    Q.   Okay.
13         Is the attachment on this email string?  Okay.
14         So looking at this proposal, let me ask you, does this
15    include all of the C lot neighborhoods where you owned lots?
16    A.   No.  It ignores a significant portion of our lots,
17    particularly the ones that would be considered secondary in
18    terms of quality or desirability.
19    Q.   Were you concerned about that ASH might not buy certain of
20    your lots?
21    A.   Yeah.
22         With this proposal they are cherry-picking the best of the
23    best.  Ignoring the rest.
24    Q.   And right under that list it states:  Timing for balance of
25    neighborhoods not listed subject to continued study and slotting
```

Direct Examination - David Erickson

1   pursuant to ASH's business plans and growth goals.

2       Correct?

3   A.   Yes.

4   Q.   Okay.  Prior to the June 2 meeting, did you ever get a

5   suggestion on what they wanted you to do regarding the balance

6   of neighborhoods that aren't listed here?

7   A.   No.

8   Q.   On the right, where it says:  Phasing to be determined,

9   what does that mean?

10  A.   Well, Auburn Farms single family houses, off the top of my

11  head, has something like 200 and some lots.  Let's call it 210.

12  You would never want to develop all of those at one time for the

13  reasons I stated this morning.  So you have to figure out -- you

14  are gonna eat it in small bites.  You are gonna to take 20 at a

15  time, 30 at a time, 60 at a time.  It's a broad paintbrush

16  without any detail.

17  Q.   Regarding the detail on the C lot neighborhoods that are

18  there, was it satisfactory for you to know simply the

19  neighborhood name?

20  A.   Simply because I know all the moving parts, it tells me

21  what they are talking about at least, yes.  There is

22  complexities to this conversation that might be difficult for

23  others to do, but if you know all the moving parts, it's useful.

24  It's a start.  But it's far from complete.

25  Q.   At the June 2nd meeting, in your view, did ASH condition

Direct Examination - David Erickson

1    agreement regarding the LPA negotiation on other things?

2    A.   Oh, yeah.  In the end it came down to, We're going to agree

3    on everything, we're going to agree on nothing, and you're going

4    to pay extortion fees.  There was lots of other conversation,

5    but that pretty well sums it up.

6    Q.   Was the renegotiation of the Land Purchase Agreement a

7    condition to agreeing globally?

8    A.   In that conversation we had a complete reformatting of the

9    LPA.  It was -- effectively it was a brand new document.

10        We are talking about June 2nd now, correct?

11   Q.   Yes, sir.

12   A.   Okay.

13   Q.   Did you reach any agreement on anything in the June 2nd

14   meeting?

15   A.   We agreed we did not have an agreement.

16        MR. QUACKENBOSS:  May we see DX342, please?

17   Previously admitted.

18   BY MR. QUACKENBOSS:

19   Q.   Subsequently, we heard Mr. Darnold testify about the day

20   before the June 1 meeting:  Marshall is good with the no

21   negotiation strategy for Erickson.

22        Correct?

23   A.   Yes.

24   Q.   Was a potential buy-out of your ASH shares also part of the

25   conversation?

1157

Direct Examination - David Erickson

1    A.    It was.  We had been advised that ASH was apparently in at

2    least a serious conversation about a SPAC, which is a form of

3    going public.  And I think they were required to give us that

4    transparency.  So the buy-out of shares was a topic of

5    discussion as well.

6    Q.    How did you calculate what you thought your shares would

7    cost at this point in time?

8    A.    There was enough information of what was disclosed to us

9    that somebody who was reasonably knowledgable about that could

10   do some quick calculations and make a pretty good estimate of

11   what the valuation was per share of existing ASH shares.

12   Q.    Okay.

13        How much time went by before ASH filed its lawsuit?

14   A.    Around the time of the June 2 meeting -- we had the

15   meeting, of course, but there was a lot of focus on they wanted

16   a bunch of lots.  They had lots under contract and they wanted

17   to make sure they got those lots.

18        And trying to be the greater good and help bridge the gap,

19   I said, We will make sure we get those lots to you to complete

20   your contracts already in-hand.

21        I'm working from memory here, but I think we delivered

22   those lots on June 12th and the lawsuit happened like five days

23   later.

24   Q.    Okay.

25        And at the time they filed the lawsuit against you on

1    June 14th, or whenever it was filed, were you still ahead of

2    schedule delivering lots to ASH?

3    A.    We were.  We were well ahead of schedule.

4    Q.    Do you know about how many?

5    A.    120 or so.  I don't normally look at those that closely.

6    Q.    So now you have been sued.  How do you respond?  What do

7    you do?

8    A.    Say, Congratulations, Mr. Attorney, you got a lot of work.

9    So we defend ourself.  We end up sending a letter, or notice,

10   about the C schedule.  We continued to deliver lots for the

11   third quarter, as I recall.  I think that's the general

12   framework.  We're still trying -- I'm trying to do something

13   proactive to solve the problem.

14   Q.    Did you attempt to terminate the Land Purchase Agreement?

15   A.    That's where the notice comes in place.  This is now a

16   default.  Prior to the June 2 meeting we had had a notice.  Both

17   sides had withdrawn their notices in the interest of trying to

18   come together and do something.  And so we made an attempt at

19   June 2.  So I was, Well, okay, fine, then we are going to have

20   to start the process again of notice for default of the C lots.

21   Q.    The question is, did you attempt to terminate the Land

22   Purchase Agreement?

23   A.    Yes.  In the end we terminated the Land Purchase Agreement

24   after notice.

25   Q.    Okay.  Based upon what alleged default?

Direct Examination - David Erickson

1  A.    Failure to come to agreement on the schedule.  That's the

2  only mechanism available in the contract.  We have to give them

3  notice and terminate.

4  Q.    At the same time was ASH still expecting and demanding you

5  to deliver lots?

6  A.    Yes.

7  Q.    Now the Court had an opportunity to review that and you

8  were eventually ordered to begin selling some lots again,

9  correct?

10  A.    That's correct.

11  Q.    That was an interim order to maintain the status quo while

12  this lawsuit ran its course, correct?

13  A.    That's correct.

14        I would also like to add that it was with the bond.  But

15  you are correct.

16  Q.    You have a counterclaim, correct, against ASH in the

17  lawsuit?

18  A.    We have.

19  Q.    For what?

20  A.    Cancellation of the Consulting Agreement for cause that I

21  think was falsely done under false pretenses.

22  Q.    The Consulting Agreement is already in the record.  It's

23  been preadmitted.

24        Do you agree with Ms. Allen's testimony yesterday about

25  amounts you are owed under that for insufficient termination?

Direct Examination - David Erickson

1    A.    Yeah.  The amount for the consulting fee was clear, and

2    then the only variable was the health insurance which she said

3    was five thousand and some dollars.  But, you know, they are

4    correct.

5    Q.    Okay.

6    A.    Let me restate that.  If Amy knows it, she knows it.

7    Q.    All right.  I would like to turn now directly to the claims

8    against you in this trial.

9          Number one, the alleged failure to agree to an order of

10   development of C lots in the first year.

11         Did you violate the Land Purchase Agreement by not agreeing

12   to a C lot order in the first year?

13   A.    No.  I think I made tremendous efforts to try to get it

14   accomplished, but it's a two party discussion.

15         MR. QUACKENBOSS:  May we see, for example, PX396,

16   please?

17   BY MR. QUACKENBOSS:

18   Q.    Is this an email exchange between you and Mr. Benson on

19   October of 2020?

20   A.    It is.

21         MR. QUACKENBOSS:  Your Honor, I move to admit PX396

22   into evidence.

23         MR. KRAMER:  No objection, Your Honor.

24         THE COURT:  Admitted.

25         (DEFENDANTS EXHIBIT PX396:  Received in evidence.)

Direct Examination – David Erickson

1    BY MR. QUACKENBOSS:

2    Q.   Dave, at the bottom on October 4, you say:  Greg, in the

3    spring Chuck and I approached Chris Recker with Kathy Long in

4    attendance, I believe, about our idea building townhomes in a

5    3.5-acre parcel on Warm Springs Road.  After discussions on the

6    lots, the townhome product, estimated cost, et cetera, we

7    received approval and a commitment by ASH to purchase these

8    townhome lots.

9        This same conversation occurred with Ken Thirtyacre at our

10   first face-to-face meeting on lots with Chuck in attendance, at

11   which time he expressed no reservation.

12       Subsequently, Chuck informs me that Ken Thirtyacre also

13   confirmed by email the desire and confirmation of ASH to

14   purchase these lots being engineered for townhomes.

15       About two weeks ago Chuck received a phone call from

16   Ken Thirtyacre in which he said ASH was not going to pursue

17   these lots at this time and you had agreed to this plan.

18       Were these A, B or C lots?

19   A.   They were not completed and not priced, so they had to be

20   some form of a C lot.

21   Q.   Okay.

22       And you were looking for direction as of October 4 from ASH

23   about how to proceed with these, correct?

24   A.   Correct.

25   Q.   Okay.

1   A.   Significant is the fact that the pattern of one person

2   gives us a green light and then somebody else comes back and

3   takes it away.  We were frequently getting bounced around where

4   we start stop, start stop, and we just didn't know what to do.

5   Q.   The email above it, dated October 16, from you to

6   Greg Benson, again, says:  Greg, resending this email.  I have

7   not received an answer to my request for clarification.

8        Had Mr. Benson gone 12 days without responding to you?

9   A.   That's correct.

10  Q.   Okay.

11       And then you add:  Additionally, the Land Purchase

12  Agreement calls for both parties to develop and agree to a plan,

13  agree to the order in which specific C lots will be developed

14  under paragraph 10, page 3 of the LPA.  This is to happen within

15  the first year, being November 15, 2020, as the deadline.  We

16  need to work on this, please.

17       Is that correct?

18  A.   It is.

19       And I would like to highlight that I had been pinging this

20  subject frequently throughout 2020.  This is simply a --

21  essentially another round to say, Hey, we got a deadline coming.

22  Let's get this done.

23  Q.   So you have been having conversations as well?

24  A.   Conversations with some email confirmation we will see as

25  well, but this is deep into the process.  I just want it to be

1    known that this isn't the first time I have brought it up.  It's

2    been a regular topic.

3              MR. QUACKENBOSS:  May we see above this email, please?

4    BY MR. QUACKENBOSS:

5    Q.   So two days later Mr. Benson does respond, he says:  Dave,

6    I will have an answer later today.  Just analyzing some market

7    data.

8        Now there have been suggestions that you did not deliver

9    information to ASH which caused their delay in agreeing.  Have

10   you heard that?

11   A.   I have heard those statements, yes.

12   Q.   Is there any reason for you to have not given them every

13   piece of information they wanted about your C lot development?

14   A.   No.  There is no secrets here.  I mean, the land is the

15   land.  And if they wanted to know the status of something, or

16   what we think the cost of something, we would do everything

17   within reason to try to help them.

18   Q.   How much time prior to buying your company did Mr. Benson

19   have to look at your C lot property?

20   A.   Well, the LOI was approximately June 1.  We closed

21   November 15.  That's four-and-a-half months, I think.  They had

22   all of that.  And we sent them boxes and boxes and boxes of

23   paperwork about proposed plats, and where they are -- you could

24   get some engineering information out of there.  Anybody that

25   wanted to research them could pull them up and quickly make some

Direct Examination - David Erickson

1   opinions about how they might fit into a future plan.  And,

2   again, nothing hidden here.  We tried to document everything we

3   can within reason.

4   Q.   Okay.  Just one more email.

5          MR. QUACKENBOSS:  May we please bring up DX317?

6   BY MR. QUACKENBOSS:

7   Q.   Is this an email between you and Ryan Twiss on March 5th of

8   2021?

9   A.   May I see this whole document?  We are looking at the top.

10  I want to see what's below it.

11  Q.   So, it's between --

12  A.   There is a chain here.  I want to make sure I have context

13  properly.

14      Okay.  Continue.

15  Q.   Is this an email exchange between you and Mr. Benson dated

16  March 4, '21?

17  A.   It is.

18         MR. QUACKENBOSS:  Your Honor, I move to admit DX317.

19         MR. KRAMER:  No objection.

20         THE COURT:  Admitted.

21         MR. KRAMER:  It's already in.

22         THE COURT:  It's already in evidence.

23         Is it already evidence as 317?

24         MR. SHEBELSKIE:  Yes, sir.

25         THE COURT:  Okay.

Direct Examination - David Erickson

```
 1    BY MR. QUACKENBOSS:
 2    Q.    You write to Mr. Benson -- this is March 4, correct?  This
 3    is three-and-a-half months -- or excuse me.  Two-and-a-half
 4    months after the deadline has passed for Phase C order to be
 5    agreed upon?
 6    A.    It is.
 7    Q.    You write:  Greg, in the past year, but particularly in the
 8    past six months, we at GH Lot Holdings, Inc. have had a lack of
 9    tranparency and communication on the Land Purchase Agreement and
10    how lots are planned, developed, and delivered.
11          Did you write that?
12    A.    It's my email.  That's my words.  Yes.
13    Q.    Okay.
14          In trying to implement the LPA over the past year we've had
15    a number of conversations with various leaders of ASH-Grayhawk
16    and American Southern Homes.
17          On more than one occasion we have received clear
18    commitments from ASH leadership only to be overruled at a later
19    date, or advised that the first person didn't have the authority
20    to make such a commitment.  In other circumstances, the ASH
21    decisions are indeed the guiding instructions we are to follow.
22    This has happened both with verbal and written commitments and
23    we have received conflicting information on who can make what
24    commitments and when.
25          Did you write that?
```

Direct Examination - David Erickson

1   A.   I did.

2          MR. QUACKENBOSS:  If you would continue scrolling down

3   there.

4   BY MR. QUACKENBOSS:

5   Q.   Currently, we have lots pending delivery in three

6   subdivisions based on previous verbal or written discussions and

7   instructions along with our own initiatives.  We are about to

8   break ground on two additional locations as well.

9          Currently, in all of these situations, we do not currently

10  have a full commitment from ASH-G, or ASH, on which lots will be

11  purchased and at what price and they will be taken by

12  ASH-Grayhawk.

13         Bottom line, we just don't have a very good plan of

14  execution on what is supposed to be happening in land

15  development for the LPA.  Compounding our problem, in paragraph

16  10 of the LPA, the LPA calls for both parties to agree on the

17  order of land development within the first full year.

18         For the past six weeks, I have been on my assistant,

19  Chuck McClure, to try and address this disconnect.  To date he

20  has had little success getting a firm commitment on resolving

21  the paragraph ten commitment.

22         Correct?

23  A.   Correct.

24          MR. QUACKENBOSS:  Can we look up at the subsequent

25  email, please, in this chain?

Direct Examination - David Erickson

1   BY MR. QUACKENBOSS:

2   Q.   What we see is Mr. Benson, upon receiving it, sends it to

3   Mr. Pehrkon, Mr. Twiss, and Mr. Kramer.   Correct?

4   A.   Correct.

5   Q.   Okay.

6   A.   Not taking action himself.

7   Q.   Okay.

8        And then you do ultimately get a response here on March 5

9   from Mr. Twiss -- we have already seen his response during his

10  testimony, I believe -- where he says that:   ASH -- in the

11  second sentence -- ASH was poised to initiate discussions under

12  Section 10 of the LPA before Greg and Ken were removed in

13  October.

14       Correct?

15  A.   Correct.

16  Q.   Is there any reason at all why you would not have wanted a

17  Phase C lot order more than anyone?

18  A.   I am probably at the top of the wish pile.

19  Q.   Does the LPA, in your interpretation, require that you

20  continue to negotiate a Phase C lot order after the first year?

21  A.   No.

22  Q.   That deadline is the first year, correct?

23  A.   That's the reason it has the deadline.   Has a date.

24  Q.   To this day has ASH ever given you a complete list of the

25  lots they wanted to buy from you?

Direct Examination - David Erickson

1  A.    They have not.

2  Q.    Can you think of any way ASH-Grayhawk was harmed by the

3  absence of a C lot order agreed to by the parties?

4  A.    Well, nothing obvious other than they are hurting their own

5  future delivery.

6  Q.    Now I would like to move on.

7       You are being sued separately for not delivering the lots

8  you were supposed to, and I believe we covered some of this

9  before so I won't repeat it, but at one point you stopped

10 developing your C lots, correct?

11 A.    Correct.

12 Q.    Why did you do that?

13 A.    Well, as stated in one or two of those exhibits right in

14 front of us, we had projects going forward based upon verbal

15 things that ASH kept saying, Yeah, yeah, yeah, you're going in

16 the right direction.  Saying they would do the paperwork later

17 on, which never got done.

18      So I had projects that were halfway built.  And a

19 development project halfway done is not good.  You got open

20 trenches, you got pipes, it can all get compromised by water and

21 mud.  You get heaving and there is all kinds of things that can

22 go badly.  It's like walking out of a facelift in the middle of

23 the surgery.  It's not going to end well.

24      I chose to go forward, to stabilize it, make sure it was

25 saved up for the future.

Direct Examination - David Erickson

1  Q.   My question was, why did you stop at some point developing

2  the C lots?

3  A.   I don't have a schedule.  I am spending money blindly.  I

4  don't know what we are going to do when we are going to do it.

5  It's bad business for everybody.

6  Q.   And at the time you stopped developing lots was ASH

7  accusing you of poor lot quality?

8  A.   Yes.

9  Q.   At the time you stopped developing lots, was ASH accusing

10 you of price inflation on your lots?

11 A.   Yes.

12 Q.   At one point you began -- strike that.

13      After you stopped developing your C lots, did you continue

14 to sell them B lots?

15 A.   I did.

16 Q.   Were you continuing to meet the schedule of minimum sale

17 obligations under the LPA?

18 A.   I was.

19 Q.   And have you now sold all of your available B lots to ASH?

20 A.   We are getting down to the last few.

21 Q.   Why did you begin to develop C lots again recently?

22 A.   Well, I don't have a schedule.  I have got some commitment

23 to deliver some more B lots and I don't have anymore B lots

24 left.  So I am bringing stuff forward to try to put something on

25 the table to meet what obligations I can the way I can because I

Direct Examination - David Erickson

1    am working in a void.

2    Q.    My question was, what caused you to begin developing C lots

3    again?

4    A.    I am looking to do them as a substitute for B lots to keep

5    the momentum going for delivering the best commitments I can.

6    Q.    So that you can continue to maintain your minimum delivery

7    of lots over the course of the contract?

8    A.    Correct.  Fulfill my obligation the best I can.

9    Q.    At the moment you have got some C lots developed in

10   Charleston Place development?

11   A.    They are very far along.  Imminent to become final

12   accepted.

13   Q.    How many?

14   A.    40.

15   Q.    And what is preventing you from finishing the development

16   of those?

17   A.    I have to have clear title to give to the city of Columbus.

18   I have to give it to them for free.  And I have to have clear

19   title to do that.  And we have tried three different ways to get

20   it done in the last few weeks, and ASH says they don't want to

21   do that.

22   Q.    To be clear, what's interfering with your clear title on

23   those lots?

24   A.    There is a legal mechanism called lis pendens.  It's

25   probably Latin, I assume.  And it basically says that they have

1    a hold on that property, or a claim to that property, and as a

2    result you can't hand it off to somebody else unless you can

3    clear that claim.

4    Q.    ASH has placed the lis pendens on those properties?

5    A.    Those properties, and every other property I got in the

6    C list.

7    Q.    Have you requested that ASH lift the C lots on the -- lift

8    the lis pendens on the Charleston Place C lots?

9    A.    Three different letters.  Yes, sir.

10   Q.    And they have declined?

11   A.    Declined or not responded.

12   Q.    So you are being sued for failure to deliver C lots,

13   correct?

14   A.    Correct.

15   Q.    Is there anything else preventing you from delivering those

16   C lots other than the lis pendens?

17   A.    At least with the small batch we're talking about, their

18   permission to move forward is the barrier.  And I am being sued

19   for the same thing they won't let me do.

20   Q.    If it gets lifted, are you prepared to continue developing

21   and delivering C lots throughout the duration of the contract?

22   A.    I have -- I am prepared.  And I have been prepared since

23   day one, but all of those extortion claims and whatnot got to

24   get out the door.  You can't work when you got all these guns

25   shooting at you.

Direct Examination - David Erickson

1    Q.   Did you ever terminate the Land Purchase Agreement --

2    excuse me.

3        After the Court determined that you did not effectively

4    terminate it, did you terminate it again?

5    A.   I believe we have.

6    Q.   Did you ever breach the Land Purchase Agreement?

7    A.   In my mind, no.  I have done everything I can to meet the

8    terms of the Land Purchase Agreement.  If I can't get a

9    schedule, all I can do is follow the wording of the contract to

10   the best of my knowledge.

11   Q.   Did you ever signal an anticipatory breach of the Land

12   Purchase Agreement?

13           MR. KRAMER:  Objection, Your Honor.

14           MR. QUACKENBOSS:  All right.  I will withdraw it.

15   BY MR. QUACKENBOSS:

16   Q.   Do you have any information about whether ASH has even

17   built homes on the lots that you have been selling them over the

18   course of the last year?

19   A.   We have.  I personally have done two reconnaissance of all

20   the lots we sold them in the last year-and-a-half, and there are

21   many of them that they have not took [sic] any action on to

22   build on yet.

23   Q.   And how do you know this?

24   A.   I personally went and looked at every single lot.

25   Q.   All right.

Direct Examination - David Erickson

1    I would like to spend a few minutes talking about this

2    confidential information allegation.  You are being sued for

3    using ASH's confidential information, correct?

4    A.    That's correct.

5    Q.    There has been testimony about the Dorn -- the Dorn

6    acquisition.  Did you attempt to purchase Dorn in between the

7    time that Mr. Benson failed and you ultimately succeeded?

8    A.    I worked to get a purchase contract put together with

9    Dave Grounds, the owner of Dorn Homes.  I was specifically, and

10   purposely, working to get a deal put together with the intent of

11   offering it to the Board and say, Here it is.  Mr. Benson

12   couldn't get it done.  I've got it for you.  If you want it,

13   please take it.  If you don't want it, then I am prepared to

14   take the deal myself.

15       But it was all with the proviso, You get first chance at

16   it.  I'm a Board member.  I have a responsibility to be -- to

17   honor the Board and the company's actions first above my own.

18   Q.    Did you use any confidential information of ASH in the

19   course of your conversations with Dorn?

20   A.    No.

21   Q.    For your own benefit, I mean?

22   A.    No.

23   Q.    Okay.

24   A.    For the record, Dorn Homes was part of my Builder 20 club

25   for probably six or eight years.  I already knew the company.  I

Direct Examination - David Erickson

1    had been there.  I had physically seen his houses and models and

2    talked to the sales people.  Only thing I didn't know was how

3    many did they sell last week.  I already knew most of that

4    information off the top of my head.

5    Q.   Did you bring Dorn to the attention of ASH for their

6    acquisition in the first place?

7    A.   Yes.  I started the process, as I recall, in December of

8    2019, roughly a month after the purchase.  I proactively reached

9    out to my friend, Dave, and said, ASH is looking to acquire

10   companies.  You might be something they want to look at.  Are

11   you interested?

12       He gave me a thumbs up and told me he had been in

13   conversation with other acquirers in the year previous and he

14   would seriously consider the possibility.

15       So I was teeing it up for ASH to say, Let's go take a look

16   at these people.

17   Q.   In the end, did your negotiations of the Dorn deal save ASH

18   money?

19   A.   ASH was offering to make the purchase at a higher price

20   using company stock.  So in terms of the actual transaction

21   price, I ended up negotiating a cash heavy deal but at a lower

22   price.

23   Q.   So overall price was lower in the deal you put together for

24   ASH to buy Dorn, correct?

25   A.   Correct.  More importantly, I actually got it done.  You

Direct Examination - David Erickson

1    can talk about it all day long, but if you don't get it done, it

2    doesn't matter.

3    Q.   Let's talk about this non-disclosure agreement that --

4           THE COURT:  Mr. Quackenboss, do you think you are

5    going to wrap-up your direct within the next 15 minutes or so,

6    or not?  It's 1:00 o'clock.  If you are going to wrap it up, I'd

7    like to go ahead and finish and then we will do the

8    cross-examination after lunch.  But if you are not going to wrap

9    it up within the next 15 minutes, or so, I am going to let the

10   jury go to lunch.

11          MR. QUACKENBOSS:  What I have left, Your Honor, is not

12   much, but I do think it may be more than 15 minutes.

13          THE COURT:  Okay.  All right.

14          Ladies and gentlemen, I am not going to starve you to

15   death, so we are going to take a lunch break.

16          Do not discuss the case during the break.

17          Come back -- it's 1:05.  Let's be back here at 2:15.

18   That will give you a little over an hour for lunch.  We will see

19   you back here at 2:15.

20          Do not discuss the case over the break.

21          Enjoy your lunch.

22      (Jury out at 1:05.)

23          THE COURT:  So as I understand it, this will be the

24   defendants' last witness, other than their expert who is not

25   available until Monday.  Is that correct?

1    MR. QUACKENBOSS:  That is correct.  Yes.  Our last

2 witness.

3    THE COURT:  And, Mr. Kramer, do you know at this point

4 whether you would likely have any rebuttal witnesses?

5    MR. KRAMER:  At this point, we don't anticipate any

6 rebuttal witnesses, Your Honor.

7    THE COURT:  Okay.  All right.

8    MR. KRAMER:  We'd just as soon get the case to the

9 jury today.

10    THE COURT:  I know you would, and you would also like

11 to get it there without them having their expert testify.

12    MR. KRAMER:  I'd love to cross-examine their expert,

13 Your Honor.

14    THE COURT:  Yeah.  That's just the problem.

15    We have gone a week.  I am not going to deprive the

16 defendants of having their expert testify in the case because of

17 some miscalculation on defendants' part as to how fast the case

18 would proceed.

19    I mean, I did throw out some claims that they thought

20 they were going to have to defend, so we are going to be coming

21 back Monday for that.

22    So my plan would be that we will finish Mr. Erickson

23 today with the direct and cross-examination.

24    And if you were going to put up any rebuttal witness,

25 who is here, I'd just as soon get that done today, even though

1    the defendant will not have formally rested.  But if not, then

2    what we will do the rest of the afternoon, we will have our

3    charge conference so that we will have nailed down exactly what

4    I am going to charge the jury on before y'all leave this

5    afternoon.

6            The way we do it is I provide the lawyers with the

7    draft written charge and we work off that in the charge

8    conference.  So you should review that draft written charge and

9    be prepared to make any objections directly to the draft charge

10   and any suggested additions to it.

11           I have got that here -- I think I have got that and

12   the written questions to the jury.  I believe I have got a

13   number of copies to provide two copies per side.

14           Mr. Gunn, if you could give that to one group of the

15   lawyers and this to the other.

16           THE COURTROOM DEPUTY:  Yes, sir.

17           THE COURT:  So that's what we will be working off of

18   after we finish with Mr. Erickson.

19           We will take a little break.  You can look at it over

20   lunch, but we will take a little break after Mr. Erickson for

21   you to look at it, look over it some more.  But we will get that

22   finalized before we finish this afternoon.

23           We will be in recess until 2:15.

24           MR. KRAMER:  Thank you, Your Honor.

25       (Recess taken 1:09.)

1           (Resumed at 2:13.)

2                 THE COURT:  Be seated.  Bring the jury down.

3                 MR. KRAMER:  Your Honor, while we are waiting for the

4      jury --

5                 THE COURT:  Yes, sir.

6                 MR. KRAMER:  -- I think the testimony this morning

7      opened the door to questions about Mr. Erickson's military

8      disciplinary record, but I wanted to check that before I go

9      ahead and do it in front of the jury.

10                 There was a lot of character evidence presented, and I

11     think we should respond, or could respond, including just a few

12     questions about that.

13                 THE COURT:  All I remember him saying was he was in

14     the Army for 10 years, the sharp shooter -- what was it --

15     Marksmanship Unit and then the Reserves.

16                 MR. KRAMER:  That's right.  There was a lot of

17     testimony about leadership qualities and St. Jude's and all

18     kinds of character evidence that serves no purpose but to

19     bolster.

20                 MR. QUACKENBOSS:  It's ordinary background information

21     the man is entitled to give.

22                 THE COURT:  I'm not going to --

23                 MR. KRAMER:  Okay.  That's why I checked, Your Honor.

24     That's fine.

25                 THE COURT:  -- exclude it under 403, if nothing else.

```
 1              MR. KRAMER:  The Court has already ruled.  I just
 2    wanted to check.
 3              THE COURT:  Yes, sir.
 4          (Jury in at 2:14.)
 5              THE COURT:  All right.
 6              Mr. Quackenboss, you may continue.
 7              MR. QUACKENBOSS:  Thank you, Your Honor.
 8                  CONTINUED DIRECT EXAMINATION
 9    BY MR. QUACKENBOSS:
10    Q.   All right.  Dave, we were about to discuss the allegation
11    that you stole a non-disclosure agreement which is confidential
12    from American Southern Homes Holdings.
13         First of all, do you have in your offices versions of
14    non-disclosure agreements?
15    A.   Yes.
16    Q.   How many different -- if you could estimate how many
17    different non-disclosure agreement forms have you seen in your
18    30 some years of being in business?
19    A.   At least 20 or 30.
20    Q.   Did you need to use a non-disclosure agreement that any
21    company in particular might have briefly sent you?
22    A.   No, sir.  They are generally very generic.
23    Q.   Have you seen versions of non-disclosure agreements on the
24    Internet?
25    A.   Yes.
```

1    Q.    Do you have any recollection of particularly selecting an

2    ASH non-disclosure agreement to use for any purpose?

3    A.    I do not.

4    Q.    Is it possible that you used a form you had in your files

5    for those occasions?

6    A.    Very possible.

7    Q.    And, again, do you consider language within a

8    non-disclosure agreement to be confidential to anyone?

9    A.    No.

10          I was about to say, I'm not sure a confidential agreement

11   with anybody is confidential.  It's a pretty generic document.

12   Q.    In fact, it is sent out to parties with whom you have no

13   confidentiality agreement in the first place, correct?

14   A.    Correct.

15   Q.    You are also being sued for allegedly copying something out

16   of your business -- excuse me -- something for your business

17   plan out of a Private Placement Memorandum that ASH circulated

18   regarding the Dorn acquisition, correct?

19   A.    Yes.

20   Q.    Is there anything confidential or secret about the business

21   proposal you outlined in your business plan?

22   A.    No.

23          In fact, I have circulated it widely without restriction.

24   Q.    Is there anything confidential or secret in your view about

25   the ASH business plan?

1           MR. KRAMER:  Objection, Your Honor.  I think counsel

2     is mischaracterizing the evidence.  It was a Private Placement

3     Memorandum.  Not a business plan.

4           MR. QUACKENBOSS:  No.  My question was correct.

5     BY MR. QUACKENBOSS:

6     Q.   You are familiar with ASH's business plan, are you not?  I

7     don't mean a written document.  I mean, its plan of doing

8     business, rolling up companies and selling them.

9     A.   Yeah.  That's what I was going to say.  The business plan,

10    as I know it, is a relatively generic simple concept.  I don't

11    think I have ever seen a written business plan for ASH holdings

12    or ASH, in general.

13    Q.   Is there anything secret about the land light business

14    strategy?

15    A.   No.  That's been widely known for 30 years or more.

16    Q.   Has Mr. Benson been quoted in media reports describing the

17    ASH business plan that is "land light"?

18    A.   Yeah.

19         It's fundamental to their public communications.  I think

20    it's even in their old website.

21    Q.   Do you know whether ASH itself based its business approach

22    on the business approach of some other homebuilding company?

23    A.   Yeah.  Greg -- correction.  Marshall Coleman, he flat said

24    he was using basically a variation of what NVR used, and he

25    worked with them for a long time.

1  Q.   Now the Dorn Private Placement Memorandum that you

2  received -- did you receive a copy of that when it was sent out

3  to investors?

4  A.   I did.

5  Q.   And you were an investor in ASH at the time?

6  A.   Correct.

7  Q.   And, in fact, you were considering making an additional

8  investment in ASH specific to the Dorn acquisition, correct?

9  A.   That's correct.

10  Q.   So that Dorn Private Placement Memorandum was sent to you

11  as a potential investor, correct?

12  A.   Yes.

13  Q.   All right.

14       Now, are you aware of any way in which ASH was harmed by

15  the circulation of a non-disclosure agreement that included that

16  company's name?

17  A.   No.

18  Q.   Are you aware of any way in which ASH was harmed by the

19  draft business plan you prepared and circulated?

20  A.   No.  There is no logic to that.

21  Q.   You are also being sued for exploring an acquisition of

22  Miramonte homes, correct, after you resigned as CEO?

23  A.   I know it's on the list.  I am not sure if it's a specific

24  count.

25  Q.   As part of the claim for breaching confidentiality,

1    correct?

2    A.    Under confidentiality, yeah.

3    Q.    If you had not been ASH's CEO, would you have been able to

4    learn Miramonte was shopping itself around by some other source?

5              MR. KRAMER:    Objection, Your Honor.    Calls for

6    speculation.    Hypothetical.    Not an expert.

7              THE COURT:    Rephrase.

8    BY MR. QUACKENBOSS:

9    Q.    After you were -- after you resigned, how did you learn

10   that Miramonte was still on the market?

11   A.    Simply called the broker.

12   Q.    Which was who?

13   A.    Tony Avala in California.

14   Q.    What did he tell you at that time about Miramonte still

15   being available?

16   A.    He says he is still representing Miramonte.    They are still

17   available.

18             MR. KRAMER:    Objection, Your Honor.    Hearsay.

19             MR. QUACKENBOSS:    Your Honor, again, this is -- as

20   with the texts, it was about what he did in response to what he

21   was told by Mr. Avala.

22             THE COURT:    Overruled.

23   BY MR. QUACKENBOSS:

24   Q.    What did he tell you about Miramonte's availability?

25   A.    He said that he was still representing Miramonte and they

1    were still available.

2    Q.    Is Miramonte one of the companies that you specifically put

3    on your transition email to Marshall Coleman?

4    A.    Yeah.  That was the email labeled clean-up items.  You are

5    correct.

6    Q.    Did ASH ever even send a written proposal to Miramonte for

7    acquiring it?

8    A.    No.  Quite honestly, Miramonte isn't anything close to

9    something ASH would normally approach.  It is a land-heavy

10    company.  Very, very land intensive.  That's the complete

11    opposite end of the spectrum of what ASH would ever want to do.

12    Q.    What made you interested in talking to Miramonte?

13    A.    Well, one, I was looking for simply investment

14    opportunities.

15        Two, I am very comfortable with land activities as land

16    solo, or land involving a builder.  It's just a variation of

17    what we do.

18        As I expressed earlier today, as my business evolved in

19    Columbus developing with homebuilding became a pattern that I

20    had been doing my entire career.

21    Q.    You did not end up acquiring Miramonte, correct?

22    A.    I did not.

23    Q.    Do you know whether ASH attempted to pursue Miramonte again

24    after your attempt?

25    A.    I have kept in contact with the president of Miramonte and

1    he has never --

2            MR. KRAMER:  Objection, Your Honor.  Hearsay.

3    BY MR. QUACKENBOSS:

4    Q.    If you are basing your answer on what someone else told

5    you, then you may not answer that.

6    A.    To your question, no.

7    Q.    Okay.

8            Finally, was it your intention to take away an opportunity

9    that you understood ASH was still interested in?

10   A.    No.

11           As the record will clearly show, I have gone out of my way

12   to try to make sure that I wasn't even working in the same area

13   where ASH was considering.

14           The first indication that they were interested in it I

15   would have backed away, I would have said, Sorry I got in your

16   way.  I will step away.

17   Q.    Similar questions regarding Prominence.  You are being sued

18   for exploring acquiring Prominence after you resigned as CEO,

19   correct?

20   A.    I am.

21   Q.    Were you trying to interfere with ASH's attempt to acquire

22   Prominence?

23   A.    Again, for the exact same reasons I was pushing on Tony.

24   Tony is a shareholder of ASH.  I said, Tony, before I go on

25   this, help me make sure that I am not doing something that ASH

1  may have an interest in.

2  Q.    So you learn about Prominence's availability from

3  Mr. Avala, the broker, after you resigned?

4  A.    That's correct.

5  Q.    You did not acquire Prominence, correct?

6  A.    No.  It didn't come together.

7  Q.    And ASH did not acquire Prominence?

8  A.    No.

9  Q.    Do you know any way in which ASH was somehow harmed by your

10  talks with Miramonte or Prominence about a possible acquisition?

11  A.    I have no indication of any harm to ASH from that.

12  Q.    You are also being sued for exploring pursuing a company

13  called Surrey Homes, correct?

14  A.    I am.

15  Q.    Was Surrey an acquisition target of ASH in the first place?

16  A.    They did an acquisition visit in February of 2020, that I

17  was involved in.  And Mr. Benson did something with them in

18  October of 2020, before I became CEO.  I wasn't aware he did it

19  until after I became CEO, and I was of the opinion that it never

20  went anywhere on a second attempt.

21  Q.    Were Miramonte, Prominence and Surrey the only companies

22  about which you spoke with Mr. Avala about possible acquisitions

23  after you resigned?

24  A.    There is a good possibility we may have talked about

25  another name, but they were not, obviously, available, as Tony

1    related it.

2    Q.    Again, was it your intention to take away an opportunity

3    that ASH had with Surrey?

4    A.    No.  Once again, if I had any hint that ASH was even in the

5    neighborhood looking around, I would have backed away

6    immediately.

7    Q.    Did you have an interest in protecting ASH's acquisition

8    opportunity?

9    A.    For sure.  Again, I am a significant shareholder of ASH.

10   What's good for ASH is good for me, as long as it isn't being

11   done at my penalty by trying to get money out of me.

12   Q.    All right.

13         And finally -- oh, next to finally, you are also being sued

14   regarding a due diligence checklist.

15         What is a due diligence checklist?

16   A.    Due diligence checklist is -- essentially it's a list of

17   items of pieces of information that you would like to get from a

18   seller in order to evaluate the company to decide whether it has

19   characteristics you are looking for, that it has the history

20   that has been represented to you, particularly in terms of

21   financial strength or future projection, things of that nature.

22   Q.    Do you have other forms of due diligence lists in your

23   business files?

24   A.    Oh, yeah.  Very common document.  Relatively standard in

25   format.

```
1    Q.    Did you need to copy a due diligence list from ASH?

2    A.    No.  It's no different than just a checklist of these are

3    the things you want to ask for.  I can rattle off chunks of one

4    off the top of my head.  It's very ordinary information.  It's

5    the same information you would get if you were buying an ice

6    cream shop, or a steel manufacturer, or a boat manufacturer, or

7    something like that.  You would ask the same basic questions,

8    maybe with slightly different terminology, but the same basic

9    questions would be asked in most due diligence processes.

10   Q.    Is it possible in drafting your due diligence checklist

11   that you started with a form in your files and edited it?

12   A.    It's not illogical.  I don't remember doing that.

13   Q.    Have you seen versions of due diligence checklists

14   available for free on the Internet?

15   A.    I have.

16   Q.    Finally, regarding the confidentiality; we have the

17   conversation you had with Mr. Darnold after you left your

18   position as CEO.

19         Do you recall Mr. Darnold's testimony about that?

20   A.    I do.

21   Q.    When you called him the first time, why did you call him?

22   A.    Are you talking about early December?

23   Q.    Yes.  No.  After you resigned as CEO.

24   A.    When I called after I had left ASH?

25   Q.    Yes.
```

1  A.   Got it.

2       I was calling with the specific intent of checking in on

3  what's going on in the South Texas market.  He was based in

4  San Antonio.  He'd been there for awhile.  He would know the

5  characteristics.  Austin and San Antonio have a lot of similar

6  background.

7  Q.   When you reached out to him, did you know he was still

8  pursuing the position with ASH?

9  A.   I had no idea he was doing anything with ASH.

10 Q.   In fact, he talks to you for quite some time without

11 telling you; is that correct?

12 A.   That's correct.

13 Q.   When you learned that he had become an employee of ASH, did

14 you stop calling him?

15 A.   I did.

16 Q.   Did he provide you comments on your business plan?

17 A.   I do not recall any feedback from him, no.

18 Q.   Did he ever tell you to stop calling him?

19 A.   No.

20 Q.   Did he ever tell you, My availability is confidential.  You

21 may not talk to me?

22 A.   No.

23 Q.   Are you aware of any way that your conversations with

24 Mr. Darnold harmed ASH?

25 A.   I have no -- nothing to support that statement.

1  Q.   How about harm to Mr. Darnold?

2  A.   Same answer.  I don't see any reason why that would happen.

3  Q.   Backing up.  You first spoke to him when you were serving

4  as interim CEO, correct?

5  A.   Correct.

6  Q.   And it was a job interview?

7  A.   For lack of a better term, yeah, it was a job interview for

8  the potential of being a COO, with the expectation that I

9  thought I was likely to become the CEO and I was looking for

10 that person within ASH.

11 Q.   And your concern was that he needed to remain in Texas and,

12 therefore, couldn't perform as COO in Virginia?

13 A.   For my needs I needed a senior executive working in the

14 office in Virginia, and he specifically said he was not prepared

15 to leave Texas, so that kind of ended that conversation.  And as

16 a courtesy, I just inquired about whether he would be interested

17 in some other positions.  If you don't ask, you won't find out.

18 Q.   And, in fact, ASH did not hire him as COO either, did they?

19 A.   They did not.

20 Q.   They hired him as regional president and corporate

21 integration officer?

22 A.   I am not exactly sure the title, but effectively he was

23 charged with organizing Dorn and integrating them into the

24 system of how ASH was intended to operate.

25 Q.   I want to ask you couple of questions about your

1   negotiation for the permanent CEO position.  You exchanged a

2   proposal or two with Mr. Coleman, correct?

3   A.   Yes.

4   Q.   And your proposed salary was $520,000, correct?

5   A.   At least one of them was.  I am not sure if both of them

6   were the same.

7   Q.   How did you calculate $520,000?

8   A.   Well, Marshall Coleman had already offered, and was

9   prepared to do, the $10,000 a week he was doing for the interim

10  CEO.  Multiply it times 52 and you get that answer.

11  Q.   What was your rate of pay under your consulting agreement

12  which you had in place?

13  A.   It was $250 an hour, maximum of an eight-hour day.  $2000 a

14  day, which is 10,000 a week.

15  Q.   Is that how you came up with your $520,000 salary proposal?

16  A.   Yeah.  I just took what was already on the table and tried

17  not to negotiate against myself and put it on the table.

18  Q.   In fact, Mr. Coleman, in his response to you, offered you a

19  $400,000 salary, correct, for CEO?

20  A.   He did.

21  Q.   Do you know what Mr. Darnold's salary was when Mr. Darnold

22  was first hired as regional president as ASH?

23        MR. KRAMER:  Objection, Your Honor.  Foundation.  I

24  think he knows this only from being a defendant in the

25  litigation, but let's have some foundation.

1       THE COURT:  If you have no personal knowledge,

2   don't -- you can't testify.  But if you have personal knowledge,

3   you can testify.

4   BY MR. QUACKENBOSS:

5   Q.   Have you viewed documents that outline what Mr. Darnold's

6   salary was in his first year?

7       MR. KRAMER:  Same objection, Your Honor.  He only has

8   access to those as a defendant in litigation in discovery.

9       MR. QUACKENBOSS:  Fair enough.

10      THE COURT:  Sustained.

11      MR. QUACKENBOSS:  It's a minor point.

12  BY MR. QUACKENBOSS:

13  Q.   Is ASH welcome to buy your remaining C lots under the price

14  schedule in the existing Land Purchase Agreement?

15  A.   They are.  I would like the extortion fees to go away, but

16  they are.

17  Q.   So to wrap-up, Dave, we heard some testimony about how this

18  lawsuit has harmed ASH, the burden of having to prosecute it.

19  How has defending this lawsuit impacted you personally?

20  A.   Well, ASH is working out of shareholder's money.  They are

21  fighting against me, out of my personal checkbook.  It's been

22  quite a fight.

23      I am really aggrieved that a lot of people, who are really

24  good people, who used to work for me, who were ASH employees,

25  have been dramatically impacted by this needlessly.  A lot of

1    people have been hurt by this process, myself included, but a

2    lot of people who didn't need to get hurt here.  And I am just

3    really disappointed in the whole process.  It didn't need to

4    happen this way at all.  We could have solved whatever issues

5    they had in an afternoon conversation.

6    Q.    Dave, there was some testimony about the fact that you have

7    offered to pay for some of the witnesses' legal fees in the case

8    to defend them at depositions, and subpoenas for phone records,

9    and things like that.  Explain to the jury why you offered that.

10   A.    Well, this whole thing is the result of ASH trying to get

11   to me for claims that they are alleging.  I have already talked

12   about them enough.  And they are trying to -- they are trying to

13   bully people who know things that are going on, needlessly.

14        I am lucky enough to have enough fire power to help others

15   so they aren't needlessly hurt and dragged into this.  They are

16   trying to get to me, but they are hurting other people to try to

17   do it.  I don't like that.

18   Q.    When you have offered to help some of the witnesses with

19   their attorney's fees, did you ever tell them it was conditional

20   on them cooperating with you or changing testimony?

21   A.    No.  No conditions.

22   Q.    Okay.

23              MR. QUACKENBOSS:  Thank you, Dave.

24              I will pass the witness.

25              THE COURT:  Cross-examination?

1    MR. KRAMER:  Yes, sir.

2    CROSS-EXAMINATION

3    BY MR. KRAMER:

4    Q.    Mr. Erickson, did you just testify that this entire lawsuit

5    and all the consequences from it are all about you?

6    A.    I would say that you have made it about me.

7    Q.    Me, personally?

8    A.    You the lead dog, guy.  You get the fun.

9    Q.    You said on direct, on the witness stand for the first time

10   in several years, that ASH is welcome to buy phase C lots from

11   you.  Didn't you just say that?

12   A.    I did.

13   Q.    You've been refusing to sell lots to ASH for years, haven't

14   you?  Phase C lots.

15   A.    All I've asked from the beginning is give me a schedule.

16         And while you are at it, give me a schedule and drop the

17   extortion fee guns and let's get the thing done.  It's been on

18   the table since day one.

19   Q.    Well, if you had sold lots, those people wouldn't have lost

20   their jobs; isn't that true?

21   A.    In retrospect I don't think that's true.  I think you would

22   have done it anyhow.

23   Q.    You've said several times on direct, while Mr. Quackenboss

24   was texting -- was questioning you -- "we'll get there."

25         How many times did you practice your testimony?

Cross-Examination - David Erickson

1    A.    What term?

2    Q.    "We'll get there."

3          How many times did you practice your testimony?

4    A.    My testimony practice with him?  I didn't.

5    Q.    Okay.

6          You're familiar with the concept of an earn-out, right?

7    A.    Yes.

8    Q.    That means that if you sell a business you don't get paid

9    the full amount unless the business hits certain success

10   targets, right -- earnings targets?  It has to be successful in

11   order for you to get paid, right?

12   A.    Well, I think you are more narrowly characterizing it.

13         An earn-out, in general, is the concept of the money is

14   earned by -- the party in this case, usually a seller -- based

15   upon either sticking around for a certain amount of time, the

16   company achieving financial terms, like you say, maybe achieve

17   better financial terms, but any variation of that is paid over

18   time based on some range of performance or variation.

19   Q.    Right.

20         The Letter of Intent that you struck with ASH called for

21   you to have an earn-out for some of that $26 million you were

22   paid, right?

23   A.    The original Letter of Intent?

24   Q.    Yes.

25   A.    I think that's correct.

Cross-Examination – David Erickson

```
 1   Q.   But before you sold your business, you changed your mind
 2   and refused to agree to an earn-out; didn't you?
 3   A.   I don't think I refused to do it.
 4        Keep in mind --
 5   Q.   You didn't agree to an earn-out, did you?
 6   A.   In the end it did not take an earn-out format.  We went
 7   with a different approach.
 8   Q.   Okay.
 9        Do you think that was better for ASH or better for you?
10   A.   I don't think it was better or worse.  It's just a matter
11   of the format.  You do it.
12   Q.   The business didn't have to succeed in order for you to get
13   paid, right?
14   A.   Restate your question, please.
15   Q.   The business didn't have to succeed in order for you to get
16   paid because there was no earn-out, isn't that right?
17   A.   We took the earn-out component of the sale process out of
18   the final contract.
19        But I would also state that there are many other things
20   that were in the LOI that got taken out also, and a number of
21   things that got put in that weren't in the LOI.
22   Q.   Were there other things taken out that would have given you
23   an incentive to make sure the business succeeded after you sold
24   it?
25        Could you give us an example?
```

1    A.    I don't have anything I could hit off the top of my head.

2    Q.    Okay.

3          So you testified a minute ago that this is about me, in

4    part.  Is any of this your fault, Mr. Erickson?

5    A.    Is any of this my fault?

6    Q.    Yeah.  Why we're here today.

7    A.    Well, there's a smartass answer I shouldn't say so, no, I

8    won't say that.

9    Q.    You testified about the post-closing adjustment on the

10   purchase price for Grayhawk Homes, right?

11   A.    We did.

12   Q.    You heard Amy Allen testify yesterday that most of that

13   money -- well, first of all.  You said on direct that it was a

14   little late, right?  You were criticizing ASH because -- you

15   can't hear me?

16   A.    Yeah.  It's a little weak.

17   Q.    How is that?  Is that better?

18   A.    Noticably better.  Thank you.

19   Q.    Sure.

20         You testified that ASH was a little late with the

21   post-closing adjustment.  Remember that?

22   A.    Yes.  Ninety days late.

23   Q.    Right.

24         When you brought that to ASH's attention they just gave you

25   $700,000 to appease you, right?

Cross-Examination - David Erickson

1   A.   That was my suggestion.

2   Q.   Oh, you demanded that?

3   A.   I don't think I demanded.  I made a suggestion that based

4   upon what I thought I knew it was a good start in the right

5   direction, because they were already noticeably late at the time

6   I was writing that email.

7   Q.   Okay.

8        And ASH gave you $700,000 to tide it over, right?

9   A.   Yeah.  It's good faith that they were working in the right

10  direction at least.

11  Q.   Okay.

12       You said -- you heard Amy Allen testify yesterday that most

13  of the money you got at closing was used to pay off loans,

14  right?  And then you repeated that this morning.  Didn't you?

15  A.   I did hear her say that.

16  Q.   Isn't it true that the total loan repayment at closing was

17  about $16.9 million?

18  A.   I would have to look at documents to confirm that.

19  Q.   Like the settlement statement?  Would that refresh your

20  recollection?

21  A.   That would be what you would start with.  Yes.

22           MR. KRAMER:  Let's put up PX846 for Mr. Erickson,

23  please.  Let's go to the final page.

24  BY MR. KRAMER:

25  Q.   Let me know if that refreshes your recollection,

Cross-Examination - David Erickson

1   Mr. Erickson.

2       It's the final page of the exhibit.

3   A.   Okay.  We talking about the settlement statement?

4   Q.   Yes.

5   A.   Well, then I'm not looking at it.

6   Q.   You just have to be patient there until we get to the final

7   page.

8   A.   Okay.

9       What am I supposed to be looking at here?

10  Q.   We will come back to that.  Looks like I got my document

11  wrong.

12      You said that -- and I wrote it down -- you were paid --

13  well, let me just see if you remember.  You know, let me just

14  see if you remember.

15      You got about -- of that loan repayment that you made at

16  closing, isn't it true that only about $1.5 million went to

17  lenders other than that Ranier Capital?

18  A.   We talking about the initial purchase of Grayhawk Homes?

19  Q.   Yeah.

20  A.   I would have to look at the statement.

21  Q.   Do you remember how much Ranier Capital got paid at

22  closing?

23  A.   I'd have to look at the statement also.

24  Q.   It was about $15 1/2 million, wasn't it?

25  A.   Again, I didn't look at those details.

1200

Cross-Examination - David Erickson

1    Q.    Okay.

2          The last page of the closing statement --

3    A.    I am looking at Attachment 2, Closing Statement, at the

4    back of this package.

5    Q.    Yes.

6          Do you see where it says:  Debt pay off to Ranier Capital

7    $15.45 million?

8    A.    I do.

9    Q.    And then do you see:  Total debt pay-off $16.9 million?

10   A.    I do.

11   Q.    So you told the jury that most of the money went to pay off

12   loans, but 15 1/2 million of it was a loan from an entity that

13   you own, at least in part, right?

14   A.    That's correct.

15   Q.    All right.

16         Ms. Allen testified that maybe Ranier Capital borrowed

17   money in order to lend it, again, and that's what's being paid

18   off.  Is that really what happened?

19   A.    Ranier Capital does have loans from time to time with

20   outside banks.

21   Q.    Ranier Capital didn't borrow $15 1/2 million for some

22   purpose and then give it to you in another loan for another

23   purpose, did they?

24   A.    Not that I specifically recall.

25   Q.    You also said -- and I wrote it down -- that you were,

1    quote, paid a premium that was $10 million.

2         That was the deal, right?

3    A.   The premium for the purchase of Grayhawk Homes and related

4    assets, the lots, was negotiated at $10 million.  Correct.

5    Q.   Yep.

6         And you also said on direct, and I quote, Big numbers are

7    getting thrown around here, but in the end I am getting

8    $10 million over a four-year time period.

9         You don't think $10 million is a big number?

10   A.   Dang right it is.  It is a big number.  But I haven't

11   received $10 million either.

12   Q.   You received $6.4 million, right?

13   A.   That is correct.  And you've made about 20.

14   Q.   Is that a big number, $6.4 million?

15   A.   Definitely big numbers.

16   Q.   Okay.

17        You said that when the parties started having disputes

18   suddenly -- you were talking about the February 2021 timeframe.

19   You said in recent times there were disputes about lot quality.

20   Do remember that?  Do you remember using that?

21   A.   I agree.

22   Q.   That started in the fall with Mr. Thirtyacre and

23   Mr. Benson, didn't it, complaints about the quality of the lots

24   you were delivering?

25   A.   I started hearing rumblings during the summer and fall.

Cross-Examination – David Erickson

1    That's correct.

2    Q.    That's right.

3          And then you got them fired and it came back up after

4    Mr. Benson returned, right?

5    A.    I disagree.

6    Q.    Do you remember when those lot quality issues came back up

7    you were supplied with third-party inspection reports from

8    Barrett Simpson?

9    A.    You talking about the spreadsheet chart?

10   Q.    Yep.

11   A.    I have seen that.  Yes.

12   Q.    And ASH hired a third party to go evaluate the lots and

13   compare them to the requirements of the LPA, and the report

14   showed that they didn't meet the requirements of the LPA, right?

15   A.    You might want to note that you also added about six or

16   eight extra characteristics to be measured in that report.

17   Q.    Okay.

18         You said, about the non-disclosure agreement at the end

19   there, that you didn't need to use an ASH non-disclosure

20   agreement.

21         Do you remember that?

22   A.    That's correct.

23   Q.    You did though, didn't you?

24   A.    As I said, I don't have specific recall.

25   Q.    You did send a version to three different companies that

1    said "ASH" all over it.  Right?

2    A.    It was in there.  It was in advertent mistake.

3    Q.    So you did use the one from ASH?

4    A.    It has ASH on it.  Where it came from, how it got there, I

5    don't know.

6    Q.    Do you work with another ASH?

7    A.    Not to my knowledge.

8    Q.    You also said you didn't need a due diligence checklist,

9    but you did copy a due diligence checklist, didn't you?

10   A.    We sent a due diligence checklist.  It has some formatting

11   similarities -- and that's a stretch.  Beyond that, there are

12   huge differences in those two lists.

13   Q.    That's the checklist that you compared to something that

14   you would use to buy an ice cream shop, right?

15   A.    If you were purchasing any business, if you are going to do

16   it in a professional way, you should have a due diligence list.

17   And you would use a similar form of due diligence list for most

18   business acquisitions.

19   Q.    Doesn't the one you copied refer to land positions and

20   houses and homebuilding issues that wouldn't be present in an

21   ice cream shop?

22   A.    No.  Instead you would be asking about sugar, and cream,

23   and refrigeration systems, and things like that.

24   Q.    Now, you still don't remember if you copied an NDA or a

25   due diligence checklist?

1204
Cross-Examination – David Erickson

1   A.   As I said before, I don't have any specific memory of that.

2   Q.   You seem to have a very strong memory of conversations with

3   people like Tony Avala and Marshall Coleman.  Are you better at

4   remembering conversations than you are written words?

5   A.   Well, what you are citing here with Tony Avala is a very

6   specific set of conversations.  Very simple points where I am

7   trying to make sure I am doing the right thing and I am being a

8   professional in doing it.

9   Q.   Of course, Tony Avala and Marshall Coleman aren't here to

10  testify, right?

11  A.   It's amazing, isn't it?

12  Q.   You relied on Mr. Avala to give you permission to go get

13  homebuilders that ASH had been pursuing, right?

14  A.   No.

15  Q.   Okay.

16       He's a broker, isn't he?

17  A.   He is.

18  Q.   He makes money when he sells a homebuilder to somebody,

19  doesn't he?

20  A.   As a broker that's generally a part of his business,

21  correct.

22  Q.   Do you trust Tony Avala?

23  A.   To a degree.

24  Q.   Are you still on good terms with him?

25  A.   Haven't spoken to him in quite awhile.

1   Q.   Did you believe everything that he told you?

2   A.   Excuse me?

3   Q.   Did you believe everything he told you?

4   A.   I did, for the purposes of this conversation.

5   Q.   You still trust him?

6   A.   As I said, to a degree.

7   Q.   Okay.

8        So you only trust him for purposes of what conversation?

9   A.   Well, for the purposes of him representing that he was

10  representing a company and that they were available, I can

11  certainly trust him on that fact.

12  Q.   You kept going to him in emails and asking him to get

13  permission from ASH that you thought you didn't need.

14       Do I have that right?

15  A.   That was the general format of what I was saying.

16  Q.   Okay.

17       And you testified the other day, if my memory serves, that

18  you didn't ask ASH because you knew the answer would be no to

19  that and everything including Botswana.  Do you remember that?

20  A.   That was my testimony, yes.

21       MR. KRAMER:  Let's look at PX998A.  It's already in

22  evidence.  I would like to look at Section 4A through C.

23  BY MR. KRAMER:

24  Q.   This is the Prominence Homes due diligence checklist that

25  you used, right?  And Section 4 says --

Cross-Examination - David Erickson

1     Is that right, Mr. Erickson?

2   A.   It looks familiar.

3   Q.   Okay.

4        It says:  For land and inventory.  A, current controlled

5   lots and land schedule.  B, current inventory reports.  C,

6   proformas and projections for all active or planned subdivisions

7   if available.

8        Did I read that correctly?

9   A.   That's what it says.

10            MR. KRAMER:  Let's look at PX86A.  Section 3A through

11  C.

12  BY MR. KRAMER:

13  Q.   Exactly the same words, right?  Identical?

14  A.   Agreed.  They are.

15  Q.   I will ask you again, is that a coincidence?

16  A.   It's a list of standard things you would ask in a due

17  diligence list.  There is nothing particularly unique about this

18  list.  And there is no information here that says this is

19  something we obviously need to protect.  It you disagree, I'm

20  sorry.  We have a difference of perspective.

21  Q.   Well, you called my office after you left ASH and asked for

22  advice on your contracts with ASH, right?

23  A.   I asked on my restrictions trying to validate that I was

24  doing the right thing in the right way.

25  Q.   Remember you testified on direct that I didn't call you

1    back fast enough and you had to send a letter on December 30th?

2    A.    I don't remember you calling me back, period.

3    Q.    Right.  Was I your lawyer at that point?

4    A.    No, you were not.

5    Q.    You had other lawyers, right?

6    A.    That's correct.

7    Q.    You were represented by Randy Lomax, who is your long-time

8    personal lawyer?

9    A.    He is my business lawyer.

10   Q.    You were also represented by Jim Sack at that point?

11   A.    That would be correct.

12   Q.    And now you are represented by Mr. Quackenboss in DC,

13   right?

14   A.    For the purpose of dealing with you, that's correct.

15         I would also like to add for the fact at that moment I was

16   contacting you I felt that I was on good terms with ASH and that

17   I would get a reasonable answer of guidance.

18   Q.    Right.

19   A.    Obviously that was a mistake.

20   Q.    I think you testified -- Well, let's talk about that.  I

21   think you testified on direct, quote, you were, quote, Trying to

22   be as transparent as I could possibly be.

23         Do you remember saying that?

24   A.    That was the principle of what I was trying to do.

25   Q.    You didn't disclose to me that you had already attempted to

Cross-Examination - David Erickson

1   acquire Miramonte, Prominence, and Surrey, right?

2   A.   This was what date?

3   Q.   December 30th.

4   A.   Sending an NDA to somebody does not launch something that

5   is an acquisition.  It simply says that two parties are prepared

6   to talk to each other under the terms of a NDA.

7   Q.   I thought we had this conversation the other day.  Didn't

8   you testify that that's the first-step process of acquiring a

9   homebuilder?

10  A.   It is.  But it's also not irreversible.  You could easily

11  back away and do no further action.

12  Q.   You didn't disclose that you were using ASH documents,

13  right?

14  A.   I don't believe I was using any ASH documents.

15  Q.   You didn't disclose that you were trying to recruit

16  Lee Darnold, right?

17  A.   I didn't disclose that I was trying to recruit Lee Darnold.

18          MR. KRAMER:  Let's look at PX72 already in evidence.

19  BY MR. KRAMER:

20  Q.   This is the -- oh, I'm sorry.  Correct.  I'm sorry.  It was

21  New Year's Eve at 7:53 AM when you sent this letter, right?

22  A.   It is.

23  Q.   This is the one you sent to Marshall after I didn't call

24  you back?

25  A.   That's correct.

Cross-Examination – David Erickson

1      MR. KRAMER:  Let's take a look at the attachment.

2   BY MR. KRAMER:

3   Q.   That's the Marshall who was in the hospital in November and

4   December, right?

5   A.   He was in the hospital in November.  I was not aware of him

6   being in the hospital in December.

7   Q.   In this letter did you disclose that you were attempting to

8   acquire Miramonte, Prominence, and Surrey as part of your effort

9   to be as transparent as you could possibly be?

10  A.   No.  I didn't make any disclosure to that effect.

11  Q.   Okay.

12      The letter is dated December 30.  Maybe that's why I got

13  confused.

14      Do you see that?

15  A.   I do.

16      MR. KRAMER:  Let's take a look at PX118.

17  BY MR. KRAMER:

18  Q.   This is an email, the same day, December 30, to Tony Avala

19  from you, right?

20  A.   It is.

21  Q.   And you say here:  I need/we need to get a clear written

22  waive off from ASH on various companies ASH has had an

23  opportunity at.

24      And then you list Prominence, Miramonte and Surrey, right?

25  A.   Yes.

1210

1    Q.   So you send a letter to ASH.  You don't include this

2    information.  And on the very same day you send a letter to

3    Mr. Avala and you do include it.

4         Is it still your testimony that you were being as

5    transparent as you could possibly with be ASH?

6    A.   You're good at emphasizing something, but you are

7    forgetting several things.

8         Number one, I have already got verbal permission from Tony

9    that he has already confirmed this information.

10        Number two, I don't have to do any of these things.  The

11   documents I have, and the restrictions as they are written,

12   allow board members and consultants to be independent.  They are

13   people.  They are not owned by ASH.

14        I don't have to do any of that.  But I am trying to make

15   sure that I do the right thing, that I be professional, and

16   don't inadvertently cause a problem.  I will leave it at that.

17   Q.   Those documents also state that you can't take non-public

18   information and use it for yourself, right?

19   A.   But if I am starting over with a broker, and I am starting

20   over with a new NDA, I am not taking anything from ASH.

21   Q.   You were careful to point out that your wife is here today,

22   right?

23   A.   I was courteous enough to introduce the jury.  My wife

24   happened to be in the audience.  I felt that was a reasonable

25   courtesy.  Goes both ways.

1  Q.   She's not --

2  A.   My wife also might appreciate my bringing her and not

3  pointing her out.

4  Q.   She is not involved in developing lots, is she?  That's

5  what you do.

6  A.   Not in any clear definition of doing that.

7  Q.   Okay.

8       She doesn't have any responsibilities with the companies

9  that are defendants in this case, right?

10  A.   She owns a couple of them.

11  Q.   Why does she own them if she doesn't have any involvement

12  in developing lots?

13  A.   Well, owning a development company and being involved in it

14  day-to-day are mutually exclusive.  You don't have to do one to

15  do the other.

16  Q.   You manage all the companies, right?

17  A.   I am the manager.  Yes.

18  Q.   So why does she own them?

19  A.   Well, she and I made a decision some years back to make

20  sure that our assets, our estate, is balanced out a little bit,

21  so that she has some specific things in her name so if she needs

22  to do something, or something should happen to me, she had ready

23  control of assets that she could control herself.

24  Q.   Okay.

25       Does that protect you from liability at all?

Cross-Examination - David Erickson

1   A.   It would be an awkward way of stating it.

2   Q.   You are a developer of lots, right?  We just established

3   that.

4   A.   I am a developer and I do develop lots, and I do it under

5   multiple names.

6   Q.   It's true that the best thing a developer can do is sell

7   lots ahead of schedule, right?

8   A.   In most circumstances that would be a desirable answer.  I

9   agree.

10  Q.   You did that, right?  You sold some lots ahead of schedule

11  to ASH, at least for a time?

12  A.   I did.

13  Q.   In fact, you were able to develop Phase C lots without

14  agreement on the order of Phase C lots development, weren't you?

15  A.   We were moving forward with projects that were designated

16  as C lots that already had momentum in them.  And I had some

17  verbal guidance that, Yeah, yeah, yeah, we want those lots.

18       But I also had some verbal commitment from ASH, Mr. Benson

19  in particular, that said, We'll get you the paperwork real soon.

20  Q.   What paperwork --

21  A.   Dang if it doesn't show up.

22  Q.   What paperwork are you talking about?

23  A.   Supposed to be some paperwork at the beginning of the

24  process saying, We are bringing these lots to the table.  This

25  is approximately how many.  This is our estimated budget.  And

1    ASH says, Hey, we want those.  We are prepared to do that.

2    Proceed onward.

3    Q.    Where does it say that?  What contract is that in?

4    A.    I believe it's embedded or implied in the language of the

5    Land Purchase Agreement.

6    Q.    Oh, it's implied.  It doesn't actually say it?

7    A.    I think it's in there.

8    Q.    That's what you wanted, right, but that's not what the

9    contract says, right?  You wanted a development agreement, but

10   all the contract says is to agree on an order of Phase C lot

11   development, right?

12   A.    I think there is some other language in there related to

13   what I just discussed.

14   Q.    Your counsel will have a chance to point that out.

15         You knew there was a Takedown Schedule, right?

16   A.    Yes.  There is a defined Takedown Schedule.

17   Q.    You could have just developed lots and ASH would have been

18   obligated to take down the minimum number every quarter, right?

19   A.    Well, then you're going to get into a whole different

20   problem.

21   Q.    Didn't you just say that you are developing lots and you

22   are willing to sell them with ASH -- sell them to ASH, but there

23   is no paperwork, is there?

24   A.    Right.  There is no paperwork, including a C schedule.

25   Q.    No C schedule.  Because you wouldn't agree, right?

Cross-Examination - David Erickson

1    A.    No, I would not agree, especially under the extortion terms

2    you were requiring.

3    Q.    So it's Mr. Benson's fault that you didn't agree on an

4    order of Phase C lot development.

5         Do I have that right?

6    A.    I won't put the blame on Mr. Benson, because I really don't

7    know for sure what's going on behind the scenes between Benson

8    and the approving authorities above him.  It may be unfair to

9    label Mr. Benson specifically.

10   Q.    Do you think there is a conspiracy against you among the

11   approving authorities?

12   A.    I wouldn't characterize it like that.

13   Q.    Okay.

14        So the agreement to -- the requirement to agree on the

15   order of Phase C lot development, that's something that requires

16   a two-way discussion, right?

17   A.    You're right.  Look at how many times there was a one-way

18   towards and I didn't get the back.

19   Q.    Right.  And you testified, I think, that you have never

20   once proposed an order of Phase C lots development yourself,

21   right?

22   A.    That would be an accurate statement.

23   Q.    Okay.

24        And the only communications you can remember within the

25   first year about this issue were with Greg Benson, right?

Cross-Examination – David Erickson

1    A.    He is the target man.  Heck, there is only two executives

2    in the whole company.

3              MR. KRAMER:  Let's take a look at 339, just for the

4    witness.

5    BY MR. KRAMER:

6    Q.    This is an email from you to Greg Benson dated October 16,

7    2020.  Do you remember this email?  The subject line is:  Warm

8    Springs Road townhomes?

9    A.    Yes.  We talked about this an hour or so ago.

10   Q.    Right.

11             MR. KRAMER:  Plaintiffs offer PX393.

12             THE COURT:  Any objection.

13             MR. QUACKENBOSS:  No objection.

14             THE COURT:  Admitted.

15       (PLAINTIFFS EXHIBIT PX393:  Received in evidence.)

16             THE WITNESS:  I think it's already admitted,

17   Your Honor.

18             THE COURT:  Okay.

19   BY MR. KRAMER:

20   Q.    You say here in this email:  The Land Purchase Agreement

21   calls for both parties to develop and agree to a plan.  Agree to

22   the order in which specific Phase C lots will be developed.

23        And then you cite paragraph 10 of the LPA.  Do you see

24   that?

25   A.    I do.

Cross-Examination - David Erickson

1  Q.   What's the reference to the Warm Springs Road townhomes?

2  A.   It's a piece of property on Warm Springs Road, at the

3  intersection of McCatherine Road to the north, and I think

4  that's East Heights to the south, that was originally intended

5  for commercial when I bought it some years.  But I had resolved,

6  prior to the purchase of American Southern Homes -- by American

7  Southern Homes, probably would be better suited as a townhome

8  community.

9  Q.   Did you testify that those were Phase C lots?

10 A.   They would have to be, because they didn't have a specific

11 price on them and you would have to develop them under a Phase C

12 formula to go forward.

13         MR. KRAMER:  Could we have PX24 up, please?  I think

14 it's around page 17.

15         First, let's let Mr. Erickson -- this document is in

16 evidence.  Let's let Mr. Erickson see the first page.

17 BY MR. KRAMER:

18 Q.   Let me know if you can identify this as the Land Purchase

19 Agreement.

20 A.   This is the Land Purchase Agreement.  That's correct.

21         MR. KRAMER:  Let's go to page 17.

22         All right.  Let's go to the next page.

23 BY MR. KRAMER:

24 Q.   Are you sure those weren't phase A lots, Mr. Erickson?

25 A.   You are right there.  Go one more page.  You will get to

1  the A lots.

2  Q.   Okay.  Let's go -- is it back one or forward one?

3  A.   I think it's further -- it's further deeper into the

4  document.

5  Q.   There it is.

6  A.   There is your A.  Go one more.

7  Q.   All right.

8         MR. KRAMER:  Let's page on down until we see the Warm

9  Springs --

10        THE WITNESS:  You got to blow it up.

11        MR. KRAMER:  Let's keep going down.  It's not on the

12  first -- this is --

13  BY MR. KRAMER:

14  Q.   These are phase A lots, right?

15  A.   I believe these are A lots.  I assume Exhibit A is.

16  Q.   All right.

17       And we have -- do you see the Warm Spring lots on here?

18  A.   I didn't see that.

19  Q.   There it is.

20       Do you see them on the bottom?

21  A.   Yeah.  There are two Warm Springs properties.

22  Q.   So they weren't Phase C lots, were they?

23  A.   No.  No.  They were offered as -- my apologies.

24       They were offered as two parcels of land without specific

25  residential building pads on them.  Total price is $119,000.

1    Q.    All right.  Let's go back --

2    A.    For three acres.

3              MR. KRAMER:  Let's go back to PX393.

4    BY MR. KRAMER:

5    Q.    This is the email we were just looking at with the subject

6    line:  Warm Springs Road townhomes.  And we now know this was

7    not about Phase C lots, at least Warm Springs Road Phase C lots,

8    right?

9    A.    I just saw the bottom of this a moment ago.  I think I can

10   clarify it if you want to widen it out.

11   Q.    I think I just need to confirm that they are not Phase C

12   lots.

13        This is an email that you sent to Mr. Benson and

14   Mr. McClure on October 16th about the order of phase

15   development, right?

16   A.    It is, yes.

17   Q.    At this point the deadline was about a month away?

18   A.    Yes.

19   Q.    And by the time we got to October 28th, 12 days later, you

20   were the interim CEO, right?

21   A.    That's correct.

22   Q.    Okay.

23        I want to be clear about this.  Isn't it true that you have

24   no recollection of raising this incredibly important development

25   order with anyone while you were the interim CEO?

Cross-Examination – David Erickson

1    A.    I did raise it.

2    Q.    Oh.

3          MR. KRAMER:  Let's go to clip EC9.  Oh, sorry.

4    Forget --

5    BY MR. KRAMER:

6    Q.    You started some conversations, right?

7    A.    Say that again.

8    Q.    Who did you raise it with?

9    A.    Sean Coleman.

10   Q.    Okay.

11         In writing?

12   A.    No.

13   Q.    So that's just another conversation that you remember?

14   A.    I know I had a conversation.

15   Q.    Okay.

16         MR. KRAMER:  Let's go to 215A.  PX215A.  Just for the

17   witness.

18   BY MR. KRAMER:

19   Q.    Do you recognize this as the November 24, 2020 response

20   that you gave to the land purchase committee?

21   A.    Can I see the wider version, please?

22   Q.    Sure.

23         You can see there is a letter you wrote in all caps in red

24   afterwards?

25   A.    Yeah.  I recognize the letter.

1          MR. KRAMER:  Plaintiffs offer PX215A.

2          THE COURT:  Any objection?

3          MR. QUACKENBOSS:  No objection.

4          THE COURT:  Admitted.

5      (PLAINTIFFS EXHIBIT PX215A:  Received in evidence.)

6  BY MR. KRAMER:

7  Q.    Paragraph 3 here says:  Additionally, the LPA committee

8  requests a status update on the Phase C lot development status

9  under the LPA and wishes to discuss a development schedule for

10  when these Phase C lots will be brought online.

11          Do you see that?

12  A.    I do.

13  Q.    And your response is:  In process.  Kathy, myself, and my

14  staff met yesterday to try and get this under control.

15          Is that what you wrote?

16  A.    I did write that.

17  Q.    So I think your testimony is that you talked to Kathy Long

18  and Chuck McClure about this issue, right?  That's what you did

19  to get it under control?

20  A.    What I was doing with Kathy Long and Chuck McClure was I

21  was trying to help bring them up-to-speed to the task that

22  needed to be done.  And I was trying to enlist Kathy, in

23  particular, with Chuck to assist her, to be the eyes and ears of

24  the land committee.

25          The land committee is in Virginia.  They have no knowledge

1    about what's in Columbus, Georgia, or in the area.  They need

2    somebody to say, That's a premier piece of property.  That's a

3    second tier piece of property.  This is great for this type of

4    house.  This is great for a different type of house.  How would

5    they integrate that into a process and make that happen.

6        As Kathy related yesterday, she has a decent amount of

7    experience in that.  She's been not far removed from Grayhawk's

8    activity for many years.

9        I am trying to set up some eyes and ears so the committee

10   can engage in a viable conversation.  Because in the end the

11   decision needs to be between myself and the land purchase

12   committee.

13       I can't negotiate with myself, because I am barred from

14   regulation by the Board.  And, two, just from a -- what's the

15   right term -- good governance perspective.  I can't negotiate

16   with myself.

17   Q.   Got it.

18   A.   It's not the right thing to do.

19   Q.   I am just focused on what Kathy and Chuck were doing around

20   this time.  We've heard both of them testify in this trial,

21   right?

22   A.   I did.

23   Q.   And neither one of them remembered working with you to

24   develop an order of Phase C lot development around this time;

25   did they?

Cross-Examination - David Erickson

1    A.    From my perspective they were not tasked with developing

2    the order.

3    Q.    So what did you do to get it under control?

4    A.    I told Kathy what the challenges were.  I encouraged her to

5    get familiar with the items on the C list and make sure she

6    reached out to Sean to have some conversation about it.

7          Now, what happened between her and Sean after that, I don't

8    know.  I heard her very clearly say yesterday that she talked

9    with Sean several times.

10   Q.    She had a couple of phone calls with Sean Coleman.  That's

11   what she said, right?

12   A.    To what extent and how much, that's not my role.

13   Q.    Okay.

14         So you instructed your long-time employee, Kathy Long, who

15   you had installed as the interim president of Grayhawk, to be

16   your eyes and ears on the ground to negotiate with the land

17   committee?

18   A.    She is the best available source who does -- who can do

19   that with the degree of usefulness for the land committee.

20   Q.    Why didn't you just propose an order of Phase C lot

21   development?

22   A.    Because I don't know what the priorities are of the land

23   committee that's representing the Board.

24         In the end, the dang thing would have to get approved by

25   the Board anyhow.  So you got three members of the Board on the

1   land committee.  Educate them.  Inform them.  Shape them.  If

2   they would get into a dialogue, which I had been asking for, for

3   a year, we could probably put the thing together in about two

4   hours.

5   Q.   It's not your fault, right?

6   A.   Well, I dang sure tried for a year.

7   Q.   Okay.

8           MR. KRAMER:  PX694, please.

9   BY MR. KRAMER:

10  Q.   This is an email from Chuck McClure to you dated

11  September 30, 2021.

12       Do you see this?  Do you remember this?

13  A.   September 30, 2021.  I see it.  Yes, sir.

14  Q.   And then if we go down, there is another email underneath.

15          MR. KRAMER:  First of all, plaintiffs offer PX 694.

16          MR. QUACKENBOSS:  No objection.

17          THE COURT:  Admitted.

18       (PLAINTIFFS EXHIBIT PX694:  Received in evidence.)

19  BY MR. KRAMER:

20  Q.   Okay.

21       Underneath there is December -- well, hold on.

22          MR. KRAMER:  Let's go back up to that top email there.

23  BY MR. KRAMER:

24  Q.   Why did Mr. McClure -- did you ask Mr. McClure to send this

25  email to you in September of 2021 so you would have it for

1  litigation?

2  A.    I probably wanted to make sure I preserved it under my

3  control so I knew where it was.

4  Q.    Okay.

5        Let's look at what you tried to preserve under your control

6  so you knew where it was.

7        Do you see that?  It's a December 4, 2020 email from

8  Chuck McClure to Kathy Long?

9  A.    I do.

10 Q.    Subject line is:  Timeline for new communities or phase.

11       Okay.

12       You can't confirm, can you, that this exchange was part of

13 any effort to set the Phase C lot development order, right?

14 A.    Obviously he is updating Kathy Long.

15       This is December 4th, so this is like a week or so --

16 probably ten days or so after that exchange we just had.  And he

17 is outlining every project we have, what their status is.  I see

18 some timelines for finishing various components of it.  Looks

19 like a pretty reasonable framework for all the pieces.

20 Q.    Do you remember being asked about this document at your

21 deposition?

22 A.    Not specifically.

23            MR. KRAMER:  Could we have clip EC11, please?

24            MR. QUACKENBOSS:  Can you share the page and line of

25 this, please?

```
 1              MR. KRAMER:  Sure.

 2              I tell you what.  We will use the book.  I want to

 3    look at page 211, line 14.  It's 30(b)(6) deposition 212, 10

 4    through 15.

 5              I am going to approach, Your Honor?

 6              THE COURT:  Yes.

 7              THE WITNESS:  I'll find it.

 8              MR. KRAMER:  Page 212.

 9              THE WITNESS:  A deposition.

10              MR. KRAMER:  212, 10 through 15.

11              THE WITNESS:  212.  Page 212?

12              MR. KRAMER:  Yep.

13              THE WITNESS:  I am on 220.  212.

14              MR. KRAMER:  Here we go.  I got the clip right here.

15    Let's play it.  Okay.

16        (A videotape deposition excerpt of David Erickson was

17    published to the jury at 3:25 PM)

18    BY MR. KRAMER:

19    Q.    That's the question you were asked and the answer you gave

20    under oath at your deposition, right?

21    A.    I did.

22    Q.    Let's go back to the email, which is PX694.

23          If we look at the list of lots.

24              MR. KRAMER:  Let's blow that up for Mr. Erickson.

25
```

1  BY MR. KRAMER:

2  Q.  Some of these are Phase B developments, right?

3  A.  Yeah.  There are certainly some B mixed in here as well.

4  Q.  So this is not a proposed order of Phase C lot development

5  surely, right?

6  A.  Reading the timeline up there where it says, regarding

7  timeline for new communities or phases, "phases," implies to me

8  like something that's already going on as opposed a new

9  community delivery.

10  Q.  Okay.

11      MR. KRAMER:  Let's go to PX202, please.  This is

12  already in evidence.

13  BY MR. KRAMER:

14  Q.  This is a March 5, 2021 email from you to Ryan Twiss,

15  right?

16  A.  March 5th, yes.

17  Q.  This is after you resigned from ASH and picked up

18  conversations, at your behest, about the Phase C lot development

19  order in March of 2021, right?

20  A.  Back up.  Say that again.

21  Q.  This is after you resigned from ASH, right?

22  A.  Correct.

23  Q.  And in March of 2021, you initiated conversations with

24  Ryan Twiss about the Phase C lot development, right?

25  A.  I initiated the conversation with Benson, and it appears he

Cross-Examination – David Erickson

1   forwarded it on to others, including yourself.

2   Q.    Okay.

3         If we go down to the bottom of this chain, pages 2 and 3,

4   it says -- there is a paragraph that begins with:  Compounding

5   our problem.

6              MR. KRAMER:  We can blow that up.

7   BY MR. KRAMER:

8   Q.    Do you see where it says:  For the past six weeks I've been

9   on my assistant, Chuck McClure, to try and address this

10  disconnect.  To date he has had little success getting a firm

11  commitment on resolving the paragraph ten commitment.

12        Did I read that correctly?

13  A.    That's correct.

14  Q.    He didn't remember any of this when he testified by video

15  the other day, did he?

16  A.    That's what he said.

17  Q.    So you really don't know what Mr. McClure did or didn't say

18  to anyone at ASH about the Phase C lot development order, do

19  you?

20  A.    I would not have written these words unless I believed it

21  to be accurate at the time.

22  Q.    Okay.

23  A.    Chuck was a consistent, dependable employee for a long

24  time.  So if he told me he had been working on it for six weeks,

25  and he couldn't get any dialogue, then I would believe him.

Cross-Examination – David Erickson

1   Q.   Do you remember the conversations you had with him when you

2   said you were, "on him for the past six weeks"?

3   A.   Well, he passed through my office with some frequency.  And

4   I had asked him to try to help me break this logjam.

5   Q.   How frequently?

6   A.   Well, probably -- if it was over six weeks, I probably

7   brought it up every week to ten days.

8   Q.   He didn't remember that, did he?

9   A.   He chose not to.

10  Q.   He chose not to?  Do you have a personal dispute with

11  Mr. McClure?

12  A.   No.  But I have a suspicion that he didn't want to be in

13  your deposition in the first place.

14  Q.   He had counsel supplied by you, right?

15  A.   He's still his own person.

16  Q.   You think he was lying under oath?

17  A.   He just didn't remember it.

18  Q.   Let's focus on just the period between that email we looked

19  at, October 16, and your March 4 email that we are looking at

20  right now.

21       During that period, you didn't have any discussions with

22  ASH about the order of Phase C lot development, aside from maybe

23  raising the issue with Sean Coleman in a verbal conversation?

24  A.   No.  Not maybe.  I know I raised the issue with Sean

25  Coleman.  He said he would take it under advisement and he would

1    bring it up with a land committee.

2    Q.    That was another conversation you remember, right?

3    A.    That was all one conversation.  And it took another three

4    weeks for the land committee to get formed and start something.

5    Q.    Just to be clear, you are aware, aren't you, that the land

6    committee only existed while you were the interim CEO, right?

7    That was its only purpose?

8    A.    To my knowledge, yes.

9    Q.    Did you say you were surprised to become the interim CEO?

10   A.    I was.

11   Q.    Didn't you help prepare the document that had you appointed

12   as interim CEO?

13   A.    Restate that again.

14   Q.    The consent that the Board signed, didn't you help prepare

15   that?

16   A.    The document initiated by the Board saying, This is who we

17   are going to put in and what date we are going to do it, is that

18   what you are referring to?

19   Q.    Yeah.  You reviewed it before it was -- and commented and

20   made changes before it went to the Board, didn't you?

21   A.    Yeah.  I think I did it with you, and that was about five

22   days after I had already been told, Dave, we want you to do it.

23   Q.    By Marshall Coleman?

24   A.    By Marshall Coleman.

25   Q.    And that's the conversation you remember where he offered

1  you the permanent CEO position, but you didn't feel like you

2  were ready?

3  A.    That was the start of the process.  And it wasn't about my

4  being ready.  I said I didn't understand the actual scope of the

5  job and I didn't want to commit to the full scope of the job

6  until I understood what the job was.

7  Q.    Okay.

8       Do you remember you testified about --

9           MR. KRAMER:  Well, let's go back to the timeline.

10          PX200, please.

11  BY MR. KRAMER:

12  Q.    This is an email from you to Ryan Twiss dated March 16,

13  2021.  Right?  Already in evidence.

14  A.    Yes.

15  Q.    All right.

16          MR. KRAMER:  And if we go to PX200A.  Look at the

17  attachment.  Maybe it's at the bottom.  Scroll down.

18          Let's look at 200B.  My apologies.

19  BY MR. KRAMER:

20  Q.    This is the spreadsheet that you and Mr. McClure sent to

21  Ryan Twiss, right?

22  A.    I believe so.

23  Q.    The first neighborhood is Charleston Place, right?  40

24  lots?

25  A.    It is.

1231

Cross-Examination – David Erickson

1    Q.    That's still not finished, right?

2    A.    It is not.

3    Q.    Okay.

4          That's the one your lawyer contacted us about approximately

5    two weeks ago, right?

6    A.    Yeah.  Maybe closer to three weeks.

7    Q.    Okay.

8          So is that neighborhood still going to produce 40 lots?

9    A.    I got a plat in my office that's got 40 lots on it.

10   Q.    Great.

11         You are more than 40 lots behind on the Phase C Takedown

12   Schedule, right?

13   A.    As it happens, that's similar, yes.

14   Q.    Okay.

15         This spreadsheet doesn't list all the Phase C lots, does

16   it?

17   A.    It does not, because I wasn't asked for that.

18   Q.    You were asked for what you already had under development,

19   right?

20   A.    No.  I was asked what the status is of the projects that

21   were -- available to be in the pipeline, because you also see

22   Warm Springs Road here.

23         MR. KRAMER:  Let's look at the next page.

24   BY MR. KRAMER:

25   Q.    There is a column here with the heading "delivery date,"

1   and that's when you -- as of March 2021, that's when you

2   anticipated that these lots could be finished and delivered,

3   right?

4   A.    It is.

5   Q.    Charleston Place is at the top?

6   A.    Yeah.  You have to extend across, but, yeah, Charleston

7   Place is at the top.

8   Q.    It was late spring 2021 with development agreement?

9   A.    That's correct.

10  Q.    Were you insisting on some kind of development agreement at

11  this point?

12  A.    The whole purpose of this exercise, starting a week before

13  he asked for an update, was, Hey, let's get a development

14  agreement.  A common ASH response was, Oh, hey, I need more

15  info, as in, Let's not have a conversation.  You get me more

16  info.

17       I just need an agreement.  Please help me get an agreement.

18  I had been asking for it at this point 15 months.

19  Q.    You were asking for something that wasn't required by the

20  LPA, right?  You wanted something more?

21  A.    The LPA is asking for a C lot schedule.

22  Q.    Right.

23       An order.

24  A.    Repeat.  Repeat.  Repeat.

25  Q.    Order, right?  Order.

1  A.  Order, schedule.  They are being used interchangeably.  My

2  apology.  It probably does say "order," in the LPA.

3  Q.  Doesn't say "development agreement," does it?

4  A.  Not that I remember.

5  Q.  You wanted a development agreement.  That's something that

6  you were insisting on that wasn't required by the contract,

7  right?

8  A.  What's your development agreement, before we get too deep

9  in this mud?

10  Q.  It's your term, Mr. Erickson.  I honestly don't know

11  what -- go ahead and answer.

12    You were insisting on a development agreement that wasn't

13  required by the LPA, right?

14  A.  I was insisting upon a C lot schedule, which to have any

15  merit needs to have enough specificity that I can deliver the

16  quantity of lots, at the right time, at the right place, for the

17  right end-use by both parties.

18  Q.  That wasn't required by the LPA, was it?  It was just the

19  order of neighborhoods.

20  A.  Well, I dang didn't get that either.

21  Q.  Okay.

22    Well, you did, didn't you?  You testified this morning that

23  Ryan Twiss made a proposal that covered all the neighborhoods in

24  the Phase C list, right?

25  A.  And it's completely useless.

Cross-Examination – David Erickson

1    Q.    It's useless because it's not what you wanted, or because

2    it's not what's required by the contract?

3    A.    It's not executable.

4    Q.    Was that Ryan Twiss's fault?

5    A.    I don't know.  For all I know you told him to do it.

6    Q.    Okay.

7          Is that part of the conspiracy against you?

8    A.    I didn't saying anything about a conspiracy.  You've said

9    it twice now.

10   Q.    Okay.

11         So all the lots on the list here, except for one, are

12   supposed to be -- you say you can deliver them in spring, fall,

13   or summer of 2021 if you got your development agreement.

14         That's what it says, right?

15   A.    Yeah.

16         I mean, the whole purpose of this email chain started with,

17   Hey, Ryan, I've been getting the runaround.  How about helping

18   me get this straightened out.

19         Actually, I restate that.

20         I started with Mr. Benson.  He kicked it to Ryan and said,

21   Here, work with this.

22         What's going on in the politics of headquarters nowadays,

23   at this time, I can't tell you.

24   Q.    Do you think it was --

25         Of these subdivisions, Garrett Pines is the only one that

Cross-Examination – David Erickson

1  was actually finished, right, what's in Phase C lots?

2  A.   At this point in time Garrett Pines is actually finished.

3  Q.   You testified that ASH was, I think the word you used was,

4  "foot dragging," when it came to buying lots in Garrett Pines.

5       That's what you said this morning, isn't it?

6  A.   Oh, it was foot dragging on the paperwork at the front end

7  acknowledging what we are doing and you want us to do that.

8  Q.   You mean the development agreement that's not required by

9  the LPA?

10  A.   I still think there is one in there.

11  Q.   Okay.

12       ASH was four lots ahead of schedule by the time you were

13  first required to deliver Phase C lots, right?

14  A.   Good for ya.

15  Q.   Was that a yes?

16  A.   That would be a yes.

17  Q.   You think this is funny?

18  A.   No.  I think you are being extremely sarcastic to me, so

19  I'm at least trying to put a little levity into it.

20  Q.   Okay.

21       ASH bought the minimum required in the third quarter of

22  2021, right?

23  A.   It did.

24  Q.   And then ASH tried to buy the minimum required in the

25  fourth quarter of 2021, right?

Cross-Examination - David Erickson

1   A.    They did.

2   Q.    And you refused?

3   A.    At this point in time we had terminated the Land Purchase

4   Agreement for cause.

5   Q.    Okay.

6         You also said ASH made agreement on the order of Phase C

7   lot development contingent on you agreeing to everything else.

8   Is that basically what you said?

9   A.    That was your term sheet, specifically, in March -- I think

10  that was the 6th.

11  Q.    Oh, my term sheet?  The one --

12  A.    I think it was the 12th.

13  Q.    -- that said everything is agreed, nothing is agreed --

14  A.    Right.

15  Q.    That's what you are relying on when you say that ASH made

16  everything contingent on -- made agreement on the schedule

17  contingent on agreement with everything else, right?

18  A.    As of that date and your document, yes.

19         MR. KRAMER:  Let's go to PX197A.  This is a letter

20  from --

21  BY MR. KRAMER:

22  Q.    Do you remember this as a letter from Ryan Twiss to you?

23         MR. KRAMER:  It is not yet in evidence, is it?  It's

24  in.

25

Cross-Examination - David Erickson

1  BY MR. KRAMER:

2  Q.   Do you remember this as a letter from Ryan Twiss from

3  March 18, 2021?

4  A.   I do.

5  Q.   All right.

6       Let's go to the last -- this is the letter that attached

7  the development order that you said was complete but "completely

8  useless," right?

9  A.   That's what he sent.

10 Q.   Okay.

11      And here is what Mr. Twiss says:  Additionally, in your

12 letter you make reference to separate and ongoing negotiations

13 between Grayhawk, yourself, and other affiliated parties, the

14 global resolution, alleging that AG-Grayhawk is now demanding

15 delivery of lots to a standard that is in conflict with the

16 actual wording of the LPA and APA.

17      You with me?

18 A.   I see that.

19 Q.   Okay.

20      And then he goes on:  As previously discussed herein, it's

21 my desire to have an open discussion with transparency.

22 Accordingly, we would very much appreciate it if you could let

23 us know what specific requests Grayhawk has made regarding the

24 delivery of a finished lot as defined in the LPA that you

25 believe to be in conflict with the standards set forth.

Cross-Examination – David Erickson

1    Did I read that correctly?

2    A.    That's what it says.

3    Q.    He is asking you for information about this conflict about

4    lot quality standards, right?

5    A.    This particular paragraph is related to that.

6    Q.    Okay.

7    And then he goes on.  He says:  I agree with your sentiment

8    and welcome, on behalf of Grayhawk, further discussion to

9    resolve the issues relating to the paragraph 10 of the LPA and

10   setting the development order.

11   And then the final sentence:  However, due to the broad

12   nature and scope of the ongoing global resolution, I believe it

13   makes sense to limit the scope of our discussion to the

14   development order, at least for now.

15   So he just wanted to talk to you about the development

16   order, right?

17   A.    That's correct.

18   You had, effectively, segmented that portion out and said,

19   Ryan, go work on this part.  You got the demand letter.  You

20   control the future.  And it says, Everything is agreed or

21   nothing is agreed.  Extortion fee required.  We will go ahead

22   and have a schedule with you.

23   Q.    I didn't write this letter though, right?

24   A.    Well, it has his signature block, so maybe it got your

25   authority but it's gone out there.

1    The effective is, we now have two lines of negotiation that

2    are somewhat in conflict with each other.

3    Q.   Okay.

4        Well, let's go to the term sheet.

5            MR. KRAMER:  Let's look at one that your counsel

6    didn't show you this morning.  DX333.

7    BY MR. KRAMER:

8    Q.   This is an email from Mr. Quackenboss to me dated

9    May 6, 2021.

10       Do you see that?

11   A.   Yeah.  May 6.

12   Q.   May 6.  Did I say the wrong thing?

13   A.   No.  I was just making note that all of those previous

14   conversations were early March.

15   Q.   Okay.

16       So now we have gone forward to May 6, about two months,

17   right?

18   A.   Yep.  We got two attorneys talking for two more months

19   about it.

20   Q.   All right.

21       Your attorney says:  Attached is Dave's response to the

22   latest term sheet.

23       Right?

24   A.   I see that, but I see subject of the email is ASH annual

25   meeting.

Cross-Examination - David Erickson

 1        What's that about?

 2   Q.    I am just asking you what your attorney wrote in the email.

 3        That's what it says, right?

 4        Let's look at the term sheet --

 5   A.    Yeah.  Starting the next sentence I recognize that, so,

 6   yeah, I remember this.

 7   Q.    Let's go to page 5.

 8        Well, let's get to the -- page 5.

 9        This is the term sheet that says:  Nothing is agreed until

10   everything is agreed, at the top.  Right?

11   A.    Let me see the top so I can confirm that, please.

12   Q.    Okay.

13            MR. KRAMER:  Let's go back two pages.  There it is.

14            THE WITNESS:  For the benefit of the jury, can you

15   blow up that beginning section right there?

16            MR. KRAMER:  Sure.  Let's go back two more pages

17   forward.  All right.

18            So let's blow up little Roman numeral II, there.  And

19   the response underneath for Mr. Erickson.

20            It says here, in the term sheet:  Parties to negotiate

21   and memorialize a development schedule for remaining Phase C

22   lots.

23   BY MR. KRAMER:

24   Q.    Do you see that?

25   A.    I do.

1    Q.    And your response is:  Agreed in principle, subject to

2    resolution of other points.

3        Right?

4    A.    Acknowledged.

5    Q.    And there is a Footnote 2.  Do you see that?

6    A.    Where is Footnote 2?

7    Q.    It's after the first sentence.

8    A.    This is from the original sentence above footnote below.

9    Q.    Yep.

10   A.    Okay.

11   Q.    And there is an ASH NTD.

12       You heard testimony about the ASH NTD already in this

13   trial, right?

14   A.    I think that's your terminology for note to document or

15   note to draft.

16   Q.    That's right.

17       And the ASH note says:  LPA creates a two-way obligation to

18   agree on development order, which is not, and should not, be

19   contingent on agreement to other terms, including LPA changes.

20   ASH requests a response to its March 18 proposal.

21       The March 18 proposal was the complete but "completely

22   useless," spreadsheet that Ryan Twiss sent you, right?

23   A.    That's correct.

24   Q.    Okay.

25       So here ASH is not making agreement on the Phase C lot

1    development order contingent on anything else.

2         Wouldn't you agree?

3    A.   Then why did you put it in?

4    Q.   It says is not and should not be contingent, right?

5    A.   So you are contradicting yourself.

6    Q.   I am just asking you, is that what it says here,

7    Mr. Erickson?

8    A.   It does say that.  But you wrote it.

9    Q.   Well, why don't you read your response?

10        Can you read it out loud to the jury, please?

11   A.   Erickson NTD.  Erickson is willing to provide a response to

12   the negotiations as the negotiations progress, but does not plan

13   to reach an interim agreement on schedule without an agreement

14   on other points.  As ASH has stated repeatedly, nothing is

15   agreed until everything is agreed.

16   Q.   So you made it contingent, didn't you?

17   A.   No.  I just decided you had a good plan, so we will just

18   stick with it.

19        If you're going to be shooting at me continuous, we're not

20   going to be playing with little pieces.  We're gonna solve the

21   whole problem.

22   Q.   Okay.

23        ASH was trying to agree with you and you refused.  Fair?

24   A.   No.  I think ASH was trying to play games.  Run two

25   different segments at the same time so they could try to say

Cross-Examination - David Erickson

1  that.

2  Q.   All right.

3           MR. KRAMER:   Let's go to page 6.

4  BY MR. KRAMER:

5  Q.   There is a reference here to a buy-out and separation,

6  right?

7  A.   There is.

8  Q.   You wanted to be bought out of ASH at this point, right?

9  A.   I am not allowed to talk about the whole details of this,

10 but actually you had agreed to that previously.

11 Q.   Uh-huh.

12      And I think you testified earlier -- well, we heard some

13 testimony, didn't you come into that June 2, 2020 meeting with

14 a -- your request was $340 a unit, right?  That's what you

15 thought was a fair price?

16 A.   Based upon the valuation of the SPAC information that was

17 offered to us, which is based on the SPAC's evaluation of ASH.

18 Q.   Right.

19      You had paid $8.7 million for your units in ASH, right?

20 A.   I think at this point it's 8.6.

21 Q.   Okay.

22      And that was at a valuation of $100 a unit, right?

23 A.   That's correct.

24 Q.   And you wanted -- a year or two later you wanted $340 a

25 unit, right?

Cross-Examination - David Erickson

1    A.    Yes.   Based on that SPAC valuation of ASH, which means that

2    anybody else who has an ownership of ASH, in theory, has an even

3    greater number, because I did not even put down the full number

4    of what the SPAC people were offering.

5    Q.    Right.   The SPAC transaction didn't actually close though,

6    right?   That didn't happen?

7    A.    Well, obviously it didn't happen.

8    Q.    Right.

9          But if you -- 8.7, it would have gone up to about

10   30 million at your valuation, right?   That's what you were

11   demanding for a buy-out?

12   A.    Yes.

13         That would also have affected Marshall Coleman and

14   Tony Avala and a bunch of other people who were shareholders of

15   the same portion.

16   Q.    Well, were you offering to wait until the SPAC transaction

17   closed, or were you demanding to be bought out at what you

18   thought the company would be worth after it was purchased by a

19   SPAC and taken public in a transaction that never happened?

20   A.    Mr. Kramer, at this point in time, we are told a SPAC is on

21   the table.   It's a live thing.   We have been given the formula

22   about how the SPAC is valuing the whole company.   I know for a

23   fact we did not offer the full amount.   I don't remember the

24   exact number, but in theory the SPAC people were offering an

25   even greater value per share.   Otherwise -- but there is -- and

1    this is normal investment practice -- there is an uncertainty of

2    whether the SPAC is going to happen.

3    Q.    Right.

4    A.    You don't go for the full amount.  You try to get a

5    reasonable amount, so that it's in the best interest of ASH to

6    take the number being offered because they will get the upside.

7    There is a downside though.  And it is a negotiable number.

8    Q.    So you thought it was in the best interest of ASH to pay

9    you $30 million for units that you got for $8.6 million a year

10   or two earlier?

11   A.    Well, if the SPAC is offering at 40 or 45, they are getting

12   a great deal.

13   Q.    But that deal didn't happen, right?  Mr. Darnold testified

14   about that.  He said, No, the SPAC bought another company in

15   August.  Wasn't real.

16         Remember that?

17   A.    The information I know, at the time myself and

18   Mr. Quackenboss walked into your meeting, is you had a SPAC

19   offer on the table.  We had been given what that valuation was,

20   and because you had already put in a to-be-negotiated component

21   of the buy-out, we are darn well going to talk about.

22   Q.    My meeting?  Didn't you testify this morning that you

23   organized a meeting so you could get everybody together and talk

24   it through?

25   A.    I requested it.  Yes.

Cross-Examination - David Erickson

1   Q.   And it was at your lawyer's office in Washington, right?

2   A.   Yes, indeed it was.

3   Q.   Isn't it true that you wanted to exit ASH with $30 million

4   to fund your new venture at Grand Oak Builders?

5   A.   I already had my own funding available.

6   Q.   Okay.

7        But when ASH said no, you stopped selling lots, right?

8   A.   When ASH said no to what?

9   Q.   Excuse me.  Your $30 million demand.

10  A.   Well, it was part of a long list of things that we talked

11  about that day.  You know full well what that long list was.

12  Q.   Right.  ASH said no, and then you tried to terminate the

13  LPA and then you stopped selling lots.

14       That's at least part of what happened, right?

15  A.   You are placing it all on one bullet point?  That seems

16  like a big stretch, Mr. Kramer.

17            MR. KRAMER:  Let's have PX698.

18  BY MR. KRAMER:

19  Q.   Do you recall at that meeting declining to agree to extend

20  the stand-still agreement to avoid litigation, before we get to

21  the document?

22  A.   There were some conversations in that realm, but I don't

23  remember the exact details.

24  Q.   Is that because you left early?

25  A.   The only thing early about it, I was going to catch a

1   9:00 o'clock fight.  My, you know, conversations with you had

2   pretty much come to an end by about -- later afternoon.

3   Q.   You left before lunch, didn't you?  And your lawyer stayed

4   behind to negotiate on your behalf because you were angry that

5   ASH wouldn't agree to your $30 million demand?

6   A.   That's your characteristic and I don't believe it's

7   accurate.

8   Q.   What part of that is inaccurate?

9   A.   I went for lunch with my attorneys.  I was in the building

10  until later in the afternoon.

11  Q.   But you wouldn't come in the room to negotiate?

12  A.   That would be attorney/client discussion.  I probably

13  shouldn't reveal that.

14  Q.   Okay.

15           MR. KRAMER:  698.

16  BY MR. KRAMER:

17  Q.   This is a letter from your attorney dated June 21st, 2021,

18  right?

19  A.   June 21.  Okay.  Got it.

20  Q.   It's a notice of default?

21  A.   I see that.

22  Q.   Are you familiar with this document?

23  A.   I am.

24           MR. KRAMER:  Plaintiffs offer PX698.

25           THE WITNESS:  You talking to me?

1           THE COURT:  Any objection?

2           MR. QUACKENBOSS:  No objection.

3           THE COURT:  Admitted.

4       (PLAINTIFFS EXHIBIT PX698:  Received in evidence.)

5   BY MR. KRAMER:

6   Q.   If we look at the second page, the default notice refers

7   to -- in the final paragraph -- Section 10 of the LPA.

8       Do you see that?

9   A.   Let me read this paragraph, please.

10      (Pause in proceedings.)

11          THE WITNESS:  Continue.

12  BY MR. KRAMER:

13  Q.   All right.  Do you see the reference to Section 10 of the

14  LPA?

15  A.   I do.

16  Q.   And you are declaring ASH in default of the LPA for failing

17  to agree on the order of lot development, right?

18  A.   I am.  Or we are.

19  Q.   Right.

20      You also say here:  ASH did not purchase all available lots

21  for the first quarter of 2021, specifically, the four lots in

22  the Solamere and Garrett Creek subdivisions.

23      Do you see that?

24  A.   I do.

25  Q.   By the time you sent this letter, ASH had already purchased

Cross-Examination – David Erickson

1    the lots, right?

2    A.    I don't remember that specifically.

3    Q.    Okay.

4          Next line it says:    ASH took down these lots just last

5    week.

6          Right?

7    A.    It does.

8    Q.    Do you think that's true?

9    A.    I don't remember that lot transaction with enough accuracy

10   I could add to it.

11   Q.    In any event, when you sent this default -- or your lawyer

12   sent this default notice, you still hadn't responded to

13   Mr. Twiss' completely, but as you say "completely useless,"

14   order of Phase C lot development, right?

15   A.    We had not, because it had been conditioned already that

16   it's an all or nothing deal.

17   Q.    By you, right, in that note to draft?

18   A.    No.  By you.  Remember you wrote the terms six days before

19   him.

20   Q.    Okay.

21   A.    So I'm in the burden of your extortion claims all or

22   nothing from that point on.  You have never released that.

23   Q.    Okay.

24               MR. KRAMER:  PX699, please.

25

1250
Cross-Examination - David Erickson

1    BY MR. KRAMER:

2    Q.    This is a default notice from ASH dated June 21, 2021,

3    correct?

4    A.    Yes, sir.

5              THE WITNESS:  Plaintiffs offer PX699.

6              THE COURT:  Any objection?

7              MR. QUACKENBOSS:  No, sir.

8              THE COURT:  Admitted.

9         (PLAINTIFFS EXHIBIT PX699:  Received in evidence.)

10   BY MR. KRAMER:

11   Q.    This is the same date as your default notice, right?

12   A.    Yes, it is.

13   Q.    And you had 15 days to cure a default under the LPA, right?

14   A.    That's the terms of the LPA.

15   Q.    That's what you agreed to, right?

16   A.    I think that's actually in the APA.  Not the LPA.

17   Q.    It is the LPA.  It's Section 34, right?

18   A.    I will take your word for it.

19   Q.    35?  Okay.

20         Well, in any event, you had 15 days to cure, right?

21   A.    That's correct.

22   Q.    And then in this letter ASH invited you to agree on the

23   proposal that Ryan Twiss made and you did not agree, right?

24   A.    I did not agree.

25   Q.    ASH gave you 15 days and said, Please agree.  We thought

Cross-Examination - David Erickson

1   that this has been agreed in principle already.

2       Right?

3   A.   Well, that would be your perception.  I disagree with that.

4   Q.   Okay.

5       You didn't respond at all, did you?

6   A.   I think you and my attorney were talking.  He was speaking

7   on my behalf.

8   Q.   Okay.

9       45 days later you declared ASH in default for not agreeing

10  on the order of Phase C lot development, right?

11  A.   We did.

12  Q.   That's when you tried to terminate the LPA, right?

13  A.   I believe we sent you notice accordingly.

14  Q.   But you had already defaulted by that point, hadn't you?

15  A.   Under your terminology.  That's how you perceive it.

16  Q.   But that's what the contract says, isn't it?

17      You testified this morning that the contract only required

18  you to negotiate in the first year.

19      Do you remember saying that?

20  A.   That's correct.

21  Q.   Didn't the contract also say that if one party defaulted,

22  the other party had to give them notice and opportunity to cure.

23  And then, and only then, if they failed to cure there would be a

24  breach.

25      Isn't that what it said?

1    A.    Yes.

2         So if you go back to March, I sent a letter, incurious

3    [sic] and say, Hey, let's get this fixed.

4         You responded back, Oh, by the way, I have terms.  We're

5    going to do all of this stuff.  You're going to pay a big

6    extortion fee.  And then we will agree to your stuff.

7    Q.    I am just asking what the contract said, Mr. Erickson.

8    A.    I'm not a lawyer, but I don't think I'm required to go to

9    your agreement when you got a cannon pointed at my head.

10   Q.    Okay.  You don't think you were required to comply with the

11   contract?

12        I will withdraw the question.

13             MR. KRAMER:  Could we have PX700?

14   BY MR. KRAMER:

15   Q.    This is a letter from me to your counsel dated July 12,

16   2021, correct?

17   A.    That's what it is.

18   Q.    Okay.  Already in evidence.

19        This is a final notice of default under the Land Purchase

20   Agreement, right?

21   A.    That's what it says.

22   Q.    And you got it before you tried to terminated the LPA,

23   right?

24   A.    I did.

25   Q.    And at this point, July 12, 2021, you had never proposed an

1    order of Phase C lot development, and you had not responded to

2    Mr. Twiss' complete, but "completely useless," proposal, right?

3    A.    Restate that again, please.

4    Q.    By this point, July 12, 2021, you had never proposed an

5    order of Phase C lot development that was so important to you,

6    right?

7    A.    That's correct.

8    Q.    And despite the importance of this issue to you, you

9    haven't even responded to Mr. Twiss' March 18 proposal, right?

10   A.    Correct.  As I stated two minutes ago.

11   Q.    Okay.

12         MR. KRAMER:  We can take that down.

13   BY MR. KRAMER:

14   Q.    You testified you couldn't develop Phase C lots because ASH

15   placed a lis pendens on them.  Do you remember that?

16   A.    I couldn't complete lots.

17   Q.    The lis pendens was placed in the summer of 2021, right

18   after the lawsuit, right?

19   A.    Yep.

20   Q.    And at that point the lots were in "dormant status," as you

21   put it the last time you were testifying?

22   A.    I don't think that's correct.

23   Q.    No?  Okay.

24         In any event, it's been a couple of years, right?

25   A.    It's been awhile.

Cross-Examination – David Erickson

1    Q.   Isn't it true that in August 2021 ASH agreed to remove the

2    lis pendens at your request for a piece of property owned by

3    Carolton Development?

4    A.   I believe that's accurate.

5            MR. KRAMER:  Could we have a new exhibit, PX843, for

6    the witness, please?

7    BY MR. KRAMER:

8    Q.   Is this a notice of cancellation of lis pendens?

9            And if we flip to the next page, maybe you can tell me if

10   it relates to the Carolton property?

11   A.   It's for Carolton Development.

12           Just for clarity to the jury, I would also note that

13   Carolton Development was never part of the LPA.

14           MR. KRAMER:  Plaintiffs offer PX843.

15           MR. QUACKENBOSS:  It's not on the exhibit list,

16   Your Honor.

17           MR. KRAMER:  This is a new issue, Your Honor, arising

18   from a letter we got from Mr. Lomax, and a new defense in this

19   trial, that for some reason Mr. Erickson has been hindered by

20   lis pendens.

21           MR. QUACKENBOSS:  If the last three weeks of

22   correspondence are now going to become exhibits, Your Honor, we

23   are going to have quite an extension here.

24           We were careful not to introduce any paperwork about

25   that.  We are happy to, but we did not put it on the exhibit

1    list for that reason.

2            THE COURT:  Sustained.

3            MR. KRAMER:  Okay.

4    BY MR. KRAMER:

5    Q.   Well, you can at least look at this, Mr. Erickson, and

6    confirm for me that ASH released that lis pendens at your

7    request, right?

8    A.   Yes.  In part, because it should never have been there in

9    the first place.

10   Q.   Right.  And you told -- when you sent that request, you

11   said that you had a commitment from a buyer to purchase the

12   property for $4.4 million.

13           Do you remember that?

14   A.   I did.

15   Q.   But you don't know if that is actually true, do you?

16   A.   What's actually true?

17   Q.   That you had a commitment from a buyer to buy it for

18   $4.4 million.

19   A.   Oh, I had a commitment.

20   Q.   Well, you haven't sold the property yet, have you?

21   A.   That's true.  One doesn't mean the other one was wrong.

22           THE COURT:  Mr. Kramer, you got 15 minutes, so focus

23   on the most important things left.

24           MR. KRAMER:  Okay.

25   BY MR. KRAMER:

Cross-Examination - David Erickson

1   Q.   Mr. Erickson, there was a second notice -- ASH released a

2   lis pendens, again, in October of 2021 in order to enable you to

3   sell lots in Garrett Pines to ASH, right?

4   A.   You had to release a lis pendens to sell to yourself?

5   Q.   You don't remember that?

6   A.   I do not specifically remember this conversation.

7   Q.   Isn't that what you just asked ASH to do a couple of weeks

8   ago, release a lis pendens so you could develop lots and sell

9   them to ASH?

10  A.   If they were in Garrett Pines, they were already finished

11  lots.

12  Q.   Okay.

13       ASH released a notice of lis pendens in October of 2021

14  relating to a right-of-way for the Georgia Department of

15  Transportation, right?

16  A.   That sounds correct.

17  Q.   There was a request and ASH said yes, right?

18  A.   Correct.

19  Q.   You sold that property?

20  A.   I think this was also a commercial piece of property that

21  is about five feet wide running along the side of Veteran's

22  Parkway.  It's not a residential property and never had any

23  stuff -- anything you had to clear action upon.

24  Q.   So just so we are clear, Tiger Creek owns Phase C lots,

25  right?

Cross-Examination – David Erickson

1    A.    Tiger Creek owns the land to become Phase C lots.

2    Q.    Okay.

3          Do you recall estimating in August of 2021, for purposes of

4    this litigation, that the Phase C lots were worth $39,384,000?

5    A.    I think this was in the context for a bond number.

6    Q.    Right.

7    A.    Fair enough.

8    Q.    Do you remember that?  Is that the number?

9    A.    I remember generating a number for my attorneys.  The exact

10   number I couldn't tell you off the top of my head.

11         MR. KRAMER:  Let's go to PX517, page 11, to refresh

12   Mr. Erickson's recollection.

13   BY MR. KRAMER:

14   Q.    Is that your estimate, Mr. Erickson, $39,384,000 for the

15   Phase C lots?

16   A.    Yes.  For the purposes of the bond valuation in the low

17   left corner of this document.

18   Q.    When you submitted it to the Court, did you believe it to

19   be true?

20   A.    At that time, I felt it to be a reasonable estimate.

21   Q.    Do you think it's gone up since then?

22   A.    It's situational.  I would be hesitant to say that

23   categorically across the board.

24   Q.    Okay.

25         You are still holding a $2.5 million deposit from ASH,

1258

Cross-Examination - David Erickson

1  right?

2  A.  We are.

3  Q.  You have put that money -- you didn't put that money in a

4  segregated account, did you?

5  A.  I did not.  And to my knowledge I was not required to.

6  Q.  It's not even in the account of one of the entities that

7  signed the LPA, right?

8  A.  It is not.  And to my knowledge I was not required to.

9  Q.  You invested it in stocks, right?

10  A.  We invested it in tradable securities.  That is correct.

11  Q.  At Morgan Stanley or Stifel?

12  A.  I think it's Stifel.

13  Q.  And by "we," you mean Ranier Capital, you, and your wife,

14  right?

15  A.  Collectively.  Yes.

16  Q.  Ranier Capital is not a party in the LPA, is it?

17  A.  It's not a signer of the LPA.

18  Q.  You invested that money in November of 2019, right?

19  A.  Thereabouts.  It could have been December or January also.

20  Q.  I assume you have earned some returns by now.  Is that

21  right?

22  A.  Well, I hope so.

23  Q.  You didn't lose any of that money, did you?

24  A.  To my knowledge, we have not.

25  Q.  But you did put it at risk, right?

Cross-Examination - David Erickson

1   A.   Excuse me?

2   Q.   You did put it at risk in the stock market, didn't you?

3   A.   Well, it's in an investable security.  So there is ups and

4   there is downs.

5   Q.   And ASH has asked you to return that money several times,

6   correct?

7   A.   At least one that I recall.

8   Q.   And you have always said no, right?

9   A.   We have said no.

10  Q.   You filed some claims in this lawsuit that are no longer in

11  front -- are no longer at issue at trial, right?

12  A.   Say that again, please.

13  Q.   You filed a number of claims in this lawsuit that are not

14  being tried today, right?

15  A.   We filed them?

16  Q.   Yeah.  Counterclaims.

17  A.   My apologies, but I don't recall those well enough that I

18  could give you a proper answer.

19  Q.   Okay.

20       You don't remember claiming that ASH breached the LPA?

21  A.   I am of the opinion that ASH has breached the LPA.

22  Q.   Okay.

23       And you don't remember claiming that -- you don't remember

24  any of other the claims that are not going to be presented in

25  this case to the jury?

Cross-Examination – David Erickson

1    A.   I don't remember them being part of the lawsuit.  That's

2    what I am confused with.

3    Q.   Okay.

4         Last topic, you heard Mr. Quackenboss say ASH wants to

5    leave Columbus.  Do you remember that?

6    A.   I believe I heard him say that.

7    Q.   Is that based on a board presentation that refers to ASH

8    wanting to rotate out of Columbus and into Atlanta?

9    A.   That's -- that was my interpretation as well.

10   Q.   Mr. Darnold explained what he actually meant by that when

11   he testified, right?

12   A.   He did state his intention here.

13   Q.   He said that ASH would rotate like a wheel into Atlanta and

14   keep its base of operations here in Columbus, right?

15   A.   That's what he said.

16   Q.   Okay.

17        And you heard him explain that ASH signed a lease for new

18   office space for the next five years that was three times bigger

19   than the last one, right?

20   A.   I am aware that they signed a lease.  I don't remember the

21   amount of time.

22   Q.   It's not true that ASH is planning to leave Columbus, is

23   it?

24   A.   Mr. Kramer --

25   Q.   You don't know, do you?

1    A.    I don't know what you're thinking.  And for -- it's a

2    changeable item.  ASH could leave Columbus Tuesday afternoon.

3    Q.    You think Mr. Darnold was lying?

4    A.    I didn't say that.

5              MR. KRAMER:  No further questions.

6              THE COURT:  Redirect?

7              MR. QUACKENBOSS:  Absolutely nothing, Your Honor.

8              THE COURT:  All right.

9              Sir, you may step back.

10             All right.

11             Ladies and gentlemen, it's my understanding that the

12   defendant has one more witness, an expert witness on the issue

13   of damages, who is from out of town, and he was unable to get

14   here today so we are going to have to come back on Monday.

15             We were probably going to have to come back on Monday

16   anyway because the lawyers have to give closing arguments.  I

17   have to give you my instructions on the law.  And then you have

18   to deliberate.  So as hard as we pushed this week, I think we

19   are probably coming back on Monday anyway.

20             That means you are going to get to go early today,

21   because I don't think there is anything else for you to do here

22   today.

23             So I am going to let you go.  I am going to meet with

24   the lawyers.  I have to have a conference with them about the

25   jury instructions and what I will tell you the law is going to

1    be, and we will do that this afternoon so we will not have to do

2    that on Monday.

3              On Monday we will come back and the defendants will

4    call that one witness, and then the lawyers will give their

5    closing arguments and I will instruct you on the law, and you

6    should be able to begin those deliberations on Monday.

7              I want to caution you, once again, during our break

8    that you do not discuss the case with anyone.  Don't let anybody

9    discuss it with you.  Don't go Google something about the case

10   and do any kind of independent investigation.  Don't ride

11   around -- not that you would.  I know you have better things to

12   do -- but don't ride around town trying to find out where these

13   lots are, or anything like that.  Just enjoy your weekend.

14             We will start Monday at 9 AM.

15             So you can leave your notes pads in your chair.  They

16   will be protected while you are gone.

17             We will see you back here Monday at 9:00 o'clock.

18             Have a good weekend.

19        (Jury out at 4:09.)

20             THE COURT:  Okay.  Y'all probably need a little time

21   to review those instructions that I gave you at lunch.  So we

22   will -- we will reconvene at 4:30 and we will have our charge

23   conference at 4:30.

24             We will recess until that time.

25        (Recess taken 4:10.)

1    (Resumed at 4:32.)

2              THE COURT:  Be seated.  All right.

3              This will be the charge conference in this case.  The

4    Court has previously distributed its draft charge to the jury as

5    well as the verdict form, and this is the opportunity for the

6    parties to provide suggestions and objections to the charge.

7              We will start with the instructions first.

8              Plaintiffs, I will hear from you first.

9              MR. KRAMER:  Thank you, Your Honor.

10             Ms. Agnew is going to speak.

11             Would you like to do this instruction by instruction

12   or do you want us to go all the way through?

13             THE COURT:  I want you to tell me which ones you

14   object to and any omissions that you suggest.  I want to make

15   sure I get the full input before we agree on the final charge.

16             MR. KRAMER:  Okay.

17             THE COURT:  Ms. Agnew?

18             MS. AGNEW:  Would you prefer at the table or at the

19   podium?

20             THE COURT:  Whatever is best for you.  You can remain

21   seated if you like.

22             MS. AGNEW:  Thank you.

23             Okay.

24             First, I believe we can address two instructions that

25   we believe should be added.  The first would be the standard

```
 1   instruction for stipulated facts.  I believe there is a version
 2   in both parties' submitted proposed instructions.
 3            There were a number of stipulated facts submitted with
 4   the joint pretrial order that either should be included in the
 5   instructions orally or in writing for the jury.
 6            THE COURT:  All right.
 7            There have been no stipulated facts provided to the
 8   jury.  The typical process is for those to have been read into
 9   the record, and that has not yet been done.  Was that the
10   intention for that to have been done?
11            MR. KRAMER:  Yes, Your Honor.  We weren't sure what
12   the process would be that the Court prefers, but we can read
13   them into the record at an appropriate time.
14            THE COURT:  We don't have much time left.  So
15   typically the plaintiff would read them into prior resting their
16   case.  But we will make sure -- I can read them in, but I will
17   need a copy of them.
18            MR. KRAMER:  We will supply one, Your Honor.
19            THE COURT:  There is nothing in the charge that says
20   that the facts that are stipulated there has to be no further
21   proof of them?
22            MS. AGNEW:  That instruction is not in the current
23   charge.
24            THE COURT:  All right.
25            I will probably just give that instruction when I read
```

```
 1    the stipulated facts to the jury, but I need somebody to provide
 2    me with the agreed-upon stipulated facts before -- I guess I
 3    will read them after the defendants' last witness and before the
 4    defendant rests.
 5            Defendants have any objection to the Court reading in
 6    the stipulated facts?
 7            MR. SHEBELSKIE:  No, sir.
 8            We did look at them during the break, all that has
 9    been established in the record.  They are probably unnecessary.
10    But I have no objection to your reading them.
11            THE COURT:  Okay.
12            Y'all have agreed to stipulated facts?
13            MS. AGNEW:  Yes, Your Honor.  They were agreed as part
14    of the joint pretrial order.
15            THE COURT:  How long are they?
16            MS. AGNEW:  I would guess a few pages.
17            MR. SHEBELSKIE:  Probably four pages.
18            THE COURT:  Oh, my gosh.
19            MR. KRAMER:  I can hand up them up, Your Honor.  I
20    think we managed to agree on a few things here.
21            THE COURT:  Hand them up.
22            That's fine.  After defendants call their last
23    witness, I will read the stipulated facts and explain to the
24    jury that there needs to be no further proof with regard to
25    those stipulated facts.
```

1          Okay.  What else?

2          MS. AGNEW:  Thank you, Your Honor.

3          The next instruction that is not in the current charge

4    is an instruction either that the defendants have not properly

5    terminated the LPA, or a clear statement that the plaintiffs

6    have not breached the LPA.

7          We heard on several occasions that Mr. Erickson

8    testified that in his opinion ASH had breached the LPA, or in

9    his opinion he had properly terminated the LPA.

10         There is no claim left in this case that ASH has

11   breached the LPA.  And the Court has already ruled that the

12   termination was not effective.  So we would like a brief

13   instruction to make those rulings clear to the jury so there is

14   no confusion as to whether or not there might be a competing

15   claim against ASH with respect to the Land Purchase Agreement.

16         THE COURT:  Doesn't the current charge explain exactly

17   what the claims are that the jury has to decide and doesn't the

18   verdict form do that also?

19         MS. AGNEW:  Yes, Your Honor.

20         They do explain what the charges are, but there is

21   nothing to clarify the evidence that the jury has heard that in

22   Mr. Erickson's opinion ASH has breached the LPA, or that

23   Mr. Erickson properly terminated the LPA.

24         THE COURT:  But there is nothing in the verdict form,

25   or the charges, for a claim by Mr. Erickson against the

```
1   plaintiffs for plaintiffs' breach of the LPA, is there?
2           MS. AGNEW:  That's correct.
3           THE COURT:  Did I say that correctly?
4           Is that what you are concerned about, whether or not
5   the jury would be confused as to whether Mr. Erickson has a
6   counterclaim for breach of the LPA?
7           MS. AGNEW:  Yes.  That's correct.
8           THE COURT:  The charges clearly don't indicate that
9   there is such a claim.  And there is no way for the jury to find
10  that in the verdict form.  So I think the current charges are
11  adequate --
12          MS. AGNEW:  Okay.  Understood, Your Honor.
13          THE COURT:  -- on that issue.
14          MS. AGNEW:  Understood.
15          THE COURT:  Of course, I am not preventing you from
16  arguing any of this.  There is not a claim.  You will see on the
17  verdict form that there is not a claim.  There is not an issue.
18          MS. AGNEW:  Yes.  Understood.
19          The next charge is charge number 9, which is an
20  instruction with respect to the breach of contract claims.  In
21  numerated paragraph number 3, which is on page 8, it describes
22  the claim as being plaintiffs' claim that the LPA sellers
23  breached Section 10 of the Land Purchase Agreement by failing to
24  go deliver lots that they were obligated to provide under the
25  agreement.
```

1          The plaintiffs' claim is broader than that and not

2   limited to Section 10, so we would ask either that it says

3   breached Section 6 and Section --

4          THE COURT:  Where are you reading from specifically?

5          MS. AGNEW:  This is numbered paragraph 3 that's on

6   page 8.

7          THE COURT:  Page 8?

8          MS. AGNEW:  Yeah.

9          THE COURT:  Let me take a look at this.

10         Okay.  Maybe I missed it but what is your -- I thought

11  the breach was that the sellers failed to deliver the lots.

12         MS. AGNEW:  That is part of the claim that would be

13  under Section 6 of the LPA.

14         Section 10 relates to the agreement on the order of

15  Phase C lot development.

16         We would ask that the instruction either just say:

17  Breached the Land Purchase Agreement, or that it reference both

18  Section 6 and Section 10.

19         THE COURT:  That Section 10 goes to the ordering of

20  the lots and not the failing to deliver the lot?

21         MS. AGNEW:  That's correct, Your Honor.

22         THE COURT:  Okay.  I would prefer -- and I think it

23  would be less subject to confusion -- if it just said:  Breached

24  the Land Purchase Agreement by failing to deliver the lots, and

25  take out Section 10 altogether.  Is that okay?

1          MS. AGNEW:  Yes.

2          THE COURT:  I mean, you also contend that he breached

3    his duty to reach agreement on the order, but as I interpret

4    that that goes to the failure to deliver the lots breach.

5    Correct?

6          MS. AGNEW:  They are related, but our claim is that

7    those are two separate breaches that could be independent of

8    each other.

9          THE COURT:  Isn't the contention that he didn't just

10   deliver the lots; he failed to deliver the lots in part because

11   he wouldn't agree to an order in regard to the C lots?

12         MS. AGNEW:  Yes.

13         THE COURT:  I'm just trying to get the essence to the

14   jury and let y'all make the argument without me adding any

15   confusion.

16         Do you want me -- are you requesting that I say:

17   Breached the Land Purchase Agreement by failing to deliver lots

18   that they were obligated to provide under the agreement and by

19   failing to agree to a schedule for the order in which the lots

20   would be developed or delivered?

21         MS. AGNEW:  Yes, Your Honor.

22         THE COURT:  All right.

23         Tell me the language you would request that I insert

24   here exactly.

25         MS. AGNEW:  Sure.

1    So item number 3 would then read:  American Southern

2  Homes Holdings, LLC and ASH-Grayhawk, LLC, claim that the LPA

3  sellers, David Erickson, GH Lot Holdings, Inc, Tiger Creek

4  Development, Inc., Cusetta Road, LLC, Grey Rock Development,

5  LLC, Windsong Bonacre LLC, Erickson Investments, LLC, and Sage,

6  Inc. breached the Land Purchase Agreement by failing to deliver

7  lots that they were obligated to provide under the agreement.

8    THE COURT:  Slow down.  And what?

9    MS. AGNEW:  It currently reads --

10    THE COURT:  I know what it currently reads.  What do

11  you want me to put after "under the agreement"?  You want me to

12  put and --

13    MS. AGNEW:  And by failing to agree to an order of

14  Phase C lot development.

15    THE COURT:  Failing to agree to an order --

16    MS. AGNEW:  Of Phase C lot development.

17    THE COURT:  -- of Phase C lot development.

18    MS. AGNEW:  I misspoke.  It should be "or," and not

19  "and" -- my apologies -- in between that last phrase.

20    THE COURT:  Actually you contend and/or, right?

21    MS. AGNEW:  Yes.  That's correct.

22    THE COURT:  Okay.  Was there some objection to that,

23  Mr. Shebelskie?  This is just, at this point, stating their

24  claim.

25    MR. SHEBELSKIE:  Yes.  I think it is appropriate to

1    say simply, after listening to the defendants:  Breached the

2    Land Purchase Agreement.  Period.  And then that allows the

3    jurors to hear the argument from counsel and decide how, if at

4    all, they think it was breached.

5          For example, as I think the Court has sometimes

6    understood it, they may well conclude that no breach occurred --

7    because of the failure to agree on the Phase C lot order no

8    breach occurs with respect to the delivery of the Phase C lots.

9          The way the language has been proposed here, the jury

10   could view this as saying they have to view those as separate

11   unrelated obligations.  And I don't think the instruction should

12   put a thumb on the scale of how the jurors view that issue.

13         THE COURT:  Well, I don't think by saying this is the

14   contention of the plaintiff, this is the claim, I don't think

15   that puts the thumb on the scale of anything.

16         I'm going to add the plaintiffs' requested addition

17   revision at that point.

18         Now, is that going to require modification elsewhere

19   when I tell them what the elements of the charge are, or not?

20         MS. AGNEW:  Yes, I believe it is.  I believe this will

21   carry over into the verdict form as well.

22         THE COURT:  Over into what?

23         MS. AGNEW:  The verdict form.

24         THE COURT:  What about over here?  I see -- what

25   section of the Land Purchase Agreement is it that requires the

1    providing of the lots?  Because we keep referring to Section 10

2    in our charges.  And paragraph 10 we refer to -- charge 10 we

3    refer to Section 10.

4            MS. AGNEW:  It's Section 6 of the LPA that is the

5    requirement to deliver lots.

6            Section 10 relates to the order of the Phase C lot

7    development.

8            THE COURT:  The order.  Right.

9            Okay.

10           So in the verdict form that would be question --

11           MS. AGNEW:  I believe it's question number 6.

12           THE COURT:  -- regarding question 6?

13           MS. AGNEW:  Yes, Your Honor.

14           THE COURT:  I think in the verdict form I am just

15   going to -- I am just going to ask them to answer:  Do you find

16   that they proved by a preponderance of the evidence that the LPA

17   sellers breached the Land Purchase Agreement.

18           Take out just the reference to Section 10 in the

19   verdict form.

20           MS. AGNEW:  Yes, Your Honor.

21           THE COURT:  I think the same for question 7 in the

22   verdict form.  It should be:  Prevented the LPA sellers from

23   performing their obligations under the Land Purchase Agreement,

24   and remove reference to paragraph 10.

25           Okay.  What else in the charge?

1              MS. AGNEW:  This is -- we are back to charge number 9.

2    This is the paragraph following the paragraph we were just

3    discussing, which defines the elements of a claim for breach.

4              And after the sentence with the four elements, we

5    would ask for the sentence be added, which is part of the

6    proposed instructions we submitted this morning, and that

7    sentence would read:  A breach occurs if a party to the contract

8    repudiates or renounces liability under the contract, fails to

9    perform in the manner specified in the contract, or does some

10   act that renders performance impossible, which comes from

11   Georgia Court of Appeals case law as the definition of a breach.

12             THE COURT:  I believe our charge here came from the

13   pattern charges with regard to -- pattern Georgia charges with

14   regard to breach of contract.

15             Let me read your extra sentence.

16             Okay.  You're saying that our charge defines breach of

17   contract as being a breach of the duty but doesn't define what

18   breach is?

19             MS. AGNEW:  Yes, Your Honor.

20             THE COURT:  They may not understand what the word

21   "breach," means, and you say this is the definition of breach --

22             MS. AGNEW:  Yes, Your Honor.

23             THE COURT:  -- under Georgia law.

24             And:  Repudiation or renouncing of liability under a

25   contract or failure to perform it in the manner specified in the

1  contract or doing some act that renders performance impossible.

2           MS. AGNEW:  Yes, Your Honor.

3           THE COURT:  I think that's an accurate statement of

4  the law.

5           Mr. Shebelskie, what's y'all's observation with regard

6  to that?

7           MR. SHEBELSKIE:  That is an incomplete statement of

8  the law.

9           THE COURT:  What?

10          MR. SHEBELSKIE:  That is an incomplete statement of

11  the Georgia law on the definition of a breach.

12          THE COURT:  What is the complete definition?

13          MR. SHEBELSKIE:  The complete definition would

14  include:  The measure of performance is substantial performance,

15  and likewise a breach is defined as the non-performance without

16  legal excuse.

17          And so if we are going to define "breach," we have to

18  have the full definitions that balance out the plaintiffs' and

19  the defendants' views of what constitute breach, or not.

20          THE COURT:  Or not.

21          Is the --

22          MR. SHEBELSKIE:  And then we would have to define what

23  a "repudiation" is.  The case law defines "repudiation" as an

24  unconditional refusal to perform.  And so they would need to

25  find that element to find a repudiation breach in the form of a

1    repudiation.

2            THE COURT:  Georgia pattern charge does not define

3    breach.  Okay.

4            MS. AGNEW:  I do not believe that they have that

5    additional language in the pattern instructions.

6            THE COURT:  I am assuming they just assumed that there

7    is a duty or obligation under the contract, and if you do not

8    comply with that duty or obligation, you breached it, rather

9    than -- your suggestion basically gives examples of breaches,

10   which, according to defendant, is not entirely complete.

11           What's the defendants' position?  Just leave as is and

12   consistent with the pattern charge under Georgia law?

13           MR. SHEBELSKIE:  Yes, sir.

14           THE COURT:  I think I am going to leave it as is.

15           What's next?  What other objections do you have?

16           MS. AGNEW:  The next one would be in charge 10.

17           THE COURT:  Of course, you can argue all of these

18   things.  You can argue this is breach.

19           MS. AGNEW:  Yes, sir.

20           THE COURT:  Go ahead.

21           MS. AGNEW:  The next would be charge 10, the second

22   paragraph, although I believe we may have resolved this.  This

23   is the reference to Section 10 of the Land Purchase Agreement

24   with respect to the defendants' affirmative defenses.

25           I think we might have already addressed that issue in

1    making the language --

2            THE COURT:  You are saying we should strike under

3    Section 10?

4            Defendants, this is your affirmative defense.  You

5    want to strike under Section 10?

6            MR. SHEBELSKIE:  Yes, sir.

7            THE COURT:  Prevented the LPA sellers from performing

8    their obligations under the Land Purchase Agreement.

9            Okay.

10           And then the same down there, the last line of that

11   page, under the Land Purchase Agreement, rather than

12   specifically referencing Section 10.

13           What else?

14           MS. AGNEW:  On page 11, the paragraph addressing

15   mitigation of damages.  We would ask that language be added.  As

16   the Court ruled in its order on the motions in limine, that the

17   plaintiffs do not have an obligation to buy additional lots from

18   defendants.  And do not have an obligation to continue working

19   with the defendants as part of their duty to mitigate.  This was

20   in the Court's ruling on the motions in limine.

21           MR. SHEBELSKIE:  On that point, Your Honor, I think

22   that's already reflected in the language here that says the

23   mitigation -- you define what can be mitigation.

24           You say:  Fail to mitigate by -- that lots comparable

25   to the LPA seller lots were available.  So you limit mitigation

1    to the acquisition of lots outside of the control of the LPA

2    sellers.  So I don't think this is an issue.

3             MS. AGNEW:  Your Honor, I believe that would be a very

4    confusing distinction for the jurors to make, and we expect that

5    the defendants will argue that offering Phase B lots was

6    offering lots comparable to the LPA seller.

7             THE COURT:  They would not argue that unless they are

8    going to argue it contrary to my order, and then they will be

9    called down in the middle of their closing argument, which I

10   doubt they would want to do.

11            MS. AGNEW:  Understood, Your Honor.  We are just

12   trying to make it clear for the jury to understand that included

13   in the definition of substantially equivalent lots is not lots

14   from the defendants and the LPA sellers.

15            THE COURT:  What if they said:  Lots comparable to the

16   LPA seller's lots but not under LPA seller's control?

17            MS. AGNEW:  I believe that would probably work.

18            Yes, Your Honor.

19            MR. SHEBELSKIE:  Your Honor, it might even be simpler

20   after that first --

21            THE COURT:  I am all for simpler.  What is it?

22            MR. SHEBELSKIE:  After that number one:  Lots that

23   were available from other persons.

24            THE COURT:  Lots comparable to the --

25            MR. SHEBELSKIE:  I think we're trying to get to the

```
 1   notion here that the lots have to -- we are talking about

 2   non-LPA lots.

 3              THE COURT:  Right.  Lots comparable to the LPA

 4   seller's lots.

 5              Yeah.  But you've got the phrase there that we are

 6   subject to the Land Purchase Agreement.  That makes that

 7   confusing.

 8              MR. SHEBELSKIE:  I see your point.

 9              You could put "available" at front to say:  Lots were

10   available from third persons that were comparable to the LPA

11   seller's lots.

12              THE COURT:  It's just getting very wordy.

13              MR. KRAMER:  Your Honor, if I may, the first numbered

14   clause here could simply say that:  That comparable lots were

15   available from sources other than the LPA sellers.

16              THE COURT:  Sure.  But then it's got to be -- they got

17   to be comparable to the LPA seller's lots.  That's the thing.

18   They got to be comparable to the LPA seller's lots, but they

19   cannot have come from the LPA sellers.

20              MR. KRAMER:  Right.

21              What was your suggestion, Ms. Agnew?

22              MS. AGNEW:  I believe the way we would have it read

23   would be -- well, there is two options.  One would be to revise

24   that numerated paragraph one.  We could also add a sentence

25   before that full sentence that reflects the language from the
```

1   Court's order that says that:  American Southern Homes Holdings,

2   LLC and ASH-Grayhawk are not required to mitigate damages by

3   renegotiating with the LPA's sellers or obtaining lots from the

4   LPA sellers, as a separate sentence.

5            THE COURT:  So you would have that after number 2?

6            MS. AGNEW:  Either -- yes.

7            THE COURT:  So you have to prove that American

8   Southern Homes Holdings and ASH failed to mitigate.  LPA sellers

9   must prove by a preponderance of the evidence that lots

10  comparable to the LPA seller's lots, that were subject of the

11  Land Purchase Agreement, were available.

12           And, two, that American Southern Homes Holdings, LLC

13  and ASH did not make reasonable efforts to obtain such lots.

14           MR. SHEBELSKIE:  Judge, couldn't you just --

15           THE COURT:  Wait a second.

16           We need to make this accurate, complete and straight

17  forward.

18           What if we put at the end of that sentence that:

19  American Southern Holdings, LLC and ASH-Grayhawk, LLC had no

20  duty to attempt to obtain lots from the LPA sellers.

21           MS. AGNEW:  Yes, Your Honor.  That would work.

22           MR. SHEBELSKIE:  That's fine, Your Honor.  Consistent

23  with your ruling.

24           THE COURT:  American Southern Holdings, LLC and

25  ASH-Grayhawk LLC had no duty to attempt to obtain lots from the

 1    LPA sellers.

 2              What's next, Ms. Agnew?

 3              MS. AGNEW:  The next is on top of page 13, which is

 4    the instruction regarding undue delay and waiver.  And we would

 5    ask for additional language regarding the standard for waiver,

 6    which is that:  The waiver may be expressed or may be inferred

 7    from actions under the totality of the circumstances -- that's

 8    the existing language -- a waiver must be clear and

 9    unmistakable.  The evidence must be so clearly indicative of an

10    intent to give up a contractual right such that there can be no

11    other reasonable explanation.

12              And that's one of the proposed jury instructions we

13    submitted earlier today as well.

14              THE COURT:  My only concern about this, no other

15    reasonable explanation, is it seems to potentially conflict with

16    the burden of proof and preponderance of the evidence.

17              I mean, in effect that's what you are doing.  You are

18    grafting on here a heightened burden of proof.  I am just going

19    to -- I am going to make the following modification.

20              Where it says, "a waiver," third line down:  A waiver

21    must be clear and unmistakable, and it may be expressed or may

22    be inferred from actions under the totality of the

23    circumstances.

24              MS. AGNEW:  Thank you, Your Honor.

25              THE COURT:  Okay.  What next?

1        MS. AGNEW:  The next is the following paragraph which

2   addresses of how to award damages, including the instruction on

3   the issue of other damages you must consider any damages caused

4   by each LPA seller separately.

5        As the Court is aware, we submitted a proposed jury

6   instruction with respect to joint liability.

7        THE COURT:  Yeah.  I am overruling that.  The Court of

8   Appeals can decide differently.  But I am convinced that damages

9   have to be decided on a per defendant basis.

10        So given that ruling, what modifications do you

11   request?  You have preserved your argument for appeal that you

12   think it should be joint.

13        MS. AGNEW:  We understand.  We will address the issue

14   with respect to the verdict form with a similar objection.

15        THE COURT:  Okay.  What other?

16        MS. AGNEW:  The final one would be the instruction --

17   excuse me.  The second to last would be the instruction on

18   page 14 with respect to lost profits.  And we would just ask

19   that the term, "lost future profits," be revised to "lost

20   profits," to the extent a component of the lost profits relates

21   to the years 2022 and 2023.

22        THE COURT:  I don't have a problem with that.

23        Any problem with that by the defendants, just having

24   the inclusive phrase, "lost profits," instead of, "lost future

25   profits"?

1    MR. SHEBELSKIE:  I think that the last sentence on
2    page 14 would still have to say "future profits," because that
3    concerns discounting.
4    THE COURT:  Correct.  Correct.  But earlier in the
5    charge we will just strike "future".
6    Also the sentence that says:  To determine whether
7    lost future profits should be awarded, you may consider whether
8    they had a proven track record.
9    That really is a charge with regard to future profits,
10   I think.  But I can change that to just "profits."  I guess it
11   would apply to past profits, too.
12   Okay.  We will just strike "future" throughout.
13   Included several times.
14   Then the -- we will leave it in the last sentence
15   where it says:  Any lost future profit damages must be limited
16   to the present cash value of the future loss.
17   MS. AGNEW:  Yes.
18   THE COURT:  What else, Ms. Agnew?
19   MS. AGNEW:  The last charge is charge number 11 and
20   this would be the third paragraph.  This is discussing the
21   quantum meruit claim and we would ask that in that -- I suppose
22   that's the first sentence.
23   MR. SHEBELSKIE:  Counsel, I don't want to interrupt
24   but I can short-circuit this.  When we plan to rest, we are not
25   going to put on any additional evidence related to quantum

1  meruit, Your Honor.

2            In light of the trademark cases being out of the case,

3  and the evidence that came in that the plaintiffs aren't

4  disputing the Transition Services Agreement and the obligations

5  under it, we don't need that claim anymore.

6            THE COURT:  So you are not pursuing quantum meruit?

7            MR. SHEBELSKIE:  Correct.

8            THE COURT:  All right.  We will strike that there, and

9  we will strike it at the beginning if we make mention of a

10  quantum meruit claim.

11            I'm sure it's mentioned -- maybe it's not.  Is that

12  the first time it's mentioned?  Quantum meruit?  We will go back

13  through and make sure we remove quantum meruit throughout.

14            Okay.  We could have tried this case in three days if

15  we had narrowed down the claims the way they have been narrowed

16  down thus far.

17            You said that's your last one?

18            MS. AGNEW:  Yes.  With respect to the charges.  Yes.

19            THE COURT:  Let me hear from the defendant with regard

20  to the charges, and then I will come back to you on the verdict

21  form.

22            We will do the verdict form separate.

23            Mr. Shebelskie?

24            MR. SHEBELSKIE:  Yes, sir, Your Honor.  On charge 9,

25  and this would appear on page 8, three things:  One, is a

1     housekeeping matter.  In the enumerated paragraph 3 with the

2     listing of the parties, I believe the Cusseta Road defendant has

3     been previously dismissed by agreement.

4          MS. AGNEW:  Your Honor, I believe that was Carolton

5     Development that was dismissed.

6          MR. SHEBELSKIE:  Carolton Development.  All right.

7     Then I'm mistaken.

8          THE COURT:  Just so y'all won't be accused of being

9     foreigners when you give your closing arguments, it's Cuseeta

10    Road.

11         MR. SHEBELSKIE:  As soon as I said it, I knew it.

12         THE COURT:  Both sides have made that mistake, I

13    think.

14         The proper Creek Indian pronunciation is probably

15    Casetta, but the local Columbusites call it Cuseeta.  Of course,

16    there are a lot of new Columbusites, and that would be people

17    that have moved here in the last 30 years, and they probably

18    still, some of them, probably call it Casetta.  Casetta and

19    Buena Vista.  You know they are not originally from Columbus if

20    they say Casetta, or Bwayna Vista.

21         Anyway.  We agree Cusseta Road is still in the case?

22         MR. SHEBELSKIE:  Yes, sir.  That was an error of mine.

23         THE COURT:  What else?

24         MR. SHEBELSKIE:  At the end of the next paragraph,

25    between the elements of the breach -- or the cause of action,

1    rather, and before you get to damages, I think it would be

2    appropriate to have two standard instructions there.  One, is

3    the instruction from the Georgia Code on obligation of good

4    faith from Section 11-1-304.

5              THE COURT:  Yes.  I did -- that needs to be in here.

6              Do you have that?

7              MR. SHEBELSKIE:  I do have it here, sir.  The language

8    is --

9              THE COURT:  Do you have it typed out?

10             MR. SHEBELSKIE:  I have it printed out.  Sure.

11             THE COURT:  Pass it up here.

12             Give a copy to Ms. Agnew.

13             There is implied in every contract a duty of good

14   faith?  Is that the -- that needs to be added.

15             Where do you suggest it needs to be added?  In between

16   the elements and the sentence that begins:  On the issue of

17   contract damages?

18             MR. SHEBELSKIE:  Yes, sir.

19             THE COURT:  Let's insert that there.

20             Okay.  What else?

21             MR. SHEBELSKIE:  Same place, in charge 9, like I said,

22   it could either be before or after the good faith instruction,

23   the standard instruction that:  A contract is to be interpreted

24   as a whole.

25             Because, for example, in the provisions of the

1    contract they are going to be focused on Section 6 and 10.  We

2    are going to be talking about, I think it's Section 5, on time

3    is of the essence and the language in the appendices.  I don't

4    think the jury should feel mistakenly that they should look at

5    nothing other than 6 and 10.

6              THE COURT:  The jury is not supposed to be

7    interpreting the contract at all.  They are supposed to be

8    interpreting the facts to determine whether the contract was

9    breached.

10             MR. SHEBELSKIE:  But in order to do that they have to

11   look at the contract as a whole.

12             THE COURT:  Okay.

13             MS. AGNEW:  Your Honor, as you stated, we would

14   believe that that would be unnecessary, particularly given that

15   there has been no finding that the LPA is ambiguous in any

16   respect.  And as you stated, the jury does not need to interpret

17   the LPA.

18             THE COURT:  Yeah. I think it's unnecessary.

19             You can argue it.

20             If that ends up being the reversible error in this

21   case, then it wasn't meant to be.

22             What's next?

23             MR. SHEBELSKIE:  One last one, Your Honor.  This is

24   charge 10 on affirmative defenses, but it's a matter that's on

25   the third affirmative defense.  That's on page 12.  The last

```
1   full sentence of that paragraph where it starts:  In August 2023
2   plaintiffs stated their intent to terminate --
3            THE COURT:  Wait a minute.  Page --
4            MR. SHEBELSKIE:  12.
5            THE COURT:  -- 12.  Okay.  The last sentence.
6            MR. SHEBELSKIE:  Last full sentence.
7            THE COURT:  Full sentence.
8            In August 2023?
9            MR. SHEBELSKIE:  Yes.
10           THE COURT:  Okay.
11           MR. SHEBELSKIE:  Said:  Plaintiffs stated their intent
12  to terminate the Land Purchase Agreement.
13           So two matters there, Your Honor:  The form, or
14  document, that the plaintiffs filed doesn't actually say
15  "terminate or express an intent to terminate."
16           THE COURT:  What if we say:  In August 2023, American
17  Southern Holdings, LLC and ASH-Grayhawk contend that they stated
18  their intent to terminate.
19           That is what you contend, right, Mr. Kramer?
20           MR. KRAMER:  Yes, Your Honor.
21           THE COURT:  Rather than the Court commenting on it.
22           MR. SHEBELSKIE:  That's my point, Your Honor.
23           THE COURT:  I will say:  The plaintiffs contend that
24  they stated their intent to terminate the Land Purchase
25  Agreement and seek damages at trial instead of continuing to
```

```
 1    pursue performance.

 2             Okay.  What else?

 3             MR. SHEBELSKIE:  That's on all on the charge,

 4    Your Honor.

 5             THE COURT:  Okay.

 6             Ms. Agnew, what about the verdict form?

 7             MR. KRAMER:  Before we move on, Your Honor, I just

 8    want to preserve our objection to the inclusion of any

 9    instruction on waiver as a result of the election that's --

10             THE COURT:  You don't think that's even a jury

11    question?  You think the Court should find as a matter of law

12    that there was no waiver?

13             MR. KRAMER:  I understand the Court has -- I

14    understand the Court has already ruled.

15             THE COURT:  Correct.  What you are preserving is your

16    right to argue that there is no waiver as a matter of law?

17             MR. KRAMER:  That's right.

18             THE COURT:  On appeal or whenever?

19             MR. KRAMER:  Yes, sir.

20             THE COURT:  Yeah.  You have preserved that right.

21             MR. KRAMER:  Thank you.

22             THE COURT:  Okay.

23             Verdict form?

24             MS. AGNEW:  Yes, Your Honor.

25             The first one would be question 6, which is the
```

1    revision we already spoke about deleting Section 10 in reference

2    to Section 10 in question 6.

3          THE COURT:  We are going to strike Section 10 and just

4    have it say:  Breached the Land Purchase Agreement.

5          Anything else with regard to that paragraph?

6          MS. AGNEW:  No, Your Honor.

7          THE COURT:  All right.

8          MS. AGNEW:  The next would be to move what is now

9    paragraph 8 with respect to the LPA deposit up so that it comes

10   behind paragraph 6, given the language of the LPA in Section 35.

11         MR. KRAMER:  If I may be heard on this, Your Honor --

12   I am sorry to step on Ms. Agnew's argument -- our position on

13   8 and 9 here is that there is no jury question as to the amount

14   of the deposit.  It's specified in the contract.  And also as it

15   says in the instructions:  Prejudgment interest is automatic as

16   to a liquidated amount, which this is.  The 2.5 million.  So the

17   question whether to award interest follows automatically.

18         THE COURT:  Yeah.  There is a peculiar -- I think in

19   this case you may be correct.  There is a peculiarity in Georgia

20   law where the jury -- I guess if there is a dispute --

21         MR. KRAMER:  Right.

22         THE COURT:  -- the jury would determine the period for

23   which interest is owed.  But really that's not in dispute here?

24         MR. KRAMER:  No, Your Honor.

25         THE COURT:  There is a dispute as to whether there is

1    a breach at all, but --

2            MR. KRAMER:  I know it sounds greedy, but our position

3    is --

4            THE COURT:  What is it you think the jury needs to

5    find in that regard?

6            MR. KRAMER:  I think a finding of liability

7    automatically triggers a return of the deposit in a liquidated

8    amount with prejudgment interest, pursuant to Section 35C -- or

9    35B -- sorry.  It's been a long day, Your Honor.  Pursuant to

10   Section 35 of the LPA, which is the default provision.

11           THE COURT:  So you don't think question 8 needs to be

12   in there at all?  If the jury finds a breach then the Court, as

13   a matter of law, would impose judgment for that amount?

14           MR. KRAMER:  Yes.  Plus prejudgment interest.

15           THE COURT:  I think if that's the case I think you

16   need to move for judgment as a matter of law under Rule 50.  I

17   guess you can still do it after the plaintiff closes their case

18   as to the amount.  I don't know if that's something that can be

19   just determined by the Court post-verdict.

20           MR. KRAMER:  Fair, Your Honor.  We can revisit that at

21   the end of the defendants' case.

22           THE COURT:  I don't want to lead you down a road that

23   may be problematic for you later on.  There is always a concern

24   when there is an award of monetary damages that the jury doesn't

25   award.

1    MR. KRAMER:  Uh-huh.

2    THE COURT:  Do the defendants dispute that if the jury

3  finds that defendant has breached the LPA, do you dispute that,

4  as a matter of law, he owes back the 2.5 million?

5    MR. SHEBELSKIE:  No, we don't, Your Honor.  I am glad

6  to report maybe a rare instance where the parties agree on

7  something.

8    But also I do think that the assessment of interest on

9  this liquidated portion of the claim is matter for the Court

10  that does not go to the jury.  I think what the jury would have

11  to decide, in all candor, is the date of the breach.  So there

12  is a time period -- we know when interest is supposed to

13  commence.  That could be a factual dispute.

14    THE COURT:  That's in question 9.  But the question

15  is, then, if it's agreed that, as a matter of law, the

16  defendants owe the $2.5 million deposit back, if the jury

17  answers question --

18    MR. SHEBELSKIE:  6, I think.

19    THE COURT:  -- 6 yes, and 7 no, then they don't need

20  to answer 8.  The only thing they need to answer is the date of

21  the breach.  But if -- well, no.  If they find -- if they find a

22  breach, then they get interest from the date they paid the

23  deposit, don't they?  It doesn't date from the breach.

24    MR. SHEBELSKIE:  No, sir.

25    THE COURT:  If they paid him a deposit to -- would the

```
 1    interest not run back to the date that he's held their money?
 2              MR. SHEBELSKIE:  No, sir.  The --
 3              THE COURT:  From the date of the breach?
 4              MR. SHEBELSKIE:  Yes, sir.
 5              MR. KRAMER:  We agree, Your Honor.  That's how we
 6    calculated it as well.
 7              THE COURT:  Okay.
 8              Are we in agreement that we don't need question 8?
 9              MR. KRAMER:  Yes, Your Honor.
10              MR. SHEBELSKIE:  Yes, Your Honor.
11              THE COURT:  Okay.  Then we need a question that
12    asks -- instead of question 9, we need a question that simply
13    asks:  On what date did the --
14              Well, really we could do it under 6.  We can do it
15    under 6:  Do you find that Southern Homes -- blah, blah, blah --
16    breached the Land Purchase Agreement and caused damages to
17    American Southern Homes.
18              If you answered yes -- first of all, you would say:
19    State the date that the breach occurred.
20              MR. SHEBELSKIE:  I think that's right.
21              MR. KRAMER:  That works, Your Honor.
22              THE COURT:  And then there will be a blank.  And then
23    if you answered yes, go to question 7.  And we just insert that
24    in between that first yes or no, and if you answered, yes go to
25    question 7.
```

1              And then we would take out 8 and 9.

2              And then if we are going to do that -- there are

3    substantive instructions on prejudgment interest.  Those don't

4    need to be given at all.

5              MR. SHEBELSKIE:  Correct.

6              THE COURT:  Because the jury is only going to be

7    deciding --

8              MR. SHEBELSKIE:  Future.

9              THE COURT:  -- the date, and then I would do the

10   calculation.

11             MR. SHEBELSKIE:  Right.

12             THE COURT:  Does everybody agree on that?

13             MR. KRAMER:  Yes.

14             THE COURT:  Okay.

15             The plaintiffs agree that we do not need to instruct

16   the jury on prejudgment interest if the only thing they are

17   going to be deciding is the date of the breach.

18             MR. KRAMER:  That's right, Your Honor.  Yes, we do.

19             THE COURT:  You agree with that?

20             MR. KRAMER:  Yes.  Yes, Your Honor.

21             THE COURT:  Mr. Shebelskie agrees with that?

22             MR. SHEBELSKIE:  I do.

23             THE COURT:  Just so we are clear, if the jury answers

24   yes to question 6, and no to question 7, then the Court would

25   enter a judgment, as a matter of law, in favor of the plaintiff

1  against the defendants in the amount of the $2,500,000 deposit.

2              Defendants agree to that?

3              MR. SHEBELSKIE:  Yes.

4              THE COURT:  Okay.  All right.

5              We will make that change, and then we will have to do

6  some renumbering.

7              What else, Ms. Agnew?

8              MS. AGNEW:  The only other would be question number 12

9  which, again, relates to the allocation of damages.

10             THE COURT:  Given my ruling on that, is there any

11 concern or objection to how we have set it out, given my ruling?

12             MS. AGNEW:  The only one would be, I believe, GH Lot

13 Holdings, Inc.

14             THE COURT:  Would be what?

15             MS. AGNEW:  GH Lot Holdings, Inc. is listed as one of

16 the LPA sellers.

17             THE COURT:  I'm sorry.  I am not -- I am not

18 understanding.

19             MS. AGNEW:  Well, from your order yesterday we are

20 trying to understand whether they need to allocate damages among

21 the LPA sellers or those who own the lots.

22             THE COURT:  Okay.

23             Who does not own the lots?

24             MS. AGNEW:  To my knowledge, GH Lot Holdings, Inc.,

25 does not own Phase C lots.

1    MR. SHEBELSKIE:  I believe that would be correct and

2    consistent with Ms. Allen's testimony.

3        THE COURT:  I think, given my ruling, there would be

4    no damages against someone who does not own lots.

5        We will strike GH Lot Holdings.  I can just see a

6    juror sending a note back that says, We see that GH Lot Holdings

7    is an LPA seller.  Why are they not listed?

8        MR. KRAMER:  Happy to --

9        THE COURT:  What's the defense position with regard to

10   whether GH Lot Holdings, Inc. should be listed there?

11       MR. SHEBELSKIE:  Well, if the instructions are clear

12   to the jury that the damages can only be allocated according to

13   lot ownership then, necessarily, I suppose the damages for

14   GH Lot Holdings will have to be zero regardless.

15       THE COURT:  The defendants are not concerned that we

16   are injecting any error in the case with that holding, that the

17   contract only obligates damages against someone who can sell the

18   lots, which is the owner?

19       MR. SHEBELSKIE:  Correct.

20       We agree that is a correct interpretation of the

21   contract.

22       THE COURT:  Okay.

23       Let's strike GH Lot Holdings, Inc.

24       We'll ride this pony to the very end of the deal.

25       MR. SHEBELSKIE:  While that -- I know I am

1   interjecting --

2           THE COURT:  Well, let me see if they have any other

3   objections to the verdict form.

4           Any other objections by the plaintiff to the verdict

5   form?

6           MS. AGNEW:  With the removal of the quantum meruit

7   claim, no, Your Honor.

8           MR. KRAMER:  And if the Court is not interested in

9   riding that pony, we'd be happy to have some more argument on

10  joint liability, Your Honor.

11          THE COURT:  Yeah.  I really went back and read my

12  Rose Anne Erickson order, and it was damn good, so I'm not going

13  to part from it.

14          MR. KRAMER:  It's a fine order.  I don't think it's

15  inconsistent insofar as now we are talking about damages as

16  opposed to -- there is no authority on allocating damages.

17          THE COURT:  I'm sticking with it.

18          Go ahead.

19          MR. KRAMER:  It's just -- we just haven't seen any

20  authority that requires an allocation of damages like this at

21  all.  And the Georgia cases and Eleventh Circuit cases that we

22  cited this morning would seem to create --

23          THE COURT:  Pretty distinguishable.  Those cases stand

24  for the proposition where it's clear that there has been a joint

25  obligation undertaken, that they jointly agree to do something

1  that they could have the authority to do and had the ability to

2  do.

3        Here, unless one of these sellers, or more of these

4  sellers, guaranteed performance as a guarantor, the only ones

5  that could provide the lots is the person that's got title to

6  the lots.

7        Nobody else can make that happen unless they were

8  guarantor under the contract.

9        And to hold otherwise would be to pierce the corporate

10  company veils of these separate entities by saying that really

11  Mr. Erickson could make them do anything that he wanted.  But

12  that would cause the Court to disregard that corporate company

13  veil and not treat them as separate legal entities.  And that

14  issue has never been pressed.

15        In this case --

16        MR. KRAMER:  Understood, Your Honor.

17        THE COURT:  -- the corporate veil should be

18  breached --

19        MR. KRAMER:  We were --

20        THE COURT:  -- so those cases, I think, are

21  distinguishable, and I think this is what the law is, based upon

22  the limited authority that I have to base that decision on.  And

23  so that's what we are going to do.

24        MR. KRAMER:  Okay.  Thank you, Your Honor.

25        THE COURT:  And if -- all right.

```
 1            I'm still hopeful that after there is some indication
 2   of what 12 jurors think about this case that there is still some
 3   opportunity for resolution down the road.  But I have been
 4   singing that song from day one and that may not happen.
 5            I believe if you would let Mr. Buchanan and Mr. Lomax
 6   go in a room by themselves, and give them the authority to
 7   resolve this thing, it could get resolved.  I think the
 8   combatants -- the active combatants are in -- which you should
 9   be at this stage -- y'all are in combat mode.  And we need
10   some -- we need some facilitators.
11            In any event, we will see what happens.
12            I just hope if it has to be retried I am still here
13   and I don't have to pass this on to somebody else.
14            All right.
15            Defendants' comments on the verdict form?
16            MR. SHEBELSKIE:  Just one, Judge, on page 5.  There is
17   one more LPA seller who has no Phase C lots.  That's Windsong
18   Bonacre.  Ms. Allen testified it had owned, what, one acre, and
19   it had transferred title of that to Tiger Creek.
20            MR. KRAMER:  That's disputed, Your Honor, based on the
21   contract.
22            THE COURT:  It's disputed?  Okay.
23            MR. SHEBELSKIE:  Okay.  If it's disputed, then,
24   obviously, it needs to be left in.
25            THE COURT:  Who owns all the lots?  Tiger Creek?
```

```
1            MR. SHEBELSKIE:  The bulk of them, yes.

2            THE COURT:  Is that mainly in raw land that has not

3   been developed, or are there roads or --

4            MR. SHEBELSKIE:  Well, there are multiple --

5            THE COURT:  Tiger Creek has multiple subdivisions?

6            MR. SHEBELSKIE:  Yes, sir.

7            THE COURT:  All right.

8            Any other objections or comments on the verdict form

9   by the defendants?

10           MR. SHEBELSKIE:  No, sir.

11           THE COURT:  Okay.

12           We will make these changes that I have indicated.

13           As I indicated each -- of course, we will hear from

14  the defendants' expert first thing Monday morning.  And then we

15  will have closing arguments.

16           Each side will get one hour.  Plaintiffs collectively

17  get an hour.  Defendants collectively get an hour.  Plaintiffs,

18  having the burden of proof, can open and close with rebuttal.

19  But the hour applies to both.

20           Anything else we need to take up, from the plaintiffs'

21  perspective?

22           MR. KRAMER:  No, sir.

23           Thank you.

24           THE COURT:  Defendants?

25           MR. QUACKENBOSS:  No, sir.
```

1          MR. SHEBELSKIE:  But otherwise to make the comment, I

2     don't know how we would have gotten four other witnesses on and

3     off the stand this afternoon if we had Mr. Erickson.

4          THE COURT:  How we would have?  No.  Probably not.

5     But I thought Mr. Quackenboss was slow-playing me there for

6     awhile thinking that I was still going to make him put up his

7     expert this afternoon, but...

8          MR. SHEBELSKIE:  That's just the way he talks, Judge.

9          THE COURT:  Okay.

10         I am sure my weekend will be more enjoyable than

11    y'all's.

12         We will see you on Monday morning.

13      (Proceedings concluded at 5:34 PM on Friday, September 22,

14    2023.)

15                         * * * * * * * *

16         I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
17    Any redaction of personal data identifiers pursuant to the
      Judicial Conference Policy on Privacy are noted within the
18    transcript.

19    /s/ Lisa C. Snyder                    10/5/2023

20    Lisa C. Snyder, RPR, CRR              Date
      Official U.S Court Reporter

21

22

23

24

25

```
 1                          I N D E X

 2    DEFENDANTS' WITNESSES                        PAGE

 3    SEAN COLEMAN  (By video deposition)

 4    DAVID ERICKSON
      Direct Examination By Mr. Quackenboss       1058
 5    Cont. Direct Examination By Mr. Quackenboss 1179
      Cross-Examination By Mr. Kramer             1194
 6

 7                        E X H I B I T S

 8    DEFENDANTS' EXHIBITS                OFFERED  RECEIVED

 9    236                                 1057     1057

10    DX150                               1092     1092

11    DX162                               1094     1094

12    DX149                               1098     1098

13    PX62                                1102     1102

14    DX238                               1108     1108

15    DX239                               1109     1109

16    PX199                               1113     1113

17    PX207A                              1116     1116

18    DX291                               1121     1121

19    DX29                                1123     1123

20    DX300                               1129     1129

21    DX303                               1131     1131

22    PX201                               1138     1138

23    PX201A                              1140     1140

24    PX454A                              1147     1147

25    PX396                               1160     1160
```

```
 1   PLAINTIFFS' EXHIBITS                    OFFERED   RECEIVED

 2   PX393                                     1215     1215

 3   PX215A                                    1220     1220

 4   PX694                                     1223     1223

 5   PX698                                     1248     1248

 6   PX699                                     1250     1250

 7   OTHER RECORD MADE                                  PAGE

 8   Charging Conference                                1263

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```